**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

--------------------------------------------------------------------X

RICHARD ALLEN
545 Fillmore Street
Denver, Colorado  80206

DAVID SHWAYDER                                    **Case No:**
1802 S. Race Street
Urbana, Illinois  61801

FCT AMERICA LIMITED                               **<u>COMPLAINT</u>**
150 S. Wacker Drive
Suite 805
Chicago, Illinois  60606

CHARLES DEVENS
14 Bonsai Drive
Boynton Beach, Florida  33436

EDWARD DONAHUE
Donahue and Associates
299 Concord Avenue
Cambridge, Massachusetts  02138

MIKE TESSAROWICZ
4070 Sleeping Indian Lane
Colorado Springs, Colorado  80904

RICHARD ABEL
1556 Manzanita Avenue
Santa Rosa, California  95404

DANIEL CILLIE
509 Madison Street, #2B
Hoboken, New Jersey  07030

CI HERZOG
64-08 217th Street
Bayside, New York  11364

CHARLES SMITH
1471 Golden Bell Court
Downers Grove, Illinois  60515

GUNTER WITTICH
6120 W. Tropicana A16
Las Vegas, Nevada  89103

Z.E. THIJSSEN
p/a Duitslandlaan 31
7761 HC Schoonebeek
The Netherlands

                 Plaintiffs,

      v.


RUSSIAN FEDERATION
Ministry of Justice of the Russian Federation
ul. Vorontsovo Pole, 4a
Moscow 109830, GSP
GH-28 Russian Federation

Consular Division of the
Embassy of the Russian Federation in
Washington, DC
Attn:  Vadim V. Saveliev
2641 Tunlaw Road, NW
Washington, DC  20007

OAO GAZPROM
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

OOO GAZPROMNEFT
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

BAIKALFINANSGROUP
Novotorzhskaya 12b
Tver
Russian Federation

OAO ROSNEFT OIL COMPANY
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

OAO ROSNEFTEGAZ
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

DMITRY A. MEDVEDEV
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

ALEXEI B. MILLER
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

ALEXEI L. KUDRIN
c/o Ministry of Finance
Ulitsa Ilyinka 9, Entrance 1
Moscow 103097
Russian Federation

FARIT R. GAZIZULLIN
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

IGOR K. YUSUFOV
c/o OAO Gazprom
16 Nametkina Street  GSP-7 117997
Moscow
Russian Federation

VIKTOR B. KHRISTENKO
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

SERGEY BOGDANCHINKOV
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

IGOR SECHIN
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

NIKOLAI BORISENKO
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation
                              Defendants.
-----------------------------------------------------------X


## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

### I. NATURE OF ACTION

1.     This Complaint arises out of the coordinated attack of Defendant Russian

Federation and other defendant co-conspirators (collectively, "Defendants")  against Yukos Oil

Company and its owners.  The purpose and effect of this attack has been the de facto re-

nationalization of Yukos without payment of any compensation to its owners. This confiscation has been carried out in two ways. First, Defendant Russian Federation and the other Defendants have deprived Yukos's owners of their right to derive economic benefit from their investment. This has been accomplished through the imposition of illegal and confiscatory tax levies and through the transfer of Yukos's most important asset to the State. Second, Defendants have deprived Yukos's owners of their right to have Yukos managed in accordance with their wishes by people of their choosing. This has been accomplished through the direct seizure of a majority of Yukos shares and through the intimidation and harassment of Yukos directors and executives to the point at which they have either resigned, left Russia, or otherwise been rendered unable to manage the business in the ordinary course.

2.    Officials from countries adhering to the rule of law have expressed grave concern over the Defendants' conduct, particularly the likelihood that Defendant Russian Federation is pursuing the criminal and tax prosecutions described in this Complaint for what transparently are political and commercial purposes. From the United States, President Bush, Secretary of State Condoleezza Rice, and former Secretary of State Colin Powell have questioned the defendant Russian Federation's actions, and Senators McCain and Lieberman have called for the suspension of Russia's participation in the G-8. A U.S. Bankruptcy Judge has found that "[t]he weight of the evidence supports a finding that it is substantially likely that the [tax] assessments and manner of enforcement regarding [Yukos] taxes were not conducted in accordance with Russian law." (*Yukos Oil Company v. Russian Federation*, Adv. No. 04-3952, Memorandum Opinion (Bankr. S. D. Tex. Dec. 16, 2004)).

3.    In January 2005, The Parliamentary Assembly of the Council of Europe endorsed the findings of a Special Rapporteur, former German Justice Minister Sabine Leutheusser-

Schnarrenberger, who, in part, summarized her assessment of the Defendant Russian

Federation's conduct of the criminal proceedings against Yukos officials as follows:

> I have come to my own conclusion, namely that the presence of an
> interest of the State that exceeds its normal interest in criminal
> justice being done and includes such elements as: to weaken an
> outspoken political opponent, to intimidate other wealthy
> individuals, and *to regain control over "strategic" economic assets*
> -- can hardly be denied.

(Emphasis added.)

4.      The Defendants' actions have reached such an extreme that Andrei Illarionov, a

senior economic advisor to President Putin, has called the 2004 "auction" of Yuganskneftegaz

the "swindle of the year."   Following this comment, Mr. Illarionov was removed from his

position as Russia's presidential representative to the G-8.

5.      Furthermore, on March 18, 2005, Senior District Judge Workman of the Bow

Street Magistrate's Court for London denied the Russian Federation's request to extradite two

former Yukos Oil Company executives, finding that the charges were politically motivated and

that the prosecution of the former Yukos executives had been "directed" by President Putin.

6.      Plaintiffs have been caught in the wake of the Defendants' scheme.   Their

investment in Yukos, a company once valued in the billions, is now all but worthless.   The

Defendant Russian Federation touted Russia as a secure place for commercial investment, and

Plaintiffs placed their capital in Yukos Oil Company.   Initially, they saw very promising returns

as the company emerged as the leader of the Russian oil sector.   However, despite express

representations -- directed at U.S. and global securities markets -- that Yukos was not a target of

their attack, the Defendants have now expropriated the company from its owners, controlling its

operation to whatever extent they see fit and appropriating to themselves all of the economic benefits of ownership.

7.     Plaintiffs now seek redress.  Specifically, this is an action under the Racketeering Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961 *et seq.*), the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78a *et seq.*), and common law seeking to recover, *inter alia*, damages for the losses Plaintiffs have suffered as a result of the confiscation and conversion of their property by Defendants.  Several, if not all, of the Defendants engaged in acts in furtherance of the conspiracy notwithstanding a United States Court's order to the contrary.  The Defendants' conspiracy was and remains aimed at taking Yukos from its owners without payment of any compensation and at deceiving participants in the market for Yukos shares.  As a result, the Defendants' conspiracy and the acts associated with it have had and will have adverse effects on United States commerce.

## II. PARTIES, JURISDICTION AND VENUE

### A. Plaintiffs

8.     Plaintiff Richard Allen is a citizen of the United States residing in Denver, Colorado.  Plaintiff Allen is the holder of 500 Yukos American Depository Receipts (ADRs) purchased on the over-the-counter ("OTC") market in the United States prior to October 25, 2003.

9.     Plaintiff Mike Tessarowicz is a citizen of the United States residing in Colorado Springs, Colorado.  Plaintiff Tessarowicz is the holder of 2,875 Yukos ADRs purchased on the OTC market in the United States prior to October 25, 2003.

10.     Plaintiff Gunther Wittich is a citizen of the United States residing in Las Vegas, Nevada.  Plaintiff Wittich is the holder of 1,710 Yukos ADRs purchased on the OTC market in the United States prior to October 25, 2003.

11.     Collectively, in connection with the Yukos ADR purchases set forth above, Plaintiffs Allen, Tessarowicz, and Wittich are referred to herein as "Plaintiff Yukos ADR Holders."

12.     Plaintiff Richard Abel is a citizen of the United States residing in Santa Rosa, California.  Plaintiff Abel bought Yukos ADRs on the OTC market in the United States on the following date and at the following price:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 11/24/2003 | 75 | $46.75 | $3,506.00 |

13.     Plaintiff Abel sold Yukos ADRs on the OTC market in the United States on the following date and at the following price:

| Date of Sale | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 12/31/2004 | 75 | $2.50 | $188.00 |

14.     Plaintiff Daniel Cillie is a citizen of the United States residing in Hoboken, New Jersey.  Plaintiff Cillie bought Yukos ADRs on the OTC market in the United States on the following date and at the following price:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 8/3/2004 | 50 | $13.60 | $680.00 |

15.    Plaintiff Charles Devens is a citizen of the United States residing in Boynton Beach, Florida.  Plaintiff Devens bought Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
| --- | --- | --- | --- |
| 12/2/2003 | 5,000 | $43.76 | $218,800.00 |
| 12/5/2003 | 5,000 | $41.51 | $207,538.40 |
| 12/9/2003 | 2,500 | $41.41 | $103,518.40 |
| 12/9/2003 | 2,500 | $41.51 | $103,770.00 |
| 12/16/2003 | 3,000 | $39.91 | $119,724.00 |
| 12/16/2003 | 2,000 | $39.76 | $79,514.40 |

16.    Plaintiff  Devens sold Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Sale | Number of ADRs | Unit Cost | Total Price |
| --- | --- | --- | --- |
| 12/20/2004 | 10,000 | $2.25 | $22,491.47 |
| 12/30/2004 | 10,000 | $2.50 | $24,991.41 |

17.    Plaintiff Edward Donahue is a citizen of the United States residing in Cambridge, Massachusetts.  Plaintiff Donahue bought Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
| --- | --- | --- | --- |
| 11/18/2003 | 500 | $47.13 | $23,565.00 |
| 12/10/2003 | 500 | $38.52 | $19,258.00 |
| 6/14/2004 | 500 | $26.45 | $13,225.00 |

18.     Plaintiff Donahue sold Yukos ADRs on the OTC market in the United States on the following date and at the following price:

| Date of Sale | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 12/20/2004 | 1000 | $1.89 | $1,890.00 |

19.     Plaintiff Ci Herzog is a citizen of the United States residing in Bayside, New York.  Plaintiff Herzog bought Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 7/1/2004 | 300 | $26.88 | $8,075.00 |
| 10/20/2004 | 300 | $12.35 | $4,075.00 |

20.     Plaintiff David Shwayder is a citizen of the United States residing in Urbana, Illinois.  Plaintiff Shwayder bought Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 10/30/2003 | 100 | $46.90 | $4,690.00 |
| 7/7/2004 | 100 | $32.70 | $3,270.00 |
| 7/23/2004 | 100 | $21.45 | $2,145.00 |

21.     Plaintiff Shwayder sold Yukos ADRs on the OTC market in the United States on the following date and at the following price:

| Date of Sale | Number of ADRs | Unit Cost | Total Price |
| --- | --- | --- | --- |
| 3/18/2004 | 100 | $53.24 | $5,324.00 |

22.     Plaintiff Charles Smith is a citizen of the United States residing in Downers Grove, Illinois.  Plaintiff Smith bought Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
| --- | --- | --- | --- |
| 11/19/2003 | 120 | $42.00 | $5,040.00 |
| 11/21/2003 | 120 | $45.75 | $5,490.00 |

23.     Plaintiff Smith sold Yukos ADRs on the OTC market in the United States on the following date and at the following price:

| Date of Sale | Number of ADRs | Unit Cost | Total Price |
| --- | --- | --- | --- |
| 12/29/04 | 240 | $2.45 | $588.00 |

24.     Plaintiff Z.E. Thijssen is a citizen of, and resides in, the Netherlands.  Plaintiff Thijssen bought Yukos ADRs on the London Stock Exchange on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
| --- | --- | --- | --- |
| 11/18/2003 | 1000 | $45.94 | $45,940.52 |
| 11/19/2003 | 1000 | $43.42 | $43,418.43 |
| 6/1/2004 | 1000 | $30.71 | $30,705.90 |
| 6/17/2004 | 1000 | $29.80 | $29,801.79 |

25.     Plaintiff FCT America Limited is a Cayman Island corporation with its principal place of business in Chicago, Illinois.  Plaintiff FCT America Limited bought Yukos ADRs on the London Stock Exchange under terms set forth in various Contracts for Differences ("CFDs") on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 6/10/2004 | 10,000 | $30.01 | $300,100.00 |
| 6/11/2004 | 5,000 | $28.70 | $143,500.00 |
| 6/11/2004 | 2,500 | $28.60 | $71,500.00 |
| 6/11/2004 | 2,500 | $28.95 | $72,375.00 |
| 6/14/2004 | 10,000 | $25.80 | $258,000.00 |
| 7/1/2004 | 10,000 | $33.70 | $337,000.00 |
| 7/20/2004 | 10,000 | $27.50 | $275,000.00 |
| 7/20/2004 | 10,000 | $27.00 | $270,000.00 |
| 11/25/2004 | 20,000 | $4.00 | $80,000.00 |

26.     Plaintiff FCT America Limited sold Yukos ADRs on the London Stock Exchange under terms set forth in various CFDs on the following dates and at the following prices:

| Date of Sale | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 4/19/2005 | 10,000 | $2.10 | $21,000.00 |
| 4/19/2005 | 10,000 | $2.15 | $21,500.00 |
| 5/3/2005 | 20,000 | $2.57 | $51,400.00 |
| 5/9/2005 | 10,000 | $2.50 | $25,000.00 |

| Date of Sale | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 5/13/2005 | 5,000 | $2.08 | $10,400.00 |
| 5/17/2005 | 10,000 | $2.10 | $21,000.00 |
| 5/23/2005 | 15,000 | $2.21 | $33,150.00 |

27.    After October 25, 2003, Plaintiff Allen purchased Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 11/7/2003 | 200 | $49.85 | $9,975.00 |
| 12/1/2003 | 100 | $48.10 | $4,815.00 |
| 1/2/2004 | 100 | $42.90 | $4,290.00 |
| 8/5/2004 | 1,000 | $17.20 | $17,210.00 |

28.    After October 25, 2003, Plaintiff Tessarowicz purchased Yukos ADRs on the OTC market in the United States on the following dates and at the following prices:

| Date of Purchase | Number of ADRs | Unit Cost | Total Price |
|---|---|---|---|
| 10/30/2003 | 500 | $49.50 | $24,750.00 |
| 5/10/2004 | 1000 | $35.75 | $35,750.00 |
| 6/14/2004 | 1000 | $26.25 | $26,250.00 |
| 7/23/2004 | 1,000 | $21.50 | $21,500.00 |

29.    Collectively, Plaintiffs Abel, Cillie, Devens, Donahue, Herzog, Shwayder, Smith, Thijssen, and FCT America Limited, together with Plaintiffs Allen and Tessarowicz (insofar as

the latter two plaintiffs purchased Yukos ADRs after October 25, 2003), are referred to herein as "Plaintiff Yukos ADR Purchasers."

## B. Defendants

30.     Defendant Russian Federation, or Russia, is a "foreign state" within the meaning of 28 U.S.C. § 1330.

31.     Defendant Open Joint Stock Company Gazprom ("Gazprom") is a publicly traded joint stock company organized under the laws of the Russian Federation with its principal place of business in Moscow.  In June 2005, Gazprom announced that the Russian Federation had obtained a controlling stake in the company through its purchase of a 10.7 percent package of Gazprom shares.  (Report by Dmitry Medvedev, Gazprom's Board of Directors' Chairman, on the liberalization of Gazprom's share market (June 24, 2005)).  Gazprom states on its website that it is the largest gas producing company in the world, responsible for approximately 20 percent of global natural gas production and controlling almost 60 percent of Russian gas reserves.     (Gazprom,     "About     the     Company"     (January     5,     2005), <http://www.gazprom.com/eng/articles/article8511.shtml>).     Gazprom produces about 90 percent of Russian gas and is responsible for eight percent of Russia's GDP.  Defendant Gazprom ADRs are traded on the London Stock Exchange and represent Gazprom American Depository Shares ("ADSs") held by the Bank of New York.

32.     Defendant OOO Gazpromneft ("Gazpromneft") is a limited liability company organized under the laws of the Russian Federation that was established to engage in oil production.  Until December 2004, Gazpromneft was a wholly owned subsidiary of Gazprom. Shortly before the Yuganskneftegaz ("YNG") auction held on December 19, 2004, Gazprom sold Gazpromneft to an unknown, "unaffiliated" company.  Gazpromneft, along with Gazprom,

- 11 -

was named as a defendant, and appeared, in the Yukos bankruptcy proceedings in the United States District Court for the Southern District of Texas (*In re Yukos Oil Co.*, Case No. 04-47742 (S.D. Tex. 2004)).

33.     Defendant BaikalFinansGroup ("BFG") is a company registered in the western Russian city of Tver.  It was founded shortly before the YNG auction held on December 19, 2004.  Defendant BFG lists as its address a building that houses a bar, a mobile phone shop, a tour operator agency and the offices of several small local companies – but no office of BFG.

34.     Defendant OAO Rosneft Oil Company ("Rosneft") is an oil and gas production company owned by the Russian Federation.  Rosneft and Yukos are direct competitors.

35.     Defendant OAO Rosneftegaz ("Rosneftegaz"), which holds 100 percent of Rosneft stock, is wholly owned by Defendant Russian Federation.

36.     Defendant Dmitry A. Medvedev ("Medvedev") is the Chairman of the Board of Gazprom and a resident of the Russian Federation.  He also serves as Head of the Presidential Administration of the Russian Federation.  Defendant Medvedev is being sued in his individual capacity.

37.     Defendant Alexei B. Miller ("Miller") is the Chairman of the Management Committee of Gazprom and previously served as Deputy Minister of Energy of the Russian Federation.  Defendant Miller is being sued in his individual capacity.

38.     Defendant Alexei L. Kudrin ("Kudrin") is the Minister of Finance of the Russian Federation.  Defendant Kudrin is being sued in his individual capacity.

39.     Defendant Farit R. Gazizullin ("Gazizullin") is a Member of the Board of Directors of Gazprom and former Minister of Property Relations of the Russian Federation.  Defendant Gazizullin is being sued in his individual capacity.

40.    Defendant Igor K. Yusufov ("Yusufov") is a Member of the Board of Directors of Gazprom, Special Representative of the President on International Energy Cooperation, former Chairman of the Board of Rosneft, and former Minister of Industry and Energy of the Russian Federation.  Defendant Yusufov is being sued in his individual capacity.

41.    Defendant Viktor B. Khristenko ("Khristenko") is a Member of the Board of Directors of Gazprom and Minister of Industry and Energy of the Russian Federation. Defendant Khristenko is being sued in his individual capacity.

42.    Defendant Sergey Bogdanchikov ("Bogdanchikov") is the President of Rosneft. Defendant Bogdanchikov is being sued in his individual capacity.

43.    Defendant Igor Sechin ("Sechin") is Deputy Head of the Presidential Administration of Russia, a former KGB officer, a close associate of Russia's President Vladimir Putin, and Chairman of the Board of Directors of Defendant Rosneft.  Defendant Sechin is being sued in his individual capacity.

44.    Defendant Nikolai Borisenko ("Borisenko") is Vice President of Rosneft and, while in that position, represented Defendant Gazpromneft at the YNG auction.   Defendant Borisenko is being sued in his individual capacity.

45.    Collectively, Defendants Medvedev, Miller, Kudrin, Gazizullin, Yusufov, Khristenko, Bogdanchikov, Sechin, and Borisenko are referred to herein as the "Individual Defendants."

### C. <u>Material Non-Parties</u>

46.    OAO NK Yukos Oil Company ("Yukos") is an open joint stock corporation organized under the laws of the Russian Federation with its principal place of business in Moscow, Russia.  Yukos is a vertically integrated oil and gas company.   Its business activities

include: exploration for, and development and production of, crude oil and natural gas; refining crude oil into finished petroleum products; and marketing and distributing petroleum products. Yukos ADRs, which represent Yukos ADSs, are a form of security registered with the Securities and Exchange Commission ("SEC") and trade on the OTC market in the United States, and in the United Kingdom and continental Europe. Yukos ADSs are held by a New York-based Deutsche Bank depositary in accordance with a deposit agreement governed by New York law.

47.    Mikhail B. Khodorkovsky ("Khodorkovsky") is a Russian citizen who became Russia's wealthiest and most progressive businessman. He was one of the founders of Group Menatep, and until his arrest on contrived criminal charges, was a member of the Yukos Board of Directors and Chairman of the Board of Directors of OOO Yukos-Moscow, the company with responsibility for managing Yukos. Through his leadership, Yukos became a profitable company that paid record dividends to all of its shareholders. Khodorkovsky also transformed Yukos into a transparent, fiscally responsible, socially conscious and highly influential company that was poised to become a leading force in the global oil and gas market acting independently of the Russian Federation. The Defendants and other unnamed co-conspirators began to perceive Khodorkovsky as both a commercial *and* political threat and to view Yukos as a desired commercial and strategic property.

48.    Group Menatep Limited ("Group Menatep") is a privately held corporation established under the laws of, and with its principal place of business in, Gibraltar. Group Menatep owns 51 percent of the stock of Yukos Oil Company through two wholly owned subsidiaries, as described below.

49.     Yukos Universal Limited ("YUL"), a wholly owned subsidiary of Group Menatep, is a corporation established under the laws of the Isle of Man, where it also maintains its principal place of business. YUL owns approximately a two-percent interest in Yukos.

50.     Hulley Enterprises Limited ("Hulley"), a wholly owned subsidiary of YUL, is a corporation established under the laws of Cyprus, where it also maintains its principal place of business. Hulley owns approximately a 49 percent interest in Yukos.

51.     Yuganskneftegaz ("YNG") is a major oil-producing company responsible for more than one percent of the world's annual oil production. Prior to December 20, 2004, Yukos was the majority stockholder in YNG. YNG accounted for over 60 percent of Yukos's total production.

52.     OAO First Venture Company and ZAO Intercom are entities of unknown nature and unknown location that applied to participate in the auction of confiscated Yukos property. Neither company in fact participated, however.

53.     OAO Sibneft ("Sibneft") is an oil exploration, production, refining and marketing company located in the Russian Federation. Sibneft's ADRs are traded on the OTC market in the United States, and in Europe, and represent Sibneft ADSs held by the Bank of New York. Sibneft agreed to merge with Yukos in 2003, as the initial part of a two-part transaction, the second part of which was to have been the sale of a major stake in the merged company to a major U.S. oil company. With the tacit approval of several of the Defendants, however, Sibneft refused to carry out its legal obligations under the merger agreements and instead attacked the merger in several judicial fora. Sibneft's repudiation of its contractual commitments is the subject of arbitration proceedings in the United Kingdom. In September 2005, Gazprom announced an agreement to purchase a 73 percent stake in Sibneft for $13 billion.

## D.  Jurisdiction and Venue

54.    This Court has jurisdiction pursuant to 28 U.S.C. § 1330 (as to Defendants Gazprom, Rosneft, Rosneftegaz, and the Russian Federation, none of which is entitled to immunity under 28 U.S.C. §§ 1605-07), § 1331 (federal question), and § 1367 (supplemental jurisdiction), § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (securities fraud), and 18 U.S.C. § 1964(c) (RICO) (with respect to all defendants except Gazprom, Rosneft, Rosneftegaz, and the Russian Federation).

55.    Venue is proper in this Court as against all of Defendants except Gazprom, Rosneft, Rosneftegaz, and the Russian Federation pursuant to 28 U.S.C. § 1391(d), authorizing an action against an alien in any district.  Venue is proper in this court against Defendants Gazprom, Rosneft, Rosneftegaz, and the Russian Federation pursuant to 28 U.S.C. §1391(f)(4), authorizing civil actions against a foreign state or instrumentality in the District of Columbia.

## III.  FACTS COMMON TO ALL COUNTS

### A.  History of Yukos

56.    The proven natural gas reserves of the Russian Federation are the largest in the world; its proven oil reserves are among the largest.  It is a major oil exporting country, eclipsing the exports of many OPEC nations.  Following the collapse of the Soviet Union in the early 1990s and the dissolution of its command economy, however, oil production plummeted.  The Russian Federation's oil and gas industry consisted of hundreds of separate state-owned entities, most of which were inefficiently run, unprofitable, and overstaffed.  They survived only through state support.

57.    In 1993, the newly created government of the Russian Federation sought to restructure the nation's oil and gas sector, primarily through privatization.  On April 15, 1993,

the Russian government founded Yukos as a separate legal entity and consolidated certain state-owned producing, refining and distribution entities into its structure.

58.    Between 1995 and 1996, Yukos became Russia's first fully privatized oil and gas company.  Group Menatep acquired approximately 75 to 80 percent of the shares through the loans-for-shares program implemented by the Russian Federation and through an investment tender.  Until that time, Yukos had been plagued by poor management and, as a result, was saddled with mounting debts, including significant outstanding tax liabilities.

59.    Following its acquisition of Yukos and after the collapse of the Russian economy in 1998, Khodorkovsky transformed Yukos from an ailing, debt-ridden, inefficient company into one of Russia's largest and fastest growing companies.  The Russian Federation was an initial beneficiary of Yukos's financial development through the company's payment of its outstanding tax liabilities.

60.    Yukos implemented corporate and financial transparency, and other western business practices.  For example, Yukos hired PriceWaterhouseCoopers (PWC) to prepare audited financial statements according to US generally accepted accounting principles (GAAP) and established an independent board composed principally of outside directors, nearly half of whom were prominent international business leaders.

61.    Yukos also implemented a program to introduce advanced technology into its operations.  For example, Yukos created a technology center in Moscow and a special training institute in Tomsk for petroleum engineers.  It also entered into joint ventures with Schlumberger Limited and other providers of oilfield services to assist Yukos in raising its oil production and lowering costs.

62. These practices contributed to enhanced performance and profitability. The company's annual production, for instance, grew by 17 percent in 2001, and by 19 percent in 2002, by which time Yukos accounted for approximately 18 percent of Russia's total oil production and a significant portion of its total natural gas production. Those production numbers continued to increase in 2003, when Yukos's combined production of natural gas and oil outstripped both ChevronTexaco and Total. Yukos operated through various subsidiaries including YNG, its main production unit, and was beginning to compete with Gazprom. Yukos also clashed with Rosneft in a number of settings, including competition over licenses to develop fields in eastern Siberia.

63. Beginning in March 2001, approximately 15 percent of Yukos's common stock became available for trading in the form of Level 1 ADRs in the United States, where they are traded on the OTC market.

64. In 2003, Yukos announced plans to expand its participation in foreign markets by entering Eastern Europe, China, the United States, and Kazakhstan, either through local production and refining or through exports from Russia. The merger with Sibneft described below, and the resulting creation of the world's fourth-largest oil company, was intended to advance these goals.

65. Recognizing that Yukos could not increase its exports without increased transportation capacity, Yukos became Russia's leader in designing and promoting new pipelines, including a pipeline that would link the Angarsk region in Eastern Siberia to Daqing, China. Yukos also pursued the development of a pipeline from YNG's petroleum-rich oil fields in Siberia to the Arctic port of Murmansk. Transneft, the pipeline monopoly wholly owned by the Russian Federation, opposed both of these projects as unwelcome private-sector competition.

66.    In 2003, following the announcement of the YukosSibneft merger, it was widely reported that Yukos held talks with U.S. oil majors ExxonMobil and ChevronTexaco concerning the potential acquisition of a large stake in Yukos.

67.    The YukosSibneft merger, announced April 22, 2003, was approved on or about August 14, 2003, by the Russian Anti-Monopoly Ministry, subject to certain standard conditions. The merger closed on October 3, 2003, creating Russia's largest oil and gas group and the world's fourth largest oil producer.  Yukos acquired 92 percent of Sibneft's stock and in return paid Sibneft $3 billion plus a 26.01 percent stock interest in Yukos.  The day of the merger, the Moscow Times reported that ExxonMobil was considering the purchase of a 25 percent stake in YukosSibneft for $17.5 billion, a price that would have valued YukosSibneft at approximately $70 billion. (Moscow Times, "Exxon Rumors Buoy Yukos, Sibneft Shares," (October 3, 2003)). An extraordinary shareholders meeting to finalize certain administrative requirements and elect a new board was scheduled for November 28, 2003; the merged entity was scheduled to begin joint operations on January 1, 2004.

68.    During this period of rapid growth, Yukos shares and ADRs increased in value. By April 2004, Yukos's market capitalization was estimated to exceed $40 billion, and its performance was significantly more robust than that of its principal Russian competitor, Gazprom.

69.    This period of rapid growth resulted in benefits to Yukos's shareholders, including the holders of ADRs traded in the United States and Europe.  Yukos paid significant dividends to all of its shareholders in 2002 (approximately $700 million) and 2003 (approximately $2 billion).

## B. **Defendants' Energy Businesses**

70.    Defendant Russian Federation is one of the most important commercial participants in the global energy market and, as such, is in direct competition with Yukos – especially within Russia.  For example, Defendant Russian Federation is the sole owner of Defendant Rosneft Oil Company, a vertically integrated oil company created in 1993 and reorganized in 1995 so that it might better compete with large private Russian oil companies. Defendant Rosneft exports approximately 50 percent of its oil production, and has announced a joint venture with Marathon Oil Corporation, Urals North American Marketing (UNAM), to export oil to the United States.  The remaining oil is refined for sales on the Russian and international markets.  During each of 2001 and 2002, Defendant Rosneft's revenues exceeded $2 billion, primarily from sales of oil, gas, and refined products, as well as from processing fees. In the first six months of 2003, the company was accruing revenues at an annual rate in excess of $3 billion.  In 2001 and 2002, Defendant Rosneft paid dividends to Defendant Russian Federation of approximately $35 million and $49 million, respectively.

71.    Defendant Igor K. Yusufov simultaneously served as Defendant Russian Federation's Energy Minister and as Chairman of the Board of Directors of Rosneft (positions from which Yusufov stepped down in 2004).  Other high-ranking Rosneft officials have simultaneously served as officials of the Russian government.

72.    Defendant Russian Federation also owns a controlling stake in Gazprom, the world's largest gas-producing company.  Gazprom controls almost 60 percent of Russian gas reserves and accounts for approximately 90 percent of all Russian gas production.

73.    In June 2005, Defendant Rosneftegaz, which is a holding company that is wholly owned by the Russian Federation and through which the Russian Federation owns Rosneft,

entered into a $7.1 billion agreement to purchase a 10.7 percent stake in Gazprom. Following the June 2005 agreement, Gazprom announced that the Russian Federation had obtained a controlling stake in Gazprom.

74.     The Chairman of Gazprom's Board of Directors, Defendant Dmitry Anarolieyich Medvedev, also serves as the Head of Defendant Russian Federation's Presidential Administration. Gazprom's board also includes: Defendant Viktor Borisovich Khristenko, Russian Industry and Energy Minister (and former Deputy Prime Minister); Farit Rafikovich Gazizullin (former Russian Minister for Property Relations); Igor Khanukovich Yusufov (former Russian Energy Minister and former Chair of Rosneft's board); and German Oskarovich Gref (former Russian Minister for Economic Development & Trade).

75.     In 2002 and 2003, Yukos acquired large gas fields in Russia and announced its intention to become a major producer and transporter of natural gas, moves that increasingly placed it in competition with Gazprom.

76.     Defendant Russian Federation owns 100 percent of the common stock of Transneft Open Joint Stock Oil Transporting Company, which operates approximately 50,000 km of pipelines in Russia, Europe, and Asia, and transports approximately 93 percent of the oil produced in Russia. Transneft's current Board of Directors includes two government officials who also serve on Rosneft's Board of Directors: Yuri Mitrofanovich Medvedev and Viktor Borisovich Khristenko. Defendant Khristenko currently serves as Defendant Russian Federation's Industry and Energy Minister, and formerly served as Deputy Prime Minister.

77.     In addition, Defendant Russian Federation operates "Zarubezhneft," the Russian Foreign Economic Association State Enterprise. Zarubezhneft develops and implements oil and gas projects both outside and within Russia. It contributes in excess of $500 million to

Defendant Russian Federation's budget each year. Zarubezhneft has collaborated with each of Rosneft, Gazprom, and Transneft, and is currently a co-shareholder in projects with Rosneft and Gazprom. Zarubezhneft is scheduled to become an open joint stock company that will remain wholly owned by the government (like Rosneft).

78.    According to Gazprom, it is the world's largest gas company, accounting for approximately 20 percent of global production and 86 percent of Russia's total production in 2004.   (Gazprom, "Gazprom, the Open-Joint Stock Company," <http://eng.gazprom questions.ru/page4.shtml>; "Production," <http://eng.gazpromquestions.ru/page7.shtml>). To further increase its share of the world and Russian energy markets, Gazprom announced in 2004 that it would merge with Defendant Rosneft, a company then responsible for nearly 10 percent of Russia's daily oil production. (Moscow Times, "Gazprom to Grab Rosneft" (September 15, 2004)).

79.    Although the Russian Federation ultimately abandoned the Gazprom/Rosneft merger (due in part to legal uncertainties surrounding the title to the expropriated YNG asset, as described in paragraphs 153 to 168 below), Gazprom has continued to act to further its expansionist goals. For example, Gazprom recently announced its $13 billion purchase of a 73 percent stake in Sibneft.

## C. Defendants' Conspiracy To Re-nationalize Yukos Without Compensating Owners of the Company

80.    Beginning in approximately mid-2003, Defendants and each of them formulated and began to execute a scheme (a) to disrupt Yukos's conduct of its business affairs, (b) to conceal their intentions through a series of misleading and deceptive statements directed at U.S. and global securities markets and the investing public, (c) to coerce physically Yukos's management into abandoning their active management roles, and (d) to dismantle and ultimately

re-nationalize Yukos, without compensation to the company's owners, by confiscating its assets and redistributing them to state-controlled entities and by appropriating for the Russian Federation all of the economic benefits of ownership of Yukos.

## 1. Arrests and Physical and Economic Intimidation

81.    On June 21, 2003, in the midst of the YukosSibneft merger, and during the negotiation of plans to construct pipelines to Murmansk that would compete with the government's pipeline, the Defendant Russian Federation arrested Yukos security manager Alexei Pichugin. Pichugin was charged with committing, or directing the commission of, several murders or attempted murders. Pichugin's arrest was a transparent attempt to coerce him to implicate one or more of the founders of Group Menatep, who, through their ownership of interests in Group Menatep, were among the principal owners of Yukos. During his pre-trial detention in the Lefortovo Prison, Pichugin's rights were consistently violated. For example, he was denied access to counsel and interrogated with the aid of psychotropic drugs. Ultimately, Pichugin was subjected to a closed trial, during which the Court decided to dismiss the entire jury, ostensibly on grounds of absent jurors. Following the empanelment of a new jury, the government secured a conviction.

82.    The following month, on July 2, 2003, the Defendant Russian Federation arrested Platon Lebedev, Chairman of the Board of Group Menatep. The arrest occurred while Lebedev was hospitalized. He too was taken to the Lefortovo Prison where he was held without bond, without appropriate medical attention, and without access to legal counsel during his initial detention hearing.

83.    On October 25, 2003, approximately twenty armed Russian state security (FSB) agents arrested Khodorkovsky while traveling to Siberia. Prior to his arrest, Khodorkovsky

frequently traveled internationally and always returned to Russia. He repeatedly stated that he would not flee to avoid his possible arrest. Following the arrest, Khodorkovsky was held without bail or the imposition of any terms of release, as provided for under Russian law, and was denied confidential access to his defense counsel.

### 2. Defendants' Misrepresentations in the Wake of Khodorkovsky's Arrest

84.    Defendant Russian Federation arrested Khodorkovsky and Lebedev for the ostensible reasons of tax evasion, theft of state property, and fraud. In fact, the charges had no basis in law or fact.

85.    News of Khodorkovsky's arrest roiled the securities and commodities markets throughout the world, sending the price of Yukos ADRs down by at least 10 percent. In the wake of Khodorkovsky's arrest and its impact on Yukos stock, Russia's RTS Stock Exchange briefly halted trading of Yukos shares. In order to stem the market reaction and otherwise to conceal their scheme, Defendants, including the Russian Federation, made misrepresentations directed at U.S. and global securities markets, claiming that Khodorkovsky's arrest did not reflect any intention by the Russian Federation to attack Yukos or its assets.

86.    As reported by Interfax News Agency on October 27, 2003, Russian Federation President Vladimir Putin issued a statement claiming that Khodorkovsky's arrest was no cause for "generalization, analogies, to say nothing about precedents, especially in connection with privatization," and that there was no reason for any "hysteria and speculation in this matter." Putin also claimed that the Russian Federation was, in effect, a neutral bystander with respect to the arrest, stating: "I ask the government not to get involved in this discussion."

87.    The foregoing statements were false. As revealed by Defendants' subsequent conduct, and contrary to Putin's representations, Defendant Russian Federation's purpose and

intent in arresting Khodorkovsky was a step in its scheme to re-nationalize Yukos and its assets, without compensation to the company's owners, and thereby erase the effects of the Yukos privatization, which had been beneficial to the operations of the company and thus to its shareholders.

88.    Putin's assertion, moreover, that there was no need for the government "to get involved in this discussion" was deceptive in that Defendant Russian Federation was in fact directing the actions alleged herein and was doing so to achieve its goal of returning Yukos to state control.

89.    During the summer and fall of 2003, while Putin was disclaiming any interest in Yukos, the Procurator General was instructing the Tax Ministry to examine the records of Yukos companies throughout Russia.  The tax authorities, sometimes accompanied by Russian state security (FSB) officers and armed militia, essentially stormed numerous Yukos offices, intimidating personnel and seizing documents and electronic files.  Some offices were raided more than once.  In addition, the Ministry of Natural Resources examined Yukos's production licenses for compliance violations.  The Ministry threatened several important licenses and backed off only after government officials recognized the importance of the production disruptions that interference with the licenses would cause.  Stock prices fluctuated at the mere suggestion that licenses would be lost.

### 3. Other Acts of Intimidation and Rights Violations

90.    Defendant Russian Federation also filed charges against, and sought the arrest of, other Yukos officials and founders of Group Menatep.  Leonid Nevzlin (former First Deputy Chairman of Yukos), Mikhail Brudno (former First Vice President of Yukos Refining and Marketing), and Vladimir Dubov (major Yukos shareholder and associate of Mr.

Khodorkovsky), all were forced to leave Russia in the face of the tactics utilized by the Russian authorities.

91.    Beginning with the arrests described above, the Defendant Russian Federation and its agents continually interfered with the right to counsel of accused individuals and repeatedly harassed defense counsel for the individuals and the company.  For example, on October 9, 2003, two dozen Russian Federation internal security agents ransacked the office of Khodorkovsky and Lebedev's counsel, Anton Drel, while he was appearing in court on Lebedev's behalf.  The agents confiscated his personal computer and hundreds of files, many relating to his proposed defense of his clients.  The agents refused to produce a warrant, as required under Russian law (Article 165 of the Russian Criminal Procedure Code), for the search of an advocate's office.  In addition, the Defendant Russian Federation has taken actions against criminal defense attorneys Olga Artyukhova and Tatiana Akimtseva, Yukos's in-house counsel Dmitry Gololobov (General Counsel) and Svetlana Bakhmina, and Yukos's outside counsel Pavel Ivlev and Vyacheslav Patskov.  Mr. Gololobov has left Russia and Ms. Bakhmina has remained in custody for months.  Agents of the Defendant Russian Federation have stated that Ms. Bakhmina could be released if Mr. Gololobov returned to the country, making her, in essence, a hostage.

92.    In August of 2003, Defendant Russian Federation secretly submitted requests for mutual legal assistance to the Attorney General of Switzerland requesting the seizure of business documents related to, *inter alia*, Group Menatep, its subsidiaries and counsel, Khodorkovsky, Lebedev, Yukos, and Yukos-related trading companies.  Subsequently, in March 2004, Defendant Russian Federation sought to freeze numerous bank accounts in Switzerland held in the names of the same entities and individuals.  The Swiss Attorney General froze accounts

which held approximately $4.9 billion. On June 8, 2004, the Swiss Federal Supreme Court directed the Swiss Attorney General to release several of the accounts (those with orders ripe for review), finding that the Russian request did not contain a description of the cause, nature, and scope of damages that would justify the ordering of the contested freeze. *Pecunia Universal Ltd. v. The Office of the Attorney General of Switzerland*, No. 1A.86/2004/col at 6 (Tribunal Fédéral June 8, 2004). The Court went on to assess a 5,000 Swiss Franc penalty on the Swiss Attorney General. *Id.* Procedural hurdles have delayed filing for the release of the remaining accounts.

93. Prior to implementing the Swiss Supreme Court's ruling, the Swiss Attorney General contacted Defendant Russian Federation's representatives and asked whether it had any additional evidence to warrant the freeze of the accounts. Defendant Russian Federation's representatives did not offer such evidence and accounts containing approximately $4.7 billion dollars were released.

94. In 2003, Defendant Russian Federation also asked the Attorney General of Liechtenstein to seize records allegedly located in Liechtenstein and relating to illegal activity on the part of Khodorkovsky and Group Menatep. Menatep and Khodorkovsky objected, and Liechtenstein's highest court denied the request, finding that (i) there were no facts presented that supported the criminal allegations against Khodorkovsky and Lebedev, (ii) there was reason to believe that the alleged tax offenses were not based in fact and that the alleged crimes were unsubstantiated, (iii) the request by the Russian government was a fishing expedition, and (iv) granting the seizure request would amount to a violation of international law. (Case No. 12 RS.2003.255-ON 25 at 6 (Fürstliches Obergericht April 25, 2004)).

95. The eleven-month trial of Khodorkovsky and Lebedev ended in May 2005, with both men convicted on charges of tax evasion and fraud, and each sentenced to nine-year prison

terms, one year short of the maximum ten-year sentence sought by the state prosecution. In response, President Bush expressed concern that "it appeared to us -- at least people in my administration -- that it looked like [Khodorkovsky] had been judged guilty prior to [having] a fair trial." Khodorkovsky and Lebedev appealed their convictions in a timely manner. Following a series of adjournments and delays, in September 2005 a Moscow court took less than a day to reach a decision upholding all but one of the nine counts against Khodorkovsky and Lebedev and reducing each of their sentences from nine to eight years. The dismissal of Khodorkovsky's appeal foreclosed his ability to carry out his stated goal of pursuing a seat in the State Duma in parliamentary by-elections to be held in December 2005.

96. Days before the verdict was to be released, Russian prosecutors announced that new charges would be brought against Khodorkovsky and Lebedev, purportedly based on money laundering activities. To date, such charges have not been brought, although Russian investigators have carried out fresh raids on Yukos offices.

### 4. Interference with YukosSibneft Merger

97. By September 2003, it was "widely known that ChevronTexaco and ExxonMobil [were] vying to buy a large stake, perhaps as much as 25 percent, in Yukos[.]" (New York Times, "With Oil Smoothing Ties, Russia Sends Message to U.S. About Iraqi Contracts" (September 27, 2003)).

98. On October 3, 2003, the Yukos acquisition of 92 percent of Sibneft was formally completed, with the newly combined company being named YukosSibneft Oil Company.

99. Also on October 3, 2003, investigators and police (equipped with machine guns and bulletproof vests) carried out searches in a Yukos business center, the home of Lebedev, the offices of Vladimir Dubov, and a Yukos-funded orphanage outside of Moscow. Commentators

viewed the actions as a clear signal to potential investors in YukosSibneft that Yukos remained under attack by the government.

100.    Defendant Russian Federation stepped up its attack three weeks later, arresting Khodorkovsky on October 25, 2003 (see paragraph 83 above), and seizing all shares of Yukos common stock owned by YUL and Hulley, which amounted to approximately 51 percent of the equity of Yukos (see paragraph 104 below).    By seizing the Yukos shares, the Russian Federation effectively eliminated any possibility that ChevronTexaco, ExxonMobil, or any other major western oil company would acquire a substantial interest in YukosSibneft.

101.    On November 28, 2003, just minutes before Yukos and Sibneft were to hold their joint shareholders' and board meetings to approve, *inter alia,* charter revisions in connection with the merger, Sibneft announced -- reportedly with the tacit approval of the Russian government -- that the merger was being placed "on hold."

102.    Thereafter, it emerged that Rosneft, the state-owned oil company, was attempting to acquire Sibneft, in conjunction with an Indian oil company.  Sibneft then refused to negotiate in good faith terms for the de-merger of the two companies.  Instead, it engaged in delaying tactics, and, as of the filing of this action, continues to retain the $3 billion cash payment received from Yukos when the merger closed.

103.    Sibneft's actions were undertaken with the approval of the Defendant Russian Federation and one or more of the Individual Defendants as well as other un-named co-conspirators.

### 5. Seizure of Yukos Stock

104.    On or about October 30, 2003, just days after Khodorkovsky's arrest and Putin's statements described in paragraphs 81 through 89, above, that defendant Russian Federation had

no intent to re-nationalize Yukos, Defendant Russian Federation entered the Trust and Investment Bank, which held the registry of Yukos's shares in Russia, and seized all of the shares of common stock of Yukos owned by YUL and Hulley (each a foreign corporation), which amounted to approximately 51 percent of the equity of Yukos.

105.    Defendant Russian Federation stated that the shares had been seized "as security against material damage" in connection with the criminal case against Khodorkovsky.    That statement was false.    Because Khodorkovsky did not own the stock (it was instead owned by foreign corporations), the stock could not have been used to satisfy any of his alleged liabilities to Defendant Russian Federation, which allegations themselves were false.    The fact that the value of the shares exceeded Khodorkovsky's exposure in the criminal cases by a factor of ten is further proof that the Defendant Russian Federation used the criminal charges as a pretext for its actual goal -- seizing the Yukos shares, all in violation of the constitution of the Russian Federation, the Russian Criminal Procedure Code, and international law.

106.    The seizure of these Yukos shares advanced the re-nationalization of Yukos in two ways.    First, it effectively transferred control of Yukos to Defendant Russian Federation, thus putting the Russian government in a position to frustrate any actions the company might wish to take to resolve the coming tax claims.    Second, it prevented Yukos's principal shareholders from using their shares to facilitate a resolution of the same claims.    Defendant Russian Federation could not allow a settlement of the coming tax claims because it would be those claims that provided the pretext for the uncompensated transfer of YNG to entities controlled by Defendant Russian Federation.

107.    These purposes, of course, were not yet fully apparent when the shares were seized.    But what was unmistakable even at that relatively early point was that Defendant

Russian Federation now effectively controlled Yukos. Within days, that realization drove the value of Yukos shares down by 18 percent.

### 6. Imposition of Confiscatory Taxes

#### a. Russian Tax Audit and Post-Audit Procedures

108. Russian tax law is governed by the Tax Code of the Russian Federation ("Tax Code"), in force since January 1999. The Tax Code established procedures for (i) tax audits and (ii) post-audit dispute settlement. These procedures were intended to eliminate the arbitrary character of tax audits that previously had been used to harass legitimate businesses. The new procedures established clearer rules as to how and when an audit could be initiated, who conducts it, and how it could be administratively and judicially reviewed. As illustrated below, these procedures were violated by the Tax Ministry in the tax assessment of Yukos.

109. The tax audit procedure is as follows:

(a)    a tax audit is initiated by the head of a tax agency of his deputy;

(b)    within two months after the end of the audit, the auditors must provide the taxpayer with an audit report, which is called an act of audit. The act of audit sets out the conclusions reached by the auditors. The act of audit has no independent legal force -- it is a fact-finding document that makes proposals, such as additional assessment of taxes, interest, and penalties;

(c)    the taxpayer has two weeks after receiving the act of audit to present objections to it;

(d)    the head of the tax agency then has two weeks to consider the act of audit and the objections, after which he is required to meet with the taxpayer to consider the objections; and

(e)    after considering the objections, the tax agency issues a resolution on the tax audit, which is called an act of resolution.

110.    The act of resolution is the executive document that provides the legal basis for subsequent actions against the taxpayer, such as seizing money from its accounts.  All further court proceedings focus on the validity of the resolution.

111.    The act of resolution typically establishes additional tax assessments, interest on those assessments, and penalties.  The tax agency can seize taxes and interest from a taxpayer's account without resorting to a court procedure.  The tax agency must go to court, however, in order to collect penalties.

112.    After the act of resolution has been adopted, the tax agency issues a written demand for voluntary payment in accordance with the resolution.  The demand specifies when the tax and interest are to be paid.  Normally, there is a time period of approximately five days between the date the resolution is delivered to the taxpayer and the date the demand is made.  After the demand is made, a taxpayer typically has two weeks to present its claim in court and ask for a stay order.  These time frames are intended to allow the tax process to proceed in an orderly manner, providing the taxpayer with an opportunity to defend itself, while avoiding manipulation of the process by fraudulent taxpayers.

113.    The judicial review process is governed by the Arbitrage Code of the Russian Federation and includes a review by three main levels of the arbitrage courts:

(a)    the first instance level, which consists of a trial division and an appeal division.  The appeal division is an intermediate appellate court that reexamines decisions made by the trial division;

(b)    the second instance level, which are called courts of cassation; and

(c)    the third instance level, which is called the Supreme Arbitrage Court of the Russian Federation.

114.    In tax cases where an act of resolution is challenged, a stay order is requested and routinely granted at the commencement of the proceedings.  Since the tax authorities can seize taxes and interest from a company's account without obtaining any court order, a stay in tax cases is often essential to protect the taxpayer's account.  A stay order can be requested at any stage of the proceedings.

### b. Russia's "Special" Tax Audit of Yukos

115.    In December 2003, Defendant Russian Federation conducted a "special" tax audit of Yukos.  Prior to Defendant Russian Federation's arrest of Khodorkovsky and its eleventh-hour interference with the YukosSibneft merger, agents of the Defendant Russian Federation's regional and federal tax authorities had regularly audited Yukos's tax compliance and had never raised any material problems with Yukos's tax-minimization practices or its tax payments.

116.    During the spring of 2003, the regional tax ministry conducted a two-month audit of Yukos's tax reporting and payments for the year 2000 and concluded that Yukos had just a small additional tax liability for that year, which Yukos paid immediately.  On September 19, 2003, the Interregional Tax Inspectorate No. 1 issued a Statement for use by the Central Bank of the Russian Federation that Yukos "does not have any unsettled debts, whether on taxes or on any other obligatory payments, and has not committed any breach of the tax laws as of [September 1,] 2003."  The Interregional Inspectorate issued similar certificates on October 23, and November 17, 2003, reaffirming that Yukos was compliant with its tax obligations.

117.    In December 2003, Defendant Russian Federation, in furtherance of its plan to re-nationalize Yukos, began an extraordinary re-audit of Yukos's domestic profits tax payments for

2000. The audit lasted less than two weeks, and resulted in the assessment of an additional U.S. $3.4 billion (99 billion rubles) in taxes, interest, and penalties for 2000. This alleged tax deficiency was the largest reassessment ever faced by a Russian taxpayer and constituted a total tax burden of approximately 85 percent of Yukos's *gross* income for that year.

118.   Yukos representatives identified numerous errors in the tax calculations that resulted in an overstatement of the amount owed. The representatives of the Defendant Russian Federation acknowledged the errors, but rather than reducing the tax assessment by these amounts, they created new "violations" that were equivalent to the originally assessed amounts.

119.   The tax practices at issue concerned Yukos trading company affiliates which, given their location in economically depressed regions of Russia, enjoyed favorable tax treatment.

120.   Yukos for years had established independent oil trading companies in regions such as Mordovia, which specifically sought investments of this type by energy companies. These independent corporations purchased oil from Yukos production subsidiaries and exported that oil on behalf of themselves and Yukos. Mordovia and the other regions taxed the independent trading companies' profits from these trades at reduced tax rates. Many other Russian oil companies utilized similar tax-minimization practices during this period of time.

121.   According to Christof Rühl, Chief Economist of the World Bank's Russia Country Department in Moscow, "state-owned companies appear to engage in these [tax minimization] practices as much as private ones," which understate the share of the Russian economy attributable to the oil and gas sector. (Wall Street Journal, "Potemkin's GDP," (February 19, 2004)). Indeed, if one attributes Russian oil and gas sales by trading affiliates to the production, rather than services, sector, "oil and gas as a share of the [Russian] economy

almost triples, to about 25% of GDP." (*Id.*)

122.    Yukos's use of trading companies located in tax havens was known to its outside auditor PWC, which certified Yukos's financial reports beginning with the year 2000.

123.    Furthermore, Yukos and the trading companies were the subject of government tax audits for the years 2000 to 2003, and neither the legitimacy of the trading arrangements nor the methodology for calculating and reporting taxes was ever challenged.

124.    Yukos never hid or disguised its utilization of this tax-minimization program. Although not required to do so, Yukos voluntarily disclosed in its public financial statements the impact that the trading companies' reduced tax rates had on its performance.   For example, Yukos disclosed in its annual reports that its effective tax rates for 2000-2002 were markedly lower than the statutory rates:

| Year | Statutory Tax Rate | Effective Tax Rate |
|------|--------------------|--------------------|
| 2000 | 30 percent | 24 percent |
| 2001 | 35 percent | 18.2 percent |
| 2002 | 24 percent | 19.6 percent |

Yukos also included in the notes to its Financial Statements a reconciliation of its actual income-tax expense to the expense that it would pay if all of its income were taxed at statutory rates.   In the reconciliation, Yukos included an item titled "Income taxed at other rates."   For 2000–2002, the amounts of pre-tax income, income taxed at other rates, and net income were as follows:

| Year | Income before income taxes and minority interest (millions) | Income taxed at other rates (millions) | Net income (millions) |
|------|------------------------------------------------------------|----------------------------------------|-----------------------|
| 2000 | $4,950 | $854 | $3,724 |
| 2001 | $3,866 | $828 | $3,156 |
| 2002 | $3,810 | $745 | $3,058 |

Yukos then disclosed the reasons that its effective tax rates were below statutory rates. For example, the Management's Discussion and Analysis section of its 2002 annual report stated that:

> Our effective tax rate is affected significantly by enacted rates in the several tax jurisdictions both within Russia and internationally where we have operations. Many of the companies in our consolidated group are resident in tax jurisdictions in Russia and internationally where statutory tax rates are lower than the statutory maximum in Russia or where we benefit from regional tax incentives.

125.    Yukos timely filed objections to its tax reassessment on January 12, 2004.

126.    On April 14, 2004, the Tax Ministry issued Resolution # 14-3-05/1609-1. That Resolution essentially adopted the findings of the field tax audit. On the same day, the Tax Ministry issued two Tax Payment Demands for tax year 2000. Together the Demands sought approximately 99.4 billion rubles, or U.S. $3.4 billion, in back taxes, default interest, and penalties. The Government presented Yukos with these demands on April 16 and demanded full payment that same day.

127.    In May 2004, Yukos challenged the tax demands by filing an Application Seeking to Declare Unlawful the Resolution of the Ministry of Taxes of the Russian Federation and Levies with the Moscow Arbitration Court. The Court denied Yukos the opportunity to inspect

the evidence submitted by the prosecution, thus denying Yukos a meaningful opportunity to present its defense. The court also assumed for purposes of the case against Yukos that the government had proved its parallel allegations against Khodorkovsky, even though Khodorkovsky's trial had not yet even begun. On May 26, 2004, the Court of Arbitration upheld 99 percent of the government's tax claims. The government appealed the remaining 1 percent. By law, Yukos was entitled to 30 days to file an appeal. However, in disregard for Russian law, the appellate court conducted a hearing a few days later, thus denying Yukos its procedural and substantive rights.

### 7. Scheme To Confiscate Yukos's Property

128.    As part of its effort to re-nationalize Yukos without compensation to the company's owners, Defendant Russian Federation, in consultation with other Defendants, ordered that various Yukos bank accounts and stockholdings be confiscated or frozen.

129.    Integral to the Defendants' scheme, however, was the need to falsely assure the securities markets and the public that Defendants had no plans to convert even a large part of Yukos's value to their own unlawful benefit, much less to re-nationalize the company without compensating its shareholders. Accordingly, Defendants continued to make false and deceptive statements designed to alleviate any concerns that the Russian Federation intended to confiscate Yukos's assets and redistribute them to state-owned entities.

### a. Acts of Confiscation

130.    On April 15, 2004, and June 30, 2004, Defendant Russian Federation obtained *ex parte* injunctions effectively freezing all Yukos assets and requiring additional tax payments. Those assets included, *inter alia*, the entirety of Yukos's majority interest in YNG.

131.    Yukos had cash and other relatively liquid assets worth more than $25 billion at

this time.  Moreover, throughout 2004, Yukos repeatedly requested permission to use its frozen assets to satisfy its alleged outstanding tax liability pending appeal.  However, because of Defendants' confiscatory scheme, the requests were ignored or rejected.

132.    For example, on July 1, 2004, Russian Federation court officers accompanied by armed guards arrived at Yukos's Moscow headquarters and presented the company with an order to discharge the asserted $3.4 billion tax and penalties for FY 2000 in five days.  Yukos offered its interest in Sibneft as collateral to secure the alleged tax liability.  Defendant Russian Federation ignored the offer and instead, on the same day: (1) directed Court officers to freeze all of Yukos's accounts in Russian banks, and (2) directed the Tax Ministry to file an entirely new $3.4 billion tax claim against Yukos, this time ostensibly for 2001 liabilities.

133.    On August 31, 2004, YNG's bank accounts were frozen.  On September 9, 2004, following yet another tax levy, thirteen further freezing orders were imposed on Yukos's other subsidiary operating accounts.

134.    On or about September 3, 2004, the Russian Federation, through its Ministry of Tax, levied yet another tax liability on Yukos, for $4.1 billion in respect of the 2002 tax year.

135.    On November 2, 2004, the Russian Federation announced additional tax liabilities for FY 2001 and 2002, adding another $10 billion in claims.

### b. Contemporaneous Deceptions

136.    During the same period that Defendants were engaged in the foregoing conduct, Defendants, including the Russian Federation, issued a series of false statements and engaged in other deceptive conduct at the highest levels designed to create the appearance that its objectives were simply the even-handed execution of Russian law, that Defendants had no intention of forcing Yukos into liquidation to satisfy tax claims, and that Defendants were receptive to a

negotiated settlement of the tax issues. Defendants' fraudulent and deceptive statements and conduct were essential to their scheme ultimately to re-nationalize Yukos without payment of any compensation to its shareholders.

137.    For example, between May 20, 2004, and June 17, 2004, following news of the adverse actions taken by Defendant Russian Federation in its pursuit of its then $3.4 billion "tax" claim against Yukos for FY 2000, the price of Yukos stock and ADRs declined substantially. Amid rumors of a possible Yukos bankruptcy, the ADRs fell from a close of $40.50 on May 20 to a close of $25 on June 16.

138.    In response, and in furtherance of Defendant Russian Federation's effort to conceal its true scheme and intent, on June 17, 2004, President Putin stated publicly that Defendant Russian Federation was "not interested in the bankruptcy of such a company as Yukos." According to press reports, including the Associated Press, Putin stated that the matter of addressing Yukos's asserted tax liability (then claimed to be $3.4 billion, solely for FY 2000), was for the courts. Putin added that the Russian Federation "will try to act so as not to destroy this company."

139.    In response to Putin's assertions, the price of Yukos stock and ADRs immediately shot up. Yukos ADRs went from a close of $25 per share on June 16 up to a close of $35.65 per share on June 18.

140.    In fact, Putin's public comments on June 17, 2004, regarding Yukos were intentionally false. Contrary to Putin's statement, Defendant Russian Federation planned to destroy all shareholder value in Yukos (1) by forcing the transfer of its most valuable assets to entities owned and controlled by the Russian Federation to satisfy spurious tax liabilities, and (2) by otherwise appropriating to itself all remaining economic benefits of ownership of Yukos,

thereby re-nationalizing the company without payment of any compensation to any of its owners, in violation of Russian and, in the case of alien investors, international law.

141.    As alleged above, on or about July 1, 2004, the Russian Federation not only demanded payment of the asserted FY 2000 liability in five days and rejected Yukos's offer to collateralize the asserted debt, it also immediately levied an additional assessment of $3.4 billion (this time for FY 2001) and then froze all of Yukos's Russian bank accounts.

142.    In addition, as alleged above, on July 20, 2004, Defendant Russian Federation announced that it intended to auction YNG, Yukos's crown jewel, to discharge Yukos's alleged tax liability.

143.    Throughout the summer of 2004, the value of Yukos shares fluctuated in response to statements such as that of President Putin described above.    Officials in the Russian Federation, including one or more of the Individual Defendants, traded Yukos shares based on prior knowledge of the statements and their impact on the market.

144.    In furtherance of its plan to re-nationalize Yukos, Defendant Russian Federation, beginning in early September 2004, purported to levy yet additional tax liabilities.    (*See* paragraphs 134-35 above.)    The Russian Federation's assertions that these claims were valid assessments were false.    In fact, the claims had no basis in fact or Russian law, and were asserted in amounts and on demand terms designed solely to provide a basis for forcing Yukos to transfer any asset of value to an entity controlled by Defendant Russian Federation.    Including penalties and interest, the assessments eventually totaled approximately $27.5 billion, which was roughly equal to Yukos's gross income for the years in question.

145.    Parallel to these public events, defendant Russian Federation deceptively encouraged efforts initiated by Yukos's representatives to negotiate a settlement of the tax issues,

misrepresenting to world leaders its receptivity to a negotiated resolution allowing for Yukos's continued existence as a viable private enterprise, all in an effort to further mask Defendant Russian Federation's true objective of re-nationalizing Yukos and distributing its assets to state-owned commercial enterprises.

146.    Specifically, from in or around July 2004 and continuing through November 2004, the Right Honorable Jean Chrétien, former Canadian Prime Minister ("Prime Minister Chrétien"), engaged in communications with authorities at the highest levels of Defendant Russian Federation to effectuate a settlement of Yukos's tax issues on a basis that would be consistent with its continued existence as a going concern with substantial shareholder value.

147.    Following discussions with President Putin in July 2004, Prime Minister Chrétien tendered a multi-billion dollar written offer of settlement of all tax issues on behalf of Yukos. President Putin assured Prime Minister Chrétien that the Russian Federation would respond to his settlement proposal.  Over the next several months, notwithstanding several inquiries by Prime Minister Chrétien, no response to the written offer of settlement was provided.

148.    In furtherance of its fraudulent and deceptive scheme to mask its true intentions as to Yukos, in or around September 2004, following meetings with President Chirac of France and Chancellor Schroeder of Germany, Defendant Russian Federation, through President Putin, represented to President Chirac that a settlement to Yukos's tax issues was possible, and that President Putin shortly would be providing a letter to Prime Minister Chrétien setting forth his thoughts on how to proceed on Yukos.

149.    Despite Defendant Russian Federation's representations to President Chirac, no such letter was provided by President Putin to Prime Minister Chrétien.

150.    Defendant Russian Federation's promised "response" to the written tender of

settlement it had invited was provided on November 19, 2004, not in the form of a letter to Prime Minister Chrétien, but in the form of a public announcement that Russia would auction off YNG, Yukos's principal asset.

151.    Ultimately, Prime Minister Chrétien concluded that "[t]he level of arbitrary tax assessments and the [Russian] Minister of Justice's disinclination to respond to any settlement offers leaves the international community with only one conclusion . . . [t]he [Russian] Ministry of Justice is intent on expropriating Yukos without compensation." (National Post, "Chrétien speaks out: 'Russia is a precarious place to do business'" (December 10, 2004)).

152.    Further proof that Defendant Russian Federation's campaign against Yukos was unrelated to legitimate tax collection or fair-minded prosecution of tax offenses is the failure of defendant Russian Federation to respond to any of the more than 50 proposals made by Yukos or Group Menatep to resolve the outstanding tax claims. Among the ignored proposals was an offer by Khodorkovsky to turn over his shares of Yukos to the Russian government. Defendant Russian Federation did not accept any of these offers because resolution of its tax claims against Yukos was not its goal; the uncompensated re-nationalization of the company was.

### 8. Auction of Yukos Assets

153.    Prior to the official announcement of the YNG auction, the press reported that the Defendant Russian Federation would set the starting bid price as low as approximately $2 billion. In response to pressure to justify the opening bid, Defendant Russian Federation hired DKW Dresdner Bank to appraise the value of YNG. Dresdner appraised the asset to be worth no less than $17 billion. Separately, Yukos received an appraisal from JP Morgan which set the value of YNG at as much as $25 billion.

154.    On or about November 19, 2004, Defendant Russian Federation announced that it

would conduct an auction of YNG stock to be held on Sunday, December 19, 2004, allegedly to raise money to liquidate all or part of Yukos' alleged tax liability. The auction was scheduled for December 19th in order to effectuate the expropriation of YNG before Yukos could conduct an emergency shareholders meeting scheduled for Monday, December 20, 2004, for the purpose of approving legal actions that would impede the auction.

155.   On December 8, 2004, the Board of Directors of Gazprom authorized Gazpromneft to participate in the auction. Under the internal arrangements adopted by the Gazprom board, Gazprom would borrow the funds that would be used by Gazpromneft to bid on and to purchase the YNG stock.

156.   As of mid-December, at least three entities had indicated to Russian officials an interest in participating in the auction as bidders: (1) OOO Gazpromneft; (2) OAO First Venture Company; and (3) ZAO Intercom. Thereafter, prior to the auction, these three entities were certified to participate in the auction. Other companies had also expressed an interest in participating in the auction, including China National Petroleum Corp. ("CNPC").

157.   As a result of Defendant Russian Federation's campaign to destroy the company by eliminating any opportunity to satisfy massive tax levies that were confiscatory on their face, Yukos filed for bankruptcy protection in the United States District Court for the Southern District of Texas. *See In Re Yukos Oil Company*, Case No. 04-47742 (Bankr. S.D. Tex. filed Dec. 14, 2004). The Bankruptcy Court noted probable jurisdiction over Yukos and, following a hearing at which Gazprom, Gazpromneft, the Russian Federation, and various financial institutions that were to finance the stock purchase were present, issued an order (1) freezing all Yukos assets including the YNG stock that was to be the subject of the auction and (2) enjoining "Gazpromneft, ZAO Interkom, OAO First Venture Company, [and the financial institutions],

their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them . . . from taking any actions with respect to the stock or shares of ownership of [YNG], including, but not limited to, conducting or participating in an auction of such stock or shares of ownership." *Yukos Oil Co. v. Russian Federation et al.*, Adv. No. 04-3952, Temporary Restraining Order (Bankr. S.D. Tex. Dec. 16, 2004).

158.    In an effort to evade the Court Order, the Defendants, including agents and employees of Gazpromneft, Gazprom, and the Russian Federation, rescored their orchestration for the auction in two significant ways. First, Defendants First Venture and Intercom were quietly replaced at the auction by a new company, Defendant BFG. Defendant BFG was a sham company with no assets, no fixed address, and no prior history, whose identity remains a mystery. Second, shortly after the Court Order was entered, Defendant Gazprom announced that it had sold off its wholly owned subsidiary, Gazpromneft. (*See* Moscow News, "Gazprom Sells Oil Arm Gazpromneft That Took Part In Yugansk Auction" (December 22, 2004)). Gazpromneft's attendance at the YNG auction was imperative to the scheme to expropriate Yuganskneftegaz because, under Russian law and the terms of the auction, at least two putative bidders must be present for a lawful auction to occur.

159.    Notwithstanding the Court Order, the auction proceeded as scheduled and lasted ten (10) minutes. BFG's eventual bid of $9.3 billion was uncontested and BFG thereby acquired the YNG stock for a fraction of its actual value and barely half of the valuation established by DKW Dresdner Bank.

160.    Defendant Russian Federation's agents allowed the auction to proceed despite violations of the protocol for the auction. In particular, the requirement that at least two bidders be present was not satisfied because Gazpromneft did not substantively participate. Defendant

Borisenko, Vice President of Defendant Rosneft, represented Gazpromneft at the auction. Following an initial bid by BFG, Borisenko asked the auctioneer for permission to leave the auction room and make a telephone call to unidentified third parties, a practice contrary to the stated auction rules. Following the telephone call, Borisenko did not place any bid on behalf of Gazpromneft. The auction was then reduced to a comical exercise of BFG bidding against itself to achieve what appeared to be a predetermined auction price.

161. In September 2005, the Kremlin press service announced that Borisenko had been awarded the Order for Services to the Fatherland, Second Class, under a presidential decree signed September 20. (Moscow Times, "Putin Gives State Award to Key Player in Yukos Saga," September 29, 2005).

162. Only days after the YNG auction, and prior to the date on which payments would have been due from Defendant BFG, Defendant BFG was acquired by Defendant Rosneft. Defendant BFG, which was created days before the auction, had no assets, and never engaged in for-profit activity, has since disappeared. Rosneft now characterizes the acquisition of YNG as "the most monumental bargain in Russia's modern history." (Rosneft, "Place in economy of Russia," <http://www.rosneft.ru/english/company/economy.html>) (last visited October 23, 2005)).

163. In response to the YNG auction, U.S. State Department Spokesman Richard Boucher observed that "[w]e looked for a solution to [the Yukos] problem that would observe tax laws and would not infringe on the rights of the company's shareholders, creditors, and employees. We don't believe that the auction was a step in this direction." In contrast, President Putin characterized the auction as the Russian government's use of "absolutely legal market mechanisms" to secure its interests, which, in Putin's view, was "quite normal."

- 45 -

164.    Prior to the auction, Gazprom and Rosneft had announced plans to merge.  As discussed in paragraphs 169-70 below, however, the Russian Federation ultimately abandoned the merger due in part to legal complications surrounding the title to the expropriated YNG asset.

165.    Rosneft has made clear its intention concerning the treatment of undisputed liabilities of its newly acquired asset.  As reported in the Moscow Times in April 2005, Rosneft, without questioning the legitimacy of the liabilities, informed various banks which had lent funds secured by Yuganskneftegaz that it would not service the debt.  (Moscow Times, "Agency: Rosneft Can Repay Yugansk Debt" (April 21, 2005)).  Rosneft also warned the banks not to take legal actions to collect the debt "if the banks wanted to continue doing business in Russia and maintain good relations with the Kremlin."  Rosneft has sued Yukos on the grounds that Yukos should repay these debts.

166.    In April 2005, the press also reported that Sibneft settled a $1 billion tax assessment for a payment in the amount of $300 million.  Defendant Russian Federation never froze any of Sibneft's assets and did not attempt to auction any of its assets in order to satisfy the obligation.  Rather, Defendant Russian Federation permitted the tax authorities to resolve the matter for a fraction of the amount officially demanded by the State.

167.    In June 2005, Vedomosti reported that files from the Russian Central Bank reflect that, to the extent funds were transferred to create the appearance of payment of the auction price, the funds were paid from the Central Bank of Russia rather than from Rosneft's accounts. (*See* Moscow Times, "Paper Sheds Light on Yukos Sale" (August 16, 2005)).  None of the Defendants has denied this report of sham transfers in connection with the auction of the Yukos subsidiary.

168.    Rosneft's 2004 annual report, released in August 2005, subsequently revealed that

BFG was in fact bidding on behalf of Rosneft at the YNG auction. In its annual report, Rosneft disclosed a 0 percent loan made to BFG (50 billion rubles) nearly equivalent in value to the amount deposited by BFG (49.35 billion rubles) days before the YNG sale, which reserved BFG's spot in the sham auction that it ultimately "won."

169.   Given the legal uncertainties surrounding Rosneft's title to the YNG asset, the Russian Federation abandoned the Gazprom/Rosneft merger in May 2005. In its place, Russia created a special purpose vehicle, Defendant Rosneftegaz, which in June 2005 entered into a $7.1 billion agreement to purchase a 10.7 percent interest in Gazprom. Following the transaction, Gazprom announced that the Russian Federation had acquired a controlling stake in the company.

170.   Rosneftegaz's $7.1 billion purchase of the Gazprom stake has been financed by a syndicate of Western banks, including ABN Amro, Dresdner Kleinwort Wasserstein, JP Morgan, and Morgan Stanley. The loan will be repaid by an initial public offering of a minority stake in Rosneft in 2006, which is expected to be held on the London Stock Exchange and organized by the same syndicate of Western banks. The loan to Rosneftegaz -- the entity holding 100 percent of the shares of Rosneft, which itself holds bad title to the expropriated YNG asset -- is the largest ever to a Russian borrower.

### D. Defendant Russian Federation's Pattern of Expropriation

171.   Although a target of discriminatory treatment by Russia, Yukos is not the only Russian company to have been re-nationalized through Byzantine corporate metamorphoses, old fashioned intimidation, and thievery. Nor is it the first company that has sought the assistance of the United States Courts in protecting important private property rights from confiscation, as described below.

- 47 -

172.     The second largest Russian export behind oil and gas is vodka.  Prior to the collapse of the Soviet Union, trademarks to Russian vodka products were state-owned.  When the Soviet Union collapsed in 1991, the vodka industry was privatized and SPI International NV ("SPI") became the legal owner of Stolichnaya Vodka, one of the most popular brands of vodka in the world.  These rights were confirmed by the statements of various Russian government officials and trade representations.

173.     Since the privatization of the Russian vodka industry took place, investors infused SPI with tens of millions of dollars to build SPI into one of the world's leading vodka producers.  For the next decade, SPI sold Stolichnaya Vodka to American and European markets without any claim by the Russian Federation.

174.     In April, 2002, the Moscow Times reported that the Russian Federation had set up a federal enterprise to nationalize and monopolize the vodka industry.  Since then, the Russian Federation has expropriated SPI's trademarks to Stolichnaya and other brands of Russian vodka.  In conjunction with the expropriation, the Russian Federation threatened criminal prosecutions and engaged in physical threats against SPI employees.

175.     Expropriation and confiscation has not been limited to liquids.  Recently, the Russian Federation attempted to expropriate the rights to Russian animated films (*i.e.*, cartoons).  *See Films by Jove, Inc. v. Berov*, 341 F.Supp.2d 199 (E.D.N.Y. 2004).

176.     In *Jove*, plaintiffs acquired the exclusive copyright license for worldwide distribution outside the former Soviet Union of about 1500 Russian animated films.  The copyrights had been owned by Soyuzmultfilm, a state-owned enterprise that was transformed into a private company in which the state retained an interest.  Relying on its license agreements, plaintiffs invested more than $3 million to restore, update and revise the film library.

177.    In 1998, plaintiffs institute a copyright infringement action against Joseph Berov, a Russian citizen.  Berov did not dispute that he had infringed those copyrights; instead, Berov argued that the licensing agreements under which plaintiffs had been operating were invalid.  In particular, he argued that a new state-owned entity, not Soyuzmultfilm, was the actual owner of the copyrights.  The district court, finding in favor of the plaintiffs, concluded that "there was persuasive evidence that the [decision of a Russian court] was the coordinated result of the efforts on the part of the Russian government to improperly use the courts to recapture property rights lost during privatization in Russia, and thereby expropriate without compensation the plaintiff's property rights in the lease and concomitantly cause the loss of the plaintiffs' multi-million-dollar investment."  *Id*. at 202.

178.    On May 19, 2004, the European Court of Human Rights ("ECHR") ruled against Defendant Russian Federation in the case of *Gusinskiy v. Russia* for similar conduct as that alleged in this Complaint.  There Vladimir Gusinskiy, majority owner of the Russian firm Media-Most, filed suit against Defendant Russian Federation for its expropriation and confiscation of his holdings in a company known as Media-Most.  Gusinskiy had used his media outlets to champion liberal and pro-Western thinking in Russia.  In the late 1990s, when Gusinskiy became increasingly critical of Russia's political leaders, Russian authorities arrested and detained him.  They then forced Gusinskiy to transfer his interest in Media-Most to Gazprom (the same entity named as a defendant herein), in exchange for his release.  In its decision, the ECHR acknowledged the improper motivation for the Gusinskiy prosecution and found that Defendant Russian Federation had used the criminal justice system as a commercial bargaining chip and a means to engage in extortion in breach of Articles 5 and 18 of the European Convention on Human Rights. *Gusinskiy v. Russia*, 70276/01 [2004] ECHR 205 (May 19, 2004).

### E.  The Consequences of Defendants' Unlawful Conduct

179.   Before Defendants seized YUL and Hulley's shares in Yukos on October 30, 2003, the market value of Yukos stock was more than $40 billion.  Since that time, the market capitalization has decreased by more than 95 percent.  Defendants have effectively re-nationalized Yukos by (1) seizing control of a majority of Yukos shares, (2) transferring Yukos's most valuable assets to commercial entities controlled by Defendant Russian Federation, and (3) diverting to state-controlled entities all remaining benefits of owning an interest in Yukos. Moreover, Defendants have done this without paying a penny of compensation to the owners of Yukos.  Plaintiffs' ADRs are now effectively worthless, and they have become worthless because Yukos's most valuable asset has been transferred to a state-owned commercial enterprise and the value of its remaining assets does not equal the unjustifiable and confiscatory tax liabilities remaining to be satisfied.

### IV. CAUSES OF ACTION

### COUNT I
### Conspiracy and Common Law Conversion
### (Against All Defendants)

180.   Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-179, above.

181.   Plaintiffs bring this claim for the unlawful conversion of property, namely, OAO NK Yukos Oil Company, of which Plaintiffs are partial owners.

182.   Defendants wrongfully control and/or exercise dominion over the property of Plaintiffs in that:

   a. They have directly and wrongfully seized a majority of Yukos common stock, as described in paragraphs 104-106, above;

    b.  They have directly and wrongfully seized the most valuable asset of Yukos, as described in paragraphs 153-168, above; and

    c.  Through the imposition of enormous tax liabilities on Yukos that in fact are not owed, they have created a situation in which they wrongfully realize all of the benefits that otherwise would accrue to the owners of Yukos even from the company's greatly reduced current level of operations.

183.    Defendants wrongfully continue to retain possession of the property of Plaintiffs.

184.    As a result of the foregoing conduct, Defendants have unlawfully converted property of the Plaintiffs.

185.    Each Defendant participated in, and continues to benefit from, the conversion.

186.    As a direct and proximate result of Defendants' conversion of Plaintiffs property, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II
## RICO
### (Violation of 18 U.S.C. § 1962(b))
### (Acquisition of Control of Enterprise)
### (By Plaintiff Yukos ADR Holders Against all Defendants Except the Russian Federation, Gazprom, Rosneft, and Rosneftegaz)

187.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-186, above.

188.    At all times relevant herein, each of the Plaintiff Yukos ADR Holders was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

189.    At all times relevant herein, each of the Individual Defendants and Defendants Gazpromneft and BFG was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

190.    At all times relevant herein, Yukos Oil Company constituted an "enterprise" under RICO, as defined in 18 U.S.C. § 1961(4).

191.    At all times relevant herein, the enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

192.    At all times relevant herein, the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators acquired an interest in and/or control of Yukos through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(b).

193.    Specifically, at all times relevant herein, the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators, on numerous occasions and acting to acquire an interest in and/or control of Yukos, engaged in "racketeering activity" within the meaning of that term under 18 U.S.C. § 1961(1) by engaging in the following acts:

a.    The Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators, through the confiscation of YNG, converted Yukos property worth more than $5,000 -- specifically, oil and gas produced by YNG -- and transported said oil and gas in foreign commerce in violation of 18 U.S.C. § 2314.

b.    The Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators unlawfully evaded the Court Order prohibiting their participation in the YNG auction, and knowingly and fraudulently received property from a debtor after the filing of a case under Title 11 of the U.S. Code, with intent to defeat the provisions of Title 11, through the use of sham transactions and straw entities, including but not necessarily limited to BFG, all in violation of 18 U.S.C. § 152, which, under 18 U.S.C. § 1961(1), constitutes an offense involving fraud connected with a case under Title 11.

c.    The Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators  transmitted information by means of wire communication in interstate or foreign

commerce in connection with a scheme to defraud in violation of 18 U.S.C. § 1343, specifically by issuing misleading statements concerning the Defendants' actions aimed at the de facto re-nationalization of Yukos.

194.    Each of the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators committed and/or aided and abetted in the commission of two or more of these acts of racketeering activity.

195.    The foregoing acts of racketeering constituted a pattern of racketeering activity within the meaning of that term under 18 U.S.C. § 1961(5).  These racketeering acts were related to each other by virtue of:  (a) common participants in the form of the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators; (b) common victims including Plaintiffs; (c) the use of common and recurring methods in commission of the racketeering acts; and (d) the common purpose of the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators in enriching themselves at the expense of Plaintiffs and others.

196.    As a result of the acquisition of an interest in and/or control of Yukos through a pattern of racketeering activity by the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators, Plaintiffs have suffered damage to their business and property.

197.    As a result of their misconduct, the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators are liable to Plaintiffs for their losses in an amount to be determined at trial.

198.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages in addition to the costs and attorneys' fees from the Individual Defendants,  Defendants Gazpromneft and BFG, and other conspirators.

**COUNT III**
**RICO**
**(Violation of 18 U.S.C. § 1962(c))**
**(Association-in-Fact Enterprise)**
**(By Plaintiff Yukos ADR Holders Against all Defendants Except the Russian Federation,**
**Gazprom, Rosneft, and Rosneftegaz)**

199.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-198, above.

200.    At all times relevant herein, each of the Plaintiff Yukos ADR Holders was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

201.    At all times relevant herein, each of the Individual Defendants and Defendants Gazpromneft and BFG was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

202.    At all times relevant herein, the Individual Defendants and Defendants Gazpromneft and BFG formed, and operated as, an association-in-fact for the purpose of defrauding Plaintiffs.    This association-in-fact constituted an "enterprise" under RICO, as defined in 18 U.S.C. § 1961(4).

203.    At all times relevant herein, the enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

204.    At all times relevant herein, the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators knowingly and willfully conducted or participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

205.    Specifically, at all times relevant herein, the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators, on numerous occasions and acting to further the affairs of and in association with the enterprise, engaged in "racketeering activity" within the meaning of that term under 18 U.S.C. § 1961(1) by engaging in the following acts:

a.      The Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators, through the confiscation of YNG, have converted property worth more than $5,000 -- specifically, oil and gas produced by YNG -- and transported said oil and gas in foreign commerce in violation of 18 U.S.C. § 2314.  The targets of this conspiracy were all holders of Yukos shares, for the confiscation of YNG was but a step in the uncompensated re-nationalization of Yukos.

b.      The Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators acting through and in association with their enterprise and to further that enterprise, unlawfully evaded the Court Order prohibiting their participation in the YNG auction, and knowingly and fraudulently received property from a debtor after the filing of a case under Title 11 of the U.S. Code, with intent to defeat the provisions of Title 11, through the use of sham transactions and straw entities, including but not necessarily limited to BNG, all in violation of 18 U.S.C. § 152, which, under 18 U.S.C. § 1961(1), constitutes an offense involving fraud connected with a case under Title 11.

c.      The Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators acting through and in association with their enterprise and to further that enterprise, transmitted information by means of wire communication in interstate or foreign commerce in connection with a scheme to defraud in violation of 18 U.S.C. § 1343, specifically by issuing misleading statements concerning the Defendants' actions aimed at the de facto re-nationalization of Yukos.

206.    Each of the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators committed and/or aided and abetted in the commission of two or more of these acts of racketeering activity.

207.    The foregoing acts of racketeering constituted a pattern of racketeering activity within the meaning of that term under 18 U.S.C. § 1961(5).  These racketeering acts were related to each other by virtue of:  (a) common participants in the form of the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators; (b) common victims including Plaintiffs; (c) the use of common and recurring methods in commission of the racketeering acts; and (d) the common purpose of the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators in enriching themselves at the expense of Plaintiffs and others.

208.    As a result of the above noted actions of the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators, Plaintiffs have suffered damage to their business and property.

209.    As a result of their misconduct, the Individual Defendants, Defendants Gazpromneft and BFG, and other co-conspirators are liable to Plaintiffs for their losses in an amount to be determined at trial.

210.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages in addition to the costs and attorneys' fees from the Individual Defendants,  Defendants Gazpromneft and BFG, and other conspirators.

## COUNT IV
## RICO
**(Violation of 18 U.S.C. § 1962(d)—Conspiracy to Violate §§ 1962(b) and 1962(c))**
**(Acquisition of Control of Enterprise; Association-in-Fact Enterprise)**
**(By Plaintiff Yukos ADR Holders Against all Defendants Except the Russian Federation, Rosneft, and Rosneftegaz)**

211.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-210, above.

212.    At all times relevant herein, each of the Plaintiff Yukos ADR Holders was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

213.    At all times relevant herein, each of the Individual Defendants, and Defendants Gazpromneft and BFG, was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

214.    At all times relevant herein, Yukos Oil Company constituted an "enterprise" under RICO, as defined in 18 U.S.C. § 1961(4).

215.    At all times relevant herein, the enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

216.    As set forth in Count II, *supra*, the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators acquired an interest in and/or control of Yukos through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(b).

217.    At all times relevant herein, the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators conspired to violate 18 U.S.C. § 1962(b); that is, each agreed to conduct and participate, directly and indirectly, in acquiring an interest in and/or control of Yukos through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

218.    The Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objectives thereof, including, but not limited to, the acts set forth above.

219.    At all times relevant herein, the Individual Defendants, and Defendants Gazpromneft and BFG, formed and operated as an association-in-fact for the purpose of defrauding Plaintiffs.  This association-in-fact constituted an "enterprise" under RICO, as defined in 18 U.S.C. § 1961(4).

220.    At all relevant times herein, the enterprise was engaged in, and its activities

affected, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

221.    As set forth in Count III, *supra*, the Individual Defendants, Defendants Gazpromneft, and BFG, and other conspirators knowingly and willfully conducted or participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

222.    At all times relevant herein, the Individual Defendants, Defendants Gazpromneft, and BFG, and other conspirators each were associated with the enterprise and conspired to violate 18 U.S.C. § 1962(c); that is, each agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

223.    The Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objectives thereof, including, but not limited to, the acts set forth above.

224.    As a direct and proximate result of the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators' violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damage to their businesses and property.

225.    As a result of the conspiracy to violate 18 U.S.C. §§ 1962(b) and 1962(c), the Individual Defendants, Defendants Gazpromneft and BFG, and other conspirators are liable to Plaintiffs for their losses in an amount to be determined at trial.

226.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages in addition to the costs and attorneys' fees from the Individual Defendants, Defendants

Gazpromneft and BFG, and other conspirators.

## COUNT V
### Prima Facie Tort
### Against All Defendants

227.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-226, above.

228.    Defendants and each of them with a malevolent intent and without justification participated in the confiscation of Plaintiffs' property through their participation in the uncompensated re-nationalization of Yukos and the distribution of its principal assets to state-owned commercial enterprises.

229.    As a direct and proximate result of the aforementioned conduct, Defendants injured all of the Plaintiffs.

## COUNT VI
### Common Law Fraud and Deceit
### Against All Defendants
### By Plaintiff Yukos ADR Holders

230.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-229, above.

231.    Plaintiff Yukos ADR Holders bring Count V for fraud against all Defendants arising from their misrepresentations and omissions that induced plaintiffs to maintain their ownership of Yukos ADRs through and including December 19, 2004.

232.    On or about March 17, 2003, Yukos registered with the SEC 400,000,000 ADSs, each share representing fifteen common shares of Yukos. The ADSs are held by a New York-based Deutsche Bank depositary, in accordance with a deposit agreement governed by New York law. Yukos Level 1 ADRs are traded on the OTC market in the United States, and in Great Britain and continental Europe. Yukos ADRs represent approximately 15 percent to 19 percent

of the company's common stock, much of which is or has been owned by institutional investors and others in the United States.

233.    As alleged more particularly above, from at least October 25, 2003, and through December 19, 2004, Defendants engaged in a manipulative and deceptive scheme, course of business, and conspiracy to take from the owners of Yukos all of the value of their property, and to do so without payment of any compensation.

234.    In the course of such activities, Defendants made false and  misleading statements as alleged above.

235.    In particular, through statements by, among others, Defendant Russian Federation President Vladimir Putin, Defendants fraudulently misrepresented that the Russian Federation was "not interested in" bankrupting Yukos or causing its destruction and was not intent on re-nationalizing the company.

236.    This misrepresentation of Defendants' true intent was part of their scheme to defraud Yukos's shareholders.  In furtherance of the scheme, the Defendants, among other things:  (i) initiated an ever escalating series of fraudulent and legally frivolous tax claims against Yukos which were, in fact, nothing more than elements of an uncompensated taking of Yukos from its owners; (ii) rejected Yukos's repeated offers to pay off the tax claims in their entirety and responded to such offers by assessing even larger claims; (iii) froze Yukos's majority interest in YNG, Yukos's most crucial and valuable asset, and then announced plans to sell off YNG, a move that so obviously violated Russian law that even a subservient Russian court declared that the Federation had to first liquidate less significant assets; (iv) froze all of Yukos's Russian bank accounts, intentionally precipitating a liquidity crisis; (v) overcame impediments to its scheme to take Yukos from its owners by concocting additional fraudulent tax

claims in overwhelming amounts; (vi) conducted a charade of an "auction" of the YNG stock; and (vii) after issuance of the bankruptcy court order enjoining the auction, acted to evade the order by, inter alia, creating the sham entity BFG to "buy" all the YNG stock, when in fact the true party in interest was the Federation itself.

237.    The magnitude, scope and true purpose of Defendants' scheme and artifices to defraud Yukos and its shareholders of all value of Yukos and to re-nationalize Yukos and its assets was only revealed to the markets and the public, at the earliest, on December 19, 2004, when Defendants completed the purported sale of all of Yukos's stock in YNG to BFG for an amount that was no more than half of YNG's value, all of which went to satisfy spurious tax claims rather than to compensate the owners of Yukos for their loss.  Within days, BFG was "acquired" by Defendant Rosneft.

238.    As alleged above, each of the Defendants, directly or indirectly, engaged in manipulative and deceptive schemes by directly or indirectly employing manipulative and/or deceptive artifices and devices to defraud plaintiffs of the value of their Yukos ADRs.

239.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs were induced to retain, and not sell, Yukos ADRs.  Plaintiffs relied on the false and deceptive statements by Defendants in deciding to retain their Yukos ADRs. Had the Russian Federation and the other defendants revealed their true design and intent to re-nationalize Yukos without compensation, Plaintiffs would have liquidated their Yukos ADRs at a far greater price than the price of the ADRs upon disclosure of Defendants' fraud.

### COUNT VII
### Action for Securities Fraud
### Against All Defendants

240.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-239,

above.

241.    Plaintiff Yukos ADR Purchasers bring Count VII for securities fraud against all Defendants arising from their misrepresentations and omissions that induced Plaintiffs to purchase Yukos ADRs at artificially inflated prices.

242.    Yukos ADRs were traded on the OTC market in the United States, and in Great Britain and continental Europe.  Yukos ADRs represent approximately 15 percent to 19 percent of the company's common stock, much of which is or has been owned by institutional investors and others in the United States.

243.    Defendants carried out a plan, scheme and course of conduct which was intended to and did deceive the investing public, including Plaintiffs, as alleged herein; and caused Plaintiff Yukos ADR Purchasers to purchase Yukos ADRs at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

244.    Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff Yukos ADR Purchasers in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

245.    Defendants, individually and in concert, directly and indirectly, by the use, means and/or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Yukos as specified herein.

246.    The Defendants employed devices, schemes and artifices to defraud, and engaged in acts, practices and a course of conduct as alleged herein, to assure the investing public and the world markets that the Russian Federation would not "destroy" or "bankrupt" Yukos and had no plans or designs to re-nationalize the company when, in fact, the opposite was true, and which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about or concerning Yukos and its business and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the buyers of Yukos ADRs, including Plaintiff Yukos ADR Purchasers.

247.    The Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged herein, or acted with reckless disregard for the truth.   Such material misrepresentations and/or omissions and deceptive and manipulative actions of Defendants were done knowingly or recklessly and for the purpose of concealing the true objectives of the Russian Federation and the other Defendants regarding Yukos and with the effect of artificially inflating the price of Yukos stock and ADRs.

248.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Yukos ADRs was artificially inflated.   In ignorance of the fact that the market price of Yukos ADRs was artificially inflated, and relying directly and/or indirectly on the false and misleading statements and deceptive and manipulative actions, Plaintiff Yukos ADR Purchasers acquired Yukos ADRs which, had they known the truth, Plaintiffs Yukos ADR Purchasers would not have purchased at

all, or would not have purchased at the artificially inflated prices paid, and as a result were damaged thereby.

249.  By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated there under.

250.  As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff Yukos ADR Purchasers suffered damages in connection their purchases of their Yukos ADRs.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court award a judgment on all claims and award it such damages and compensation, including punitive damages, interest, attorneys fees, costs and such other relief as this Court may deem just.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

Respectfully Submitted,

O. Thomas Johnson, Jr. (Bar No. 218527)
Mark E. Feldman (Bar No. 474943)
COVINGTON & BURLING
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

*Attorneys for Plaintiffs*

October 24, 2005