## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------X

RICHARD ALLEN, *et al.*

                 Plaintiffs,         Case No. 1:05CV02077

      v.

                                     **DECLARATION OF**
                                     **CARA LAFORGE**

RUSSIAN FEDERATION, *et al.*

                 Defendants.
-------------------------------------------------------X

       I, Cara LaForge, a non-party to this action over the age of 18 years, hereby state:

      1.      This declaration is based on my personal knowledge and on information I have obtained from agents in Ireland and Russia who have personal knowledge.

      2.      I am a licensed process server employed by Legal Language Services, a firm specializing in international litigation support, located at 8014 State Line Road, Suite 110, Leawood, KS 66208.

      3.      I have over thirteen years of experience assisting U.S. litigants with service of process abroad, including service upon defendants located in the Russian Federation.

      4.      On or about January 3, 2006, I began the process of effecting service of a summons and complaint upon the individual Russian defendants in the above-captioned matter.

**Inability to Serve Process in the Russian Federation Pursuant to Federal Rule of Civil Procedure 4(f)(1) and Federal Rule of Civil Procedure 4(f)(2)(A) and (B)**

5.      There currently exists no reciprocity between the United States and the Russian Federation with respect to international judicial assistance.  In my experience, the Russian Federation is declining to execute Hague service requests, letters of request, or letters rogatory emanating from the United States.

6.      As a result, I could not pursue service of the individual defendants under Federal Rules of Civil Procedure ("FRCP") 4(f)(1), which provides for service pursuant to any internationally agreed means reasonably calculated to give notice, such as the Hague Convention of 1965 on the Service Abroad of Judicial and Extrajudicial Documents ("The Hague Service Convention"), because the Russian Federation is not currently applying The Hague Service Convention in relation to the United States.

7.      I was equally barred from pursuing alternative forms of service under FRCP 4(f)(2)(A), which provides for service effected in the manner prescribed by the law of the foreign jurisdiction for service in that country in an action in any of its courts of general jurisdiction, because I was informed by Russian counsel and judicial authorities at the Russian Ministry of Foreign Affairs that such service could only be effected by a Russian court bailiff, acting on the instructions of a Russian judge, acting in turn in response to a letter rogatory, and that any such letter rogatory would be refused by the Russian Ministry of Foreign Affairs.

8.      For the same reason, I could not pursue service under FRCP 4(f)(2)(B),

which provides for service as directed by the foreign authority in response to a letter

rogatory.

**Service of Process in the Russian Federation Pursuant to FRCP 4(f)(2)(C)**

9.      I then investigated the possibility of effecting service under

FRCP 4(f)(2)(C), which provides that, unless prohibited by the law of the foreign

country, service may be effected by personal delivery to an individual of a copy of the

summons and the complaint or by any form of mail requiring a signed receipt to be

addressed and dispatched by the clerk of the court.

10.      I consulted with Russian counsel in Moscow and was advised that service

of foreign pleadings via a private agent was not prohibited under Russian law; likewise,

service by mail was not prohibited under Russian law.

11.      I therefore undertook to make every effort to obtain personal service upon

the Russian individual defendants in Russia by means of a private agent pursuant to

FRCP 4(f)(2)(C)(i) and by mail service pursuant to FRCP 4(f)(2)(C)(ii).

12.      I contacted three Russian law firms and explained that I required

assistance in effecting personal service upon the individual defendants. All three of these

law firms informed me that they were unwilling to speak with me; that to be associated

with such a politically-sensitive case involving highly-placed defendants carried with it

the threat of professional or personal retaliation.

13.     I then contacted several private detective agencies in Moscow and asked if they would assist in effecting personal service upon the individual defendants. All of these firms informed me that they were unwilling to take on the work for fear of reprisal by the defendants.

### Personal Service by Agent in a Foreign Country Other than the Russian Federation

14.     During the first week of January 2006, I learned that two of the defendants, Mr. Medvedev and Mr. Bogdanchikov, would participate in an energy conference in Davos, Switzerland. I decided to attempt service upon these defendants in Davos.

15.     Switzerland is a member of the Hague Service Convention and has objected under Article 10 of that treaty to direct service by judicial officer and by mail. As a result, only service pursuant to Article 5 through the Swiss Central Authority is available to foreign litigants seeking service in Swiss territory.

16.     On January 4, 2006, I contacted the Central Authority for the canton of Graubünden, in which Davos is located, and spoke to a legal advisor there, Mr. Matthias Faessler, and asked if the courts of Graubünden could effect service upon two foreign defendants temporarily staying in its territory.

17.     In response to my inquiry, Faessler informed me that the Russian defendants were transient visitors with no legal domicile in Switzerland and that "tag jurisdiction" under these circumstances was incompatible with Swiss law and service via the Hague Service Convention was not possible.

18.    I subsequently learned that three of the defendants, Mr. Khristenko, Mr. Miller and Mr. Medvedev, would attend conferences in Berlin and/or Hannover in Germany and decided to attempt personal service there.

19.    Germany is also a member of the Hague Service Convention and under Article 10 of that treaty has objected to direct service by judicial officer and service by mail. Germany effects service through its own Central Authorities under Article 5.

20.    I contacted the Central Authorities for Berlin and Lower Saxony as well as Dr. Mattias Heger of the Federal German Ministry of Justice to determine if the German judicial authorities could honor a Hague Request seeking service upon the defendants through its courts.

21.    Mr. Baum of Lower Saxony and Dr. Heger, legal advisor for the Ministry of Justice, informed me that tag jurisdiction was a practice which was compatible with German law and that they would cooperate in arranging for special service by court bailiff.

22.    However, final approval of service by the German authorities was delayed until after the events had passed and the defendants had left Germany, thereby precluding the possibility of service.

23.    In early February 2006, I learned that defendant Mr. Bogdanchikov would attend an energy conference in London.

24.    I consulted with UK counsel who advised me that service via Article 5 was possible upon Mr. Bogdanchikov in English territory and that the question of tag jurisdiction presented no obstacle under English law.

25.    I therefore filed a Hague Service Request with the Central Authority for England and Wales on February 13, 2006 and arranged for personal service to be effected upon Defendant Bogdanchikov by an officer of the High Court; that service was perfected on February 14, 2006.

26.    In late April and early May 2006, I subsequently attempted to effect personal service upon defendant Mr. Medvedev while he was traveling in London and Uzbekistan, but I was unable to obtain sufficient lead time to arrange for service.

**Personal Service by Agent Inside the Russian Federation**

27.    I also arranged for personal service upon the defendants inside the Russian Federation.

28.    Given that I could not find any Russian law firm or detective agency that was willing to effect personal service upon the defendants, I turned to security firms based in Western Europe to provide me with process servers.

29.    The assignment was refused by a dozen Western security firms, who described the mission as "excessively risky." These security experts told me that the defendants were not guarded by ordinary security details, but rather by security details trained to defend against terrorist attacks, and that the threat of terrorist attacks from Chechen rebels was a real one for the defendants. The security experts I spoke with said

the security details of the defendants were unlikely to distinguish between an unfamiliar process server delivering papers and a possible terrorist and, therefore, might respond with gunfire.

30.     I eventually hired Ian Withers, George Richter, and Gerry Mahoney, agents with UK investigative firm Priority Investigators Limited, who have experience effecting service of U.S. process in foreign jurisdictions, including the Russian Federation (hereinafter "the Irish agents").

31.     Mr. Withers has 46 years of experience as a licensed detective and process server, including 17 years operating a detective agency in the State of Maryland and 29 years operating a UK agency, and he is familiar with U.S. rules for service of process. Mr. Withers has effected service of process in Moscow on numerous occasions for Western plaintiffs.

32.     Mr. Richter specializes in high risk service for Mr. Withers. Mr. Richter's credentials include successful service of process on several members of the political entourages of Slobodan Milosovic and Zeljko Raznatovic a/k/a "Arkan," in Belgrade during the Balkan War and as well as service upon various Sinn Fein members in Ireland considered to be dangerous. Mr. Richter also has extensive experience conducting investigations in Russia and in the former Soviet Republics.

33.     Mr. Mahoney has 10 years of experience as an investigator and process server, and has conducted extensive international investigations, including investigations in the Central European States.

34.    Mr. Withers and I hired a team of local Moscow agents (hereinafter "the Moscow agents") who, on condition that we safeguarded their anonymity, were willing to perform due diligence and background investigation prior to the Irish agents' arrival in order to determine defendants' whereabouts, to identify their residential addresses, and to identify opportunities during which service might be effected.

35.    The Moscow agents provided me and the Irish agents with the following information regarding the defendants:  the defendants were not listed in any telephone directory; the defendants' names did not appear on the rolls of the local utility companies; titles to the defendants' homes were probably held by private corporations or by the Russian government, but, in any case, were not held by defendants.

36.    The Moscow agents informed us that many of the defendants lived along the Rublyevo-Uspenskoye highway.  That stretch of highway is populated with small suburbs that have housed the Russian elite since the Soviet era.  For security reasons, the highway itself as well as a zone around the highway is controlled by Moscow Security Police and the FSB (Russian State Security Agency, formerly the KGB).  To gain entry to the residential subdivisions off the highway where the defendants' dachas are located, a visitor must present a formal invitation in writing plus a pass obtained from the FSB.

37.    The Moscow agents also informed us that virtually all of the defendants are guarded around the clock by security details, that the defendants travel in convoys with armed bodyguards in unmarked cars with tinted glass, and that anyone following such a convoy would run the risk of being detained if caught.  Additionally, many of the defendants do not publicly release details of their schedules more than 24 hours in

- 8 -

advance. Defendant Sechin in particular does not release details of his schedule more than 5 hours in advance.

38.     Having been briefed with this information, I determined that it was unlikely that an outside process server would be able to approach the defendants' residences, but that other opportunities for personal service might present themselves.

39.     I instructed the Irish agents to fly to Moscow and attempt personal service inside the Russian Federation.

40.     The Irish agents reported to me on a regular basis while they were in Moscow and detailed the many difficulties Mr. Richter and Mr. Mahoney experienced in locating defendants for personal service. Richter and Mahoney informed me that they attempted service at the defendants' residences and at a Gazprom Board of Directors meeting.

41.     The Irish agents informed me that they delivered all summonses and complaints for individual defendants Mr. Miller, Mr. Medvedev, Mr. Yusufov, Mr. Khristenko, and Mr. Gazizullin to Gazprom Headquarters on April 28, 2006, at 1:15 p.m.

**Service by Mail Pursuant to Federal Rule of Civil Procedure 4(f)(2)(C)(ii) in the Russian Federation**

42.     In view of the difficulty I was experiencing in arranging for personal service, I proceeded to seek service by mail upon the defendants through the Clerk of the Court pursuant to FRCP 4(f)(2)(C)(ii).

43.     I was unable to obtain specific street addresses for defendants' residences. The U.S. Postal Service's Global Express Guaranteed was unable to deliver packages to defendants without a specific street address. I therefore abandoned my plan to effect service by mail upon the defendants at their residences. I decided to serve defendants at their places of business by U.S. mail.

44.     I furnished the Clerk of the Court with copies of the summons, complaint and Russian translations thereof, and requested that the Clerk forward the same to the defendants using the U.S. postal service's Global Express Guaranteed mail, which requires a signed receipt.

45.     I furnished the Clerk of the Court with addresses for each of the defendants at his corporate office and/or government office. Specifically, I provided the Clerk with service packages for: Alexi B. Miller, Igor I. Sechin, Dmitry A. Medvedev, Igor K. Yusufov, Alexei L. Kudrin, Nikolai Borisenko, Viktor B. Khristenko, and Farit R. Gazizullin.

46.     These packages were dispatched by the Clerk of the Court and, with the exception of one package to Mr. Yusufov, were subsequently delivered to the defendants. I have provided a detailed return of service affidavit regarding delivery of these packages.

- 10 -

I declare under penalty of perjury under the laws of the United States that the

foregoing statements are true and accurate to the best of my knowledge and belief.

LEGAL LANGUAGE SERVICES
*A Division of ALS International, Inc.*

Cara LaForge
Manager, International
Litigation Support

Dated: June ___8___, 2006

Subscribed and sworn to before
me this ___June   8___ 20 _06_

Notary Public ___K. Shf___
KARINA SHREEFER
Notary Public, State of Kansas
Qualified in Johnson County
Commission Expires November 15, 2009