UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------X

RICHARD ALLEN, et al.

                Plaintiffs,                Case No. 1:05CV02077

v.

                                              **DECLARATION OF**

RUSSIAN FEDERATION, et al.

                                              **GEORGE RICHTER**

                Defendants.

-----------------------------------------------------X

        I, George Richter, a non-party to this action over the age of 18 years, hereby state:

        1.       This declaration is based on my personal knowledge and on information I have obtained from agents in Russia who have personal knowledge.

        2.       I am an investigator and process server operating under the laws of the Republic of Ireland, and employed by Priority Investigations Limited, a UK firm specializing in international investigations. Priority Investigations' address is P.O. Box 266, Belfast, Northern Ireland, BT5 4AQ, in the United Kingdom.

        3.       I have over twenty-five years experience tracing individuals and effecting service of process, including service on behalf of U.S. plaintiffs as well as service upon defendants located in foreign countries.

        4.       I specialize in high risk service for Priority Investigations. In the past, I have successfully completed service of process on several members of the political entourages of Slobodan Milosovic and Zeljko Raznatovic, a/k/a "Arkan," in Belgrade during the Balkan War

-2-

as well as service upon various Sinn Fein members in Ireland considered to be dangerous. I also have extensive experience conducting investigations in Russia and in the former Soviet Republics.

5.  On or about April 13, 2006, I was instructed by Cara LaForge of Legal Language Services, an international litigation support firm, to effect service of a summons and complaint along with Russian translations thereof in the Russian Federation on eight Russian defendants: Alexei Miller, Igor Sechin, Dmitry Medvedev, Igor Yusufov, Alexei Kudrin, Nikolai Borisenko, Viktor Khristenko, and Farit Gazizullin.

6.  My colleague Gerry Mahoney and I separately booked seats on the same Alitalia flights to Moscow, with connecting flights in both London and Milan. We traveled Dublin-London-Milan-Moscow on April 25, 2006 (which marked the end of the Russian Easter holiday period).

7.  As described below, during my stay in Moscow, Mahoney and I were followed by teams of men as we moved about Moscow seeking means to serve the court documents. These men waited for us in our hotel reception area, noted down the license plates of taxis we took from the hotel, and repeatedly took our photographs.

8.  I was concerned about my personal safety throughout my stay in Moscow.

**Arrival at Moscow Airport and Missing Luggage**

9. Upon my arrival in Moscow, I was told by a baggage handler for Alitalia that my checked luggage, which contained the documents for service, had not made it onto the Alitalia flight from Milan to Moscow (the last leg of my journey). My colleague Mahoney was told the same about his luggage. We appeared to be the only passengers on the flight to have this problem with our luggage. Alitalia personnel told me that my luggage was lost and that they would contact me if it was found.

10. Alitalia told Mahoney and I to speak with Aeroflot personnel and Russian customs authorities about our missing bags. Mahoney and I were required to complete a number of official forms, in Russian, which we were told would enable our suitcases to be cleared through security and customs once they were found. Russian customs agents also photocopied our passports. We were told we would be contacted by Aeroflot or Alitalia once our bags were found.

**Arrival in Moscow Center**

11. Based on my professional experience, I decided it was likely that we would now be followed during our stay in Moscow. As a precaution, we changed hotels and did not stay at the hotel where we had made reservations in advance. I also warned my colleague, Ian Withers, not to follow us to Moscow.

12. Although the service documents were in our luggage and therefore not in our possession, Mahoney and I nevertheless began to explore opportunities to serve defendants, possibly at their residences or during public meetings.

- 4 -

**Claiming Luggage from Moscow Airport**

13.     I called Alitalia at regular intervals on April 25, April 26, and April 27, 2006 to inquire about my lost luggage. On April 27, the Alitalia representative recommended that I come to the airport to locate my bags.

14.     When Mahoney and I returned to the airport on April 27, Alitalia directed us to Aeroflot security. I explained that we had not arrived on an Aeroflot flight. Nevertheless, we proceeded to Aeroflot security.

15.     An Aeroflot security representative instructed me to report to the customs office with my passport. I did so, as did Mahoney. The two of us were taken to several different offices where we filled out paperwork and signed forms, all in Russian, and had our passports inspected. Most of our time at the airport was spent going back and forth between different offices at the airport.

16.     Finally, after approximately two hours, our bags, which contained the documents for service, were returned to us.

17.     While in one of the customs offices, I noticed that we were being observed by several men in plain clothes that did not appear to work for customs or Aeroflot. These men photographed us as we left the security area.

18.     We returned to our hotel with our bags. Our taxi was followed by another car containing three men. When we arrived at the hotel, two of the three men took up seats in the reception area.

19. Upon my return to Dublin, I contacted Alitalia and asked about my lost luggage. The Alitalia representative in Dublin informed me that my bags had not missed the Alitalia flight from Milan to Moscow, but that my baggage had arrived in Moscow on our original flight on April 25.

**Service Attempt at Defendants' Residences**

20. On April 27, 2006, after I had the court papers in my possession, I tried to visit the Rublyevo-Uspenskoye highway, located 15 kilometers from Moscow center, to scope out the possibility of personal service on the defendants at their residences. Although I did not have street addresses for the defendants, I knew that Miller lived in this area, and I thought it might be possible to learn specifically where he lived. It is well-known that many senior Kremlin officials and oil and gas company executives live along this stretch of highway.

21. When I left the hotel, I observed a man noting down the license plate of my taxi. I changed taxis in Moscow Center and had a new driver take me to the Rublyevo-Uspenskoye highway.

22. I observed many policemen along the highway, posted in groups at regular intervals. The taxi had not moved very far up the highway when it was flagged down by a group of policemen. The taxi driver was asked to produce his papers, and I was asked to produce my passport. The police demanded to see my visa. The police then told me that my visa only gave me the right to travel in central Moscow and that I had no right to be in the area of the highway.

23. I was left with the impression that the police had been alerted to be on the lookout for me. I instructed the driver to take me back to my hotel.

### Service Attempt at Gazprom Board of Directors General Meeting

24. On the afternoon of April 27, 2006, Mahoney and I decided to attempt service upon the defendants at Gazprom. I knew that Gazprom was holding a Board of Directors General Meeting the afternoon of April 27 at Gazprom's main offices at 16 Nametkina Street, Moscow, and that several of the defendants were likely to participate.

25. Prior to my arrival in Moscow, my company, working with Legal Language Services, hired agents located in Moscow to provide us with background information. The Moscow agents had informed us that the Gazprom corporation is located in a highly secure compound consisting of several multi-story office buildings within an area in excess of 1.5 square miles. The area is surrounded by a double security perimeter controlled by armed police and military forces, with laser-alarmed fencing and dog patrols.

26. The Moscow agents also informed us that each vehicle entering the Gazprom compound must present a pre-issued pass to security, and that the vehicle is then checked by security with respect to its contents and passengers, and put through a mirror inspection with respect to its exterior wheel-arches and undercarriage to screen for bombs.

27. The Moscow agents also told us that persons entering the Gazprom compound must wear an official ID badge issued in response to a formal "invitation" forwarded by Gazprom; that to obtain the ID badge, a visitor must surrender his passport to Gazprom security and be issued a temporary day pass; and that visitors to Gazprom, once admitted to the compound, are accompanied at all times by a Gazprom official.

28. Finally, I was informed that the main road to the Gazprom gate is lined with police and military personnel.

29. Based on the information provided by the Moscow agents and my past experience, I determined that it would be incredibly difficult to gain access to the Gazprom facility to deliver personal service on defendants.

30. Nevertheless, I knew that a number of journalists and photographers would be on hand for the Board of Directors General Meeting on April 27. On the afternoon of April 27, I left the hotel with Mahoney and traveled to Gazprom by taxi. I knew that Gazprom allowed journalists and photographers onto the premises for Board of Directors meetings, and I thought that it might be possible to gain access to the premises if we mingled with the journalists congregating outside security.

31. When I left the hotel, I saw the same two men who had been waiting in the hotel reception area a few hours earlier note down the license plate of my taxi. Those two men then followed me and Mahoney by car. We attempted to lose the men by changing taxis in downtown Moscow.

32. We arrived at Gazprom and waited with journalists and photographers for about an hour for the Board of Directors General Meeting to begin.

33. During this time, I moved in and out of the crowd and realized that I was still being followed. At one point I approached one of the men who was following us, but he refused to speak with me.

34. Eventually, word spread among the crowd that the Board of Directors General Meeting would not take place.

35. I then contacted the Moscow agents and asked them to find out if the meeting had been rescheduled. They made some phone calls and were told that the General Meeting had been moved to the Gazprom Plant in Tomsk (Siberia), a three-hour flight from Moscow.

**Service on Defendants at Gazprom**

36. The following day was Friday, April 28, 2006, the start of the Russian Mayday celebrations, a major Russian national holiday that was to last until May 9. I believed it would be very difficult to located the defendants during the holiday period.

37. Mahoney and I determined that the only recourse left to us was to attempt to deliver the papers to Gazprom headquarters.

38. On the morning of April 28 we left the hotel in a taxi and went to Gazprom headquarters at 16 Nametkina Street, Moscow. Upon arriving at Gazprom headquarters, Mahoney and I approached the first of two security offices. I asked to be admitted in order to make an important confidential delivery. I was told over a speaker system to use a bank of four telephones adjoining the windows to call Gazprom personnel inside the compound for permission to enter.

39. I made the call through my Russian interpreter and spoke to an unidentified woman. I told the woman I needed to deliver my documents to defendants, their staff or, at the

very least, to the Gazprom receptionist. When I revealed the names of the recipients, the woman on the telephone, who refused to give her name or title, said that I could not be admitted.

40.     I told the woman that I would leave my passport with the security personnel at the gate in exchange for an admittance badge. The woman indicated that this was handled by the Gazprom personnel at the second group of security windows.

41.     At this point, a large security guard exited the first security booth and began to follow us closely and shout questions at us.

42.     At the second security booth, an unknown young woman who spoke English and who was herself in the process of obtaining an entry pass intervened for us and tried to negotiate on our behalf with the security personnel behind the glass.

43.     I handed the young woman a list of the defendants' names which I had had typed up in Russian and in English and indicated that I needed to meet with someone within Gazprom who could accept delivery of documents on behalf of these individuals.

44.     Upon seeing the names, the young woman looked alarmed, returned the paper to me and walked away from me without another word.

45.     I then began to walk towards the barrier leading into the Gazprom compound, hoping to find an escort to take me inside. The security guard who had been following me became very agitated and shouted repeatedly at me that Mahoney and I had to leave.

46. I suggested to the security guard that he should himself accept and sign for the documents. The guard refused. The guard then agreed I could deliver the documents to the security personnel behind the glass windows at the second security area.

47. Each of the windows at the second security area was equipped with a sliding teller slot. In the presence of my colleague Gerry Mahoney, on April 28, 2006, at 1:15 p.m., I put each set of court documents, one by one, through the slot. Each set of court documents was sealed in an envelope bearing the defendant's name in English and in Russian. Each set of court documents included a copy of the summons and complaint and Russian translations of the same.

48. The guards behind the window accepted sealed envelopes addressed to Alexei Miller, Dmitry Medvedev, Igor Yusufov, Viktor Khristenko, and Farit Gazizullin. The guards reviewed and checked the name on each as it was submitted, and agreed to deliver each to the addressee indicated.

49. I could see more clearly through the mirrored glass at this bank of security windows than at the previous bank of security windows, and can thus describe the two men who took the documents on the other side.

50. Both men were in their late forties. The first was about 6'1" and that the second was about 5'10". They were both broad-shouldered and well-built. They both had dark, slightly graying hair and wore light green company uniforms.

51. After the Gazprom personnel accepted the packages, Mahoney and I left the premises. Soon thereafter, Mahoney and I departed Moscow and returned to Dublin, Ireland.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and accurate to the best of my knowledge and belief.

George Richter
Process Server

Dated: June 8th, 2006

Jeremiah P. Mahoney
Witness

Dated: June 8, 2006