# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------X

RICHARD V. ALLEN
545 Fillmore Street
Denver, Colorado  80206

DAVID SHWAYDER
1802 S. Race Street
Urbana, Illinois  61801

FCT AMERICA LIMITED
150 S. Wacker Drive
Suite 805
Chicago, Illinois  60606

CHARLES DEVENS                          **Case No: 05-cv-02077 (CKK)**
14 Bonsai Drive
Boynton Beach, Florida  33436           **<u>AMENDED COMPLAINT</u>**

EDWARD DONAHUE
Donahue and Associates
299 Concord Avenue
Cambridge, Massachusetts  02138

RICHARD ABEL
1556 Manzanita Avenue
Santa Rosa, California  95404

DANIEL CILLIE
509 Madison Street, #2B
Hoboken, New Jersey  07030

CI HERZOG
64-08 217th Street
Bayside, New York  11364

CHARLES SMITH
1471 Golden Bell Court
Downers Grove, Illinois  60515

GUNTER WITTICH
6120 W. Tropicana A16
Las Vegas, Nevada  89103

Z.E. THIJSSEN
p/a Duitslandlaan 31
7761 HC Schoonebeek
The Netherlands

RICHARD ALEMIAN
131 Beach Street
Cohasset, Massachusetts 02025

PAUL D. ALLEN
91 Francis Street
Brookline, Massachusetts 02446

JOEL ALVORD
75 Federal St., 18th Floor
Boston, Massachusetts 02110

SUSAN ASHTON-LINKSEY
1299 S. River Street
Marshfield, Massachusetts 02050

LAWRENCE W. BALDWIN
4208 51st Ave. S
Seattle, Washington 98118-1430

MATTHEW P. BOYLAN
197 Coolidge Terrace
Wyckoff, New Jersey 07481

PAUL CIFRINO
46 Beach Street
Cohasset, Massachusetts 02025

GEORGE COUPOUNAS
35 Single Tree Road
Chestnut Hill, Massachusetts 02467

ARTHUR DAVIS
78 Wachusett Avenue
Lawrence, Massachusetts 01841

RONALD L. FOSTER
6334 Creekbend Drive
Houston, Texas 77096

WILLIAM E. HAYNSWORTH
161 Buckminster Road
Brookline, Massachusetts 02445

E. BYRON HENSLEY
221 Columbus Avenue, Apt 201
Boston, Massachusetts 02116

DAVID INGBER
6201 Valley Circle Blvd. #17
Woodland Hills, California 91367

CHARLES LIBBY
15 Adams Street
Somerville, Massachusetts 02145

EDITH MABREY
46 Pheasant Landing Road
Needham, Massachusetts 02492

DONALD E. MARCUS
PO Box 111
Cataumet, Massachusetts 02534

LYNN D. MCCALLISTER
1915 Thompson Rd.
Knoxville, Tennessee 37932

WILLIAM MCDONNELL
TGU 67
P.O. Box 25387
Miami, Florida 33102-5387

CYNTHIA D. MCLAUGHLIN
25 Crooked Trail Rd., Box 69
Norwalk, Connecticut 06853

JOLANTA N. MILLER
WAYNE A. MILLER, TRUSTEES
Aparat Medical Sales Co. PS Plan
2852 Calle Guadalajara
San Clemente, California 92673-3517

VINCENT NEISIUS
1010 The 16th Fairway
Atlanta, Georgia 30350

EUGENE L. PETERSON
N 3119 1st St. [Lunds]
Shawano, Wisconsin 54166

JERRY LOUIS REINHARDT
24107 48th Ave. West
Mountlake Terrace, Washington 98043

JONATHAN ROOSEVELT
452 Concord Street
Sudbury, Massachusetts 01776

SAM ROSENFELD
4239 Mangrove Place
Sarasota, Florida 34242

JONATHAN STRONG
4545 Connecticut Ave., NW, Apt. 805
Washington, DC 20008

THOMAS URMY
53 State St., 37th Floor
Boston, Massachusetts 02109

MAXWELL VAN DE VELDE
32 Jackson Pond Road
Dedham, Massachusetts 02026

MARY VISCUSI
109-10 Queens Blvd.
Forest Hills, New York 11375

CATHERINE L. WEISBROD and
LUCIEN WEISBROD
203 Allston Street
Cambridge, Massachusetts 02139

DOUG WILLIAMS
2300 Audubon Rd.
Chaska, Minnesota 55318

JUDITH B. WITTENBERG
146 Allerton Road
Newton Highlands, Massachusetts 02461


        Plaintiffs,


    v.


RUSSIAN FEDERATION
Ministry of Justice of the Russian Federation
ul. Vorontsovo Pole, 4a
Moscow 109830, GSP
GH-28 Russian Federation

OAO GAZPROM
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

OOO GAZPROMNEFT
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

BAIKALFINANSGROUP
Novotorzhskaya 12b
Tver
Russian Federation

OAO ROSNEFT OIL COMPANY
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

OAO ROSNEFTEGAZ
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

DMITRY A. MEDVEDEV
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

ALEXEI B. MILLER
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

ALEXEI L. KUDRIN
c/o Ministry of Finance
Ulitsa Ilyinka 9, Entrance 1
Moscow 103097
Russian Federation

IGOR K. YUSUFOV
c/o OAO Gazprom
16 Nametkina Street  GSP-7 117997
Moscow
Russian Federation

VIKTOR B. KHRISTENKO
c/o OAO Gazprom
16 Nametkina Street
GSP-7 117997
Moscow
Russian Federation

SERGEY BOGDANCHIKOV
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

IGOR SECHIN
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow

Russian Federation

NIKOLAI BORISENKO
c/o OAO Rosneft Oil Company
26/1, Sofiyskaya Embankment, 1
GSP-8 115998
Moscow
Russian Federation

                              Defendants.
------------------------------------------------------------X


## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

### I. NATURE OF ACTION

1.      This Complaint arises out of the coordinated attack of Defendant Russian Federation and other defendant co-conspirators (collectively, "Defendants")  against Yukos Oil Company and its owners.  The purpose and effect of this attack has been the expropriation of Yukos without payment of any compensation to its owners.  The motivations for the confiscation of Yukos were many.  They included: the elimination of Yukos as a competitor for sales of Russian petroleum in the United States and other international markets; the elimination of Yukos as a vehicle for investment by United States and other Western energy companies in the development of Russian petroleum resources and the marketing of such resources in the United States and other international markets; and the maintenance of control over the assets of Yukos for the ongoing enrichment of Defendants.  This confiscation scheme has been carried out in two ways.

2.      First, Defendant Russian Federation and the other Defendants have deprived Yukos's owners of their right to derive economic benefit from their investment.  This has been accomplished through illegal and confiscatory tax levies and through the seizure of Yukos's most important asset by the state, all for the personal and commercial benefit of Defendants.

3.    Second, Defendants have deprived Yukos's owners of their right to have Yukos managed in accordance with their wishes by people of their choosing.  This has been accomplished through, *inter alia*, the direct seizure of a majority of Yukos shares and the intimidation and harassment of Yukos directors and executives to the point at which they have either resigned, left Russia, or otherwise been rendered unable to manage the business in the ordinary course.  Indeed, Defendant Russian Federation has installed a management team in Moscow that has not been approved by Yukos's shareholders and that operates without regard to the wishes of management selected by the shareholders.  Yukos is now the corporate equivalent of an occupied state in World War II, with its legitimate management operating in exile from London and its Quisling management carrying out the wishes of the occupying state in Moscow.

4.    Defendants also have used bankruptcy proceedings in Russia to paralyze Yukos's London-based management team.  The bankruptcy trustee, Eduard Rebgun, put in place at the request of Defendant Rosneft, now controls Yukos's re-structuring.  Yukos's legitimate management has been frozen out of this process.  According to the *New York Times*, the Moscow-based Chairman of the Board of Yukos has stated that it would be "reasonable" to sell all remaining Yukos assets to Defendant Rosneft as part of the bankruptcy-liquidation process.

5.    Officials from countries adhering to the rule of law have expressed grave concern over Defendants' conduct, particularly the likelihood that Defendant Russian Federation is pursuing the criminal and tax prosecutions described in this Amended Complaint for what transparently are political and commercial purposes.  From the United States, President George W. Bush, Vice President Richard Cheney, Secretary of State Condoleezza Rice, and former Secretary of State Colin Powell have questioned Defendant Russian Federation's actions, and Senators John McCain and Joseph Lieberman have called for the suspension of Russia's

participation in the Group of 8 ("G8").  A U.S. bankruptcy judge has found that "[t]he weight of the evidence supports a finding that it is substantially likely that the [tax] assessments and manner of enforcement regarding [Yukos] taxes were not conducted in accordance with Russian law." (*Yukos Oil Company v. Russian Federation*, Adv. No. 04-3952, Memorandum Opinion (Bankr. S. D. Tex. Dec. 16, 2004)).

6.    In January 2005, the Parliamentary Assembly of the Council of Europe endorsed the findings of a Special Rapporteur, former German Justice Minister Sabine Leutheusser-Schnarrenberger, who, in part, summarized her assessment of Defendant Russian Federation's conduct of the criminal proceedings against Yukos officials as follows:

> I have come to my own conclusion, namely that the presence of an interest of the State that exceeds its normal interest in criminal justice being done and includes such elements as:  to weaken an outspoken political opponent, to intimidate other wealthy individuals, and *to regain control over "strategic" economic assets* – can hardly be denied.  (Emphasis added.)

7.    Defendants' actions have reached such an extreme that Andrei Illarionov, a senior economic advisor to Russian Federation President Vladimir V. Putin ("Putin"), called the 2004 "auction" of Yukos's principal asset the "swindle of the year."   Following this comment, Illarionov was removed from his position as Russia's presidential representative to the G8.

8.    Furthermore, on March 18, 2005, Senior District Judge Workman of the Bow Street Magistrate's Court for London denied the Russian Federation's request to extradite two former Yukos executives, finding that the charges were politically motivated and that the prosecution of the former Yukos executives had been "directed" by Putin.  On December 23, 2005, a London court rejected another Russian request to extradite Alexander Temerko, a former manager at Yukos and close ally of Mikhail B. Khodorkovsky.

9.      Defendants' scheme has been successfully executed.  Yukos has been stripped of its principal production asset, Yuganskneftegaz ("YNG"), which has been transferred by means of a sham auction to Defendant Rosneft.  Yukos shipments of crude oil to the United States have been halted.  Yukos's plans to expand pipelines and other facilities so as to become a major long-term energy supplier to the United States have been blocked.  The plans of major U.S. oil companies to invest heavily in Yukos have been frustrated.  All economic benefits generated by what remains of Yukos have been diverted to the Russian Treasury.  Complete and formal dissolution of Yukos in Russian bankruptcy proceedings and the formal transfer of all remaining Yukos assets to Rosneft or some other state entity are imminent.

10.      Plaintiffs have been caught in the wake of Defendants' scheme.  The company in which they held an ownership interest has been taken from them.  Their investment in Yukos, a company once valued in the billions, is now all but worthless.  The Defendants touted Russia as a secure place for commercial investment, and Plaintiffs placed their capital in Yukos.  Initially, they saw very promising returns as the company emerged as the leader of the Russian oil sector.  However, despite express representations directed at U.S. and global securities markets that Yukos was not a target of their attack, the Defendants have now taken the company from its owners, controlling its operation to whatever extent they see fit and appropriating to themselves all of the economic benefits of ownership.  Some Defendants also have profited personally from the gyrations in Yukos's share value caused by the false statements described in this Amended Complaint.

11.      Plaintiffs now seek redress.  Specifically, this is an action under the Racketeering Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961 *et seq.*), the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78a *et seq.*), international

10

law, common law, and Russian law seeking to recover, *inter alia*, damages for the losses Plaintiffs have suffered as a result of the scheme described above and the expropriation and conversion of their property by Defendants.

## II. PARTIES, JURISDICTION, AND VENUE

### A. Plaintiffs

12.     Plaintiff Richard V. Allen is a citizen of the United States residing in Denver, Colorado.  Plaintiff R. Allen is the holder of 400 Yukos American Depository Receipts ("ADRs") purchased on the over-the-counter ("OTC") market in the United States prior to October 7, 2003.

13.     Plaintiff William McDonnell is a citizen of St. Kitts & Nevis residing in Tegucigalpa, Honduras.  Plaintiff McDonnell was the holder of 150 Yukos ADRs purchased on the OTC market in the United States prior to October 7, 2003.

14.     Plaintiff Eugene L. Peterson is a citizen of the United States residing in Shawano, Wisconsin.  Plaintiff Peterson is the holder of 50 Yukos ADRs purchased on the OTC market in the United States prior to October 7, 2003.

15.     Plaintiff Doug Williams is a citizen of the United States residing in Chaska, Minnesota.  Plaintiff Williams was the holder of 416 Yukos ADRs purchased on the OTC market in the United States prior to October 7, 2003.

16.     Plaintiff Gunther Wittich is a citizen of the United States residing in Las Vegas, Nevada.  Plaintiff Wittich was the holder of 1,210 Yukos ADRs purchased on the OTC market in the United States prior to October 7, 2003.

17.     Collectively, in connection with the Yukos ADR purchases set forth above, Plaintiffs R. Allen, McDonnell, Peterson, Williams, and Wittich are referred to herein as "Plaintiff Yukos ADR Holders."

18.     Plaintiff Richard Abel is a citizen of the United States residing in Santa Rosa, California.  Plaintiff Abel purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

19.     Plaintiff Daniel Cillie is a citizen of the United States residing in Hoboken, New Jersey.  Plaintiff Cillie purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

20.     Plaintiff Charles Devens is a citizen of the United States residing in Boynton Beach, Florida.  Plaintiff Devens purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

21.     Plaintiff Edward Donahue is a citizen of the United States residing in Cambridge, Massachusetts.  Plaintiff Donahue purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

22.     Plaintiff Ci Herzog is a citizen of the United States residing in Bayside, New York.  Plaintiff Herzog purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

23.     Plaintiff David Shwayder is a citizen of the United States residing in Urbana, Illinois.  Plaintiff Shwayder purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

24.     Plaintiff Charles Smith is a citizen of the United States residing in Downers Grove, Illinois.  Plaintiff Smith purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

25.     Plaintiff Z.E. Thijssen is a citizen of, and resides in, the Netherlands. Plaintiff Thijssen purchased Yukos ADRs on the London Stock Exchange as set forth in Exhibit A.

26.     Plaintiff FCT America Limited is a Cayman Island corporation with its principal place of business in Chicago, Illinois.  Plaintiff FCT America Limited purchased  and sold Yukos ADRs on the London Stock Exchange under terms set forth in various Contracts for Differences ("CFDs") as set forth in Exhibit A.

27.     Plaintiff Richard Alemian is a citizen of the United States residing in Cohasset, Massachusetts.   Plaintiff Alemian purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

28.     Plaintiff Dr. Paul D. Allen is a citizen of the United States residing in Brookline, Massachusetts.  Plaintiff P. Allen purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

29.     Plaintiff Joel Alvord is a citizen of the United States residing in Boston, Massachusetts.  Plaintiff Alvord purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

30.     Plaintiff Susan Ashton-Linksey is a citizen of the United States residing in Marshfield, Massachusetts.  Plaintiff Ashton-Linksey purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

31.      Plaintiff Lawrence W. Baldwin is a citizen of the United States residing in Seattle, Washington.  Plaintiff Baldwin purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

32.    Plaintiff Matthew P. Boylan is a citizen of the United States residing in Wyckoff, New Jersey.  Plaintiff Boylan purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

33.    Plaintiff Paul Cifrino is a citizen of the United States residing in Cohasset, Massachusetts.  Plaintiff Cifrino purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

34.    Plaintiff George Coupounas is a citizen of the United States residing in Chestnut Hill, Massachusetts.  Plaintiff Coupounas purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

35.    Plaintiff Arthur Davis is a citizen of the United States residing in Lawrence, Massachusetts.  Plaintiff Davis purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

36.    Plaintiff Ronald L. Foster is a citizen of the United States residing in Houston, Texas.  Plaintiff Foster purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

37.    Plaintiff William E. Haynsworth is a citizen of the United States residing in Brookline, Massachusetts.  Plaintiff Haynsworth purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

38.     Plaintiff E. Byron Hensley is a citizen of the United States residing in Boston, Massachusetts.  Plaintiff Hensley purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

39.     Plaintiff David Ingber is a citizen of the United States residing in Woodland Hills, California.  Plaintiff Ingber purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

40.     Plaintiff Charles Libby is a citizen of the United States residing in Somerville, Massachusetts.  Plaintiff Libby purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

41.     Plaintiff Edith Mabrey is a citizen of the United States residing in Needham, Massachusetts.  Plaintiff Mabrey purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

42.     Plaintiff Donald E. Marcus is a citizen of the United States residing in Cataumet, Massachusetts.  Plaintiff Marcus purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

43.     Plaintiff Lynn D. McCallister is a citizen of the United States residing in Knoxville, Tennessee.  Plaintiff McCallister purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

44.     Plaintiff Cynthia D. Mclaughlin is a citizen of the United States residing in Norwalk, Connecticut.  Plaintiff Mclaughlin purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

45.     Plaintiffs Jolanta N. Miller and Wayne A. Miller are citizens of the United States residing in San Clemente, California.  Plaintiffs Miller purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

46.    Plaintiff Vincent Neisius is a citizen of the United States residing in Atlanta, Georgia.  Plaintiff Neisius purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

47.    Plaintiff Jerry Louis Reinhardt is a citizen of the United States residing in Mountlake Terrace, Washington.  Plaintiff Reinhardt purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

48.    Plaintiff Jonathan Roosevelt is a citizen of the United States residing in Sudbury, Massachusetts.  Plaintiff Roosevelt purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

49.    Plaintiff Sam M. Rosenfeld is a citizen of the United States residing in Sarasota, Florida.  Plaintiff Rosenfeld purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

50.    Plaintiff Jonathan Strong is a citizen of the United States residing in Washington, DC.  Plaintiff Strong purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

51.     Plaintiff Thomas Urmy is a citizen of the United States residing in Brookline, Massachusetts.  Plaintiff Urmy purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

52.    Plaintiff Maxwell Van De Velde is a citizen of the United States residing in Dedham, Massachusetts.  Plaintiff Van De Velde purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

53.     Plaintiff Mary Viscusi is a citizen of the United States residing in Forest Hills, New York.  Plaintiff Viscusi purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

54.     Plaintiffs Catherine L. Weisbrod and Lucien Weisbrod are citizens of the United States residing in Cambridge, Massachusetts.  Plaintiffs Weisbrod purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

55.     Plaintiff Judith B. Wittenberg is a citizen of the United States residing in Newton Highlands, Massachusetts.  Plaintiff Wittenberg purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

56.     After October 7, 2003, Plaintiff R. Allen purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

57.     After October 7, 2003, Plaintiff Peterson purchased Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

58.     After October 7, 2003, Plaintiff Wittich purchased and sold Yukos ADRs on the OTC market in the United States as set forth in Exhibit A.

59.     Collectively, Plaintiffs Abel, Cillie, Devens, Donahue, Herzog, Shwayder, Smith, Thijssen, FCT America Limited, Alemian, P. Allen, Alvord, Ashton-Linksey, Baldwin, Boylan, Cifrino, Coupounas, Davis, Foster, Haynsworth, Hensley, Ingber, Libby, Mabrey, Marcus, McCallister, Mclaughlin, Miller, Neisius, Reinhardt, Roosevelt, Rosenfeld, Strong, Urmy, Van De Velde, Viscusi, Weisbrod, and Wittenberg, together with Plaintiffs R. Allen, Peterson, and Wittich (insofar as the latter three plaintiffs purchased Yukos ADRs after October 7, 2003), are referred to herein as "Plaintiff Yukos ADR Purchasers."

## B. **Defendants**

60.    Defendant Russian Federation, or Russia, is a "foreign state" within the meaning of 28 U.S.C. § 1330.

61.    Defendant Open Joint Stock Company Gazprom ("Gazprom") is a publicly traded joint stock company engaged in commercial activity and organized under the laws of the Russian Federation with its principal place of business in Moscow.  As asserted in Gazprom's 2005 Annual Report, a majority of Gazprom's stock  is "[c]ontrolled by the Russian Federation."  The Russian Federation owns 38.373 percent of Gazprom's shares directly through the Federal Agency for Management of Federal Property.   The Russian Federation owns an additional 10.74 percent of Gazprom's shares through OAO Rosneftegaz, which, in turn, is 100 percent owned by the Russian Federation.  Finally, the Russian Federation owns 0.889 percent of Gazprom's shares through OAO Rosgazifikatsiya, which, in turn, is 100 percent owned by the Russian Federation.

62.    Gazprom is subject to direction and control by the Russian Federation through, *inter alia*, the appointment of high-ranking present and former officials of the Russian Federation to its Board of Directors and controlling management positions at Gazprom.   In matters relevant to this action, Gazprom has acted as a co-conspirator of Defendant Russian Federation.

63.    Gazprom states on its website that it is the largest gas producing company in the world, responsible for approximately 20 percent of global natural gas production and controlling almost 60 percent of Russian gas reserves.  Gazprom produces about 90 percent of Russian gas and is responsible for eight percent of Russia's GDP.  Gazprom and Yukos were direct competitors.

64.    Defendant Gazprom has sponsored Level-1 ADRs using the Bank of New York as the depositary bank.  Gazprom ADRs are registered with the Securities and Exchange Commission ("SEC") and trade on the OTC market in the United States and in Europe.

65.    Gazprom is extensively and actively engaged in U.S. commerce. Gazprom has extensive contractual and other relationships with U.S. companies to develop, produce, and/or sell natural gas for and in U.S. commerce.  Gazprom also is extensively engaged in the procurement of goods and services in the United States that are used in its operations. Gazprom has identified the United States as a strategically important market for its long-term commercial interests.

66.    Defendant OOO Gazpromneft ("Gazpromneft") is a limited liability company organized under the laws of the Russian Federation.  On October 29, 2004, Defendant Miller, in his capacity as Chairman of Gazprom, signed a resolution creating Gazpromneft, seven weeks before the auction of Yukos's main production unit, YNG.  Miller appointed Defendant Sergey Bogdanchikov, who was president of Rosneft at the time, as General Director.

67.    Shortly before the YNG auction held on December 19, 2004, Gazprom announced that it had plans to sell Gazpromneft to an unknown, "unaffiliated" company. Gazpromneft was a sham participant in the December 19, 2004 auction.  Gazpromneft, along with Gazprom, was named as a defendant and appeared in the Yukos bankruptcy proceedings in the United States District Court for the Southern District of Texas (*In re Yukos Oil Co.*, Case No. 04-47742 (S.D. Tex. 2004)).

68.    Defendant BaikalFinansGroup ("BFG") is a company registered in the western Russian city of Tver.  It was founded shortly before the YNG auction held on December

19, 2004. Defendant BFG lists as its address a building that houses a bar, a mobile phone shop, a tour operator agency, and the offices of several small local companies – but no office of BFG.

69.    BFG is a shell corporation used by Defendants to purchase YNG and then transfer it to Defendant OAO Rosneft Oil Company. Within days of BFG purportedly spending $9.3 billion to acquire YNG at the sham auction, Defendant BFG was acquired by Defendant OAO Rosneft Oil Company.

70.    Defendant OAO Rosneft Oil Company ("Rosneft") produces oil and gas and is controlled by the Russian Federation. One share of Rosneft's stock is held by the Federal Property Agency, while the remainder is held by Defendant OAO Rosneftegaz, which is itself wholly owned by the Russian Federation.

71.    Rosneft operates and holds itself out as a commercial enterprise engaged in commercial activity. In exercising these functions and in all matters relevant to this action, Rosneft acts as an agent and co-conspirator of the Russian Federation. Rosneft is subject to the direction and control of the Russian Federation through, *inter alia*, the appointment of high-ranking present and former officials of the Russian Federation to its board of directors and to controlling positions in Rosneft's management.

72.    Rosneft conducts its commercial activities as an agent for the Russian Federation. Rosneft has acknowledged, for example, that "the positive results of Rosneft's operations have motivated the state to appoint Rosneft to exercise the state's strategic interests both in the oil and gas industry as well as the fuel industry as a whole."

73.    Rosneft is extensively and actively engaged in U.S. commerce. Among other things, Rosneft has extensive contractual and other relationships with U.S. and other companies to develop oil and/or gas supplies for sale to the United States, and to procure goods

and services used in its operations.  Rosneft also actively avails itself of U.S. financial services, including in connection with its efforts to raise $13 billion or more through its upcoming initial public offering ("IPO").  The proceeds of the IPO are intended to carry out the scheme to, among other things, fund exploitation of unlawfully obtained Yukos asset YNG and to re-pay debt incurred in the execution of the scheme.

74.    Defendant OAO Rosneftegaz ("Rosneftegaz"), which holds 100 percent of Rosneft stock minus one share, is wholly owned by Defendant Russian Federation through the Federal Agency for the Management of Federal Property.  Rosneftegaz was created in June 2005 as a holding company for the Russian Federation's Rosneft shares.

75.    Defendant Dmitry A. Medvedev ("Medvedev") is the Chairman of the Board of Gazprom and a resident of the Russian Federation.  He also serves as First Deputy Prime Minister of the Russian Federation and was the Head of the Presidential Administration of the Russian Federation, or Putin's chief of staff, from October 2003 to November 2005.  Through his interlocking positions, Defendant Medvedev participated in the development and execution of the scheme set forth in this Amended Complaint, including using, and directing the use of, color of official right to take Yukos from its owners and to obtain control of key Yukos assets, all for the private and commercial benefit of Defendants.  Defendant Medvedev is being sued in his individual capacity.

76.    Defendant Alexei B. Miller ("Miller") is the Chairman of the Management Committee of Gazprom, Deputy Chairman of the Board of Directors of Gazprom, and previously served as Deputy Minister of Energy of the Russian Federation.  Defendant Miller also serves as Chairman of the Council of Gazprombank, Gazprom's authorized banking agent.

77. Miller visited the United States in September 2003 to discuss Gazprom's entry into the U.S. market as a supplier of liquefied natural gas ("LNG"). He met with U.S. government officials in Washington, D.C., then traveled to Houston to meet with top officials from the U.S. petroleum companies ConocoPhillips and Syntroleum. Miller made another such visit to the United States in September 2004, meeting with top executives of U.S. energy businesses and U.S. government officials to plan Gazprom's entry into the U.S. market. Miller signed a memorandum of understanding in Washington, D.C. with ChevronTexaco CEO David O'Reilly, then traveled to New York to have meetings with top officials from ExxonMobil, ConocoPhillips, and Petro-Canada. Miller visited the United States again in April 2005 to promote Gazprom's entry into the U.S. market. On that visit, he met with U.S. Energy Secretary Samuel Bodman and Commerce Secretary Carlos Gutierrez. Miller discussed with these officials the need for closer business cooperation between Gazprom and U.S. energy firms in marketing Russian gas in the United States. As reported by the ITAR-TASS News Agency on April 12, 2005, at the close of the talks, Miller remarked: "Promoting cooperation with U.S. energy companies along the entire LNG business chain, from extraction to marketing, will move the energy dialogue between our firms to a qualitatively new level." Defendant Miller is being sued in his individual capacity.

78. Defendant Alexei L. Kudrin ("Kudrin") is the Minister of Finance of the Russian Federation and previously served as a director of Gazprom. Kudrin has visited Washington, D.C. and the United States on a regular basis since 2001. Kudrin traveled to Washington, D.C. to speak at the U.S.-Russia Business Council's Ninth Annual Members and Directors Meeting in October 2001. Kudrin attended a U.S.-Russia Business Council luncheon in his honor in Washington, D.C. in April 2002. In April 2004, Kudrin spoke in New York as

part of the Global Leader Series of the Eurasia Group, then spoke at a conference in New York organized by the EastWest Institute. He was the keynote speaker at the U.S.-Russian Banking Conference in Washington, D.C. in April 2005. He traveled to Washington, D.C. in January 2006, and again in April 2006 to speak at the Carnegie Endowment for International Peace. Through his interlocking positions, Defendant Kudrin has played a key role in the scheme set forth in this Amended Complaint, including using, and directing the use of, color of official right to take Yukos from its owners and to obtain control of key Yukos assets, all for the private and commercial benefit of Defendants. Defendant Kudrin is being sued in his individual capacity.

79.    Defendant Igor K. Yusufov ("Yusufov") is a Member of the Board of Directors of Gazprom and currently serves as Special Representative of the President on International Energy Cooperation, a position he has held since July 2004. Prior to holding these positions, Yusufov simultaneously served as Chairman of the Board of Rosneft and Minister of Industry and Energy of the Russian Federation. Yusufov traveled to the United States in October 2002, when he attended the U.S./Russia Commercial Energy Summit in Houston, Texas, a gathering of U.S. and Russian energy executives. Yusufov visited the United States again in May 2003, visiting Washington, D.C., and then Detroit. Through his interlocking positions, Defendant Yusufov participated in the development and execution of the scheme set forth in this Amended Complaint, including using, and directing the use of, color of official right to take Yukos from its owners and to obtain control of key Yukos assets, all for the private and commercial benefit of Defendants. Defendant Yusufov is being sued in his individual capacity.

80.    Defendant Viktor B. Khristenko ("Khristenko") is a Member of the Board of Directors of Gazprom and currently serves as Minister of Industry and Energy of the Russian Federation, a position he has held since March 2004. He served as First Deputy Prime Minister

from May 2000 to March 2004.  Khristenko visited the United States in October 2005 to discuss the prospects of delivering LNG to the United States and to secure U.S. investment in projects to develop Russia's hydrocarbon transportation infrastructure.  Mr. Khristenko was accompanied by a number of chief executives of Russia's major oil companies who were also seeking U.S. investors in Russian projects, including Rosneft President Sergey Bogdanchikov.  Mr. Khristenko and the other executives met with the heads of Conoco-Phillips, Chevron, and other U.S. companies in Texas and in Washington, D.C.  Through his interlocking positions, Defendant Khristenko participated in the development and execution of the scheme set forth in this Amended Complaint, including using, and directing the use of, color of official right to take Yukos from its owners and to obtain control of key Yukos assets, all for the private and commercial benefit of Defendants.  Defendant Khristenko is being sued in his individual capacity.

81.     Defendant Sergey Bogdanchikov ("Bogdanchikov") is the President of both Rosneft and Rosneftegaz and is a member of each company's board of directors. Bogdanchikov was appointed as Rosneft's President and to the Rosneftegaz Board of Directors by the Russian Federation.  When Defendant Miller, in his role as Chairman of Gazprom, created Gazpromneft in October 2004, Defendant Bogdanchikov was named Gazpromneft's General Director.  Bogdanchikov joined Khristenko on the October 2005 trip to the United States to promote Russian commercial oil and gas interests, as described immediately above. Bogdanchikov also was part of the road show delegation that visited New York to promote Rosneft's IPO.  Defendant Bogdanchikov is being sued in his individual capacity.

82.     Defendant Igor Sechin ("Sechin") is Deputy Head of the Presidential Administration of Russia, a former KGB officer, and a close associate of Putin.  Sechin also

serves as Chairman of the Board of Directors of Defendant Rosneft as a representative of the Russian Federation, a position he has held since July 2004. In February 2006, the Russian Federation appointed Defendant Sechin to the Board of Directors of Defendant Rosneftegaz. Through his interlocking positions, Defendant Sechin participated in the development and execution of the scheme set forth in this Amended Complaint, including using, and directing the use of, color of official right to take Yukos from its owners and to obtain control of key Yukos assets, all for the private and commercial benefit of Defendants. Defendant Sechin is being sued in his individual capacity.

83. Defendant Nikolai Borisenko ("Borisenko") is First Vice President of Rosneft and serves on the Board of Directors of Rosneftegaz. Defendant Borisenko represented Defendant Gazpromneft at the YNG auction for the purpose, *inter alia*, of insuring that YNG was acquired for the ultimate benefit of Rosneft, in accordance with the scheme set forth in this Amended Complaint. Defendant Borisenko is being sued in his individual capacity.

84. Collectively, Defendants Medvedev, Miller, Kudrin, Yusufov, Khristenko, Bogdanchikov, Sechin, and Borisenko are referred to herein as the "Individual Defendants."

### C. Material Non-Parties

85. OAO NK Yukos Oil Company ("Yukos") is an open joint stock corporation organized under the laws of the Russian Federation with its principal place of business in Moscow, Russia. Yukos is a vertically integrated oil and gas company. Its business activities include: exploration for, and development and production of, crude oil and natural gas; refining crude oil into finished petroleum products; and marketing and distributing petroleum products. Yukos ADRs are a form of security registered with the SEC that trades on the OTC market in the United States and in Europe. Yukos sponsored these Level-1 ADRs using a New

York branch of Deutsche Bank as a depositary in accordance with a deposit agreement governed by New York law that provides for ADR holders to be paid dividends in the United States.

86.    Mikhail B. Khodorkovsky ("Khodorkovsky") is a Russian citizen who became Russia's wealthiest and most progressive businessman.  He was one of the founders of Group Menatep Limited, now known as GML Limited, and until his arrest on contrived criminal charges, was a member of the Yukos Board of Directors and Chairman of the Board of Directors of OOO Yukos-Moscow, the company responsible for managing Yukos.  Through his leadership, Yukos became a profitable company that paid record dividends to all of its shareholders.  Khodorkovsky also transformed Yukos into a transparent, fiscally responsible, socially conscious, and highly influential company that was actively engaged in U.S. commerce, was attracting growing U.S. investment and was poised to become a leading force in the global oil and gas market acting independently of the Russian Federation.  The Defendants and other unnamed co-conspirators began to perceive Khodorkovsky as both a commercial *and* political threat and to view Yukos as a desired commercial and strategic property.

87.    Group Menatep Limited, now known as GML Limited ("GML Limited"), is a privately held corporation established under the laws of, and with its principal place of business in, Gibraltar.  GML Limited owns 51 percent of the stock of Yukos through two wholly owned subsidiaries, as described below.

88.    Yukos Universal Limited ("YUL"), a wholly owned subsidiary of GML Limited, is a corporation established under the laws of the Isle of Man, where it also maintains its principal place of business.  YUL owns approximately a two percent interest in Yukos.

89. Hulley Enterprises Limited ("Hulley"), a wholly owned subsidiary of YUL, is a corporation established under the laws of Cyprus, where it also maintains its principal place of business. Hulley owns approximately a 49 percent interest in Yukos.

90. YNG is a major oil-producing company responsible for more than one percent of the world's annual oil production. Prior to December 20, 2004, Yukos was the majority stockholder in YNG. YNG accounted for over 60 percent of Yukos's total production.

91. OAO First Venture Company and ZAO Intercom are entities of unknown nature and unknown location that applied to participate in the auction of confiscated Yukos property. Neither company in fact participated, however.

92. OAO Sibneft ("Sibneft") is an oil exploration, production, refining, and marketing company located in the Russian Federation. Sibneft's ADRs are traded on the OTC market in the United States and in Europe. Sibneft agreed to merge with Yukos in 2003, as the initial part of a two-part transaction, the second part of which was to have been the sale of a major stake in the merged company to a major U.S. oil company. With the tacit approval of several of the Defendants, however, Sibneft refused to carry out its legal obligations under the merger agreements and instead attacked the merger in a Moscow Arbitration Court. The Moscow court ruled against Yukos, freezing Yukos's 35 percent ownership of Sibneft's shares, for which Yukos had paid $3 billion in cash, and ordering Yukos to return an additional 57 percent of Sibneft's shares that had been acquired by Yukos through a share swap.

93. The Federal Agency for the Management of Federal Property ("Federal Property Agency") is the former Ministry for State Property of the Russian Federation. The Federal Property Agency currently falls under the jurisdiction of the Russian Federation's Ministry of Trade and Economic Development. The Federal Property Agency holds and

manages property owned by the Russian Federation.  The Federal Property Agency also serves as the Russian Federation's financial auditor.  In that role, it evaluated the potential Gazprom-Rosneft merger in 2004.  The Federal Property Agency is headed by Gleb Nikitin, who is a member of the Rosneft Board of Directors.  Defendant Medvedev, Chairman of the Board of Gazprom and First Deputy Prime Minister of the Russian Federation, also serves as Deputy Head of the Federal Property Agency.

94.    Gazprombank JSB (JSC) ("Gazprombank"), located in the Gazprom complex at 16/1 Nametkina St., Moscow, is Defendant Gazprom's authorized banking agent and is majority-owned by Defendant Gazprom.  Defendant Miller serves as Chairman of the Council of Gazprombank, and Mr. A.I. Akimov serves as Deputy Chairman of the Council of Gazprombank.

### D. <u>Jurisdiction and Venue</u>

95.    This Court has jurisdiction pursuant to 28 U.S.C. § 1330 (as to Defendants Rosneft, Rosneftegaz, and the Russian Federation, none of which is entitled to immunity under 28 U.S.C. §§ 1605-07), § 1331 (federal question), § 1367 (supplemental jurisdiction), § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (securities fraud), and 18 U.S.C. § 1964(c) (RICO).

96.    Venue is proper in this Court as against all Defendants pursuant to 28 U.S.C. § 1391(d), authorizing an action against an alien in any district.  Venue also is proper in this court against Defendants Rosneft, Rosneftegaz, and the Russian Federation pursuant to 28 U.S.C. § 1391(f)(4), authorizing civil actions against a foreign state in the District of Columbia.

### III. ADDITIONAL FACTS COMMON TO ALL COUNTS

### A. <u>History of Yukos</u>

97.    The proven natural gas reserves of the Russian Federation are the largest in the world; its proven oil reserves are among the largest.  It is a major oil-exporting country,

eclipsing the exports of many OPEC nations.  Following the collapse of the Soviet Union in the early 1990s and the dissolution of its command economy, however, oil production plummeted. The Russian Federation's oil and gas industry consisted of hundreds of separate state-owned entities, most of which were inefficiently run, unprofitable, and overstaffed.  They survived only through state support.

98.    In 1993, the newly created government of the Russian Federation sought to restructure the nation's oil-and-gas sector, primarily through privatization.  On April 15, 1993, the Russian government founded Yukos as a separate legal entity and consolidated certain state-owned producing, refining, and distribution entities into its structure.

99.    Between 1995 and 1996, Yukos became Russia's first fully privatized oil-and-gas company.  GML Limited acquired approximately 75 to 80 percent of the shares through the loans-for-shares program implemented by the Russian Federation and through an investment tender.  Until that time, Yukos had been plagued by poor management and, as a result, was saddled with mounting debts, including significant outstanding tax liabilities.

100.    Following GML Limited's acquisition of Yukos and after the collapse of the Russian economy in 1998, Khodorkovsky transformed Yukos from an ailing, debt-ridden, inefficient company into one of Russia's largest and fastest growing companies.  The Russian Federation was an initial beneficiary of Yukos's financial development through the company's payment of its outstanding tax liabilities.

101.    Yukos implemented corporate and financial transparency, and other Western business practices.  For example, Yukos hired PriceWaterhouseCoopers (PWC) to prepare audited financial statements according to U.S. Generally Accepted Accounting Principles (GAAP) and established an independent board composed principally of outside

directors, nearly half of whom were prominent international business leaders and none of whom was a current official of the Russian Federation. Yukos also adopted the U.S. dollar as its reporting currency. Further, Yukos implemented a program to introduce advanced technology into its operations. For example, Yukos created a technology center in Moscow and a special training institute in Tomsk for petroleum engineers.

102. As a result of the foregoing reforms, in early 2004, Yukos's corporate governance practices were ranked second among the world's top 20 publicly-traded oil and gas companies. As reported by the industry periodical *Energy Compass*, Yukos's climb to the top of the rankings "reflect[ed] huge efforts . . . to adopt the most up-to-date Western governance standards. . . . [Yukos] has a well-sized board, split CEO/Chairman, annual elections, and the highest level of independence of any of the boards in the survey. To reassure investors, five of its directors are drawn from Western business, with one a former Phillips vice president, and another a director of Schlumberger." The periodical went on to sharply distinguish Yukos from state-controlled entities: "The divergence between new and old Russia is striking. . . . [T]he unreconstructed . . . Gazprom [comes in] second-to-last place. [Gazprom] has not yet introduced anything that approximates to international corporate governance standards."

103. These practices contributed to enhanced performance and profitability. The company's annual production, for instance, grew by 17 percent in 2001, and by 19 percent in 2002, by which time Yukos accounted for approximately 18 percent of Russia's total oil production and a significant portion of its total natural gas production. Those production numbers continued to increase in 2003, when Yukos's combined production of natural gas and oil rivaled both ChevronTexaco and Total. Yukos operated through various subsidiaries including YNG, its main production unit, and was beginning to compete with Gazprom.

104.    Yukos also adopted a policy of openness to U.S. and other foreign investment, both in ownership of Yukos and via joint ventures and other projects.  Beginning in March 2001, approximately 15 percent of Yukos's common stock became available for trading in the form of Level-1 ADRs in the United States, where they are traded on the OTC market. Additional Yukos common stock is traded on the Russian stock market.  GML and its subsidiary companies own only 51 percent of Yukos shares.

105.    Becoming an energy supplier to the United States was a key strategic priority of Yukos.  Yukos completed its first shipment of crude oil from Russia to the United States on July 3, 2002, when the supertanker Astro Lupus arrived in Texas with 1.72 million barrels of Yukos crude oil.  Yukos announced that the shipment "signaled our Company's intention to supply the U.S. market."  Over the remainder of 2002, seven additional shipments of Yukos oil, for a total of 10.9 million barrels for the year, were sent directly to  U.S. Gulf Coast refineries and Yukos publicly announced that these shipments were important steps on an ongoing "path to creating an efficient system of providing a stable source of non-OPEC crude oil for the U.S."   At the time, Yukos had the capacity to ship as much as 600,000 barrels of oil a day to the United States.  Yukos exported 768,500 metric tons of crude oil – more than 5.75 million barrels – to the United States during 2003.

106.    In 2003, Yukos announced that it was proceeding with plans to expand its presence in U.S. commerce.  The merger with Sibneft, described below, was intended to advance these goals.

107.    Recognizing that Yukos could not increase its shipments to the United States and other markets without increased transportation capacity, Yukos became Russia's leader in designing and promoting new pipelines, including one pipeline that would link the

Angarsk region in Eastern Siberia to Daqing, China and another that would link Yukos production to an Adriatic Sea terminal in order to send supertanker shipments to the United States via the Mediterranean Sea. Yukos also pursued the development of a pipeline from YNG's petroleum-rich oil fields in Siberia to the Arctic port of Murmansk. Transneft, the pipeline monopoly wholly owned by the Russian Federation, opposed these projects as unwelcome private-sector competition. Yukos's involvement in these projects was intended, *inter alia*, to increase Yukos's export sales to the United States.

108.    In 2003, following the announcement of the Yukos-Sibneft merger, it was widely reported that Yukos had held talks with U.S. oil majors ExxonMobil and ChevronTexaco concerning the potential acquisition of a large stake in Yukos. Yukos stood ready to allow U.S. companies to acquire large stakes in Yukos as part of its long-term strategy to maintain and expand its presence in U.S. commerce.

109.    The Yukos-Sibneft merger, announced April 22, 2003, was approved on or about August 14, 2003, by the Russian Anti-Monopoly Ministry, subject to certain standard conditions. The merger closed on October 3, 2003, creating Russia's largest oil and gas group and the world's fourth largest oil producer. Yukos acquired 92 percent of Sibneft's stock and in return paid Sibneft $3 billion plus a 26.01 percent stock interest in Yukos. The day of the merger, the *Moscow Times* reported that ExxonMobil was considering the purchase of a 25 percent stake in YukosSibneft for $17.5 billion, a price that would have valued YukosSibneft at approximately $70 billion. The *Financial Times*, meanwhile, reported that ExxonMobil was considering a 40 percent stake in the merged company for $25 billion. An extraordinary shareholders meeting to finalize certain administrative requirements and elect a new board was

scheduled for November 28, 2003; the merged entity was scheduled to begin joint operations on January 1, 2004.

110.    During this period of rapid growth, Yukos shares and ADRs increased in value.  In October 2003, Yukos's market capitalization was estimated to exceed $30 billion, and its performance was significantly more robust than that of its principal Russian competitors, Gazprom and Rosneft.

111.    This period of rapid growth resulted in benefits to Yukos's shareholders, including the holders of ADRs traded in the United States and Europe.  Yukos paid significant dividends to all of its shareholders, including ADR holders, in 2002 (approximately $700 million) and 2003 (approximately $2 billion).  Following the Defendants' assult on Yukos, Yukos ceased paying dividends in the fourth quarter of 2003.

112.    Thus, prior to the launching of Defendants' attack on Yukos, Yukos had established itself as an active participant in U.S. commerce with ongoing shipments of crude oil moving from Yukos production fields in Siberia to U.S. Gulf Coast refineries and was actively engaged in expanding its presence via infrastructure programs to handle expanded volume and via negotiations for expanded ventures with U.S. companies.  Yukos had secured a competitive advantage over its state-owned competitors by moving more rapidly into sales in the United States and had clearly communicated that it intended to exploit that advantage and expand its U.S. presence.  Following the Defendants' assault on Yukos, Yukos ceased paying dividends in the fourth quarter of 2003.

113.    Defendants were well aware of these developments.  An integral and intended element of Defendants' scheme was to eliminate Yukos as a competitor in the sale of

Russian crude oil in the United States and other markets and to substitute themselves for Yukos in these spheres for the commercial benefit and enrichment of Defendants.

## B. Defendants' Energy Businesses

114.    Defendant Russian Federation is one of the most important commercial participants in the global energy market and, as such, is in direct competition with Yukos. Russia is a high-stakes investor, selling, for example, its 7.59 percent stake in Lukoil to U.S. company ConocoPhillips in 2004 for $1.99 billion.    President Putin, who has referred to the energy sector as the "holy of holies" of the Russian economy, has told U.S. officials that Russia aspires to be the third-largest energy exporter to the United States by 2010.

115.    The Russian Federation is building Rosneft and Gazprom into energy producers big enough to compete with companies like ExxonMobil.

116.    Since Defendants' expropriation of Yukos, the Russian Federation has increased state companies' share of the nation's oil output from 10 to 30 percent, largely as a result of the illegal re-nationalization of Yukos.

### 1. Rosneft

117.    Defendant Russian Federation is the sole owner of Rosneftegaz, which in turn owns all but one of the shares in Defendant Rosneft, a vertically integrated oil company created in 1993 and reorganized in 1995 so that it might better compete with large private Russian oil companies.    Defendant Rosneft exports approximately 50 percent of its oil production, and has announced a joint venture with Marathon Oil Corporation to export oil to the United States.

118.    In 2001 and 2002, Defendant Rosneft paid all of its dividends to Defendant Russian Federation; these payments totaled approximately $35 million in 2001 and $49 million in 2002, respectively.

119.    The Russian Federation dominates Rosneft's Board of Directors.  Until recently, all of Rosneft's Board Members were officials of the Russian government, with the exception of Rosneft's President, Defendant Bogdanchikov.  Even today, six of the eight Members of the Board simultaneously hold official positions within the Russian government. The Chairman of the Board, Defendant Sechin, also serves as Deputy Head of the Presidential Administration of the Russian Federation and is a close advisor to President Putin.  Other high-ranking Rosneft officials have simultaneously served as officials of the Russian government. The current Deputy Minister of Economic Development and Trade, Kirill Androsov, the current Head of the Federal Property Agency, Gleb Nikitin, and the current Deputy Minister of Industry and Energy, Andrey Reus, all sit on Rosneft's Board.

120.    Rosneft is operated for the benefit of the Russian Federation.  Rosneft has stated on its website that "Rosneft pursues a business strategy which best meets the interests of the Russian economy."  The Russian government closely supervises Rosneft's day-to-day operations. For example, Rosneft's fuel supply schedules are subject to the approval of the Russian Federation's Ministry of Energy and Ministry of Agriculture.

121.    In fact, initial announcements regarding Rosneft's upcoming IPO came not from company executives, but from the Russian Federation's Ministry of Economic Development and Trade.   In statements during March 2005, the Ministry announced that before an IPO for Rosneft could go forward, it would be necessary for the Russian Federation to acquire a controlling stake in Gazprom and for Rosneft to integrate YNG into its structure, a process that the Director of the Ministry's Structural Reform Department – not Rosneft executives – estimated would take approximately one year.  As recently as February 8, 2006, Rosneft's President, Defendant Bogdanchikov, observed that "the issue of holding the IPO falls under the

jurisdiction of the company's owner, which is the government." In early April 2006, Economic Development and Trade Minister German O. Gref indicated that his ministry would determine the final schedule for Rosneft's IPO. Then, on April 17, 2006, Gref announced that the Ministry had approved the schedule and procedure for the upcoming IPO, including the date of the IPO, share numbers, and other details. In June 2006, Gref confirmed that the Russian government would determine the number of shares Rosneft would offer for sale.

122. Rosneft activities extend to the United States. Rosneft exports oil to North America via the tanker station *Belokamenka*, as described in a May 27, 2006, article in *The Economist* titled "Russian Oil: Going Twice - Fancy a Piece of Expropriated Property? Then give Vladimir Putin a Call." In December 2005, Rosneft's own website confirmed *The Economist* report, stating that the *Belokamenka* "allows oil to be delivered to customers in the U.S.A[.]" The *Belokamenka* has separately been described by Rosneft's export vice president as "a unique export complex, completely controlled by Rosneft." Rosneft reportedly expects to ship more than three million tons of oil to overseas markets via the *Belokamenka* in 2006. About 20 percent of the oil shipped out of the station is delivered to the United States.

123. In October 2002, as mentioned above, Rosneft signed a letter of intent with Marathon Oil Corporation, a U.S. corporation, to transport crude oil from the Ural Mountains to the United States to increase Rosneft's sales to the U.S. market. Generally, in 2003, U.S. buyers of Russian Urals oil included ExxonMobil, Valero, Atofina, Citgo, and Flint Hills.

124. Rosneft also has substantial dealings with U.S. companies and significant contacts with the United States, dating back to 1993. Rosneft partnered with U.S. companies ExxonMobil and ChevronTexaco to submit a winning bid in a 1993 tender for the Sakhalin-3 oil

and gas project in Russia.  Rosneft also partnered with ExxonMobil and others in the Sakhalin-1 project and with ConocoPhillips in the Polar Lights venture.  Such partnerships are typical, with the Russian Federation using Rosneft as a vehicle for government involvement in Western oil projects in Russia.  Since September 2004, Rosneft has used the Caspian Pipeline, which is operated by a consortium led by U.S.-based ChevronTexaco, to transport crude oil.  Rosneft also has contracted with the U.S.-headquartered firm Strat Petroleum in August 2005 to service the YNG oil field.

125.    The U.S. market is also a source of investment dollars, and Rosneft has repeatedly and actively canvassed U.S. financing over the last decade.  In May 1995, Rosneft signed a three-year non-disclosure agreement with an Illinois partnership, Chicago International Network, whereby Rosneft sought "advice and assistance" with regard to the potential sale of its securities "in the United States and elsewhere."

126.    The Russian Federation also sponsored a "road show" in the United States in June 1998 to attract investors in anticipation of Rosneft's privatization.  According to then First Deputy State Property Minister Alexander Braverman, the Ministry for State Property (now the Federal Property Agency) held this road show because "We want to attract Western strategic investors, notably investment banks, to the Rosneft sell-off[.]"  Russian government representatives held meetings in the United States with Dresdner Kleinwort, ING Barings, CS First Boston, Bank of New York, Salomon Smith Barney, SBC Warburg, JP Morgan, Paribas, and other Western banks before deciding not to go forward with the privatization.

127.    In recent months, Rosneft has again actively solicited investment funds in the United States, this time for its upcoming IPO.  In February and March 2006, Rosneft's President, Defendant Bogdanchikov, and Rosneft's Vice President for Finance, Anatoly

Baranovsky, led a delegation that traveled throughout the United States and met with numerous banks and investment funds. Defendant Bogdanchikov, Baranovsky, and other Rosneft representatives met with approximately 30 large banks and funds, including pension funds, in the United States.

128. The Russian Federation itself has been actively recruiting U.S. investment dollars for the Rosneft IPO. In April 2006, Anatoly Aksakov, Deputy Chairman of the State Duma Committee on Credit Organizations, visited the New York Stock Exchange and had a meeting with American brokers and investors who were interested in Rosneft's IPO. Also in New York to discuss the IPO and other business opportunities in Russia were the First Deputy Chairman of the Central Bank of Russia, Andrei Kozlov; Head of the Department for Banking Affairs of the Ministry of Finance, Alexei Savatyugin; and Department Head, Ministry of Economic Development and Trade, Anna Papova. In addition to New York meetings, Aksakov also met with the U.S.-Russia Business Council in Washington in April 2006. A second IPO road show brought Rosneft officials to the United States in early July 2006. U.S. and other Western banks are participating as lead managers in the Rosneft IPO, scheduled for mid-July 2006.

## 2. Gazprom

129. Defendant Russian Federation also owns a controlling stake in Gazprom, the world's largest gas-producing company. Defendant Russian Federation has long owned 40 percent of Gazprom directly. In June 2005, Defendant Rosneftegaz, a holding company that is wholly owned by the Russian Federation and through which the Russian Federation owns 100 percent of Rosneft, entered into a $7.1 billion agreement to purchase a 10.74 percent stake in Gazprom. Following the June 2005 agreement, Gazprom announced that the Russian Federation had obtained a controlling stake in Gazprom.

130.    The Chairman of Gazprom's Board of Directors, Defendant Medvedev, also serves as Russia's First Deputy Prime Minister and served as the Head of Defendant Russian Federation's Presidential Administration until November 2005.  Gazprom's board also includes:  Defendant Khristenko, Russian Industry and Energy Minister (and former Deputy Prime Minister); Defendant Yusufov (former Russian Industry and Energy Minister and former Chairman of the Board of Rosneft); Defendant Miller (former Russian Deputy Minister of Energy); German O. Gref (Russian Minister for Economic Development and Trade); and Farit Gazizullin (former Russian Minister for Property Relations).

131.    Unsponsored Gazprom ADRs have long traded in the United States. Gazprom has had a deposit agreement for these ADRs filed with the SEC for nearly a decade.  In April 2006, Gazprom elevated its presence in the U.S. capital market by sponsoring Level-1 ADRs in the United States, using the Bank of New York as the depositary bank.  These sponsored ADRs trade on the U.S. OTC market.  At the time of the sponsorship, Gazprom's Chairman, Defendant Miller, commented: "Although we have had our [depositary receipt] program for the better part of 10 years, the recent share liberalization affords us the opportunity to expand our equity presence throughout the international investment community."

132.    In addition to the U.S. ADRs, Gazprom has substantial dealings with U.S. companies and U.S. markets.  Gazprom has targeted the U.S. market, particularly in the area of LNG, and sees shipments to the United States as a core part of its strategic business plan. Indeed, Gazprom has launched an aggressive strategy to tap into the U.S. market; the company expects to complete its plans to enter the U.S. LNG market by the end of 2006, with the stated ambition of becoming a household name in the United States.  Gazprom has most recently described its efforts to expand its U.S. presence in its 2005 Annual Report:

> In 2005, the company stepped over the Atlantic and entered one of the world's largest liquefied natural gas markets as first tankers with LNG reached the USA. . . . On September 2, 2005, the first tanker with Gazprom's liquefied natural gas arrived at the Cove Point regasification terminal in the USA. . . . A number of Memorandums of Understanding have been signed with such American companies as Chevron, ConocoPhilips, ExxonMobil, and Sempra Energy, which envisage Gazprom participation in projects of LNG regasification in North America, marketing of gas supplies to the USA, and carrying out gas exchange transactions[.] . . . Gazprom['s] strategic goal is to arrange long-term contracts for direct Russian LNG supply to the USA. . . .  The target markets for the Russian LNG supply are the Gulf of Mexico and the US East coast.

133.   Gazprom entered into several contracts with Moncrief Oil in Texas for joint development of an oil field in Russia.  As part of these contracts, Gazprom Vice Chairman Boris Yurlov visited Houston in October 2002 for a joint U.S.-Russia Commercial Energy Summit.

134.   In September 2004, Gazprom signed a memorandum of understanding with ChevronTexaco on cooperation in the gas sector pursuant to which Gazprom would participate in a ChevronTexaco-led natural gas-import-terminal project in North America, moving the companies closer to supplying U.S. markets with LNG.  At the time of signing, Gazprom Chairman Defendant Miller asserted:

> The signing of the MOU [memorandum of understanding] is confirmation of the commercial dialogue between Russia and the United States as well as an example of the cooperation between our two companies.  For Gazprom, access to the American gas market is strategically important, and in addition, we are keen to bring advanced LNG production and transportation technologies to Russia.

135.   In April 2005, Gazprom signed a memorandum of understanding with U.S.-based Sempra Energy providing for the importation of Gazprom LNG into Sempra's terminals in Texas.  At the time of signing, Gazprom Chairman Defendant Miller said: "This

agreement is an important step in providing Russian gas supply to the U.S. market.  Sempra Global is well-positioned as a gas trading and transportation company in the United States and, because they do not intend to enter the production business outside the United States, they make an ideal partner for us."

136.    In November 2005, Gazprom signed an agreement with Gaz de France to supply LNG to the United States.  LNG tankers carrying Gazprom gas arrived at the Shell Western LNG re-gasification terminal in Cove Point, Maryland at the start of December 2005. Gazprom Chairman Defendant Miller met with BG Group Chief Executive Frank Chapman of BP in April 2006 to discuss cooperation in the U.S. and U.K. gas markets.

137.    In June 2006, Gazprom entered into a partnership with Itera, a Florida-registered corporation that trades and produces gas.  The deal gives Gazprom a 51 percent stake in the Itera subsidiary Sibneftegas.

138.    Gazprom is widely expected to select either ChevronTexaco or ConocoPhillips to assist Gazprom in developing the giant Shtokman natural gas field in the Barents Sea because most of the gas from the field will be sold in the U.S. market.  The winner will be announced in the summer of 2006, according to Gazprom Board Member and Russian Minister of Industry and Energy Defendant Khristenko.

139.    Gazprom uses U.S. investment banks to manage its public debt issues.  In summer 2004, Gazprom used U.S. investment banks to manage a $1 billion bond issue.  In May 2006, Gazprom revealed plans to issue an additional $500 million in bonds, again using U.S. investment banks to arrange the bond placement.

140.    To further increase its share of the world and Russian energy markets, Gazprom announced in 2004 that it would merge with Defendant Rosneft, a company then responsible for nearly 10 percent of Russia's daily oil production.

141.    Although the Russian Federation ultimately abandoned the Gazprom/Rosneft merger (due in part to legal uncertainties surrounding title to expropriated YNG, as described below), Gazprom has continued to act to further its expansionist goals. For example, Gazprom recently purchased a 73 percent stake in Sibneft for $13 billion.

### C. Defendants' Conspiracy To Re-Nationalize Yukos Without Compensating Owners of the Company

142.    Beginning in approximately mid-2003, Defendants, individually and collectively, and each of them formulated and began to execute a scheme (a) to disrupt Yukos's conduct of its business affairs, (b) to conceal their intentions through a series of misstatements and omissions of material fact directed at U.S. and global securities markets and the investing public, (c) to coerce physically Yukos's management into abandoning their active management roles and to replace them with a management team controlled by Defendant, and (d) to dismantle and ultimately re-nationalize Yukos, without compensation to the company's owners, by seizing control of its assets and redistributing them to state-controlled entities and by appropriating for themselves any remaining economic benefits of ownership of Yukos. In the course of this scheme, individual Defendants acted under color of official right to orchestrate and execute elements of the scheme for purposes of benefiting themselves and/or the commercial enterprises in which they hold positions of authority and from which they receive funding. It was an intended purpose and inevitable consequence of the scheme that Yukos would be eliminated as a competitor in the supply of energy to the United States and other non-Russian markets.

### 1. Arrests and Physical and Economic Intimidation: June – October 2003

143.    On June 21, 2003, in the midst of the Yukos-Sibneft merger, and during the negotiation of plans to construct pipelines to Murmansk that would compete with the government's pipeline and provide infrastructure for increased Yukos crude-oil sales to the United States, Defendant Russian Federation arrested Yukos security manager Alexei Pichugin. Pichugin was charged with committing, or directing the commission of, several murders or attempted murders.  Pichugin's arrest was a transparent attempt to coerce him to implicate one or more of the founders of GML Limited, who, through their ownership of interests in GML Limited, were among the principal owners of Yukos.  During his pre-trial detention in the high security Lefortovo Prison, which is run by the Russian state security service ("FSB"), the post-Soviet successor to the KGB, Pichugin's rights were consistently violated.  For example, he was denied access to counsel and interrogated with the aid of psychotropic drugs.  Ultimately, Pichugin was subjected to a closed trial, during which the court decided to dismiss the entire jury, ostensibly on grounds of absent jurors.  Following the empanelment of a new jury, the government secured a conviction.

144.    The following month, on July 2, 2003, Defendant Russian Federation arrested Platon Lebedev, Director of GML Limited.  The arrest occurred while Lebedev was hospitalized.  He, too, was taken to the Lefortovo Prison where he was held without bond, without appropriate medical attention, and without access to legal counsel during his initial detention hearing.

145.    On October 25, 2003, approximately twenty armed FSB agents arrested Khodorkovsky while traveling to Siberia.  Prior to his arrest, Khodorkovsky frequently traveled internationally and always returned to Russia.  He repeatedly stated that he would not flee to avoid his possible arrest.  Following the arrest, Khodorkovsky was held without bail or the

imposition of any terms of release, as provided for under Russian law, and was denied confidential access to his defense counsel.

146.    Defendant Russian Federation arrested Khodorkovsky and Lebedev for the ostensible reasons of tax evasion, theft of state property, and fraud.  In fact, the charges had no basis in law or fact and constituted use of color of official right for the purpose of carrying out the scheme set forth in this Amended Complaint.

## 2. Defendants' Misrepresentations in the Wake of Khodorkovsky's Arrest

147.    News of Khodorkovsky's arrest roiled the securities and commodities markets throughout the world, sending the price of Yukos ADRs down by at least 10 percent.  In the wake of Khodorkovsky's arrest and its impact on Yukos stock, Russia's main stock exchange, the Russian Trading System ("RTS"), and another exchange, the Moscow Interbank Currency Exchange ("MICEX"), temporarily halted trading of Yukos shares.  In order to stem the market reaction and otherwise to conceal Defendants' scheme, Putin, speaking on behalf of Defendant Russian Federation, made misstatements and omissions of material fact directed at U.S. and global securities markets, claiming that Khodorkovsky's arrest did not reflect any intention by the Russian Federation to attack Yukos or its assets.

148.    As reported by the Interfax news agency on October 27, 2003, Putin, speaking on behalf of Defendants Russian Federation and Rosneft at a nationally televised cabinet meeting, stated that Khodorkovsky's arrest was no cause for "generalization, analogies, to say nothing about precedents, especially in connection with privatization," and that there was no reason for any "hysteria and speculation in this matter."  Putin also claimed that the Russian Federation was, in effect, a neutral bystander with respect to the arrest, stating:  "I ask the government not to get involved in this discussion."

149.    Putin's televised statements were widely reported in the Western media, including in the October 28, 2003 editions of major periodicals such as the *Los Angeles Times* and the *New York Times*.

150.    The *New York Times* reported on the same day that Putin portrayed Khodorkovsky's arrest "as an isolated criminal matter in the hands of independent prosecutors."

151.    On November 2, 2003, Defendant Medvedev, as reported by *Deutsche Presse-Agentur*, stated on behalf of himself and Defendants Russian Federation, Rosneft, and Gazprom on the state television channel *Rossiya* that, "We are proceeding on the assumption that these matters will be exhaustively examined and that a verdict on the guilt of the person in question [Khodorkovsky] will only be reached in accordance with Russian law."    BBC Monitoring reported that Medvedev, whose appearance was on *Rossiya's "Vesti Nedeli,"* or "News of the Week," program, continued:

> At the same time, it is very important that the law, including laws about responsibilities, is applied not selectively but across the board to all Russian citizens. . . . I believe that the state must help law-enforcement bodies and ensure their independence in everyday work, not allowing various forces to intervene in their activities.

152.    Medvedev's statements were made during his first public appearance as Head of the Presidential Administration.  His predecessor, Alexander S. Voloshin, resigned in protest following Khodorkovsky's arrest.

153.    The foregoing representations of Putin and Defendant Medvedev constituted misstatements and omissions of material fact.  As revealed by Defendants' subsequent conduct, and contrary to the foregoing representations, the arrest of Khodorkovsky was but a step in the scheme to expropriate and re-nationalize Yukos without payment of any compensation to the company's owners.

154.    In fact, while Putin publicly disclaimed any interest in Yukos during the summer and fall of 2003, the Procurator General was instructing the Tax Ministry to examine the records of Yukos companies throughout Russia.  The tax authorities, sometimes accompanied by FSB officers and armed militia, essentially stormed numerous Yukos offices, intimidating personnel and seizing documents and electronic files.  Some offices were raided more than once.  In addition, the Ministry of Natural Resources examined Yukos's production licenses for compliance violations.  These actions, and those alleged at paragraphs 203−222 herein, were taken under color of official right in furtherance of the scheme set forth in this Amended Complaint.  The Ministry also threatened several important licenses and backed off only after government officials recognized the importance of the production disruptions that interference with the licenses would cause.  Stock prices fluctuated at the mere suggestion that licenses would be lost.

155.    Putin's assertion that there was no need for the government "to get involved in this discussion" also was deceptive in that Defendant Russian Federation, with Putin at its helm, was in fact directing the foregoing actions and was doing so to achieve its goal of taking Yukos from its owners and transferring all of its assets to Defendants.

156.    Indeed, despite nominal checks and balances between and among the executive, legislative, and judicial branches of government, the Russian Federation, already a *de jure* super-presidential republic, functions akin to an autocracy, with nearly all power residing with its president.  It is well-established among Russia experts and legal scholars that Russian federal prosecutors act at the direction of the Kremlin, and that the Russian executive exercises a firm grip over the country's judiciary.

### 3. Other Acts of Intimidation and Rights Violations

157.    Defendant Russian Federation also filed charges against, and sought the arrest of, other Yukos officials and founders of GML Limited.  Leonid Nevzlin (former First Deputy Chairman of Yukos), Mikhail Brudno (former First Vice President of Yukos Refining and Marketing), and Vladimir Dubov (major Yukos shareholder and associate of Khodorkovsky), all were forced to leave Russia in the face of the tactics utilized by the Russian authorities.

158.    Beginning with the arrests described above, Defendant Russian Federation and its agents continually interfered with the right to counsel of accused individuals and repeatedly harassed defense counsel for the individuals and the company.  For example, on October 9, 2003, two dozen Russian Federation internal security agents ransacked the office of Khodorkovsky and Lebedev's counsel, Anton Drel, while he was appearing in court on Lebedev's behalf.  The agents confiscated his personal computer and hundreds of files, many relating to his proposed defense of his clients.  The agents refused to produce a warrant, as required under Russian law (Article 165 of the Russian Criminal Procedure Code), for the search of an advocate's office.  In addition, Defendant Russian Federation has taken actions against criminal defense attorneys Olga Artyukhova and Tatiana Akimtseva, Yukos's in-house counsel Dmitry Gololobov (General Counsel) and Svetlana Bakhmina, and Yukos's outside counsel Pavel Ivlev and Vyacheslav Patskov.  Mr. Gololobov left Russia and Ms. Bakhmina was arrested and held in custody for months.  Agents of Defendant Russian Federation stated that Ms. Bakhmina could have been released if Mr. Gololobov returned to the country, making her, in essence, a hostage.  Mr. Gololobov has remained in exile, and, on April 20, 2006,  a month after being indicted, Ms. Bakhmina was sentenced to seven years in prison for tax evasion and embezzlement.  The length of Ms. Bakhmina's prison term made her ineligible for release under

a Russian Federation-granted amnesty for mothers sentenced to six years or less in prison.  Ms. Bakhmina has two sons, Fyodor and Grigory.  At the time of her sentencing, they were four- and eight-years-old, respectively.

159.    In August 2003, Defendant Russian Federation secretly submitted requests for mutual legal assistance to the Attorney General of Switzerland requesting the seizure of business documents related to, *inter alia*, GML Limited, its subsidiaries and counsel, Khodorkovsky, Lebedev, Yukos, and Yukos-related trading companies.  Subsequently, in March 2004, Defendant Russian Federation sought to freeze numerous bank accounts in Switzerland held in the names of the same entities and individuals.  The Swiss Attorney General froze accounts which held approximately $4.9 billion.  On June 8, 2004, the Swiss Federal Supreme Court directed the Swiss Attorney General to release several of the accounts (those with orders ripe for review), finding that the Russian request did not contain a description of the cause, nature, and scope of damages that would justify the ordering of the contested freeze.  The Court went on to assess a 5,000 Swiss Franc penalty on the Swiss Attorney General.  This gentleman, Valentin Roschacher, was forced to resign his position last week in part because of his role in the Yukos matter.

160.    Prior to implementing the Swiss Supreme Court's ruling, the Swiss Attorney General contacted Defendant Russian Federation's representatives and asked whether it had any additional evidence to warrant the freeze of the accounts.  Defendant Russian Federation's representatives did not offer such evidence and accounts containing approximately $4.7 billion were released.  Procedural hurdles have delayed filing for the release of the remaining accounts.  To date, $125 million still remains frozen even though the Russian

Federation has not come forward with any evidence linking the funds to alleged criminal conduct.

161.    On January 9, 2006, the Swiss Supreme Court issued a ruling blocking the transfer of bank documents to Russia for its investigation of Yukos because Moscow provided insufficient evidence of wrongdoing.

162.    In 2003, Defendant Russian Federation also asked the Attorney General of Liechtenstein to seize records allegedly located in Liechtenstein and relating to illegal activity on the part of Khodorkovsky and GML Limited.   Menatep and Khodorkovsky objected, and Liechtenstein's highest court denied the request, finding that (i) there were no facts presented that supported the criminal allegations against Khodorkovsky and Lebedev, (ii) there was reason to believe that the alleged tax offenses were not based in fact and that the alleged crimes were unsubstantiated, (iii) the request by the Russian government was a fishing expedition, and (iv) granting the seizure request would amount to a violation of international law.   (Case No. 12 RS.2003.255-ON 25 at 6 (Fürstliches Obergericht April 25, 2004)).

163.    The eleven-month trial of Khodorkovsky and Lebedev ended in May 2005, with both men convicted on charges of tax evasion and fraud, and each sentenced to nine-year prison terms, one year short of the maximum ten-year sentence sought by the state prosecution.   In response, President Bush expressed concern that "it appeared to us – at least people in my administration – that it looked like [Khodorkovsky] had been judged guilty prior to [having] a fair trial."

164.    Khodorkovsky and Lebedev appealed their convictions in a timely manner.   Following a series of adjournments and delays, in September 2005, a Moscow court took less than a day to reach a decision upholding all but one of the nine counts against

Khodorkovsky and Lebedev and reducing each of their sentences from nine to eight years.  The dismissal of Khodorkovsky's appeal foreclosed his ability to carry out his stated goal of pursuing a seat in the State Duma in parliamentary by-elections to be held in December 2005.

165.    Days before the verdict was to be released, Russian prosecutors announced that new charges would be brought against Khodorkovsky and Lebedev, purportedly based on money laundering activities.  To date, such charges have not been brought, although Russian investigators have carried out further raids on Yukos offices.

166.    Khodorkovsky, who has been sent to serve his prison term in a remote region of Siberia, has continued to undergo harassment while incarcerated.  The Russian authorities have isolated him not only from his family and friends, but also from his legal counsel.  In January 2006, he was transferred to solitary confinement for receiving Justice Ministry documents on inmates' rights.  In March 2006, Khodorkovsky was transferred to solitary confinement once again, this time for allegedly drinking tea in the wrong place.  In April 2006, Khodorkovsky was attacked by a fellow prisoner while he was sleeping.

167.    The treatment of Khodorkovsky and Lebedev prompted the U.S. Senate in November 2005 to conclude that, "the criminal justice system in Russia has not accorded Mikhail Khodorkovsky and Platon Lebedev fair, transparent, and impartial treatment under the laws of the Russian Federation."  While the Senate also called upon the Russian Federation to take action to "dispel widespread concerns" that "in cases dealing with perceived political threats to the authorities, the judiciary of Russia is an instrument of the Kremlin and such judiciary is not truly independent," no such action has been taken.

168.    Concerns over their own safety have prompted Yukos's management team, led by Yukos CEO Steven Theede, to relocate to London.  In the spring of 2006, two

Moscow-based Yukos executives refused to take future direction from Theede. This "mutiny" included the re-appointment of Stanislav Vinokurov, the former head of Yukos Trading House, who Theede had dismissed for his suspicious role in losses of up to $100 million involving discounted sales to an un-named third-party trader. At the same time, at least one Moscow-based executive who remained loyal to Theede found himself being questioned by federal prosecutors in Moscow. The Moscow-based Yukos management has grown increasingly aligned with Rosneft's interests. The Moscow-based Chairman of the Board commented that it would be "reasonable" for Yukos to sell off its remaining assets to Defendant Rosneft as a means of dealing with its current Russian bankruptcy proceedings.

### 4. Interference with Acquisition by a Western Oil Company and Related Deceptive Statements

169.    By September 2003, the *New York Times* reported that it was "widely known that ChevronTexaco and ExxonMobil [were] vying to buy a large stake, perhaps as much as 25 percent, in Yukos[.]

170.    On October 3, 2003, the Yukos acquisition of 92 percent of Sibneft was formally completed, with the newly combined company being named YukosSibneft Oil Company. A Yukos-Sibneft merger was a pre-requisite of any acquisition of a substantial interest in Yukos by a major Western oil company.

171.    Also on October 3, 2003, investigators and police, equipped with machine guns and bulletproof vests, carried out searches in a Yukos business center, the home of Lebedev, the offices of Vladimir Dubov, and a Yukos-funded orphanage outside of Moscow. Commentators viewed the actions as a clear signal to potential investors in YukosSibneft that Yukos remained under attack by the government. Irina Khakamada, then the deputy speaker of the Russian State Duma and an outspoken critic of the Putin administration, told the *Ekho*

*Moskvy* radio station that day that the searches were linked to the possible sale of YukosSibneft shares to ExxonMobil.

172.    Throughout October 2003, however, Defendants, including the Russian Federation, made misstatements of material fact falsely asserting that they supported ExxonMobil's potential purchase of a large stake in YukosSibneft. Such misstatements, which were intended to influence U.S. and global securities markets, are set forth below.

173.    On October 10, 2003, Defendant Yusufov, then the Russian Federation's Minister of Industry and Energy, speaking on behalf of himself and Defendants Russian Federation, Rosneft, and Gazprom at a news conference with foreign reporters, said it would be "a positive step" if ExxonMobil were to acquire a stake in YukosSibneft. "Of course, it fills us with pride that discussions are under way with the first company in the world, ExxonMobil," Yusufov said, according to the Associate Press. "To receive that kind of partner, in my view would be everyone's wish."

174.    On October 12 and 13, 2003, the *Financial Times* and *Moscow Times*, respectively, also reported Defendant Yusufov's foregoing statements regarding ExxonMobil. The English-language *Moscow Times* further reported that, on October 7, 2003, "an unnamed government source," speaking on behalf of Defendants Russian Federation and Rosneft, told the Interfax news agency that no legal barriers were standing in the way of ExxonMobil's purchase of a large stake in YukosSibneft. Likewise, on October 9, 2003, also speaking on behalf of Defendants Russian Federation and Rosneft, First Deputy Economic Development and Trade Minister Arkady Dvorkovich told a conference in New York that the Russian government did not object to a foreign company acquiring control of Yukos. Additionally, the *Moscow Times* quoted Paul Collison, a senior energy analyst at Brunswick UBS, as having said that, "[t]here are

increasing signals from Russia that it would welcome a deal. It seems that this could be coming to a head[.]"

175. On October 20, according to the *Financial Times*, an advisor within the Russian government stated on behalf of Defendants Russian Federation and Rosneft that, "The deal between Yukos and ExxonMobil will be finalized. There have been no objections from President Vladimir Putin."

176. The foregoing statements of Defendant Yusufov and those made on behalf of Defendant Russian Federation and Rosneft deceived investors into believing that the Defendants did not seek to impede ExxonMobil's acquisition of a large stake in YukosSibneft. In reality, however, as part of their fraudulent scheme to expropriate Yukos, Defendants had no intention of allowing the acquisition. As highly placed officials in the Russian Federation, the declarants, which included the state's Minister of Industry and Energy and its President, knew facts or had access to information that demonstrated the falsity of their representations. Indeed, during the course of their representations, the Russian Federation's investigation into Yukos intensified, and only weeks later, Khodorkovsky would be arrested in Siberia in a well-planned and carefully coordinated manner that indicated involvement at the highest levels of government.

177. The attack on Yukos was stepped up three weeks later, on October 30, 2003, when all shares of Yukos common stock owned by YUL and Hulley, which amounted to approximately 51 percent of the equity of Yukos, were seized. By seizing the Yukos shares, the Russian Federation effectively eliminated any possibility that ChevronTexaco, ExxonMobil, or any other major Western oil company would acquire a substantial interest in YukosSibneft.

178. On November 28, 2003, just minutes before Yukos and Sibneft were to hold their joint shareholders' and board meetings to approve, *inter alia,* charter revisions in

connection with the merger, Sibneft announced – reportedly with the tacit approval of the Russian government – that the merger was being placed "on hold."

179.    Thereafter, it emerged that Rosneft, the state-owned oil company, was attempting to acquire Sibneft, in conjunction with an Indian oil company.  Sibneft then refused to negotiate in good faith terms for the de-merger of Yukos and Sibneft.  Instead, Sibneft engaged in delaying tactics, and retained the $3 billion cash payment received from Yukos when the merger closed.

180.    Sibneft's actions were undertaken with the approval of Defendant Russian Federation and one or more of the Individual Defendants as well as other un-named co-conspirators.

181.    Two years later, in late 2005, Gazprom announced its intention to acquire approximately 70 percent of Sibneft.  Unlike the Yukos-Sibneft merger, the Gazprom-Sibneft merger received the blessing of the Russian Federation and was consummated in October 2005.  In June 2006, Gazprom announced that it wanted to buy Yukos's remaining 20 percent ownership interest in Sibneft, although, to date, Gazprom has not offered Yukos a fair market price for its shares.

## 5. Seizure of Yukos Stock and Contemporaneous Deceptive Statements

182.    On October 30, 2003, just days after Khodorkovsky's arrest and  Putin's statements described in paragraphs 148–150, above, Defendant Russian Federation entered the Trust and Investment Bank, which held the registry of Yukos's shares in Russia, and seized all of the shares of common stock of Yukos owned by YUL and Hulley (each a foreign corporation), which amounted to approximately 51 percent of the equity of Yukos.

183.    On the day of the seizure, according to the *Washington Post*, a spokeswoman for the prosecutor general's office, Natalya B. Vishnyakova, speaking on behalf of Defendants Russian Federation and Rosneft, stated that the shares had been seized "as security against material damage" in connection with the criminal case against Khodorkovsky. That statement was false. Because Khodorkovsky did not own the stock (it was instead owned by foreign corporations), the stock could not have been used to satisfy any of his alleged liabilities to Defendant Russian Federation, allegations which themselves were false. The fact that the value of the shares exceeded Khodorkovsky's exposure in the criminal cases by a factor of ten is further proof that the criminal charges were used as a pretext for the actual goal – re-nationalizing Yukos – all in violation of the constitution of the Russian Federation, the Russian Criminal Procedure Code, and international law.

184.    The seizure of Yukos stock advanced the expropriation of Yukos in two ways. First, it effectively transferred control of Yukos to Defendant Russian Federation, thus putting Defendants in a position to frustrate any actions the company might wish to take to resolve tax claims. Second, it prevented Yukos's principal shareholders from using their shares to facilitate a resolution of the same claims. Defendants could not allow a settlement of the coming tax claims because it would be those claims that provided the pretext for the uncompensated transfer of YNG to Defendant Rosneft and the basis for appropriating all value that remained in Yukos.

185.    These purposes, of course, were not yet fully apparent when the shares were seized. But what was unmistakable even at that relatively early point was that Defendant Russian Federation now effectively controlled Yukos. Within days, that realization drove the value of Yukos shares down by 18 percent.

186.    Meanwhile, Defendants, including the Russian Federation, continued to conceal their fraudulent scheme via a series of misstatements and omissions of material fact throughout the following month.  These misstatements and omissions, which were directed at U.S. and global securities markets, sought to deceive investors into believing that the Defendants, including the Russian Federation, had no intention to bankrupt or expropriate Yukos without compensations to its owners.    Such misstatements and omissions are set forth below.

187.    As reported by the *Financial Times* on October 31, 2003, during a 90 minute meeting on behalf of Defendants Russian Federation and Rosneft with international bankers in Moscow the previous day, "Putin stressed that his aim was to preserve Yukos as a company."   Additionally, the newspaper reported that, "Charles Ryan, the chairman of the United Financial Group, a Moscow-based investment bank, said Mr. Putin referred to Yukos as a sad affair in which the government had to enforce the law."   According to another participant, "Mr. Putin was very clear that it would be a catastrophe if Yukos fell apart as a company.  A third participant said Putin told the group that the investigation of Yukos "was not part of confiscation or renationalization of assets."   That same day, the *New York Times* and *Washington Post* each carried a similar report on their front page.  The *Times* also reported that, just prior to the meeting with foreign investors, in a statement on Russian state television, Putin "spoke broadly of the need to hone the country's financial laws to protect minority shareholders." According to three investors present at the meeting, the *Times* continued, Putin "emphasized that the investigation was about enforcing the country's laws and not a broader assertion of state control over business."   Meanwhile, the *Post* cited Ryan of United Financial Group as having said that Putin "was at pains to say" that the government was not seeking to nationalize Yukos.

188.    Putin's misstatements of material fact were echoed by the above-mentioned spokeswoman for the prosecutor general's office, Vishnyakova.  As reported by the *New York Times* on October 31, 2003, Vishnyakova, speaking on behalf of Defendants Russian Federation and Rosneft, said in a televised statement that the seizure of Yukos shares was not a "confiscation or nationalization" of the company's assets.  Vishnyakova's televised statements were carried by the *Washington Post* on that same day.

189.    On November 3, 2003, Defendant Kudrin stated on behalf of himself and Defendants Russian Federation and Rosneft, "I've heard personally from Putin and clearly understand myself that this is not a redistribution of property."  Kudrin's statement, originally made in an interview with the Russian business newspaper *Kommersant*, was also published on November 4 in the *Moscow Times*.

190.    On November 4, 2003, on the eve of an official visit to Italy and on behalf of Defendants Russian Federation and Rosneft, Putin stated to journalists, "I am categorically opposed to the review of privatizations, even if the results were not ideal.  It is my deep conviction that this would have serious negative impact on the economy and the social welfare. Therefore there will be no deprivatization."  Putin's statements were carried in the industry periodical *Platt's Oilgram News* the following day.

191.    On November 5, 2003, speaking to reporters on behalf of Defendants Russian Federation and Rosneft in Rome, Putin again misrepresented his government's aims.  As reported in the *Wall Street Journal*, Putin said that, "[t]he state shouldn't strive to destroy [Yukos], because the economic consequences would be quite negative and it wouldn't serve any legal purpose."  The *Washington Post*'s November 6 edition also carried Putin's deceptions, quoting him as stating, "[t]he state should not really seek to destroy the activity of the Yukos

company.  The results would be negative."  The *Financial Times* published a similar quotation, in which Putin stated that, "the state surely does not want to destroy the company."

192.    On November 6, 2003, in statements during an official press conference with Putin in Rome, EU Commission President Romano Prodi stated that Putin, speaking on behalf of Defendants Russian Federation and Rosneft, assured EU officials "that the law will not be applied in a discriminatory way" to Yukos.  Putin's deceptive assurances to Prodi were reported on November 7 in *Platt's Oilgram News*.

193.    On November 29, 2003, the *Los Angeles Times* reported that Russian Economic Development and Trade Minister German O. Gref, speaking on behalf of Defendants Russian Federation and Gazprom, stated that, "the nationalization of Yukos is not an issue."

194.    On January 20, 2004, Defendant Medvedev, on behalf of himself and Defendants Russian Federation, Rosneft, and Gazprom contributed an op-ed to the *Financial Times* in which he intentionally misrepresented to Yukos investors that the Russian Federation would provide the company and its former chairman a fair and impartial judicial process:

> An independent and competent judiciary, protecting the rights of everyone, is an essential part of a prosperous society.  The importance that people attach to the judiciary helps explain why the Yukos case became such a talking point for Russian and foreign media[.]  .  .  .  Mikhail Khodorkovsky, head of the oil company, was accused of tax evasion and taken into custody.  But whatever the outcome, one point should be noted: this is not a story about prosecutors "hounding businessmen," but about equality before the law for everyone, however wealthy.

195.    As stated above, each of Defendants' foregoing representations, including those of the Russian Federation, constituted misstatements or omissions of material fact that aimed to deceive investors into believing that Defendants did not seek to expropriate Yukos without compensation to its owners.  Despite these widely reported statements denying any intention to bankrupt or nationalize Yukos, Defendants' intention was to do precisely that.

**6. Imposition of Confiscatory Taxes**

**a. Russian Tax Audit and Post-Audit Procedures**

196.     Russian tax law is governed by the Tax Code of the Russian Federation ("Tax Code"), in force since January 1999.  The Tax Code established procedures for (i) tax audits and (ii) post-audit dispute settlement.  These procedures were intended to eliminate the arbitrary character of tax audits that previously had been used to harass legitimate businesses. The new procedures established clearer rules as to how and when an audit could be initiated, who conducts it, and how it could be administratively and judicially reviewed.  These procedures were violated by the Tax Ministry in the tax assessment of Yukos.

197.     The tax audit procedure is as follows:

(a)     a tax audit is initiated by the head of a tax agency or his deputy;

(b)     within two months after the end of the audit, the auditors must provide the taxpayer with an audit report, which is called an act of audit.  The act of audit sets out the conclusions reached by the auditors.  The act of audit has no independent legal force – it is a fact-finding document that makes proposals, such as additional assessment of taxes, interest, and penalties;

(c)     the taxpayer has two weeks after receiving the act of audit to present objections to it;

(d)     the head of the tax agency then has two weeks to consider the act of audit and the objections, after which he is required to meet with the taxpayer to consider the objections; and

(e)     after considering the objections, the tax agency issues a resolution on the tax audit, which is called an act of resolution.

198.    The act of resolution is the executive document that provides the legal basis for subsequent actions against the taxpayer, such as seizing money from its accounts.  All further court proceedings focus on the validity of the resolution.

199.    The act of resolution typically establishes additional tax assessments, interest on those assessments, and penalties.  The tax agency can seize taxes and interest from a taxpayer's account without resorting to a court procedure.  The tax agency must go to court, however, in order to collect penalties.

200.    After the act of resolution has been adopted, the tax agency issues a written demand for voluntary payment in accordance with the resolution.  The demand specifies when the tax and interest are to be paid.  Normally, there is a time period of approximately five days between the date the resolution is delivered to the taxpayer and the date the demand is made.  After the demand is made, a taxpayer typically has two weeks to present its claim in court and ask for a stay order.  These time frames are intended to allow the tax process to proceed in an orderly manner, providing the taxpayer with an opportunity to defend itself, while avoiding manipulation of the process by fraudulent taxpayers.

201.    The judicial review process is governed by the Arbitrage Code of the Russian Federation and includes a review by three main levels of the arbitrage courts:

(a)    the first instance level, which consists of a trial division and an appeal division.  The appeal division is an intermediate appellate court that reexamines decisions made by the trial division;

(b)    the second instance level, which are called courts of cassation; and

(c)    the third instance level, which is called the Supreme Arbitrage Court of the Russian Federation.

202.    In tax cases where an act of resolution is challenged, a stay order is requested and routinely granted at the commencement of the proceedings.    Since the tax authorities can seize taxes and interest from a company's account without obtaining any court order, a stay in tax cases is often essential to protect the taxpayer's account.    A stay order can be requested at any stage of the proceedings.

### b. Russia's "Special" Tax Audit of Yukos

203.    In December 2003, Defendant Russian Federation conducted a "special" tax audit of Yukos.    Prior to Defendant Russian Federation's arrest of Khodorkovsky and its eleventh-hour interference with the YukosSibneft merger, agents of the Defendant Russian Federation's regional and federal tax authorities had regularly audited Yukos's tax compliance and had never raised any material problems with Yukos's tax-minimization practices or its tax payments.

204.    During the spring of 2003, the regional tax ministry conducted a two-month audit of Yukos's tax reporting and payments for the year 2000 and concluded that Yukos had just a small additional tax liability for that year, which Yukos paid immediately.    On September 19, 2003, the Interregional Tax Inspectorate No. 1 issued a Statement for use by the Central Bank of the Russian Federation that Yukos "does not have any unsettled debts, whether on taxes or on any other obligatory payments, and has not committed any breach of the tax laws as of [September 1,] 2003."    The Interregional Inspectorate issued similar certificates on October 23, and November 17, 2003, reaffirming that Yukos was compliant with its tax obligations.

205.    In December 2003, Defendant Russian Federation, in furtherance of Defendants' plan to re-nationalize Yukos, began an extraordinary re-audit of Yukos's domestic profits tax payments for 2000.    The audit lasted less than two weeks, and resulted in the assessment of an additional U.S. $3.4 billion (99 billion rubles) in taxes, interest, and penalties

for 2000. This alleged tax deficiency was the largest reassessment ever faced by a Russian taxpayer and constituted a total tax burden of approximately 85 percent of Yukos's *gross* income for that year.

206. Yukos representatives identified numerous errors in the tax calculations that resulted in an overstatement of the amount owed. The representatives of the Defendant Russian Federation acknowledged the errors, but rather than reducing the tax assessment by these amounts, they created new "violations" that were equivalent to the originally assessed amounts.

207. The tax practices at issue concerned Yukos trading company affiliates which, given their location in economically depressed regions of Russia, enjoyed favorable tax treatment.

208. Yukos for years had established independent oil trading companies in regions such as Mordovia, which specifically sought investments of this type by energy companies. These independent corporations purchased oil from Yukos production subsidiaries and exported that oil on behalf of themselves and Yukos. Mordovia and the other regions taxed the independent trading companies' profits from these trades at reduced tax rates. Many other Russian oil companies utilized similar tax-minimization practices during this period of time.

209. On February 19, 2004, the *Wall Street Journal* quoted Christof Rühl, Chief Economist of the World Bank's Russia Country Department in Moscow, as stating that "state-owned companies appear to engage in these [tax minimization] practices as much as private ones," which understate the share of the Russian economy attributable to the oil and gas sector. According to Mr. Rühl, if one attributes Russian oil and gas sales by trading affiliates to

the production, rather than services, sector, "oil and gas as a share of the [Russian] economy almost triples, to about 25 percent of GDP."

210.    Yukos's use of trading companies located in tax havens was known to its outside auditor PWC, which certified Yukos's financial reports beginning with the year 2000.

211.    Furthermore, Yukos and the trading companies were the subject of government tax audits for the years 2000 to 2003, and neither the legitimacy of the trading arrangements nor the methodology for calculating and reporting taxes was ever challenged.

212.    Yukos never hid or disguised its utilization of this tax-minimization program.  Although not required to do so, Yukos voluntarily disclosed in its public financial statements the impact that the trading companies' reduced tax rates had on its performance.  For example, Yukos disclosed in its annual reports that its effective tax rates for 2000-2002 were markedly lower than the statutory rates:

| Year | Statutory Tax Rate | Effective Tax Rate |
|------|--------------------|--------------------|
| 2000 | 30 percent | 24 percent |
| 2001 | 35 percent | 18.2 percent |
| 2002 | 24 percent | 19.6 percent |

Yukos also included in the notes to its Financial Statements a reconciliation of its actual income-tax expense to the expense that it would pay if all of its income were taxed at statutory rates.  In the reconciliation, Yukos included an item titled "Income taxed at other rates."  For 2000–2002, the amounts of pre-tax income, income taxed at other rates, and net income were as follows:

| Year | Income before income taxes and minority interest (millions) | Income taxed at other rates (millions) | Net income (millions) |
|------|------|------|------|
| 2000 | $4,950 | $854 | $3,724 |
| 2001 | $3,866 | $828 | $3,156 |
| 2002 | $3,810 | $745 | $3,058 |

Yukos then disclosed the reasons that its effective tax rates were below statutory rates.  For example, the Management's Discussion and Analysis section of its 2002 annual report stated that:

> Our effective tax rate is affected significantly by enacted rates in the several tax jurisdictions both within Russia and internationally where we have operations.  Many of the companies in our consolidated group are resident in tax jurisdictions in Russia and internationally where statutory tax rates are lower than the statutory maximum in Russia or where we benefit from regional tax incentives.

213.    Yukos timely filed objections to its tax reassessment on January 12, 2004.

214.    On April 14, 2004, the Tax Ministry issued Resolution # 14-3-05/1609-1. That Resolution essentially adopted the findings of the field tax audit.  On the same day, the Tax Ministry issued two Tax Payment Demands for tax year 2000.  Together the Demands sought approximately 99.4 billion rubles, or U.S. $3.4 billion, in back taxes, default interest, and penalties.  The Government presented Yukos with these demands on April 16 and demanded full payment that same day.

215.    In May 2004, Yukos challenged the tax demands by filing an Application Seeking to Declare Unlawful the Resolution of the Ministry of Taxes of the Russian Federation and Levies with the Moscow Arbitration Court.  The Court denied Yukos the opportunity to inspect the evidence submitted by the prosecution, thus denying Yukos a meaningful opportunity

to present its defense.  In fact, the Russian Federation gave Yukos's lawyers only a few hours to read 342 volumes of evidence before the tax hearing.  The court also assumed for purposes of the case against Yukos that the government had proved its parallel allegations against Khodorkovsky, even though Khodorkovsky's trial had not yet even begun.  On May 26, 2004, the Court of Arbitration upheld 99 percent of the government's tax claims. The government appealed the remaining 1 percent.  By law, Yukos was entitled to 30 days to file an appeal. However, in disregard for Russian law, the appellate court conducted a hearing a few days later, thus denying Yukos its procedural and substantive rights.

### c. Freeze Orders and Additional Confiscatory Assessments

216.    On April 15, 2004, and June 30, 2004, Defendant Russian Federation obtained *ex parte* injunctions effectively freezing all Yukos assets and requiring additional tax payments.  Those assets included, *inter alia*, the entirety of Yukos's majority interest in YNG.

217.    Yukos had cash and other relatively liquid assets worth more than $25 billion at this time.  Moreover, throughout 2004, Yukos repeatedly requested permission to use its frozen assets to satisfy its alleged outstanding tax liability pending appeal.  However, because of Defendants' confiscatory scheme, the requests were ignored or rejected.

218.    For example, on July 1, 2004, Russian Federation court officers accompanied by armed guards arrived at Yukos's Moscow headquarters and presented the company with an order to discharge the asserted $3.4 billion tax and penalties for FY 2000 in five days.  Yukos offered its interest in Sibneft as collateral to secure the alleged tax liability. Defendant Russian Federation ignored the offer and instead, on the same day: (1) directed Court officers to freeze all of Yukos's accounts in Russian banks, and (2) directed the Tax Ministry to file an entirely new $3.4 billion tax claim against Yukos, this time ostensibly for 2001 liabilities.

219.    On August 31, 2004, YNG's bank accounts were frozen.  On September 9, 2004, following yet another tax levy, thirteen further freezing orders were imposed on Yukos's other subsidiary operating accounts.

220.    On or about September 3, 2004, the Russian Federation, through its Ministry of Tax, levied yet another tax liability on Yukos, for $4.1 billion in respect of the 2002 tax year.

221.    On or about November 1, 2004, the Russian Federation announced additional tax liabilities for FY 2001 and 2002, adding another $10 billion in claims.  This pattern of asserting confiscatory tax levies in furtherance of Defendants' scheme to re-nationalize Yukos continues.  The Russian Federation announced $8 billion in additional levies for 2003, and in December 2005 announced another tax levy of $3.5 billion for 2004, bringing the total additional tax liabilities levied against Yukos to approximately $30 billion.

222.    Just for the period 2000 to 2003, the total tax burden placed on Yukos, including additional tax levies imposed by the Russian Federation for those years, equaled a staggering 92 percent of Yukos's revenues for the same period.  The specific tax burdens for 2001 and 2002 actually exceeded Yukos's revenues for those years.  The  $3.5 billion in taxes levied against the company for 2004 is 115 percent of the company's revenues for that year.  Yukos attempted to challenge this 2004 assessment in Moscow's Arbitration Court, but the court recently suspended the proceedings and has not let Yukos present its case.

### d. Contemporaneous Deceptions Concerning the Attack on Yukos

223.    During the same period that Defendants were engaged in the foregoing conduct, Defendants, including the Russian Federation,  made a series of  misstatements and omissions of material fact and engaged in other deceptive conduct at the highest levels designed to create the appearance that its objectives were simply the even-handed execution of Russian

law, that Defendants had no intention of forcing Yukos into liquidation to satisfy tax claims, and that Defendants were receptive to a negotiated settlement of the tax issues.

224.    These misstatements and omissions, each of which was directed at U.S. and global securities markets, are described below.

225.    Between May 20, 2004, and June 17, 2004, following news of the adverse actions taken by Defendant Russian Federation in its pursuit of its then $3.4 billion "tax" claim against Yukos for FY 2000, the price of Yukos stock and ADRs declined substantially. Amid rumors of a possible Yukos bankruptcy, the ADRs fell from a close of $39.29 on May 20 to a close of $26.50 on June 16.

226.    In response, and in furtherance of Defendant Russian Federation's effort to conceal its true scheme and intent, on June 17, 2004, President Putin, while attending a summit in Tashkent, Uzbekistan, stated publicly on behalf of Defendants Russian Federation and Rosneft that "Russian authorities, the government, and the economic officials of our country are not interested in seeing Yukos go bankrupt." Newswires, including the Associated Press, immediately picked up Putin's statements. According to such press reports, Putin added that the Russian Federation "will try to do everything not to topple this company."

227.    In addition to the foregoing misstatements, Putin remarked that the matter of addressing Yukos's asserted tax liability (then claimed to be $3.4 billion, solely for FY 2000), was for the courts: "But what happens in the courts is a separate matter. The courts should speak of this themselves."

228.    In response to Putin's assertions, the price of Yukos stock and ADRs immediately shot up. Yukos ADRs went from a close of $26.50 per share on June 16 up to a

close of $35.65 per share on June 17.  As reported by the *Moscow Times* on June 18, following

Putin's statements:

> Yukos's share price . . . exploded.  In a session so frenzied that trading in the stock had to be stopped for an hour, Yukos shares ended the day up an astounding 34.2 percent[.] . . .  MICEX and RTS indices rose 8.8 and 10.1 percent respectively, a gain on the RTS last seen when Boris Yeltsin unexpectedly handed Putin the keys to the Kremlin on December 31, 1999.

229.    On June 17 and 18, 2004, Putin's statements were published in English

language newswires, major dailies, and industry periodicals worldwide, including the Associated

Press, *Financial Times*, *New York Times*, *Washington Post*, *Moscow Times*, *International Oil

Daily*,  and *Platt's Oilgram News*.  In the days and weeks that followed, Putin's statements were

repeatedly re-published in major news outlets.

230.    The *International Oil Daily*'s June 18 story reported that Putin's statement

came after Yukos's management, "fearing that bankruptcy was imminent, . . . sent a last-minute

plea to [Russian Federation] Prime Minister [Mikhail Y.] Fradkov asking to be allowed to settle

the tax bill out of court."  In addition, the periodical explained that, "Putin's remarks appear to

signal that the government is willing to accept Yukos's proposed compromise.   Putin's

endorsement all but ensures that Yukos will remain intact as a company − alleviating investor

fears that the government would tear to pieces one of Russia's best-run companies through

forced bankruptcy sell-offs."

231.    On June 21, 2004, Defendant Kudrin, speaking on behalf of himself and

Defendants Russian Federation and Rosneft, deceived investors by echoing Putin's statements

and claiming that the tax authorities and Yukos were cooperating on settling the claims against

the company.   "Cooperation on the possible settlement of the claims [against Yukos] is under

way.  I think Yukos has enough funds to pay its liabilities," Kudrin said, as reported by the June

22 *New York Times*.  Kudrin's statements, made at a Moscow investment conference as the city's

Arbitration Court adjourned after hearing arguments in Yukos's tax case, were also reported by

the *Wall Street Journal*, *Washington Post*, *Oil Daily*, and *Platt's Oilgram News*.

232.    On June 22, the *Wall Street Journal* reported that Putin's "comments

fueled hopes that Yukos might be able to reach a deal with the government on the back-taxes

claim that wouldn't drive it into insolvency."

233.    On June 25, 2004, ITAR-TASS, the Russian Federation's official news

agency, reported that Defendant Miller stated on behalf of himself and Defendant Gazprom that

Gazprom did not seek to destabilize Yukos, but, "on the contrary, it wants to develop joint

projects with the company."

234.    On July 1, 2004, *Platt's Energy Economist* reported that, at the Moscow

investment conference at which Defendant Kudrin made his statements set forth in paragraph

231, "Kudrin in fact appeared in a relaxed mood, suggesting that the government would be

happy for Yukos to sell assets on the open market, rather than to the state or to 'state-approved'

companies, to pay off its debts."  Kudrin also maintained that the tax claims against Yukos were

not political but were part of a "routine" investigation.

235.    The deceptive nature of Defendant Kudrin's immediately preceding

statements is demonstrated by the following statement in a research note published by the

investment bank Renaissance Capital: "We consider this the most important of Mr. Kudrin's

statements, as it supports the impression given last week that the government has finally

established its policy goals for the end-game in the Yukos affair, and that the end-game now

appears not to include bankrupting Yukos."

236.    As stated above, each of Defendants' foregoing representations constituted misstatements and omissions of material fact.  Putin, for example, speaking on behalf of Defendants Russian Federation and Rosneft, when referring  to  the independence of Russian courts on June 17, 2004, failed to explain that, despite representations to the contrary in the Constitution of the Russian Federation, the country's executive controls the judiciary.  Moreover, Kudrin's July 1, 2004, statement regarding the routine nature of the Yukos investigations omitted the material fact that politically motivated tax and other claims are themselves routine in the Russian Federation.  Additionally, like Putin before him, Kudrin omitted the material fact that the Russian Federation's executive controls the judiciary, rendering the outcome of the investigation preordained.  Defendant Miller's statement of late June 2004 regarding Gazprom's intentions regarding Yukos also were false, as will be demonstrated by Gazprom's role in the dismemberment of Yukos, which is described in paragraphs 274–277, below.

237.    Defendants' misstatements and omissions were designed to deceive Plaintiffs and other investors.  Contrary to Defendants' misstatements and omissions, Defendants planned to destroy all shareholder value in Yukos (1) by forcing the transfer of its most valuable assets to entities owned and controlled by the Russian Federation to satisfy spurious tax liabilities, and (2) by appropriating to themselves all remaining economic benefits of ownership of Yukos, thereby taking the company from its owners without payment of any compensation, in violation of Russian and international law.

238.    Plaintiffs followed the English-language press and were aware of these public misstatements and omissions and were deceived by them.  In deciding whether to purchase or to hold Yukos ADRs, Plaintiffs relied on the Defendants' misstatements that they

would not take steps to re-nationalize or bankrupt Yukos, and Plaintiffs further relied on the Defendants' omissions of material fact regarding their true intentions.

239.    The market for Yukos ADRs in the United States is open and developed, such that public statements that materially affect the overall mix of information about the security, such as Defendants' statements described above, are translated into an effect on the price of the security.

### e. Insider Trading of Yukos Shares

240.    Upon information and belief, one or more of the Defendants traded Yukos shares based on prior knowledge of the misleading statements described in this Amended Complaint, other material developments related to Yukos, and their impact on the market.  For example, in late May 2004, Defendant Gazprom, having received material, nonpublic information regarding the outcome of Yukos's pending challenge to the Russian Federation's tax demands, engaged in a short sale of Yukos stock.  Defendant Gazprom used Gazprombank, Gazprom's majority-owned subsidiary and authorized banking agent, to execute this transaction.

241.    Specifically, on May 25, 2004, and in response to orders from senior Gazprombank management, A.S. Khavin, the Head of the Treasury at Gazprombank, executed a short sale of 650,000 Yukos shares on the OTC market.  This short sale was executed the day before the Moscow Court of Arbitration issued a decision upholding 99 percent of Defendant Russian Federation's tax claims against Yukos, as described in paragraph 245, below.

242.    Khavin executed this sale himself, rather than delegating the task to one of the many traders who normally carry out stock sales for Gazprombank.  In fact, Khavin tried and failed to get one of his subordinates to conduct the sale, because such a sale of Yukos stock directly contradicted the policies and controls of Gazprombank.

243.     Before Khavin executed the short sale of Yukos stock, he approached Victor Borodulin, Head of the Securities Trading Department, and ordered Borodulin to execute the sale.     However, under Gazprombank procedures, trades were only authorized if Gazprombank's Assets and Liabilities Management Committee ("ALMC") had established trading limits for a particular stock and the proposed trade was within those limits.  In the case of Yukos stock, the ALMC had considered setting trading limits for Yukos, but had rejected trades in Yukos stock as too risky.  Borodulin therefore refused to execute the short sale of Yukos because it was against Gazprombank policy.  In fact, Borodulin was quite surprised by the request, given that he was not aware of any market trend that would support a short sale of Yukos stock.

244.     Also on May 25, 2004, Khavin and other senior Gazprombank officials asked Borodulin which stocks would fall the most if Yukos's stock plunged in value.  Borodulin said he would expect Lukoil and RAO UES stocks to fall the most.  Later that same day, Khavin instructed his traders to execute short sales of these stocks as well.  Since it was clear to Borodulin that Gazprombank management was privy to nonpublic information that would result in a fall in the price of Yukos stock, and after top management ordered short sales in Yukos, Lukoil and RAO UES, Borodulin received approval from Khavin and also closed out Gazprombank's long positions in Lukoil and RAO UES.  Although traders followed Borodulin's orders, they were reluctant to close out these long positions because there was no public information that would suggest that such an immediate sale was warranted.

245.     At the end of the day on May 26, 2004, the press reported that a Moscow Court of Arbitration had ruled against Yukos's challenge to Defendant Russian Federation's tax claims, finding that Yukos owed the government 99 billion rubles in tax liabilities.  On May 27,

2004, in response to this public announcement, the price of Yukos stock began to fall. Gazprombank closed out short positions in Yukos, Lukoil, and RAO UES that same day.

246.    This short sale of Yukos stock by Gazprom was executed contemporaneously with the stock purchase of Plaintiff Reinhardt.

247.    Upon information and belief, several of the other Defendants also engaged in Yukos stock trades based on material, nonpublic information.  As reported by *Agence France Presse* on August 10, 2004, the Russian daily newspaper *Izvestia* reported that "[o]fficials have made money with their announcements, and they will continue to do so today."  The *Izvestia* press report came after Yukos's shares rose more than 16 percent in value after a seemingly favorable court decision for Yukos was announced on Friday evening, August 6, 2004, after the market closed.  The court announced that the arrest, or seizure, of Yukos's shares in YNG was illegal.  The court then reversed its decision and re-arrested the shares hours later, but failed to announce the reversal until the following Monday.  Upon the announcement that the shares had been re-arrested, the value of Yukos stock fell by approximately 15 percent.

248.    The *Business* similarly reported on August 15, 2004 that movements in the price of Yukos's stock are suspected because "Russian officials have been deliberately holding back announcements while they speculated in Yukos stock."  Regarding the August 6 court decision, The *Business* reported that a senior Russian official close to Defendant Sechin "was shorting Yukos shares on Monday morning before the [re-]arrest of the [YNG] shares was announced."

### f. Further Deceptions Related to the Expropriation of Yukos

249.    In furtherance of the scheme set forth in this Amended Complaint, Defendant Russian Federation, beginning in early September 2004, purported to levy yet additional tax liabilities on Yukos.  The Russian Federation's assertions that these claims were

valid assessments were false. In fact, the claims had no basis in fact or Russian law, and were asserted in amounts and on demand terms designed solely to provide a basis for forcing Yukos to transfer any asset of value to an entity controlled by Defendant Russian Federation.

250.    Parallel to these public events, Defendant Russian Federation deceptively encouraged efforts initiated by Yukos's representatives to negotiate a settlement of the tax issues, misrepresenting to world leaders its receptivity to a negotiated resolution allowing for Yukos's continued existence as a viable private enterprise, all in an effort to further mask Defendants' true objective of taking Yukos from its owners and distributing its assets to state-owned commercial enterprises.

251.    Specifically, from in or around July 2004 and continuing through November 2004, the Right Honorable Jean Chrétien, former Canadian Prime Minister ("Prime Minister Chrétien"), engaged in communications with authorities at the highest levels of Defendant Russian Federation to effectuate a settlement of Yukos's tax issues on a basis that would be consistent with its continued existence as a going concern with substantial shareholder value.

252.    Following discussions with President Putin in July 2004, Prime Minister Chrétien tendered a multi-billion dollar written offer of settlement of all tax issues on behalf of Yukos. President Putin assured Prime Minister Chrétien that the Russian Federation would respond to his settlement proposal. Over the next several months, notwithstanding several inquiries by Prime Minister Chrétien, no response to the written offer of settlement was provided.

253.    In furtherance of the fraudulent and deceptive scheme to mask Defendants' true intentions as to Yukos, in or around September 2004, following meetings with

President Chirac of France and Chancellor Schroeder of Germany, Defendant Russian Federation, through President Putin, represented to President Chirac that a settlement of Yukos's tax issues was possible, and that President Putin shortly would be providing a letter to Prime Minister Chrétien setting forth his thoughts on how to proceed on Yukos.

254.    Despite Defendant Russian Federation's representations to President Chirac, no such letter was provided by President Putin to Prime Minister Chrétien.

255.    Defendant Russian Federation's promised "response" to the written tender of settlement it had invited was provided on November 19, 2004, not in the form of a letter to Prime Minister Chrétien, but in the form of a public announcement that Russia would auction off YNG, Yukos's principal asset.

256.    As reported in the *National Post* on December 10, 2004, Prime Minister Chrétien ultimately concluded that "[t]he level of arbitrary tax assessments and the [Russian] Minister of Justice's disinclination to respond to any settlement offers leaves the international community with only one conclusion . . . [t]he [Russian] Ministry of Justice is intent on expropriating Yukos without compensation."

257.    Further proof that the campaign against Yukos was unrelated to legitimate tax collection or fair-minded prosecution of tax offenses is the failure of Defendant Russian Federation to respond to any of the more than 50 proposals made by Yukos or GML Limited to resolve the outstanding tax claims.  Defendant Russian Federation did not accept any of these offers because resolution of its tax claims against Yukos was not its goal; the uncompensated expropriation of the company was.

258.    That Yukos was targeted for discriminatory treatment is also evidenced in Sibneft's settlement of its tax assessments following Defendants' interference with the  Yukos-

Sibneft merger.  In April 2005, Sibneft settled a $1 billion tax assessment for a payment in the amount of $300 million.  Defendant Russian Federation never froze or attempted to auction any of Sibneft's assets to satisfy the obligation.  Rather, Defendant Russian Federation permitted the tax authorities to resolve the matter for a small fraction of the amount due.

259.    The arbitrary nature of the tax claims against Yukos also was reinforced by a Russian court decision in April 2006 reducing the tax liabilities of YNG (now owned by Defendant Rosneft) by $4 billion, from $4.676 billion to a mere $760 million, including fines. According to the *Dow Jones International News* on May 24, 2006, "A spokesman for Rosneft said he couldn't explain the decision by the court.  'I suspect the court accepted our arguments,' he said."

260.    The *Financial Times* wryly commented on this latter point in its Lex Column on May 26, 2006 writing:

> Those looking for an explanation of this turn of events might look to the notes in Rosneft's accounts: "Legislation and regulations regarding taxation in Russia continue to evolve."  Quite.  Last December, regulators slapped another claim of $3.5 billion dollars on Yukos for the year 2004 – an amount equal to 115 percent of the company's revenues for that year.  Coming just weeks before Rosneft is due to list, the timing is fortuitous indeed.  It also confirms that the acquisition of an asset worth perhaps $30 billion or more for less than a third of that amount.

### g. Auction of Yukos Assets and Related Deceptive Statements

261.    On July 20, 2004, Defendant Russian Federation announced that it would auction off YNG, although it did not then set a date for the auction.  Immediately following this announcement, Yukos shares fell by more than 13 percent on the RTS and by 15 percent on the MICEX, the latter being forced to suspend trading for an hour. Prior to the official announcement of the date of the YNG auction, the press reported that Defendant Russian Federation would set the starting bid price as low as approximately $2 billion.  In response to

pressure to justify the opening bid, Defendant Russian Federation hired DKW Dresdner Bank to appraise the value of YNG.  Dresdner appraised the asset to be worth no less than $17 billion. Separately, Yukos received an appraisal from JP Morgan which set the value of YNG at as much as $25 billion.

262.    At and around this time, Defendants, including the Russian Federation, continued making misstatements and omissions of material fact and engaging in deceptive conduct that aimed to create the appearance that Defendants wanted neither to bankrupt Yukos nor to profit from the company's dismemberment.  Additionally, Defendants, including the Russian Federation, offered false assurances that, if Yukos assets were sold, such asset sales would abide by Russian law.  Such misstatements and omissions, which were directed at U.S. and global securities markets, are set forth below.

263.    On July 21, 2004, the day after the announcement of the YNG auction, agents acting on behalf of Defendants Gazprom and Miller and Defendants Russian Federation and Rosneft, respectively, falsely stated that neither company planned to acquire Yukos assets. As reported in *Platt's Oilgram News* the following day, Sergei Kuprianov, the spokesman for Gazprom CEO Defendant Miller, told *Ekho Moskvy*, a major Moscow radio station, that, "Gazprom is not considering acquiring Yukos assets."  Likewise, in a telephone interview with *Platt's*, Rosneft's press spokesman Alexander Stepanenko said that Rosneft was "not planning any asset acquisitions in the near future.  None."  A similar report regarding Rosneft was carried in the industry publication *Nefte Compass* on July 22, stating that Rosneft, speaking on behalf of itself and Defendant Russian Federation, "announced it is not interested in bidding for [YNG]."

264.    On September 6, 2004, Putin, speaking on behalf of Defendants Russian Federation and Rosneft, during a three-and-a-half hour meeting with Western journalists and

academics at his official residence, stated, "I don't want to bankrupt Yukos." Marshall Goldman, the Associate Director of Harvard University's Davis Center for Russian and Eurasian Studies, was present at the meeting and reported Putin's statements to the *Moscow Times*. In response to a question about whether other Russian government officials sought to bankrupt the company, Goldman cited Putin as having said, "Give me the names of the government officials who want to bankrupt Yukos and I'll fire them." Further, Putin stated, "As regards members of my administration, we aren't worried about them taking over Yukos assets." Putin's statements were also reported in the industry periodical *Energy Compass*.

265.    In an interview with the *Financial Times* published on September 13, 2004, Defendant Kudrin, speaking on behalf of himself and Defendants Russian Federation and Rosneft, dismissed as a "myth" the theory that Yukos would be forced into bankruptcy, even as government agents sealed off and searched Yukos's Moscow headquarters. Implicitly referring to the auction of YNG, Kudrin stated that, "[t]he state will do everything possible to ensure a deal takes place in accordance with the law and in an absolutely transparent and market-oriented way." The following day, Kudrin's statements were picked up by the *Moscow Times* and *International Oil Daily*. These statements were false.

266.    On September 24, 2004, speaking on behalf of Defendants Russian Federation and Rosneft, Putin falsely told reporters in Moscow, that "there was no aim to nationalize" Yukos. Putin's statement was reported in the following day's edition of the *New York Times*. Additional press reports of Putin's appearance before reporters on September 24, including that of the *Moscow Times*, wrote that Putin emphasized that, "there was no, there is no and there will be no plan for Yukos's nationalization or the state assuming control of it. . . . The state did not set before itself the task to nationalize this company or lay hands on it. And there is

no such aim now."  Additionally, Putin asserted that future Yukos asset sales would abide by Russian law: "We shall do this in strict accordance with the law.  I want to stress it – in strict accordance with the law."

267.    Also on September 24, Defendant Miller, speaking on behalf of himself and Defendant Gazprom, in an effort to deceive investors about his own and Gazprom's roles in the dismemberment of Yukos, stated that Gazprom had no interest in acquiring YNG.  "Gazprom does not have any plans to buy Yukos assets.  We are interested in this company being stable," Miller said a press conference in Helsinki, as reported by the *Moscow Times*.  Miller's deceptive comments were also reported by the *International Oil Daily*.

268.    On October 2, 2004, Defendant Miller again deceived investors, stating on behalf of himself and Defendant Gazprom, "We are not considering the possibility of taking part in an auction" of Yukos assets.

269.    On October 28, 2004, the *Moscow Times* reported that on the previous day, during an official visit to Kiev, Ukraine, Defendant Miller stated to reporters on behalf of himself and Defendant Gazprom, "I haven't heard anything about this," referring to plans by Gazprom to take part in the auction of YNG.  The newspaper wrote that, "Miller's enigmatic answer about one of the most controversial sell-offs in post-Soviet Russia came amid mounting reports tipping Gazprom as a prime contender for the unit. . . . Miller had previously denied that Gazprom would bid for [YNG]."

270.    As stated above, each of Defendants foregoing representations, constituted misstatements and omissions of material fact.  Putin's September 6, 2004 statements to Western journalists and academics simply repeated the false refrain about not wanting to bankrupt Yukos. Defendant Kudrin's mid-September 2004 assurances to the *Financial Times* regarding legality

and transparency would be shown to be utterly false by the sham auction of YNG described below. Putin's denials of any aim to nationalize Yukos would be conclusively demonstrated to be false in the looming YNG auction. Defendants Gazprom and Miller's repeated statements that Gazprom had no plans to buy Yukos assets would themselves prove false as Gazprom, and later Gazpromneft, would register as bidders in the auction of YNG. Finally, Defendant Rosneft's July 2004 statements that it, too, had no plans to acquire Yukos would be revealed as false as Rosneft would go on to acquire YNG.

271.    On or about November 19, 2004, Defendant Russian Federation announced that it would conduct an auction of YNG stock to be held on Sunday, December 19, 2004, allegedly to raise money to liquidate all or part of Yukos's alleged tax liability. The auction was scheduled for December 19 in order to effectuate the expropriation of YNG before Yukos could conduct an emergency shareholders meeting scheduled for Monday, December 20, 2004, for the purpose of approving legal actions that would impede the auction. The auction of YNG violated Russian law in that core assets of a debtor are to be sold last, not first. YNG was Yukos's principal asset, accounting for approximately 60 percent of total Yukos production.

272.    As reported by *Platt's Oilgram News* on November 22, 2004, "[w]hen the auction of [YNG] is finally held, little competition is expected. Energy minister Viktor Khristenko sidestepped the issue of the starting price [on] Nov. 19, saying the auction would decide the firm's value."

273.    The looming clouds over Yukos' future had a tangible impact on Russian oil trade with the U.S. While oil shipments to the United States, including those from Yukos, had reached 400,000 barrels/day in June and July of 2004, in November 2004 all Russian crude shipments to the U.S. fell to zero.

274.    On December 8, 2004, the Board of Directors of Gazprom authorized Gazpromneft to participate in the auction.  Under the internal arrangements adopted by the Gazprom board, Gazprom would borrow the funds that would be used by Gazpromneft to bid on and to purchase the YNG stock.

275.    As of mid-December, at least three entities had indicated to Russian officials an interest in participating in the auction as bidders: (1) Gazpromneft; (2) OAO First Venture Company; and (3) ZAO Intercom.  Thereafter, prior to the auction, these three entities were certified to participate in the auction.  Other companies had also expressed an interest in participating in the auction, including China National Petroleum Corp. ("CNPC").

276.    As a result of the campaign to destroy the company by eliminating any opportunity to satisfy massive tax levies that were confiscatory on their face,  Yukos filed for bankruptcy protection in the United States District Court for the Southern District of Texas.  *See In Re Yukos Oil Company*, Case No. 04-47742 (Bankr. S.D. Tex. filed Dec. 14, 2004).  The Bankruptcy Court noted probable jurisdiction over Yukos and, following a hearing at which Gazprom, Gazpromneft, the Russian Federation, and various financial institutions that were to finance the stock purchase were present, issued an order (1) freezing all Yukos assets including the YNG stock that was to be the subject of the auction and (2) enjoining "Gazpromneft, ZAO Interkom, OAO First Venture Company, [and the financial institutions], their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them . . . from taking any actions with respect to the stock or shares of ownership of [YNG], including, but not limited to, conducting or participating in an auction of such stock or shares of ownership."  *Yukos Oil Co. v. Russian Federation et al.*, Adv. No. 04-3952, Temporary Restraining Order (Bankr. S.D. Tex.  Dec. 16, 2004).

277.    In an effort to evade the Court Order, the Defendants, including agents and employees of Gazpromneft, Gazprom, and the Russian Federation, rescored their orchestration for the auction in two significant ways.  First, Intercom and First Venture were quietly replaced at the auction by a new company, Defendant BFG.  Defendant BFG was a sham company with no assets, no fixed address, and no prior history, whose identity remains a mystery.  Second, shortly after the Court Order was entered, Defendant Gazprom announced that it had plans to sell off its wholly owned subsidiary, Gazpromneft.  Gazpromneft's attendance at the YNG auction was imperative to the scheme to expropriate Yuganskneftegaz because, under Russian law and the terms of the auction, at least two putative bidders had to be present for a lawful auction to occur.

278.    Notwithstanding the Court Order, the auction proceeded as scheduled and lasted ten minutes.  BFG's eventual bid of $9.3 billion was uncontested and BFG thereby acquired the YNG stock for a  fraction of its actual value and barely half of the valuation established by DKW Dresdner Bank at the request of Defendant Russian Federation.  According to the Russian business daily *Vedomosti*, the two individuals that represented BFG at the auction did not participate in the Federal Property Fund's post-auction press conference.  In fact, almost immediately after the auction, BFG's two representatives left Russia.

279.    Defendant Russian Federation's agents allowed the auction to proceed despite violations of the protocol for the auction.  In particular, the requirement that at least two bidders be present was not satisfied because Gazpromneft did not substantively participate. Defendant Borisenko, Vice President of Defendant Rosneft, represented Gazpromneft at the auction.  Following an initial bid by BFG, Borisenko asked the auctioneer for permission to leave the auction room and make a telephone call to unidentified third parties, a practice contrary

to the stated auction rules.  Following the telephone call, Borisenko did not place any bid on behalf of Gazpromneft.   The auction was then reduced to a comical exercise of BFG bidding against itself to achieve what appeared to be a predetermined auction price.  As reported by the *Moscow Times*, it was clear to "every impartial observer . . . that the Russian government [was] acting beyond the bounds of its own laws."

280.    As part of the scheme to destroy Yukos, it was thus agreed among Defendants that BFG, a shell corporation, would be the sole bidder at the auction for YNG, and would thereafter transfer YNG to an entity determined by Defendants.  In this way, Defendants hoped to avoid litigation risks in U.S. courts.

281.    On December 20, 2004, the day after the YNG auction, Stanislav Belkovsky, President of the National Strategy Institute and  political consultant for Defendant Bogdanchikov, said that a group of government officials and businessmen led by Defendant Sechin was behind BFG.  According to reports cited by the *Financial Times* on December 20, Sechin "personally inspected the building where the sale of Yukos's assets took place."  The *Financial Times* also reported that another "key player in the redistribution of Yukos assets is Sergei Bogdanchikov, chief executive of Rosneft – an oil company made up of the leftovers from the privatization of the early 1990s."  Nonetheless, Rosneft publicly denied any association with BFG.

282.    On December 21, 2004, speaking on behalf of Defendants Russian Federation and Rosneft at a joint press conference with German Chancellor Gerhard Schroeder in Schleswig, Germany, Putin stated that, "the shareholders of [BFG] are exclusively private individuals . . . who have for many years engaged in the energy business."  Putin continued, explaining that these shareholders "intend[ed] to establish certain relationships with other

Russian energy companies, which may be interested in this asset." Putin's statements were reported by a number of Western dailies on December 22, including the *New York Times* and various energy periodicals. Additionally, as reported by the *International Oil Daily*, that day Putin also asserted on December 21 that "the auction [of YNG] conformed completely with current Russian law and I expect that all other activities in this area in the future will also take place according to the law."

283. Also on December 21, 2004, the *Times* of London reported that, "few people were more surprised at the result of the [YNG] auction than drinkers at the London café in Tver, 125 miles outside Moscow." The newspaper continued:

> Virtually the only thing known about BFG was that it was registered at 12B, Novoturzhskaya Street . . . in the center of Tver.
>
> When hordes of reporters descended on the address yesterday, all they found was a dilapidated building housing an off-license, a grocery, a mobile phone shop and the London Café, a favourite hangout of alcoholics and homeless people.
>
> "There's no security, just a man on the second floor who stops people from using the toilets. He was so surprised when all these journalists started taking his picture," Zoya Glazecheva, a local reporter who visited the building, said.

284. Only days after the YNG auction, and prior to the date on which payments would have been due from Defendant BFG, Defendant BFG was acquired by Defendant Rosneft. On the due date, January 11, 2005, BFG would also have been forced to disclose its true identity. "The deal suggests that the auction for [YNG] . . . was a carefully staged affair," the *Financial Times* reported on December 23, 2004. According to the December 23 edition of the *Times* of London, which described the deal as "a victory" for Putin, Rosneft "refused to reveal how much it had paid for [BFG]." The *Moscow News*, the English language edition of the Russian newspaper *Moskovskiye Novosti*, however, later reported on January 19, 2005 that a "source

84

close to the state company [Rosneft] said that the sum of the deal was a laughable 10,000 rubles ($350)." Whatever the price, as recently as October 2005, Rosneft's website characterized the acquisition of YNG as "the most monumental bargain in Russia's modern history."

285. On December 23, 2004, at his annual year-end press conference in the Kremlin, speaking on behalf of Defendants Russian Federation and Rosneft, Putin defended the auction of YNG: "Today the state, using absolutely legal market mechanisms, is securing its interests. I consider this to be quite normal." Putin's statements, which were carried by the *New York Times* and *Los Angeles Times*, could not hide the continuing absurdity surrounding the Yukos affair. As reported by the *New York Times* on December 24:

> The main subsidiary of Yukos, once Russia's largest and most profitable company, was auctioned on Sunday for a fraction of its estimated value to a previously unheard-of shell company, and later sold to Rosneft, a company owned by the state. No final sales price has been disclosed, and the process remains cloaked in mystery. Industry analysts have characterized the transfers as Kremlin-rigged farces.
>
> . . .
>
> Mr. Putin said the sales were justified and suggested they righted past wrongs. He neglected to say that as recently as late September, he said Russia had no intention of nationalizing the oil giant and had vowed transparency since then.

286. Putin himself revealed that his statements regarding the YNG auction were false in an interview with the Spanish press on February 7, 2006. As reported on the Kremlin's official website and by the RIA Novosti news agency, a journalist asked Putin, "Why does the [Russian] state use non-transparent schemes? What for? The state, [for example], uses Baikalfinansgroup to buy Yuganskneftegaz. . . . Why do you need these schemes?" Speaking on behalf of Defendants Russian Federation and Rozneft, Putin replied:

> As regards Baikalfinansgroup, everything is simple. The issue was resolved within the legal . . . field. The future owners had to think

about how they would . . . face possible [law] suits brought against them on the secondary market.  So the claims of those who later bought the property were practically reduced to zero.

287.    In addition, the Russian government has admitted that BFG received its financing for the purchase of YNG from banks controlled by Defendant Russian Federation.

288.    On December 30, 2004, despite Rosneft's post-auction purchase of BFG, Defendant Khristenko stated that Rosneft did not intend to control YNG, according to the Interfax news agency.  Khristenko's statements were false, and were made in an attempt to continue to deceive investors that Defendants had no interest in expropriating Yukos's principal production asset without compensation to its owners.

289.    Rosneft's illegal acquisition of YNG transformed Rosneft from a fledgling oil company into a wealthy enterprise.  Rosneft's earnings surged in the first half of 2005 to $2.44 billion from a mere $339.8 million a year earlier, and sales rose to $9.86 billion from $2.3 billion.  Rosneft describes on its own website how "the purchase and integration into the holding structure of Yuganskneftegaz . . . has allowed Rosneft to become a leader amongst both Russian and foreign producers of oil and oil products."

290.    In response to the YNG auction, and as reported by the *New York Times*, U.S. State Department Spokesman Adam Ereli stated that, "We certainly don't think it's been disposed of in a transparent or open way."  Ereli added that the Yukos affair "raises serious concerns about the rule of law as applied in Russia and the way that justice is perhaps politically or selectively applied."  In contrast, President Putin characterized the auction as the Russian government's use of "absolutely legal market mechanisms" to secure its interests, which, in Putin's view, was "quite normal."

291.    Prior to the auction, Gazprom and Rosneft had announced plans to merge. Given the legal uncertainties surrounding Rosneft's title to the YNG asset, however, the Russian

Federation abandoned the Gazprom-Rosneft merger in May 2005. In its place, Russia created a special purpose vehicle, Defendant Rosneftegaz, which in June 2005 entered into a $7.1 billion agreement to purchase a 10.74 percent interest in Gazprom. Following the transaction, Gazprom announced that the Russian Federation had acquired a controlling stake in the company.

292.    In June 2005, *Vedomosti* reported that files from the Russian Central Bank reflect that, to the extent funds were transferred to create the appearance of payment of the auction price, the funds were paid from the Central Bank of Russia rather than from Rosneft's accounts. None of the Defendants has denied this report of sham transfers in connection with the auction of the Yukos subsidiary.

293.    Rosneft's 2004 annual report, released in August 2005, subsequently revealed that BFG was in fact bidding on behalf of Rosneft at the YNG auction. In its annual report, Rosneft disclosed a zero percent loan made to BFG (50 billion rubles) nearly equivalent in value to the amount deposited by BFG (49.35 billion rubles) days before the YNG sale, which reserved BFG's spot in the sham auction that it ultimately "won."

294.    Defendants have taken their scheme to expropriate Yukos a step further by unlawfully seizing YNG on the one hand and refusing to assume the vast majority of YNG's liabilities on the other. As reported in the *Moscow Times* and the *Wall Street Journal Europe* of April 18, 2006, Rosneft, without questioning the legitimacy of the YNG liabilities, informed various banks in late 2005 that it would not service the vast majority of YNG's debt. At the same time, Rosneft warned the banks holding YNG's debt not to take legal action to collect the debt if the banks wanted to maintain good relations with the Kremlin.

295.    In September 2005, the Kremlin press service announced that Borisenko had been awarded the Order for Services to the Fatherland, Second Class, under a presidential

decree signed September 20.  Putin also decorated at least one other official involved in the Yukos case, Prosecutor Dmitry Shokhin, who represented the state in the trial of Yukos founder Mikhail Khodorkovsky.  According to the *Moscow Times*, Shokhin received the Order of Honor in December 2004, just days after the YNG auction."

### 7. Russian Bankruptcy Proceedings

296.    Defendants also have used Russian bankruptcy proceedings in furtherance of their scheme to expropriate Yukos without compensating its owners.  In December 2005, Defendant Rosneft agreed to pay $455 million to buy Yukos's outstanding $482 million in debt from a consortium of international banks, on the condition that those banks launch involuntary bankruptcy proceedings against Yukos in Moscow.  The banks instituted the involuntary bankruptcy proceedings in March 2006, and Rosneft's assumption of Yukos's debt shortly followed.

297.    The day after the bank consortium filed for bankruptcy in Moscow, Yukos's President Steven Theede contacted one of the banks to say that Yukos was about to close a $1 billion deal to sell its Lithuanian refinery, Mazeikiu Nafta, and would be able to repay the debt in a matter of days.  No one returned Theede's calls.

298.    Rather than accepting payment in full by Yukos, the banks initiated involuntary bankruptcy proceedings in Moscow and then promptly sold their claims to Rosneft, conveniently leaving Rosneft at the helm of the involuntary bankruptcy proceedings.

299.    As part of the involuntary bankruptcy proceedings orchestrated by Defendants, Yukos has been put under the supervision of an external manager selected by Defendant Rosneft, Eduard Rebgun.  All major decisions regarding Yukos's operations and management, including all asset sales over $1 million, go through Rebgun.

300.    Throughout the execution of their scheme to expropriate Yukos without compensation, the Defendants have continuously used the Russian courts as tools to further their unlawful conduct.  For example, in June 2006, as part of the Moscow bankruptcy proceedings, a judge in Moscow's arbitration court decided to include $13 billion of back-tax claims in Yukos's creditors' list after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials.

301.    Such maneuvers, as well as the Russian courts' repeated rulings against Yukos and Yukos allies, lead to the inevitable conclusion that the Russian court system takes direction from the Russian Federation and is biased against Yukos.  As reported in the *Financial Times* on June 19, 2006, "State companies can also seek to use a compliant judiciary and tax policy to put pressure on targets."

### D. Defendant Russian Federation's Pattern of Expropriation

302.    Although a target of discriminatory treatment by Russia, Yukos is not the only Russian company to have been re-nationalized through Byzantine corporate metamorphoses, old fashioned intimidation, and thievery.  Nor is it the first company that has sought the assistance of the United States Courts in protecting important private property rights from confiscation, as described  below.

303.    The second largest Russian export behind oil and gas is vodka.  Prior to the collapse of the Soviet Union, trademarks to Russian vodka products were state-owned.  When the Soviet Union collapsed in 1991, the vodka industry was privatized and SPI International NV ("SPI") became the legal owner of Stolichnaya Vodka, one of the most popular brands of vodka in the world.  These rights were confirmed by the statements of various Russian government officials and trade representations.

304.    Since the privatization of the Russian vodka industry took place, investors infused SPI with tens of millions of dollars to build SPI into one of the world's leading vodka producers.  For the next decade, SPI sold Stolichnaya Vodka to American and European markets without any claim by the Russian Federation.

305.    In April, 2002, the *Moscow Times* reported that the Russian Federation had set up a federal enterprise to nationalize and monopolize the vodka industry.  Since then, the Russian Federation has expropriated SPI's trademarks to Stolichnaya and other brands of Russian vodka.  In conjunction with the expropriation, the Russian Federation threatened criminal prosecutions and engaged in physical threats against SPI employees.

306.    Expropriation and confiscation has not been limited to liquids.  Recently, the Russian Federation attempted to expropriate the rights to Russian animated films (*i.e.*, cartoons).  *See Films by Jove, Inc. v. Berov*, 341 F. Supp. 2d 199 (E.D.N.Y. 2004).

307.    In *Jove*, plaintiffs acquired the exclusive copyright license for worldwide distribution outside the former Soviet Union of about 1500 Russian animated films.  The copyrights had been owned by Soyuzmultfilm, a state-owned enterprise that was transformed into a private company in which the state retained an interest.  Relying on its license agreements, plaintiffs invested more than $3 million to restore, update and revise the film library.

308.    In 1998, plaintiffs instituted a copyright-infringement action against Joseph Berov, a Russian citizen.  Berov did not dispute that he had infringed those copyrights; instead, Berov argued that the licensing agreements under which plaintiffs had been operating were invalid.  In particular, he argued that a new state-owned entity, not Soyuzmultfilm, was the actual owner of the copyrights.  The district court, finding in favor of the plaintiffs, concluded that "there was persuasive evidence that the [decision of a Russian court] was the coordinated

result of the efforts on the part of the Russian government to improperly use the courts to recapture property rights lost during privatization in Russia, and thereby expropriate without compensation the plaintiff's property rights in the lease and concomitantly cause the loss of the plaintiffs' multi-million-dollar investment." *Films by Jove*, 341 F. Supp. 2d at 202.

309.    On May 19, 2004, the European Court of Human Rights ("ECHR") ruled against Defendant Russian Federation in the case of *Gusinskiy v. Russia* for similar conduct as that alleged in this Complaint.  There Vladimir Gusinskiy, majority owner of the Russian firm Media-Most, filed suit against Defendant Russian Federation for its expropriation and confiscation of his holdings in a company known as Media-Most.  Gusinskiy had used his media outlets to champion liberal and pro-Western thinking in Russia.  In the late 1990s, when Gusinskiy became increasingly critical of Russia's political leaders, Russian authorities arrested and detained him.  They then forced Gusinskiy to transfer his interest in Media-Most to Gazprom (the same entity named as a defendant herein), in exchange for his release.  In its decision, the ECHR acknowledged the improper motivation for the Gusinskiy prosecution and found that Defendant Russian Federation had used the criminal justice system as a commercial bargaining chip and a means to engage in extortion in breach of Articles 5 and 18 of the European Convention on Human Rights. *Gusinskiy v. Russia*, 70276/01 [2004] ECHR 205 (May 19, 2004).

### E. The Consequences of Defendants' Unlawful Conduct

310.    Before Defendants seized YUL and Hulley's shares in Yukos on October 30, 2003, the market value of Yukos stock was more than $40 billion.  Since that time, Yukos's market capitalization has decreased by more than 95 percent.  Defendants have effectively re-nationalized Yukos by (1) seizing control of a majority of Yukos shares, (2) transferring Yukos's most valuable assets to commercial entities controlled by Defendant Russian Federation, and (3) diverting to state-controlled entities all remaining benefits of owning an interest in Yukos.

Moreover, Defendants have done this without paying a penny of compensation to the owners of Yukos. Plaintiffs' ADRs are now effectively worthless, and they have become worthless because Yukos's most valuable asset has been transferred to a state-owned commercial enterprise and the value of its remaining assets does not equal the unjustifiable and confiscatory tax liabilities remaining to be satisfied.

### IV. CAUSES OF ACTION

### COUNT I
### Common Law Conversion – District of Columbia Law
### (Against All Defendants)

311. Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–310, above.

312. Plaintiffs bring this claim for the unlawful conversion of property, namely, OAO NK Yukos Oil Company, of which Plaintiffs are partial owners.

313. Defendants wrongfully control and/or exercise dominion over the property of Plaintiffs in that:

(a) They have directly and wrongfully seized a majority of Yukos common stock, as described in paragraphs 182–184, above;

(b) They have directly and wrongfully seized the most valuable asset of Yukos, as described in paragraphs 261–294, above; and

(c) Through the scheme set forth in this Amended Complaint, they have created a situation in which they wrongfully realize all of the benefits that otherwise would accrue to the owners of Yukos even from the company's greatly reduced current level of operations.

314.    Defendants wrongfully continue to retain possession of the property of Plaintiffs in denial of Plaintiffs' right thereto.

315.    As a result of the foregoing conduct, Defendants have unlawfully converted property of the Plaintiffs.

316.    Each Defendant participated in, and continues to benefit from, the conversion.

317.    As a direct and proximate result of Defendants' conversion of Plaintiffs' property, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT II**
**Conversion – Law of the Russian Federation**
**(Civil Code, Ch. 59, Arts. 1064, 1068, 1069, 1080, and 1082)**
**(Against All Defendants)**

318.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1-317, above.

319.    Plaintiffs bring this claim for damages resulted from the unlawful conversion of their property by Defendants under Chapter 59 of the Civil Code of the Russian Federation, including conversion of Plaintiffs' ownership interest in OAO NK Yukos Oil Company ("Yukos").

320.    Defendants converted Plaintiffs' property through Defendants' unlawful control and/or dominion over Yukos, which resulted in destruction of Yukos as a viable entity, in that:

(a)    the Defendants have directly and unlawfully seized the most valuable asset of Yukos, YNG, as described in paragraphs 261−294, above; and

(b)    through the scheme set forth in this Amended Complaint, the Defendants have created a situation in which Defendants unlawfully realize all of the benefits that otherwise would accrue to the Plaintiffs as owners of Yukos.

321.    Defendants unlawfully continue to retain possession of and receive benefits from Plaintiffs' property in denial of Plaintiffs' right thereto.

322.    As a result of the foregoing conduct, Defendants have unlawfully converted property of the Plaintiffs.

323.    Each Defendant individually and jointly participated in, and continues to benefit from, the conversion.

324.    Through the fault of the Defendants, and as a direct and proximate result of Defendants' conversion of Plaintiffs' property, Plaintiffs have been injured and must be compensated in an amount to be determined at trial.

## COUNT III
### Conspiracy to Commit Common Law Conversion – District of Columbia Law
### (Against All Defendants)

325.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–324, above.

326.    Defendants, pursuant to an actual or tacit agreement and/or understanding, conspired to unlawfully convert property, namely, Yukos, of which plaintiffs are partial owners.

327.    Defendants have taken numerous tortious and unlawful overt acts in furtherance of this conspiracy, including unlawfully seizing the most valuable asset of Yukos, unlawfully seizing a majority of Yukos common stock, and imposing fraudulent and illegitimate tax liabilities on Yukos that are not in fact owed.

328.    Each Defendant participated in and is jointly and severally liable for the conspiracy.

329.    Defendants' conspiracy directly and proximately injured Plaintiffs, as described above, by depriving them of all of the rights associated with ownership of a commercial enterprise, including the right as Yukos's owners to participate in the control of that enterprise and to realize the economic benefits generated by the enterprise, in an amount to be determined at trial.

**COUNT IV**
**RICO**
**(Violation of 18 U.S.C. § 1962(b))**
**(Acquisition of Control of Enterprise)**
**(By Plaintiff Yukos ADR Holders Against all Defendants Except the Russian Federation, Rosneftegaz, Gazpromneft, and Rosneft (the "RICO Defendants"))**

330.    Plaintiff Yukos ADR Holders re-allege and repeat the allegations contained in paragraphs 1–329, above, except allegations of fraud in the purchase or sale of securities (*e.g.*, paragraphs 147–153, 155, 173–176, 183, 187–195, 224–231, 233–234, 236–238, 240–248, and 265–268).

331.    At all times relevant herein, each of the Plaintiff Yukos ADR Holders was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

332.    At all times relevant herein, each of the RICO Defendants was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

333.    At all times relevant herein, Yukos constituted an "enterprise," within the meaning of 18 U.S.C. § 1961(4).   At all times relevant herein Yukos also constituted an enterprise engaged in, or the activities of which affected, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1962(b).

334. RICO Defendants and their co-conspirators acquired or maintained a direct or indirect interest in and/or control of Yukos through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(b).

335. Specifically, at all times relevant herein, the RICO Defendants and their co-conspirators, on numerous occasions and acting to acquire a direct or indirect interest in and/or control of Yukos, engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

336. The pattern of unlawful activity used to acquire and maintain an interest in and control of Yukos, has included:

(a)    violations of 18 U.S.C. §§ 1341 and 1343 by making, and causing to be made, false and fraudulent pretenses, representations and statements in furtherance of the scheme set forth in this Amended Complaint and which were transported, transmitted and/or delivered in interstate or foreign commerce, including the statements set forth in paragraph 263, above. Such statements were made for the purpose of facilitating the execution of the scheme by falsely denying its existence and/or its intent (1) to replace the management of Yukos with management selected and controlled by the RICO Defendants and their co-conspirators and (2) to take Yukos from its owners, all for the purpose of preventing or minimizing opposition to the execution of the scheme;

(b)    interference with commerce within the meaning of 18 U.S.C. § 1951 involving acts of unlawful taking and wrongful use of color of official right, as set forth in this Amended Complaint. More specifically, the RICO Defendants agreed to and did make use of governmental processes and authority, including without limitation governmental processes and authority related to the imposition and collection of taxes, the seizure of private property for

the satisfaction of tax liabilities, and the application of national bankruptcy laws, all for the unlawful private, commercial motives of destroying the interests of Yukos's owners and seizing control of Yukos;

(c)     travel in interstate and foreign commerce with intent to carry on and maintain unlawful activity, as set forth in this Amended Complaint, in violation of 18 U.S.C. § 1952, including travel to and within the United States for purposes of soliciting funds to be used to maintain and exploit control of Yukos, including the travel identified in paragraphs 80–81 and 127–128, above.

(d)     conversion of Yukos property – through the confiscation of YNG and otherwise – worth more than $5,000, specifically, oil and gas produced by YNG and other Yukos producing assets and transportation of such property in foreign commerce in violation of 18 U.S.C. § 2314; and

(e)     the unlawful evasion of the Court Order prohibiting participation by various Defendants in the YNG auction, and knowingly and fraudulently receiving property from a debtor after the filing of a case under Title 11 of the U.S. Code, with intent to defeat the provisions of Title 11, through the use of sham transactions and straw entities, including BFG, in violation of 18 U.S.C. § 152, which, under 18 U.S.C. § 1961(1), constitutes an offense involving fraud connected with a case under Title 11.

337.    The foregoing acts of racketeering constituted a pattern of racketeering activity within the meaning of that term under 18 U.S.C. § 1961(5).  These acts were related to each other by virtue of:  (a) common participants in the form of the RICO Defendants, and other co-conspirators; (b) common victims including Plaintiff Yukos ADR Holders; (c) the use of common and recurring methods in commission of the racketeering acts; and (d) the common

purpose of the RICO Defendants and other co-conspirators in enriching themselves at the expense of Plaintiff Yukos ADR Holders and others, all as set forth in this Amended Complaint.

338.    As a direct and proximate result of the acquisition of an interest in and/or control of Yukos through a pattern of racketeering activity on the part of the RICO Defendants and other co-conspirators, Plaintiff Yukos ADR Holders have suffered damage to their business and property.

339.    As a result of their misconduct, the RICO Defendants and other co-conspirators are liable to Plaintiff Yukos ADR Holders for their losses in an amount to be determined at trial.

340.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Yukos ADR Holders are entitled to recover threefold their damages in addition to their costs and attorneys' fees from the RICO Defendants and other conspirators.

### COUNT V
### RICO
### (Violation of 18 U.S.C. § 1962(c))
### (Association-in-Fact Enterprise)
### (By Plaintiff Yukos ADR Holders Against the RICO Defendants)

341.    Plaintiff Yukos ADR Holders re-allege and repeat the allegations contained in paragraphs 1–340, above, except allegations of fraud in the purchase or sale of securities (*e.g.*, paragraphs 147–153, 155, 173–176, 183, 187–195, 224–231, 233–234, 236–238, 240–248, and 265–268).

342.    At all times relevant herein, each of the Plaintiff Yukos ADR Holders was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

343.    At all times relevant herein, each of the RICO Defendants was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

344.    At all times relevant herein, beginning not later than June 21, 2003 and continuing thereafter, the RICO Defendants have been associated in fact in an "enterprise," as defined in 18 U.S.C. § 1961(4).

345.    At all times relevant herein, the RICO Defendants' enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

346.    At all times relevant herein, the RICO Defendants participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).  This pattern of racketeering activity is described in paragraphs 335−338, above.

347.    Each of the RICO Defendants, and other co-conspirators, committed and/or aided and abetted the commission of two or more of the acts of racketeering activity described in paragraphs 335−338, above.

348.    As a direct and proximate result of the violation of 18 U.S.C. § 1962(c) by RICO Defendants and other co-conspirators, Plaintiff Yukos ADR Holders have suffered damage to their business and property.

349.    As a result of their misconduct, the RICO Defendants and other co-conspirators are liable to Plaintiff Yukos ADR Holders for their losses in an amount to be determined at trial.

350.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Yukos ADR Holders are entitled to recover threefold their damages in addition to their costs and attorneys' fees from the RICO Defendants and other conspirators.

**COUNT VI**
**RICO**
**(Violation of 18 U.S.C. § 1962(d) − Conspiracy to Violate §§ 1962(b) and 1962(c))**
**(Acquisition of Control of Enterprise; Association-in-Fact Enterprise)**
**(By Plaintiff Yukos ADR Holders Against the RICO Defendants)**

351.    Plaintiff Yukos ADR Holders re-allege and repeat the allegations contained in paragraphs 1−350, above, except allegations of fraud in the purchase or sale of securities (*e.g.*, paragraphs 147−153, 155, 173−176, 183, 187−195, 224-231, 233−234, 236−238, 240−248, and 265−268).

352.    At all times relevant herein, the RICO Defendants and other conspirators conspired to violate 18 U.S.C. § 1962(b) and (c); that is, each agreed to conduct and participate, directly and/or indirectly, in the scheme set forth in this Amended Complaint and, with other conspirators, committed, agreed to commit, and/or caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objectives thereof, including, but not limited to, acts set forth in this Amended Complaint.

353.    As a direct and proximate result of the RICO Defendants and other conspirators' violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damage to their businesses and property.

354.    As a result of the conspiracy to violate 18 U.S.C. §§ 1962(b) and 1962(c), the RICO Defendants and other conspirators are liable to Plaintiffs for their losses in an amount to be determined at trial.

355.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages in addition to their costs and attorneys' fees from the RICO Defendants and other conspirators.

## COUNT VII
### Common Law Fraud and Deceit – District of Columbia Law
### (Against All Defendants except Rosneftegaz (the "Fraud Defendants"))

356.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–355, above.

357.    Plaintiffs bring this claim for fraud against the Fraud Defendants arising from their misstatements and omissions of material fact that induced Plaintiffs to maintain their ownership of Yukos ADRs through and including December 19, 2004, or to purchase Yukos ADRs at artificially inflated prices.

358.    In March 2001, Yukos registered ADRs with the SEC, each ADR representing fifteen common shares of Yukos.  The ADRs were placed on the market using a New York branch of Deutsche Bank as a depositary in accordance with a deposit agreement governed by New York law.  Yukos Level-1 ADRs are traded on the OTC market in the United States and in Europe.  Yukos ADRs represent approximately 15 percent of the company's common stock, much of which is or has been owned by institutional investors and others in the United States.

359.    The market for Yukos ADRs in the United States is open and developed, such that public statements that materially affect the overall mix of information about the securities, such as the Fraud Defendants' statements above, are translated into an effect on the price of the security.

360.    As alleged more particularly above, from at least October 7, 2003, and through December 19, 2004, the Fraud Defendants engaged in a manipulative and deceptive scheme, course of business, and conspiracy to take from the owners of Yukos all of the value of their property, and to do so without payment of any compensation.

361.    In the course of such activities the Fraud Defendants made misstatements and omissions of material fact that fraudulently led investors to believe that the Fraud Defendants did not seek to expropriate Yukos without compensation to its owners. Such misstatements and omissions were made by, among others, President Vladimir V. Putin, on behalf of Defendants Russian Federation and Rosneft; Defendant Dmitry A. Medvedev, on behalf of himself and Defendants Russian Federation and Gazprom; Defendant Viktor B. Khristenko, on behalf of himself and Defendants Russian Federation, Gazprom, and Gazpromneft; Defendant Alexei L. Kudrin, on behalf of himself and Defendants Russian Federation and Rosneft; Defendant Alexei B. Miller, on behalf of himself and Defendant Gazprom; and Defendant Igor K. Yusufov, on behalf of himself and Defendants Russian Federation, Rosneft, and Gazprom.

362.    The Fraud Defendants' misstatements and omissions of material fact aimed to calm investors that otherwise would have withdrawn from the Russian Federation's capital markets.  Maintaining investor confidence in such markets enabled the Fraud Defendants to stem capital flight that would have adversely affected their personal fortunes, businesses and, in the case of Defendant Russian Federation, the national economy.   Moreover, the Fraud Defendants engaged in deliberately illegal acts to effectuate their fraudulent scheme, and had knowledge of the falsity of their representations.  The Fraud Defendants knew facts or had access to nonpublic information that cannot be reconciled with their public statements.  Plaintiffs were aware of the Fraud Defendants' misrepresentations, relied on them, and were injured as a result.

363.    As the most politically and economically powerful individuals and entities in the Russian Federation, the Fraud Defendants had the opportunity and capability of achieving the foregoing aims by the means alleged.

364.     This misrepresentation of the Fraud Defendants' true intent was part of their scheme to defraud Yukos's shareholders.   In furtherance of the scheme, the Fraud Defendants, among other things:  (i) initiated an ever escalating series of fraudulent and legally frivolous tax claims against Yukos which were, in fact, nothing more than elements of an uncompensated taking of Yukos from its owners; (ii) rejected Yukos's repeated offers to pay off the tax claims in their entirety and responded to such offers by assessing even larger claims; (iii) froze Yukos's majority interest in YNG, Yukos's most crucial and valuable asset, and then announced plans to sell off YNG, a move that so obviously violated Russian law that even a subservient Russian court declared that the Russian Federation had to first liquidate less significant assets; (iv) froze all of Yukos's Russian bank accounts, intentionally precipitating a liquidity crisis; (v) overcame impediments to its scheme to take Yukos from its owners by concocting additional fraudulent tax claims in overwhelming amounts; (vi) conducted a charade of an auction of the YNG stock; and (vii) after issuance of the bankruptcy court order enjoining the auction, acted to evade the order by, *inter alia*, creating the sham entity BFG to "buy" all the YNG stock, when in fact the true party in interest was the Russian Federation itself.

365.     The magnitude, scope, and true purpose of the Fraud Defendants' scheme and artifices to defraud Yukos and its shareholders of all value of Yukos was only revealed to the markets and the public, at the earliest, on December 19, 2004, when the Fraud Defendants completed the purported sale of YNG to BFG for an amount that was no more than half of YNG's value, all of which went to satisfy spurious tax claims rather than to compensate the owners of Yukos for their loss.  Within days, BFG, and thus YNG, was "acquired" by Defendant Rosneft.

366.    As alleged above, each of the Fraud Defendants, directly or indirectly, engaged in manipulative and deceptive schemes by directly or indirectly employing manipulative and/or deceptive artifices and devices to defraud plaintiffs of the value of their Yukos ADRs.

367.    As a direct and proximate result of the Fraud Defendants' wrongful conduct, Plaintiffs were induced to retain, and not sell, or to purchase Yukos ADRs.  Plaintiffs relied on the Fraud Defendants' misstatements and omissions of material fact in deciding to retain or to purchase Yukos ADRs.  Had the Russian Federation and the other Fraud Defendants not made intentional misrepresentations, Plaintiffs would have liquidated their Yukos ADRs at a far greater price than they in fact realized or than they now are worth, or they would not have purchased at all, or they would not have purchased at the artificially inflated prices paid.  Plaintiffs relied on the Fraud Defendants' misstatements and omissions of material fact to their detriment, as evidenced by the fact that, as the Fraud Defendants' true intent became evident, the price of Yukos ADRs fell to near zero.  Plaintiffs have been injured as a direct and proximate result of the Fraud Defendants' wrongful conduct in an amount to be determined at trial.

## COUNT VIII
### Fraud and Deceit – Law of the Russian Federation
**(Civil Code Ch. 59, Arts. 1064, 1068, 1069, 1080, and 1082;**
**Federal Law on the Securities Market, No. 39-FZ of April 22, 1996, Arts. 31–33, and 51)**
**(Against the Fraud Defendants)**

368.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–367, above.

369.    Plaintiffs bring this claim for damages resulting from fraud and deceit by the Fraud Defendants under Chapter 59 of the Civil Code and Federal Law on the Securities Market, No. 39-FZ of April 22, 1996, of the Russian Federation.  This claim arises from specific acts by the Fraud Defendants, namely their misstatements and omissions of material fact that

induced Plaintiffs to maintain their ownership of Yukos ADRs, or to purchase Yukos ADRs at artificially inflated prices. Such acts by the Fraud Defendants are described in paragraphs 361–363, above.

370. As alleged more particularly above, from at least October 7, 2003, and through December 19, 2004, the Fraud Defendants engaged in a manipulative and deceptive scheme, course of business, and conspiracy to take from the owners of Yukos all of the value of their property, and to do so without payment of any compensation. In the course of such activities the Fraud Defendants made misstatements and omissions of material fact that fraudulently led investors to believe that the Fraud Defendants did not seek to expropriate Yukos without compensation to its owners, as alleged in paragraphs 361–364, above.

371. The magnitude, scope, and true purpose of the Fraud Defendants' scheme and artifices to defraud Yukos and its shareholders of all value of Yukos was only revealed to the markets and the public, at the earliest, on December 19, 2004, when the Fraud Defendants completed the purported sale of YNG to BFG for an amount that was no more than half of YNG's value, all of which went to satisfy spurious tax claims rather than to compensate the owners of Yukos for their loss.

372. As alleged above, each of the Fraud Defendants, directly or indirectly, engaged in manipulative and deceptive schemes by directly or indirectly employing manipulative and/or deceptive artifices and devices to defraud plaintiffs of the value of their Yukos ADRs.

373. As a direct and proximate result of the Fraud Defendants' wrongful conduct, Plaintiffs were induced to retain, and not sell, or to purchase Yukos ADRs. Plaintiffs relied on the Fraud Defendants' misstatements and omissions of material fact in deciding to retain or to purchase Yukos ADRs. Had the Russian Federation and the other Fraud Defendants

not made intentional misrepresentations, Plaintiffs would have liquidated their Yukos ADRs at a far greater price than they in fact realized or than they now are worth, or they would not have purchased at all, or they would not have purchased at the artificially inflated prices paid.

374.    Plaintiffs relied on the Fraud Defendants' misstatements and omissions of material fact to their detriment, as evidenced by the fact that, as the Fraud Defendants' true intent became evident, the price of Yukos ADRs fell to near zero.  Plaintiffs have been injured as a direct and proximate result of the Fraud Defendants' wrongful conduct in an amount to be determined at trial.

**COUNT IX**
**Conspiracy to Commit Common Law Fraud and Deceit – District of Columbia Law**
**(Against All the Fraud Defendants)**

375.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–374, above.

376.    The Fraud Defendants, pursuant to an actual or tacit agreement and/or understanding, conspired fraudulently to induce Plaintiffs and others to maintain their ownership of Yukos ADRs through and including December 19, 2004, or to purchase Yukos ADRs at artificially inflated prices.

377.    The Fraud Defendants committed numerous tortious and unlawful overt acts in furtherance of this conspiracy, including, *inter alia*, making false statements concerning the intentions of the Fraud Defendants with respect to Yukos, as described in Count VII and elsewhere in this Amended Complaint.

378.    Each Defendant participated in and is jointly and severally liable for the conspiracy.

379.    As a direct and proximate result of the Fraud Defendants' conspiracy, Plaintiffs were induced to retain, and not sell, or to purchase Yukos ADRs.  Plaintiffs relied on the Fraud Defendants' fraudulent misstatements and omissions of material fact in deciding to retain or to purchase Yukos ADRs.  Had the Russian Federation and the other Fraud Defendants revealed their true intent to expropriate Yukos without compensation, Plaintiffs would have liquidated their Yukos ADRs at a far greater price than they in fact realized or than they now are worth, or they would not have purchased at all, or they would not have purchased at the artificially inflated prices paid.  Plaintiffs relied on the Fraud Defendants' misstatements and omissions of material fact to their detriment, as evidenced by the fact that, as the Fraud Defendants' true intent became evident, the price of Yukos ADRs fell to near zero.  Plaintiffs have been injured as a direct and proximate result of the Fraud Defendants' conspiracy in an amount to be determined at trial.

## COUNT X
### Aiding and Abetting Common Law Fraud and Deceit – District of Columbia Law
### (Against the "Fraud Defendants")

380.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–379, above.

381.    As set forth above, the Fraud Defendants made misstatements and omissions of material fact that fraudulently misrepresented to Plaintiffs that the Fraud Defendants did not seek to expropriate Yukos without compensation to its owners.  Such misstatements and omissions induced Plaintiffs to maintain their ownership of Yukos ADRs through and including December 19, 2004, or to purchase Yukos ADRs at artificially inflated prices.

382.    Each Fraud Defendant aided and abetted the fraud committed by each of the other Fraud Defendants, as described above.

383.    Each Fraud Defendant had actual knowledge of the fraud described above and knowingly or recklessly provided substantial assistance in the perpetration of the fraudulent conduct alleged herein.

384.    Plaintiffs relied on the Fraud Defendants' misstatements and omissions of material fact to their detriment, as evidenced by the fact that, as the Fraud Defendants' scheme became evident, the price of Yukos ADRs fell to near zero.

385.    As a direct and proximate result of the conduct of each Fraud Defendant, as described above, Plaintiffs were induced to maintain their ownership of or to purchase Yukos ADRs at artificially inflated prices and have sustained damages in an amount to be determined at trial.

## COUNT XI
### Securities Fraud
### (Violation of 15 U.S.C. §78(b))
### (By Plaintiff Yukos ADR Purchasers Against the "Fraud Defendants")

386.    Plaintiff Yukos ADR Purchasers re-allege and repeat the allegations contained in paragraphs 1–385, above.

387.    Plaintiff Yukos ADR Purchasers bring this claim for securities fraud against the Fraud Defendants arising from the Fraud Defendants' misstatements and omissions of material fact that induced Plaintiff Yukos ADR Purchasers to purchase Yukos ADRs at artificially inflated prices, or from their substantial participation in a fraudulent scheme, in which the Fraud Defendants directly or indirectly employed a manipulative or deceptive device intended to mislead investors regarding their planned expropriation of Yukos without compensation to its owners.

388.    Yukos ADRs were traded on the OTC market in the United States and in Europe.  Yukos ADRs represent approximately 15 percent of the company's common stock, much of which is or has been owned by institutional investors and others in the United States.

389.    The market for Yukos ADRs in the United States is open and developed, such that public statements that materially affect the overall mix of information about the securities, such as the Fraud Defendants' statements above, are translated into an effect on the price of the securities.

390.    The Fraud Defendants carried out a plan, scheme, and course of conduct that was intended to and did deceive the investing public, including Plaintiff Yukos ADR Purchasers, as alleged herein; and caused Plaintiff Yukos ADR Purchasers to purchase Yukos ADRs at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Fraud Defendants, together and individually, made the misleading statements set forth in Amended Complaint.

391.    The Fraud Defendants (a) employed devices, schemes, and artifices to defraud; (b) made misstatements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff Yukos ADR Purchasers in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

392.    The Fraud Defendants, individually and in concert, directly and indirectly, by the use, means and/or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Yukos as specified herein.

393.    The Fraud Defendants employed devices, schemes, and artifices to defraud, and engaged in acts to assure the investing public and the world markets that the Russian Federation would not "destroy" or "bankrupt" Yukos when, in fact, the opposite was true, and which included the making of, or the participation in the making of, misstatements of material fact and omitting to state material facts necessary in order to make the statements made about or concerning Yukos and its business and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the buyers of Yukos ADRs, including Plaintiff Yukos ADR Purchasers.

394.    The Fraud Defendants had actual knowledge of the misstatements and omissions of material fact alleged herein, or acted with reckless disregard for the truth. Such material misstatements and/or omissions and deceptive and manipulative actions of the Fraud Defendants were done knowingly or recklessly and for the purpose of manipulating the market and concealing the true objectives of the Russian Federation and the other Fraud Defendants regarding Yukos, and with the effect of artificially inflating the price of Yukos stock and ADRs.

395.    The above-described misstatements and omissions were made by, among others, President Vladimir V. Putin, on behalf of Defendants Russian Federation and Rosneft; Defendant Dmitry A. Medvedev, on behalf of himself and Defendants Russian Federation and Gazprom; Defendant Viktor B. Khristenko, on behalf of himself and Defendants Russian Federation, Gazprom, and Gazpromneft; Defendant Alexei L. Kudrin, on behalf of himself and Defendants Russian Federation and Rosneft; Defendant Alexei B. Miller, on behalf of himself and Defendant Gazprom; and Defendant Igor K. Yusufov, on behalf of himself and Defendants Russian Federation, Rosneft, and Gazprom. Additional Defendants substantially participated in

the fraudulent scheme to expropriate Yukos by directly or indirectly employing a manipulative or deceptive device intended to mislead investors. Such Defendants included, among others, Defendant Sergey Bogdanchikov, acting on behalf of himself and Defendants Russian Federation, Rosneft and BFG; Defendant Nikolai Borisenko, acting on behalf of Defendants Russian Federation, Rosneft, Gazprom, and Gazpromneft; and Defendant Igor Sechin, acting on behalf of himself and Defendants Russian Federation, Rosneft, and BFG.

396.    The Fraud Defendants' misstatements and omissions of material fact aimed to calm investors that otherwise would have withdrawn from the Russian Federation's capital markets. Maintaining investor confidence in such markets enabled the Fraud Defendants to stem capital flight that would have adversely affected their personal fortunes, businesses, and, in the case of Defendant Russian Federation, the national economy. Moreover, the Fraud Defendants knew facts or had access to nonpublic information that could not be reconciled with their public representations, which were not accurate. Plaintiff Yukos ADR Purchasers or those advising Plaintiff Yukos ADR Purchasers were aware of the Fraud Defendants' misstatements and relied on them. Plaintiff Yukos ADR Purchasers were injured as a result.

397.    As the most politically and economically powerful individuals and entities in the Russian Federation, the Fraud Defendants had the opportunity and capability of achieving the foregoing aims by the means alleged.

398.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Yukos ADRs was artificially inflated. In ignorance of the fact that the market price of Yukos ADRs was artificially inflated, and relying directly and/or indirectly on the false and misleading statements and deceptive and manipulative actions, Plaintiff Yukos ADR Purchasers acquired

Yukos ADRs which, had they known the truth, Plaintiff Yukos ADR Purchasers would not have purchased at all, or would not have purchased at the artificially inflated prices paid. Plaintiff Yukos ADR Purchasers relied on the Fraud Defendants' misstatements and omissions of material fact to their detriment, as evidenced by the fact that, as the Fraud Defendants' scheme became evident, the price of Yukos ADRs fell to near zero, and, as a result, Plaintiff Yukos ADR Purchasers were damaged.

399.    By virtue of the foregoing, the Fraud Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

400.    As a direct and proximate result of the Fraud Defendants' wrongful conduct, Plaintiff Yukos ADR Purchasers suffered damages in connection their purchases of their Yukos ADRs.

**COUNT XII**
**Insider Trading**
**Violation of Section 20A of the Exchange Act (15 U.S.C. § 78t-1(a))**
**(By Plaintiff Reinhardt Against Defendant Gazprom)**

401.    Plaintiff Reinhardt re-alleges and repeats the allegations contained in paragraphs 1–400, above.

402.    Defendant Gazprom engaged in a short sale of Yukos stock on May 25, 2004.

403.    Plaintiff Reinhardt purchased Yukos ADRs contemporaneously with the short sale of Yukos stock by Defendant Gazprom.

404.    Defendant Gazprom knew it was in possession of material, nonpublic information about Yukos at the time of its short sale of Yukos stock on May 25, 2004.

405.    By virtue of its participation in the scheme to defraud Plaintiffs described in paragraphs 387–400, above, and its short sale of Yukos stock while in possession of adverse,

material, nonpublic information concerning Yukos, Defendant Gazprom violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

406.    By virtue of the foregoing, Defendant Gazprom has violated Section 20A of the Exchange Act.

407.    As a direct and proximate result of Defendant Gazprom's wrongful conduct, Plaintiff Reinhardt has suffered damages in connection with his purchase of Yukos ADRs at artificially inflated market prices and is entitled to such damages in an amount to be determined at trial.

408.    Defendant Gazprom is required to account for all Yukos stock sales based on material, nonpublic information and to disgorge its profits or ill-gotten gains.

### COUNT XIII
### Expropriation in Violation of International Law
### (Against All Defendants)

409.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1−408, above.

410.    As holders of ADRs, Plaintiffs are owners of Yukos.

411.    Defendants have actually or constructively confiscated Yukos from all of its owners by seizing Yukos's most important asset, by subjecting Yukos to enormous and illegitimate tax liabilities, and depriving Plaintiffs and all owners of Yukos of any ability whatsoever to control their property.

412.    Defendants have neither paid nor offered any compensation to Plaintiffs or any other owners of Yukos.

413.    Defendants' actions and omissions thus constitute an expropriation in violation of international law, as set forth in numerous international treaties, customary

international laws, *jus cogens* norms, and fundamental human rights as enshrined in the Universal Declaration of Human Rights.

414.    As a result of these violations of international law, Plaintiffs have suffered injury and are entitled to judgment against Defendants on this cause of action for compensatory damages and other relief in an amount to be determined at trial.

**COUNT XIV**
**Restitution Based on Unjust Enrichment – District of Columbia Law**
**(Against Defendants Russian Federation, Rosneftegaz, Rosneft, BaikalFinansGroup,**
**Bogdanchikov, Sechin, and Borisenko ("the Unjust Enrichment Defendants"))**

415.    Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–414, above.

416.    Plaintiffs bring this claim for restitution based on unjust enrichment against Defendants Russian Federation, Rosneft, Rosneftegaz, BaikalFinansGroup, Bogdanchikov, Sechin, and Borisenko (the "Unjust Enrichment Defendants") arising from the uncompensated, and thus illegal, expropriation of Yukos from its owners and the transfer of Yukos's most valuable asset, YNG, to Rosneft, a wholly owned agency and instrumentality of the Russian Federation.

417.    The Unjust Enrichment Defendants have received and retained, and continue to receive, all profits and other economic benefits that result from the operation of YNG and Yukos, which in justice and equity belong to the owners of Yukos, including Plaintiffs.  The Unjust Enrichment Defendants, therefore, have been unjustly and unlawfully enriched at the expense of Plaintiffs.

418.    As a result of the Unjust Enrichment Defendants' unjust enrichment, Plaintiffs are entitled to restitution of their *pro rata* share of profits and other economic benefits

stemming from the operation of Yukos and any of its former assets and to the return of their *pro rata* share of the value of Yukos prior to the illegal expropriation.

## COUNT XV
### Restitution Based on Unjust Enrichment – Law of the Russian Federation
### (Civil Code, Ch. 60, Arts. 1102 – 1109)
### (Against the Unjust Enrichment Defendants)

419. Plaintiffs re-allege and repeat the allegations contained in paragraphs 1–418, above.

420. Plaintiffs bring this claim for restitution based on unjust enrichment under Chapter 60 of the Civil Code of the Russian Federation against the Unjust Enrichment Defendants arising from the uncompensated, and thus illegal, expropriation of Plaintiffs' property, including Yukos and Yukos's most valuable asset, YNG.

421. Such property has been acquired and retained by the Unjust Enrichment Defendants without legal basis. Yukos and its assets belong to the owners of Yukos, including Plaintiffs, not the Unjust Enrichment Defendants.

422. The Unjust Enrichment Defendants have received and retained, and continue to receive, all income and other economic benefits that result from the operation of Yukos, including the operation of YNG.

423. The Unjust Enrichment Defendants, therefore, have been unjustly and unlawfully enriched at the expense of Plaintiffs.

424. As a result of the Unjust Enrichment Defendants' unjust enrichment, Plaintiffs are entitled to restitution of their *pro rata* share of income and other economic benefits stemming from the operation of Yukos and any of its former assets, as well as the return of Plaintiffs' property, *i.e.*, Yukos itself. Plaintiffs are entitled to fair compensation for their lost property, in an amount to be determined at trial.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court award a judgment on all claims and award it such damages and compensation, including punitive damages, interest, attorneys fees, costs and such other relief as this Court may deem just.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

Respectfully Submitted,


\s\ O. Thomas Johnson, Jr.
O. Thomas Johnson, Jr. (Bar No. 218527)
James A. Goold (Bar No. 430315)
Marney L. Cheek (Bar No. 470596)
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401

*Attorneys for Plaintiffs*


July 13, 2006

**Exhibit A**
**Plaintiff ADR Purchasers**

| Plaintiff | Date | Number of Shares | Unit Cost | Amount |
|---|---|---|---|---|
| Richard Abel | | | | |
| Purchase | 11/24/2003 | 75 | $46.75 | $3,506.25 |
| Sale | 12/31/2004 | 75 | $2.50 | $187.75 |
| Daniel Cillie | | | | |
| Purchase | 8/3/2004 | 50 | $13.60 | $680.00 |
| Charles Devens | | | | |
| Purchase | 12/2/2003 | 5,000 | $43.76 | $218,800.00 |
| Purchase | 12/5/2003 | 5,000 | $41.51 | $207,550.00 |
| Purchase | 12/9/2003 | 2,500 | $41.41 | $103,525.00 |
| Purchase | 12/9/2003 | 2,500 | $41.51 | $103,775.00 |
| Purchase | 12/16/2003 | 3,000 | $39.91 | $119,730.00 |
| Purchase | 12/16/2003 | 2,000 | $39.76 | $79,520.00 |
| Sale | 12/20/2004 | 10,000 | $2.25 | $22,500.00 |
| Sale | 12/30/2004 | 10,000 | $2.50 | $25,000.00 |
| Edward Donahue | | | | |
| Purchase | 11/18/2003 | 500 | $47.13 | $23,565.00 |
| Purchase | 12/10/2003 | 500 | $38.52 | $19,260.00 |
| Purchase | 6/14/2004 | 500 | $26.45 | $13,225.00 |
| Sale | 12/20/2004 | 1,000 | $1.89 | $1,890.00 |
| Ci Herzog | | | | |
| Purchase | 7/1/2004 | 300 | $26.88 | $8,064.00 |
| Purchase | 10/20/2004 | 300 | $12.35 | $3,705.00 |
| David Shwayder | | | | |
| Purchase | 10/30/2003 | 100 | $46.90 | $4,690.00 |
| Purchase | 7/7/2004 | 100 | $32.70 | $3,270.00 |
| Purchase | 7/23/2004 | 100 | $21.45 | $2,145.00 |
| Sale | 3/18/2004 | 100 | $53.24 | $5,324.00 |
| Charles Smith | | | | |
| Purchase | 11/19/2003 | 120 | $42.00 | $5,040.00 |
| Purchase | 11/21/2003 | 120 | $45.75 | $5,490.00 |
| Sale | 12/29/2004 | 240 | $2.45 | $588.00 |
| Z. E. Thijssen | | | | |
| Purchase | 11/18/2003 | 1,000 | $45.94 | $45,940.52 |
| Purchase | 11/19/2003 | 1,000 | $43.42 | $43,418.43 |
| Purchase | 6/1/2004 | 1,000 | $30.71 | $30,705.90 |
| Purchase | 6/17/2004 | 1,000 | $29.80 | $29,801.79 |
| FCT America Limited | | | | |
| Purchase | 6/10/2004 | 10,000 | $30.01 | $300,100.00 |
| Purchase | 6/11/2004 | 5,000 | $28.70 | $143,500.00 |
| Purchase | 6/11/2004 | 2,500 | $28.60 | $71,500.00 |
| Purchase | 6/11/2004 | 2,500 | $28.95 | $72,375.00 |

| Plaintiff | Date | Number of Shares | Unit Cost | Amount |
|---|---|---|---|---|
| Purchase | 6/14/2004 | 10,000 | $25.80 | $258,000.00 |
| Purchase | 7/1/2004 | 10,000 | $33.70 | $337,000.00 |
| Purchase | 7/20/2004 | 10,000 | $27.50 | $275,000.00 |
| Purchase | 7/20/2004 | 10,000 | $27.00 | $270,000.00 |
| Purchase | 11/25/2004 | 20,000 | $4.00 | $80,000.00 |
| Sale | 4/19/2005 | 10,000 | $2.10 | $21,000.00 |
| Sale | 4/19/2005 | 10,000 | $2.15 | $21,500.00 |
| Sale | 5/3/2005 | 20,000 | $2.57 | $51,400.00 |
| Sale | 5/9/2005 | 10,000 | $2.50 | $25,000.00 |
| Sale | 5/13/2005 | 5,000 | $2.08 | $10,400.00 |
| Sale | 5/17/2005 | 10,000 | $2.10 | $21,000.00 |
| Sale | 5/23/2005 | 15,000 | $2.21 | $33,150.00 |
| Richard Alemian | | | | |
| Purchase | 6/23/2004 | 300 | $34.50 | $10,350.00 |
| Sale | 1/4/2005 | 300 | $3.00 | $900.00 |
| Paul D. Allen | | | | |
| Purchase | 7/1/2004 | 150 | $31.90 | $4,785.00 |
| Sale | 1/4/2005 | 150 | $3.00 | $450.00 |
| Joel Alvord | | | | |
| Purchase | 6/30/2004 | 1,000 | $32.00 | $32,000.00 |
| Purchase | 8/10/2004 | 500 | $15.10 | $7,550.00 |
| Sale | 1/4/2005 | 1,000 | $3.00 | $3,000.00 |
| Sale | 1/4/2005 | 500 | $3.00 | $1,500.00 |
| Susan Ashton-Linksey | | | | |
| Purchase | 8/26/2004 | 300 | $16.00 | $4,800.00 |
| Sale | 1/4/2005 | 300 | $3.00 | $900.00 |
| Lawrence W. Baldwin | | | | |
| Purchase | 11/10/2003 | 400 | $47.75 | $19,100.00 |
| Sale | 5/6/2004 | 100 | $39.90 | $3,990.00 |
| Matthew P. Boylan | | | | |
| Purchase | 11/04/2003 | 750 | $50.20 | $37,650.00 |
| Purchase | 11/06/2003 | 500 | $47.25 | $23,625.00 |
| Purchase | 11/14/2003 | 250 | $47.40 | $11,850.00 |
| Purchase | 12/01/2003 | 250 | $44.50 | $11,125.00 |
| Purchase | 6/16/2004 | 750 | $25.00 | $18,750.00 |
| Purchase | 6/21/2004 | 2,000 | $37.80 | $75,600.00 |
| Purchase | 7/30/2004 | 1,000 | $15.00 | $15,000.00 |
| Purchase | 9/21/2004 | 1,000 | $15.25 | $15,250.00 |
| Paul Cifrino | | | | |
| Purchase | 6/22/2004 | 300 | $35.00 | $10,500.00 |
| Purchase | 8/12/2004 | 600 | $16.00 | $9,600.00 |
| Sale | 11/11/2004 | 300 | $12.00 | $3,600.00 |
| Sale | 1/25/2005 | 600 | $2.60 | $1,560.00 |

| Plaintiff | | Date | Number of Shares | Unit Cost | Amount |
|---|---|---|---|---|---|
| George Coupounas | | | | | |
| | Purchase | 7/6/2004 | 1,000 | $28.50 | $28,500.00 |
| | Sale | 12/28/2004 | 1,000 | $3.10 | $3,100.00 |
| Arthur Davis | | | | | |
| | Purchase | 6/22/2004 | 150 | $35.00 | $5,250.00 |
| | Sale | 12/31/2004 | 150 | $2.80 | $420.00 |
| Ronald L. Foster | | | | | |
| | Purchase | 11/04/2003 | 30 | $50.00 | $1,500.00 |
| William E. Haynsworth | | | | | |
| | Purchase | 6/23/2004 | 300 | $34.50 | $10,350.00 |
| | Purchase | 8/10/2004 | 300 | $15.00 | $4,500.00 |
| | Sale | 10/4/2004 | 300 | $18.25 | $5,475.00 |
| | Sale | 1/4/2005 | 300 | $3.00 | $900.00 |
| E. Byron Hensley | | | | | |
| | Purchase | 6/23/2004 | 300 | $34.50 | $10,350.00 |
| | Purchase | 10/28/2004 | 300 | $15.00 | $4,500.00 |
| | Sale | 12/21/2004 | 300 | $1.95 | $585.00 |
| | Sale | 12/21/2004 | 300 | $1.95 | $585.00 |
| David Ingber | | | | | |
| | Purchase | 4/22/04 | 400 | $50.05 | $20,020.00 |
| Charles Libby | | | | | |
| | Purchase | 6/23/2004 | 250 | $34.75 | $8,687.50 |
| | Purchase | 8/12/2004 | 250 | $15.55 | $3,887.50 |
| | Sale | 1/4/2005 | 250 | $3.00 | $750.00 |
| | Sale | 1/4/2005 | 250 | $3.00 | $750.00 |
| Edith Mabrey | | | | | |
| | Purchase | 6/23/2004 | 150 | $34.75 | $5,212.50 |
| | Purchase | 8/12/2004 | 150 | $15.60 | $2,340.00 |
| | Sale | 9/15/2004 | 150 | $15.70 | $2,355.00 |
| Donald E. Marcus | | | | | |
| | Purchase | 6/29/2004 | 300 | $31.50 | $9,450.00 |
| | Purchase | 8/13/2004 | 300 | $17.40 | $5,220.00 |
| | Sale | 11/9/2004 | 300 | $12.50 | $3,750.00 |
| | Sale | 3/31/2005 | 300 | $2.10 | $630.00 |
| Lynn D. McCallister | | | | | |
| | Purchase | 7/1/2004 | 100 | $27.60 | $2,760.00 |
| Cynthia D. Mclaughlin | | | | | |
| | Purchase | 6/30/2004 | 100 | $32.00 | $3,200.00 |
| | Purchase | 8/17/2004 | 100 | $17.00 | $1,700.00 |
| | Sale | 1/4/2005 | 100 | $3.00 | $300.00 |
| Jolanta N. Miller and Wayne A. Miller | | | | | |
| | Purchase | 8/5/2004 | 300 | $17.30 | $5,190.00 |

A-3

| Plaintiff | | Date | Number of Shares | Unit Cost | Amount |
|---|---|---|---|---|---|
| Vincent Neisius | | | | | |
| | Purchase | 6/21/2004 | 400 | $38.20 | $15,280.00 |
| | Sale | 8/13/2004 | 100 | $17.50 | $1,750.00 |
| | Sale | 8/31/2004 | 300 | $16.50 | $4,950.00 |
| Jerry Louis Reinhardt | | | | | |
| | Purchase | 11/18/2003 | 500 | $43.00 | $21,500.00 |
| | Purchase | 5/11/2004 | 500 | $35.50 | $17,750.00 |
| | Purchase | 7/1/2004 | 500 | $29.75 | $14,875.00 |
| | Sale | 11/5/2004 | 1,500 | $11.50 | $17,250.00 |
| Jonathan Roosevelt | | | | | |
| | Purchase | 6/30/2004 | 300 | $32.10 | $9,630.00 |
| | Purchase | 9/7/2004 | 300 | $15.65 | $4,695.00 |
| | Sale | 1/4/2005 | 300 | $3.00 | $900.00 |
| Sam M. Rosenfeld | | | | | |
| | Purchase | 7/7/2004 | 1,500 | $32.00 | $48,000.00 |
| | Sale | 12/30/2004 | 1,500 | $2.50 | $3,750.00 |
| Jonathan Strong | | | | | |
| | Purchase | 8/3/2004 | 100 | $17.25 | $1,725.00 |
| | Purchase | 8/26/2004 | 100 | $15.75 | $1,575.00 |
| | Sale | 7/19/2005 | 100 | $2.45 | $245.00 |
| | Sale | 7/19/2005 | 100 | $2.45 | $245.00 |
| Thomas Urmy | | | | | |
| | Purchase | 8/16/2004 | 250 | $17.50 | $4,375.00 |
| Maxwell Van De Velde | | | | | |
| | Purchase | 6/16/2004 | 200 | $25.30 | $5,060.00 |
| | Purchase | 6/23/2004 | 100 | $34.75 | $3,475.00 |
| | Purchase | 6/30/2004 | 150 | $32.00 | $4,800.00 |
| | Purchase | 7/6/2004 | 100 | $29.75 | $2,975.00 |
| | Purchase | 7/27/2004 | 300 | $14.25 | $4,275.00 |
| | Purchase | 8/10/2004 | 300 | $15.10 | $4,530.00 |
| | Sale | 9/13/2004 | 100 | $17.25 | $1,725.00 |
| | Sale | 12/21/2004 | 200 | $1.90 | $380.00 |
| | Sale | 12/21/2004 | 300 | $1.90 | $570.00 |
| | Sale | 2/24/2005 | 100 | $3.15 | $315.00 |
| | Sale | 2/24/2005 | 300 | $3.15 | $945.00 |
| | Sale | 10/3/2005 | 500 | $4.95 | $2,475.00 |
| Mary Viscusi | | | | | |
| | Purchase | 8/4/2004 | 500 | $17.10 | $8,550.00 |
| Catherine L. Weisbrod and Lucien Weisbrod | | | | | |
| | Purchase | 10/29/2003 | 75 | $53.00 | $3,975.00 |
| | Purchase | 10/29/2003 | 40 | $53.00 | $2,120.00 |
| Judith B. Wittenberg | | | | | |
| | Purchase | 6/29/2004 | 150 | $31.65 | $4,747.50 |

A-4

| Plaintiff | Date | Number of Shares | Unit Cost | Amount |
|---|---|---|---|---|
| Richard V. Allen | | | | |
| Purchase | 10/16/2003 | 100 | $64.00 | $6,400.00 |
| Purchase | 11/7/2003 | 200 | $49.85 | $9,970.00 |
| Purchase | 12/1/2003 | 100 | $48.10 | $4,810.00 |
| Purchase | 1/2/2004 | 100 | $42.90 | $4,290.00 |
| Purchase | 8/5/2004 | 1,000 | $17.20 | $17,200.00 |
| Eugene L. Peterson | | | | |
| Purchase | 11/13/2003 | 50 | $48.00 | $2,400.00 |
| Purchase | 2/3/2004 | 50 | $42.70 | $2,135.00 |
| Purchase | 2/3/2004 | 50 | $42.70 | $2,135.00 |
| Gunther G. Wittich | | | | |
| Purchase | 11/3/2003 | 500 | $52.00 | $26,000.00 |
| Sale | 2/2/2005 | 1710 | $2.30 | $3,933.00 |