**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

RICHARD ALLEN, *et al.*,

               Plaintiffs,

      v.

RUSSIAN FEDERATION, *et al.*,

             Defendants.

1:05-cv-02077-CKK

Hon. Colleen Kollar-Kotelly

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT**
**OF THE JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**
**BY OAO GAZPROM AND ALEXEI B. MILLER**

W. Gordon Dobie  (*pro hac vice*)
Greg Vamos  (*pro hac vice*)
Brooke B. Ward
Jennifer M. Erickson
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700

William M. Sullivan, Jr. (DC Bar No. 467269)
Jane E. Chang (DC Bar No. 476545)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone:  (202) 282-5000
Facsimile:  (202) 282-5100

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

ARGUMENT ......................................................................................................................9

I.   PERSONAL JURISDICTION OVER GAZPROM AND MILLER DOES
     NOT EXIST ..............................................................................................................9

     A.   The Amended Complaint Does Not Allege Sufficient Contacts Between
          Gazprom Or Miller And The United States To Create Personal Jurisdiction........10

          1.   Plaintiffs Have Not Alleged That Gazprom Or Miller "Purposely
               Directed" Actions Toward The U.S. Or That Any Claim Arises
               Out Of Those Actions ...............................................................................10

          2.   Plaintiffs Have Not Alleged Sufficient Contacts Between Gazprom
               And The U.S. To Create General Jurisdiction ...........................................14

          3.   Plaintiffs Have Not Alleged Sufficient Contacts Between Miller
               And The U.S. To Create General Jurisdiction ...........................................20

     B.   Forcing Gazprom Or Miller To Defend This Litigation In The District Of
          Columbia Would Violate Traditional Notions Of Fair Play And Substantial
          Justice...................................................................................................................21

     C.   Personal Jurisdiction Cannot Exist Because Plaintiffs Failed To Serve
          Gazprom Or Miller In Accordance With The Hague Convention........................23

II.  THE ACT OF STATE DOCTRINE, POLITICAL QUESTION DOCTRINE
     AND DOCTRINE OF COMITY ALL REQUIRE THE DISMISSAL OF THE
     AMENDED COMPLAINT .......................................................................................24

     A.   The Act Of State Doctrine Mandates Dismissal Of The Amended Complaint .....24

     B.   The Political Question Doctrine Mandates Dismissal Of The Amended
          Complaint...............................................................................................................25

     C.   International Comity Mandates Dismissal Of The Amended Complaint.............26

III. PLAINTIFFS LACK STANDING TO PURSUE COUNTS I, II, III, IV, V, VI
     AND XIII OF THE AMENDED COMPLAINT................................................................27

IV.  THE AMENDED COMPLAINT SHOULD BE DISMISSED UNDER THE
     DOCTRINE OF *FORUM NON CONVENIENS*................................................................29

V.      PLAINTIFFS' RICO AND FEDERAL SECURITIES CLAIMS MUST BE
        DISMISSED BECAUSE THESE LAWS CANNOT BE APPLIED
        EXTRATERRITORIALLY TO THE ALLEGED CONDUCT ........................................32

VI.     PLAINTIFFS' SECURITIES FRAUD CLAIMS ARE BASELESS ...............................34

        A.      Plaintiffs Cannot Rely Upon Alleged Misstatements By Yukos'
                Competitor, Gazprom (Or Its Chairman), "In Connection With" The
                Purchase Or Sale Of A Security.................................................................35

        B.      Plaintiffs Have Failed To Plead Scienter On The Part Of Gazprom Or Miller .....36

        C.      Plaintiffs Have Failed To Allege Loss Causation..................................................37

        D.      Plaintiffs Have Failed To Allege Material Misstatements Or Omissions
                On The Part Of Gazprom Or Miller........................................................41

                1.      Plaintiffs Improperly Attribute Statements To Gazprom...........................41

                2.      No Material Misstatements Were Made By Gazprom Or Miller .............44

VII.    THE "INSIDER TRADING" COUNT AGAINST GAZPROM MUST BE
        DISMISSED ........................................................................................................45

        A.      Reinhardt Has Not Alleged Facts Supporting An Insider Trading Theory ..........46

        B.      Reinhardt Lacks Standing To Pursue Any Insider Trading Claim .......................48

        C.      Securities "Of The Same Class" Were Not Traded ...............................................50

        D.      Reinhardt Failed To Allege A Predicate Violation.................................................51

VIII.   PLAINTIFFS' RICO CLAIMS MUST BE DISMISSED .................................................51

        A.      Plaintiffs Lack RICO Standing ...........................................................................51

        B.      Plaintiffs Have Failed To Plead Viable RICO Claims...........................................52

                1.      Plaintiffs Have Failed Sufficiently To Allege Predicate Acts .................52

                        a.      Mail and wire fraud are not properly alleged.................................52

                        b.      A "Hobbs Act" claim is not adequately pled .................................54

                        c.      A "Travel Act" claim is not adequately pled .................................55

d.      A claim of transportation of stolen property is not adequately pled................................................................................................56

e.      No violation of the bankruptcy fraud statute has been pled...........57

2.      Plaintiffs Have Failed To Allege A Pattern Of Racketeering Activity Or The "Specific Nature" Of Gazprom's Or Miller's Participation..........58

3.      Count IV Fails To Sufficiently Plead That Gazprom Or Miller Acquired An Interest In Or Control Over Yukos.......................................58

4.      Count V Fails To Sufficiently Plead An Association-In-Fact Enterprise ................................................................................................59

5.      Count VI Fails To Sufficiently Plead That Gazprom Or Miller Was A Party To An Alleged RICO Conspiracy ..................................................60

6.      Plaintiffs Have Failed To Plead Causation And Damages ........................62

C.      Plaintiffs' RICO Claims Are Barred By The PSLRA ............................................62

IX.     PLAINTIFFS' COMMON LAW CAUSES OF ACTION FAIL UNDER U.S. LAW .....65

A.      Plaintiffs Have Failed To Allege Gazprom Or Miller Committed Essential Elements Of Conversion And Conspiracy To Commit Conversion....................65

1.      Plaintiffs Have Failed To Allege Essential Elements Of Conversion Under D.C. Law.........................................................................................65

2.      Plaintiffs Have Failed To Allege Essential Elements Of Conspiracy To Commit Conversion Under D.C. Law....................................................65

B.      Plaintiffs' Common Law Fraud And Deceit Claims Are Fatally Deficient...........66

1.      Plaintiffs Have Not Alleged Elements Of Common Law Fraud ...............66

2.      Plaintiffs Have Not Alleged Elements Of Conspiracy To Commit Fraud .........................................................................................................67

3.      Plaintiffs' "Aiding and Abetting Fraud" Claim Is Deficient ....................67

X.      PLAINTIFFS' EXPROPRIATION THEORY SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM .......................................................................................68

CONCLUSION....................................................................................................................70

# TABLE OF AUTHORITIES

*Cases*

Adler v. Berg Harmon Assoc., 790 F. Supp. 1222 (S.D.N.Y. 1992)..............................................61

Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315
    (6th Cir. 1999).....................................................................................................................59

AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64 (D.D.C. 2004)............... passim

Alfus v. Pyramid Tech. Corp., 745 F. Supp. 1511 (N.D. Cal. 1990)..........................................48

Allendale Mut. Ins. Co. v. Bull Data Sys., 10 F.3d 425 (7th Cir. 1993) .....................................64

Amalgamated Bank of New York v. Marsh, 823 F. Supp. 209 (S.D.N.Y. 1993) ........................58

Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991 (2006) .....................................................51, 62

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989) ..............................23

Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102 (1987) ........................9, 22

Asher v. Baxter Int'l Inc., 377 F.3d 727 (7th Cir. 2004) ...........................................................41

Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34 (D.D.C. 2003) .............................9, 16, 19

Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103
    (2d Cir. 2001)......................................................................................................................32

Backman v. Polaroid Corp., 540 F. Supp. 667 (D. Mass. 1982), aff'd, 910 F.2d 10
    (1st Cir. 1990) .....................................................................................................................49

Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379 (7th Cir. 1990)........................................28

Baisch v. Gallina, 346 F.3d 366 (2d Cir. 2003)..........................................................................62

Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321 (3d Cir. 1999)........................63

Baltierra v. West Va. Bd. of Med., 253 F. Supp. 2d 9 (D.D.C. 2003)..........................................19

Banco Nacional de Cuba v. Chemical Bank N.Y. Trust Co., 822 F.2d 230 (2d Cir. 1987) ..........69

Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964).................................................24, 26

Bancoult v. McNamara, 214 F.R.D. 5 (D.D.C. 2003) ...................................................9, 10, 13, 14

Base Metal Trading Ltd. v. Russian Aluminum, 98 Fed. Appx. 47 (2d Cir. 2004)......................30

Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory", 283 F.3d 208
    (4th Cir. 2002)...................................................................................................19

Basic Inc. v. Levinson, 485 U.S. 224 (1988) .............................................................40

Batchelder v. Kawamoto, 147 F.3d 915 (9th Cir. 1998)..........................................29

Bennett v. Kiggins, 377 A.2d 57 (D.C. 1977) ..........................................................45

Bersch v. Drexel Firestone, Inc., 519 F.2d 974 (2d Cir. 1975)...............................33

Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc., 140 F.3d 898
    (11th Cir. 1998)..................................................................................................52

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)...............................36

Brady v. Livingood, 360 F. Supp. 2d 94 (D.D.C. 2004)...........................................66

Brennan v. Chestnut, 973 F.2d 644 (8th Cir. 1992)..................................................52

Brokerwood Prods. Int'l (U.S.), Inc. v. Cuisine Crotone, Inc., 104 Fed. Appx. 376
    (5th Cir. 2004)....................................................................................................20

Brooke v. Schlesinger, 898 F. Supp. 1076 (S.D.N.Y. 1995) ....................................54

Brunson v. Kalil & Co., 404 F. Supp. 2d 221 (D.D.C. 2005)..............................10, 13

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)......................................9, 13, 17

Burrows Paper Corp. v. R.G. Eng'g, Inc., 363 F. Supp. 2d 379 (N.D.N.Y. 2005).......17

Byer Indus., Inc. v. Gulf Ins. Co., 888 F. Supp. 1 (D.D.C. 1995) ................................53

Cadle Co. v. Flanagan, 271 F. Supp. 2d 379 (D. Conn. 2003) .................................57

Cadle Co. v. Schultz, 779 F. Supp. 392 (N.D. Tex. 1991) .......................................59

Callejo v. Bancomer, S.A., 764 F.2d 1101 (5th Cir. 1985) .......................................25

Calvetti v. Antcliff, 346 F. Supp. 2d 92 (D.D.C. 2004)......................................65, 66

Casey v. Department of State, 980 F.2d 1472 (D.C. Cir. 1992).................................26

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
    511 U.S. 164 (1994)............................................................................................41

Central Freight Lines, Inc. v. APA Transp. Corp., 322 F.3d 376 (5th Cir. 2003).........20

Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. Rosvoorouzhenie,
172 F. Supp. 2d 79 (D.D.C. 2001) ..........................................................31

Chaiken v. VV Publ'g Corp., 119 F.3d 1018 (2d Cir. 1997) ...........................22

Chanoff v. United Surgical Corp., 857 F. Supp. 1011 (D. Conn. 1994),
aff'd, 33 F.3d 50 (2d Cir. 1994) ............................................................50

Chiarella v. United States, 445 U.S. 222 (1980) ..................................46, 47

Chisolm v. TranSouth Fin. Corp., 95 F.3d 331 (4th Cir. 1996) ...................53

Clay v. Riverwood Int'l Corp., 157 F.3d 1259 (11th Cir. 1998),
as modified, 176 F.3d 1381 (11th Cir. 1999) ...........................................50

Cole v. Federal Home Loan Mortg. Ass'n, No. 90-2812, 1991 WL 180295,
Fed. Sec. L. Rep. ¶ 96,234 (D.D.C. Aug. 27, 1991) ...................................38

Coleman v. American Broad. Cos., Inc., No. 84-1594, 1985 WL 365
(D.D.C. June 18, 1985) ........................................................................21

Color Sys., Inc. v. Meteor Photo Reprographic Sys., Inc., No. 86-2516,
1987 WL 11085 (D.D.C. May 8, 1987) ...................................................23

Columbraria Ltd. v. Pimenta, 110 F. Supp. 2d 542 (S.D. Tex. 2000) ...........63

COMSAT Corp. v. Finshipyards S.A.M., 900 F. Supp. 515 (D.D.C. 1995) ....11, 13

Copland v. Grumet, 88 F. Supp. 2d 326 (D.N.J. 1999) ..............................48

Covad Commc'n Co. v. Bell Atlantic Corp., 201 F. Supp. 2d 123 (D.D.C. 2002) ......64

Croker v. Carrier Access Corp., No. 05CV01011, 2006 WL 2035366
(D. Colo. July 18, 2006) .......................................................................49

D.E.&J. Ltd. P'ship v. Conaway, 133 Fed. Appx. 994 (6th Cir. 2005) ..........39

Dammarell v. Islamic Republic of Iran, No. 01-2224, 2005 WL 756090
(D.D.C. Mar. 29, 2005) ........................................................................31

Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220 (D.C. Cir. 1991) ......53, 61

Davidson v. Wilson, 973 F.2d 1391 (8th Cir. 1992) ..................................41

Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 60 F.3d 591 (9th Cir. 1995) ..............41

Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837 (2d Cir. 1998).......41

Dirks v. SEC, 463 U.S. 646 (1983)........................................................47

District Telecomm. Dev. Corp. v. District Cablevision, Inc., 638 F. Supp. 418
    (D.D.C. 1985) ................................................................................................59

Doe I v. State of Israel, 400 F. Supp. 2d 86 (D.D.C. 2005)................................... passim

Dover Ltd. v. A.B. Watley, Inc., 423 F. Supp. 2d 303 (S.D.N.Y. 2006).......................42

Dow Chem. Co. v. Calderon, 422 F.3d 827 (9th Cir. 2005).....................................12

Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) ............................................. passim

Eastman Outdoors Inc. v. Archery Trade Ass'n, No. 05-74015, 2006 WL 1662641
    (E.D. Mich. June 6, 2006)................................................................................17

Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260 (D.C. Cir. 1995) .........58

EEOC v. Arabian American Oil Co., 499 U.S. 244 (1991)......................................32

Egilman v. Keller & Heckman, LLP, 401 F. Supp. 2d 105 (D.D.C. 2005)...................17

Ellicott Mach. Corp. v. John Holland Party, Ltd., 995 F.2d 474 (4th Cir. 1993) .........22

Ellipso, Inc. v. Mann, No. 05-1186, 2006 WL 1126814 (D.D.C. Apr. 27, 2006) .................66, 67

Erne Shipping Inc. v. HBC Hamburg Bulk Carriers GMBH & Co. KG,
    409 F. Supp. 2d 427 (S.D.N.Y. 2006)................................................................17

Everett v. Nissan Motor Corp., 628 A.2d 106 (D.C. 1993) .....................................21

Eze v. Yellow Cab Co., 782 F.2d 1064 (D.C. Cir. 1986) .........................................64

Fandel v. Arabian American Oil Co., 345 F.2d 87 (D.C. Cir. 1965)...........................16

Far West Capital v. Towne, 46 F.3d 1071 (10th Cir. 1995) .....................................14

First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004).................61

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994).................62

Florida Evergreen Foliage v. E.I. duPont de Nemours & Co., 165 F. Supp. 2d 1345
    (S.D. Fla. 2001), aff'd, 341 F.3d 1292 (11th Cir. 2003)............................................63

Flynn v. Merrick, 881 F.2d 446 (7th Cir. 1989) .....................................................27

Gaff v. Federal Deposit Ins. Corp., 814 F.2d 311 (6th Cir. 1987),
    vacated in part on other grounds, 828 F.2d 1145 (6th Cir. 1987)............................27

Gates Learjet Corp. v. Jensen, 743 F.2d 1325 (9th Cir. 1984) .....................................17

Gatz v. Ponsoldt, 297 F. Supp. 2d 719 (D. Del. 2003) ................................................64

General Elec. Co. v. Deutz A.G., 270 F.3d 144 (3d Cir. 2001)......................................27

Gershon v. Wal-Mart Stores, Inc., 901 F. Supp. 128 (S.D.N.Y. 1995) ...........................35

Gowens v. DynCorp, 132 F. Supp. 2d 38 (D.D.C. 2001) .........................................10, 13

Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947) ....................................................30, 31

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) ...................................................68

Hall v. Clinton, 285 F.3d 74 (D.C. Cir. 2002) ...........................................................66

Harlow v. Children's Hosp., 432 F.3d 50 (1st Cir. 2005)...............................................16

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408 (1984) ............................10, 19

Hemispherx Biopharma, Inc. v. Asensio, No. CIV. A. 98-5204, 1999 WL 144109
    (E.D. Pa. Mar. 15, 1999)................................................................................63

Hernandez v. Ballesteros, 333 F. Supp. 2d 6 (D.P.R. 2004), aff'd, 449 F.3d 240
    (1st Cir. 2006) .............................................................................................54

Holmes v. Securities Investor Prot. Corp., 503 U.S. 258 (1992).....................................51

Howard v. America Online, Inc., 208 F.3d 741 (9th Cir. 2000)........................................64

IDT Corp. v. eGlobe, Inc., 140 F. Supp. 2d 30 (D.D.C. 2001)....................................34, 36

IM Partners v. Debit Direct Ltd., 394 F. Supp. 2d 503 (D. Conn. 2005) ...........................23

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999).........................................51

In re AST Research Sec. Litig., 887 F. Supp. 231 (C.D. Cal. 1995) .................................48

In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1 (D.D.C. 2000) .........................................33

In re Dein Host, Inc., 835 F.2d 402 (1st Cir. 1987) ......................................................27

In re EAL (Delaware) Corp., No. 93-578, 1994 WL 828320 (D. Del. Aug. 3, 1994)...................12

In re Empyrean Bioscience, Inc. Sec. Litig., 255 F. Supp. 2d 751 (N.D. Ohio 2003)....................44

In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d 1018 (C.D. Cal. 2003),
    aff'd, 2006 WL 1791042 (9th Cir. June 30, 2006) ..................................................41

In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724 (W.D. Ky. 2004) .......................44

In re Loewen Group, Inc., No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004)...............36

In re MicroStrategy Inc. Sec. Litig., 115 F. Supp. 2d 620 (E.D. Va. 2000) ...........................48, 49

In re Redback Networks, Inc., No. C03-5642, 2006 WL 1805579
    (N.D. Cal. Mar. 20, 2006)........................................................................................48

In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334 (D. Md. 2004)...............13, 44

In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860 (S.D. Tex. 2001)..............................46

In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, No. 1428 01 Civ. 7342,
    2003 WL 1807148 (S.D.N.Y. Apr. 4, 2003)..............................................................18

In re Sotheby's Holdings, Inc., No. 00 Civ. 1041, 2000 WL 1234601,
    Fed. Sec. L. Rep. ¶ 91,059 (S.D.N.Y. Aug. 31, 2000).........................................42, 44

In re Sunrise Sec. Litig., 916 F.2d 874 (3d Cir. 1990)..................................................................52

In re Verifone Sec. Litig., 784 F. Supp. 1471 (N.D. Cal. 1992), aff'd,
    11 F.3d 865 (9th Cir. 1993) ....................................................................................48

In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288, 2003 WL 21488087
    (S.D.N.Y. June 25, 2003).........................................................................................42

In re Yukos Oil Co., 321 B.R. 396 (Bankr. S.D. Tex. 2005).......................................7, 12, 13, 23

Information Res., Inc. v. Dun & Bradstreet Corp., 127 F. Supp. 2d 411 (S.D.N.Y. 2000)...........64

Interbrew, S.A. v. EdperBrascan Corp., 23 F. Supp. 2d 425 (S.D.N.Y. 1998) ............................33

International Shoe Co. v. Washington, 326 U.S. 310 (1945) ...........................................................9

Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697 (2d Cir. 1994).........................51

Jackson v. American Univ. in Cairo, 52 Fed. Appx. 518 (D.C. Cir. 2002)...................................29

Jacobsen v. Oliver, 201 F. Supp. 2d 93 (D.D.C. 2002) ..................................................................6

Jet Charter Serv., Inc. v. Koeck, 907 F.2d 1110 (11th Cir. 1990) .................................................13

Johnson v. Woodcock, 444 F.3d 953 (8th Cir. 2006) ....................................................................16

Jones v. Meridian Towers Apartments, Inc., 816 F. Supp. 762 (D.D.C. 1993)............................60

Kaempe v. Myers, 367 F.3d 958 (D.C. Cir. 2004) ..........................................................................6

Koal Indus. Corp. v. Asland, S.A., 808 F. Supp. 1143 (S.D.N.Y. 1992) ......................................33

Kowal v. MCI Commc'ns Corp., No. 90-2862, 1992 WL 121378
   (D.D.C. May 20, 1992), aff'd, 16 F.3d 1271 (D.C. Cir. 1994)...................................35

Labovitz v. Washington Times Corp., 900 F. Supp. 500 (D.D.C. 1995),
   aff'd, 172 F.3d 897 (D.C. Cir. 1999) ......................................................................28

Lakonia Mgmt., Ltd. v. Meriwether, 106 F. Supp. 2d 540 (S.D.N.Y. 2000) ................52

Leach v. F.D.I.C., 860 F.2d 1266 (5th Cir. 1988)........................................................52

Lee v. State Comp. Ins. Fund, No. 05-670, 2005 WL 1903343 (D.D.C. July 13, 2005) ........19, 21

Lindblom v. Mobile Telecomms. Techs. Corp., 985 F. Supp. 161 (D.D.C. 1997) .......................35

Manson v. Stacescu, 11 F.3d 1127 (2d Cir. 1993)........................................................52

Marcantonio v. Primorsk Shipping Corp., 206 F. Supp. 2d 54 (D. Mass. 2002)...........................23

Mays v. Meeks, No. 05-2116, 2006 WL 890671 (D.D.C. Apr. 5, 2006) .....................................21

McCreary v. Heath, No. 04-0623, 2005 WL 3276257 (D.D.C. Sept. 26, 2005) ...........................66

Medellin v. Dretke, 544 U.S. 660, 125 S. Ct. 2088 (2005) ...........................................26

Miller v. Champion Enters., Inc., 346 F.3d 660 (6th Cir. 2003) ...................................37

Miller v. Yokohama Tire Corp., 358 F.3d 616 (9th Cir. 2004) ......................................53

Minebea Co. v. Papst, 377 F. Supp. 2d 34 (D.D.C. 2005)............................................31

Moncrief Oil Int'l, Inc. v. OAO Gazprom, Civ. No. 4:05-CV-353-Y, slip op.
   (N.D. Tex. March 21, 2006) ......................................................................18, 21

Morales v. New Valley Corp., 936 F. Supp. 119 (S.D.N.Y. 1996) ................................50

Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105 (S.D.N.Y. 1993).............33

Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd., 91 F.3d 790 (6th Cir. 1996)....................20

Neder v. United States, 527 U.S. 1 (1999).................................................................53

Network Project v. Corporation for Pub. Broad., 561 F.2d 963 (D.C. Cir. 1977).......................64

New York State Bar Ass'n v. FTC, 276 F. Supp. 2d 110 (D.D.C. 2003)....................................43

Newby v. Lay (In re Enron Corp. Sec.), 258 F. Supp. 2d 576 (S.D. Tex. 2003)....................48, 50

Nix v. Hoke, 62 F. Supp. 2d 110 (D.D.C. 1999) .........................................................14

North South Fin. Corp. v. Al-Turki, 100 F.3d 1046 (2d Cir. 1996) ...............................32

Novak-Canzeri v. HRH Al Saud, 864 F. Supp. 203 (D.D.C. 1994) ...............................14

O'Donnell v. Shalayev, No. 01-4721, 2004 WL 2958698 (D.N.J. Dec. 22, 2004)......................23

Oetjen v. Central Leather Co., 246 U.S. 297 (1918) ....................................................25

OMI Holdings, Inc. v. Royal Ins. Co., 149 F.3d 1086 (10th Cir. 1998)................................14, 22

Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97 (1987) ...........................................23

Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,
    369 F.3d 27 (2d Cir. 2004).........................................................................35

OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F. Supp. 2d 357 (S.D.N.Y. 2005) ...................32

Painewebber Inc. v. Chase Manhattan Private Bank (Switz.), 260 F.3d 453 (5th Cir. 2001) .......12

Pavlov v. Bank of N.Y. Co., 135 F. Supp. 2d 426 (S.D.N.Y. 2001),
    vacated on other grounds, 25 Fed. Appx. 70 (2d Cir. 2002)....................................30

Pieczenik v. Cambridge Antibody Tech. Group, No. 03 Civ. 6336, 2004 WL 527045
    (S.D.N.Y. Mar. 16, 2004) ........................................................................18

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981).........................................29, 30, 31

Provenz v. Miller, 102 F.3d 1478 (9th Cir. 1996) .......................................................37

Quickturn Design Sys., Inc. v. Meta Sys., No. C-96-0881, 1996 WL 671230
    (N.D. Cal. Oct. 31, 1996).........................................................................17

Quinto v. Legal Times of Washington, Inc., 506 F. Supp. 554 (D.D.C. 1981) ...........................21

Redmond v. Birkel, 933 F. Supp. 1 (D.D.C. 1996) ......................................................67

Reebok Int'l Ltd. v. McLaughlin, 49 F.3d 1387 (9th Cir. 1995) .....................................12

Reese v. Geneva Enters., Inc., No. 96-1575, 1997 WL 214864 (D.D.C. Apr. 18, 1997).............21

Republic of Austria v. Altmann, 541 U.S. 677 (2004) ..................................................24

Reves v. Ernst & Young, 507 U.S. 170 (1993).............................................................60

Rewis v. United States, 401 U.S. 808 (1971) ..............................................................55

Richard v. Bell Atlantic Corp., 976 F. Supp. 40 (D.D.C. 1997).........................................20

Riddell v. Riddell Washington Corp., 866 F.2d 1480 (D.C. Cir. 1989) .......................................65

Riggs Nat'l Corp. & Subsidiaries v. Commissioner, 163 F.3d 1363 (D.C. Cir. 1999) ................24

Roeder v. Alpha Indus., Inc., 814 F.2d 22 (1st Cir. 1987) ............................................52

Rong v. Liaoning Provincial Gov't, 362 F. Supp. 2d 83 (D.D.C. 2005),
    aff'd, 452 F.3d 883 (D.C. Cir. July 7, 2006)...............................................................69

Rylewicz v. Beaton Servs., Ltd., 888 F.2d 1175 (7th Cir. 1989)....................................52

Saadeh v. Farouki, 107 F.3d 52 (D.C. Cir. 1997) ........................................................64

Saleh v. Tital Corp., 436 F. Supp. 2d 55 (D.D.C. 2006)...............................................21

Salovaara v. Jackson Nat'l Life Ins. Co., 66 F. Supp. 2d 593 (D.N.J. 1999) ...............48

Sedima, S. P. R. L. v. Imrex Co., 473 U.S. 479 (1985) ................................................62

Semon v. Ledecky (In re United States Office Prods. Sec. Litig.), 326 F. Supp. 2d 68
    (D.D.C. 2004) ....................................................................................................34, 36

Shulman v. Voyou, L.L.C., 251 F. Supp. 2d 166 (D.D.C. 2003) ...................................65

Siam Kraft Paper Co. v. Parsons & Whittemore, Inc., 400 F. Supp. 810 (D.D.C. 1975),
    aff'd, 521 F.2d 324 (D.C. Cir. 1975) ......................................................................18

Simplicity Inc. v. MTS Prods., Inc., No. 05-3008, 2006 WL 924993
    (E.D. Pa. Apr. 6, 2006) ..........................................................................................16

Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for
    Southern Dist. of Iowa, 482 U.S. 522 (1987) ...........................................................26

Sparling v. Hoffman Constr. Co., 864 F.2d 635 (9th Cir. 1988) ..................................52

Stephenson v. Deutsche Bank AG, 282 F. Supp. 2d 1032 (D. Minn. 2003) ................63

Stuhley v. Hyatt, 667 F.2d 807 (9th Cir. 1982) ..........................................................57

Sturdza v. Gov't of the United Arab Emirates, 281 F.3d 1287 (D.C. Cir. 2002) .........67

Sunlite, Inc. v. BFG Bank AG, 849 F. Supp. 74 (D.D.C. 1994)....................................21

T. Rowe Price New Horizon Fund, Inc. v. Preletz, 749 F. Supp. 705 (D. Md. 1990)...................48

Tal v. Hogan, 453 F.3d 1244 (10th Cir. 2006) ...........................................................61

Tarasevich v. Eastwind Transport Ltd., No. 02 Civ. 1806, 2003 WL 21692759
    (S.D.N.Y. July 21, 2003) ........................................................................................30

Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984)..............................25

Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134 (5th Cir. 1992) ..............................54, 61

Theoharous v. Fong, 256 F.3d 1219 (11th Cir. 2001) ....................................................................37

Tittle v. Enron Corp. (In re Enron Corp. Sec. Deriv. & ERISA Litig.),
  284 F. Supp. 2d 511 (S.D. Tex. 2003) .............................................................................63, 64

Tomran, Inc. v. Passano, 891 A.2d 336 (Md. App. Ct. 2006) .......................................................29

Torah Soft Ltd. v. Drosnin, 136 F. Supp. 2d 276 (S.D.N.Y. 2001).................................................64

Trudeau v. FTC, 456 F.3d 178 (D.C. Cir. 2006) ...........................................................................42

TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976) ..............................................................45

United States ex rel. Fisher v. Network Software Assoc., 227 F.R.D. 4 (D.D.C. 2005) ...............67

United States v. Cassese, 273 F. Supp. 2d 481 (S.D.N.Y. 2003) ..................................................47

United States v. Corona, 885 F.2d 766 (11th Cir. 1989) ...............................................................56

United States v. Ferrara, 54 F.3d 825 (D.C. Cir. 1995) ................................................................10

United States v. French, 483 F. Supp. 523 (E.D. Mo. 1980), rev'd on other grounds,
  628 F.2d 1069 (8th Cir. 1980) ..............................................................................................54

United States v. Kramer, 73 F.3d 1067 (11th Cir. 1996)................................................................56

United States v. Markowski, 772 F.2d 358 (7th Cir. 1985)............................................................56

United States v. Merklinger, 16 F.3d 670 (6th Cir. 1994)..............................................................53

United States v. Morrow, No. 04-355, 2005 WL 1389256 (D.D.C. June 13, 2005) ....................60

United States v. O'Hagan, 521 U.S. 642 (1997)............................................................................47

United States v. Richardson, 167 F.3d 621 (D.C. Cir. 1999) ........................................................59

United States v. Smithfield Foods, Inc., 332 F. Supp. 2d 55 (D.D.C. 2004)..............................9, 14

United States v. Tillem, 906 F.2d 814 (2d Cir. 1990) ....................................................................54

United States v. Turkette, 452 U.S. 576 (1981)..............................................................................59

United States v. Vanichromanee, 742 F.2d 340 (7th Cir. 1984).....................................................56

Utz v. Correa, 631 F. Supp. 592 (S.D.N.Y. 1986).........................................................................54

VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696 (6th Cir. 2000) ...........................53

Varnelo v. Eastwind Transport, Ltd., No. 02 Civ. 2084, 2003 WL 230741
    (S.D.N.Y. Feb. 3, 2003) ....................................................................................30

Virginia Academy of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.,
    878 A.2d 1226 (D.C. App. 2005)........................................................................67

W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400 (1990) ......................24

Wagh v. Metris Direct, Inc., 363 F.3d 821 (9th Cir. 2003) ............................................59

Warren v. Manufacturers Nat'l Bank, 759 F.2d 542 (6th Cir. 1985) ...........................................52

Western Assocs. Ltd. P'ship v. Market Square Assocs., 235 F.3d 629
    (D.C. Cir. 2001) ...........................................................................52, 58, 59

Wiggins v. Equifax Inc., 853 F. Supp. 500 (D.D.C. 1994)............................................................20

Wilson v. Comtech Telecomm. Corp., 648 F.2d 88 (2d Cir. 1981) ..............................................49

Wright v. Ernst & Young LLP, 152 F.3d 169 (2d Cir. 1998)....................................................41, 43

Wright v. Herman, 230 F.R.D. 1 (D.D.C. 2005) ........................................................................28

Yadlosky v. Grant Thornton, L.L.P., 120 F. Supp. 2d 622 (E.D. Mich. 2000) ...........................63

### *Statutes*

15 U.S.C. § 78t-1 .....................................................................................................45, 46

15 U.S.C. § 78u-4 ...................................................................................................34, 36

18 U.S.C. § 1341 ......................................................................................................52, 53

18 U.S.C. § 1343 ......................................................................................................52, 53

18 U.S.C. § 152...............................................................................................................57

18 U.S.C. § 1951 ......................................................................................................54, 55

18 U.S.C. § 1952 ...........................................................................................................55

18 U.S.C. § 1962(b) ........................................................................................................58

18 U.S.C. § 1962(c) ........................................................................................................58

18 U.S.C. § 1962(d) ..................................................................................................58, 60

18 U.S.C. § 1964...........................................................................................................51

18 U.S.C. § 2314 ................................................................................................57

D.C. Code § 29-1052 ...........................................................................................28

***Other Authorities***

Energy Charter Treaty, Article 13, 33 I.L.M. 360                                     69

Federal Law No. 208-FZ of Dec. 26, 1995 on Joint-Stock Companies                    28

***Rules***

Fed. R. Civ. P. 4(k)(2) ........................................................................................ 23

Fed. R. Civ. P. 9(b) ............................................................................... 34, 53, 67

***Treatises***

1 William Meade Fletcher, <u>Fletcher Cyclopedia of Law of Private Corporations</u> § 31 (1999) ... 68

14 <u>Am. Jur.</u> 2d Champerty, Maintenance, and Barratry § 1 ......................................... 5

Restatement (Third) of Foreign Relations Law of the United States § 711 (1987) ..................... 68

Restatement (Third) of Foreign Relations Law of the United States § 712 (1987) ..................... 68

Restatement (Third) of Foreign Relations Law of the United States § 713 (1987) ..................... 68

## **INTRODUCTION**

Rather than comply with an agreed order setting forth a timetable to respond to defendants' comprehensive motions to dismiss the complaint, plaintiffs – individuals who claim to have held, bought, or sold American Depository Receipts ("ADRs") in Yukos Oil Co. ("Yukos"), a large Russian oil and gas company – abruptly filed an amended complaint that is 121 pages in length (including an appendix), contains 424 paragraphs, and includes many additional causes of action. The new allegations and theories of relief, however, only serve to confirm that the amended complaint should be promptly dismissed.

Just as with the initial complaint, plaintiffs' amended complaint centers on the highly publicized, government-ordered auction of a division of Yukos and on other law-enforcement actions taken to satisfy Yukos' $27.5 billion unpaid tax obligation owed to the Russian Federation. As the amended complaint alleges, both Yukos and the division that was auctioned, Yuganskneftegas ("YNG"), are involved in the extraction and refinement of oil and gas reserves located under the soil of the Russian Federation. The auction occurred in the Russian Federation after lengthy Russian enforcement and court proceedings that upheld the tax fraud rulings against Yukos. Plaintiffs claim that, well after the alleged, highly-publicized "campaign" to "expropriate" Yukos was instituted in 2003, they were somehow lulled into purchasing Yukos ADRs by alleged statements of members of the Russian Federation and Yukos' business adversaries suggesting that Yukos' future, contrary to ongoing events, was bright.

As with the first iteration of the complaint, the amended complaint improperly seeks to drag across the ocean the Russian Federation and various Russian companies, officials, and individuals that have no meaningful connection to the United States or to the District of Columbia. Further, notwithstanding its prolixity, the amended complaint still suffers from a fatal

absence of any facts providing a basis for personal jurisdiction over defendants OAO Gazprom ("Gazprom") and its Chairman, Alexei B. Miller ("Miller"). Just as fatally, the amended complaint again improperly seeks to have this Court sit in judgment of the sovereign actions of the Russian Federation and declare its taxing, law enforcement, and regulatory actions to be illegal, and reverse the Russian authorities' determination that Yukos engaged in massive tax fraud under Russian law. Not only does the amended complaint seek and require this intrusion into another nation's sovereign affairs, it reiterates plaintiffs' demand that the Court use U.S. federal securities and RICO statutes in unprecedented ways to supplant the laws of the Russian Federation. The amended complaint also confirms that plaintiffs possess little or no standing to pursue their novel claims – claims that, to the extent they should be pursued at all, should proceed in the appropriate forum: the Russian Federation.

Plaintiffs have mistaken this Court for a tribunal authorized to hear and decide international political grievances. This Court should now dismiss this case against all defendants, including Gazprom and Miller. First, there is no personal jurisdiction over these defendants. As alleged in the amended complaint, Gazprom is an oil and gas company headquartered and located in the Russian Federation. Miller is a Russian citizen who serves as Gazprom's Chairman in the Russian Federation. The amended complaint is devoid of any meaningful connection between Gazprom or Miller and the District or the United States; the amended complaint does not allege that Gazprom maintains any real property, personnel or offices or conducts any meaningful business in the United States or that Miller has any cognizable contacts with the United States. Second, there is no plausible legal claim or theory to assert against these defendants. Among the 424 paragraphs in the amended complaint, neither Gazprom nor Miller is alleged to have taken any actions with respect to the auction and sale of

Yukos; indeed, Gazprom is alleged *not* to have participated in the auction (after selling off a subsidiary that was authorized to participate) and is not alleged to have acquired anything belonging to Yukos.  Further, plaintiffs have no viable legal theory under which Gazprom or Miller could be liable for securities (or any other) fraud to Yukos ADR holders; and, they fail to plead detailed facts establishing defendants' scienter, false statements, reliance and causation.  Finally, under well-settled act of state, political question, and comity doctrines, and basic rules of standing and *forum non conveniens*, this action cannot proceed in this Court.

## BACKGROUND

The 43 plaintiffs in this case are holders and former holders of ADRs in Yukos who claim to have bought or sold limited quantities of ADRs during the 2003-2005 timeframe over the OTC market and the London Stock Exchange.  (Am. Compl. ¶¶ 12-59.)  Plaintiffs are United States citizens, with the exceptions of plaintiffs Z.E. Thijssen (Netherlands), FCT America Limited (Cayman Islands corporation), and William McDonnell (St. Kitts & Nevis).  (Id.)

The acts and events of which plaintiffs complain involved official acts of the Russian Federation taking place entirely outside the borders of the United States, inside the sovereign Federation of Russia.  As plaintiffs themselves state, their amended complaint centers on the alleged "re-nationalization" or "expropriation" of Yukos.  (Id. ¶¶ 1, 2, 3, 153, 183, 195, 237, 270, 288, 294, 296, 310.)  The opening paragraphs of the amended complaint, which purport to summarize "the two ways" in which the alleged confiscation of Yukos has taken place, make the official character of the events plaintiffs challenge tellingly clear.  First, plaintiffs complain of "tax levies" and a government "seizure" of Yukos' "most important asset."  (Id. ¶ 2.)  Second, plaintiffs complain that the government of the Russian Federation engaged in a "direct seizure" of "a majority of Yukos shares" and intimidated Yukos' management, leading to the Russian

Federation's alleged installation of its own management of Yukos. (Id.) As detailed below, these highly public events began in 2003, well before any of the plaintiff-ADR holders purchased their first share.

Plaintiffs allege that Yukos became involved in the extraction, refinement, and sale of oil and gas products in the Russian Federation. (Id. ¶¶ 85, 99, 103.) Russian oligarch Mikhail Khodorkovsky and the entity he founded, Group Menatep, gained control over Yukos. (Id. ¶¶ 86, 87.) Khodorkovsky was a member of Yukos' board of directors and also headed Yukos' management company. (Id. ¶ 86.) Yukos has common stock that trades on the Russian stock market; separately, Yukos Level-1 ADRs are traded on the OTC market. (Id. ¶ 104.)

According to the amended complaint, beginning in "mid-2003," the Russian Federation began investigating criminal wrongdoing on the part of Yukos, Khodorkovsky, and members of Group Menatep and also began taking highly publicized law-enforcement actions against them. The amended complaint alleges that the Russian Federation arrested Yukos' security manager in June 2003 (id. ¶ 143), arrested the director of Group Menatep in July 2003 (id. ¶ 144) and arrested Khodorkovsky in October 2003 (id. ¶ 145). As plaintiffs themselves allege, "[n]ews of Khodorkovsky's arrest roiled the securities and commodities markets throughout the world." (Id. ¶ 147.) Khodorkovsky allegedly remained in custody until he was convicted of tax evasion and fraud in May 2005. (Id. ¶ 163.) The Federation also filed charges against and sought the arrest of numerous other "Yukos officials and founders of" Group Menatep. (Id. ¶ 157.)[1]

---

[1]    Published accounts state that this litigation is being financed by Group Menatep. See "New legal threat over Yukos sale," Financial Times, July 10, 2006, available at http://news.moneycentral.msn.com/ provider/providerarticle.asp?feed=FT&Date=20060710&ID=5855763; "State Has to Answer for Yukos in U.S.," Moscow Times, Mar. 23, 2006, available at http://www.themoscowtimes.com stories/2006/03/23/002.html; "U.S. Shareholders Sue Russia Over Yukos," Financial Times, Oct. 24, 2005; "Yukos Unit Up for Sale at Discount Price," Moscow Times, Oct. 13, 2004, available at http://www.themoscowtimes.com/stories/2004/10/13/001.html; "US group sues over Yukos share losses," The Lawyer, Feb. 6, 2006, available at http://www.thelawyer.com/cgi-bin/item.cgi?id=118687&d=122&h=24&f=

According to plaintiffs' own complaint, in the summer and fall of 2003, the Russian Federation launched an investigation into whether Yukos had complied with Russia's tax laws. (Id. ¶ 154.)  Plaintiffs allege that the "tax authorities, sometimes accompanied by FSB officers and armed militia, essentially stormed numerous Yukos offices, intimidating personnel and seizing documents and electronic files."  (Id.)  In addition, in early October 2003, "investigators and police" searched a Yukos business center and the home of a Group Menatep principal.  (Id. ¶ 171.)  Plaintiffs allege that "commentators viewed the actions as a clear signal to potential investors . . . that Yukos remained under attack by the government."  (Id.)  The "attack on Yukos was stepped up three weeks later, on October 30, 2003, when all shares of Yukos common stock owned by YUL and Hulley, which amounted to 51 percent of the equity of Yukos, were seized" by the Russian Federation.  (Id. ¶¶ 177, 182.)  This seizure allegedly "transferred control of Yukos to the Russian Federation" (id. ¶ 184) and made it "unmistakable even at that early point" that "the Russian Federation now effectively controlled Yukos" (id. ¶ 185).  As a result, Yukos' share price was "driven down by 18 percent."  (Id. ¶ 185.)

After an initial audit of Yukos' records, in December 2003 the Russian taxing authorities concluded that Yukos owed $3.4 billion in back taxes, penalties, and interest for the year 2000. (Id. ¶¶ 203, 205.)  This assessment was subsequently upheld in April 2004 by a ruling from the Russian Tax Ministry and on May 26, 2004, by the Court of Arbitration, which upheld 99 percent of the Russian Federation's tax assessment.  (Id. ¶¶ 214-15.)  Following this decision, according to the amended complaint, in April and June 2004 the Russian Federation froze

---

46.  This revelation raises serious concerns under long-standing rules preventing the maintenance of a lawsuit by a nonparty, such as Group Menatep.  See 14 Am. Jur. 2d Champerty, Maintenance, and Barratry § 1 ("'Maintenance' is officious intermeddling in a suit which in no way belongs to the intermeddler, by maintaining or assisting either party to the action, with money or otherwise, to prosecute or defend it. 'Champerty' is a type of maintenance in which the intermeddler makes a bargain with one of the parties to the action to be compensated out of the proceeds of the action.").

Yukos' assets, including Yukos' interest in YNG. (Id. ¶ 216.) On July 1, 2004, the Russian Federation allegedly demanded payment of the owed taxes, directed the freezing of Yukos' bank accounts and instructed the tax authorities to file a new $3.4 billion tax claim against Yukos for the 2001 tax year. (Id. ¶ 218.) On July 20, 2004, the Russian Federation announced that it would auction YNG in order to satisfy Yukos' bill for tax fraud. (Id. ¶ 261.) Yukos' share price immediately plummeted. (Id.) YNG's bank accounts allegedly were frozen in August 2004, and on September 3, 2004 Yukos was assessed an additional $4.1 billion in tax liability for the year 2002. (Id. ¶ 220.) On November 2, 2004, the Russian Federation determined Yukos owed an additional $10 billion for 2001 and 2002. (Id. ¶ 221.) On November 19, 2004, the Russian Federation announced that the auction of YNG would occur on December 19, 2004. (Id. ¶ 271.)

Yukos filed for bankruptcy protection in the United States District Court for the Southern District of Texas just five days before the auction. (Id. ¶ 276.) On December 16, 2004, the bankruptcy court entered an order preventing three named bidders (including Gazprom's then-subsidiary Gazpromneft) from participating in the auction. (Id. ¶ 276.) Gazprom was not a defendant when the order was entered, was not named in the order itself, and was never served with process. (Ex. A, Bankr. S.D. Tex., Docket Entry 9.)[2] The auction allegedly took place as scheduled in the Russian Federation on December 19, 2004, and Baikalfinansgroup ("BFG") acquired YNG for $9.3 billion. (Am. Compl. ¶ 278.) Plaintiffs themselves allege that Gazprom sold off Gazpromneft prior to the auction and that "Gazpromneft did not substantively

---

[2]     This Court may take judicial notice of public records, including other court opinions and pleadings. Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004) ("[T]he cited documents are public records subject to judicial notice on a motion to dismiss."); Jacobsen v. Oliver, 201 F. Supp. 2d 93, 110 (D.D.C. 2002) ("In deciding this motion to dismiss, the Court may consider extra-record materials, such as matters of public record and previous filings with the Court.").

participate" and did not bid in the auction.  (<u>Id.</u> ¶¶ 277, 279.)   Nor is there any claim that Gazprom itself participated in the auction.

After the auction – and after discovery and a hearing – on February 24, 2005 the U.S. bankruptcy court dismissed Yukos' petition "for cause" pursuant to the factors enumerated in 11 U.S.C. § 1112(b) and on the "totality of the circumstances."  <u>In re Yukos Oil Co.</u>, 321 B.R. 396, 410-11 (Bankr. S.D. Tex. 2005).  The bankruptcy court found that "[t]he vast majority of the business and financial activities of Yukos continue to occur in Russia" and that "Yukos was, on the petition date, one of the largest producers of petroleum products in Russia, and was responsible for approximately 20 percent of the oil and gas production in Russia."  <u>Id.</u> at 411. The court further reasoned that the "sheer size of Yukos, and correspondingly, its impact on the entirety of the Russian economy, weighs heavily in favor of allowing resolution in a forum in which participation of the Russian government is assured."  <u>Id.</u>  Neither in that opinion nor thereafter did the bankruptcy court ever comment, suggest, or hold that any entity, including Gazprom, had transgressed the court's prior December 16, 2004 order.

The 43 individual plaintiffs have buried the details of their Yukos ADR trades in an appendix at the end of their amended complaint for good reason.  The appendix reveals that the first purchase of any Yukos ADRs by any plaintiff did not occur until plaintiff Allen purchased ADRs on October 15, 2003 – *after* the well-publicized arrests of Yukos' owners and leaders and after the Russian Federation began investigating whether Yukos had engaged in tax fraud. Indeed, the bulk of plaintiffs' alleged purchases occurred in very late 2003 and 2004, in the very midst of the alleged stock, asset, and bank seizures related to YNG, the adverse tax decisions and assessments involving billions of dollars, the setting of the auction of YNG, other regulatory and law enforcement actions, and Yukos' falling stock price.  Throughout the entire time period

discussed in the amended complaint, plaintiffs speculatively purchased Yukos ADRs on dozens of occasions between October 30, 2003 and November 25, 2004. Plaintiffs' theory is that, during the highly public campaign ostensibly to "re-nationalize" Yukos and its assets, they somehow reasonably relied on the public statements of Russian President Putin, other Russian officials, and executives for Rosneft and Gazprom (including Miller) suggesting that Yukos' future, notwithstanding obvious storm clouds, was somehow promising. The amended complaint is silent as to any reassuring statements by Yukos itself.

Plaintiffs now attempt to draw Gazprom and Miller into their self-made financial problems. The amended complaint alleges that Gazprom is the largest oil and gas producer in Russia and is now majority owned (though indirectly) by the Russian Federation. (Am. Compl. ¶¶ 61, 63.) However, there is not a single allegation in the amended complaint to suggest that Gazprom or Miller caused or participated in any of the Russian Federation's official law and tax enforcement actions relating to Yukos. On the contrary, the amended complaint alleges that Gazprom did not participate in the auction of YNG, that it sold off Gazpromneft prior to the auction and that Gazprom was not involved with any actual acquisition of YNG's assets.

The amended complaint fails to allege any meaningful connection between Gazprom and the United States. The amended complaint does not allege that Gazprom had any offices, employees, property, bank accounts, or physical business presence in the United States. Instead, the amended complaint sets forth isolated, sporadic, prospective, and unrelated allegations that cannot justify forcing Gazprom to defend this lawsuit in the United States. The amended complaint is just as deficient with respect to defendant Miller: all that is alleged is that he made three trips to the United States over a three-year period to meet with U.S. officials and others, on

matters unrelated to Yukos.  (Id. ¶ 77.)  Plaintiffs' claims have no place in a U.S. courtroom.  To the extent that this lawsuit can go forward at all, it should proceed in the Russian Federation.

## ARGUMENT

### I.    PERSONAL JURISDICTION OVER GAZPROM AND MILLER DOES NOT EXIST

Despite its length, the amended complaint fails to offer facts permitting this Court to exercise personal jurisdiction over Gazprom, a Russian corporation doing business in the Russian Federation, or Miller, a Russian citizen.  It is well established that "the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant."  Bancoult v. McNamara, 214 F.R.D. 5, 9 (D.D.C. 2003).  To meet this burden, plaintiffs must allege "specific acts connecting the defendant with the forum."  Id.; see also United States v. Smithfield Foods, Inc., 332 F. Supp. 2d 55, 60 (D.D.C. 2004).  It is equally well settled that the jurisdictional allegations in a complaint must demonstrate the defendant's purposeful, "minimum contacts" with the U.S.  International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34 (D.D.C. 2003).  The complaint must allege facts demonstrating that the defendant "purposefully directed" its conduct toward the U.S. forum.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).  Even if such contacts are alleged, however, a court should decline to exercise jurisdiction if doing so would violate "traditional notions of fair play and substantial justice."  Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 113 (1987); see also AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64, 76 (D.D.C. 2004).

A complaint "cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant."  Atlantigas Corp., 290 F. Supp. 2d at 42.  Instead, plaintiffs must allege facts properly establishing jurisdiction over

each defendant.  Here, plaintiffs have attempted to manufacture claims of personal jurisdiction

over Gazprom by alleging that it aspires to work with U.S. companies, that its personnel have

had a few isolated contacts with U.S. government officials, that it has ADRs that trade on the

OTC market, and that it has other insignificant or sporadic "contacts" with the U.S.  Plaintiffs

also suggest that Miller is subject to personal jurisdiction on the basis of three trips to the United

States over a three-year period, to meet U.S. officials and other individuals on matters unrelated

to Yukos.  As demonstrated below, these jurisdictional allegations are grossly insufficient.

### A. The Amended Complaint Does Not Allege Sufficient Contacts Between Gazprom Or Miller And The United States To Create Personal Jurisdiction

#### 1. Plaintiffs Have Not Alleged That Gazprom Or Miller "Purposely Directed" Actions Toward The U.S. Or That Any Claim Arises Out Of Those Actions

Specific jurisdiction exists only when the defendant "purposefully" directs its actions at

the relevant forum, and the cause of action arises out of or relates to those activities.

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); Bancoult, 214

F.R.D. at 12-13; Gowens v. DynCorp, 132 F. Supp. 2d 38, 42 (D.D.C. 2001).  This requires a

showing that the defendant "expressly aimed" its conduct at the forum.  E.g., United States v.

Ferrara, 54 F.3d 825, 828-30 (D.C. Cir. 1995) (no personal jurisdiction existed when defendant's

actions were not "expressly aimed" at the forum, and their effects on the District were, "at most,

incidental" despite having a direct effect in the District).  In addition, the defendant must have

"purposely availed" itself of the privilege of conducting activities within the forum and invoked

the benefits and protections of the forum's laws.  Brunson v. Kalil & Co., 404 F. Supp. 2d 221,

224, 237 (D.D.C. 2005) (defendant did not "purposefully avail itself" of benefits of forum by

communicating with an attorney in the forum to conduct negotiations with the plaintiff).  The

fact that a plaintiff or some other third party engaged in "unilateral actions" in the forum or

suffers injury in the forum is likewise insufficient.  COMSAT Corp. v. Finshipyards S.A.M., 900 F. Supp. 515, 518 (D.D.C. 1995).

Plaintiffs do not allege any "specific" contacts between Miller and the U.S.  As for Gazprom, plaintiffs allege only one specific, supposed "contact" between it and the United States: the strained effort to connect Gazprom to Yukos' failed bankruptcy petition in the Southern District of Texas.  (Am. Compl. ¶¶ 276-78.)  Gazprom is not alleged to have made any "statements" in the United States and is not alleged to have undertaken any other conduct in the United States from which plaintiffs' claims arise.  As shown below, Yukos' unilateral decision to seek bankruptcy protection in the U.S. – an attempt that was rejected because under the "totality of circumstances," the case involved predominantly Russian matters – hardly provides a basis for specific personal jurisdiction over Gazprom in this separate action.

There is no allegation (nor can there be) that Gazprom had any role in Yukos' decision to file for bankruptcy in the U.S.  After making its own decision to file a bankruptcy case in the United States, on December 16, 2004, at Yukos' request, the bankruptcy court entered an order "enjoining 'Gazpromneft, ZAO Interkom, OAO First Venture Company, [and the financial institutions], and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them'" from participating in the YNG auction.  (Id. ¶ 276.)  Gazprom was not named in this order.  At the time the TRO was entered, Gazprom had not been served (and indeed was never served) and was not named as a defendant in any pleading in the bankruptcy action.  (See Ex. A, Docket Entry 9.)[3]  The amended complaint alleges that before

---

[3]     While plaintiffs allege that Gazprom was named a "defendant" in the bankruptcy proceedings, that allegation is immaterial.  As the bankruptcy court's docket reflects, Gazprom was ultimately named as a defendant in an amended complaint filed in the adversary proceedings well after the TRO was entered and the YNG auction completed.  (See Ex. A, Docket Entry 96.)  That fact alone, however, does nothing to suggest that Gazprom is now subject to personal jurisdiction in this Court.  Indeed, it is well-settled that, even when a defendant in a prior suit substantively participates in that suit, that alone will not give rise to personal

the December 19 auction of YNG, Gazprom "sold off" Gazpromneft.  (Am. Compl. ¶ 277.)

Gazpromneft "*did not* substantively participate" and "did not place any bid" in the auction held

in the Russian Federation on December 19.  (Id. ¶ 279 (emphasis added).)  There is no claim that

Gazprom itself participated in the auction.

Approximately two months later, on February 24, 2005, the bankruptcy court dismissed

Yukos' petition.  In its written opinion, the bankruptcy court never suggested that Gazprom was

bound by or had breached its previous TRO and, indeed, stated that "it is not clear that this court

can obtain personal jurisdiction of the pertinent parties sufficient to grant much of the relief

sought in the instant case."  In re Yukos Oil Co., 321 B.R. 396, 411 (Bankr. S.D. Tex. 2005).[4]

The bankruptcy court dismissed Yukos' petition "for cause" under the "totality of the

---

jurisdiction in future litigation.  Dow Chem. Co. v. Calderon, 422 F.3d 827, 833-36 (9th Cir. 2005);
Painewebber Inc. v. Chase Manhattan Priv. Bank (Switz.), 260 F.3d 453, 459-60 (5th Cir. 2001) (defendant did
not consent to jurisdiction in the Southern District of Texas, where it participated in another suit that was
ultimately transferred from New York to Texas over the party's objection).  Hence, the simple assertion that
Gazprom was named as a defendant or was "present" at a hearing in the bankruptcy proceedings – a claim
plaintiffs cannot support in any event – does not provide a proper basis for asserting personal jurisdiction over
Gazprom in this case.

[4]     Any claim that the TRO is somehow relevant to the question of specific personal jurisdiction over
Gazprom in this independent action must be rejected.  Plaintiffs' own allegations do not support any
suggestion that Gazprom violated the TRO or that the TRO has any bearing on their claims against Gazprom.
Instead, plaintiffs allege that Gazprom sold off Gazpromneft before the auction, and that Gazpromneft did not
"substantively participate" and did not bid in the auction.  (Am. Compl. ¶ 279.)  There is no allegation that
Gazprom participated in the auction.  Moreover, even if plaintiffs had alleged facts demonstrating that
Gazprom was bound by and had transgressed the TRO – and they have not – specific jurisdiction still would
not exist.  Courts have refused to assert personal jurisdiction over foreign nonparties accused of violating
orders entered by courts in the U.S.  E.g., Reebok Int'l Ltd. v. McLaughlin, 49 F.3d 1387, 1390-94 (9th Cir.
1995) (reversing district court's conclusion that nonparty Luxembourg bank was subject to jurisdiction in the
U.S. because it assisted U.S. defendants in transferring certain moneys in violation of an injunction); In re
EAL (Delaware) Corp., 1994 WL 828320, at *16 (D. Del. Aug. 3, 1994) (U.S. bankruptcy court's "automatic
stay and stay order did not operate against" European agency that participated in detention of debtor's assets in
Europe unless European agency had "'minimum contacts' with the United States needed for this Court and the
Bankruptcy Court to exercise jurisdiction over it").  As noted above, Gazprom was never served in the Texas
bankruptcy proceedings and was not even named as a defendant until well after the December 16, 2004 TRO
was entered and the YNG auction was completed.  Gazprom was not named in the TRO and the bankruptcy
court itself expressed doubt about its jurisdiction over foreign entities.  In re Yukos Oil Co., 321 B.R. at 411.
Specific jurisdiction simply cannot exist on any theory that Gazprom somehow "violated" the TRO.

circumstances" because the case involved predominantly Russian matters centrally connected to the Russian Federation. Id. at 410-11.

These facts and allegations demonstrate that plaintiffs cannot support even a *prima facie* case that Gazprom "purposefully directed" or "expressly aimed" any conduct at the United States in connection with Yukos' failed bankruptcy filing in Texas. See Burger King Corp., 471 U.S. at 472. The sole theory of the amended complaint is that Russian actors somehow acted within the Russian Federation to dismantle certain assets of Yukos – a Russian corporation. By plaintiffs' own admission, all of Gazprom's conduct (as well as that of the other defendants) occurred within the borders of the Russian Federation and was allegedly directed solely at entities that were also within the Russian Federation, primarily Yukos. Accordingly, there can be no legitimate claim that these alleged actions were "expressly aimed" or "purposefully directed" at the U.S. E.g., In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 354 (D. Md. 2004) (personal jurisdiction did not exist over director of Netherlands corporation in shareholder lawsuit when allegedly fraudulent letters were sent from one foreign corporation to another and the fraud itself was directed at the Netherlands and globally, but not specifically directed at shareholders in the U.S.).[5]

---

[5]     In addition, plaintiffs cannot show, as they must, that their causes of action against Gazprom arise from or relate to Gazprom's alleged activities in a U.S. forum. Under plaintiffs' own theory, all of the alleged conduct – including Gazprom's supposed decision to "sell off" Gazpromneft before the auction (and indeed, the actual sale of Gazpromneft itself) – occurred within the Russian Federation, not the United States. Accordingly, plaintiffs' claims against Gazprom simply do not and cannot arise from any actions by Gazprom in the U.S. See Jet Charter Serv., Inc. v. Koeck, 907 F.2d 1110, 1113-14 (11th Cir. 1990) (specific jurisdiction did not exist over Swiss bank where the bank representative's contacts with Florida were not "essential" to its involvement in the transaction with the Florida plaintiff); Bancoult, 214 F.R.D. at 12-13 (specific jurisdiction did not exist when causes of action did not arise out of defendant's activities in the forum); Gowens, 132 F. Supp. 2d at 41-42 (same). Nor is there any allegation that Gazprom "purposefully availed itself" of the privilege of engaging in any activities in the U.S. or invoked the benefits of U.S. laws. Brunson, 404 F. Supp. 2d at 224. The fact that *Yukos* unilaterally and unsuccessfully attempted to do so is simply irrelevant. Yukos' decision to file for bankruptcy in the U.S. – a filing that was rejected as inappropriate – is precisely the kind of "unilateral act" that cannot serve as a basis to force Gazprom to defend itself from suit in the U.S. E.g., COMSAT Corp., 900 F. Supp. at 518 (no personal jurisdiction existed over Monaco accounting authority that operated a "land-earth station" when theory of jurisdiction depended on recipients' unilateral actions in

### 2. Plaintiffs Have Not Alleged Sufficient Contacts Between Gazprom And The U.S. To Create General Jurisdiction

Similarly, notwithstanding the length of the amended complaint, plaintiffs have failed to allege facts permitting general personal jurisdiction to be asserted over Gazprom under a nationwide contacts theory. General jurisdiction exists only when it is shown that the defendant has substantial contacts with the forum that "are so continuous and systematic that it could foresee being haled into a court" in the forum. AGS Int'l Servs. S.A., 346 F. Supp. 2d at 74; Doe I v. State of Israel, 400 F. Supp. 2d 86, 108 (D.D.C. 2005). The threshold for showing general jurisdiction is substantial. OMI Hold. Inc. v. Royal Ins., 149 F.3d 1086, 1091 (10th Cir. 1998).[6]

Far from alleging "continuous and systematic" contacts with the U.S., plaintiffs' allegations demonstrate Gazprom's overwhelming connection to Russia and its lack of any cognizable connection to the United States. Plaintiffs assert that Gazprom is a Russian corporation, organized, headquartered and doing business in the oil and gas industry in the Russian Federation. (Am. Compl. ¶¶ 61, 63.) By contrast, plaintiffs do not allege that Gazprom has any offices, assets, personnel or physical business presence in the United States, that it is licensed to do business in the United States, or even that it is engaged in any meaningful product

---

receiving transmissions in a U.S. jurisdiction); Doe I, 400 F. Supp. 2d at 109. Likewise, any allegation that U.S. citizens allegedly suffered harm in the U.S. is insufficient to confer jurisdiction over Gazprom. See Far West Capital v. Towne, 46 F.3d 1071, 1079 (10th Cir. 1995) (claim that resident in the forum is injured does not establish jurisdiction).

[6] While plaintiffs allege, in conclusory fashion, that Gazprom is "extensively and actively engaged in U.S. commerce," has "extensive contractual and other relationships with U.S. companies to develop, produce, and/or sell natural gas for and in U.S. commerce," and is "extensively engaged" in procuring goods and services in the U.S. (Am. Compl. ¶ 65), plaintiffs fail to support, and in fact contradict, these bare assertions in the paragraphs of the amended complaint (id. ¶¶ 129-39) purporting to set forth jurisdictional facts. Plaintiffs' conclusory assertions must be rejected. District of Columbia courts have uniformly recognized that "[b]are allegations and conclusory statements are insufficient" to support personal jurisdiction. Bancoult, 214 F.R.D. at 9; see also Smithfield Foods, 332 F. Supp. 2d at 60; Nix v. Hoke, 62 F. Supp. 2d 110, 113 (D.D.C. 1999); Novak-Canzeri v. HRH Al Saud, 864 F. Supp. 203, 206 (D.D.C. 1994) (explaining that assertions that do not specify "when, why and with whom" the jurisdictional activities took place are not sufficient to support a finding of personal jurisdiction).

sales or other business in the U.S. Instead, lacking concrete ties to the United States, plaintiffs allege the following types of supposedly jurisdictional "facts":

- **Gazprom's alleged meetings with U.S. officials.** Plaintiffs allege that Miller, as a representative of Gazprom, made visits to the United States – once in 2003, once in 2004 and once in 2005 – to meet with U.S. energy officials and executives to discuss Gazprom's future entry into the U.S. market. (Am. Compl. ¶ 77.)

- **Events that occurred after the date on which plaintiffs filed their complaint (October 24, 2005).** Plaintiffs allege that in "*April 2006*, Gazprom elevated its presence in the U.S. capital market by sponsoring Level-1 ADRs in the United States" (Am. Compl. ¶ 131 (emphasis added)); that "Gazprom has launched an aggressive strategy to tap into the U.S. market; the company *expects to complete its plans* to enter the U.S. LNG [liquefied natural gas] market *by the end of 2006*" (id. ¶ 132 (emphasis added)); that "Gazprom chairman Defendant Miller met with BP Group Chief executive Frank Chapman of BP *in April 2006* to discuss cooperation in the U.S. and U.K. gas markets" (id. ¶ 136) (emphasis added); that "LNG tankers carrying Gazprom gas arrived at the Shell Western LNG re-gasification terminal in Cove Point, Maryland *at the start of December 2005*" (id. ¶ 136 (emphasis added)); that "*in June 2006*, Gazprom entered into a partnership with Itera, a Florida-registered corporation that trades and produces gas" (id. ¶ 137 (emphasis added)); that "Gazprom is widely expected to select either ChevronTexaco or ConocoPhilips to assist Gazprom in developing the giant Shtokman natural gas field in the Barents sea . . . [t]he winner will be announced *in the summer of 2006*" (id. ¶ 138 (emphasis added)); and that in "*May 2006*, Gazprom revealed plans to issue an additional $500 in bonds, again using U.S. investment banks to arrange the bond placement" (id. ¶ 139 (emphasis added)).

- **Allegations that focus on Gazprom's alleged aspirations and future business strategy, including alleged memoranda of understanding**. See Am. Compl. ¶¶ 77, 132, 135, 137, 139 (alleging Gazprom's supposed expectations and plans).

- **Allegations concerning Gazprom's U.S.-related financial activities.** Plaintiffs allege that "Gazprom has sponsored Level-1 ADRs using the Bank of New York as a depository bank" and that these ADRs "are registered with the Securities and Exchange Commission and trade on the OTC." (Am. Compl. ¶ 131.) Plaintiffs further allege that "Gazprom uses U.S. investment banks to manage its public debt issues," including using "U.S. banks to manage a $1 billion bond issue" in the Summer of 2004. (Id. ¶ 139.)

- **Allegations about Gazprom's relationship with Texas-based Moncrief Oil.** Plaintiffs allege the existence of a contractual relationship between Gazprom and one U.S. company – Texas-based Moncrief Oil – for the joint development of a Russian oil field. (Am. Compl. ¶ 133.)

15

These allegations do not come close to establishing "continuous and systematic" contacts with the United States.

**Meetings with U.S. officials.**  The District of Columbia courts have long held that a defendant's contacts with the federal government in the District cannot be considered in deciding whether personal jurisdiction exists.  See Atlantigas, 290 F. Supp. 2d at 44; AGS Int'l Servs. S.A., 346 F. Supp. 2d at 74-75; Fandel v. Arabian American Oil Co., 345 F.2d 87 (D.C. Cir. 1965) (Saudi Arabian oil company's office in the District used to communicate with government, and its social contacts with Washington representatives of U.S. oil companies, were insufficient to create general jurisdiction).  Accordingly, plaintiffs cannot rely on alleged contacts between Gazprom – or any representative of Gazprom – and government officials in the District of Columbia.

**Post-Filing events.**  Courts have repeatedly held that, in determining whether general jurisdiction exists, a defendant's contacts with the forum are relevant only up to the time of the filing of the complaint.  E.g., Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006); Harlow v. Children's Hosp., 432 F.3d 50, 64-65 (1st Cir. 2005) ("[C]ontacts after the filing of the complaint are not considered."); Simplicity Inc. v. MTS Prods., 2006 WL 924993 (E.D. Pa. Apr. 6, 2006).  Therefore, plaintiffs cannot rely on allegations occurring after October 24, 2005 in attempting to assert a theory of general jurisdiction over Gazprom.

**Gazprom's alleged future plans.**  Plaintiffs' allegations concerning Gazprom's alleged aspirations – e.g., that Gazprom has entered into memoranda of understanding with U.S. companies "which *envisage* Gazprom participation in projects of LNG regasification in North America" (Am. Compl. ¶¶ 133-35 (emphasis added)) – also do not suffice.  Courts have repeatedly held that plans and future projects are not jurisdictional "contacts."  See Quickturn

Design Sys., Inc. v. Meta Sys., 1996 WL 671230, at *3 (N.D. Cal. Oct. 31, 1996) (phone calls, letters and visits to negotiate possible mergers or future transactions failed "to meet the substantial or continuous and systematic standard"); Eastman Outdoors Inc. v. Archery Trade Ass'n, 2006 WL 1662641, at *6 (E.D. Mich. June 6, 2006) (contacts with Michigan for the purpose of lobbying the state to either continue or start up programs in the public schools did not constitute continuous or systematic contacts); Erne Shipping Inc. v. HBC Hamburg Bulk Carriers GMBH & Co. KG, 409 F. Supp. 2d 427, 434 (S.D.N.Y. 2006) ("plans to someday open an office in New York," along with contracts with New York corporations providing two percent of the defendant's revenue, did not reach the level of continuous and systematic contacts); see also Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1330-31 (9th Cir. 1984) (solicitation of a distributorship agreement in Arizona along with visits, letters and phone calls to Arizona did not constitute continuous and systematic contacts); Burrows Paper Corp. v. R.G. Eng'g, Inc., 363 F. Supp. 2d 379, 384 (N.D.N.Y. 2005) ("solicitation of business alone" will not establish general jurisdiction). The same Annual Report cited by plaintiffs (which is properly considered in deciding a motion to dismiss)[7] makes clear that even at the end of 2005, Gazprom had not yet completed the commercial facilities intended to convert natural gas into liquefied natural gas for shipments to North America – let alone the United States. (Gazprom 2005 Ann. Rpt. at 4, 58-59.) This further demonstrates why plaintiffs' reliance on Gazprom's alleged plans and aspirations is fundamentally flawed.[8]

---

[7]    E.g., Egilman v. Keller & Heckman, LLP, 401 F. Supp. 2d 105, 109-10 (D.D.C. 2005).

[8]    Indeed, even if plaintiffs had alleged that Gazprom had entered written, enforceable contracts with U.S. companies – which is not alleged – this still would not establish systematic contacts with the U.S. sufficient to allow Gazprom to be sued here.  See Burger King Corp., 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, . . . the answer is clearly that it cannot.").

*Gazprom's alleged financial activities.* It is also well settled that the existence of ADRs or ADSs do not create general jurisdiction over the corporation in which such shares or receipts are held. Pieczenik v. Cambridge Antibody Tech. Group, 2004 WL 527045, at *6 (S.D.N.Y. Mar. 16, 2004); see also In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 2003 WL 1807148, at *6, n.12 (S.D.N.Y. Apr. 4, 2003) ("The fact that a corporation has minority shareholders in a jurisdiction in no way indicates that it is engaged in continuous and systematic business in that jurisdiction."). Plaintiffs' vague allegations about Gazprom's use of U.S. banks to manage unidentified "bond issues" are likewise deficient. Plaintiffs do not allege that Gazprom did anything *in* the U.S. in connection with these alleged debt issues or that Gazprom raised money in or from the U.S. Regardless, courts have held that contacts with the forum simply for the purposes of financing are not the same thing as "doing business" in a forum. E.g., Siam Kraft Paper Co. v. Parsons & Whittemore, Inc., 400 F. Supp. 810, 812 (D.D.C. 1975) (entry into any jurisdiction for the purpose of securing a loan or an insurance guaranty with accompanying negotiations among the parties did "not confer jurisdiction on the local courts"), aff'd, 521 F.2d 324 (D.C. Cir. 1975); In re Ski Train Fire, 2003 WL 18071, at *6, n.12 ("A long line of cases establishes that a foreign defendant is not 'present' in New York for the purposes of jurisdiction simply because it has engaged in financing transactions here.").

*Gazprom's relationship with Moncrief.* The United States District Court for the Northern District of Texas has already ruled that this alleged relationship – for the development of an oil field in the Russian Federation – was not sufficient to subject Gazprom to personal jurisdiction in the state of Texas. Moncrief Oil Int'l, Inc. v. OAO Gazprom, Civ. No. 4:05-CV-353-Y, slip op. at 9 (N.D. Tex. March 21, 2006). If this alleged relationship was insufficient to

constitute a sufficient "contact" in Texas in a diversity case, it is plainly insufficient to serve as a sufficient "contact" in this case under a nationwide jurisdictional test.

   ***The totality of the allegations still do not suffice.***  Even if the Court were to consider plaintiffs' allegations in their totality, the sporadic events asserted fall far short of the high standard required to establish general personal jurisdiction.  Plaintiffs have not alleged that Gazprom had any offices, property, personnel or assets in the United States or in this District – the hallmark indicia of whether general jurisdiction exists.  See Doe I, 400 F. Supp. 2d at 108 (no jurisdiction when "the complaint establishes that the individual Israeli defendants live abroad, acted abroad, and are employed abroad"); Lee v. State Comp. Ins. Fund, 2005 WL 1903343, at *3 (D.D.C. July 13, 2005); Atlantigas Corp., 290 F. Supp. 2d at 42 (no personal jurisdiction when "all of the [defendants] are incorporated and maintain their principal offices outside" the forum); Baltierra v. West Va. Bd. of Med., 253 F. Supp. 2d 9, 14 (D.D.C. 2003).

   Far from alleging these well-settled bases of jurisdiction, the preliminary and sporadic events identified by plaintiffs (including the alleged arrival in the U.S. of a single tanker containing Gazprom LNG in September 2005 (Am. Compl. ¶ 132)) are wholly insufficient to show "continuous and systematic" contacts with the United States.  For example, in Helicopteros, 466 U.S. at 416-17, the Court ruled that a Colombian corporation did not have systematic and continuous contacts with Texas even though it had purchased "helicopters, equipment, and training services" there "for substantial sums," had sent its personnel to Texas for training, had sent its CEO to Texas to negotiate a contract and had drawn checks on a Texas bank.  Likewise, in Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory", 283 F.3d 208, 214-15 (4th Cir. 2002), the court ruled that a Russian aluminum manufacturing corporation did not have systematic and continuous contacts with the U.S., despite claims that it

had shipped product to the U.S., negotiated with and entered into a "possible joint venture" with U.S. companies, purchased aluminum in the U.S. and had its representatives attend trade conferences in the U.S.[9]  Just as in the foregoing cases, plaintiffs have alleged only isolated, unrelated and entirely insignificant "contacts" between Gazprom and the United States.

### 3. Plaintiffs Have Not Alleged Sufficient Contacts Between Miller And The U.S. To Create General Jurisdiction

The allegations in the amended complaint likewise cannot confer general personal jurisdiction over defendant Miller.  The amended complaint asserts only that Miller, on behalf of Gazprom, visited the United States on three occasions between 2003 and 2005 to meet with government officials and/or business executives in the United States.  (Am. Compl. ¶¶ 77, 134, 135.)[10]  As a threshold matter, because these allegations focus on actions taken in Miller's corporate capacity for Gazprom, they cannot be considered in deciding whether personal jurisdiction properly exists over him individually.  See Richard v. Bell Atlantic Corp., 976 F. Supp. 40, 49 (D.D.C. 1997); Wiggins v. Equifax Inc., 853 F. Supp. 500, 503 (D.D.C. 1994);

---

[9]     Other courts have reached similar conclusions.  See Brokerwood Prods. Int'l (U.S.), Inc. v. Cuisine Crotone, Inc., 104 Fed. Appx. 376, 382 (5th Cir. 2004) (transmission of three demand letters to Louisiana companies, filing a lawsuit in Louisiana, negotiating a loan with a Louisiana entity and international website marketing did not reach the level of continuous and systematic contacts); AGS Int'l Servs. S.A., 346 F. Supp. 2d at 76-77 (14 trips to the District between January 2000 and December 2002 were not of "such significant 'frequency and volume' that [defendant] could reasonably anticipate being haled into court in the District for actions which occurred in Peru pursuant to a contract governed by Peruvian law"); Central Freight Lines, Inc. v. APA Transp. Corp., 322 F.3d 376, 381 (5th Cir. 2003) (no general jurisdiction where defendant routinely arranged and received shipments to and from Texas and sent sales people to the state on a regular basis to develop business, negotiate contracts and service national accounts, because the defendant never registered to do business in the state, never maintained any kind of business office or records in the state and never paid taxes in the state); Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd., 91 F.3d 790, 793-94 (6th Cir. 1996) (contacts consisting of prior reinsurance agreement with another Ohio company, a prior reinsurance agreement with the plaintiff (an Ohio company), and participation in another agreement with the plaintiff deemed insufficient).

[10]    The amended complaint also asserts that Miller met an executive of British Petroleum "in April 2006 to discuss cooperation in the U.S. and U.K. gas markets."  (Am. Compl. ¶ 136.)  This allegation, however, does not suggest that Miller was in the United States or even dealt with a U.S. entity.  Furthermore, as demonstrated above, the fact that this "contact" occurred long after the filing of the complaint means that it is simply irrelevant.

Coleman v. American Broad. Cos., Inc., 1985 WL 365 (D.D.C. June 18, 1985); Quinto v. Legal Times of Washington, Inc., 506 F. Supp. 554 (D.D.C. 1981). Even if Miller's supposed contacts could be considered, the reasons discussed above compelling the conclusion that Gazprom cannot be sued here likewise demonstrate that personal jurisdiction over Miller cannot exist.[11]

**B.**     **Forcing Gazprom Or Miller To Defend This Litigation In The District Of Columbia Would Violate Traditional Notions Of Fair Play And Substantial Justice**

Even if plaintiffs did allege facts sufficient to demonstrate that Gazprom or Miller maintained the required level of contacts with the United States, this Court nevertheless should decline to exercise personal jurisdiction because doing so would violate traditional notions of fair play and substantial justice. Indeed, the United States District Court for the Northern District of Texas recently held that compelling Gazprom to defend a diversity case in Texas would violate the Due Process Clause. Moncrief Oil Int'l, Inc. v. OAO Gazprom, Civ. A. No. 4:05-CV-353-Y, slip op. at 20-22 (N.D. Tex. March 21, 2006). The same is true here.

---

[11]     In the event the Court dismisses plaintiffs' RICO and federal securities laws claims, as it should, the personal jurisdiction analysis would focus only on Gazprom's or Miller's contacts with the District of Columbia. See Doe I, 400 F. Supp. 2d at 120; Saleh v. Tital Corp., 436 F. Supp. 2d 55, 59 (D.D.C. 2006). Plaintiffs, however, do not allege any contacts in this District from which plaintiffs' claims arise. Accordingly, there is no basis for a claim of specific personal jurisdiction over Gazprom or Miller in the District. See Mays v. Meeks, 2006 WL 890671, at *5 (D.D.C. Apr. 5, 2006) (no specific jurisdiction where the events underlying the claim occurred in Georgia); Lee v. State Comp. Ins. Fund, 2005 WL 1903343, at *3 (D.D.C. July 13, 2005) (no specific jurisdiction where defendant did not engage in the conduct outlined in D.C. Code § 13-423). Likewise, plaintiffs cannot satisfy the general personal jurisdiction requirements of D.C. Code § 13-334(a), which requires a foreign corporation to be "doing business" in the District. Plaintiffs have not alleged a "consistent pattern of regular business activity" in the District necessary to establish general jurisdiction. Sunlite, Inc. v. BFG Bank AG, 849 F. Supp. 74, 74 (D.D.C. 1994) (no general jurisdiction when plaintiffs alleged single contact between defendant and jurisdiction); AGS Int'l Servs. S.A., 346 F. Supp. 2d at 76 (defendant not subject to general jurisdiction when employees traveled to District numerous times for financing purposes). Jurisdiction likewise does not exist under the "doing business" provision when the defendant has been served outside the District of Columbia. Everett v. Nissan Motor Corp., 628 A.2d 106, 108 (D.C. 1993); Reese v. Geneva Enters., Inc., 1997 WL 214864, at *3-*4 (D.D.C. Apr. 18, 1997). Here, plaintiffs have conceded that they did not effect service of process upon Gazprom or Miller in the District of Columbia. Instead, plaintiffs have attempted to serve Gazprom and Miller in the Russian Federation. (Docket Entries Nos. 7, 11, 39.) This is precisely the type of service that fails to satisfy § 13-334. Everett, 628 A.2d at 108; Reese, 1997 WL 214864, at *3-*4.

An analysis of "fair play and substantial justice" takes into consideration (1) the burden on the defendant, (2) the interests of the forum state, and (3) the plaintiff's interests in obtaining relief.  Asahi, 480 U.S. at 113; Doe I, 400 F. Supp. 2d at 109; AGS Int'l Servs. S.A., 346 F. Supp. 2d at 76.  The burden on the defendant is especially acute when, as here, it is a foreign citizen or corporation.  E.g., Asahi, 480 U.S. at 114.  Just as in Asahi, Gazprom and Miller would be unfairly burdened by being compelled to travel from the Russian Federation to the District, only to have this case submitted to a foreign jurisdiction's judicial system.

At the same time, plaintiffs' interests and the interests of this forum are minimal.  None of the relevant alleged acts or events took place in the United States, and none of the key players is a U.S. citizen or corporation.  See id.  The bulk of plaintiffs' claims concern only indirect harm to the plaintiffs themselves; the alleged direct injury (if any) was suffered by a foreign corporation, Yukos, which is located in the Russian Federation along with all of the defendants.  Given the large burden to Gazprom and Miller, their lack of connection to the U.S. and the minimal interests of this forum in being injected into this dispute, Gazprom and Miller cannot be sued here consistent with any notion of fair play and substantial justice.  See Chaiken v. VV Publ'g Corp., 119 F.3d 1018, 1021 (2d Cir. 1997) (Israeli newspaper could not be sued in Massachusetts when its circulation there was minimal, litigation in the U.S. would impose a significant burden, Massachusetts had little interest in adjudicating the claim, all the evidence was located in Israel and no social policy weighed in favor of resolving the issue in Massachusetts); OMI Holdings, Inc., 149 F.3d at 1090 (Canadian insurers could not be sued in Kansas when they had no license to conduct business in Kansas, maintained no offices in Kansas, employed no agents in Kansas, and insured no Kansas residents); Ellicott Mach. Corp. v. John Holland Party, Ltd., 995 F.2d 474, 479-80 (4th Cir. 1993) (no personal jurisdiction existed

in breach of contract action against Australian dredging company performing contract in Australia).

### C. Personal Jurisdiction Cannot Exist Because Plaintiffs Failed To Serve Gazprom Or Miller In Accordance With The Hague Convention

As a final matter, personal jurisdiction does not exist because neither Gazprom nor Miller has been properly served with process. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987). Federal Rules of Civil Procedure 4(f)(1) and 4(h)(2) require that service on Gazprom and Miller be conducted via the Hague Convention. See Color Sys., Inc. v. Meteor Photo Repro. Sys., 1987 WL 11085, at *7-*8 (D.D.C. May 8, 1987); In re Yukos Oil Co., 321 B.R. at 410 n.9; IM Partners v. Debit Direct Ltd., 394 F. Supp. 2d 503, 511 (D. Conn. 2005); O'Donnell v. Shalayev, 2004 WL 2958698, at *6 (D.N.J. Dec. 22, 2004); Marcantonio v. Primorsk Shipping Corp., 206 F. Supp. 2d 54, 56-58 (D. Mass. 2002). Articles 1, 3 and 5 of the Hague Convention require that an appropriate authority or judicial officer send prescribed materials to the designated Central Authority.

Here, plaintiffs have attempted to serve Gazprom only by registered mail (Docket Entry Nos. 7, 25), which does not comply with the Hague Convention. Plaintiffs also freely admit that they have made no attempt to serve Miller pursuant to the Hague Convention; instead, a private investigator supposedly left an envelope containing the summons and complaint with an unidentified security guard at Gazprom's headquarters. (Docket Entry No. 39 at 2-4.) Accordingly, the amended complaint must be dismissed. See Argentine Repub. v. Amerada Hess Shipping Corp., 488 U.S. 428, 435 n.3 (1989); Fed. R. Civ. P. 4(k)(2).

## II.   THE ACT OF STATE DOCTRINE, POLITICAL QUESTION DOCTRINE AND DOCTRINE OF COMITY ALL REQUIRE THE DISMISSAL OF THE AMENDED COMPLAINT

### A.   The Act Of State Doctrine Mandates Dismissal Of The Amended Complaint

The amended complaint makes very clear that plaintiffs want this Court to reexamine and overturn the Russian Federation's domestic tax assessment and law enforcement actions against Yukos.  The act of state doctrine, however, prevents this Court from doing so.

The act of state doctrine holds that the "courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts."  Republic of Austria v. Altmann, 541 U.S. 677, 700 (2004); see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428 (1964).  Under this doctrine, an action in a U.S. court is barred where:  (1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed in the action would require a court in the United States to declare invalid the foreign sovereign's official act.  W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400, 405 (1990).

The act of state doctrine plainly bars this Court from judging invalid the Russian Federation's enforcement of its tax laws and its tax auction of YNG (all of which occurred within the Russian Federation).  See Banco Nacional de Cuba, 376 U.S. at 428-37 (explaining that the act of state doctrine prevents the court from questioning the validity of a sovereign state's taking of property located within its own territory).  The act of state doctrine also bars this Court from passing judgment on the acts of parties who allegedly participated in the Russian Federation's auction or other challenged, official actions.  See Riggs Nat'l Corp. & Subs. v. Commissioner, 163 F.3d 1363, 1367-68 (D.C. Cir. 1999) (act of state doctrine prohibited review of privately owned bank's action taken pursuant to foreign sovereign's decision on same

subject); Callejo v. Bancomer, S.A., 764 F.2d 1101, 1113 (5th Cir. 1985) (noting the act of state doctrine applies "even if the defendant is a private party . . . and even if the suit is not based specifically on a sovereign act").

Here, plaintiffs' allegations against Gazprom and Miller relate to Gazprom's alleged, pre-TRO authorization of its then-subsidiary, Gazpromneft, "to participate in an auction" ordered by the Russian Federation, as well as supposed statements made in connection with those activities. (Am. Compl. ¶ 274.)  It is impossible for this Court to consider whether Gazprom's or Miller's alleged wrongful conduct violated U.S. (or any other) laws without making a determination that the Russian Federation's official conduct in taxing Yukos and conducting the auction itself were also improper or unlawful.  Indeed, the amended complaint asserts that the Russian Federation's (and the Russian courts') conclusions about Yukos' violations of the Russian tax code were wrong and expressly seeks a determination that the Russian Federation's actions violated "international" and federal law.  (Id. ¶¶ 5, 163, 167, 196, 206, 215, 222, 249, 279, 289, 290, 364, 411.)  Because this Court is precluded from reexamining the propriety of the Russian Federation's conduct, the amended complaint against Gazprom and Miller must be dismissed.

### B.    The Political Question Doctrine Mandates Dismissal Of The Amended Complaint

The political question doctrine is "based upon respect for the pronouncements of coordinate branches of government that are better equipped and properly intended to consider issues of a distinctly political nature."  Doe I, 400 F. Supp. 2d at 111.  In cases like this, where U.S. foreign relations with another country is in issue, courts lack jurisdiction to hear the case. Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918); Tel-Oren v. Libyan Arab Repub., 726 F.2d 774, 803 (D.C. Cir. 1984) (Bork, J., concurring).  Here, plaintiffs' claims present political questions appropriately left to the determination of the executive branch.

Plaintiffs' claims directly implicate U.S. foreign policy related to the Russian Federation. The claims revolve around the Russian Federation's tax treatment of a major Russian oil and gas producing company, and plaintiffs themselves rely on acts of senior Russian officials to attempt to assert such claims. Further, the amended complaint notes that key figures within the United States' executive branch – including President Bush, Vice President Cheney, Secretary of State Rice and former Secretary of State Powell – have already taken stances addressing the issues underlying the amended complaint. (Am. Compl. ¶ 5.) For this independent reason, the Court should decline jurisdiction to hear this case.

### C.    International Comity Mandates Dismissal Of The Amended Complaint

The doctrine of comity also compels dismissal of this action. Comity applies where the resolution of a case "touch[es] the laws and interests of other sovereign states." Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist. of Iowa, 482 U.S. 522, 544 (1987). The Supreme Court has emphasized the goal of international comity "in a variety of contexts." Casey v. Department of State, 980 F.2d 1472, 1477 (D.C. Cir. 1992).

Comity applies in cases such as this, where a challenge is being made to the acts and judgments of a foreign state. Banco Nacional de Cuba, 376 U.S. at 417-18 (finding under the act of state doctrine and principles of international comity that Cuban expropriation decree could not be challenged). In Banco Nacional de Cuba, the Court stated that the "principle that the conduct of one independent government cannot be successfully questioned in the courts of another" rested on "the highest considerations of international comity and expediency." Id. Just the same, "where 'comity of this nation' calls for recognition of a judgment rendered abroad, 'the merits of the case should not be tried afresh upon the mere assertion that the judgment was erroneous in law or in fact.'" Medellin v. Dretke, 125 S. Ct. 2088, 2094 (2005) (Ginsburg, J., concurring) (quotation omitted). Accordingly, because this Court must avoid retrying the actions of the

Russian Federation concerning Yukos' delinquent taxes, and the subsequent decisions of the Russian courts relating to Yukos' appeal of the tax penalties, plaintiffs' amended complaint should be dismissed under the doctrine of comity.  See General Elec. Co. v. Deutz A.G., 270 F.3d 144, 160 (3d Cir. 2001).

### III.    PLAINTIFFS LACK STANDING TO PURSUE COUNTS I, II, III, IV, V, VI AND XIII OF THE AMENDED COMPLAINT

Plaintiffs lack standing to bring Counts I through VI and XIII of the amended complaint because these claims seek to recover for alleged injuries to Yukos.  Under Russian law – which governs plaintiffs' standing to sue for alleged injuries to Yukos – ADR holders cannot pursue claims against third parties on behalf of their corporation.  These plaintiffs would also lack standing to bring the corporation's claims on their own behalf if U.S. law applied to plaintiffs' claims.

Plaintiffs assert claims for "conversion" under D.C. law and Russian law, conspiracy to commit common law conversion under D.C. law, alleged violations of RICO and conspiracy to violate RICO, and expropriation in violation of international law.[12]  Because plaintiffs are seeking to recover for alleged injuries to Yukos, which allegedly led to a decline in the value of plaintiffs' ADRs (e.g., Am. Compl. ¶ 10), they lack standing to bring suit under United States law.  See, e.g., Flynn v. Merrick, 881 F.2d 446, 449 (7th Cir. 1989) ("'[D]iminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right.'"); Gaff v. Federal Deposit Ins. Corp., 814 F.2d 311, 315 (6th Cir. 1987), vacated in part on other grounds, 828 F.2d 1145 (6th Cir. 1987); In re Dein Host, Inc., 835 F.2d 402, 405-06 (1st Cir. 1987).

---

[12]     Plaintiffs' lack of standing to pursue their RICO claims is further detailed below in Section VIII.A.

Likewise, Russian law – which controls the question of whether shareholders may bring suit on behalf of the corporation – does not allow for this lawsuit.  The District of Columbia follows the "internal affairs" doctrine, under which the question of whether a shareholder may pursue claims belonging to the corporation is governed by the law of the jurisdiction in which the corporation is organized.  Wright v. Herman, 230 F.R.D. 1, 8 (D.D.C. 2005); Labovitz v. Wash. Times Corp., 900 F. Supp. 500, 503 (D.D.C. 1995), aff'd, 172 F.3d 897 (D.C. Cir. 1999); Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 382 (7th Cir. 1990); D.C. Code § 29-1052.

Here, it is undisputed that Yukos is organized under the laws of the Russian Federation and maintains its principal place of business in Moscow, Russia.  (Am. Compl. ¶ 85.)  Thus, whether plaintiffs may bring Yukos' claims is governed by Russian law.  Russian law, however, makes no provision for foreign ADR holders to sue on behalf of the corporation.  (Ex. B, Federal Law No. 208-FZ of Dec. 26, 1995 on Joint-Stock Companies, art. 71(5) (providing that only shareholders possessing at least one percent of common stock may bring suit against a member of the board of directors); id. art. 48 (providing description of authority and powers of the General Meeting of Shareholders, which does not include the ability to bring suit on behalf of the company); id. art. 65(1) (providing responsibilities of the board of directors); id. art. 69(2) (providing that executive body of company shall have authority over all other matters not allocated to the General Meeting of Shareholders or board of directors).)[13]  Courts considering identical situations involving other foreign countries have likewise found that ADR holders of shares in foreign companies lack standing to pursue lawsuits based on injury to the corporation.

---

[13]     Notably, the Russian Joint-Stock Companies law constrains a true shareholder's ability to sue the corporation's own directors on behalf of the corporation.  Under the Russian law, a stockholder must own at least one percent of the company's stock in order to file a claim against a member of the board of directors for harm caused by a director to the corporation.  (Ex. B, Federal Law No. 208-FZ of Dec. 26, 1995 on Joint-Stock Companies, art. 71(5).)  Here, plaintiffs are not true shareholders (they are foreign ADR holders) and do not claim to own more than one percent of Yukos' stock.

E.g., Tomran, Inc. v. Passano, 891 A.2d 336, 346-48 (Md. App. Ct. 2006) (U.S. ADR holders in Irish corporation lacked standing under Irish law to pursue claims on behalf of corporation); Batchelder v. Kawamoto, 147 F.3d 915, 920 (9th Cir. 1998) (U.S. ADR holders in Japanese corporation lacked standing under Japanese law to pursue claims on behalf of corporation). Accordingly, Counts I through VI and XIII must be dismissed for lack of standing.

## IV.   THE AMENDED COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

This Court should dismiss plaintiffs' amended complaint on the independent ground of *forum non conveniens*.   Dismissal under *forum non conveniens* is appropriate "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'"   Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981).   In applying this standard, the Court should determine (1) whether there is an adequate alternative forum and (2) whether private interest and public interest factors weigh in favor of the alternate forum.   Jackson v. American Univ. in Cairo, 52 Fed. Appx. 518, 518 (D.C. Cir. 2002).

Here, an adequate alternative forum plainly exists: the Russian Federation.   The United States Supreme Court has noted that, ordinarily, the requirement that an adequate alternative forum exists "will be satisfied when the defendant is 'amenable to process' in the other jurisdiction."   Piper Aircraft Co., 454 U.S. at 254 n.22.   That requirement is easily satisfied in the present case, in which Gazprom is a Russian corporation with its principal place of business in Moscow, and Miller is a citizen of the Russian Federation.   (Am. Compl. ¶¶ 61, 77.)   Further, Yukos itself appealed the tax assessments underlying this action within the Russian court system.

(Id. ¶¶ 213, 215.)  The possibility that plaintiffs may encounter less favorable law or results in

the Russian courts is not a factor given weight in a *forum non conveniens* analysis.  Piper

Aircraft Co., 454 U.S. at 250-51.[14]

Additionally, both private interests and public interests weigh overwhelmingly in favor of

litigating this suit in the Russian Federation.  Evaluating the private interests of the litigants

requires an examination of "the relative ease of access to sources of proof; availability of

compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing,

witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and

inexpensive."  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).  In this case, all of the acts

and events challenged by plaintiffs occurred in the Russian Federation.  Accordingly, it stands to

reason that the sources of proof relevant to this case are located within the Russian Federation.

Similarly, most witnesses will also be located in the Russian Federation.  Plainly, this action is

much more efficiently and properly pursued in the Russian Federation.

The public interest factors also demonstrate that this action must be pursued, if at all, in

the Russian Federation.  The public interest factors include administrative difficulties resulting

from congestion of the court; whether the community's relation to the litigation justifies the

imposition of jury duty upon the people of the community; the strength of the local interest of

having localized controversies decided at home; and the interest of the court in having the case

tried in the forum whose laws will be applied.  Id.  This litigation is tied exclusively to actors and

events located in the Russian Federation.  The central events of this dispute – focused on one of

---

[14]    Courts have routinely found Russia to be an adequate alternative forum.  See, e.g., Base Metal Trading
Ltd. v. Russian Aluminum, 98 Fed. Appx. 47, 50 (2d Cir. 2004) (finding Russia to be an adequate alternative
forum); Varnelo v. Eastwind Transport, Ltd., 2003 WL 230741, at *13-*18 (S.D.N.Y. Feb. 3, 2003) (same);
Tarasevich v. Eastwind Transport Ltd., 2003 WL 21692759, at *3 (S.D.N.Y. July 21, 2003) (same); Pavlov v.
Bank of N.Y. Co., 135 F. Supp. 2d 426, 435 (S.D.N.Y. 2001) (same), vacated on other grounds, 25 Fed. Appx.
70 (2d Cir. 2002).

the major natural resources of the Russian Federation and the role of the Russian government in regulating its own citizens – are clearly of great importance to the Russian Federation and of minimal importance to this District.

In addition, plaintiffs now allege four independent Russian civil law theories: conversion; fraud and deceit (based on the Russian Civil Code and the Russian Federal Law on the Securities Market); and restitution for "unjust enrichment." (Am. Compl. ¶¶ 318-24, 368-74, 419-24.) Plaintiffs' explicit inclusion of causes of action under the Russian legal code now requires this Court to interpret and apply the laws of the Russian Federation, a factor weighing heavily in favor of dismissal. Id.; Piper Aircraft Co., 454 U.S. at 254.[15]  For these reasons, this Court should dismiss the present litigation because the Russian Federation provides a more convenient and appropriate jurisdiction for the resolution of plaintiffs' claims.

---

[15]    In deciding choice-of-law issues with respect to U.S. common law claims, the District of Columbia considers "the governmental policies underlying the applicable law and which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review," and "(i) the place where the injury occurred; (ii) the place where the conduct causing the injury occurred; (iii) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (iv) the place where the relationship, if any, is centered." Dammarell v. Islamic Republic of Iran, 2005 WL 756090, at *18 (D.D.C. Mar. 29, 2005) (internal quotations omitted).  Under this test, Russian law applies to the allegations in the amended complaint.  All of the acts causing injury alleged in the amended complaint took place in the Russian Federation.  (Am. Compl. ¶¶ 142-58, 163-275, 277-301.)  Only one of the plaintiffs is a resident of the District of Columbia, and all of the defendants are residents of the Russian Federation.  These facts dictate an application of Russian law.  See Minebea Co. v. Papst, 377 F. Supp. 2d 34, 38 (D.D.C. 2005) (German law controlled where a "significant portion of the conduct alleged . . . occurred in Germany[,] [n]one of the relevant events occurred in New York, nor are any of the parties New York entities").  Further, the Russian Federation has a strong interest in having its laws applied to the present case.  These considerations require an application of Russian law.  Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. Rosvoorouzhenie, 172 F. Supp. 2d 79, 94 (D.D.C. 2001) (Russian law applied where the defendant was an agency or instrumentality of the Russian government and "Russia has an extremely strong interest in ensuring that its state-controlled agencies are not subjected to laws that contravene its own").  That Russian law applies to this dispute strongly supports dismissal on the basis of *forum non conveniens* and is also consistent with the conclusion that U.S. securities and RICO statutes should not be applied extraterritorially to the conduct alleged, as discussed below.

**V.    PLAINTIFFS' RICO AND FEDERAL SECURITIES CLAIMS MUST BE DISMISSED BECAUSE THESE LAWS CANNOT BE APPLIED EXTRATERRITORIALLY TO THE ALLEGED CONDUCT**

This Court should refuse to apply U.S. RICO and securities laws to the actions alleged in the amended complaint.  It is a basic "principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991).  Congress intended RICO to be applied to a "controversy involving significant and material contact with the United States."  North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir. 1996); Attorney Gen. v. R.J.R. Holdings, Inc., 268 F.3d 103 (2d Cir. 2001).

In Doe I v. State of Israel, the D.C. District Court recently reaffirmed that extraterritorial application of RICO may occur only in an extremely narrow category of cases – when there are "substantial, deleterious effects that such activity has on the United States" – and also reemphasized that Congress did not contemplate that RICO would permit "individual citizens to invalidate a foreign sovereign's internal policies."  400 F. Supp. 2d at 115-16.  Just as in Doe I, this Court must refrain from applying RICO to the actions alleged because there can be no claim that the wholly foreign conduct alleged had "substantial, deleterious" effects in the U.S. and because plaintiffs seek to use RICO to invalidate the official internal actions of a foreign sovereign.[16]

The Court should likewise refuse to apply U.S. securities laws to the wholly foreign conduct that plaintiffs challenge.  Just as with RICO, there is a presumption against the

---

[16]    In addition, three plaintiffs are not U.S. citizens, thus creating an even more compelling case for the Court to refrain from applying RICO extraterritorially.  See, e.g., OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F. Supp. 2d 357, 367 (S.D.N.Y. 2005) (dismissing RICO claim of foreign plaintiffs against foreign defendants, court found "it is unlikely that Congress intended for federal courts to devote precious resources to claims based on foreign injuries resulting from a foreign company's foreign conduct.  To hold otherwise would be to extend RICO liability over the world.").

extraterritorial application of United States' securities laws. In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 9, 11 (D.D.C. 2000). When a plaintiff attempts to hold a party liable under the Exchange Act for actions committed outside the United States, the courts generally apply the "effects test" and inquire whether "acts done outside a jurisdiction [were] intended to produce and produc[ed] detrimental effects within it." Id. at 10. In addition, the connection between the defendant, the defendant's alleged statements and the plaintiff must be concrete and clear before U.S. securities laws may be applied extraterritorially. See, e.g., Interbrew, S.A. v. EdperBrascan Corp., 23 F. Supp. 2d 425, 429-30 (S.D.N.Y. 1998) (U.S. securities laws did not apply to Canadian corporation's misrepresentations concerning the value of another corporation, despite the fact that certain investors in the other corporation were Americans); cf. Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 989 (2d Cir. 1975) (U.S. securities laws did not apply when securities were never intended to be offered in the United States, despite claim that defendant provided misinformation concerning its securities that reached U.S. investors).

U.S. securities law cannot be applied in the instant case. All of the alleged conduct took place inside the Russian Federation, by entities (including the Russian government itself) that have no connection or relationship with these plaintiff-ADR purchasers – such as issuer-buyer or shareholder-director in the same corporation – as to which extraterritorial jurisdiction could be appropriate.[17] Further, there is no claim, nor can there be, that any defendant intentionally directed any information or statement to these plaintiffs in the United States. As a result, any alleged statement or omission was clearly not "intended to" produce detrimental effects in the

---

[17] It is especially clear that United States securities laws cannot be applied to plaintiffs Thijssen, FCT America Limited and McDonnell because they are not even U.S. citizens and did not purchase ADRs on U.S. stock exchanges. See Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993) (securities laws did not apply to claims arising from transactions on foreign exchanges); Koal Indus. Corp. v. Asland, S.A., 808 F. Supp. 1143, 1155 (S.D.N.Y. 1992) (extraterritorial application of the securities laws was not available to a non-American investor).

U.S. and any alleged "effects" here were indirect and incidental. Indeed, plaintiffs concede as much by alleging violations of the Russian Federation's securities code (Count VIII) based on the same conduct they challenge under U.S. law. Counts IV-VI, XI, and XII must be dismissed.

## VI.    PLAINTIFFS' SECURITIES FRAUD CLAIMS ARE BASELESS

In Count XI of their amended complaint, plaintiffs attempt to hold a corporation (Gazprom) – in which they have not purchased or held shares – as well as its Chairman (Miller) liable for securities fraud under the United States Securities and Exchange Act. As shown below, plaintiffs' securities fraud claim is absurd and must be dismissed for failing to state the elements of a viable claim.

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misstatement or omission, (2) made with scienter, (3) made in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); IDT Corp. v. eGlobe, Inc., 140 F. Supp. 2d 30, 33 (D.D.C. 2001). A plaintiff must plead securities fraud with particularity. Fed. R. Civ. P. 9(b). The Private Securities Litigation Reform Act ("PSLRA"), which amended the Securities Exchange Acts of 1933 and 1934, mandates that a complaint alleging securities fraud "specify each statement alleged to have been misleading," "the reason or reasons why the statement is misleading," and defendants' scienter. 15 U.S.C. § 78u-4(b)(1). The allegations must include the "time, place, and content of the false misrepresentations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud." Semon v. Ledecky (In re United States Office Prods. Sec. Litig.), 326 F. Supp. 2d 68, 73 (D.D.C. 2004).

A.    **Plaintiffs Cannot Rely Upon Alleged Misstatements By Yukos'
Competitor, Gazprom (Or Its Chairman), "In Connection With" The
Purchase Or Sale Of A Security**

Plaintiffs' securities fraud claims are premised on the incorrect assumption that either an

omission or a misstatement by one corporation (or its chairman) can form the basis of securities

fraud claim by shareholders of another, unrelated, antagonistic corporation.    However, one

company, especially an alleged competitor such as Gazprom, has no duty of disclosure to the

shareholders of another company/competitor, such as Yukos.    See Lindblom v. Mobile

Telecomms. Techs. Corp., 985 F. Supp. 161, 161-62 (D.D.C. 1997) (subsidiary had no duty of

disclosure to shareholders of its parent); Gershon v. Wal-Mart Stores, Inc., 901 F. Supp. 128, 131

(S.D.N.Y. 1995) ("Even presuming that Wal-Mart was in possession of material non-public

information . . . it still had no disclosure duty . . . because it lacked the requisite fiduciary

relationship to Gitano shareholders.").    In fact, shareholders cannot sue their own corporation for

failing to disclose material information about a competitor.    Kowal v. MCI Commc'ns Corp.,

1992 WL 121378, at *5 (D.D.C. May 20, 1992), aff'd, 16 F.3d 1271 (D.C. Cir. 1994) (finding

MCI's omissions were not made "in connection with" the purchase or sale of securities because

it had no duty to provide its shareholders information about AT&T's successful marketing

campaign).

Similarly, neither Gazprom nor Miller can be held liable by shareholders in another

company for affirmative misstatements.    See Ontario Pub. Serv. Employees Union v. Nortel

Networks Corp., 369 F.3d 27, 28-29 (2d Cir. 2004).    In Ontario, the Second Circuit affirmed the

dismissal of a complaint brought by shareholders of JDS against Nortel, a company that had

close business relationships with JDS.    Id.    The court found the JDS shareholders did not have

standing to bring their suit against Nortel because, "instead of purchasing securities of the entity

that made the alleged misrepresentations [Nortel], they purchased securities of a company that

35

had a business relationship with the misrepresenter [JDS]." Id. at 32. The Second Circuit went on to explain that in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 747 (1975), the Supreme Court had articulated a purchaser-seller requirement that "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." Id. The Court for this District has reached a similar conclusion concerning misstatements made by another company, albeit with less explanation. Lindblom, 985 F. Supp. at 161-62, 164 (finding statements were not issued "in connection with" the purchase or sale of a security, explaining simply: "[The subsidiary] was not selling stock."). In light of these authorities, it is plain that Gazprom and Miller owed Yukos ADR holders no duty and plaintiffs cannot rely upon Gazprom's or Miller's alleged misstatements. Rather, if plaintiffs are truly intent on seeking relief under Rule 10b-5, the proper defendant is Yukos and its directors.

### B. Plaintiffs Have Failed To Plead Scienter On The Part Of Gazprom Or Miller

The amended complaint also fails to, "with respect to each act or omission alleged to violate [Section 10], state with particularity facts giving rise to strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also Dura Pharm., Inc., 544 U.S. at 345; IDT Corp., 140 F. Supp. 2d at 33; Semon, 326 F. Supp. 2d at 79.

Here, rather than alleging facts giving rise to a strong inference that Gazprom or Miller made knowingly false statements, plaintiffs state only conclusions of "knowing" and "reckless" conduct (Am. Compl. ¶ 394), which fail to satisfy the heightened pleading standards under the PSLRA. See Semon, 326 F. Supp. 2d at 78 (dismissing allegations of "a factual statement coupled with a conclusory allegation that the defendants acted with fraudulent intent"); In re Loewen Group, Inc., 2004 WL 1853137, at *18 (E.D. Pa. Aug. 18, 2004) ("To survive the motion to dismiss on this claim plaintiffs must plead specific facts that would support an

inference that Mr. Loewen or another executive officer had actual knowledge that Loewen Group had no intention of exploring the possibility of securitizing receivables.").[18]  Since enactment of the PSLRA, plaintiffs typically allege "motive and opportunity" and additional particulars that create a strong inference of scienter.  See Provenz v. Miller, 102 F.3d 1478 (9th Cir. 1996).  Thus, if – as in Provenz – plaintiffs had alleged that *Yukos* insiders – not Gazprom – had touted Yukos stock, while secretly dumping all of their shares, they may have come close to alleging the requisite scienter.

In this case, the crux of plaintiffs' securities fraud claim is that Gazprom or Miller falsely "touted" Yukos – thereby inflating the value of their stock.  But the broader thesis of plaintiffs' amended complaint is that "the defendants" wanted to obtain control of Yukos' assets "on the cheap."   This inconsistency only underscores the deficiencies hidden behind plaintiffs' conclusory allegations of scienter.  Plaintiffs fall far short of satisfying their burden of alleging specific facts providing a strong inference of Gazprom's or Miller's scienter.

### C.       Plaintiffs Have Failed To Allege Loss Causation

The amended complaint makes no effort to show how any one of the 43 individual plaintiffs' injuries was caused by Gazprom's or Miller's allegedly false statements.   Rather, Exhibit A to plaintiffs' amended complaint simply lists dozens of purchases of Yukos ADRs throughout 2003 and 2004.   Rather than meeting their pleading burden, plaintiffs instead maintain that they suffered loss due to the government's December 2004 alleged "nationalization" of Yukos, and acquisition by Rosneft.

---

[18]       In addition, where the alleged misstatements are "forward looking" statements, such as statements concerning Gazprom's future intentions, an allegation of "actual knowledge" of their falsity on the part of the defendant is required.  Miller v. Champion Enters., Inc., 346 F.3d 660, 672 (6th Cir. 2003); Theoharous v. Fong, 256 F.3d 1219, 1224-25 (11th Cir. 2001).

Loss causation requires a "direct or proximate relationship between the loss and the misrepresentation." Cole v. Federal Home Loan Mortg. Ass'n, 1991 WL 180295, at *6 (D.D.C. Aug. 27, 1991); Dura Pharm., 544 U.S. at 342-43. Here, plaintiffs have made no attempt to show either how the truth of Gazprom's or Miller's specific alleged false statements caused the price of the shares to drop, or how that timing corresponds to a loss suffered by any of the plaintiffs – who sold their shares over a period of *18 months*.[19]

Rather, plaintiffs have alleged several dozen misstatements made by the various defendants over the course of more than one year. The alleged misstatements relate to numerous individual facts, such as whether Mikhail Khodorkovsky's criminal trial would comport with due process under Russian law,[20] whether various defendants were supportive of ExxonMobile acquiring a stake in Yukos,[21] whether the tax audit of Yukos would comport with due process under Russian law,[22] whether any of the defendants had "intended" Yukos assets be "nationalized,"[23] and whether Gazprom would participate in the Russian Federation's auction of Yukos' YNG asset.[24] Plaintiffs allege that the "truth" regarding these facts also became known at various times over the course of the year and a half.[25]

---

[19]    The first plaintiff to sell his Yukos ADRs is David Shwayder on March 18, 2004; the last plaintiff to sell his Yukos ADRs is Maxwell Van De Velde on October 3, 2005. (Am. Compl. Ex. A.)

[20]    See, e.g., Am. Compl. ¶¶ 147-51.

[21]    See, e.g., Am. Compl. ¶¶ 172-75.

[22]    See, e.g., Am. Compl. ¶¶ 183, 187, 192, 194, 227, 265.

[23]    See, e.g., Am. Compl. ¶¶ 187, 188-91, 193, 226, 230-31, 234, 266.

[24]    See, e.g., Am. Compl. ¶¶ 263, 267-69.

[25]    See, e.g., Am. Compl. ¶¶ 163, 178, 185, 225-26, 261, 271, 274.

Because the price of Yukos ADRs fluctuated continuously over the course of the eighteen months in question, and because the timing of plaintiffs' sales of their shares also varied widely, plaintiffs have failed to plead loss causation with specificity.  The Supreme Court has explained:

> When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

Dura Pharm., 544 U.S. at 342-43.  As a result, plaintiffs must allege and prove traditional elements of causation.  Id. at 346; see also D.E.&J. Ltd. P'ship v. Conaway, 133 Fed. Appx. 994, 999-1000 (6th Cir. 2005) (holding plaintiff had not pled loss causation where it "did not estimate the damages that the alleged fraud caused, and did not connect the alleged fraud with the ultimate disclosure and loss").

Plaintiffs have not met that burden with respect to Gazprom or Miller.  Plaintiffs make no attempt to link the decrease in the price of Yukos ADRs to the issue of whether a competitor – Gazprom – was or was not interested in the Russian Federation's tax auction of Yukos assets. Rather, plaintiffs allege that "Plaintiffs' ADRs are now effectively worthless, and they have become worthless because Yukos's most valuable asset has been transferred to a state-owned commercial enterprise."  (Am. Compl. ¶ 310.)  Plaintiffs have taken painstaking steps to lay out the actions they believe led to the loss of the Yukos assets:  the Russian Federation's tax assessment against Yukos.  In sum, plaintiffs have failed to plead loss causation.

Relatedly, the timing of plaintiffs' purchases belies any claim that they did so as a result of any statement made by Gazprom or Miller.  The requirement of "reliance" – sometimes phrased as one of "causation" – is a method of insuring the existence of a causal link between the misrepresentation or omission and the plaintiff's alleged injuries.  See Dura Pharm., 544 U.S. at

341.  While plaintiffs have not made any showing that it is appropriate to presume reliance based on fraud-on-the-market theory,[26] even if they had, the presumption of reliance can be rebutted through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."  Basic, Inc. v. Levinson, 485 U.S. 224, 248 (1988).

Here, plaintiffs' amended complaint Exhibit A clearly shows that the overwhelming majority of their purchases had no relation whatsoever to Gazprom's or Miller's alleged misstatements.  For example, plaintiff Alemian purchased his Yukos ADRs on June 23, 2004. (Am. Compl. Ex. A.)  Even if the Court accepts plaintiffs' premise that virtually any statement can be attributed to Gazprom or Miller, and thus considers all nine statements alleged by plaintiffs, the closest possible Gazprom/Miller statement on which Alemian could have relied occurred over six months earlier, on January 20, 2004 (made by Medvedev concerning the Russian Federation's treatment of Yukos).  The same is true of plaintiff Davis, who purchased his shares on June 22, 2004, plaintiff Neisius, who purchased his shares on June 21, 2004, and plaintiff Ingber, who purchased his shares on April 22, 2004.  Accordingly, plaintiffs' allegations of reliance – a necessary element of a Section 10b-5 cause of action – are both conclusory and contrary to the facts pleaded in the amended complaint.

Nor could plaintiffs have reasonably relied on the statement of a competitor (or its chairman).  As established above, Gazprom and Miller had no duty to Yukos shareholders. Indeed, according to plaintiffs' own amended complaint, Gazprom's interests were adverse to Yukos.  (E.g., Am. Compl. ¶¶ 103, 113.)  In addition, plaintiffs' "reliance" on or "loss" caused

---

[26]    Plaintiffs have not made any effort to demonstrate that the fraud-on-the-market theory may be appropriately applied to Yukos stock or ADRs, particularly given their allegation that more than 50% of Yukos stock is controlled by insiders like Group Menatep, the same group that is paying plaintiffs' attorneys to bring this suit.

by the allegedly calming representation of the Russian Federation occurred when the highly public and publicized investigation and prosecution of Yukos, its officers, and its shareholders were all storm warnings that Yukos was in danger. E.g., Davidson v. Wilson, 973 F.2d 1391, 1400-01 (8th Cir. 1992) (rejecting investors' claims of reasonable reliance where misleading statements came from a party who owed no fiduciary duty to the investors, with whom the investors had no long-standing relationship, and where the investors had access to information that directly contradicted the statements); Asher v. Baxter Int'l, Inc., 377 F.3d 727, 732 (7th Cir. 2004) ("An investor who invokes the fraud-on-the-market theory must acknowledge that *all* public information is reflected in the price.").

### D. Plaintiffs Have Failed To Allege Material Misstatements Or Omissions On The Part Of Gazprom Or Miller

#### 1. Plaintiffs Improperly Attribute Statements To Gazprom

In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), the Supreme Court held that aiding and abetting liability for securities fraud is unavailable under Section 10(b). The lower federal courts have similarly rejected aiding and abetting claims which are phrased as "conspiracy" claims – like here. E.g., Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 841-43 (2d Cir. 1998); In re GlenFed, Inc. Sec. Litig., 60 F.3d 591, 592 (9th Cir. 1995). The rule announced in Central Bank requires "a plaintiff to allege that each and every defendant committed its own independent primary violation of securities laws in order to state a claim." In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d 1018, 1039-40 (C.D. Cal. 2003), aff'd, 2006 WL 1791042 (9th Cir. June 30, 2006). Thus, for primary liability to attach to a defendant, the misrepresentation must be attributed to that specific actor. Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) ("the misrepresentation must be attributed to that specific actor *at the time of public*

*dissemination*, that is, in advance of the investment decision") (emphasis added); see also In re Sotheby's Holdings, Inc., 2000 WL 1234601, at *5 (S.D.N.Y. Aug. 31, 2000).

Plaintiffs now seek to avoid these rules by alleging in conclusory fashion that certain "statements" were made on "behalf of" Gazprom.  (Am. Compl. ¶¶ 151, 173, 193, 194, 233, 263, 267, 268-69.)    Plaintiffs allege Gazprom was somehow responsible for nine supposed misstatements.  But of these nine statements, four are entirely unrelated to Gazprom.  (Id. ¶¶ 151, 173, 193, 194.)  While plaintiffs allege in conclusory fashion that these "statements" were made "on behalf of" Gazprom, the Court need not accept such bare legal conclusions where they are unsupported by the actual facts pled.   Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation . . . or to accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint") (quotations omitted); Dover Ltd. v. A.B. Watley, Inc., 423 F. Supp. 2d 303, 318-21 (S.D.N.Y. 2006) (allegations that statements by an affiliate's principal had been made "on behalf of" another firm were legally insufficient); In re WorldCom, Inc. Sec. Litig., 2003 WL 21488087, at *10 (S.D.N.Y. June 25, 2003) (same).  Here, plaintiffs have not only failed to plead facts to support the conclusion these statements were made "on behalf of" Gazprom, but they have actually pled to the contrary of their bald allegations.

For example, in paragraph 151 plaintiffs allege:

On November 2, 2003, Defendant Medvedev, . . . stated *on behalf of* himself and Defendants Russian Federation, Rosneft, and Gazprom on the state television channel *Rossiya* that, "We are proceeding on the assumption that these matters will be exhaustively examined and that a verdict on the guilt of the person in question [Khodorkovsky] will only be reached in accordance with Russian Law." BBC Monitoring reported that Medvedev . . . continued:  "At the same time, it is very important that the law, including laws about responsibilities, is applied not selectively but across the board to all Russian citizens . . . I believe that the state must help law-enforcement bodies and ensure their independence in everyday work, not allowing various forces to intervene in their activities."

(Am. Compl. ¶ 151 (emphasis added).)  However, the facts actually alleged do nothing to support the bare assertion that Medvedev was speaking "on behalf of" Gazprom or even that he had any relationship with Gazprom; indeed, the cited "quotes" themselves makes no reference to Gazprom.  Read in their context, the articles identify Medvedev as "the Kremlin's influential new chief of staff" – and likewise do not mention Gazprom.  (Ex. C.)[27]  Plaintiffs also recognize that at the time the statement was made, Medvedev was President Putin's Chief of Staff.  (Am. Compl. ¶ 75.)  Given the substance of the statements – relating to the Russian Federation's handling of Khodorkovsky's trial – these "statements" cannot fairly be attributed to Gazprom. This same is true of the other statements allegedly made "on behalf of" Gazprom in paragraphs 173,[28] 193[29] and 194[30] of the amended complaint.  In none of these articles is the speaker ever tied to Gazprom, nor is Gazprom ever mentioned.  (Exs. D, E, F.)  Accordingly, none of these statements satisfy the primary violation requirement of <u>Central Bank</u>.  <u>See Wright</u>, 152 F.3d at 172 (holding auditor could not be held liable in connection with client's press release that did not mention auditor); <u>In re Sotheby's Holdings, Inc.</u>, 2000 WL 1234601, at *5 (S.D.N.Y. Aug. 31,

---

[27]    It is well settled that in ruling on a Rule 12(b)(6) motion directed to a securities fraud claim, the Court may properly consider the entire newspaper article or other source containing the allegedly misleading statements.  <u>New York State Bar Ass'n v. FTC</u>, 276 F. Supp. 2d 110, 114 n.6 (D.D.C. 2003).

[28]    "On October 10, 2003, Defendant Yusufov, then the Russian Federation's Minister of Industry and Energy, speaking on behalf of himself and Defendants Russian Federation, Rosneft, and Gazprom at a news conference with foreign reporters, said it would be 'a positive step' if ExxonMobile were to acquire a stake in YukosSibneft.  'Of course, it fills us with pride that discussions are under way with the first company in the world, ExxonMobile,' Yusufov said, according to the Associate Press.  'To receive that kind of partner, in my view would be everyone's wish.'"  (Am. Compl. ¶ 173.)

[29]    "On November 29, 2003, the *Los Angeles Times* reported that Russian Economic Development and Trade Minister German O. Gref, speaking on behalf of Defendants Russian Federation and Gazprom, stated that, 'the nationalization of Yukos is not an issue.'"  (Am. Compl. ¶ 193.)

[30]    "On January 20, 2004, Defendant Medvedev, on behalf of himself and Defendants Russian Federation, Rosneft, and Gazprom contributed an op-ed to the *Financial Times* in which he intentionally misrepresented to Yukos investors that the Russian Federation would provide the company and its former chairman a fair and impartial judicial process . . . ."  (Am. Compl. ¶ 194.)

2000) (subsidiary not responsible for press reports that did not identify the corporate speaker as someone working for subsidiary).

### 2.    No Material Misstatements Were Made By Gazprom Or Miller

Plaintiffs' five remaining alleged misstatements relate to Gazprom's supposed intentions concerning its potential participation in the Russian Federation's auction of Yukos' assets. Plaintiffs allege that Miller made statements on behalf of Gazprom during the summer and fall of 2004 indicating:  (1) that Gazprom did not seek to destabilize Yukos, but, "on the contrary, it wants to develop joint projects with the company" (Am. Compl. ¶ 233); (2) that "Gazprom is not considering acquiring Yukos assets" (id. ¶ 263); (3) that "Gazprom does not have any plans to buy Yukos assets.  We are interested in this company being stable" (id. ¶ 267); (4) that "We are not considering the possibility of taking part in an auction" of Yukos assets (id. ¶ 268); and (5) that Miller stated to reporters, "I haven't heard anything about this," referring to plans by Gazprom to take part in the auction of YNG (id. ¶ 269).

As a threshold matter and as noted above, plaintiffs do not state with particularity facts establishing Miller's and/or Gazprom's scienter.  Second, even assuming – contrary to law – that plaintiffs could or did "rely" on these alleged statements, they are not actionable as statements of alleged "fact" because they concern *future* alleged intentions and plans – not past or present facts – and they were made by a company in which plaintiffs do not even own stock.  See In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 371 (D. Md. 2004) ("projections of future performance not worded as guarantees are generally not actionable under the federal securities laws"); In re Empyrean Bioscience, Inc. Sec. Litig., 255 F. Supp. 2d 751, 763 (N.D. Ohio 2003) (noting protected forward-looking statements include "statements of plans and objectives"); In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724, 737-38 (W.D. Ky. 2004) (finding statements that relate management's expectations for the company's future

operations are "classically forward-looking"); cf. Bennett v. Kiggins, 377 A.2d 57, 61 (D.C. 1977) (corporation's statement of belief it would achieve liquidity in three to five years not actionable).

Third, the alleged statements are not "material" as a matter of law.  A statement is "material" when it would alter the "mix" of information available to an investor such that it would meaningfully affect the investment decision.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  Here, the cited statements of Gazprom's future plans not to acquire Yukos are not conceivably "material."  Whether Gazprom was going to participate in an auction of Yukos hardly altered the "total mix of information."  Id.  Such a statement by a competitive company has no legal relevance or legal materiality to stockholders or Yukos, particularly given the well-known tax issues with Russian Federation authorities.  (See Section VI.A.)

Finally, the amended complaint on its face demonstrates that there was nothing "false" about the cited statements.  The amended complaint alleges that Gazprom did not participate in the auction and that it sold off Gazpromneft prior to the auction (and even Gazpromneft is alleged not to have participated in the auction).  There is no allegation that Gazprom acquired any Yukos assets.  Plaintiffs have not asserted a plausible theory of a false statement.

## VII.    THE "INSIDER TRADING" COUNT AGAINST GAZPROM MUST BE DISMISSED

Along with the deficient securities fraud claim, the amended complaint contains a count (Count XII) by a single plaintiff – Jerry Louis Reinhardt – alleging "insider trading" under section 20A(a) of the 1934 Securities Exchange Act (15 U.S.C. § 78t-1(a)) against Gazprom.[31]

---

[31]         Section 20A(a) provides: "Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased

The amended complaint alleges generally that "in late May 2004," Gazprom "received material, nonpublic information regarding the outcome of Yukos's pending challenge to the Russian Federation's tax demands" and "engaged in a short sale of Yukos stock." (Am. Compl. ¶ 240.) The amended complaint alleges that Gazprom made this trade on May 25, 2004 using its "majority-owned subsidiary and authorized banking agent." (Id. ¶¶ 240-41.) The amended complaint further alleges that on May 27, 2004 – the day after the tax court decision upholding Yukos' tax fraud liability – "the price of Yukos stock began to fall." (Id. ¶ 245.) Gazprombank allegedly "closed out" its "short positions" in Yukos on May 27, 2004. (Id.) As shown below, Reinhardt's insider trading claim against Gazprom predicated on these allegations is baseless for at least four independent reasons.

### A.    Reinhardt Has Not Alleged Facts Supporting An Insider Trading Theory

Reinhardt has failed to allege, and cannot allege, a cognizable "insider trading" theory against Gazprom.  First, as with plaintiffs' securities fraud claims, Reinhardt's vague and conclusory assertion that Gazprom "received" unspecified "nonpublic information regarding" Yukos' pending tax appeal "in late May 2004" fails to satisfy the heightened pleading standards under the PSLRA.  See In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 916 (S.D. Tex. 2001) ("[t]here is no specific allegation of what nonpublic information was used by Defendants to trade or how they knew such information was material or nonpublic").  Second, an insider trading claim is limited to persons who improperly use "inside" information of a company in breach of a fiduciary duty – i.e., "insiders" of the company, those tipped by them, or those who misappropriate confidential information from the company in breach of a duty to the source of the information.  See Chiarella v. United States, 445 U.S. 222, 228 (1980) (insider

_____

(where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."  15 U.S.C. § 78t-1(a).

trading exists under § 10(b) when there is a "relationship of trust and confidence" between shareholders of a corporation and "those insiders who have obtained confidential information by reason of their position with" corporation); Dirks v. SEC, 463 U.S. 646, 660 (1983) ("[T]ippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee, and the tippee knows or should know that there has been a breach."); United States v. O'Hagan, 521 U.S. 642, 652, 655-66 (1997) (person who trades on material, non-public information in breach of a fiduciary duty to source of information (by deceiving source through failing to disclose such information) may be liable under misappropriation theory of insider trading).

Here, Gazprom plainly is not an "insider" of Yukos, is not alleged to have received any information from an insider of Yukos, and is not alleged to have obtained any of *Yukos'* inside information. There is no claim, nor can there be, that Gazprom owed a fiduciary duty to Yukos, its shareholders, or holders of Yukos ADRs. Indeed, there is no allegation, or facts supporting any claim, that Gazprom owed, much less breached, any "duty" to anyone; the alleged "source" of the information is not even mentioned. Instead, the amended complaint vaguely alleges that "in late May 2004," Gazprom supposedly "received" information regarding Yukos' tax litigation. (Am. Compl. ¶ 240.) Reinhardt's allegations simply do not raise a cognizable "insider trading" claim against Gazprom. See, e.g., Chiarella, 445 U.S. at 232-33 (printer who traded on advance knowledge of takeover bids not liable for insider trading because he had no prior dealings with target companies, "was not their agent, not a fiduciary," and "was not a person in whom the sellers placed their trust and confidence"); United States v. Cassese, 273 F. Supp. 2d 481, 486-87 (S.D.N.Y. 2003) (dismissing insider trading count in indictment against

CEO who traded on information provided by competitor / potential acquirer); Salovaara v. Jackson Nat'l Life Ins. Co., 66 F. Supp. 2d 593, 602 (D.N.J. 1999) (dismissing insider trading claim "because Plaintiffs were not the source of the information . . . and there was no fiduciary relationship").

### B.     Reinhardt Lacks Standing To Pursue Any Insider Trading Claim

Separately, Reinhardt has no standing to pursue his insider trading claim because his alleged trades substantially preceded and post-dated the transaction he attempts to challenge. It is a black-letter rule that a plaintiff bringing an insider trading claim cannot seek to recover for trades made before the defendant's trades. Newby v. Lay (In re Enron Corp. Sec.), 258 F. Supp. 2d 576, 600 (S.D. Tex. 2003) ("the plaintiff's trades must have taken place after the challenged insider trading transaction"); In re MicroStrategy Inc. Sec. Litig., 115 F. Supp. 2d 620, 663-64 n.91 (E.D. Va. 2000) (same); In re Verifone Sec. Litig., 784 F. Supp. 1471, 1489 (N.D. Cal. 1992) ("No liability can attach for trades made by plaintiffs before the insider engages in trading activity."), aff'd, 11 F.3d 865 (9th Cir. 1993); T. Rowe Price New Horizons Fund v. Preletz, 749 F. Supp. 705, 710 (D. Md. 1990); Alfus v. Pyramid Tech. Corp., 745 F. Supp. 1511, 1522 (N.D. Cal. 1990). In addition, the courts have overwhelmingly interpreted the contemporaneousness requirement in the statute strictly and have required that the plaintiff trade *when* the defendant trades to state a viable claim. In re Redback Networks, Inc., 2006 WL 1805579, at *7 (N.D. Cal. Mar. 20, 2006) ("contemporaneous requirement" requires "trading on the same day"); In re MicroStrategy, 115 F. Supp. 2d at 664 ("one-day contemporaneity period is appropriate"); Copland v. Grumet, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) (two-day difference not contemporaneous); In re AST Research Sec. Litig., 887 F. Supp. 231, 234 (C.D. Cal. 1995) (same-day trades required); In re Enron Corp. Sec., 258 F. Supp. 2d at 600 ("two or three days, certainly less than a week" is appropriate period).

While the amended complaint asserts, in conclusory fashion, that Gazprom's alleged "short sale of Yukos stock" was "executed contemporaneously with the stock purchase" of Reinhardt (Am. Compl. ¶¶ 246, 403), the details of his alleged trades buried in the appendix to the amended complaint conclusively disprove this bald contention. According to the appendix, Reinhardt made purchases of Yukos ADRs on November 18, 2003, May, 11, 2004, and July 1, 2004. (Am. Compl. ¶ 47 & A-4.) Two of these alleged purchases long preceded the alleged Gazprom transaction (May 25 or 27, 2004) and therefore fail under the rule preventing recovery for trades that occurred before the defendant's alleged trades.

Just as critically, none of Reinhardt's alleged trades was "contemporaneous" with Gazprom's alleged trade – indeed, the closest occurred two weeks before the challenged, alleged transaction and the others occurred months before (November 18, 2003) and after it (July 1, 2004). These allegations fail as a matter of law. See In re MicroStrategy Inc. Sec. Litig., 115 F. Supp. 2d at 664 (three-day separation insufficient); Croker v. Carrier Access Corp., 2006 WL 2035366, at *13 (D. Colo. July 18, 2006) (trades 15 and 27 days apart from defendant's trade insufficient); Wilson v. Comtech Telecomm. Corp., 648 F.2d 88, 95 (2d Cir. 1981) (purchase one month after challenged transaction insufficient); Backman v. Polaroid Corp., 540 F. Supp. 667, 671 (D. Mass. 1982) (trades occurring four and eleven days after challenged trades not sufficient), aff'd, 910 F.2d 10 (1st Cir. 1990).

The application of these rules makes particular sense here. Reinhardt's own allegations define a very short period during which Gazprom allegedly had or acted on "nonpublic" information: from "late May 2004" (when it "received" the allegedly non-public information regarding Yukos' tax claim litigation), until May 26, 2004 (when the decision rejecting Yukos' tax appeal was announced). Reinhardt, however, either purchased ADRs long before Gazprom

allegedly "received" or acted on any inside information (his first two purchases), or long after the tax decision was announced (his third and final purchase).   It is plain that Reinhardt cannot pursue an insider trading claim.

### C.   Securities "Of The Same Class" Were Not Traded

Reinhardt's own allegations demonstrate that he did not, as the statute requires, trade in "securities of the same class."   The amended complaint alleges that the "insider trade" by Gazprom was in "Yukos stock," whereas Reinhardt allegedly bought or sold Yukos ADRs. (Am. Compl. ¶¶ 47, 240, 243, 402-08 & A-4.)   Indeed, the amended complaint is careful to distinguish Yukos ADRs from the actual stock of Yukos, which "is an open joint stock corporation organized under the laws of the Russian Federation" (id. ¶ 85).   (Compare id. ¶¶ 12, 85 with id. ¶ 87 (alleging that Group Menatep "owns 51 percent of Yukos stock").)   The amended complaint also plainly alleges that Yukos' "common stock is traded on the Russian stock market," known as the RTS.   (Id. ¶ 104.)   Because the amended complaint states on its face that Reinhardt and Gazprom did not engage in alleged trades of securities in "the same class," Reinhardt's insider trading count must be dismissed for this independent reason as well.   See In re Enron Corp. Sec., 258 F. Supp. 2d at 639 n.66 (defendant's transfers of "Enron Cumulative Second Preferred Stock" were not in "securities of the same class" as plaintiffs' common stock); Clay v. Riverwood Int'l Corp., 157 F.3d 1259, 1269-71 (11th Cir. 1998), as modified, 176 F.3d 1381 (11th Cir. 1999) (stock appreciation rights (SARs) are not "in the same class" as common stock); Morales v. New Valley Corp., 936 F. Supp. 119, 125-26 (S.D.N.Y. 1996) (convertible stock in corporation deemed separate class of stock from preferred and common in determining whether short-swing profits had to be disgorged pursuant to 15 U.S.C. § 78p(b)); Chanoff v. United States Surgical Corp., 857 F. Supp. 1011, 1021 n.10 (D. Conn. 1994) (insider trading

claim not appropriate when plaintiffs did not trade in subject stock), <u>aff'd</u>, 33 F.3d 50 (2d Cir. 1994).

### D.    Reinhardt Failed To Allege A Predicate Violation

Finally, a section 20A claim must be predicated on a separate violation of the 1934 Act or its rules and regulations.  <u>See, e.g.</u>, <u>In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 541 (3d Cir. 1999); <u>Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.</u>, 32 F.3d 697, 703 (2d Cir. 1994). Reinhardt's "insider trading" claim makes no effort to set forth any such violation.  To the extent his claim relies on the other plaintiffs' "securities fraud" theories, it fails for same reasons.

## VIII.   PLAINTIFFS' RICO CLAIMS MUST BE DISMISSED

### A.    Plaintiffs Lack RICO Standing

This Court should dismiss plaintiffs' RICO claims (Counts IV-VI) because plaintiffs lack standing to bring them.  RICO confers a private right of action on "[a]ny person injured in his business or property by reason of a violation of section 1962(c) of this chapter."  18 U.S.C. § 1964(c).  To recover under § 1964(c), plaintiffs must show that the defendant's conduct is the proximate cause of their injury.  <u>Anza v. Ideal Steel Supply Corp.</u>, 126 S. Ct. 1991, 1999 (2006); <u>Holmes v. Securities Inv. Prot. Corp.</u>, 503 U.S. 258, 268 (1992).

The RICO claims are pursued only by "holders" of Yukos ADRs, <u>i.e.</u>, those plaintiffs whose ADRs allegedly declined in value.  Thus, these plaintiffs claim that they have been injured in their business and property because, as a result of defendants' alleged acts, plaintiffs' "investment in Yukos, a company once valued in the billions, is now all but worthless."  (Am. Compl. ¶ 10.)   This indirect injury is inadequate to support a RICO claim.  All circuits addressing such claims have held that a plaintiff cannot bring an individual action under RICO for injuries to the corporation in which the plaintiff owns stock, absent an injury that is separate and distinct from the injury sustained by the corporation or other shareholders.  <u>E.g.</u>, <u>In re</u>

<u>Sunrise Sec. Litig.</u>, 916 F.2d 874, 880 (3d Cir. 1990); <u>Lakonia Mgmt., Ltd. v. Meriwether</u>, 106 F. Supp. 2d 540, 551 (S.D.N.Y. 2000).[32]  The only harm plaintiffs allege is the diminution in value of their ADR shares as a result of the alleged "re-nationalization" of certain of Yukos' assets. Because these are clearly alleged injuries suffered directly by Yukos, and only to the shareholders indirectly, they do not give rise to shareholder standing.  Thus, Counts IV, V and VI must be dismissed.

### B.    Plaintiffs Have Failed To Plead Viable RICO Claims

#### 1.    Plaintiffs Have Failed Sufficiently To Allege Predicate Acts

##### a.    *Mail and wire fraud are not properly alleged*

Plaintiffs' assertion that the mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343) have been violated is based on the contention that "Defendants" made false statements that were transported, transmitted, and/or delivered in interstate and foreign commerce.  (Am. Compl. ¶ 336(a).)  Plaintiffs also cite a statement from the spokesman for Gazprom's Chairman that allegedly aired on a Moscow radio station.  (<u>Id.</u> ¶ 263.)  These contentions do not come close to setting forth cognizable mail or wire fraud claims.

To allege mail fraud under § 1341, "'it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud.'"  <u>Miller v. Yokohama Tire Corp.</u>, 358 F.3d 616, 620

---

[32]    <u>See also</u> <u>Roeder v. Alpha Indus., Inc.</u>, 814 F.2d 22, 30 (1st Cir. 1987); <u>Manson v. Stacescu</u>, 11 F.3d 1127, 1131 (2d Cir. 1993); <u>Leach v. F.D.I.C.</u>, 860 F.2d 1266, 1273-74 (5th Cir. 1988); <u>Warren v. Manufacturers Nat'l Bank</u>, 759 F.2d 542, 544 (6th Cir. 1985); <u>Rylewicz v. Beaton Servs., Ltd.</u>, 888 F.2d 1175, 1179 (7th Cir. 1989); <u>Brennan v. Chestnut</u>, 973 F.2d 644, 648 (8th Cir. 1992); <u>Sparling v. Hoffman Constr. Co.</u>, 864 F.2d 635, 640 (9th Cir. 1988); <u>Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.</u>, 140 F.3d 898, 908 (11th Cir. 1998); <u>cf. Western Assocs. Ltd. P'ship v. Market Square Assocs.</u>, 235 F.3d 629, 635 (D.C. Cir. 2001) (to the extent that plaintiffs' partners in limited partnership suffered losses as a result of racketeering activity against the partnership, they were injured indirectly, which does not make them individual victims under RICO).

(9th Cir. 2004).  Similarly, to allege wire fraud under § 1343, it is necessary to show (1) the existence of a scheme to defraud, (2) use of wire communications in furtherance of the scheme, and (3) that the scheme was intended to deprive a victim of money and property.  United States v. Merklinger, 16 F.3d 670, 679 (6th Cir. 1994).  In addition, a RICO plaintiff alleging fraud as a predicate act must "stat[e] with particularity" the facts supporting that allegation.  Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1229 (D.C. Cir. 1991) (quoting Fed. R. Civ. P. 9(b)); see also Neder v. United States, 527 U.S. 1, 21-25 (1999) (term "defraud" in the mail fraud statute is given its established common law meaning).

Just as with plaintiffs' deficient securities fraud claims, their mail and wire fraud claims likewise fail to allege with any particularity the basics of fraud, including scienter, duty, falsity and reliance.  Plaintiffs have wholly failed to allege facts establishing the requisite intent or falsity on the part of Gazprom or Miller.  The amended complaint contains no specific allegations that any of the 43 plaintiffs, much less all, relied on any challenged statement.  These failures are fatal.  See Byer Indus., Inc. v. Gulf Ins. Co., 888 F. Supp. 1, 2 (D.D.C. 1995) (dismissing RICO complaint alleging wire fraud because it failed to plead a misrepresentation and detrimental reliance with "sufficient particularity"); VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701-02 (6th Cir. 2000) (dismissing RICO complaint based on wire fraud because plaintiffs "failed to allege facts 'with particularity' which would show either intent to defraud or reliance"); Chisolm v. TranSouth Fin. Corp., 95 F.3d 331, 337-38 (4th Cir. 1996) (dismissing RICO claim for failure to "specifically plead" justifiable reliance).

Moreover, in order for mail or wire fraud to occur, the defendant must intentionally use or cause to be used the mails or wires.  18 U.S.C. §§ 1341, 1343.  There is no such claim here; instead, plaintiffs have not alleged any of the defendants, including Gazprom and Miller,

specifically used any mails, much less mails in the United States, or mailed anything to or from the U.S. Plaintiffs' only allegation relating to the use of wires is that a "spokesman" for Defendant Miller made a statement that was aired on a Russian radio station and a Rosneft "spokesman" made a statement in a telephone interview with a Russian newspaper. (Am. Compl. ¶ 263.) The U.S. mail and wire fraud statutes simply do not reach these defective allegations. Hernandez v. Ballesteros, 333 F. Supp. 2d 6, 12 (D.P.R. 2004) ("An essential element of the federal wire fraud statute is the use of interstate communication lines."), aff'd, 449 F.3d 240 (1st Cir. 2006); Brooke v. Schlesinger, 898 F. Supp. 1076, 1082 (S.D.N.Y. 1995) ("'[W]ire fraud requires the additional element of a communication crossing state lines.'"); Utz v. Correa, 631 F. Supp. 592, 596 (S.D.N.Y. 1986) ("[T]he predicate act of wire fraud requires an interstate telephone call."); Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992) (misrepresentations that occurred at a meeting do not constitute wire or mail fraud).

### b. A "Hobbs Act" claim is not adequately pled

To the extent that plaintiffs are asserting that Gazprom or Miller somehow violated 18 U.S.C. § 1951, such a contention is baseless and must be rejected. This statute prohibits "extortion" by obtaining "property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Extortion "under the color of official right" is the wrongful taking by a public officer of money or property not due him or his office. United States v. French, 483 F. Supp. 523, 523 (E.D. Mo. 1980), rev'd on other grounds, 628 F.2d 1069 (8th Cir. 1980); United States v. Tillem, 906 F.2d 814, 821 (2d Cir. 1990). Gazprom and Miller are not alleged to be, and are not, "public" or "official" entities/officials and are not alleged to have "obtained" any of plaintiffs', or even Yukos', property.

Moreover, § 1951 requires an obstruction of "commerce," which includes only commerce "within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."  18 U.S.C. § 1951(b)(3).  Here, plaintiffs have not come close to satisfying this requirement because all of their allegations involve the property of Yukos inside the Russian Federation, not the U.S., and there is no plausible claim that Gazprom's or Miller's alleged misconduct affected commerce within the U.S.

c.    A "Travel Act" claim is not adequately pled

Plaintiffs' allegation that the "RICO defendants" traveled with the intent to carry on unlawful activity in violation of 18 U.S.C. § 1952 is also insufficient.  Section 1952 requires that the defendant travel in interstate or foreign commerce with the intent to "(1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."  18 U.S.C. § 1952(a).[33] Section 1952 is "aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another."  Rewis v. United States, 401 U.S. 808, 811 (1971).

---

[33]    "Unlawful activity" under 18 U.S.C. § 1952(b) is defined as (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under 31 U.S.C. § 5311 (the "Bank Secrecy Act"), 18 U.S.C. § 1956 (laundering of monetary instruments), or 18 U.S.C. § 1957 (engaging in monetary transactions in criminally derived property from unlawful activity).  18 U.S.C. § 1952(b).

While plaintiffs allege that the "RICO defendants" traveled "to and within the United States for the purposes of soliciting funds to be used to maintain and exploit control of Yukos" (Am. Compl. ¶ 336(c)), there is no claim that Gazprom or Miller "traveled" anywhere (including the U.S.) for "purposes" of soliciting any funds in connection with Yukos.  Instead, plaintiffs (referring to Am. Compl. ¶ 80) allege that defendant Khristenko "visited the United States in October 2005 to discuss the prospects of delivering LNG to the United States and to secure U.S. investment in projects to develop Russia's hydrocarbon transportation infrastructure."  (Am. Compl. ¶ 80.)  Plaintiffs do not allege that Minister Khristenko made this trip on behalf of Gazprom or that Gazprom had any connection to this alleged visit.  Even if plaintiffs had set forth such allegations, there is and would be nothing "unlawful" as that term is defined under § 1952.  United States v. Kramer, 73 F.3d 1067, 1071 (11th Cir. 1996) (§ 1952 requires showing that "the defendant traveled in interstate commerce with the intent to promote unlawful activity and thereafter actually did promote or attempt to promote the unlawful activity"); United States v. Corona, 885 F.2d 766, 773 (11th Cir. 1989) (defendant's trip to Florida to arrange bail for codefendant was not sufficient to establish intent to facilitate illegal conduct); United States v. Markowski, 772 F.2d 358, 365 (7th Cir. 1985) (social meeting with potential favorable implication to defendant's smuggling operation was incidental to the unlawful conduct and not a § 1952 violation); United States v. Vanichromanee, 742 F.2d 340, 349 (7th Cir. 1984) (travel must relate significantly, rather than incidentally or minimally, to the illegally activity).

> d.      *A claim of transportation of stolen property is not adequately pled*

Without providing any detail, plaintiffs allege that defendants "converted" Yukos property "through the confiscation of YNG and otherwise," including "oil and gas produced by YNG and other Yukos producing assets" in violation of 18 U.S.C. § 2314.  (Am. Compl. ¶ 336(d).)  Section 2314 prohibits the transportation or transfer "in interstate or foreign commerce

any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314. This statute has no conceivable application to Gazprom or Miller: plaintiffs have not made any allegation that Gazprom or Miller obtained, much less transported or transferred, anything belonging to Yukos.

### e.    No violation of the bankruptcy fraud statute has been pled

Relying on Yukos' failed bankruptcy filing in the U.S., plaintiffs assert that defendants "evaded" the Texas bankruptcy court's pre-auction order and also "knowingly and fraudulently receiv[ed] property from a debtor" after Yukos filed its bankruptcy petition, supposedly in violation of 18 U.S.C. § 152. This contention is specious. Section 152 is designed to prevent fraud in connection with the filing or administration of a bankruptcy petition. E.g., Stuhley v. Hyatt, 667 F.2d 807, 809 n.3 (9th Cir. 1982) (principal objective of § 152 is to prevent and punish efforts by a bankrupt to avoid distribution of any part of a liable bankrupt estate); Cadle Co. v. Flanagan, 271 F. Supp. 2d 379, 385-86 (D. Conn. 2003) (allegations that debtor fraudulently transferred portion of his assets to others prior to filing for bankruptcy protection to keep assets out of bankruptcy estate filed false bankruptcy accounts supported claim that debtor violated § 152). The only conduct that approached fraud in the bankruptcy matter was Yukos' own attempt to manufacture jurisdiction in the U.S. – an effort ultimately rejected by the Bankruptcy Court under 11 U.S.C. § 1112(b).

In any event, plaintiffs' effort to invoke § 152 against Gazprom and Miller fails. Section 152 does not purport to reach alleged violations of stay orders entered by bankruptcy courts. Even if it did, there is no allegation that Gazprom or Miller *did* violate any court order. Nor did Gazprom or Miller acquire or "receive" any of Yukos' assets. Plaintiffs' § 152 theory against Gazprom and Miller has no merit. Accordingly, Counts IV, V and VI must be dismissed.

### 2.    Plaintiffs Have Failed To Allege A Pattern Of Racketeering Activity Or The "Specific Nature" Of Gazprom's Or Miller's Participation

Plaintiffs' RICO claims also must be dismissed because they have alleged only a single scheme (the alleged de facto re-nationalization of Yukos' assets), a single injury (the alleged loss of Yukos' economic value), and a single victim (Yukos).  To state a claim under RICO, a plaintiff must allege that the defendant engaged, or conspired to engage, in "a pattern of racketeering activity."  18 U.S.C. §§ 1962(b)-(d).  In this Circuit, it is "virtually impossible" for plaintiffs to state a RICO claim based on a "single scheme, single injury and few victims." Edmondson & Gallagher v. Alban Towers Ten. Ass'n, 48 F.3d 1260, 1265 (D.C. Cir. 1995); Western Assocs. Ltd. P'ship v. Market Sq. Assocs., 235 F.3d 629, 634 (D.C. Cir. 2001) (finding plaintiffs' allegations of "only a single scheme, a single injury, and a single victim (or single set of victims)" could not support plaintiffs' RICO claim and were "more accurately characterized as a single effort to diminish the value of [plaintiffs'] partnership interest").  As a matter of law, therefore, plaintiffs' allegations cannot support a finding that there was a "pattern of racketeering activity."  Much the same, plaintiffs' RICO claims should be dismissed because plaintiffs fail to allege facts suggesting that Gazprom or Miller participated in any alleged pattern of racketeering activity.  E.g., Amalgamated Bank of N.Y. v. Marsh, 823 F. Supp. 209, 216 (S.D.N.Y. 1993) ("Where there are multiple defendants, the complaint must disclose the specific nature of each defendant's participation in the alleged fraud.").  Accordingly, Counts IV, V and VI must be dismissed.

### 3.    Count IV Fails To Sufficiently Plead That Gazprom Or Miller Acquired An Interest In Or Control Over Yukos

Count IV must also be dismissed because it fails to establish that Gazprom or Miller "acquired an interest in or control of" Yukos.  To avoid dismissal for failure to state a claim under § 1962(b), "a plaintiff must articulate how each defendant acquired or maintained an

interest in an enterprise, or acquired control of an enterprise, by means of a racketeering activity." Cadle Co. v. Schultz, 779 F. Supp. 392, 397 (N.D. Tex. 1991); see also Wagh v. Metris Direct, Inc., 363 F.3d 821, 830 (9th Cir. 2003) (affirming dismissal of § 1962(b) claim because plaintiff "did not include more than the vaguest allusions to the acquisition or maintenance of any interest in or control of the alleged enterprise"); Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 329 (6th Cir. 1999) (affirming dismissal of § 1962(b) claim because plaintiff pled only a legal conclusion by "simply parrot[ing] the language of the RICO statute"). Plaintiffs have not alleged any facts capable of supporting any inference that Gazprom or Miller secured a proprietary interest in or operational control over Yukos. Count IV must be dismissed.

### 4. Count V Fails To Sufficiently Plead An Association-In-Fact Enterprise

Plaintiffs' Count V, alleging a violation of § 1962(c) on the theory that defendants were an association-in-fact that engaged in racketeering activity, also fails because plaintiffs have not sufficiently pled an association-in-fact enterprise and have not alleged any participation by Gazprom or Miller in the management or control of any such enterprise.

A violation of § 1962(c) requires "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Western Assocs. Ltd. P'ship, 235 F.3d at 633. This Circuit specifically requires that an association-in-fact enterprise have three characteristics: "(1) a common purpose among the participants, (2) organization, and (3) continuity." United States v. Richardson, 167 F.3d 621, 625 (D.C. Cir. 1999). Additionally, an "'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." United States v. Turkette, 452 U.S. 576, 583 (1981); see also District Telecomm. Dev. Corp. v. District Cablevision, Inc., 638 F. Supp. 418, 421 (D.D.C. 1985) (dismissing RICO allegations when "common denominator" among defendants in the alleged

enterprise was involvement in the transaction that was the subject of the suit). Here, however, Count V does not identify any organization or continuity among Gazprom/Miller and the other alleged RICO defendants, who are the alleged participants in the enterprise. Accordingly, plaintiffs have failed to satisfy the element of pleading an association-in-fact enterprise.

Moreover, Count V fails because plaintiffs do not allege any facts demonstrating that Gazprom or Miller "participate[d] in the operation or management of the enterprise itself," as required under § 1962(c). <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179, 185 (1993) (defendant must have "*some* part in directing the enterprise's affairs") (emphasis in original); <u>see also</u> <u>Jones v. Meridian Towers Apart., Inc.</u>, 816 F. Supp. 762, 772 (D.D.C. 1993) (noting "the commission of predicate acts violates § 1962(c) 'only when those acts were the vehicle through which a defendant conduct[ed] or participated . . . in the conduct of [the] enterprise's affairs'") (alterations in original). The amended complaint contains only conclusory allegations about the "defendants" generally and contains *no* specific allegations that Gazprom or Miller participated in the operation or management of the alleged enterprise. Accordingly, plaintiffs' Count V must be dismissed.

**5.    Count VI Fails To Sufficiently Plead That Gazprom Or Miller Was A Party To An Alleged RICO Conspiracy**

Plaintiffs have also fallen far short of asserting a viable conspiracy claim against Gazprom or Miller under § 1962(d). (Am. Compl. ¶¶ 351-55.) Subsection (d) makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c)" of RICO. 18 U.S.C. § 1962(d). In order to prove a RICO conspiracy in violation of § 1962(d), a plaintiff must establish: "(1) that two or more people agreed to commit a substantive RICO offense, and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." <u>United States v. Morrow</u>, 2005 WL 1389256, at *12 (D.D.C. June 13, 2005) (Kollar-Kotelly, J.); <u>see</u>

also <u>Doe I</u>, 400 F. Supp. 2d at 120 (dismissing RICO conspiracy count, court found plaintiffs failed to adequately plead subjective agreement or intent of defendants necessary to form a conspiracy actionable under § 1962(d)).

Here, Count VI does not make *any* direct allegation against or *any* reference to Gazprom or Miller.  (Am. Compl. ¶¶ 351-55.)  Rather, plaintiffs offer bare, conclusory allegations against the "conspirators" without any discussion of whether any of these "conspirators" knew of or agreed to the overall objective of the RICO offense.  Plaintiffs incorporate by reference the preceding paragraphs of the Complaint into Count VI, but these paragraphs do not contain any allegation that Gazprom or Miller "knew of and agreed to the overall objective of the RICO offense."  As a result, Count VI against Gazprom and Miller must be dismissed.  <u>See</u> <u>Tel-Phonic Serv., Inc. v. TBS Int'l, Inc.</u>, 975 F.2d 1134, 1139-40 (5th Cir. 1992) ("conclusory allegation that the Defendants 'conspired'" was insufficient; the "complaint does not allege facts implying any agreement involving each of the Defendants to commit at least two predicate acts"); <u>Adler v. Berg Harmon Assoc.</u>, 790 F. Supp. 1222, 1234 (S.D.N.Y. 1992) (allegation that "[a]ll of the defendants conspired among themselves to further the scheme to defraud, which was in violation of 18 U.S.C. § 1962(c) as described above" and "knowingly and willingly participating in the conspiracy" fell "short of alleging that each defendant personally agreed to commit two or more predicate acts").  In addition, the RICO conspiracy count must be dismissed for the independent reason that plaintiffs have failed to plead the existence of an underlying, substantive RICO violation by Miller or Gazprom.  <u>Tal v. Hogan</u>, 453 F.3d 1244, 1270 (10th Cir. 2006); <u>First Capital Asset Mgmt. v. Satinwood, Inc.</u>, 385 F.3d 159, 182 (2d Cir. 2004) (same); <u>Danielsen</u>, 941 F.2d at 1232 (same).

### 6. Plaintiffs Have Failed To Plead Causation And Damages

Lastly, plaintiffs have not adequately pled causation or damages with respect to any of the alleged predicate acts. In order to state a viable claim, a plaintiff's injury must have been proximately caused by the RICO predicate acts. Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 1999 (2006); Sedima, S. P. R. L. v. Imrex Co., 473 U.S. 479, 497 (1985). Once it is established that the RICO violations caused the injury, the plaintiff must show that his injury was "direct" and "foreseeable." Baisch v. Gallina, 346 F.3d 366, 373 (2d Cir. 2003). To be direct, a plaintiff must allege an injury that it can trace to the defendant's actions without relying on the actions of any third party. Anza, 126 S. Ct. at 1998.

Here, there is no claim that any act by Gazprom or Miller caused any harm to plaintiffs. Indeed, there is no claim that any of the plaintiffs heard or were even aware of the one alleged "Gazprom" event singled out – a Moscow radio transmission. Moreover, these RICO plaintiffs – who have only held ADRs, not sold them at a loss – have not suffered cognizable damages. See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994) (RICO cause of action does not accrue "until the amount of damages becomes clear and definite"). In sum, the Court should dismiss Counts IV, V and VI.

### C. Plaintiffs' RICO Claims Are Barred By The PSLRA

The PSLRA amended § 1964(c) of the RICO statute to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). This "amendment was intended not simply 'to eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been

actionable as securities fraud.'"  <u>Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.</u>, 189 F.3d 321, 327 (3d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-369, at 47 (1995)).[34]

Plaintiffs' own allegations demonstrate that the PSLRA bar is warranted here because plaintiffs have continued to include their complaints about alleged misstatements in connection with the acquisition and retention of Yukos ADRs.  While plaintiffs now claim to exclude their "allegations of fraud in the purchase or sale of securities" (Am. Compl. ¶ 330), they continue to allege – just as with their securities fraud claims – that defendants issued "misleading statements" concerning the alleged re-nationalization of Yukos (<u>id.</u> ¶¶ 10, 336(a)).  Plaintiffs continue explicitly to allege that defendants made (or caused to be made) "false and fraudulent pretenses, representations and statements" and that "[s]uch statements were made for the purpose of facilitating the execution" of a "scheme."  (<u>Id.</u> ¶ 336(a).)  This "scheme" was to secure new investors (at an inflated price) and prevent existing investors from selling their ADRs until Yukos assets were allegedly "re-nationalized."  Indeed, plaintiffs' mail and wire fraud contentions are based on defendants' allegedly "misleading statements."  (<u>Id.</u> ¶ 336(a).)

When, as here, plaintiffs assert RICO claims predicated on conduct underlying securities fraud claims, courts find that the RICO claims are barred.  <u>E.g.</u>, <u>Florida Evergreen Foliage v. E.I. duPont de Nemours & Co.</u>, 165 F. Supp. 2d 1345, 1356-59 (S.D. Fla. 2001), <u>aff'd</u>, 341 F.3d 1292 (11th Cir. 2003).  For example, in <u>In re Enron Corp. Sec. Deriv. & ERISA Litig.</u>, 284 F. Supp. 2d 511, 622 (S.D. Tex. 2003), the shareholder plaintiffs alleged RICO and state law

---

[34]    The PSLRA bar applies in cases when, as here, the plaintiffs' securities claims are deficient.  <u>See</u>, <u>e.g.</u>, <u>Yadlosky v. Grant Thornton, L.L.P.</u>, 120 F. Supp. 2d 622, 631-33 (E.D. Mich. 2000) (dismissing Section 10(b) and Rule 10b-5 claims for failure to plead fraud with particularity, and dismissing RICO claims against the same defendants under the PSLRA bar); <u>Stephenson v. Deutsche Bank AG</u>, 282 F. Supp. 2d 1032, 1071 (D. Minn. 2003) (dismissing securities fraud claims and RICO claims under the PSLRA bar); <u>Hemispherx Biopharma, Inc. v. Ascension</u>, 1999 WL 144109, at *4-*8 (E.D. Pa. Mar. 15, 1999) (dismissing RICO claims under the PSLRA bar despite finding plaintiff failed to adequately plead any securities fraud claims); <u>Columbraria Ltd. v. Pimenta</u>, 110 F. Supp. 2d 542, 548 (S.D. Tex. 2000) (RICO bar would apply even though plaintiff was time-barred from suing under Rule 10b-5).

claims, asserting that the defendants enacted a fraudulent scheme to "loot" the company. In an attempt to preserve their RICO claims, the plaintiffs argued that predicate acts of mail and wire fraud, embezzlement, obstruction of justice, and interstate transportation offenses did "not sound in fraud and therefore cannot be barred by the RICO Amendment as a matter of law." Id. The court held that, even though the predicate acts were technically not actionable as securities fraud, the RICO claims were barred under the PSLRA because the predicate acts were part of a scheme "that operated as a fraud on sellers or purchasers of securities." Id.

Just as in In Enron Corporation, a core component of plaintiffs' RICO claim is the alleged scheme to defraud Yukos ADR holders – the exact "scheme" underlying plaintiffs' securities fraud counts.[35] These contentions plainly raise securities fraud issues – a conclusion confirmed by the fact that plaintiffs have brought securities laws claims in this lawsuit.[36]

---

[35]    Plaintiffs' attempt to plead around this bar by limiting their RICO claims to ADR "holders" does not salvage their RICO theories. The PSLRA bars plaintiffs' RICO claims regardless of whether the *particular* plaintiff can bring the securities fraud claim. All courts addressing the issue have held that it is not necessary that the particular RICO plaintiff be able to maintain a claim for securities fraud; if the alleged conduct is actionable as securities fraud, the RICO claim is barred. E.g., Howard v. America Online, Inc., 208 F.3d 741, 749 (9th Cir. 2000) (precluding RICO action where claims implicated conduct which could have been actionable securities fraud despite plaintiffs' lack of standing to assert those claims); Gatz v. Ponsoldt, 297 F. Supp. 2d 719, 731 (D. Del. 2003) ("Whether plaintiffs were purchasers or sellers of securities would only be relevant to the inquiry of their standing to bring a securities fraud claim, whereas [§ 1964(c)] . . . applies regardless of whether a particular plaintiff has standing to bring a civil action under § 10b and Rule 10b-5.").

[36]    Given the absence of any viable U.S. statutory or common-law claims, the Court should likewise decline to exercise any pendent jurisdiction over any of plaintiffs' remaining claims against Gazprom, including the Russian-law claims (Counts II, VIII and XV). See Torah Soft Ltd. v. Drosnin, 136 F. Supp. 2d 276, 292 (S.D.N.Y. 2001) (declining "to exercise supplemental jurisdiction over plaintiff's remaining copyright infringement claims arising under foreign law" when plaintiff's federal claim was dismissed); Information Res., Inc. v. Dun & Bradstreet Corp., 127 F. Supp. 2d 411, 418 (S.D.N.Y. 2000) (declining to exercise supplemental jurisdiction over foreign law claim); Network Project v. Corporation for Pub. Broad., 561 F.2d 963, 970 (D.C. Cir. 1977); Doe I, 400 F. Supp. 2d at 120 n.13; Covad Commc'n Co. v. Bell Atlantic Corp., 201 F. Supp. 2d 123, 135 (D.D.C. 2002). There is no basis other than federal question jurisdiction (based on RICO and securities laws) asserted in the amended complaint against Gazprom or Miller. Diversity jurisdiction under 28 U.S.C. § 1332 does not exist because the diversity statute does not confer jurisdiction over a lawsuit involving aliens on one side of the dispute and aliens and U.S. citizens (here, plaintiffs) on the other side. Saadeh v. Farouki, 107 F.3d 52, 55 (D.C. Cir. 1997); Eze v. Yellow Cab Co., 782 F.2d 1064, 1065 (D.C. Cir. 1986); Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 10 F.3d 425, 428 (7th Cir. 1993). In the event argument on the merits of plaintiffs' Russian-law claims is warranted, Gazprom and Miller will file an appropriate motion pursuant to Fed. R. Civ. P. 12(c) or other appropriate procedure.

## IX.    PLAINTIFFS' COMMON LAW CAUSES OF ACTION FAIL UNDER U.S. LAW

### A.    Plaintiffs Have Failed To Allege Gazprom Or Miller Committed Essential Elements Of Conversion And Conspiracy To Commit Conversion

#### 1.    Plaintiffs Have Failed To Allege Essential Elements Of Conversion Under D.C. Law

Count I of the amended complaint alleges the "unlawful conversion" of "OAO NK Yukos Oil Company." (Am. Compl. ¶ 312.) This Count, however, must be dismissed because, in addition to lacking standing to bring this claim, plaintiffs fail to allege that Gazprom or Miller ever exercised the required ownership, dominion, or control over plaintiffs' property. "Conversion is the unlawful exercise of ownership and dominion and control over the personal property of another in denial or repudiation of that person's right thereto." Calvetti v. Antcliff, 346 F. Supp. 2d 92, 106 (D.D.C. 2004); see also Shulman v. Voyou, L.L.C., 251 F. Supp. 2d 166, 170 (D.D.C. 2003). Although Count I includes the general allegation that "Defendants wrongfully continue to retain possession of the property of Plaintiffs" (Am. Compl. ¶ 314), there is a glaring absence of any specific allegations that Gazprom or Miller had or has possession, custody, or control of plaintiffs' property. While the amended complaint contains conclusory assertions that "defendants" seized Yukos' property and refers to other enumerated paragraphs, there is no specific allegation against Gazprom or Miller. (Am Compl. ¶¶ 313(a), 313(c).) This is consistent with plaintiffs' own allegations that neither Gazprom nor Miller acquired any of Yukos' (or other) property. Plaintiffs' conversion claims must be dismissed.

#### 2.    Plaintiffs Have Failed To Allege Essential Elements Of Conspiracy To Commit Conversion Under D.C. Law

Plaintiffs' assertion that defendants conspired to commit conversion under D.C. Law also fails. The District does not recognize independent causes of action for civil conspiracy. Riddell v. Riddell Wash. Corp., 866 F.2d 1480, 1493 (D.C. Cir. 1989). Even if this claim were available,

plaintiffs have not alleged any requisite agreement between the defendants.  In order to show civil conspiracy, a plaintiff must allege:  "'(1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner; and (2) an overt tortious act in furtherance of the agreement that causes injury.'"  Ellipso, Inc. v. Mann, 2006 WL 1126814 (D.D.C. Apr. 27, 2006) (quoting Hall v. Clinton, 285 F.3d 74, 82-83 (D.C. Cir. 2002)).

Plaintiffs allege in a conclusory manner that "Defendants, pursuant to an actual or tacit agreement and/or understanding, conspired to unlawfully convert property."  (Am. Compl. ¶ 326.)  To survive a motion to dismiss, however, "a plaintiff must set forth more than just conclusory allegations of an agreement." McCreary v. Heath, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005) (dismissing claim where the complaint failed to allege any "events, conversations, or documents indicating that there was ever an agreement or 'meeting of the minds' between any of the defendants"); see also Brady v. Livingood, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (dismissing claims where plaintiff "merely alleges that the Seven . . . Defendants 'agreed among themselves' to subject him to discriminatory acts").  Here, plaintiffs fail to make any specific allegations concerning Gazprom or Miller.  Count III must be dismissed.

### B.    Plaintiffs' Common Law Fraud And Deceit Claims Are Fatally Deficient

### 1.    Plaintiffs Have Not Alleged Elements Of Common Law Fraud

Count VII of the amended complaint alleges common law fraud under District of Columbia law.  Plaintiffs' common law fraud claim suffers from the same inadequacies as their securities fraud claim; indeed, the theories are premised on the same events.  To support their claim for fraud, plaintiffs must allege facts showing: "(1) a false representation, (2) in reference to [a] material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken on reliance upon the representation." Calvetti v. Antcliff, 346 F. Supp. 2d 92, 100 (D.D.C. 2004); see also Virginia Acad. v. Group Hosp. & Med. Servs., 878 A.2d 1226, 1233

(D.C. App. 2005). A fraud plaintiff must prove each of the elements by clear and convincing evidence; lack of proof as to one or more elements causes a fraud claim to fail. Redmond v. Birkel, 933 F. Supp. 1, 3 (D.D.C. 1996). Further, fraud claims must be pled with particularity. Fed. R. Civ. P. 9(b); United States v. Network Software Assoc., 227 F.R.D. 4, 9 (D.D.C. 2005). For the same reasons discussed in Section VI above (including lack of scienter, reliance/causation, damages), plaintiffs' common law fraud claims should be dismissed.

### 2.    Plaintiffs Have Not Alleged Elements Of Conspiracy To Commit Fraud

Nor have plaintiffs sufficiently alleged conspiracy to commit fraud. As discussed above in Section IX.A.2, in order to plead a civil conspiracy, a plaintiff must allege: "'(1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner; and (2) an overt tortious act in furtherance of the agreement that causes injury.'" Ellipso, Inc., 2006 WL 1126814. All averments of fraud – including those for conspiracy to commit fraud – must be pled with particularity. Sturdza v. Gov't of the United Arab Emirates, 281 F.3d 1287, 1306 (D.C. Cir. 2002). Just as with their other deficient conspiracy claims, plaintiffs have failed to allege the required elements with any particularity.

### 3.    Plaintiffs' "Aiding and Abetting Fraud" Claim Is Deficient

Plaintiffs have included a count of "aiding and abetting common law fraud and deceit" under District of Columbia law. As a threshold matter, very few cases in the District of Columbia even recognize this theory as a viable cause of action. Even if the District recognized such a cause of action, however, plaintiffs have failed to plead the requisite facts with any particularity. See Sturdza, 281 F.3d at 1306. In general, aiding and abetting liability consists of three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and

substantially assist the principal in violation." Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983). Here, plaintiffs have set forth only bare, conclusory allegations concerning all "defendants'" involvement and make no mention of Gazprom's or Miller's specific role or how they provided "substantial assistance" to any co-defendant. The aiding and abetting claim fails.

## X.   PLAINTIFFS' EXPROPRIATION THEORY SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Plaintiffs' claim against Gazprom and Miller for "expropriation in violation of international law" (Count XIII) fails for multiple reasons. First, as demonstrated above in Section III, plaintiffs lack standing to pursue any such claim. Plaintiffs do not allege that their property has been taken or that Gazprom or Miller "took" anything. Rather, plaintiffs allege that the Russian Federation took shares of Yukos owned by other shareholders, bank accounts owned by Yukos and shares of Yuganskneftegas owned by Yukos. (Am. Compl. ¶¶ 182, 216, 218-19, 261, 271, 278.) These assets never belonged to plaintiffs who are current and prior ADR holders and, therefore, cannot be a basis for an allegation by plaintiffs for expropriation. E.g., 1 William Meade Fletcher, Fletcher Cyclopedia of Law of Private Corporations § 31 (1999).

Second, plaintiffs cannot seek to hold Gazprom – a private corporation – or its Chairman liable for expropriation.[37] To the extent that any such claim could be pursued by plaintiffs, an essential element of an expropriation claim is that a *state* take property of a foreign national that is not for a public purpose, is discriminatory and without just compensation. Restatement (Third) of Foreign Relations Law of the United States § 712 (1987); see also Restatement (Third) of Foreign Relations §§ 711, 713 (states are responsible for acts of expropriation); Banco

---

[37]    In contrast to their initial complaint, plaintiffs do not allege that Gazprom is an agency or instrumentality of the Russian Federation under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-11. Thus, any claim of expropriation in violation in international law, which is typically asserted by plaintiffs attempting to defeat FSIA immunity, has no application or relevance to Gazprom. 28 U.S.C. § 1605(a)(3).

<u>Nacional de Cuba v. Chemical Bank</u>, 822 F.2d 230, 237 (2d Cir. 1987). Plaintiffs' claim that defendants (including Gazprom and Miller) have violated "numerous" but unidentified "international treaties" only confirms this point. A treaty would require the *state* to have expropriated a foreign national's property and any remedy would have to be sought from the *state*. <u>See, e.g.</u>, Energy Charter Treaty, art. 13, 33 I.L.M. 360.

Finally, even if plaintiffs could hold a private corporation or citizen liable for expropriation, plaintiffs have failed to adequately plead such a cause of action. Even assuming the Russian Federation "took" property of its own national – Yukos – there is no violation of international law. <u>E.g.</u>, <u>Rong v. Liaoning Provincial Gov't</u>, 362 F. Supp. 2d 83, 101 (D.D.C. 2005) ("expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law"), <u>aff'd</u>, 452 F.3d 883 (D.C. Cir. 2006). In short, the Court should dismiss Count XIII of the amended complaint.

## **CONCLUSION**

For the foregoing reasons, defendants Gazprom and Miller respectfully request that the

Court promptly dismiss the Amended Complaint in its entirety.

Dated:  September 8, 2006                    Respectfully submitted,

  /s/ Jane E. Chang *for*
William M. Sullivan, Jr. (DC Bar No. 467269)
Jane E. Chang (DC Bar No. 476545)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone:  (202) 282-5000
Facsimile:  (202) 282-5100

W. Gordon Dobie  (*pro hac vice*)
Greg Vamos  (*pro hac vice*)
Brooke B. Ward
Jennifer M. Erickson
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700

*Attorneys for OAO Gazprom and Alexei B. Miller*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2006, this motion was electronically filed with the Clerk of the Court and that, in the same manner, an electronic copy was served on all counsel of record.

_____/s/ Jane E. Chang_____
Jane E. Chang
