**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


RICHARD ALLEN, *et al.*        )
                          )     Civil Action No.: 05-cv-02077 (CKK)
           Plaintiffs,   )
                          )
       v.               )
                          )
RUSSIAN FEDERATION, *et al.*  )
                          )
          Defendants.   )


**MOTION BY VIKTOR KHRISTENKO,**
**ALEXEI KUDRIN, DMITRY MEDVEDEV, IGOR SECHIN AND IGOR YUSUFOV**
**TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**


        Pursuant to Federal Rules of Civil Procedure 9(b), 12(b) and the Foreign Sovereign

Immunities Act, 28 U.S.C. § 1602 *et seq*., and for the reasons stated fully in the Statement of

Points and Authorities In Support of the Motion by Viktor Khristenko, Alexei Kudrin, Dmitry

Medvedev, Igor Sechin and Igor Yusufov To Dismiss Plaintiffs' Amended Complaint, Defendants

Viktor Khristenko, Alexei Kudrin, Dmitry Medvedev, Igor Sechin and Igor Yusufov respectfully

move for the dismissal of all the claims alleged against them in the plaintiffs' amended complaint.

September 8, 2006

Respectfully submitted,

 /s/ Jay L. Alexander
Jay L. Alexander (DC Bar No. 412905)
Ryan E. Bull (DC Bar No. 481473)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington D.C.  20004
Telephone: (202) 639-7700
Facsimile:  (202) 585-4064

Michael S. Goldberg
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas  77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

*Counsel to Minister Viktor Khristenko, Minister Alexei Kudrin, Minister Dmitry Medvedev, Deputy Head of the Presidential Administration Igor Sechin, and Ambassador Igor Yusufov*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RICHARD ALLEN, *et al.* | ) | |
| | ) | Civil Action No.: 05-cv-02077 (CKK) |
| Plaintiffs, | ) | |
| v. | ) | |
| RUSSIAN FEDERATION, *et al.* | ) | |
| Defendants. | ) | |

## STATEMENT OF POINTS AND AUTHORITIES
## IN SUPPORT OF THE MOTION BY VIKTOR KHRISTENKO, ALEXEI KUDRIN, DMITRY MEDVEDEV, IGOR SECHIN AND IGOR YUSUFOV TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Michael S. Goldberg
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002
Telephone:  (713) 229-1234
Facsimile:  (713) 229-1522

Jay L. Alexander (DC Bar No. 412905)
Ryan E. Bull (DC Bar No. 481473)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington D.C.  20004
Telephone: (202) 639-7700
Facsimile:  (202) 585-4064

## Table of Contents

Introduction ................................................................................................................. 1

Procedural and Factual Background ........................................................................ 2

    1.    Plaintiffs' Allegations Concerning the Russian Federation's Criminal
        Enforcement Actions and the Allegedly False Statement Relating to Them..............3

    2.    Plaintiffs' Allegations Concerning the Tax Investigation of Yukos and the
        Allegedly False Statements Relating To It ..................................................8

Argument ................................................................................................................ 11

I.     THE MINISTERS ARE ENTITLED TO SOVEREIGN IMMUNITY ..............................11

II.    THIS COURT LACKS PERSONAL JURISDICTION OVER THE MINISTERS ............13

    A.  Plaintiffs Have Not Alleged A Cause Of Action Arising Out Of Minimum
        Contacts With The United States ..........................................................14

    B.  Plaintiffs Have Not Satisfied The Requirement Of "Fair Play and Substantial
        Justice" ...............................................................................................15

III.   THE ACT OF STATE DOCTRINE REQUIRES DISMISSAL OF THE
       AMENDED COMPLAINT ...........................................................................17

IV.   PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE UNDER THE POLITICAL
       QUESTION DOCTRINE ..............................................................................20

V.    THE DOCTRINE OF INTERNATIONAL COMITY BARS THE REVIEW OF
       DISPUTES THAT HAVE ALREADY BEEN DECIDED IN RUSSIA............................21

VI.   THE *FORUM NON CONVENIENS* DOCTRINE REQUIRES DISMISSAL OF
       THE AMENDED COMPLAINT .....................................................................23

    A.  The Russian Federation Offers An Adequate Alternative Forum .....................23

    B.  The Balance Of Private And Public Factors Confirms That Russia Provides The
        Most Appropriate Forum For Resolving Plaintiffs' Claims .............................24

VII. PLAINTIFFS' U.S. STATUTORY CLAIMS MUST BE DISMISSED ..............................26

    A.  The Yukos ADR Holders' RICO Claims Must Be Dismissed ..........................26

        1.    All RICO Claims Must Be Dismissed for Lack of Standing ...................27

       a.    *The RICO Counts Must Be Dismissed Because the ADR Holders Have Suffered No Direct Injury* ..............................................................................27

       b.    *The ADR Holders Cannot Allege a Clear and Definite Injury* .......................28

  2.    Congress Did Not Intend RICO to Apply Extraterritorially to Circumstances Like Those Alleged Here ............................................................................29

  3.    The ADR Holders' RICO Claims Are Barred by the PSLRA .................................30

  4.    The ADR Holders Are Unable to Allege a Pattern of Racketeering Activity .........31

       a.    *The Ministers Are Not "Indictable" for Any Predicate Crimes* .....................31

       b.    *The ADR Holders Are Unable to Allege Any Predicate Crimes* ....................32

  5.    Count IV Must Be Dismissed for the Additional Reason that the Ministers Have Not Acquired an Interest in or Control Over Yukos .......................................37

  6.    Count V Must Be Dismissed for the Additional Reasons that the ADR Holders Are Not Able to Allege (i) an Association-In-Fact Enterprise, or (ii) Facts Showing that the Ministers "Participated in the Conduct of an Enterprise" ............................................................................................38

  7.    Count VI Must Be Dismissed Because the ADR Holders Are Unable to State a Viable Claim Under §§ 1962(b) or (c). ............................................................41

B.  Plaintiffs' Securities Fraud Claim Must Be Dismissed ..................................................41

  1.    Plaintiffs Cannot, as a Matter of Law, Sue the Ministers for Alleged Public Policy Statements on Behalf of the Russian Federation ...........................................42

  2.    The U.S. Securities Law Does Not Apply Extraterritorially to Foreign Ministers with No Connection or Relationship to the Plaintiffs or the Security at Issue. ......................................................................................41

  3.    The Amended Complaint Fails to Allege False Statements by Any of the Ministers. ....................................................................................43

  4.    Plaintiffs Are Unable To Allege Scienter ..............................................................46

  5.    Any Statements by the Ministers Are Insufficiently Connected to the Purchase or Sale of Yukos's Securities to Induce Reasonable Reliance. .................47

  6.    Plaintiffs Fail To Allege Loss Causation ...............................................................48

VIII. PLAINTIFFS' CONVERSION, FRAUD AND RESTITUTION CLAIMS MUST
     BE DISMISSED ..................................................................................................49

    A.  Plaintiffs Are Unable To State A Claim For Conversion ....................................49

        1.    Plaintiffs Lack Standing Because They Have No Possessory Right to the
            Assets at Issue .....................................................................................50

        2.    Even If Plaintiffs Had Standing, Plaintiffs Cannot Allege that the Ministers
            Obtained or Exercise Any Rights Over the Allegedly Converted Assets.................50

        3.    Plaintiffs Are Unable to Plead Unlawful Possession by the Ministers....................51

        4.    Plaintiffs Are Unable to State a Claim for Conspiracy to Commit
            Conversion ..........................................................................................51

    B.  Plaintiffs Are Unable To State A Claim For Fraud .........................................52

    C.  Plaintiffs Are Unable to State A Restitution Claim Against Minister Sechin ..................54

IX.    PLAINTIFFS' CLAIM OF EXPROPRIATION IN VIOLATION OF
     INTERNATIONAL LAW MUST BE DISMISSED............................................55

Conclusion .....................................................................................................56

## Table of Authorities

### CASES

*ABB Daimler-Benz Transp.(North America), Inc. v. National R.R. Passenger,*
   14 F. Supp. 2d 75 (D.D.C. 1998) ...................................................................................49

*AK Steel Corp. v. United Steel Workers of America,*
   No. C-1-00-3742002, 2002 WL 1624290 (S.D. Ohio 2002) .............................................36

*Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n,*
   176 F.3d 315 (6th Cir. 1999) ........................................................................................38

*Anza v. Ideal Steel Supply Corp.,*
   126 S. Ct. 1990 (2006) .................................................................................................28

*Arent v. Distribution Sci., Inc.,*
   975 F.2d 1370 (8th Cir. 1992) ......................................................................................53

*Argentine Republic v. Amerada Hess Shipping Corp.,*
   488 U.S. 428 (1989) ......................................................................................................32

*Arnlund v. Deloitte & Touche LLP,*
   199 F. Supp. 2d 461 (E. D. Va. 2002) ..........................................................................53

*Asahi Metal Indus. Co., Ltd. v. Superior Court of Calif.,*
   480 U.S. 102 (1987) ................................................................................................14, 16

*Atlantigas Corp. v. Nisource, Inc.,*
   290 F. Supp. 34 (D.D.C. 2003) ....................................................................................14

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings,*
   268 F.3d 103 (2d Cir. 2001) ....................................................................................22, 30

*Bald Eagle Area School Dist. v. Keystone Fin., Inc.,*
   189 F.3d 321 (3d Cir. 1999) ........................................................................................30

*BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.,*
   194 F.3d 1089 (10th Cir. 1999) ...................................................................................41

*Bancoult v. McNamara,*
   445 F.3d 427 (D.C. Cir. 2006) .....................................................................................20

*Bankers Trust Co. v. Rhoades,*
   859 F.2d 1096 (2d Cir. 1988) ......................................................................................28

*Base Metal Trading Ltd. v. Russian Aluminum,*
  2004 WL 928165 (2d Cir. April 30, 2004) .......................................................24

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988)...........................................................................................45

*Berger v. Pierce,*
  239 F.3d 440 (6th Cir. 1991) ............................................................................32

*Bivens Gardens Offic Bldg, Inc. v. Barnett Banks of Florida, Inc.,*
  140 F.3d. 898 (11th Cir. 1998) .........................................................................28

*Bledsoe v. Crowley,*
  849 F.2d 639 (D.C. Cir. 1988) ..........................................................................49

*Burdett v. Harrah's Kansas Casino Corp.,*
  260 F. Supp. 2d 1109 (D. Kan. 2003) ...............................................................38

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985).....................................................................................13, 14

*Burnett v. Al Baraka Investment and Development Corp.,*
  292 F. Supp 2d. 9 (D.D.C. 2003) ......................................................................12

*Burnham v. Superior Ct of Cal.,*
  495 U.S. 604 (1990)...........................................................................................15

*Butte Mining PLC v. Smith,*
  76 F.3d 287 (9th Cir. 1996) ..............................................................................30

*Byer Indus., Inc. v. Gulf Ins. Co.,*
  888 F. Supp. 1 (D.D.C. 1995) ...........................................................................33

*Bynum v. Equitable Mortgage Group,*
  No. 99 CV-2266-SBC-JMF, 2005 WL 818619 (D.D.C. Apr. 7, 2005).......................51, 52

*COMSAT Corp. v. Finshipyards S.A.M.,*
  900 F. Supp. 515 (D.D.C. 1995) .......................................................................14

*Cadle Co. v. Schultz,*
  779 F. Supp. 392 (N.D. Tex. 1991) ...................................................................38

*Callejo v. Bancomer, S.A.,*
  764 F.2d 1101 (5th Cir. 1985) ..........................................................................18

*Camelio v. American Federation*,
  137 F.3d 666 (1st Cir. 1998) .............................................................................35

\*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
  511 U.S. 164 (1994)...............................................................................41, 44

*Chanoff v. United States Surgical Corp.*,
  857 F. Supp. 1011 (D. Conn. 1994) .....................................................................53

*Chiarella v. U.S.*,
  445 U.S. 222 (1980)...........................................................................................44, 45

*Chisholm v. Transouth Fin. Corp.*,
  95 F.3d 331 (4th Cir. 1996) ...............................................................................33

*Chuidian v. Philippine Nat'l Bank*,
  912 F.2d 1095 (9th Cir. 1990) .....................................................................12, 13

*Cobbs v. Sheahan*,
  385 F. Supp. 2d 731 (N.D. Ill. 2005) ...............................................................41

*Cowin v. Bresler*,
  741 F.2d 410 (D.C. Cir. 1984) .............................................................................50

*Crocker v. Federal Deposit Ins. Corp.*,
  826 F.2d 347 (5th Cir. 1987) ...............................................................................53

*Crocker v. Piedmont Aviation, Inc.*,
  49 F.3d 735 (D.C. Cir. 1995) .............................................................................54

*Curaflex Health Serv. Inc. v. Bruni*,
  877 F. Supp. 30 (D.D.C. 1995) ...........................................................................50

*Danielson v. Burnside-Ott Aviation Training*,
  941 F.2d 1220 (D.C. Cir. 1991) .....................................................................33, 41

*Dayton v.  Czechoslovak Socialist Rep.*,
  834 F.2d 203 (D.C. Cir. 1987) .............................................................................18

*District Telecomm. Dev. Corp. v. District Cablevision, Inc.*,
  638 F. Supp. 418 (D.D.C. 1985) .....................................................................39, 41

\*Doe I v. State of Israel,
  400 F. Supp. 2d 86 (D.D.C. 2005) .....................................................................12, 21, 30

*Doe I v. Unocal Corp.*,
    395 F.3d 932 (9th Cir. 2002) ........................................................................30

*Dooley v. United Techs. Corp.*,
    803 F. Supp 428 (D.D.C. 1992) ...................................................................36

*Dowling v. United States*,
    473 U.S. 207 (1985)......................................................................................37

*Dura Pharmaceuticals v. Broudo*,
    544 U.S. 336 (2005)................................................................................44, 49

*Eastern Trading Co. v. Refco, Inc.*,
    229 F.3d 617 (7th Cir. 2000) .......................................................................54

*El-Fadl v. Central Bank of Jordan*,
    75 F.3d 668 (D.C. Cir. 1996) .......................................................................11

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
    749 A.2d 724 (D.C. 2000) ............................................................................52

*Farley-Jones v. Buckingham*,
    132 F. Supp. 2d 92 (E.D.N.Y. 2001) ...........................................................52

*Federal Treasury Enterprise Sojuzplodoimport v. Spirits Int'l N.V.*,
    425 F. Supp. 2d 458 (S.D.N.Y. 2006)...........................................................54

*Ferguson v. Christie*,
    No. Civ. A. 04-2289 (CKK), 2005 WL 3201065 (D.D.C. Oct. 12, 2005) .......12

*First American Bank, N.A. v. District of Columbia*,
    583 A.2d 993 (D.C. 1990) ............................................................................51

*First Capital Asset Management, Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)..........................................................................31

*First Chicago Int'l v. United Exchange Co.*,
    836 F.2d 1375 (D.C. Cir. 1988).....................................................................14

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)............................................................................29

*Florida Evergreen Foliage v. E.I. Du Pont De Nemours & Co.*,
    165 F. Supp 2d 1345 (S.D. Fla. 2001) ..........................................................31

- vii -

*Foley Bros., Inc. v. Filardo*,
    336 U.S. 281 (1949).............................................................................................29

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
    717 F.2d 602 (D.C. Cir 1983)...........................................................................24

*GTE New Media Services, Inc. v. Ameritech Corp.*,
    21 F. Supp. 2d 27 (D.D.C. 1998)......................................................................14

*GTE New Media Services, Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000).........................................................................14

*Gaff v. Federal Deposit Ins. Corp.*,
    814 F.2d 311 (6th Cir. 1987)..............................................................................38

*Glen v. Club Mediterranee, S.A.*,
    450 F.3d 1251 (11th Cir. 2006)..........................................................................18

*Godbey v. Frank E. Basil, Inc.*,
    603 F. Supp. 775 (D.D.C. 1985).........................................................................50

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998)..............................................................................40

*Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd.*,
    750 F. Supp. 838 (N.D. Ohio 1990)...................................................................32

*Green Leaf Nursery v. E.I. Dupont de Nemours & Co.*,
    341 F.3d 1292 (11th Cir. 2003)..........................................................................31

*Haig v. Agee*,
    453 U.S. 280 (1981)............................................................................................21

*Hakki v. Zima Co.*,
    No. 03-9183, 2006 WL 852126 (D.C. Sup. March 28, 2006)............................55

*Hall v. Clinton*,
    285 F.3d 74 (D.C. Cir. 2002)..............................................................................52

*Hayden v. Pataki*,
    No. 00 Civ. 8586(LMM), 2004 WL 1335921 (S.D.N.Y. June 14, 2004).........56

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)............................................................................................14

*Hemispherx Biopharma, Inc. v. Asencio, No. Civ. A. 98-5204,*
    1999 WL 144109 (E.D. Pa. 1999) ....................................................................31

*Hilton v. Guyot,*
    159 U.S. 113 (1895).....................................................................................22

*Holmes v. Sec. Investor Protection Corp.,*
    503 U.S. 258 (1992).....................................................................................27

*Howard v. America Online, Inc.,*
    208 F.3d 741 (9th Cir. 2000) ......................................................................31

*Hutchings v. Manchester Life and Cas. Mgmt Corp.,*
    896 F. Supp. 946 (E.D. Mo. 1995)................................................................50

*Ibrahim v. Titan Corp.,*
    391 F. Supp. 2d 10 (D.D.C. 2005) ..............................................................56

*In re American Investors Life Ins. Co. Annuity Marketing and Sales Practices Litigation,*
    MDL No. 1712, 2006 WL 1531152 (E.D. Pa. 2006)......................................32

*In re Baan Co. Sec. Litig.,*
    103 F. Supp. 2d 1 (D.D.C. 2000) ..........................................................42, 43

*In re Enron Corp. Sec. Derivative & ERISA Litig.,*
    284 F. Supp 2d 511 (S.D. Tex. 2003) ...........................................................31

*In re Interbank Funding Corp. Sec. Litig.,*
    329 F. Supp. 2d 84 (D.D.C. 2004)...............................................................44

*In re Lorazepam & Clorazepate Antitrust Litigation,*
    295 F. Supp. 2d 30 (D.D.C. 2003) ..............................................................55

*In re Mastercard Int'l Inc.,*
    132 F. Supp. 2d 468 (E.D. La. 2001) ..........................................................41

*In re Newbridge Networks Sec. Litig,*
    926 F.Supp. 1163 (D.D.C. 1996) .................................................................48

*In re U.S. Office Products Sec. Litig.,*
    326 F. Supp. 2d 68 (D.D.C.  2004) .........................................................47, 50

*In re WorldCom, Inc. Sec. Litig.,*
    336 F. Supp. 2d 310 (S.D.N.Y. 2004)..........................................................53

*In re Yukos Oil Co. Sec. Litig.*,
    No. 04-CV-5243 (WHP), 2006 WL 800736 (S.D.N.Y. March 30, 2006).........................8

*Interbrew v. EdperBrascan Corp.*,
    23 F. Supp.2d 425 (S.D.N.Y. 1998).........................43

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945).........................13

*Isen v. Calvert Corp.*,
    379 F.2d 126 (D.C. Cir. 1967).........................52

*Islamic Amer. Relief Agency v. Unidentified FBI Agents*,
    394 F. Supp. 2d 34 (D.D.C. 2005).........................15

*Iwanowa v. Ford Motor Co.*,
    67 F. Supp. 2d, 424 (D.N.J. 1999).........................21

*Jones v. Meridian Towers Apartments, Inc.*,
    816 F. Supp. 762 (D.D.C. 1993).........................40, 41

*\*Jungquist v. Sheik Sultan Bin Khalifa Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997).........................11, 12, 13

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004).........................5, 51

*Kagan v. Edison Bros. Stores, Inc.*,
    907 F.2d 690 (7th Cir. 1990).........................53

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984).........................14

*Keller v. Cent. Bank of Nigeria*,
    277 F.3d 811 (6th Cir. 2002).........................32

*Klinghoffer v. S.N.C. Achile Lauro*,
    937 F.2d 44 (2d Cir. 1991).........................16

*Koal Indus. Corp. v. Asland, S.A.*,
    808 F. Supp. 1143 (S.D.N.Y. 1992).........................43

*Koster v. Lubermens Mut. Cas. Co.*
    330 U.S. 518 (1947).........................23

*Kowal v. MCI Communications Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) .......................................................................44, 48, 52

*Labovitz v. Washington Times Corp.*,
172 F.3d 897 (D.C. Cir. 1999) ........................................................................50

*Lakonia Mgmt Ltd. v. Meriwether*,
106 F. Supp. 2d 540 (S.D.N.Y. 2000) .............................................................28

*Leach v. FDIC*,
860 F.2d 1266 (5th Cir. 1988) ........................................................................28

*Lightning Lube, Inc. v. Venuto*,
4 F.3d 1153 (3d Cir. 1993) .............................................................................41

*Lincoln House, Inc. v. Dupre*,
903 F.2d 845 (1st Cir. 1990) ...........................................................................29

*Lindblom v. Mobile Telecomms. Tech. Corp.*,
985 F. Supp. 161 (D.D.C. 1997) .....................................................................45

*Ling v. Deutsche Bank, AG*,
2005 WL 1244689 (S.D.N.Y. 2005) ...............................................................41

*Luftig v. McNamara*,
373  F.2d 664 (D.C. Cir. 1967) .......................................................................21

*Magellan Int'l. Corp. v. Salzgitter Handel GmbH*,
76 F. Supp. 2d 919 (N.D. Ill. 1999) .................................................................5

*Manson v. Stacescu*,
11 F.3d 1127 (2d Cir. 1993) ...........................................................................28

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996) ........................................................................15

*McNeily v. United States*,
6 F.3d 343 (5th Cir. 1993) ..............................................................................32

*Meng v. Schwartz*,
116 F. Supp. 2d 92 (D.D.C. 2000) ..................................................................28

*Moffat Enterprises, Inc. v. Borden, Inc.*,
763 F. Supp. 143 (W. D. Pa. 1990) .................................................................39

*Moore v. Mitchell*,
    30 F.2d 600 (2d Cir. 1929)............................................................................23

*Motorola Credit Corp. v. Uzan*,
    322 F.3d 130 (2d Cir. 2003)........................................................................29

*Murray v. The Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804)........................................................................30

*Nathan Gordon Trust v. Northgate Exploration, Ltd.*,
    148 F.R.D. 105 (S.D.N.Y. 1993) .................................................................43

*Nemariam v. Fed. Democratic Repub. of Ethiopia*,
    315 F.3d 390 (D.C. Cir. 2003) .....................................................................23

*Nordberg v. Trilegiant Corp.*,
    No. C-05-3246-MHP, 2006 WL 2038685 (N.D. Cal. 2006) ...........................42

*Norris v. Dept. of Defense*,
    No. 96-5326, 1997 WL 362495 (D.C. Cir. May 5, 1997) ...............................32

*North South Fin.  Corp. v. Al-Turki*,
    100 F.3d 1046 (2d Cir. 1996).......................................................................30

*O'Rourke v. Crosley*,
    847 F.Supp. 1208 (D.N.J. 1994) ..................................................................35

*Oetjen v. Cent. Leather Co.*,
    246 U.S. 297 (1918)..............................................................................17, 21

*Okusami v. Psychiatric Institute of Washington, Inc.*,
    959 F.2d 1062 (D.C. Cir. 1992) ....................................................................52

*One-O-One Enterprises, Inc. v. Caruso*,
    848 F.2d 1283 (D.C. Cir. 1988) ...............................................................48, 52

*Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004)..........................................................................43

*Oscar v. University Students Co-op. Ass'n*,
    965 F.2d 783 (9th Cir. 1992) .......................................................................29

*Ostler v. Codman Research Group, Inc.*,
    Civ. No. 98-356-JD, 1999 WL 1059684 (D.N.H. April 20, 1999)....................31

*PT United Can Co. v. Crown Cork & Seal Co.*,
    138 F.3d 65 (2d Cir. 1998) ................................................................24

*Palmetto State Med. Center v. Operation Lifeline*,
    117 F.3d 142 (5th Cir. 1997) ............................................................31

*Pennsylvania Ass'n of Edwards Heirs v. Rightenour*,
    235 F.3d 839 (3d Cir. 2000) ............................................................41

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ......................................................45, 47

*Phillips v. Lithia Motors*,
    Civil No. 03-3109-HO, 2006 WL 1113608 (D. Or. 2006) .................41

*Phoenix Consulting, Inc. v. Republic of Angola*,
    216 F.3d 36 (D.C. Cir. 2000) ............................................................2

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ........................................................................23

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003) ..............................................................24

*Pyramid Sec. Ltd. v. I.B. Resolution, Inc.*,
    924 F.2d 1114 (D.C. Cir. 1991) ......................................................39

*Rand v. Anaconda-Ericsson, Inc.*,
    794 F.2d 843 (2d Cir. 1986) ............................................................28

*Republic of Philippines v. Marcos*,
    665 F. Supp. 793 (N.D. Cal. 1987) ..................................................15

*Ricaud v. American Metal Co.*,
    246 U.S. 304 (1918) ........................................................................17

*\*Riggs Nat'l Corp. v. Comm'r*,
    163 F.3d 1363 (D.C. Cir. 1999) ..................................................18, 19

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987) ..............................................................28

*Roehrs v. Conseys, Inc.*,
    No. Civ. A. 3:05-CV-829-M, 2005 WL 3454015 (N.D. Tex. 2005) ................52

*Rombach v. Chang,*
 355 F.3d 164 (2d Cir. 2004)................................................................47, 48

*Sanchez-Espinoza v. Reagan,*
 770 F.2d 202 (D.C. Cir. 1985)..................................................................56

*Scheidler v. National Org. of Women,*
 537 U.S. 393 (2003)................................................................................35

*Schneider v. Kissinger,*
 412 F.3d 190 (D.C. Cir. 2005)..................................................................20

*Sea-Land Service, Inc. v. Atlantic Pacific Int'l, Inc.,*
 57 F. Supp. 2d 1048 (D. Haw. 1999)........................................................36

*Sears v. Likens,*
 912 F.2d 889 (7th Cir. 1990)....................................................................28

*Sedima, S.P.R.L. v. Imrex Co.,*
 473 U.S. 479 (1985)......................................................................27, 32, 39

*Serv. Employees Int'l Union v. Philip Morris,*
 249 F.3d 1068 (D.C. Cir 2001)..................................................................27

*Shea v. Fridley,*
 123 A.2d 358 (D.C. 1956).........................................................................50

*Shenandoah Associates Ltd. Partnership v. Tirana,*
 182 F. Supp. 2d 14 (D.D.C. 2001)............................................................52

*Shoenbaum v. Firstbrook,*
 405 F.2d 200 (2d Cir. 1968)......................................................................42

*Shulman v. Voyou, L.L.C.,*
 251 F. Supp. 2d 166 (D.D.C. 2003)..........................................................50

*Silverman v. Weil,*
 662 F. Supp. 1095 (D.D.C. 1987)..............................................................54

*\*Small v. Fritz Companies, Inc.,*
 65 P.3d 1255 (Cal. 2003).........................................................................53

*Smith v. Washington Sheraton Corp.,*
 135 F.3d 779 (D.C. Cir. 1998)..................................................................50

*Societe Nationale Industrielle Arospatiale v. Southern Dist. Ct. of Iowa*,
   482 U.S. 522 (1987)............................................................................................22

*Sound Video Unlimited, Inc. v. Video Shack, Inc.*,
   700 F. Supp. 127 (S.D.N.Y. 1988)....................................................................28

*Sparling v. Hoffman Constr. Co*,
   864 F.2d 635 (9th Cir. 1988) .............................................................................28

*Stephenson v. Deutsche Bank AG*,
   282 F. Supp. 2d 1032 (D. Minn. 2003) .............................................................31

*Stutts v. De Dietrich Group*,
   No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006)............56

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)............................................................................................45

*Teague v. Bakker*,
   35 F.3d 978 (4th Cir. 1994) ................................................................................38

*Tel-Oren v. Libyan Arab Republic*,
   726 F.2d 774 (D.C. Cir. 1984) .....................................................................21, 56

*Timberlane Lumber Co. v. Bank of Am.*,
   549 F.2d 597 (9th Cir. 1976) .............................................................................30

*United States v. Childress*,
   58 F.3d 693 (D.C. Cir. 1995) .............................................................................36

*United States v. Crop Growers Group*,
   954 F. Supp. 335 (D.D.C. 1997) ........................................................................45

*United States v. Perholtz*,
   842 F.2d 343 (D.C. Cir. 1988) ...........................................................................40

*United States v. Richardson*,
   167 F.3d 621 (D.C. Cir. 1999) ...........................................................................40

*United States v. Turkette*,
   452 U.S. 576 (1981)......................................................................................39, 40

*Univ. of Maryland v. Peat, Marwick, Main & Co.*,
   996 F.2d 1534 (3d Cir. 1993)..............................................................................40

*Vandenbroeck v. CommonPoint Mortgage Co.,*
　　210 F.3d 696 (6th Cir. 2000) ..................................................33

**W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l,*
　　493 U.S. 400 (1990)..........................................................17

*Wagh v. Metris Direct, Inc.,*
　　363 F.3d 821 (9th Cir. 2003) ...........................................38, 41

*Western Associates Ltd P'ship v. Market Square Associates,*
　　235 F.3d 629 (D.C. Cir. 2001) ...............................................28

*Whaley v. Auto Club Ins. Ass'n,*
　　891 F. Supp. 1237 (E.D. Mich. 1995)........................................38

*White v. Union Leader Co.,*
　　No. Civ. 00-122-B, 2001 WL 821527 (D.N.H. 2001) .....................36

**World Wide Minerals v. Republic of Kazakhstan,*
　　296 F.3d 1154 (D.C. Cir. 2002)........................2, 17, 18, 19, 51

## STATUTES

Fed. R. Civ. P. 9(b) ..................................................................33, 52

18 U.S.C. § 152........................................................................33, 37

18 U.S.C. §§ 1341 ........................................................................33

18 U.S.C. § 1951 ..........................................................................33

18 U.S.C. § 1952 ......................................................................33, 36

18 U.S.C. § 1961(1) ..................................................................32, 39

28 U.S.C. §§ 1962 ..........................................................26, 38, 39, 40, 41

18 U.S.C. § 1964(c) ..................................................................27, 30

18 U.S.C. § 2314........................................................................33, 35

28 U.S.C. § 1330........................................................................32

## MISCELLANEOUS

Restatement (Third) Of The Law of Foreign Relations Of The United States, § 403 (1986)........................................................................................................................30

Restatement (Third) Of The Law of Foreign Relations Of The United States, § 421(2) (1986)........................................................................................................................15

Restatement (Third) Of The Law Of Foreign Relations Of The United States, § 483 (1986)........................................................................................................................23

Restatement (Third) Of The Law of Foreign Relations Of The United States, § 907 (1986)........................................................................................................................56

Restatement (Second) of Conflict of Laws § 106 (1969) ...........................................22

W. Prosser, Law of Torts § 108, at 715-16 (4th ed. 1971) .........................................52

Wright & Miller, Federal Practice & Procedure (Civil 2d), § 1357 at 539 (2004)......48

## INTRODUCTION

This motion to dismiss is filed on behalf of five senior officials of the Russian Federation. Viktor Khristenko is the Minister of Industry and Energy of the Russian Federation, and served as the First Deputy Prime Minister from May 2000 to March 2004. *See* Amended Complaint ("AC"), ¶80. Alexei Kudrin is the Minister of Finance of the Russian Federation. *Id.*, ¶78. Dmitry Medvedev is the First Deputy Prime Minister of the Russian Federation, and served as the Head of the Presidential Administration of the Russian Federation from October 2003 to November 2005. *Id.*, ¶75. Igor Sechin is the Deputy Head of the Presidential Administration of the Russian Federation. *Id.*, ¶82. Igor Yusufov is the Special Ambassador for International Energy Policy of the Russian Federation, and formerly served as the Minister of Industry and Energy. *Id.*, ¶79. Plaintiffs allege that these five high-ranking officials (collectively referred to as "the Ministers") have engaged in criminal racketeering, securities fraud, and other tortious conduct.

The Ministers are immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), and the claims against them must be dismissed before further burden and expense is incurred. In support of this relief, the Ministers adopt, in full, the Statement of Points and Authorities in Support of the Russian Federation's Motion to Dismiss Plaintiffs' Amended Complaint. Although the plaintiffs try to avoid the obvious consequence of the Ministers' sovereign immunity by conclusorily asserting that each is "being sued in his individual capacity," the amended complaint fails to identify *any* personal acts of misconduct by *any* of the Ministers. Rather, the Ministers are alleged to have participated in the Russian Federation's alleged expropriation of Russian assets, and the few specific allegations against the Ministers refer to acts expressly taken in their governmental capacities.

Not only do plaintiffs' bare assertions that the Ministers acted in their personal capacities fail under the FSIA's jurisdictional bar, but their substantive claims are legally (and factually)

unsustainable.  *First*, plaintiffs have failed to allege any basis to assert personal jurisdiction over the Ministers in either their official or their individual capacities.  *Second*, the essential premise of all the plaintiffs' claims is that the Russian government has illegally applied Russian criminal and tax laws (i) to expropriate the assets of Yukos Oil Company ("Yukos"), a Russian company and (ii) to investigate and prosecute Yukos's corporate officials in Russia.  But each of the act of state doctrine, the political question doctrine and international comity bars a U.S. court from reviewing those alleged wrongs.  *Third*, because the amended complaint is so blatantly Russia-centric with virtually no connection to this venue, the *forum non conveniens* doctrine requires its dismissal.  *Fourth*, even if the complaint could survive each of the foregoing legal defects, none of its counts states a viable legal claim on which relief can be granted.  Thus, while plaintiffs' conclusory allegations that the Ministers have engaged in criminal racketeering, securities fraud and other tortious conduct may garner temporary headlines, their lawsuit could not survive as a matter of law even if it alleged personal conduct by any of the Ministers.

## PROCEDURAL AND FACTUAL BACKGROUND[1]

On October 25, 2005, plaintiffs filed a complaint against the Russian Federation, the Ministers and various other defendants.[2]  In sum, plaintiffs alleged that their investments in Yukos

---

[1]     Solely for purposes of this motion, the Ministers do not dispute the false factual allegations of the amended complaint.  *See Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).  Accordingly, this motion is based on the allegations of the plaintiffs' amended complaint, documents incorporated by reference therein, and matters subject to judicial notice. *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154, 1157 n.2 (D.C. Cir. 2002).

[2]     Plaintiffs are investors in Yukos ADRs who, collectively, claim to hold (or to have held) a tiny fraction of one percent of Yukos's total equity.  *See* AC, ¶110 (alleging total market cap of $30 billion).  Approximately two-thirds of even this nominal holding is alleged to have been owned by two foreign plaintiffs.  Yukos's majority owner, Group Menatep, is not a plaintiff.  Public records confirm, however, that Group Menatep is instigating and funding this lawsuit.  When this lawsuit was filed, the lead plaintiff, Richard Allen, was (and may still be) employed by Group Menatep's public relations firm, APCO.  *See* http: //www.apcoworldwide.com/content/newsroom/press_releases/03_05_27.cfm ("APCO continues to support the holding company for YUKOS, Group MENATEP . . . .") (visited Aug. 22, 2006); http://www.apcoworldwide.com/content/bios/allen.cfm (APCO biography for Richard V. Allen)

(a Russian company) lost value when the Russian Federation brought allegedly unjustified criminal and tax enforcement actions against Yukos and its officers.[3]  Although plaintiffs' attempts to serve their complaint were ineffective, most of the defendants appeared specially and filed motions to dismiss.  In response to these motions, plaintiffs attempted to cure the defects in their lawsuit with an amended complaint.  Because, however, the fundamental defects in plaintiffs' claims are incurable, plaintiffs' amendments do not confront — much less correct — those defects.

The essence of plaintiffs' allegations remains the same:  that (i) the Russian Federation's criminal and tax enforcement measures against Yukos and its officers have allegedly destroyed the value of plaintiffs' investments in Yukos and (ii) the Russian Federation and its officials failed to disclose those alleged enforcement intentions.  Plaintiffs do not allege that their ADRs, or the Yukos shares on which those ADRs are founded, have been expropriated.[4]  Although the Russian government did take criminal and tax actions against Yukos and its executives, neither those actions nor the government statements about them are judicially reviewable in the U.S.

### 1.  Plaintiffs' Allegations Concerning the Russian Federation's Criminal Enforcement Actions and the Allegedly False Statements Relating to Them

Plaintiffs complain that the Russian Federation has brought criminal charges in Russia against a group of Yukos executives and attorneys.  *Id.*, ¶¶143-45, 157-68.  In June 2003, plaintiffs

---

(visited on Nov. 16, 2005).  Group Menatep is paying plaintiffs' legal fees.  *See* http://www.mosnews.com/news/2005/10/25/yukostrial.shtml (visited August 10, 2006) ("Johnson admitted that Covington and Burling was being paid by Group Menatep. . . ."); www.yukosshareholdercoalition.com/adr_initiatives/us_adr_holder_suit.html (visited August 10, 2006) ("*The attorneys representing the plaintiffs are not being compensated by the plaintiffs nor are they being paid on a contingency fee basis*") (emphasis in original).  Yukos and Group Menatep — which have threatened a "lifetime of litigation" and are pursuing equally meritless legal claims against the Russian Federation in Russia — are funding this action for ulterior purposes.

[3]    According to plaintiffs, Yukos's principal place of business is in Russia and it "is a vertically integrated oil and gas company" that is actively engaged in the oil and gas business.  AC, ¶85.  Plaintiffs further allege that in March 2006 (after Yukos was denied voluntary bankruptcy protection in the U.S.), Yukos entered involuntary bankruptcy in Russia.  *Id.*, ¶298.

[4]    Many plaintiffs continue to hold some or all of their allegedly devalued ADRs.  *Id.*, ¶¶12-17 & Ex. A.  The remainder of the ADRs at issue were voluntarily sold, allegedly at market price.

- 3 -

allege that the Russian Federation arrested Yukos's former security manager on charges of murder. *Id*., ¶143. The security manager has been tried and convicted. *Id*. The next month, the Russian Federation arrested the chairman of Group Menatep on charges of tax evasion and fraud. *Id*., ¶¶144, 163. In October 2003, the Russian Federation arrested Mikhail Khodorkovsky, the chief executive officer of Yukos and majority owner of Group Menatep, on similar charges. *Id*., ¶¶145, 163. A Russian court thereafter authorized the Russian Federation to attach — in Russia — shares of Yukos common stock owned by YUL and Hulley as security in connection with Mr. Khodorkovsky's arrest. *Id.*, ¶¶182-83.[5]

Following these arrests and criminal enforcement actions, various Yukos officials fled, while others have been prosecuted. *See id.*, ¶¶157-58. After an extended trial, both the former chairman of Group Menatep and Mr. Khodorkovsky were convicted. *Id*., ¶163. Both are serving prison terms in Russia. *Id*., ¶¶164-66. Plaintiffs allege that the criminal charges against the former chairman and Mr. Khodorkovsky "had no basis in law or fact and constituted use of color of official right for the purpose of carrying out the [alleged confiscation] scheme." *Id*., ¶146. Plaintiffs want this Court to adjudicate whether these criminal prosecutions of Russian businessmen by Russian prosecutors in Russian courts complied with Russian law.

Plaintiffs do not allege any specific involvement by any of the Ministers in the Russian government's criminal enforcement actions. Plaintiffs do allege that two of the five Ministers — Minister Medvedev and Minister Kudrin — (as well as various non-defendants, such as Russian President Putin) made false statements about those enforcement activities. *Id.*, ¶¶151, 189, 194.

---

[5] Group Menatep held *and continues to hold* its majority stake in Yukos through wholly-owned entities called Yukos Universal Limited ("YUL") and Hulley Enterprises ("Hulley"). *Id*., ¶¶87, 177. Plaintiffs allege that the Russian Federation seized Group Menatep's shares in Yukos as security for damage claims against Mr. Khodorkovsky, but do not — and truthfully could not — claim that ownership or voting rights in those shares changed. *Id.*, ¶¶182-83. Rather, plaintiffs admit that Group Menatep still "owns" the 51 percent stake through these two subsidiaries (*id.*, ¶87), and that the Russian Federation did not accept Mr. Khodorkovsky's offer to "turn over" these shares in settlement of government claims (*id.*, ¶257).

The alleged statements of these two Ministers, which were made in Russia, are revealing. *First*, each statement was made in the Minister's capacity as a senior government official, and each is expressly so characterized by the news article publishing it. *Second*, the complete text of each news report or statement completely contradicts the characterizations of those statements in the amended complaint.[6]

Minister Medvedev's Alleged Statements:  Plaintiffs allege that on November 2, 2003, Minister Medvedev gave false answers to an interviewer regarding the prosecution of Mr. Khodorkovsky.  AC, ¶151.  As the text of the interview shows, it was conducted with Minister Medvedev in his capacity as the Chief of Staff of the Russian Presidential Administration.  *See* Ex. A.  In the question and answer cited by plaintiffs, Minister Medvedev made no specific mention of Mr. Khodorkovsky, but discussed the importance of thorough law enforcement activities without favoring accused government and business leaders.  In the passage that follows, plaintiffs cut and pasted into their amended complaint only the snippets that we have italicized (*id.*):

> (Brilev)  Last week the papers wrote not only about your appointment and your biography, which we have just discussed, but also whether major Russian companies, major Russian businesses, are complying with laws.  What would you say?
>
> (Medvedev)  From the very beginning of his term in office, the president defined the problem of strict compliance with the law by all people, regardless of their post or financial situation, as a top priority task for the development of our legal system.  *At the same time it is very important that the law, including laws about responsibilities, is applied not selectively but across the board to all Russian citizens.*
>
> We see nowadays that the law-enforcement bodies are actively engaged in investigating several cases which are connected with the activities of major federal officials, regional leaders and businessmen.  At the same time, investigations are under way into the cases of policemen on suspicion of various crimes.  *We assume*

---

[6]    The plaintiffs' amended complaint consistently quotes snippets of public statements or press releases out of context.  The Court may take judicial notice of entire statements and documents in deciding this motion.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *see also* Fed. R. Evid. 106; *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 923 (N.D. Ill. 1999).

*that all these cases will be thoroughly investigated. Whether these people are guilty or not will be decided only by the courts on the basis of our legislation.*[7]

*I believe that the state must help law-enforcement bodies and ensure their independence in everyday work, not allowing forces to intervene in their activities....*

There is nothing false or fraudulent in this three-page interview, which was not even about the arrest of Mr. Khodorkovsky. If anything, Minister Medvedev's statement clearly forewarned that the powerful and the wealthy would not be treated preferentially.[8]

*Minister Kudrin's Alleged Statement*: Plaintiffs allege that Minister Kudrin gave an interview on November 3, 2003, to the Russian newspaper Kommersant. AC, ¶189. As the full text of the interview published by Kommersant confirms, the interview was given by Minister Kudrin in his capacity as the Russian Federation's Deputy Prime Minister and Finance Minister. Ex. C at 1. According to the amended complaint, Minister Kudrin allegedly falsely stated that "'I've heard personally from Putin and clearly understand myself that this is not a redistribution of property.'" AC, ¶189. Plaintiffs allege that this statement was false because it deceived investors into believing

---

[7]     Plaintiffs apparently disliked the language of this middle passage from the BBC's apparently verbatim translation of the interview, preferring the following mischaracterization: "'We are proceeding on the assumption that these matters will be exhaustively examined and that a verdict on the guilt of the person in question [Khodorkovsky] will only be reached in accordance with Russian law.'" AC, ¶151 (bracketed name inserted by plaintiffs in amended complaint). Notably, the bracketed reference to Khodorkovsky is inconstent with Minister Medvedev's reported statement.

[8]     Plaintiffs also allege that Minister Medvedev submitted a false "Comment" piece, headlined "Russia will not stray from the path of reform." *Id.*, ¶194; Ex. B. Minister Medvedev submitted the Comment as "head of the Russian president's administration." Ex. B. According to plaintiffs, Minister Medvedev's "Comment" "intentionally misrepresented to Yukos investors that the Russian Federation would provide the company and its former chairman a fair and impartial judicial process" and "den[ied] any intention to bankrupt or nationalize Yukos." AC, ¶¶194-95. But the topic of the Comment was the impact of Russia's December 2003 elections on governmental reform, generally. *See* Ex. B. In a single paragraph regarding judicial reforms, Minister Medvedev reiterated the point he had made in his November 2 interview — that the wealthy would not receive preferential treatment. The Comment has nothing to do with alleged government intent to bankrupt Yukos or nationalize its assets, and explicitly *avoids* commenting upon Mr. Khodorkovsky's prosecution, instead stating that businessmen, generally, need not fear being "hounded" but that all — including the wealthy — will be accountable before the law: "whatever the outcome [of the Khodorkovsky prosecution], . . . . this is not a story about prosecutors 'hounding businessmen,' but about equality before the law for everyone, however wealthy." *See* Ex. B.

that the Russian Federation was not pursuing an expropriation of Yukos from its owners. *Id.*, ¶195. According to the cited news report, Minister Kudrin was asked whether the attachment of Group Menatep's shares in Yukos was the beginning of a program of redistribution of property in which "other large companies owned by oligarchs will be affected after Yukos?" Ex. C at 1. In the passage cited by plaintiffs, Minister Kudrin first said that he was *not* speaking about Yukos (*id.* ("I am not entitled to take a view on the Yukos story before a court decision")) and then expressly addressed the question asked by denying that the government was pursuing an "anti-oligarch campaign." *Id.* For this reason, Minister Kudrin explained, there is no need to discuss "any correction of the macroeconomic forecast." *Id.*[9] Nothing that Minister Kudrin said in his two-page interview was false.

The amended complaint also refers to a number of statements by others, including Russian President Putin and other government officials. AC, ¶¶147-56. The plaintiffs do not allege that any of these statements were made on behalf of any of the Ministers, and plainly they were not. Moreover, the various snippets cited in the amended complaint are equally misleading. For example, plaintiffs allege that President Putin's statement on October 27, 2003, falsely stated "that Khodorkovsky's arrest did not reflect any intention by the Russian Federation to attack Yukos or its assets." AC, ¶¶147-48. Whatever the intent of the Russian Federation may have been, President Putin's statement simply did *not* address the Russian government's intentions with regard to Yukos or its assets. To the contrary, it expressly steered clear of that topic, explaining instead that the government's enforcement actions in "the Yukos case" should not give *other* privatized companies reason for concern (Ex. E at 2):

> At the same time, I do understand the business community's concern because any action taken by the federal authorities often gets turned into some kind of campaign.

---

[9]    Plaintiffs' amended complaint refers to the Kommersant interview, but quoted instead from a republication of portions of that interview in the Moscow Times. *See* Ex. D. This is no excuse for mischaracterization of the interview, as originally reported in Kommersant.

> I must make it clear that the Yukos case should in no way be seen as setting a
> precedent or giving rise to analogies and generalisations regarding the results of
> previous privatisations, and I would ask therefore that all speculation and hysteria on
> this issue come to an end and that the government not get drawn into this debate.

President Putin made no representations about future actions toward Yukos's assets or its officers.

### 2. Plaintiffs' Allegations Concerning the Tax Investigation of Yukos and the Allegedly False Statements Relating To It

In December 2003, the Russian Federation's Ministry of Taxes and Levies ("Tax Ministry")

completed a tax audit of Yukos for the 2000 tax year. AC, ¶205. The Tax Ministry's official

resolution, issued on April 14, 2004, assessed back taxes against Yukos equivalent to US$ 1.6

billion, plus interest and penalties of an additional US$ 1.8 billion. *See id.*, ¶214 (describing Tax

Ministry Resolution # 14-3-05/1609-1).[10]  The Tax Ministry's official resolution revealed that

Yukos's tax evasion was the largest in Russian history. *See id.*, ¶205. The Tax Ministry

immediately initiated enforcement action in Russian courts — including the freezing of Yukos's

assets — to recover the unpaid taxes. *See id.*, ¶216. Thereafter, the Tax Ministry arrested the

shares that Yukos owned in another Russian company, Yuganskneftegaz ("YNG"), and auctioned

approximately 76 percent of those shares to help pay Yukos's tax arrearages. *See, e.g.*, *id.*, ¶271.

Plaintiffs' many accusations that the Tax Ministry's issuance and enforcement of its tax

determinations were illegal or wrongful under Russian law have been litigated before Russian

courts. So far, they have been rejected. *See, e.g.*, *id.*, ¶215.

Plaintiffs do not identify any specific conduct by any of the Ministers in the tax enforcement

actions. Rather, plaintiffs assert that Ministers Kudrin and Khristenko (as well as various non-

defendants, such as Russian President Putin) made several statements regarding these tax

enforcement measures that were allegedly false. AC, ¶¶231, 265, 288. As with the statements

regarding the criminal enforcement measures discussed above (*see supra* pp. 4-8), the statements of

---

[10]     Thereafter, in July, September and November 2004, the Tax Ministry issued resolutions finding
similar tax evasions during the 2001, 2002 and 2003 tax years. *Id.*, ¶¶218-220.

these two Ministers regarding tax enforcement measures were made in their official capacities and are not false.

    *Minister Kudrin's Alleged Statements*:  Plaintiffs claim that Minister Kudrin stated on June 21, 2004, that "the tax authorities and Yukos were cooperating on settling the claims against the company."  AC, ¶231.  The New York Times article cited by the amended complaint makes clear at the outset that Minister Kudrin was speaking as "a top Kremlin official" and characterized his statement as an "official acknowledgement" of the Russian government's position.  Ex. F at 1. According to the news article, Minister Kudrin said "'As far as I know, *Yukos* has offered to cooperate with the tax ministry on settling the claims that have been made . . . . Cooperation on the possible settlement of the claims is under way.  I think Yukos has enough funds *to pay its liabilities*'. . . . Mr. Kudrin said Yukos might have to sell some assets *to pay its bill*."  *Id.* (emphasis added).  Plaintiffs admit that Yukos did offer to cooperate (AC, ¶250-52), and Minister Kudrin's quoted statement twice says that the government expected Yukos to pay its tax debts (and not some portion of them).  The newspaper *interprets* Minister Kudrin's statements in various ways, but such interpretations (whether or not inaccurate) are not the statements of Minister Kudrin.[11]

    Plaintiffs also allege that Minister Kudrin made false statements in an interview that was published on September 13, 2004.  AC, ¶265.  As the news report makes clear, the interview was with Minister Kudrin in his capacity as "Russia's finance minister," and addressed a range of financial issues in Russia, including Russia's accession to the World Trade Organization.  Ex. G. With regard to Yukos, Minister Kudrin is reported as having (i) denied that Yukos was being

---

[11]    Similarly, paragraph 234 of the amended complaint refers to a July 1, 2004, article in *Platt's Energy Economist* that offers that periodical's own interpretation of Minister Kudrin's June 21st statement.  According to the amended complaint, *Platt's* reported "'Kudrin in fact appeared in a relaxed mood, suggesting that the government would be happy for Yukos to sell assets on the open market, rather than to the state or to 'state-approved' companies, to pay off its debts.'"  AC, ¶234. Minister Kudrin surely bears no responsibility for a news reporter's impressions about the Minister's mood and comments, and what they might imply about the Russian government's intentions.

pushed into bankruptcy and (ii) said that the sale of YNG would be done transparently and in a market-oriented way. *Id*. Although the amended complaint alleges these statements were false (AC, ¶265), it further alleges that Yukos did not enter involuntary bankruptcy until years later and that YNG was sold through a public auction.[12]

*Minister Khristenko's Alleged Statements*:  Plaintiffs allege that Minister Khristenko falsely stated to the Interfax news agency in Russia, on December 30, 2004, that "Rosneft did not intend to control YNG." AC, ¶288. The alleged "statement," not quoted in the amended complaint, was allegedly "made in an attempt to continue to deceive investors that Defendants had no interest in expropriating Yukos's principal production asset without compensation to its owners." *Id*. Again, the actual text of the Interfax report is essential. Ex. I. The Interfax report makes clear that the statement was made by Minister Khristenko in his official capacity. Thus, the report identifies its source as "the Russian Industry and Energy Ministry's Public Relations Center[, which] said in a statement, quoting Viktor Khristenko, the ministry's head." *Id*. Plaintiffs' characterization of this official statement is also indefensible. The Interfax report explains that "state-owned Rosneft has acquired Baikal Finance Group, which bought 76.79% of Yuganskneftegaz at the auction." *Id.* The report further explains that because YNG could not be part of the anticipated consolidation of Gazprom and Rosneft for financial reasons, "the assets of Yuganskneftegaz will be transferred to a separate, wholly state-owned company." *Id.* The statement candidly admits that YNG is owned by Rosneft and later will be owned by another state-owned company. There is no concealment of the fact that YNG was and would remain owned by the Russian Federation. Because the merger between Gazprom and Rosneft ultimately was not concluded (AC, ¶141), the transfer of YNG

---

[12]     The same article that reported Minister Kudrin's statement further reported that the Russian Ministry of Natural Resources "was considering swiftly removing Yukos's operating licenses at Yuganskneftegaz, its key oil production subsidiary . . . for non-payment of taxes." Ex. H. License revocation — a quintessentially sovereign act — posed a much greater risk to Yukos than bankruptcy. *See* AC, ¶154.

became unnecessary.  There was nothing false or misleading about Minister Khristenko's statement on December 30, 2004.[13]

Finally, with regard Minister Sechin, plaintiffs identify no allegedly false statement by him at all.  Rather, paragraph 248 of the amended complaint references a newspaper and alleges that "a[n] [unnamed] senior official close to Defendant Sechin 'was shorting Yukos shares on Monday morning before the [re-]arrest of the [YNG] shares was announced."  Although this attempt at mudslinging is offensive and disappointing, it alleges nothing said — or done — by Minister Sechin.

<u>**ARGUMENT**</u>

## I.    THE MINISTERS ARE ENTITLED TO SOVEREIGN IMMUNITY

The amended complaint admits that each of the Ministers is a senior official of the Russian Federation.  As such, each of the Ministers is entitled to the protections of the FSIA for any alleged misconduct taken in his "official capacit[y]."  *Jungquist v. Sheik Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997); *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 102, 105 (D.D.C. 2005) (finding allegations in complaint to allege official conduct, rather than personal, insofar as the complaint in essence challenged "official policy of the sovereign state of Israel"); *see also Ferguson v. Christie*, No. Civ. A. 04-2289 (CKK), 2005 WL 3201065 (D.D.C. Oct. 12, 2005).

---

[13]    The only other alleged false statement by any of the Ministers is a purported statement by Minister Yusufov in October 2003 regarding ExxonMobil's alleged interest in buying a stake in Yukos.  AC, ¶173.  Minister Yusufov spoke in his capacity as Russia's then-Energy Minister.  Ex. I. Plaintiffs assert that his statement praising ExxonMobil's interest in Yukos misled investors about the Russian government's intentions about Yukos.  AC, ¶176.  Notably, none of the snippets quoted in the amended complaint expresses any view — positive or negative — about the Russian government's intent toward Yukos.  More important, however, the amended complaint omits the portion of the article in which Minister Yusufov is quoted as *expressly cautioning* that ExxonMobil "'have to understand the conditions surrounding the goods they are buying, . . . . If we take some steps tomorrow, Exxon could say, 'That's it, we're leaving the market.'  So we have to inform our partner.'"  Ex. I (emphasis added).  Minister Yusufov's statement was not false or misleading.

This Court cannot accept conclusory assertions that each Minister is being sued in his "individual capacity," but must evaluate the conduct actually alleged to determine its sovereign or personal nature. The relevant inquiry "focuses on the *nature* of the individual's alleged actions, *rather than the alleged motives* underlying them." *Jungquist*, 115 F.3d at 1028 (emphasis added). Even if official duty and personal interest converge, such convergence "'does not serve to make [the] action any less an action of [a] sovereign.'" *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp 2d. 9, 14 (D.D.C. 2003) (quoting *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1107 (9th Cir. 1990)).

For at least three reasons, it is indisputable that the nature of the Ministers' alleged misconduct is official and sovereign. *First*, the amended complaint is premised on the Russian Federation's alleged attempt to "expropriate" Yukos's assets through tax and criminal enforcement actions. Expropriation is an inherently sovereign act and any alleged conduct by the Ministers in support thereof would be governmental. *See, e.g.*, *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1166 (D.C. Cir. 2002). *Second*, the only specific misconduct alleged in the amended complaint against any of the Ministers is the supposedly false statements described above. *See supra* pp. 5-7, 9-11. Those statements were all made by, and attributed to, the Ministers in their official capacities. In fact, the amended complaint concedes that the Ministers' alleged statements were, *inter alia*, "on behalf of the Russian Federation." AC, ¶¶361, 395. This must be true since the alleged statements would only be newsworthy if their source was high government office. *Third*, the amended complaint concedes that each of the Ministers participated in the development and execution of the alleged scheme through their use of "color of official right." *See id.*, ¶¶75, 78, 79, 80, 82. The amended complaint further alleges that in acting under color of official right, the Ministers made "use of governmental processes and authority, including without limitation governmental processes and authority related to the imposition and collection of taxes, the seizure of private property for the satisfaction of tax liabilities, and the application of national

- 12 -

bankruptcy laws," all for alleged private motives.  AC, ¶336(b).  Use of governmental processes and authority is necessarily sovereign, not personal, in nature.

Because plaintiffs' substantive allegations establish that the Ministers are being sued for alleged acts taken in their official capacities, the Ministers are presumptively immune from this lawsuit.  *See, e.g.*, *Jungquist*, 115 F.3d at 1028.  For all the reasons stated in the Russian Federation's Motion to Dismiss, plaintiffs cannot overcome that presumption:  none of the exceptions to immunity applies.  Accordingly, the claims against the Ministers must be dismissed, and this Court should not reach the lawsuit's remaining insurmountable legal deficiencies.[14]

## II.    THIS COURT LACKS PERSONAL JURISDICTION OVER THE MINISTERS

To establish specific personal jurisdiction, a plaintiff must (i) identify "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the [United States], thus invoking the benefits and protections of its laws," (ii) allege a cause of action arising out of that act, and (iii) demonstrate that the exercise of personal jurisdiction over the defendant would comport with traditional notions of fair play and substantial justice.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  For a defendant's acts to be purposefully directed at the forum, those acts must be expressly aimed there; mere "forseeability of causing *injury*" in the forum is not enough.  *Burger King Corp.*, 471 U.S. at 474; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774-75 (1984).  Moreover, extending personal jurisdiction into the international field demands heightened care, *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987), particularly with respect to sitting foreign officials.  Plaintiffs' failure to allege any facts supporting specific jurisdiction over any of the Ministers necessitates dismissal of the claims against them.  *See, e.g.*, *First Chicago Int'l v. United*

---

[14]    Because plaintiffs have also sued the Russian Federation, claims against its officials are redundant and must be dismissed as a matter of law.  *See Chuidian*, 912 F.2d at 1101 ("a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly").

*Exch. Co.* 836 F.2d 1375, 1378-79 (D.C. Cir. 1988) (affirming dismissal based on lack of allegation that defendant purposefully availed itself of District of Columbia); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 53 (D.D.C. 2003); *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 36 (D.D.C. 1998), *remanded on other grounds sub nom, GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000); *COMSAT Corp. v. Finshipyards S.A.M.*, 900 F. Supp. 515, 520 (D.D.C. 1995).[15]

### A. Plaintiffs Have Not Alleged A Cause Of Action Arising Out Of Minimum Contacts With The United States

Plaintiffs do not assert that Ministers Medvedev and Sechin have had *any* contact with the U.S. at all. AC, ¶¶75, 82. The sole jurisdictional allegation regarding Minister Yusufov is that he made two brief trips to the U.S. while he served as the Russian Minister of Industry and Energy, one in October 2002 and one in May 2003. *Id.*, ¶79. Plaintiffs do not allege that either of Minister Yusufov's trips was related to their claims and, indeed, both trips predate the alleged scheme. The sole jurisdictional allegation regarding Minister Khristenko is that in October 2005, while serving as the Minister of Industry and Energy, he led a trade mission to the U.S. *Id.*, ¶80. Plaintiffs do not allege this trip had any connection to the scheme alleged in their complaint and, indeed, the trip was under way when their lawsuit was filed. Finally, Minister Kudrin is alleged to have made six trips to the U.S. between October 2001 and April 2006 to speak at conferences. *Id.*, ¶78. Plaintiffs do not allege that any of these six trips was related to the alleged scheme.[16]

---

[15] The complaint also fails to allege facts that would support a finding that any of the Ministers has had "continuous and systematic" contacts with the District of Columbia (or the U.S.) to justify an exercise of *general* jurisdiction over any of them. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984).

[16] For purposes of specific jurisdiction, contacts prior to mid-2003, which predate the alleged inception of the alleged conspiracy, are irrelevant. Contacts after October 24, 2005, are also irrelevant since the relevant point for measuring personal jurisdiction is the date of filing the complaint. *See McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300-01 (D.C. Cir. 1996). Thus, only Minister Kudrin is alleged to have *any* trips to the U.S. during the relevant period, and his two trips during that period are not alleged to have had any relation to the alleged misconduct.

It is not surprising the plaintiffs are unable to allege a cause of action arising out of minimum contacts by the Ministers with the U.S.  The entire premise of their lawsuit is that the Russian government (along with the other Russian defendants) allegedly used its police and taxing powers in Russia to damage a Russian company and expropriate its Russian assets.    Because the alleged scheme is unrelated to the U.S., there is no reason for minimum contacts to exist.[17]

**B.  Plaintiffs Have Not Satisfied The Requirement of "Fair Play and Substantial Justice"**

In considering whether the exercise of personal jurisdiction offends fair play and substantial justice, the court considers (i) the burden on the defendant, (ii) the forum state's interest in adjudicating the dispute, (iii) the plaintiff's interest in obtaining convenient and effective relief, (iv) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (v) the shared interest of the several states in furthering fundamental substantive social policies. *Asahi*, 480 U.S. at 113.  Where jurisdiction over an alien is at issue, the procedural and substantive interests of the other nation, as well as federal foreign-relations interests, require a careful inquiry

---

Moreover, even if the few contacts alleged for Ministers Kudrin, Khristenko and Yusufov were relevant to a jurisdictional analysis, none of those contacts are attributable to them in their personal capacities because they were all conducted in an official capacity on behalf of the Russian Federation.  It is "well-settled" that a court "cannot assert jurisdiction over an individual defendant based on his actions taken pursuant to his employment."  *Islamic Amer. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 58 (D.D.C. 2005) (collecting cases).

[17]    Even the purported personal service on Ministers Kudrin and Khristenko during separate diplomatic missions to the U.S. does not establish personal jurisdiction.  *First*, personal service on foreign officials traveling on official business in the U.S. is ineffective.  *See Republic of Philippines v. Marcos*, 665 F. Supp. 793, 799-800 (N.D. Cal. 1987) (quashing service of subpoena on Philippines official temporarily visiting U.S. on diplomatic business).  *Second*, even when personal service is completed on a foreign citizen visiting the U.S., this Court must still find that the foreign citizen had constitutionally mandated minimum contacts with the United States.  *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, § 421(2) (explaining that jurisdiction over a non-resident defendant may be based on the defendant's presence in the forum, "other than transitorily."); *id*. at cmt. e (explaining "'tag' jurisdiction . . . is not generally acceptable under international law."); *cf. Burnham v. Superior Court of Cal.*, 495 U.S. 604, 628  (1990) (Brennan, J., concurring); *id.* at 640 (Stevens, J., concurring).  Where, as here, there is no allegation of any meaningful contact, the Constitution forbids an assertion of personal jurisdiction.

into the reasonableness of asserting jurisdiction. *Id.* at 115. Serious burdens on an alien defendant are not outweighed lightly. *Id.*

Asserting jurisdiction over the Ministers greatly offends fair play and substantial justice. According to *plaintiffs*, the Ministers have had no (or virtually no) contact with the U.S. and their alleged misconduct was to cooperate within their own home country in implementing their own government's domestic policies. *See* AC, ¶1 (accusing all defendants of conspiring with the Russian Federation in a coordinated action). In other words, this Court has no greater claim to personal jurisdiction over the Ministers than would any other court in the world (at least any venue in which at least one Yukos shareholder, ADR-holder or creditor resided). Given the nature of public service, the precedential effect of asserting personal jurisdiction over the Ministers on these facts would have enormous international and federal foreign-relations implications. Government officials throughout the world would be fair game for being dragged hither and yon, as their public statements and public acts will inevitably be unpopular (and, therefore, be deemed to be damaging) to some. *Cf. Klinghoffer v. S.N.C. Achile Lauro*, 937 F.2d 44, 51-52 (2d Cir. 1991) (declining to exercise jurisdiction over PLO based on diplomatic contacts with the U.S.).

In this case, the burden on the Ministers of defending themselves half a world from their Ministries and their public duties is enormous. This Court and this forum have no particular interest in creating that burden. The plaintiffs, themselves, point to no particular interest in bringing these Ministers here. Rather, the plaintiffs (i) are basing their claims on Russian, as well as U.S., law; and (ii) reside throughout the U.S. and elsewhere (in fact, approximately two-thirds of the purported value of plaintiffs' claims are held by foreigners). It offends fair play and substantial justice to assert personal jurisdiction over the Ministers. The amended complaint must be dismissed because it fails to establish a *prima facie* case for the exercise of personal jurisdiction.

### III.    THE ACT OF STATE DOCTRINE REQUIRES DISMISSAL OF THE AMENDED COMPLAINT

The central acts alleged in the complaint — (i) pursuing criminal arrests and prosecutions in Russia; (ii) conducting searches of offices in Russia; (iii) issuing and enforcing tax rulings imposing back taxes, penalties and interest obligations in Russia; (iv) attaching, seizing and auctioning Yukos assets in Russia; and (v) publicly announcing Russian government policy relating to some of these official acts — are sovereign acts of the Russian government taken within Russia.  The act of state doctrine requires this Court to respect those acts as lawful.

The act of state doctrine recognizes that foreign governments are sovereign within their own borders and that U.S. courts have no right to intrude on — much less to judge — the exercise of that sovereignty.  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990).  To "permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations."  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 304 (1918).

The act of state doctrine operates on principles similar to *res judicata*, requiring courts to accept sovereign acts of a foreign government as final and lawful:

> [The act of state doctrine] requires only that when it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result . . . must be accepted by our courts as a rule for their decision.

*Ricaud v. Am. Metal Co.*, 246 U.S. 304, 309 (1918); *see also Kirkpatrick*, 493 U.S. at 406. When allegations of a case require a court to review or judge a foreign sovereign's acts, even if only indirectly, the case must be dismissed.  *See World Wide Minerals,* 296 F.3d at 1165-66 (affirming dismissal of conversion and RICO claims against Kazakhstan on act of state grounds).  Dismissal is mandated whether the defendant is the foreign sovereign whose act is being challenged, or a third party.  *See, e.g., Riggs Nat'l Corp. v. Comm'r*, 163 F.3d 1363, 1368 (D.C. Cir. 1999) (applying act of state doctrine to vacate U.S. tax claim against private party where claim questioned legality of

Brazilian Tax Ministry's rulings); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1122 (5th Cir. 1985) (applying act of state doctrine to dismiss claims against a non-sovereign defendant).

The sovereign acts about which plaintiffs complain are classic acts of state. Most fundamentally, the amended complaint alleges the expropriation of Yukos's assets, within Russia. In *Banco Nacional de Cuba v. Sabbatino*, the Supreme Court explained that U.S. courts "will not examine the validity of a taking of property within its own territory by a foreign sovereign government." 376 U.S. 398, 428 (1964). This Circuit, too, has stressed that alleged "expropriation of property is the classic act of state addressed in the case law." *World Wide Minerals*, 296 F.3d at 1166; *see also Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1256-57 (11th Cir. 2006); *Dayton v. Czechoslovak Socialist Republic*, 834 F.2d 203, 206 (D.C. Cir. 1987). This basic act of state principle bars plaintiffs from challenging the alleged expropriation in Russia.

Plaintiffs' allegations that the Russian Federation's Tax Ministry imposed unlawful taxes are also irreconcilable with the act of state doctrine. In *Riggs*, the D.C. Circuit recognized that the act of state doctrine bars even an indirect attack on a foreign sovereign's tax assessments. 163 F.3d at 1368. In that case, the Brazilian tax authority had ruled, under Brazilian law, that a U.S. taxpayer was required to pay Brazilian tax on interest earned on loans it had made to the Brazilian Central Bank. The Brazilian Central Bank then recovered those unpaid Brazilian taxes from the U.S. taxpayer. The case arose when the United States' IRS disallowed the U.S. taxpayer's foreign tax credit claim because, the IRS argued, the U.S. taxpayer was not liable for the Brazilian taxes that had been assessed by the Brazilian tax authority. The D.C. Circuit rejected the IRS's claim, explaining that the act of state doctrine "directs United States courts to refrain from deciding a case when the outcome turns upon the legality or illegality (whether as a matter of U.S., foreign, or international law) of official action by a foreign sovereign performed within its own territory." *Riggs*, 163 F.3d at 1367. Because the Brazilian tax authority's order directing the Brazilian Central Bank to withhold Brazilian taxes from the interest payments constituted an act of state, an order

- 18 -

from a U.S. court affirming the IRS determination that the Brazilian taxes were not owed would have the effect of reviewing the legality of that sovereign act. *Id.* Accordingly, the Court of Appeals reversed the trial court's affirmance of the IRS disallowance of the U.S. tax credit, holding that the act of state doctrine "requires courts to abstain from even engaging in . . . an inquiry" that could have the effect of revisiting an act of state. *Riggs*, 163 F.3d at 1368.

Plaintiffs ask this Court to do exactly what the D.C. Circuit held in *Riggs* and *World Wide Minerals* could not be done: rule that sovereign criminal and tax enforcement actions of the Russian government within Russia are illegal and subject the Russian Federation and its alleged co-conspirators to suit in the U.S. for conversion, restitution, RICO, international expropriation, and fraud. Plaintiffs' claims must fail.[18] For example, the possessory claims (e.g., conversion, restitution, RICO, violation of international law) would require this Court to rule that Russia's tax enforcement measures were unlawful and did not result in the lawful passage of title to Yukos's assets, such as the auctioned shares of YNG. Similarly, plaintiffs' fraud and securities fraud claims would require this Court to rule that the various alleged false statements about the Russian government's intent regarding Yukos were untrue because the Russian government's pursuit of criminal and tax enforcement measures violated Russian law. Because this Court must treat the state actions of the Russian Federation and its officials as lawful and valid, the essential premises of plaintiffs' complaint fail and, as a result, the amended complaint must also fail.[19]

---

[18]     A court in England recently reached the same conclusion on the facts of this case. Yukos filed an action in the London High Court, challenging an initial public offering by Rosneft Oil Company on the London Stock Exchange. Yukos sought to enjoin that IPO by arguing "that dishonestly, unlawfully and in a manner which constituted a fraud on the shareholders of Yukos, YNG was (a) expropriated from Yukos and (b) acquired by Rosneft." Ex. J, ¶5. The High Court rejected Yukos's challenge on act of state grounds, citing, *inter alia*, Lord Templeman's statement that "[n]o English judge could properly entertain such an attack launched on a friendly state." *Id.*, ¶¶86, 90.

[19]     Failing to respect the enforcement actions of the Russian Federation would undoubtedly lead to arguments — like those advanced by the plaintiffs here — in foreign courts by foreign stakeholders adversely affected by U.S. investigations and prosecutions. For example, foreign stakeholders in Enron, Worldcom, Martha Stewart and Arthur Andersen might file claims like those presented here.

## IV.    PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE UNDER THE POLITICAL QUESTION DOCTRINE

The political question doctrine prohibits courts from exercising jurisdiction over cases that would require them to decide political issues committed by the Constitution exclusively to the political branches of the government. *Bancoult v. McNamara*, 445 F.3d 427, 432-33 (D.C. Cir. 2006); *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005).   In applying the doctrine, a dispute is nonjusticiable if it meets any one of six criteria (*Schneider*, 412 F.3d at 194):

> Prominent on the surface of any case held to involve a political question is found a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

(quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).   The amended complaint implicates at least the first, fourth, fifth and sixth *Baker* factors because this case involves significant and complex issues of foreign policy that are committed to the political branches, and on which those branches have already established a position that this Court must respect.

Plaintiffs' complaint asks this Court to declare that the Russian Federation has committed fraud and conversion, that the Ministers are racketeers, and that none of them respect the rule of law.  Such a declaration would implicitly condemn American foreign policy, which treats Russia as an important ally and partner.  *See Doe I*, 400 F. Supp. 2d at 110.  The Constitution commits questions of foreign policy — such as whether to treat a major foreign power as a partner or a racketeer — to the political branches.  *Oetjen*, 246 U.S. at 302 ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative – 'the

---

Application of the act of state doctrine serves precisely to avoid such second-guessing of each nation's enforcement policies.

political' – departments."). For that reason, this Court lacks jurisdiction to decide them. *See Haig v. Agee*, 453 U.S. 280, 292 (1981); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 (D.C. Cir. 1984) (Bork, J., concurring) ("Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied."); *Luftig v. McNamara*, 373 F.2d 664, 665-66 (D.C. Cir. 1967); *Doe I*, 400 F. Supp. 2d at 110; *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d, 424, 484 (D. N.J. 1999) ("[T]he most appropriate case for applicability of the political question doctrine concerns the conduct of foreign affairs.").

Plaintiffs' amended complaint reveals the serious foreign policy issues at hand, alleging that President Bush, Secretary of State Rice and former Secretary of State Colin Powell have all "questioned" the Russian Federation's actions involving Yukos. AC, ¶5. Such careful equivocation is far different from any *action* that would undermine the U.S.-Russia partnership. By accepting jurisdiction to consider plaintiffs' accusations that the Russian Federation, President Putin, the Ministers, and other government officials are racketeers, fraudsters or thieves, this Court would be undoing the Executive's careful handling of its relations with the Russian government. For this reason as well, the Court lacks jurisdiction and must dismiss this lawsuit.[20]

## V.     THE DOCTRINE OF INTERNATIONAL COMITY BARS THE REVIEW OF DISPUTES THAT HAVE ALREADY BEEN DECIDED IN RUSSIA

"'Comity' . . . is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience." *Société Nationale Industrielle Aérospatiale v. So. Dist. Court of Iowa*, 482 U.S. 522, 543-44 n.27 (1987) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)). In *Medellin v. Dretke*, the Supreme Court reinforced the established rule that comity precludes re-litigation of the

---

[20]     Use of judicial power can have important consequences for U.S. relations with Russia. For example, when a U.S. bankruptcy court accepted jurisdiction over Yukos's application for a temporary restraining order in December 2004, the Russian parliament responded by considering legislation that would deny sovereign immunity to the U.S. and its diplomats. *See* Ex. K (proposed Russian legislation). Fortunately, the U.S. bankruptcy court dismissed the action.

decisions of foreign tribunals — as well as the revisiting of legislative and executive acts (544 U.S.

660, 670 (2005)):

> It is the long-recognized general rule that, when a judgment binds or is
> respected as a matter of comity, a "let's see if we agree" approach is out of
> order. See *Hilton v. Guyot*, 159 U.S. 113, 202- 203, 16 S. Ct. 139, 40 L. Ed.
> 95 (1895) (where "comity of this nation" calls for recognition of a judgment
> rendered abroad, "the merits of the case should not ... be tried afresh ... upon
> the mere assertion ... that the judgment was erroneous in law or in fact"); *see
> also* Restatement (Second) of Conflict of Laws § 106 (1969) ("A judgment
> will be recognized and enforced in other states even though an error of fact or
> of law was made in the proceedings before judgment ...."); *id.*, § 106,
> Comment *a* ("Th[is] rule is ... applicable to judgments rendered in foreign
> nations....").

The deference under international comity to a foreign nation's legislative, executive and

judicial decisions becomes mandatory when the matter at issue involves a nation's domestic

enforcement of its own tax or criminal laws.  In *Attorney General of Canada v. R.J. Reynolds

Tobacco Holdings*, the Second Circuit explained that because tax laws serve to implement a

nation's political, moral and ideological principles and goals, U.S. courts must avoid entanglement

in foreign tax disputes to "help[] nations maintain their mutual respect and security."  268 F.3d 103,

111 (2d Cir. 2001).  Citing Judge Learned Hand, the Second Circuit continued (*id.*, at 114):

> To pass [judgment] upon the provisions for the public order of another state is,
> or at any rate should be, beyond the powers of a court; it involves the relations
> between the states themselves, with which courts are incompetent to deal, and
> which are intrusted to other authorities . . . . Revenue laws fall within the same
> reasoning; they affect a state in matters as vital to its existence as its criminal
> laws."  (quoting *Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand,
> J., concurring)).

*See also* RESTATEMENT (THIRD) OF THE LAW OF FOREIGN RELATIONS OF THE UNITED STATES, §

483 (1986).

The twin pillars supporting the doctrine of comity — respect for the decisions of foreign

sovereigns and promoting judicial efficiency — are squarely implicated in this case.  The Russian

executive and judicial branches have decided the tax and criminal measures that plaintiffs now seek

to put back at issue in this lawsuit.  Those decisions — which are central to the "public order" of the

Russian Federation — are entitled to comity from this Court. Because the amended complaint would require this Court to allow the re-litigation of the legality of those actions in violation of international comity, it should be dismissed.

## VI.  THE *FORUM NON CONVENIENS* DOCTRINE REQUIRES DISMISSAL OF THE AMENDED COMPLAINT

Even if any of plaintiffs' claims were viable, the *forum non conveniens* doctrine would require dismissal in favor of a Russian forum. This doctrine follows a two-step analysis. *Jackson v. Am. Univ. in Cairo*, 52 Fed. App'x 518 (D.C. Cir. 2002) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 255-61 (1981)). *First*, the Court must decide if Russia is an adequate alternative forum. *Piper Aircraft*, 454 U.S. at 241, 254; *Nemariam v. Fed. Democratic Republic of Ethiopia*, 315 F.3d 390, 394 (D.C. Cir. 2003). *Second*, because it is, this Court must balance the "private interest factors" and "public interest factors" to decide if dismissal is justified. *Piper Aircraft*, 454 U.S. at 241. Dismissal is appropriate if, for example, trial in the U.S. forum would "'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper*, 454 U.S. at 241 (quoting *Koster v. Lubermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).

By pleading Russian law claims in their amended complaint, plaintiffs themselves highlight the fact that this case is utterly Russia-centric. The witnesses are in Russia, the documents are in Russia (and in Russian), Russian law governs plaintiffs' claims, and the proper application of Russian tax and criminal law is central to the plaintiffs' theory of a "coordinated attack" against Yukos. Under these circumstances, *forum non conveniens* dismissal is proper

### A.  The Russian Federation Offers an Adequate Alternative Forum

An alternative forum is generally adequate if "the defendant is amenable to process in the foreign jurisdiction." *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 607

(D.C. Cir 1983) (internal citations omitted); *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329

F.3d 64, 74 (2d Cir. 2003). The "availability of an adequate alternative forum does not depend on

the existence of the identical cause of action in the other forum," or on identical remedies. *PT*

*United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998). Federal courts have

consistently held that Russian courts are an adequate alternative forum.[21] Moreover, *plaintiffs* allege

that Russian law provides causes of action for their alleged injuries. Because Russian courts are

open to plaintiffs, Russia provides an adequate, alternative forum.

### B. The Balance of Private and Public Factors Confirms that Russia Provides the Most Appropriate Forum For Resolving Plaintiffs' Claims

In *Gulf Oil Corp. v. Gilbert*, the Supreme Court summarized the type of private and public

interest factors relevant to a *forum non conveniens* motion (330 U.S. 501, 508-09 (1947)):

> An interest to be considered, and the one likely to be most pressed, is the
> private interest of the litigant. Important considerations are the relative ease of
> access to sources of proof; availability of compulsory process for attendance
> of unwilling, and the cost of obtaining attendance of willing, witnesses; . . .
> and all other practical problems that make trial of a case easy, expeditious and
> inexpensive. There may also be questions as to the enforcibility [sic] of a
> judgment if one is obtained . . . .
>
> * * *
>
> Factors of public interest also have [a] place in applying the doctrine.
> Administrative difficulties follow for courts when litigation is piled up in
> congested centers instead of being handled at its origin. Jury duty is a burden
> that ought not to be imposed upon the people of a community which has no
> relation to the litigation. In cases which touch the affairs of many persons,
> there is reason for holding the trial in their view and reach rather than in
> remote parts of the country where they can learn of it by report only. There is
> a local interest in having localized controversies decided at home. There is an
> appropriateness, too, in having the trial of a [] case in a forum that is at home
> with the [] law that must govern the case, rather than having a  court in some
> other forum untangle problems in conflict of laws, and in law foreign to itself.

---

[21]    *See, e.g.*, *Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. App'x 47 (2d Cir. 2004);
*Varnelo v. Eastwind Transp., Ltd.*, No. 02 Civ. 2084 (KMU), 2003 WL 230741 at *2, 18 (S.D.N.Y.
Feb. 3, 2003) (adequate for claims brought under the Death On the High Seas Act and general
maritime law); *Tarasevich v. Eastwind Transp. Ltd.*, No. 02 Civ. 1806 (JSM), 2003 WL 21692759
at *3 (S.D.N.Y. Feb. 3, 2003) (adequate for personal injury).

The private factors weigh in favor of a Russian forum.  Virtually all sources of proof relevant to the plaintiffs' allegations and the defendants' defenses are in Russia and in the Russian language.  All of the alleged misconduct occurred in Russia.  The underlying tax and criminal misconduct of Yukos will be reflected in Yukos's records in Moscow.  Records of the Russian court proceedings and judgments, too, are all in Russia in the Russian language.  Apart from the plaintiffs, virtually all potential witnesses to the alleged misconduct are located in Russia.  This Court cannot compel the attendance of witnesses from Russia.  And if the plaintiffs were to seek to call the Ministers as witnesses, the impropriety and offensiveness of haling such officials into a U.S. court (or even of directing their depositions) is apparent.  Finally, the cost of bringing foreign government officials to the U.S. — including distraction from their official duties and the cost of providing security — far outweighs the inconvenience to private plaintiffs of traveling to Russia to litigate claims relating to their investments in a Russian company.  In fact, because the plaintiffs are not even paying the legal expenses and other costs of this lawsuit, *see supra* note 2, they will not suffer any burden at all.

The public interest factors also weigh heavily in favor of dismissal.  The plaintiffs' allegations concerning the Russian Federation's enforcement of its tax laws against Yukos are far more important to the people of Russia than they are to the U.S.  Moreover, for all the reasons detailed in sections I through V above, the U.S. has an affirmative interest *not* to hear this dispute.  Finally, this dispute will impose numerous practical burdens on this Court.  *First*, because documents and witnesses will be predominantly Russian, there are tremendous translation and interpretation obstacles here that would not exist in Russia.  *Second*, because choice of law principles require application of Russian law to plaintiffs' claims, this Court would be required to translate, then apply, Russian law that is more naturally understood and applied by a Russian court.  *Third*, because the crux of plaintiffs' claims is the illegal application of Russian tax and criminal laws to Yukos, this Court would be required to interpret those laws, then perform an essentially appellate review of the multiple Russian judicial proceedings that applied those laws to Yukos and

its officials.  This case presents an unnecessary and costly burden on this Court, the District of

Columbia, and its jurors, even though this jurisdiction has no genuine interest in the dispute.

## VII.   PLAINTIFFS' U.S. STATUTORY CLAIMS MUST BE DISMISSED

Beyond the insurmountable immunity, jurisdictional, and justiciability bars to this action,

plaintiffs' claims cannot even survive as a matter of law.  Sections VII.A and VII.B address the

incurable legal deficiencies of the U.S. racketeering and securities law claims.[22]  Sections VIII and

IX address the incurable deficiencies in plaintiffs' non-statutory claims.

### A.     The Yukos ADR Holders' RICO Claims Must Be Dismissed

In Counts IV, V, and VI, the ADR Holders allege that the Ministers, the remaining

individual defendants, Baikal Finance Group and Gazprom (the "RICO Defendants") engaged in

racketeering in violation of 28 U.S.C. §§ 1962(b), (c), and (d).  Count IV alleges that the RICO

Defendants "acquired an interest in and/or control of Yukos" through a pattern of racketeering

activity.  AC, ¶334.  Count V alleges that the RICO Defendants formed an association in fact

enterprise and conducted its affairs through a pattern of racketeering activity.  *Id.*, ¶¶344-47.  Count

VI alleges that the RICO Defendants conspired to violate §§ 1962(b) and (c).  *Id.*, ¶352.

All three RICO counts suffer the same four fatal defects.  *First*, the ADR Holders lack

standing to pursue RICO relief.  *Second*, the RICO statute does not apply extraterritorially to the

circumstances presented here.  *Third*, all the ADR Holders' RICO claims are barred by the PSLRA.

*Fourth*, there is no "pattern of racketeering activity."  Parts 1 through 4, below, discuss these four

independent grounds for dismissing all the RICO claims.

In addition to these four universal defects, each RICO count also suffers from its own

unique defect.  Part 5, below, explains that Count IV also fails because the ADR Holders cannot

---

[22]    For purposes of their U.S. statutory claims, plaintiffs divide themselves into "ADR Holders"
and "ADR Purchasers."  The "ADR Holders" assert the RICO claims, while the "ADR Purchasers"
assert the securities law claim.  This division is a transparent  — and futile — attempt to evade the
Private Litigation Securities Reform Act ("PLSRA") RICO bar.  *See infra* pp. 30-31.

allege that any of the RICO Defendants have "acquired an interest in or control over" Yukos, which is the alleged enterprise. Part 6, below, explains that Count V also fails because the ADR Holders cannot plead a cognizable association-in-fact enterprise. Part 7, below, explains that because the ADR Holders cannot allege a viable substantive RICO claim, the RICO conspiracy claim (Count VI) cannot survive alone.

### 1. All RICO Claims Must Be Dismissed for Lack of Standing

A RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see also* 18 U.S.C. § 1964(c). The ADR Holders lack standing for two independent reasons. *First*, the purported predicate acts allege direct injuries only to *Yukos*, and the ADR Holders lack standing to assert *Yukos's* injuries. *Second*, even if an indirect injury could provide standing under RICO (which it cannot), the ADR Holders have not suffered a "clear and definite" injury because they still hold their ADRs.

### a. The RICO Counts Must Be Dismissed Because the ADR Holders Have Suffered No Direct Injury

Only a plaintiff who suffers a direct injury, proximately caused by the alleged RICO misconduct has standing under RICO. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Serv. Employees Int'l Union v. Philip Morris*, 249 F.3d 1068, 1072 (D.C. Cir. 2001) (affirming dismissal of RICO claims, explaining "the Supreme Court has insisted on an appropriate plaintiff, namely, a plaintiff whose alleged injury possesses a sufficiently direct causal relationship to the alleged wrongdoing").

Because the RICO Defendants have taken no action directly against the ADR Holders or their ADRs, the ADR Holders can only complain that the value of their ADRs has been reduced by alleged racketeering acts that directly affected *Yukos* by depriving *Yukos* of *its* assets (*e.g.*, allegedly expropriating the shares of *Yukos's* subsidiary, YNG) and *its* management. Reduction in the value

- 27 -

of plaintiffs' ADRs because of alleged racketeering activity against *Yukos*, however, is an indirect injury that is inadequate as a matter of law.  RICO's standing requirement is *not* satisfied by "losses suffered by a company's stakeholders as a result of racketeering activity against the company." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d. 898, 906 (11th Cir. 1998).[23]  In *W. Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629, 635 (D.C. Cir. 2001), the D.C. Circuit similarly reasoned that individual partners of a limited partnership who suffer losses from racketeering activity against their partnership do not have standing under RICO because "they [are] injured indirectly."  *See also Meng v. Schwartz*, 116 F. Supp. 2d 92, 97 (D.D.C. 2000), *aff'd*, 48 Fed. App'x 1 (D.C. Cir. 2002) (dismissing on standing grounds RICO claim brought by shareholders for injury to company).[24]

Because the ADR Holders can allege no direct injury from the alleged scheme, their RICO claims must be dismissed for lack of standing.

### b. The ADR Holders Cannot Allege a Clear and Definite Injury

Even if a reduction in ADR value could provide the ADR Holders with RICO standing, a "cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 1768 (2d Cir. 1994).[25]

---

[23]    *See also Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993); *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990); *Sparling v. Hoffman Constr. Co*, 864 F.2d 635, 640-41 (9th Cir. 1988); *Leach v. FDIC*, 860 F.2d 1266, 1273 (5th Cir. 1988); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 29-30 (1st Cir. 1987); *Gaff v. Fed. Deposit Ins. Corp.*, 814 F.2d 311, 317 (6th Cir. 1987); *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986); *Lakonia Mgmt. Ltd. v. Meriwether*, 106 F. Supp. 2d 540, 550-51 (S.D.N.Y. 2000); *Sound Video Unlimited, Inc. v. Video Shack, Inc.*, 700 F. Supp. 127, 136 (S.D.N.Y. 1988).

[24]    Just last term the Supreme Court reinforced the importance of standing limits on civil RICO. *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1996-97 (2006).  In *Anza*, the plaintiff argued that a competitors' tax fraud enabled it to lower prices, thereby injuring the plaintiff's business. The Court rejected this theory on standing grounds because the State of New York was the direct victim of the tax fraud, not the plaintiff.  *Id.* at 1997.

[25]    *See also Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990) (finding plaintiff lacked standing because "alleged injury [wa]s clearly contingent on events that may not occur as

Because the ADR Holders continue to hold their ADRs, the alleged indirect injury to the value of their ADRs has not become "clear and definite." *See Lincoln House*, 903 F.2d at 847. Yukos is still operating. As a result, it is unknown what injury, *if any*, the ADR Holders will actually suffer from the alleged RICO violations. RICO claims that are filed before a "concrete and definite" injury has occurred must be dismissed for lack of standing. *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003); *First Nationwide Bank*, 27 F.3d at 768.

### 2. Congress Did Not Intend RICO to Apply Extraterritorially to Circumstances Like Those Alleged Here

"[L]egislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949). Because the RICO statute reflects no intent to apply beyond the borders of the U.S., it will only apply to a "controversy involving . . . significant and material contact with the United States." *N. S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1052 (2d Cir. 1996); *see also Butte Mining PLC v. Smith*, 76 F.3d 287, 291 (9th Cir. 1996); *Doe I*, 400 F. Supp. 2d at 114-15.[26]

The fraudulent scheme described by the ADR Holders does not have significant and material contact with the U.S. The alleged impact on the U.S. is limited to supposed macroeconomic effects, such as eliminating Yukos as a U.S. supplier of oil and as a potential partner for U.S. oil companies. AC, ¶¶9, 105-08. In the world's increasingly global economy, these types of allegations would

---

anticipated or may not occur at all"); *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992) (RICO requires a showing of concrete financial loss).

[26] The impropriety of extraterritorial effect is heightened in this case because the allegations of racketeering strike directly at alleged sovereign conduct of the Russian Federation within its own borders. The doctrines of act of state, political question and international comity strongly disfavor the extraterritorial application of RICO. *See Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C.J.) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."); *Doe I*, 400 F. Supp. 2d at 116; Restatement (Third) of the Foreign Relations Law of the United States, § 403; *cf. Timberlane Lumber Co. v. Bank of Am.*, 549 F.2d 597, 614 (9th Cir. 1976) (stating that U.S. interests must be weighed against the interests of other nations in assessing the appropriateness of extraterritorial application of U.S. antitrust laws).

permit RICO to apply to virtually any incident involving any multinational corporation. Congress never intended the federal RICO statute to apply to international controversies with such little connection to the U.S. *See, e.g.*, *Doe I v. Unocal Corp.*, 395 F.3d 932, 961 (9th Cir. 2002); *Doe I*, 400 F. Supp. 2d at 114-15; *see also Attorney General of Canada*, 268 F.3d at 114 (recognizing Congress did not intend RICO to displace fundamental notions of international comity). Accordingly, the RICO claims must be dismissed.

### 3. The ADR Holders' RICO Claims Are Barred by the PSLRA

The PSLRA amended § 1964(c) by adding that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). Through this amendment, Congress barred the ADR Holders from pleading both RICO claims and securities claims that are premised on the same alleged underlying misconduct. *See, e.g.*, *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999). Application of this bar does not depend on whether the ADR Holders themselves could bring a securities fraud claim; rather, the PSLRA broadly prohibits RICO claims that are based on "conduct" that could be actionable as securities fraud by *anyone*. *See Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000). Applying this standard, courts have held, for example, that the PSLRA "bars plaintiffs from pleading RICO counts in the alternative" to securities fraud counts. *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1072 (D. Minn. 2003); *Hemispherx Biopharma, Inc. v. Asencio*, No. Civ. A. 98-5204, 1999 WL 144109, at *4 (E.D. Pa. 1999) (same); *Ostler v. Codman Research Group, Inc.*, Civ. No. 98-356-JD, 1999 WL 1059684, at *6 (D.N.H. Apr. 20, 1999) (same).

Although the ADR Holders artfully attempt to avoid the PSLRA bar (*see, e.g.*, AC, ¶330), they cannot. The securities fraud claims in the amended complaint, like the RICO claims, rest on the same underlying, alleged scheme to expropriate Yukos's assets. Because the ADR Holders cannot meaningfully distinguish their RICO claims from the conduct underlying the alleged

securities fraud claims, the RICO claims must be dismissed.  *See In re Enron Corp. Sec. Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003); *Florida Evergreen Foliage v. E.I. Du Pont De Nemours & Co.*, 165 F. Supp. 2d 1345, 1356-59 (S.D. Fla. 2001), *aff'd sub nom.*, *Green Leaf Nursery v. E.I. Dupont de Nemours & Co.*, 341 F.3d 1292 (11th Cir. 2003).

### 4.   The ADR Holders Are Unable to Allege a Pattern of Racketeering Activity

Even if the ADR Holders could overcome the insurmountable obstacles outlined in the prior three sections, they cannot allege a pattern of racketeering activity.  To survive a motion to dismiss, the ADR Holders must allege that *each* defendant *individually* engaged in "a pattern of racketeering activity."  *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004) ("assuming arguendo that the alleged predicate acts constituting the pattern were adequately pled, we evaluate the RICO allegations with respect to each defendant individually"); *Palmetto State Med. Center v. Operation Lifeline*, 117 F.3d 142, 148 (5th Cir. 1997) ("To prove a violation of § 1962(c), Palmetto must show that each defendant conducted an enterprise through a pattern of racketeering activity") (citing *Sedima*, 473 U.S. at 496); *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, MDL No. 1712, 2006 WL 1531152, at *12 (E.D. Pa. 2006).

The ADR Holders cannot allege that any of the Ministers committed a pattern of racketeering activity for two independent reasons: (i) the Ministers, as instrumentalities of the Russian Federation, are not "indictable" and, therefore, could not have committed *any* predicate act; and (ii) even if the Ministers were indictable, none of the alleged predicate acts actually state a violation of the underlying criminal statute by *any* of the Ministers.

#### a. The Ministers Are Not "Indictable" for Any Predicate Crimes

"[R]acketeering activity" is limited to those acts that are "indictable" under particular sections of state or federal law.  18 U.S.C. § 1961(1)(B).  Foreign states and their agencies and instrumentalities are not "indictable" in the United States because they are immune from criminal jurisdiction.  *See* 28 U.S.C. § 1330 (granting American courts jurisdiction to hear only *civil* claims

against non-immune foreign states); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (explaining that FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts").  For that reason, foreign states (including their agencies and instrumentalities) cannot be engaged in "racketeering activity" under RICO.  *See Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 821 (6th Cir. 2002) ("[A] foreign sovereign is not indictable, and therefore not amenable to civil RICO claims"); *Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 750 F. Supp. 838 (N.D. Ohio 1990); *see also Norris v. Dept. of Def.*, No. 96-5326, 1997 WL 362495 at *1 (D.C. Cir. May 5, 1997) (summarily affirming dismissal of RICO claims based on the doctrine of official immunity); *McNeily v. United States*, 6 F.3d 343, 350 (5th Cir. 1993) (holding that FDIC is not subject to RICO because it is not "'chargeable', 'indictable', or 'punishable' for violations of specified criminal provisions") (quoting *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991)).

The ADR Holders tacitly concede the inapplicability of RICO to "foreign states" by not alleging any RICO claims against the three defendants (the Russian Federation, Rosneftegaz, and Rosneft) that they allege to be foreign sovereigns.  AC, ¶95.  Because the Ministers also qualify as "foreign states" for purposes of the FSIA (*see supra* pp. 11-13), they cannot be liable under RICO. Counts IV, V and VI must, therefore, be dismissed.

### b.   *The ADR Holders Are Unable  to Allege Any Predicate Crimes*

The ADR Holders attempt to allege five types of racketeering activity:  wire fraud (18 U.S.C. §§ 1341 and 1343); Hobbs Act offense through the wrongful use of "color of official right" (18 U.S.C. § 1951); Travel Act offense (18 U.S.C. § 1952); violation of 18 U.S.C. § 2314; and violation of 18 U.S.C. § 152.  Even if the Ministers were indictable in the U.S., the ADR Holders are unable to plead the commission of even one predicate act by any of the Ministers.

*The Mail and Wire Fraud Allegation*:  A RICO plaintiff alleging mail or wire fraud as a predicate act must "stat[e] with particularity" the facts supporting that allegation.  *Danielson v. Burnside-Ott Aviation Training*, 941 F.2d 1220, 1229 (D.C. Cir. 1991) (quoting Fed. R. Civ. P.

- 32 -

9(b)); *Byer Indus., Inc. v. Gulf Ins. Co.*, 888 F. Supp. 1, 2 (D.D.C. 1995).[27]   Although the ADR

Holders generically allege the Ministers violated the wire fraud statute by "making, and causing to

be made, false and fraudulent pretenses, representations, and statements in furtherance of the

scheme set forth in the Amended Complaint and which were transported, transmitted and/or

delivered in interstate or foreign commerce," they do not identify any allegedly false statements

except for the "statements set forth in paragraph 263, above."  AC, ¶336(a).  Paragraph 263 of the

amended complaint does not allege any statement by any of the Ministers.  *Id.*, ¶263.

        Moreover, the introductory paragraph of each RICO claim expressly *excludes* the allegedly

false statements of Ministers Medvedev, Kudrin and Yusufov that are elsewhere alleged in the

amended complaint.  *See id.*, ¶330 (excluding statements found in  ¶¶151, 173, 189, 194, 231, 234,

and 265).  Because there is no allegation anywhere in the amended complaint that Minister Sechin

made any false statement, the sole allegedly false statement by any of the Ministers that could even

conceivably — if it had been so pleaded — support the alleged mail or wire fraud predicate act is

the December 30, 2004, statement by Minister Khristenko.  *See id.*, ¶288.  With respect to that

statement, the amended complaint alleges (*id.*):

> On December 30, 2004, despite Rosneft's post-auction purchase of BFG
> [which had acquired 76% of YNG at the government auction], Defendant
> Khristenko stated that Rosneft did not intend to control YNG, according to the
> Interfax news agency.  Khristenko's statements were false, and were made in
> an attempt to continue to deceive investors that Defendants had no interest in
> expropriating Yukos's principal production asset without compensation to its
> owners.

As explained above (*see supra* at p. 10-11), plaintiffs grossly mischaracterize Minister Khristenko's

statement.  The full text of the Interfax report explains (i) "The state-owned Rosneft has acquired

Baikal Finance Group, which bought 76.79% of Yuganskneftegaz at the auction," (ii) "The assets of

Yuganskneftegaz . . . will be transferred to a separate, wholly state-owned company," and (iii) "The

---

[27]    *See also Vandenbroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 701-02 (6th Cir. 2000);
*Chisholm v. Transouth Fin. Corp.*, 95 F.3d 331, 337-38 (4th Cir. 1996).

process of consolidation of Gazprom and Rosneft assets is going [according] to plan . . . .

'Yuganskneftegaz will not be among the assets to be consolidated, primarily because the state as

Gazprom's main shareholder does not intend to increase its direct participation beyond a controlling

interest.'"  Ex. H.  The Interfax report — as distinguished from plaintiffs' mischaracterization of it

— was entirely true.  YNG ultimately did not need to be transferred to another state-owned

company because the planned Gazprom/Rosneft consolidation was cancelled.  *See* AC, ¶141.

Clearly, however, the statement could not have been intended to deceive investors (or defraud

anyone else) into believing the "Defendants [i.e., the Russian government] had no interest in

expropriating [YNG] without compensation to its owners" since the statement acknowledged that

YNG was and would remain state-owned.  For these reasons, the RICO claims fail to allege any act

of mail or wire fraud as a predicate act against any of the Ministers.

        *The Hobbs Act Allegation*:  The Hobbs Act defines extortion as "the obtaining of

property from another, with his consent, induced by wrongful use of actual or threatened force,

violence, or fear, or under color of official right."  § 1951(b)(2).  The ADR Holders allege that

under color of official right, "the RICO Defendants agreed to and did make use of governmental

processes and authority . . . all for the unlawful private, commercial motives of destroying the

interests of Yukos's owners and seizing control of Yukos."  AC, ¶336(b).  The ADR Holders cannot

state an offense under the Hobbs Act for three reasons.

        *First*, the Hobbs Act does not apply to the acts of foreign government officials acting "under

color of official right" in their home country.  *See generally supra* pp. 29-30 (discussing limits on

extraterritorial application of U.S. laws).  Not surprisingly, we have found no case that extends the

reach of the Hobbs Act to foreign officials acting under color of their official right.

        *Second*, with regard to the property element of a Hobbs Act claim, the ADR Holders must

allege that *their* property was obtained by the Ministers.  *Scheidler v. Nat'l Org. of Women*, 537

U.S. 393, 404 (2003) ("we have construed the extortion provision of the Hobbs Act at issue in these

cases to require not only the deprivation but also the acquisition of property"). Because the ADR

Holders still hold their ADRs, they cannot claim that *their* property was taken by anyone; rather, the

ADR Holders only claim that Yukos's property (*i.e.*, shares in YNG) was obtained. That is

insufficient as a matter of law. *O'Rourke v. Crosley*, 847 F. Supp. 1208, 1215 & n.8 (D. N.J. 1994)

(dismissing Hobbs Act claim where plaintiff failed to allege particular defendant did anything to

plaintiff). Nor do (or can) the ADR Holders allege that any property was obtained by any of the

Ministers.

Third, to state an offense under the Hobbs Act, the receipt of property under color of official

right must be *with the consent* of the victim. *Camelio v. Am. Fed'n*, 137 F.3d 666, 671 (1st Cir.

1998) ("the complaint alleges that Carmelio's injuries were actually caused by defendants'

unilateral acts which, although reprehensible, do not violate the Hobbs Act").[28] The ADR Holders

do not allege that they — or Yukos — consented to the alleged takings of property. To the

contrary, the amended complaint alleges that Yukos's assets were "seiz[ed]." AC, ¶2.

The Travel Act Allegation: To allege that any of the Ministers violated the Travel

Act, the amended complaint must allege, *inter alia*, that the defendant (i) engaged in interstate

travel, (ii) with the intent to promote an unlawful activity, and (iii) performed an overt act in

furtherance of the unlawful activity. 18 U.S.C. § 1952; *see United States v. Childress*, 58 F.3d 693,

719 (D.C. Cir. 1995). Plaintiffs do not allege any act by which any of the Ministers violated the

Travel Act. The only reference to interstate travel to perform an overt act is the allegation at

paragraphs 127-28 of the amended complaint regarding travel to the U.S. in early 2006. AC,

---

[28]    *See also Rowell v. Voortman Cookies, Ltd*, No. 02 C 0681, 2002 WL 31116640, at * 7 (N.D.
Ill. Aug. 12, 2002) (plaintiffs' repeated allegations that commissions were taken without consent
failed to state a claim under the Hobbs Act); *White v. Union Leader Co.*, No. Civ. 00-122-B, 2001
WL 821527, at * 6 n.8 (D. N.H. July 13, 2001) (plaintiff's Hobbs Act claim based on defendant's
failure to reimburse her for funds failed to state a claim because she did not allege consent); *Sea-
Land Serv., Inc. v. Atl. Pac. Int'l, Inc.*, 57 F. Supp. 2d 1048, 1053 (D. Haw. 1999) (plaintiff's
allegation that the property was taken "without consent and unlawfully" failed to allege a Hobbs
Act violation).

¶336(c); *see id.*, ¶127-28; *compare* AC, ¶80 (alleging single trip by Minister Khristenko in October

2005 without alleging any intent to promote unlawful activity or overt act). None of the Ministers

are alleged to have participated in the early 2006 travel described in paragraphs 127-28. Even if the

Ministers had engaged in interstate travel, plaintiffs have not alleged the commission of any

"unlawful activity" that could have been furthered by the travel. *See Dooley v. United Techs. Corp.*,

803 F. Supp. 428, 439-40 (D.D.C. 1992) (defendants could not have committed the alleged

unlawful activity; therefore, they could not have violated the Travel Act); *See AK Steel Corp. v.

United Steel Workers of Am.*, No. C-1-00-3742002, 2002 WL 1624290, at * 6 (S.D. Ohio Mar. 30,

2002) (Travel Act violations could not be used as RICO predicates, in part, because plaintiff failed

to allege "specific facts" as to how the defendants used interstate commerce in furtherance of

unlawful activity). The ADR Holders thus fail to allege a Travel Act violation against any of the

Ministers.

   *The 18 U.S.C. § 2314 Allegation*:  To state an offense under Section 2314, the ADR

Holders must allege "[1] that the defendant[s] have transported goods, wares, or merchandise in

interstate or foreign commerce; [2] that those goods have a value of $5,000 or more; and, [3] that

the defendant[s] know the same to have been stolen, converted or taken by fraud." *Dowling v.

United States*, 473 U.S. 207, 214 (1985) (internal quotations and brackets omitted). For two

reasons, the ADR Holders' allegation of the illegal transport in foreign commerce of converted oil

and gas (oil and gas produced by YNG) must fail. *First*, as a matter of law, this Court cannot find

that the oil and gas produced by YNG was converted. It is undisputed that YNG's ownership was

transferred from Yukos through a government tax auction in December 2004. AC, ¶¶216, 271.

That transfer must be treated by this Court as entirely lawful — and not a conversion — under the

act of state doctrine and international comity. *See supra* pp. 17-20, 22-23. Because there was no

conversion, there can be no transfer of converted property in interstate commerce. *Second*, even if

YNG (and its oil) had been converted, there is no allegation that any Minister possesses, or was involved in the transport of, that oil and gas.

   *The 18 U.S.C. §152 Allegation*:  To state an offense under Section 152, the ADR Holders must allege that the Ministers "knowingly and fraudulently receiv[ed] any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11."  18 U.S.C. § 152(5).  The ADR Holders' allegation of an "evasion" of a bankruptcy court order leading to the receipt of property of a debtor through the tax auction of the YNG shares fails to state an offense by any of the Ministers under Section 152.  AC, ¶336(e).  *First*, even if an improperly filed bankruptcy petition could support a violation of Section 152, *see In re Yukos Oil Co.*, 321 B.R. 396 (Bankr. S.D. Tex. 2005), the ADR Holders' allegation tacitly acknowledges that there was no actual violation of a bankruptcy court order.  AC, ¶336(e) (alleging "evasion" of court order).  *Second*, there is no allegation that any of the Ministers received the shares of YNG or any other Yukos asset at any time.

   **5.  Count IV Must Be Dismissed for the Additional Reason that the Ministers Have Not Acquired an Interest in or Control Over Yukos**

   Section 1962(b) "makes it unlawful to acquire control of an enterprise through a pattern of racketeering activity."  *Danielsen*, 941 F.2d at 1231.  To "avoid dismissal for failure to state a claim [under 18 U.S.C. § 1962(b)], a plaintiff must articulate how each defendant acquired or maintained an interest in an enterprise, or acquired control of an enterprise, by means of a racketeering activity."  *Cadle Co. v. Schultz*, 779 F. Supp. 392, 397 (N.D. Tex. 1991).  The alleged "enterprise" in Count IV is Yukos.  AC, ¶333.  Count IV must be dismissed because the amended complaint fails, as a matter of law, to allege facts establishing that any Minister "acquire[d] . . . an interest in or control of" Yukos.  *Cadle Co.*, 779 F. Supp. at 396; *see also Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 830 (9th Cir. 2003) (affirming dismissal of § 1962(b) claim where plaintiff "did not include more than the vaguest allusions to the acquisition or maintenance of any interest in or

control of the alleged enterprise"); *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 329 (6th Cir. 1999) (affirming dismissal of § 1962(b) claim when plaintiff pleaded only legal conclusion parroting statutory language); *Burdett v. Harrah's Kans. Casino Corp.*, 260 F. Supp. 2d 1109, 1120-21 (D. Kan. 2003) (same).

Although the RICO statute does not define "control" or "interest," precedent stresses that defendants must obtain a proprietary interest in an enterprise, or the operational control associated with a proprietary interest. *Teague v. Bakker*, 35 F.3d 978, 995 (4th Cir. 1994) (defendants had control of the day-to-day operations of the business); *Whaley v. Auto Club Ins. Ass'n*, 891 F. Supp. 1237, 1240–41 (E.D. Mich. 1995) ("The type of 'interest' contemplated in § 1962(b) is not just any 'interest' but a proprietary one, such as the acquisition of stock, and the 'control' contemplated is the power gained over an enterprise's operations by acquiring such interest."); *Moffat Enters., Inc. v. Borden, Inc.*, 763 F. Supp. 143, 147 (W.D. Pa. 1990) (defendants had control through ability to appoint directors and officers). Other than conclusory allegations, the ADR Holders have not alleged facts capable of supporting an inference that any Minister (or any other RICO Defendant) obtained a proprietary interest in or operational control over *Yukos*. *See* AC, ¶¶2, 10, 75, 78-80, 82, 113, 142. Therefore, Count IV must be dismissed.

### 6. Count V Must Be Dismissed for the Additional Reasons that the ADR Holders Are Not Able to Allege (i) an Association-In-Fact Enterprise, or (ii) Facts Showing that the Ministers "Participated in the Conduct of an Enterprise."

A violation of Section 1962(c) requires, *inter alia*, (i) conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity. *Pyramid Sec. Ltd. v. I.B. Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991) (quoting *Sedima,* 473 U.S. at 496). An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In Count V, the ADR Holders allege that the RICO Defendants were an association-in-fact that engaged in racketeering activity. AC, ¶¶344-46. Count V must be dismissed because (i) the allegations of an

association-in-fact enterprise fail as a matter of law, and (ii) there is no allegation that the Ministers

(or any other defendant) participated in the management or control of the alleged enterprise.

An "enterprise" — even an "association in fact enterprise" — must have organization and

continuity.  *See Dist. Telecomm. Dev. Corp. v. Dist. Cablevision, Inc.*, 638 F. Supp. 418, 421

(D.D.C. 1985) (dismissing RICO allegations where the only "common denominator" among the

defendants in alleged enterprise was their involvement in the transaction that was the subject of the

suit).  The enterprise "is not [a] 'pattern of racketeering activity'; [it] is an entity separate and apart

from the pattern of activity in which it engages."  *United States v. Turkette*, 452 U.S. 576, 583

(1981).  Moreover, it is not enough for a group of individuals to commit acts enumerated by §

1961(1); a plaintiff must assert that those individuals were organized together in some way, and that

there was a structure to the association.  *Turkette*, 452 U.S. at 583; *United States v. Perholtz*, 842

F.2d 343, 363 (D.C. Cir. 1988).  Applying these standards, an association-in-fact enterprise must

have three characteristics:  "(1) a common purpose among the participants, (2) organization, and (3)

continuity."  *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999).  Because Count V

does not identify any organization or continuity among the defendants, it must be dismissed as a

matter of law.  *See Dist. Telecomm.*, 638 F. Supp. at 421.

Count V also does not allege any facts demonstrating that any Minister (or any other RICO

Defendant) "conduct[ed] or participate[d], directly or indirectly, in the operation" of any enterprise.

In *Reves v. Ernst & Young*, the Supreme Court held that a defendant "must participate in the

operation or management of the enterprise itself" to be liable under Section 1962(c).  507 U.S. 170,

185 (1993).  In other words, "*some* part in *directing* the enterprise's affairs is required."  *Id*. at 179

(second emphasis added).[29]  Because the amended complaint contains only conclusory statements

---

[29]    *See also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) ("mere participation
in the activities of the enterprise is insufficient"); *Jones v. Meridian Towers Apartments, Inc.*, 816
F. Supp. 762, 772 (D.D.C. 1993) ("the commission of predicate acts violates § 1962(c) 'only when

about the defendants — and contains *no* allegation that any Minister (or any other RICO Defendant) directed the alleged enterprise's affairs — Count V must be dismissed. *See Goren*, 156 F.3d at 727 ("It is not enough . . . for a plaintiff simply to allege the [§ 1962(c)] elements in boilerplate fashion; instead, she must allege sufficient facts to support each element [of a RICO claim]."); *Univ. of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539-40 (3d Cir. 1993) (affirming dismissal for failure to state claim where plaintiff failed to allege the defendant had any part in managing or directing affairs of the alleged enterprise).

Finally, the ADR Holders cannot allege § 1962(c) liability based on any alleged aiding and abetting of two or more predicate acts. *See* AC, ¶347. Not only have the ADR Holders failed to allege adequately any predicate acts or any assistance by any of the Ministers regarding any predicate act (*see* text at p. 33-38, *supra*), but aiding and abetting liability is foreclosed by *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) and the text of § 1962(c). In *Central Bank*, the Supreme Court refused to read aiding and abetting liability into § 10(b), explaining: "If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Id.* at 177. The same reasoning applies with equal force to § 1962(c) of RICO. As the Third Circuit observed, "nothing in *Central Bank* indicates that its reasoning is specific to the particular statute presented in that case. Rather, the majority's reasoning . . . is equally applicable to RICO as well." *Pa. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 843 (3d Cir. 2000); *see also Phillips v. Lithia Motors*, Civil No. 03-3109-HO, 2006 WL 1113608, at * 9 (D. Or. Apr. 27, 2006) (no aiding and abetting liability under § 1962(c)); *Cobbs v. Sheahan*, 385 F. Supp. 2d 731, 739 (N.D. Ill. 2005) (same); *Ling v. Deutsche Bank*, AG, 2005 WL 1244689, at *3 (S.D.N.Y. May 26, 2005) (same); *In re*

---

those acts were the vehicle through which a defendant 'conducted or participated . . . in the conduct of the enterprise's affairs'") (citation omitted)).

*Mastercard Int'l Inc.*, 132 F. Supp. 2d 468, 494-95 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002) (same).

### 7.  Count VI Must Be Dismissed Because the ADR Holders Are Unable to State a Viable Claim Under §§ 1962(b) or (c).

Section 1962(d) prohibits any person from conspiring to violate subsections (a), (b), or (c), but does not create a new substantive offense. *Danielson*, 941 F.2d at 1232; *see also Jones*, 816 F. Supp. at 772.  Because the ADR Holders have not stated a claim under any of the substantive RICO sections, their claim under section 1962(d) must also be dismissed.  *See Danielson*, 941 F.2d at 1232. [30]  Moreover, even if a conspiracy were possible, the amended complaint fails to allege the facts of any supposed conspiratorial agreement.

## B.  Plaintiffs' Securities Fraud Claim Must Be Dismissed

Count XI alleges that the defendants committed securities fraud in violation of Section 10(b) and Rule 10b-5 by supposedly making false statements or omissions with the intent to keep the price of Yukos shares artificially high.  Plaintiffs' claim fails for at least five reasons.

### 1.  Plaintiffs Cannot, as a Matter of Law, Sue the Ministers for Alleged Public Policy Statements on Behalf of the Russian Federation

We are aware of no case in which a securities fraud claim has been brought against a government or its officials (domestic or foreign) for their public statements.  In the context of foreign governments and officials, the absence of such claims is explained in part by the act of state and political question doctrines.  *See supra* pp. 17-21.  It is not plausible that foreign public officials can be held liable under the U.S. securities laws for speaking — or not speaking — on matters relating to domestic tax and criminal enforcement, or on the importance of equal application of the laws to all citizens.  The absurdity of a contrary rule is revealed if one considers the possibility of a

---

[30]     *See also Wagh*, 363 F.3d at 831; *BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999); *Lightning Lube, Inc. v. Venuto*, 4 F.3d 1153, 1191 (3d Cir. 1993); *Nordberg v. Trilegiant Corp.*, No. C-05-3246-MHP, 2006 WL 2038685, at *7 (N.D. Cal. Apr. 4, 2006).

foreign shareholder filing a securities fraud action under its local law against the U.S. or its Cabinet officials for an allegedly false public statement that allegedly affected the price of a security.

The Second Circuit's analysis in *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004), *cert. denied*, 125 S. Ct. 919 (2005), is instructive. In that case, which did not even involve foreign government officials, the court held that a stockholder lacked standing to sue a non-issuer of the stock under Section 10(b) — even after assuming that the third party's alleged material misrepresentation impacted the stockholder's stock — because the defendant was too attenuated from the purchase or sale of securities. The statements of government officials and regulators are far too attenuated. Count XI must be dismissed.

### 2. The U.S. Securities Law Does Not Apply Extraterritorially to Foreign Ministers with No Connection or Relationship to the Plaintiffs or the Security at Issue

The general presumption against the extraterritorial application of U.S. law applies with equal force to U.S. securities laws. *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 9, 11 (D.D.C. 2000). An act committed outside the U.S. does not support subject-matter jurisdiction under U.S. securities law unless the act was intended to produce, and in fact produced, detrimental effects in the U.S. *Id.*; *see also Shoenbaum v. Firstbrook*, 405 F.2d 200, 206 (2d Cir. 1968). Moreover, even an intent to cause substantial effects in the U.S. will not extend jurisdiction to claims by foreign plaintiffs concerning shares purchased on foreign exchanges. *Baan*, 103 F. Supp. 2d at 11 (explaining that the "effects test" applies "only . . . to those American plaintiffs who are affected" by a foreign act).

Congress could not have intended the U.S. securities laws to apply to claims against foreign government officials — such as the Ministers — who have no relationship to the plaintiffs, or even to the foreign security in question. As discussed *supra* at Section II, none of the Ministers is alleged to have had any meaningful contacts with the U.S. No conduct by the Ministers is alleged to have been directed at the U.S., or is alleged to have had a substantial effect in the U.S. In fact, given the

nature of the allegedly false statements (*see supra* pp. 5-7, 9-11) and the amount of public

information regarding Yukos at the time, those statements could not have had a substantial effect. [31]

Finally, the two plaintiffs — FCT America, Ltd and Z.E. Thijssen — that account for two-thirds of

the Yukos securities allegedly purchased by the ADR Purchasers are neither U.S. citizens nor

alleged to have purchased and/or sold Yukos ADRs on U.S. securities markets. *See* AC, ¶¶25-26

(alleging securities transactions on the London Stock Exchange). These plaintiffs cannot seek the

benefit of U.S. securities laws. *See Baan*, 103 F. Supp 2d at 11; *Interbrew v. EdperBrascan Corp.*,

23 F. Supp. 2d 425, 429-30 (S.D.N.Y. 1998); *Nathan Gordon Trust v. Northgate Exploration, Ltd.*,

148 F.R.D. 105, 108 (S.D.N.Y. 1993); *Koal Indus. Corp. v. Asland, S.A.*, 808 F. Supp. 1143, 1155

(S.D.N.Y. 1992). Because the ADR Purchasers' allegations do not present the intentional

connection with the U.S. needed to support extraterritorial application of U.S. securities laws to

conduct taken outside the U.S, Count XI must be dismissed.

### 3. The Amended Complaint Fails to Allege False Statements By Any Of The Ministers

Plaintiffs must plead each element of their securities fraud claim with particularity. *Kowal

v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276-78 (D.C. Cir. 1994) (allegations must include the

"time, place, and content of the false misrepresentations, the fact misrepresented, and what was

retained or given up as a consequence"). Essential to the violation of Section 10(b) is a false

---

[31] The Supreme Court has repeatedly cautioned that allegedly fraudulent statements must be examined in light of the "total mix" of information available to investors. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). When a reasonable factfinder could not conclude that a contested statement allegedly giving rise to a violation of Section 10(b) constitutes a material misrepresentation, the complaint must be dismissed. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999) ("If what [the defendant] actually said here is examined in the context of all information publicly available, we believe that a reasonable factfinder could not conclude that the contested statement constitutes a material misrepresentation [and therefore dismiss the complaint]."). No reasonable factfinder could conclude that the statements of the Ministers — particularly given the total mix of information that the amended complaint alleges was available regarding Yukos and its officers — are material misrepresentations. *Compare, e.g.*, AC, ¶171 (acts of Russian government were "a clear signal" to investors) *with* AC, ¶176 (alleged false statement deceived investors).

statement or an omission in the face of a duty to speak. *Dura Pharms. v. Broudo*, 544 U.S. 336,

341-42 (2005). Liability does not arise for an omission unless the defendant has a "duty to disclose

arising from a relationship of trust and confidence between parties to a transaction." *Chiarella v.*

*United States*, 445 U.S. 222, 230 (1980). A defendant can only be liable under Section 10(b) for his

own statement. *Cent. Bank of Denver*, 511 U.S. at 177; *In re Interbank Funding Corp. Sec. Litig.*,

329 F. Supp. 2d 84, 90 (D.D.C. 2004). The ADR Purchasers cannot meet these standards.

*First*, the amended complaint does not even allege a false statement by Minister Sechin.

With respect to Minister Khristenko, the only allegedly false statement is his statement on

December 30, 2004 — which is after the last alleged purchase of any security by any of the

plaintiffs. Accordingly, the ADR Purchasers lack even a statement to justify their assertion of

Count XI against these two Ministers.

*Second*, the securities fraud claim fares no better against Ministers Medvedev, Kudrin and

Yusufov. Plaintiffs' allegations primarily complain that these Ministers spoke about Yukos or

Khodorkovsky without disclosing the deliberative processes of the Russian government concerning,

*inter alia*, the largest tax fraud in Russian history. None of these Ministers owed the international

investing public a duty to make such disclosures (indeed, such disclosures would undoubtedly

violate Russian secrecy laws) — even assuming the Ministers knew of such deliberations (which is

not alleged in the amended complaint). *See Chiarella*, 445 U.S. at 230; *Lindblom v. Mobile*

*Telecomms. Tech. Corp.*, 985 F. Supp. 161, 161-62 (D.D.C. 1997); *United States v. Crop Growers*

*Group*, 954 F. Supp. 335, 350 (D.D.C. 1997). Regardless, none of the Ministers' statements were

false. *See supra* pp. 5-7, 9-11; *see also supra* p. 43 note 10 (falsity must be assessed in the context

of the total mix of available information).

The two allegedly false statements by Minister Medvedev are discussed above at pp. 5-6 and

note 8. The ADR Purchasers complain that Minister Medvedev's November 2, 2003, statement

failed to say that "the arrest of Khodorkovsky was but a step in the scheme to expropriate and re-

nationalize Yukos without payment of any compensation to the company's owners."  AC, ¶153.

Not only would such a statement have been absurd, but Minister Medvedev would have had no duty

to say it even if it had been true.  *See Chiarella*, 445 U.S. at 230.[32]  There was also nothing false

about Minister Medvedev's January 20, 2004 opinion.  *See supra* note 8.  Although the ADR

Purchasers complain that Minister Medvedev misrepresented that the Russian Federation would

provide Yukos and Mr. Khodorkovsky a fair and impartial judicial process, the statement does not

discuss any particular judicial proceedings at all.  In fact, the statement expressly avoided

commenting on the particular proceedings against Yukos and Mr. Khodorkovsky.

The allegedly false statements by Minister Kudrin are discussed *supra* pp. 6-7, 9-10.  The

amended complaint alleges that Minister Kudrin's November 3, 2003, statement "deceive[d]

investors into believing that Defendants did not seek to expropriate Yukos without compensation"

(AC, ¶¶189, 195), but the plain language of the statement does not address Yukos at all.  *See supra*

pp. 6-7.  The ADR Purchasers further allege that Minister Kudrin's June 21, 2004, statement failed

to disclose "that politically motivated tax and other claims are themselves routine in the Russian

Federation" and "that the Russian Federation's executive controls the judiciary, rendering the

outcome of the investigation preordained."  AC, ¶236**.**  Apart from the absurdity of all of these

allegations, Minister Kudrin had no duty to make any disclosures to the ADR Purchasers.  Finally,

plaintiffs allege that Minister Kudrin's September 12, 2004 statement falsely denied that Yukos was

being forced into bankruptcy and that the tax sale of YNG would be transparent and market-

---

[32]    Not only is the allegedly omitted "fact" absurd, but the fact that plaintiffs must prove such
conduct by the Russian Federation to establish their various fraud claims shows precisely why the
act of state doctrine must bar this case from proceeding.  Under that doctrine, this Court must
accept, for example, that the Russian tax assessments and tax auction were lawful.  Therefore, this
Court could not find that the arrest of Khodorkovsky was a step in a scheme to expropriate.  Nor
could it find that the alleged statement was false, as plaintiffs allege.  Each allegedly false statement
in the amended complaint raises a similar act of state problem.

oriented.  As explained above, based on the face of these statements and the facts alleged in the amended complaint, these statements were not false.  *See supra* pp. 44-46.

Finally, the one allegedly false statement by Minister Yusufov is discussed *supra* n.14. Plaintiffs allege that this statement "deceived investors into believing that the Defendants did not seek to impede ExxonMobil's acquisition of a large stake in YukosSibneft.  In reality, however, . . . Defendants had no intention of allowing the acquisition."  AC, ¶176.  Minister Yusufov's statement, however, did not say whether an acquisition by ExxonMobil would be allowed or not, and nothing he did say is alleged to be false.  Notably, Minister Yusufov's cautionary remarks about any acquisition (*see supra* note 13) — which the ADR Purchasers omitted from the portion of the statement quoted in the amended complaint — are  precisely the sort of statement the ADR Purchasers are complaining he should have made.

### 4.   Plaintiffs Are Unable To Allege Scienter

The PSLRA "prevent[s] abusive and meritless [securities] lawsuits."  *In re U.S. Office Products*, 326 F. Supp. 2d at 74.  It requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to "each act or omission alleged to violate [the securities laws].  15 U.S.C. §78u-4(b)(2).

Plaintiffs cannot allege facts sufficient to establish scienter for any of the Ministers' alleged statements.  A "pleading technique that couples a factual statement with a conclusory statement of fraudulent intent is insufficient to support the inference that the defendants . . . acted with fraudulent intent."  *In re U.S. Office Products*, 326 F. Supp. 2d at 77 (quoting *Rombach v. Chang*,  355 F.3d 164, 176 (2d Cir. 2004)).  Other than conclusory allegations concerning the existence of a "coordinated attack," plaintiffs have alleged no fact to support an inference that the Ministers had any reason to believe that their statements were not true.  All of the alleged statements focused on issues of Russian public policy, often with no specific mention of Yukos and never with any representation that Yukos would emerge unaffected by the largest tax fraud in Russian history.

Such statements — absent a particularized representation of facts giving rise to a strong inference of fraudulent intent — are legally insufficient to support a securities fraud claim.

The facts alleged in the amended complaint create a strong inference that the Ministers did not have fraudulent intent. According to the plaintiffs, the Ministers supposedly intended to destroy Yukos. If that were true, they would have wanted Yukos's stock price to collapse (not rise), and they would *not* have made statements with the intent of inflating the price of Yukos stock. *See Phillips*, 190 F.3d at 621 ("In order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.") (internal quotation omitted). Because plaintiffs' theory that the Russian government was persecuting Mr. Khodorkovsky and his Yukos empire is inconsistent with their allegation that the Ministers had the intent to inflate the value of his Yukos shares, the Court should disregard it. On a motion to dismiss, it is inappropriate to accept conclusory assertions or to draw inferences that are illogical. *Kowal*, 16 F.3d at 1277; 5B Wright & Miller, FEDERAL PRACTICE & PROCEDURE (Civil 2d), § 1357 at 539 (2004).

Plaintiffs' false allegations are precisely the sort of abusive claims that Congress barred with the PSLRA's heightening pleading standards.

### 5. Any Statements By the Ministers Are Insufficiently Connected to the Purchase or Sale of Yukos's Securities to Induce Reasonable Reliance

Plaintiffs cannot plead specific facts establishing reliance on any of the Ministers' alleged statements. *See One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283,1286 (D.C. Cir. 1988) (holding "plaintiffs' allegations must indicate that their reliance . . . was reasonable."); *Rombach*, 355 F.3d at 169 n. 4 ("[P]laintiff must plead . . . that plaintiff's reliance on defendant's action caused plaintiff's injury."). Plaintiffs must allege specific acts of reliance by each plaintiff, and their failure to do so mandates dismissal. *In re Newbridge Networks Sec. Litig*, 926 F. Supp. 1163, 1175 (D.D.C. 1996)

Plaintiffs do not allege specific acts of reliance because they cannot. The alleged statements by Ministers Medvedev, Kudrin and Yusufov are incapable of inducing reasonable reliance from prospective investors of Yukos in light of the overall context in which they were made. As the amended complaint makes clear, Minister Yusufov's statements concerning the Russian Federation's attitude toward a potential Western investment in a contemplated YukosSibneft entity were made prior to completion of the YukosSibneft combination, and the alleged potential Western investment was contingent on many things, including completion of that combination and a commercial agreement with the Western investor. AC, ¶¶171-173. It would have been unreasonable to purchase Yukos ADRs on the assumption that the investment might take place, much less on whether the Russian Federation might ultimately approve that purchase. Similarly, the alleged false statements by Ministers Kudrin and Medvedev were discrete comments, made in the context of a highly publicized criminal prosecution and the largest tax fraud in Russian history. In fact, according to the amended complaint, these plaintiffs purchased and held their ADRs notwithstanding (i) announcements by Russian prosecutors of criminal misconduct at the highest levels of Yukos and its controlling shareholder; (ii) continuing announcements by Russian tax officials of findings of massive corporate tax frauds, (iii) the repeated freezing of Yukos assets; and (iv) the announcement of the auction of shares of YNG. In fact, many of these plaintiffs apparently still hold their ADRs. In this context, it is clear that the plaintiffs were merely speculating on the outcome without relying on any particular reports or public statements. Having lost their speculative gamble, they now unjustly seek to shift that loss to others. For this reason, too, Count XI must be dismissed.

### 6. Plaintiffs Fail To Allege Loss Causation

Plaintiffs also fail to plead "loss causation" adequately. Plaintiffs' bare allegation that they purchased "artificially inflated" Yukos stock and were injured as a result is insufficient to plead "loss causation" under Section 10(b). AC, ¶¶387, 396; *see Dura*, 125 S.Ct. at 1631. In *Dura*, the

Supreme Court ordered dismissal of a securities fraud complaint containing identical conclusory allegations. *Id.* at 1630 (dismissing complaint alleging that plaintiffs "paid artificially inflated prices . . . and suffered damages thereby"). The Court held that each plaintiff must plead a connection between each specific misrepresentation and the economic loss it allegedly caused that plaintiff. *Id.* at 1634. No such specific connections have been pleaded with respect to the several statements allegedly made by Ministers Medvedev, Kudrin and Yusufov. Count XI must be dismissed.

## VIII. PLAINTIFFS' CONVERSION, FRAUD AND RESTITUTION CLAIMS MUST BE DISMISSED

Plaintiffs allege a series of conversion, fraud and restitution related claims in Counts I, III, VII, IX, X and XIV under District of Columbia law, and in Counts II, VIII and XV under Russian law. These claims must also be dismissed as a matter of law.[33]

### A. Plaintiffs Are Unable to State a Claim For Conversion

Plaintiffs' claim for conversion under Russian law (Count II) parallels their claim for conversion under D.C. law (Count I). Based on the allegations of the amended complaint, plaintiffs cannot state a claim for conversion.

---

[33]    Because the amended complaint does not allege any material differences between District of Columbia common law and the Russian Civil Code, the Ministers are proceeding, solely for the purposes of this motion to dismiss, as if plaintiffs' conversion, fraud and restitution claims under Russian and District of Columbia law fail for the same reasons. *See, e.g.*, *ABB Daimler-Benz Transp.(North America), Inc. v. National R.R. Passenger*, 14 F. Supp. 2d 75, 88 (D.D.C. 1998) (explaining that forum law is presumed to apply in absence of evidence of conflict). The Ministers note, however, that because the Russian Federation has the greater interest in applying its laws to this intrinsically Russian dispute, Russian law will be the applicable law. *See, e.g., Bledsoe v. Crowley*, 849 F.2d 639, 641 (D.C. Cir. 1988) (applying D.C.'s modified governmental interest approach to choice-of-law). Selection of Russian law will require dismissal of Counts I, III, VII, IX, X and XIV, all founded on District of Columbia common law. *See, e.g.*, *Godbey v. Frank E. Basil, Inc.*, 603 F. Supp. 775, 777 (D.D.C. 1985).

1. **Plaintiffs Lack Standing Because They Have No Possessory Right To the Assets at Issue**

A plaintiff lacks standing to assert conversion unless it either owns or has an immediate right to possess the property at issue.  *Shulman v. Voyou, L.L.C.*, 251 F. Supp. 2d 166, 171 (D.D.C. 2003) (granting motion to dismiss conversion claim where plaintiff had only contractual right, as opposed to proprietary right, to possess the property allegedly converted); *Curaflex Health Servs. Inc. v. Bruni*, 877 F. Supp. 30, 32 (D.D.C. 1995); *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956) ("Where there has been no dispossession of property rights, there can be no action for conversion.").

Although plaintiffs own and have an immediate right to possess their ADRs, they do *not* allege that any ADRs have been taken from them.  Instead, plaintiffs allege that the defendants have converted *Yukos's* property  AC, ¶320.  It is, however, a fundamental principle of corporate law that shareholders do not own or have possessory rights in corporate assets.  *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 786 (D.C. Cir. 1998).  For that reason, courts have repeatedly held that shareholders (much less ADR-holders) lack standing to assert claims for conversion of corporate assets.  *Labovitz v. Washington Times Corp.*, 172 F.3d 897, 904-05 (D.C. Cir. 1999); *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984); *In re U.S. Office Products Sec. Litig.*, 326 F. Supp. 2d 68, 82 (D.D.C. 2004); *Hutchings v. Manchester Life and Cas. Mgmt. Corp.*, 896 F. Supp. 946, 948 (E.D. Mo. 1995).

2. **Even If Plaintiffs Had Standing, Plaintiffs Cannot Allege that the Ministers Obtained or Exercise Any Rights Over the Allegedly Converted Assets**

Even if plaintiffs had standing to assert a claim for conversion, the amended complaint does not allege that any of the Ministers exercise (or has ever exercised) ownership, dominion or control over the shares of YNG or any other Yukos property that was allegedly converted.  *See Kaempe*, 367 F.3d at 964 ("an action for conversion is recognized only when a defendant unlawfully exercises ownership, dominion, or control over the personal property of another") (quotation

- 50 -

omitted).  Because plaintiffs cannot allege ownership or control by any of the Ministers, they cannot state a claim for conversion against any of the Ministers.  *See id*.; *Bynum v. Equitable Mortgage Group*, No. 99 CV-2266-SBC-JMF, 2005 WL 818619, at *15 (D.D.C. Apr. 7, 2005).

### 3.    Plaintiffs Are Unable to Plead Unlawful Possession by the Ministers

A defendant cannot be liable for conversion unless he *wrongfully* or *unlawfully* possesses the plaintiff's asset.  *See First Am. Bank, N.A. v. Dist. of Columbia*, 583 A.2d 993, 998 (D.C. 1990) (dismissing alleged conversion claim against District of Columbia when city seized property in accord with statutory powers).  In this case, the act of state doctrine and international comity require this Court to find the Russian acts of attaching and auctioning the assets of YNG were lawful.  *See World Wide Minerals*, 296 F.3d at 1160; *see generally supra* pp. 17-20, 22-23.  Because the alleged transfer of assets must be treated as lawful, no claim for conversion is possible.

### 4.    Plaintiffs Cannot State a Claim for Conspiracy to Commit Conversion

Plaintiffs do not allege a claim of conspiracy to convert under Russian law because it does not exist under Russian law.  Even under D.C. law, such a claim must fail with the dismissal of the underlying alleged tort.  Under D.C. law, there can be no claim for conspiracy to commit a tort if there is no underlying tortious act.  *Hall v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002*); Executive Sandwich Shoppe, Inc. v. Carr Realty Corp*., 749 A.2d 724, 738 (D.C. 2000).[34]

---

[34]    *See also Roehrs v. Conseys, Inc.*, No. Civ. A. 3:05-CV-829-M, 2005 WL 3454015, at *7 (N.D. Tex. Dec. 14, 2005) (dismissal of underlying conversion claim dictates dismissal of conspiracy to convert); *Shenandoah Assocs. Ltd. P'ship v. Tirana*, 182 F. Supp. 2d 14, 24 (D.D.C. 2001) (applying Virginia law, dismissing conspiracy to convert for failure to state a claim for conversion); *Farley-Jones v. Buckingham*, 132 F. Supp. 2d 92, 106 (E.D.N.Y. 2001) ("the claim for conspiracy to convert must fail because of the failure of the conversion claims").  Plaintiffs also fail to identify any actual agreement among the defendants.  *See Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066-67 (D.C. Cir. 1992) (affirming dismissal of civil conspiracy where plaintiff failed to allege an agreement); *see also Bynum*, 2005 WL 818619 at *16 (dismissing conversion conspiracy claim for lack of agreement among defendants).

### B.  Plaintiffs Are Unable to State a Claim for Fraud

Plaintiffs' claim for fraud under Russian law (Count VIII) parallels their claim for fraud under D.C. law (Count VII).  Based on the allegations of the amended complaint, plaintiffs cannot state a claim for fraud for five reasons.

*First*, as detailed *supra* pp. 5-7, 9-11, 44-47, the Ministers have not made any false statements.  Plaintiffs' failure to allege with specificity a false statement is fatal to their claim.  Fed. R. Civ. P. 9(b); *Kowal*, 16 F.3d at 1278.

*Second*, as detailed *supra* pp. 43-44, public statements on issues of public concern by foreign public officials cannot form the basis for a fraud claim.  To the extent that such statements are capable of inducing reliance, it is because they purport to reflect the views of a sovereign state with respect to an issue of public concern.  For that very reason, they must be deemed acts of state, and thus treated as valid by federal courts of the United States. *See supra* pp. 17-20.

*Third*, plaintiffs have not pleaded with specificity (*see* Fed. R. Civ. P. 9(b)), and could never establish, reasonable reliance on the alleged misstatements of the Ministers.  *See One-O-One*, 848 F.2d at 1286; *Isen v. Calvert Corp.*, 379 F.2d 126, 130 (D.C. Cir. 1967); W. Prosser, LAW OF TORTS § 108, at 715-16 (4th ed. 1971) ("[N]ot only must there be reliance (upon the misrepresentation at issue), but the reliance must be found to be justifiable under the circumstances . . . . [Even] where the plaintiff's reliance in fact, and his good faith, are unquestioned, it may still be held that his conduct was so foolish as to bar his recovery."); *Small v. Fritz Companies, Inc.*, 65 P.3d 1255 (Cal. 2003) (emphasis added).  For all of the reasons stated *supra* pp. 48-49, plaintiffs' fraud claim must be dismissed.

*Fourth*, plaintiffs' alleged injury is far too speculative to support relief.  *See Arent v. Distrib. Sci., Inc.*, 975 F.2d 1370, 1374 (8th Cir. 1992); *Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 692 (7th Cir. 1990); *Crocker v. Fed. Deposit Ins. Corp.*, 826 F.2d 347, 351 (5th Cir. 1987); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 488 (E.D. Va. 2002); *Chanoff v. United States*

- 52 -

*Surgical Corp.*, 857 F. Supp. 1011, 1018 (D. Conn. 1994), *aff'd*, 31 F.3d 66 (2d Cir. 1994); *see also In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2004). The alleged ADR Holders theory of injury assumes that disclosure of an alleged scheme to re-nationalize Yukos assets without compensation would have *increased* the value of Yukos ADRs, or at least enabled the ADR Holders to sell their ADRs at prices higher than they may now be able to realize. But neither logic, nor the facts alleged, support a causal connection between disclosure of the alleged scheme of re-nationalization and a higher price for Yukos ADRs. If the alleged "truth" had been disclosed earlier, an efficient market would have lowered the price of the ADRs at that time, thereby placing the ADR Holders in no better position than they are in now. *Compare Crocker*, 826 F.2d at 351-52; *Kagan*, 907 F.2d at 692.

The alleged ADR Purchasers also cannot allege any damages. Their theory assumes that the price of Yukos ADRs after October 2003 was artificially inflated by allegedly false statements of the Ministers and others, rather than by the tax fraud perpetrated by Yukos's management upon the Russian Federation and Yukos's shareholders. *Cf. In re Yukos Oil Co. Sec. Litig.*, No. 04-CV-5243 (WHP), 2006 WL 800736, at *15 (S.D.N.Y. March 30, 2006). Any allegedly inflated purchase price, however, resulted from the deceptions of Yukos and its officers in concealing the nature and scope of their tax and criminal offenses. (Under the act of state doctrine, plaintiffs are not at liberty to contest the validity of the tax and criminal actions.) The unraveling of that tax fraud — through tax assessments and recoveries — simply restored the value of Yukos's shares to their appropriate level.

*Fifth*, plaintiffs allege neither a claim for conspiracy to defraud under Russian law, nor a claim for aiding and abetting fraud under Russian law. Even under D.C. law, such claims fail. The conspiracy claim would fail because a civil conspiracy to commit a fraud cannot exist without an underlying fraud. *See supra* pp. 51-52. For similar reasons, an aiding and abetting claim cannot survive without an underlying fraud claim. *See, e.g., Fed. Treasury Enter. Sojuzplodoimport v.*

*Spirits Int'l N.V.*, 425 F. Supp. 2d 458, 474 (S.D.N.Y. 2006) (failure to allege fraud mandated dismissal of aiding and abetting fraud claim); *see also E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000) ("There is nothing to be gained by multiplying the number of torts, and specifically by allowing a tort of aiding and abetting a fraud to emerge by mitosis from the tort of fraud, since it is apparent that one who aids and abets a fraud . . . is himself guilty of fraud."). Moreover, plaintiffs never allege with specificity the who, what, when, where and why of an alleged aiding and abetting by any Minister. *See, e.g.*, *Silverman v. Weil*, 662 F. Supp. 1195, 1200-01 (D.D.C. 1987) (dismissing aiding and abetting claim for failure to plead with particularity); *Filler v. Hanvit*, 156 Fed. App'x 413, 417 (2d Cir. 2005) (same).

### C. Plaintiffs' Are Unable To State A Restitution Claim Against Minister Sechin

Plaintiffs' claim against Minister Sechin for restitution under Russian law (Count XV) parallels their claim for restitution under D.C. law (Count XIV). The term "restitution" refers to "that body of law in which (1) substantive liability is based on unjust enrichment, (2) the measure of recovery is based on defendant's gain instead of plaintiff's loss, *or* (3) the court restores to plaintiff, in kind, his lost property or its proceeds." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735 (D.C. Cir. 1995) (internal quotation omitted). To state a claim for restitution based on unjust enrichment, plaintiffs must allege: "(1) they conferred a legally cognizable benefit upon Defendants; (2) Defendants possessed an appreciation or knowledge of the benefit; and (3) Defendants accepted or retained the benefit under inequitable circumstances." *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50 (D.D.C. 2003). Plaintiffs allege that Minister Sechin was unjustly enriched by the "profits and other economic benefits that result from the operation of YNG and Yukos" at the plaintiffs' expense and therefore owes plaintiffs restitution. AC, ¶417. Plaintiffs' claim for restitution from Minister Sechin is unsustainable for at least three reasons.

*First*, just as plaintiffs lack standing to sue for conversion of Yukos's property, they also lack standing to seek restitution for harm allegedly suffered by Yukos as a result of the sale of its property. *See supra* p. 50.

*Second*, there is no allegation that any plaintiff conferred a legally cognizable benefit on any defendant, much less on Minister Sechin in his personal capacity. The absence of that allegation requires dismissal of the restitution claim. *See Hakki v. Zima Co.*, No. 03-9183, 2006 WL 852126 , *3 (D.C. Super. March 28, 2006) (dismissing claim for unjust enrichment "because the complaint does not allege that [plaintiff] has conferred a benefit on any Defendant); *see also Rapaport v. U.S. Dep't of Treasury*, 59 F.3d 212, 221 (D.C. Cir. 1995) ("[U]njust enrichment simply does not lie when the plaintiff has not bestowed some sort of benefit upon the defendant.").

*Third*, even assuming the indirect acquisition of YNG by defendant Rosneft could somehow be linked to Minister Sechin, this Court is required by the act of state doctrine to treat the Russian Federation's tax assessments and the resulting auction of YNG as valid. *See supra* pp. 17-20. Accordingly, the Court cannot conclude that the retention of YNG (or the proceeds of YNG's ongoing operations) is unlawful.

## IX.    PLAINTIFFS' CLAIM OF EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW MUST BE DISMISSED

In Count XIII, plaintiffs assert a claim against all defendants, including the Ministers, for the alleged expropriation "of Yukos" in violation of international law. Plaintiffs allege that the defendants "have actually or constructively confiscated Yukos from all of its owners by seizing Yukos's most important asset, by subjecting Yukos to enormous and illegitimate tax liabilities, and depriving Plaintiffs and all owners of Yukos of any ability whatsoever to control their property." AC, ¶411. Count XIII must be dismissed for at least two reasons.

*First*, U.S. law does not authorize private individuals to bring private claims based on international law in the absence of an international agreement of the U.S. conferring a private right

of action.  *See* RESTATEMENT OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES (Third), §

907(2) & Cmt. a ("Generally, customary international law does not grant rights to private persons

that would serve as a basis for remedies in domestic courts."); *Tel-Oren v. Libyan Arab Republic*,

726 F.2d 774, 791-95 (D.C. Cir. 1984) (Edwards, J., concurring).  Plaintiffs cannot cite to any

international agreement between the U.S. and the Russian Federation that would confer upon them a

private right of action enforceable in a U.S. court, *see* AC, ¶413, because no such treaty exists.

"[I]n the absence of a private right of action, plaintiffs' claims under customary international law

fail."  *Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060, *8 (E.D.N.Y. June

30, 2006); *see also Hayden v. Pataki*, No. 00 Civ. 8586(LMM), 2004 WL 1335921, *7 (S.D.N.Y.

June 14, 2004), *aff'd*, 449 F.3d 305 (2d Cir. 2006).

     *Second*, even if a private right of action for expropriation under international law existed,

that action would fail as a matter of law because — as explained at pages 8-12 of the Russian

Federation's Motion — there has been no violation of international law.[35]

<u>CONCLUSION</u>

     The Ministers are high-ranking representatives of the Russian Federation.  They are

named in this lawsuit precisely because of the government positions they hold, and the notoriety

that comes with publicly characterizing them as racketeers and fraudsters.  But their government

positions entitle the Ministers to sovereign immunity, and the claims against them must be

dismissed for that reason alone.  Dismissal is equally justified on numerous additional grounds, also

detailed in this Motion.  Because U.S. courts can provide no remedy for the alleged misconduct, the

Ministers respectfully request that this Court promptly dismiss this entire action.

---

[35]   Finally, this issue could only be reached if this Court were to find that the Ministers were not entitled to sovereign immunity because they somehow acted in their personal capacities.  But then, there would be no basis in international law for recovering damages from them because natural persons or private entities cannot violate international law.  *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206-07 (D.C. Cir. 1985) (explaining that law of nations does not reach private, non-state conduct); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 14 (D.D.C. 2005) (same).

September 8, 2006                              Respectfully submitted,


                                               /s/ Jay L. Alexander
                                              Jay L. Alexander (DC Bar No. 412905)
                                              Ryan E. Bull (DC Bar No. 481473
                                              Baker Botts L.L.P.
                                              1299 Pennsylvania Avenue, N.W.
                                              Washington D.C.  20004
                                              Telephone: (202) 639-7700
                                              Facsimile:  (202) 585-4064

                                              Michael S. Goldberg
                                              Baker Botts L.L.P.
                                              One Shell Plaza
                                              910 Louisiana Street
                                              Houston, Texas  77002
                                              Telephone: (713) 229-1234
                                              Facsimile: (713) 229-1522

                                              *Counsel to Minister Viktor Khristenko,
                                              Minister Alexei Kudrin, , Minister Dmitry
                                              Medvedev, Deputy Head of the Presidential
                                              Administration Igor Sechin, and Ambassador
                                              Igor Yusufov*

**<u>Certificate of Service</u>**

I hereby certify that on September 8, 2006, the Motion by Viktor Khristenko, Alexei Kudrin, Dmitry Medvedev, Igor Sechin and Igor Yusufov To Dismiss Plaintiffs' Amended Complaint and corresponding Statement of Points and Authorities were electronically filed with the Clerk of the Court, and that, in the same manner, an electronic copy was served on all counsel of record.

/s/ Ryan E. Bull
Ryan E. Bull