**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RICHARD ALLEN, *et al.* | ) | |
| | ) | Civil Action No.: 05-cv-02077 (CKK) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RUSSIAN FEDERATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT J

**TO**

**STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF THE MOTION BY VIKTOR KHRISTENKO, ALEXEI KUDRIN,
DMITRY MEDVEDEV, IGOR SECHIN AND IGOR YUSUFOV TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**

[2006] EWHC 2044 (admin)

**IN THE HIGH COURT OF JUSTICE**                                    **CO/5799/2006**
**QUEEN'S BENCH DIVISION**
**ADMINISTRATIVE COURT**

Royal Courts of Justice
The Strand
London WC2A 2LL

18th July 2006

**Before:**
**MR JUSTICE CHARLES**

BETWEEN:

**The Queen on the application of**
**(1) YUKOS OIL COMPANY**
**(2) STICHTING ADMINISTRATIEKANTOOR YUKOS INTERNATIONAL**
                                                                    Claimants

-and-

**(1) FINANCIAL SERVICES AUTHORITY**
**(2) LONDON STOCK EXCHANGE**

                                                                    Defendants

-and-

**(1) OJSC ROSNEFT**
**(2) OJSC ROSNEFTEGAZ**

                                                                    Interested Parties

- - - - - - -
Computerised Transcript of
Smith Bernal Wordwave Limited
190 Fleet Street  London EC4A 2AG
Tel No: 020 7404 1400 Fax No: 020 7831 8838
(Official Shorthand Writers to the Court)
- - - - - - -

**MS MONTGOMERY QC** and **MR HERBERG** and **MR GARDNER** (instructed by Byrne and Partners) appeared on behalf of the Claimants.
**MR BRINDLE QC** and **MR COLEMAN (instructed by Ashursts) appeared on behalf of the FSA.**
**MR GORDON QC** and **MR ADAM** (instructed by Freshfields) appeared on behalf of the LSE.
**MR HOWARD QC** and **MR CHAMBERLAIN** and **MR BIRT** (instructed by Travers Smith) appeared on behalf of Rosneft.

**Judgment**
**(As Approved by the Court)**

1.  MR JUSTICE CHARLES:  Before I start to deliver this judgment I would like to make one or two preliminary comments.  First I would like to record my gratitude for the assistance I have been given by all counsel for all of the parties.

2.  Secondly, as will have been apparent during the course of the hearing, a number of issues have arisen and I record that certainly some of the submissions made today have caused me to re-think the positions I reached on a preliminary basis last night.  That led me to consider whether or not it would be appropriate for me to attempt to give this judgment which is necessarily ex tempore.  However, I have concluded that against the backdrop that exists in this case, which I am told includes the Court of Appeal sitting ready and waiting to deal with the matter, I should attempt to give my reasons now.

3.  I record now what my decision is going to be.  My decision is that I am going to refuse the application for permission for judicial review.  Further, in the alternative, I will consider whether, if I have been persuaded that permission ought to be granted, I would have granted interlocutory relief.  The answer to that question is: no, I would not have granted interlocutory relief.

4.  The proceedings before me are a challenge by way of judicial review to decisions of the Financial Services Agency (the "FSA") and the London Stock Exchange ("LSE") relating to the proposed listing and offering for sale of ordinary shares in OJSCOC Rosneft in the form of global depository receipts, GDRs.  The selling shareholder is OJSC Rosneftegaz.  All of the shares in that company are owned by the Russian Federation.  The claimants are Yukos Oil Company ("Yukos") and then, as I understand it, another company within the Yukos group.  The relationship between those companies is set out in paragraph 2 of the Grounds of Claim.

5.  In 2003, Yukos had a wholly owned subsidiary, referred to as YNG, which owned assets of considerable value.  As has been well publicised in this country and in a number of other countries, the claimants maintain that dishonestly, unlawfully, and in a manner which constituted a fraud on the shareholders of Yukos, YNG was (a) expropriated from Yukos and (b) acquired by Rosneft.  Rosneft dispute this.  So YNG, and thus its assets, which were once owned by Yukos, now form a significant element of the value placed on Rosneft for the purposes of the proposed IPO.  Unsurprisingly, in the context of these proceedings and more generally the events in Russia which resulted in YNG being acquired by Rosneft, are described differently by the claimants on the one hand, and Rosneft on the other.

6.  In the skeleton argument put in on behalf of Rosneft, the claimants' assertions of dishonest expropriation are described as a conspiracy theory.  The three main elements of the expropriation allegation or conspiracy theory are, in my view, accurately summarised in a very truncated form in paragraph 9 of the skeleton argument of Rosneft which reads as follows, with some omissions:

> "There are three main elements.  First, it is alleged that a series of arbitrary purported tax reassessments were issued against Yukos by the Russian tax authorities and that Yukos's assets were then frozen by the Russian court preventing it from paying those tax

assessments. Secondly, complaint is made about the conduct of the bailiff appointed by the Russian court and of the court itself in enforcing the tax liabilities. Thirdly, Yukos complains about the auction of its shares in YNG in respect of which it alleges that there are reasonable grounds to suspect, if not more, that there was a concerted plan to deprive Yukos of its interest in YNG by unlawful means."

7.    On the claimants' case that plan involved the participation of officers of the Russian state and of the Russian courts.

8.    The allegations are, therefore, extremely serious ones and at their heart are allegations against various parts or emanations of the Russian Federation, including its courts.

9.    In opening and in the documents, Yukos have made a number of points in support of the force of their claim, included within them was the point that a number of the tax assessments exceeded 100 per cent of the revenue of the company during the relevant year. Other allegations relate to the conduct of hearings in the Russian courts. There are more.

10.   In the Russian court, Yukos's claims have thus far been unsuccessful at every level and on every occasion to-date, although its claims in respect of the third element relating to the auction are still pending. Yukos have also made a claim in the European Court of Human Rights. In that claim Yukos seek, amongst other things, an order for restitution of the YNG shareholding (and thus its assets) under Article 41 ECHR.

11.   In the Grounds of Claim the claimants assert:

1. Such an order would establish a directly enforceable obligation, binding in Russian law, under Article 1 of the Federal Law of 30th March 1988 in 54/FZ on Ratification of the Convention for the Protection of Human Rights and Fundamental Freedoms and Associated Protocols.

2. In accordance with article 46 of the ECHR the Russian Federation should recognise **ipso facto** and without any special agreement the jurisdiction of the European Court of Human Rights to be binding in all matters concerning the interpretation and application of the ECHR and its associated protocols.

3. A finding of the European Court of Human Rights would provide grounds for the reopening of settled national proceedings by virtue of Article 311(7) of the Code of Arbitration Procedure of the Russian Federation, and that this provides that where the European Court of Human Rights has held that the judgment of a Russian arbitration court gave rise to a violation of the ECHR, it should be grounds for revision of the judgment of that court. The judgments at issue in the proceedings described are those of Russian arbitration courts to which the provision applies.

12.   In the alternative, it is asserted that even if the European Court of Human Rights merely makes a declaratory finding that YNG shares had been expropriated from Yukos, this would provide statutory grounds to reopen the proceedings concerning the tax

liabilities, the attachment of the YNG shareholding, the decision to sell the YNG Shareholding and the legality of the auction.

13.  Then a passage from Article 311(7) of the Code of Arbitration Procedure is cited.

14.  The grounds go on to assert that since the European Court would **ex hypothesi** have found a violation of Yukos's ECHR rights that finding would be binding on the arbitration courts when the matter was re-opened.

15.  The present position of the proceedings in the European Court of Human Rights is that they have not yet been admitted but indications have been given that they are being given priority.

16.  On 12th July of this year Yukos received notification that the European Court of Human Rights had asked a number of questions of the Russian Government. Those are set out in the Grounds of Claim, at paragraph 122:

"1.  Was there an interference with the applicant company's rights under Article 1 of Protocol No 1 as a result of the Tax Assessments in respect of the years 2001, 2002, 2003 and 2004 and, if so, was it lawful and proportionate?

"2.  Did the acts of which the applicant company was held responsible by the Tax Assessments in respect of the years 2001, 2002, 2003 and 2004 constitute a criminal offence under national law at the time when it was committed, as envisaged by Article 7 of the Convention? Was this law and its implementation sufficiently accessible and precise to enable the applicant company to know in advance whether its conduct was criminal?

"3.  Was there an interference with the applicant company's rights under Article 1 of Protocol No 1 as a result of the enforcement proceedings against the applicant company and, if so, was it lawful and proportionate? The reference is being made, in particular, to the company's allegation that the requirement to pay the sums due and the simultaneous seizure of all of its assets was self-contradictory.

"4.  Did the forced sale of OAO Yuganskneftgas constitute an interference with the company's rights under Article 1 of Protocol No 1? If so, was it lawful and proportionate? In particular, did the authorities make reasonable efforts to sell OAO Yuganskneftgas at a fair price? Also, did the authorities inform the company of the outcome of the auction and the effects of the forced sale on the company's tax debt? What is the applicable domestic law?

"5.  Did the applicant company comply with the exhaustion criterion set out in Article 35 § 1 of the Convention in respect of the above complaints? Also, did the applicant company have an access to court in respect of these complaints, as required by Article 6 of the Convention?

"6.  Have any similar tax re-assessment claims in respect of the period between 2000 and 2004 been brought by the State against other Russian companies and, if so, when and what was their outcome?"

17.  The last question raised reflects points made by Yukos on the tax assessments, together with a point I have already mentioned, that some of them exceed 100 per cent of the revenue, not the profits of the company for the relevant years. Three decisions are challenged. They are referred to in the claim form as:

1.  The FSA prospectus decision. That is the decision or proposed decision of the FSA to approve the prospectus submitted to it regarding its proposed listing in the offering for ordinary shares in the form of GDRs in Rosneft, the Rosneft GDRs.

2.  The FSA listing decision; namely, the decision or the proposed decision of the FSA to approve the application for admission of the Rosneft GDRs to the official list.

3.  The LSE decision; namely, the decision or proposed decision of the LSE to admit Rosneft GDRs to trading on the LSE's international order book.

18.  The two FSA decisions were communicated to the claimants by a letter dated 11th July 2006. That letter indicated that the FSA would proceed to approve the prospectus and admit the securities for listing. I quote in the normal way, subject to the receipt of a formal application and the need to take account of any change of circumstances in the interim. This would lead, so I was told, to securities being listed on 19th July 2006; that is, tomorrow.

19.  The LSE decision was indicated to the claimants by a letter dated 10th July 2006. The LSE assert that that is a "minded to" decision. The reference to proposed decisions reflects the position of both the FSA and the LSE that a relevant change in circumstances could alter the position and thus, for example, the position of the FSA that in approving the prospectus it would have regard to new events and thus, for example, these proceedings, my decision therein and the request made by the European Court of Human Rights.

20.  In my judgment the FSA and the LSE are plainly right to indicate their current views with such provisos.

Some preliminary comment

21.  Although there are some unusual features of the background to and the issues that arise in this case, other features of it relate to a situation which is faced regularly in the context of the listing of securities and the approval of a prospectus.

22.  That situation being one in which a significant and important claim is being made against the company whose shares are the subject of the proposed listing, such a claim could, as here, be one in which the relevant claimant seeks restitution and further or alternatively damages. Also the claim could, as here, be one that would result in a very significant reduction in the value of the company if the claim was successful.

23.  It follows that decisions as to how claims against a company seeking a listing of its shares should be dealt with in the prospectus and in the decision-making process of the FSA and the LSE is nothing new or unusual.

24.  In a number of respects the relevant issues in the context of the prospectus are ones of presentation to ensure that investors and others are given a full and fair description of the relevant matters to enable them to make a properly informed investment decision; in other words, to enable them to assess the relevant risks and make their own minds up. There is also nothing new or unusual in differing accounts and views being given by the relevant company and the relevant claimant as to the nature and prospects of success of claims made against the company.

25.  Sometimes such claims can be made late in the process relating to a listing with the intention or asserted intention of putting pressure on a company to settle the claim. Sometimes those seeking a listing can forge ahead or seek to forge ahead without paying due regard to a claim or minimising its potential effect and thus with a view to putting pressure on the relevant claimant.

26.  Part of the function of the FSA considering and, if it thinks appropriate, approving a prospectus is to have regard to the assertions of the claimants and the company in respect of such a claim with a view to ensuring that potential investors are properly informed. The FSA and, indeed, the LSE are not decision-makers as to the merits or demerits of the claim or the defences advanced to a claim. They are faced with allegations and counter-allegations which they are generally not in a position to determine in carrying out their functions. Often the position will be that the claim will be one before the English courts and that the English courts will be the decision-maker. In those circumstances, investors will be left to make their own decisions as to the prospects of the claim being successful or of it being rejected against that background, having regard to the information provided in the prospectus. Thus, there is nothing new or unusual in a prospectus having to deal with the risk posed to potential investors by a claim against a company that a substantial part of its assets should be restored to a claimant, and further or alternatively that it should pay the claimant a large sum in damages.

27.  Unusual circumstances to this case, however, relate to: the amounts involved; the involvement in the events relating to the claim by Yukos of a sovereign state, namely the Russian Federation; the issues raised as to criminality in the claim form and the issues related thereto concerning Act of State.

A timetable of the proceedings and the issues before the court

28.  The application for judicial review was issued very promptly after the decision letters on 13th July 2006.

29.  The matter was listed before me on Friday 14th July for directions. At that hearing directions were given largely by consent as to the filing and service of evidence and written arguments by the defendants and the interested party, Rosneft.

30.  A considerable amount of material was produced which, in significant amounts, mirrored argument rehearsed in correspondence, following a letter dated 21st June 2006 written on behalf of the claimants to the FSA, which are repeated in the claim form.

31.    At the directions hearing I said I would determine what issues the court would deal with
       in the time that was available and in the light of the material provided. Having regard
       to the material provided, the case was opened before me on behalf of the claimants on
       the basis that I would be dealing with the application to bring the proceedings and, if
       that was granted, interim relief.

32.    In my judgment that was the correct course for counsel for the claimants to adopt, and,
       indeed, no objection was taken to it.

33.    Issues relating to timing also arise in the context of the issue of whether or not
       interlocutory relief should be granted.

       The approach to the granting of permission

34.    The standard approach is summarised in CPR Part 54, 4.2 as follows, "Test for granting
       permission":

               "The purpose of the requirement for permission is to eliminate at
               an early stage claims which are hopeless, frivolous or vexatious
               and to ensure that a claim only proceeds to a substantive hearing if
               the court is satisfied that there is a case fit for further
               consideration."

35.    Leaving out a part of that note, it then continues:

               "Permission will be granted only where the court is satisfied that
               the papers disclose that there is an arguable case that a ground for
               seeking judicial review exists which merits full investigation at a
               full oral hearing with all the parties and all the relevant evidence."

36.    As is well-known, the rules provide that in the general course permission is first
       considered on the papers with an opportunity to renew that application by way of oral
       hearing.

37.    The FSA referred me to other authorities in the context of the approach to be taken
       under the heading in their skeleton argument, "The test for permission in urgent cases".
       The first of those cases was **Mass Energy Limited v Birmingham City Council
       [1994] ELR 298**, where it is asserted that the Court of Appeal considered whether the
       case was strong, ie likely to succeed rather than being arguable because it had seen
       extensive material, heard detailed argument and the matter was urgent.

38.    That is a fair summary but also, as I recall, the judgment of Lord Justice Glidewell, it
       included in it an assertion to the effect that he was in as good a position as the court
       hearing the substantive review would have been in.

39.    The other case I was referred to is **The Queen on the Application of Federation of
       Technological Industries v Commissioners of Customs & Excise [2004] EWHC
       254**, which is unreported and is a decision of Mr Justice Lightman. The passage relied
       on shows, and I would accept, that the court has an ability to take a flexible approach in

the context of a permission hearing. For example, this is shown in this case. If the court had heard this case initially on the papers, the reasons challenge might have formed an integral part of the court's consideration. It is now accepted that that challenge has been overtaken by events because reasons have been given.

40. It seems to me that the approach I should take is one in considering, having regard to where we have now got to, whether this case raises a sufficiently arguable case to warrant permission being given for another round which will include a repeat, if it is not before me, of a number of the issues already argued.

41. The standing of the claimants. In my view and, as I understand it, the contrary was not argued, the claimants have a sufficient and identifiable interest enabling them to bring proceedings if the grounds raise points that are sufficiently arguable. A related point was raised in this context which goes to the question that, when considering whether or not to grant permission the court can, in my judgment, have regard to all the issues that would arise within the judicial review process and thus to the remedies that would be available and the remedies that the court would be likely to give in determining whether or not to grant permission.

The regulatory framework

42. There is effectively common ground between the claimants and the FSA and the LSE on the relevant regulatory framework set out in statute and documents issued by both public bodies.

43. In their arguments Rosneft took a point that the claimants have in their Grounds of Claim misinterpreted the FSMA in respect of the reliance placed on the regulatory objectives of the FSA. However, in my view, that submission was based on a misreading of the claim form.

44. In that document the claimants acknowledge that those objectives have been expressly disapplied by the statute. The claimants' position is nonetheless that the regulatory objectives are relevant considerations to which the FSA should have regard in exercising its functions and discretions under sections 74 and 75(5) of the statute relating to listing and under section 87A relating to approval of the prospectus.

45. In my view correctly, the FSA do not take any real issue with that approach and accept that they are matters to be taken into account, as secondary or background considerations.

46. Also, in my view correctly, the FSA point out in this context that in part VI of the Act the statutory objectives are those in section 73 and that:

"As with the statutory objectives in sections (3) to (7) of the Act, they apply to general functions as defined, which include the function of determining the general policy and principles by reference to which it performs particular functions under part VI (see section 73(2)(c)). However, one of the applicable statutory objectives in section 73 is the international character of capital markets and the desirability of maintaining the competitive position of the United Kingdom. Matters [it is asserted and I agree]

bearing on the integrity and good reputation of the capital markets in the United Kingdom would fall within that objective."

47.    The FSA in the skeleton argument also assert, in my judgment, correctly:

1.    A prospectus must contain the information necessary to enable investors to make an informed assessment of, amongst other things, the assets and liabilities, financial position, profits and losses and prospects of the issuer (see section 87A(2)(a)).   The exact requirements are set out in detail in the prospectus rules and in the prospectus regulation.

2.    All issuers wishing to raise money on the main market of the London Stock Exchange must have the securities admitted to the official list.   The FSA as the competent authority responsible for maintaining the official list under section 74(1) of the Act.   Approval of the prospectus by the FSA is a condition of admission.

3.    The FSA may refuse an application for listing if, for a reason relating to the issuer, it considers that granting it would be detrimental to the interest of investors (section 75(5) of the Act).

48.    I shall not set out, in delivering this judgment, the relevant legislation but when transcribed the judgment should contain in a schedule to it paragraphs 19 and 20 of the Grounds of Claim which summarise the relevant statutory framework:

"II. THE STATUTORY FRAMEWORK

"(1)  The Financial Services Authority

"(a)  Relevant provisions of FSMA

"19.  One of the key functions of the FSA is to maintain the Official List, which lists those securities which have met certain regulatory requirements and can be traded on certain markets in the United Kingdom.   The FSA's duties and powers in this regard are set out in Part VI of FSMA ('Official Listing'), which provides, so far as is relevant:

"72  The competent authority

"(1)  On the coming into force of this section, the functions conferred on the competent authority by this Part are to be exercised by the Authority.

"(2)  Schedule 7 modifies this Act in its application to the Authority when it acts as the competent authority.

"73  General duty of the competent authority

"(1)  In discharging its general functions the competent authority must have regard to
—

"(a) the need to use its resources in the most efficient and economic way;

"(b) the principle that a burden or restriction which is imposed on a person should be proportionate to the benefits, considered in general terms, which are expected to arise from the imposition of that burden or restriction;

"(c) the desirability of facilitating innovation in respect of listed securities and in respect of financial instruments which have otherwise been admitted to trading on a regulated market or for which a request for admission to trading on such a market has been made;

"(d) the international character of capital markets and the desirability of maintaining the competitive position of the United Kingdom;

"(e) the need to minimise the adverse effects on competition of anything done in the discharge of those functions;

"(f) the desirability of facilitating competition in relation to listed securities and in relation to financial instruments which have otherwise been admitted to trading on a regulated market or for which a request for admission to trading on such a market has been made.

"(2)  The competent authority's general functions are —

"(a) its function of making rules under this Part (considered as a whole);

"(b) its functions in relation to the giving of general guidance in relation to this Part (considered as a whole);

"(c) its function of determining the general policy and principles by reference to which it performs particular functions under this Part.

"73A  Part 6 Rules

"(1)  The competent authority may make rules ('Part 6 rules') for the purposes of this Part.

"(2)  Provisions of Part 6 rules expressed to relate to the official list are referred to in this Part as 'listing rules'.

"74  The official list

"(1)  The competent authority must maintain the official list.

"(2)  The competent authority may admit to the official list such securities and other things as it considers appropriate.

"(3)  But—

"(a) nothing may be admitted to the official list except in accordance with this Part; ...

"(5)  In the following provisions of this Part — 'listing' means being included in the official list in accordance with this Part.

"75  Applications for listing

"(1)  Admission to the official list may be granted only on an application made to the competent authority in such manner as may be required by listing rules ...

"(4)  The competent authority may not grant an application for listing unless it is satisfied that —

"(a) the requirements of listing rules (so far as they apply to the application), and

"(b) any other requirements imposed by the authority in relation to the application,

"are complied with.

"(5)  An application for listing may be refused if for a reason relating to the issuer, the competent authority considers that granting it would be detrimental to the interests of investors.

"76  Decision on application

"(7)  If securities are admitted to the official list, their admission may not be called into question on the ground that any requirement or condition for their admission has not been complied with.

"84  Matters which may be dealt with by prospectus rules

"(1)  Prospectus rules may make provision as to —

"(a) the required form and content of a prospectus (including a summary);

"(e) the manner in which applications to the competent authority for the approval of a prospectus are to be made.

"(2)  Prospectus rules may also make provision as  to —

"(f) the disclosure, publication or other communication of such information as the competent authority may reasonably stipulate;

"(7)  Nothing in this section affects the competent authority's general power to make prospectus rules

"85  Prohibition of dealing etc in transferable securities without approved prospectus

"(1)  It is unlawful for transferable securities to which this subsection applies to be offered to the public in the United Kingdom unless an approved prospectus has been made available to the public before the offer is made

"(2) It is unlawful to request the admission of transferable securities to which this subsection applies to trading on a regulated market situated or operating in the United Kingdom unless an approved prospectus has been made available to the public before the request is made.

"(7) 'Approved prospectus' means, in relation to transferable securities to which this section applies, a prospectus approved by the competent authority of the home State in relation to the issuer of the securities.

"87A Criteria for approval of prospectus by competent authority

"(1) The competent authority may not approve a prospectus unless it is satisfied that —

"(a) the United Kingdom is the home State in relation to the issuer of the transferable securities to which it relates,

"(b) the prospectus contains the necessary information, and

"(c) all of the other requirements imposed by or in accordance with this Part or the prospectus directive have been complied with (so far as those requirements apply to a prospectus for the transferable securities in question).

"(2) The necessary information is the information necessary to enable investors to make an informed assessment of —

"(a) the assets and liabilities, financial position, profits and losses, and prospects of the issuer of the transferable securities and of any guarantor; and

"(b) the rights attaching to the transferable securities.

"(3) The necessary information must be presented in a form which is comprehensible and easy to analyse.

"(4) The necessary information must be prepared having regard to the particular nature of the transferable securities and their issuer.

"(5) The prospectus must include a summary (unless the transferable securities in question are ones in relation to which prospectus rules provide that a summary is not required).

"(6) The summary must, briefly and in non-technical language, convey the essential characteristics of, and risks associated with, the issuer, any guarantor and the transferable securities to which the prospectus relates.

"87J Requirements imposed as condition of approval

"(1) As a condition of approving a prospectus, the competent authority may by notice in writing —

"(a) require the inclusion in the prospectus of such supplementary information necessary for investor protection as the competent authority may specify;

"(b) require a person controlling, or controlled by, the applicant to provide specified information or documents;

"(c) require an auditor or manager of the applicant to provide specified information or documents;

"(2) 'Specified' means specified in the notice

"87K  Power to suspend or prohibit offer to the public

"(1)  This section applies where a person ('the offeror') has made an offer of transferable securities to the public in the United Kingdom ('the offer').

"(2) If the competent authority has reasonable grounds for suspecting that an applicable provision has been infringed, it may —

"(a) require the offeror to suspend the offer for a period not exceeding 10 working days;

"(b) require a person not to advertise the offer, or to take such steps as the authority may specify to suspend any existing advertisement of the offer, for a period not exceeding 10 working days.

"(3) If the competent authority has reasonable grounds for suspecting that it is likely that an applicable provision will be infringed, it may require the offeror to withdraw the offer.

"(4)  If the competent authority finds that an applicable provision has been infringed, it may require the offeror to withdraw the offer.

"(5) 'An applicable provision' means —

"(a) a provision of this Part,

"(b) a provision contained in prospectus rules,

"(c) any other provision made in accordance with the prospectus directive, applicable in relation to the offer.

"87L  Power to suspend or prohibit admission to trading on a regulated market

"(1)  This section applies where a person has requested the admission of transferable securities to trading on a regulated market situated or operating in the United Kingdom.

"(2)  If the competent authority has reasonable grounds for suspecting that an applicable provision has been infringed and the securities have not yet been admitted to trading on the regulated market in question, it may —

"(a) require the person requesting admission to suspend the request for a period not exceeding 10 working days;

"(b) require a person not to advertise the securities to which it relates, or to take such steps as the authority may specify to suspend any existing advertisement in connection with those securities, for a period not exceeding 10 working days.

"(5) 'An applicable provision' means —

"(a) a provision of this Part,

"(b) a provision contained in prospectus rules,

"(c) any other provision made in accordance with the prospectus directive, applicable in relation to the admission of the transferable securities to trading on the regulated market in question.

"20.  The FSA's 'general duties' and 'regulatory objectives' are set out in Part 1 of FSMA, which provides, so far as is relevant:

"(a) As to the FSA's general duties, by section 2:

"(1)  In discharging its general functions the Authority must, so far as is reasonably possible, act in a way —

"(a) which is compatible with the regulatory objectives; and

"(b) which the Authority considers most appropriate for the purpose of meeting those objectives.

"(2) The regulatory objectives are —

"(1) market confidence;

"(2) public awareness;

"(3) the protection of consumers; and

"(4) the reduction of financial crime.

"(4)  The Authority's general functions are —

"(a) its function of making rules under this Act (considered as a whole);

"(b) its function of preparing and issuing codes under this Act (considered as a whole);

"(c) its functions in relation to the giving of general guidance (considered as a whole); and

(d) its function of determining the general policy and principles by reference to which it performs particular functions.

"(b) As to the FSA's regulatory objectives:

"3  Market confidence

"(1)  The market confidence objective is: maintaining confidence in the financial system.

"(2)  'The financial system' means the financial system operating in the United Kingdom and includes —

"(a) financial markets and exchanges;

"(b) regulated activities; and

"(c) other activities connected with financial markets and exchanges.

"6  The reduction of financial crime

"(1)  The reduction of financial crime objective is: reducing the extent to which it is possible for a business carried on —

"(a) by a regulated person, or

"(b) in contravention of the general prohibition, to be used for a purpose connected with financial crime.

"(2) In considering that objective the Authority must, in particular, have regard to the desirability of—

"(a) regulated persons being aware of the risk of their businesses being used in connection with the commission of financial crime;

"(b) regulated persons taking appropriate measures (in relation to their administration and employment practices, the conduct of transactions by them and otherwise) to prevent financial crime, facilitate its detection and monitor its incidence;

"(c) regulated persons devoting adequate resources to the matters mentioned in paragraph (b).

"(3) 'Financial crime' includes any offence involving —

"(a) fraud or dishonesty;

"(b) misconduct in, or misuse of information relating to, a financial market; or

"(c) handling the proceeds of crime.

"(4) 'Offence' includes an act or omission which would be an offence if it had taken place in the United Kingdom.

"(5) 'Regulated person' means an authorised person, a recognised investment exchange or a recognised clearing house."

The Proceeds of Crime Act 2002 ("POCA")

49.   It is common ground that issues arise in respect of this Act.   Section 340 is the interpretation section and it provides:

"340 Interpretation

"(2) Criminal conduct is conduct which—

"(a) constitutes an offence in any part of the United Kingdom, or

"(b) would constitute an offence in any part of the United Kingdom if it occurred there.

"(3) Property is criminal property if—

"(a) it constitutes a person's benefit from criminal conduct or it represents such a benefit (in whole or part and whether directly or indirectly), and

"(b) the alleged offender knows or suspects that it constitutes or represents such a benefit.

"(4) It is immaterial—

"(a) who carried out the conduct;

"(b) who benefited from it;

"(c) whether the conduct occurred before or after the passing of this Act.

"(9) Property is all property wherever situated and includes—

"(a) money;

"(b) all forms of property, real or personal, heritable or moveable;

"(c) things in action and other intangible or incorporeal property.

"(11) Money laundering is an act which—

"(a) constitutes an offence under section 327, 328 or 329,

"(b) constitutes an attempt, conspiracy or incitement to commit an offence specified in paragraph (a),

"(c) constitutes aiding, abetting, counselling or procuring the commission of an offence specified in paragraph (a), or

"(d) would constitute an offence specified in paragraph (a), (b) or (c) if done in the United Kingdom."

50.    These definitions need to be read into section 328 which provides:

"328 Arrangements

"(1) A person commits an offence if he enters into or becomes concerned in an arrangement which he knows or suspects facilitates (by whatever means) the acquisition, retention, use or control of criminal property by or on behalf of another person.

"(2) But a person does not commit such an offence if—

"(a) he makes an authorised disclosure under section 338 and (if the disclosure is made before he does the act mentioned in subsection (1)) he has the appropriate consent;

"(b) he intended to make such a disclosure but had a reasonable excuse for not doing so;

"(c) the act he does is done in carrying out a function he has relating to the enforcement of any provision of this Act or of any other enactment relating to criminal conduct or benefit from criminal conduct.

"(3) Nor does a person commit an offence under subsection (1) if—

"(a) he knows, or believes on reasonable grounds, that the relevant criminal conduct occurred in a particular country or territory outside the United Kingdom, and

"(b) the relevant criminal conduct—

"(i) was not, at the time it occurred, unlawful under the criminal law then applying in that country or territory, and

"(ii) is not of a description prescribed by an order made by the Secretary of State.

"(4) In subsection (3) 'the relevant criminal conduct' is the criminal conduct by reference to which the property concerned is criminal property."

51.    The approach to review of the decisions of the FSA and the LSE.  The focus of submissions was in fact as to the review of decisions of the FSA but the points of law apply to both.  In this context I acknowledge that the court should acknowledge the statutory role given to regulators and their expertise.

52.    In this context I was referred by the FSA, to **The Queen v Securities and Futures Authorities ex parte Panton**, which was unreported and dated 20th June 1994, where Sir Thomas Bingham MR said this:

"The clear intention of the Act is that bodies established under the Act, ie the predecessors of the FSA, should be the regulatory bodies and it is not the function of the court in anything other than a clear case to second-guess their decisions or, as it were, to look over their shoulder. Thus the position that I think we end up with is that these bodies are amenable to judicial review but are in anything, other than in very clear circumstances, to be left to get on with it. It is for them to decide on facts whether it is or it is not appropriate to proceed against a member as not being a fit and proper person. It is essentially a matter for their judgment as to the extent to which a complaint is investigated. That being so, I am not, for my part, persuaded that either of the major decisions which Mr Panton wishes to challenge are ones which this court would properly hold to be lawful. They may involve factual error, they may even be disputable questions of law that arise, but it appears to me that these decisions that Mr Panton seeks to attack fall well within the jurisdiction of the SFA.

"I am quite satisfied that the court would be exceeding its proper role, on the facts disclosed by this application, if it were to grant leave to move for judicial review and seek to interfere with what the SFA has done."

53. By reference to that decision, it was argued on behalf of the FSA that questions of law of different types arise. First it was said there is the question whether the decision-maker has applied the right criteria, that that is a jurisdictional question, and if the decision-maker has erred in law in that identification and thus as to the approach to be taken and the factors to be taken into account, that renders the decision unlawful.

54. It was, however, argued that, secondly, issues of both law and fact may arise for consideration by the decision-maker in applying those criteria and thus in the carrying out of its statutory function. As to such points of law and, indeed, fact it was asserted the relevant decision-maker, here the FSA or the LSE, may or may not be in a position to and may or may not have to form a view to perform their statutory decision-making functions. It was, however, asserted that if in that context the statutory decision-maker did reach a conclusion on a point of law, then the question that should be asked was not whether that decision was right or wrong, but whether it was in the range of decisions reasonably open to the decision-maker.

55. That approach was described by Ms Montgomery on behalf of the claimants as heresy and in that context she referred me to a textbook passage citing from a speech of Lord Denning in the House of Lords referring to a distinction between areas as to jurisdiction and other areas of law:

"I would suggest that this distinction should now be discarded. The way to get things right is to hold thus: no court of tribunal has any jurisdiction to make an error of law on which the decision of the case depends. If it made such an error it goes outside its

jurisdiction and certiorari rely to correct it."

56. Ms Montgomery asserts that that basic point, as she puts it, of public law is qualified by reference to materiality of the point.

57. I was also referred to the decision of **The Queen on the application of SYT v The Monopolies and Mergers Commission (1993) 1 WLR 23**. In particular, to the speech of Lord Mustill at page 32. Starting at letter E Lord Mustill said this:

> "The question of jurisdiction by contrast is a hard-edge question. There is no room for legitimate disagreement. Either the commissioners had jurisdiction or it had not. The fact that it is quite hard to discover the meaning of section 64(3) makes no difference."

> I pause to say the relevant phrase in that was what was a substantial part of the United Kingdom:

> "It does have a correct meaning, and one meaning alone, and once this is ascertained a correct application of it to the facts of the case will always yield the same answer. If the commissioners reached a different answer, it is wrong and the court can and must intervene.

> "I agree with this argument in part, but only in part. Once the criterion for a judgment has been properly understood, the fact that it was formerly part of a range of possible criteria from which it was difficult to choose and on which opinions might legitimately differ becomes a matter of history. The matter now proceeds unequivocally on the basis of the criterion as ascertained. So far no room for controversy but this clear-cut approach cannot be applied to every case where the criterion so established may itself be so imprecise that different decision-makers, each acting rationally, may each reach differing conclusions when applying it to the facts of a given case. In such a case the court is entitled to substitute its own opinion for that of the person to whom the decision has been entrusted only if the decision is to abhorrent that it cannot be classed as irrational."

58. In the context of that passage, as I understand the point advanced by Ms Montgomery in disputing the argument advanced on behalf of the FSA by Mr Brindle, she says, part of the identification of the criteria for the judgment is, in this case, an issue of law; namely, the issue as to the application of POCA. She says, once having identified that issue of law, if an error is made by the decision-maker in considering it, and that issue is material to the decision-making process of the decision-maker, then that error of law renders the decision open to judicial review.

59. She goes on to say that respect for the role of the decision-maker means that should the relevant error of law be established, it would be normal for the court to remit the matter to the decision-maker for the decision-maker to apply the criteria, including within it, therefore, the legal point on a correct basis. Therefore she says the underlying issue on arguability is whether the advice accepted by the FSA that the position as to Act of State was clear was correct or incorrect. She points to evidence provided by the FSA to indicate that the FSA considered that advice and view to be a relevant point in its decision-making process, both as to listing and as to the prospectus. Therefore she says it is a material consideration.

60. I proceed on the basis that that analysis is the correct one for present purposes and that Mr Brindle's argument that all I have to consider is whether or not that advice is in the range of reasonable advice is not correct.

61. However, it does seem to me that in asking the question whether the relevant statutory decision-maker has erred in law, the court has to consider it in the context of what the statutory decision-maker has to decide. It seems to me that in that context what the statutory decision-maker has to decide is what the law presently is not what the law might be, for example. Mr Brindle's advice as recorded and revealed in evidence, was that the POCA question raises difficult issues. His submission, and this is reflected in the approach taken by the FSA and indeed by the conference note, is that albeit difficult the answer to the difficult point is a clear one. His submission is, and the FSA's position is, that they proceeded on the basis that the doctrine of Act of State clearly applied.

62. There are, of course, degrees of clarity so far as that is concerned. The issue as it has been put to me is that that was the view which the FSA formed on advice. It is also a view shared by the LSE on advice and it is the position adopted and asserted by Rosneft on advice.

63. The position adopted by the claimants is that that view is simply wrong. Not only is it not clear, it is wrong.

The issues of criminality

64. These arise under POCA and in other respects in the context of the review. First they arise, it seems to me, in the context that both the FSA and the LSE themselves have to make decisions as to whether POCA applies to them and thus whether they should themselves make an authorised disclosure. They have both decided that they do not have to make such disclosure because in their view it is clear that section 328(1) does not apply to them.

65. That personal decision must, in my view, inform their approach to the issues arising in the Grounds of Claim relating to criminality and thus their approach to deciding what information should be provided to protect potential investors and thus what should be included in the prospectus and of course in determining whether they should make the listing decision under challenge.

66.  In the Grounds of Claim the criminality issues arise primarily in Ground 6, which is to be found in paragraphs 186 to 188 of the claim form.

67.  "In deciding to admit Rosenft GDRs to the Official List, the FSA explicitly or implicitly took the view that:

(1)    so doing was "appropriate" (FSMA, s.72(2) and was not "detrimental to the interests of investors" (FSMA, s.75(5); LR 2.1.3), taking into account the objectives of:

    (i)  "maintaining confidence in the financial system" (FSMA, s.3); and

    (ii)    "the reduction of financial crime" (FSMA, s.6) which includes "any offence involving fraud or dishonesty ... or handling the proceeds of crime", in which context "[o]ffence' includes an act or omission which would be an offence if it had taken place in the United Kingdom";

(2)    the requirements of the Listing Rules had been complied (FSMA, s.75(4));

(3)    the admission of Rosneft GDRs need not be made "subject to any special requirement that it considers appropriate to protect investors" (LR 2.1.4); and

(4)    the decision to admit could properly be taken without:

    (i)    carrying out further enquiries or requesting further information (LR 3.2.6(1));

    (ii)    requesting that Rosneftegaz answer questions concerning the matters raised in Yukos' Representations, in particular Rosneft's acquisition of the YNG shareholding (LR 3.2.6(2)); OR

    (iii)    imposing any additional conditions on Rosneftegaz (LR 3.2.6(5)).

68.  In deciding to admit Rosneft GDRs to trading on the International Order Book, the LSE explicity or implicitly took the view that:

(1)    so doing was not "detrimental... to the reputation of the markets as a whole" (Admission and Disclosure Standards", Part 2, paragraph 1.4) [F/12];

(2)    so doing would not enable the LSE's facilities to "be used for a purpose connected with market abuse or financial crime" (2001 Regulations, Schedule, Part I, paragraph 4(2)(f) [F1/8];

(3)    so doing was compatible with its duty to "promote and maintain high standards of integrity and fair dealing in the carrying on of regulated activities by persons in the course of using the facilities provided by the exchange" (2001 Regulations, Schedule, Part I, paragraph 6(1));

(4)   Roseneftegaz was "in compliance with the requirements of" the FSA, which must include each of the requirements set out at paragraph 186 above ("Admission and Disclosure Standards", Part 2, paragraph 1.3); and

(5)   there is a "proper market" for Rosneft GDRs (2001 Regulations, Schedule, Part I, paragraph 4(2)(b)).

69.   In light of the facts and matters set out above and expressly drawn to the attention of both the FSA and the LSE prior to taking their respective Decisions, each of these views and each of the Decisions which was based upon these views was irrational. Further, the said Decisions were unlawful in that FSA and LSE were not entitled to facilitate the listing in the light of the money laundering issues referred to below. Without prejudice to the generality of the foregoing, Yukos relies upon the following grounds."

70.   As is apparent from that description of the ground, this ground relies on points made earlier and later in respect of the applicability of POCA and the applicability of sections 3 and 6 and in particular section VI of the FSA.  As I understand it, the more general assertion that the expropriation of YNG would be criminal if it had occurred if the United Kingdom is also relied on.  In particular, reliance is placed on the error of law asserted in ground 4; namely, the error of law in the FSA listing decision by having regard to doctrines of Act of State and/or non-justiciability.

The overarching arguments on the criminality issues

71.   I confess and acknowledge that during the course of the hearing I made comments which expressed my then view that it was simply not practical to give fair and proper consideration to these issues in the context of an application for permission.

72.   As the process continued, I was however taken to more and more authority on the issue. I have concluded that it is, at this stage, not only open to me to reach my own conclusion as to whether or not the advice given to and therefore the views taken by the FSA, the LSE and Rosneft are correct and, in this context, clearly correct (because what is alleged is that the FSA made an error of law in concluding that they were clearly correct) but that I should do so.

73.   The way in which the claimants put their case is twofold.  Firstly, they say that as a matter of statutory construction of POCA and section VI, whether a literal or a purposive approach is taken has the result that both statutes exclude the Act of State and/or non-justiciability issue as exemplified, for example, in **Buttes Gas**.  Secondly, the argument is developed that if that is wrong, albeit that that is not the argument first put in the claim form, that Act of State has exemptions or exceptions to it (and I accept that that is the case because it is to be noted that in the original authorities relating to the doctrine, room for exceptions is flagged up) and that this is a case in which an exception would be found to exist.

74.   I propose, firstly, to deal with the point of statutory construction.  In this context I acknowledge that the LSE took other points as to the applicability of POCA.  The FSA

did not take such points themselves. I confess that I found them less convincing than the point which the FSA have taken and I have left them out of account. That is not to say that I do not accept that they might at some stage win the day.

75. Turning to the issue of statutory construction (and in this context I will take it from the Proceeds of Crime Act because the argument is mirrored in the context of section VI) the heart of the literal and, indeed, the purposive construction urged on me by the claimants, is to be found in the interpretation section stating that criminal conduct is conduct which would constitute an offence in any part of the United Kingdom if it occurred there. I was also particularly directed to section 328(3) read in the light of the relevant statutory instrument, indicating that events outside this jurisdiction are brought into the statute.

76. What is said is, by reference to that language, the Act of State/non-justiciability principle or doctrine is excluded. It is not asserted and cannot be asserted that it is excluded by express words, but it is said that the effect of the words used is such as to exclude the relevant doctrine or principle.

77. I confess that when first put I was attracted to that as an assertion. However, on further consideration, and in particular having regard to the point made in paragraph 35 of the skeleton argument put in on behalf of the FSA, which is to the effect that what that statutory wording and the equivalent wording in section VI of the SFMA is directed at, is the common law rule sometimes called the second rule in **Phillips v Eyre**, it seems to me that having regard to the underlying bases for the doctrine of Act of State as explained in a number of cases of high authority, that the statutory wording does not, read in its context, have the effect of excluding that principle or doctrine. In the **Pinochet** decision, it was said that if Parliament has excluded the principle or doctrine then obviously it does not apply, but I conclude that this is not the literal effect of the statutory provisions.

78. What about a purposive approach? I was taken to material by counsel for the claimants. I was unconvinced that it added anything to the arguments put by reference to the language or indicated in any clear way that if interpreted purposively, the statute would exclude the doctrine.

79. I confess that if I had more time, I would have wished to give this part of my reasoning more fully and with greater precision. I, however do, not have the luxury of that time.

80. In short, on the point of statutory construction, I prefer the arguments advanced by the defendants. It seems to me that albeit they can be fairly categorised as difficult, nonetheless the answer is clear. That is quite often the case on issues of statutory construction: having wrestled with the points in the end, the relevant decision-maker reaches a clear view. It seems to me that whether on a permission application or a substantive application for judicial review in this context, where it is accepted by the regulator that the regulator has to make a decision on a point of law to properly inform its statutory decision-making process, what the court should do is put itself in the position of the decision-maker and decide within that process whether it thinks that the conclusion is correct at law. And in my judgment, the conclusion that the Act of State

doctrine is not excluded by the relevant statutory provisions is correct and clearly correct. That was the conclusion reached by the FSA and followed by the LSE.

81.  The second line of argument advanced by the claimants is that this case has elements in it which mean that a court at First Instance or a regulator can and should reach the conclusion that it is within decided authority excluding the application of the principle.

82.  One line of argument put, in this respect, was that the matters alleged included commercial activities. I confess, I was always wholly unconvinced of that as an assertion. The underlying point has always been in this case that the mind behind the relevant events was the Russian Federation.

83.  The next step is to look at cases in which the approach or principle has not been applied. To my mind it is clear that all those cases are clearly distinguishable from the situation that exists here, for the reasons pointed out to me both by Mr Brindle and by Mr Howard. In my judgment, the present situation does not in fact come close to the situation that exists in any of those cases where the principle has not been applied.

84.  It was pointed out to me, and in my judgment correctly, that what this case does come close to is cases in which the principle has in fact been applied. Indeed, in the earlier cases, the same country, in broad terms -- and I say "broad terms", in the sense that Russia is included in the title of the country -- was involved. A point is made that those cases might have been differently decided if decided today because of the existence and effect of the ECHR. To my mind that does not alter the position as to the nature and extent of, or the application of the relevant principle.

85.  After citation of authority, both from textbook and the authorities themselves -- and those citations obviously included citations from **Dicey v Morris; Luther v Sagor [1991] 3 QB 523-548;** the **Central Leather** case, as cited in **Buttes Gas;** and of course **Buttes Gas** itself, that is **Buttes Gas Oil Company v Hammer [1982] AC 888.**

86.  Mr Howard who was the last to speak, subject to the reply on behalf of the claimants, referred me to **Williams and Humbert v W&H Trade Marks (Jersey) [1986] AC 368** where Lord Templeman said this, and he refers back to the earlier authorities:

> "These authorities illustrate the principle that an English court will recognise the compulsory acquisition law of a foreign state and will recognise the change of title to property which has come under the control of the foreign state and will recognise the consequences of that change of title. The English court will decline to consider the merits of compulsory acquisition. In their pleadings the appellants seek to attach the motives of the Spanish legislators to allege oppression on the part of the Spanish Government and to question the good faith of the Spanish administration in connection with the enactment, terms and implementation of the law on 29th June 1983. No English judge could properly entertain such an attack launched on a friendly state."

87. This is a clear exposition of the principle. It has to be read with the acknowledgment that there have been circumstances when it has not been applied. However, it seems to me, on the present state of the authorities, that a first instance judge, having regard to the authority binding upon him or her, would necessarily reach the conclusion that Act of State does apply to the situation under attack in this case.

88. I accept and would not rule out the possibility that there could be further expansion of the law to include other circumstances which the courts find the principle not to apply to. Standing back from the issue and asking whether it is sensible to find that a decision of a regulator is unlawful if based and, in my view, firmly and properly based, on existing authority, binding on a first instance judge, by reference to the prospect that at some time in the future, either in this case or in another further development in the law will occur to found or support the view that the principle does not apply, I have concluded that that is simply not a correct or sensible approach to take.

89. The regulator, just like the court, has to and indeed is obliged under statute to make decisions on the law as it stands at that time.

90. In my judgment, on the law as it stands at present, notwithstanding the submissions persuasively advanced on behalf of the claimants, that there is room for development in that law, that the answer is clear and it is that the Act of State doctrine does apply. The range of arguments advanced in the claim form and orally, in particular paragraph 182 of the claim form, do not, in my judgment, indicate that the FSA erred in law on this point.

91. Therefore, returning to Ground 6 and Ground 4, the conclusion I have reached on what I have described as the overarching issue relating to criminality, namely the application of the Act of State doctrine or principle, to my mind answers these points and renders them unarguable.

92. First, I have found, under Ground 4, that no such error of law exists.

93. Second, in respect of Ground 6, which is put in this way, that having regard to the error of law, the listing decision and the LSE decision are open to attack also fails for the reasons I have given.

94. The point is also put more widely by reference to, not only the arguments on criminality, but also the more general arguments put and advanced by reference to the nature and asserted strength of the case on expropriation.

95. I confess that I see and accept force in a number of the points made in respect of the strength of that case. They are gathered together at the end of recent evidence put in on behalf of the claimants. To my mind the points that are raised there are points that anyone who has spent time in litigation and/or, indeed, anyone who was considering the issues would raise. It also seems to me that they are points raised by the European Court of Human Rights.

96. However, even assuming that those points are strong points, I fail to see, on the basis of the applicability of the Act of State doctrine, how the decision-making process of the

regulatory authorities can be classed as being irrational or one that is outside the range of decisions open to them, having regard in particular to the primary considerations that they have to take into account in reaching that conclusion. In particular, I have in mind here the statutory objectives included in section 73(1)(b) and (d). ((d) is the passage I have already mentioned by reference to the skeleton argument put in by the FSA.)

97.   I pause at this stage also to record that I accept that in some respects there is a degree of unreality as to the POCA issues, save, I accept, and to the extent that it is acknowledged by the FSA that they and the underlying and more general issues of criminality are relevant to the decision as to listing. The unreality it seems to me arises in the context of the predicted application of POCA. Its primary purpose is the notification of the proper authorities in this country to take particular steps. I ask rhetorically, "What steps is it expected they would take?" It is difficult to identify the answer.

98.   I turn, therefore, now to Grounds 1, 2, 5 and 7 and I propose to deal with those more briefly. They were not dealt with at any length in oral argument. I accept that in part, or indeed in large measure, that was because of time pressures. In my view the claimants' counsel was correct to take the approach that she did which very properly had regard to all of the parties' need to make submissions.

99.   Ground 5 is in fact a safety net or catch-all, being failure to have regard to considerations and, as I understand it, has not been brought into play.

100.  Ground 1 was a failure to give reasons. In my view, when the proceedings were launched this was a ground which was plainly arguable, not least because of the terms of the correspondence preceding the decision letters. But in my view it is now water under the bridge because reasons have been given. As I have indicated, that is part of the flexibility of approach which I accept the court can take in determining whether or not to grant permission.

101.  Ground 2 relates to the LSE. The LSE correctly accepts and assert that, absent valid decisions of the FSA, their decision cannot be made. They have points as to whether the letter was in fact a decision or only a "minded to" decision. An essential ground of attack to their decision was Grounds 4 and 6 and it was based on the assertions that the FSA erred and the LSE erred in the same way. It seems to me that that ground falls for the same reasons as Ground 6. As put, the effect included an assertion that the LSE had not made their own decision and had thereby fettered their discretion. In the light of the evidence put in, very properly, this argument was not pursued because the evidence indicated that that was not the case. As indicated in argument, it seemed to me it was very understandable, given the lack of reasons, that this argument was included in the claim form at the time it was drafted. But that aspect of it is now water under the bridge.

102.  Turning to Ground 7, which is breaches of the Human Rights Act. I confess that I have difficulty in seeing this as a freestanding argument over and above the arguments put as to circumstances in which the Act of State doctrine would not apply. As I understood it, it was put in this way, that there are cases and I accept that that there are such cases, that an act of a public authority in this country can be in breach of human rights, even

where the primary infringement is or would be committed in another country. In that context, the case of **Syria v United Kingdom [1989] 11 EHRR 439** and **The Queen on the Application of Ullah v The Special Adjudicator [2004] 2 AC 323** was referred to. However, I do not accept the proposition that what is being done by the FSA, the LSE or by the listing is a furtherance of the alleged expropriation. It seems to me that that has happened. I therefore do not accept that the decisions engage the Human Rights Act in the way in which it was asserted in the claim form.

103. That leaves Ground 3, which is described as error of law and irrationality in relation to the FSA prospectus decision. This divides into two. One part relates to the way in which the POCA issue should be dealt with in the prospectus. The other part relates to the issue as to how the risk that potential investors run by reference to the claims made by Yukos should be dealt with in the prospectus. What is argued in respect of the latter point is that to enable prospective investors to reach a properly informed view and thus to ensure that they have necessary information, is that further details of what are asserted to be and which I accept on the face can be said to be telling points in favour of the arguments advanced by Yukos, and which will be advanced by Yukos in the European Court of Human Rights, should be included within the prospectus. I do not agree. Here it seems it me that one is very much within the area which is not unusual or uncommon for the relevant authorities, namely, the FSA to be considering. It also seems to me that here the passage in the SYT decision is fully engaged. Also, the approach, as demonstrated by the evidence that is generally taken by the FSA is fully engaged.

104. Here I accept that there are some unusual circumstances. However, to my mind there is considerable force in the point that if the prospectus embarks upon essentially setting out the pleadings, allegations and counter-allegations in respect of claims, where on earth does one stop? I can see there is some force in the other side of the argument, that in the particular circumstances of this case there are points which might properly inform an investor as to the nature and extent of the risk.

105. However, standing back and reading this prospectus, it does seem to me that in this context the risk is writ large in the prospectus. The fact that this claim is being made, the fact that there are proceedings in the European Court of Human Rights is made clear. The nature of the claim is made clear. One asks: how would potential investors be better informed by having further information? It seems to me that they have the necessary information and could themselves make enquiry, if they wished, as to information that was in the public domain relating to the nature of the claims. If the points made on behalf of the claimants are to be added, that may, of itself, trigger a number of points, as to some of which at this stage there has been silence from the other side on the facts, but others would relate to perhaps a more detailed explanation of certain legal points. To my mind, this part of the attack is one which founders on the proposition that it is not one that is based on an assertion that the regulator has applied the wrong criteria, but one that the regulator has come to an inappropriate decision in applying that criteria. To my mind, it simply cannot be said that the decision-making process of the regulator and the conclusion reached is one which falls outside the range open to the FSA in this context.

106.  The next issue in the context of disclosure relating to the prospectus is the POCA issue. At this stage it takes on a different aspect because it is concerned with providing necessary information to the prospective investors.  In this context it is those potential investors who are the relevant decision-makers who, like the FSA, LSE, and Rosneft will have to make a decision as to whether or not in their view they should make an authorised disclosure.  There has been discussion in the course of the hearing, because on my reading of the disclosure relating to this, it is not sufficiently clear.  The riposte was that what I thought it should be saying was in fact what it meant.  I still remain a little unconvinced that that is the position.  However, I have received, as I understand it, an assurance from the FSA (and, indeed, non-objection, effectively, on behalf of Rosneft because their assertion is, "Well, what you say it should be saying is in fact what it says") that what I think is a defect will be addressed by the FSA.  What I have in mind is it should be made quite clear in that passage that what it is providing is the view of the company that POCA does not apply and included within that view is the view of the company shared by the FSA and, indeed, by myself, that the Act of State doctrine has the effect that it does not apply.  However, it does seem to me that the prospectus should make it clear that the decision is one for each individual investor to take.  Like the prospectus, I am not giving advice to potential investors.

107.  That, I think, covers the issues relied on in the grounds.  To my mind in the context of the point raised by me as to the detail of the disclosure relating to POCA, I am of course mindful of the point made to me forcefully that I should not trespass into that area.  It is a matter for the FSA.  However, having trespassed and having identified with counsel that it is possible that we were dancing on the head of a pin, I mentioned the point, I do not go further in the context of this application in considering whether or not it raises an arguable ground.  The potential it seems to me would be that in that context there had been an inappropriate focus on the purpose for including the provision.  I acknowledge real difficulty in that, having regard to the exchanges I was taken to between the FSA and the company, as to what the FSA were seeking to ensure happened by reference to that inclusion in the prospectus.  As I read that, what the FSA were seeking to provide was that it was made clear to potential investors that there is a POCA issue and that they are to make their own minds up about it.  That is their decision.  They are, then, the decision-makers.  That is, then, their risk in the commercial world.  In the light of the assurance from the FSA, it seems to me, it would be quite wrong to grant permission in respect of that aspect of the case.

108.  Naturally the conclusions that I have reached mean that I do not have to consider the issue of interlocutory relief, save potentially I suppose in the context of a period pending appeal of my decision.

109.  The point, however, has been argued before me with some vigour.  Background points relate to timing.  It seems to me that in this context there are points to be made on each side.  On behalf of the claimants I accept there is force in the point that, until a prospectus was available and a firm decision was made, they were not in a position to write setting out detailed grounds and that they are therefore now having a timetable imposed upon them by the listing company.

110.  On the other side of the equation I accept that there is force in the point that the evidence shows that a representative of a major shareholder in the claimants was indicating, not only that a listing would not be opposed, but would be actively supported.  I can see that those working hard on the listing at that stage could take comfort from that.

111.  Points both ways, it seems to me, arise, given the longstanding battles that have been taking place between Yukos and Rosneft.  Both of them could have written to the other at a much earlier stage raising these points.  I can well understand why, tactically, decisions were made not to take that course.  The position is, as I see it, we are where we are and the situation is one of urgency.

112.  There are other points relating to the grant of interlocutory relief.  In a helpful supplemental skeleton, put in on behalf of the claimants, the relevant principles are identified, largely by reference to **BACONGA (2003) 1 WLR 2839**.  That demonstrates that the public law element is one of the special factors referred to in the **American Cyanimid** case.  What is also pointed out, and I accept, in that skeleton, that the court can grant interlocutory relief without a cross-undertaking being given or without a cross-undertaking of sufficient value being given.  It is, however, the case that the norm is that cross undertakings in damages are given.  In this case no cross-undertaking has been offered.

113.  At first blush one has some sympathy to that because the underlying claim is that assets have been expropriated from Yukos.  There are, however, points made and made, it seems to me, with some force, that the persons or bodies behind Yukos may or may not have funds.  It was perfectly open to them to offer a cross-undertaking.  What is said on behalf of the claimants is that they should be given the opportunity to approach such shareholders and persons to see whether or not they would be prepared to give such a cross-undertaking.  To my mind, they have had plenty of time to do that.  They have been well aware of the relevant principles.  They have set their stall by the assertion that they, Yukos, and the other claimant are simply not in a position to offer a cross-undertaking.

114.  Also, and to my mind importantly, if not decisive on this point, is the nature of the assertion made by Yukos that they will suffer damage if the listing goes ahead.  To my mind, unsurprisingly, this was attacked wholesale by the FSA and by Rosneft.

115.  The argument goes that if third party investors take shares in Rosneft, this will impede the primary remedy sought by Yukos, which is restitution of the assets held by YNG and still held by YNG.

116.  In this context, as I understand it, Yukos assert that following a successful hearing in the European Court of Human Rights, the Russian Government would be ordered to make restitution and that that is then something which would have to take place through the Russian courts.  It is then said that that would be impeded because effectively there would be bona fide purchasers for value without notice of the shares.

117. In support of that, late in the day, evidence was produced by a Professor Maggs, which I confess, in agreement with the submissions made about it, is not a compelling document. Not least because the citation of the relevant Russian law is one which, through English eyes, would show that the problem that Yukos say they will face only arises in respect of a good faith acquirer and I accept the force of the submission that so far as this prospectus is concerned, it is difficult to see how the shareholders would be, in our terms, bona fide purchasers without notice of the problem.

118. Further, and this is where it seems to me the cross-undertaking point also comes in, is the point that if restitution of the assets cannot be achieved, in the sense of the shares in YNG being returned (that company is still retaining the original assets) or if the original assets or what represents them cannot be returned, the European Court of Human Rights would be in a position to award, as I understand the position, full monetary compensation based on the loss of that restitutionary remedy.

119. I accept on what was shown to me (or that to happen) that there would have to be shown to be a gross breach. But, if successful, it seems to me that is something that Yukos will inevitably have shown.

120. So in this context what Yukos are saying is that what they would suffer is that their prospects of recovering the relevant assets would be made more difficult against a backdrop that if they were not to recover the assets they would be able to claim full monetary restitution from the Russian state. The Russian state would be good for the money.

121. Against that, what Yukos urge is that the listing should be held up. It is common ground, and obvious, that that is likely to cause significant damage to a number of people. Why should that be held up having regard to that loss to Yukos? Yukos, it seems to me, can nearly be compensated in money terms. The loss that would flow from the listing being held up would, absent a cross-undertaking, be irrecoverable.

122. Albeit, therefore, that there is force in the argument that the status quo is one which leaves all the shares in the hands of the existing shareholders, it seems to me that applying the **Cyanimid** principles, with the appropriate modifications as set out in the skeleton argument advanced by the claimants, the balancing exercise comes down firmly in favour of refusing interlocutory relief on the basis of that (albeit not their prime wish), if Yukos, at the end of the day, are successful, they have a money claim against a defendant who is worth powder and shot. If they are not successful and this listing is held up by reference to their application, considerable and widespread loss will be caused to a considerable number of people and institutions which will simply be a loss.

123. Accordingly, if I had found that there was an arguable case for judicial review, and even if I had found that case to be one of reasonable strength, I would have refused an application for interlocutory relief.

124. As I said at the beginning of this judgment, therefore, I dismiss the application for permission.