UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------x
                                    )
RICHARD V. ALLEN, *et al.*          )
                                    )
            Plaintiffs,             )      Case No: 1:05-cv-02077 (CKK)
                                    )      Hon. Colleen Kollar-Kotelly
    v.                              )
                                    )      ORAL ARGUMENT REQUESTED
RUSSIAN FEDERATION, *et al.*        )
                                    )
            Defendants.             )
                                    )
---------------------------------------------------x

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

O. Thomas Johnson, Jr.
James A. Goold
Marney L. Cheek
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
*Counsel to Plaintiffs*

October 13, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ vii

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    THIS COURT HAS JURISDICTION OVER THE RUSSIAN FEDERATION,
      ROSNEFTEGAZ, AND ROSNEFT UNDER THE FOREIGN SOVEREIGN
      IMMUNITIES ACT ................................................................................................. 4

      A.    Rosneft Is Subject to the Court's Jurisdiction Under the FSIA, and Its
            Conduct Is Attributable to the Russian Federation. ................................... 4

            1.    Rosneft Is the Russian Federation's Agent, and Its Acts Are
                  Attributable to the Federation. ...................................................... 5

            2.    Rosneft Should Be Treated as an Agency or Instrumentality of the
                  Russian Federation. ....................................................................... 8

      B.    Jurisdiction Exists Over the Russian Federation, Rosneftegaz, and Rosneft
            Under the Expropriation Exception. ......................................................... 10

            1.    Plaintiffs' Rights in Unlawfully Taken Property Are at Issue. ......... 11

            2.    Plaintiffs' Property Was Taken in Violation of International Law ....... 13

            3.    Rosneft, an Agency or Instrumentality of a Foreign State, Is
                  Engaged in Commercial Activity in the United States. ..................... 14

      C.    Jurisdiction Exists Under the FSIA's Commercial Activities Exception. ............ 15

            1.    The Action Is Based on Acts Outside the United States in
                  Connection with Commercial Activity of Rosneft and the Russian
                  Federation. ................................................................................... 16

            2.    The Acts Caused Direct Effects in the United States. ...................... 19

II.   THIS COURT HAS PERSONAL JURISDICTION OVER EACH OF THE
      DEFENDANTS. ..................................................................................................... 21

      A.    This Court Has Personal Jurisdiction over the Russian Federation,
            Rosneftegaz, and Rosneft Pursuant to the FSIA ......................................... 21

B.   The Federal Long-Arm Statute Confers Personal Jurisdiction over All Non-Sovereign Defendants, and This Court Can Exercise Such Jurisdiction Consistent with the Due Process Clause of the Fifth Amendment. .................................................................................................. 23

1.   Gazprom Is Subject to the Court's Jurisdiction Because of Its Continuous and Systematic Contacts with the United States. .................. 25

2.   Should This Court Decline To View Rosneft as an Agency or Instrumentality of the Russian Federation for Purposes of the FSIA, Rosneft Would Remain Subject to This Court's Jurisdiction Because of Its Continuous and Systematic Contacts with the United States. ...................................................................................................... 29

3.   The Court Has Personal Jurisdiction over the Individual Defendants. ............................................................................................... 32

a)   The Court Has Personal Jurisdiction over Khristenko and Kudrin Because They Were Served in the District of Columbia. .................................................................................... 32

b)   This Court Has Personal Jurisdiction over Yusufov, Bogdanchikov, Miller, Sechin, Borisenko, and Medvedev Based on Their Continuous and Systematic Contacts with the United States and on Their Roles as Co-Conspirators. ........... 33

4.   For All Defendants, Exercising Personal Jurisdiction Comports with Traditional Notions of Fair Play and Substantial Justice. ................. 36

C.   As Required by the Federal Long-Arm Statute, All Defendants Have Been Properly Served. ..................................................................................................... 38

III.   THIS COURT IS THE ONLY PROPER FORUM FOR THIS DISPUTE, AND THE EXTRAORDINARY REMEDY OF DISMISSAL UNDER THE FORUM NON CONVENIENS DOCTRINE IS INAPPROPRIATE. ............................ 40

A.   No Adequate Alternative Forum Exists, as Plaintiffs Would Face Undue Inconvenience and Prejudice if Forced To Litigate This Action in Russia. ......... 42

1.   Russia Is Not an Adequate Alternative Forum Because All Defendants Have Not Conceded That They Are Amenable to Process in Russia, and Plaintiffs' Russian Law Claims Are Not Dispositive. ............................................................................................. 43

2.   Anti-Yukos Bias in the Russian Courts Prevents Plaintiffs from Receiving a Fair Hearing on Their Claims in Russia. ............................... 44

a)   Prosecution and Intimidation of Yukos Individuals .................... 47

b)    Prosecution and Intimidation of Yukos Counsel ......................... 51

c)    Harassment of Process Server in This Case................................. 52

d)    Denial of Due Process for Yukos in Bankruptcy and Other Court Proceedings........................................................................ 53

3.    The Russian Courts Are Unduly Influenced by Russian Elites, Including Defendants, in a Manner That Would Prejudice the Outcome of Any Case Brought by Plaintiffs in Russia. ......................... 55

a)    Russian Courts Are Inappropriately Influenced by the Executive in Yukos-Related Matters. ........................................... 55

b)    Plaintiffs Cannot Receive a Fair Trial in Russia Because of the Courts' Lack of Independence, Especially in Cases Involving Re-Nationalized Property. ........................................... 55

(1)    U.S. Courts Have Found a Lack of Judicial Independence When Re-Nationalizations Are Challenged in Russia....................................................... 56

(2)    The U.S. Government Has Concluded That Russian Courts Lack Judicial Independence. ................................ 57

(3)    Even Russian Government Officials Have Acknowledged the Courts' Lack of Independence........... 59

(4)    Legal Scholars Also Recognize That the Russian Judiciary Is Influenced by the Kremlin, Especially When Re-Nationalized Property Is Contested. ................. 60

B.    The Public and Private Factors Weigh in Favor of Resolving This Dispute in the United States. ............................................................................... 62

1.    Defendants Have Not Established That the Private Interest Factors Strongly Favor Russia as an Alternative Forum. ...................................... 63

2.    Defendants Have Not Demonstrated That the Public Interest Factors Favor Dismissal of This Case. ..................................................... 65

IV.    THE ACT OF STATE DOCTRINE DOES NOT REQUIRE THE COURT TO ABSTAIN FROM ADJUDICATING THIS CASE ON THE MERITS. ........................ 68

A.    The Act of State Doctrine Does Not Require Abstention in Cases Governed by Settled Norms of International Law. ................................................ 68

B.    International Law on Expropriation Is Settled and Provides a Rule of Decision in This Case. ........................................................................ 69

C.    An Expropriation Is Not Rendered Unreviewable Purely Because It Was Effected by Unlawful Tax Measures. ................................................ 70

D.    The Executive Branch Has Made Clear That Adjudication of the Merits of This Case Will Not Embarrass the Conduct of Foreign Affairs. ......................... 71

E.    The U.S.-Russia Bilateral Investment Treaty of 1992 Also Provides Controlling Legal Principles Permitting Adjudication of This Case Consistent with *Sabbatino*. ................................................................. 72

F.    The Second Hickenlooper Amendment Renders the Act of State Doctrine Inapplicable in This Case. ...................................................................... 74

G.    Many of Plaintiffs' Causes of Action Do Not Require the Court to Examine the Validity of the Russian Federation's Actions. ................................ 75

H.    No Other Prudential Considerations Bar Adjudication of the Merits of This Case. ....................................................................................... 76

1.    The Political Question Doctrine Does Not Render This Case Non-Justiciable. ................................................................................ 77

2.    International Comity Does Not Provide a Separate Ground for Dismissal. .................................................................................. 78

V.    PLAINTIFFS HAVE STANDING TO BRING THE CLAIMS SET FORTH IN THE AMENDED COMPLAINT. ............................................................. 80

VI.    THE COURT NEED NOT DETERMINE AT THIS STAGE WHAT LAW WILL APPLY TO THE COMMON-LAW CLAIMS. ..................................... 81

VII.    THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR CONVERSION. ...................................................................................... 82

VIII.    THE AMENDED COMPLAINT STATES A CLAIM FOR CONSPIRACY TO COMMIT CONVERSION. .................................................................. 86

IX.    PLAINTIFFS HAVE PROPERLY PLED A CLAIM FOR RESTITUTION BASED ON UNJUST ENRICHMENT. ...................................................... 88

X.    THE    AMENDED    COMPLAINT    STATES    A    CLAIM    FOR EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW. ........................... 89

XI.    THE AMENDED COMPLAINT STATES A CLAIM FOR SECURITIES FRAUD UNDER 15 U.S.C. § 78(b). ........................................................ 93

A.     Each Fraud Defendant Misstated or Omitted a Material Fact or Employed a Manipulative or Deceptive Device Intended To Mislead Investors.................. 95

     1.     The Fraud Defendants Who Made Misstatements of Material Fact Owed a Duty of Disclosure to ADR Purchasers....................................... 96

     2.     The Fraud Defendants Also Are Liable for Employing a Manipulative or Deceptive Device Intended To Mislead Investors. ........ 97

     3.     ADR Purchasers Accurately Quote the Individual Fraud Defendants' Public Statements. ............................................... 100

          a)     Kudrin's Misstatements ............................................... 101

          b)     Khristenko's Misstatements....................................... 103

          c)     Medvedev's Misstatements........................................ 104

          d)     Yusufov's Misstatements........................................... 105

B.     ADR Purchasers Have Alleged Scienter on the Part of Each Fraud Defendant.......................................................................................... 106

C.     The Fraud Defendants' Material Misstatements and Manipulative or Deceptive Acts Took Place "In Connection with" the Purchase or Sale of a Security. ..................................................................................... 109

D.     ADR Purchasers Have Alleged Reliance............................................ 111

E.     ADR Purchasers Have Alleged Loss Causation. ................................. 113

F.     U.S. Securities Laws Apply Extraterritorially to Defendants' Conduct............. 114

XII.     THE AMENDED COMPLAINT STATES A CLAIM FOR COMMON-LAW FRAUD AND DECEIT. .......................................................................... 116

A.     Plaintiffs Have Alleged Misstatements or Omissions of Material Fact by the Fraud Defendants. ....................................................................... 117

B.     Plaintiffs Have Alleged That Rosneft's Statements Were Made with Knowledge of Their Falsity and with an Intent To Deceive............................... 118

C.     Plaintiffs Have Alleged Reliance....................................................... 119

D.     Plaintiffs' Injury Is Not Speculative. ................................................. 120

XIII.     THE AMENDED COMPLAINT STATES A CLAIM FOR CONSPIRACY TO COMMIT COMMON-LAW FRAUD. .................................................... 121

XIV.   THE AMENDED COMPLAINT STATES A CLAIM FOR AIDING AND
       ABETTING COMMON-LAW FRAUD. ....................................................................... 122

XV.    THE AMENDED COMPLAINT STATES A CLAIM FOR INSIDER
       TRADING UNDER 15 U.S.C. § 78t-1(a). ................................................................. 123

XVI.   THE AMENDED COMPLAINT STATES VALID RICO CLAIMS........................... 126

       A.   RICO Plaintiffs Have Standing To Maintain Their RICO Claims. .................... 128

       B.   Defendants' RICO Violations Took Place and Had Substantial Effects In
            the United States. ............................................................................................. 131

       C.   Plaintiffs Have Alleged Sufficient Predicate Acts. ............................................. 132

            1.   Violations of the Hobbs Act ................................................................ 132

            2.   Fraud in Connection with a Bankruptcy Proceeding .............................. 135

            3.   Violations of the Travel Act ................................................................ 137

            4.   Transportation of Stolen Goods ............................................................ 139

            5.   Mail and Wire Fraud............................................................................ 139

            6.   The PSLRA Does Not Affect RICO Plaintiffs' RICO Claims. .............. 141

       D.   The Official Positions of the Individual RICO Defendants Do Not Insulate
            Them from Suit Under RICO. ............................................................................ 142

       E.   Plaintiffs Have Alleged a "Pattern" of RICO Activity. ....................................... 143

       F.   Plaintiffs Have Pled Substantive Violations of RICO. ....................................... 145

            1.   Plaintiffs Have Alleged the Acquisition of an Interest in or Control
                 over Yukos............................................................................................ 146

            2.   Plaintiffs Have Alleged the Existence of an Association-in-Fact
                 Enterprise in Which All RICO Defendants Participated. ....................... 147

            3.   Plaintiffs Have Alleged a Conspiracy to Violate RICO. ........................ 148

CONCLUSION..................................................................................................................... 150

# TABLE OF AUTHORITIES

## CASES

*Adams v. Quattlebaum*, 219 F.R.D. 195 (D.D.C. 2004) ................................................ 25

*Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358 (7th Cir. 1985) ...................... 23

*Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250 (7th Cir. 1983) ............................ 12

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) ................................. 71

*Am. Int'l Group, Inc. v. Islamic Republic of Iran*, 493 F. Supp. 522 (D.D.C. 1980) .................. 73

*Anza v. Ideal Steel Supply Co.*, 126 S. Ct. 1991 (2006) ............................................. 129

*Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140 (2d Cir. 1999) ...................... 97

*Artis v. Greenspan*, 223 F. Supp. 2d 139 (D.D.C. 2002) ............................................. 20

*Atlantic Tele-Network, Inc. v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126 (D.D.C. 2003) ........... 43

*Avianca, Inc. v. Corriea*, No. 85-3277 (RCL), 1991 U.S. Dist. LEXIS 21622
(D.D.C. May 31, 1991) ............................................................................ 64

*BCCI Holdings (Luxembourg) S.A. v. Khalil*, 56 F. Supp. 2d 14 (D.D.C. 1999) ...................... 146

*Baker v. Carr*, 369 U.S. 186 (1962) ................................................................ 77-78

*Baker v. Henderson*, 150 F. Supp. 2d 13 (D.D.C. 2001) ............................................ 125

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321 (3d Cir. 1999) ...................... 141

*Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 822 F.2d 230 (2d Cir. 1987) .............. 72

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ................................... 68-73

*Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006) ........................................ 77-78

*Base Metal Trading S.A. v. Russian Aluminum*, 253 F. Supp. 2d 681 (S.D.N.Y. 2003) ........ 41, 46

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................ 111, 119

*Biton v. Palestinian Interim Self-Gov. Auth.*, 310 F. Supp. 2d 172 (D.D.C. 2004) ............... 30, 32

*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898
(11th Cir. 1998) .................................................................................. 130

*Blanco v. Banco Indust. De Venezuela, S.A.*, 997 F.2d 974 (2d Cir. 1993) ................................ 43

*Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221 (D.D.C. 2005) ....................................................... 37

\*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) .............................................. 24-25, 34

*Burnham v. Super. Ct. of Cal.*, 495 U.S. 604 (1990) ................................................................... 32

*Byer Indus., Inc. v. Gulf Ins. Co.*, 888 F. Supp. 1 (D.D.C. 1995) ......................................... 140-41

*Calder v. Jones*, 465 U.S. 783 (1984) ....................................................................................... 35

*Canadian Overseas Ore Ltd. v. Compania de Acero del Pacifico S.A.*, 528 F. Supp. 1337
    (S.D.N.Y. 1982) ..................................................................................................................... 12

*Carrera v. Carrera*, 174 F.2d 496 (D.C. Cir. 1949) .................................................................. 33

*Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954 (SAS), 2006 WL 1716862
    (S.D.N.Y. June 20, 2006) ..................................................................................................... 114

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ........ 98

*Century 21, Inc. v. F.W. Woolworth Co.*, 181 A.D.2d 620 (1st Dep't 1992) ............................ 116

*Century Int'l Arms LTD v. Fed. State Unitary Enter. State Corp.*, 172 F. Supp. 2d 79
    (D.D.C. 2001) ...................................................................................................................... 66-67

*Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018 (2d Cir. 1997) ....................................................... 37

*Chisolm v. Transouth Fin. Corp.*, 95 F.3d 331 (4th Cir. 1996) ............................................. 140-41

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990) ............................................. 22

*Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929 (D.C. Cir. 1988) ...... 76

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................................ 3, 87-88

*Cowin v. Bresler*, 741 F.2d 410 (D.C. Cir. 1984) ........................................................... 83, 129-30

*Cox v. Admin'r U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994) ................................... 127

*Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454 (D.C. Cir. 1990) ................................................ 21

*Crist v. Republic of Turkey*, 995 F. Supp. 5 (D.D.C. 1998) ....................................................... 13

*Croesus EMTR Master Fund L.P. v. Brazil*, 212 F. Supp. 2d 30 (D.D.C. 2002) ........................ 20

*Croixland Prop. Ltd. P'ship v. Corcoran*, 174 F.3d 213 (D.C. Cir. 1999) ................................. 87

*Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333, 2002 WL 31158901
    (S.D.N.Y. Sept. 27, 2002) .................................................................................................... 112

*DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14 (D.D.C. 2002) .............................................. 36

*Dammarell v. Islamic Republic of Iran*, No. Civ. A. 01-2224, 2005 WL 756090
    (D.D.C. Mar. 29, 2005) ................................................................................................ 143

*DiRienzo v. Chodos*, 232 F.3d 49 (2d Cir. 2000) ....................................................................... 66

*Diamond Chem. Co., Inc. v. Atofina Chem., Inc.*, 268 F. Supp. 2d 1 (D.D.C. 2003) .................... 3

*Dirks v. SEC*, 463 U.S. 646 (1983) ......................................................................................... 124

*Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005) .................................................. 13

*Doe v. Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) ............................................................... 131-32

*Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002) .............................................................. 131

*\*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) ........................................................ 5, 9, 18

*\*Dooley v. United Techs. Corp.*, 786 F. Supp. 65 (D.D.C. 1992) ......................................... 23, 36

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .......................................................... 94, 113

*\*Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078 (S.D. Fla. 1997) ........................... 43-46, 58-60

*Edmondson & Gallagher v. Alban Towers Tenants Assoc.*, 48 F.3d 1260 (D.C. Cir. 1995) ..... 144

*El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996) ................................................ 42

*El-Hadad v. Embassy of United Arab Emirates*, 69 F. Supp. 2d 69 (D.D.C. 1999) .................... 25

*Ellicott Mach. Corp. v. John Holland Party, Ltd.*, 995 F.2d 474 (4th Cir. 1993) ....................... 37

*Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841 (D.D.C. 1996) ................................ 82

*Equity Group v. PaineWebber Inc.*, 839 F. Supp. 930 (D.D.C. 1993) ....................................... 84

*Filler v. Hanvit Bank*, No. 01 Civ. 9510, 2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003) ........ 122

*\*Films by Jove, Inc. v. Berov*, 250 F. Supp. 2d 156 (E.D.N.Y. 2003) ................................... 56-57

*\*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec")*,
    462 U.S. 611 (1983) ................................................................................................ 4-5, 7

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) .............................. 130

*Fisher v. Network Software Assocs.*, 227 F.R.D. 4 (D.D.C. 2005) ............................................ 140

*Fleet Nat'l Bank v. Boyle, No. 04 CV 1277, 2005 WL 2455673
(E.D. Pa. Sept. 12, 2005) ..................................................... 141-42

*Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438 (D.C. Cir. 1990).......... 16-19

Foremost McKesson, Inc. v. Islamic Republic of Iran, No. 82-0220, 1989 WL 44086
(D.D.C. Apr. 18, 1989) ..................................................... 73, 81

Freeland v. Iridium World Commc'ns, Ltd., 233 F.R.D. 40 (D.D.C. 2006)............................ 114

Friends for All Children, Inc. v. Lockheed Aircraft Corp., 717 F.2d 602 (D.C. Cir. 1982)......... 67

Ganino v. Citizens Util. Co., 228 F.3d 154 (2d Cir. 2000)....................................... 112

Gershon v. Wal-Mart Stores, Inc., 901 F. Supp. 128 (S.D.N.Y. 1995) ....................... 97

Gibbons v. Republic of Ireland, 532 F. Supp. 668 (D.D.C. 1982)................................. 7

Gilson v. Republic of Ireland, 682 F.2d 1022 (D.C. Cir. 1982) ................................. 5

Good v. Zenith Elec. Corp., 751 F. Supp. 1320 (N.D. Ill. 1990)................................ 119

Goren v. New Vision Int'l, Inc., 156 F.3d 721 (7th Cir. 1998) ................................. 127

Greenberg v. Crossroad Sys., Inc., 364 F.3d 657 (5th Cir. 2004) ........................ 111-12

Greenpeace, Inc. (U.S.A.) v. State of France, 946 F. Supp. 773 (C.D. Cal. 1996) .................... 14

Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947).................................... 63, 67

Gutch v. Fed. Republic of Germany, No. 05-2338, 2006 WL 2075259
(D.D.C. July 27, 2006)...................................................11-12, 83-84

*H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229 (1989)...........................................143-44

*HSBC USA, Inc. v. Prosegur Paraguay, No. 03 Civ. 3336, 2004 WL 2210283
(S.D.N.Y. Sept. 30, 2004) ..................................................45-46

Haig v. Agee, 453 U.S. 280 (1981) ............................................ 77

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) ..................................85-87, 121

Hall v. Clinton, 285 F.3d 74 (D.C. Cir. 2002) ........................................ 121

Hanson v. Denckla, 357 U.S. 235 (1958) ......................................... 31

Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408 (1984) ..................... 24

Hercules & Co., Ltd. v. Shama Rest. Corp., 613 A.2d 916 (D.C. 1992) ................... 116

*Herero People's Reparations Corp. v. Deutsche Bank*, 370 F.3d 1192 (D.C. Cir. 2004)............ 89

*Herero People's Reparations Corp. v. Deutsche Bank*, No. 01-01868, 2003 U.S. Dist. LEXIS 27094 (D.D.C. July 31, 2003) .............................................. 90

*Hilton v. Guyot*, 159 U.S. 113 (1895) ............................................................... 79

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)........................................ 128

*Howard v. Am. Online, Inc.*, 208 F.3d 741 (9th Cir. 2000) ....................................... 141

*Hutchings v. Manchester Life and Cas. Mgmt. Corp.*, 896 F. Supp. 946 (E.D. Mo. 1995) ......... 83

*In re Atlantic Fin. Sec. Litig.*, No. 89-0645, 1990 WL 171191 (E.D. Pa. Oct. 31, 1990) .......... 119

*In re Am. Bus. Computers Corp. Sec. Litig.*, [1995 Transfer Binder], Fed. Sec. L. Rep. (CCH) 98,839 (S.D.N.Y. Feb. 24, 1994) .......................................... 125

*In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1 (D.D.C. 2000) ...................................... 100, 115-16

*In re BMC Software, Inc. Sec. Litig.*, 183 F. Supp. 2d 860 (S.D. Tex. 2001)....................... 123-24

*In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d 728 (M.D. Tenn. 2006)..................................... 113

*In re Columbia Sec. Litig.*, 747 F. Supp. 237 (S.D.N.Y. 1990) ......................................... 100-101

*In re Disaster at Riyadh Airport*, 540 F. Supp. 1141 (D.D.C. 1982)........................................... 41

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511 (S.D. Tex. 2003) ..... 141

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 439 F. Supp. 2d 692 (S.D. Tex. 2006)........................................................................94, 96, 99, 113-14

*In re Estate of Corbin*, 391 So. 2d 731 (Fla. App. 1980).............................................................. 84

*In re Health Management, Inc., Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997)......................... 98

*In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161 (D. Mass. 2003) .................98-99, 123

*In re Lorazepam & Chlorozepate Antitrust Litig.*, 295 F. Supp. 2d 30 (D.D.C. 2003) ...........88-89

*In re Merrill Lynch Ltd. P'Ships Litig.*, 154 F.3d 56 (2d Cir. 1998) ......................................... 130

*In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163 (D.D.C. 1996)........................... 101, 119

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005)................................99, 113-114

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) ...................... 108

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) ..................................... 96

*In re U.S.A. Classic Sec. Litig.*, No. 93 Civ. 667, 1995 WL. 363841
    (S.D.N.Y. June 19, 1995)................................................................................. 98

*In re U.S. Office Prod. Sec. Litig.*, 326 F. Supp. 2d 68 (D.D.C. 2004)........................ 83

*In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310 (S.D.N.Y. 2004) ................................... 120

*In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 800736
    (S.D.N.Y. Mar. 30 2006) ................................................................................. 116

*Int'l Telecomm. Satellite Org. v. Colino*, Nos. 88-1266, 87-2749, 1992 WL. 93129
    (D.D.C. Apr. 15, 1992) ................................................................................... 122

*Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*,
    347 F.3d 589 (5th Cir. 2003) ........................................................................... 79

*Interbrew S.A. v. EdperBrascan Corp.*, 23 F. Supp. 2d 425 (S.D.N.Y. 1998) .......................... 115

*Irwin v. World Wildlife Fund, Inc.*, No. 05-1287, 2006 U.S. Dist. LEXIS 58565
    (D.D.C. Aug. 22, 2006).................................................................................42-43

*Itoba Ltd. v. LEP Gropu PLC*, 54 F.3d 118 (2d Cir. 1995) ..................................... 116

*JPMorgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393 (S.D.N.Y. 2004) ..................... 145-146

*Jacobsen v. Oliver*, 201 F. Supp. 2d 93 (D.D.C. 2002) ..................................... 21

*Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp., Inc.*, 98 F. Supp. 2d 480
    (S.D.N.Y. 2000) .............................................................................................. 131

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) ......... 22, 142

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995).................................................... 32, 69

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*,
    729 F.2d 422 (6th Cir. 1984) ........................................................................... 70

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*,
    616 F. Supp. 660 (W.D. Mich. 1985) ......................................................... 11, 15, 72, 81

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) ...................................................... 112

*Koster v. Lumbermens Mut. Co.*, 330 U.S. 518 (1947).................................................. 63

*Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C. Cir. 1982)...........................................8-9

*Labovitz v. Washington Times Corp.*, 172 F.3d 897 (D.C.Cir. 1999) ........................... 83

*Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132 (S.D.N.Y. 1994) ................................. 139

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*,
    507 U.S. 163 (1993) ................................................................................................................. 86

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ..................................................... 114

*Lincoln House, Inc. v. Dupre*, 903 F.2d 845 (1st Cir. 1990) ....................................................... 130

*Lindblom v. Mobile Telecomms. Techs. Corp.*, 985 F. Supp. 161 (D.D.C. 1997) ......... 97, 110-111

*Loughman v. Consol.-Pennsylvania Coal Co.*, 6 F.3d 88 (3d Cir. 1993) ...................................... 85

*\*Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001) .......................................................................... 129

*Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298 (D.D.C. 2005) ................................... 14, 92

*Marra v. Papandreou*, 216 F.3d 1119 (D.C. Cir. 2000) ............................................................... 92

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ....................................................................... 86

*MasterCard Int'l Inc. v. Argencard Sociedad Anonima*, No. 01 Civ. 3027,
    2002 WL 432379 (S.D.N.Y. Mar. 20, 2002) ...................................................................... 40

*\*McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346 (D.C. Cir. 1995) ............................. 5-7

*McKesson Corp. v. Islamic Republic of Iran*, No. Civ. A. 82-220, 1997 WL 361177
    (D.D.C. June 23, 1997) ........................................................................................................ 21

*Medellin v. Dretke*, 544 U.S. 660 (2005) ...................................................................................... 79

*Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419 (1st Cir. 1991) ...................................................... 43

*Miller v. Rau*, 216 Cal. App. 2d 68 (Cal. App. 1963) ................................................................... 84

*Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp. 14 (D.D.C. 1998) ............ 13

*Minebea Co. v. Papst*, No. 97-0590, 2006 WL 2374458 (D.D.C. Aug. 17, 2006) ...................... 82

*\*Minpeco, S.A. v. Hunt*, 718 F. Supp. 168 (S.D.N.Y. 1989) ...................................................... 119

*Mishkin v. Agelhoff*, No. 97 Civ. 2690, 1998 WL 651065 (S.D.N.Y. Sept. 23, 1998) ................ 98

*Moncrief Oil Int'l, Inc. v. OAO Gazprom*, No. 4:05-CV-353-Y (N.D. Tex. Mar. 21, 2006) ....... 28

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134 (C.D. Cal. 2005) ......................... 63

*Munusamy v. McClelland Engineers, Inc.*, 590 F. Supp. 891 (E.D. Tex. 1984) .......................... 82

*Mwani v. bin Laden, 417 F.3d 1 (D.C. Cir. 2005) .................................................. passim

Nalls v. Rolls-Royce, Ltd., 702 F.2d 255 (D.C. Cir. 1983) ........................................ 65

Neder v. United States, 527 U.S. 1 (1999) ............................................................. 140

Nemariam v. Fed. Democratic Republic of Ethiopia, 315 F.3d 390 (D.C. Cir. 2003) ................ 42

Nemariam v. Fed. Democratic Republic of Ethiopia, 400 F. Supp. 2d 76 (D.D.C. 2005) ........... 11

*Newport Components, Inc. v. NEC Home Elecs (U.S.A.), Inc., 671 F. Supp. 1525
     (C.D. Cal. 1987) ............................................................................................. 26

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ........................................................ 106

OMI Holdings, Inc. v. Royal Ins. Co. of Can., 149 F.3d 1086 (10th Cir. 1998) ................... 37

*Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332, 2006 WL 2711527
     (D.D.C. Sept. 21, 2006) ............................................................. 19, 131, 147

Ontario Public Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,
     369 F.3d 27 (2d Cir. 2004) ........................................................................... 110

*Pain v. United Tech. Corp., 637 F.2d 775 (D.C. Cir. 1980) ............................... 39, 40-41

Pavlov v. The Bank of New York Co., 135 F. Supp. 2d 426 (S.D.N.Y. 2001) ................ 41, 46

Pereira v. United States, 347 U.S. 1 (1954) ........................................................... 140

Peterson v. Royal Kingdom of Saudi Arabia, 332 F. Supp. 2d 189 (D.D.C. 2004) .................. 11

Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83 (D.C. Cir. 2005) ......................... 92

*Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d Cir. 2002) ................................ passim

Pinkerton v. United States, 328 U.S. 640 (1946) ....................................................... 85

*Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) ...................................... 40, 43, 63, 66-67

Polymedica Corp. Sec. Litig., 432 F.3d 1 (1st Cir. 2005) ........................................... 111

Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289
     (S.D.N.Y. 2003) ............................................................................................. 69

Ramirez de Arellano v. Weinberger, 745 F.2d 1500 (D.C. Cir. 1984) ................. 12-13, 75, 83

Rapaport v. U.S. Dep't of Treasury, 59 F.3d 212 (D.C. Cir. 1995) ................................. 88

*Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580
(2d Cir. 2005) ............................................................................................ 82

*Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir. 1991) ............................................... 64

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) .............................. 18, 19

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ............................................... 14

*Republic of Philippines by Central Bank of Philippines v. Marcos*,
665 F. Supp. 793 (N.D. Cal. 1987) ............................................................. 33

*Reuther v. Smith*, No. Civ. A. 01-3625, 2002 WL 1303119 (E.D. La. June 12, 2002) ............. 130

\*Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480 (D.C. Cir. 1989) ............................... 86

*Riggs Nat'l Corp. v. Comm'r of IRS*, 163 F.3d 1363 (D.C. Cir. 1999) ......................... 71

*Robbie v. Wilkie*, 300 F.3d 1208 (10th Cir. 2002) ................................................. 127

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (2d Cir. 1987) .................................... 96, 97

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ................................................. 108

*Rong v. Liaoning Province Gov't*, 452 F.3d 883 (D.C. Cir. 2006) ............................... 18

*Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83 (D.D.C. 2005) ...................... 11, 75

*Rustal Trading US, Inc. v. Makki*, 17 Fed. App'x. 331 (6th Cir. 2001) ......................... 43

*Salinas v. United States*, 522 U.S. 52 (1997) .............................................. 147-150

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ......................................... 77

*Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968) ................................... 114, 115

*Schuler v. United States*, 617 F.2d 605 (D.C. Cir. 1979) ........................................ 3

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ................................. 98

*Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ..................................... 126

\*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ............................... 109-10

*Shahmirzadi v. Smith Barney, Harris Upham & Co.*, 636 F. Supp. 49 (D.D.C. 1985) ............. 137

*Shields v. Washington Bancorporation*, No. 90-1101, 1992 WL 88004
(D.D.C. Apr. 17, 1992) ............................................................................ 137

*Siam Kraft Paper Co., Ltd. v. Parsons & Whittemore, Inc.*,
    400 F. Supp. 810 (D.D.C. 1975) ............................................................ 30

\*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992) ............. 12, 15, 20, 81

*Siewick v. Jamieson Science and Eng'g, Inc.*, 191 F. Supp. 2d 17 (D.D.C. 2002) ........................ 8

*Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir. 2006) ................................... 98, 100

*Smith v. Washington Sheraton Corp.*, 135 F.3d 779 (D.C. Cir. 1998) ........................................ 83

\*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ................................................................ 90-92, 93

*Southway v. Cent. Bank of Nigeria,* 198 F.3d 1210 (10th Cir. 1999) ........................................ 143

*Sperber v. Boesky*, 849 F.2d 60 (2d Cir. 1988) .................................................................. 129, 139

*Stirone v. United States*, 361 U.S. 212 (1960) .................................................................... 132-33

*Sys. Mgmt., Inc. v. Loiselle*, 303 F.3d 100 (1st Cir. 2002) ........................................................ 140

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005) ................ 21-23

*Tarasevich v. Eastwind Transp., Ltd.*, No. 02 Civ. 1806, 2003 U.S. Dist. LEXIS 12452
    (S.D.N.Y. July 21, 2003) ......................................................................... 41, 46

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ...................................... 77, 90

*Thomson Consumer Elecs., Inc. v. Innovatron, S.A.*,
    3 F. Supp. 2d 49 (D.D.C. 1998) ............................................................. 82

*Transamerica Leasing*, 21 F. Supp. 2d 47 (D.C. Cir. 2000) ...................................................... 67

*United States v. Abadie*, 879 F.2d 1260 (5th Cir. 1989) ......................................................... 138

*United States v. Arena*, 180 F.3d 380 (2d Cir. 1999) ......................................................... 133-34

*United States v. Auerbach*, 913 F.2d 407 (7th Cir. 1990) ...................................................... 138

*United States v. BCCI Holdings (Lux.), S.A.*, 977 F. Supp. 1 (D.D.C. 1997) ........................... 67

*United States v. Buffey*, 899 F.2d 1402 (4th Cir. 1990) ........................................................ 133

*United States v. Cardall*, 885 F.2d 656 (10th Cir. 1989) ....................................................... 135

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) ...................................................... 124

*United States v. Connery*, 867 F.2d 929 (6th Cir. 1989) ....................................................... 136

*United States v. Edwards*, 324 F. Supp. 2d 10 (D.D.C. 2004).....................................................133

*United States v. Fetlow*, 21 F.3d 243 (8th Cir. 1994) ............................................................137-38

*United States v. Finley*, 705 F. Supp. 1272 (N.D. Ill. 1988)................................................134

*United States v. Gigante*, 737 F. Supp. 292 (D.N.J. 1990)........................................................148

*United States v. Green*, 350 U.S. 415 (1956)..........................................................................133

*United States v. Hollis*, 725 F.2d 377 (6th Cir. 1984) ...............................................................137

*United States v. Hughes*, 895 F.2d 1135 (6th Cir. 1990) ...........................................................148

*United States v. Key*, 859 F.2d 1257 (9th Cir. 1988) ................................................................136

*United States v. Knickerbocker Fur Coat Co.*, 66 F.2d 388 (2d Cir. 1933) .............................136

*United States v. Marcy*, 777 F. Supp. 1393 (N.D. Ill. 1991) ....................................................134

*United States v. Morrow*, No. Crim.A. 04-355, 2005 WL 1389256 (D.D.C. June 13, 2005) ....148

*United States v. Noriega*, 746 F. Supp. 1506 (S.D. Fla. 1990)..................................................131

*United States v. Peete*, 919 F.2d 1168 (6th Cir. 1990) ..............................................................133

*United States v. Pena*, 731 F.2d 8 (D.C. Cir. 1984)......................................................................8

*United States v. Philip Morris, Inc.*, No. Civ. A. 99-2496, 2006 WL 2380622
    (D.D.C. Aug. 17, 2006).......................................................................................................131

*United States v. Phillip Morris, Inc.*, 273 F. Supp. 2d 3 (D.D.C. 2002)....................................140

*United States v. Polanco*, 145 F.3d 536 (2d Cir. 1998)..............................................................143

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
    793 F. Supp. 1114 (E.D.N.Y. 1992) ..................................................................................127

*United States v. Reid*, 533 F.2d 1255 (D.C. Cir. 1976) .............................................................139

*United States v. Richardson*, 167 F.3d 621 (D.C. Cir. 1999) ....................................................147

*United States v. Saadey*, 393 F.3d 669 (6th Cir. 2005).............................................................133

*United States v. Santoni*, 585 F.2d 667 (4th Cir. 1978).............................................................133

*United States v. Second Nat'l Bank of N. Miami*, 502 F.2d 535 (5th Cir. 1974) ........................71

*United States v. Stern*, 858 F.2d 1241 (7th Cir. 1988)...............................................................138

*United States v. Sutton*, 337 F.3d 792 (7th Cir. 2003) .................................................. 133

*United States v. Tillem*, 906 F.2d 814 (2d Cir. 1990) ................................................. 133

*United States v. Victor Teicher & Co., L.P.*, 785 F. Supp. 1137 (S.D.N.Y. 1992)..................... 124

*United States v. Wernikove*, 214 F. Supp. 112 (E.D. Pa. 1963)........................................... 135-36

*United States v. White*, 116 F.3d 903 (D.C. Cir. 1997) ....................................... 143, 146

*United States v. Yeager*, 331 F.3d 1216 (11th Cir. 2003) ........................................ 140

*University of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534
    (3d Cir. 1993)........................................................................................... 146

*Varnelo v. Eastwind Transp., Ltd.*, No. 02 Civ. 2084, 2003 WL 23074
    (S.D.N.Y. Feb. 3, 2003) ...................................................................... 41, 46

*Vine v. Republic of Iraq*, No. 01-02674, 2006 WL 2583696 (D.D.C. Sept. 7, 2006)................... 78

*Virginia Acad. of Clinical Psychologists*, 878 A.2d 1226 (D.C. 2005)..................................... 119

*Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887 (5th Cir. 1998) .................... 19

*W. Assocs. Ltd. P'Ship v. Market Square Assocs.*, 235 F.3d 629 (D.C. Cir. 2001) ................... 144

*W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*,
    493 U.S. 400 (1990)........................................................................... 69, 75-76

*West v. Multibanco Comermex, S.A.*, 807 F.2d 820 (9th Cir. 1987)................................. 12, 75, 92

\**Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887
    (S.D.N.Y. Feb. 28, 2002) ............................................................. 132, 133, 148

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) ........... 71

*Yellow Bus Line, Inc. v. Drivers' Chauffeurs & Helpers Local Union 639*, 913 F.2d 948
    (D.C. Cir. 1990) ................................................................................ 126-27

*Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................... 109

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001).................................... 96

*Zoelsch v. Arthur Anderson & Co.*, 824 F.2d 27 (D.C. Cir. 1987) ........................................... 114

## STATUTES

15 U.S.C. § 78a *et seq.* (Securities Exchange Act)....................................... 23, 93, 123

18 U.S.C. § 2 ................................................................................................ 135

18 U.S.C. § 152 ............................................................................................ 132

18 U.S.C. § 371 ........................................................................................ 135-37

18 U.S.C. § 1341 .......................................................................................... 132

18 U.S.C. § 1343 ................................................................................... 132, 140

18 U.S.C. § 1951 (Hobbs Act) ................................................................. 132-35

18 U.S.C. § 1952 (Travel Act) ............................................................ 132, 137-39

18 U.S.C. § 1961 ............................................................................ 23, 132, 147

18 U.S.C. § 1962 ....................................................................................... *passim*

18 U.S.C. § 1964 .......................................................................................... 128

18 U.S.C. § 2314 ................................................................................... 132, 139

22 U.S.C. 2370 ......................................................................................... 74-75

28 U.S.C. § 1330 .................................................................................... 22, 66

28 U.S.C. § 1350 .................................................................................... 90, 91

28 U.S.C. § 1391 ........................................................................................... 66

28 U.S.C. § 1605 ....................................................................................... *passim*

28 U.S.C. § 1608 .................................................................................... 22, 38

Fed. R. Civ. P. 4(k)(2) ............................................................................ 21-39

Fed. R. Civ. P. 4(h)(2) ............................................................................ 38-39

Fed. R. Civ. P. 9(b) ....................................................................... 86, 136-37, 140

Fed. R. Civ. P. 44.1 ................................................................................. 81-82

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 107 ................... 141-42

Racketeer Influenced and Corrupt Organizations (RICO) Act of 1970,
    Pub. L. No. 91-452, § 901 *et seq.* ............................................................. *passim*

## TREATIES

Convention on the Service Abroad of Judicial and Extrajudicial Documents, Nov. 15, 1965,
658 U.N.T.S. 163 ................................................................................38-39

U.S.-Iran Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955,
8 U.S.T. 899 ...................................................................................... 73

U.S. Russia Bilateral Investment Treaty, June 17, 1992, 31 I.L.M. 794 ................................72-74

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ......................... 74

## MISCELLANEOUS

17 C.F.R. § 240.10b-5 (2006) ..................................................................... *passim*

H. Rep. No. 91-1549 (1970) ....................................................................... 126

S. Rep. No. 91-617 (1969) ........................................................................ 126

Ethan S. Burger, *Corruption in the Russian Arbitrazh Courts: Will There Be Significant
Progress in the Near Term?*, 38 Int'l Law, 15 (2004) ................................................60-62

Restatement (Third) of Foreign Relations Law § 712 (1987)........................................ 70

Restatement (Second) of Torts § 525 (1938)....................................................... 116

Stephen M. Schwebel, *The Influence of Bilateral Investment Treaties on Customary
International Law*, 98 Am. Soc'y Int'l L. Proc. 27 (2004) ............................................. 70

Louise L. Shelley, *Putin's Russia: Why a Corrupt State Can't Be a Strong State in the
Post-Yeltsin Era*, 9 E. Eur. Const. Rev. 12 (2000)............................................. 61

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1476
(2d ed. 1990) ................................................................................... 25

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2443
(2d ed. 2004) ................................................................................... 82

## INTRODUCTION

Defendants have expropriated Yukos Oil Company ("Yukos") without paying compensation to any of its owners, including Plaintiffs. The Russian Federation chose not to issue a simple decree to re-nationalize Yukos and deny Plaintiffs compensation; rather, the Russian Federation and the other Defendants unlawfully seized Yukos piece by piece, as part of an opaque and complex scheme full of smoke, mirrors, and lies. As the smoke clears, what we are left with is a creeping expropriation that is no less illegal – and no less damaging – because of its lack of transparency.

Plaintiffs invested in Yukos in reliance on Defendants' misrepresentations that the company would be preserved. Contrary to these statements, Defendants targeted Yukos and eventually seized it from its owners. Defendants' taking of Yukos gives rise to causes of action for conversion, restitution based on unjust enrichment, expropriation, fraud, and racketeering. This Court is the only forum to which Plaintiffs can turn for relief. It can and should exercise jurisdiction over all Defendants and allow Plaintiffs to prove their claims on the merits.

## FACTUAL BACKGROUND

Plaintiffs are holders and purchasers of American Depository Receipts ("ADRs") of Yukos, a firm that was once hailed as the Russian Federation's most successful. Their action arises out of the coordinated attack of the Russian Federation and other co-conspirators (collectively, "Defendants") against Yukos. The purpose and effect of this attack has been the expropriation of Yukos without compensation to its owners. Defendants' sought the elimination of Yukos as a competitor for sales of Russian petroleum in the United States and other international markets, the elimination of Yukos as a vehicle for investment by U.S. and other Western energy companies in the development of Russian petroleum resources and the

marketing of such resources, and the maintenance of control over the assets of Yukos for the ongoing enrichment of Defendants.

To effect their scheme, Defendants have levied illegal and confiscatory multi-billion dollar tax demands on Yukos sufficient to appropriate all of the company's economic value (*see* Am. Compl. ¶¶ 196-222), and seized the company's principal production asset, Yuganskneftegaz ("YNG"), through an auction that has been widely acknowledged as a sham. *See id.* ¶¶ 261-95. Defendants also seized a majority of Yukos shares and imprisoned its executives, including the company's CEO Mikhail B. Khodorkovsky ("Khodorkovsky"). *See id.* ¶¶ 143-46, 157-68, 182-86. Other Yukos executives have been intimidated and harassed to the point at which they have either resigned or fled Russia or both. *See id.* ¶¶ 157-58, 168. In their place, Defendants have installed a management team that Yukos shareholders have not approved and that operates without regard to the wishes of the company's shareholder-selected leadership, which, until recently, operated from forced exile in London. *See id.* at ¶ 168. Russian bankruptcy proceedings instituted by Defendants last March resulted in the appointment of a trustee who now manages Yukos, under the direction of Defendants. Yukos's shareholder-selected management now plays no role whatsoever in the company's affairs. *See id.* ¶¶ 296-301. As a consequence of Defendants' unlawful re-nationalization of Yukos, Plaintiffs' ADRs are effectively worthless.

Defendants' actions have been uniformly condemned in countries that adhere to the rule of law. In the United States, both Congress and the State Department have criticized the Russian Federation for its conduct in the Yukos affair. *See id.* ¶ 5. Similar criticisms have come from the Parliamentary Assembly of the Council of Europe and even from a senior economic advisor to

Russian Federation President Vladimir V. Putin ("Putin"), who was dismissed after he described the seizure of YNG as the "swindle of the year."  *See id.* ¶¶ 6-7.

As a result of Defendants' misconduct, Yukos's plans to become a long-term energy supplier to the United States, and the plans of major U.S. oil companies to invest heavily in Yukos, have been blocked.  *See id.* ¶¶ 9, 105-09, 112, 273.  Rosneft, a one-time bit player in the Russian petroleum industry, is emerging as the greatest beneficiary from Yukos's now-certain liquidation.  *See id.* ¶¶ 282-84, 298-99.

## ARGUMENT

Plaintiffs' Amended Complaint alleges specific facts that are sufficient to establish personal jurisdiction over all Defendants and subject matter jurisdiction over all of Plaintiffs' claims, including those claims brought against the Russian Federation and other sovereign Defendants.  The Defendants do not challenge Plaintiffs' Russian law claims (Counts II, VIII, and XI), and these counts accordingly survive Defendants' motions to dismiss.

Defendants' Rule 12(b)(6) motions with respect to Plaintiffs' other claims must be denied, as Plaintiffs have stated claims for relief on all counts.  When ruling on Defendants' 12(b)(6) motions, the Amended Complaint must be liberally construed in favor of Plaintiffs, "who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (court cannot grant Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *Diamond Chem. Co., Inc. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 16 (D.D.C. 2003) (CKK) (same).  For the reasons set forth below, Defendants' motions to dismiss must be denied in their entirety.

I.     **THIS COURT HAS JURISDICTION OVER THE RUSSIAN FEDERATION, ROSNEFTEGAZ, AND ROSNEFT UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT.**

In their motions to dismiss, Defendant Russian Federation ("the Russian Federation") claims to be immune from suit as a foreign state under the Foreign Sovereign Immunities Act ("FSIA") (Russ. Fed. Mem. at 3), Defendant OAO Rosneftegaz ("Rosneftegaz") claims immunity as an agency or instrumentality of the state (Rosneft Mem. at 11), and Defendant OAO Rosneft Oil Company ("Rosneft") claims to fall outside of the FSIA under the terms of a 2003 Supreme Court decision, because it is not directly owned by the Russian Federation (*id.* at 25 n.9, citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003)). In reality, however, Rosneftegaz is a shell, created in 2005 by the Russian Federation as a holding company for its 100 percent ownership interest in Rosneft. And, as the Amended Complaint describes, Rosneft has been the pliant instrument through which the Russian Federation has stolen Yukos from its rightful owners, including the plaintiffs in this suit.

Unfortunately for Defendants, the law of sovereign immunity in this country is not as formalistic or as easily manipulated as they might suppose. In particular, it permits the Court to see through sham corporate arrangements like Rosneftegaz and to attribute to the Russian Federation responsibility for acts carried out by its agent, Rosneft. Once the Court does so, it becomes apparent that all three Defendants are subject to this Court's subject matter and personal jurisdiction pursuant to the expropriation and commercial activities exceptions to the FSIA.

A.     **Rosneft Is Subject to the Court's Jurisdiction Under the FSIA, and Its Conduct Is Attributable to the Russian Federation.**

Supreme Court precedent establishes two important consequences under the FSIA when a foreign state dominates a corporate entity as the Russian Federation does Rosneft. First, under *Bancec*, the state may be found to exercise such extensive control over the entity that a

relationship of principal and agent is created. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611, 629 (1983). In such instances, the acts of the agent are attributed to the foreign state and may form the basis for both jurisdiction and liability as to that state. *Id.* (establishing this principle with regard to liability); *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1026 n.16 (D.C. Cir. 1982) (citations omitted) (noting that "the activities of an agent may be attributed to the principal for jurisdictional purposes"); *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351-53 (D.C. Cir. 1995) (affirming the district court's exercise of jurisdiction over the Islamic Republic of Iran based on the conduct of a corporation that acted as its agent). Second, under *Dole Food*, a court may pierce the corporate veil, disregarding sham intermediate ownership structures and treating the corporate entity as an agency or instrumentality of the foreign state. 538 U.S. at 475 (noting that "[t]he veil separating corporations and their shareholders may be pierced in some circumstances," by way of exception to the general rule laid down in that case reserving agency or instrumentality status for entities directly owned by the foreign state). The facts alleged in the Amended Complaint require that the Court view Rosneft as an agent of the Russian Federation and pierce the veil between the Federation and the shell company Rosneftegaz.

> **1. Rosneft Is the Russian Federation's Agent, and Its Acts Are Attributable to the Federation.**

The Amended Complaint provides the court with ample grounds for a finding that Rosneft is the Russian Federation's agent. In *McKesson Corp.*, the Court of Appeals for the D.C. Circuit upheld this Court's attribution of a commercial entity's conduct to the government of Iran where the government was found to have had "extensive involvement in the day-to-day operations" of the entity. 52 F.3d at 352. Here, the Amended Complaint alleges facts indicating

a degree of state control over Rosneft's day-to-day activities more than sufficient to justify

attribution of its conduct to the Russian Federation:

- The Russian Federation is (as of the date of the Amended Complaint) the indirect owner of 100 percent of Rosneft's shares, one share of which is directly held by the Federal Property Agency and the remainder by Rosneftegaz. Am. Compl. ¶ 70.

- The Russian Federation dominates Rosneft's Board of Directors. Until recently, all of the seats on Rosneft's Board of Directors, other than that occupied by Defendant Sergey Bogdanchikov ("Bogdanchikov") as President, were held by officials of the government of the Russian Federation. *Id.* ¶ 119. Notwithstanding some recent cosmetic changes to make Rosneft more attractive to foreign investors, a majority of the Board members continue to be government officials, including its influential Chairman, Defendant Igor Sechin ("Sechin"). Sechin is also Deputy Head of the Presidential Administration of the Russian Federation and a close advisor to President Putin. *Id.*

- Rosneft's business strategy is determined by Russian state interests rather than its own commercial judgment. Until recently, Rosneft's website boasted that "[t]he positive results of Rosneft's operations have motivated the state to appoint Rosneft to exercise the state's strategic interests in the oil and gas industry as well as in the fuel industry as a whole." *Id.* ¶ 72. The website also made clear that "Rosneft pursues a business strategy which best meets the interests of the Russian economy." *Id.*

- Routine business decisions by Rosneft are subject to approval by the Russian government. Rosneft's schedules of fuel supplies are subject to the approval of the Russian Federation's Energy and Agriculture Ministries. *Id.* ¶ 120. Rosneft's day-to-day decisions about corporate structure and funding continue to be dictated by the Russian government. In February 2006, for example, Rosneft's President, Bogdanchikov, acknowledged that "the issue of holding the [July 2006] IPO falls under the jurisdiction of the company's owner, which is the government." *Id.* ¶ 121. Consistent with the close governmental control of Rosneft's business operations, officials of the Russian Federation have taken a leading role in promoting the Rosneft IPO to the U.S. financial community. *Id.*

- Rosneft acted at the direction of the Russian government in acquiring the undervalued YNG assets taken from Yukos. The appointment by President Putin of Defendant Sechin, the Deputy Head of the Presidential Administration, as Chairman of Rosneft's Board in July 2004 (*Id.* ¶ 82) and Rosneft's role in the subsequent events described in the Amended Complaint, strongly support the inference that the company was chosen by the Kremlin to execute a preconceived plan to seize Yukos's prime asset as a step toward the expropriation of the company from its legitimate owners.

Attribution of Rosneft's conduct to the Russian Federation is justified both by the degree

of control exercised in general by the Federation over Rosneft's day-to-day decisions and by the

involvement of Russian government officials in directing the specific unlawful actions of Rosneft alleged in the Amended Complaint. *McKesson Corp.* upheld this Court's attribution of the conduct of a state-controlled corporation to Iran based on the corporation's implementation of state policies at the expense of its commercial mission and the state's role in directing the nonpayment of dividends challenged in the complaint. *See McKesson Corp.*, 52 F.3d at 351 ("Pak Dairy was no longer a joint stock company whose primary fiduciary duty was to its stockholders. Rather, 'the profit of the people and the Government should also be considered' and 'the main objective is . . . to protect the interests of the country'"); *id.* at 352 ("Iran's Cabinet Ministers (and officials answerable to them) became involved in this decision-making process"). Similarly here, Rosneft's own statements during the period covered by the Amended Complaint indicate that it saw itself as an instrument of state policy, rather than a commercial enterprise pursuing its own business interests. Moreover, with its Board of Directors dominated by government officials, Rosneft's decision-making regarding acquisition of Yukos's seized assets could not but be dictated by the desires of the Kremlin. *See Gibbons v. Republic of Ireland*, 532 F. Supp. 668, 672 (D.D.C. 1982) (emphasizing the importance for attribution of determining whether government officials acted in concert with employees of an instrumentality).

In *Bancec*, the Supreme Court observed that governmental instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such. 462 U.S. at 626-27. In view of the extensive government control alleged by Plaintiffs in this case, however, *Bancec* requires the Court to view Rosneft as an agent of the Russian Federation and attribute the acts of Rosneft to the Federation, both for purposes of establishing jurisdiction under the FSIA and for purposes of assessing Plaintiffs' substantive claims against the Russian Federation.

2.    **Rosneft Should Be Treated as an Agency or Instrumentality of the Russian Federation.**

Because Rosneftegaz is a sham organization, with no purpose other than to act as a vehicle for the Russian Federation's shareholding in state-owned oil and gas companies, the Court should disregard its existence for jurisdictional purposes under the FSIA, and treat Rosneft as an agency or instrumentality of the Russian Federation as if it were directly owned by the state.

Federal common law provides the applicable standard for piercing the corporate veil in the context of deciding whether jurisdiction exists under the FSIA. *United States v. Pena*, 731 F.2d 8, 12 (D.C. Cir. 1984) (federal common law applies "after it has been determined that some federal interest is implicated by the veil-piercing inquiry."). The D.C. Circuit "employs a two-prong test to determine whether federal common law supports piercing the corporate veil: '(1) is there such a unity of interest and ownership that the separate personalities of the corporation and the [shareholder] no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?'" *Siewick v. Jamieson Science and Eng'g, Inc.*, 191 F. Supp. 2d 17, 21 (D.D.C. 2002) (quoting *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982)). The shareholder-corporation relationship between the Russian Federation and Rosneftegaz satisfies both prongs of this test.

First, as the Amended Complaint makes clear, Rosneftegaz is an artificial creation established in June 2005 to act as a holding company for the Russian Federation's 100 percent shareholding in Rosneft (barring one Rosneft share owned by the Federal Property Agency). Am. Compl. ¶¶ 70, 74. Rosneftegaz operates no productive assets itself. If Rosneftegaz has any purpose other than that of defeating jurisdiction, it is to act as the Russian government's alter ego in the latter's efforts to reestablish control over the country's oil and gas reserves. *See* Am.

Compl. ¶ 129 (describing Rosneftegaz's purchase of a 10.74 percent shareholding in Gazprom and Gazprom's subsequent announcement that the Russian Federation had obtained a controlling stake in the company). Such a purpose is, of course, entirely consistent with the unity of interest and ownership required by the first prong of the *Labadie* test.

Second, an inequitable result will certainly follow if Rosneftegaz is treated as an entity with an existence independent of the Russian Federation and therefore capable of shielding Rosneft from agency or instrumentality status under *Dole Food*. As explained in more detail in Section I.B.3, the Court can only exercise jurisdiction over the Russian Federation pursuant to the expropriation exception if Rosneft – an entity engaged in commercial activity in the United States which now owns and operates Yukos's stolen assets – is considered an agency or instrumentality of the state. Given the extensive and direct control exercised by the Russian Federation over the day-to-day activities of Rosneft, it would be an inequitable result if the Federation were permitted to escape the Court's jurisdiction solely by virtue of its decision last year (after much of the injury described in the Amended Complaint had been accomplished[1]) to create Rosneftegaz as an artificial buffer between itself and Rosneft.

The Court should accordingly pierce the corporate veil, disregard Rosneftegaz's sham existence, recognize the Russian Federation as Rosneft's direct owner, and treat Rosneft as an agency or instrumentality of the Federation.

---

[1] The Supreme Court separately held in *Dole Food* that courts applying the FSIA generally should determine instrumentality status on the facts at the time suit is filed. 538 U.S. at 478. Unless the Court pierces the corporate veil with respect to Rosneftegaz, therefore, it must regard Rosneft as a non-agency or instrumentality for all periods described in the Amended Complaint, despite the undisputed fact that Rosneft was directly owned by the Russian Federation before June 2005. In addition to the obvious inequities of such an outcome in this case – Rosneft's most important actionable conduct occurred before the creation of Rosneftegaz – there are broader policy reasons for denying foreign sovereigns that injure U.S. citizens the ability to rewrite history in this way.

**B.    Jurisdiction Exists Over the Russian Federation, Rosneftegaz, and Rosneft Under the Expropriation Exception.**

Under the FSIA's expropriation exception, a foreign state is not immune when

> rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in commercial activity in the United States[.]

28 U.S.C. § 1605(a)(3).

Defendants' arguments that the expropriation exception does not apply in this case depend on their mischaracterization of Plaintiffs' claim as one for the taking of their ADRs, or the value of their ADRs.  *See, e.g.*, Russ. Fed. Mem. at 9 (incorrectly asserting that plaintiffs allege that the Russian Federation's enforcement actions "had the indirect effect of impairing some vague, undefined intangible rights created by their ADRs"); Rosneft Mem. at 21 ("[t]he alleged loss in value to plaintiffs' ADRs cannot constitute an expropriation of property.").  In reality, however, Plaintiffs' claim is based on the illegal taking of the Yukos Oil Company from its owners. *See, e.g.*, Am. Compl. ¶ 1 (referring to "the expropriation of Yukos without payment of any compensation to its owners"); *id.* ¶ 10 ("[t]he company in which [Plaintiffs] held an ownership interest has been taken from them."); *id.* 411 ("Defendants have actually or constructively confiscated Yukos from all its owners").

When Plaintiffs' claim is properly understood, it is clear that the expropriation exception applies to deny immunity to the Russian Federation and its agents and instrumentalities. Plaintiffs' property rights in the Yukos Oil Company and its assets are at issue.  The Russian Federation has neither paid nor offered compensation for its constructive taking of Yukos, placing itself in violation of international law.  YNG, which accounted for 60 percent of Yukos

production, is currently owned and operated by Rosneft. Am. Compl. ¶¶ 90, 284. The remainder of Yukos has been forced into bankruptcy to pay fictitious tax assessments and awaits dissolution and distribution of the remainder of its assets, most likely also to Rosneft. *Id.* ¶¶ 296-301 As shown above, the Court should pierce the corporate veil between the Russian Federation and Rosneftegaz and treat Rosneft as an agency or instrumentality of a foreign state as if it were directly owned by the Federation. As such, Rosneft is engaged in commercial activity in the United States, including in relation to the very property illegally taken from Yukos's owners.

### 1.     Plaintiffs' Rights in Unlawfully Taken Property Are at Issue.

The expropriation exception is properly invoked to permit suit against a foreign government that expropriates control of the assets and profits of a corporation. *See Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 616 F. Supp. 660, 663 (W.D. Mich. 1985). Defendants' mischaracterization of Plaintiffs' claims cannot change this reality. Nor can the case law Defendants cite to the effect that intangible interests do not amount to "property" under the expropriation exception. See Russ. Fed. Mem. at 9-10 (citing *Nemariam v. Federal Democratic Republic of Ethiopia*, 400 F. Supp. 2d 76, 81 (D.D.C. 2005), *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 98-101 (D.D.C. 2005), and *Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 197 (D.D.C. 2004)); Rosneft Mem. at 21. These cases are not relevant because Plaintiffs' claim is not for the loss or diminished value of ADRs. Rather, Plaintiffs' claim is for the uncompensated taking of Yukos, the company, and the physical assets on which its business was based. These are indubitably tangible property. As this Court recently held in *Gutch v. Federal Republic of Germany*, "[a]lthough stocks themselves are not tangible property, the subject of a foreign government's seizure of a controlling interest in the stock of a company constitutes tangible property under Section 1605(a)(3) because it is the

equivalent to control over the assets and profits of the company."  No. 05-2338, 2006 WL 2075259, at *7 (D.D.C. July 27, 2006) (citation, footnote and quotations omitted).[2]

For the purposes of section 1605(a)(3), a minority shareholder in a company expropriated in this way has a right in property sufficient to invoke application of the exception.  In *Siderman de Blake v. Republic of Argentina*, for example, plaintiffs alleged that the Argentine state seized their company in a sham judicial proceeding and that military officials and the appointed receivers had "extracted funds from [the company], purchased various assets owned by [the company] at sharply discounted prices, and diverted [the company's] profits and revenues to themselves."  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 704 (9th Cir. 1992). The Court of Appeals for the Ninth Circuit ruled that the expropriation exception applied to defeat Argentina's immunity in respect of the claim of a U.S. citizen minority shareholder.  *Id.* at 712.  *See also Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 255 (7th Cir. 1983) (noting in the case of a minority shareholder that all of the elements for application of the expropriation exception were present, except a violation of international law).

These cases are consistent with the long-standing position of the D.C. Circuit that share ownership entails a property interest in a corporation's assets:  "It is settled law that ownership of stock constitutes a specific interest in the corporation's property. . . .  Likewise, this circuit acknowledged in *Nielsen v. Secretary of the Treasury* that shareholders have a property interest

---

[2] As this Court also recognized in *Gutch*, "[t]he Court of Appeals for the District of Columbia Circuit has not determined the bearing of the tangible/intangible property distinction on the court's subject-matter jurisdiction." *Gutch v. Federal Republic of Germany*, 2006 WL 2075259, at *7 n.6 (D.D.C. 2006).  Neither Defendants nor the cases they cite advance a rationale for qualifying the broad language of Section 1605(a)(3) in this seemingly arbitrary manner.  In fact, at its origin the distinction appears to have been borrowed, without justification, from Second Circuit case law applying the Second Hickenlooper Amendment in the context of the act of state doctrine. *See Canadian Overseas Ore Ltd. v. Compania de Acero del Pacifico S.A.*, 528 F. Supp. 1337, 1346 (S.D.N.Y. 1982); *see also West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 830 (9th Cir. 1987) (rejecting the tangible/intangible distinction as applied to the Second Hickenlooper Amendment).

in assets of a corporation." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1518 (D.C. Cir. 1984) (quoting *Nielsen*, 424 F.2d 833, 843 (D.C. Cir. 1970)).  Accordingly, the Court should not hesitate to apply the expropriation exception to the claims by Plaintiff minority shareholders whose property rights in an unlawfully expropriated company and its assets are at issue.

### 2.    Plaintiffs' Property Was Taken in Violation of International Law.

"An expropriation is a violation of international law if the taking is not for public purpose, is discriminatory, or does not provide for just compensation." *Crist v. Republic of Turkey*, 995 F. Supp. 5, 10 (D.D.C. 1998) (citation omitted).  Plaintiffs have alleged that the Russian Federation has taken their property without just compensation.  "It is well settled that such a claim is sufficient for purposes of alleging that the taking violated international law." *Id.* at 11.[3]

Defendants argue that the Court should decline to hear Plaintiffs' claim because they have not exhausted their remedies in the Russian Federation.  *See* Russ. Fed. Mem. at 11-12; Rosneft Mem. at 22.  However, it is well-established that a claimant is not required to exhaust his local remedies where to do so would be futile, a point borne out by the very cases on which Defendants rely.  In *Millicom International Cellular, S.A. v. Republic of Costa Rica*, for example, before holding the expropriation exception inapplicable this Court specifically found that there was "no indication that the Costa Rican court system is not independent or that any efforts to pursue judicial remedies would be futile." 995 F. Supp. 14, 23 (D.D.C. 1998); *see also Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 25 (D.D.C. 2005).  As the Amended Complaint

---

[3] Having established that the property rights at issue here belong to Plaintiffs, none of whom is a Russian citizen, there is no need to address Defendants' meritless argument that the expropriation did not violate international law because it affected only property owned by Russian citizens.  *See* Russ. Fed. Mem. at 11; Rosneft Mem. at 21.

makes clear, the same cannot be said in this case.[4]  *See, e.g.*, Am. Compl. ¶ 156 ("It is well-established among Russia experts and legal scholars that Russian federal prosecutors act at the direction of the Kremlin, and that the Russian executive exercises a firm grip over the country's judiciary."); *id.* ¶ 163 ("President Bush expressed concern that 'it appeared to us – at least people in my administration – that it looked like [Khodorkovsky] had been judged guilty prior to [having] a fair trial'."); *id.* ¶ 167 (quoting the U.S. Senate's conclusion that "the criminal justice system in Russia has not accorded Mikhail Khodorkovsky and Platon Lebedev fair, transparent, and impartial treatment under the laws of the Russian Federation."); *id.* ¶ 215 (the Moscow Arbitration Court "denied Yukos the opportunity to inspect the evidence submitted by the prosecution, thus denying Yukos a meaningful opportunity to present its defense.").  For the same reasons that the Russian Federation does not provide an adequate forum to hear this case, it would be utterly futile for plaintiffs to bring their claim in the courts of that country.  *See* Section III.A.

> **3.    Rosneft, an Agency or Instrumentality of a Foreign State, Is Engaged in Commercial Activity in the United States.**

Neither the Russian Federation nor Rosneft attempts to argue that Rosneft is not engaged in commercial activity in the United States.  *See* Russ. Fed. Mem. at 12; Rosneft Mem. at 22. Indeed, the Amended Complaint contains multiple examples of Rosneft's commercial activity in the United States, all of which may be attributed to the Russian Federation for the reasons discussed in Section I.A.1.  These commercial activities include:

---

[4] Nor are the other cases cited by Defendants to the contrary.  In *Malewicz v. City of Amsterdam*, the Court held that the exhaustion requirement would not apply if operation of the statute of limitations in the alternative forum would bar the plaintiff's claims.  362 F. Supp. 2d 298, 307 (D.D.C. 2005).  In *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) and *Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp. 773 (C.D. Cal. 1996), the claimants did not contend that it would have been futile to pursue local remedies.

- Supplying the U.S. market with oil. In 2006, Rosneft's oil exports to the U.S. market via the tanker station *Belokamenka* alone are expected to amount to some 600,000 tons. Am. Compl. ¶ 122.

- Signing a letter of intent with Marathon Oil Corporation in October 2002, to transport crude oil from the Ural mountains to the United States. Am. Compl. ¶ 123.

- Contracting with a U.S.-headquartered company, Strat Petroleum, to service the YNG oil field, one of the expropriated assets at issue in this case. Am. Compl. ¶ 124.

- Substantial dealings with U.S. companies and significant contacts with the United States dating back to 1993. These dealings and contacts include partnering with ExxonMobil and Chevron Texaco in bidding for exploration rights in the Sakhalin-3 project in Russia, partnering with ExxonMobil in the Sakhalin 1 project; using the Caspian Pipeline operated by a consortium led by Chevron Texaco to transport crude oil (Am. Compl. ¶ 124); and signing a non-disclosure agreement with an Illinois partnership, Chicago International Network, whereby Rosneft sought "advice and assistance" with regard to the potential sale of its securities in the United States and elsewhere. Am. Compl. ¶ 125.

- Repeatedly soliciting investment funds in the United States, including through road shows in 1998 to attract investors in anticipation of its expected privatization, and again in March and April 2006 to promote its planned IPO. In the second of these road shows alone, Rosneft's representatives met with approximately 30 large U.S. banks and funds. Am. Compl. ¶¶ 126-28.

These long-standing and systematic commercial dealings with the United States are more than sufficient to satisfy the jurisdictional nexus required by an expropriation exception. *See Siderman de Blake*, 965 F.2d at 712 (finding the nexus satisfied by solicitation and entertainment of U.S. guests at the expropriated company's hotel in Argentina and acceptance by that hotel of U.S. credit cards and traveler's checks); *Kalamazoo Spice*, 616 F. Supp. at 664 ($4.9 million of sales in the United States and purchasing of supplies from at least one U.S. company).

## C.     Jurisdiction Exists Under the FSIA's Commercial Activities Exception.

The FSIA provides that a foreign state shall not be immune from jurisdiction in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the

> foreign state elsewhere and that act causes a direct effect in the
> United States.

28 U.S.C. § 1605(a)(2).

The Court has jurisdiction in this case under the third clause of this provision. Plaintiffs' claims are based on acts constituting the constructive taking of Yukos which include the illegal acquisition of Yukos assets by Rosneft. As an agent of the Russian Federation, *see* Section I.A.1, Rosneft's acts are attributable to the Federation and were performed in connection with Rosneft's and the Russian Federation's commercial activities in the oil and gas sector. Those acts have caused direct effects in the United States, including non-payment of dividends which, under the terms of Yukos's contract with Plaintiffs, would otherwise have been payable in dollars in this country.

      **1.**    **The Action Is Based on Acts Outside the United States in Connection with Commercial Activity of Rosneft and the Russian Federation.**

Contrary to Defendants' assertions, under D.C. Circuit case law the commercial activities exception may be applied to establish jurisdiction over a foreign sovereign that expropriates property through a combination of sovereign and commercial activity. *Compare* Rosneft Mem. at 17 (claiming that Plaintiffs "cannot rely on the commercial-activities exception for what clearly amounts to an expropriation claim"), *with Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 n.15 (D.C. Cir. 1990) (rejecting defendant's argument that the expropriation exception is the only basis on which a state may be denied immunity from suit for the taking of property: "It is clear that if a proper showing is made, the appellee can rely on the 'commercial activity' exception").

In *Foremost-McKesson*, the D.C. Circuit upheld this Court's reliance on the commercial activities exception to exercise jurisdiction over Iran for a constructive expropriation resulting from government measures to prevent the payment of dividends to an American investor in an

Iranian company.  905 F.2d at 449-50.  In doing so, the Court of Appeals deemed it significant that, rather than issuing a formal declaration nationalizing the company, the Government had allegedly acted through shareholding entities it controlled to lock the plaintiff out of the management of the company.  Notwithstanding Iran's insistence that expropriation is "a governmental act, not a commercial one," the Court of Appeals held that jurisdiction could be based on the commercial activities because some of the alleged acts that provided the basis for the plaintiff's cause of action were commercial in nature.  *Id.*

Similarly here, the Russian Federation simply could have taken Yukos from its owners by means of a decree nationalizing the company.  Instead, it elected to achieve the same result by stealth through a combination of contrived tax and criminal proceedings and commercial acts by state-controlled entities including Rosneft.  Having made that choice, the Federation and its co-defendants must live with the consequence of being subject to this Court's jurisdiction pursuant to Section 1605(a)(2).

The application of the *Foremost-McKesson* rule to this case is entirely in keeping with the statutory language, as a review of the facts alleged in the Amended Complaint makes clear.  The third clause of Section 1605(a)(2) requires that the action be based on acts in connection with the commercial activities of a foreign state.  Some of the principal acts on which this action is based are acts in connection with the commercial activities of Rosneft.  For example, Rosneft's participation in a conspiracy to eliminate Yukos as a competitor for sales of Russian petroleum in the United States and other international markets is quite clearly an act in connection with Rosneft's commercial activities in the oil industry.  Am. Compl. ¶ 1.  The same is true of the acquisition by Rosneft of oil-producing assets formerly owned by Yukos.  *Id.* ¶ 9.  Acts such as conspiring to drive a competitor from a market or acquiring the competitor's assets

at firesale prices are not "conduct peculiar to sovereigns," as Defendants claim.  *See* Russ. Fed. Mem. at 6.  Rather, they are just the type of acts that a private actor might engage in.  *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).  As shown in Section I.A.1, Rosneft acts as an agent of the Russian Federation, and this is true whether or not one pierces the veil between the Federation and Rosneftegaz.  Rosneft's acts in connection with commercial activities are therefore attributable to the Federation.[5]

Defendants' misplaced reliance on *Rong* only underlines the appropriateness of applying the commercial activities exception in this case.  *See, e.g.*, Russ. Fed. Mem. at 5; Rosneft Mem. at 17-18 (quoting *Rong v. Liaoning Province Gov't*, 452 F.3d 883 (D.C. Cir. 2006)).  In *Rong*, the plaintiff complained that a Chinese provincial government had taken his shares, other equity interests, and other property for its own commercial benefit.  The D.C. Circuit found the commercial activities exception inapplicable because, while some of the acts alleged by the plaintiff seemed commercial, in reality they all flowed from a declaration by a government committee asserting that the property in question constituted state assets and demanding that the plaintiff transfer them to the Province.  452 F.3d at 886, 889.  This government declaration of nationalization is precisely what was missing in *Foremost-McKesson* and what is missing here.  This difference, together with the role played by commercial entities acting as agents of the state

---

[5] It is common ground in this case that, prior to June 2005, all Rosneft shares were directly owned by the Russian Federation.  Under *Dole Food*, therefore, Rosneft was an agency or instrumentality of the Russian Federation – and thus fell within the FSIA's definition of a "foreign state" – at all times here relevant prior to June 2005.  *Dole Food*, 538 U.S. at 478.  Most of the Rosneft commercial activities described above – and all of the most important ones – occurred prior to June 2005.  Because Rosneft then fell within the FSIA's definition of a "foreign state," all of those activities constitute "commercial activity of [a] foreign state" for purposes of the FSIA's commercial activities exception.  Thus, even though Rosneft clearly acted (and acts) as Russia's agent, the court need not reach this question in order to conclude that Plaintiffs' action is based upon an act "in connection with a commercial activity of [a] foreign state" and therefore qualifies for the commercial activities exception.

to effect an expropriation, explains why the Court can and should invoke the commercial activities exception to establish jurisdiction in this case.

## 2.    The Acts Caused Direct Effects in the United States.

An effect in the United States is direct for the purpose of Section 1605(a)(2) if it is non-trivial and follows as an immediate consequence of the defendant's activity. *Weltover*, 504 U.S. at 618. In one of its most recent cases applying the commercial activities exception, this Court found the direct effects requirement satisfied where the complaint alleged "shipping and selling petroleum . . . in the United States for [defendant's] commercial profit and depositing the proceeds of these sales to the [defendant's] bank accounts in the United States." *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527, at *5 (D.D.C. Sept. 21, 2006). According to the Court, "*either one of these actions* satisfies the 'direct effect' requirement because the effect 'follows as an immediate consequence of the [defendant's] activity.'" *Id.* (emphasis added) (quoting *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994)). In this case the Amended Complaint alleges that Rosneft supplies the U.S. market with oil, with exports via one tanker station alone expected to amount to some 600,000 tons in 2006. Am. Compl. ¶ 122. As in *Oceanic Exploration*, this is sufficient to establish the requisite direct effect in the United States.

In addition, where a claim involves non-payment of funds, a direct effect exists if "[m]oney that was supposed to have been delivered [in the United States] was not forthcoming." *Weltover*, 504 U.S. at 619 (rescheduling of bond repayments had direct effect in United States where respondents had designated their accounts in New York as the place of payment). *See also Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 896 (5th Cir. 1998) (Bank of China's failure to pay on a letter of credit caused a direct effect in the United States where plaintiff had instructed the defendant to wire payment to its bank account in Houston).

Precisely this sort of direct effect exists in this case because the taking of Yukos from its owners by the Russian Federation had the immediate and non-trivial consequence of halting dividend payments in the United States to Plaintiff ADR holders ("ADR holders").  Am. Compl. ¶ 111 (describing total dividend payments by Yukos of $700 million in 2002 and $2 billion in 2003).  Section 4.01 of the Deposit Agreement by and among Yukos, Bankers Trust Co. of New York as Depositary, and the holders and beneficial owners of ADRs, provides that:

> Whenever the Depositary shall receive any cash dividend or other cash distribution on any Deposited Securities, the Depositary shall . . . convert such dividend or distribution into Dollars . . . and shall distribute the amount thus received . . . as promptly as practicable, to the Holders . . .

Ex. 1, at 13; *see* Am. Compl. ¶¶ 85, 358.[6]  Thus, according to the Deposit Agreement's clear terms, Yukos dividends are payable to ADR holders in the United States.  The taking of Yukos from its owners terminated these dividends.  Am. Compl. ¶ 111 (noting that, following Defendants' assault on the company, Yukos, ceased paying dividends in the fourth quarter of 2003).

The Ninth Circuit faced a similar situation in *Siderman de Blake*, where plaintiffs were owners and shareholders of an Argentine corporation and entitled to receive a share of its profits. 965 F.2d at 711.  The court held that if the corporation was required "to pay those dividends at the shareholder's place of residence, the United States, . . . the direct effect requirement would be satisfied."  *Id.*  The same result obtains in this case, where Plaintiffs were entitled as Yukos

---

[6] "A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction."  *Artis v. Greenspan*, 223 F. Supp. 2d 139, 152 n. 1 (D.D.C. 2002).  "It is likewise appropriate for the Court to consider declarations and other factual materials in the context of defendant's motion to dismiss under the principles of forum non conveniens."  *Croesus EMTR Master Fund L.P. v. Brazil*, 212 F. Supp. 2d 30, 32 n.1 (D.D.C. 2002).

shareholders to receive a share in the company's profits and the Deposit Agreement provided that dividends were to be paid to them in the United States.[7]

## II.     THIS COURT HAS PERSONAL JURISDICTION OVER EACH OF THE DEFENDANTS.

The facts alleged in the Amended Complaint are sufficient to establish personal jurisdiction as to each Defendant and defeat Defendants' motions to dismiss under Rule 12(b)(2). Plaintiff's burden is "only a minimal one," *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 104 (D.D.C. 2002) (citation and brackets omitted), and any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane v. New York Zoological Soc'y,* 894 F.2d 454, 456 (D.C. Cir. 1990). Plaintiffs have established that personal jurisdiction exists under the federal long-arm statute.[8]

### A.     This Court Has Personal Jurisdiction over the Russian Federation, Rosneftegaz, and Rosneft Pursuant to the FSIA.

"The FSIA confers upon district courts subject matter jurisdiction as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity, . . . and personal jurisdiction follows where proper service has been made[.]" *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005) (citations omitted). Since the

---

[7] Indeed, this Court has found a direct effect in the United States arising from non-payment of dividends in much less compelling circumstances than are presented here. *See McKesson Corp. v. Islamic Republic of Iran*, No. Civ. A. 82-220TAF, 1997 WL 361177 (D.D.C. June 23, 1997) (finding that Iran's discontinuation of dividend payments constituted a direct effect on an American plaintiff in the United States, even if the dividends were payable in Iran).

[8] Defendants argument that this Court does not have specific jurisdiction under the District of Columbia long-arm statute is inapposite. *See, e.g.,* Gazprom Mem. at 11-13; Rosneft Mem. at 24. Plaintiffs do not contend that this Court has specific jurisdiction under the District of Columbia long-arm statute. Rather, this Court has general jurisdiction over the non-sovereign Defendants under the federal long-arm statute (as well as RICO and the Securities Exchange Act).

Russian Federation, Rosneftegaz, and Rosneft have been properly served[9] and the Court has subject matter jurisdiction over Plaintiffs' claims under the FSIA, *see* Section I, this Court also has personal jurisdiction over these sovereign Defendants.  *See* 28 U.S.C. §§ 1608, 1330(b).

All of the Individual Defendants[10] acted in their individual capacities.  However, to the extent this Court finds that any of the Individual Defendants acted in their official rather than individual capacities, personal jurisdiction would attach to those Individual Defendants under the FSIA because their immunity rises or falls with that of the Russian Federation, Rosneftegaz, or Rosneft.  *See Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990) ("a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly"); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997) (citing *Chuidian*, 912 F.2d at 109-1103 for the proposition that an individual may qualify as an agency or instrumentality of a foreign state).  If the Court finds that any of the Individual Defendants acted in their official capacities, it need not determine whether the exercise of personal jurisdiction over those Individual Defendants comports with due process. *See TMR Energy Ltd.*, 411 F.3d at 301 ("[i]f the [foreign state] exert[s] sufficient control over the [defendant] to make it an agent of the State, then there is no reason to extend to the [defendant] a constitutional right that is denied to the sovereign itself.").

---

[9] The Russian Federation, *see* Russ. Fed. Mem. at 1, and Rosneftegaz, *see* Rosneft Mem. at 11, concede that they have been properly served under the FSIA.  Rosneft, as an agency and instrumentality of the Russian Federation, *see* Section I.A., also was properly served under the FSIA.  *See* Docket No. 25 (Rosneft Return of Service).

[10] The Individual Defendants are Dmitri A. Medvedev, Alexei B. Miller, Alexei L. Kudrin, Igor K. Yusufov, Viktor B. Khristenko, Sergey Bogdanchikov, Igor Sechin, and Nikolai Borisenko.

**B.    The Federal Long-Arm Statute Confers Personal Jurisdiction over All Non-Sovereign Defendants, and This Court Can Exercise Such Jurisdiction Consistent with the Due Process Clause of the Fifth Amendment.**

Federal Rule of Civil Procedure 4(k)(2), the federal long-arm statute, establishes personal jurisdiction over a defendant for claims arising under federal law where "a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment."[11]  *See Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005).  Plaintiffs have brought three counts under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, two counts under the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. 78a *et seq.*, and one count under federal common law (for expropriation in violation of international law), thus satisfying the federal long-arm statute's requirement that at least one claim arise under federal law.  These federal statutes, which contain nationwide service provisions, also serve as an independent basis for personal jurisdiction over Defendants.[12]  Finally, the federal long-arm statute requires that

---

[11] The D.C. Circuit recently noted that "although courts often assume the minimum contacts test applies in suits against foreign 'persons,' that assumption appears never to have been challenged."  *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 302 n.14 (D.C. Cir. 2005); *see also Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1362 (7th Cir. 1985) (citations omitted) (Posner, J.) ("Countless cases assume that foreign companies have all the rights of U.S. citizens to object to extraterritorial assertions of personal jurisdiction. . . . The assumption has never to our knowledge actually been examined . . .").

[12] Where nationwide service of process is authorized, "due process requires only that a defendant in a federal suit have minimum contacts with the United States."  *Dooley v. United Techs. Corp.*, 786 F. Supp. 65, 71 (D.D.C. 1992) (RICO); *see also Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002) (national contacts test applied in Securities Exchange Act (the "Exchange Act") action).

Given the multiple bases for applying a nationwide minimum contacts test in this case, this Court need not reach the Rosneft Defendants' argument (at 27) that the Exchange Act's venue provisions also must be satisfied in order for the Exchange Act to provide an independent basis for personal jurisdiction based on a nationwide contacts test. Nevertheless, to the extent that this Court determines that the Exchange Act's venue provision is relevant here, this pre-condition of establishing venue under the Exchange Act is easily satisfied.  Plaintiff Jonathan Strong resides in the District of Columbia, and several of Defendants' fraudulent statements – acts constituting violations of the Exchange Act – were published in the *Washington Post*.  *See* Section XI; *see also* Am. Compl. ¶¶ 50, 183, 187-88, 191, 229, 231.

Defendants be properly served.  All Defendants have been properly served, as explained in detail

in Section II.C.  Where, as here, "the defendant contends that he cannot be sued in the forum

state and refuses to identify any other where suit is possible, then the federal court is entitled to

use Rule 4(k)(2)."  *Mwani*, 417 F.3d at 11.

It is well-settled that a court may exercise personal jurisdiction over a defendant where

that defendant "'purposefully directed' [its] activities at residents of the forum."  *Burger King v.*

*Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Keeton v. Hustler Magazine*, 465 U.S. 770, 774

(1984)).  In this case, each Defendant has continuous and systematic contacts with the United

States that allow this Court to exercise personal jurisdiction.  *See Helicopteros Nacionales de*

*Colom., S.A. v. Hall*, 466 U.S. 408, 416 (1984) (jurisdiction is appropriate where continuous and

systematic contacts with the United States exist).[13]

In an attempt to diminish the significance of their ample contacts with the United States,

Defendants mistakenly focus on the physical nature of the contacts.  *See* Indiv. Mem. at 14.  The

Supreme Court has stated that "[j]urisdiction in these circumstances may not be avoided merely

because the defendant did not *physically* enter the forum[.] . . . So long as a commercial actor's

efforts are 'purposefully directed' toward residents of another [forum] we have consistently

rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."

*Burger King*, 471 U.S. at 476-77;  *Mwani*, 417 F.3d at 12-13 (same).

---

[13] The facts presented in *Helicopteros* represent one end of a continuum of minimum contacts where, ultimately, the court failed to find sufficient minimum contacts to exercise jurisdiction.  The case before this Court is distinguishable on several grounds.  First, *Helicopteros* was an examination of contacts under the Texas long-arm statute and did not involve the nationwide contacts test used here.  *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 413 n.7 (1984).  Second, the defendant in *Helicopteros* never sold any product that reached the forum, never solicited business in the forum, and never signed any contracts in the forum.  *Id.* at 416.  As noted elsewhere in this Section, Defendants in this case have had extensive contacts with the United States, including selling product into the U.S. market and soliciting business here – specific contacts that the *Helicopteros* defendants lacked.

It is worth noting that between the filing of the Complaint in this action in October 2005 and the filing of the Amended Complaint in July 2006, Defendants have continued to avail themselves of this forum.[14]  Specifically, they have continued to ship product to the United States, to travel to the United States, to sign agreements with U.S. companies, and to solicit financial assistance from U.S. banks.  This purposeful, continuing contact with the United States is such that Defendants "should reasonably anticipate being haled into court [here]."  *Burger King*, 471 U.S. at 474.

1.    **Gazprom Is Subject to the Court's Jurisdiction Because of Its Continuous and Systematic Contacts with the United States.**

Defendant OAO Gazprom's ("Gazprom") contacts with the United States are hardly "insignificant or sporadic," as Gazprom (at 10) claims.  To the contrary, Gazprom's continuous and systematic contacts with the United States support this Court's exercise of personal jurisdiction over Gazprom.  Non-sponsored Gazprom ADRs have actively traded on U.S. securities markets for nearly a decade.  Am. Compl. ¶ 131.  In April 2006, Gazprom sponsored Level-I American Depositary Receipts in the United States, using the Bank of New York as the depositary bank.  *Id.*  Despite Gazprom's claims to the contrary (at 18), these sponsored ADRs, which trade on U.S. securities markets, alone are sufficient to establish personal jurisdiction.  In *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361 (3d Cir. 2002), defendant Roche sponsored an ADR facility in the United States in the same manner as Gazprom.  The *Pinker* court concluded

---

[14] An Amended Complaint becomes the "operative complaint" and "supersedes" the original complaint.  It therefore follows that personal jurisdiction can be created through contacts alleged before the Amended Complaint is filed. *See Adams v. Quattlebaum*, 219 F.R.D. 195, 197 (D.D.C. 2004); *El-Hadad v. Embassy of United Arab Emirates*, 69 F. Supp. 2d 69, 71 n.1 (D.D.C. 1999); *see also* 6 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1476 (2d ed. 1990) ("Once an amended pleading is interposed, the original pleading no longer performs any function in the case.").  The cases Defendants cite in an attempt to argue that "plaintiffs cannot rely on allegations occurring after October 24, 2005," *see, e.g.,* Gazprom Mem. at 16, do not address a situation such as this one where an Amended Complaint has been filed.

that personal jurisdiction is "appropriate where a foreign corporation has directly solicited investment from the American market. A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court." *Id.* at 371-72.

> The Third Circuit further observed:

> > By sponsoring an ADR, therefore, Roche took affirmative steps purposefully directed at the American investing public. . . . The aim of sponsoring an ADR, after all, is to allow American investors to trade equities of a foreign corporation domestically. Roche, therefore, clearly took "action" – sponsoring an ADR in a deliberate attempt to solicit American capital – "purposefully directed toward the [United States]." *Asahi Metal Indus.*, 480 U.S. at 112.

*Id.* at 371 (emendation in original). Similarly, in *Newport Components, Inc. v. NEC Home Electronics (U.S.A.), Inc.*, the court exercised jurisdiction over a defendant ADR issuer because, "by registering with, and transacting business under the auspices of, the United States Securities and Exchange Commission, [the defendant] has availed itself of the privileges and protections of the United States and its government." 671 F. Supp. 1525, 1539-40 (C.D. Cal. 1987).

As with Roche's actions in *Pinker*, Gazprom has sponsored an ADR facility in the United States, which required Gazprom to deposit shares with a U.S. depositary bank, the Bank of New York, and to enter into a deposit agreement with ADR holders. Am. Compl. ¶ 131. Gazprom thus took affirmative steps purposefully directed at the American investing public in order to solicit U.S. capital. As in *Newport*, there are "obvious benefits the use of ADRs provide to [the issuer], and in light of the fact that these securities are actively traded in the United States, and regulated by federal law, the Court believes it is proper to consider the trading of these securities for purposes of establishing personal jurisdiction." *Newport*, 671 F. Supp. at 1540.

While Gazprom's sponsorship of ADRs is alone sufficient to establish personal jurisdiction, the company has numerous other deliberate, continuous, and systematic contacts with the United States that support personal jurisdiction under the federal long-arm statute. Gazprom's marketing and sales activities extend to the United States, where it has supplied the U.S. market with LNG since September 2005.  As reported by Gazprom:

> In 2005, the company stepped over the Atlantic and entered one of the world's largest liquefied natural gas markets as first tankers with LNG reached the USA. . . . On September 2, 2005, the first tanker with Gazprom's liquefied natural gas arrived at the Cove Point regasification terminal in the USA. . . . A number of Memorandums of Understanding have been signed with such American companies as Chevron, ConocoPhilips, ExxonMobil, and Sempra Energy, which envisage Gazprom participation in projects of LNG regasification in North America, marketing of gas supplies to the USA, and carrying out gas exchange transactions[.] . . . Gazprom['s] strategic goal is to arrange long-term contracts for direct Russian LNG supply to the USA. . . . The target markets for the Russian LNG supply are the Gulf of Mexico and the US East coast.

Am. Compl. ¶ 132 (quoting Gazprom's 2005 Annual Report).  This Gazprom statement completely contradicts Gazprom's assertion (at 14) regarding "its lack of any cognizable connection to the United States."

Although Gazprom did not publicly announce the creation of its U.S. subsidiary until August 2006 (after Plaintiffs filed their Amended Complaint), as early as July 2006 Gazprom created a Houston-based subsidiary, Gazprom Marketing and Trading USA.  Ex. 2 (*Kommersant* report).  As Gazprom itself notes (at 19), having "any offices, property, personnel or assets in the United States" is among "the hallmark indicia of whether general jurisdiction exists."  According to *Kommersant*, Gazprom Marketing and Trading USA is "to manage the regular delivery of liquid natural gas and the purchase of regasification terminals in the United States."  *Id*. Gazprom states on its website that this U.S. subsidiary is "engaged on behalf of OAO Gazprom

in LNG and natural gas marketing operations in the USA as well contribute [sic] to expanding the Group's presence in the USA on a long-term basis."    Ex. 3 (Gazprom webpage).

*Kommersant* reports that Gazprom is planning "to snap up 20% of the [U.S.] market."  Ex. 2.

Further, Gazprom has signed agreements with a number of U.S. companies related to joint development of gas projects in the United States and Russia.  As set forth in the Amended Complaint:

- Gazprom entered into several contracts with Moncrief Oil in Texas for joint development of an oil field in Russia.[15]    Am. Compl. ¶ 133.   In furtherance of these contracts, Gazprom Vice Chairman Boris Yurlov visited Houston in October 2002 for a joint U.S.-Russia Commercial Energy Summit.  *Id.*

- In September 2004, Gazprom signed a memorandum of understanding (MOU) with ChevronTexaco on cooperation in the gas sector pursuant to which Gazprom would participate in a ChevronTexaco-led natural gas-import-terminal project in North America, moving the companies closer to supplying U.S. markets with LNG.  *Id.* ¶ 134.  At the time of signing, Gazprom Chairman, Defendant Alexei B. Miller ("Miller"), asserted: "The signing of the MOU is confirmation of the commercial dialogue between Russia and the United States as well as an example of the cooperation between our two companies.  For Gazprom, access to the American gas market is strategically important, and in addition, we are keen to bring advanced LNG production and transportation technologies to Russia."  *Id.*

- In April 2005, Gazprom signed a MOU with U.S.-based Sempra Energy providing for the importation of Gazprom LNG into Sempra's terminals in Texas.  *Id.* ¶ 135.  At the time of signing, Gazprom Chairman Miller said: "This agreement is an important step in providing Russian gas supply to the U.S. market. Sempra Global is well-positioned as a gas trading and transportation company in the United States and, because they do not intend to enter the production business outside the United States, they make an ideal partner for us."  *Id.*

- In November 2005, Gazprom signed an agreement with Gaz de France to supply LNG to the United States.  *Id.* ¶ 136.

---

[15] Gazprom (at 18) attempts to discount its contacts with Moncrief Oil by noting that a Texas district court found that Gazprom's contacts with Texas were insufficient under the Texas long-arm statute to establish specific jurisdiction for a contractual dispute between Moncrief Oil and Gazprom.  Citing a Fifth Circuit case, the District Court for the Northern District of Texas found it relevant under the Texas long-arm statute that one of the contracts had a choice of law provision providing for arbitration in the Russian Federation.  *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, Civ. No. 4:05-CV-353-Y, slip op. at 13-15 (N.D. Tex. Mar. 21, 2006).  This finding under the Texas long-arm statute has no bearing on this Court's analysis under the federal long-arm statute's nationwide contacts test.

- In June 2006, Gazprom entered into a partnership with Itera, a Florida-registered corporation that trades and produces gas. *Id.* ¶ 137. The deal gives Gazprom a 51 percent stake in the Itera subsidiary Sibneftegas. *Id.*

In addition to its ADRs and its systematic business contacts in the U.S. market, Gazprom also uses U.S. investment banks to manage its public debt issues. In summer 2004, Gazprom used U.S. investment banks to manage a $1 billion bond issue. Am. Compl. ¶ 139. In May 2006, Gazprom revealed plans to issue an additional $500 million in bonds, again using U.S. investment banks to arrange the bond placement. *Id.* As discussed in Section XI, Gazprom also directed fraudulent statements at the U.S. market. *Id.* ¶¶ 142, 147-56, 174-76, 182-95, 223-39, 261-72, 282, 285-86. All of these contacts are activities "purposefully directed" at the United States and, taken together, they are more than sufficient for this Court to exercise personal jurisdiction over Gazprom consistent with due process.

> **2.    Should This Court Decline To View Rosneft as an Agency or Instrumentality of the Russian Federation for Purposes of the FSIA, Rosneft Would Remain Subject to This Court's Jurisdiction Because of Its Continuous and Systematic Contacts with the United States.**

Exercising personal jurisdiction over Rosneft is proper under the FSIA. *See* Section I.A. Even if Rosneft were found to fall outside of the scope of the FSIA, however, Rosneft would still be subject to the Court's jurisdiction because of its continuous and systematic contacts with the United States. Rosneft has ample contacts with the United States and continues to purposefully direct its activities at the United States, giving Rosneft "'fair warning' that [its] activities would 'subject [it] to the jurisdiction' of the United States." *Mwani*, 417 F.3d at 13 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring). Rosneft's contacts include:

- Rosneft's supply of oil to the U.S. market. Rosneft supplies substantial amounts of oil to the U.S. market through its tanker station *Belokamenka*, with 20 percent of *Belokamenka*'s oil delivered to the United States. In December 2005, Rosneft's website confirmed that the *Belokamenka* "allows oil to be delivered to customers in the U.S.A[.]" Rosneft expects to ship more than three million tons of oil to overseas markets via the *Belokamenka* in 2006. Am. Compl. ¶ 122.

- Rosneft also has come to the United States repeatedly to seek investment dollars and has on numerous occasions engaged U.S. financiers in its efforts to raise capital. Rosneft officials traveled to the United States and solicited investment funds in the United States for its initial public offering (IPO). *Id*. ¶ 125-27.

- In February and March 2006, Rosneft's President, Bogdanchikov, and Rosneft's Vice President for Finance, Anatoly Baranovsky, led a delegation that traveled throughout the United States and met with numerous banks and investment funds. Bogdanchikov, Baranovsky, and other Rosneft representatives met with approximately 30 large banks and funds, including pension funds, in the United States to raise capital. A second IPO road show brought Rosneft officials to the United States in early July 2006. *Id*. ¶¶ 125-128.

- Rosneft also sought investment capital in the United States through Russian Federation officials. In April 2006, the Deputy Chairman of the State Duma Committee on Credit Organizations visited the New York Stock Exchange and met with American brokers and investors who were interested in Rosneft's IPO. The First Deputy Chairman of the Central Bank of Russia, Head of the Department for Banking Affairs of the Ministry of Finance, and Department Head of the Ministry of Economic Development and Trade all traveled to New York to support Rosneft's IPO. *Id*. ¶ 128.

- U.S. and other Western banks participated as lead managers in the Rosneft IPO, scheduled for mid-July 2006, and raised more than $10 billion for Rosneft. *Id*. ¶ 127.[16]

- In May 1995, Rosneft signed a three-year non-disclosure agreement with an Illinois partnership, Chicago International Network, whereby Rosneft sought "advice and assistance" with regard to the potential sale of its securities in the United States. *Id*. ¶ 125.

- The Russian Federation also sponsored a "road show" in the United States in June 1998 to attract investors in anticipation of Rosneft's privatization. According to then First Deputy State Property Minister Alexander Braverman, the Ministry for State Property held this road show because "We want to attract Western strategic investors, notably investment banks, to the Rosneft sell-off[.]" Russian Federation officials held meetings in the United States with Dresdner Kleinwort, ING Barings, CS First Boston, Bank of New York, Salomon Smith Barney, SBC Warburg, JP Morgan, Paribas, and other Western banks before deciding not to go forward with the 1998 privatization. *Id*. ¶ 126.

---

[16] Rosneft's assertion (at 28) that "contacts with a forum through the use of financial services are not sufficient to confer personal jurisdiction" is wrong. The case on which Rosneft relies for this proposition, *Siam Kraft Paper Co., Ltd. v. Parsons & Whittemore, Inc.*, 400 F. Supp. 810 (D.D.C. 1975), deals not with financial services but with contacts with the U.S. government. Additionally, cases such as *Biton v. Palestinian Interim Self-Government Authority* explicitly look to the defendant's contacts with U.S. financial institutions as part of a minimum contacts analysis. *See* 310 F. Supp. 2d 172, 180 (D.D.C. 2004) (considering U.S. bank accounts as one relevant contact).

- Rosneft has had continuous dealings with the United States dating back to 1993, including several significant partnerships with U.S. companies. *Id*. ¶¶ 123-24.

- Rosneft partnered with U.S. companies ExxonMobil and ChevronTexaco to submit a winning bid in a 1993 tender for the Sakhalin-3 oil and gas project in Russia. Rosneft also partnered with ExxonMobil and others in the Sakhalin-1 project and with ConocoPhillips in the Polar Lights venture. *Id*. ¶ 124.

- In October 2002, Rosneft signed a letter of intent with U.S. corporation Marathon Oil to transport crude oil from the Ural Mountains to the United States to increase Rosneft's sales to the U.S. market. *Id*. ¶ 123.

- Rosneft contracted with the U.S.-headquartered firm Strat Petroleum in August 2005 to service the YNG oil field. *Id*. ¶ 124.

- Rosneft also made numerous fraudulent statements aimed at the U.S. securities markets, including statements made by the Russian Federation on Rosneft's behalf. *Id*. ¶¶ 148-51, 173-76, 183, 187-92, 194, 226-31, 234-36, 263-66, 282, 285.

These contacts go well beyond the minimum contacts required to exercise personal jurisdiction over Rosneft. In *Mwani*, for example, defendants had far fewer contacts, yet the court still found that it had jurisdiction. The defendants in *Mwani* had shipped a cell phone power supply to the United States, scheduled an interview in Afghanistan through an agent in the United States, transmitted content of an interview to the U.S. public via U.S. media outlets, and had their communications printed in newspapers distributed in the United States. 417 F.3d at 12. Rosneft's shipments of oil to the U.S. market are far more significant than shipping a cell phone power supply to the United States. Indeed, as a supplier of oil to the U.S. market, Rosneft has made itself a substantial player in the U.S. economy that has "purposefully availed itself of the privilege of conducting activities" in the U.S. market. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). As in *Mwani*, Rosneft also has made public statements reprinted and distributed in newspapers in the United States. *See, e.g.,* Am. Compl. ¶ 263.

As noted above, Rosneft also hired at least one U.S. consulting firm, the Chicago International Network, to provide it with strategic advice for the U.S. market. A similar contact

served as a basis for personal jurisdiction in *Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004). In *Biton*, the court found personal jurisdiction over the Palestinian Authority based, in part, on its employment of a U.S. lobbying firm, a telecommunications contract with a Virginia corporation, and its maintenance of bank accounts in New York, among other contacts. *Id.* at 180. As in *Biton*, Rosneft here has had numerous and continuous contacts with U.S. banks, has employed a strategic consulting firm, and presumably has some type of contractual arrangements with U.S. partners that permit it to supply the U.S. market with oil. Rosneft's continuous and systematic contacts with the United States make the exercise of jurisdiction over Rosneft eminently reasonable.

### 3. The Court Has Personal Jurisdiction over the Individual Defendants.

#### a) The Court Has Personal Jurisdiction over Khristenko and Kudrin Because They Were Served in the District of Columbia.

As the Supreme Court made clear in *Burnham v. Superior Court of California*, 495 U.S. 604 (1990), personal service of process within a jurisdiction is sufficient to create personal jurisdiction over an individual. The Supreme Court has held that "jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.'" *Burnham*, 495 U.S. at 619; *see also Kadic v. Karadzic*, 70 F.3d 232, 246-47 (2d Cir. 1995) (effective service of process on foreign government official physically present in New York as a United Nations invitee on official business). As Defendant Viktor B. Khristenko ("Khristenko") and Defendant Alexei L. Kudrin ("Kudrin") were both properly served in the District of Columbia, this Court has jurisdiction over both of them.[17]

---

[17] In addition to valid service in the District of Columbia, Docket Nos. 4 (Khristenko Return of Service) and 10 (Kudrin Return of Service), Kudrin also was served by mail at his place of business in Russia. Docket No. 38 (continued…)

Khristenko and Kudrin argue that personal service while on "diplomatic missions" is ineffective. Indiv. Mem. at 15 n.17.  First, neither Khristenko nor Kudrin provides any support for the assertion that they were on a "diplomatic mission" to the United States.  This is unsurprising when one considers that Khristenko was served while he was in Washington attending a U.S.-Russia Business Council event.  Am. Compl. ¶ 80.  Moreover, in the one case cited by Kudrin and Khristenko, *Republic of Philippines by Central Bank of Philippines v. Marcos*, the court concluded that "whether a diplomatic agent is entitled to diplomatic immunity is a matter for the State Department to decide."  665 F. Supp. 793, 799 (N.D. Cal. 1987).[18]  In that case, the Philippines sent a formal letter to the U.S. State Department requesting "diplomatic immunity" on behalf of the Philippine Solicitor General, and the State Department suggested that immunity from service of process was appropriate.  *Id.*  If Defendants requested such a determination here, their request must have been denied, because there is no State Department suggestion of immunity before this Court.[19]

> **b)     This Court Has Personal Jurisdiction over Yusufov, Bogdanchikov, Miller, Sechin, Borisenko, and Medvedev Based on Their Continuous and Systematic Contacts with the United States and on Their Roles as Co-Conspirators.**

As stated above, the federal long-arm statute gives this Court jurisdiction over all Defendants, including the Individual Defendants.  Under that statute, the minimum contacts

---

(Ex. H).  Khristenko also was served by mail and hand delivery at his places of business in Russia.  Docket Nos. 37, 38 (Exs. K, L).

[18] *See also Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949) (no diplomatic immunity unless State Department grants diplomatic status).

[19] While minimum contacts are irrelevant with respect to Khristenko and Kudrin, both men do have continuous and systematic business contacts with the United States.  Khristenko has visited the United States to discuss the prospects of delivering LNG to the United States and to secure U.S. investment in projects to develop Russia's hydrocarbon transportation infrastructure.  Am. Compl. ¶ 80.  Kudrin has visited the United States on a regular basis since 2001.  Am. Compl. ¶ 78.

analysis focuses on each Defendant's contacts with the United States as a whole such that this Court may exercise personal jurisdiction over a defendant where that defendant "purposefully directed [its] activities at residents of the forum." *Burger King*, 471 U.S. at 472 (quotation omitted). The Individual Defendants' specific jurisdiction analysis (at 13) misses the mark and fails to focus on the continuous and systematic contacts with the United States that should be the focus of this Court's jurisdiction analysis.

Contrary to the assertions of Miller, Bogdanchikov, and Defendant Igor K. Yusufov ("Yusufov") that their contacts with the United States have been minimal or non-existent (Gazprom Mem. at 20; Rosneft Mem. at 28; Indiv. Mem. at 14), these Defendants all have had numerous contacts with the United States that satisfy the "minimum contacts" requirement. Yusufov traveled to the United States in October 2002, when he attended the U.S./Russia Commercial Energy Summit in Houston, Texas, a gathering of U.S. and Russian energy executives. Am. Compl. ¶ 79. Yusufov visited the United States again in May 2003, visiting Washington, D.C., and then Detroit. *Id.* Yusufov also made a fraudulent statement in October 2003 that was directed at the American investing public. Am. Compl. ¶ 173.

Similarly, Bogdanchikov joined Khristenko on a October 2005 trip to Texas and Washington, D.C., to promote Rosneft's commercial oil and gas interests. Am. Compl. ¶ 81. Bogdanchikov also was part of the road show delegation that visited New York to promote Rosneft's IPO. *Id.* In February and March 2006, Bogdanchikov and Rosneft's Vice President for Finance, Anatoly Baranovsky, led a delegation that traveled throughout the United States and met with numerous banks and investment funds. Am. Compl. ¶ 127. Bogdanchikov's contention (Rosneft Mem. at 23) that these contacts cannot be considered by the Court because they happened after the original Complaint was filed has no merit. As explained in note 12,

personal jurisdiction can be created through all contacts alleged in the Amended Complaint, as the Amended Complaint supersedes the original Complaint.

Miller also has had continuous and systematic contacts with the United States. While Miller argues that these contacts must be imputed to Gazprom and not considered in deciding whether there is personal jurisdiction over Miller himself (Gazprom Mem. at 20), such an assertion is false. To be sure, jurisdiction over Miller does not automatically follow from jurisdiction over Gazprom. Miller's own contacts with the United States can nevertheless serve as an independent basis for personal jurisdiction. *See, e.g.*, *Calder v. Jones*, 465 U.S. 783, 790 (1984) (employees are not somehow insulated from jurisdiction by their employers). Miller visited the United States in September 2003 to discuss Gazprom's entry into the U.S. market as a supplier of LNG. Am. Compl. ¶ 77. During this trip Miller also met with officials from the U.S. petroleum companies ConocoPhillips and Syntroleum. *Id.* Miller engaged in another series of meetings in the United States in September 2004, meeting with top executives of U.S. energy businesses and U.S. government officials to plan Gazprom's entry into the U.S. market. *Id.* Miller also signed a memorandum of understanding in Washington, D.C. with ChevronTexaco CEO David O'Reilly, then traveled to New York to have meetings with top officials from ExxonMobil, ConocoPhillips, and Petro-Canada. *Id.*

Miller visited the United States again in April 2005. *Id.* On that visit, he met with U.S. officials to discuss the need for closer business cooperation between Gazprom and U.S. energy firms in marketing Russian gas in the United States. *Id.* As reported by the ITAR-TASS News Agency on April 12, 2005, at the close of the talks, Miller remarked: "Promoting cooperation with U.S. energy companies along the entire LNG business chain, from extraction to marketing, will move the energy dialogue between our firms to a qualitatively new level." *Id.* Miller made

several fraudulent statements aimed at the U.S. securities markets (*Id.* ¶¶ 233, 263, 267-69), as did Defendant Dmitri A. Medvedev ("Medvedev") (*Id.* ¶¶ 151, 194).

This Court also should exercise personal jurisdiction over Sechin, Nikolai Borisenko ("Borisenko"), and Medvedev, even though Plaintiffs do not allege that these Defendants have had physical contacts with the United States. This Court can exercise jurisdiction over Sechin, Borisenko, Medvedev, and all of the Individual Defendants because they are co-conspirators, and an act in furtherance of the conspiracy occurred in the United States. In *Dooley v. United Technologies*, the court concluded that it could exercise jurisdiction over a non-resident co-conspirator based on conspiracy jurisdiction. 786 F. Supp. 65, 78-80 (D.D.C. 1992). Before exercising such jurisdiction, the court determined that it had jurisdiction over one co-conspirator, that plaintiffs had properly alleged the existence of a conspiracy, and that an act in furtherance of the conspiracy had been committed within the forum. *Id.*; *see also DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 20-21 (D.D.C. 2002) (exercising conspiracy jurisdiction). In the case at bar, Plaintiffs have alleged numerous facts showing the existence of a conspiracy involving Sechin, Borisenko, Medvedev, and the other Defendants. *See* Section VIII. One or more Defendants have engaged in acts in furtherance of the conspiracy within the United States. *See id.* Because this Court has jurisdiction over not just one but several of the co-conspirators, it may also exercise personal jurisdiction over Sechin, Borisenko, and Medvedev on the basis of conspiracy jurisdiction.

### 4. For All Defendants, Exercising Personal Jurisdiction Comports with Traditional Notions of Fair Play and Substantial Justice.

As stated above, the federal long-arm statute establishes personal jurisdiction over a defendant for claims arising under federal law where "a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process

Clause of the Fifth Amendment." *See Mwani*, 417 F.3d at 11. Due process requires that "the defendant must (1) purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, and (2) reasonably anticipate being haled into court in the forum state; finally (3) the suit cannot offend traditional notions of fair play and substantial justice. . . ." *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 237 (D.D.C. 2005) (CKK). It has been demonstrated, *see* Section II.B.1-3, that the first two conditions are satisfied with respect to all Defendants. The Supreme Court has defined a defendant's burden in these circumstances;"'Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Mwani*, 417 F.3d at 14 (quoting *Burger King*, 471 U.S. at 476-77) (internal citations omitted). Defendants have not met this burden.

In examining whether notions of fair play and substantial justice block the exercise of personal jurisdiction when the first two conditions stated in *Brunson* have been met, this Court looks at the jurisdiction's interest in adjudicating the dispute, Plaintiffs' interest in obtaining convenient and effective relief, and the burden to Defendants in defending the suit in the United States.[20] *See* 404 F. Supp. 2d at 238. For reasons discussed more fully in Section III, Defendants do not face a significant burden defending this suit here, especially when weighed against the United States' interest in protecting American investors from fraud and theft, and the impossibility of Plaintiffs' obtaining convenient and effective relief in any another forum. For

---

[20] The cases cited by Gazprom (at 22-23) are distinguishable from the case at bar. *See Ellicott Mach. Corp. v. John Holland Party, Ltd.*, 995 F.2d 474 (4th Cir. 1993) (plaintiff could obtain convenient and effective relief in Australia as alternative forum); *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018 (2d Cir. 1997) (minimal interest in adjudicating dispute involving non-resident plaintiffs); *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086 (10th Cir. 1998) (same).

these reasons, this Court should conclude that exercising jurisdiction over all Defendants is not only warranted by Defendants' continuous and systematic contacts with the United States, but also comports with notions of "fair play and substantial justice" under the Due Process Clause of the Fifth Amendment.

### C.    As Required by the Federal Long-Arm Statute, All Defendants Have Been Properly Served.

Kudrin and Khristenko were properly served in the District of Columbia, as described in Section II.B.3.a).  Rosneft, Gazprom, and Miller are the only other Defendants who have made any objection to service of process.  Rosneft (at 25 n.9) objects to service of process under the FSIA because it claims it is not an agency or instrumentality of a foreign sovereign.[21]  However, service on Rosneft under the FSIA was proper because Rosneft is in fact an agent or instrumentality of the state.  *See* Section I; Docket No. 25 (Rosneft Return of Service).  In any event, Rosneft was given actual notice of this suit through service under the FSIA's service provisions.  *See id.*; *see also* 28 U.S.C. §§ 1608(b)(3)(B), 1608(d).  Whether or not Rosneft is an agency or instrumentality of the state or a non-sovereign foreign corporation, such service by mail requiring a signed receipt constitutes valid service.  *See* Fed. R. Civ. P. 4(h)(2) and 4(f)(2)(C)(ii).

Despite Gazprom and Miller's protestations to the contrary, service of Gazprom and Miller also was proper.  Gazprom and Miller rely on a fundamental misreading of the Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention") to argue (at 23) that service in this case must be effected pursuant to the

---

[21] While the Rosneft Memorandum (at 25) provides an unsupported assertion that "Rosneftegaz, Rosneft, Bogdanchikov, and Borisenko have not been properly served," the corresponding footnote (n.9) objects only to Rosneft's service.  Defendants do not even attempt to argue that service of Rosneftegaz, Bogdanchikov, and Borisenko was ineffective.

Convention.  Gazprom and Miller fail to note that it is not possible for plaintiffs in a U.S. action to serve an entity in the Russian Federation under the Hague Convention, because the Russian Federation currently refuses to apply the Convention in relation to the United States.  *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents, Nov. 15, 1965, 658 U.N.T.S. 163, Russian Federation Reservation VIII.[22]  Since the Hague Convention is not an available method of service under Rule 4(f)(1), Plaintiffs served Gazprom by registered mail consistent with Rule 4(f)(2)(C)(ii), as well as through Gazprom Board Member Khristenko.[23] *See* Docket Nos. 5, 25 (Gazprom Returns of Service).  Plaintiffs served Miller at his place of business by hand delivery and by registered mail.  *See* Docket Nos. 37, 38 (Ex. A) (Miller Returns of Service).

---

[22] Russia's Reservation VIII reads:

> The Russian Federation assumes that in accordance with Article 12 of the Convention the service of judicial documents coming from a Contracting State shall not give rise to any payment or reimbursement of taxes or costs for the services rendered by the State addressed.  Collection of such costs (with the exception of those provided for by subparagraphs a) and b) of the second paragraph of Article 12) by any Contracting State shall be viewed by the Russian Federation as refusal to uphold the Convention in relation to the Russian Federation, and, consequently, the Russian Federation shall not apply the Convention in relation to this Contracting State.

Convention on the Service Abroad of Judicial and Extrajudicial Documents, Nov. 15, 1965, 317 12 NBI-CLE 146, 224, Russian Federation Reservation VIII.  Russia will not apply the Hague Convention to states that collect costs for service of process.  Because the United States collects costs for services rendered, the Russian Federation currently does not apply the Convention in relation to the United States.

[23] Gazprom was properly served twice.  Gazprom was served via one of its board members, Viktor Khristenko, on October 26, 2005, while Khristenko was traveling in Washington, D.C. to promote Gazprom's corporate interests. *See* Docket No. 5 (Gazprom Return of Service).  Gazprom also was served by mail requiring a signed receipt.  *See* Docket No. 25 (Gazprom Return of Service).  While Gazprom also received notice of the suit through mail under the FSIA's service provisions, service by mail requiring a signed receipt is valid service for foreign corporations as well. *See* Fed. R. Civ. P. 4(h)(2) and 4(f)(2)(C)(ii).

III.   **THIS COURT IS THE ONLY PROPER FORUM FOR THIS DISPUTE, AND THE EXTRAORDINARY REMEDY OF DISMISSAL UNDER THE FORUM NON CONVENIENS DOCTRINE IS INAPPROPRIATE.**

The pervasive, coordinated attack against Yukos and its owners by the Russian Federation and other Defendants will prevent Plaintiffs from receiving a fair trial in Russia. This prejudice alone renders Russia a wholly inadequate forum for Plaintiffs' claims and precludes dismissal of this case under the forum non conveniens doctrine. "Defendants bear a heavy burden of establishing that plaintiffs' choice of forum is inappropriate and that the action should therefore be dismissed." *Pain v. United Technologies Corp.*, 637 F.2d 775, 784 (D.C. Cir. 1980), *cert. denied*, 454 U.S. 1128 (1981). Defendants fail to meet this burden. This Court is not an inconvenient forum; to the contrary, it is the only forum in which Plaintiffs can receive a fair trial and an adequate remedy for their injuries.

As a threshold matter, it is well established that there is a "strong presumption in favor of the plaintiff's choice of forum[,]" and Defendants must prove that Plaintiffs' choice of forum should be rejected. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254-55 (1981) (defendant bears the burden of proof on all aspects of motion to dismiss on forum non conveniens grounds). Plaintiffs in this case are U.S. citizens whose decision to sue in U.S. federal court must receive considerable deference. *Id.* at 254; *see also MasterCard Int'l Inc. v. Argencard Sociedad Anonima*, No. 01 Civ. 3027 (JGK), 2002 WL 432379, at *6-7 (S.D.N.Y. Mar. 20, 2002) ("The plaintiff's choice is afforded even greater deference, where, as here, an American plaintiff is filing suit against a foreign defendant."). The Rosneft Defendants acknowledge (at 36) that Plaintiffs' choice of forum should receive deference, while at the same time they assert (at 37) that Plaintiffs are "forum shopping." In fact, 40 of the 43 Plaintiffs in this action are U.S. citizens, and one additional Plaintiff has its principal place of business in Chicago, Illinois. Am.

Compl. ¶¶ 12-55.  These Plaintiffs have suffered a significant loss as a result of the unlawful actions of foreign Defendants, and they are entitled to bring their claims in the United States.

Defendants cite cases involving foreign entities bringing suit in the United States, rather than to cases where U.S. investors have filed suit in their home forum.  On these grounds alone, the cases cited by Defendants are easily distinguishable and provide no support for upsetting Plaintiffs' choice of forum.  *See, e.g., Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 694 (S.D.N.Y. 2003) (original suit involved no citizens or residents of the United States), *aff'd*, 98 F. App'x 47 (2d Cir. 2004); *Varnelo v. Eastwind Transport, Ltd.*, No. 02 Civ. 2084 (KMW) (AJP), 2003 WL 23074 (S.D.N.Y Feb. 3, 2003) (Russian widow, residing in Russia, as plaintiff in negligent death claim against Russian ship owner); *Tarasevich v. Eastwind Transport, Ltd.,* No. 02 Civ. 1806 (JSM), 2003 U.S. Dist. LEXIS 12452 (S.D.N.Y. July 21, 2003) (Russian seaman, residing in Russia, as plaintiff in personal injury suit against Russian ship owner); *Pavlov v. The Bank of New York Co.*, 135 F. Supp. 2d 426 (S.D.N.Y. 2001) (Russian investors as plaintiffs against U.S. bank), *vacated*, 25 F. App'x 70 (2d Cir. 2004); *In re Disaster at Riyadh Airport*, 540 F. Supp. 1141, 1144 (D.D.C. 1982) (forum non conveniens motion considered only after all U.S. claims had settled).

With respect to Defendants' forum non conveniens defense, this Court should examine the factors outlined by the D.C. Circuit in *Pain*.  First, a court must determine whether an "adequate alternative forum exists which possesses jurisdiction over the whole case."  *Pain*, 637 F.2d at 784.  A court then considers "all relevant factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum of choice," as well as whether "factors of public interest tip the balance in favor of a trial in a foreign forum."  *Id.* Finally, if the judge determines that a foreign forum is otherwise appropriate, the judge must

"ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice." *Id.; see also El-Fadl v. Cent. Bank of Jordan,* 75 F.3d 668, 679 (D.C. Cir. 1996) (same).

As discussed below, the prejudice that Plaintiffs would face in a Russian court – which is uncontroverted by Defendants – requires the Court to reject Defendants' motions to dismiss on forum non conveniens grounds. While Defendants argue for dismissal on forum non conveniens grounds (Rosneft Mem. at 37-42; Gazprom Mem. at 29-31; Indiv. Mem. at 23-26), they omit any discussion of the serious prejudice that would result if Plaintiffs are forced to bring their claims in Russia – prejudice that would prevent Plaintiffs from receiving a fair hearing on the merits and an adequate remedy.

A.    **No Adequate Alternative Forum Exists, as Plaintiffs Would Face Undue Inconvenience and Prejudice if Forced To Litigate This Action in Russia.**

In this Yukos-related case, the threshold question of whether an adequate alternative forum exists is inextricably linked to the question of whether the trial judge "can ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice." *See Nemariam v. Fed. Democratic Republic of Ethiopia*, 315 F.3d 390, 393 (D.C. Cir. 2003) (quoting *Pain*, 637 F.2d at 784-85). Although courts in this jurisdiction usually analyze the question of prejudice only after the court determines that the balance of private and public interests favors a foreign forum – a determination that Plaintiffs do not concede – in this case, the issue of prejudice proves dispositive.

It is appropriate to consider judicial corruption and bias when examining the adequacy of an alternative forum.[24] *See, e.g.*, *Irwin v. World Wildlife Fund, Inc.*, No. 05-1287 (EGS), 2006

---

[24] Most Circuits engage in a three-prong, rather than four-prong, forum non conveniens analysis, first assessing the adequacy of the forum, and then weighing the private and public factors. In these Circuits, an examination of bias in (continued…)

U.S. Dist. LEXIS 58565, at *10-11 (D.D.C. Aug. 22, 2006) (analyzing allegations of corruption in the Gabonese judicial system as part of the adequate forum determination); *Atl. Tele-Network, Inc. v. Inter-American Dev. Bank*, 251 F. Supp. 2d 126, 137 (D.D.C. 2003) (applying same analysis with respect to Guyana); *see also Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) (noting Eleventh Circuit four-prong test and concluding that the first and fourth prongs "converge" because of compelling evidence of bias in Bolivian court system). Regardless of the private and public interest factors involved here, this case cannot be dismissed on forum non conveniens grounds because Russia is an inadequate alternative forum in which Plaintiffs would face serious prejudice if they attempted to seek relief.

> ### 1.    Russia Is Not an Adequate Alternative Forum Because All Defendants Have Not Conceded That They Are Amenable to Process in Russia, and Plaintiffs' Russian Law Claims Are Not Dispositive.

As an initial matter for the Court's consideration, not all Defendants have conceded that they are amenable to process in Russia. Specifically, the Individual Defendants do not state that they are amenable to process in Russia. *See* Indiv. Mem. at 23-24; *Piper*, 454 U.S. at 254 n.22 (requiring defendant to be "amenable to process" in alternate jurisdiction). It therefore appears that this case cannot be reinstated in Russia against all of Defendants.

Furthermore, while Defendants make much of the fact that Plaintiffs have pled several claims under both U.S. and Russian law, this fact is hardly dispositive of whether this Court should dismiss Plaintiffs' claims on forum non conveniens grounds. *See* Section III.B.2 (citing cases retaining jurisdiction over foreign law claims). Even if Russian law provides a remedy for

---

the alternative forum is part of the "adequacy of the alternative forum" analysis. *See, e.g., Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 423 (1st Cir. 1991) (considering allegations of "profound bias" against Americans and foreign women as part of adequacy of forum determination); *Blanco v. Banco Indus. De Venezuela, S.A.*, 997 F.2d 974, 980-82 (2d Cir. 1993) (considering allegations of bias and corruption as part of adequacy of forum determination); *Rustal Trading US, Inc. v. Makki*, 17 Fed. App'x. 331, 335-38 (6th Cir. 2001) (same).

some of Plaintiffs' claims,[25] this fact alone is not sufficient to establish Russia as an *adequate* alternative forum. As discussed in great detail below, it is simply inconceivable that Plaintiffs could receive a fair hearing on the merits of their Yukos-related claims in Russia. The evidence of pervasive anti-Yukos bias is overwhelming and definitive, requiring this Court to retain jurisdiction over this dispute because of the complete inadequacy of Russia as an alternative forum.

> **2.  Anti-Yukos Bias in the Russian Courts Prevents Plaintiffs from Receiving a Fair Hearing on Their Claims in Russia.**

The Russian authorities, with the assistance of the Russian judiciary, have waged a political campaign against Yukos, people affiliated with Yukos, and even counsel involved in defending Yukos and persons associated with the company. Based on this Yukos-specific animus, ADR holders cannot possibly receive a fair trial in Russia, and Defendants' conclusory arguments that Russia is an adequate alternative forum must fail. Defendants' observations that other U.S. courts have recognized Russia as an adequate forum are of minimal relevance here, as none of those cases included specific allegations of prejudice that Plaintiffs would face if forced to litigate their Yukos-related claims in Russia.

Plaintiffs are not suggesting that this Court engage in a general indictment of the Russian legal system. Rather, courts have routinely held that judicial fora in other countries were inadequate, given specific evidence of prejudice, manipulation by private or public elites, collaboration with the executive, or the potential for physical harm to foreign litigants. *See, e.g., Eastman Kodak* (specific prejudice faced by plaintiffs in Bolivian courts rendered Bolivian

---

[25] Some of Plaintiffs' claims, such as those for insider trading and securities fraud under the Securities Exchange Act, have no counterpart under Russian law. Some of Plaintiffs' other claims arise under both U.S. and Russian law.

courts inadequate); *HSBC USA, Inc. v. Prosegur Paraguay S.A.*, No. 03 Civ. 3336 (LAP), 2004 WL 2210283 (S.D.N.Y. Sept. 30, 2004) (Paraguay an inadequate forum due to the undue influence of wealthy elites over the judiciary).

In *Eastman Kodak*, the court denied a motion to dismiss on forum non conveniens grounds because it found plaintiffs' evidence of bias in the Bolivian courts compelling. The case involved numerous claims arising under Bolivian law as a result of the retaliatory actions taken by the defendant Bolivian company upon termination of its exclusive distributorship agreement with a U.S. corporation. *See* 978 F. Supp. at 1081-82. The Bolivian Minister of Justice himself observed that the courts are influenced by "the intrusion of powerful pressures by political and economic groups," and several experts, the World Bank, and the U.S. State Department all noted the widespread corruption in Bolivian courts. *Id.* at 1085-86. These general claims served as a "backdrop" for plaintiffs' case-specific allegations of influence peddling and spurious criminal charges filed against Eastman Kodak employees, ultimately resulting in one of them serving time in prison, and others being convicted and sentenced in absentia. *Id.* at 1086. The *Eastman Kodak* allegations mirror the facts of this case, where general corruption in the Russian courts – acknowledged by Russia's own officials, *see* Section III.A.3.b.3 – serves as a "backdrop" for pervasive anti-Yukos sentiment that specifically impacts Plaintiffs.

Similarly, in *HSBC*, the district court denied a motion to dismiss on forum non conveniens grounds amidst findings of rampant corruption in Paraguayan courts and specific threats to the safety of an American company's employees and witnesses. *HSBC USA, Inc. v. Prosegur Paraguay*, No. 03 Civ. 3336, 2004 WL 2210283, at *3 (S.D.N.Y. Sept. 30, 2004). The court noted that when performing a forum non conveniens analysis, "the foreign forum cannot be one in which 'the plaintiff [is] highly unlikely to obtain basic justice." *Id.* at *2 (quoting

*Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983), aff'd 767 F.2d 908 (2d Cir. 1985)).   Applying this principle, the court determined Paraguayan courts were inadequate given specific evidence of physical threats and intimidation aimed at HSBC agents in Paraguay, and evidence that political elites controlled the judiciary.   *HSBC*, 2004 WL 2210283, at *3.   As discussed below, the Kremlin's control over the judiciary, as well as likely physical intimidation and bias faced by Plaintiffs in any Russian court hearing their Yukos-related claims, would prevent Plaintiffs from receiving a fair trial in Russia.

The Defendants' reliance on *Base Metal* to support their contention that Russia is an adequate alternative forum is misplaced.[26]   Gazprom Mem. at 30 n.14; Rosneft Mem. at 38; Indiv. Mem. at 24 n.21.   The *Base Metal* court was asked "to accept a mass indictment of the Russian judicial system that [was] not supported by the record."   *Id.* at 709.   In contrast to *Base Metal*, Plaintiffs here provide ample evidence of Yukos-specific bias, intimidation, and undue influence of the Kremlin on the courts, consistent with the facts presented in *Eastman Kodak* and *HSBC* – both of which rejected the adequacy of the alternative forum presented by defendants. The facts described below make plain that Plaintiffs could not bring their claims in Russia with the slightest expectation of basic justice, or of a fair hearing on the merits, due to specific evidence of the Kremlin's influence over the judiciary and specific animus in the Russian legal system against Yukos-related parties and claims.

---

[26] The other cases relied upon by Defendants also can be distinguished on grounds similar to *Base Metal*.  None of the cases included specific allegations of prejudice that would support the conclusion that Russia is an inadequate forum.   The Russian plaintiffs in *Varnelo v. Eastwind Transport, Ltd.*, No. 02 Civ. 2084, 2003 WL 230741 (S.D.N.Y. Feb. 3, 2003), and *Tarasevich v. Eastwind Transport, Ltd.*, No. 02 Civ. 1806, 2003 WL 21692759 (S.D.N.Y. July 21, 2003), did not allege any prejudice in the Russian courts, but instead argued that Russian courts might provide a smaller recovery and that Russian courts might not have jurisdiction over non-Russian defendants, an argument refuted by the defendants.   In *Pavlov v. The Bank of New York Co.*, 135 F. Supp. 2d 426, 433-35 (S.D.N.Y. 2001), the plaintiffs did allege judicial corruption as a reason why Russian courts would be inadequate, but plaintiffs relied on "broad brush, hearsay accounts" of corruption, and attempted to indict the entire judicial system.  *Id.* at 433-34.   The judicial bias at issue in the present case is specific to matters related to Yukos.

### a)    *Prosecution and Intimidation of Yukos Individuals*

The inadequacy of Russia as an alternative forum is perhaps best demonstrated by the arrest, prosecution, and conviction of Mikhail B. Khodorkovsky, CEO of Yukos, in what has been internationally condemned as a politically motivated attack.  Am. Compl. ¶¶ 6, 8, 163, 167; Ex. 4 (BBC report).  Fearing that Yukos might provide unwanted competition to Rosneft and Gazprom, Russian prosecutors, presumably at the behest of the Kremlin, ordered the arrest of Khodorkovsky and Platon Lebedev, Director of GML, ostensibly for tax evasion, theft of state property, and fraud.  Am. Compl. ¶ 146; Exs. 5-6 (*New York Times* and BBC reports).  Khodorkovsky was subsequently held without bail and denied confidential access to his defense counsel.  Am. Compl. ¶ 145; Ex. 6 (BBC report).  After an eleven-month trial, Khodorkovsky and Lebedev were both convicted on charges of tax evasion and fraud, and were each sentenced to nine-year prison terms.

Khodorkovsky's trial and conviction resulted in universal condemnation of Russian judicial procedures in the Yukos-related matter.  President Bush expressed concern that "it appeared to us – at least people in my administration – that it looked like [Khodorkovsky] had been judged guilty prior to [having] a fair trial."  Am. Compl. ¶ 163; Ex. 7, at 3 (White House press conference).  The U.S. Congress voiced similar concerns.  In November 2005, the U.S. Senate passed a Resolution concluding that "the criminal justice system in Russia has not accorded Mikhail Khodorkovsky and Platon Lebedev fair, transparent, and impartial treatment under the laws of the Russian Federation."  Am. Compl. ¶ 167; Ex. 8.  The Senate also observed that "Secretary of State Condoleezza Rice has remarked that the arrest of Mr. Khodorkovsky and the dismantling of his company have 'raised significant concerns' about the independence of the judiciary in Russia."  *Id.*  The Senate called upon the Russian Federation to take action to "dispel

widespread concerns" that the Russian judiciary answers to the Kremlin and is not truly independent. *Id.*

In addition to the persecution of Khodorkovsky and Lebedev, many other individuals with various connections to Yukos have been prosecuted in Russia. This includes everyone from the General Counsel of Yukos to its Director of Human Resources, as well as defense attorneys representing Yukos employees. For example, Alexei Pichugin, Yukos's security manager, was arrested, denied access to counsel, and interrogated with the aid of psychotropic drugs. Am. Compl. ¶ 143; Exs. 9-11 (*Financial Times, Los Angeles Times,* and *Gazeta* reports). Yukos's Director of Human Resources, Anton Zakharov, was arrested in December 2004 and released after two days of interrogation. Ex. 12 (*MosNews* report). In April 2006, just five days after he was appointed Executive Vice President of Yukos, Vasily Alexanyan was arrested and charged with embezzlement and money laundering. Exs. 13-14 (*Kommersant* and *Moscow Times* reports). Despite the white-collar nature of the allegations, Alexanyan was held in solitary confinement for 10 days before being transferred to a regular prison cell, where he remains.

The Russian authorities' campaign against Yukos has extended to the criminal investigation of, and issuance of arrest warrants for, Leonid Nevzlin (former First Deputy Chairman of Yukos), Mikhail Brudno (former First Vice President of Yukos Refining and Marketing), and Vladimir Dubov (major Yukos shareholder and associate of Khodorkovsky). All of these individuals fled Russia fearing politically motivated prosecution of the same type brought upon Khodorkovsky and Lebedev. Am. Compl. ¶¶ 157, 168; Exs. 15-16 (*Washington Post* and *MosNews* reports). Yukos figures located abroad also have been targeted for prosecution. The Russian Federation brought charges against, and sought the extradition of, Yukos Vice President and Board Member Alexander Temerko, along with two other Yukos-

related defendants, Natalia Chernysheva, senior banker for Yukos shareholder GML, and Dmitri Maruev, Yukos's Deputy Chief Accountant, all of whom reside in Britain.  Am. Compl. ¶ 8; Ex. 17 (*Kommersant* report).

Senior District Judge Workman of the Bow Street Magistrate's Court for London refused Russia's extradition requests for Temerko, Chernysheva, and Maruev.  With respect to charges against former Yukos employees Chernysheva and Maruev, Judge Workman found that these prosecutions were "politically motivated" and had been "directed" by Putin.  Am. Compl. ¶ 8; *The Government of the Russian Federation v. Dmitry Maruev and Natalya Chernysheva*, (2005) Bow Street Magistrates' Court (U.K.); Ex. 18, at 3, 5.  Judge Workman held that while

> it must . . . be a presumption that the courts in Russia do exercise judicial independence[,] . . . in respect of this particular case, I am satisfied that it is so politically motivated that there is a substantial risk that the Judges of the Moscow City court would succumb to political interferences in a way which would call into question their independence.  I have therefore after very careful consideration come to the conclusion that a fair trial of these two defendants [Chernysheva and Maruev] is likely to be prejudiced by their political opinions and the opinions of those associated with them.

*Id*. at 5.  Judge Workman based his findings on expert testimony of Professor William Bowring that "the defendants 'would most certainly not' receive a fair trial in Russia."  *Id*. at 5.  Bowring provided Judge Workman with expert findings to the effect that those associated with Yukos were very unlikely to receive a fair hearing in Russia.  Ex. 19, ¶ 15 (Bowring expert report). Judge Workman reached a similar conclusion with respect to Russia's extradition attempt against Temerko.[27]  Judge Workman agreed with Bowring's expert testimony that "it is highly unlikely, if not impossible, for Mr. Temerko to receive a fair trial" in Russia.  Ex. 20, at 7.

---

[27] Judge Workman came "to the conclusion that the motivation for the charges against Mr Temerko are inextricably entwined with the motivation for the prosecution of Mr Khodorkovsky.  I therefore find that the prosecution of Mr Temerko is politically motivated and the request for his extradition is made for the purpose [of] prosecuting or (continued…)

The Council of Europe also has concluded that the attacks against Yukos and its executives were economically and politically motivated. Based on the findings of a Special Rapporteur, former German Justice Minister Sabine Leutheusser-Schnarrenberger, the Parliamentary Assembly of the Council of Europe summarized the Russian Federation's conduct of the criminal proceedings against Yukos officials as follows:

> [T]he findings call into question the fairness, impartiality and objectivity of the authorities, which appear to have acted excessively in disregard of fundamental rights of the defence guaranteed by the Russian Criminal Procedure Code and by the ECHR. . . . The Assembly notes that the circumstances surrounding the arrest and prosecution of the leading Yukos executives strongly suggest that they are a clear case of non-conformity with the rule of law and that these executives were – in violation of the principle of equality before the law – arbitrarily singled out by the authorities. Intimidating action by different law-enforcement agencies against Yukos and its business partners and other institutions linked to Mr. Khodorkovsky and his associates and the careful preparation of this action in terms of public relations, taken together, give a picture of a co-ordinated attack by the state. . . . *[T]he circumstances of the arrest and prosecution of leading Yukos executives suggest that the interest of the state's action in these cases goes beyond the mere pursuit of criminal justice, and includes elements such as the weakening of an outspoken political opponent, the intimidation of other wealthy individuals and the regaining of control of strategic economic assets. . .* [T]he Assembly . . . requests the executive authorities of the Russian Federation to guarantee the full independence of the judicial proceedings against leading Yukos executives from any attempt to influence them and to take measures to stop any such attempt.

Am. Compl. ¶ 6; Ex. 21, ¶¶ 7, 9, 11, 14, 17; Ex. 22 (Council of Europe resolutions and reports) (emphasis added).

---

punishing him on account of his political opinions." *The Government of the Russian Federation v. Alexander Viktorovich Temerko*, (2005) Bow Street Magistrates' Court (U.K.); Ex. 20, at 5.

Foreigners are not exempt from this campaign against Yukos.  In August 2006, with the assistance of the courts and presumably in retaliation for exercising their fiduciary duties to protect Yukos's foreign assets from Russian expropriation, the Russian General Procuracy launched an investigation of embezzlement and money laundering against, and sought extradition of, non-Russians with a connection to Yukos, including U.S. citizens Steven Theede (CEO of Yukos), Bruce Misamore (CFO of Yukos), and David Godfrey (Yukos managing adviser and General Counsel), as well as U.K. citizen Tim Osborne (Managing Director of GML, Yukos's core shareholder).  Exs. 23-24 (Russian Prosecutor General announcement; *Washington Post* report).  Many press stories linked these charges to a Dutch court's decision that angered the Kremlin; namely, that court's determination that it would not recognize the Yukos bankruptcy proceeding in Russia since it had been challenged in the European Court of Human Rights.  Ex. 25 (*Financial Times* report); Ex. 26 (*New York Times* report); Ex. 27, ¶ 13 (Dutch court judgment).

### b)    *Prosecution and Intimidation of Yukos Counsel*

The Russian Federation and its agents also have continually interfered with the right to counsel of Yukos-related individuals, harassing defense counsel for both individuals and the company.  Internal security agents refused to produce a warrant before ransacking the office of Khodorkovsky and Lebedev's counsel, Anton Drel, while Drel was appearing in court on Lebedev's behalf.  Am. Compl. ¶ 158; Ex. 28 (International Commission of Jurists letter to Putin).  The Russian Federation also has taken actions against criminal defense attorneys Olga Artyukhova and Tatiana Akimtseva, Yukos's in-house counsel Dmitry Gololobov, and Yukos's

outside counsel Vyacheslav Patskov.[28]   Am. Compl. ¶ 158; Exs. 11; 31-34 (various news reports).

One of the most prominent human rights lawyers in Russia, Yuri Markovich Schmidt, who served as part of Khodorkovsky's defense team, catalogued his own experience and the experiences of more than 20 outside lawyers harassed, searched, disbarred, expelled, and physically assaulted because of their connection with the Yukos case.  Schmidt concluded:

> We are used to seeing defence lawyers harassed and intimidated in Russia, but the MBK/Yukos case stands in a class of its own when it comes to contempt for defence lawyers and actual attacks on them to control them through intimidation, to extract data from them in defiance of privilege and to serve as a warning to other lawyers in the case. . . . There has been a systematic harassment and intimidation of lawyers acting for Khodorkovsky and of lawyers acting for companies and individuals in the wider MBK/Yukos case.

Ex. 35, ¶ 16, 95.[29]

### c)      *Harassment of Process Server in This Case*

Even in the case before this Court, when Plaintiffs hired a process server to serve the Individual Defendants in Russia, the process server was detained at the airport and followed.  *See* Ex. 36 (Richter Decl., Docket No. 39-2).  As a result, the process server feared for his personal safety.  *Id.* ¶ 8.  The process server was repeatedly photographed, both at the airport and at the hotel where he stayed.  *Id*. ¶¶ 7, 17.

---

[28] One of Yukos's in-house counsel, Svetlana Bakhmina, was held in custody for months before being sentenced to seven years in prison for tax evasion and embezzlement, a sentence length that made her ineligible for an amnesty for mothers with young children despite having two sons, ages four and eight.  Am. Compl. ¶ 158; Exs. 29-30 (*Washington Post* and *Moscow Times* reports).

[29] In the Temerko extradition case described above, Judge Workman similarly found that "there is a clear picture of prevarication and obstruction by the authorities which impinged upon proper preparation of the defence. . . .  I am satisfied that at least some of these lawyers suffered harassment and intimidation."  Ex. 20, at 6, 7.

**d)** **Denial of Due Process for Yukos in Bankruptcy and Other Court Proceedings**

The Yukos bankruptcy proceedings in Russia also demonstrate how Defendants have used the Russian courts to further their own unlawful conduct. In March 2006, a consortium of international banks – acting at the instance of Rosneft – launched involuntary bankruptcy proceedings against Yukos in Moscow. Am. Compl. ¶ 296; Ex. 37 at 3 (*The Business* report). Rosneft promptly paid these banks the full amount owed by Yukos and assumed their position as a principal Yukos creditor. Am. Compl. ¶ 296; Ex. 38 (*Moscow Times* report). With Rosneft at the helm of the involuntary bankruptcy proceedings (Am. Compl. ¶¶ 297-98), Yukos's legitimate management was promptly frozen out of the bankruptcy process. All major decisions regarding Yukos's operations and management, including all asset sales over $1 million, were made by an external manager, Eduard Rebgun, who was appointed by Rosneft, not Yukos. Am. Compl. ¶ 299; Exs. 39-41 (various news reports). Rebgun has acknowledged his close ties to the *siloviki*, or Russian security establishment. Ex. 42 (*Agence France Presse* report).

As reported in the *Financial Times* on June 19, 2006, "State companies can also seek to use a compliant judiciary and tax policy to put pressure on targets." Am. Compl. ¶ 301; Ex. 43. This is exactly what Defendants have done to take Yukos from its owners. As further evidence of the prejudiced nature of the Yukos bankruptcy proceedings, in June 2006, a judge in Moscow's arbitrazh court[30] decided to include an additional $13 billion of back-tax claims in Yukos's creditors' list after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials. Am. Compl. ¶ 300; Ex. 44 (*Reuters* report).

---

[30] "Arbitrazh courts," or "arbitration courts," are the courts of first instance for commercial disputes in Russia.

In late July 2006, Rebgun estimated the value of Yukos at $17.7 billion − 2.3 times less than Yukos management's estimate − even though Rebgun admitted that he did not use market value and had assumed a 40 percent discount because of the necessity of a hasty liquidation.[31] Ex. 46 (*The Business* report).  On August 1, 2006, a Moscow arbitrazh court dutifully declared Yukos bankrupt.  Ex. 47 (Bankruptcy ruling).  Throughout the bankruptcy proceedings, Yukos has been denied a fair hearing and representation of its choosing.

The Kremlin's influence over the courts in Yukos-related claims is further exemplified by the Russian Federal Tax Ministry's removal of judges who ruled in favor of Yukos.  After a judge hearing Yukos's tax appeal failed to reject the appeal outright as requested by the Tax Ministry on grounds that an appropriate person had not signed the appeal, the Tax Ministry demanded – and obtained – the judge's removal.  Ex. 48 (*Wall Street Journal* report).  The judge who replaced her stepped down soon after, citing unspecified "psychological pressure."  Ex. 49 (*Associated Press* report).  A third judge was later relieved from her duties at the insistence of the Tax Ministry after a tax ruling favoring Yukos.  Ex. 50 (*MosNews* report).

*          *          *

The treatment of individuals and counsel related to Yukos, the intimidation experienced by a process server hired in this very case, and the manipulation and lack of basic due process protections that has characterized Yukos-related proceedings all require a finding that Russia cannot serve as an adequate alternative forum for claims such as those here at issue, all of which relate to the taking of Yukos from its owners for the benefit of Defendants.  The more general and pervasive failings of the Russian judicial system, discussed immediately below, serve as an

---

[31] Conveniently, just days before the July 2006 creditors meeting, Russian President Putin signed a law that allowed a creditors meeting to appoint a temporary manager (such as Rebgun) as external supervisor, preventing a company debtor (such as Yukos) from asking for the manager's removal.  Ex. 45, at 2 (*Interfax* report).

important "backdrop" for consideration of this Yukos-specific prejudice and compel this Court to conclude that Russia is not an adequate alternative forum.

        3.      **The Russian Courts Are Unduly Influenced by Russian Elites, Including Defendants, in a Manner That Would Prejudice the Outcome of Any Case Brought by Plaintiffs in Russia.**

        a)      *Russian Courts Are Inappropriately Influenced by the Executive in Yukos-Related Matters.*

Professor William Bowring, who served as an expert witness in the Bow Street Magistrates Court in London, agreed with a May 2004 OECD Report that concluded that, in Russia, "interference in judicial processes by state institutions is also a problem. The courts are often subservient to the executive, while the security services, the prosecutors and the police remain highly politicised. The so-called 'Yukos case' reflects these problems." Ex. 19, ¶¶ 45, 106.

Bowring also described the "unfair treatment" meted out to Yukos-related parties in Russian proceedings: "There are good reasons to believe that the trial court has come under pressure to behave in a manner which favours the prosecution and disadvantages the defence. Moreover, I am led by the facts and matters set out below to conclude that the judicial system in Moscow is structurally biased against defendants such as [the Yukos defendants]." *Id.* ¶ 17.

        b)      *Plaintiffs Cannot Receive a Fair Trial in Russia Because of the Courts' Lack of Independence, Especially in Cases Involving Re-Nationalized Property.*

While Yukos-specific bias is enough to preclude a finding that Russia is an adequate alternative forum, the Kremlin's undue influence on the Russian courts, particularly in cases involving re-nationalized property, also serves as an obstacle to a fair trial. Am. Compl. ¶ 156. U.S. federal courts, U.S. government bodies and officials, legal scholars, and Russian

government officials − including Russian President Vladimir Putin − all agree that Russian courts are beholden to Kremlin interests.

> **(1)   U.S. Courts Have Found a Lack of Judicial Independence When Re-Nationalizations Are Challenged in Russia.**

U.S. courts have concluded that the Russian justice system is subject to undue influence by the Kremlin, particularly when the state seeks to re-nationalize private property.  Am. Compl. ¶¶ 302-09.  In *Films by Jove, Inc. v. Berov*, 250 F. Supp. 2d 156 (E.D.N.Y. 2003), the court concluded that a Russian judgment supporting the re-nationalization of Soviet copyrights should not be acknowledged as valid because there was "specific evidence indicating that the [Russian court's] decision was, in fact, animated by coordinated efforts on the part of the Russian government."  Am. Compl. ¶¶ 307-08; *Films by Jove*, 250 F. Supp. 2d at 196.  The district court relied on testimony that the Russian court's decision was "nonsensical" and "could only have been motivated by the [Russian] court's desire to manufacture an outcome perceived to be favorable to the financial interests of the Russian state."  250 F. Supp. 2d at 198.  Further, the district court agreed with expert testimony that "there was a distortion in this case of the legal framework in favor of the interests of the organs of executive power.   In Russia this phenomen[on] is called 'an ordered judicial decision.'"  *Id.* at 199.

Such "ordered" decision-making by the courts undercuts the independence of the Russian judiciary.  As the court noted in *Films by Jove*, "the judges and staff of the current [Russian] arbitrazh courts are for the most part former employees of the Soviet 'State Arbitrazh,' a system that was designed to resolve disputes between socialist enterprises administratively rather than judicially, with an implied objective of [protecting] the Soviet state's interests."  *Id.* at 206 (quotation omitted).  Further, the district court accepted expert testimony that the "arbitrazh

courts are consistently underfunded and are dependent on budget allotments from the Russian Federation Government," resulting in "bias . . . against private property holders in disputes with the state." *Id.* at 206. The court also credited expert testimony that judges and staff in the arbitrazh courts receive "far greater benefits (such as company cars, summer houses, low-cost vacations at resorts, service in Kremlin hospitals and clinics for themselves and their families, clothing at special tailor's shops, passes to the exclusive cafeteria on Ilyinka street, and apartments) from the hands of officials of the Russian Federation President's Administration," than they do in annual salary.[32] "The court chairmen then use their power over case assignments, promotions, and their distribution of various benefits among lower court judges to influence[] these judges' rulings." *Id.* at 207.

Like the plaintiffs in *Films by Jove*, Plaintiffs in this case will not receive a fair trial in a Russian court. Given the unlawful actions of Defendants, including Defendants' expropriation of Plaintiffs' property, this court cannot expect Russia to serve as an adequate forum for Plaintiffs' claims. It is likely that any Russian judge hearing this case would be "strongly influenced, if not coerced," by Russian government officials seeking to retain the benefits of re-nationalized property. *See id.* at 216.

**(2)    The U.S. Government Has Concluded That Russian Courts Lack Judicial Independence.**

Numerous statements and reports by the U.S. government and U.S. government officials confirm that Russian courts are beholden to the Russian Federation and its interests, especially

---

[32] Defendant Sechin currently serves as Deputy Head of the Presidential Administration, and Defendant Medvedev served as Head of the Russian Federation Presidential Administration from October 2003 to November 2005. Am. Compl. ¶¶ 75, 82.

with respect to Yukos. The State Department's annual *Country Report on Human Rights*, released in March 2006, concluded:

> [T]he judiciary did not consistently act as an effective counterweight to other branches of the government. Judges allegedly remained subject to influence from the executive, military, and security forces, *particularly in high profile or politically sensitive cases*. While judges' salaries have increased significantly, the judiciary remained susceptible to corruption. . . . Judges accepted bribes from officials and others. From 2001 to 2004, 196 judges were fired for unprofessional behavior, 513 received "warnings," 12 were convicted of criminal offenses. One NGO specializing in issues of corruption estimated that in 2005 judges received $209 million (5.9 billion rubles) in bribes annually for favorable rulings. . . . Judicial watchers have alleged that the executive's role in approving and reconfirming judges has ensured an increasingly pro-Kremlin judiciary.

Ex. 51, at 7 (emphasis added). The State Department *Report on Human Rights* is a relevant factor to consider as a "backdrop" for the Yukos-specific bias that is so clearly present in this case. *See Eastman Kodak*, 978 F. Supp. at 1085-86 (giving weight to State Department assessment of widespread corruption in Bolivian courts, along with other evidence of bias against plaintiffs).

Another State Department report, released in January 2006, concluded that Russian courts are "subject to undue influence" from the Kremlin, specifically with respect to Yukos:

> The judiciary remains seriously impaired by a shortage of resources and by corruption and is still subject to undue influence from the executive branch. In September 2004, the Federation Council proposed legislation that would increase presidential control over the judiciary, allowing the president to nominate 10 of 21 members of the Supreme Collegium – who make decisions on appointing judges – and to choose one member himself. . . . *Ongoing legal actions against Yukos, its former CEO Mikhail Khodorkovskiy, and other company officials raise serious concerns about the Russian Government's commitment to promote transparency and rule of law and its willingness to ensure that legal cases are judged fairly and in accordance with due process.* On May 31, Khodorkovskiy was sentenced to nine years in prison for fraud and tax evasion. He had remained in detention since his

- 58 -

> arrest on October 25, 2003. The timing of his arrest, following his
> political activism and negotiations with Western energy companies
> to possibly sell Yukos assets, suggest his arrest and trial were
> politically motivated. In addition, there were concerns about the
> judiciary's lack of independence in its handling of the case and
> allegations of intimidation of witnesses and their family members.

Ex. 52, at 2 (emphasis added).

In its "2006 Investment Climate Statement" for Russia, the State Department reiterated its analysis of executive influence over the judiciary, finding that "Regional and local courts are often subject to political pressure." Ex. 53, at 9.[33]

In Congressional testimony given in February 2006, Assistant Secretary of State Barry F. Lowenkron cited a Freedom House report that found that Putin has "increased the role of the federal security service in governing Russia and arbitrarily wielded the power of state institutions, such as the courts, tax inspectors, and the police for political ends." In the same testimony, Mr. Lowenkron noted the United States' concern about whether "the Russian Government is selectively enforcing the law as a political weapon." Ex. 55, at 3.

The U.S. Congress similarly has recognized that "in cases dealing with perceived political threats to the authorities, the judiciary of Russia is an instrument of the Kremlin and such judiciary is not truly independent." Ex. 8. Yukos is cited as a specific example of this lack of independence. *Id.*; *see* Section III.A.2.a).

### (3) Even Russian Government Officials Have Acknowledged the Courts' Lack of Independence.

Even Russian government officials concede that Russian courts have been co-opted by the Kremlin and its interests. This self-critique of one's own lack of judicial independence was a

---

[33] Similarly, in background information on Russia last updated in July 2006, the State Department observed that in Russia, "many judges still see their role not as of impartial and independent arbiters, but as of government officials protecting state interests. . . . The judiciary is often subject to manipulation by political authorities and is plagued by large case backlogs and trial delays." Ex. 54, at 6.

significant factor in the *Eastman Kodak* court's ultimate finding that Bolivia was not an adequate alternative forum. *See Eastman Kodak*, 978 F. Supp. at 1085-86 (Bolivian Minister of Justice observed that the courts lack independence and are politically influenced). In a recent interview in August 2006, Yuri Chaika, Prosecutor-General of the Russian Federation, acknowledged that the General Procuracy (the government prosecution office whose functions approximate the FBI and the U.S. Department of Justice) often launches "ordered" cases. Ex. 56 (*Gazeta* report). Because courts often act at the behest of the General Procuracy, it is recognized that these "ordered" cases are often initiated by "influential friends" with the cooperation and complicity of the courts. *Id*.

President Putin also has acknowledged the scale and scope of executive influence over Russian courts. In his annual address to the Federal Assembly in 2001, Putin recognized that Russian courts fall far short of delivering justice, stating:

> We are in urgent need today of court reform. The country's judicial system is lagging behind life and in practice is of little help in carrying out economic transformations. For businesspeople and for many others, the courts are not speedy, just, or fair. . . . We have practically reached the dangerous point when judges or other law enforcers can choose the particular law they think most suitable. Along with a shadow economy then, this creates a kind of "shadow justice." . . . This kind of law enforcement clearly also creates huge opportunities for abuses of citizens' rights and freedoms and forms a breeding ground for corruption amongst civil servants. The root of this problem lies in ineffective law enforcement instruments and in the structure of our legislation itself.

Ex. 57, at 3-6.

> **(4)     Legal Scholars Also Recognize That the Russian Judiciary Is Influenced by the Kremlin, Especially When Re-Nationalized Property Is Contested.**

According to scholars, one of the most troubling legacies of the old Soviet system in Russia is the continuing "political dominance of the Russian court system by . . . political

leaders," such as federal officials, regional governors, or ministers of other political subdivisions.[34]  This "political dominance" was known as "telephone justice" during Soviet times, where Communist party officials would call judges and mandate judicial outcomes.[35]

An analysis of the Russian judiciary conducted by The Russian Axis, a London-based NGO, concluded that "administrative pressure on courts is all-embracing when making decisions on legal disputes where the Kremlin or siloviki [Russian security establishment] have a clearly visible interest," especially "[c]riminal cases against prominent politicians and entrepreneurs," "[a]ppeals against actions and decisions by the state," "[t]ax disputes between the state and private companies," and "appeals against actions and decisions by the authorities in the economic sphere."  Ex. 61, at 31.  Thus, in cases where Russian political elites stand to benefit, the Russian judiciary cannot function independently of the executive branch, and therefore cannot provide an adequate forum for foreign plaintiffs.

Scholars also have chronicled how foreigners in particular have a difficult time litigating against entrenched Kremlin-related interests in Russia.  A leading western attorney specializing in Russian law recently noted at an OECD conference that "while Russian law provided for non-discriminatory treatment of foreign investors, 'many foreign investors have found it difficult, if

---

[34] Ethan S. Burger, *Corruption in the Russian Arbitrazh Courts: Will There be Significant Progress in the Near Term?*, 38 Int'l Law. 15, 21 (2004); Ex. 58.

[35] *Id.* (citing Louise L. Shelley, *Putin's Russia: Why a Corrupt State Can't be a Strong State in the Post-Yeltsin Era*, 9 E. Eur. Const. Rev. 12 (2000); Ex. 59, at 3.  Due to the Russian judiciary's lack of independence, the Kremlin often is able to engage in illegal behavior without a proper judicial check, especially when political elites stand to gain financially.  In 2005, for example, a group of Canadian and British owners of a Moscow car dealership were forcibly evicted from their property by security guards sent by the Kremlin property administration without a court order.  Ex. 60 (*Los Angeles Times* report).  The dealership was handed over to a "little-known company with friends at the Kremlin."  *Id.*  When the legality of this action was challenged by one of the Western investors, a Russian official replied that the Kremlin "is above the law − of course above the law."  *Id.*

not impossible, to have their rights recognized, particularly when they find themselves in conflict with a politically powerful or well-connected Russian party.'"[36]

*          *          *

The U.S. government, U.S. courts, Russian government officials, and legal scholars have all concluded that Russian courts are not independent, especially in cases involving re-nationalization of private property, and most especially in cases related to the re-nationalization of Yukos.  This lack of independence, coupled with the specific Yukos-related bias described above, demonstrates beyond any doubt that Russia is an inadequate alternative forum for Plaintiffs' claims, and that Plaintiffs would not have their "day in court" if forced to bring this case in the Russian Federation.  In contrast to the cases relied upon by Defendants in which the plaintiffs made general and conclusory allegations of corruption, Plaintiffs here have provided the Court with specific evidence of the pervasive bias in the Russian legal system against Yukos-related parties and claims, as well as the undue influence of the Kremlin on judges, especially in matters involving expropriated property.  The animus exhibited towards Yukos by the Russian courts weighs decisively in favor of rejecting Russia as an adequate alternative forum.

**B.    The Public and Private Factors Weigh in Favor of Resolving This Dispute in the United States.**

Assuming arguendo that Defendants have met their burden of proving that Russia is an adequate alternative forum, they fail to prove that the private and public factors weigh in favor of resolving this dispute in Russia.  A plaintiff "should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's

---

[36] *See* Burger, at 26 (quoting Jeffrey M. Hertzfeld, *Corporate Governance in Russia: The Foreign Direct Investor's Perspective*, May 31 – June 2, 1999; Ex. 62, at 6).

convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative or legal problems." *Koster v. Lumbermens Mut. Co.*, 330 U.S. 518, 524 (1947); *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (unless balance strongly favors defendant, "plaintiff's choice of forum should rarely be disturbed"). Here, the relative advantages and obstacles to a fair trial weigh in favor of maintaining Plaintiffs' choice of forum in the United States.

### 1. Defendants Have Not Established That the Private Interest Factors Strongly Favor Russia as an Alternative Forum.

Defendants have not shown that Plaintiffs can physically bring their case in Russia given the retaliation against those who have opposed the Russian Federation and supported Yukos. In examining the private interest factors in this dispute, the Court examines the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses … and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Piper,* 454 U.S. at 241 n.6. In this case, Plaintiffs anticipate only a few non-party witnesses that they would want to subpoena. Those few non-party witnesses may include former Yukos executives, including former Yukos CEO Steven Theede and former Yukos CFO Bruce Misamore, both of whom are U.S. citizens and now reside in the United States. These witnesses will be unavailable if this case is brought in Russia, as both men fear arrest and imprisonment if they travel to Russia. Am. Compl. ¶ 168; Exs. 63-64 (Misamore Aff. ¶ 7; Theede Aff. ¶ 7). *Cf. Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1143 (C.D. Cal. 2005) (alternative forum is inadequate where plaintiffs cannot pursue their claims or travel to the foreign forum without fear of retaliation).

The Individual Defendants' assertion (at 25) that the costs of Defendants' travel to the United States "far outweigh[] the inconvenience to private plaintiffs of traveling to Russia to

litigate [their] claims" is disingenuous.  It would be considerably less burdensome and costly for Plaintiffs to travel to the District of Columbia than to Russia for trial.  One Plaintiff, Jonathan Strong, already lives in the District of Columbia.  On the other hand, Defendants, many of whom regularly travel to the United States and the District of Columbia for business, *see* Am. Compl. ¶¶ 75-83, should have little difficulty appearing in the District of Columbia to testify.

Plaintiffs concede that many of the relevant documents in this case will be in Russian. Regarding translation issues, however, given that Plaintiffs are all English-speaking, the private expense of translating documents will be borne by the parties regardless of the forum in which the suit is filed.  Therefore, neither Defendants' travel to the United States nor the need for translation weigh significantly, if at all, in favor of rejecting Plaintiffs' choice of forum.  *See Avianca, Inc. v. Corriea*, No. 85-3277, 1991 U.S. Dist. LEXIS 21622, at *14 (D.D.C. May 31, 1991) ("The court is not deaf to defendant Cornelissen's appeals that trial in this forum may require witnesses to travel from Colombia and translation of some documents. These concerns, while real, do not outweigh the substantial factors favoring trial in this forum.").

Defendants also make much of their financial burden of litigating in U.S. courts. However, "courts must be sensitive to the realities of the plaintiff's position.  An individual . . . is in a very different practical and economic position from a large multinational corporation engaging in a worldwide business."  *See Reid-Walen v. Hansen*, 933 F.2d 1390, 1398 n.11 (8th Cir. 1991) (forum non conveniens doctrine is an instrument of justice that must be sensitive to plaintiff's position).  In this case, Plaintiffs, many of whom lost much of their retirement savings due to Defendants' unlawful actions, face a much greater financial burden litigating in Russia than Defendants face litigating here.

The Rosneft Defendants' assertion (at 38) that "[n]o event relating to any of the claims occurred in the United States," is not only factually incorrect, but relies upon *Nalls v. Rolls-Royce, Ltd.*, 702 F.2d 255 (D.C. Cir. 1983), a dissenting opinion from a denial of rehearing *en banc* that has no precedential value.  In any event, while the majority of the actions alleged in the Amended Complaint took place in Russia, Plaintiffs are holders of U.S. securities governed by a U.S. Deposit Agreement, whose revenue stream is payable in the United States.  Am. Compl. ¶ 111; see also Sec. I.C.2.  This revenue stream was halted when Defendants unlawfully expropriated Yukos.  *Id.*  Additionally, the misstatements and omissions of material fact made by the Fraud Defendants were directed at U.S. securities markets, and all of the statements were reported in the English-language press.  Am. Compl. ¶¶ 142, 147-56, 174-76, 182-95, 223-39, 261-72, 282, 285-86.  Several of these misstatements were reported in the *Washington Post*. Am. Compl. ¶¶ 183, 187-88, 191, 229, 231.

On balance, when the Court weighs all of these private factors, the burdens on Plaintiffs of litigating their case in Russia are considerable and outweigh the burdens of proceeding with Plaintiffs' choice of forum in the District of Columbia.

### 2. Defendants Have Not Demonstrated That the Public Interest Factors Favor Dismissal of This Case.

Defendants also have failed to meet their burden of showing that the public interest factors favor dismissal on forum non conveniens grounds.  When weighing the public factors, a court examines "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law, and the unfairness

of burdening citizens in an unrelated forum with jury duty." *Piper,* 454 U.S. at 241 n.6 (quotation omitted).

The United States has a strong interest in protecting its citizens and holders of U.S. securities from fraud, theft, misrepresentation, racketeering, and conspiracy. The Second Circuit has held that there is a "strong public interest favoring access to the American courts for those who use American securities markets. . . . Moreover, the United States has a strong interest in enforcing its securities laws." *DiRenzo v. Chodos*, 232 F.3d 49, 65-66 (2d Cir. 2000). Here, all of Plaintiffs hold U.S. securities and bring claims of securities fraud under U.S. law. Plaintiffs represent only a fraction of the thousands of U.S. investors injured by Defendants unlawful actions who are not parties to this lawsuit. The interest in having this controversy decided in the United States where so many of those ADR holders reside is strong and weighs in favor of this court adjudicating Plaintiffs claims rather than having a Russian court do so.

Defendants have not alleged that there is any backlog, congestion, or administrative difficulty in this court. This venue also is appropriate because Congress explicitly fixed venue in the District of Columbia for cases when the defendant is a foreign sovereign. *See* 28 U.S.C. §§ 1330, 1391(f)(4).

Finally, U.S. law governs Plaintiffs' RICO, securities fraud, and common-law claims. While Plaintiffs also bring claims under Russian law, questions of Russian law, to the extent a conflict of laws is found, do not pose such an insurmountable burden as to warrant dismissal in this case. Indeed, courts routinely retain jurisdiction over cases involving foreign law. Gazprom (at 31 n.15) cites to *Century Int'l Arms LTD v. Fed. State Unitary Enter. State Corp.*, 172 F. Supp. 2d 79, 94 (D.D.C. 2001), for the proposition that Russian law should be applied in this case. While Plaintiffs believe that at this stage it is inappropriate for the Court to engage in a

conflict of laws analysis, *see* Section VI, it is worth noting that in this same case cited by Gazprom, the District Court for the District of Columbia retained jurisdiction and analyzed Russian law in a case involving a Russian government instrumentality's commercial contracts with the United States. *See id.* at 90-95 (U.S. court retained jurisdiction over Russian law claims in FSIA case and did not resolve conflict of law issue until summary judgment); *United States v. BCCI Holdings (Lux.), S.A.*, 977 F. Supp. 1, 7-12 (D.D.C. 1997) (applying Bangladeshi law to claim against Bangladesh government and instrumentality).   As the Supreme Court noted in *Piper* with respect to the application of foreign law, "this factor alone is not sufficient to warrant dismissal[.]" 454 U.S. at 260 n.29.   In *Transamerica Leasing*, the D.C. Circuit held that "this Court does not consider the burden of applying foreign law to be very significant in relation to the [balancing] test overall."  21 F. Supp. 2d 47, *rev'd on other grounds*, 200 F.3d 843 (D.C. Cir. 2000).   Since the application of foreign law is not a considerable burden and the other factors weigh in favor of the District of Columbia as the proper forum, the public interest factors weigh in favor of this Court retaining jurisdiction over this case.  *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 610 (D.C. Cir. 1982) (forum non conveniens motion properly denied because "the private interest factors counsel that the motion be denied and . . . the public interest factors are in rough balance").

*          *          *

The Supreme Court has held that "[u]nless the balance [of public and private interests] is *strongly* in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508 (emphasis added).   Defendants fail to meet this burden.  Moreover, even if they had, the Yukos-related bias that is pervasive in the Russian judicial system, particularly when viewed in light of persuasive evidence regarding the lack of an independent

judiciary in Russia, leads to the inevitable conclusion that Russia does not provide an adequate alternative forum where Plaintiffs could bring their claims without undue prejudice. This alone precludes dismissal of this case on grounds of forum non conveniens.

## IV. THE ACT OF STATE DOCTRINE DOES NOT REQUIRE THE COURT TO ABSTAIN FROM ADJUDICATING THIS CASE ON THE MERITS.

Defendants mischaracterize the act of state doctrine as an unbending and immutable prohibition on courts adjudicating the merits of disputes involving the acts of foreign sovereigns. *See, e.g.*, Rosneft Mem. at 31-32 (arguing that "plaintiffs' allegations would improperly require an American court to examine the validity of the Russian Federation's alleged taking of property in Russia" and that the case "must be dismissed under the act of state doctrine"). In fact, as the Supreme Court made clear in its landmark ruling defining the modern understanding of the act of state doctrine, it is a flexible doctrine reflecting the separation of powers and designed to prevent embarrassment to the conduct of U.S. foreign relations that might result from judicial rulings on sensitive matters for which international law fails to provide "controlling legal principles." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964). This action, however, raises no issues relevant to the act of state doctrine that cannot be resolved by the application of what are today well-established norms of international law. For this and other reasons, adjudication of Plaintiffs' claims will present no risk of embarrassment to the conduct of U.S. foreign relations, leaving no reason under the act of state doctrine not to adjudicate the merits of this case.

### A. The Act of State Doctrine Does Not Require Abstention in Cases Governed by Settled Norms of International Law.

In *Sabbatino*, the Supreme Court was clear that it did "not believe that [the act of state] doctrine is compelled either by the inherent nature of sovereign authority, or by some principle of international law." *Id.* at 421. Rather, "its continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the

Government on matters bearing upon foreign affairs." *Id.* at 427-28. Specifically, the doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder" the conduct of foreign affairs. *Id.* at 423. From this it followed that "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it." *Id.* at 428. *See also Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995) (noting that the act of state doctrine should be applied only "in a context . . . in which world opinion [is] sharply divided."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 345 (S.D.N.Y. 2003) ("[t]he more clear-cut the alleged violation of international law, the less deference is due to the acts of a foreign sovereign").

In its post-*Sabbatino* decisions, the Supreme Court has continued to warn against mechanical application of the act of state doctrine. *See, e.g., W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990) (reiterating the Court's previous suggestion that "the policies underlying the act of state doctrine should be considered in deciding whether, despite the doctrine's technical availability it should nonetheless not be invoked"). The Court should heed this guidance by declining to invoke the doctrine in this case.

### B. International Law on Expropriation Is Settled and Provides a Rule of Decision in This Case.

Defendants make much of the Supreme Court's conclusion in *Sabbatino* that U.S. courts "will not examine the validity of a taking of property within its own territory by a foreign sovereign government." *See* Gazprom Mem. at 24; Indiv. Mem. at 18 (citing *Sabbatino*, 376 U.S. at 428). Defendants omit, however, the Court's clear statement that it was not "laying down or reaffirming an inflexible and all-encompassing rule in this case." 376 U.S. at 428. The Court's caution in this respect turned out to be prescient. Whereas in 1964 "[t]here [were] few if

- 69 -

any issues in international law . . . on which opinion seem[ed] to be so divided as the limitations on a state's power to expropriate the property of aliens," *id.*, today the principle that a taking absent "prompt, just and effective compensation" violates international law is entirely uncontroversial.

The emergence of this principle as a settled norm of international law since 1964 is reflected in its incorporation in a huge number of bilateral investment treaties between and among both developed and developing countries. *See* Stephen M. Schwebel, *The Influence of Bilateral Investment Treaties on Customary International Law*, 98 Am. Soc'y Int'l L. Proc. 27, 27 (2004) ("Customary international law governing the treatment of foreign investment has been reshaped to embody the principles of law found in more than two thousand concordant bilateral investment treaties."). *See also Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 729 F.2d 422, 426 (6th Cir. 1984) (noting the many treaties requiring "prompt, just and effective compensation" for takings and finding this to be "a controlling legal standard in the area of international law."). Such is "the degree of codification [and] consensus" surrounding this principle today that, properly read, *Sabbatino* counsels adjudication of this case on the merits, rather than the abstention urged by Defendants.

C.    **An Expropriation Is Not Rendered Unreviewable Purely Because It Was Effected by Unlawful Tax Measures.**

Defendants argue that the Amended Complaint's allegations that the Russian Federation's Tax Ministry imposed unlawful taxes are irreconcilable with the act of state doctrine. *See, e.g.*, Indiv. Mem. at 18. However, it is well understood, that, in addition to formal expropriation, "a state may seek to achieve the same result by taxation and regulatory measures designed to make continued operations of a project uneconomical, so that it is abandoned." Restatement (Third) of Foreign Relations Law, Section 712, rep. n.7 (1987). None of the cases

cited by Defendants establishes that there is anything so special about the taxation decisions of foreign governments as to preclude this Court from adjudicating this case in accordance with well-settled norms of international law.  Indeed, in none of these cases was it even alleged that the foreign state had used the tax or other regulatory measure in question to effect a taking of property.  *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002) (making clear that plaintiff challenged the denial of an export license as a breach of contract, not as an expropriatory act); *Riggs Nat'l Corp. v. Comm'r of IRS*, 163 F.3d 1363, 1368 (D.C. Cir. 1999) (applying the act of state doctrine to prevent the IRS from questioning the legality of a foreign state's determination of tax due from a U.S. bank); *United States v. Second Nat'l Bank of N. Miami*, 502 F.2d 535, 545 (5th Cir. 1974) (case involving no foreign sovereign or other foreign entity).

>   **D.     The Executive Branch Has Made Clear That Adjudication of the Merits of This Case Will Not Embarrass the Conduct of Foreign Affairs.**

As shown above, the Judicial Branch's desire not to undercut the Executive Branch's conduct of U.S. foreign affairs is one of the key policies underlying the modern act of state doctrine.  The Executive Branch's attitude toward the prospect of federal courts adjudicating claims against foreign governments is therefore highly relevant to whether the act of state doctrine applies here.  In fact, the Department of State made clear as long ago as 1974 that "in general this Department's experience provides little support for a presumption that adjudication of acts of foreign states in accordance with relevant principles of international law would embarrass the conduct of foreign policy."  Brief for the United States as Amicus Curiae at 49, *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) (No. 73-1288) (appendix containing letter from the Legal Adviser, Department of State, to the Solicitor General).  The Department has subsequently made clear that this general proposition applies in

particular to cases involving takings of property by foreign states.  In a letter to the parties in

*Kalamazoo Spice* the Department "[p]osit[ed] that the mere complication of the United States'

relations with the expropriating state should rarely lead the court to abstain from adjudicating a

dispute."  *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 822 F.2d 230, 234

(2d Cir. 1987) (quoting from the letter).  Indeed:

> the State Department stated that even if it did not issue a . . . letter
> covering the precise situation in a case "[w]hen . . . there is a
> controlling legal standard [of international law] for compensation,
> we believe that the presumption should be that adjudication would
> not be inconsistent with foreign policy interests under the Act of
> State Doctrine."

*Id.* at 234-35.

The relevant controlling legal standard of international law in this case is the requirement

that takings of alien property be accompanied by "prompt, just and effective compensation."

The Court should not hesitate to apply it in adjudicating this dispute.[37]

### E.    The U.S.-Russia Bilateral Investment Treaty of 1992 Also Provides Controlling Legal Principles Permitting Adjudication of This Case Consistent with *Sabbatino*.

If, despite the modern clarity in customary international law on expropriation, the Court

is reluctant to rely on it as a ground for not invoking the act of state doctrine, *Sabbatino* provides

an alternative justification for adjudicating the merits of this case.  Defendants' quotations from

*Sabbatino*'s holding omitted a further important qualification:

> [R]ather than laying down or reaffirming an inflexible and all-
> encompassing rule in this case, we decide only that the Judicial
> Branch will not examine the validity of a taking of property within

---

[37] In view of the separation-of-powers principles underpinning the act of state doctrine in the United States and the clearly expressed view of the Executive Branch that U.S. federal courts should rarely abstain from adjudicating disputes involving expropriations by foreign states, English judicial decisions applying that country's version of the act of state doctrine are of no persuasive value.  Rosneft's reference (at 32) to *Yukos Oil Co. v. Fin. Servs. Auth.*, [2006] EWHC 2044 (admin.) (Q.B.)), is therefore inapposite.

> its own territory by a foreign sovereign government, extant and
> recognized by this country at the time of suit, *in the absence of a*
> *treaty or other unambiguous agreement regarding controlling*
> *legal principles*, even if the complaint alleges that the taking
> violates customary international law.

376 U.S. at 428 (emphasis added).

This so-called "treaty exception" to the act of state doctrine has been recognized and

applied by this and other federal courts.  *See Foremost McKesson, Inc. v. Islamic Republic of*

*Iran*, No. 82-0220, 1989 WL 44086, at *6 (D.D.C. Apr. 18, 1989) ("the Treaty between Iran and

the United States does provide a 'controlling legal standard' within the meaning of *Sabbatino*

and . . . the so-called treaty exception to the Act of State doctrine applies"); *Am. Int'l Group, Inc.*

*v. Islamic Republic of Iran*, 493 F. Supp. 522, 525 (D.D.C. 1980) ("the Act of State Doctrine

does not preclude judicial review where, as here, there is a relevant, unambiguous treaty setting

forth agreed principles of international law applicable to the situation at hand").

The Bilateral Investment Treaty, signed by the United States and Russia on June 17,

1992, provides a controlling legal standard in this case.  "Investments shall not be expropriated

or nationalized either directly or indirectly through measures tantamount to expropriation or

nationalization . . . except . . . upon payment of prompt, adequate and effective compensation."[38]

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, June 17, 1992,

U.S.-Russian Federation, art. III(1), 31 I.L.M. 794 ("U.S.-Russia Bilateral Investment Treaty").

The applicability of this controlling legal standard is in no way lessened by the fact that

the Russian Federation has not ratified the Bilateral Investment Treaty.  First, even without

Russian ratification, this treaty establishes that the executive branches of each government are in

---

[38] As incorporated in the Treaty of Amity between the United States and Iran, this is the same controlling legal
standard the court applied in *Foremost McKesson* and *AIG*.  Treaty of Amity, Economic Relations, and Consular
Rights, Aug. 15, 1955, art. IV(2), 8 U.S.T. 899.

agreement as to the controlling legal standard.  Moreover, the Vienna Convention on the Law of Treaties obliges states "to refrain from acts which would defeat the object and purpose of a treaty" when a state "has signed the treaty or has exchanged instruments constituting the treaty subject to ratification . . ., until it shall have made its intention clear not to become a party to the treaty."  Vienna Convention on the Law of Treaties, May 23, 1969, art. 18, 1155 U.N.T.S. 331. The object and purpose of the Bilateral Investment Treaty is clearly expressed in its first preambular paragraph as being "to promote greater economic cooperation . . . with respect to investments by nationals and companies of one Party in the territory of the other Party."  U.S.-Russia Bilateral Investment Treaty, preamble.  The uncompensated expropriation of property owned by U.S. investors quite clearly defeats this object and purpose.  Moreover, the Russian Federation has not, since 1992, renounced or made clear its intention not to become a party to the U.S.-Russia Bilateral Investment Treaty.  The Federation is accordingly bound by its Article III(1) commitment, which may serve as a controlling legal principle to guide adjudication of the merits of this case.

> **F.    The Second Hickenlooper Amendment Renders the Act of State Doctrine Inapplicable in This Case.**

This Court is statutorily bound to adjudicate this case on the merits.  The Second Hickenlooper Amendment states:

> [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party . . . based upon (or traced through) a confiscation or other taking . . . by an act of that state in violation of the principles of international law, including the principles of compensation . . . .

22 U.S.C. § 2370(e)(2).  *Cf. West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 829 n.8 ("In the context of expropriation claims, Congress has determined both that the courts are competent to resolve such claims . . . and that the relevant content of international law is clear.").

By its plain language, the Amendment applies to this case.  As shown in Section I.B.1, Plaintiffs have a claim of right to property taken from them when the Russian Federation and its instrumentalities expropriated Yukos and its assets.  Moreover, this taking was in violation of the principles of international law and, in particular, the principle of "prompt, adequate and effective" compensation.  *See* Section I.B.2.

Despite the statute's plain language, some courts have read into the Amendment an additional requirement that the property in question be personal property located in the United States.  Notwithstanding an isolated and unreasoned decision of this Court to the contrary, *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83 (D.D.C. 2005), this additional requirement has never been part of the law in this Circuit.  In *Ramirez de Arellano v. Weinberger*, the Court of Appeals for the D.C. Circuit discussed the relevant case law at some length, concluding that "[g]utting the amendment by the addition of external language . . . would be inconsistent" with the purpose of the statute.  745 F.2d 1500, 1541 n.180 (D.C. Cir. 1984).[39]

**G.    Many of Plaintiffs' Causes of Action Do Not Require the Court to Examine the Validity of the Russian Federation's Actions.**

"Act of state issues only arise when a court *must decide* – that is, when the outcome of the case turns upon – the effect of official action by a foreign sovereign."  *W.S. Kirkpatrick*, 493 U.S. at 406.  The Supreme Court has accordingly made clear that the doctrine does not "bar[ ] a

---

[39] Although *Ramirez* was vacated on other grounds because of subsequent legislation, 471 U.S. 1113 (1985), and is not therefore binding on the Court, vacation does nothing to undercut the logic or persuasiveness of the Court of Appeals' opinion on this point.  This is especially so when *Ramirez*'s considered analysis of the statutory language is compared to the uncritical assumption of the contrary position by *Rong*, based on citations to two opinions from other circuits written before *Ramirez* was decided.

court in the United States from entertaining a cause of action that does not rest upon the asserted invalidity of an official act of a foreign sovereign, but that does require imputing to foreign officials an unlawful motivation . . . in the performance of such an official act." *Id.* at 401.

In this case, several of Plaintiffs' causes of action do not rely upon the invalidity of the Russian Federation's actions and therefore raise no issue under the act of state doctrine. Specifically, Plaintiffs' RICO and insider trading claims are brought exclusively against either non-sovereign entities or officials acting in their individual capacities. *See* Am. Compl., Counts IV-XII, at ¶¶ 330-355, 401-408. Moreover, neither these claims nor Plaintiffs' fraud claims (Am. Comp. ¶¶ 356-400) require the Court to consider the legality or otherwise of the Russian Federation's expropriation of Yukos from its owners.[40] They can thus be adjudicated by the Court without declaring the Russian Federation's criminal and tax proceedings against Yukos and its employees "invalid and thus ineffective as a rule of decision for the courts of this country." *W.S. Kirkpatrick*, 493 U.S. at 405.

> **H.     No Other Prudential Considerations Bar Adjudication of the Merits of This Case.**

Having established that the act of state doctrine need not be invoked in this case, the Court should not hesitate to reject the duplicative arguments advanced by Gazprom and the Individual Defendants for declining to adjudicate the merits of this case on either political question or international comity grounds.

---

[40] For example, even if, contrary to fact, the tax assessments against Yukos had been consistent with Russian tax law, the RICO defendants still would have been acting unlawfully under color of authority because those assessments were motivated not by a proper desire to enforce the tax laws, but by an improper desire to enforce the tax laws selectively for the purpose of taking over Yukos in violation of 18 U.S.C. § 1962(b).

1.    **The Political Question Doctrine Does Not Render This Case Non-Justiciable.**

Defendants misstate the law in their attempt to inflate the political question doctrine into a virtual prohibition on courts hearing cases implicating foreign affairs. *See, e.g.*, Gazprom Mem. at 25 ("In cases like this, where U.S. foreign relations with another country is [sic] in issue, courts lack jurisdiction to hear the case.")  As the Supreme Court made clear in its most authoritative modern decision interpreting the doctrine, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962).  *See also Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 934 (D.C. Cir. 1988) ("the doctrine's shifting contours and uncertain underpinnings make it susceptible to indiscriminate and overbroad application to claims properly before the federal courts.") (quotations omitted).  Having satisfied the requirements of the FSIA and the act of state doctrine, the Court may justifiably consider redundant any further analysis of the Amended Complaint under the political question doctrine.  *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 798 n.30 (D.C. Cir. 1984) (Edwards, J., concurring) (noting that the FSIA and act of state doctrine "delimit[] the scope of necessary judicial restraint in cases involving foreign affairs" and declining "to fashion yet another doctrine of nonjusticiability").

Almost all of the modern cases cited by defendants invoking the political question doctrine involved frontal assaults on Executive Branch foreign or defense policymaking.  *See, e.g.*, *Haig v. Agee*, 453 U.S. 280 (1981) (challenge to the Secretary of State's decision to revoke the passport of a former CIA officer who had exposed confidential information);  *Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006) (challenge to the relocation of island populations by U.S. forces to make way for a U.S. military base); *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) (challenge to alleged U.S. encouragement and support for a coup d'etat in Chile).  By

contrast, the plaintiffs in this case are not attacking the foreign or defense policy of the United States, but are rather seeking relief for injuries received as a result of actions by a foreign government, the legality of which has already been questioned by Executive Branch officials. Am. Compl. ¶ 5.

In *Vine v. Republic of Iraq*, this Court rejected the defendant's argument that the case presented a non-justiciable political question because "any decision to award plaintiffs compensation would undermine the efforts of the President and Congress to create a stable Iraq." No. 01-02674, 2006 WL 2583696, at *6 (D.D.C. Sept. 7, 2006). The Court reasoned: "This case does not require an evaluation of any executive or congressional policy decision or value judgment. Rather, it involves the liability of a foreign sovereign under a well-defined statutory scheme." *Id.* Similarly, Plaintiffs here are not challenging any executive or congressional policy decision or value judgment and, insofar as they ask the Court to impose liability on foreign sovereign defendants, seek only the application of well-defined standards of international law.

This case implicates none of the *Baker* factors: specifically, it does not require the Court to second guess U.S. foreign policy, or to express a lack of respect for coordinate branches of government or to resolve a dispute in the absence of judicially discoverable and manageable standards. *See Baker*, 369 U.S. at 686. The connection to U.S. foreign policy is indirect at most, and "[a]ttenuated connections to foreign affairs do not prevent judicial review." *Bancoult*, 445 F.3d at 435. As in *Vine*, the Court should reject Defendants' suggestion that the case presents a non-justiciable political question.

> ## 2. International Comity Does Not Provide a Separate Ground for Dismissal.

Similarly, the comity arguments advanced by Gazprom and the Individual Defendants are either redundant or inapposite. As the passage Gazprom quotes from *Sabbatino* suggests, to the

extent comity considerations are relevant, the Court has already weighed them as part of its FSIA and act of state doctrine analyses.  *See* Gazprom Mem. at 26.

For the rest, both Gazprom and the Individual Defendants rely heavily on selective quotation from cases dealing with the recognition and enforcement of foreign judgments by U.S. courts.  *See, e.g., id.*; Indiv. Mem. at 21-22 (quoting *Medellin v. Dretke*, 544 U.S. 660, 670 (2005) (Ginsburg, J., concurring) ("where comity of the nation calls for recognition of a judgment rendered abroad, the merits of the case should not be tried afresh") (quotations omitted).  This avails Defendants nothing.  First, this case does not involve recognition or enforcement of a judgment in the formal sense discussed in *Medellin* and the other sources Defendants cite.  Second, if it did, the Court would be bound to take notice of the factors determining *whether* "comity of the nation calls for recognition of a judgment rendered abroad." These are set out at some length in the very passage from which Justice Ginsburg was quoting in *Medellin* :

> [W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895).  *Accord Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 594 (5th Cir. 2003).

The Amended Complaint makes clear that the Russian judicial proceedings against Yukos suffered from many of the infirmities described by the Supreme Court in the passage

above. *See, e.g.,* Am. Compl. ¶ 163 (reporting President Bush's concern that Khodorkovsky "had been judged guilty prior to [having] a fair trial."); *id.* ¶ 167 (quoting the U.S. Senate's conclusion that "the criminal justice system in Russia has not accorded Mikhail Khodorkovsky and Platon Lebedev fair, transparent, and impartial treatment under the laws of the Russian Federation."); *id.* ¶ 215 (the Moscow Arbitration Court "denied Yukos the opportunity to inspect the evidence submitted by the prosecution, thus denying Yukos a meaningful opportunity to present its defense."); Sec. III (discussion of forum non conveniens factors).  In effect, therefore, Defendants are asking this Court not to question judicial decisions of the Russian Federation that the Court would refuse to enforce if judicial enforcement were sought in this country.  If anything, Defendants' authority stands for the proposition that these decisions should be ignored because of the manifest failure of Russian authorities to respect basic standards of judicial fairness, and that this Court is free to reexamine the issues adjudicated by them.

## V.     PLAINTIFFS HAVE STANDING TO BRING THE CLAIMS SET FORTH IN THE AMENDED COMPLAINT.

Defendants' various challenges to Plaintiffs' standing are meritless, resting as they do on the same mischaracterization of the Amended Complaint as their flawed argument for applying sovereign immunity.  *See* Rosneft Mem. at 33-36; Gazprom Mem. at 27-29; Indiv. Mem. at 27, 50.  According to Rosneft, for example, "[t]he entire basis for plaintiffs' alleged damages is that Yukos suffered damage . . . and that plaintiffs' ADRs consequently decreased in value."  Rosneft Mem. at 34.  Based on this distorted reading, Defendants argue that plaintiff's injury is insufficiently direct to satisfy the Article III standing requirements.  *Id.* at 33-34.

In fact, as the Amended Complaint makes amply clear, plaintiffs seek recovery for the uncompensated taking of the Yukos Oil Company and the physical assets on which its business was based.  *See* Section I.B (Am. Compl. ¶¶ 1, 10, 411).  As individuals whose ownership rights

in the company have been expropriated by Defendants, Plaintiffs have suffered a direct injury to their property rights more than sufficient to establish standing.  Indeed, courts in this circuit and elsewhere frequently recognize the standing of expropriated shareholders to seek recovery for the uncompensated taking of the company in which they hold an ownership interest.  *See, e.g.*, *Foremost McKesson, Inc. v. Islamic Republic of Iran*, No. 82-0220, 1989 WL 44086 (D.D.C. Apr. 18, 1989) (plaintiff alleged the constructive taking of its ownership interest in a dairy after the government of Iran prevented it from receiving dividends); *see also Siderman de Blake*, 965 F.2d 699 (plaintiffs alleged the expropriation of a company in which they were shareholders, after it was seized by the Argentine military in a "sham judicial intervention"); *Kalamazoo Spice*, 616 F. Supp. 660  (plaintiff alleged that Ethiopia had expropriated control of the assets and profits of the corporation in which it had previously been the majority shareholder).

Gazprom's challenge to Plaintiffs' standing under Russian law is similarly flawed. Gazprom Mem. at 27.  Plaintiffs are pursuing their claims as directly injured parties and not derivatively on behalf of the corporation.

## VI.    THE COURT NEED NOT DETERMINE AT THIS STAGE WHAT LAW WILL APPLY TO THE COMMON-LAW CLAIMS.

Notably, nowhere in their more than 200 pages of briefing do any of Defendants challenge the sufficiency of the pleadings as to the Russian law claims, which must accordingly survive their various motions to dismiss.  Rosneft's argument that the state common-law claims should be dismissed because they are governed by Russian law is, however, premature.  Rosneft Mem. at 61.  The inclusion of Russian law claims in the Amended Complaint conforms with the requirement of Rule 44.1 that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable notice."  Fed. R. Civ. P. 44.1. Pleading state and foreign law claims in the alternative in a complaint is "reasonable" and

"satisf[ies] the notice requirements of Rule 44.1." *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 586 (2d Cir. 2005). "The function of the notice is not to spell out the precise content of foreign law but rather to inform the court and litigants that it is relevant to the lawsuit." CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2443 (2d ed. 1994).

The Court need only conduct a choice of law analysis if it finds that the District of Columbia and Russian laws in question will produce different outcomes on the same facts. *See Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 847-48 (D.D.C. 1996). As Rosneft indicates, if the Court decides that such an analysis is required, it will need to make a series of complex judgments to determine which law applies, including evaluating the governmental policies underlying the applicable laws. Rosneft Mem. at 62. In deciding these issues, the Court will benefit from the kind of expert testimony that is commonly offered subsequent to the pleading stage to assist in determining the content of foreign law. *See, e.g.*, *Minebea Co. v. Papst*, No. 97-0590, 2006 WL 2374458, at *99 (D.D.C. Aug. 17, 2006); *Thomson Consumer Electronics, Inc. v. Innovatron, S.A.*, 3 F. Supp. 2d 49, 52 (D.D.C. 1998). A rush to judgment without the benefit of this additional testimony, as Rosneft advocates, is both inappropriate and unnecessary. *See Munusamy v. McClelland Engineers, Inc.*, 590 F. Supp. 891, 892 (E.D. Tex. 1984) ("the postponement of a choice of law until trial is not significant.").

## VII.    THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR CONVERSION.

As previously shown, Defendants' standing and choice of law challenges to the common-law conversion claim in Count I have no merit. Nor do any of their residual objections. The Amended Complaint properly states a claim for conversion: Defendants have unlawfully taken

the Yukos Oil Company, with all of its assets, from Plaintiffs and continue to exercise control over this property in denial of Plaintiffs' rights.

As shareholders in Yukos, plaintiffs have property rights in the company and its assets. "It is settled law that ownership of stock constitutes a specific interest in the corporation's property." *Ramirez*, 745 F.2d at 1518. *See also* Sec. I.B.1.[41]  In the normal course of business, a shareholder would ordinarily vindicate such rights by suing derivatively for injuries sustained by the corporation. *See Labovitz v. Washington Times Corp.*, 172 F.3d 897, 901 (D.C. Cir. 1999). However, "[a] shareholder who suffers an injury peculiar to itself should be able to maintain an individual action, even though the corporation also suffers an injury from the same wrong." *Id.* (quoting *Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del. 1986)).  Where, as here, the corporation itself has been taken from its owners, the injury sustained by the shareholders is distinct from any injury to the corporation and an individual action is appropriate.

Plaintiffs' property rights in the corporation are properly the subject of a claim for conversion.  Defendants' scheme to expropriate Yukos by unlawfully seizing control of the company constitutes a deprivation of tangible property because it has eliminated any control plaintiffs formerly had over the assets and property of the company.  *See Gutch v. Federal Republic of Germany*, No. 05-2338, 2006 WL 2075259, at *7 (D.D.C. July 27, 2006) ("although stocks themselves are not tangible property, the subject of a foreign government's seizure of a

---

[41] The cases cited by Defendants are not to the contrary.  *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 786 (D.C. Cir. 1998) stands for the limited and distinguishable proposition that a corporate parent cannot generally be held liable for injuries sustained to the property of a wholly-owned subsidiary.  Rosneft's selective quotation from *Hutchings v. Manchester Life and Casualty Management Corp.*, 896 F. Supp. 946, 947 (E.D. Mo. 1995) obscures the fact that the court there was expressly describing Missouri law only.  None of the other cases cited by the Individual Defendants as holding that shareholders lack standing to assert claims for conversion of corporate assets even involved conversion claims.  *See Labovitz v. Washington Times Corp.*, 172 F.3d 897, 904-05 (D.C. Cir. 1999) (conspiracy to injure plaintiffs' business and property interests"); *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984) (improper management of a corporation); *In re U.S. Office Products Sec. Litig.*, 326 F. Supp. 2d 68, 82 (D.D.C. 2004) (breach of contract).

controlling interest in the stock of a company constitutes tangible property under Section 1605(a)(3) because it is the equivalent to control over the assets and profits of the company"). This taking of Plaintiffs' tangible property satisfies the element of the tort of conversion requiring unlawful dominion over the personal property of another. *See Equity Group v. PaineWebber Inc.*, 839 F. Supp. 930, 933 (D.D.C. 1993) (listing elements).

Even if ownership interests in Yukos were intangible property interests not properly described as personal property, plaintiffs would still be entitled to bring a conversion claim because those interests constitute "intangible rights which are customarily merged in, or identified with some document." *Id.* Specifically, Plaintiffs' rights to share in the control and profits of Yukos, which together form the bundle of rights associated with an ownership interest in a corporation, are identified with the ADRs they hold.[42]

The element of conversion requiring an "unlawful" exercise of ownership, dominion, or control over the property of another is satisfied because, as the Amended Complaint makes clear, Defendants expropriated Yukos from its rightful owners in violation of both international law and Russian law.  See Am. Compl. ¶ 1 (referring to "the expropriation of Yukos without payment of any compensation to its owners."); *id.* ¶¶ 409-14 (stating a claim for expropriation in violation of international law); *id.* ¶ 2 (referring to the Russian Federation's "illegal and confiscatory tax levies").

---

[42] Even if plaintiffs did not possess ADRs, "[a]ctions for conversion may properly be brought for a wrongful taking over of intangible interests in a business venture." *In re Estate of Corbin*, 391 So. 2d 731, 732 (Fla. App. 1980); *see also Miller v. Rau*, 216 Cal. App. 2d 68, 76 (Cal. App. 1963) (action for conversion appropriate where members of a joint venture appropriate the venture's assets to their own use to the exclusion of another venturer).

Plaintiffs' unlawfully expropriated property is currently under the control of Rosneft and the Russian Federation.[43]   The Russian Federation has controlled Yukos since its seizure of a majority of the common stock of the company.   *See* Am. Compl. ¶ 182.   It exercises an additional element of control as a result of the involuntary bankruptcy proceedings in Russia orchestrated by Defendants, in the course of which the company has been placed under the supervision of an external manager selected by Rosneft.  *Id.* ¶ 299.  Rosneft itself now owns and operates YNG, formerly Yukos's most productive asset, as a result of the illegal and rigged auction conducted by the Russian Federation on December 19, 2004.  *Id.* ¶ 284.

Notwithstanding the protestations of Gazprom, Miller, and the Individual Defendants that they do not currently possess the converted property (Gazprom Mem. at 65, Indiv. Mem. at 50-51), each of these Defendants is vicariously liable for the substantive tort of conversion by reason of their participation in the conspiracy to commit common-law conversion described in Count III of the Amended Complaint.  *See Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946) (conspirators are liable for the substantive offenses committed by their co-conspirators in furtherance of the conspiracy); *Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 103 (3d Cir. 1993) (in a civil conspiracy "every conspirator is jointly and severally liable for all acts of co-conspirators taken in furtherance of the conspiracy"); *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. cir. 1983) ("conspiracy . . . is a means for establishing vicarious liability for the underlying tort.").

---

[43] As shown at Section I.A, Rosneft serves as an agent of the Russian Federation.  Its control of converted property is therefore attributable to the Federation.

## VIII.  THE AMENDED COMPLAINT STATES A CLAIM FOR CONSPIRACY TO COMMIT CONVERSION.

Defendants' argument that there is no independent cause of action for civil conspiracy in the District of Columbia, and therefore that Count III cannot survive dismissal of the conversion claim, is redundant.[44]  *See* Rosneft Mem. at 70; Gazprom Mem. at 65; Indiv. Mem. at 51.  As shown above, the Amended Complaint properly states a claim for conversion, to which the claim for conspiracy to commit common-law conversion is the well-pled counterpart.

In addition, Rosneft and Gazprom argue that the Amended Complaint fails properly to allege an agreement between Defendants.  *See, e.g.*, Gazprom Mem. at 65-66.  The Court should discount this argument to the extent that it relies on inapposite case law applying a heightened standard of pleading.  *See* Rosneft Mem. at 70 (citing *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987)).[45]  *See also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993) (making clear that special pleading requirements are limited to specific types of allegations such as fraud or mistake under Rule 9(b), and that allegations regarding all other matters need only meet the "short and plain statement" requirement of Rule 8(a)).

In reality, the Amended Complaint is more than sufficient to meet the Rule 8(a) standard.  Count III expressly alleges that Defendants "pursuant to an actual or tacit agreement and/or

---

[44] The Gazprom Defendants cite *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1483 (D.C. Cir. 1989), in support of this proposition.  All *Riddell* stands for is the unremarkable proposition that a conspiracy to commit some wrong cannot exist apart from the actual commission of the wrong by one or more of the conspirators.  "Under both federal and District of Columbia law, civil conspiracy is not actionable in and of itself. . . .  Rather, its purpose is to serve as a device through which vicarious liability for the underlying wrong may be imposed upon all who are a party to it, where the requisite agreement exists among them."  *Id.*

[45] Rosneft again misstates the law by selective quotation.  Read in context, it is clear that the passage Rosneft cites from *Martin* is applying a heightened pleading standard used by the D.C. Circuit in the very specific circumstance of a damages action against a U.S. government official.  *See Martin*, 830 F.2d at 254.

understanding, conspired to unlawfully convert property, namely, Yukos." Am. Compl. ¶ 326.

*See Halberstam*, 705 F.2d at 477 ("Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement."). The remainder of the Amended Complaint contains ample facts from which the Court could infer an actual or tacit agreement. *See Croixland Properties Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999) (on a motion to dismiss, courts "must accept the allegations of the complaint as true, and draw all reasonable inferences in the plaintiff's favor."). For example, the Amended Complaint:

- Provides numerous examples of individuals serving simultaneously as officials of the Russian Federation and executives of one or more of Defendant enterprises and identifies specific Defendants who used interlocking positions to play a key role in the conspiratorial scheme. ¶¶ 60-83.

- Notes the competitive advantage obtained by Yukos over its state-owned competitors by virtue of its U.S. presence and specifies that one element of Defendants' scheme was to eliminate Yukos as a competitor in the sale of Russian crude oil in the United States. ¶¶ 112-13.

- Identifies mid-2003 as the approximate starting point of the scheme to dismantle Yukos. ¶ 142.

- Contains a detailed account of insider trading by Gazprom using material, nonpublic information regarding the outcome of Yukos's pending challenge to the Russian Federation's tax demands. ¶¶ 240-48.

- Describes collusive behavior on the part of Gazprom, Gazpromneft, Rosneft, BFG, and the Russian Federation leading up to and in the conduct of the auction of YNG in December 2004. ¶¶ 261-95.

In short, there is simply no comparison between the Amended Complaint and the conclusory conspiracy allegations in the cases cited by Defendants. A complaint may not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the complaint] which would entitle him to relief." *Conley*, 355 U.S.

at 45-46.  As illustrated above, the Amended Complaint far exceeds this low threshold for surviving a motion to dismiss.[46]

## IX.    PLAINTIFFS HAVE PROPERLY PLED A CLAIM FOR RESTITUTION BASED ON UNJUST ENRICHMENT.

The Court should reject the formalistic approach to unjust enrichment on which Rosneft and the Individual Defendants base their challenge to Count XIV.  Rosneft Mem. at 73; Indiv. Mem. at 55-56.  Both sets of Defendants choose to focus narrowly on whether Plaintiffs conferred a benefit on the Unjust Enrichment Defendants.  In concluding that no benefit was conferred and no restitution is therefore due, Defendants misread the very case law they cite.

"[T]he fundamental characteristic of unjust enrichment is 'that the defendant has been unjustly enriched by receiving something . . . that properly belongs to the plaintiff [,thereby] forcing restoration to the plaintiff."  *Rapaport v. U.S. Dep't of Treasury*, 59 F.3d 212, 217 (D.C. Cir. 1995) (quoting Dan B. Dobbs, LAW OF REMEDIES § 4.1(2)) (alterations in original).  "Because of the doctrine's equitable nature: 'Every unjust enrichment case is factually unique, for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next'."  *In re Lorazepam & Chlorozepate Antitrust Litig.*, 295 F. Supp. 2d 30, 51 (D.D.C. 2003) (quoting *BCCI Holdings (Luxembourg) S.A. v. Khalil*, 56 F. Supp. 2d 14, 64 (D.D.C. 1999)).  Indeed, "[a] plaintiff alleging an unjust enrichment may be seeking to recover a benefit which he gave directly to Defendant, or one which was transferred to Defendant by a third party."  *Id.*

---

[46] Rosneft also argues that the Amended Complaint fails to plead facts supporting an allegation that any of Defendants committed an unlawful act.  Rosneft Mem. at 72.  As explained in Section VII, Defendants' continuing control of Plaintiffs' property is unlawful because that property was taken in violation of both international and Russian law.

Accordingly, in *In re Lorazepam*, this Court rejected a formalistic approach to determining whether the plaintiff had conferred a benefit on the defendant. In that case, it was alleged that the defendant drug companies had been unjustly enriched through payments made by plaintiff insurers to reimburse their subscribers for purchases of price-fixed prescription drugs. *Id.* at 50. The plaintiffs had no contractual relationship with the defendants and paid no money directly to them. Nonetheless, because the effect of plaintiffs' payments to their subscribers was to inflate defendants' profits, the Court ruled that it would be unjust or inequitable for defendants to retain the benefit. *Id.* at 51.

The same logic applies here. The effect of Defendants' successful scheme to illegally expropriate Yukos and its key productive assets has been to divert to those Defendants the profits which were formerly paid to shareholders in the form of dividends. Defendants are being unjustly enriched by a benefit which properly belongs to Yukos's original owners, including Plaintiffs. The Court should order restitution.

## X.    THE AMENDED COMPLAINT STATES A CLAIM FOR EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW.

Once again, Defendants are guilty of misstatement in their view that "U.S. law does not authorize private individuals to bring private claims based on international law in the absence of an international agreement of the U.S. conferring a private right of action." Indiv. Mem. at 56. *See also* Rosneft Mem. at 46. Two and a half years ago it might have been fair to say that it was an open question in the U.S. federal courts whether a private cause of action could exist for a violation of international law in the absence of a statute. *Cf. Herero People's Reparations Corp. v. Deutsche Bank*, 370 F.3d 1192, 1195 (D.C. Cir. 2004) (noting that "the Supreme Court has yet to rule on the subject, and the theory has received support in court decisions and law review articles."). It might even have been fair to conclude that the weight of opinion within the D.C.

Circuit favored Defendants' position.  *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 775 (Edwards, J., concurring) (suggesting that no private cause of action exists in the absence of congressional action); *id.* at 798 (Bork, J., concurring) (same).  *See also Herero People's Reparations Corp. v. Deutsche Bank*, No. 01-01868, 2003 U.S. Dist. LEXIS 27094 (D.D.C. July 31, 2003) (declining to recognize a cause of action for a violation of international human rights law in the absence of a federal statute).

Since then, however, the Supreme Court has held that federal courts may, in certain circumstances, "recognize private claims under federal common law" for violations of norms of international law.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004).  The question presented in *Sosa* was whether the Alien Tort Statute ("ATS") created a cause of action for an alleged violation of the law of nations.  The Court concluded that although the statute was jurisdictional in nature,[47] "[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time."  *Id.* at 724.  The Court went on to make clear that federal courts retained the ability to recognize new causes of action for violations of international law.  *Id.* at 724-25 ("We assume, too, that no development in the two centuries from the enactment of the [ATS] . . . has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law.").  It observed, however, that this was a power to be exercised with restraint.  *Id.* at 725 ("we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by

---

[47] This is an unexceptionable conclusion compelled by the plain language of the statute:  "The district court shall have original jurisdiction of any civil action by any alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized.").

The Supreme Court in *Sosa* considered the types of international-law claims that federal courts could entertain under the jurisdictional grant of the ATS. Plaintiffs' expropriation count requires this Court to consider the types of international-law claims that courts may entertain under the jurisdictional grant of the FSIA. Plaintiffs submit that, if one follows the Supreme Court's guidance in *Sosa*, one reaches the conclusion that Congress has rather clearly indicated in the FSIA its understanding that federal common law provides a cause of action for expropriations by foreign states carried out in violation of international law.

As noted above, the Court in *Sosa* concluded that the ATS "is best read as having been enacted on the understanding that the common law" provided a cause of action for those violations of international law that might have given rise to personal liability in 1789, when the ATS was enacted.[48] *Id.* at 724. The language of the ATS gives no hint of what Congress might have understood the relevant norms of international law to be.[49] Compare this to the FSIA. One need not speculate in the slightest to know what norm of international law Congress had in mind when it enacted this statute and its provision for jurisdiction in any case against a foreign state "in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). If the ATS "is best read as having been enacted on the understanding" that federal common law provided a cause of action for certain offenses against international law, then the

---

[48] The ATS reads, in its entirety, as follows: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28. U.S.C. § 1350.

[49] "We think it is correct, then, to assume that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations, though we have found no basis to suspect Congress had any examples in mind beyond those torts corresponding to Blackstone's three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa*, 542 U.S. at 724.

FSIA's expropriation exception with any understanding on the part of Congress other than one to the effect that victims of expropriations carried out in violation of international have a cause of action in federal court.  As the Supreme Court concluded in relation to the ATS, it is unlikely that Congress would have provided this jurisdictional grant in the FSIA, only to have it "placed on the shelf for use by a future Congress or state legislature that might, some day, authorize the creation of causes of action."  *Sosa*, 542 U.S. at 719.

Perhaps this is why Plaintiffs have been unable to find a single case in which a claim against a foreign state for expropriation in violation of international law has been dismissed on the ground that there was no cause of action for such a claim.  Plaintiffs have found several such claims of relatively recent vintage, but none was dismissed on this ground.  *E.g.*, *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 85 (D.C. Cir. 2005); *Marra v. Papandreou*, 216 F.3d 1119, 1124 n.4 (D.C. Cir. 2000); *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 306-07 (D.D.C. 2005).  Indeed, at least one other circuit has decided a claim for "a taking of property . . . by a foreign state in violation of international law" on the merits.  *West v. Multibanco Comermex S.A.*, 807 F.2d 820, 823, 826-33 (9th Cir. 1987) (holding that jurisdiction over this cause of action was consistent with the FSIA, deciding that application of the act of state doctrine was precluded by the Second Hickenlooper Amendment, but ruling against the plaintiff on the merits).

This Court ought not use this case to make new law restricting the remedies available to the victims of confiscations by foreign states.  The Court should instead allow Plaintiffs' claim for expropriation in violation of international law to proceed.  As shown in Section IV, the principle that an expropriation must be accompanied by just compensation today constitutes an

authoritative norm of customary international law.[50]  Significantly, in light of *Sosa*'s caution that actionable norms of international law be defined with specificity, this norm also is highly specific: A taking absent "prompt, just and effective compensation" violates international law. *Cf. Sosa*, 542 U.S. at 736-38 (declining to recognize a cause of action for "a general prohibition of 'arbitrary' detention defined as officially sanctioned action exceeding positive authorization to detain under the domestic law of some government").[51]  Count XIII of the Amended Complaint states a claim for which this Court may grant relief. [52]

## XI.    THE AMENDED COMPLAINT STATES A CLAIM FOR SECURITIES FRAUD UNDER 15 U.S.C. § 78(b).

Plaintiff Yukos ADR Purchasers ("ADR Purchasers") have stated a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Russian Federation; Khristenko, Kudrin, Medvedev, Sechin,[53] and Yusufov (together, "the Individual Fraud Defendants"); Gazprom and

---

[50] As demonstrated in Section IV.B, the world has changed in this regard since the 1962 and 1980 cases cited by Rosneft for the contrary position.  *See* Rosneft Mem. at 46-47 (citing *Sabbatino*, 376 U.S. at 428-30, and *Filartiga v. Pena Irala*, 630 F.2d 876, 881 (2d Cir. 1980)).

[51] Plaintiffs do not contend that the rule of customary international law prohibiting expropriation without compensation rises to the level of a jus cogens norm.  *Cf.* Rosneft Mem. at 47.  Notably, in describing the circumstances in which federal courts could recognize a private cause of action, the Supreme Court in *Sosa* drew no distinction between jus cogens and other norms of customary international law, focusing instead on the specificity of the norm's content and its acceptance among civilized nations.  *Sosa*, 542 U.S. at 725.  As described in text, both of these factors weigh strongly in favor of recognizing a cause of action for expropriation in violation of international law.

[52] Defendants' other objections to Count XIII have no merit.  Plaintiffs' claim is based no on the dimunition in the value of ADRs but on the illegal taking of Yukos from its owners.  *Compare* Rosneft Mem. at 46 *with* Section I.B above.  A violation of international law is properly alleged because Defendants took Yukos from Plaintiffs, who are not Russian citizens.  *Compare* Rosneft Mem. at 47 and Indiv. Mem. at 56 *with* Section I.B.2.

[53] The Individual Fraud Defendants (at 11) refer to Sechin as "Minister Sechin."  Sechin, however, is not a minister of the Russian Federation; he is President Putin's deputy chief of staff.  *See* Am. Compl. ¶ 82.

Miller (together, "the Gazprom Fraud Defendants"); and Rosneft, Bogdanchikov, and Borisenko (together, "the Rosneft Fraud Defendants") (collectively, the "Fraud Defendants").[54]

Claims under Section 10(b) and Rule 10b-5 generally require six elements: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005). A defendant may also be subject to primary liability under Section 10(b) and Rule 10b-5 without making a material misstatement or omission if the defendant directly or indirectly employed a manipulative or deceptive device intended to mislead investors. *See In re Enron Corp. Secs., Derivative & ERISA Litig.*, 439 F. Supp. 2d 692, 714-16 n.27 (S.D. Tex. 2006) ("Any person who directly or indirectly engages in a manipulative or deceptive act as part of a scheme to defraud can be a primary violator" of Rule 10b-5.).

The claims of ADR Purchasers meet these requirements. Specifically, ADR Purchasers have alleged that the Fraud Defendants, in furtherance of their scheme to expropriate Yukos without compensation to its owners, made misstatements or omissions of material fact and employed a manipulative or deceptive device that concealed their involvement and motives in the attack against Yukos. These actions induced ADR Purchasers to purchase Yukos ADRs at artificially inflated prices. As the Fraud Defendants' scheme became evident, the price of Yukos ADRs fell to near zero, causing severe losses to ADR Purchasers.

In response, the Individual, Gazprom, and Rosneft Fraud Defendants[55] argue that ADR Purchasers' securities fraud claims should be dismissed because ADR Purchasers (1) have failed to allege that the Fraud Defendants made misstatements or omissions of material fact; (2) have

---

[54] A plaintiff may sue for securities fraud under Section 10(b) and Rule 10b-5 where the plaintiff purchased ADRs rather than the underlying shares. *See Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 365-66 (3d Cir. 2002).

[55] The Russian Federation has chosen to ignore ADR Purchasers' claims for securities fraud.

not alleged scienter; (3) have not alleged that the representations at issue were made "in connection with" the purchase or sale of a security; (4) have not alleged reliance; (5) have not alleged loss causation; and (6) cannot apply the U.S. securities laws extraterritorially to the Fraud Defendants' conduct.  Each of these arguments fails for the reasons below. [56]

### A.    Each Fraud Defendant Misstated or Omitted a Material Fact or Employed a Manipulative or Deceptive Device Intended To Mislead Investors.

ADR Purchasers have alleged in their Amended Complaint that the Russian Federation, Gazprom, Rosneft, Khristenko, Kudrin, Medvedev, Miller, and Yusufov each made misstatements or omissions of material fact intended to conceal from investors their roles and the true significance of various events in the unfolding attack against Yukos.  The alleged misstatements include, but are not limited to, the following:

- On November 5, 2003, President Putin, speaking on behalf of the Russian Federation and Rosneft, stated: "The state surely does not want to destroy [Yukos]."  Am. Compl. ¶ 191.

- On November 29, 2003, the Trade and Economic Development Minister of the Russian Federation, German O. Gref, speaking on behalf of the Russian Federation, Rosneft, and Gazprom, stated: "The nationalization of Yukos is not an issue."  Id. ¶ 193.

- On June 17, 2004, President Putin, speaking on behalf of the Russian Federation and Rosneft, stated: "Russian authorities, the government, and the economic officials of our country are not interested in seeing Yukos go bankrupt."  Id. ¶ 226.

- On July 21, 2004, Rosneft press spokesman Alexander Stepanenko stated: "[Rosneft is] not planning any asset acquisitions in the near future.  None."  Id. ¶ 263.

- On September 6, 2004, President Putin, speaking on behalf of the Russian Federation and Rosneft, stated:  "I don't want to bankrupt Yukos. . . .  Give me the names of the government officials who want to bankrupt Yukos and I'll fire them."  Id. ¶ 264.

---

[56] The Individual Fraud Defendants also argue (Indiv. Mem. at 41-42) that the lack of cases in which similar claims have been made against a government or its officials for securities fraud supports dismissal of this action.  A lack of similar cases, however, does not resolve the issues presented here, for the facts of this case are unusual, if not unique.  That is, rarely, if ever before, has there been such extensive overlap between high-level governmental and commercial spheres as in today's Russian Federation.

- On September 24, 2004, President Putin, speaking on behalf of the Russian Federation and Rosneft, stated: "[T]here was no, there is no, and there will be no plan for Yukos's nationalization or the state assuming control of it . . ..  The state did not set before itself the task to nationalize this company or lay hands on it.  And there is no such aim now."  Putin also asserted that any Yukos asset sales would abide by Russian law: "We shall do this in strict accordance with the law.  I want to stress it – in strict accordance with the law."  *Id.* ¶ 266.

- On October 2, 2004, Miller, speaking on behalf of himself and Gazprom, stated: "We are not considering the possibility of taking part in an auction [of Yukos assets]."  *Id.* ¶ 268.

In addition, ADR Purchasers have alleged that the Russian Federation, Rosneft, Gazprom, Bogdanchikov, Borisenko, and Sechin, among others, created and financed the sham entity BFG and/or effected the sham auction of YNG to conceal from investors their intentions to expropriate Yukos without compensating its owners.   These actions and statements are actionable as securities fraud.

### 1.    The Fraud Defendants Who Made Misstatements of Material Fact Owed a Duty of Disclosure to ADR Purchasers.

The Individual, Gazprom, and Rosneft Fraud Defendants argue (Indiv. Mem. at 44-45; Gazprom Mem. at 35-36; and Rosneft Fraud Mem. at 52) that they did not owe a duty of disclosure to ADR Purchasers and, therefore, cannot be liable for the omissions alleged against them.  Whether or not they owed a general duty of disclosure, however, there is no question that the statements they made were required to be complete and accurate.  *See Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 27 (2d Cir. 1987) ("When a corporation makes a disclosure − whether it be voluntary or required – there is a duty to make it complete and accurate.").[57]

---

[57] *See also In re Enron Corp. Sec., Derivative & ERISA Litig.,* 439 F. Supp. 2d 692, 713 (S.D. Tex. 2006) ("defendants had made statements on specific subjects and therefore had an affirmative duty to disclose"); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty of disclosure arises whenever secret information renders prior public statements materially misleading."); *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001) (duty to disclose arises where defendant's silence would make defendant's prior speech misleading).

The cases upon which the Fraud Defendants rely to argue that they owed no duty of disclosure to ADR Purchasers are easily distinguishable. In *Lindblom v. Mobile Telecomms. Techs. Corp.*, 985 F. Supp. 161, 161-62 (D.D.C. 1997) (Indiv. Mem. at 44; Gazprom Mem. at 35), the subsidiary's statements in question were not material to the central issue in the case, the parent's financial situation. *Id.* at 164. By contrast, in this case, the Fraud Defendants' misstatements related directly to Yukos's financial survival, a central issue, triggering a duty of disclosure to ADR Purchasers.

In *Gershon v. Wal-Mart Stores, Inc.*, 901 F. Supp. 128 (S.D.N.Y. 1995), (Gazprom Mem. at 35), the court noted that "[t]here [was] no claim that [defendant]Wal-Mart . . . made any statements itself." *Id.* at 130. By contrast, in this case, the Fraud Defendants made numerous misleading and inaccurate statements about Yukos throughout the course of their fraudulent scheme. Whether the Fraud Defendants owed ADR Purchasers a duty of disclosure before making these statements is irrelevant; once the Fraud Defendants did speak, they had a duty to ensure that their statements were "complete and accurate." *See Roeder*, 814 F.2d at 27.[58]

### 2. The Fraud Defendants Also Are Liable for Employing a Manipulative or Deceptive Device Intended To Mislead Investors.

The Individual and Rosneft Fraud Defendants argue (Indiv. Mem. at 11; Rosneft Mem. at 47, 49-50) that Sechin, Bogdanchikov, and Borisenko cannot be liable because they are not

---

[58] Gazprom and Rosneft also argue (Gazprom Mem. at 41-44; Rosneft at 8-10, 51-52) that certain misstatements that ADR Purchasers claim were made "on behalf of" Gazprom and Rosneft are not actionable against those defendants because the officials who made the misstatements did not attribute them to either company at the time the statements were made.

With respect to Gazprom, the misstatements alleged to have been on its behalf were each made by the company's chairman or other board members on Gazprom's behalf. *See Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 149 (2d Cir. 1999) (principal is liable for acts of agent where agent acts with the "kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers") (citations and quotations omitted). Similarly, when Russian government officials made statements about the energy sector, they necessarily were speaking on behalf of the government's representative in that sector, Rosneft.

alleged to have made material misstatements or omissions.  Courts have repeatedly held, however, that "a material misstatement or omission . . . is but one of *two* ways to prove primary liability," *Mishkin v. Agelhoff*, No. 97 Civ. 2690, 1998 WL 651065, at *17 (S.D.N.Y. Sept. 23, 1998) (emphasis added):  Section 10(b) "prohibits . . . the making of a material misstatement (or omission) *or* the commission of a manipulative act." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (emphasis added)[59]; *see also SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (plaintiff may establish primary liability under Section 10(b) and Rule 10b-5 by showing that defendant made a material misstatement or omission *or* used a fraudulent device). *See also Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1049-50 (9th Cir. 2006) (liability may be imposed under Section 10(b) "for conduct other than making a material misstatement or omission"); *In re Health Management, Inc., Sec. Litig.*, 970 F. Supp. 192, 209 (E.D.N.Y. 1997) ("the plaintiffs need not allege that [defendants] made any fraudulent statements" to state a claim under Rule 10b-5).

The Fraud Defendants' roles in creating BFG and effecting the auction of YNG constitute manipulative and deceptive acts that subject each to primary liability under Section 10(b) and Rule 10b-5.  *See* Am. Compl. ¶ 261-295.  Indeed, "[a]ny person who directly or indirectly engages in a manipulative or deceptive act as part of a scheme to defraud can be a primary

---

[59] The Individual and Rosneft Fraud Defendants rely (Indiv. Mem. at 44; Rosneft Mem. at 5, 51-52) on *Central Bank* for the proposition that defendants who are not alleged to have made a material misstatement or omission cannot be held liable under Section 10(b).  In *Central Bank*, however, the plaintiffs "concede[d] that [the defendant] did not commit a manipulative or deceptive act within the meaning of Section 10(b)[.]" *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).  Therefore, "the Supreme Court limited its analysis to whether [the defendant] was 'secondarily liable under Section 10(b) for its conduct in aiding and abetting the fraud.'" *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 171 (D. Mass. 2003) (quoting *Central Bank*, 511 U.S. at 191).  The Supreme Court did not, as this Court must, examine "the extent to which participants in a securities fraud are *primary violators* under Section 10(b)." *Lernout & Hauspie*, 236 F. Supp. at 121 (emphasis added); *see also In re U.S.A. Classic Sec. Litig.*, No. 93 Civ. 667, 1995 WL 363841, at *5 (S.D.N.Y. June 19, 1995) ("*Central Bank* does not limit the liability of those who participate in a scheme to defraud, for [the defendant] in *Central Bank* had not committed a manipulative or deceptive act").

violator" under Section 10(b) and Rule 10b-5.  *Enron*, 439 F. Supp. 2d at 714-15 & n.27.  To

conclude otherwise would effectively read subsections (a) and (c) out of Rule 10b-5.  *See In re*

*Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 498 (S.D.N.Y. 2005).[60]

      Among the manipulative or deceptive acts that courts have found actionable are the

"creation or financing of a sham entity," or the participation in "sham" transactions.  *See In re*

*Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003); *Parmalat*, 376 F.

Supp. 2d at 502.  In *Lernout & Hauspie*, the court held that the plaintiffs stated a claim under

Rule 10b-5(a) and (c) against defendants who created and funded sham entities for the sole

purpose of artificially inflating one particular company's bottom line.  *Lernout & Hauspie*, 236

F. Supp. 2d at 166-67.  The sham entities had no employees, were undercapitalized, and "had no

general ability to conduct any business of their own."  *Id.* at 166; *see also Parmalat*, 375 F.

Supp. 2d at 504 (Where a sham entity "create[s] an appearance of substance where substance is

lacking," its creator or financer is liable as a primary violator of Rule 10b-5.).  The court in

*Lernout & Hauspie* explained that primary liability may be imposed on a defendant who

participates in a scheme by "directly or indirectly employing a manipulative or deceptive device

(like the creation of a sham entity) intended to mislead investors, *even if a material misstatement*

*by another person creates the nexus between the scheme and the securities market*."  *Lernout &*

*Hauspie*, 236 F. Supp. 2d at 173 (emphasis added).

      The Fraud Defendants are similarly liable as primary violators under Rule 10b-5(a) and

(c) for creating and financing BFG, a sham entity, and effecting the auction of YNG, a sham

---

[60] Subsections (a) and (c) state, in relevant part:

> It shall be unlawful for any person, directly or indirectly . . . (a) To employ any device, scheme, or artifice to defraud, . . . or (c) To engage in any act, practice or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2006).

transaction; the sole purpose of these shams was to further Defendants' fraudulent scheme.  *See AOL Time Warner*, 452 F.3d at 1048 (primary liability under Section 10(b) requires that defendant "engage[] in conduct that ha[s] the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme").  Rosneft, Sechin, and Bogdanchikov, among others, were the primary actors behind the creation of BFG, an entity that lacked even a modicum of substance.  *See* Am. Compl. ¶¶ 281, 283-85.[61]

Meanwhile, the Russian Federation, Rosneft, Gazprom, Sechin, Bogdanchikov, and Borisenko, among others, effected the sham auction of YNG.  *See id.* ¶¶ 274-86.  The auction, which the *Moscow Times* described as "beyond the bounds" of Russian law, was a farcical spectacle that lasted just ten minutes and in which one of the two registered participants did not even bid.  *See id.* ¶¶ 277-79.  As a result, BFG was forced to bid against itself to reach what appeared to be a predetermined price of $9.3 billion, barely half of the valuation established by DKW Dresdner Bank at the request of Russian Federation.  *See id.* ¶¶ 278-79.

### 3. ADR Purchasers Accurately Quote the Individual Fraud Defendants' Public Statements.

The Individual Fraud Defendants accuse ADR Purchasers of misconstruing their words or quoting them out of context, but cannot deny that they made the statements alleged.[62]  The

---

[61] Indeed, in the days after the YNG auction, the *Times* of London reported that, "[v]irtually the only thing known about BFG was that it was registered at 12B, Novoturzhskaya Street" in the Russian city of Tver.  *See* Am. Compl. ¶ 283.  The newspaper continued:  "When hordes of reporters descended upon the address . . ., all they found was a dilapidated building housing an off-license, a grocery, a mobile phone shop and the London Café, a favourite hangout of alcoholics and homeless people."  *See id*.

[62] The Rosneft Fraud Defendants, for their part, argue (at 50) that verbatim quotations of the Fraud Defendants' misstatements that appeared in leading international news sources are not actionable under Section 10(b) and Rule 10b-5.  This argument, however, is not supported by the case law.  *See In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 13-14 (D.D.C. 2000) (court concluded that two quotations of defendants that appeared in news articles are actionable under the securities laws); *In re Columbia Sec. Litig.*, 747 F. Supp. 237, 245 (S.D.N.Y. 1990) ("When corporate spokesmen make statements to the press, they must speak truthfully or risk 10b-5 liability.").

(continued...)

Individual Fraud Defendants also assert that their statements were not false at the time they were made. Each of these statements, however, was proven false by later events, advance knowledge of which the Individual Fraud Defendants cannot credibly deny.

### a)    *Kudrin's Misstatements*

The Individual Fraud Defendants argue that (at 6-7, 45) the allegations against Kudrin are based on statements taken out of context. In truth, the Individual Fraud Defendants have created an entirely fictional context.

On November 3, 2003, Kudrin stated, "I've heard personally from Putin and clearly understand myself that this is not a redistribution of property." Am. Compl. ¶ 189. The Individual Fraud Defendants argue that this statement, quoted from the *Moscow Times*, refers not to the then-recent seizure of Yukos shares but to concerns that the allegations against Yukos were the start of a broad de-privatization campaign. In support of this argument, the Individual Fraud Defendants claim that the question to which Kudrin was responding addressed de-privatization generally. This is a mischaracterization; the question clearly asked, *first*, whether the Yukos affair was a redistribution of property and, *then*, whether other companies would meet a similar fate: "Are the claims true that the redistribution of property has begun, and other large companies owned by oligarchs will be affected after Yukos?"

---

The Rosneft Fraud Defendants rely upon *In re Newbridge Networks Securities Litigation*, 926 F. Supp. 1163 (D.D.C. 1996) for the proposition that "plaintiffs must allege that defendants had some control over the final version of the article, because spokespersons might be quoted inaccurately or out of context." Rosneft Mem. at 50. *Newbridge*, however, involved independent analysts' reports, not verbatim quotations in news articles. *See Newbridge*, 926 F. Supp. at 1171. Analysts reports involve forecasts to which companies may not subscribe and that they may not control. By contrast, individuals who are quoted in the media have full control over the contents of their speech. *See Columbia*, 747 F. Supp. at 245 ("While defendants certainly had less than complete control over what the reporter wrote, they did have control over what [defendants] said. If, as plaintiffs allege, [defendants] made a false statement to the . . . reporter, that statement may properly serve as a basis for plaintiffs' fraud claim.").

The Individual Fraud Defendants also argue that ADR Purchasers should have quoted Kudrin's comments as they appeared in *Kommersant*, the source of the *Moscow Times* quotation. The *Kommersant* version of Kudrin's remarks, however, provides even greater support for ADR Purchasers' allegations:

> As an official I am not entitled to take a view on the Yukos story before a court decision. This is also what all members of the government were asked to do by the President. *But* I have heard him saying myself that *this was* no redistribution of property and no anti-oligarch campaign[.]

*See* Indiv. Mem. at Ex. C (emphasis added). The antecedent of the word "this" in the preceding paragraph plainly is what Kudrin refers to as "the Yukos story." Contrary to Kudrin's assertions, however, later events would prove that the "Yukos story" was, in fact, a redistribution of property. Kudrin was aware of this at the time he made his November 3, 2003 statement; his representation was therefore false.

Also, on June 21, 2004, Kudrin said, "Cooperation on the possible settlement of claims is under way. I think Yukos has enough funds to pay its liabilities." Am. Compl. ¶ 231. The Individual Fraud Defendants argue (Indiv. Mem. at 9) that this statement is not actionable because the *New York Times*, the newspaper in which the comments appeared, improperly "interpret[ed]" it.[63] Yet this is a verbatim quotation of Kudrin's own words. By making this statement, Kudrin held out the possibility of complete settlement of Yukos's tax liabilities when he knew that the Russian Federation intended, not to settle with the company, but to nationalize it without paying anything to its owners. Kudrin's statement was therefore false.

---

[63] The Rosneft Fraud Defendants also argue (at 50) that the ADR Purchasers cannot rely on an article describing a Rosneft official's statements because it represented only the view of the author. *See* Am. Compl. ¶ 263. It is clear, however, that the statement at issue – that Rosneft "announced it is not interested in bidding for [YNG]" – was not the view of the author but a summary of remarks by Rosneft First Vice President Sergei Alexeyev.

In an interview with the *Financial Times* that was published on September 13, 2004, Kudrin called speculation that the Russian government sought to bankrupt Yukos a "myth" and implicitly promised that YNG would be auctioned off "in an absolutely transparent and market-oriented way."  Am. Compl. ¶ 265.  The Individual Fraud Defendants suggest (Indiv. Mem. at 9-10) that these statements were not false because (1) "Yukos did not enter involuntary bankruptcy until years later" and (2) "YNG was sold through a public auction."  Both statements, however, would be uncovered as false with time.  The Fraud Defendants' scheme to drive Yukos into bankruptcy succeeded less than two years later, on August 1, 2006; that time was required to achieve this goal is irrelevant.  Further, the auction of YNG may have been "public" in the sense that the "public" watched BFG bid against itself and then watched the gavel fall, but to call it "absolutely transparent and market-oriented" would be a lie.  Indeed, in the days following YNG's auction and subsequent sale to Rosneft, the *New York Times* reported that, "[i]ndustry analysts . . . characterized the transfers as Kremlin-rigged farces."  Am. Compl. ¶ 285.

Perhaps most telling with respect to Kudrin is what the Fraud Defendants leave unchallenged:  nowhere do they attempt to defend or explain his outrageous June 21, 2004 statement that the tax claims against Yukos were not political but were part of a "routine" investigation.  Am. Compl. ¶ 234.[64]

### b)    *Khristenko's Misstatements*

The Individual Fraud Defendants argue (at 44) that the only false statement that Khristenko is alleged to have made is dated December 30, 2004, which is after the ADR Purchasers' last purchase of Yukos ADRs.  The Individual Fraud Defendants are mistaken.  On

---

[64] The deceptive effect of Kudrin's June 21, 2004 statements is sharply evidenced in a research note published by the investment bank Renaissance Capital:  "We consider this the most important of Mr. Kudrin's statements, as it supports the impression given last week that the government has finally established its policy goals for the end-game in the Yukos affair, and that end-game now appears not to include bankrupting Yukos."  Am. Compl. ¶ 235.

November 22, 2004, according to *Platt's Oilgram News*, Khristenko said that the auction of YNG would decide the value of the firm.  *See* Am. Compl. ¶ 272.  In no meaningful sense, however, did the auction determine the value of YNG.  *See id.* at 278.  Khristenko's statement was therefore false.

### c)      Medvedev's Misstatements

The Individual Fraud Defendants assert that the ADR Purchasers have misconstrued Medvedev's statements in a November 2, 2003 television interview.  Specifically, they suggest (Indiv. Mem. at 5-6) that the interview did not in any way relate to Yukos but, rather, was a wholly independent discussion of the Russian government's supposed commitment to impartial law enforcement.  The Individual Fraud Defendants omit to mention, however, that one week prior, on October 25, Khodorkovsky was arrested and that, on October 30, Russian authorities seized approximately 51 percent of the equity of Yukos.  Indeed, one interview question, the answer to which is quoted in part in the Amended Complaint (¶ 151), is a clear reference to the recent arrest and seizure:  "*Last week* the papers wrote not only about your appointment and your biography, which we have just discussed, but also *whether major Russian companies, major Russian businesses, are complying with the laws*.  What would you say?"  (Emphasis added.)[65]

---

[65] In response to this question, Medvedev stated, among other things, that "We are proceeding on the assumption that these matters will be exhaustively examined and that a verdict on the guilt of the person in question [Khodorkovsky] will only be reached in accordance with Russian law."  The Individual Fraud Defendants assert (at 5-6) that ADR Purchasers, by inserting Khodorkovsky's name in brackets following "the person in question" (*see* Am. Compl. ¶ 151), falsely claimed that Medvedev's comments were made in reference to the former Yukos CEO.  Based on the full text of the Deutsche Presse-Agentur report, however, "the person in question" is a clear reference to Khodorkovsky.  Indeed, the sentence that immediately follows Defendant Medvedev's above statement in that report reads:  "Khodorkovsky and other senior Yukos officials, Russia's second largest oil company, are accused of swindling the state out of more than a billion U.S. dollars."

The Individual Fraud Defendants also claim that the translation upon which ADR Purchasers relied, that of Deutsche Presse-Agentur, is a "mischaracterization."  *See* Indiv. Mem. at 6 n.7.  Specifically, they take issue with the phrase "the person in question," which the BBC translates differently, as "these people."  ADR Purchasers do not know which translation is correct.

ADR Purchasers have also alleged, among other things, that Medvedev deceptively characterized the Russian government's motives in the Yukos affair in a *Financial Times* op-ed on January 20, 2004. In response, the Individual Fraud Defendants assert (at 6 n.8, 45), that Medvedev's comments have "nothing to do" with Yukos and "explicitly *avoid*[] commenting on Mr. Khodorkovsky's prosecution" (emphasis in original). The op-ed, however, plainly does comment on the Russian government's charges against Khodorkovsky and Yukos:

> The importance that people attach to the judiciary helps explain why the *Yukos* case became such a talking point for Russian and foreign media just before the polls. *Mikhail Khodorkovsky*, head of the oil company, was accused of tax evasion and taken into custody. But whatever the outcome, one point should be noted: this is not a story about prosecutors "hounding businessmen," but about equality before the law for everyone, however wealthy.

*See* Am. Compl. ¶ 194 (emphasis added). Medvedev thereby stated that the allegations against Khodorkovsky were not politically motivated. These representations were false.

### d) Yusufov's Misstatements

On October 10, 2003, Yusufov, a Gazprom board member who at the time also served as the Russian Federation's Minister of Industry and Energy, stated that it would be "a positive step" if ExxonMobil were to acquire a stake in YukosSibneft: "Of course, it fills us with pride that discussions are under way with the first company in the world, ExxonMobil," Yusufov said. Am. Compl. ¶ 173. "To receive that kind of partner, in my view, would be everyone's wish." *Id.* These statements deceived ADR Purchasers into believing that Defendants did not intend to block ExxonMobil's purchase of a large stake in YukosSibneft. *See* Am. Compl. ¶ 176.

The Individual Fraud Defendants argue (at 11 n.13, 46) that Yusufov's statements are not actionable because he tempered them with the following "cautionary remarks": ExxonMobil "ha[s] to understand the conditions surrounding the goods they are buying . . . . If we take some step tomorrow, Exxon could say, 'That's it, we're leaving the market.' So we have to inform our

partner." *Id.* These vague comments did not, however, sufficiently balance Yusufov's positive statements about ExxonMobil's potential acquisition. *See* Section XI.B (n.64).

### B.    ADR Purchasers Have Alleged Scienter on the Part of Each Fraud Defendant.

The Individual, Gazprom, and Rosneft Fraud Defendants argue (Indiv. Mem. at 46-47; Gazprom Mem. at 36-37; Rosneft Mem. at 54-55) that ADR Purchasers have failed to allege scienter. Plaintiffs' Amended Complaint, however, includes numerous specific facts that demonstrate scienter on the part of each Fraud Defendant: ADR Purchasers have alleged, in detail, that the Fraud Defendants intended to, and did, expropriate Yukos without compensation to its owners.

"In order to plead scienter, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]" *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (citations and quotations omitted). A strong inference of scienter may be established either "by alleging facts to show that defendants had both motive and opportunity to commit fraud," *or* "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 307. "Motive . . . entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity . . . entail[s] the means and likely prospect of achieving concrete benefits by the means alleged.'" *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Strong circumstantial evidence of conscious misbehavior or recklessness, meanwhile, may be shown by "deliberately illegal behavior," including "securities trading by insiders privy to undisclosed and material information," or where defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 308, 311.

ADR Purchasers have alleged facts sufficient to show that each Fraud Defendant had a motive to defraud. *See, e.g.*, Am. Compl. ¶¶ 142-47, 154-55, 157-68, 171, 178-85, 196-222, 225, 236-37, 249, 256, 160-61. These facts establish that the Fraud Defendants' misstatements and omissions of material fact aimed to calm investors who otherwise would have withdrawn from Russian Federation's capital markets.[66] Maintaining investor confidence in such markets enabled the Fraud Defendants to stem capital flight that would have adversely affected their personal fortunes, business prospects, and, in the case of the Russian Federation, the national economy. *See, e.g.*, *id.* ¶¶ 147, 225, 228, 261. In addition, ADR Purchasers have alleged facts that establish that, by organizing the sham auction of YNG and creating and financing the sham entity of BFG, the Fraud Defendants – in particular, the Russian Federation, Rosneft, Sechin, and Bogdanchikov – sought to mislead investors into believing that Yukos would receive fair compensation for YNG. *See, e.g.*, *id.* ¶¶ 262-90. This deception enabled the Fraud Defendants to continue to stem capital flight from the Russian Federation while appropriating Yukos's chief production asset at a fraction of its true worth. Moreover, ADR Purchasers have alleged facts sufficient to show that the Fraud Defendants are the most politically and economically powerful individuals and entities in the Russian Federation, a status that provided them with the opportunity and ability to achieve their aims by the means alleged. *See, e.g.*, *id.* ¶¶ 60-83.

ADR Purchasers have also alleged facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness on the part of each Fraud Defendant. For example, each of the Fraud Defendants' statements that ADR Purchasers allege to have been false at the time

---

[66] The Individual and Gazprom Fraud Defendants argue (Indiv. Mem. at 47; Gazprom Mem. at 37) that, if Defendants truly had wanted to destroy Yukos, they would have wanted the company's stock price to fall, not rise. A low stock price, however, was not necessary for Defendants to effect their expropriation; all that was necessary were sufficiently large false tax assessments and a rigged liquidation of Yukos assets. The Fraud Defendants' false representations and deceptive conduct simply sought to make the Russian government's actions appear legitimate and thereby limit the damage done as the uncompensated expropriation unfolded.

made has been proven false by subsequent events: President Putin stated that the Russian Federation was "not interested in seeing Yukos go bankrupt" (*Id*. ¶ 226), yet the Russian Federation later conspired to institute involuntary bankruptcy proceedings against the company (*Id*. ¶ 296); Miller stated on October 2, 2004 that Gazprom "was not considering the possibility of taking part in an auction" of Yukos assets (*Id*. ¶ 268), yet Gazprom registered as a bidder in the auction of YNG just two months later; and Kudrin stated that YNG would be auctioned off "in accordance with the law and in an absolutely transparent and market-oriented way" (*Id*. ¶ 265), yet the auction was a ridiculous sham.[67]

Further, ADR Purchasers have alleged that Gazprom profited from a short-sale of Yukos stock on May 25, 2004, at which time Gazprom knew that it was in possession of material, nonpublic information about the company (*Id*. ¶¶ 240-46); that BFG bid against *itself* to validate the auction of YNG (*Id*. ¶ 279); and that Sechin and Bogdanchikov created and financed BFG, an entity that was later revealed to be an empty shell (*Id*. ¶ 281). These facts and more, which need not be repeated here, establish a strong inference of scienter on the part of each Fraud Defendant.

---

[67] The Gazprom Fraud Defendants argue (at 44) that Miller's alleged misstatements disclaiming any intention of Gazprom to acquire Yukos assets (Am. Compl. ¶¶ 233, 263, 267-69) are not actionable because they concerned future intentions and plans. Similarly, the Rosneft Fraud Defendants assert (at 50) that Rosneft spokesman Alexander Stepanenko's statement of July 22, 2004, that Rosneft was "not planning any acquisitions in the near future" (Am. Compl. ¶ 263), is not actionable because "[n]othing in the Amended Complaint suggests that this was not true at the time the statement was made."

The Gazprom and Rosneft Fraud Defendants' misstatements of material fact that concerned future intentions or plans, however, are actionable under the Section 10(b) and Rule 10b-5 because these defendants did not identify their statements as "forward-looking" or accompany them with "meaningful cautionary statements." *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (Under the "bespeaks caution" doctrine, a safe harbor exists for forward-looking statements identified as such and accompanied by meaningful cautionary language.) Moreover, the Fraud Defendants knew their statements were false when made. *See In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made").

C.     **The Fraud Defendants' Material Misstatements and Manipulative or Deceptive Acts Took Place "In Connection with" the Purchase or Sale of a Security.**

The Gazprom and Rosneft Fraud Defendants argue (Gazprom Mem. at 35-36; Rosneft Mem. at 55) that ADR Purchasers have not alleged that Gazprom or Miller made material misstatements or omissions "in connection with" the purchase or sale of a security. Underlying this argument is the notion that ADR Purchasers may not seek damages under Section 10(b) and Rule 10b-5 from a company in which they do not own stock. This theory, however, is incorrect. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000); *see also Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 965 (N.D. Cal. 2005) ("[Defendant] argues that misstatements may be considered 'in connection with' a transaction only where the statements are made by the issuer of securities and/or refer to the securities in question. The case law does not dictate such a bright line rule.").

In *Semerenko*, plaintiff investors in one company alleged that a second, unrelated company made actionable misstatements during a tender offer for the former company's shares. 223 F.3d at 169. The Third Circuit held that the plaintiffs were able to seek damages under the securities laws from the unrelated company, so long as the plaintiffs "show[] that the [unrelated company's] misrepresentations . . . were disseminated to the public in a medium upon which a reasonable investor would rely, and that they were material when disseminated." *Id.* at 176. By doing so, *Semerenko* explained, the plaintiffs would satisfy the "in connection with" element of Rule 10b-5. *See id.* at 177-78 ("We emphasize . . . that it is no defense that the alleged

misrepresentations were made in the context of a tender offer or a proposed merger, or that they did not specifically refer to the investment value of the security that was bought or sold.").[68]

The instant case presents analogous facts to those in *Semerenko*. ADR Purchasers are investors in one company, *i.e.*, Yukos, who have alleged that unrelated companies, *i.e.*, Gazprom and Rosneft, made actionable misstatements and performed manipulative or deceptive acts during a period, much like a tender offer, in which there was active speculation about their interest in Yukos's major assets. *See Semerenko*, 233 F.3d at 177 ("It is well established that information concerning a tender offer or a proposed merger may be material to persons who trade in the securities of the target company, despite the highly contingent nature of both types of transactions."). As documented in the Amended Complaint, the Fraud Defendants' material misstatements and conduct were disseminated to the investing public via leading international

---

[68] Both the Rosneft and Gazprom Fraud Defendants rely on *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 33-34 (2d Cir. 2004), in which the court held that plaintiff investors in one company did not have standing to sue another, unrelated company because the latter did not issue the plaintiffs' shares. *Id.* at 29-30. This case can be distinguished, however, from *Semerenko*: in *Nortel*, the defendant company's statements concerned only itself (*i.e.*, its own financial state), not another issuer or the defendant's intentions with respect to another issuer. *Id.* at 30. The instant case falls on the *Semerenko* side of this divide in that the Fraud Defendants' statements concerned Yukos and their intentions with respect to Yukos.

   The Individual Fraud Defendants also rely upon *Nortel* for the proposition that ADR Purchasers lack standing because the Individuals' alleged misstatements were "far too attenuated" from Plaintiffs' purchase or sale of securities. *See* Indiv. Mem. at 42. This argument, of course, raises a factual issue, but is also wrong. *Nortel*, which does not use the language "far too attenuated," simply distinguished between two transactions, one where standing exists and another where it does not. *See Ontario Pub. Serv. Employees Union v. Nortel Networks Corp.*, 369 F.3d 27, 33-34 (2d. Cir. 2004). Where, for example, Company A contemplates a major transaction, such as a merger, with Company B, purchasers of Company B's securities have standing to sue Company A for its misstatements in the run-up to the transaction. *See id.* at 34. But where the transaction between the companies is relatively minor, such as the sale of a business unit, the purchasers would not have standing. *See id.* In the instant case, the Individual Fraud Defendants' misstatements concerned something that can only be analogized to a major transaction: the potential for the forced bankruptcy and uncompensated nationalization of Yukos. Applying this test, the ADR Purchasers plainly have standing to bring this claim.

news sources upon which the market relied. Therefore, ADR Purchasers have adequately alleged the "in connection with" element of their securities fraud claim.[69]

### D. ADR Purchasers Have Alleged Reliance.

The Individual, Gazprom, and Rosneft Fraud Defendants argue (Indiv. Mem. at 47-48; Gazprom Mem. at 7-8, 40-41; Rosneft Mem. at 52-54) that ADR Purchasers have not alleged reliance. To state a claim under Rule 10b-5, however, ADR Purchasers need not prove individualized reliance on the Fraud Defendants' misrepresentations. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 247-48 (1988). Rather, Plaintiffs may proceed under the "fraud on the market" doctrine, a theory that allows for a presumption of reliance. *Id.* at 247. To invoke the presumption, "a party need only establish 'basic facts[.]'" *Polymedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir. 2005) (quoting *Basic*, 485 U.S. at 245). Specifically, a plaintiff must establish: (1) that the defendant's public misstatements, omissions, or acts were material; (2) that the securities at issue traded on an efficient market; and (3) that the plaintiff traded the securities between the time the misrepresentations were made and the time that the truth was revealed. *Greenberg v. Crossroad Systems, Inc.*, 364 F.3d 657, 661 (5th Cir. 2004) (citing *Basic*, 485 U.S. at 247 n.27).[70] The Amended Complaint satisfies each of these requirements.[71]

---

[69] Gazprom also appears to rely (at 36) upon *Lindblom v. Mobile Telecomms. Techs. Corp.*, 985 F. Supp. 161 (D.D.C. 1997) for the proposition that misstatements by one company are not actionable in a securities fraud claim by shareholders of another company. In *Lindblom*, in addition to seeking damages under Section 10(b) and Rule 10b-5 against the issuer of their securities, plaintiffs sued a subsidiary of the issuer. *Id.* at 163. Examining the subsidiary's motion to dismiss, the court held that the subsidiary's alleged misstatements were not made "in connection with" the purchase or sale of the plaintiffs' securities because the statements were irrelevant to the plaintiffs' factual allegations. *See id.* at 164. Gazprom has misinterpreted the court's holding to have turned not upon the irrelevancy of the subsidiary's alleged misstatements but upon the fact that the plaintiffs were not purchasers of the subsidiary's stock. *See id.* This latter fact, however, was merely incidental to the core of the court's analysis. *See id.*

[70] The Rosneft Fraud Defendants argue (at 15 n.18) that ADR Purchasers have not alleged reliance against them because "the majority of ADRs were purchased prior to the alleged statements by Rosneft." This argument incorrectly assumes that the false representations of President Putin and other government officials are not (continued…)

With respect to materiality, all of the Fraud Defendants argue that their alleged false representations are immaterial in light of disclosures in Yukos's public filings and news reports about the challenges facing the company.  In effect, this argument attempts to rebut the "fraud on the market" presumption "by showing that the truth of the matter was already known."  *See Ganino v. Citizens Utilities Company*, 228 F.3d 154, 167 (2d Cir. 2000) (explaining the "truth on the market" doctrine:  "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market").  This argument fails, however, for two reasons.

First, "the truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint for failure to plead materiality."  *Ganino*, 228 F.3d at 167; *see also Kaplan v. Rose*, 49 F.3d 1363, 1378 (9th Cir. 1994) ("claims based on fraud on the market theory are fact-specific and generally for the trier of fact decide") (citing *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993)).  Second, assuming for the sake of argument that the truth about the Fraud Defendants' scheme began to

---

attributable to Rosneft.  The Rosneft Fraud Defendants also argue that, because certain ADR Purchasers purchased both before and after Rosneft's summer 2004 statements disclaiming interest in Yukos assets, these Purchasers could not have relied upon the statements.  Assuming for the sake of argument that the statements of President Putin and other officials are not attributable to Rosneft, the Purchasers who bought both before and after the summer 2004 statements still have actionable claims under the "fraud on the market" theory for their post-statement purchases.  That they also purchased ADRs before the statements is irrelevant; investors purchase securities at different times for different reasons.

[71] Some courts also have held that claims that invoke the "fraud on the market" theory must show that the false representations at issue "actually affected" the price of the security.  *See Greenberg*, 364 F.3d at 662 (citing *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 415 (5th Cir. 2001)).  An "actual effect" may be shown by "an increase in price following the allegedly false positive statements or a corresponding decrease in price following the revelation of the misleading nature of the[] statements."  *Greenberg*, 364 F.3d at 662 (citing *Nathenson*, 267 F.3d at 415); *see also Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333 (AGS), 2002 WL 31158901, at *6 (S.D.N.Y. Sept. 27, 2002) (even though the price of the security at issue did not increase after defendants' misrepresentations, plaintiffs adequately pled reliance under the fraud on the market theory because the price of the security at issue declined after the misrepresentations were revealed as false).  In the instant case, as the Fraud Defendants' statements were revealed as false, the price of Yukos ADRs fell to near zero.

emerge before certain Plaintiffs purchased their ADRs, the full extent of the fraud was not revealed until after the auction of YNG. *See Pinker*, 292 F.3d at 375 (holding that, because the "full truth" about a fraudulent scheme "had not yet emerged by the time at which [plaintiff] purchased his ADRs," plaintiff "has adequately pled reliance under a fraud-on-the-market theory of liability").

Further, the Gazprom Fraud Defendants argue (at 40) that Plaintiffs may not plead reliance on misrepresentations that did not take place immediately before their purchases. The case law does not support this assertion: as stated above, Plaintiffs need only purchase their ADRs between the date of the misrepresentation and the time that the truth was revealed. *See Greenberg*, 364 F.3d at 661; *see also In re Bridgestone Sec. Litig.*, 430 F.Supp. 2d 728, 735 (M.D. Tenn. 2006) (holding that a jury could find that plaintiff who invoked the fraud on the market theory reasonably relied upon statements made over four months before the date she purchased securities).

### E.     ADR Purchasers Have Alleged Loss Causation.

The Individual and Gazprom Fraud Defendants argue (Indiv. Mem. 48-49; Gazprom Mem. 37-41) that ADR Purchasers have failed to allege loss causation because they have merely alleged that they purchased Yukos ADRs at "artificially inflated" prices. This mischaracterizes ADR Purchasers' claim.

To plead loss causation, a complaint need only provide "some indication of the loss and causal connection that the plaintiff has in mind" between that loss and the misrepresentation. *See Dura*, 544 U.S. at 347; *see also Parmalat*, 376 F. Supp. 2d at 510 ("the loss causation requirement will be satisfied if [the deceptive or manipulative conduct in violation of Rule 10b-5(a) and (c)] had the effect of concealing the circumstances that bore on the ultimate loss"); *Enron*, 439 F. Supp. 2d at 720 (Plaintiffs "need only prove that [a Defendant's] act was a

'significant contributing cause' of [Plaintiffs'] loss, but it need not be the 'sole and exclusive cause.'") (quoting *Parmalat*, 376 F. Supp. 2d at 509).  ADR Purchasers have met this requirement by alleging that the Fraud Defendants' material misstatements or omissions and manipulative or deceptive acts caused ADR Purchasers to purchase Yukos ADRs at artificially inflated prices and that, as the Fraud Defendants' scheme became evident, the price of Yukos ADRs fell to near zero.  *See* Am. Compl. ¶ 398.[72]  Plaintiffs' losses were a foreseeable consequence of the Fraud Defendants' actions.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73 (2d Cir. 2005) (the loss in question is foreseeable where the complaint alleges "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").  ADR Purchasers have therefore alleged loss causation.

> **F.      U.S. Securities Laws Apply Extraterritorially to Defendants' Conduct.**

The Individual, Gazprom, and Rosneft Fraud Defendants each assert that the U.S. securities laws do not apply extraterritorially to the Fraud Defendants.  Indiv. Mem. at 41-43; Gazprom Mem. at 32-34; Rosneft Mem. at 42-45.  Yet courts repeatedly have recognized that the Exchange Act has extraterritorial application.  *See, e.g., Zoelsch v. Arthur Anderson & Co.*, 824 F.2d 27, 30 (D.C. Cir. 1987) ("The courts have not confined federal jurisdiction to securities transactions consummated in the United States."); *Schoenbaum v. Firstbrook*, 405 F.2d 200, 206 (2d Cir. 1968) ("[T]he anti-fraud provision of Section 10(b) . . . reaches beyond the territorial limits of the United States and applies when a violation of the Rules is injurious to United States

---

[72] Courts have repeatedly held that a plaintiff's economic loss need not be the result of a formal corrective disclosure.  *See Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 & n.9 (D.D.C. 2006); *Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954 (SAS), 2006 WL 1716862, at *4 (S.D.N.Y. June 20, 2006); *Enron*, 439 F. Supp. 2d at 701.  Rather, economic loss may occur as "as relevant truth begins to leak out," or "after the truth makes it way into the market place[.]"  *See Dura Pharms. v. Broudo*, 544 U.S. 336, 342 (2005).

investors."). Courts have applied U.S. securities laws extraterritorially where the extraterritorial conduct produces substantial effects within the United States, such as effects on domestic markets or domestic investors. *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 9 (D.D.C. 2000) (holding jurisdiction exists where plaintiffs "allege that conduct outside the United States has produced a substantial effect within the United States").

Plaintiffs' allegations establish subject-matter jurisdiction because the Fraud Defendants' misconduct has had a substantial, detrimental effect on American investors in Yukos. *See Interbrew S.A. v. EdperBrascan Corp.*, 23 F. Supp. 2d 425, 429 (S.D.N.Y. 1998) (an effect is "substantial" where the extraterritorial conduct at issue affects stock traded in the United States and harms the interests of American investors); *Schoenbaum*, 405 F.2d at 208 (holding that subject matter jurisdiction exists over the claim of an American investor in a Canadian company because the company's shares traded in the United States and the extraterritorial conduct at issue was detrimental to U.S. investors, despite the fact that the plaintiff purchased his securities abroad).[73] Indeed, Plaintiffs have alleged that, as a direct result of the Fraud Defendants' misconduct, Plaintiffs' ADRs have effectively become worthless, representing a combined loss of approximately $3.5 million. More generally, American investors in Yukos ADRs have seen the value of their investments plunge by approximately $6 billion.[74] Contrary to the Fraud

---

[73] The Individual, Gazprom, and Rosneft Fraud Defendants argue (Indiv. Mem. at 42; Gazprom Mem. at 33-34; Rosneft Mem. at 42-43) that their alleged misconduct must have been *intended* to cause detrimental effects in the United States for Plaintiffs to establish subject-matter jurisdiction. Such an intention underlies Plaintiffs' theory in the Amended Complaint; that is, the Fraud Defendants' material misstatements and omissions and manipulative and deceptive acts were directed at U.S. and global securities markets in an attempt to defraud Plaintiffs and the investing public. *See, e.g.*, Am. Compl. ¶¶ 10, 142, 147, 186, 224, 262.

[74] The Rosneft Fraud Defendants argue (at 44) that the "fraud on the market" theory, under which Plaintiffs bring their securities fraud claim, may not be used to create subject-matter jurisdiction in an extraterritorial action. The case upon which the Fraud Defendants rely for this proposition, however, states only that the "fraud on the market" theory may not be used to establish subject matter jurisdiction over conduct that has taken place *within* the United States and causes detrimental effects *abroad*. *See Baan*, 103 F. Supp. 2d at 10. The loci of the Fraud Defendants' (continued…)

Defendants' claims, such effects are hardly "incidental." *See, e.g., Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118, 124 (2d Cir. 1995) (holding that over $100 million lost in shareholders' corporate equity constitutes substantial, detrimental effects).[75]

## XII.  THE AMENDED COMPLAINT STATES A CLAIM FOR COMMON-LAW FRAUD AND DECEIT.

A valid claim for common-law fraud in this jurisdiction must allege five elements: (1) a false representation, (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) action is taken in reliance upon the representation. *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C. 1992); *see also Century 21, Inc. v. F.W. Woolworth Co.*, 181 A.D.2d 620, 625 (1st Dep't 1992) (plaintiffs who refrain from action in reliance upon a false representation may state a claim for common-law fraud) (citing *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 151 N.E.2d 833, 835 (N.Y. 1958)); Restatement (Second) of Torts § 525 (1938) (same).

Plaintiffs' Amended Complaint has alleged these elements as to the Fraud Defendants. Specifically, Plaintiffs have alleged that the Fraud Defendants, in furtherance of their scheme to expropriate Yukos without compensation to its owners, made misstatements or omissions of

---

misconduct and resultant detrimental effects are the reverse of what was disapproved in *Baan*, rendering Defendants' authority inapplicable.

[75] The Rosneft Fraud Defendants (at 43 n.16) cite *In re Yukos Oil Company Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 800736 (S.D.N.Y. Mar. 30 2006) in support of their claim that subject-matter jurisdiction does not exist in the instant case. In *Yukos*, three Yukos investors brought a putative class action for securities fraud against Yukos, its outside auditor, and certain of its executives. *Id.* at *2. The defendants moved to dismiss the claims of two of the three plaintiffs on the ground that the court lacked subject-matter jurisdiction. *Id.* at *7. The defendants did not move to dismiss the claims of the third plaintiff on this ground because that plaintiff, a citizen of the United Kingdom who resides in Moscow, invested in Yukos ADRs; the other plaintiffs, both of whom are foreign corporations, purchased Yukos common stock and convertible bonds on foreign exchanges. *See id.* at *2, *5. The court granted the defendants' motions, noting that the plaintiffs' securities were purchased and traded abroad and that the plaintiffs did not allege to have "suffered any effects" in the United States. *Id.* at *10. By contrast, in the case at bar, Plaintiffs, like the third plaintiff in *Yukos*, purchased Yukos ADRs. Further, all but three Plaintiffs purchased their securities on the U.S. OTC market and have alleged substantial, detrimental effects in this country.

material fact, and that the Fraud Defendants made these misrepresentations or omissions with intent to deceive. The Fraud Defendants' misstatements and omissions induced Plaintiffs to maintain their ownership of Yukos ADRs, or to purchase Yukos ADRs at artificially inflated prices, from October 7, 2003, through and including December 19, 2004. As the falsity of the Fraud Defendants' representations became evident, Yukos ADRs became near worthless in value, harming Plaintiffs as a result.

In response, the Individual, Gazprom, and Rosneft Fraud Defendants[76] argue that Plaintiffs' common-law fraud claims[77] should be dismissed because (1) Plaintiffs have not alleged that the Fraud Defendants made misstatements or omissions of material fact; (2) Plaintiffs have not alleged that Rosneft's statements were made with knowledge of their falsity or with intent to deceive; (3) Plaintiffs have not alleged reliance; and (4) Plaintiffs' alleged injury is speculative.

### A. Plaintiffs Have Alleged Misstatements or Omissions of Material Fact by the Fraud Defendants.

The Individual, Gazprom, and Rosneft Fraud Defendants argue (Indiv. Mem. at 52; Gazprom Mem. at 67; Rosneft Mem. at 65) that Plaintiffs have not alleged that the Fraud Defendants made misstatements or omissions of material fact. As explained in Section XI.A, however, Plaintiffs have alleged with specificity that the Russian Federation, Gazprom, Rosneft, Khristenko, Kudrin, Medvedev, Miller, and Yusufov each made misstatements or omissions of material fact intended to conceal from investors their intent to expropriate Yukos without compensation to its owners. *See* Am. Compl. ¶¶ 147-156 (misrepresentations in the wake of

---

[76] The Russian Federation does not address Plaintiffs' claims for common-law fraud.

[77] None of Defendants argues that Plaintiffs' allegations of fraud as a matter of Russian law are insufficient to state a claim. Plaintiffs' Russian-law fraud claim, therefore, need not be defended in this memorandum.

Khodorkovsky's arrest), 169-195 (misrepresentations regarding ExxonMobil's potential acquisition of YukosSibneft), 233-239 (misrepresentations following Yukos's failed tax appeal), 249-295 (further misrepresentations regarding the expropriation of Yukos).

The Individual Fraud Defendants also argue that "public statements on issues of public concern by foreign public officials cannot form the basis for a fraud claim." Indiv. Mem. at 52. Yet the Individual Fraud Defendants are not only public officials. Each, with the exception of Kudrin, is also a board member of a leading global energy company (*i.e.*, Rosneft or Gazprom), or was at the time of his misstatements. *See* Am. Compl. ¶¶ 75, 79, 80, 82. Their public statements therefore cannot be so easily compartmentalized. Moreover, the Individual Fraud Defendants cannot hide behind an argument that they did not owe "the international investing public a duty [of disclosure]." Indiv. Mem. at 44. As explained in Section XI.A.1, because the Individual Fraud Defendants spoke publicly, their statements were required to be complete and accurate. Their statements, however, were not.

### B. Plaintiffs Have Alleged That Rosneft's Statements Were Made with Knowledge of Their Falsity and with an Intent To Deceive.

Rosneft asserts (at 65) that Plaintiffs have not alleged that its public statements were made with knowledge of their falsity or with an intent to deceive. This assertion is incorrect. For example, Plaintiffs have alleged that, on July 21, 2004, Rosneft's press spokesman, Alexander Stepanenko, said that Rosneft was "not planning any asset acquisitions in the near future. None." Am. Compl. ¶ 263. Plaintiffs have alleged specific facts that establish that this statement was false when made and that it sought to mislead investors into believing that Rosneft neither wanted to bankrupt Yukos nor profit from its destruction. *See, e.g.*, Am. Compl. ¶ 262, 270, 280-86. Indeed, Plaintiffs have alleged similar facts for each of the misstatements made by or attributed to Rosneft. *See id.* ¶¶ 147-156, 169-195, 223-239, 249-295.

### C.      Plaintiffs Have Alleged Reliance.

The Individual, Gazprom, and Rosneft Fraud Defendants challenge the adequacy of Plaintiffs' allegations with respect to reliance.  Indiv. Mem. at 52; Gazprom Mem. at 67; and Rosneft Mem. at 66, 68.  As explained in Section XI.D, Plaintiff Yukos ADR Purchasers need not, however, allege individualized reliance upon the Fraud Defendants' misrepresentations. Instead, ADR Purchasers may invoke a presumption of reliance under the "fraud on the market" theory.  *See, e.g.*, *In re Atlantic Fin. Sec. Litig.*, No. 89-0645, 1990 WL 171191 (E.D. Pa. Oct. 31, 1990) (applying fraud on the market theory to common-law fraud claim); *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 176 (S.D.N.Y. 1989) (same).[78]   Although some courts have held the "fraud on the market" theory inapplicable to fraud claims under the common law of their jurisdictions, *see, e.g.*, *Good v. Zenith Elec. Corp.*, 751 F. Supp. 1320, 1323 (N.D. Ill. 1990), no D.C. court has ruled on the issue.  There is no good reason, however, not to extend the theory to claims of common-law fraud.  Indeed, according to the theory, an investor who "buys or sells stock at the price set by the market does so in reliance on the integrity of that price."  *Basic*, 485 U.S. at 247.  By its very logic, therefore, this theory must apply to an investor who alleges common-law fraud just as it does to one who alleges a violation of Rule 10b-5.[79]

---

[78] The Rosneft Fraud Defendants rely (at 66) upon *In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163 (D.D.C. 1996) to argue that the "fraud on the market" theory is not applicable to common-law fraud claims.  In *Newbridge*, however, the court did not apply D.C. common law to its analysis.  *See Newbridge*, 926 F. Supp. at 1175.  As importantly, the claim before the court was one of common law negligent misrepresentation, not common-law fraud. *See id.* ("[A] 'fraud on the market' theory or a presumption of reliance is [in]applicable to *this* common-law *context*.") (emphasis added).

[79] Plaintiffs have, of course, also alleged individualized reliance on the Fraud Defendants' false representations.  *See* Am. Compl. ¶¶ 238, 362, 367; *see also Virginia Academy of Clinical Psychologists*, 878 A.2d 1226, 1238 (D.C. 2005) ("It is not necessary that [a plaintiff's] reliance upon the truth of the fraudulent representation be the sole or even the predominant or decisive factor in influencing his conduct . . ..  It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.") (internal quotation marks and citations omitted).  For example, President Putin's statement of June 17, 2004, in which he said that the Russian government was "not interested in seeing Yukos go bankrupt," Am. Compl. ¶ 226, was relied upon by the following (continued...)

### D.     Plaintiffs' Injury Is Not Speculative.

The Individual and Rosneft Fraud Defendants argue that Plaintiffs' alleged injury is too speculative to support relief.  Specifically, the Rosneft Fraud Defendants argue (Rosneft Mem. at 67) that Plaintiffs do not adequately allege how they were injured by Rosneft's false representations, despite a clear statement to that effect in the Amended Complaint.  That is, but for Rosneft's misstatements and omissions, Plaintiffs would have sold their ADRs at greater prices than they realized or than the ADRs are currently worth, or they would not have purchased the ADRs at artificially inflated prices, if at all.  Am. Compl. ¶ 367.

The Rosneft Fraud Defendants argue that this allegation is "sheer speculation."  It is not any way speculative, however, to assert that, where a company is alleged to have engaged in a multi-billion-dollar tax fraud, a rational investor would sell, or not purchase, the company's securities.  This would be particularly so where tax allegations are accompanied by speculation that the government seeks to expropriate the company.  It is precisely such a fact pattern that is at issue here.  The Fraud Defendants, including Rosneft, in response to reports that they aimed to bankrupt or nationalize Yukos, reassured investors that this was not their goal.  In reliance upon these statements, Plaintiffs continued to hold, or purchased, Yukos ADRs.  Only later were the

---

ADR Purchasers: Paul D. Allen, Jonathan Roosevelt, Richard Alemian, Thomas Urmy, Judith B. Wittenberg, William E. Haynsworth, Donald E. Marcus, Edith Mabrey, Jonathan Strong, Paul Cifrino, George Coupounas, Arthur Davis, E. Byron Hensley, Charles Libby, Susan Ashton-Linksey, Joel Alvord, and Cynthia D. McLaughlin. *See* Am. Compl. ¶ 238, A-3, A-4, A-5.

The Rosneft Fraud Defendants argue (at 66 n.24, 69) that Plaintiff Yukos ADR Holders have not alleged individualized reliance with the requisite, heightened level of specificity. *See In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 320-22 (S.D.N.Y. 2004) (courts that have recognized "holder" claims require specific allegations of how many shares plaintiffs would have sold and when they would have sold them, or allegations of direct communications between plaintiffs and defendants).  While Plaintiffs acknowledge Rosneft's argument with respect to ADR Holders, it should be noted, first, that it applies to only five of the 43 Plaintiffs, and, second, that three of those five Plaintiffs also made purchases of Yukos ADRs that qualify them as Purchasers, as well. *See* Am. Compl. ¶¶ 56-58.

Fraud Defendants' statements revealed as false, resulting in the injury for which Plaintiffs now seek relief.

With respect to ADR Purchasers, the Individual Fraud Defendants argue (at 53) that the price of Yukos ADRs was inflated not by their false statements but by Yukos's alleged tax fraud. At the time of the Individual Fraud Defendants' false statements, however, the price of Yukos ADRs had already accounted for the alleged tax fraud. Indeed, the Rosneft Fraud Defendants themselves state that the market should have accounted for the claims against Yukos: "the price of a stock on a well-developed market reflects all publicly available information." Rosneft Mem. at 67 (citing *Basic*, 485 U.S. at 246 n.24). The Individual Fraud Defendants caused the price of Yukos ADRs to be artificially inflated by misrepresenting that, despite the allegations of tax fraud, they did not aim to bankrupt or nationalize the company.

For these reasons, Plaintiffs have adequately alleged common-law fraud.

## XIII. THE AMENDED COMPLAINT STATES A CLAIM FOR CONSPIRACY TO COMMIT COMMON-LAW FRAUD.

Plaintiffs have stated a claim for conspiracy to commit common-law fraud under the law of the District of Columbia. Such a claim requires that a plaintiff allege: "'(1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner; and (2) an overt tortious act in furtherance of an agreement that causes injury.'" *Hall v. Clinton*, 285 F.3d 74, 82-83 (D.C. Cir. 2002) (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)) (emphasis omitted). "Proof of tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam*, 705 F.2d at 477.

The Individual Fraud Defendants argue (at 53) that Plaintiffs cannot state a claim for conspiracy to commit common-law fraud because Plaintiffs have not sufficiently alleged an underlying fraud. As shown in Section XII, this argument is incorrect. The Gazprom Fraud

Defendants, meanwhile, argue (at 67) that Plaintiffs have not pled conspiracy to common-law fraud with sufficient particularity.[80]   Plaintiffs, however, have made detailed allegations demonstrating that the Fraud Defendants, pursuant to an actual or tacit agreement and/or understanding, conspired to defraud Plaintiffs into maintaining their ownership of Yukos ADRs through and including December 19, 2004, or into purchasing Yukos ADRs at artificially inflated prices.  *See* Am. Compl. ¶¶ 147-156, 169-195, 223-239, 249-295.

## XIV. THE AMENDED COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING COMMON-LAW FRAUD.

Plaintiffs have stated a claim for aiding and abetting common-law fraud under D.C. law. A valid claim for aiding and abetting under D.C. law requires that a plaintiff allege: "(1) the party whom the defendant aids must perform the wrongful act that causes the injury; (2) the defendant must be generally aware of his role as part of the overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation."  *Int'l Telecomm. Satellite Org. v. Colino*, Nos. 88-1266, 87-2749, 1992 WL 93129, at *13 (D.D.C. Apr. 15, 1992) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).[81]   To show "substantial assistance," a plaintiff must allege that the defendant "proximately caused" the injury for which relief is sought.  *Filler v. Hanvit Bank*, No. 01 Civ. 9510, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003).

The Individual, Gazprom, and Rosneft Fraud Defendants[82] argue (Indiv. Mem. at 53-54; Gazprom Mem. at 67-68; Rosneft Mem. at 69-70) that Plaintiffs have not alleged these elements

---

[80] The Rosneft Fraud Defendants do not contest Plaintiffs' claim for conspiracy to commit common-law fraud.

[81] The Gazprom and Rosneft Fraud Defendants assert (Gazprom Mem. at 67; Rosneft Mem. at 69 n.27) that few cases have "recognized" a claim of aiding and abetting common-law fraud under D.C. law.  Although this appears to be true, no cases have held that such a claim does not exist, and no Fraud Defendant has suggested any reason why the cases that do recognize such a claim are wrong.

[82] The Russian Federation has not addressed this claim.

sufficiently.[83]   Yet, "[a]llegations of active participation in a fraudulent scheme, with scienter, sufficient to establish primary liability under [Rule 10b-5], will *a fortiori* suffice to show aiding and abetting common-law fraud."  *Lernout & Hauspie*, 235 F. Supp. 2d at 176.  As explained in Section XI, Plaintiffs have so alleged and therefore have satisfied the above elements as to each of the Fraud Defendants.

## XV.  THE AMENDED COMPLAINT STATES A CLAIM FOR INSIDER TRADING UNDER 15 U.S.C. § 78t-1(a).

Plaintiff Reinhardt has stated a claim for insider trading under Section 20A of the Exchange Act (15 U.S.C. § 78t-1(a)) against Gazprom.  Specifically, Reinhardt has alleged that, on May 25, 2004, Gazprom, via its majority-owned subsidiary and authorized banking agent Gazprombank, executed a short sale of Yukos shares on the OTC market while in possession of material, nonpublic information about Yukos.  *See* Am. Compl. ¶ 240-48.  This short sale was executed contemporaneously with the May 11, 2004, stock purchase of Plaintiff Reinhardt.  *See id.* ¶ 246, A-4.  Gazprom's assertions (at 46) that Reinhardt's claim is "baseless" for five reasons are without merit.

First, Gazprom suggests (at 46-48) that Reinhardt has not alleged with sufficient specificity the "nonpublic information" upon which the company traded.  Reinhardt, however, plainly has alleged that Gazprom received material, nonpublic information that stated that the Moscow Arbitration Court was to uphold Russian Federation's tax claims against Yukos.  *See* Am. Compl. ¶¶ 240, 245.  The case upon which Gazprom relies, *In re BMC Software, Inc. Sec.*

---

[83] Specifically, the Rosneft Fraud Defendants assert that, "Plaintiffs have failed to demonstrate . . . that Rosneft, Bogdanchikov, or Borisenko gave any substantial assistance."  Rosneft Mem. at 69-70.  Plaintiffs have plainly alleged, however, that, among other things, Rosneft and Bogdanchikov were principal actors in the creation and financing of the sham entity BFG, while Borisenko's attendance at the YNG auction was vital in that it satisfied the requirement that at least two bidders be present.  Am. Compl. ¶¶ 279, 281.  Such actions were instrumental in causing the harm for which Plaintiffs now seek relief.

*Litig.*, 183 F. Supp. 2d 860 (S.D. Tex. 2001), for the proposition that Reinhardt's allegations lack specificity is easily distinguishable.  That is, in *BMC Software*, the plaintiffs simply did not identify the information upon which defendants allegedly traded.  *See BMC Software*, 183 F. Supp. 2d at 869, 916.

Second, Gazprom erroneously asserts that it is not liable for insider trading because it did not owe ADR holders a fiduciary duty.  Where a defendant is passed material, nonpublic information from a fiduciary who breaches a duty to the source of the information, and the defendant knows or should have known about the breach, the defendant assumes a fiduciary duty to the shareholders of the subject corporation not to trade on the information.  *Dirks v. SEC*, 463 U.S. 646, 660 (1983); *see also United States v. Chestman*, 947 F.2d 551, 556 (2d Cir. 1991) ("the predicate act of fraud may be perpetrated on the source of the nonpublic information, even though the source may be unaffiliated with the buyer or seller of securities").  If the defendant trades on the information, he is liable as a "tippee."  *Id.*  Here, Gazprom was informed, in advance, that the Moscow Arbitration Court planned to uphold the tax claims against Yukos. The only manner in which Gazprom could have received this information is if a government official who knew the outcome to be preordained and breached a duty of trust or confidence, or a court employee breached a duty owed to the court to keep the information secret.  *See United States v. Victor Teicher & Co., L.P.*, 785 F. Supp. 1137, 1148-49 (S.D.N.Y. 1992) (employees of investment and law firms are "clearly" fiduciaries with respect to the firms' information). Gazprom should have known this and, therefore, assumed a fiduciary duty to ADR holders not to trade on the information.

Third, Gazprom asserts (at 48-50) that Reinhardt lacks standing to make an insider trading claim because his trades were not contemporaneous with the challenged transaction, as

required by Section 20A.  Yet "[t]he term 'contemporaneously' may embrace the entire period while relevant material non-public information remain[s] undisclosed."  *In re Am. Bus. Computers Corp. Sec. Litig.*, [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,839, at 93,055 (S.D.N.Y. Feb. 24, 1994).  The material, nonpublic information at issue in the instant case is the Moscow Arbitration Court's decision to uphold the tax demands against Yukos.  The company filed an appeal with the Moscow court on May 6, 2004.  *See* Am. Compl. ¶ 215; Ex. 65.[84] Immediately after Yukos filed this appeal, an employee of the court informed Gazprom that the result was preordained:  Yukos was to lose.  *See id.* ¶ 240.  From this date in early May through May 26, the day on which the Moscow court's decision was officially announced, Gazprom was in possession of material, nonpublic information about Yukos.  During this period, Reinhardt purchased Yukos ADRs; this purchase was therefore contemporaneous with Gazprom's trade. *See id.* ¶ 246.

Fourth, Gazprom argues (at 50-51) that, because it traded Yukos shares rather than ADRs, it and Reinhardt did not trade in securities "of the same class."  In effect, however, Yukos ADRs and Yukos shares are one and the same in that the ADRs are simply receipts that represent a specified number of the underlying shares.  *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002) ("An ADR is a receipt . . . that represents a specified amount of a foreign security[.]").  Therefore, Gazprom's argument fails.

Fifth, Gazprom asserts (at 51) that Reinhardt has failed to allege a predicate violation of the Exchange Act or the rules and regulations promulgated thereunder.  As shown in Section XI,

---

[84] *YUKOS Oil Company v. Ministry for Taxes and Levies of the Russian Federation*, No. 14-3-05/1609-1 [appeal of claimants], Moscow Arbitrazh Court (May 6, 2004).  "[T]he court may take judicial notice of matters of a general public nature, such as court records[.]"  *Baker v. Henderson*, 150 F. Supp. 2d 13, 15 (D.D.C. 2001) (citations omitted).

however, Reinhardt has alleged that Gazprom violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

For these reasons, Reinhardt has stated a claim for insider trading against Gazprom under Section 20A.

## XVI.    THE AMENDED COMPLAINT STATES VALID RICO CLAIMS.

RICO is an expansive statute that contains a "far-reaching civil enforcement scheme." *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 483 (1985).  Indeed, in passing RICO, Congress expressly instructed that the "provisions of this title shall be liberally construed to effectuate its remedial purpose."  Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970); *see also* S. Rep. No. 91-617, at 76 (1969) ("the attack [on racketeering activity] must take place on all available fronts").  RICO's "remedial purposes" are "nowhere more evident than in the provision of a private action for those injured by racketeering activity.  *Sedima*, 473 U.S. at 498.

This case presents the paradigm that RICO proscribes:  The statute was "aimed at attacking the use of force, threats of force, enforcement of illegal debts, and corruption *in the acquisition or operation of business*" – precisely the misconduct engaged in by the RICO Defendants[85] in acquiring and operating Yukos.  *Yellow Bus Line, Inc. v. Drivers' Chauffeurs & Helpers Local Union 639*, 913 F.2d 948, 954 (D.C. Cir. 1990), *cert. denied*, 501 U.S. 1222 (1991) (emphasis in original); *see also* H. Rep. No. 91-1549 (1970), as reprinted in 1970 U.S.C.C.A.N. 4007, 4033 ("Section 1962 establishes a threefold prohibition aimed at stopping the infiltration of racketeers into legitimate organizations.").

---

[85] The "RICO Defendants" are all defendants except Russia, Rosneft, Rosneftegaz, and Gazpromneft.  The "Gazprom RICO Defendants" are Gazprom and Miller.  The "Rosneft RICO Defendants" are Bogdanchikov, and Borisenko.  The "Individual RICO Defendants" are Khristenko, Kudrin, Yusufov, Sechin, and Mededev.  Plaintiff Yukos ADR Holders are generally referred to herein as "RICO Plaintiffs".

A RICO plaintiff must allege "(1) a violation of the substantive RICO statute, 18 U.S.C. § 1962, and (2) an injury to the plaintiff's 'business or property by reason of a violation of section 1962.'" *Yellow Bus Lines*, 913 F.2d at 950 (quoting *Alcorn County, Miss. v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1167 (5th Cir. 1984)); *Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994).[86]  RICO Plaintiffs meet each requirement.

Count IV of the Amended Complaint sets forth a violation of Section 1962(b), specifically, that the RICO Defendants acquired and maintained an interest in an enterprise – Yukos – that is engaged in interstate and foreign commerce.  The RICO Defendants acquired and are maintaining that control through a pattern of racketeering activity, including evading a temporary restraining order entered by the U.S. Bankruptcy Court for the Southern District of Texas (the "Houston Bankruptcy Court"), improper use of the color of authority to carry out their schemes, travel in interstate commerce to raise money to fund their schemes, and transmission of false and misleading statements by mail and/or wire in furtherance of the illegal acquisition and control of Yukos.

Count V sets forth a violation of Section 1962(c), arising from the RICO Defendants' association-in-fact enterprise.  This enterprise engaged in a pattern of misconduct that falls squarely within the proscription of RICO, as described in the preceding paragraph, all in an effort to take Yukos from its owners.  Finally, in Count VI, RICO Plaintiffs allege that the RICO Defendants conspired to violate RICO.

---

[86] At the pleadings stage, a plaintiff need not be able to prove the substance of his RICO allegations; such considerations must await trial or summary judgment.  *See United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1127 (E.D.N.Y. 1992) ("*PSIA*").  A RICO plaintiff must only satisfy the notice pleading requirements of Rule 8(a).  *E.g., Robbie v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 n.8 (7th Cir. 1998).

Defendants challenge the Amended Complaint by conjuring up claims different from the ones Plaintiffs have stated, then explaining why these imagined claims lack viability.  For example, Defendants pretend that RICO Plaintiffs' claim is for injuries to Yukos, rather than a claim for the independent injuries that RICO Plaintiffs suffered when defendants illegally seized control and operated the enterprise.  Defendants also ignore key allegations, such as their intention to affect the U.S. economy and the actual effects their conduct caused.  None of their defenses to Palintiffs' RICO claims withstands scrutiny.

### A.    RICO Plaintiffs Have Standing To Maintain Their RICO Claims.

The Amended Complaint alleges that the RICO Defendants undertook their schemes, at least in part, for the "unlawful private, commercial motives of destroying the interests of Yukos's owners and seizing control of Yukos."  (Am. Compl. ¶ 336(b).[87])  This claim seeks redress for Defendants' illegal usurpation of RICO Plaintiffs' interests in Yukos.

Defendants mischaracterize the claim as seeking redress for "injuries suffered directly by Yukos."  Specifically, Gazprom (at 51-52) and the Individual Defendants (at 27-29) argue that RICO Plaintiffs lack standing under RICO because their injuries are derivative of injuries to Yukos and therefore indirect.  As discussed above (*see* Section I.B.1), RICO Plaintiffs' injuries result from the RICO Defendants' misappropriation of the RICO Plaintiffs' ownership interest in Yukos, *not* from injuries to Yukos.

RICO requires that a plaintiff be "injured in his business or property by reason of a violation of section 1962" in order to have standing to sue.  18 U.S.C. § 1964(c).  *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992).  A RICO plaintiff may even recover for

---

[87] Other allegations in the Amended Complaint further demonstrate that Plaintiffs' claims arise from injuries that they suffered as a result of the RICO Defendants' actions.  *E.g.,* Am. Compl. ¶¶ 2-4, 10.

injuries suffered indirectly as a result of the predicate acts, as long as the plaintiff's injuries flow "from the total effect of the pattern of racketeering in the enterprise." *Sperber v. Boesky*, 849 F.2d 60, 63 (2d Cir. 1988).[88]

The RICO Plaintiffs clearly have standing under this test. Their injury was directly the result of the RICO Defendants' scheme to secure ownership of Yukos from those who rightly held it. Whether those acts also injured Yukos does not matter, as long as they advanced the RICO Defendants' illegal scheme to oust Yukos's owners, directly injuring the RICO Plaintiffs. Yukos's owners – not the company itself – were the targeted victims of the RICO Defendants' misconduct. Because RICO Plaintiffs have pled injuries that "do not arise 'solely' out of a scheme targeting" Yukos, Plaintiffs have RICO standing. *Maiz v. Virani*, 253 F.3d 641, 655 (11th Cir. 2001).

The RICO Defendants also suggest (*e.g.,* Gazprom Mem. at 51) that a corporate shareholder can never bring a RICO suit arising out of his ownership interest in the company. The law is the opposite: "[S]imply because the plaintiff is a shareholder of a corporation, it does not necessarily follow that he lacks standing to seek RICO damages in his own right." *Maiz*, 253 F.3d at 655. A plaintiff's status as a stockholder "does not preclude standing for RICO violations if the plaintiff has alleged an injury proximately caused by the defendants' acts of racketeering that target the plaintiff." *Id.* (quoting *Beck v. Prupis*, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998)); *see also Cowin v. Bresler*, 741 F.2d 410, 415 (D.C. Cir. 1984) (individual

---

[88] *Anza v. Ideal Steel Supply Co.*, 126 S.Ct. 1991 (2006), is not to the contrary. There, the Supreme Court held that a RICO plaintiff was not directly injured by a competitor that allegedly failed to charge sales tax and therefore lowered its prices. *See id.* at 1997. The Court's decision was based on the fact that the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud." *Id.* Here, however, no such intervening cause could be present. As explained below, the RICO Defendants' actions led directly to the ouster of Yukos's rightful owners, and they intended to achieve that goal.

rather than derivative suit proper where conduct causes an injury to the shareholders distinct from any injury to the corporation itself).

This is particularly true when a defendant violates RICO to seize control of a company. *See, e.g., Reuther v. Smith*, 2002 WL 1303119, at *4 (E.D. La. June 12, 2002) (plaintiffs had standing to pursue RICO claims because "alleged goal of the RICO activity was . . . to gain control of the Corporations").[89]  Even a case relied upon by the Individual Defendants (at 28) and Gazprom (at 52 n.32) reaches the same conclusion.  *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 907 (11th Cir. 1998) (conspiracy to "wrest . . . shares of . . . stock" from RICO plaintiff was direct injury).

Finally, Gazprom (at 62) and the Individual Defendants (at 28-29) argue that RICO Plaintiffs' injuries are not sufficiently clear or definite.  RICO Plaintiffs have alleged that their ADRs are "effectively worthless" (Am. Compl. ¶ 310) and that the formal dissolution of Yukos to provide the RICO Defendants with total, unfettered control is "imminent." *Id.* ¶ 9.  The Court must accept these allegations as true for purposes of evaluating the injury.  *See In re Merrill Lynch Ltd. P'Ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998).   Under the circumstances, RICO Plaintiffs have no recourse available to them to recover for the injuries they have suffered, thus making their injuries sufficiently definite to permit a RICO suit.[90]  *See id.*

---

[89] In *Reuther*, the president of a series of closely-held corporations also served as the companies' outside counsel, and he allegedly used these interlocking positions for his own benefit at the expense of the corporations' CEO and other shareholders.  *See Reuther v. Smith*, No. Civ. A. 01-3625, 2002 WL 1303119, at *1-3 (E.D. La. June 12, 2002).  The CEO brought suit against the president under RICO, and the defendants moved to dismiss for lack of RICO standing.  The court, however, held that the plaintiff had RICO standing because the goal of the RICO scheme was to permit the defendants to "gain control of the Corporations." *Id.* at * 5.

[90] The cases that Gazprom and the Individual Defendants cite to support their argument do not lead to a different result.  In *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994), a creditor brought a RICO claim, despite the fact that it was still attempting to collect on the debt that it was owed.  In *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990), the plaintiff asserted a RICO claim based on its expected inability to recover *if* it won a judgment against the defendant in a separately pending breach of contract action.  Here, by (continued…)

**B.      Defendants' RICO Violations Took Place and Had Substantial Effects In the United States.**

Defendants argue that RICO does not apply because their conduct took place outside of the United States and did not cause a significant effect here.  (Gazprom Mem. at 32; Rosneft Mem. at 45; Indiv. Mem. at 29-30.)  The argument is factually wrong:  The RICO Defendants' conduct took place, at least in part, in the United States, including when the RICO Defendants traveled to the United States to raise money to further their enterprise, in violation of the Travel Act, 18 U.S.C. § 1952.  Am. Compl. ¶¶ 127, 336(c).

> [W]here racketeering activities . . . occur within the United States, it is unnecessary to apply any test for determining the extraterritorial reach of the statute.

*Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp., Inc.*, 98 F. Supp. 2d 480, 485 (S.D.N.Y. 2000) (citing *Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*, 842 F. Supp. 1567, 1570 (S.D.N.Y. 1994), *aff'd*, 59 F.3d 20 (2d Cir. 1995)); *see also Oceanic Exploration Co. v. ConocoPhillips, Inc.*, 2006 WL 2711527, at * 16 (D.D.C. Sept. 21, 2006) (RICO applies because "alleged misconduct . . . took place in the United States").

Further, RICO applies extraterritorially where "the racketeering activities produce effects or are intended to produce effects in this country.  *United States v. Noriega*, 746 F. Supp. 1506, 1517 (S.D. Fla. 1990); *see also Doe v. Israel*, 400 F. Supp. 2d 86, 115 (D.D.C. 2005).[91]  At least one court has held that actions abroad that affect oil imports to the United States have an effect

---

contrast, the Amended Complaint alleges that Plaintiffs' ADRs are effectively worthless *now* as a result of the RICO Defendants' actions.  There is no contingency that must come to pass before the ADRs will be worthless, and Plaintiffs have no remaining recourse.

[91] *See also United States v. Philip Morris, Inc.*, No. Civ. A. 99-2496 (GK), 2006 WL 2380622, at *167 (D.D.C. Aug. 17, 2006);  *Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002) (holding that RICO may apply extraterritorially).

on commerce sufficient to justify the extraterritorial application of RICO.  *See Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *22 (S.D.N.Y. Feb. 28, 2002).

The RICO Defendants' actions were intended to have, and in fact had, substantial effects in the United States.  Approximately 15 percent of Yukos's common stock was traded in the United States via Level 1 ADRs.  (Am. Compl. ¶ 104.)  The RICO Defendants' actions were aimed, in substantial part, at the owners of these ADRs, whose ownership interests they displaced.  In addition, Yukos shipped more than 5.75 million barrels of oil here in 2003, and it was intent on expanding that presence.  *Id.* ¶ 105.  The RICO Defendants' actions were intended to, and had the effect of, removing Yukos as a competitor in the U.S. market.  *Id.* ¶¶ 113, 273.  Given these substantial effects on U.S. commerce, it does not matter whether "the nationality of the [RICO Defendants'] criminal enterprise" is foreign.  *Doe*, 400 F. Supp. 2d at 116.  Nor does it matter  whether the "locus of [the RICO Defendants'] racketeering activity" was in Russia.  *Id.*

**C.     Plaintiffs Have Alleged Sufficient Predicate Acts.**

A RICO plaintiff must plead the elements of one or more of the statutes set forth in 18 U.S.C. § 1961, which include, *inter alia*, conversion, extortion, fraud, and violations of the Travel Act.  *See* 18 U.S.C. § 1961.  Plaintiffs have pled the elements of five such violations:  the Hobbs Act, 18 U.S.C. § 1951; fraud in connection with a bankruptcy proceeding, 18 U.S.C. § 152; the Travel Act, 18 U.S.C. § 1952; transportation of stolen property, 18 U.S.C. § 2314; and mail and/or wire fraud, 18 U.S.C. §§ 1341, 1343.  These are more than sufficient to state a claim under RICO.

**1.     Violations of the Hobbs Act**

A RICO plaintiff relying on the Hobbs Act must plead two essential elements: (1) interference with commerce and (2) obtaining property through use of "actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951; *Stirone v. United*

*States*, 361 U.S. 212, 218 (1960); *United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir. 1990).
Plaintiffs have alleged both elements.

The Hobbs Act requires "a showing of only a *de minimis* connection with interstate commerce." *United States v. Edwards*, 324 F. Supp. 2d 10, 12 (D.D.C. 2004); *see also United States v. Sutton*, 337 F.3d 792, 796 (7th Cir. 2003). Indeed, "[t]here is no requirement that there be an actual effect on interstate commerce – only a realistic probability that an extortion will have an effect on interstate commerce." *Edwards*, 324 F. Supp. 2d at 13 (quoting *United States v. Peete*, 919 F.2d 1168, 1174 (6th Cir. 1990). There also need not be any intent to affect interstate commerce, so long as the conduct in question has that natural effect. *See United States v. Arena*, 180 F.3d 380, 390 (2d Cir. 1999). The RICO Defendants' efforts to seize control of Yukos had several effects on U.S. commerce, including depriving the economy of a substantial source of oil (Am. Compl. ¶ 105) and displacing American ADR holders from their ownership rights. *Id.* ¶ 104. Plaintiffs have more than met their burden. *See Wiwa*, 2002 WL 319887, at *22.

Plaintiffs also allege the second element of a Hobbs Act violation, *i.e.*, "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990). There need not be any actual or threatened force because the "public officer's misuse of his office supplies the necessary element of coercion." *Id.* (quoting *United States v. Margiotta*, 688 F.2d 108, 130-31 (2d Cir. 1982), *cert. denied*, 461 U.S. 913 (1983)). Moreover, the person making wrongful use of color of authority need not obtain a direct benefit. *See United States v. Green*, 350 U.S. 415, 420 (1956); *United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978).

The Individual Defendants suggest (at 35) that their conduct did not force Yukos to give up anything "with its consent." The Hobbs Act, however, protects a victim from being forced to choose between relinquishing property immediately or facing unwanted consequences. *See Arena*, 180 F.3d at 395 ("the Hobbs Act definition of extortion simply prohibits the extortionist from forcing the victim to make such a choice"). The RICO Defendants plainly presented Yukos with an unlawful choice: Either voluntarily pay extortionate and illegitimate taxes or face involuntary dissolution. Yukos chose to fight. It is now in the final throes of liquidation in a Russian bankruptcy court. Am. Compl. ¶¶ 4, 296-99.

The Individual Defendants cite no cases to support their argument that the Hobbs Act does not apply to actions taken by foreign officeholders; they claim (at 34) only that they have "found no case that extends the reach of the Hobbs Act to foreign officials acting under color of their official right." This is no more than a variation on their extraterritoriality argument (as their cross-cite to that section of their own memorandum indicates), and it has no more merit. There simply is no reason why the Hobbs Act should not apply to foreigners who act "under color of official right," and the Individual Defendants do not pretend to articulate one.

Gazprom argues (at 54) that the Gazprom RICO Defendants are not "'public' or 'official' entities/officials." But "[t]he simple fact that [a defendant] is not a public official does not preclude an 'official right' extortion prosecution. If [the defendant] aided, abetted, or conspired with a public official to commit extortion he is guilty of violating Section 1951 regardless of his own official or non-official position." *United States v. Marcy*, 777 F. Supp. 1393, 1396 (N.D. Ill. 1991) (citing *United States v. Finley*, 705 F. Supp. 1272, 1279-83 (N.D. Ill. 1988)); *see also United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005). Plaintiffs have alleged that all the RICO Defendants, including Gazprom and Miller, knowingly participated with those who did

hold official positions in the scheme to use color of authority to oust Yukos's owners. Accordingly, Plaintiffs have pled the elements of conduct proscribed by the Hobbs Act, and that conduct should be attributed to Gazprom and Miller.[92]

### 2.    Fraud in Connection with a Bankruptcy Proceeding

Section 1961 of Title 18 defines "racketeering activity" to include "any offense involving fraud connected with a case under title 11. . . ."  This definition includes the offenses enumerated in Section 152 as well as conspiracy to commit those offenses and aiding and abetting the commission of those offenses.  18 U.S.C. §§ 2, 371.  Section 152 bars, *inter alia*, the knowing and fraudulent receipt and transfer of assets in order to evade Title 11.  *See* 18 U.S.C. § 152(5) and (7).  Thus, Section 152 is implicated when a defendant receives or engages in a conspiracy to receive a material amount of property from a bankrupt after the filing of a proceeding under Title 11, with the intent to defeat the Bankruptcy Act.  *See United States v. Cardall*, 885 F.2d 656, 678 n.43 (10th Cir. 1989) (approving jury instructions); *United States v. Wernikove*, 214 F. Supp. 112, 116 (E.D. Pa. 1963).

These provisions apply here.    In December 2004, after Yukos filed a voluntary bankruptcy petition, the Houston Bankruptcy Court entered a temporary restraining order that barred, among others, Gazpromneft from participating in the YNG auction.  Am. Compl. ¶ 276. The RICO Defendants then engaged in an elaborate fraud to evade that restraining order.  They set up Defendant BFG as a vehicle for that fraud, lent BFG the money to purchase YNG for a price that even Rosneft admits was well below market value, and then had Rosneft acquire BFG

---

[92] The Amended Complaint also alleges a violation of the Hobbs Act by means of an "unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury."  18 U.S.C. § 1951(b)(1).  Plaintiffs have alleged that the RICO Defendants violated the Hobbs Act when they seized Yukos documents and electronic files (Am. Compl. ¶ 154) and when they seized 51 percent of Yukos stock – and effective control of the company – by force in October 2003.  *Id.* § 182, 336(b).

*before BFG had to pay its winning bid for YNG. Id.* ¶¶ 280, 284. Thus, BFG was born, acquired YNG without ever paying a cent, and was absorbed into Rosneft, all in a flash and all as part of a hoax aimed at evading the order of the Houston Bankruptcy Court. The RICO Defendants ignore these allegations.

Instead, Gazprom (at 57) and the Individual Defendants (at 37) suggest that they cannot be guilty of violating Section 152 because they did not receive any property as a result of the fraud. However, as noted above, a person who conspires to violate Section 152 also commits a fraud in connection with a case under Title 11, and thus commits a RICO predicate act. *See United States v. Key*, 859 F.2d 1257, 1258 (9th Cir. 1988) (defendant charged with conspiracy to violate Section 152); *Wernikove*, 116 F. Supp. at 116. So too does a person who aids or abets such conduct. *See United States v. Connery*, 867 F.2d 929, 930 (6th Cir. 1989); *United States v. Knickerbocker Fur Coat Co.*, 66 F.2d 388, 390 (2d Cir. 1933). The Gazprom RICO Defendants aided and abetted the receipt of Yukos property by Rosneft through their spin-off of Gazpromneft, which ensured that a second putative bidder would attend the YNG auction and allow the auction to proceed. Am. Compl. ¶ 277.[93]

Finally, Rosneft asserts (at 59) that Plaintiffs "fail to specifically plead" fraud in connection with a bankruptcy transaction. Plaintiffs have pled bankruptcy fraud with sufficient specificity. The requirement that a plaintiff plead fraud with specificity comes from Fed. R. Civ. P. 9(b), which requires a plaintiff to "allege the time, place, manner, contents, and speaker of the

---

[93] Gazprom's suggestion (at 57) that Section 152 does not apply to violations of a Bankruptcy Court's restraining order, even if correct, would be beside the point. Violation of the order clearly was unlawful, as any violation of a restraining order must be. The principal relevance of that order, however, is that it explains why the Gazprom RICO Defendants went to the trouble of spinning off Gazpromneft on the eve of the sham YNG auction: Gazpromneft was subject to the order and hoped that the charade of the spin-off would avoid prejudicing the Houston bankruptcy proceeding. Absent the order, the Gazprom RICO Defendants had no reason to participate in the conspiracy described above, or to aid and abet Rosneft's acquisition of Yukos property while the Houston bankruptcy was pending.

allegedly fraudulent statements, in addition to a description of how the plaintiff was misled." *Shields v. Washington Bancorporation*, No. 90-1101, 1992 WL 88004, at *4 (D.D.C. Apr. 17, 1992) (citing *Shahmirzadi v. Smith Barney, Harris Upham & Co.*, 636 F. Supp. 49, 53 (D.D.C. 1985)).  Plaintiffs have satisfied this burden by alleging details about who engaged in the fraud, when they did so, and how they did so.  Am. Compl. ¶¶ 271-90.

### 3.    Violations of the Travel Act

A violation of the Travel Act consists of "engag[ing] in interstate travel with intent to promote an unlawful activity, and . . . committ[ing] an overt act in performing or attempting to perform the unlawful activity."[94]  *United States v. Fetlow*, 21 F.3d 243, 247 (8th Cir. 1994).  The Travel Act defines "unlawful activity" to include violations of the Hobbs Act.  *See* 18 U.S.C. § 1952(b)(2).  *See, e.g., United States v. Hollis*, 725 F.2d 377, 378 n.3 (6th Cir. 1984) (noting that Travel Act conviction depended on proof of Hobbs Act conviction).  Importantly, the "benefit sought or gained from the interstate travel or use need not be essential to the illegal activity.  It need only hold the promise of facilitating that activity."  *Fetlow*, 21 F.3d at 247 (quoting *United States v. Raineri*, 670 F.2d 702, 717 (7th Cir.), *cert. denied*, 459 U.S. 1035 (1982)).

Several of the RICO Defendants have traveled from Russia to the United States in furtherance of their activities.  Am. Compl. ¶ 336(c).  Specifically, Defendants Khristenko and Bogdanchikov traveled to the United States in October 2005 to promote the sale of liquefied natural gas in the United States.  *Id.* ¶¶ 80-81.  In addition, Bogdanchikov and Khristenko participated in efforts to promote Rosneft's IPO.  Indeed, Rosneft concedes (at 60) that Plaintiffs

---

[94] The Travel Act forbids "travel[] in interstate or foreign commerce . . . with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."  18 U.S.C. § 1952.

have alleged such travel by Bogdanchikov, but it ignores the remainder of Plaintiffs' allegations about that IPO – namely, that the IPO was an effort to raise money to permit the RICO Defendants to continue to exploit their control of Yukos and to repay debts that they incurred in connection with their activity.[95]    *Id.* ¶¶ 73, 81, 127.   Rosneft cannot rewrite the Amended Complaint in this manner.   Plaintiffs allege travel that holds the promise of "facilitating [unlawful] activity" and therefore constitutes a violation of the Travel Act.   *Fetlow*, 21 F.3d at 247.   Given that the RICO Defendants violated the Hobbs Act (*see* Section XVI.C.1), the travel described in the Amended Complaint places them in violation of the Travel Act.

Gazprom argues (at 56) that neither it nor Miller are alleged to have traveled, and thus Plaintiffs' Travel Act allegations do not apply to the Gazprom RICO Defendants.   However, it is well-settled that a defendant who does not travel can violate the Travel Act if he aids and abets another's travel, *see United States v. Abadie*, 879 F.2d 1260, 1266 (5th Cir. 1989), or if he participates in a conspiracy that results in a co-conspirator traveling in interstate travel, *see United States v. Auerbach*, 913 F.2d 407, 410 (7th Cir. 1990).   Indeed, a Travel Act violation "do[es] not require that the defendant knowingly cause or reasonably foresee interstate travel or use of an interstate facility."   *See United States v. Stern*, 858 F.2d 1241, 1246 (7th Cir. 1988) (quoting *United States v. McPartlin*, 595 F.2d 1321, 1361 (7th Cir. 1979), *cert denied*, 444 U.S. 833 (1979)).   The travel simply has to facilitate unlawful conduct with which the defendant is involved.   *See id.*   All of the RICO Defendants participated in the scheme to oust Yukos's owners.   *See* Section XVI.C.   Moreover, all of the RICO Defendants participated in a conspiracy to commit "unlawful activity" as defined in the Travel Act – violations of the Hobbs Act.   *See*

---

[95] Plaintiffs' allegations about the Rosneft IPO are not barred by the PSLRA, because Plaintiffs have not alleged that any aspect of the IPO was fraudulent, only that it facilitated the RICO Defendants' illegal conduct.

Section XVI.C.1.    Thus, each RICO Defendant is responsible for Bogdanchikov's and Khristenko's travel to further those schemes.

### 4.    Transportation of Stolen Goods

Defendants assert that Plaintiffs have not pled the elements of a violation of 18 U.S.C. § 2314 because "plaintiffs do not allege that *their* property, the ADRs, was converted. . . ." (Rosneft Mem. at 58.)  However, a RICO plaintiff need not plead that he was injured by every predicate act in which the defendants engaged.  Instead, the RICO plaintiff must allege only that he was injured by the total effect of the pattern of racketeering.  *Sperber*, 849 F.2d at 63.  Section 2314 forbids the "transport[], transmission[], or transfer[] in interstate or foreign commerce [of] any goods [or] securities . . . of the value of $5,000 or more knowing the same to have been stolen, converted, or taken by fraud. . . ."  18 U.S.C. § 2314.  The Amended Complaint alleges the transportation and sale of "oil and gas produced by YNG and Yukos producing assets and transportation of such property in foreign commerce. . . ."    (Am. Compl. ¶ 336(d).)    These allegations suffice.[96]

### 5.    Mail and Wire Fraud

The elements of a claim of mail or wire fraud are the same:  each defendant must have (1) participated in a scheme to defraud and (2) knowingly caused the use of the mails or interstate wires to further the scheme.  *See Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 136 (S.D.N.Y. 1994).  A statement need not be false or inaccurate, so long as it is "utilized in furtherance of or pursuant to [a] scheme to defraud."  *United States v. Reid*, 533 F.2d 1255, 1263 (D.C. Cir. 1976) (footnote omitted).  One is responsible for mail or wire fraud any time it is

---

[96] The Individual Defendants also claim (at 36), without support, that the act of state doctrine prevents this Court from finding that the oil and gas produced by YNG was converted, since YNG was transferred to BFG in a state tax auction.  See discussion of the act of state doctrine's inapplicability in this case at Sec. IV.

reasonably foreseeable that a statement will be transmitted via mail or wire. *See Pereira v. United States,* 347 U.S. 1, 8-9 (1954).

Rosneft (at 58-59) and the Individual Defendants (at 32-33) contend that Plaintiffs have not pled fraud with specificity, pursuant to Rule 9(b). The Amended Complaint, however, explains in detail the statements that the RICO Defendants made, the time and place that the statements were made, that they went into the mail or over the wire, and how they furthered the overall scheme. *See*, *e.g.*, Am. Compl. ¶¶ 288, 336(a). Those allegations are more than sufficient to ensure the RICO Defendants have notice of the claims against them. *See Fisher v. Network Software Assocs.*, 227 F.R.D. 4, 9 (D.D.C. 2005).[97]

Gazprom (at 53) also finds fault in Plaintiffs' supposed failure to allege "the basics of fraud, including scienter, duty, falsity and reliance." That argument simply ignores legions of cases holding that the "mail and wire fraud statutes, whose violations constitute the predicate acts for [a] RICO claim, do not require proof of reliance or damages or completion of the scheme to defraud." *United States v. Phillip Morris, Inc.*, 273 F. Supp. 2d 3, 6 (D.D.C. 2002); *see also Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("Common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes."); *United States v. Yeager*, 331 F.3d 1216, 1221 (11th Cir. 2003).[98]

---

[97] Rosneft suggests (at 58) that statements made outside the United States cannot constitute mail or wire fraud. However, by its terms, the wire fraud statute reaches transmissions made in "foreign commerce." 18 U.S.C. § 1343. Congress therefore clearly intended that the statute would reach statements made abroad and mailed or transmitted to the United States.

[98] Gazprom cites *Byer Indus., Inc. v. Gulf Ins. Co.*, 888 F. Supp. 1, 2 (D.D.C. 1995), in support of its argument that Plaintiffs were required to plead that they relied on the RICO Defendants' statements. However, *Byer* was decided *before* the Supreme Court's decision in *Neder*. After *Neder*, this Court unequivocally rejected the same argument that Gazprom advances here, holding that "reliance on a false representation" is not "required to be proven under RICO." *Phillip Morris*, 273 F. Supp. 2d at 6. Other courts have reached similar conclusions in light of the Supreme Court's decision in *Neder*. *See, e.g., Sys. Mgmt., Inc. v. Loiselle*, 303 F.3d 100, 103-04 (1st Cir. 2002). Moreover, both *Byer* and *Chisolm v. Transouth Fin. Corp.*, 95 F.3d 331 (4th Cir. 1996), which Gazprom also cites, were cases (continued…)

6.        **The PSLRA Does Not Affect RICO Plaintiffs' RICO Claims.**

All of the RICO Plaintiffs are holders of Yukos ADRS, not purchasers.  Defendants argue that the claims of these Plaintiffs are barred by the Private Securities Litigation Reform Act ("PSLRA") because they are based on conduct that is actionable as securities fraud.[99]  (Gazprom Mem. at 62-64; Rosneft Mem. at 56-58; Indiv. Mem. at 30-31).   The crux of Defendants' PSLRA arguments is their position that the PSLRA bars a RICO claim any time a predicate act could be pled as securities fraud by *anyone* – even if a particular plaintiff has no such claim. (*E.g.,* Gazprom Mem. at 64 n.35.)

Defendants' broad proposed interpretation of the PSLRA is an issue of first impression in this Circuit, and one on which there is a split of authority among the courts that have addressed the issue.  *Compare Fleet Nat'l Bank v. Boyle*, No. 04 CV 1277, 2005 WL 2455673, at *4 (E.D. Pa. Sept. 12, 2005) (PSLRA does not bar claim based on providing fraudulent 10-K to potential lender), *with Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (PSLRA bars RICO claim based on conduct that could be brought as securities fraud by plaintiff with proper standing).[100]   In *Boyle*, the defendants allegedly misled a syndicate of banks that had extended

---

in which the only alleged predicate acts were mail and wire fraud, meaning that the plaintiffs alleged reliance in order to satisfy the proximate cause inquiry under RICO.  *See, e.g., Chisolm*, 95 F.3d at 336; *Byer*, 888 F. Supp. at 2. Here, however, Plaintiffs have alleged a more far-reaching RICO pattern that involves predicate acts based on more than just fraud.  Thus, Plaintiffs need not plead reliance to demonstrate that they were injured as a result of the RICO Defendants' actions.

[99] The PSLRA, Pub. L. No. 104-67, § 107, 109 Stat. 737, 758 (1995), amended RICO to eliminate as a predicate offense "any conduct that would have been actionable as fraud in the purchase or sale of securities."

[100] This case is unlike *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511 (S.D. Tex. 2003), because, in that case, the central focus of Defendants' actions was securities fraud –  what the court described as a "Ponzi scheme."  *Id.* at 622.  Thus, the plaintiffs could challenge all of the defendants' actions under the rubric of securities fraud.  That is not the case here, where the RICO Defendants engaged in conduct that was not dependent on or actionable as securities fraud.  As the Third Circuit explained in a case that the *Enron* court cited at length, the proper inquiry under the PSLRA is whether the wrongful conduct is "actionable as securities fraud," not whether it is "connected to and dependent on securities fraud."  *Bald Eagle Area School Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).

them credit, in part by providing the banks with fraudulent 10-Ks to document their creditworthiness.  *See Boyle*, 2005 WL 2455673, at *4.  The court noted that the plaintiff "did not engage in the purchase or sale of securities nor base its RICO action thereon."  *Id.*  The court held that "to implicate [the PSLRA] in the instant case would stretch the PSLRA beyond its plain meaning that the fraud that may not be relied upon is that which involves 'the purchase or sale of securities.'"  *Id.*

The court's logic in *Boyle* applies with equal force here.  Plaintiff Yukos ADR Holders – the only plaintiffs asserting RICO claims – cannot bring a securities claim against the RICO Defendants because they have not engaged in the purchase or sale of securities.  Defendants fault Plaintiffs for limiting their RICO claims to the ADR Holders.  In fact, however, Plaintiffs' careful pleading is appropriately and carefully tailored to the facts of this case.[101]

### D.    The Official Positions of the Individual RICO Defendants Do Not Insulate Them from Suit Under RICO.

The Individual Defendants argue (at 31-32) that they cannot be sued under RICO because, as sovereigns, they are not "indictable" for any RICO predicate act.  But the Amended Complaint asserts claims against them in their individual capacities, rather than their official capacities.  Am. Compl. ¶¶ 76-83.  That allegation is fatal to the Individual Defendants' argument.  *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997) ("Individuals acting *in their official capacities* are considered 'agenc[ies] or instrumentalit[ies] of a foreign state.'" (alterations in original) (emphasis added)).

---

[101] Even if the Court adopts Defendants' proposed broad reading of the PSLRA, Plaintiff ADR Holders would still have a RICO claim based on predicate acts, such as violations of the Travel Act and the Hobbs Act, that have nothing to do with securities fraud against anyone.

Moreover, even if it applied, the FSIA would not immunize the Ministers from suit under RICO.  Indeed, the Tenth Circuit has rejected the same argument that the Ministers make here and held that the "FSIA confers subject-matter jurisdiction upon the district court over civil RICO claims against foreign states, their agencies, and instrumentalities, provided that the commercial activity exception, or another exception contained in . . . the FSIA applies." *Southway v. Central Bank of Nigeria*, 198 F.3d 1210, 1216 (10th Cir. 1999).[102]

**E.     Plaintiffs Have Alleged a "Pattern" of RICO Activity.**

Gazprom (at 58) and Rosneft (at 60-61) argue that Plaintiffs' allegations demonstrate only a single scheme, a single injury, and a single victim.  They argue that Plaintiffs' allegations do not establish that they participated in the pattern of RICO activities.

To establish a pattern of racketeering activity, a plaintiff must show the commission of at least two acts of racketeering, "the last of which occurred within ten years . . . after the commission of a prior" racketeering act.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237 (1989).  The predicate acts forming the pattern need not be similar or directly related to each other, so long as they further the goals of or otherwise benefit an enterprise.  *See United States v. Polanco*, 145 F.3d 536, 541 (2d Cir. 1998); *United States v. White*, 116 F.3d 903, 925 n.7 (D.C. Cir. 1997).  "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *H.J.*, 492 U.S. at 236. The D.C. Circuit has identified six factors that determine whether a pattern of racketeering activity exists:  "the number of unlawful acts, the length of time over which the acts were

---

[102] At least one Court in this District has cited *Southway* with approval.  *See Dammarell v. Islamic Republic of Iran*, No. Civ. A. 01-2224JDB, 2005 WL 756090, at *9 (D.D.C. Mar. 29, 2005).

committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *W. Assocs. Ltd. P'Ship v. Market Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995).

As the Supreme Court has explained, a "'scheme' is in the eye of the beholder, since whether a scheme exists depends on the level of generality at which criminal activity is viewed." *H.J.*, 492 U.S. at 241 n.3. Here, regardless of the level of generality at which the RICO Defendants' conduct is viewed, they have engaged in multiple schemes. At a high level, the RICO Defendants have engaged in schemes to seize control of Yukos and to displace Yukos from United States oil and gas markets. At a more granular level, they have engaged in a host of schemes intended to solidify their control of Yukos, including evading the Houston Bankruptcy Court's restraining order, using color of authority to enhance their control of Yukos, and exploiting the assets that were taken from Yukos.

Moreover, the six factors identified by the D.C. Circuit make clear that the RICO Defendants' conduct constitutes a pattern. Plaintiffs have alleged a substantial number of predicate acts that took place over more than three years, and remain ongoing.[103] These predicate acts all were attacks on Yukos's owners. The acts were committed by at least the ten RICO Defendants, as well as corporate employees, unnamed co-conspirators, and other agents. Finally, the acts were the type that RICO was intended to prevent – illegal actions by outsiders to muscle their way into an otherwise legitimate business.

---

[103] The RICO Defendants' schemes continue to pose a threat of future activity as the RICO Defendants put the finishing touches on their control over Yukos via Russian bankruptcy proceedings and continue to convert for their own benefit property rightly belonging to Plaintiffs.

Finally, Plaintiffs have alleged that each RICO Defendant participated in this pattern by committing at least two predicate acts in furtherance of their scheme:

- Individual RICO Defendants:  The Individual Defendants do not dispute that Plaintiffs have alleged that each of them used his official position to participate in the various schemes that violated the Hobbs Act.  That concession is enough, on its own, to demonstrate that the Individual RICO Defendants participated in a pattern of racketeering activity.  In addition, the Individual RICO Defendants do not deny that each of them participated in the auction of YNG, making them participants in the fraud on the Houston Bankruptcy Court.  Statements made by some of the Individual RICO Defendants constituted wire fraud.  (Am. Compl. ¶ 288.)  Finally, Khristenko violated the Travel Act when he visited the United States in an effort to raise money to further the RICO conspiracy.  *Id.* ¶ 80.

- Gazprom RICO Defendants:  Gazprom and Miller participated in the fraud on the Houston Bankruptcy Court by spinning off Gazpromneft, a necessary step to evading that court's restraining order.  In addition, they violated the Travel Act when Miller traveled to the United States to further the enterprise's goals by raising funds and usurping opportunities in the U.S. market.  Finally, the Gazprom RICO Defendants committed wire fraud with their false statements about their intentions towards Yukos.

- Rosneft RICO Defendants:  Rosneft participated in the scheme to evade the Houston Bankruptcy Court's restraining order.  It was a central player – advancing money to BFG to pay for YNG and then acquiring BFG.  Am. Compl. ¶¶ 284, 293.  Because Bogdanchikov (President), Borisenko (First Vice President), and Sechin (Chairman) are high-ranking officers of Rosneft, all of Rosneft's actions can be attributed to them.  *See JPMorgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 399-400 (S.D.N.Y. 2004) (at pleadings stage it is appropriate to infer that persons occupying high-level positions at company knew of company's actions).  Bogdanchikov also assisted efforts to raise money to exploit Yukos's assets in furtherance of the RICO conspiracy (Am. Compl. ¶¶ 81, 127) and he participated in the YNG auction in his capacity as chairman of Gazpromneft.  *Id.* ¶ 66.

### F.    Plaintiffs Have Pled Substantive Violations of RICO.

Rosneft does not challenge, and therefore implicitly concedes, that Plaintiffs' allegations state substantive RICO violations against the Rosneft RICO Defendants.  However, Gazprom (at 59-60) and the Individual Defendants (at 37-38) argue that RICO Plaintiffs' Section 1962(b) claim fails because neither the Gazprom nor the Individual RICO Defendants have acquired an interest in or control over Yukos.  These Defendants also argue (at 59-60 and 38-41,

respectively) that RICO Plaintiffs' Section 1962(c) claim fails because Plaintiffs have not alleged the structure of an association-in-fact enterprise or their participation in such an enterprise.

### 1.  Plaintiffs Have Alleged the Acquisition of an Interest in or Control over Yukos.

Section 1962(b) makes it unlawful for any person "through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).  One maintains an interest in or control of an enterprise if he directs the affairs of the enterprise in some capacity.  *See Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1538 (3d Cir. 1993).  A defendant's control can be direct or indirect.  *See BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil*, 56 F. Supp. 2d 14, 51 (D.D.C. 1999) (finding indirect control based on "economic leverage"), *rev'd in part and aff'd in part by BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168 (D.C. Cir. 2000).

Plaintiffs have alleged that Rosneft acquired YNG, and that it stands to acquire the rest of Yukos's assets shortly.  Am. Compl. ¶¶ 284, 298.  As a result, Bogdanchikov, Borisenko, and Sechin – all high-level Rosneft officials – have "control" over most of Yukos now, and they will soon control the rest.  *Winnick*, 350 F. Supp. 2d at 399-400.  Notably, Sechin played an important part in developing and executing the overall scheme against Yukos, and he has maneuvered himself into a position – Chairman of Rosneft – from which he now controls Yukos.  Am. Compl. ¶ 82.

Gazprom and the Individual Defendants are wrong about the factual allegations in the Amended Complaint.  Although the Individual Defendants have not obtained an interest in or control over *YNG*, they, acting with the Russian Federation, have continuously controlled the remainder of Yukos since the controlling shares of Yukos's majority owner were seized in

October 2003.  Am. Compl. ¶ 177.  This control continues to be exercised today through a
Russian bankruptcy trustee.  *Id.* ¶¶ 296-301.

> ## 2.      Plaintiffs Have Alleged the Existence of an Association-in-Fact Enterprise in Which All RICO Defendants Participated.

Section 1962(c) prohibits "(1) the conduct (2) of an enterprise (3) through a pattern of
racketeering activity."  *Salinas v. United States*, 522 U.S. 52, 62 (1997).  RICO defines an
"enterprise" to include "any union or group of individuals associated in fact although not a legal
entity."  18 U.S.C. § 1961(4);  *United States v. White*, 116 F.3d 903, 924 (D.C. Cir. 1997)
(quoting *United States v. Perholtz*, 842 F.2d 343, 362 (D.C. Cir. 1988).  "At the motion to
dismiss stage, plaintiffs need only plead the existence of an enterprise."  *Oceanic Exploration*,
2006 WL 2711527, at *16; *see also PSIA*, 793 F. Supp. at 1126-27 (sufficient to allege that
enterprise consisted of "'a group composed of, but not limited to' all the named defendants
'associated in fact for the purpose of controlling the waste disposal industry on Long Island
. . . ,).'"[104]  While the enterprise must be an entity separate from its pattern of predicate acts, the
"existence of the enterprise may be inferred from proof of the pattern" of predicate acts.  *United
States v. White*, 116 F.3d 903, 923 (D.C. Cir. 1997).

Plaintiffs' allegations demonstrate an organized effort directed against Plaintiffs' interests
in Yukos, rather than a few isolated acts.  Plaintiffs have alleged that each of the RICO
Defendants participated in an enterprise. Am. Compl. ¶ 345.  That allegation is sufficient to state
a claim.  *See Oceanic Exploration*, 2006 WL 2711527, at *16.  Moreover, the overall breadth
and organized pattern of the attack on Yukos supports an inference of an organized structure.

---

[104] Ultimately, a plaintiff alleging violations of 1962(c) must prove "(1) a common purpose among the participants,
(2) organization, and (3) continuity."  *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) (citing
*United States v. Perholtz*, 842 F.2d 343, 362 (D.C. Cir. 1988)).

For example, the use of various Russian processes to consolidate control over Yukos required coordinated efforts among different parties. Similarly, the effort to evade the Houston Bankruptcy Court's restraining order required the creation of an elaborate sham transaction, which included spinning off Gazpromneft from Gazprom and creating BFG from scratch. Plaintiffs' allegations therefore establish the existence of an association-in-fact.[105] Finally, it bears repeating that Plaintiffs allege that each RICO Defendant participated in the scheme to oust Yukos's owners.

### 3.    Plaintiffs Have Alleged a Conspiracy to Violate RICO.

Section 1962(d) bars conspiracies to violate Section 1962(b) or Section 1962(c). A plaintiff alleges a RICO conspiracy if he alleges "(1) that two or more people agreed to commit a substantive RICO offense, and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Morrow*, No. Crim.A. 04-355 (CKK), 2005 WL 1389256, at *12 (D.D.C. June 13, 2005). Section 1962(d) does not require that a plaintiff allege that any defendant committed an overt act in furtherance of the conspiracy. *See Salinas*, 522 U.S. at 64; *Wiwa*, 2002 WL 319887, at *26. "A 1962(d) violation merely requires proof that the defendant agreed that a pattern of racketeering activities would be committed and the defendant need not personally agree to commit those acts." *United States v. Gigante*, 737 F. Supp. 292, 296-97 (D.N.J. 1990). Moreover, a defendant's "agreement to participate in the RICO conspiracy may be inferred from [his] acts." *United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990).

---

[105] Both Gazprom (at 60) and the Individual Defendants (at 39) also claim that the Amended Complaint does not allege that they participated in the association-in-fact. However, the Individual Defendants participated in, among other things, the various efforts to use Russian legal and governmental processes, and the Gazprom RICO Defendants participated in the association's efforts to evade the Houston Bankruptcy Court's restraining order. In addition, all RICO Defendants participated in efforts to conceal the existence of the criminal enterprise.

In Count VI, RICO Plaintiffs allege a violation of Section 1962(d).  Only Gazprom challenges the sufficiency of RICO Plaintiffs' RICO conspiracy pleadings, arguing (at 61) that the Amended Complaint does not make any allegation against the Gazprom RICO Defendants. Gazprom's arguments ignore the well-settled legal principles discussed above.  The Amended Complaint plainly contains allegations of actions taken by the Gazprom RICO Defendants which indicate their agreement to participate in the RICO conspiracy.  Gazprom and Miller spun off Gazpromneft in order to facilitate the evasion of the Houston Bankruptcy Court's restraining order.  Am. Compl. ¶ 277.  That action was a crucial facilitating step to allow the auction to go forward.  *Id.*  In addition, Defendant Miller traveled to the United States to assist Gazprom in seizing the market opportunities that were left to it as a result of Yukos's demise.  *Id.* ¶ 77. Gazprom also merged with Sibneft after the RICO Defendants and their co-conspirators blocked Yukos's merger with Sibneft.  *Id.* ¶ 181.  These and other actions by the Gazprom RICO Defendants, many of which constitute predicate acts in their own right, create a strong inference that the Gazprom RICO Defendants joined the conspiracy.[106]  Moreover, the Amended Complaint alleges that Gazprom "agreed to commit, and/or cause to be committed a series of overt acts in furtherance of the conspiracy and to effect the objectives thereof. . . ."  *Id.* ¶ 352.

The Individual Defendants (at 41) argue that the RICO conspiracy claim should be dismissed because RICO Plaintiffs have failed to allege a claim under Sections 1962(b) and (c). However, even if the Individual Defendants were correct (and they are not) that there is no substantive RICO claim *against them*, the RICO Plaintiffs have stated a claim against other

---

[106] Gazprom ignores Supreme Court rulings on 1962(d) and suggests (at 61) that Plaintiffs must allege a "substantive RICO violation by Miller or Gazprom to proceed with its conspiracy claim."  In *Salinas*, the Court held that the "interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."  522 U.S. at 65.  Gazprom's argument would, in effect, have this Court revisit that Supreme Court holding.

RICO Defendants, including the Rosneft RICO Defendants (who do not challenge the sufficiency of Plaintiff's allegations under Sections 1962(b) or (c)). The Individual Defendants do not dispute that the Amended Complaint alleges that they supported the Rosneft RICO Defendants' actions. Thus, the Individual Defendants have implicitly conceded that RICO's conspiracy provision applies to their actions. *See Salinas*, 522 U.S. at 64 ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.").

## CONCLUSION

For the reasons stated herein, the Court should deny Defendants' Motions to Dismiss and exercise jurisdiction over all Defendants and all causes of action set forth by Plaintiffs in their Amended Complaint. Plaintiffs request oral argument on Defendants' Motions to Dismiss.

October 13, 2006                           Respectfully Submitted,


                                           \s\ O. Thomas Johnson, Jr.
                                           O. Thomas Johnson, Jr. (DC Bar No. 218527)
                                           James A. Goold
                                           Marney L. Cheek
                                           COVINGTON & BURLING LLP
                                           1201 Pennsylvania Avenue, N.W.
                                           Washington, D.C. 20004
                                           Telephone: (202) 662-6000
                                           Facsimile: (202) 662-6291

                                           *Counsel to Plaintiffs*