**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
-------------------------------------------------------x
                                                )
RICHARD ALLEN, et al.                           )
                                                )
                      Plaintiffs,               )      Case No: 1:05-cv-02077 (CKK)
                                                )      Hon. Colleen Kollar-Kotelly
              v.                                )
                                                )
RUSSIAN FEDERATION, et al.                      )
                                                )
                      Defendants.               )
                                                )
-------------------------------------------------------x
```

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# EXHIBIT 19

**IN THE BOW STREET
MAGISTRATES COURT**

**GOVERNMENT OF THE RUSSIAN FEDERATION**

- V -

**NATALIA CHERNYSHEVA AND
DMITRY MARUEV**

_____

**EXPERT REPORT OF
PROFESSOR WILLIAM BOWRING**

_____

**Introduction and summary**

*Qualifications and experience*

1.    I am a Barrister of Gray's Inn called in 1974 and am Professor of Human Rights and International Law at the London Metropolitan University (formerly the University of North London). I am a member of the Chambers of Ashley Underwood QC at 2-5 Field Court, Gray's Inn. I practised at the Bar full time until 1990, when I began my academic career. I still practise in the field of human rights, as detailed below.

2.    I am fluent in Russian, and have since 1983 visited Russia and other countries of the former USSR regularly, and have studied the Russian language, history, and Soviet and Russian law and practice. I have published many articles and chapters on these subjects.

3.    From 1997 to the end of 2003 I was the contract Adviser to the UK Government's Department for International Development on "Human Rights in

Russia", and for the latter three years on "Access to Justice and Rights Issues in Russia." In this capacity I initiated and monitored large projects in the Russian Federation in the field of judicial reform, reform of the penitentiary system, human rights monitoring, and alternative dispute resolution. This work took me to all parts of Russia, and allowed me to meet official and civil society actors at all levels. The projects included the £1.2m Judicial Support Project working with the courts of general jurisdiction in Russia, the £600,000 Independent Monitoring Project enabling NGOs to monitor human rights in Russia; and two large projects in the penitentiary system, the Alternatives to Imprisonment Project (with Penal Reform International) introducing community services orders across Russia, and the Prisons Partnership Project (with the International Centre for Prison Studies), twinning Moscow remand prisons with UK prisons. The last two projects enabled me to visit a number of remand centres (SIZOs) and prisons.

4.      I also regularly act as an expert on Russian and other post-Soviet law and practice for the Council of Europe, European Union, Organisation on Security and Cooperation in Europe (OSCE), the US Department of Justice, and other national and international organisations.

5.      I was one of the experts nominated by the Council of Europe to work with senior Russian official on the new Criminal Procedural Code which came into force on 1 July 2002, and was also nominated by them to work on the World Bank's "Diagnostic Project" on the Russian judicial system in early 1992. I presently work with the Council of Europe on human rights and minority rights issues.

6.      I have worked in an expert capacity for EU projects since 1994, in the fields of reform of social welfare, reform of local government, and presently the establishment of a system of administrative courts in Russia. In October 2004 I hosted a visit to London by the First Deputy Chairmen of the Supreme Court

and Higher Arbitration Court of the Russian Federation, together with leading parliamentarians and members of the executive branch of government.

7.      I therefore visit Russia at least once a month, working not only in Moscow, but in a number of provincial centres.

8.      As an advocate, I have since 1994 represented Turkish, Latvian, Estonian and Russian applicants taking cases to the European Court of Human Rights in Strasbourg. My clients have won a number of cases (*Ozgur Gundem v Turkey, Aktas v Turkey, Ekinci v Turkey, Ipek v Turkey, Podkolzina v Latvia, Zhdanoka v Latvia*) and I am representing the first six Chechen applicants whose cases against Russia, arising from the events of late 1999 and early 2000, were declared admissible by the Court in December 2002. On 14 October 2004 I represented these applicants before the European Court of Human Rights on the oral hearing of the merits of their applications.

9.      In addition, I have worked for international organisations in most countries of Central Asia, the Caucasus as well as Belarus and Ukraine. All post-Soviet countries show a wide gap between the letter of many new laws, and the practice of implementing those laws. This is the result of a long period (more than 70 years in Russia, less in some others) of acculturation to Soviet practices. Many if not most police, prison officers and judges were trained and had their formative experience under Soviet rule.

10.     I confirm that I understand my duty to the court, and have complied and will continue to comply with that duty. Insofar as the facts stated in my report are within my own knowledge I have made clear which they are and I believe them to be true, and that the opinions I have expressed represent my true and complete professional opinion.

*Summary of conclusions*

11.     I am instructed by solicitors acting for Natalia Chernysheva and Dmitry Maruev to provide an expert report on a number of issues relating to the criminal proceedings brought against them in Russia and those that have been brought against Mikhail Khodorkovsky, Platon Lebedev, Alexei Pichugin, and Andrei Krainov. These issues are:

a.      Are there grounds for believing that the criminal proceedings brought in Russia against Mr Maruev, Ms Chernysheva, Mr Khodorkovsky, Mr Lebedev, Mr Krainov and Mr Pichugin are motivated by the authorities' reaction to the political opinions of Mr Khodorkovsky, or the perceived political threat he poses to the present regime? I will refer to this as the 'political motivation issue'.

b.      Is there evidence that those individuals named above who are currently on trial in Russia (Messrs Khodorkovsky, Lebedev, Krainov and Pichugin) have been discriminated against during their trial on any of the grounds set out in Section 81 of the Extradition Act 2003? If so, is there a real risk that either Mr Maruev or Ms Chernysheva will be similarly prejudiced if they were to be returned? I will refer to this as the 'discrimination issue'.

c.      Are there grounds to believe that there is a real risk that Mr Maruev's or Ms Chernysheva's rights under the European Convention on Human Rights will be violated if they are extradited to stand trial in Russia? I will refer to this as 'the Convention rights issue'.

12.     Section 81 of the Extradition Act 2003 provides that a person's extradition to a Category 2 territory is barred by reason of extraneous considerations if and only if it appears that:

a.  the request for his extradition (though purporting to be issued on account of the extradition offence) is in fact issued for the purpose of prosecuting or punishing him on account of his race, religion, nationality, gender, sexual orientation or political opinions (section 81(a));

b.  if extradited he might be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality, gender, sexual orientation or political opinions (section 81(b));

13.  Hence section 81(a) relates to the political motivation issue and section 81(b) relates to the discrimination issue. In relation to section 81(b) it is sufficient for the defendant to establish that there is a 'reasonable chance' or 'serious possibility' of prejudice: *Fernandez v Government of Singapore* [1981] 1 WLR 987, 994.

14.  My conclusions in summary are as follows:

*a) The political motivation issue*

15.  There is compelling evidence that the arrest and prosecution of Mikhail Khodorkovsky are politically motivated; that is, he would not have been prosecuted were it not for his political ambitions, and the government's political desire to remove him from active politics. The defendants Ms Chernysheva and Mr Maruev were close business associates and employees of Mr Khodorkovsky. The Russian government wishes to prosecute them on charges and evidence identical in part, and closely related to, those mobilised against Mr Khodorkovsky and Mr Lebedev. The similarity of the cases, the timing of the prosecution and the other circumstances of the case lead me to conclude (as they have led many others to conclude) that the request for their extradition is

5

politically motivated. Hence in my opinion the restriction on extradition in section 81(a) is satisfied in this case.

*b) The discrimination issue*

16.    There is also compelling evidence that Messrs Khodorkovsky, Lebedev, Krainov and Pichugin have been singled out for unfair treatment during their trials.

17.    There are good reasons to believe that the trial court has come under pressure to behave in a manner which favours the prosecution and disadvantages the defence. Moreover, I am led by the facts and matters set out below to conclude that the judicial system in Moscow is structurally biased against defendants such as these. Hence there is evidence which demonstrates that there is a reasonable chance or a serious possibility Mr Maruev or Ms Chernysheva would be prejudiced at their trial by reason of their political opinions. It follows that in my opinion the test contained in section 81(b) is satisfied.

*c) The Convention rights issue*

18.    In my opinion there is compelling evidence of a real risk that Ms Chernysheva's and Mr Maruev's rights under the Convention would be infringed if they were to be extradited, in particular their rights under articles 3, 5, 6 and 18 of the Convention.

**a)    The political motivation issue**

19.    There was a long established pattern in the USSR of political leaders using criminal prosecutions (and often the mere threat of prosecution) as tools in struggles with their colleagues and opponents.[1]  This pattern has continued in

---

[1] See "The Use of Criminal Law by the CPSU in the Struggle for Power and in the Inner-Party Struggle", in D. A. Loeber, ed, *Ruling Communist Parties and Their Status Under Law* (1987) Dordrecht: Martinus Nijhoff [1]

post-Soviet Russia, and a new term has been coined to describe such cases: *zakaznye dela* ('prosecutions to order').

20.    The decision earlier this year of the European Court of Human Rights in *Gusinskiy v Russia*[2] contains a judicial finding at the highest level that the Russian authorities have on at least one occasion commenced a criminal investigation and deprived a person of his liberty not on reasonable suspicion that he has committed an offence, but for an improper reason, namely to intimidate him, as part of a commercial bargaining strategy.

21.    The Court held that because Russia had broken its own domestic law by detaining the applicant, it had thereby violated article 5 of the European Convention on Human Rights in conjunction with article 18.    The Court's reliance on the latter provision was unprecedented.    For the first time the Court held that the government of a member state had used the criminal law for ulterior motives. The Court found as follows:

> The applicant also complained that his detention represented an abuse of power. He claimed that by detaining him the authorities intended to force him to sell his media business to Gazprom on unfavourable terms and conditions The Court will consider this complaint under article 18 of the Convention which provides: "The restrictions permitted under [the] Convention to the said rights and freedoms shall not be applied for any purpose other than those for which they have been prescribed." ... In the Court's opinion, it is not the purpose of such public-law matters as criminal proceedings and detention on remand to be used as part of commercial bargaining strategies. The facts that Gazprom asked the applicant to sign the "July Agreement" when he was in prison, that a State Minister endorsed such an agreement with his signature, and that a State investigating officer later implemented it by dropping the charges, insistently suggest that the applicant's prosecution was used to intimidate him.

> In such circumstances the Court cannot but find that the restriction of the applicant's liberty permitted under Article 5(1) (c) was applied not only for the purpose of bringing

---

[2] Application no. 70276/01, decision of 19 May 2004

7

him before the competent legal authority on reasonable suspicion of having committed an offence, but also for alien reasons.

There has, accordingly been a violation of Article 18 in conjunction with Article 5 of the Convention.

22.    Similar reasoning was followed by the Spanish court - the Central Magistrates' Court in Madrid (the Criminal Chamber of the National Court) – which heard and rejected the Russian government's attempt to extradite Mr Gusinsky on 4th April 2001.

23.    A number of international observers have expressed the view that the Khodorkovsky case, and the linked civil proceedings against the Yukos oil company, are another example of political prosecution and that Mr Khodorkovsky and his associates have been singled out for arbitrary prosecution by the Russian Government.

24.    I will summarise some of this evidence in the following paragraphs. Before doing so, however, it is necessary to explain why there should be political motivation in this case.

*Mikhail Khodorkovsky as a threat to Vladimir Putin*

25.    Mikhail Khodorkovsky is widely reported to be one of the richest, if not the richest, person in Russia. It is clear from his speeches and activities that he harbours political ambitions. As early as July 2003 (three months before Mr Khodorkovsky's arrest) a leading commentator, Fred Weir, reported[3]:

"The first hint that trouble might be now brewing beneath the apparently placid surface of Kremlin-tycoon relations came last month when 23 political experts, calling

---

[3] Fred Weir "Trouble brews between the Kremlin and the oligarchs. Executives at a major oil firm were targeted last week in what experts say are 'showcase' prosecutions." *Christian Science Monitor* July 9, 2003, at http://www.cdi.org/russia/264-5.cfm [2]

themselves the Center for National Strategy (CNS)[4], warned of a "creeping oligarchic coup." The experts alleged that a cabal of business kingpins was plotting to take control of parliament and rewrite Russia's Constitution to drastically curb presidential powers. Khodorkovsky was singled out as ringleader, accused of bankrolling both liberal and communist parties and scheming to become prime minister.

"I think that (CNS) paper was designed to present Yukos as a political threat," says Vyacheslav Nikonov, head of the independent Politika think tank, adding that many Kremlin or oligarchic factions, hoping to stir the pot, might have funded it. "Myths can take on a life of their own and become more powerful than reality."

The rumours of Khodorkovsky's political activism are not entirely mistaken, say experts. He is believed to have supported the Communist Party. Two Yukos executives are expected to be running for the Duma, or lower house of parliament, as Communist candidates, in December elections, which precede the presidential vote in March. The businessman has acknowledged funding the liberal Yabloko party, and is said to have funded the President's own party, United Russia.

"Khodorkovsky is the only tycoon who's helping Yabloko," says Ms. Lilia Shevtsova of the Carnegie Institute. "He's also aided independent media and given money to human rights groups. It's very depressing: he's the first [of the oligarchs] to start behaving in a different way, and he gets slapped down for it."

26.    This analysis is confirmed by William Tompson, Reader in Politics at Birkbeck College, University of London, whose *Putin and the Oligarchs: A Two-Sided Commitment Problem*,[5] includes the following:

> This is not the place for a detailed consideration of the chronology of the Yukos affair, or even for a consideration of the factors that might have accounted for the selection of Yukos's owners as targets for the Kremlin's wrath. There was no shortage of the latter. Khodorkovsky had clashed with both the Kremlin and a number of companies

---

[4] This Center is closely connected to, if not funded by, a department in the President's Administration
[5] 'Putin and the "Oligarchs": A Two-Sided Commitment Problem', in Alex Pravda (ed.), *Leading Russia: Putin in Perspective: Essays in Honour of Archie Brown* (Oxford: Oxford University Press, 2005), also published as Royal Institute of International Affairs Paper, August 2004, at http://www.riia.org/pdf/research/rep/BNAug04.pdf [3]

linked to it. Alone among the oligarchs, he had allowed himself publicly to contradict the President, doing so on at least one occasion to Putin's face. He had also publicly hinted at future political ambitions of his own, leading many to suspect that he wished to succeed Putin. Khodorkovsky provided substantial financial support to at least two opposition parties, Yabloko and the Union of Right Forces, while another core Yukos shareholder contributed to the Communists. In short, the Yukos chief seemed no longer to regard himself as bound by any bargain, implicit or explicit, to stay out of politics. The scale of Khodorkovsky's wealth and the openness of his political ambitions set him apart from his fellow oligarchs, while his plans to sell a stake in the newly merged Yukos-Sibneft to a US oil major threatened to create a company too large and too influential in Washington for the Kremlin to manage easily. In all likelihood, each of these factors, and others besides, played a role in the decision to destroy Khodorkovsky.  Yet the real significance of the affair far transcended the specific complaints against the tycoon. Initially, perhaps the aim of the assault on Yukos was to discipline Khodorkovsky or to destroy him as a political force, but as the campaign unfolded, it became clear that Khodorkovsky's destruction was a means to a larger end – the re-definition of the Kremlin's relationship with big business.

27.    For reasons that I explain further below Mr Khodorkovsky poses a political threat to President Putin. His trial and detention have, paradoxically, given him a platform from which he has continued to propagate his incisive condemnation of President Putin's policies. A recent example is his widely circulated article "Property and Freedom"[6]. He writes:

> "… the YUKOS affair is not a conflict between business and government. It is a politically and commercially motivated attack by one company (represented by state officials) on another. The state, in this particular case, is a hostage to the interests of certain individuals wielding the power of state officials…. My oppressors know that there isn't any solid evidence at all in the criminal case against me – but that doesn't matter. I could always be charged with setting fire to the Manezh building, or plotting an economic counter-revolution. I have been told that the authorities want to keep me in jail for as long as possible: five years, say, or longer. They fear that I will seek revenge."

28. This article has received very wide publicity in Russia.

29. The nature of the threat Mr Khodorkovsky poses to the President is authoritatively analysed in the article 'Wealth Versus Political Power: The Russian Case', posted on the 'Johnson's Russian List' (produced by the US Center for Defense Information) on 25th November 2003 by Professor Vladimir Shlapentokh of Michigan State University.[7]

30. Shlapentokh argues that President Putin had good reason to fear the following aspects of Khodorkovsky's intervention into Russian national politics:

   a. Khodorkovsky was very rich, and Putin believes that in a country as corrupt as Russia money can buy great influence.

   b. He has excellent connections with the governors and presidents in the 89 subjects regions of the Russian Federation.

   c. The 'Open Russia' Foundation[8], founded by Mr Khodorkovsky, was officially launched in December 2001 in London with an endowment of £10 million. The motivation for the establishment of the Open Russia Foundation was to foster openness, understanding, and integration between the people of Russia and the rest of the world. The US launch took place in the US Library of Congress on 18th September 2002.[9] It was the first-ever international corporate philanthropic foundation in Russia's history.

   d. He has influence in the media. In September 2003, using 'Open Russia' as a vehicle, he purchased the prestigious weekly newspaper 'Moscow

---

[6] Published in *Vedomosti*, the leading business daily paper, published jointly with the *Financial Times*, 29 December 2004 [4]
[7] JRL 7438, No.10 - http://www.cdi.org/russia/johnson/7438-10.cfm [5]
[8] See http://www.openrussia.info/eng/index.php3
[9] See http://www.Yukos.com/exclusive/exclusive.asp?id=6107 [6]

News' and installed the charismatic commentator Yevgenii Kiselyov there as editor.

e.    He could buy as many Duma deputies as need be to block the Kremlin's legislation.

f.    Khodorkovsky frequently dealt directly with foreign firms and even governments. Thus, in the United States he reportedly had meetings with senior military officers and the Vice-President, and hired former Clinton administration official Stuart Eisenstadt to help him lobby effectively. In this was he began to 'do things that in Russia only the President can do.'[10]

g.    Khodorkovsky appears to be a patriot, through his sponsorship of culture, education and science – planning to spend $100m over ten years to develop the Moscow Humanities University.

h.    Khodorkovsky is young, 10 years younger than the President, and could be a more serious competitor in 2008.

i.    Khodorkovsky is regarded as a brilliant manager.  He is regarded as having an attractive and relatively clean image. While he is unpopular with the mass of the population largely due to his wealth he is popular with educated people. In a survey carried out by Radio Ekho Moskvy (the most independent mass media outlet) after his arrest, 75% said they would prefer Khodorkovsky in a contest between him and Putin.

j.    Khodorkovsky claims to be honest, and has put much effort into importing Western standards of corporate governance.

---

[10] Interview with the respected analyst Lilia Shevtsova, *Radio Ekho Moskvy*, 28th October 2003. [7]

12

k.    Khodorkovsky has allies in the West. In the eyes of many Western commentators and politicians he is the symbol of Russian liberal capitalism. He has lavished money on the Carnegie Endowment for International Peace, the American Enterprise Institute, the Library of Congress, and others.

31.    According to the polling organisation VTSIOM-A Khodorkovsky's arrest had the effect of boosting Putin's popularity from a high 73% in October 2003 to an unassailable 82% in November 2003. The poll of 1,600 Russians was conducted between 13th and 16th November 2003. According to Levada:

> This event had a strong influence on the president's job approval rating. His rating grew. The majority of the population approved of the attack against Yukos and Khodorkovskii because the very rich are extremely disliked in this country and people are ready to believe any accusation against them. Because of this, in a measurable period of time, Putin's job approval rating grew significantly.[11]

32.    It should be noted that a more recent poll carried out in 2005 by VTsIOM discovered that 45% of respondents believe that the oil and gas sector of the Russian economy should be completely nationalized. A third of respondents disagree; and 5% of respondents would prefer Russian oil companies to be sold to Western corporations. 43% of respondents believe that the Yukos affair has been only the first in a sequence of such moves, and that other major companies will be the next targets. An equal number of respondents believe that this campaign is fair and justified; only 16% objected.[12]

33.    Shlapentokh's conclusion, with which I concur, is as follows:

---

[11] Jeremy Bransten "Russia: Elections? What Elections? Voters Profess Little Or No Interest In Upcoming Duma Polls" Radio Free Europe – Radio Liberty, 27 November 2003, at http://www.rferl.org/features/2003/11/27112003181713.asp [8]

[12] Anastasia Samotorova "Wishing you a smooth landing (behind bars). Almost half of respondents are in favor of nationalization and prosecution of major companies YUKOS is not the last major company to find itself in trouble" *Noviye Izvestiya* 11 January 2005 [9]

> With his victory over Khodorkovsky, Putin revealed the extent of his power and showed that nobody can undermine his position as master of the Kremlin. In some ways, however, the Khodorkovsky affair does not refute the popular view that Putin is a weak ruler, particularly if we are talking about his ability to impact the economic and social processes in Russia... Putin is unable to fight crime and corruption effectively. He has failed to implement his various promises in economic and social life. The abyss separating Moscow from the provinces is as great as it was during the Yeltsin period. The local barons, if they stay away from Moscow's politics, are almost fully autonomous entities... Putin's bureaucracy is deeply corrupt and inept ...

*Council of Europe*

34.    On 15th March 2004 the Committee on Legal Affairs and Human Rights of the Council of Europe's Parliamentary Assembly (PACE) appointed Mrs Sabine Leutheusser-Schnarrenberger, a former German Minister of Justice, as its Special Rapporteur on the circumstances surrounding the arrest and prosecution of leading Yukos executives. The Parliamentary Assembly is the parliamentary organ of the Council of Europe consisting of a number of individual representatives from each member State. It has a number of Committees of which the Committee on Legal Affairs and Human Rights is one.

35.    The Rapporteur carried out two fact-finding visits to Moscow in May and September 2004 and spoke to a number of persons connected with the case. In an interview on 7th August 2004 on *ZDF*, the second German TV channel, she said:

> There are many circumstances which lead us to believe, that there must be a political motivation in [the case] as well. Khodorkovsky is the only oligarch who sits in prison since October last year. There are massive claims for back taxes directed against him, for the years 2000 and 2001. 2002 and 2003 are still expected to follow. And this all is not happening to any other large company in Russia. These are all circumstances where one can say there is politics involved, not just the rule of law.[13]

---

[13] http://www.supportkhodorkovsky.com/pdfs/zdf_sls_7-8-04_engl.pdf [10]

36.     On 1st October 2004, she told the *Financial Times* that there was in her view a 'political background' to the case brought by the authorities against Mr Khodorkovsky. In addition, she highlighted a series of concerns that prevented him and Mr Lebedev from receiving a fair trial.[14]

37.     On 18th November 2004 the Rapporteur presented her Report to PACE.[15] Adopting the Report, the Committee said in para. 11 of the Draft Resolution that:

> ... the circumstances surrounding the arrest and prosecution of the leading Yukos executives strongly suggest that they are a clear case of non-conformity with the rule of law and that these executives were – in violation of the principle of equality before the law - arbitrarily singled out by the authorities

38.     The Draft Resolution presents the Rapporteur's findings in strong terms (para. 7 et seq):

> ... On balance, the findings put into question the fairness, impartiality and objectivity of the authorities, which appear to have acted excessively in disregard of fundamental rights of the defence guaranteed by the Russian Criminal Procedure Code and by the European Convention on Human Rights.
>
> 8. The most serious corroborated shortcomings include the following:
>
> i. despite specific requests of the defence lawyers, tests were not carried out in good time that could have established whether or not Mr Pichugin had been injected with psychotropic drugs; Mr Pichugin was also held in the "Lefortovo" prison that is not subject to the usual controls of the Ministry of Justice and remains under the direct authority of the FSB, contrary to a specific commitment the Russian Federation undertook when joining the Council of Europe;
>
> ii. shortcomings in medical attention to Mr Lebedev in prison: in the face of serious concern about Mr Lebedev's deteriorating state of health, the prison authorities have so

---

[14] Andrew Jack "Russia faces stern rebuke over judicial standards" *Financial Times* 1 October 2004 [11]

far refused to allow an examination of Mr Lebedev by independent doctors, despite repeated requests;

iii. delays in obtaining the prosecutor's permission have prevented the lawyers from entering into contact with their clients during a particularly critical time after their arrests, making it more difficult for them to organise their defence; a legislative reform abolishing the requirement of a prior permission from the prosecutor's office for a lawyer to visit his or her client in prison has not been applied in practice, at least not in the cases of the former Yukos executives;

iv. denial of access of Mr Lebedev's defence lawyers to the courtroom during the hearing deciding on his pre-trial detention;

v. search and seizure of documents in the defence lawyers' offices, summons of lawyers for questioning on their clients' cases, and alleged eavesdropping against defence lawyers: The prosecution must not be allowed to circumvent the lawyer-client privilege by a simple play on case file numbers, especially when the cases are as closely related to one another as the criminal cases against Khodorkovsky, Lebedev, and Pichugin, and the tax cases against Yukos and its subsidiaries;

vi. Unjustified restrictions on the publicity of certain court proceedings: members of the public have had extremely limited access to certain hearings that were announced as public, whilst other hearings were or are being held *in camera* in the first place. In particular, all proceedings against Mr Pichugin have been held *in camera*, even though only a small portion of the case file has been classified as secret; his lawyers have been placed under strict instructions not to discuss the proceedings in public, even the reasons of the final judgment may be kept secret;

vii. denial of bail (in particular regarding Mr Khodorkovsky): Mr Khodorkovsky was placed in pre-trial detention several months after Mr Lebedev's arrest, on very similar grounds, an arrest that media reports interpreted as a "warning" to Mr Khodorkovsky. Mr Khodorkovsky's conduct showed that there was no risk of absconding, or of interfering with evidence. After the completion of the pre-trial investigation, Mr Khodorkovsky and Mr Lebedev were kept in custody, which raises additional issues in light of the judgments of the European Court of Human Rights in the cases of

---

[15] http://assembly.coe.int/ASP/APFeaturesManager/defaultArtSiteView.asp?ArtId=97 [12]

Kalashnikov v. Russia and Letellier v. France. Also, following a recent legislative reform, persons accused of non-violent "economic crimes", such as those allegedly committed by Mr Khodorkovsky, are generally not placed in pre-trial detention.

viii. other unfair features of the trials against Mr Khodorkovsky, Mr Lebedev and Mr Pichugin: the court systematically allows the prosecutor to read out the minutes of the pre-trial interrogation of witnesses and to put pressure on the witness in the courtroom to simply confirm those minutes. This undermines the effectiveness of the right of the defence to question witnesses of the prosecution, whose pre-trial interrogation they are generally not able to attend. The defence lawyers are also not allowed to exchange written notes with the accused in the pre-trial detention centre, and in the courtroom, they can only exchange notes after the court has first read them."

The Committee concludes:

10. In particular, the allegedly abusive practices used by Yukos to minimise taxes were also used by other oil and resource companies operating in the Russian Federation, which have not been subjected to a similar tax reassessment, or its forced execution, and whose leading executives have not been criminally prosecuted. Whilst the law was changed in 2004 and the alleged "loophole" thus closed, the incriminated acts date back to 2000, and retrospective prosecution started in 2003.

11. Intimidating action by different law enforcement agencies against Yukos and its business partners and other institutions linked to Mr Khodorkovsky and his associates and the careful preparation of this action in terms of public relations, taken together, give a picture of a co-ordinated attack by the State.

12. The criminal charges laid against persons who made use of the possibilities offered by the law as it stood at the time of the incriminated acts, following a retroactive change of the tax law, raises serious issues pertaining to the principle of *nullum crimen, nulla poena sine lege* laid down in Article 7 ECHR, and also to the right to the protection of property laid down in Article 1 of the First Protocol to the ECHR.

13. In view of the above (paragraphs 8-12), the Assembly considers that the circumstances of the arrest and prosecution of leading Yukos executives suggest that the interest of the State's action in these cases goes beyond the mere pursuit of criminal

justice, to include such elements as to weaken an outspoken political opponent, to intimidate other wealthy individuals, and to regain control of strategic economic assets.

14. The Assembly recognises the right, and even the duty, of the law enforcement bodies to bring to justice the perpetrators of criminal offences. It also recognises the legitimate right of the elected political leadership to pursue its political objectives, including in the economic sphere. However, it strongly objects to the use of law enforcement procedures for such purposes. In this context, reference is made to the judgment of 19 May 2004 of the European Court of Human Rights in the *Gusinskiy* case, in which the Court found that the detention in remand of N-TV founder Gusinskiy violated Article 5 ECHR because it had established that the applicant's prosecution had been used to intimidate him into selling off his stake in N-TV to Gazprom.

39.   The report is due for plenary debate by PACE in 2005, possibly at its January session (24th –28th January 2005).

*Members of the Russian Executive*

40.   The opinion of the Council of Europe Special Rapporteur appears to be confirmed at least in part by the leading reformer and Russian Minister of Trade and Economic Development, Mr German Gref, who was very close to President Putin.   On 23rd June 2004 the BBC reported that he had told their Moscow correspondent that "Mr Khodorkovsky's company Yukos had been involved in 'political activities'". Mr Gref indicated that he saw this as disloyal to President Putin, and that Mr Khodorkovsky had then made himself an easy target by allegedly trying to evade taxes and to commit fraud.[16]

41.   Mr Gref has repeated these opinions in an interview with the German newspaper *Die Zeit* published on 15th October 2004 in the *Nezavisimaya Gazeta (Independent Newspaper)*.[17] Confirming that he has and had a very bad opinion of Khodorkovsky, he continued… "it is obvious that one oligarch abandoned the

---

[16] http://news.bbc.co.uk/1/hi/business/3831631.stm [13]
[17] Yevgenii Grigoriev "Gref collides with the President's Administration" , at http://www.ng.ru/printed/politics/2004-10-15/1_gref.html [14]

limits of economics and invested money in politics in order to secure for himself suitable legislation…". He added that the Yukos case has done a great deal of damage to the dynamics of the market in securities and to Russia as a place for investments.

42.   Furthermore, on 11th November 2004 a close colleague of Mr Gref, Mr Andrei Illarionov, President Putin's economic adviser, and Russia's envoy to the Group of 8, comprising the world's major industrialized nations and Russia, told a Moscow press conference organised by RIA Novosti that the legal onslaught against Yukos was politically motivated and should stop.[18]

43.   On Tuesday 22nd December 2004 Mr Illarionov told another news conference: "The sale of the main oil-producing asset of the best Russian oil company… and its purchase by Rosneft company, 100% owned by the state, has undoubtedly become the scam of the year. When the Yukos case began, everybody was asking which will be the rules of the game. Now it is clear that there are no rules of the game".[19] On Wednesday 29th December 2004 Mr Illarionov added: "Not only Russia's best company came under attack in 2004 – so did some outstanding professionals. They include Mikhail Khodorkovsky… There is evidence that the crossroads where a choice of path might have been possible is already behind us. We are already living in a different country."[20]

44.   On 3rd January 2005, following these interview, and also a visit to the court to pay New Year's respects to Mr Khodorkovsky, Mr Illarionov was relieved by President Putin from his post as envoy to G8. Mr. Putin reassigned those duties

---

[18] Charles Gurin "Illarionov Says YUKOS Affair Is Political" *Eurasia Daily Monitor,* The Jamestown Foundation, Volume 1, Issue 126, Friday November 12 2004 [15]
[19] David Holley, Sergey Loiko "A Top Advisor to Putin Calls Oil Takeover the "Scam of the Year"", *Los Angeles Times* 29 December 2004 [16]
[20] Irina Granik, Nikolai Vardul "The Year of Great Misfortune" *Kommersant* 29 December 2004 [17]

to a presidential aide who is seemingly a more loyal Kremlin insider, Igor I. Shuvalov.[21]

*OECD*

45.    In its Annual Economic Survey of Russia published in May 2004, the Organisation for Economic Cooperation and Development (OECD), commented (p71) that:

> … interference in judicial processes by state institutions is also a problem. The courts are often subservient to the executive, while the security services, the prosecutors and the police remain highly politicised. The so-called 'Yukos case' reflects these problems. Whether the charges against the company and its core shareholders are true or not, it is clearly a case of highly selective law enforcement. Charges pertaining to alleged privatisation abuses could be directed against hundreds of companies, and charges of tax evasion against millions of companies and citizens. The simultaneous eruption of so many criminal cases and investigations – many of them eight or nine years old – does not look like the impartial operation of the law enforcement agencies and the courts. Nor is the Yukos affair unique: similar legal campaigns have been directed at other businessmen in conflict with the authorities at both federal and regional levels. In one high-profile case[22], it is known that officials in the presidential administration met representatives of the Supreme Arbitration Court to underscore the importance of the case for "state interests". As long as it engages in such practices, the state will find it hard to curtail corruption in the judicial system or to prevent powerful private-sector interests from abusing judicial processes. At the same time, there is clearly a need to regulate the political activities of Russian business better and thereby to provide clearer "rules of the game" governing business-state relations. It is well known that Yukos's aggressive lobbying antagonised the authorities, but in the absence of any law on lobbying, the limits of permissible behaviour are unclear."

---

[21] C J Chivers "Putin demotes adviser critical of the Kremlin" *New York Times* 4 January 2005 **[18]**

[22] The reference is to *Films By Jove v. Berov* 250 F. Supp. 2d 156 (EDNY 2003), in which there was evidence that in a case concerning title to motion pictures, there had been such a meeting held *ex parte* to influence the outcome of the case. **[19]**

46.     Finally, in the paper referred to above, William Tompson confirmed this analysis, and wrote:

> The arrest in early July [2003] of one of the oil company's core shareholders [Lebedev] marked the beginning of a protracted and wide-ranging legal and political campaign directed against Yukos and its owners by the Kremlin. Many of the charges involved were probably true, but there was no doubt that Yukos was the victim of politically motivated and highly selective law enforcement. Charges pertaining to alleged privatisation abuses could have been directed against hundreds of Russian companies, while charges of tax evasion could have been brought not only against most businesses but probably also against most Russian citizens who earned anything more than subsistence wages in the 1990s. Moreover, the simultaneous eruption of so many criminal cases and investigations – many of them eight or nine years old – made it hard to conclude that the attacks were anything but political.

*Russian public opinion*

47.     A large section of the Russian public believes that the prosecution is politically motivated. Whilst obviously not conclusive, these views provide corroboration for the conclusions reached by international observers that I have set out above.[23]

48.     The results of a public opinion survey conducted in late May 2004 by Yuri Levada's VTsIOM-A centre for public opinion analysis, showed that as many as 34% believed that the charges against Yukos and its former CEO were politically motivated, which was just a little short of the 40% who believed in the official 'economic' version. When asked if they expect the impending trial of the former Yukos CEO to be fair and impartial only 28 per cent said "definitely yes", or "rather yes than no", while 49 per cent said a definite "no", or "rather no

---

[23] It is also consistent with the approach of the European Court of Human Rights where questions about the impartiality of a court are raised. Here, the Court has said that the view of the accused are important but not decisive: see eg *Remli v. France* (1996) 22 EHRR 253

than yes". Asked if there were political prisoners in Russia today, 50 per cent answered in the affirmative, while only 30 per cent said no.[24]

49. This generally held perception is reflected in the very many public commentaries on the Yukos case which point out its political nature. For example:

    a.    On 13th July 2004 Erin Arvelund commented in the *New York Times* that

> The trial of Mr. Khodorkovsky and Mr. Lebedev is part of a series of cases that the Russian government has brought against Yukos and its owners. President Vladimir V. Putin has insisted that the trial is a matter for the courts, and that he has no interest in bankrupting Yukos. Many experts believe, however, that the legal campaign stems from Mr. Putin's fury over Mr. Khodorkovsky's fund-raising activities in last year's parliamentary elections and advocacy for privately owned oil pipelines.[25]

    b.    On 23rd June 2004 Jill Dougherty, CNN Moscow Bureau Chief, commented:

> Although the two legal cases [ie the Khodorkovsky criminal case and the civil case against Yukos] are technically separate, some observers believe they are both part of a Kremlin-directed effort to take over the company and eliminate Khodorkovsky's economic and political clout.[26]

    c.    On 16th July 2003 the prominent Moscow lawyer Andrei Makarov said on *Radio Ekho Moskvy* that in his opinion the Yukos case was a "political order" connected with the forthcoming elections. He commented that in April 2003 the General Procuracy had a completely

---

[24] http://www.mosnews.com/commentary/2004/05/31/Yukosdivid.shtml [20]
[25] http://www.nytimes.com/2004/07/13/international/europe/13russ.html [21]
[26] http://www.cnn.com/2004/WORLD/europe/06/23/russia.Yukos/ [22]

different position; then it was considered that everything was lawful and that there were no grounds for interference by the General Procuracy.[27]

d.    Geert Groot Koerkamp, the Moscow Correspondent of Radio Netherlands reported on 16th June 2004 that "Observers believe that Mr Khodorkovsky's trial is politically motivated"[28]

e.    On 8th June 2004 Mara D. Bellaby reported in "The Agonist" that "Many see his arrest and the relentless probe by state prosecutors and tax officials into Yukos as Kremlin-backed retaliation for Khodorkovsky's political aspirations and policy statements."[29]

*Sequence of events in the prosecution of Maruev and Chernysheva*

50.    There are a number of features about the sequence of events in this prosecution that support the view that the prosecution is politically motivated and directly linked to the Khodorkovsky prosecution. The facts (with reference to documents in the prosecution case files) are as follows.

51.    On 27th April 1998 an investigation was commenced into financial transactions in Volgograd, centring on the activities of the deputy head of the city administration, Galushkin, as well as Zurabov and Maruev. By 24th August 1998 this investigation had acquired a number, No. 509466, and was being conducted by a Volgograd prosecutor, Muzraev, in a team led by Volgograd prosecutor Alyshev. On 13th and 24th December 1998 the Federal Treasury presented the conclusions of audits ordered by the prosecutors on 26th August 1998. The focus of attention was a contract of 14 May 1998. On 3rd March 1999 prosecutor Alyshev made an Order in case No. 509466 refusing to start a criminal case

---

[27] http://www.echo.msk.ru/news/151074.html [23]
[28] http://www.rnw.nl/hotspots/html/rus040616.html [24]
[29] http://scoop.agonist.org/archives/016239.html [25]

against Galushkin, Usov, Satonov, Pikman, Stavski, Yalozenko, Mossur, Karpov and Mangulov because of the "absence in their activities of the elements of a crime". On 4th March 1999 prosecutor Alyshev closed the criminal case commenced on 27th April 1998 in respect of Krainov and Koval, and ordered the cancellation of their bail surety, as well as unfreezing the assets of a firm (the name of this firm is illegible). The Order has references to investigations concerning Chernysheva and Maruev, and contains Maruev's deposition.

52.    Nothing then happened in the investigation until 17th October 2003 when prosecutor Biryukov, First Deputy Prosecutor General in Moscow, made an Order referring to case No. 509466, cancelling Alyshev's Order of 4th March 1999 closing the case against Krainov and Koval, and ordering the re-starting of investigations. The Order stated that there had been no legal evaluation of the activities of Dubov, Chernyshova and Anilionis, or the leaders of Yukos, in activities which appeared to have the attributes of a crime under Article 159(b)(3) of the Criminal Code. On 16th October 2003 prosecutor Lyseiko of the General Procuracy in Moscow made an Order in case No. 18/41-03 (the case number under which Chernyshova and Maryuev were charged) ordering that Volgograd prosecutor Alyshev be added to the investigative team, in view of the volume of work involved. This Order was counter-signed, by way of service and non-objection, by Krainov, the original accused.

53.    On 5th November 2003 Chernysheva was charged in relation to case No. 18/41-03. Maruev was charged in relation to the same case on 27th January 2004.

54.    No explanation was given in the Order of 17th October 2003 as to why the prosecution was being recommenced after a period of more than four years. The facts give rise to a strong inference, in the circumstances, that the decision to re-start the case was a political decision. The run-up to the Duma elections of 7th December 2003, leading to the presidential elections of 14th March 2004, was

precisely the time when it became important for President Putin to consolidate his electoral position by striking at Mr Khodorkovsky and his associates.

55.     At the time these events were taking place in respect of Mr Maruev and Ms Chernysheva matters were also beginning to unfold in respect of Mr Khodorkovsky and Yukos. On 3rd October 2003 the Prosecutor General's office raided premises run by Yukos and removed computer servers holding company financial data. On 9th October the Prosecutor General's office carried out a raid on Yukos' security offices and the offices of Anton Drel, the lawyer for Platon Lebedev. On 17th October the Prosecutor General's office filed tax evasion charges against Vasily Shakhnovsky, a Yukos shareholder and elected member of the Federation Council Senate, and detained him for questioning. On 21st October the Prosecutor General's office carried out raids on the Bank Menatep premises in St Petersburg. On 23rd October the Prosecutor General's office raided a public relations agency hired by the Yabloko party, detaining two of the party's deputies and confiscating five computer servers. Mr. Khodorkovsky had in the past contributed funds to the Yabloko party. Finally, on 25th October Mr Khodorkovsky was arrested at gunpoint at a Siberian airfield by Russian special forces and taken to Moscow.

56.     In respect of these events the PACE concludes in para. 11 of the Draft Resolution:

> Intimidating action by different law enforcement agencies against Yukos and its business partners and other institutions linked to Mr Khodorkovsky and his associates and the careful preparation of this action in terms of public relations, taken together, give a picture of a co-ordinated attack by the State.

57.     Given the realities of power in the Russian Federation it is highly unlikely that officials in the Prosecutor General's office or the police would have dared to launch such a co-ordinated attack on the richest person in the country and his close associates without the implied blessing of the current President. Whilst no-

one save President Putin himself or his inner circle can say whether he expressly authorized the Yukos or Khodorkovsky cases, it must certainly be the case that he would have known about plans to do so and given his at least tacit agreement. Georgyi Satarov, head of a leading think tank in Moscow has suggested that the President chose not to control the power group within the Kremlin that allegedly turned against Mr Khodorkovsky.[30]   The fact that Putin has been a major beneficiary of Mr Khodorkovsky's arrest supports this thesis.

*Chernysheva and the 'purge' in the President's Administration*

58.    Further light was thrown on these coincidences by the political commentators Ivan Sas, Dmitrii Simakin and Roman Ukolov, writing in the daily *Nezavisimaya Gazeta (Independent Newspaper)* on 20 October 2004, immediately after one of the extradition hearings in London[31]. They point out that in the extradition proceedings Maruev is described as the former deputy chief accountant of Yukos, while Chernysheva figures as the former head of the administration of the regional business ZAO Rosprom, and before that as the head of the privatisation department of the Menatep Bank.

59.    This description of the defendants, while accurate, is incomplete to the point of being misleading. The President's Administration confirmed to the newspaper that until the autumn of 2003 Chernysheva in fact occupied the high position of Head of the Directorate of Relations with the Public and Humanitarian Policy of the Chief Directorate of Internal Policy of the President's Administration. This Directorate has, according to its terms of reference, responsibility for "... informational-analytical, and organisational assistance for realising for the

---

[30] Interview on *Radio Ekho Moskvy*, 27th October 2003 **[26]**

[31] I. Sas, D. Simakin, R. Ukolov "*Dobralis do Kremlya. "Delo YUKOSa" privelo k zachistke vazhneishevo podrazdeleniya administratsii prezidenta" (Case gets to Kremlin. The "YUKOS Case" led to a purge of the most important sub-department of the President's administration)*" 20 October 2004 *Nezavisimaya Gazeta (Independent Newspaper)* at http://www.ng.ru/events/2004-10-20/1_ukos.html **[27]**

President his constitutional competence for setting out the fundamental directions of the internal policy of the State."

60.    The Directorate of Internal Policy is led by the present Deputy Head of the President's Administration, the President's Assistant Vladislav Surkov, who was recently rated as the third most powerful person in Russia. It was this Directorate which was responsible for two presidential and parliamentary campaigns, and also the presidential elections in Chechnya.

61.    As the three analysts point out, the piquancy of the situation lies in the fact that the backbone of the Department of Internal Policy of the President's Administration was formed from people who had left Menatep, the main shareholder in Yukos. As well as Chernysheva, there were Sergei Abramov, the first deputy head of the Chief Directorate of Internal Policy, and the head of the department for contacts with business circles and public associations Anatoly Kudrashov.

62.    Another *Nezavisimaya* journalist, Svetlana Ofitova, had foreseen the likelihood that Ms Chernysheva and others linked to Mr Khodorkovsky would be dismissed on 28th October 2003[32], when she wrote that these three senior civil servants were amongst those most likely to be fired – because they were suspected of connections with Mr Khodorkovsky. At that time the paper pointed out that Ms Chernysheva had already been abroad for two months "for medical treatment". The forecast was fulfilled. Sergei Abramov was also fired, and is now a court witness in the Yukos case.

63.    The article of 28th November 2004 also noted that at the end of January 2004 the First Deputy Prosecutor General Yurii Biryukov stated that there were international arrest warrants for ten people concerned with Yukos. At that time

of those ten, only the main shareholders of Yukos were named: Leonid Nevzlina, Vladimir Dubov and Mikhail Brudno. In relation to the others it was said that they were leaders of subsidiary companies through which the tax evasion took place. According to the authors of the article, there is good reason to think that the names of Chernysheva and Maruev also figured on that list of arrest warrants.

*Conclusion*

64.    I therefore agree with the conclusions in paras. 13 and 14 of the PACE Draft Resolution:

> In view of the above ... the Assembly considers that the circumstances of the arrest and prosecution of leading Yukos executives suggest that the interest of the State's action in these cases goes beyond the mere pursuit of criminal justice, to include such elements as to weaken an outspoken political opponent, to intimidate other wealthy individuals, and to regain control over strategic economic assets.
>
> The Assembly recognises the right, and even the duty, of the law enforcement bodies to bring to justice the perpetrators of criminal offences. It also recognises the legitimate right of the elected political leadership to pursue its political objectives, including in the economic sphere. However, it strongly objects to the use of law enforcement procedures for such purposes.

**b)    The discrimination issue**

65.    There is compelling evidence to support the assertion that the defendants Maruev and Chernysheva will be prejudiced at their trial or punished, detained or restricted in their personal liberty by reason of their association with Mr Khodorkovsky and his political ambitions. In particular, there is a wealth of evidence to suggest that Mr Khodorkovsky and the other defendants have been

---

[32] Svetlana Ofitova " 'The bears' deal the final blow to Yukos'. The 'witch-hunt', the first victim of which was the millionaire Vladimir Dubov, may also unfold in the Kremlin" *Nezavisimaya Gazeta* 28 October 2003, at http://www.ng.ru/politics/2003-10-28/1_er.html [28]

treated more harshly and deprived of important procedural safeguards in the trial process because of their status as or association with political opponents. The evidence further shows that in cases of this sort the judiciary acts as an insufficient safeguard.

*The Council of Europe findings*

66. The PACE Draft Resolution adopted by the Human Rights Committee put forward following the Rapporteur's investigation lists a number of significant due process violations that have occurred in the Khodorkovsky trial. These do not instil confidence about the fairness of any trial of Chernysheva or Maruev. Para. 7 of the Resolution concludes that the violations call into question the fairness, impartiality and objectivity of the authorities, and demonstrate they have acted excessively in disregard of fundamental rights of the defence guaranteed by the Russian Criminal Procedure Code and by the European Convention on Human Rights. The violations highlighted are as follows:

   a.   despite specific requests of the defence lawyers, tests were not carried out in good time that could have established whether or not Mr Pichugin had been injected with psychotropic drugs; Mr Pichugin was also held in the 'Lefortovo' prison that is not subject to the usual controls of the Ministry of Justice and remains under the direct authority of the FSB, contrary to a specific commitment the Russian Federation undertook when joining the Council of Europe;

   b.   shortcomings in medical attention to Mr Lebedev in prison: in the face of serious concern about Mr Lebedev's deteriorating state of health, the prison authorities have so far refused to allow an examination of Mr Lebedev by independent doctors, despite repeated requests;

c.    delays in obtaining the prosecutor's permission prevented defence lawyers from contacting their clients immediately after their arrests, making it more difficult for them to organise their defence; a legislative reform abolishing the requirement of a prior permission from the prosecutor's office for a lawyer to visit his or her client in prison has not been applied in practice, at least not in the cases of the former Yukos executives;

d.    denial of access of Mr Lebedev's defence lawyers to the courtroom during the hearing deciding on his pre-trial detention;

e.    search and seizure of documents in the defence lawyers' offices, summons of lawyers for questioning on their clients' cases, and alleged eavesdropping against defence lawyers.

f.    unjustified restrictions on the publicity of certain court proceedings: members of the public have had extremely limited access to certain hearings that were announced as public, whilst other hearings were or are being held *in camera* in the first place. In particular, all proceedings against Mr Pichugin have been held *in camera*, even though only a small portion of the case file has been classified as secret; his lawyers have been placed under strict instructions not to discuss the proceedings in public, even the reasons of the final judgment may be kept secret;

g.    denial of bail (in particular regarding Mr Khodorkovsky): Mr Khodorkovsky was placed in pre-trial detention several months after Mr Lebedev's arrest, on very similar grounds, an arrest that media reports interpreted as a 'warning' to Mr Khodorkovsky. Mr Khodorkovsky's conduct showed that there was no risk of absconding, or of interfering

with evidence. After the completion of the pre-trial investigation, Mr Khodorkovsky and Mr Lebedev were kept in custody despite the fact that following a recent legislative reform persons accused of non-violent 'economic crimes' such as those allegedly committed by Mr Khodorkovsky, are generally not placed in pre-trial detention;

h.    other unfair features of the trials against Mr Khodorkovsky, Mr Lebedev and Mr Pichugin: the court systematically allows the prosecutor to read out the minutes of the pre-trial interrogation of witnesses and to put pressure on the witness in the courtroom to simply confirm those minutes. This undermines the effectiveness of the right of the defence to question witnesses of the prosecution, whose pre-trial interrogation they are generally not able to attend. The defence lawyers are also not allowed to exchange written notes with the accused in the pre-trial detention centre, and in the courtroom, they can only exchange notes after the court has first read them.

67.    In her Explanatory Memorandum to the Draft Resolution the Special Rapporteur concluded at p15:

> The sheer number and seriousness of procedural violations that I described above in my view exceeds a mere accumulation of mistakes that could be explained by a lack of experience or professionalism.  During my mandate, I have been confronted by a number of examples of the serious problems which the Russian judiciary suffers in general, including its notorious openness to corruption, lack of respect for the rights of the defence, and, in particular, the overwhelming influence of the procuracy which in turn is a tool in the hands of the Executive.

*Further evidence of discrimination*

68.     In this section I set out considerable further evidence that Mr Khodorkovsky and the other defendants have been or are likely to be prejudiced. In summary:

> (a) Olga Yegorova, the Chairman of the Moscow City Court (the Court which would be the court of appeal (cassation) for the district court at which Ms Chernysheva's and Mr Maruev's case would be heard) is known to have close links with the Kremlin. She has dismissed a number of judges for demonstrating too much independence or "whistle-blowing" and exercises close control not only over the Moscow City Court, but over all the district courts in Moscow. This is a systemic problem, and she is typical of other court chairmen.

> (b) There is considerable evidence that the judiciary in Russia is still far from fully independent of the Executive, and that in high profile political cases judges come under pressure to do the Executive's bidding which they are unable to resist, or they are already willing to do so without pressure.

> (c) Future proposed reforms will further weaken judicial independence.

*i) The role of the court chairman*

69.     It is important to note that in Russia the chairman of a court, at whatever level, is the *tsar-bog* – tsar and god – of his or her court. Not only does the chairman decide which cases are heard by which judges, he or she also plays the most important role in deciding whether a new judge is given a permanent post after the initial three year appointment, but also whether the judge will be promoted or even keep his or her position.

70.     Court chairmen always know whom to trust for the conduct of cases that matter to the authorities. When a judge refuses to cooperate, there may be severe consequences. Two examples are the cases of the Moscow City Court Judges

Olga Kudeshkina, who refused to heed the advice of her Chairman, Olga Yegorova, to follow the desires of the prosecutor in a particular case; and Sergey Pashin, who was made the subject of disqualification proceedings by Yegorova's predecessor, Zoia Korneeva (known as "Iron Zoia"), on the basis of minor procedural violations that served as a pretext for his dismissal.

*Judge Pashin*

71.    Judge Pashin is one of Russia's most distinguished jurists. He visited England several times during the early 1990s with large parties of Russian judges when, as Deputy Head of the President's Legal Administration, he was encouraging the start of jury trial in Russia. He worked closely with English judges at the highest levels, through the British Institute of International and Comparative Law.

72.    From 1987 he was responsible for proposals for judicial reform in Russia, and in October 1991 he was appointed Vice-Chairman of President Yeltsin's Council on Judicial Reform. He drafted the first law for Russia's new Constitutional Court, as well as a model Criminal Procedural Code for the CIS (Commonwealth of Independent States). He was awarded the distinction of "Distinguished Jurist of the Russian Federation". In early 1994 President Yeltsin proposed Pashin for the post of Head of the Department of Legal Reform in the GPU (General Legal Administration of the President). But instead, after falling out of favour, Pashin was sacked.

73.    In 1996 he was appointed a judge of first instance in the Moscow City Court. His acquittal rate was 8%, as against the 0.8% of his fellow judges. In October 2000 he was removed from his position by the Qualifications Commission of the Moscow City Court, on the grounds of procedural irregularity, and appealed to the Supreme Court. It was widely recognised that the real reason was his outspoken criticism of injustice. He won his appeal and was reinstated, but the

following year was removed again, and decided to return to academic life rather than remain in the hostile environment of the Moscow City Court.

*Olga Yegorova*

74. The Chairman of the Moscow City Court, Olga Yegorova, has become notorious for her control of her own and the lower courts in Moscow, and for a large number of dismissals.   Since the Moscow City Court is the court which hears all appeals in the case against Messrs Khodorkovsky, Krainov and Lebedev, and would hear appeals in a trial of Ms Chernysheva and Mr Maruev, it is important to pay close attention to her special role.

75. There are good grounds for believing that Judge Yegorova, who was appointed on 29th December 2000, is a judge with close relations to the Kremlin, and that she is regarded as reliable by the Russian leadership. A Russian journalist, Igor Korolkov, has reported[33] that Olga Yegorova's candidacy for the post of Chairman was, for reasons not disclosed, refused by the relevant commission for personnel policy of the President. Judicial appointments are made by the President. Under normal circumstances Yegorova should only have been able to apply for the post again after a year. But this was overruled in her case, after, it is said, interventions by former FSB (previously known as the KGB) officers now in leading positions around President Putin.   The fact that her husband is General Yegorov of the FSB may have helped.

*Judge Kudeshkina*

76. Judge Kudeshkina had worked as a Federal Judge for 20 years. Her case was the subject of an article by Guy Chazan in the *Wall Street Journal* of 5th August

---

[33] 30th April 2004, *Moskovskiye Novosti (Moscow News)*: "Boss of Justice: Scandals, which more and more affect the colleagues of Judge Yegorova, are engulfing the present chairman of the capital's justice system." **[29]**

2004.[34]    The case started as the result of an attempt to pressure Judge Kudeshkina by the prosecutor Dmitrii Shokhin – who happens to be the prosecutor in the case against Messrs Khodorkovsky, Lebedev and Krainov.

77.    Judge Kudeshkina was allocated the appeal of the prosecution against the acquittal of a Mr Zaitsev. In fact, the Russian prosecutors appeal almost every one of the small number of acquittals rendered by the lower courts, and in many cases succeed.  The article describes what happened:

> Before the trial started, she says, the prosecutor in the case, Dmitry Shokhin, stopped by her office for a chat. Using thinly veiled language, Mr. Shokhin told her she needed to render a guilty verdict, Ms. Kudeshkina says. She recalls telling Mr. Shokhin she'd listen to the arguments before making a decision. A spokeswoman for the prosecutor's office says Mr. Shokhin - who is also a prosecutor in the Khodorkovsky trial - won't comment and that Ms. Kudeshkina's account is "complete rubbish."

> The trial, which began in late May 2003, quickly deteriorated. According to court transcripts, toward the end of the first week Mr. Shokhin began protesting Ms. Kudeshkina's line of questioning, accusing her of favoring the accused.

> Mr. Shokhin turned for support to the court's two lay jurors. Soviet-era holdovers, lay jurors are members of the public who act as mini juries, although they have no power to render verdicts. The position was scrapped earlier this year. Mr. Shokhin asked them to replace the judge and when they refused, he called for their removal, too.

> Four days later, Ms. Kudeshkina was summoned to the office of her boss, Olga Yegorova, Moscow's chief judge. As they talked about the trial, Ms. Yegorova telephoned a man she identified as Russia's deputy prosecutor general…to discuss the case, Ms. Kudeshkina recalls. She says the chief judge faxed to the prosecutor copies of Mr. Shokhin's complaints.

---

[34] *In Russia's Courts, A Judge Speaks Up - And Gets Fired. Political Pressure, Corruption Taint Post-Soviet Justice; Prosecutors Wield Clout. The Trials of Ms. Kudeshkina.* [30]

That day, the lay jurors withdrew from the case. In written statements filed with the court, they said the prosecutor's "disgusting behavior" - namely the pressure he put on them and the judge - was damaging their health. One complained of high blood pressure, the other of heart problems.

The chief judge instructed Ms. Kudeshkina to exclude the jurors' statements from the case file and remove references to them from the transcript, Ms. Kudeshkina recalls. That would have had the effect of removing from the record Mr. Shokhin's courtroom tactics. "She was effectively telling me to falsify court records," Ms. Kudeshkina says.

Ms. Kudeshkina refused. In her written summary of the case, she detailed the prosecutor's actions and included the jurors' protests. Ms. Yegorova promptly removed Ms. Kudeshkina from the case. Last November (2003), another judge found Mr. Zaitsev guilty and gave him a two-year suspended sentence. He is appealing."

78.    Judge Kudeshkina was dismissed in May 2004.

79.    On 7th October the appeal of Judge Kudeshnika against her dismissal came before the civil division of the Moscow City Court, to be chaired by Judge S E Kurtsinsh, allocated to the case by Judge Yegorova, who was also a witness in the case. Judge Kudeshkina objected on the grounds that Judge Kurtsinsh could not in the circumstances be impartial, and applied to the Chairman of the Supreme Court of the Russian Federation for her case to be transferred to any other court. When the case went ahead at Moscow City Court, she asked for an adjournment pending a reply. This request was refused, and she refused to participate further.[35] The journalist Leonid Nikitinski reminds his readers that "no-one should be the judge in their own case". Nevertheless, the Moscow City Court rejected her application. She intends to appeal further, if necessary to the European Court of Human Rights.

---

[35] See Leonid Nikitinskii "I refuse to participate in the trial. The case in which the Chairman of the Moscow City Court is involved is heard by the very same court" *Novaya Gazeta (New Newspaper)* no.75, 11 October 2004, http://2004.novayagazeta.ru/nomer/2004/75n/n/5n-s24.shtml [31]

*Further examples of Judge Yegorova's activities*

80.   Another four former judges had complained by December 2003 about the fact
      that Moscow City Court "acts under instructions", and that Judge Yegorova
      interferes in the court with the objective of inhibiting the exercise of justice.[36]
      These were retired judge Nataliya Shershova, who served for 12 years at
      Moscow City Court, and supports Judge Kudeshkina's contention that Moscow
      judges come under pressure. She described Judge Kudeshkina as a principled
      person. Judge Alla Kasimova, retired judge of the Presnenskii Inter-Municipal
      Court in Moscow, told the radio station "Ekho Moskvy" (regarded as the most
      liberal and critical independent radio station in Moscow, and also highly
      popular) that she also had been removed through the action of Judge Yegorova.
      Her dismissal and criminal prosecution followed her own protest against the
      dismissal of Judge Kupryanova, former acting chairman of that court, again
      through Judge Yegorova's actions, without any reasons being given. She pointed
      out that Judge Yegorova is able to pressurise or dismiss any judge in Moscow.
      Finally, the former judge of the Solntsevo Inter-Municipal Court of Moscow,
      Judge Yelena Kureneva, told the same radio station that she had also been
      summarily removed, after she complained that she had come under pressure
      from, amongst others, Judge Yegorova.

81.   On 30th April 2004 Igor Korolkov wrote an article in the national weekly
      newspaper *Moskovskiye Novosti (Moscow News)*[37] entitled "Boss of Justice:
      Scandals, which more and more affect the colleagues of Judge Yegorova, are
      engulfing the present chairman of the capital's justice system." Tellingly,
      Korolkov points out that in 2001 eight judges resigned from Moscow City
      Court, while four were sacked; and in 2002 a further ten judges resigned.

---

[36] See www.newsru.com/Russia/03Dec2003/4more_print.html [32]

[37] *Moscow News* No.16 of 2004 (30 April 2004), at www.mn.ru/issue.php?2004-16-29 [29]

82.    The latest manifestation of Judge Yegorova's activities is the result of the adoption in July 2003 of the law "On the creation and organisation of district courts in the city of Moscow and amendments to Article 21 of the Law of the RSFSR "On the court system of the RSFSR".[38] In the summer of 2003 all inter-municipal courts in Moscow were transformed into district courts, and it was anticipated that all serving judges would be automatically transferred. However, the President's Decree nominating judges for the new district courts did not appear until 31st May 2004 for some reason, and did not include the names of 13 serving judges, all of whom were judges who had incurred the displeasure of Judge Yegorova. Most of them resigned their positions voluntarily, under pressure from her. Three of them appealed to the Qualifications Collegium of Judges of Moscow. On 3rd November 2004 the Collegium confirmed the dismissal of Olga Ovchinnikova, a judge of the Basmanniy Court, and on 24 November heard the appeals of Judge Aleksandr Melikov of the Dorogmislovskii District Court and Judge Nataliya Zyateva of the Meshchanskii District Court. Judge Melikov's dismissal (after 17 ½ years service as a judge) was confirmed on 8 December 2004, and in his view he was dismissed because he was against Judge Yegorova. She accused him of excessive leniency: "… his practice of imposing sentences in criminal cases also witnesses to the clear dubiousness and strange leniency of a whole series of sentences and warnings of Judge Melikov…". She wanted all the judges in Moscow to hand down as many convictions as possible – in a system where the acquittal rate is less than 1%.

83.    On 9 December 2004 Mr Melikov conducted a lengthy interview on the radio station *Ekho Moskvy*[39] saying that that he will appeal the decision for his dismissal to the Constitutional Court of the Russian Federation.

   *ii) Judicial independence*

---

[38] See http://pda.lenta.ru/Russia/2004/11/23/judges – "Mosgorsud provodit zachistku ryadov" (Moscow City Court is carrying out a purge of the ranks) [33]

84.   I have noted above the evidence that the Executive uses the courts to pursue its agenda just as it did during the Soviet era. Despite considerable legislation for judicial reform since 1991 and especially in the last few years, just over a decade is a very short period of time to overhaul a deeply entrenched system. A few thousand additional judges of general jurisdiction have recently been appointed, in order to cope with the transfer of functions to the judiciary since July 2002, so that the total is now over 20,000, as against 17,000 a few years ago. But a large number of judges were appointed before the collapse of the USSR, and were trained and had their formative experience in the Soviet system. Most of the remainder were appointed and trained before the latest reforms. It is therefore unsurprising that in political cases judges very often defer to the Executive's wishes.

85.   It is commonly accepted that it will take at least a generation before judges have assimilated the spirit of the reforms. For example, *Washington Post* correspondent Peter Baker, who observed the first jury trial (of Igor Bortnikov) in Moscow City Court, reported[40] that under the new Criminal Procedural Code rules, judges are supposed to be neutral arbiters. But the trial judge, Judge Pyotr Shtunder, interrupted repeatedly to steer the proceedings. "When defense attorneys objected to the introduction of a witness statement they had never seen, he barked, "That's your problem." And when they questioned the identification of a witness, he interrupted them. "Stop this," he ordered. "To doubt the investigation is illegal."

86.   For the bulk of cases, criminal and civil alike there are few problems with political pressure because the cases do not attract the attention of powerful people. However Russian criminal procedure still reflects a prosecutorial bias, which stems partly from the uneven playing field in the pre-trial phase and

---

[39] See http://www.echo.msk.ru/guests/10107/, and http://echo.msk.ru/news/220685.phtml **[34]**
[40] *Washington Post*, 2 September 2003 **[35]**

partly from traditional patterns of deference to the prosecution on the part of judges. This bias is reflected in an extraordinarily low rate of acquittal - now 1% of trials as opposed half that rate before the new Code went into effect.

87.    The question is how judges handle the small group of cases that matter to the Executive and the political leadership. During the 1990s there were a few examples of judges in Russia actually handing out acquittals in cases of alleged violations of the rules of state secrecy. The prosecution and final acquittal of Aleksandr Nikitin, which started in St. Petersburg in 1995, and ended in 2000 when the Supreme Court confirmed the series of acquittals, was a noteworthy example[41]. I observed all these hearings on behalf of Amnesty International.

88.    The initial decision in the case of Igor Sutyagin, which involved a scholar who sold non-classified, but hard to find materials on the strength of Russian military forces to foreigners was also an acquittal. Significantly, the Sutyagin case was eventually moved to Moscow, where the judges were recognized as more reliable; in the end the case went to a jury trial, and to secure a conviction in spring 2004 the Chairman of the Moscow City Court had to change both judge and jury. The Supreme Court panel that reviewed the conviction chose not to pay heed to the clear procedural violations committed by the trial judge[42] .

89.    The point is that even in politically important cases, during the first decade after the collapse of the USSR, there was a chance of acquittal, however small. This could happen, however, only when the judge was courageous and insisted on being impartial, even at the expense of displeasing the procurator and often the chairman of the court.

90.    There is a further factor which compromises judicial independence. It remains the case that, contrary to the express provisions of the Russian Constitution,

---

[41] On the Nikitin case, see the group of articles published in *East European Constitutional Review*, 9:4 (Fall 2000) as "Explaining the Nikitin Acquittal", at http://www.ilpp.ru/kpvo/index.html [36]

many courts receive funding from their local authority, thus compromising their independence. In Moscow, it was recently and may still be the case that Moscow City is paying a large proportion of accommodation, servicing and even salary costs. Judges still receive benefits in kind such as accommodation, medical treatment, cars, access to dachas, holidays, etc. It would be surprising if judges were not susceptible to pressure from on high to convict.

91.  This conclusion is also supported by the findings of an investigation carried out in 2002, funded by the UK Government's Department for International Development (DFID), under the supervision of the University of Nottingham's Human Rights Law Centre. This study is entitled *Independence of Judicial Authorities in Russia: Practices and Procedures of Responsibilities* (November 2002) [37].

92.  The study particularly notes the fact that judges, who still receive inadequate salaries, are highly susceptible to pressure from the authorities: "A somewhat worse situation is observed when it comes to disputes between administrative structures and individuals. Thus, the Leninsky district court of the city of Yekaterinburg that usually considers grievances against city mayor's regulatory acts, rules in favour of an individual complainant in less than 30% of cases. Suspicions regarding what lies behind these statistics is regularly expressed. According to human rights activist V.D. Guslyannikov of the Republic of Mordovia, "for our courts the telephone call by a bigwig is above any law".

93.  Similarly, the well-known State Duma deputy B. Y. Nemtsov, commenting on a judgement passed by the judge of the Nizhny Novgorod district court to arrest the ballots during the night count following the 15th September 2002 elections of the Nizhny Novgorod mayor, stated: "The court of Nizhny Novgorod as an independent authority is non-existent."

---

[42] for details see *www.sutyagin.org*

94.  The report outlines compelling evidence of judicial corruption, and, in particular, cites Judge Marat Baglai, the Chairman of the Constitutional Court of the Russian Federation, who maintained:

> ... it would be foolish to assume that as soon as it is rid of undue influences exerted by the prosecutor's office, the court will immediately become independent and unbiased... There is still a problem of corruption among judges themselves and today it is highly important to combat corruption.

95.  This position has also been taken by his successor as Chairman of the Court, Valerii Zorkin. On 24th October 2004 he marked the 13th anniversary of Russia's judicial reform by saying that the country's judicial system is in many aspects worse now than it was in the Soviet era.[43] He said that judges are often corrupt and that professional standards among them are low. "I am convinced that if we do not force through a legal reform in the country, then all the other reforms will almost certainly fail," Zorkin said. "And soon." He said that loopholes and exceptions in existing laws create opportunities for corruption and must be eliminated as much as possible.

96.  This was followed, not surprisingly, by a sharp counter-attack by the Supreme Court, which is at the head of the system of courts of general jurisdiction, including most of the judges whom Zorkin stated are corrupt. The Supreme Court said that it intends to compel Judge Zorkin to withdraw his allegations, the daily *Vremya Novostei* reported on 28th October 2004. The daily reported that a Supreme Court letter to Zorkin obligates him to "submit to the presidium of the Supreme Court studies that he cited during his interview and evidence about any known facts of corruption in specific courts and by specific judges." The daily commented that the Supreme Court's request is the latest development in a longstanding dispute between the two courts. In a commentary published in

---

[43] *Izvestiya*, 25th October 2004: see http://www.hri.org/news/balkans/rferl/2004/04-10-25.rferl.html#11 [38]

*Izvestiya* on 29th October, Zorkin wrote: "I am defending the public authority of the Russian judicial system. One can only defend that authority by acknowledging the truth and by asking the proper questions about the nature of the phenomenon."[44]

97.   This exchange is symptomatic of a state of affairs in which any politicised trial – and indeed any trial – is likely to be prejudiced by influence and corruption.

98.   It is also noteworthy that a newspaper daring to raise questions of judicial corruption may very well face a suit for damages in another court. This is exemplified by the case of Judge Alexandr Chernov, the Chairman of the Krai (Regional) Court of Krasnodar Krai, one of the richest regions of Russia.

99.   The case concerned the daily paper *Novaya Gazeta*, which is known for its criticism of the Chechen conflict and its investigations into state corruption. In a story published in January 2002, *Novaya Gazeta* reported that Judge Chernov had a $50 000 watch, drove luxury cars, frequented expensive resorts and was building a $1 million mansion in Sochi - all on a monthly salary of $300. Chernov filed a defamation suit in the Basmannyi district court, within whose territory the newspaper is located, for 300 million rubles. He asked that the money go to the state budget. In a telephone interview, Chernov said the newspaper had fabricated the story and that only one allegation was true - the fact that he wears expensive suits. "I run an important office and I must wear decent clothes," he said. "But that does not mean that anybody is entitled to dig into my dirty laundry."

100.  Many observers concluded that the paper was the target of a government-backed campaign to muzzle independent media. *Novaya Gazeta* lost the case. Judge Yelena Ptanskaya ordered the newspaper on 22nd February 2002 to pay about $1 million for a report alleging that the Krasnodar region's top judge was living

---

[44] see http://www.hri.org/news/balkans/rferl/2004/04-10-29.rferl.html#09 [39]

well beyond his means. *Novaya Gazeia*'s lawyer Yaroslav Kozheurov said the newspaper has good reason to be disliked by judicial authorities; the day before the trial, it ran a highly critical story about the chairman of the Moscow city court Olga Yegorova. "Solidarity among the judges could be the reason for the harsh verdict," he said. Chernov acknowledged that solidarity could have played a role. "I have nothing against this kind of corporate solidarity," he said. "Perhaps this is the first time in Russia when a judge has imagined herself in my place."[45]

101.   Much of the information in the Nizhny Novgorod report found its way into the very detailed *Alternative NGO Report on Observance of the UN ICCPR by the Russian Federation, Submitted to the Attention of the UN Human Rights Committee in Connection with the Upcoming Consideration of the Fifth Periodical Report of the Russian Federation* in the period from 1997 to 2002[46]. This was prepared jointly by several Russian non-governmental organizations: Moscow Helsinki Group, Memorial Human Rights Center, Center for Assistance to International Protection, Nizhnii Novgorod Committee against Torture, Information Center SOVA, Center for the Development of Democracy and Human Rights, the Glasnost Defense Foundation, the Independent Council of Legal Expertise, Interregional Group "Human Rights Network," the Movement for Human Rights, and the Center of Social Labour Rights. The highly regarded and reputable Moscow Helsinki Group coordinated the work on the Alternative Report and also assumed the capacity of the Report's editor. I am acquainted and work on a regular basis with many of these groups and people.

---

[45] Nabi Abdullaev "Novaya Gazeta Facing the Wall" *St Petersburg Times* 19 March 2002 at ttp://www.sptimesrussia.com/archive/times/754/news/n_5985.htm **[40]**
[46] In English at http://www.memo.ru/hr/news/doklnpo/eng/head.htm **[41]**

102.  According to the Report prepared by the London based NGO Russian Axis[47], interviews of 102 experts (a mixture of lawyers, law professors, business consultants, human rights activists and some judges) revealed that

> … administrative pressure on courts is all-embracing when making decisions on legal disputes where the Kremlin or siloviki [police and military] have a clearly visible interest.

103.  These cases include criminal cases based on charges of espionage and terrorism; administrative cases relating to elections and civil rights, as well as criminal cases against prominent politicians and entrepreneurs. The experts confirm that although most judges most of the time are able to adjudicate impartially in certain types of cases they are forced to conform to the expectations of their judicial and political superiors.

104.  The recently published survey carried out by *Russian Axis* revealed that of all types of courts, the Moscow City court and the district courts that it directs (including Basmannyi and Meshchansky) were those most open to influence on the part of executive power, coming well above most courts of general jurisdiction, and all arbitrazh courts.[48]

105.  Yet another detailed study of the violations of due process and "equality of arms" which occur on a daily basis in the Moscow courts is provided by a study based on day to day observation of cases in the Basmannyi Inter-Municipal Court in Moscow which was carried out on 13th-17th October 2003, and now published in English.[49] This presents a worrying first hand insight into daily

---

[47]'The Judicial System of the Russian Federation: A System-Crisis of Independence' Report published by Russian Axis, 2004, available at www.russianaxis.org., p16, referred to hereafter "Russian Axis Study" [42]
[48] Russian Axis Study, p24. The Supreme Court of the RF was seen to be more protected than the others, and the Constitutional Court virtually free from direct influence.
[49] *Consolidated Report on the Basmanny Inter-Municipal Court of Moscow (Center for Assistance to International Protection, in Human Rights in Russian Regions 2003* (2004) Moscow Helsinki

petty violations in relatively unimportant civil and criminal cases. The authors of the report concluded[50] that they could make one positive comment, namely, that as a result of the new Procedural Codes the principles of equality and adversariality were observed. However, they made several negative points:

a.    disparaging treatment, by the judges, of the external attributes of judicial power (for example, arriving at court late, ignoring formalities), and in some cases of the very adjudication procedure.

b.    violation of the principle of transparency of legal proceedings in the majority of cases.

c.    preservation of the accusatorial character of criminal cases, not only to be noted in the behaviour of prosecutors, but in some cases also of judges and defence lawyers.

d.    lack of adequate free defence to defendants

106.    All the facts and matters set out above provide, in my opinion, compelling evidence of the prejudice which already affects persons coming before Russian courts, and the Moscow City Court in particular especially in relation to high profile politicised cases. There is a realistic chance that Ms Chernysheva and Mr Maruev will also suffer just such prejudice.

*iii) New draft legislation*

107.    Proposed legislative changes to judicial self-government threaten further inroads into what remains of judicial independence. In the autumn of 2004 the State Duma approved in first reading a bill initiated and developed by Sergei Mironov of the Federation Council that cuts to the core of judicial self-government represents a serious threat to judicial independence. One of the great achievements of post Soviet judicial reform was the acquisition by the judiciary

Group, with the assistance of the European Commission and the MacArthur Foundation, pp.157-259 [43]

of control over the disciplining and dismissal of judges for cause. From 1992, only the Judicial Qualification Colleges, composed entirely of judges selected by the judicial community, could make these decisions. This contrasts sharply with the Communist era when most judges had short term appointments and politicians could easily secure their recall in midterm. In 2002, after the working party of the President's Administration led by Dmitrii Kozak questioned whether this arrangement promoted judicial accountability, the membership in these bodies was changed so that one third of the members consisted of non judges (usually lawyers) and one member was a representative of the President. While some critics saw this as a significant erosion of judicial power, it was tolerable.

108.    The Mironov proposal of 2004[51] would reduce the number of judges to half of the core membership, so that taking into account the presidentially appointed member, judges would consist of less than half of the number. Moreover, the judge members would not be chosen by the judicial community alone, but would be presented by the President for confirmation by the Federation Council. Further, the quorum for meetings of the colleges, including the Supreme Judicial Qualification College, would be reduced from two thirds to a simple majority, so that a convocation with no judges present could authorize the firing of a judge.

109.    This plan has provoked sharp criticism[52] from some prominent Russian judges and lawyers, and it will be reviewed by the Congress of Judges before second and third readings occur. There is reason to believe that the draft law will be modified before passage, if only to bring the number of judges over 50% and avoid problems with the international community. In comparable bodies in former communist countries of Eastern Europe, as a rule two thirds of the

---

[50] Ibid, p.259
[51] See Dmitrii Zharkov, "Sud udaliaetsia na zaveshchanie," *Kommersant-vlast*, no.40 (11 October 2004) [44]

members are judges (with the exception of Lithuania where the judicial discipline body contains only judges). Among countries of Western Europe, this ratio is maintained in Spain and Italy. The closest to the Russian proposal is Portugal, where the Higher Council of Judiciary consists of 17 persons, of whom nine are judges (7 elected by their peers, one judge appointed by the President, and the Head of the Supreme Court)[53]. There is no country in Europe where either the executive or legislative branches take part in the appointment of most of the judge members on their judicial councils.

110. The fact that the Mironov proposals, which many observers assume have the tacit consent of the President, are taken seriously, stands as a threatening cloud over the heads of Russian judges. While the package may not be approved ultimately in its current form, it signifies a readiness on the part of the executive and legislative branches to place the judicial branch back under the control of the Executive, and is symptomatic of a belief by many politicians that the independence of the judicial branch is neither necessary nor desirable.

111. A less noticed part of the Mironov proposals is its proposition that the Head of the Judicial Department, the agency founded in 1999 to provide administrative support for the courts of general jurisdiction and remove the Ministry of Justice from supervising courts, should be appointed not by the Chairman of the Supreme Court (with the Head of the Judicial Council) but rather by the President on the advice of the Supreme Court Chairman. Again, this puts the executive branch squarely into the business of the courts.

112. The context of these new proposals has included an outbreak of talk in public about judicial corruption (also noted above), starting from Mironov's own proposal (which he asserted would provide better response to incidents of

---

[52] See, for example, coverage in *Kommersant*, no.182, 30 September 2004 **[45]**, and 11 October 2004 **[44]**; also in Online *Vremya Novostei*, 6 October 2004 **[46]**, or in *Izvestiya*, 24 September 2004 **[47]**

judicial bribe taking); a report on the "compromat.ru" web-site of a special police operation against allegedly corrupt judges in the provinces[54]; and the release of new public opinion polls, with familiar responses – as to lack of confidence in the judiciary - from a cynical public that consistently exaggerates the problem.

113.    At the same time, President Putin has been making new overtures to the judges.[55] On Tuesday 30th November 2004 he addressed the All-Russian Congress of Judges in Moscow, and promised, to resounding applause, that judicial salaries would be raised by two- or three-fold, or higher. He also said that the retirement age for judges would be raised to 70 years, an attractive proposal for court chairmen, but unlikely to promote the introduction of new blood into the judiciary. The President did not fail to add that the government wanted something in exchange. He told the Congress that as before he intended to "fight the oligarchs". Journalist Leonid Nikitinskii comments that this appears to imply that as in Soviet times the courts are being asked to act as part of the "law enforcement organs".

c)      **The Convention rights issue**

*Article 3*

114.    There are well-attested, serious and continuing concerns about ill-treatment of detainees by the Russian police and penitentiary systems.

---

[53] See Carlo Guarnieri, and Patrizia Pederzoli, "*The Power of Judges: A Comparative Study of Courts and Democracy*, Oxford Univ. Press, 2002, p.53 **[48]**
[54] "Old Square is preparing the case of the judges" (staraya ploshchad gotovit delo sudei), at http://www.compromat.ru/main/mix/lebrdevvyach.htm **[49]**
[55] Leonid Nikitinskii "An offer they can't refuse. The President has promised to raise judicial salaries for the fight against the oligarchs" *Novaya Gazeta* 2 December 2004, at http://2004.novayagazeta.ru/nomer/2004/89n/n89n-s21.shtml **[50]**

115.    In November 1999 Human Rights Watch published their report entitled *Confessions at Any Cost. Police Torture in Russia.*[56] Their summary was as follows:

> "Torture and ill-treatment of detainees at the time of and immediately after arrest is rampant in Russia today. In the first hours after detention, police regularly beat their captives, nearly asphyxiate them, or subject them to electroshock in the pursuit of confessions or testimony incriminating others. With the exception of a few particularly grave cases in which public exposure led to prosecutions, police carry out torture with complete impunity as the provincial and federal procuracies close their eyes to evidence of abuse. The courts commonly accept forced confessions at face value, and use them as a basis for convictions. Despite overwhelming evidence that torture has become an integral part of police practice, the Russian government and law enforcement agencies generally-with some notable exceptions-deny that torture or ill-treatment is a problem, and are not taking any measures to end these abusive practices."[57]

116.    On the basis of reliable official and NGO evidence it is possible to conclude that the situation has not changed for the better. For example, the *Report on Civil Rights Violations by Officers of the Ministry of Interior Affairs (Police) and the Correction System of the Ministry of Justice of the Russian Federation* presented to the Russian Parliament on 10th October 2000 by the Plenipotentiary (Ombudsman) for Human Rights of the Russian Federation (under the Constitution) Prof Oleg Orestovich Mironov contains many detailed allegations carefully investigated by the Ombudsman, and makes for shocking reading.[58]

117.    Professor Mironov concludes[59] that the rights and freedoms of the person and citizen have still not become real values for the Russian Federation. He describes the way in which corruption, inseparable from criminality, pervades

---

[56] See http://www.hrw.org/reports/1999/russia/ [51]
[57] ibid
[58] http://www.ombudsman.gov.ru/docum/spmil.htm [52]
[59] Report on his Activities for 2002, published on 7 April 2003, http://www.ombudsman.gov.ru/docum/year-02.htm [53]

practically all spheres of power and administration (pp 4-5 of his Report). He states that the scale of its penetration today represents a threat to the nation. It extends to the law enforcement agencies. His section on *Human Rights in Places of Deprivation of Liberty* (pp14-18), demonstrates that despite important reforms he receives enormous numbers of well-founded complaints about treatment in prisons and prison conditions. He gives many concrete examples.

118.   Professor Mironov's *Report on 2003* was published on 10 February 2004.[60] This reported that the situation has not at all improved.

119.   Furthermore, in early August 2003 the US-based MacArthur Foundation published a 68-page booklet called "Torture and other serious crimes committed in the Moscow region".[61] According to the report, 57 of 250 detainees around Russia interviewed by the organisation over the past year claimed to have been tortured by police into confessing to crimes they did not commit. "Frequently, the police abuse their detainees (into forced confessions) because they are simply poorly trained and arrest the wrong suspect" but cannot admit to such mistakes to their superiors. "Torture by security personnel in Moscow and the Moscow region remains a serious problem to this day," the report said. The police are widely viewed as not only dishonest but dangerous.

120.   A recent (2004) study in English is provided by the respected human rights worker Olga Shepelyova.[62] She concludes, on the basis of a comprehensive survey, that "… we are once again forced to admit that the use of torture and cruel and inhuman treatment continues to be in evidence."

121.   On 22nd January 2004 Yelena Liptser sent a complaint in respect of Lebedev's treatment to the European Court of Human Rights. The complaint alleges that at

---

[60] http://www.ombudsman.gov.ru/docum/year-03.htm **[54]**
[61] http://www.jang.com.pk/thenews/aug2003-daily/08-08-2003/world/w11.htm **[55]**
[62] Olga Shepelyova in *Human Rights in Russian Regions 2003* (2004) Moscow Helsinki Group, with the assistance of the European Commission and the MacArthur Foundation **[43 (b)]**

the time of his arrest on 2nd July 2003 and during the investigation Articles 3 and 5 of the Convention were violated. As to Article 3, it is alleged that during his detention Lebedev has not had the possibility to obtain independent medical reports. Since December 2003 he has been in the prison hospital, but his treatment has been inadequate. The Russian government informed the Court on 9 March 2004 that Lebedev's state of health is not dangerous. On the 25th November 2004 the Court communicated this part of the complaint to the Government for its comments. Other parts of the complaint were declared to be admissible.

122.    As to Article 5, Lebedev complained of violations when the Russian court on several occasions extended the period of remand in custody, without any lawful evidence on the basis of which to do so. Moreover, on 30th March 2004 the period of remand in custody was exhausted, and the case was sent to court. But only on 7th April did the court decide on the timetable for trial, including leaving Lebedev in custody. It is alleged that for this reason he was unlawfully in custody for a week. This part of the complaint has also been communicated to the Government.

123.    However, as to the risk for Ms Chernysheva and Mr Maruev, I suggest that the *prima facie* strength of these allegations should be taken together with the following considerations, which are demonstrated to be well-founded by the Rapporteur's report:

a.    on 12th July 2004 the Meshchansky Court rejected the defence motion to provide Lebedev with appropriate medical treatment and to suspend hearings while he is receiving it;

b.    on 14th July 2004 the same court rejected the defence motion for an independent team from *Medecins Sans Frontieres* to examine Lebedev;[63]

c.    on the same date the same court rejected the defence motion requiring the prosecution to present substantive evidence on the need to impose exceptional detention in the case of Lebedev;

d.    on 19th August the court rejected a further defence motion to provide for Lebedev the necessary medical investigation of his state of health

124.    This treatment does not bode well for Ms Chernysheva and Mr Maruev of they are returned to Russia.

*Prison conditions at present*

125.    I have referred above to my own experience of reform of the Russian Penitentiary system. There is no doubt that implementation by Russia in 1998 of the Council of Europe's 1996 requirement that the penitentiary system be transferred from the Ministry of the Interior to the Ministry of Justice has brought about great changes, assisted by the sincerity and competence of Vladimir Yalunin, Head of the System, Oleg Filimonov, his Deputy, and Yuri Kalinin, Deputy Minister of Justice. They have worked closely with British NGOs such as the International Centre for Prison Studies, and Penal Reform International, both based at Kings College London. The decision on 15th July 2002 of the European Court of Human Rights in *Kalashnikov v Russia*[64], in which Russia was found to have been guilty of inhuman and degrading

---

[63] Rule 98 of the Council of Europe's 1987 Standard Minimum Rules for the Treatment of Prisoners states that "Untried prisoners shall be given the opportunity of being visited and treated by their own doctor or dentist if there is reasonable ground for the application. Reasons should be given if the application is refused. Such costs as are incurred shall not be the responsibility of the prison administration." See https://wcm.coe.int/ViewDoc.jsp?id=703309&Lang==en [56]

[64] Application no. 47095/99, [2002] ECHR 591

treatment contrary to article 3 of the Convention, provided a valuable stimulus to reform.

126. I was, however, surprised to read the judgment delivered on 27 August 2004 by the Immigration Appeal Tribunal, in Appeal No: ZB *(Russian prison conditions) Russian Federation*[65].

127. In Paragraph 23 of the Determination and Reasons, the Deputy President wrote: "... in order to succeed in this case he needs to show a real risk of treatment contrary to Article 3. There is not in our view the slightest basis for saying that the conditions in Russian prisons today are such as to amount to a breach of Article 3 for each prisoner. The general argument, on which alone the Appellant is entitled to rely in this appeal, entirely fails on the basis of the facts as they are today, in contrast to the state of Russian prisons at the time when Kalashnikov was detained."

128. Mr Kalashnikov was detained in a SIZO from 1995 to 2000.

129. I note that the IAT hearing took place in July 2004, and the Tribunal had available to it material up to July 2004. In Paragraph 14 of the Determination, the Tribunal set out evidence tending to show that there had been great improvements in the penitentiary system, especially in SIZOs.

130. However, since the Determination was delivered, there have been some surprising admissions by very senior figures in the penitentiary system.

131. First, the Russian news agency Interfax carried the following report of a statement by Vladimir Yalunin, the Head of the Penintentiary System (GUIN) on 4th October 2004, as reported by the BBC (Damian Grammaticas, BBC Moscow Correspondent)[66] :

---

[65] [2004] UKIAT00239 [57]
[66] http://news.bbc.co.uk/1/hi/world/europe/3713858.stm [58]

"Some two thirds of prisoners in Russian jails are ill, a senior official in the justice ministry has said.

The chief of the penal directorate, Vladimir Yalunin, said about 500,000 prisoners suffered from a range of complaints from mental illness to Aids. Russia jails a greater proportion of its people than any other major country in the world, apart from the US. Russian prisons are often overcrowded places that are breeding grounds for disease. Three quarters of a million people are currently in Russia's jails or remand centres.

According to Mr Yalunin, speaking in an interview with Interfax news agency, two out of every three are ill.

Global help

About 120,000 have psychiatric disorders, almost 90,000 are drug addicts, more than 50,000 have tuberculosis, and 35,000 are HIV positive. Chronic alcoholism is also rife. The government is trying to tackle overcrowding by introducing alternative sentences. And a multi-million dollar programme supported by the World Bank has helped reduce tuberculosis rates by funding the purchase of medicines and X-ray equipment. Mr Yalunin said Russia was also planning to apply to the Global Fund to Fight Tuberculosis, Malaria and Aids for further help.

But a jail sentence in Russia means time inside a grim institution, and also the real possibility of contracting a serious illness."

132.    Agence France Presses carried the following story on 15th October 2004[67] :

"Disease and drug or alcohol addiction are soaring in Russian prisons, where over 80 percent of inmates are sick, RIA-Novosti news agency quoted a top justice ministry official as saying Friday.

"In recent years, the number of alcoholics, drug addicts, people with HIV and sufferers from tuberculosis has dramatically increased," Oleg Filimonov, deputy head of the justice ministry's penal department, was quoted as saying.

---

[67] http://www.aegis.com/news/afp/2004/AF041051.html [59]

55

"Out of 615,000 inmates, 500,000 are ill," he said. Some 56,000 prisoners suffered from tuberculosis and 36,000 were infected with the HIV virus that can lead to AIDS.

Filimonov said sick inmates received medication but admitted his department efforts to improve on-site health care for prisoners were being hampered by a shortage of funds.

Russia has taken tottering steps towards revamping its penal code, introducing alternative sentencing for some crimes in an effort to reduce prison overcrowding in one of the largest penitentiary systems in the world.

With 628 prisoners for every 100,000 inhabitants, Russia has the world's third highest incarceration rate in the world. First on the list comes the United States, which has 686 prisoners for every 100,000 inhabitants, according to a study published in January 2003 by the International Center for Prison Studies."

133.    The gloomy remarks by Mr Filimonov are corroborated by a letter in "The Lancet" of 20th January 2004[68], which the IAT may not have seen. The letter was written by Dominique Lafontaine, Andrei Slavuski, Natalia Vezhnina, Oleg Sheyanenko, four medical doctors working with the highly respected NGO Médecins Sans Frontières, explaining why they had been obliged to withdraw from a project working with Siberian prisons:

"Sir - Ben Aris (Lancet, Nov 8, p 1557)1 highlights important shortfalls in the Russian public-health system and its devastating effect on health. Predetention facilities and penal colonies are breeding grounds for diseases such as tuberculosis, and contribute a third of all new tuberculosis cases in Russia each year.

Médecins Sans Frontières (MSF) started work in Siberian prisons in 1996, and has treated 10,500 patients in collaboration with regional penal authorities using the WHO-led DOTS strategy up until our withdrawal from the region in September last year. During that period, our doctors were faced with a substantial number of patients with multidrug-resistant tuberculosis who cannot be cured with the first-line tuberculosis drugs we provide.

---

[68] www.msf.org/countries/ page.cfm?articleid=23B7CAC4-21F1-4259-A292E62636CC7A97 [60]

In these prisons, around 22% of new cases and 40% of retreatment cases are multidrug-resistant, which are some of the highest rates recorded worldwide. Expensive treatment options, involving the use of quality second-line drugs for anything up to two years, were not available to us then.

In an attempt to bring the hope of a cure to these prisoners, we, together with the regional authorities in Kemerovo, submitted an application to treat multidrug-resistant tuberculosis patients to the international body the Green Light Committee. We received approval to start using second-line drugs to treat initially 150 patients in the Siberian prison colonies. On application to the Russian Ministry of Health, however, we were surprised to find that the application to start treating these patients was rejected. Despite the fact that the treatment schemes proposed were based on internationally agreed guidelines, the Russian Ministry of Health rejected it on the grounds that the treatment schemes proposed contradicted the regulations of the Russian Pharmaceutical Committee. It therefore classified the DOTS-Plus pilot project as "experimental", which is forbidden within the penal system under national law.

The primary reasons given referred to Russian drug legislation that prohibits extended use of certain second-line drugs. Such legislation bears no relation to internationally recognised treatment principles on duration with potent drugs such as capreomycin, cycloserine, and fluoroquinolones. Further, the DOTS-Plus pilot project was blocked from using non-registered drugs such as amikacin and clofazimine.

To comply with the existing drug legislation, we were effectively being asked to implement a treatment strategy for multidrug-resistant tuberculosis that contradicts the basic treatment principles outlined by WHO, which must be followed if the programme is to provide a cure to these patients. As a result, MSF medical staff in Siberia felt that it was unethical to implement a treatment strategy that does not offer a cure. In September, 2003, MSF therefore made the difficult decision to pull field teams out of Siberia and to close down our programmes.

These issues have wider implications for control of multidrug-resistant tuberculosis in the Russian Federation. On Mar 21, 2003, the Russian Ministry of Health released its long-awaited legislative ordinance,3 which provides Russian doctors with protocols for the detection and treatment of tuberculosis and multidrug-resistant tuberculosis. These new protocols, approved by WHO, should mean that control of this disease throughout

Russia now incorporates internationally recognised standards--a necessary prerequisite for a promised World Bank loan of more than US$100 million for treatment and prevention of tuberculosis. We now know that, at least for multidrug-resistant tuberculosis, these standards are not being met.

We also know that second-line drugs are currently used in many Russian regions for more than one year without clear guidelines, appropriate infrastructure, trained personnel, and with non-existent follow-up for released patients under treatment. All these mean an increased risk of creating super-resistant tuberculosis. Urgent action needs to be taken by WHO and the World Bank to rectify the inconsistencies between the Ministry of Health's ordinance and the drug legislative authorities in Russia.

Future control of tuberculosis in Russia is in the balance, and the donor community runs a high risk of doing more harm than good."

134. Taking these statements by the two most senior figures in GUIN together with the letter by the doctors set out above, and my own experience over a number of years described above, it seems certain that the reforms and improvements to which the Tribunal referred are now being undermined by a lack of funding and by the failure of government bodies to take good advice. I am sure that Mr Yalunin and Professor Filimonov have spoken out so recently in order to draw attention to this situation.

135. I note that in the *Kalashnikov v Russia* case , at paragraph 98, the European Court of Human Rights stated:

"Throughout his detention the applicant contracted various skin diseases and fungal infections, in particular during the years 1996, 1997 and 1999, necessitating recesses in the trial. While it is true that the applicant received treatment for these diseases, their recurrence suggests that the very poor conditions in the cell facilitating their propagation remained unchanged.

The Court also notes with grave concern that the applicant was detained on occasions with persons suffering from syphilis and tuberculosis, although the Government stressed that contagion was prevented."

136.  These factors contributed to the finding of a violation of Article 3 of the European Convention on Human Rights. It would appear that the Government's contention reported by the Court cannot have been true, and would be just as untrue today.

137.  I can therefore state that in my expert opinion a person entering the Russian prison system at the present time will be exposed to a grave risk of infection by drug-resistant tuberculosis, and/or HIV and other infectious illnesses.

*Ms Chernysheva's pregnancy*

138.  In particular, I understand that Ms Chernysheva is pregnant and that she is due to give birth in May 2004. This obviously raises the question of whether the authorities would be willing to provide her and her baby with the relevant post-natal care. Past experience would suggest that they would not. Ms Chernysheva's pregnancy raises a number of issues that will be addressed in other reports.

139.  The leading Russian penal reform NGO "Centre for Cooperation in Reform of Criminal Justice", headed by Valerii Abramkin,  publishes a web newsletter entitled "Tyurma i Volya" (Prison and Freedom), in which there is a special section "Women in Prison"[69]. This contains an article by the Centre's Deputy director Lyudmila Alpern, dated 8th November 1999, entitled "Have you given birth in prison? An essay in defence of motherhood".[70] This gives a harrowing account of the horrors faced at that time by pregnant mothers in the penitentiary system. The section of the site devoted to pregnancy and abortion[71] summarises the Centre's research in women's SIZOs and prisons, and confirms that despite the reforms that have taken place there remain great problems for pregnant women in detention, including lack of sufficient medical care, proper food, or

---

[69] http://www.prison.org/penal/women/index.shtml
[70] http://www.prison.org/penal/women/mother001.htm [61]

vitamins. The section on birth[72] gives a shocking account of the way in which women about to give birth are rushed to the nearest maternity hospital, give birth under guard, and must return to prison within hours of giving birth, leaving their baby behind for several days.

*Likely location of detention*

140.    The likely location of the defendants' detention if they were to be returned to Russia is a relevant factor to consider because this has a bearing on their likely treatment.    As I have already mentioned, the transfer of the whole of the penitentiary system from the Ministry of the Interior to the Ministry of Justice was one of the key obligations Russia undertook when it joined the Council of Europe in 1996. The (incomplete) transfer has already resulted in beneficial reform of the GUIN system, including the pre-trial detention centres (SIZOs) under the control of the Ministry of Justice.

141.    However, as the Council of Europe's Rapporteurs (who monitor Russia's honouring of its obligations) noted in 2002[73], Russia has failed to honour its 1996 commitment to transfer the whole of the penitentiary system to the Ministry of Justice and its Chief Administration for Execution of Punishments (GUIN).

142.    The Rapporteurs pointed out that following the presidential decree of 1998, responsibility for all prisons and pre-trial detention centres was transferred to the Ministry of Justice on 28th July 1998, with the exception of the "Lefortovo" pre-trial detention centre in Moscow which continues to be run by the Federal Security Service (FSB), successor to the Soviet KGB. The Rapporteurs concluded: "The administration of the pre-trial detention centre "Lefortovo" in Moscow should thus be transferred from the FSB to the Ministry of Justice

---

[71] http://www.prison.org/penal/women/mother002_1.htm[62]
[72] http://www.prison.org/penal/women/mother002_2.htm [63]

without further delay." Russia has to date not complied with this requirement, and to my knowledge this is not the only SIZO not under the control of the Ministry of Justice.

143. Lefortovo is under the exclusive control of the Head of the FSB, Nikolai Patrushev.

144. While the Ministry of Justice has taken unprecedented steps to open its SIZOs to independent observers, the Parliamentary Human Rights Ombudsman, and even non-Russian non-governmental organisations, this is not the case for the FSB and Lefortovo, which remains strictly closed and secret.

145. There have been, to my knowledge, many cases in which the Ministry of the Interior (police), acting with the Federal Prosecutors' service and the FSB, have sent suspects or accused to Lefortovo, including cases in which the person concerned has not been suspected or charged with state security, espionage or terrorist offences. For example, in July 2002 a senior official of the Ministry of State Property, Linar Zinatulin, was arrested by the FSB and Ministry of the Interior (Police) in connection with alleged theft of $3 dollars, and was detained in Lefortovo. Furthermore, Aleksei Glushkov, accused of economic crimes in the so-called "Aeroflot case" was held in Lefortovo following his arrest in 1991. Finally, in June 2003 Platon Lebedev and Aleksei Pichugin of "Yukos" were arrested, and detained - in Lefortovo.

146. The common denominator in these cases is that each has a political dimension. I do not know of cases in which female detainees have been sent to Lefortovo, but there is no guarantee that Ms Chernysheva as well as Mr Maruev could be sent there.

---

[73] http://assembly.coe.int/Documents/WorkingDocs/doc02/EDOC9396.htm [64]

147. Although general conditions as concern food, overcrowding, routine beatings are widely recognised to be better in Lefortovo than in the system of SIZOs run by GUIN, there are many reliable reports that the isolation regime is much harsher.

148. There is a further cause for serious concern. Writing in 2003 in relation to the detention of Lebedev and Pichugin, Ludmila Alekseyeva, one of the most authoritative human rights protectors in Russia, Chairman of the Moscow Helsinki Group and President of the International Helsinki Federation, stated that she had received information that psychotropic materials and psychological methods of pressure on detainees are used at Lefortovo in order to obtain information[74]. Pichugin has been charged with murder.

149. In August 2003, Andrei Babushkin, a leading campaigner for penal reform, told a press conference that Pichugin had in fact suffered such treatment. Pichugin's advocate, Tatyana Antonova, confirmed that Pichugin had been given psychotropic materials at his interrogation on 14th July 2003, and had also been denied access to medical assistance or to his relatives, and had been subjected to intense pressure leading to a critical nervous condition as well as to symptoms of sugar diabetes. On 8th October 2003 Alexey Pichugin's lawyers filed a formal complaint with Russian Federation Procurator-General Vladimir Ustinov, asserting that their client has been subjected to "psychological and physical pressure" at Lefortovo.[75]

150. There is a thus a serious risk that Chernysheva and Maruev could find themselves in Lefortovo if extradited, and this could contribute to a risk of violation of Article 3, in the ways stated above.

*Article 5*

---

[74] http://www.Yukos.ru/5972.shtml [65]
[75] http://www.pr-net.ru/?/2003/08/21/delosotrudni.shtml [66]

151.    It follows that because in my opinion the defendants are being prosecuted for political reasons rather than for *bona fide* law enforcement reasons, there is a risk that their rights under Article 5 would be violated.

152.    Although the European Court of Human Rights in the decision on admissibility in Mr Lebedev's case did not hold that the denial of bail violated his rights under Article 5(3), in her paragraphs 16 to 19 of her November 2004 Report on "The circumstances surrounding the arrest and prosecution of leading Yukos executives" to the PACE Committee on Legal Affairs and Human Rights, Mrs Sabine Leutheusser-Schnarrenberger commented adversely on the fact that Mr Khodorkovsky and Mr Lebedev had both been denied bail, despite the fact that neither was likely to abscond, and both were charged with non-violent economic crimes, for which there is a presumption that bail will be granted – see paragraph 8 (vii) of the Committee's recommendation, set out in full above.

153.    There is every likelihood that Ms Chernysheva and Mr Maruev would also be denied bail if returned to Russia.

*Article 6*

154.    There are a number of relevant pointers, in addition to the considerations on discrimination, judicial independence and corruption set out above.

*Commercial court violations in respect of Yukos*

155.    I refer to the Opinion of Vladimir Gladyshev, a leading member of the Moscow Bar (Chamber of Advocates). He details a series of gross violations of Russian law and of international standards in the course of the civil proceedings in relation to Yukos.

*Defects in the new Criminal Procedural Code*

156.    A further threat to a fair trial for Chernysheva and Maruev is to be found in the imperfections of the new Criminal Procedural Code (on which I worked as one of the experts nominated by the Council of Europe) which represents in many ways a considerable improvement on its predecessor.

157.    However, while the new CPC, in the view of most commentators, represents a significant step forward, it has powerful critics. These include Sergei Pashin (see below) in his "Short outline of judicial reform and revolution in Russia"[76]. His criticisms include:

a.    the new CPC contains gross violations of the 1993 Constitution, since it violates the constitutional principle as to the adversarial nature of criminal justice, the presumption of innocence, the right to judicial protection, and makes the position of the citizen worse than it was in Soviet times

b.    under the 1960 CPC, the maximum period of detention of a suspect was 72 hours - then his continued detention must be sanctioned by the prosecutor; while under the new CPC the judge can extend the period of 48 hours in police custody by another 72 hours for the police to find evidence, meaning a further 3 days in which a detainee is most at risk of torture and ill-treatment

c.    despite the rules established in 1992, the accused or suspect and his defender are prevented from seeing the materials presented to the court to justify detention rather than bail, or an extension of detention

---

[76] Sergei Pashin "Краткий очерк судебных реформ и революций в России" (Short outline of judicial reform and revolution in Russia" *Otechestvennye Zapiski (Notes from the Home Country)* No.2 (11) (2003) at http://magazines.russ.ru/oz/2003/2/pashin.html [67]

d.      the provisions of the new CPC, already dangerous for the citizen, have
        been made worse by the right of the Supreme Court and its Judicial
        Collegium for Criminal Cases to issue binding interpretation of its
        provisions.

158.    While the rights of the accused and defence counsel have been increased, both
        still depend ultimately on the good will of the investigator and have not come
        close to achieving equality with him/her. Professor Igor Petrukhin considers that
        this remains the fundamental flaw in the new CPC, and the reason why it is not
        really all that new.  To Petrukhin the defence of the human rights of the suspect
        or accused cannot be achieved as long as investigators are not neutral officers of
        a court, or alternatively the rights and powers of defence counsel changed
        drastically.[77]

        *Lebedev's trial*

159.    Lebedev is being tried at the Meshchansky District Court, by Judge Irina
        Kolesnikova. Coincidentally (or not) she also tried Vasilii Shakhnovsky, the ex-
        head of Yukos-Moscow. Shakhnovsky was accused of tax evasion, and was
        convicted and sentenced to one year's imprisonment, but released because he
        had repaid the tax alleged to be due. Lebedev on the other hand is contesting
        every allegation against him.

160.    On 20th April the court refused an application by four new advocates for
        Lebedev – Tayana Simonova, Gennadii Sharov, Yelena Liptser and Yelena
        Lvova – for five months in which to study the 165 volumes – 33 000 pages - of
        evidence presented by the prosecution.[78] Instead the judge ordered that the

---

[77] Igor. L. Petrukhin, "Kontseptsualnye osnovy reformy ugolovnogo sudoproizvodstva v Rossii," in
I.B. Mikhailovskaia, ed., *Kontseptualnye osnovy reformy ugolovnogo sudoproizvodstva v Rossii
(materialy nauchnoi konferentsii 22-23 ianvaria 2002 g. Moskva)* (Moscow: Prospekt, 2002), 6-18,
at p.13.  **[68]** See also the opinion of graduate student, Iu. Roshchina, "Sudebnyi sledovatel
garantiruet ob'ektivnost," *Rossiiskaia iustitsiia*, 2003, no.5, 60-61. **[69]**
[78] Kommersant, 22 April 2004, p.4 **[70]**

advocates had until 20th May to read the evidence, and that the trial would commence on 21st May. This was plainly an impossible task.

*Mikhail Khodorkovsky's trial*

161.  This case has developed some highly disturbing subsidiary events, which have made the front pages of national newspapers. They have also been investigated by the Rapporteur.[79] On 11th November 2003 Olga Artyukhova was detained at the exit of the "Matrosskaya Tishina" remand centre (SIZO – investigative isolator) after a meeting with Khodorkovsky. The prosecutor alleges that she had with her a list prepared by Khodorkovsky which she tried to smuggle out. A handwriting expert has now reported that she wrote the list herself.

162.  The Ministry of Justice applied for an order to deprive Olga Artyukhova of her advocate's licence. This was refused by the Moscow Bar Association, however the prosecution appealed.

163.  However, Genri Reznik also went on television to say she had been "frisked" ie searched without a warrant, and two inspectors of the SIZO and the SIZO itself are now suing Reznik for defamation. The first day of hearing, at the Cheremushkinskii District Court, was on 21st April 2004.[80] On 10th August 2004 the Moscow City Court found in favour of the prison officers. Reznik was ordered to pay 200 rubles (about 6 dollars) in compensation for groundlessly accusing the officers of the illegal search of Olga Artyukhova. He was also obliged to voice a statement refuting his words in the Country and the World program of the NTV channel.[81]

---

[79] Explanatory Memorandum, p11 **[71]**
[80] Izvestiya, 21st April 2004, p.1 and 4 **[72]**
[81] See http://www.mosnews.com/news/2004/08/10/reznik.shtml **[73]**

164.   Despite the fact that Khodorkovsky is plainly not being denied full access to his lawyers, all these manoeuvres can very well give the impression that his defence is being disrupted. Such circumstances could well give rise to a violation or violations of article 6 of the Convention.

*Complaints from the ICJ and Council of Europe*

165.   On 11th June 2004 the International Commission of Jurists wrote to President Putin expressing their concern at the reported harassment and potential disbarment of Olga Artyukhova and the reported harassment of Evgeny Baru, which constitute violations of international standards on the role of lawyers.

*166.*   I have already referred to the PACE Draft Resolution and the Rapporteur's Explanatory Memorandum. Together these provide ample evidence of the risks of a fundamental violation of article 6 should Ms Chernysheva or Mr Maruev be extradited.

*The present trial process*

167.   A table has been produced[82] showing that during the period from 24th March to 19th August 2004, a total of 18 defence motions have been rejected, and one ignored.

---

[82] In Russian at http://khodorkovsky.ru/advocacy/465.htm [74]

67

168. Only 5 have been upheld, one of them partially. In the same period, one motion by the prosecution and one by the Tax Ministry have both been upheld.

169. The trial is proceeding very slowly, and has been marked by continual judicial interruptions.

170. Most recently, on 30th September 2004[83], a scandal erupted when the judge intervened to assist the prosecutor in examination of a witness, seeking to show discrepancies with the statement made during investigation. "What prevents you now in court from answering in the same way as during your interrogation? Which of your testimonies is correct?" At this point the defence advocate Yuri Schmidt objected: "Unwarranted pressure on the witness is taking place! The questions of the court chairman are trying to return the witness to his evidence in the preliminary investigation! The court is taking upon itself the unsuitable function of supporting the position of the prosecutor! Your questions bear witness of a clear prosecution bias!".

171. The judge then accused Shmidt of lack of respect for the court and has decided to report his behaviour to the Chamber of Advocates.

172. All the matters referred to above – and there are many more – show that there is a substantial risk of violations of Article 6 in any trial of Ms Chernysheva and Mr Maruev in Russia.

**Professor William Bowring**
**London Metropolitan University**
**2-5 Field Court, Gray's Inn**

**14 January 2005**

---

[83] Marina Lepina "A brain-damaged doorkeeper has been included in the Khodorkovsky-Lebedev group" *Kommersant* 1 October 2004 No. 183 **[75]**