# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------------x
                                       )
RICHARD ALLEN, et al.                  )
                                       )
              Plaintiffs,              )     Case No: 1:05-cv-02077 (CKK)
                                       )     Hon. Colleen Kollar-Kotelly
      v.                               )
                                       )
RUSSIAN FEDERATION, et al.             )
                                       )
              Defendants.              )
                                       )
-------------------------------------------------------x
```

## CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# EXHIBIT 22

# Council of Europe

assembly.coe.int

Portail de l'Assemblée en français | Council of Europe portal | Search

## pace   Parliamentary Assembly
Council of Europe

**00** HOME

**01** News
Press releases
Newsletter
Search

**02** Quick overview
Framework
Working structure
Procedure
- Rules of Procedure and
Complementary texts
Secretariat
Origins
Download PACE Logo

**03** Committees
*(Description, Terms
of Reference, synopsis…)*
Reports under preparation

**04** All meetings
Sessions
Standing Committee
General Committees
Conferences

**05** Documents
Adopted texts
Working documents
Verbatim records

**06** President
Curriculum Vitae
Speeches
Photographs

**07** Secretary General
of the Assembly

**08** Assembly List
Members
Political groups
Bureau,
Committees
and Sub-Committees

Parliamentary **Assembly**
**Assemblée** parlementaire



PARLIAMENTARY ASSEMBLY
ASSEMBLÉE PARLEMENTAIRE

COUNCIL       CONSEIL
OF EUROPE    DE L'EUROPE

**Doc. 10368**

29 November 2004

**The circumstances surrounding the arrest and prosecution of leading Yukos executives**

Report

Committee on Legal Affairs and Human Rights

Rapporteur: Mrs Sabine Leutheusser-Schnarrenberger, Germany, Liberal, Democratic and Reformers Group

*Summary*

The report analyses the circumstances surrounding the arrest and prosecution of Mr Khodorkovsky, Mr Lebedev and Mr Pichugin, former leading Yukos executives. The Rapporteur's findings put into question the fairness, impartiality and objectivity of authorities which appear to have acted excessively in disregard of fundamental rights of the defence guaranteed by the Russian Criminal Procedure Code and by the European Convention on Human Rights.

In view of the numerous procedural shortcomings and other factors pertaining to the political and economic background detailed in the report, the draft resolution concludes that the circumstances of the arrest and prosecution of leading Yukos executives suggest that the interest of the State's action in these cases goes beyond the mere pursuit of criminal justice, to include such elements as to weaken an outspoken political opponent, to intimidate other wealthy individuals and to regain control of strategic economic assets. The draft resolution and recommendation include proposals aimed at improving the functioning of the judiciary in the Russian Federation in general, notably to further its transparency and independence. They also address concrete recommendations to the competent authorities of the Russian Federation and to the Committee of Ministers with regard to the cases of the former leading Yukos executives, including appeals to ensure the publicity of the trials and to allow an independent medical assessment of Mr Lebedev's state of health.

**I.       Draft resolution**

National delegations
*(member states, special guest, observers)*

**09 Political groups websites**
SOC
EPP/CD
ALDE
EDG
UEL

**10 Links**
Council of Europe
National parliaments
International partners

**11 Communication Unit**

1.    The Parliamentary Assembly, reaffirming its commitment to the Rule of Law as one of the Council of Europe's core values, is concerned by the shortcomings of the judicial process in the Russian Federation revealed by the cases of several former Yukos executives.

2.    The rule of law requires the impartial and objective functioning of the courts and of the prosecutors' offices, free from undue influences from other branches of government and the strict respect of procedural provisions guaranteeing the rights of the accused.

3.    The Rule of Law includes the equality of all before the law, regardless of wealth or power.

4.    The right to a fair trial, as protected by Article 6 of the European Convention on Human Rights (ECHR), includes the right to a fair and public hearing by an independent and impartial tribunal established by law, the presumption of innocence and adequate time and facilities for the preparation of the defence. A fair trial requires respect of the rights of the defence, the privileged lawyer-client relationship and the equality of arms between defence and prosecution.

5.    The public character of judicial proceedings, as guaranteed by Article 6 of the ECHR, is an important element of a fair trial, in the interests of the accused, but also of the public at large and its confidence in the correct functioning of the judiciary.

6.    The Assembly stresses the importance of the independence of the judiciary and of the independent status of judges in particular and regrets that legislative reforms introduced in the Russian Federation in December 2001 and March 2002 have not protected judges better from undue influence from the executive and have even made them more vulnerable. Recent studies and highly publicised cases have shown that the courts are still highly susceptible to undue influences. The Assembly is particularly worried about new proposals to increase further the influence of the President's administration over the judges' qualification commission.

7.    Facts pointing to serious procedural violations committed by different law enforcement agencies against Mr Khodorkovsky, Mr Lebedev and Mr Pichugin, former leading Yukos executives, have been corroborated during fact-finding visits whilst some allegations appear to have been exaggerated by the defence team. On balance, the findings put into question the fairness, impartiality and objectivity of the authorities which appear to have acted excessively in disregard of fundamental rights of the defence guaranteed by the Russian Criminal Procedure Code and by the ECHR.

8.    The most serious corroborated shortcomings include the following:

i.    despite specific requests of the defence lawyers, tests were not carried out in good time that could have established whether or not Mr Pichugin had been injected with psychotropic drugs; Mr Pichugin was also held in the "Lefortovo" prison that is not subject to the usual controls of the Ministry of Justice and remains under the direct authority of the Federal Security Service (FSB), contrary to a specific commitment the Russian Federation undertook when joining the Council of Europe;

ii.    shortcomings in medical attention to Mr Lebedev in prison: in the face of serious concern about Mr Lebedev's deteriorating state of health, the prison authorities have so far refused to allow an examination of Mr Lebedev by independent doctors, despite repeated requests;

iii.    delays in obtaining the prosecutor's permission have prevented the lawyers from entering into contact with their clients during a particularly critical time after their arrests, making it more difficult for them to organise their defence; a legislative reform abolishing the requirement of a prior permission from the prosecutor's office for a lawyer to visit his or her client in prison has not been applied in practice, at least not in

the cases of the former Yukos executives;

iv.      denial of access of Mr Lebedev's defence lawyers to the courtroom during the hearing deciding on his pre-trial detention;

v.      search and seizure of documents in the defence lawyers' offices, summons of lawyers for questioning on their clients' cases and alleged eavesdropping against defence lawyers: The prosecution must not be allowed to circumvent the lawyer-client privilege by a simple play on case file numbers, especially when the cases are as closely related to one another as the criminal cases against MM. Khodorkovsky, Lebedev and Pichugin and the tax cases against Yukos and its subsidiaries;

vi.      unjustified restrictions on the publicity of certain court proceedings: members of the public have had extremely limited access to certain hearings that were announced as public whilst other hearings were or are being held *in camera* in the first place. In particular, all proceedings against Mr Pichugin have been held *in camera* even though only a small portion of the case file has been classified as secret; his lawyers have been placed under strict instructions not to discuss the proceedings in public, even the reasons of the final judgment may be kept secret;

vii.      denial of bail (in particular regarding Mr Khodorkovsky): Mr Khodorkovsky was placed in pre-trial detention several months after Mr Lebedev's arrest on very similar grounds, an arrest that media reports interpreted as a "warning" to Mr Khodorkovsky. Mr Khodorkovsky's conduct showed that there was no risk of absconding or of interfering with evidence. After the completion of the pre-trial investigation, Mr Khodorkovsky and Mr Lebedev were kept in custody which raises additional issues in light of the judgments of the European Court of Human Rights in the cases of Kalashnikov v. Russia and Letellier v. France. Also, following a recent legislative reform, persons accused of non-violent "economic crimes", such as those allegedly committed by Mr Khodorkovsy, are generally not placed in pre-trial detention.

viii.      other unfair features of the trials against Mr Khodorkovsky, Mr Lebedev and Mr Pichugin: the court systematically allows the prosecutor to read out the minutes of the pre-trial interrogation of witnesses and to put pressure on the witness in the courtroom to simply confirm those minutes. This undermines the effectiveness of the right of the defence to question witnesses of the prosecution, whose pre-trial interrogation they are generally not able to attend. The defence lawyers are also not allowed to exchange written notes with the accused in the pre-trial detention centre and in the courtroom. They can only exchange notes after the court has first read them.

9.      The Assembly notes that the circumstances surrounding the arrest and prosecution of the leading Yukos executives strongly suggest that they are a clear case of non-conformity with the Rule of Law and that these executives were - in violation of the principle of equality before the law - arbitrarily singled out by the authorities.

10.      In particular, the allegedly abusive practices used by Yukos to minimise taxes were also used by other oil and resource companies operating in the Russian Federation which have not been subjected to a similar tax reassessment, or its forced execution, and whose leading executives have not been criminally prosecuted. Whilst the law was changed in 2004 and the alleged "loophole" thus closed, the incriminated acts date back to 2000 and retrospective prosecution started in 2003.

11.      Intimidating action by different law enforcement agencies against Yukos and its business partners and other institutions linked to Mr Khodorkovsky and his associates and the careful preparation of this action in terms of public relations, taken together, give a picture of a co-ordinated attack by the State.

12.      The criminal charges laid against persons who made use of the possibilities offered by the law as it stood at the time of the incriminated acts, following a retroactive change of the tax law, raises serious issues pertaining to the principle of

*nullum crimen, nulla poena sine lege* laid down in Article 7 of the ECHR and also to the right to the protection of property laid down in Article 1 of the First Protocol to the ECHR.

13.      In view of paragraphs 8-12 above, the Assembly considers that the circumstances of the arrest and prosecution of leading Yukos executives suggest that the interest of the State's action in these cases goes beyond the mere pursuit of criminal justice, to include such elements as to weaken an outspoken political opponent, to intimidate other wealthy individuals and to regain control of strategic economic assets.

14.      The Assembly recognises the right, and even the duty, of the law enforcement bodies to bring to justice the perpetrators of criminal offences. It also recognises the legitimate right of the elected political leadership to pursue its political objectives, including in the economic sphere. However, it strongly objects to the use of law enforcement procedures for such purposes. In this context, reference is made to the judgment of 19 May 2004 of the European Court of Human Rights in the *Gusinskiy* case in which the Court found that the detention in remand of N-TV founder Gusinskiy violated Article 5 of the ECHR because it had established that the applicant's prosecution had been used to intimidate him into selling off his stake in N-TV to Gazprom.

15.      The Assembly therefore, in general terms,

i.      calls upon the Russian authorities to vigorously pursue and implement reform of the legal and judicial system and of law enforcement agencies with a view to strengthening the Rule of Law and the protection of human rights and to continue co-operating with the Council of Europe, in the framework of ongoing programmes;

ii.      encourages the courts to assert their independence vis-à-vis the executive authorities in assessing the guilt or innocence of all accused persons, applying the law in conformity with the European Convention on Human Rights;

iii.      invites the authorities in charge of pre-trial detention centres to ensure that lawyers' access to their clients in detention is no longer subjected to any conditions not prescribed by law, notably to prior authorisation or recommendation by the public prosecutor, and to provide the conditions for the effective exercise of the defence rights of the persons in their custody, including the respect of the privileged relationship between lawyers and their clients;

iv.      urges the competent authorities to ensure that all pre-trial detention centres, including Lefortovo isolation centre in Moscow, be subject to supervision by the Ministry of Justice, in line with earlier commitments by the Russian Federation.

16.      As regards more specifically the cases of the former leading Yukos executives, the Assembly:

i.      requests the executive authorities of the Russian Federation to guarantee the full independence of the judicial proceedings against leading Yukos executives from any attempt to influence them and to take measures to stop any such attempt;

ii.      requests the public prosecutors to carry out their work in these proceedings in a professional, impartial and objective manner, respecting the letter and the spirit of the procedural protections for the accused laid down in the Russian Criminal Procedure Code and the European Convention on Human Rights and the principles set out in Recommendation (2000)19 of the Committee of Ministers on the role of public prosecution in the criminal justice system;

iii.      calls upon the courts to ensure effective public access to the hearings in the

proceedings against the leading Yukos executives;

iv.    urges the competent authorities to ensure in particular that only those parts of the trial against Mr Pichugin remain closed to public scrutiny which are directly linked to information for which there is a legitimate need for secrecy, taking account the importance attached to the principle of open court hearings by the European Convention on Human Rights;

v.    urges the competent authorities to allow immediately an independent medical assessment of Mr Lebedev's state of health.

## II.    Draft recommendation

1.    The Parliamentary Assembly, referring to its Resolution ... (2005), recommends that the Committee of Ministers in general terms:

i.    continue offering to the Russian Federation the Council of Europe's co-operation in preparing and implementing reforms of the legal and judicial system and of law enforcement agencies,  aimed in particular at further strengthening the effective independence and transparency of the courts and of their proceedings, particularly as regards the distribution of cases among judges of a given court (principle of the judge determined by law);

ii.    evaluate the extent to which progress has been achieved under past and current assistance and co-operation programmes carried out in these fields of judicial reform, and to inform the Assembly of the results of this evaluation and of any adaptations that may turn out to be necessary in order to achieve better results;

iii.    urge the Russian Federation to ensure that all pre-trial detention centres, including Lefortovo isolation centre in Moscow, be submitted to supervision by the Ministry of Justice, in line with earlier commitments and be open to visits by representatives of the Parliamentary Assembly as requested.

2.    Concerning more specifically the cases of the leading Yukos executives, the Parliamentary Assembly recommends that the Committee of Ministers:

i.    remind the Russian authorities of the importance it attaches to the principle of open court hearings and ask them to ensure that exceptions to this principle in the Pichugin case are limited to the strict minimum, in accordance with Article 6 § 1 of the European Convention on Human Rights;

ii.    remind the Russian authorities of the importance it attaches to the principle that detention on remand shall be an exceptional measure and ensure that this principle is also applied in the case of Mr Khodorkovsky;

iii.    urge the Russian authorities to immediately allow an independent medical assessment of Mr Lebedev's state of health.

## III.    Explanatory memorandum

by Mrs Leutheusser-Schnarrenberger, Rapporteur

## A.    Introduction

1. On the proposal of the Bureau, the Assembly referred the motion for a Resolution presented by Mr Bindig and others on "The circumstances surrounding the arrest and prosecution of leading Yukos executives" (Doc 10083 of 12 February 2004) to the Committee on Legal Affairs and Human Rights for Report. Following my appointment as

Rapporteur by the Committee on Legal Affairs and Human Rights at its meeting on 15 March 2004, I carried out two fact-finding visits to Moscow (on 24-27 May and 27-30 September 2004).

2. I should like to thank the Russian delegation to the Parliamentary Assembly, in particular its chairman, Mr Kosachev, and my committee colleague, Mr Grebennikov, for their support in organising the two visits. They gave me ample opportunity to talk to members of the State Duma and representatives of the competent Russian authorities (Ministry of Justice, Office of the Prosecutor General, Federal Tax Service), the Commissioner for Human Rights in the Russian Federation, Mr V. Lukin, and to representatives of non-governmental organisations, lawyers, and retired judges. I respect the decisions of the competent courts refusing to allow me to meet with Mr Khodorkovsky, Mr Lebedev or Mr Pichugin in their places of detention, or even during a break in the court hearing that I attended on 28 September 2004, even though I do not agree with them.

## B.    Restatement of the Rapporteur's mandate

3. In the Introductory Memorandum dated 22 June 2004, I explained my understanding of the mandate and my determination to avoid any interference in the ongoing judicial proceedings in the Russian Federation, or before the European Court of Human Rights. As former Federal Minister of Justice of Germany, I am well aware both of the limits of public scrutiny of judicial proceedings, and of the importance of the fairness and impartiality of such proceedings, which may, however, benefit from fair public attention. The guilt or innocence of the accused persons will be for the competent Russian courts to decide, in a "fair" trial by Council of Europe standards, which the Russian Federation has voluntarily accepted when it joined our Organisation.

4. As regards the alleged procedural violations that I have looked into, I do not even pretend to pronounce a final "judgment" on it. I merely strive to come to a well-reasoned legal and political assessment of the facts that are brought to my attention from all sides, and which I endeavour to interpret and assess rigorously, from a legal and political perspective. My work shall not, and cannot in any way, prejudge the findings of the European Court of Human Rights, which with its own methods and possibilities will judge on those issues that have been, or will be brought before it in the procedurally correct way.

## C.    Issues examined

## 1.    Mr Pichugin held in a prison (Lefortovo) not under the control of the Ministry of Justice

5. When acceding to the Council of Europe in 1996, Russia undertook "to revise the law on federal security services in order to bring it into line with Council of Europe principles and standards within one year from the time of accession, in particular the right of the Federal Security Service (FSB) to possess and run pre-trial detention centres should be withdrawn"[1]. Whilst all other pre-trial detention centres have been placed under the control of the Ministry of Justice, the "Lefortovo" pre-trial detention centre remains subjected to the FSB, despite exhortations by the Parliamentary Assembly and its Monitoring Committee. According to Tamara Morshchakova, a retired Vice-President of the Constitutional Court of the Russian Federation, the existence of an FSB-controlled prison is also a violation of the Russian Constitution[2].

6. When I enquired about the alleged violations of prisoners' rights during my meeting at the Ministry of Justice, I was told in very clear terms that Mr Pichugin (who I was informed is held at Lefortovo) is not on that Ministry's "list", and that I should ask my questions regarding Mr Pichugin elsewhere. I intended to raise the issues concerning Lefortovo prison with a representative of the FSB during my second visit, but I did not get an appointment.

7. During my second visit to Moscow, I was told that Mr Pichugin had been transferred to another prison shortly before my arrival. But this does not change the fact that he had been held in Lefortovo prison earlier and that this prison is still under the control of the FSB.

## 2.    Alleged ill-treatment of Mr Pichugin at Lefortovo Prison

8. The allegations made in detailed written or oral submissions by Mr Pichugin's lawyers, Ms Tatiana Akimtseva, Mr Oleg Solovyov, and Georgy Kaganer, and by his wife Tatiana Pichugina are very serious: Mr Pichugin was - allegedly - interrogated on 14 July 2003 by unidentified FSB operatives in the absence of his lawyers, after having been drugged with coffee laced with drugs that made him lose consciousness for several hours. The lawyers who saw him the following day noticed that he was still drowsy. Mr Pichugin showed them clearly visible injection marks whose origin he could not explain. He asserted that he had discovered them in the morning of 15 July 2003, whilst he did not have these marks prior to the interview with the two FSB operatives. Mr Pichugin – allegedly – showed the marks again on 16 July 2003, in the presence of an investigator of the procuracy, and informed the investigator of the events on 14 July. The defence petitioned the investigator to have Mr Pichugin's report thoroughly investigated, including the performance of investigative acts to objectively confirm or refute the facts set out by him. The defence alleges that a timely medical examination had been refused as "inappropriate", and that the medical examination finally performed after a week had been a mere formality, as the injection marks or traces of drugs in the blood would have disappeared by then. Mrs Pichugina is very worried about her husband's state of health. She said that he lost 40 kg, and that the diabetes he had been diagnosed prior to his arrest is worsening due to the stress of detention.

9. The defence team fears that Mr Pichugin is being put under immense pressure to incriminate himself, as well as other leading Yukos executives. I cannot myself help being concerned about possibly illicit investigative methods and pressures that Mr Pichugin could have been subjected to in a prison that remains withdrawn from the normal supervisory procedures by the Ministry of Justice, and I regret not having been given the opportunity of meeting with him in order to obtain first-hand information from him. I find the defence's thesis plausible that if no illicit substances had been used on Mr Pichugin, the prosecution would have seen to it that a proper expertise was carried out in good time so that the defence could be held responsible for such serious false allegations.

## 3.    Circumstances of the arrest of Mr Lebedev (whilst in hospital), and alleged shortcomings of medical attention whilst in prison

10. According to the defence team, Mr Lebedev was arrested whilst hospitalised at the Third Central Military Clinical Hospital, for a serious health condition (advanced hepatitis, uncontrolled hypertension, suspected stroke, cardio-vascular disease, leading to loss of eye-sight). According to them, Mr Lebedev was hospitalised for further tests on 2 July 2003, after doctors at the "ON-Clinic" had diagnosed on 30 June 2003 serious health problems that required more sophisticated diagnostic tools than those available at the said clinic.

11. According to the representatives of the prosecution that I spoke with, Mr Lebedev's health was practically normal at the time of his arrest, and continues to be so. They denied that Mr Lebedev was arrested whilst hospitalised, stating that Mr Lebedev had been summoned to come to the procuracy on 2 July 2003 at 10 am as a witness and that he was indeed arrested later on the same day, but at the procuracy. At the time set in the summons, Mr Lebedev's lawyer had phoned to say that his client was in hospital, without however being able to say in which one. After the Prosecution located Mr Lebedev, who had just been admitted to the Third Central Military Clinical Hospital, a medical examination had been performed resulting in an all-clear for any investigative acts required. [3]

12. During my second visit to Moscow, the defence lawyers handed me copy of the

official document detailing the circumstances of Mr Lebedev's arrest, which states that the place of Mr Lebedev's arrest was indeed the hospital. They also handed me copy of the convocation of Mr Lebedev, c/o lawyer Drel, for 3 July 2003 at 10 am (and not 2 July, as I was told by the representative of the prosecution).

13. Whatever the precise circumstances and place of Mr Lebedev's arrest, I consider as much more serious the disagreements between the prosecution and the defence regarding the subsequent development of Mr Lebedev's health situation. The prosecutors showed me numerous medical bulletins established by prison doctors, including one dated 25 December 2003, and by an emergency team that had intervened during a court hearing on 26 December 2003, after Lebedev had complained about an acute problem, finally by a "consilium" of doctors on 3 March 2004 lead by the Chief Physician of the City of Moscow, Mr Labeznikov. These seem to show that apart from some headaches, intestinal pains and high blood pressure, as well as some hepatitis, Lebedev was and is in reasonably good health. The prosecutors also told me that during court hearings in April 2004, Mr Lebedev had declared himself satisfied with the medical treatment he had obtained and with his state of health in general.

14. His lawyers adamantly deny this and provided me with an extract from the minutes of a court hearing on 15 April 2004 in which Mr Lebedev is cited as having made some very critical remarks, claiming that the prison doctors even refused to administer Papazol (a drug to control hypertension) to him. He now refused any treatment offered by prison doctors, whom he no longer trusted. A panel of Canadian doctors, who assessed all available data, but could not examine Mr Lebedev themselves, came to worrisome conclusions and recommended Mr Lebedev's urgent hospitalisation for further tests[4].

15. I find it difficult to understand why the prosecution has so far refused a medical examination by independent doctors, i.e. ones chosen by the defence and not linked to the administration. According to the information I obtained at the Ministry of Justice, the possibility of independent medical opinions is foreseen by Russian law, and a more forthcoming use of this possibility could easily dispel any doubts caused by protracted refusal.

4.      Refusal of bail (in particular, regarding Mr Khodorkovsky)

16. Mr Khodorkovsky was arrested several months after Mr Lebedev. According to information received from both sides, the accusations against the two are very similar[5], based on the same documentary evidence, witnesses etc … The arrest of Mr Lebedev was widely interpreted as a "warning" to Mr Khodorkovsky to leave the Russia – which several other former leading executives or shareholders of Yukos have indeed done. Mr Khodorkovsky chose to stay in Russia, declaring publicly that he intended to stand up in court to fight for his good name. He voluntarily returned to Russia from a business trip to the United States, which he undertook after Mr Lebedev's arrest. This is undisputed.

17. The Prosecution nevertheless maintains that he needed to be arrested and kept in pre-trial detention, because of the risk of flight, and of interference with the investigation. The prosecutors specified that he disposed of several passports, and had the means to procure himself false papers even after confiscation of all his passports, and that a number of key witnesses were economically dependent on Mr Khodorkovsky/ Yukos and could therefore be influenced by him.

18. The defence pointed out other possible measures of restraint (for example house arrest with external communications cut off, confiscation of all passports, bail, personal guarantees signed by a large number of honourable citizens) that could have taken the place of imprisonment, which was in their view primarily a "political" signal, and designed to prevent Mr Khodorkovsky from resisting the dismantling of his business. They also noted that in law and practice, following a recent reform, persons accused of non-violent "economic crimes" are usually not placed in pre-trial detention. The exception made for Mr Khodorkovsky and his associate, Mr Lebedev, is in their view

proof of the "political" motivation of their arrest.

19. Finally, the maintenance of Mr Khodorkovsky and Mr Lebedev in detention after the completion of the pre-trial investigations raises additional legal issues. As regards the grounds for detention on remand, the European Court of Human Rights, in the case of Kalashnikov v. Russia, states inter alia that even when interference with the investigation justified detention at the beginning of the proceedings, that ground inevitably became less relevant as the proceedings progressed and the collection of the evidence became complete (judgement of 15 July 2002, para. 117). If follows in my opinion that upon completion of the pre-trial investigation, continued detention must be justified especially carefully. I was informed by Mr Khodorkovsky's lawyers that in his case, the decision to continue detention on remand was taken by the trial court without even an application by the prosecution, without hearing the defence in any way, and without giving any reasons. I have serious doubts that this is sufficient, both according to Russian law[6] and in view of the standards set by the European Court of Human Rights in its judgment of Letellier v. France of 26 June 1991[7].

## 5.   Alleged violations of the rights of the defence

### a.   Access of lawyers to their clients subjected to conditions no longer based on law

20. The defence lawyers told me at length about the difficulties they had had in obtaining the "permission" by the prosecutor's office they said they needed in order to have access to their clients in pre-trial detention. Practical problems such as the difficulty of access to the premises of the procuracy without prior appointment, difficulty to reach prosecutors by telephone to make such an appointment etc. caused delays from several days up to several weeks before they could visit their clients, who had been arrested. This led in several instances to investigative acts taking place without the lawyer being present.

21. By contrast, I was told by representatives of the Ministry of Justice, by Deputies present at my meeting at the State Duma in May, and also in the written commentary by the Russian delegation dated 14 September 2004 on the Introductory Memorandum that following a legislative reform, prepared with the help of experts from the Council of Europe, and which entered into force on 1 July 2002, lawyers need only to show their identity card as lawyers and a copy of the mandate given by their client, on a special form designed by the Ministry of Justice, in order to have access to their client, including in pre-trial detention. A permission of any sort by the procuracy was no longer required.

22. But the prosecutors with whom I spoke themselves made an important qualification: whilst a "permission" was no longer required, it was common practice that the prosecution provided a "supportive letter" to facilitate access to the pre-trial detention centres. These letters, which the prosecutors said are routinely issued without delay, though admittedly not foreseen by law, were merely intended to avoid "technical" problems related to access to the detention centres.

23. These findings point to the existence of a serious gap between law and practice, making the lawyers' job much more difficult. According to several lawyers I spoke to, these difficulties can vary in practice depending on how "sensitive" the case is; clients held in the "Lefortovo" isolator, under the authority of the FSB, are particularly difficult to join.

24. In my view, the right of timely access to a lawyer is a core right of the defence, and must be protected in practice, not only in law, and not only in routine cases, but even more so in "sensitive" cases.

### b.   Denial of access of defence lawyers to the courtroom

25. The court hearing to decide on Mr Lebedev's pre-trial detention, on 3 July 2003, the day after his arrest, undisputedly took place without Mr Lebedev's lawyers.

26. The lawyers maintain that they tried for several hours to gain access to the courtroom, knocking on the locked door.

27. The prosecutors told me that the lawyers, Mr Drel and Mr Baru, were summoned on 3 July 2003. They signed the summons, for a hearing at 16h30, at 14h52 in the building of the procuracy, situated about 3 km from the courthouse. As the lawyers did not turn up, the Court waited until 18h. Then the hearing took place in the lawyers' absence, which is possible under Article 108 of the Criminal Procedure Code, provided the lawyers were summoned correctly. According to the representative of the prosecution, Mr Lebedev's lawyers must have given preference to the press conference, at Interfax, which they had announced that day. In reply to my question whether the courtroom had been locked, my interlocutors stated that they personally had not locked it, and had not been aware of attempts of late-comers to enter the courtroom.

28. The lawyers have maintained their version, naming several witnesses, including the president of the court who they say tried to help them obtain access to the courtroom, without success. The lawyers also deny participating in any press conference at Interfax on 3 July 2003, explaining that the Interfax reports published that day were those of journalists who were present in the courthouse and interviewed the lawyers there.

29. During my second visit to Moscow, the representative of the prosecution handed me a list of press conference announcements by Interfax, which includes a press conference on 3 July 2003 at 16h30 called by lawyer Anton Drel. During the same visit, one of the lawyers handed me a signed statement by the head of the Interfax office confirming that the above-mentioned press conference had been annulled by Mr Drel.

30. I have not had the opportunity to talk to the witnesses named by the lawyers, and I can therefore not come to a definite conclusion. If proven, the forcible exclusion of defence lawyers from a court hearing deciding on pre-trial detention would of course be a serious matter.

c.    **Search and seizure of documents in lawyer Drel's office and summons of defence lawyers for questioning**

31. I was informed by the lawyers that an office of Mr Drel, who worked both on the Yukos tax evasion case and as defence lawyer for Mr Khodorkovsky and Mr Lebedev, was searched on 9 October 2003 and that on that occasion confidential documentation was seized, including items pertaining to the privileged lawyer-client relationship. Mr Drel insists that the search in his office was carried out in respect of criminal case no. 18-4203 to which he had been admitted as a defence attorney.

32. The prosecutors insisted that the official law office of Mr Drel, located in central Moscow, had never been searched. On 9 October 2003, only premises outside the "city ring" had been searched. The prosecutors refused to give any more specific information, relying on Article 161 of the Criminal Procedure Code (secrecy of pre-trial proceedings). I was told that the search of premises on the outskirts of Moscow concerned the Yukos case, whilst Mr Drel was a defence lawyer for Mr Khodorkovsky and Mr Lebedev as individuals.

33. During the meeting at the State Duma, several interlocutors stressed the strict separation between the "Yukos case", which did not exist as a criminal case, and the criminal cases against Mr Khodorkovsky, Mr Lebedev, Mr Pichugin *et al.* as private individuals. But the prosecutors explained to me in some detail how the criminal cases against Yukos' former leading executives had "spun off" the investigation into tax and other abuses by Yukos as a corporation. They nevertheless insisted on the importance of the split into separate cases, with separate case file numbers.

34. The defence lawyers, by contrast, stressed the common origin of the individual cases and found the separation into different case files, which consisted mainly of photocopies of the same documents that are common to most files, artificial. They insisted that the search of one of Mr Drel's premises, even if it did not concern his main (downtown) office, was in any event unlawful in that Mr Drel was also mandated by Yukos as a corporation.

35. The defence lawyers also assert that within one week of the search of his office, Mr Drel himself was summoned for questioning. On the advice of the Moscow Bar Association, Mr Drel did not comply with the summons, while the Procuracy had taken no further action against him to date.

36. Another lawyer, Mr Patskov, had been summoned to the procuracy at the end of October 2003 to take part in the interrogation of a client. When he arrived at the office, he was advised that he himself would be questioned as a witness. When Mr Patskov refused, the investigator inserted some answers of his own into a draft transcript of the interrogation, and put strong pressure on Mr Patskov to sign the protocol. Mr Patskov persisted in refusing, and was eventually released.[8]

37. The prosecutors explained that there is a legal difference between defence counsels representing an accused person, and other lawyers accompanying witnesses to their interrogations. I consider that a simple play on case file numbers, changing at will the role of lawyers from that of a representative of an accused person into that of a representative of a mere witness, cannot allow the prosecution to circumvent the lawyer-client privilege protected by law, especially in a situation where these cases are as closely related to one another as in cases at issue. This applies both to searches and seizures of lawyers' offices, and to the questioning of lawyers as witnesses.

**d.    Search of defence lawyers in the detention centre and seizure of confidential documents; disciplinary pressures on defence lawyers**

38. Two defence lawyers complained to me about having been searched in the pre-trial detention centre, and that confidential papers had been browsed through and some of them confiscated. Whilst they do not object to security searches (metal detectors etc.), they complained that papers had been ripped out of their hands and searched, and that handwritten notes had been confiscated, which allegedly contained instructions from the accused to interfere with the investigation. Several lawyers told me that they were not allowed to exchange any written (or handwritten) notes with their clients in the pre-trial detention centres, which made communication with their clients a lot more difficult, given the complicated subject-matter. Even in the courtroom, notes could only be exchanged between lawyers and their clients after the court had read them and allowed them to be passed on.

39. The prosecution is attempting to have these two lawyers disciplined by the Moscow Bar Association. In one case – that of Ms Artyushova – the prosecution has appealed against the decision of the Moscow Bar Association, which had found that she had committed no disciplinary offence. I was told that the possibility of an appeal by the prosecution against disciplinary decisions by the Bar Association had been recently introduced and caused much concern among lawyers, who fear the courts' traditionally restrictive approach vis-à-vis their rights. In the other case – that of Mr Yuri Schmidt – I was told by Mr Alexey Simonov, a reputed human rights defender heading the Glasnost Defence Foundation that the purported handwritten "instruction for interference with the investigation" by the accused was in fact an unrelated political statement written by Mr Alexey Simonov himself that Mr Schmidt happened to be carrying with him on that day. Mr Schmidt, who is a highly regarded lawyer in Moscow, and who impressed me personally with his measured, precise, and well-argued statements, said that he had no fears for himself, but that the complaint with the Moscow Bar Association, and a related attack on him in the press, caused him a considerable nuisance and loss of time.

**e.    Alleged eavesdropping against defence lawyers**

40. Several lawyers expressed their suspicion – founded on indirect evidence – that their conversations with clients held in pre-trial detention were taped and listened to by the authorities. I was told that whilst there are about ten cabins for conversations between inmates and visitors - the conversation taking place by interphone, through glass separators - they were always directed to a particular cabin ("no. 4"), even if this meant they had to wait for it to be liberated, whilst others were free.

41. I was told at the Ministry of Justice and at the Procuracy that conversations between lawyers and their clients at the detention centres are absolutely private in law and practice.

42. I could not clarify this issue any further, but I should like to suggest that as a "confidence building measure" - however imperfect - lawyers and inmates should in future be allowed to chose freely the cabin they wish to use.

### f.      Alleged unfair limitation of the time for the accused to study the case-files

43. The lawyers of all three imprisoned Yukos executives complained about the unfair and unlawful (under Russian law) limitation of the time allotted to their clients to familiarise themselves with the – voluminous – files (163 volumes, according to the prosecution, in the Lebedev case). They complained that due to cumbersome procedures at the detention centre, their clients can study files only for a few hours each day. Both Lebedev and Pichugin suffered from failing eye-sight, due to their health condition, and were therefore even more limited in their possibilities. The prosecutors with whom I spoke in Moscow gave me detailed information on this issue as regards Mr Lebedev, which seems to show that while there were restrictions, Mr Lebedev succeeded in getting through the files before the actual beginning of the trial. In Mr Khodorkovsky's case, the number of volumes to study was considerably higher (over 250 volumes), and, according to his lawyers, even more unnecessary restrictions were placed on his ability to study these files in good time, and later the files concerning his co-accused Lebedev. Without having been able to reach definite conclusions on this issue, I found grounds for concern that here, too, unnecessary and unjustifiable restrictions have been placed on the defendants, making it that much more difficult for them to assure their defence.

### g.      Other unfair features of the trial, as observed during the attendance of the court hearing on 28 September 2004

44. I noticed during the session that I attended that the court, prompted by the prosecutor, systematically allowed the latter to read out the minutes of the pre-trial interrogation of witnesses. The prosecutor then exercised considerable pressure on the witness during his interrogation in the courtroom to confirm those minutes phrase by phrase. These tactics, which the lawyers affirmed are used systematically during this trial, put into question the equality of arms between the defence and the prosecution, as they undermine the effectiveness of the right of the defence to question witnesses of the prosecution, whose pre-trial interrogation they are generally not able to attend. I also noted that the defence lawyers can only exchange notes with the accused after the court has first read them.

### 6.      Unjustified restrictions on the publicity of court hearings

45. Most of the pre-trial hearings in the three proceedings were held in camera. I was told at the Ministry of Justice that the decision on the public or in camera character of court hearings is the competence of the courts. As I have not been able to ask the Presidents of the two courts concerned, who twice refused to meet with me, I have had to content myself with explanations given by the prosecutors. They referred in general terms to the interests of the victims, of witnesses, and the extent of public and media interest, which could justify in camera hearings. I was told that for those hearings which were held in public, ordinary courtrooms were used and all members of the public

wishing to attend had been able to do so.

46. The "Commentary" dated 14 September 2004 prepared by the Russian delegation on my Introductory Memorandum stresses that "the court hearings on former Yukos executives' cases are public in character" and that "[d]ifficulties may arise only because of the small capacity of courtrooms". The hearings in the cases of Khodorkovsky and Lebedev take place in one of the largest courtrooms of Meshchanksy Court, which has a floor space of 64 sq.m., and which can seat 41 persons (including the court, prosecution, defence lawyers, defendants, and guards).

47. My own impression of the courtroom in which I followed the proceedings against Mr Khodorkovsky and Mr Lebedev for a few hours was that it was by far too small to accommodate serious interest by the media and by the public at large. The procedure required to enter the courtroom was rather cumbersome, if not to say intimidating, seemingly designed to keep a lid on public curiosity. I was also rather dismayed by the way the accused were displayed in an iron cage, but I was told that this is standard practice in Russian criminal courts.

48. The defence lawyers protested against the holding of the pre-trial hearings in camera, and pointed out that even for those few hearings, which were purportedly public (19 March and 23 April 2004/Khodorkovsky), representatives of the public had *de facto* had hardly any access. In one instance, the few seats available (10-15) were allegedly mostly taken up, from the beginning, by men wearing uniforms. I was informed of a statement of protest by journalists who were refused admission to the courtroom, addressed to Mrs Moskalenko, of the Centre for Assistance in International Protection.

49. I was informed by lawyers that the trial against Mr Pichugin, which has just begun, would be held completely *in camera*. Even the judgment itself would be kept secret, with the exception of the operative part (i.e. the sanction imposed). The public at large may therefore never be informed of the reasons or evidence on the basis of which Mr Pichugin may be condemned. I was also informed that in the course of the pre-trial investigation, only a small proportion of the documentary evidence to be introduced into the trial (2%) had been declared as "secret" by the prosecution. In conjunction with the fact that Mr Pichugin has spent most of his pre-trial detention in the Lefortovo prison run by the FSB, where he may well have been subjected to illicit methods of investigation (see para. 8 above), and that his case has been much less in public view from the beginning, I cannot help worrying that Mr Pichugin, under cover of secrecy, will be subjected to pressures aimed at using his case to project more serious accusations also against other leading former Yukos executives.[9]

50. I consider the public character of judicial proceedings, as guaranteed in Article 6 ECHR, a very important element of a fair trial. The right to a public hearing is for the benefit of the accused and of the public in general, as it maintains public confidence in the courts and contributes to the fairness of a trial by making it transparent. Exceptions from the public character of hearings, which are possible for a number of reasons both in Russian law and under the ECHR, must be properly justified and limited "to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice" (Article 6 para. 1 phrase 2). Unjustified restrictions of the public character of court proceedings are serious matters amounting to a violation of the right to a fair trial (Article 6 ECHR).

51. In view of the public allegations, my advice to the Russian authorities would be to ensure in future a maximum of transparency of the proceedings against Mr Khodorkovsky and his associates. This may be the best way to counteract the impression nurtured by the secrecy imposed so far that the authorities may have something to hide.

## 7.    The political and economic circumstances of the arrest and prosecution of the leading Yukos executives

52. I have collected large amounts of information and analytical input regarding the alleged "political" and economical background of the arrest and prosecution of the leading Yukos executives. I consider this background an important factor that needs to be clarified in order to better understand the "circumstances" of the arrest and prosecution of Mr Khodorkovsky, Mr Lebedev and Mr Pichugin, in terms of the motion at the origin of my mandate and that of our Committee. I consider that the political and economic context of the arrest and prosecution of the former Yukos executives may legitimately be taken into account as part of the wider "circumstances", as it may shed some light on possible motives for the action taken against these persons.

There are two main groups of explanations for the action of the prosecution:

53. The first, defended by representatives of the State and (in a more nuanced way) by some Western interlocutors is that the State, lead by a new more patriotically-minded elite is – finally - mustering the strength to assert the rule of law, including the respect for laws against tax evasion and fraud, also vis-à-vis the most powerful players in the economic field. According to the proponents of this approach, the cases against the leading Yukos executives are only the beginning of a campaign to reassert the authority of the State, and to create a level playing field on which small and large firms can develop under the protective umbrella of a strong legal system. For the proponents of this approach, it is high time that the days of the "Wild East" are brought to an end and that normal legal standards are enforced against all. Proponents of this approach also asked me to understand that certain procedural violations may have been committed by sheer incompetence of government agencies that had lost many of their best collaborators to higher-paying employers in the private sector, and that some of the "strong-armed" methods may be the expression of a feeling of perceived helplessness of resource-starved State agencies vis-à-vis their "rich" adversaries who they knew by experience have long been in a position to "buy" their way out of any troubles with the justice system.

54. The second explanation I heard mainly from representatives of NGO's active in the human rights field is that the "Yukos" - related cases are part of a long-term strategy to "centralise" power in the hands of the "siloviki" (the representatives of the power structures, in particular the FSB), by way of a series of show trials. According to the proponents of this approach, the first stage of this strategy was the lawsuit on the takeover of N-TV by State-controlled Gazprom. The ruthless eviction of the founders, including Mr Gusinskiy, of this independent TV chain and its "ratification" by the judiciary was a warning addressed to all other media companies that made the introduction of actual censorship quite unnecessary[10]. The second stage of this strategy, in this view, is the attack on the richest, best-known and best-protected of the "oligarchs", who had dared using part of his considerable means to generate "counter-power", by advancing transparency in business and by funding civil society groups and opposition parties: Mikhail Khodorkovsky. According to this theory, the demonstration will be made that the "siloviki" can crush anyone they want, as a warning to all those who are less rich and less powerful than Mr Khodorkovsky. The final stage, predicted for the near future, would be an attack on the independence of civil society organisations, by way of limitations placed on foreign funding, "tax terror", and judicial harassment.

55. A variant of the second "version" was presented to me by independent Duma members, political analysts and journalists during my second visit. They, in brief, consider the attack on Yukos as a case of large-scale "asset grab". In their view, Khodorkovsky and his associates were jailed – and denied bail - in order to prevent them from defending Yukos against being deprived of its principal assets. In their view, the trumped-up tax reassessment, which was made legally executory in record time, and the subsequent freeze of Yukos' accounts, was designed to force a sell-off of assets at below-market prices, benefiting companies linked to the Kremlin. As the evaluation of the market value of Yugansneftegaz (Yukos' main oil producing subsidiary) by Dresdner Kleinworth (a close business partner of Kremlin-controlled Gazprom) did not produce the expected low figure, as Dresdner had a reputation in the financial markets to protect, the interested circles would further open the tap of "political risks" in order

to drive down the value of Yugansneftegaz, towards the range of what Gazprom or the State-owned oil company Rosneft could afford. These analysts found that the new power elite, who considered themselves as having unfairly lost out in the first round of "robbery of the State" by the Yeltsin era oligarchs, made one strategic error in that they did not content themselves with seizing control over remaining State assets, but decided to "rob the robbers". The mistake, in these analysts' view, lies in the fact that the new power elite thereby created a precedent, and made themselves vulnerable to being in turn deprived of their assets by the next "power elite". This "mistake" now obliged them to build a dictatorship, i.e. to put into place structures that would ensure that they would remain in power indefinitely. This explained in their opinion the recent hardening of Government policies – from the abolition of the direct election of provincial Governors (that of local mayors being predicted as the next step), via the elimination of the possibility of independent candidatures in the next State Duma elections, to the threats against civil society, the repression against dissident scientists (Sutyagin case) and

lawyers, and (typically tax-based) threats against remaining independent media. The proponents of this analysis also told me that local and regional power elites are feeling encouraged to follow the Kremlin's example at their own levels, and that business, especially small and medium-sized enterprises, had already reported increased "administrative pressure" in many places.

56. I cannot and I will not speculate as to which of the analyses presented above in a deliberately pointed manner (in which they had also been presented to me) is correct.

57. I have come to my own conclusion, namely that the presence of an interest of the State that exceeds its normal interest in criminal justice being done and includes such elements as: to weaken an outspoken political opponent, to intimidate other wealthy individuals, and to regain control over "strategic" economic assets - can hardly be denied.

58. This assessment is based on the conjunction of (a) the accumulation of procedural violations and the absence of adequate safeguards against government interference in court proceedings, (b) information pointing at Yukos executives being deprived of their main assets, and (c) other items relevant to the "political" or "economic" circumstances of the proceedings against the leading Yukos executives.

**a.    The accumulation of procedural violations and the absence of adequate safeguards against government interference in court proceedings**

59. The sheer number and seriousness of procedural violations that I described above[11] in my view exceeds a mere accumulation of mistakes that could be explained by a lack of experience or professionalism. During my mandate, I have been confronted with a number of examples of the serious problems from which the Russian judiciary suffers in general, including its notorious openness to corruption, lack of respect for the rights of the defence, and, in particular, the overwhelming influence of the procuracy, which in turn is a tool in the hands of the executive.[12]

60. In my interviews with retired Constitutional Court Vice-President Morshchakova, I learnt that recent legislative reforms have done nothing to improve the independence of the courts, or have even gone in the opposite direction. The December 2001 Law modifying the Legal Status of Judges brought back a disciplinary arsenal that had been abolished in 1992, and facilitated the criminal prosecution of judges. For judges to be prosecuted, it was now sufficient that three judges of the Supreme Court agree, whereas the agreement of the "Qualification Commission", a professional self-regulatory body, had been required beforehand. The March 2002 Law on the Organs of Judicial Bodies laid down rules about the "Qualification Commission" that decides about the downgrading or dismissal of judges. Mrs Morshchakova also criticised the procedure of the constitution of popular juries, which was open to manipulation. She also disagreed with the composition and procedural functioning of the Qualification Commission, which gave too much power to the courts' presidents, and the sweeping

formulation for the grounds for dismissal of a judge for "behaviour incompatible with the honour of a judge and the status of the courts", a formulation left unchanged from previous law. Meanwhile, I have been informed through the media that a draft law has been introduced in the Russian parliament that would further change the composition of the "Qualification Commission", giving the President of the Russian Federation the right to propose half of its members, and to directly appoint another one, thereby putting the Kremlin even more in control of hiring and firing judges. I believe that such a law would be a step in the wrong direction, further away from effective independence of the judiciary.

61. The case of Moscow City Court judge Kudeshkina[13], for example, highlights the pressures judges are subjected to, and the abuses which are made possible by the complete absence of objective rules determining which judge, or chamber, will hear a given case. The distribution of cases among judges is left entirely to the discretion of the court president. This state of affairs - to make sure sensitive cases come before "responsible" judges - was confirmed by several official interlocutors. Mrs Tamara Morshchakova, a law professor and former Vice-President of the Russian Federal Constitutional Court, has confirmed the weakness of the judges' position in the Russian courts and that instructions from prosecutors to judges are by no means exceptional. She has long pleaded in favour of reforms to strengthen judicial independence and to introduce, inter alia, objective criteria for the distribution of cases within a given court. She pointed out that Article 47 of the Russian Constitution foresees the citizens' right to have their cases heard by a judge "determined by law". But this principle was not implemented in the Law on the Organisation of Courts, which she considers to be outdated. I am aware that objective criteria for the distribution of cases within courts are also lacking in some other Council of Europe member states, but I believe that this should not stop the Assembly from pushing for reforms in this sense, in the interest of the independence and transparency of the courts. The argument that I have heard from certain official interlocutors that the independence of the courts needs to be kept in check in order to fight corruption is in my view completely inadmissible, as a matter of principle, and from a practical point of view: whoever wishes to "buy" a judgment will simply bribe the prosecutor instead of the judge, if it is known that the former can give instructions to the latter.

b.    **Information pointing at Yukos executives being deprived of their main assets**

62. I am aware that the information pointing at Yukos (and thereby its former leading executives and main shareholders) being deprived of their main asset, its oil-producing subsidiary Yugansneftegaz, must be treated with utmost caution: apart from some factual elements obtained from Yukos' current CEO, Steven Theede, and CFO, Bruce Misamore, and Yukos' international lobbyists on the one side, as well as the head of the Federal Tax Service, Mr Serdyukov, on the other, I am basing myself entirely on reports in the press, which are in turn a reflection of sometimes incomplete or contradictory public declarations by different actors, or of leaks that may be intended to test national and international public opinion, and market reaction.

63. This being said, it seems at present that the scenario unfolding before our eyes is the following: Yukos was first confronted with huge tax reassessments that were made executory in a very short time, through astonishingly rapid procedures in the competent arbitrage courts. The authorities then promptly froze Yukos' accounts, creating pressure to sell of its assets.

64. As explained by Yukos CEO Steven Theede, and CFO Bruce Misamore, whom I met in Moscow in September, 50% of Yukos' gross revenue (not: profits) has to be immediately put towards the reassessed tax debt. The remaining 50% were insufficient to cover current taxes and duties, transport costs, utility bills and salaries. Management were therefore put before harrowing choices, including cutting off (transport-intensive) oil deliveries to China, or delaying payment of bills that could lead to serious legal consequences. In the face of new tax re-assessments (the original claim of 99 bn Roubles or USD 3.3 bn concerns only the year 2000), the forced sale of assets became practically inevitable. Mr Misamore provided me with figures as to the comparative tax

burden on Yukos and its Russian competitors, before and after the reassessment, which show that while Yukos' tax burden, per barrel of oil produced, was only slightly higher than their competitors before the reassessment, it rose to about the triple with the reassessed amounts included[14].

65. This raises two separate issues: that of the justification of the tax reassessment, which pushes Yukos with its back against the wall; and the appropriateness of the price for which Yukos' assets are being forcibly sold off, and to whom. While an examination of the substance of the tax claim exceeds my possibilities and my mandate, I had to address the reproach that Yukos and its former leading executives have been discriminated against, as any discriminatory treatment would point in the direction of a "political" motivation behind these proceedings. The conditions of the sale of Yukos' assets could also shed some light on the true motives for Mr Khodorkovsky's arrest and prosecution.

66. As to the reproach of discriminatory treatment, I had an interesting exchange of views during my first visit at the State Duma with a representative of the tax ministry. He described to me the "abusive" techniques used by Yukos to minimise taxes by letting part of the profits of the mother company accrue to dependent companies domiciled in inner-Russian tax havens. He confirmed that in 2000 (the year for which the first tax reassessment – RRoub 99 bn/USD 3.3 bn - is levelled against Yukos), these techniques were widely used and considered "legal", albeit anti-social in the case of large companies not contributing to any real economic development of the tax haven regions. The law making such "abuses" possible has therefore been changed, so as to make such techniques impossible in practice. In reply to my explicit question, he confirmed that the new law entered into force only in 2004. This clearly raises an issue of the retroactive application of changes in tax laws, which is quite problematic, under property protection aspects, even when it is merely a matter of retroactively charging higher taxes for the past. In the cases of Mr Khodorkovsky and Mr Lebedev, even criminal charges seem to be attached to these retroactive changes of law or of its interpretation, which in my view would be incompatible with the principle of *nullum crimen, nulla poena sine lege* (Article 7 ECHR).

67. The meeting in September with the head of the Federal Tax Service, Mr Serdyukov focused on the discrimination issue. Referring to the figures received from Yukos, I asked for official figures as to the comparative tax burden on Russian oil companies, and inquired about the possibility for, and general practice of the Russian tax authorities to grant temporary reprieve for taxpayers threatened by financial difficulties following tax reassessments. I finally asked whether other Russian oil companies, and if so, which ones, had been subjected to similar reassessments and their executives criminally prosecuted, given that we had been told that other oil and resource companies had used the same tax minimisation schemes[15]. As these questions could not be answered on the spot, I sent them in writing after my return from Moscow, through the chairman of the Russian delegation at the Parliamentary Assembly, as agreed with Mr Serdyukov. Unfortunately, I have not yet received an answer.

68. As to the conditions of the forced sale, it is at present too soon to tell. For several months, but in particular since the middle of October, numerous press reports raise the spectre of a forced sell-off of Yugansneftegaz, Yukos' main oil producing subsidiary, at a price that would be far below the market value as previously assessed. Andrei Illarionov, a senior Kremlin economic policy adviser, reportedly[16] said at an investment conference in Moscow on 28 October that "the probability of a Yuganskneftegaz sale is high, [but] the question is the price… Yuganskneftegaz' revenues this year will be at least USD 17 bn one cannot sell the company at less than its annual revenues." By the time this report will be discussed in our committee, rumours and reports may have evolved into actual facts. At the present stage, I can only make two points: firstly, any sell-off below fair market value, forced upon Yukos by the State authorities, would raise serious issues of the protection of property under Article 1 of the First Protocol to the ECHR[17]; and secondly, any sell-off below market value could hardly be justified by "fiscal" (i.e. State revenue maximising) considerations: it would deprive Yukos of the assets needed to pay, over time, the outstanding tax claims, and in addition, the

"collateral damage" resulting from the handling of the Yukos affair in terms of loss of investor confidence, capital flight, delayed productive investments etc. has already caused the Russian State to lose more revenue than it could have possibly hoped to gain.

**c.    Other items relevant to the political or economic circumstances of the proceedings against the leading Yukos executives**

**i.    Khodorkovsky's financial support for opposition groups**

69. As a matter of simple fact, Mr Khodorkovsky and his associates had, prior to the legal action taken against them, begun to support financially a number of political parties and civil society organisations (in particular the "Open Russia Foundation"). In May 2003, Mr Khodorkovsky had announced that he would give approximately USD 15 million to the Yabloko party and a smaller amount to the Union of Right Forces, whereas I was told that he had repeatedly refused "requests" addressed to him to finance President Putin's "United Russia" party. These activities may violate an alleged "pact" between President Putin and the Yeltsin-era oligarchs according to which they would be allowed to keep their business empires provided they would not get involved in politics.

70. I was informed that in the meantime, financing for liberal-oriented political parties and a number of civil society organisations has practically dried up, not only from Yukos-related sources, but also from other donors on whom the proceedings against Mr Khodorkovsky and his associates seem to have had a chilling effect. While I do not wish to insinuate that this was the intention of the authorities, the fact remains.

**ii.    Yukos as business competitor of State-controlled Rosneft and Gazprom**

71. I was informed that Yukos has or had several business disputes with State-owned or –controlled energy companies, in particular bitter disputes with Rosneft and Gazprom.

72. As regards Rosneft, I was informed inter alia about a public struggle for control over the Vankorskoye oil and gas field (Yeniseyneftegaz).

73. As regards Gazprom, which has a share of about 20% in the world natural gas market and owns almost 60% of Russia's know gas reserves, whose largest shareholder (38%) is the Russian State, and whose senior management is closely linked to the Kremlin, Yukos may have been perceived as a threat to Gazprom's quasi-monopoly. Mr Khodorkovsky had stated publicly that Yukos, which owns gas as well as oil reserves, and already produces gas for certain markets, could produce gas more economically than Gazprom. I was informed that Yukos had been exploring the possibility of building a pipeline to the Arctic Ocean where its gas could be liquefied and exported to Europe, which would place Yukos in competition with Gazprom in the sale of gas to Europe and enable Yukos to bypass Gazprom's pipelines.

74. Before Mr Khodorkovsky was arrested, Yukos had been close to completing a merger with Sibneft. I was informed that YukosSibneft would have become the world's fourth largest oil company. At the same time, it was widely reported that Yukos was engaged in merger talks with several Western oil companies, including US-based ExxonMobil. These events may well have been perceived by the Russian Government as a threat to national control over strategic resources.

75. In my view, such strategic issues may well have played a part in the motivation of the arrest and prosecution of leading Yukos officials. In this context, I should like to recall Gazprom's role in the process that lead to the change of hands of the (then) independent and critical "NTV" television network[18].

### iii.    A campaign of intimidation against Mr Khodorkovsky and his associates

76.    I was informed of a number of intimidating action by different State powers (judiciary, federal and regional tax authorities, even environmental probes) launched against Yukos and its former leading executives and against other persons associated with them: repeated military-style searches by masked men in camouflage uniforms armed with assault rifles of Yukos offices, with threats and insults being launched against ordinary employees; similar raids on the headquarters of Yukos' IT contractor Sibintek, of the Podmoskovny Lyceum boarding school in Koralovo and a Menatep business club in Zhukovka – I was given a lot of detail about these and other, similar events, and also about the "black public-relations" campaign against Mr Khodorkovsky preceding his arrest. This "campaign" began with an anti-Khodorkovsky edition of "Compromat" magazine in May 2003, devoted entirely to allegations against Mr Khodorkovsky and Yukos, and continued with the publication on the compromat.ru website of the transcript of an alleged high-level plot to bring down Khodorkovsky, a report published in May 2003 under the aegis of a Russian think-tank (Council for National Strategy) alleging an imminent "oligarchic coup". During my second visit to Moscow, I was informed that an NTV documentary televised on the weekend before my arrival had made allegations linking Yukos and Mr Khodorkovsky to Chechen terrorism, such as the attack on the school in Beslan.

77.    Last but not least, the dramatic material circumstances of both Mr Khodorkovsky's arrest by special forces soldiers on a remote airfield in Siberia and Mr Lebedev's arrest in hospital give the impression of having been designed to intimidate.

### D.    Conclusion and outlook

78.    The findings that I felt obliged to describe above in some detail, given their seriousness, have lead me to propose the above draft resolution and draft recommendation. The proposed texts, in line with the Committee's mandate, do not address the guilt or innocence of the accused persons, which will be for the courts to decide on[19].

79.    The draft resolution and recommendation focus on the legal and procedural issues raised by the arrest and prosecution of the leading Yukos executives, but they also do not ignore the context of these proceedings: the desolate situation of the Russian judiciary in general pointing to the need for specific reforms designed to improve its independence and transparency, as well as the political and economic considerations that in my opinion are needed to correctly explain the arrest and prosecution of Mr Khodorkovsky, Mr Lebedev and Mr Pichugin, former leading Yukos executives. The latter issue, in my view, needs to be further followed by the Parliamentary Assembly, and it would be logical to also involve in this work the Assembly's Economic Affairs Committee, and, possibly, the OECD, with whom that Committee has good working relations.

**Dissenting opinion of the delegation of the Federal Assembly of the Russian Federation on the draft report by Mrs Sabine Leutheusser-Schnarrenberger on "The circumstances surrounding the arrest and prosecution of leading Yukos executives"**

The Russian delegation considers that Mrs Leutheusser-Schnarrenberger has carried out substantial work in preparing the report on "The circumstances surrounding the arrest and prosecution of leading Yukos executives", of which some individual points will doubtless help improve the work of Russia's law enforcement and judicial authorities.

Nevertheless we believe that Mrs Leutheusser-Schnarrenberger has produced an unbalanced report based essentially on the views of the defence team and taking no account whatsoever of the official documents passed to her by the Russian authorities.

The rapporteur twice visited Moscow, where she was given the opportunity to meet

competent representatives of the Russian Federation's law enforcement and judicial authorities, but her document reflects only statements of non-governmental organisations involved in human rights protection.

Acknowledging in passing that the lawyers of the former leading executives of Yukos have also made a few errors, the rapporteur has nonetheless constructed her report solely on accusations (incidentally not supported by the documents) levelled at the law enforcement agencies. Such an approach, were it to be accepted by the Assembly, could not contribute to the usual Parliamentary Assembly practice of objectively and fully elucidating the circumstances of a matter with a view to preparing exhaustive recommendations to remedy the shortcomings.

The unnecessarily emotive language used in the memorandum clearly shows whose side the rapporteur is on.

Furthermore, Mrs Leutheusser-Schnarrenberger has stepped beyond the brief given to her by the Committee. In considering the facts of the criminal case in question, the rapporteur does not have sufficient information and grounds to conclude that the entire law enforcement and judicial system has malfunctioned or to gauge the economic context underlying the events analysed.

In this connection, we deem the draft report, presented at the meeting of the Committee on Legal Affairs and Human Rights held in Paris on 18 November 2004, inadmissible for examination at a plenary session and in need of substantial reworking.

In addition we believe it necessary to discuss the question, for consideration by the Assembly, of the need to refrain from designating as rapporteurs those who propose topics for examination by the Assembly.

*[signature]* Valery GREBENNIKOV, Russia, 18.11.04

*[signature]* Valeriy FEDOROV, Russia, 18.11.04

*[signature]* Yuri SHARANDIN, Russia, 18.11.04

*Reporting committee*: Committee on Legal Affairs and Human Rights

*Reference to committee*: Doc 10083, Reference No 2931 of 2 March 2004

*Draft resolution and draft recommendation* adopted by the Committee on 18 November 2004 with respectively 13 votes in favour and one abstention, and15 votes in favour, 3 votes against and no abstentions

*Members of the Committee*: Mr Eduard **Lintner** (*Chairperson*), Mr Dick Marty, Mr Jerzy **Jaskiernia**, Mr Erik Jurgens (*Vice-Chairpersons*), Mrs Birgitta Ahlqvist, Mr Zekeriya Akçam, Mr Athanasios **Alevras**, Mr Gulamhuseyn Alibeyli (alternate: Mr Rafael **Huseynov**), Mr Alexander **Arabadjiev**, Mr Miguel Arias, Mrs Teuta Arifi, Mr Abdülkadir **Ate•**, Mrs Maria Eduarda Azevedo, Mr Jaume **Bartumeu Cassany**, Mrs Meritxell Batet, Mrs Soledad Becerril, Mrs Marie-Louise **Bemelmans-Videc**, Mr Sali Berisha, Mr Rudolf Bindig, Mr Giorgi Bokeria, Mr Malcolm Bruce (alternate: Mr Tony **Lloyd**), Mrs Pia Christmas-Møller, Mr Boriss **Cilevics**, Mr Viorel Coifan, Mr Marcello Dell'Utri, Mr Martin Engeset, Mrs Lydie Err, Mr Václav **Exner**, Mr Valeriy **Fedorov**, Mr Robert Fico, Mr György Frunda, Mr József Gedei, Mr Stef **Goris**, Mr Valery **Grebennikov**, Mr Irfan **Gündüz**, Mrs Gultakin Hajiyeva, Mrs Karin Hakl, Mr Serhiy **Holovaty**, Mr Sergei Ivanov, Mr Roman Jaki•, Mr Neven Jurica, Mr Antti Kaikkonen, Mr Hans Kaufmann, Mr Ulrich Kelber, Mr András Kelemen, Mr Nikolay Kovalev (alternate: Mr Yuri **Sharandin**), Mr Henryk Kroll, Mr František **Kroupa**, Mr Jean-Pierre Kucheida, Mrs Sabine **Leutheusser-Schnarrenberger**, Mr Andrea **Manzella**, Mr Alberto Martins, Mr Tito Masi, Mr Jean-Louis Masson, Mr Kevin **McNamara**, Mr Philippe **Monfils**, Mr Philippe

Nachbar, Mr Tomislav Nikoli•, Mr Ionel Olteanu, Mrs Ann Ormonde (alternate: Mr Paschal **Mooney**), Mrs Agnieszka **Pasternak**, Mr Ivan Pavlov, Mr Johan Pehrson, Mr Piero Pellicini, Mrs Sólveig Pétursdóttir, Mr Rino Piscitello (alternate: Mr Milos **Budin**), Mr Petro Poroshenko, Mrs Maria Postoica, Mr Christos Pourgourides, Mr Jeffrey Pullicino Orlando, Mr Martin Raguž, Mr François Rochebloine, Mr Armen Rustamyan, Mr Michael Spindelegger, Mr Vaclov Stankevic, Mr Petro Symonenko, Mr Miltiadis Varvitsiotis (alternate: Mr Nikolaos **Dendias**), Mr John **Wilkinson**, Mrs Renate Wohlwend, Mr Vladimir Zhirinovsky, Mr Zoran Žiži•

**N.B.** *The names of those members who were present at the meeting are printed in bold.*

*Secretariat of the Committee*: Mr Schokkenbroek, Mr Schirmer, Mrs Clamer, Mr Milner

---

[1] Cf. Doc. 9396 of 26 March 2002 on the Honouring of obligations and commitments by the Russian Federation (Rapporteurs: David Atkinson (UK/EDG) and Rudolf Bindig (Germany/SOC), para. 59, and Opinion No. 193 (1996) on Russia's request for membership of the Council of Europe, para. 10. xvii.

[2] The present set-up of Lefortovo prison violates the prohibition, in Article 15 of the Constitution, of non-public restrictions of human rights, and according to Article 55 III, a federal law respecting the prohibition of disproportionate restrictions of human rights would be required. She asserted that such a law legitimising Lefortovo does not exist.

[3] Lawyer Drel, whom I asked for written clarifications, confirmed that his client had indeed been summoned for interrogation as a witness at the Prosecutor's office at 10 am on 2 July 2003. Drel wrote that he arrived at the Prosecutor's office at the said time with the news that Lebedev had been hospitalised. At this time, he could not specify the name of the hospital, because he did not have such information at 10 am. Mr Drel said he was then handed a subpoena for Mr Lebedev to show up at the Prosecutor's office for interrogation as a witness on 3 July 2003 (of which I have now received a copy), but Lebedev, Drel insists, was arrested at the hospital later on 2 July.

[4] I received copy of a medical panel report dated 30 March 2004 (chair: Dr. Edward Wasser/Toronto) based on the analysis of available medical reports, including those by Dr. Rumiantsev, who examined Mr Lebedev on 30 June 2003 at the "ON Clinic" and recommended his hospitalisation for further tests, those by doctors at the Military hospital where Mr Lebedev was arrested, on a number of medical certificates and readings produced during Mr Lebedev's detention, on the response from the Russian Federation to Mr Nielsen of the registry of the European Court of Human Rights, and finally on the analysis of symptoms described by members of the defence team who visited Mr Lebedev in prison. The 22-page document paints a worrisome picture of Mr Lebedev's state of health, sums up a number of undisputed facts, and exposes inconsistencies between different official statements regarding Mr Lebedev's medical condition. But the doctors on the panel were never allowed to examine Mr Lebedev themselves.

[5]

The two proceedings were recently joined, at the request of the defence.

[6] Mr Khodorkovsky's lawyers cited to me a decision of the Constitutional Court of the Russian Federation dated 8 April 2004 which requires a minimum of procedural protections for the accused "to bring to the court's attention his own view about such an important question as the continuing of his detention".

[7] The Court found a violation of Article 5 (3) ECHR for lack of sufficient justification of the maintenance of Mrs Letellier in pre-trial detention.

[8] I met Mr Patskov in Moscow. He confirmed these facts, and gave me his understanding of the background of this episode (cf. footnote 9 below)

[9] In this context, I am particularly worried about the following:

During my second visit to Moscow, I interviewed Mr V. Patskov, one of the lawyers I had been told beforehand had been summoned by the prosecution to witness against their clients, and who had been put under undue pressure when they refused to testify (cf. para. 36 above). Mr Patskov, who gave me the impression of being a serious professional, confirmed the aforementioned incident and went on to give me his understanding of the reasons for which he had been summoned. In his view, the main purpose was to disqualify him, for the future, from acting as a lawyer for his client, Mr Y. Reshetnikov. He had been trying for several weeks to join Mr Reshetnikov at Lefortovo prison, to where he had been transferred in the autumn of 2003 from the ordinary penal colony where Mr Reshetnikov was serving a long prison sentence for a 1999 attempt to murder Mr Rybin, an outspoken Yukos foe that I was introduced to during the meeting at the State Duma in May. Lawyer Patskov told me that when he was finally allowed into Lefortovo prison, shortly after the reported incident at the prosecutor's office, his client had asked his advice on an "offer" he had received at Lefortovo. According to Mr Patskov, his client was made to understand that his case may be favourably reviewed if he would be prepared to collaborate with the prosecution in such a way as to accuse a certain senior former Yukos executive of having been behind the attempted crime against Mr Rybin. Mr Patskov, who is convinced that Mr Reshetnikov is innocent, advised him to refuse such a "deal", in the interest of justice, but also of his client, who may well be at risk of being tricked out of his reward, or endangered. Mr Patskov gave me a harrowing account of the court proceedings against Mr Reshetnikov, who was convicted on the sole basis of his identification by Mr Rybin as the perpetrator in a seriously flawed police line-up; Mr Rybin had almost one year earlier identified another man as the perpetrator of the crime who looked completely different; in addition, evidence that might have proved Mr Reshetnikov's innocence had disappeared from the case file. Mr Reshetnikov had been convicted in the first instance of having attempted to murder Mr Rybin on behalf of unnamed Yukos executives. Mr Patskov believes that Mr Rybin orchestrated the conviction of an innocent person in order to improve his position in a business dispute with Yukos before an Austrian court. Upon appeal, the reference to Yukos was struck out of the judgment, for complete lack of evidence, but Mr Reshetnikov's conviction for attempted murder (though then without a motive) was upheld.

I cannot of course draw any conclusions from the statement made by one person, without having been able to check this story with Mr Reshetnikov himself, or even to check with the prison authorities whether Mr Reshetnikov was indeed transferred to Lefortovo in the autumn of 2003, and if so, why. I have also not been able to check Mr Reshetnikov's case file to ascertain whether Mr Patskov's affirmations as to its content are correct. But I have received copy of a written appeal to the UN Committee on Human Rights by lawyer Karinna Moskalenko, which describes in a lot of detail the proceedings against Mr Reshetnikov, confirming the version I was given by Mr Patskov during my oral interview with him. In my view, Mr Patskov's statements deserve to be carefully investigated by the competent authorities, which must also ensure Mr Reshetnikov's personal safety. Lawyer Karinna Moskalenko has confirmed that Mr Reshetnikov himself told her, too, about the illicit offer, during a visit to him in Lefortovo prison.

[10] cf. paragraph 16 of the draft resolution (judgment of the European Court of Human Rights in the Gusinskiy v. Russian Federation case).

[11] Without being able, or even intending to establish them as proven facts, as explained above under item B.

[12] cf. the "Russian Animation" case referred to in footnote 17 below; a detailed study published on 21 October 2004 by the London-based think tank "Russian Axis" on the crisis of the Russian judiciary, which also refers to the Yukos-related cases, comes to the conclusion that the Kremlin's control over the judiciary is even increasing.

[13] Mrs Kudeshkina, formerly a senior judge at the Moscow city court, gave me a detailed account of the way she was ousted from the judiciary after she refused to carry out the "instructions" of the prosecutor on how to decide a case before her. The case concerned an appeal by the prosecution against the acquittal of an investigator of the Ministry of the Interior, Pavel Saitsev, who had been accused of exceeding his powers in ordering a search of the headquarters of a furniture chain belonging to a well-connected person without first asking the permission of the prosecutor's office. The prosecutor in this case had, according to Mrs Kudeshkina, understood that she was not prepared to simply follow instructions, and put pressure on Mrs Kudeshkina and her assessors in an unspeakable manner. Mrs Kudeshkina's assessors finally resigned from the case for health reasons, and she herself was taken off the case in the midst of the procedure by the President of Moscow City Court, Mrs Egorova, who had also instructed the court's secretariat to falsify the records of the proceedings in order to eliminate the references to the prosecutor's behaviour. As a result, Mr Saitsev was convicted. Mrs Kudeshkina made the scandal public, in an interview with Radio Echo Moscow, and decided to run as an independent candidate for the State Duma. She withdrew her candidature when allegations were raised in the media that her public criticism of the judiciary was merely a ploy to gain votes, in order to disprove these allegations. Mrs Kudeshkina was later fired from her job as a judge, on the initiative of Mrs Egorova, and she lost her last appeal against this decision in October 2004.

[14] According to an article in Neue Zürcher Zeitung (NZZ) of 4 November 2004 (p. 13), Steven Theede has just announced that Yukos had just been confronted with another reassessment of USD 6.7 bn for 2002, which would bring the total tax burden to over 100% of Yukos' turnover for that year. In a commentary on the same issue, an NZZ commentator (p. 24), referring to recent "plump ordered judgments" (plumpe Auftragsurteile), calls the Russian Federation "Absurdistan".

[15] According to press reports, "a long awaited report by the Audit Chamber has concluded that flaws in legislation and the absence of a free market for oil in Russia permitted the large Russian Oil companies Yukos, Lukoil, and Sibneft to avoid paying most taxes. When the Audit Chamber announced its review of those companies, some observers expected a report citing criminal wrongdoing. Instead, the Chamber's report focused on loopholes that enabled the companies to reduce their tax payments, such as subsidiaries that served as "internal offshore companies"" (RFE/RL newsline vol. 8, no. 180, part I, 21.9.2004, p. 4).

Similarly, Igor Shuvalov, a senior presidential aide on economic affairs, said at an investment conference in Moscow on 28 October that "[M]any oil companies have used tax optimization schemes – many will have to look back at their tax history and pay more taxes." (according to UBS Daily News, October 29, 2004)

[16] according to UBS Daily News, October 29, 2004

[17] In this context, another example of an alleged "expropriation" by courts acting under instruction was brought to my attention by the President of a Hollywood cartoon studio which had been deprived of an investment it had made buying the copyright of and then modernising and marketing Soviet-era cartoon characters. The studio presented me with copies of translated documents belonging to a "secret supervisory file" attached to the case file of the legal dispute decided in the last instance by the Russian High Arbitrage Court (the court that is also in charge of the Yukos tax cases). These documents, and an expert statement provided by Mr Pashin, a highly respected reformer of the judiciary under President Yeltsin, former judge and legal scholar, have convinced the US Federal District Court of New York that the Russian court had, in

substance, simply followed instructions. The New York court, in a 90-page decision dated 8 May 2003, refused to follow the interpretation of applicable Russian law given by the Russian courts in the following terms:

"*Although the alleged flaws in the Russian judicial system are troublesome, the present record does not support a sweeping condemnation of Russia's judiciary. However, in this case, it is unnecessary to reach any broad conclusions as to the impartiality and essential fairness of the arbitrazh system as a whole. Plaintiffs have produced specific evidence – in the form of documents obtained from the High Arbitrazh Court's file – of improprieties in the specific arbitrazh court proceedings leading up to the December 18, 2001 decision.* (Lexis p 49) (...)*

*It is, furthermore, apparent that the High Arbitrazh Court's December 18, 2001 decision was strongly influenced, if not coerced, by the efforts of various Russian government officials seeking to promote "state interests." Under these circumstances the High Court's decision is entitled to no deference.*" (Lexis p 57)

[18] The European Court of Human Rights, in its judgement of 19 May 2004 in the case of Gusinskiy v. Russia, had come to the conclusion that Mr Gusinskiy's detention, on fraud charges, had been motivated by the intention of the authorities to coerce him to sign away his stake in NTV to Gazprom.

[19] It was the official Russian side which confronted me, during my meeting at the State Duma in May, with extensive and emotionally charged presentations by two "crown witnesses" (Mr Kantor and Mr Rybine), who accused Mr Khodorkovsky, Mr Lebedev, and Mr Pichugin of various criminal wrongdoings. As I do not consider the guilt or innocence of the accused persons as a subject covered by my mandate, I continue to refrain, as in the Introductory Memorandum, from discussing the content of their statements (as regards Mr Rybin, cf. footnote 9).

Adresse | **Contact us webmaster.assembly@coe.int …**