## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------------x
                                        )
RICHARD ALLEN, et al.                   )
                                        )
            Plaintiffs,                  )      Case No: 1:05-cv-02077 (CKK)
                                        )      Hon. Colleen Kollar-Kotelly
      v.                                 )
                                        )
RUSSIAN FEDERATION, et al.               )
                                        )
            Defendants.                  )
                                        )
-------------------------------------------------------x
```

## CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# EXHIBIT 35

<u>IN THE BOW STREET MAGISTRATES COURT</u>

<u>BETWEEN</u>

THE RUSSIAN FEDERATION

- and -

ALEXANDER TEMERKO

---

WITNESS STATEMENT OF YURI MARKOVICH SCHMIDT

---

**I, Yuri Markovich Schmidt of Yuri Schmidt & Partners, Gagarinskaya Street, 12-42, 191187, St Petersburg, Russian Federation, WILL SAY AS FOLLOWS:-**

1. I am an advocate in independent practice based in St Petersburg. Since February 2004 I have been instructed by Mr Mikhail Borisovich Khodorkovsky to defend him in relation to the criminal charges he has faced. I am making this witness statement to assist the Bow Street Magistrates Court in understanding the harassment and intimidation of Khodorkovsky's lawyers, my involvement in the trial and cassational appeal, as well as my understanding of the political motivation that has underpinned the Khodorkovsky prosecution.

1

2.    The scope of this witness statement is limited because the Khodorkovsky case is so factually dense and widespread, there is insufficient time – and insufficient space within a relatively short statement – to be comprehensive. Necessarily, therefore, this is a selection of the evidence I could give and is not even a fully representative cross-section of the various main issues.

**Personal background**

3.    I am a criminal defence lawyer specialising particularly in human rights cases and cases that have political aspects. I was born on 10 May 1937 in what is now St. Petersburg. In 1960, I graduated from the Law Department at the University of Leningrad and was accepted into the Leningrad City Bar Association. I have been in practice for 45 years and I have specialised in human rights for the last 17 years. My experience therefore spans the Soviet period as well as latter day Russia, and long pre-dates Russian ratification of the European Convention on Human Rights. I am considered to be one of the foremost trial lawyers in Russia.

4.    In my function as a lawyer I am not afraid to expose injustice, such as abuse of the criminal system. My adherence to this belief is rooted in my own history. Three weeks after I was born, my father was arrested and put behind bars for 19 years as an enemy of the state. My parents had met in exile in Siberia in 1935. Their marriage was not registered, so my mother and I avoided being labelled as members of the family of a traitor to the Motherland.

5.    In 1986, during the Soviet period, I was disbarred for so-called dissident activity. It was at the instigation of the Regional Executive Committee of the Soviet Union Communist Party. In 1987, after contesting the disbarment for a year and half, the Soviet Supreme Court reinstated me as 'fully rehabilitated' and with compensation.

6.    In 1988–1989 I defended Arkady Manucharov, leader of the Armenians of Nagorny Karabakh, and in 1991 I defended Torez Kulumbekov, head of the South Ossetian Republic. In 1992-1993 I acted for Abdumannob Pulatov, a well-known journalist

2

and human rights activist, before the Uzbekistan Supreme Court. In 1996-1997, I pleaded a case to protect the rights of a retired Russian serviceman, S. Miroshnichenko, who was being illegally forced by the government of Estonia to leave the country. Following the assassination of Galina Starovoitova, the State Duma[1] deputy[2], I assumed the duties of the family's representative in the criminal investigation that followed.

7.    I then successfully defended two journalists from Russia's Perm region who had been accused by the FSB (Federal Security Service, formerly the KGB) of divulging state secrets in an article in 2003. In 2004 I represented the family of Sergei Yushenkov, another State Duma deputy, during the process of investigating his murder. In the last couple of years I also acted for Samodurov, the director of the A.D.Sakharov Museum Center, in the freedom of expression case regarding the "Careful-Religion!" exhibition.

8.    I think one of the most important cases I have done was the case of Alexander Nikitin who was accused of high treason. Nikitin was arrested in 1996 after he contributed to a report by the Norwegian environmental group Bellona on the dangers posed by radioactive pollution in the Arctic seas. He was acquitted in 1999. In 2000 the Supreme Court of Russia rejected the prosecution's attempts to overturn the acquittal.

9.    In 1991 I formed the Russian Committee of Lawyers in Defence of Human Rights. In 1993, Helsinki Watch selected me to be one of the international monitors honoured by Human Rights Watch at its observance of Human Rights Day. In 1997 I was privileged to be named "Lawyer of the Year" and received "Femida" – Russia's highest honour in jurisprudence. In 1999 I was honoured by the International League of Human Rights for my work in that field. This year the Andrei D. Sakharov Foundation awarded me the Sakharov medal, which was presented to me by Yelena G. Bonner, Sakharov's widow.

---

[1] Russian lower house of parliament.
[2] Elected member of the State Duma.

**My involvement in Khodorkovsky's criminal case**

10.  My evidence about the nature of the MBK[3] case and the treatment of Khodorkovsky and his lawyers is based on my participation in the case but is also informed by my experience of the criminal legal system in Russia over many years and my experience of the state's potential to manipulate it for ulterior motives. But I must make clear that I have not approached the case with unshakable predetermined views that the establishment is invariably a perpetrator and the accused invariably its victim. My status, my independence and my candour ensure I speak the truth as I experience it, whether it be that the MBK case and related prosecutions are due process of law or a politically motivated abuse of the Russian criminal justice system.

11.  Khodorkovsky was detained on 25 October 2003. I attended the Yukos offices in November 2003 for a preliminary discussion about the case and in February 2004 I received a request from Khodorkovsky seeking my assistance. I had no previous dealings with Khodorkovsky or with Yukos.

12.  I co-defended with Mr Genrikh Padva at the trial stage as I did during the cassational appeal hearing in September 2005. Padva and I have together been the two most senior members of Khodorkovsky's criminal defence team. The MBK case is extremely large in terms of the sheer magnitude of the case materials – it started with over 400 volumes of documentation and is now approaching 500 volumes[4]. It was impossible for any one lawyer to master all of the details of each of the charges. Each lawyer was therefore allocated a specific aspect of the case to deal with and I was in charge of the allegations under Article 198 relating to personal tax evasion.

---

[3] For the sake of variation, I sometimes refer to Khodorkovsky by his commonly used initials.
[4] Precise figures vary (depending on how the materials are organised or printed off), but we started with about 450 volumes (or 150,000 pages – many double sided) of documents in the case materials, then added about 6,500 pages of first instance trial transcripts, then the verdict and sentence comprised about 600 pages (the first instance verdict took the Meschansky District Court 17 days to read), then about 700 pages were filed by Khodorkovsky and his attorneys against the verdict of the first instance court.

4

**Intimidation of lawyers**

*Introduction*

13.  From the time of Khodorkovsky's detention there were indications that the view of the authorities was that defence lawyers are a nuisance just trying to impede the prosecution, though could be used as sources of information. At the investigation stage the General Prosecutor's Office (GPO) attempted to extract confidential information from some of the lawyers and, later at the SIZOs,[5] sought to extract confidential documents. For example, the GPO attempted to interrogate Khodorkovsky's lawyer Anton Drel on 17 October 2003 and again on 27 October 2003 – just before and just after Khodorkovsky's detention. Drel stood his ground and resisted, supported by the Council of the Moscow Bar Association who said it would be a breach of his professional ethics to submit.

14.  Now, more than two years later, the treatment of Khodorkovsky's criminal defence lawyers and of the defence lawyers in the greater MBK/Yukos case far transcends anything that could be dismissed as inadvertent interference or the odd isolated misunderstanding. Nine of Khodorkovsky's lawyers have risked disbarment.[6] Further, several of his lawyers have had their offices unlawfully searched and confidential and privileged documents seized (see below). There have also endured personal body searches when visiting Khodorkovsky (and recently two of his lawyers, both women, were made to strip down to their underwear before being allowed to see him).

15.  In giving this statement I have endeavoured to assemble a catalogue of lawyers who have been attacked in one way or another while acting for Khodorkovsky or Yukos or in related cases. I set it out below, but it is well short of complete. There are

---

[5] SIZO Matrosskaya tishina – the detention facility in which Khodorkovsky was held pre-trial and during the trial.

[6] On 23 September 2005, the day after the cassational appeal hearing and pronouncement that the appeal was dismissed, the GPO sent a request to the Ministry of Justice seeking to have the following stripped of the licences to practice: Anton Drel, Elena Levina, Karinna Moskalenko, Denis Dyatlev, Igor Mikheev, Vladimir Sergeev, Olga Artyukhova, Albert Mkrtychev. I was later added to the list being accused of "lack of respect to the court and the rule of law". Of these nine lawyers four were reported to their respective Bar Associations by the Ministry, but they were cleared in the consequential disciplinary proceedings: Elena Levina, Anton Drel, Denis Dyatlev and myself. Another of the nine, Olga Artyukhova, disbarred herself on 6 October 2005. Another, Albert Mkrtychev, appears to be about to be reported to his Bar Association.

some I have left out deliberately, some whose names I don't know and some I've probably overlooked or don't know about. The deliberate omissions are because some lawyers have been so intimidated and feel so vulnerable, they would not even have their names appear here. The ones whose names I don't know include, for example, the ALM Feldmans 7 lawyers (other than Agranovskaya and Ivlev, whom I name), virtually all of whom were called into the GPO and systematically interrogated following searches of the ALM Feldmans premises. Finally, the catalogue focuses on independent lawyers, so it omits the Yukos in-house lawyer (though they, too, have been targeted).

16. The point of the catalogue is that it defies belief that so many lawyers could coincidentally face so many misfortunes accidentally or by genuine due process of law. We are used to seeing defence lawyers harassed and intimidated in Russia, but the MBK/Yukos case stands in a class of its own when it comes to contempt for defence lawyers and actual attacks on them to control them through intimidation, to extract data from them in defiance of privilege and to serve as a warning to other lawyers in the case.

17. Two factors account for the catalogue that follows:

   a) there was a planned and coordinated attack focusing on the Yukos Legal Department and the firm ALM Feldmans in the run up to the forced sale of Yuganskneftegaz (ultimately acquired by state-controlled oil company Rosneft[8]); and

   b) the prevailing anti-lawyer culture promoted by the state authorities attacking Khodorkovsky/Yukos gave (and still gives) a general licence to harass lawyers and disrespect legal professional privileges.

---

[7] ALM Feldmans was a most prestigious and successful law firm in Moscow, extensively involved in acting for Yukos as well as Khodorkovsky and a number of other prominent Yukos figures.
[8] It is relevant to note that the criminal allegation against Mr Temerko was initially made by the head of Rosneft and that Igor Sechin, the senior Presidential Administration official believed by MBK and others to be driving the Khodorkovsky case, is the Chairman of the Board of Rosneft.

*Catalogue of lawyers attacked*

18.   The catalogue I have assembled is as follows:-

*AGRANOVSKAYA, Elena*
The Managing Partner of ALM Feldmans (a law firm acting for Khodorkovsky and Yukos) – detained, interrogated and still facing charges.

*AMSTERDAM, Robert*
On the night of 22 September 2005 (when the cassational appeal was heard) Robert Amsterdam, a lawyer within Khodorkovsky's international team, was visited in his hotel room, had his Russia visa cancelled and was required to leave Russia the next day.

*ARTYUKHOVA, Olga*
She was searched after seeing Khodorkovsky in November 2003. Documents were seized from her. It was alleged, wholly incorrectly, that they contained instructions from Khodorkovsky to interfere with witnesses. The authorities moved to institute disciplinary proceedings against her but she was eventually cleared. On 23 September 2005 the GPO once against initiated a process to have her disbarred and on 6 October 2005 she submitted to the pressure and disbarred herself.

*BARU, Yevgeny*
Yevgeni Baru was searched by officials at the Matrosskaya tishina SIZO as a result of which documents from the defence case were seized.

*DREL, Anton*
Anton Drel is a lawyer acting for Khodorkovsky and Platon Lebedev. The GPO tried several times to question Drel as a witness even though to do so would violate lawyer/client confidentiality. His offices were searched in 2003 and in October 2005. On 23 September 2005 the GPO initiated a process to have him disbarred.

*DYATLEV, Denis*
Denis Dyatlev, a lawyer acting for Khodorkovsky, had his office searched. He faced disbarment proceedings after the cassational hearing.

*GOFSTEIN, Alexander*
Gofstein, a lawyer acting for various people including Alexander Temerko himself and also Svetlana Bakhmina, was seriously beaten before witnesses, requiring hospitalisation.

*IVLEV, Pavel*

7

Deputy Managing Partner of ALM Feldmans.  Also interrogated by the GPO, forced abroad and facing charges.  It was reported in the press that Agranovskaya (see above) was detained as a hostage to coerce Ivlev to return.

### KAGANER, Georgy
One of Pichugin's lawyers, Georgy Kaganer faced disciplinary proceedings and was cleared.

### KOSTROMINA, Ksenia
Pichugin's lawyer dealing with the ECHR also faced disciplinary proceedings and was cleared.

### KOLESNIKOV, Ivan
Former member of the law firm ALM Feldmans, Ivan Kolesnikov is now in Cyprus facing extradition proceedings.

### KUREPIN, Dmitry
One of Pichugin's lawyers.  Also faced disciplinary charges and was cleared.

### LEVINA, Elena
Levina (and others of us) were denied access to our clients, especially during a so-called quarantine period before the cassational stage (September 2005).  As one of Khodorkovsky's trial lawyers she faced disbarment proceedings after the cassational hearing.  She was strip searched in November 2005 when she visited Khodorkovsky at Krasnokamensk penal colony.

### LIPTSER, Elena
Liptser is one of Lebedev's lawyers. She was denied access to her client and this now forms part of a petition to the European Court of Human Rights.

### MIKHEEV, Igor
A Khodorkovsky lawyer who faced disbarment following the cassational appeal hearing.

### MKRTYCHEV, Albert
The office of Albert Mkrtychev, one of Khodorkovsky's lawyers, was searched in October 2005.  At risk of disbarment.

### MOSKALENKO, Karinna
Karinna Moskalenko has been denied access to Khodorkovsky to discuss his ECHR case.  Her offices have been subjected to sudden and unexpected audits (February 2005).  She faced disbarment proceedings after the cassational hearing.

8

*SCHMIDT, Yuri*
The episodes involving me which I found the most intimidatory were the 2004 search and consequent public allegation against me (see below), and also the recent effort to disbar me.

*SERGEEV, Vladimir*
Another Khodorkovsky lawyer who faced disbarment following the cassational appeal hearing.

*ZHIDKOV, Mikhail*
One of Pichugin's lawyers. *Newsru* and *Kommersant* reported on 8 October 2005 that on 1 October 2005 he was severely beaten up and his house in Shevelkino village was robbed (refer to tab 1). The seven bandits claimed to be militia when they stormed the house. Zhidkov has also faced disbarment proceedings.

I cannot presume that every lawyer listed in the above catalogue was subjected to harassment and/or intimidation because of their involvement in the MBK/Yukos case but I can say that the majority were.

The treatment suffered by the above includes the following:-
exclusion from court
body searches
denial of access to clients
searches of work
seizure of documents
attempts to obtain privileged information about their clients
interference with their work as lawyers[9]
disciplinary proceedings and attempts to disbar them
preventing privileged communication between lawyer and client
suspected surveillance, including telephone tapping
prosecution, detention, interrogation
physical assaults
pressure to leave Russia
actual expulsion from Russia

**My treatment in March 2004**

19.    I am one of the lawyers in the above catalogue because my status as a senior member of the legal profession has not insulated me from attack. I have faced

---

[9] For example, approaches to prospective witnesses being seen as attempts to influence witnesses and the obstruction of justice (eg Artykhova)

search and seizure, the smear of a public allegation of impropriety and attempted disbarment. I can only suppose that the objective was to discredit me and bring an end to my career. The details are as follows.

20.    On 11 March 2004 I went to see Khodorkovsky at the SIZO (the Matrosskaya tishina detention facility). At about 12.20pm I left the SIZO. The inspector at the first control post demanded that I should hand over to her for inspection a transparent plastic paper-case that I had with me. I refused, explaining that it was my advocate's file and inviolable. In response, the inspector just snatched the paper-case from me, opened it, looked through it and pulled out a handwritten document. I protested against the unlawful search and I demanded the seized document to be returned to me. I explained that it was part of my professional case file and therefore confidential, and also that there was nothing "criminal" in it. Nevertheless, it was not returned and I was told to accompany her to the head of the SIZO. I did so, and a "report of seizure" was drawn up. During this process, I observed that at least four people read the confidential note.

21.    This was a premeditated contempt, intended to intimidate and assert control over me and destabilise me psychologically and, by example, to do the same in respect of the other, more junior, lawyers. I believe that the SIZO officials were only executors and that those who gave the steer were within the GPO. The fact that the document was not kept confidential but that at least four other people read it supports the view that interest in the document was excited by the GPO's presence in the matter.

22.    I wrote on 15 March 2004 to the Council of Federal Bar and to the Council of the Moscow Bar regarding search and seizure on 11 March 2004, expressing my concern (refer tab 2).

23. I later discovered that the authorities had meanwhile been quick to try to capitalise on the seizure of my document on 11 March. It transpires that on 13 March 2004 Karimov, the senior GPO official in charge of the Khodorkovsky case, wrote to Colonel S A Denisov at the Ministry of Justice stating that the note seized from me "contains instruction on counteraction to investigation by way of influence on the investigation through mass media" (see his letter attached as tab 3).

24. It is chilling that the document in question was being used to ground such an allegation. I can attach a copy of the seized document because it was returned to me by Karimov on 8 April 2004, saying he had no further need for it. The 8 April Karimov letter and the document itself are attached at tab 4. The document itself comprises two sheets. The first sheet was written by Mr Alexey Simonov, a reputed human rights defender heading the Glasnost Defence Foundation. It is in Simonov's own hand and is rough text towards a proposed letter in support of MBK (the letter envisaged was indeed published some time later). As one can clearly read, the text is essentially in Khodorkovsky's defence and asserts his prosecution is unfounded. The second sheet is my own handwriting and captures a thought that occurred to me when reading Simonov's note, namely that MBK is a victim of Russia's transitional process. Both notes – Simonov's and mine – were written quite a long time before my 11 March visit to MBK. But even if I had written both notes in Khodorkovsky's presence or upon his dictation, this would not have involved any breach of Russian law. What's unlawful in the Russian system is to take out a prisoner's correspondence, meaning correspondence in a prisoner's own hand.

25. So the seized document manifestly involved no illegality as the handwriting was not Khodorkovsky's and the content was benign. Against this background one asks the question, how on earth did a senior figure like Karimov compound the mistake made at the SIZO by deliberately asserting to the Ministry of Justice that the document "contains instruction on counteraction to investigation by way of influence on the investigation through mass media"; in other words, instructions on counteracting the

11

GPO investigation by asserting in the mass media that Khodorkovsky is innocent.

26. It doesn't end there, because Colonel Denisov then wrote on 26 March 2004 to the head of the Main Directorate of the Ministry of Justice (wrongly asserting the document had been produced voluntarily by me and failing to identify who wrote it) requesting measures to be taken against me for "gross violation of laws": refer tab 5.

27. No one saw fit to address the question of who authored the document. It is implicit from the 26 March 2004 letter that Khodorkovsky did, because that letter refers to the law that it intended "to prevent an attempt of carrying away the defendant's notes bypassing the administration". Moreover, the premise is that expressing MBK's innocence in the media would subvert his prosecution. Therefore on one or both grounds I perpetrated "gross violation of laws".

28. The head of the Main Directorate of the Ministry of Justice might have been expected to identify to stop this farce at once. Instead, it was decided to hold a press conference and publicly accuse me of attempting to smuggle Khodorkovsky's correspondence out of the SIZO. To be more accurate, the matter was put as a statement of fact, not an accusation: it was asserted that "correspondence had been repeatedly seized" and that I was one of those who "had been caught in the act".

29. The manifest unfoundedness of this accusation cannot really have been overlooked by the officials at the SIZO, Mr Karimov at the GPO, Colonel Denisov at the Ministry of Justice, the head of that Ministry's Main Directorate as well as the deputy Justice Minister who gave the press conference. The reasonable conclusion is that an event (the forcible seizure of a document which might have been correspondence from MBK or incitement to commit a criminal offence, but manifestly wasn't) was disingenuously and cynically exploited to make political capital, denigrating Khodorkovsky and one of his principal lawyers and signalling to his other lawyers that no one, not even Yuri Schmidt, will stand in the authorities'

12

way.

30. The press conference was reported in the newspaper Izvestiya on 9 April 2004. I responded to the newspaper report in a letter attached as tab 6. Then, as I have already said, I received the seized document back with Karimov's 8 April letter in which he said "there is no more need" for it. His purpose seems to have been achieved by the deputy Minister's press conference. In fact, though, the matter did not end there because on 7 May 2004 the Ministry of Justice Main Directorate wrote to the St Petersburg Bar to have them initiate disciplinary proceedings against me. Sanity finally prevailed, though, because unsurprisingly the disciplinary proceedings completely cleared me, concluding I was entitled to take the document into and out of the SIZO and that it was privileged. Khodorkovsky's right to legal professional privilege, allied to his constitutional rights to defence and legal assistance, had been breached. It is notable that the decision exonerating me shows that the Bar wrote to the Ministry of Justice asking if they had determined who wrote the document in question. It is recorded that the Ministry's reply was to the effect that the question simply had not been addressed!

31. As I said earlier, it is chilling: a non-event was ruthlessly and arrogantly exploited to smear MBK and me in public. I lodged a formal complaint with the court. The court rejected this complaint, but I appealed it higher. The Presidium sent it back to the City Court for reconsideration and it's still pending a decision.

32. Although I personally was not frightened by the episode, because I knew that I had done absolutely nothing wrong, the whole incident caused me considerable anger, frustration and distress, not to mention loss of valuable time. Undoubtedly it damaged me in some public quarters and undoubtedly it also chilled other lawyers.

*Attempts to disbar me (and others)*

33. After the cassational hearing (22 September 2005) I faced a second attempt by the authorities to have me disciplined. On this occasion the authorities' expressed

13

intention was to see me disbarred. This would not only discredit me, but also end my legal career and take away my livelihood.

34. The background is that as early as the preliminary inquiry stage, Khodorkovsky filed a written notice to inform the court that he required only two lawyers to be permanently present at the court sessions, Genrikh Padva and Elena Levina. He did not need other lawyers to be in permanent attendance in the courtroom as each of them had his or her own assignments and activities to undertake for the defence. It can readily be seen from the court records that for much of the time I was not personally present during the proceedings.

35. On 31 May 2005, sentence was pronounced. I duly filed an appeal. On 11 August 2005 I met Khodorkovsky at the SIZO and he told me that there shouldn't be any need for me to be formally engaged (by the agreement system we have in Russia) to act for him at the hearing. He asked me to focus instead on other aspects of his case, in particular his prospective remedies under the European Convention on Human Rights. He confirmed that decision at our next meeting, on 9 September 2005.

36. Meanwhile, Khodorkovsky decided to stand for the Duma. He told me this when I was visiting him at the SIZO one day in early August 2005. It was definitely prior to 11 August 2005, because I referred to it in an interview on that date: see my Ekho Moskvy interview attached as tab 7. I should explain that Khodorkovsky kept apolitical during the trial and hoped the court would be guided by the law and that it would assert its independence. He held me back from making any direct political statements. However, once the verdict was pronounced, his restraint dissolved. He wished to give public vent to his political views and views on the improvement of socio-political conditions in Russia. He of course understood that he would be serving a long sentence, but felt that if he first became an official candidate in the forthcoming Duma elections (which were to be held on 7 December 2005), he would have the legal right to lead a campaign. He perfectly understood that he would not ultimately be permitted to serve in the Duma, but he would at least have a political

14

platform albeit only for a few a few weeks or months. On 4 August 2005 – about
the time that Khodorkovsky divulged in confidence (supposedly) that he planned to
go political and announce his candidacy for the Duma – he also publicly identified
Igor Sechin, the senior Presidential Administration figure close to President Putin, as
"the organizer and driving force behind the Yukos case": see the Vedomosti article
of 4 August 2005 attached as tab 8.

37.   This is exactly what the authorities did not want. Suddenly Khodorkovsky was an
active political opponent. He had been a perceived political threat in 2003, when the
serious attack on him started, and now like a bolt from the blue he had changed
overnight from being a convicted prisoner (subject to getting the cassational appeal
out of the way) to a politician with a voice. Publicly the Kremlin took it stoically,
but no one was in any doubt that this was their worst nightmare. As Irina
Khakamada said in Moscow News 10 August 2005, when MBK's intentions became
public: "If he agrees, the authorities may get so enraged that he will never get out of
jail" (attached as tab 9). Stanislav Belkovsky, director of the National Strategy
Institute, is quoted in the same article as having observed:

   *"If he is taken off the registration, or if the appellation [cassational appeal] is sped
   up, it will prove the authorities are afraid of him. If he is not taken off – during his
   campaign he will advertise his opinions and criticize the authorities, which will
   mobilize his supporters and lower the President's rating".*

38.   Simply put, Khodorkovsky would be stopped in his political tracks once the
suspensive effect of the cassational appeal ended, therefore that appeal had to be
expedited.

39.   It is a fact that all of a sudden, following Khodorkovsky revelation in the SIZO that
he would stand for the Duma, developments unfolded at a considerable pace. A
procedure that would take a long time to prepare was suddenly being set to
breathtakingly tight time constraints. In particular, access to the trial protocol was

restricted and it was announced that any objections to it had to be lodged by 25 August 2005. As I am recorded as having observed and predicted in the 11 August Ekho Moskvy interview:

*"precisely at the time when the information on Khodorkovsky's plans became known, which was during a meeting with the lawyers, all the lawyers received notice that they had to urgently read the minutes of the court session and submit their remarks before August 25. I believe that the first reaction to his initiative [standing for the Duma] will be to speed up the progress of the case at the Moscow City Court, so that after the sentence comes into force the question of his running for the Duma would be closed".*

40. There was a pitiful scramble to try to raise objections to the protocol by 25 August with only woefully inadequate access to the protocol.

41. Next, as soon as the 25 August deadline expired, ending the period for familiarisation with the trial protocol and objections to it, a date was fixed for the cassational appeal hearing. Notice of hearing was faxed through to us on 26 August, the very next day although some objections, posted on 23 August, had apparently not arrived until 1 or 2 September. The hearing was fixed for a date less than three weeks away – 14 September 2005. By the time the case materials were transferred to the Moscow City Court on or around 2 September 2005, the court only had seven days to prepare for the appeal hearing. It was a travesty, given the extent of the materials involved and the gravity of the matter. There was now even less concern about at least giving the proceedings a veneer of due process and fairness: instead of the hearing being fixed by the Moscow City Court, in the absence of the appropriate judicial authorities (it was August), the date was fixed by the acting chairman of the first instance court (Kurdyukov); though it was beyond the competence of his office to do so.

16

42. For the avoidance of doubt, I should explain that it cannot be argued that MBK cynically put himself forward for election just to get immunity, because even if he got as far as being elected, once the appeal was dismissed and the conviction finalised, he would have been stripped of it. There was no question of getting and keeping immunity or otherwise overturning or blocking the conviction by means of an election.

43. This, therefore, was the context in which a hearing was convened for 14 September 2005. However, not having an agreement to represent Khodorkovsky at that hearing, I was not in attendance. Pursuant to Part 4, Article 49 of the Code of Criminal Procedure of the Russian Federation, "an attorney is allowed to participate in a criminal case as a defense lawyer, subject to presentation of an attorney's certificate and a warrant" [i.e. the documentation evidencing the formal agreement between lawyer and client]. Since I was not instructed to appear at the cassational appeal, I did not have such documentation. I was not entitled to be heard at that hearing and the judges were not authorised to allow me to participate.

44. Therefore I was not present at the Moscow City Court on 14 September 2005. I was in St Petersburg. It was Padva who was required to be there but, on the day, he was in hospital. It was a serious matter (I believe he required some sort of exploratory operation for suspected cancer). Suffice it to say that not even the court, once it had make enquiries, doubted Padva's reasons for not being present.

45. The hearing had to be adjourned. There was great consternation in the opposite camp. The adjournment was a short one – just to 19 September 2005. I was keeping track of events, of course, but these developments did not concern me as I was not directly involved. On 19 September I travelled to Finland to attend a meeting (planned some time prior to the 14th).

46. On 19 September, I was contacted and informed that due to Padva still being indisposed, Khodorkovsky wished to instruct me to handle his cassational appeal. I

17

readily accepted but required a further adjournment in order to get to Moscow. Whatever my whereabouts on that day, whether in Finland, St Petersburg or Moscow, I could not have stepped straight into Padva's shoes because of the time I would have needed to prepare. I later found out that the case had been adjourned to 22 September.

47.  On the 19th my deputy sent a telegram and fax to the Moscow City Court confirming that I would attend on the next occasion. At 7pm that evening a courier came from the bailiff service requiring the original of the telegram and fax. I drove back from Finland, arriving in St Petersburg on the night of the 20th. I found confirmation that the hearing on the 19th had been adjourned and that the case was now fixed for 22 September.

48.  In fact, there had also been a hearing that day – the 20th – but I had not realized it at the time. At the 20 September hearing the court issued a determination to assign a public defender to MBK. No name was mentioned. On 21 September, without a hearing, the court decided to appoint me. Why appoint me as a public defender when it had already been conveyed that I would be attending in any event? Probably in an attempt to gain greater accountability and control in respect of the defence lawyers, thereby enhancing the prospects of an effective hearing on the next occasion.

49.  On 22 September 2005 I attended the Moscow City Court. Padva, who by now was out of hospital, also attended and we both made various submissions. It was acknowledged in court that I was attending pursuant to my appointment as a defender appointed by the court. None of the judges asked me any questions about my whereabouts on the previous dated on which the court had sat. I did not expect any such questions – it was perfectly clear to everyone what my position was and what it previously had been. My conduct prior to 22nd was a complete non-issue as far as the court was concerned. Likewise, the prosecution on the 22nd said nothing whatsoever about whether I had been expected to attend on any previous day or

18

whether I had failed to explain my non-attendance.

50. The first petition of the day was an oral petition asking for an adjournment for a day to confer with the client at the SIZO. The court rejected the petition and only permitted me a short meeting within the court premises, which did not allow for a confidential meeting with the client. Thus, MBK was not given adequate time to meet with either Padva or myself to effectively prepare his defence in the cassational proceedings. On the day, I filed a petition concerned with violations observed in fixing the date for the cassational hearing (see tab 10) and MBK put in a petition asking for eight weeks to prepare for the cassational hearing. The judge should have dealt promptly and in order with these and each of the other petitions that were made that day. Instead, they were dealt with on a group basis. All the petitions were refused.

51. The court normally sits to 6pm. That day it sat to about 9.30pm. They seemed intent on completing the matter that day. The decision was announced orally at the end, after the three judges had taken less than an hour to consider their decision. It was not unusual to complete a cassational hearing in a day, but not in a case with 150,000 pages of documents and with such a short period between the completion of the trial and the cassational hearing itself. I have never come across anything like it before.

52. The decision of the Moscow City Court was to vary the verdict and reduce the sentence from nine years to eight years. This drew attention away from the fact that there had been an extraordinary push to complete the case and solidify the verdict. It was self-evidence that the court could not have had the time to consider do the bare minimum essential reading in order to conduct and consider the cassational appeal.

53. The court's written decision followed much later, when the judges had had more time in which to reflect and craft their conclusions.

19

54. Meanwhile, Khodorkovsky's letter of registration in respect of his Duma candidacy never arrived. It should have been posted on his behalf by the SIZO authorities on 7 September. The chairman of the election committee knew it was on the way and the head of the SIZO insisted it had already been sent by post, so couldn't be delivered by hand. It was obvious that the letter of registration had been purposely delayed before reaching the elections commission after the verdict had been confirmed taking almost three weeks to get across Moscow. *Interfax* reported on 29 September 2005:

> *"Mikhail Khodorkovsky cannot be registered as a candidate in the State Duma by-election, Central Elections Commission Chairman Alexander Veshnyakov said on September 29. 'The fact that the elections commission has received an application from Khodorkovsky is insignificant, because the sentence given to Khodorkovsky has been confirmed and he cannot be registered as a candidate any more,' he said."*

55. The objective had been achieved. As far as I am aware, Khodorkovsky was never registered as a Duma candidate and now he never would be. The cassational appeal had been rushed through with the most extraordinary speed, without there being any serious possibility of proper consideration.

56. The race had been won, but the authorities had been forced to lose credibility by having to make such indecent haste. It was time to punish the lawyers.

57. The very next day after the cassational appeal was dismissed – 23 September 2005 – there was a press conference at which the GPO announced their intention to seek disbarment of nine of Khodorkovsky's lawyers. When the GPO included me, they stated in a letter by Ms Galina Volchetskaya:

> *"Although duly notified of the dates for the appeal hearing by the court of cassation, defense lawyer Yuri Schmidt did not attend the court sessions on 14, 19, and 20*

20

*September 2005, nor did he notify the court of the reasons for his absence".*

58.   I indeed knew about the hearing due to take place on 14 September 2005 but indisputably, like the other hearings before 22 September, strictly speaking it was not my business to attend and neither the court nor the GPO suggested otherwise when I appeared on the 22nd.   Nor was it my place to give "the reasons for my absence".   In any event, a comprehensive explanation of such reasons had in any event been given to the court directly by Khodorkovsky when explaining that an agreement to handle his case in the cassational court had only been made with Padva.

59.   In my later statement to the St Petersburg Bar I stated:

*The true reason for the prosecution by the Prosecutor General's Office of Mikhail Khodorkovsky's defence lawyers is categorically not any mythical "dereliction of the attorney's duty", "unprofessional conduct" or "disclaimer of defence" spun out of thin air, but the fear of not acceding to an illegal instruction coming from higher authorities on conducting the cassational trial within a period of time that was indecently short. At all stages of the proceedings, including the cassational trial, the Prosecutor's Office was least concerned about the observance of Mikhail Khodorkovsky's rights. Behind this pretence, there is also a covert desire to take revenge on me for my active and uncompromising position and for the multiple statements [I have made] in the Russian and foreign press exposing the political motivation of the case."*

60.   I am glad to say that the Qualification Commission of the St Petersburg Chamber of Advocates (i.e. the St Petersburg Bar) refused to strip me of my licence.

**The court proceedings**

61.   The trial began on 16 June 2004 and the judgment was finally given almost a year later on 31 May 2005.  Given the length and factual complexity of the proceedings I

21

cannot give an exhaustive description of the numerous instances of unfairness. However, I will endeavour to provide a few examples of breaches of Khodorkovsky's rights to have a fair trial. Of course, I have already coincidentally covered aspects of this topic.

*Refusal to disclose exculpatory material*

62. In January 2003 President Putin requested the Prime Minister to investigate Khodorkovsky's involvement in the purchase of shares in 1994 in Apatit. In April 2003 the General Prosecutor of the Russian Federation, Mr Ustinov, wrote to President Putin informing him that the GPO had concluded that there were no grounds to take criminal action in relation to Apatit. On 29 April 2003 Prime Minister Kasyanov wrote to President Putin informing him that the Ministry of Internal Affairs had stated that they would not commence a criminal prosecution. On 20 June 2003 criminal case number 18/41-03 was opened nonetheless. What had changed in such a short space of time? We asked for disclosure of all of the surrounding documents relating to the investigation by the Prime Minister and by the General Prosecutor but our applications were repeatedly refused. Why? The documents would have included the investigations by various government departments and I have no doubt commentary on the real political motivation that was actually driving the decision to begin criminal proceedings.

63. Also at about this time the General Prosecutor decided to initiate a criminal case in relation to the payment of taxes by promissory notes in the closed administrative zones (the "ZATOs"[10]) in 1999 and 2000. Previous tax investigations had revealed that there was no basis to bring criminal charges. Further, independent expert analysis that had been commissioned showed that there had been no 'damage' or loss to the ZATO concerned – hence there was no criminality. All of this was made

---

[10] These special administrative territories were governed by federal law, under which all taxes collected within a ZATOs territory were retained for its own budget. ZATOs were authorised to provide tax benefits within its region. In turn, the companies receiving these tax benefits were required to transfer a percentage of their tax savings to additional budgetary funds of the ZATO.

22

quite clear in the decree by Prosecutor Biryukhov dated 18 July 2003 when he transferred the tax investigation to the GPO:

*"According to the conclusion of legal and economical expert review on the case, there were no losses caused to the federal budget and municipal budget of ZATO Lesnoy town, as a result of granting tax privileges, receiving taxes in the form of OAO NK "YUKOS" promissory notes and fulfilling the investment programme. The detected violations of the acting legislation in the form of carrying out these financial operations may be regarded as a subject matter of administrative and economic legislation. The receipt of taxes by way of promissory notes issued by OAO NK "YUKOS" was registered in the municipal budget. For the 1999-2000 fiscal year, the federal budget received payment only in the monetary form.*

*In accordance with the expert opinion, there were found no losses inflicted to the federal and municipal budgets by the decisions of officials of the Town Administration and Inspectorate of Taxes and Duties for the ZATO Lesnoy town. That is why, on 29.08.2002, the Prosecutor's Office for Sverdlovsk Region terminated the criminal proceedings on the basis of para. 2 of part 4 of Article 24 of the Criminal Procedures Code of the RF"* (refer to tab 11).

64.  Unsurprisingly we asked that the expert report should be disclosed. After all, it was highly relevant to whether Khodorkovsky had committed any corporate tax evasion. The applications were refused. Similarly our applications for the report of Bochko, a distinguished economist, to be admitted to the case files was refused. Bochko and colleagues from the Institute of Economy of the Ural Branch of Russian Academy of Science had been commissioned to prepare this report, dealing with the tax exemptions that had been granted in the ZATO of Lesnoy and whether the ZATO had suffered any losses. The conclusion, again, was that there was no damage.

65.  In short, it is apparent that in respect of core charges – relating to Apatit and Lesnoy – there was cogent, relevant exculpatory evidence which could and should have been forthcoming. No sufficient reason was ever given for the suppression of that evidence.

*'Specialist'/Expert reports*

23

66. The defence also obtained a number of specialist (or expert) reports. The trial court refused to admit a single one of those reports to the case. When we called the specialists to give evidence their questioning was so restricted that essentially they could not give any evidence. Hence it was that the defence was deprived of evidence which confirmed not only what Bochko and the unknown expert referred to in Biryukhov's decree had said (that there was no damage or loss to the ZATO of Lesnoy) but also that both the corporate and personal tax evasion charges were entirely without merit.

67. A senior tax official, Mr Shulgin, wrote to the court seeking to discredit one of our specialists, Mr Schekin. We applied for the witness to be called to be cross-examined about this. Mr Shulgin was also very relevant to our case as in 2002 he had ordered that a tax audit on the Lesnoy companies should be revoked. Why? This was pursuant to a joint letter issued in December 1999 by the Ministry of Finance and the Ministry of Taxes stating that promissory notes could be accepted in 1999 (refer to tab 12).

68. The court also refused the defence permission to cross-examine the prosecution experts. For example, we made applications for Messrs Yeloyan and Kuprianov to be called to be cross-examined on their reports. The applications explained the range of questions that we wished to be put to these two experts who had prepared reports on 2 reports on the article 198 charge (personal tax evasion) and a further report on the valuation of Apatit. Applications were made on three occasions for them to be called and each time the court refused.

### Pressure on witnesses

69. A prosecution tactic that rapidly manifested in the course of the trial was to adduce a prosecution witness' GPO record of interrogation to stand in lieu of his or her oral testimony in court. This transcended the mere putting of a previous inconsistent statement. As soon as the prosecutor felt the witness was deviating in any way from the interrogation record, he would seek to read out the latter in its entirety and the

24

court was invariably compliant. The GPO officials conducting the interrogations and transcribing them are masterful at maximising their prosecution value. Witnesses have complained that these officials change the sense of what's been said, change the emphasis, etc.

70.   One of the witnesses who faced this treatment and had her interrogation record read out was Ms Lyubov Antipina (a senior accountant at Meta Media[11]). She gave her evidence on 14 September 2004. She stood her ground, though, and maintained her oral evidence was right and the interrogation record was not accurate. At the end of the day the prosecutor asked that she not be released from questioning and that she be asked to return. He explained that he might wish to ask her further questions relating to the apparent discrepancy between her oral evidence and the interrogation record. The prosecutor added that it was not necessary for her to be recalled on the next court day. Mr Lebedev expressed a concern that there was a danger that Ms Antipina might be threatened by the GPO whilst waiting to return to give evidence. He referred to the fact that she had been threatened with a search of her workplace if she did not provide documents[12].

71.   In the event, she returned to court on 23 September 2004 and it became apparent that she had indeed been called for questioning by the GPO during the intervening period even though her evidence was part-heard. She said (on the 23rd) that at the GPO she had been asked questions about her testimony to the court. I know this from my colleagues.

72.   It is necessary to appreciate that the GPO had a convenient and continuing excuse to do this to witnesses – bringing them into the GPO for questioning around the time of giving their oral evidence. This had a real impact on our efforts to procure defence witnesses. The ongoing investigation and interrogations deterred people from giving evidence for us and in some cases even drove people abroad. We lost people who in

---

[11] She was called by the prosecutor in relation to the Media Most charges
[12] See p.92 of the transcript for 14 September 04 and p.30 of 24 September 04 transcript

a fair system would have been highly probative defence witnesses. They were scared that they would be accused in a parallel investigation if they gave defence evidence.

73. This is supported by the fact that pressure was brazenly applied to some of the people who were courageous enough to give defence evidence. This makes two points: (i) that defence witnesses were subjected to pressure, and (ii) if this is what happened in the full glare of the public gaze, imagine what does on behind closed doors in the GPO.

74. One of our witnesses to be pressured was the deputy mayor of Lesnoy, Ms Myasnikova. She gave evidence at Khodorkovsky's trial that Lesnoy had been saved from near bankruptcy in the late 1990s when the Russian government allowed it to operate as an onshore tax haven. She explained to the court that all of the promissory notes that had been paid by the companies cited in the charges against Khodorkovsky had been redeemed in full. She said: "There was no harm done to the town. On the contrary it got an additional boost for its economic and social development." She said budgetary spending per capita was three times higher than on average for the region.

75. However, soon afterwards the GPO made a public announcement that they were considering bringing criminal charges against her. As far as I am aware, none has actually been brought. But the desired effect was achieved: as a result, the court discounted her evidence on the basis that criminal proceedings might be brought against her[13].

**Bias**

76. The above events also demonstrate the trial court's bias in favour of the prosecution and compliance with their wishes. A further example of this was in relation to whether the court would admit judgments from courts in other regions. The rulings

---

[13] I spoke out about this in the media on 30 March 2005 (refer to tab 13).

were very important for us as they demonstrated the legality of some of the practices that were now been characterised as criminal. The Meschansky Court refused to admit such judgement and their reasons were utterly absurd. They said:

*"Yes, the ruling is an official document, yes, it is executed on court stationery, but 'the state emblem is not depicted against the heraldic shield.'"*

77.   Who ever heard of such a thing? Official stationery is official stationery as long as it is not forged, so what does the way the state emblem is depicted have to do with it? Incidentally we later received documents from the Moscow City Court on exactly the same type of stationery and with exactly the same depiction of the state emblem[14.] It would be laughable were it not for the fact that what was at stake was Khodorkovsky's fate and the political balance of Russia.

### The cassational hearing

78.   The unfairness of the cassational stage has already been demonstrated by my explanation of the speed of the proceedings and various related violations: insufficient access to the full 26 volumes of the protocol; insufficient time for the lawyers to prepare; the acting chairman of the first instance court fixing the cassational appeal date without authority; insufficient time for the court to undertake the minimum essential reading, etc. The GPO had access to the full version, but Khodorkovsky and my colleagues asserted that they had not received the authentic court protocol, but a culled copy.

79.   After the cassational hearing I gave an interview to Novaya Gazeta on 26 September 2005. In that interview I explained that for 45 years I have been in practice as an advocate, working through the time of Khruschev and Brezhnev, but I have never before in all my professional life seen such a mockery of justice and preposterous

---

[14] I referred to this in a 26 September 2005 interview in *Novaya Gazeta.*

debacle as the cassational hearing. I remain of that view. I attach the article in English and Russian as tab 14.

## Political motivation

80.  The prosecution of Khodorkovsky is so steeped in political motivation, it has not been possible to reach this point in my statement, covering the harassment and intimidation of his lawyers and some fair trial issues, without blatantly exposing the political underbelly of this case. Perhaps the most graphic example of this was the explanation I gave (in order to explain the more recent attempt to have me disbarred) regarding the race to solidify the conviction before Khodorkovsky could be registered as a Duma candidate and exercise his rights to a political campaign. Not only do the timing, context and supporting evidence establish the pure politics of the race, but it also demonstrates how the Moscow City Court joined with the GPO to achieve the political objective.

81.  A clear demonstration of judicial compliance with the executive is cogent evidence of political motivation, and in the final analysis the real value of Khodorkovsky's decision to stand for office is, whether or not he foresaw it, that it forced the Moscow City Court to reveal its practical assistance with the executive's political objective.

82.  This is not the only instance of apparent executive influence reaching the judiciary in the Yukos case. On 14 June 2004 The Wall Street Journal reported that Judge Cheburashkina of the Moscow Arbitration Court, who was hearing Yukos' appeal of the Tax Ministry's claim for 99 billion roubles, was removed from the case at the demand of the Tax Ministry. The Ministry contended she had demonstrated bias by failing to reject Yukos' appeal outright on grounds that an appropriate person had not signed the appeal. Judge Cheburashkina was replaced by Judge Mikhailova. Then Judge Mikhailova stepped down on 19 July 2004 due to unspecified psychological pressure (Associated Press, 19 July 2004 refer to tab 15). Another judge, Judge Vlada Bliznets, was relieved from her duties at the request of the

Russian Federal Tax Ministry after a ruling in favour of Yukos.

83.    As I have said, in my view Khodorkovsky faced a political trial in the sense that it
was started by, and has been driven by, the state at a political level, the motivations
being political and economic. Never before in my 45 years' experience has the state
made such an effort and deployed such huge resources and such a high number of
investigators to bring a prosecution. A person detained as regards an alleged
economic offence has also never before been detained by such a strong force – a
force strong enough for an armed terrorist. Just from the costs point of view, this
could not conceivably have been the GPO acting alone.

84.    There are so many other telltale indicators. For example, the criminal case against
Khodorkovsky has been accompanied by various state officials, state media outlets,
etc, telling the public that he is a criminal and has stolen money that should be in
people's pockets or the public purse. This sort of campaign to turn the public
against Khodorkovsky and ensure wide scale support for his prosecution requires, in
Russia, a state licence at a high political level.

85.    Khodorkovsky was becoming a political force and would have grown further. His
political vision has now been clearly set out in an article published in Kommersant
on 9 November 2005. He envisages a transfer from a presidential republic to a
mixed presidential and parliamentary republic in which the authority of parliament
and the prime minister is increased and that of the president is decreased. He
believed this already prior to his detention. He also had, and still has, particular
views about Russian foreign policy and economic policy. As I have shown,
following his conviction at first instance Khodorkovsky sought to gain a political
platform for these views, even if only for a short space of time.

86.    Khodorkovsky's views were and are not appealing to President Putin and the people
closest to him. His views clash with theirs in principle and, at a personal level, the
realisation of Khodorkovsky's plans would deprive the people closest to President

29

Putin of their position and power.

87. The whole start of the public confrontation between Khodorkovsky and President Putin could hardly have been more blatant, more public or more political. Generally – and particularly at a televised event in February 2003 – Khodorkovsky candidly informed President Putin that his officials are corrupt and take bribes. President Putin, not denying the allegation, said he would first look into the origins of Khodorkovsky's wealth. In other words, he would attack a political critic and credible future opponent by looking to find wrongdoing.

88. There was no shortage of reasons for Khodorkovsky to be targeted for political and economic reasons. He was trying to merge with Sibneft to make YukSi, which would have been the largest private company in Russia. It would have been one of the largest private oil companies in the world. This would have given him colossal influence.

89. Further, recent events demonstrate that the authorities were enraged by Khodorkovsky's charitable activities. Open Russia funded a lot of projects – essentially political enlightenment. The state has monopolised all the main television stations and it controls or has eradicated many newspapers, but Open Russia's promotion of the Internet and mass computerisation of the country was weakening the government's grip on the media.

90. The determinative role of the political authorities is evidenced by the fact that their initial goal was to force Khodorkovsky into voluntary exile, excising him from political, economic and commercial life in Russia and branding him as a fugitive from justice – obviously guilty but without the need to mount a massive prosecution and trial. One of the reasons why to me this was so obviously their initial goal is because it cried out logically for Khodorkovsky to be detained at the same time as Lebedev. The inescapable conclusion is that the authorities were creating the optimum opportunity for Khodorkovsky to flee. This is supported by the fact that

30

Khodorkovsky has personally confirmed to me that prior to his arrest he was told to leave the country to avoid such a fate. He told me that the message was delivered via two very senior but sympathetic political figures in office at that time.

91. Moreover, Khodorkovsky told me that after his arrest he was offered a beneficial compromise and that the offer originated from influential political figures. My understanding of what Khodorkovsky said about this is that one of the terms of the compromise was to hand over Yukos and the other main assets. Another term was for Khodorkovsky to leave the country. In return, although he would still get a sentence – because it was too late for there not to be a trial and conviction – it would be a lighter sentence and he would not have to serve further time in custody beyond the time he is sentenced.

92. My experience led me to believe that the authorities' familiar stick and carrot approach would have been applied here, and that the authorities would have pointed to Shakhnovsky as an example of a compromise along the lines on offer to Khodorkovsky.

93. As regards the actual individuals close to President Putin and charged with the advancement of the MBK/Yukos attack, Khodorkovsky believes the real drive has come from Igor Sechin, senior Presidential aide and Chairman of the Board of Directors at Rosneft, which acquired Yuganskneftegaz from Yukos via the BaikalFinanceGroup, now widely acknowledged as a mere front company used for the purpose of this acquisition.

94. I wish to clarify that Khodorkovsky's instruction to his lawyers to stay their hand and keep the defence as apolitical as possible at trial stage had nothing to do with any compromise agreed or on offer. Rather, his instruction in this regard arose from his belief that it was right to run his defence based on legal merits rather than the prosecution's political motivation. He believed his starting point to be to trust in the independence of the court. I felt he was being too naïve – the authorities'

31

determination to succeed (as evidenced by how much they had invested, in every sense) was too great. It was only after conviction that Khodorkovsky's view about this changed. This change is illustrated by his instruction to me to petition for recusal on the basis of the judiciary lacking independence. Khodorkovsky did not merely permit me to put forward such a petition, but fully supported it. Accordingly, one of my petitions at the appeal stage was for recusal based on political motivation, and I attach it as tab 16.

## Principal conclusions

95. I said at the start of this statement that I have not approached the Khodokovsky case with unshakable predetermined views that the establishment must be the perpetrator and the accused must be its victim, but that I speak the truth as I experience it. If the truth were that the MBK case is an instance of due process of law, I would say so. But the blatant truth is that it's a politically and economically motivated abuse of the Russian criminal justice system. There has been a systematic harassment and intimidation of lawyers acting for Khodorkovsky and of lawyers acting for companies and individuals in the wider MBK/Yukos case. The criminal trial and cassational proceedings have been fraught with violations.

96. In these respects, I see nothing to distinguish Temerko's position from that of Khodorkovsky. The pursuit of Temerko is indisputably part of the broad attack on Khodorkovsky and Yukos, arising out of the same GPO investigations by the same group of senior GPO investigators who for the last couple of years have been mounting the MBK/Yukos prosecutions. Temerko stepped into Khodorkovsky's shoes as Chairman of the Board of Yukos following Khodorkovsky's detention and led the Yukos defensive fight against the authorities' attack. He was the public face of Yukos after 25 October 2003 and also the company's interface with the Presidential Administration. The exact charge that the GPO is using as the pretext to extradite Temerko back to Russia may well differ from the exact charges used against Khodorkovsky or others already granted asylum in the UK, but it is indisputable that Temerko is another facet – one of the main facets – of the

MBK/Yukos case and that the authorities' underlying motives and objectives in pursuing him are the same as their motives and objectives in the rest of the MBK/Yukos case: to eradicate Khodorkovsky's power and influence and means to reacquire them, and for Yukos and related assets to be removed from Khodorkovsky and his deputies and placed under state control.

97.  Temerko's lawyers would be – and are – just as vulnerable as Khodorkovsky's.  His lawyer Gofstein also acts for Bakhmina and is in my catalogue of lawyers who have faced harassment or intimidation.  Further, if Alexander Temerko goes back to Russia to stand trial he will face the same unfairness and discrimination that Khodorkovsky has faced.  There is certainly no basis for supposing otherwise. Temerko is far from occupying a peripheral position in the overall attack on Khodorkovsky and Yukos.  On the contrary, he is virtually at the epicentre of the case.  In terms of the target at which the authorities are aiming, Khodorkovsky may be in the dead centre, but Temerko is still in the bulls-eye circle given his seniority and proximity to Khodorkovsky and others.

98.  The authorities themselves have promoted, emphasised and exploited the connection between Khodorkovsky and his deputies.  The authorities generally project the most senior Yukos executives as forming a criminal group or groups.  This has suited the GPO as a group conspiracy aggravates the offence under Russian law and increases the sentence.  They cannot seriously now suggest that Temerko is to be prised from Khodorkovsky and the rest of the senior executives and regarded in isolation.

99.  If the GPO get Temerko back, he will be a top prize in the hunt for Khodorkovsky's closest deputies.  He will be convicted and sentenced with the same regard for political objectives, rather than due process of law, as we have witnessed in Khodorkovsky's case and there will undoubtedly be promotions and medals galore within the GPO.  My years of experience and my participation in the Khodorkovsky case leave me without doubt about this.

100. I confirm that I have given the above information in Russian and that this written English statement has been translated back to me in Russian.

101. I confirm that the information contained in this witness statement is true, correct and accurate to the best of my knowledge and belief.


SIGNED:      Yuri Markovich Schmidt

DATED:       12 December 2005

34