**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
-------------------------------------------------x
                                                 )
RICHARD ALLEN, et al.                            )
                                                 )
                    Plaintiffs,                  )     Case No: 1:05-cv-02077 (CKK)
                                                 )     Hon. Colleen Kollar-Kotelly
            v.                                   )
                                                 )
RUSSIAN FEDERATION, et al.                       )
                                                 )
                    Defendants.                  )
                                                 )
-------------------------------------------------x
```

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# EXHIBIT 51



# Russia

## Country Reports on Human Rights Practices - 2005
Released by the Bureau of Democracy, Human Rights, and Labor
March 8, 2006

The Russian Federation has a weak multiparty political system with a strong presidency, a government headed by a prime minister, and a bicameral legislature (Federal Assembly) consisting of a lower house (State Duma) and an upper house (Federation Council). The pro-presidential United Russia party controlled more than two-thirds of the State Duma. The country had an estimated population of 143 million.

President Vladimir Putin was re-elected in March 2004 in an election process the Organization for Security and Cooperation in Europe (OSCE) determined did not adequately reflect principles necessary for a healthy democratic election, particularly in equal access to the media by all candidates and secrecy of the ballot. However, the voting itself was relatively free of manipulation, and the outcome was generally understood to have represented the will of the people. The government's human rights record in the continuing internal conflict in and around Chechnya remained poor. Both federal forces and their Chechen government allies generally acted with legal impunity. The civilian authorities generally maintained effective control of the security forces. Pro-Moscow Chechen paramilitaries at times appeared to act independently of the Russian command structure, and there were no indications that the federal authorities made any effort to rein in their extensive human rights abuses.

The most notable human rights development during the year was continued centralization of power in the executive branch, which was strengthened by changes in the parliamentary election laws and a move away from election of regional governors to their nomination by the president for confirmation by regional legislatures. This trend, taken together with continuing media restrictions and self-censorship, a compliant State Duma, continuing corruption and selectivity in enforcement of the law, political pressure on the judiciary, and harassment of some non-governmental organizations (NGOs) resulted in an erosion of the accountability of government leaders to the people. There were reports of the following additional significant human rights problems:

- alleged government involvement in politically motivated abductions, disappearances, and unlawful killing in Chechnya and elsewhere in the North Caucasus
- hazing in the armed forces, resulting in several deaths
- harassment, and in some cases, abduction, of individuals who appealed to the European Court of Human Rights (ECHR), reportedly to convince them to drop their cases
- torture, violence, and other brutal or humiliating treatment
- harsh and frequently life-threatening prison conditions
- corruption in law enforcement
- arbitrary arrest and detention
- allegedexecutive branch influence over judicial decisions in certain high-profile cases
- government pressure that continued to weaken freedom of expression and media independence, particularly of major national networks
- continued limitations, primarily by local authorities, on freedom of assembly and restrictions on some religious groups in some regions
- societal discrimination, harassment, and violence against members of some religious minorities
- restrictions on freedom of movement and migration
- negative official attitudes toward, and sometimes harassment of, certain NGOs involved in human rights monitoring
- violence against women and children
- trafficking in persons
- widespread governmental and societal discrimination as well as racially motivated attacks against ethnic minorities and persons from the Caucasus, Central Asia, Asia, and Africa
- instances of forced labor

There were also positive developments with regard to human rights. The judiciary demonstrated greater independence in a

number of cases. Reforms initiated in previous years continued to produce improvements in the criminal justice system. The authorities sought to combat instances of racial and ethnic mistreatment through prosecutions of groups and individuals accused of engaging in this behavior. Progress was also made in combating trafficking in persons.

Anti-government forces committed numerous human rights abuses in the internal conflict in Chechnya. They continued killing and intimidating local heads of administration. There were also reports of Chechen rebel involvement in both terrorist bombings and politically motivated disappearances in Chechnya and Ingushetiya during the year. Some Chechen rebels were allegedly involved in kidnapping to raise funds. There were also reports that explosives improvised by Chechen rebels often led to civilian casualties.

## RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no confirmed reports of political killings by the government or its agents, but there continued to be credible reports that federal armed forces engaged in unlawful killings in Chechnya. The use of indiscriminate force in areas of Chechnya with significant civilian populations resulted in numerous deaths (see section 1.g.). The security forces generally conducted their activities with impunity, but courts addressed a few incidents. For example, the Supreme Court overturned the acquittals of Captain Eduard Ullman and three other servicemen charged with killing six Chechen civilians in 2002 and ordered new trials. Lower courts had already acquitted the defendants twice, most recently in May. According to reports a retrial began in December and was continuing at year's end. At least one other serviceman was convicted on similar charges.

During the year the Ministry of Defense reported 16 deaths resulting from "non-statutory relations," a phrase used to describe situations in which officers or sergeants physically assaulted or humiliated their subordinates. Many observers complained that there was little accountability for such offenses. NGOs received numerous reports of such incidents. There were also reports linking suicides in the military to hazing (see section 1.c.).

Prison conditions were frequently life-threatening (see section 1.c.).

Government forces and Chechen fighters continued to use landmines extensively in Chechnya and Dagestan. According to estimates by the UN Children's Fund (UNICEF) 3,037 victims were killed or wounded by landmines or unexploded ordnance in Chechnya since 1995. Over the last year, UNICEF noted a decline in the number of such incidents, attributed to increased awareness on the part of local inhabitants.

There were a number of killings of government officials throughout the country, some of which may have been connected with the ongoing strife in the North Caucasus or with politics. For example, Zagir Arukhov, the minister of nationalities, external relations, and information in the Republic of Dagestan, was assassinated on May 20 when a bomb exploded as he entered his apartment building. Deputy Prosecutor General Fridinskiy reported that, as of May 2004, Chechen rebels had killed 11 local administration heads since the antiterrorist operation in Chechnya began in 1999.

The press and media NGOs reported that journalists were killed during the year for reasons that appeared to be related to their work (see section 2.a.).

Violent and sometimes fatal attacks by skinhead groups were a problem. On November 13, Timur Kacharava, a university student and a member of an anti-fascist youth movement, was stabbed to death. Approximately 10 to 15 people attacked Kacharava and a friend in St. Petersburg. His friend survived the attack and was hospitalized with serious injuries. Kacharava's friends stated that the attackers were members of a neo-Nazi group that had previously attacked Kachavara. Observers believed that the attack may have been motivated by his activism in the youth anti-fascist movement. In December the authorities reported progress in the investigation of Kacharava's death. According to different sources, 5 to 11 people were arrested and five of them confessed to taking part in the attack. One of the suspects reportedly confessed that he stabbed Kacharava in the neck. All the arrested individuals allegedly claimed that they were members of a skinhead group.

As of year's end there were no indications that suspects had been apprehended in the June 2004 killing of hate-crimes expert Nikolay Girenko. His colleagues believed that the motive for the killing was Girenko's activity as an official expert witness in a number of high-profile court cases involving ethnic and religious issues.

No progress was reported in the investigation of the 2003 killing of Yuriy Shchekochikhin, a member of the State Duma

and deputy editor of the newspaper *Novaya Gazeta*. At the time of his death, Shchekochikhin had begun to investigate allegations of Federal Security Service (FSB) responsibility for a series of 1999 apartment building bombings.

In June two of the initial six defendants were found guilty of terrorist acts and sentenced to 20 and 23 1/2 years in jail in a case involving the 1998 killing of Galina Starovoytova, a prominent State Duma deputy. The other four defendants were released. At year's end hearings were still ongoing for two additional defendants who were identified later in the investigation. The individual who ordered the killing has not been identified.

In June the Supreme Court rejected an appeal by the parents of Dmitriy Kholodov, military affairs correspondent for the daily newspaper *Moscovskiy Komsomolets*, who was killed in 1994. Kholodov's killing was believed to have been associated with his investigation of corruption in the military. The parents had appealed a March 14 decision by the Military Collegium of the Supreme Court to uphold a June 2004 acquittal of the defendants. Initial litigation began in 2000 (see section 2.a.).

During the September 2004 terrorist attack on a school in Beslan, North Ossetia, at least 330 hostages were killed. At least half of them were children (see section 1.g.).

Chechen rebels assassinated Chechen president Akhmed Kadyrov in May 2004, killed numerous civilian officials and militia associated with the federally appointed Chechen administration, and threatened to kill Kadyrov's successor Alu Alkhanov, who was elected in August 2004 (see section 1.g.). Chechen fighters killed a number of federal soldiers whom they had taken prisoner (see section 1.g.). Many other individuals were kidnapped and then killed in Chechnya during the year (see sections 1.b., 1.c., and 1.g.); both sides to the conflict, as well as criminal elements, were involved in those activities. Authorities often attributed bombings and other attacks on police or civilian officials in Dagestan and other areas in the southern part of the country to Chechen "bandits."

Societal violence against members of national, ethnic, and racial minority groups resulted in a number of killings (see section 5).

b. Disappearance

There were reports of government involvement in politically motivated disappearances in Chechnya and Ingushetiya, although the number of disappearances declined as compared to 2004. There were also reports of disappearances of individuals who had appealed court cases to the ECHR (see section 1.g.).

Criminal groups in the Northern Caucasus, possibly having links to rebel forces, frequently resorted to kidnapping. The main motivation behind such cases apparently was ransom, although some cases had political or religious overtones. The hostage-takers held many of their victims in Chechnya or Dagestan.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices; however, there were credible reports that law enforcement personnel frequently engaged in torture, violence, and other brutal or humiliating treatment or punishment to coerce confessions from suspects and that the government did not consistently hold officials accountable for such actions. Although prohibited in the constitution, torture is defined neither in the law nor the criminal code. As a result, the only accusation prosecutors could bring against police suspected of such behavior was that they exceeded their authority or committed a simple assault.

Cases of physical abuse by police officers usually occurred within the first few hours or days of arrest. Some of the methods reportedly used were: beatings with fists, batons, or other objects; asphyxiation using gas masks or bags (at times filled with mace); electric shocks; or suspension by body parts (for example, suspending a victim from the wrists, which are tied together behind the back). Allegations of abuse were difficult to substantiate because of limited access by medical professionals. There were credible reports that both government forces and Chechen fighters in Chechnya tortured detainees (see section 1.g.).

Reports by refugees, NGOs, and the press suggested a pattern of police beatings, arrests, and extortion directed at persons with dark skin or who appeared to be from the Caucasus, Central Asia, or Africa, and at Roma. For example in June 2004 the press reported that in Novosibirsk 4 policemen were arrested on suspicion of extorting over $1 million (28 million rubles) from a Romani family by kidnapping and torturing family members until their demands were met. The policemen were reportedly later tried and convicted.

Police reportedly harassed defense lawyers by calling them in for questioning regarding their conversations with their clients and continued to intimidate witnesses (see section 1.e.).

In December 2004 in the course of a massive "crime prevention" crackdown in the town of Blagoveshchensk, Bashkortostan, police and masked OMON troops (members of a special police detachment) detained over one thousand persons; the police beat many of them. According to human rights activists who carried out an investigation of the events, at least 32 of those detained had to seek medical help afterward. Individuals were apprehended on the streets, in their homes, and in their places of business and brought to the cellar of the police headquarters building in Blagoveshchensk. Bashkortostan authorities claimed that the police actions were in response to a "crowd of rowdies" who had attacked a police patrol. On August 1, the Bashkortostan prosecutor's office filed a case against eight officials on the charge of abuse of office. Defendants included the chief of Blagoveshchensk police and the OMON unit commander. Preliminary hearings opened on September 14 and went on until November 17. The first substantial hearing took place on November 18. Defense attorneys said the court case could continue until 2008. Most of the defendants continued working in their positions. In May human rights groups said that during their investigation of these events they discovered instructions, which they linked to the federal Ministry of Internal Affairs (MVD), granting police the authority to use extreme force and set up detention centers in the event of large-scale protests. In December hecklers disrupted a meeting between human rights activists and some of the individuals beaten in Blagoveshchensk; at least one of human rights activist accused the authorities of being linked the disruption.

Various abuses against military servicemen, including but not limited to the practice of *dedovshchina* (the violent, at times fatal, hazing of new junior recruits in the armed services, MVD, and border guards) continued (see section 1.a.). Press reports cited serving and former armed forces personnel, the Main Military Prosecutor's Office (MMPO), and NGOs monitoring conditions in the armed forces as indicating that such mistreatment often included the use of beatings or threats of increased hazing to extort money or material goods. Government officials announced that approximately 25 percent of the 11,500 crimes committed in the army during 2004 were related to hazing. On May 24 the main military prosecutor stated that in 2004 246 servicemen committed suicide and that many of these deaths were linked to hazing. According to defense ministry figures, there were 218 suicides through October 2005. As of October, the Moscow Committee of Soldiers' Mothers registered 700 complaints from conscripts, mostly related to beatings. Servicemen also complained about sexual abuse, torture, and enslavement. Soldiers often did not report hazing to either unit officers or military prosecutors due to fear of reprisals, since in some cases officers reportedly tolerated or even encouraged such hazing as a means of controlling their units. Officers reportedly also used beatings to discipline soldiers.

Hazing reportedly was a particularly serious problem in units that had previously served in areas of military conflict.

Both the Union of Soldiers' Mothers Committee (USMC) and the MMPO received numerous reports about "nonstatutory relations," in which officers or sergeants physically assaulted or humiliated their subordinates. Despite the acknowledged seriousness of these problems, the leadership of the armed forces made only superficial efforts to implement substantive reforms in training, education, and administration programs within units to combat abuse.

During the year federal and pro-Moscow Chechen forces, as well as Chechen rebel forces, violated the human rights of civilians, inflicting widespread civilian casualties, abductions, and other abuses (see section 1.g.).

Prison and Detention Center Conditions

Prison conditions remained extremely harsh and frequently life-threatening. The Ministry of Justice's (MOJ's) Federal Service for the Execution of Sentences (formerly the Main Division for the Execution of Sentences) administered most of the penitentiary system centrally from Moscow. The FSB ran the Lefortovo pretrial detention center in Moscow and seven other pretrial detention centers. There were five basic forms of custody in the criminal justice system: police temporary detention centers; pretrial detention facilities, known as investigation isolation facilities (SIZOs); correctional labor colonies (ITKs); prisons designated for those who violate ITK rules; and educational labor colonies (VTKs) for juveniles. As of July 1, approximately 797,500 persons were in the custody of the criminal justice system, including 48,600 women and 14,500 juveniles. On December 16, the MOJ reported that the number of the people held in custody in 2005 exceeded 800 thousand. In most cases juveniles were held separately from adults.

In 2004 according to official statistics approximately two thousand persons died in SIZOS. Most died as a result of poor sanitary conditions or lack of medical care (the leading cause of death was heart disease). The press reported on individuals who were mistreated, injured, or killed in various SIZOs. Some of the reported cases indicated habitual abuse by officers.

Abuse of prisoners by other prisoners continued to be a problem. Violence among inmates, including beatings and rape, was common. There were elaborate inmate-enforced caste systems in which informers, homosexuals, rapists, prison rape victims, child molesters, and others were considered to be "untouchable" and were treated very harshly, with little or no protection provided by the prison authorities.

Penal institutions frequently remained overcrowded, but there were reports of some improvements. For example, while many penal facilities remained in urgent need of renovation and upgrading, some reports indicated that these facilities

were closer to meeting government standards, which include the provision of four square meters per inmate.

Inmates in the prison system often suffered from inadequate medical care; however, there were some signs of improvement. The Public Council in the MOJ reported that during the 3 years ending in 2004, the number of sick prisoners and detainees decreased by 27 percent. According to the MOJ, as of September 1, 2005, there were approximately 49 thousand tuberculosis-infected persons and 31 thousand HIV-infected persons in SIZOs and correction colonies. Tuberculosis infection rates were far higher in detention facilities than in the population at large. The Moscow Center for Prison Reform (PCPR) reported that conditions in penal facilities varied among the regions.

Conditions in SIZOs, where suspects were held until the completion of a criminal investigation, trial, sentencing, or appeal, remained extremely harsh and posed a serious threat to health and life. However, conditions within different SIZOs varied considerably. Health, nutrition, and sanitation standards remained low due to a lack of funding. Poor ventilation was thought to contribute to cardiac problems and lowered resistance to disease. According to the Federal Prison Service, the total of detainees in the system increased by 31 thousand as of September 1. As a result, facilities originally designed to house 130 thousand held approximately 157 thousand suspects.

ITKs held the bulk of the nation's convicts. As of September 1, there were 633,500 inmates in 762 ITKs, which provided greater freedom of movement; however, at times, guards humiliated, beat, and starved prisoners to break down their resistance. The country's "prisons"--distinct from the ITKs--were penitentiary institutions for those who repeatedly violated the rules in effect in the ITKs.

The 62 VTKs held juvenile prisoners from 14 to 20 years of age. As of July 1 there were 62 such institutions. Conditions in the VTKs were significantly better than in the ITKs, but juveniles in the VTKs and juvenile SIZO cells reportedly also suffered from beatings and rape. The PCPR reported that such facilities had a poor psychological atmosphere and lacked educational and vocational training opportunities. Many of the juveniles were from orphanages, had no outside support, and were unaware of their rights. While juveniles were generally held separately from adults, there were two prisons in Moscow where children and adults were not separated and boys were held with adults in small, crowded, and smoky cells. Schooling in the prisons for children was sporadic at best.

In August the NGO For Human Rights reported that it had been able to monitor prisons in 40 of the country's 89 regions; however, according to the group's executive director, it has become increasingly difficult for domestic observers to monitor prison conditions in the last five years. Beginning in September 2004, authorities refused to grant the International Committee of the Red Cross (ICRC) access, under ICRC's standard criteria, to those detained as part of the conflict in Chechnya, and the ICRC subsequently suspended its detention visits.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention; however, they remained problems.

Role of the Police and Security Apparatus

The MVD, the FSB, and the Office of the Prosecutor are responsible for law enforcement at all levels of government. The FSB's core responsibilities are security, counterintelligence, and counterterrorism, but it also has broader law enforcement functions, including fighting crime and corruption. The FSB operated with limited oversight by the office of the prosecutor general and the courts.

The national police force, which falls under the MVD, is organized on the federal, regional, and local levels. Although regulations and national laws prohibit corrupt activities, corruption was widespread and with few crackdowns on illegal police activity. The government reportedly addressed only a fraction of the crimes that federal forces committed against civilians in Chechnya (see section 1.g.). Although government agencies, such as the MVD, have continued to educate officers about safeguarding human rights during law enforcement activities through training provided by foreign governments, the security forces remained largely unreformed.

There were credible reports that security forces continued regularly to single out persons from the Caucasus for document checks, detention, and the extortion of bribes (see section 2.d.). According to NGOs, federal forces and pro-Moscow Chechen militias commonly detained Chechen men at checkpoints along the borders between Chechnya and Ingushetiya in targeted operations known as "night raids," or during "mopping-up" operations following military hostilities. Detainees were often beaten or tortured. Human rights groups also reported that security forces increasingly detained women.

Arrest and Detention

Under the law an individual may be taken into custody for 48 hours without court approval if arrested at the scene of a crime, provided there is evidence of the committed crime on the individual's person or in his house or when the crime victims or witnesses identify the person as a perpetrator. Otherwise, a court-approved arrest warrant is required. According to statistics provided by the Supreme Court's Judicial Department in 2004, courts approved approximately 91 percent of arrest requests from law enforcement authorities. A detainee is then typically taken to the nearest police station where a detainee should receive a warning of his rights, and police are obliged to write an official protocol signed by the detainee and the police officer within three hours of detention, which states the grounds for the detention. The police must interrogate the detainee within the first 24 hours, but prior to the interrogation the detainee has the right to meet with an attorney for 2 hours. No later than 12 hours after a detention, the police must notify the prosecutor and the detainee's relatives about the detention unless a prosecutor's warrant to keep the fact of detention secret is obtained. The detainee must be released after 48 hours, either subject to bail conditions or on their own recognizance, unless a court decides to keep the person in custody in response to a motion filed by the police no later than 8 hours before the expiration of the 48 hour detention period. The defendant and his/her attorney must be present at the court hearing.

The law specifies that within two months of a suspect's arrest, police should complete their investigation and transfer the file to the prosecutor for arraignment, although a court may extend the criminal investigation for up to six months in "complex" cases. With the personal approval of the prosecutor general a judge may extend that period up to 18 months.

These limitations on detention were generally respected; however, there were reports of occasional violations of the 48-hour time limit following an arrest. Most frequently, the authorities failed to write the official protocol of detention within three hours after the actual detention and held suspects in excess of detention limits. In addition there were reports that the police obtained defense counsels friendly to the prosecution. These "pocket" defense counsels allowed interrogation of their clients. The general ignorance of legal rights by both citizens and their defense counsels contributed to the persistence of these violations. The government continued to engage in public education programs to inform citizens of their rights and responsibilities under the law, such as the right to a lawyer and the obligation to serve on juries. The Council of Judges together with the Supreme Court and the Russian Information Agency Novosti continued an educational program called "Public Trust" that explained the work of the judicial system and citizens' rights.

Judges suppressed confessions of suspects whose confessions were taken without a lawyer present. They also freed suspects who were held in excess of detention limits, although they usually granted prosecutors' motions to extend the detention period for good cause. The Supreme Court overturned a number of cases in which lower court judges granted permission to detain individuals on what the Supreme Court deemed inadequate grounds.

Some regional and local authorities continued to use provisions of the code to arrest persons for expressing views critical of the government. Human rights advocates in some regions were charged with libel, contempt of court, or interference in judicial procedures in cases with distinct political overtones. Journalists, among others, have been charged with other offenses and held either in excess of normal periods of detention or for offenses that do not require detention at all (see section 2.a.).

There were several reports of political detainees at various times during the year. Despite significant reforms in law enforcement in recent years, instances in which the government apparently pursued selective prosecution against political adversaries raised concerns over the arbitrary use of the judicial system. For example many observers considered the arrest, detention, and conviction on charges of fraud of prominent businessman Mikhail Khodorkovskiy to be an illustration of this problem, regardless of his guilt or innocence on the specific charges. In the months before his arrest in 2003, Khodorkovskiy had reportedly supported organizations, political parties, and media critical of the Putin administration. However, other observers believed that the case was driven by economic rather than political motives. Some human rights groups considered Svetlana Bakhmina, a lawyer who worked for Yukos Oil Company (Yukos), to be a political detainee. She was arrested in December 2004 on fraud charges and held without bail. Several organizations expressed concern about reports regarding Bakhmina's lack of access to her family and medical treatment while in custody. Some observers stated that she was being held in an attempt to pressure Dmitriy Gololobov, her former boss at Yukos, to return from London. On September 5, a Moscow city court ruled that she could be held in detention until October 7. In October her trial began in Moscow, and the case was ongoing at year's end. Many observers saw the treatment of Bakhmina as linked to the Khodorkovskiy case.

On two occasions the authorities held relatives of a wanted Chechen rebel leader, apparently attempting to force his surrender. Eight relatives of Chechen leader Aslan Maskhadov were abducted in December 2004. On May 31, seven of them were released, several weeks after Maskhadov was killed on March 8. The human rights NGO, Memorial, reported that the detainees were held in an unfurnished concrete cell with a single window. They were allowed to exit the cell only to go to the toilet. They were never interrogated nor charged with any crime. An eighth relative, Movladi Aguyev, was reportedly charged with being a member of an illegal armed group. Witnesses to the initial detention believed the abductors were members of the forces under command of the Chechen Deputy Prime Minister Ramzan Kadyrov (see section 1.g.).

In May, according to Memorial, Chechen security forces seized relatives of Chechen commander Doku Umarov, including his 70-year-old father, his wife, and his 6-month-old son. They later released the wife and child, but the father's location remained unknown. According to the Chechen Ministry of Interior, unknown gunmen abducted Umarov's sister, Natasha Khumadova, in August. At year's end there was no further information on the whereabouts of Umarov's relatives.

In September 2004 several of Maskhadov's and Chechen terrorist Shamil Basayev's relatives were taken into what authorities claimed to be protective custody during the Beslan school seizure, although human rights groups said this action was intended as retaliation for the seizure of the school; they were released shortly after the end of the school seizure. Domestic and foreign human rights observers criticized an October 2004 suggestion by the prosecutor general that a policy of seizing the relatives of hostage-takers would reduce the incidence of hostage taking.

Beginning in September 2004, authorities refused to grant the International Committee of the Red Cross (ICRC) access, under ICRC's standard criteria, to those detained as part of the conflict in Chechnya, and the ICRC subsequently suspended its detention visits.

An international NGO delegation that visited two psychiatric hospitals in 2004 noted that there was no judicial process for commitment that provided individuals subject to commitment with the right to appear before a court for a determination of the legality of their commitment.

e. Denial of Fair Public Trial

The law provides for an independent judiciary, and there were a number of indications of judicial independence; however, the judiciary did not consistently act as an effective counterweight to other branches of the government. The law provides for strengthening the role of the judiciary in relation to the prosecutor general by requiring judicial approval of arrest warrants, searches, seizures, and detentions (see section 1.d.). Judges allegedly remained subject to influence from the executive, military, and security forces, particularly in high profile or politically sensitive cases. While judges' salaries have increased significantly, the judiciary remained susceptible to corruption. Judges accepted bribes from officials and others. From 2001 to 2004, 196 judges were fired for unprofessional behavior, 513 received "warnings," 12 were convicted of criminal offences. One NGO specializing in issues of corruption estimated that in 2005 judges received $209 million (5.9 billion rubles) in bribes annually for favorable rulings.

Authorities did not provide adequate protection from intimidation or threats from powerful criminal defendants.

The judiciary is divided into three branches. The courts of general jurisdiction, including military courts, are subordinated to the Supreme Court. These courts hear civil and criminal cases and include district courts, which serve every urban and rural district, regional courts, and the Supreme Court. Decisions of the lower trial courts can be appealed only to the immediately superior court unless a constitutional issue is involved. An arbitration (commercial) court system under the High Court of Arbitration constitutes a second branch of the judicial system. Arbitration courts hear cases involving business disputes between legal entities and between legal entities and the State. The federal constitutional court (as well as constitutional courts in a number of administrative entities of the Russian Federation) constitutes the third branch.

The president approves judges after they have been nominated by the qualifying collegia, which are assemblies of judges (including some public members). After a three-year trial period, the president must reconfirm the judges. Judicial watchers have alleged that the executive's role in approving and reconfirming judges has ensured an increasingly pro-Kremlin judiciary. The collegia also have the authority to remove judges for misbehavior and to approve prosecutors' requests to prosecute judges.

Justices of the peace deal with criminal cases involving maximum sentences of less than three years and with some civil cases. In some regions where the system has been fully implemented, justices of the peace assumed 65 percent of federal judges' civil cases and up to 32 percent of their criminal matters. Justices of the peace worked in all regions except Chechnya and Nenetskiy Autonomous Okrug.

Trial Procedures

Trials typically are conducted before a judge without a jury. The defendant is presumed innocent. The defense is not required to present evidence and is given an opportunity to cross-examine witnesses and call defense witnesses. Defendants who are in custody during the trial are confined to a caged area and must consult with their attorneys through the bars in whispers. Defendants have the right of appeal.

The law provides for the nationwide use of jury trials for a limited category of "especially grave" crimes, such as murder, in higher-level regional courts. These jury trials constituted approximately 1 percent of all criminal trials in 2004. By January 1

all regions except Chechnya implemented jury trials, and Chechnya is scheduled to introduce jury trials in 2007. In contrast to trials conducted by a judge, 0.7 percent of which ended in acquittal in 2004, approximately 15 percent of cases tried by juries ended in acquittals, although one-quarter of those acquittals were later reversed on appeal.

Prior to trial, defendants are provided a copy of their indictment, which describes the charges in extensive detail. They are also given an opportunity to review the criminal file following the completion of the criminal investigation. Defense attorneys are allowed to visit their clients in prison, although prison conditions reportedly make it difficult for the attorneys to conduct meaningful and confidential consultations with their clients.

The law provides for the appointment of a lawyer free of charge if a suspect cannot afford one; however, this provision often was not effective in practice. The high cost of competent legal representation meant that lower-income defendants often lacked competent legal representation. There were no defense attorneys in remote areas of the country. Public centers, staffed on a part time basis by lawyers, continued to offer free advice on legal rights and recourse under the law; however, they were not able to handle individual cases. In August the government issued regulations to govern an experimental program creating state legal aid offices in ten regions to operate on an experimental basis beginning in January 2006.

According to the NGO the Independent Council of Legal Expertise, defense lawyers were the targets of police harassment. Professional associations at both the local and federal levels reported police efforts to intimidate attorneys and cover up their own criminal activities. In March 2004 Yevgeniy Baru, lawyer for Khodorkovskiy's codefendant Platon Lebedev, was attacked after a visit with his client. Baru reported that prison officials, including the warden, confiscated written and printed materials from his briefcase. In April 2004 five men who reportedly shouted, "You got what you're asking for. No more speeches [in court] for you," knocked human rights lawyer Stanislav Markelov unconscious on the Moscow metro. After regaining consciousness, Markelov discovered that his mobile phone containing the phone numbers of his clients, his lawyer's license card, and other identity documents and case files were missing, but his money had not been stolen. Amnesty International (AI) expressed concern that he was targeted due to his work on behalf of victims in several human rights cases that relate to Chechnya. On September 23, Robert Amsterdam, a member of Khodorkovskiy's international legal team had his visa revoked by the authorities and had to leave the country.

Authorities abrogated due process in continuing to pursue several espionage cases involving foreigners who allegedly obtained information considered sensitive by security services; in some instances prosecutors pursued such cases after earlier courts had rejected them. The proceedings in some of these cases took place behind closed doors, and the defendants and their attorneys encountered difficulties in learning the details of the charges. Observers believed that the FSB was seeking to discourage citizens and foreigners from investigating problems that the security services considered sensitive.

In February the FSB detained Oskar Kaibyshev on charges linked to exporting sensitive technological information to South Korea while working as a research scientist. Several scientific panels stated that the information Kaibyshev gave the South Koreans was not subject to export controls. The espionage charges initially brought against Kaibyshev were later dropped, but he still faced other criminal charges related to the case. Kaibyshev was later charged with unsanctioned export of technologies and theft. Court hearings opened in Ufa on October 31 behind closed doors. The trial was ongoing at year's end.

Political Prisoners

Many human rights organizations stated that Igor Sutyagin was a political prisoner, and the representatives of various domestic human rights organizations also characterized several other individuals, such as Valentin Danilov, Mikhail Khodorkovskiy, Platon Lebedev, Zara Murtazaliyeva, and Mikhail Trepashkin, as political prisoners.

On May 31, Mikhail Khodorkovskiy and co-defendant Platon Lebedev were convicted on six charges of fraud, tax evasion, and embezzlement and sentenced to 9 years in prison after an 11-month trial. Khodorkovskiy's conviction was upheld on appeal on September 21, with the sentence reduced to eight years. Both Khodorkovskiy and Lebedev continued to appeal their convictions. The arrest and conviction of Khodorkovskiy raised concerns about the rule of law, including the independence of courts, the right to due process, the sanctity of contracts and property rights, and the lack of a predictable tax regime. Many observers believed that Khodorkovskiy's conviction was the most recent of a number of politically-motivated moves against wealthy "oligarchs" who represented centers of actual or potential political and media opposition to the president. Some observers believed that despite the possibility that the charges against Khodorkovskiy may have had some merit, he was selectively targeted for prosecution because of his own politically-oriented activities and as a warning to other oligarchs against involvement in political affairs or providing financial support to independent civil society. In October the authorities transferred Khodorkovskiy to a prison in Chita Oblast and Lebedev to a prison in Yamalo-Nenetskiy Autonomous Okrug. In December Lebedev's defense team filed an appeal stating that sending him to a prison that was not in the area where Lebedev lived or was sentenced violated Russian law. Some human rights activists have objected to sentencing both men to prisons that were not in the area where they lived or were sentenced.

The May 2004 conviction of Mikhail Trepashkin, who had been a consultant to a parliamentary commission investigating possible FSB involvement in a series of 1999 apartment bombings, gave further cause for concern about the undue influence of the FSB and arbitrary use of the judicial system. The bombings were officially blamed on Chechens and served as partial justification for the government's resumption of the armed conflict against Chechen fighters. Trepashkin, an attorney and former FSB official, was arrested in 2003 and charged with disclosing state secrets and with illegal possession of a handgun and ammunition. The Moscow circuit military court sentenced him to four years of forced labor, but he was not expected to start serving his term until the conclusion of a hearing on the handgun charge. The trial reconvened in December 2004. Trepashkin's arrest came a month after his charges of FSB responsibility for the bombings were cited in a book and a week before he was scheduled to represent the relatives of a victim of one of those bombings. On April 15, a Moscow court found Trepashkin guilty of illegal possession of a handgun and added one year to his four-year term, although this additional ruling was later reversed on appeal. At the end of July, Trepashkin began serving his prison term in Nizhniy Tagil. On August 19, Trepashkin appealed for an early release from prison, and on August 29, a Nizhniy Tagil court granted him early release. On September 16, however, a Sverdlovsk regional court overturned the August 29 ruling. On September 22, according to reports, Trepashkin was again taken into custody. He was sent back to the Nizhniy Tagil prison camp. A new hearing on his early release was held on November 24, and the Nizhniy Tagil court turned down his application for release on parole. Trepashkin's attorneys had an appeal pending before the Sverdlovsk regional court at year's end. In a letter to State Duma deputy Yevgeniy Roizman, Trepashkin said he feared for his life since he was kept together with convicts who had committed capital crimes. In other statements, Trepashkin said that he was receiving no treatment for his severe asthma and that he was concerned about his health.

In June 2004 the Supreme Court overturned the 2003 jury acquittal of Valentin Danilov, who had been charged with spying for China while working on a commercial contract. In November 2004 Danilov was convicted by a judge and sentenced to 14 years. On June 29, the Supreme Court reduced his sentence to 13 years. Danilov has an appeal before the Supreme Court and the ECHR. In August he was transferred from a pretrial detention center to a prison.

In August the Supreme Court rejected an appeal by Igor Sutyagin, a disarmament researcher with the US and Canada Institute, against his conviction for espionage related charges. Prosecutors accused Sutyagin of passing classified information about the country's nuclear weapons to a London-based firm, but the Kaluga regional court ruled in 2001 that the evidence presented by the prosecutor did not support the charges brought against him and returned the case to the prosecutor for further investigation. In April 2004 a Moscow city court found Sutyagin guilty and sentenced him to 14 years in a maximum security facility (the sentence included time served since his arrest in October 1999). Sutyagin claimed the decision was unjust and insisted that he had no access to confidential information. Some observers agreed that he had no access to classified information and described the severe sentence as an effort to discourage citizens from sharing sensitive information with professional colleagues from other countries. Russian government officials asserted that Sutyagin had wittingly or unwittingly entered into a paid arrangement with a foreign intelligence service. Because of the conduct of the trial and lengthy sentence, a number of domestic and international human rights NGOs raised concerns that the charges were politically motivated. At year's end Sutyagin was allegedly in a penal facility in Arkhangelsk Oblast and his attorneys were reportedly appealing the move.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law states that officials may enter a private residence only in cases prescribed by federal law or on the basis of a judicial decision; however, authorities did not always observe these provisions. The law permits the government to monitor correspondence, telephone conversations, and other means of communication only with judicial permission and prohibits the collection, storage, utilization, and dissemination of information about a person's private life without his consent. While these provisions were generally followed, problems remained. There were accounts of electronic surveillance by government officials and others without judicial permission, and of entry into residences and other premises by Moscow law enforcement without warrants. There were no reports of government action against officials who violated these safeguards.

On September 1, the press reported that the government, citing concerns about terrorism, approved new regulations, which were scheduled to come into effect on January 1, 2006, for interactions between communication companies and certain government agencies. The new regulations would give law enforcement agencies greater access to telephone and cellular phone company clients' personal information and require providers to grant the MVD and FSB 24-hour remote access to their client databases. Some experts believed these new rules contradict the constitution.

Internet service providers are required to install, at their own expense, a device that routes all customer traffic to an FSB terminal, called the "System for Operational Investigative Measures." However, there appeared to be no mechanism to prevent unauthorized FSB access to the traffic or private information without a warrant. The FSB was not required to give telecommunications companies and individuals documentation on targets of interest prior to accessing information.

Human rights observers continued to allege that officers in the special services used their services' power to gather compromising materials on public figures. There were credible charges that regional branches of the FSB continued to exert pressure on citizens employed by foreign firms and organizations, often to coerce them into becoming informants.

Federal forces and pro-Moscow Chechen forces reportedly abducted relatives of rebel commanders and fighters (see section 1.g.).

g. Use of Excessive Force and Violations of Humanitarian Law in Internal and External Conflicts

During the year unrest continued in and around the Northern Caucasus republic of Chechnya. Federal forces and pro-Moscow Chechen forces engaged in human rights violations, including torture, summary executions, disappearances, and arbitrary detentions. Chechen rebels also committed human rights violations, including major acts of terrorism and summary executions.

The year saw a continued shift of Russian tactics away from operations involving Russian military formations and toward police operations, and from the use of federal forces toward reliance on paramilitary and police units of the Chechen Republic. There were fewer mopping-up operations, known as "zachistki," than in previous years, although more targeted operations, such as night raids, continued. According to Memorial, zachistki were often conducted with no serious human rights abuses, but Memorial noted that in some cases, zachistki were accompanied by abductions, looting, and beatings. Chechen security forces were nominally under the control of Chechen civilian authorities but also often conducted operations jointly with Russian federal forces. In reality, Chechen security forces were under the command of Chechen First Deputy Prime Minister Ramzan Kadyrov and often appeared to act with relative independence. The limited measures taken by the federal and Chechen leaders to rein them in have been largely ineffective.

Federal authorities--both military and civilian--have limited journalists' and human rights observers' access to war zones since the beginning of the second war in Chechnya in 1999, in part due to security concerns. In addition coverage has been restricted in government-controlled media, and the government has sought to pressure independent journalists into engaging in self-censorship (see sections 2.a. and 4). These restrictions made independent observation of conditions and verification of reports difficult and limited the available sources of information about the conflict. Human Rights Watch (HRW) reported in March that Chechnya was gripped by a climate of fear that witnesses described as "worse than war." HRW noted that victims of human rights abuses and their relatives were increasingly reluctant to speak to human rights monitors or to file complaints with the authorities because they feared further persecution, a fear HRW had not previously encountered. Despite these obstacles, however, human rights groups with staff in the region continued to release credible reports of human rights abuses committed during the year.

The indiscriminate use of force by government troops, which during the course of the conflict has resulted in widespread civilian casualties, the displacement of hundreds of thousands of persons, and massive destruction of property and infrastructure, appeared to decrease during the year. However, Memorial reported that in comparison to 2001-2002, government forces used less indiscriminate force in 2004 against civilian areas and this trend appeared to continue in 2005.

Nonetheless, there continued to be instances of indiscriminate use of force by government troops. According to Memorial, the mountain village of Zumsoi was subjected to repeated artillery shelling and aerial bombardment as well as sweeps by security forces during the year. In January the village was bombed for several days. Airborne forces then arrived in the village and took three men and a teenaged boy into custody. Their whereabouts remain unknown. Federal servicemen also allegedly robbed villagers, desecrated the village mosque, and killed cattle. In July unknown perpetrators, who were believed to be Chechen rebels, killed the head of the village administration. Also in July all but one of Zumsoi's residents left the village citing the continuing insecurity there.

In June members of the pro-Moscow Vostok (East) Battalion conducted a security sweep in the village of Borozdinovskaya. During that operation 11 men from the village were detained. Some homes in the village were burned and two villagers were killed. Subsequently villagers left en masse and crossed into the neighboring republic of Dagestan. Although prosecutors announced an investigation, and federal and Chechen officials publicly called for those responsible to be held accountable, the whereabouts of the men remain unknown. Military prosecutors initiated criminal proceedings against one Vostok commander Mukhadi Aziyev. A military court in Chechnya convicted him in October of abuse of power, and he received a three-year suspended sentence.

In most cases security actions affecting civilians were undertaken with impunity. Even the limited efforts of the authorities to impose accountability were frequently timid. On March 29, a Groznyy court convicted Lt. Sergey Lapin, a member of an OMON riot police unit, of inflicting serious harm to health and other charges related to the torture and disappearance of Chechen citizen Zemlikhan Murdalov in 2001. AI noted, however, that none of the charges against Lapin related to Murdalov's actual disappearance, nor were any others charged in the case.

Despite the opening of a criminal case, a human rights organization reported that no charges were filed after a federal warplane bombed Maidat Tsintsayeva's house in April 2004, killing her and her five children. According to a human rights NGO, there were no indications of progress in investigating the launching of several missiles at the village of Tevzen-Kale

in December 2004. One of the missiles hit the house of the Suleymanov family, killing one family member and wounding two others. The Chechen interior ministry told the press that the federal military refused to acknowledge that it had bombed the village and was impeding all investigation efforts.

There were no reliable estimates of civilian casualties as a result of military operations. Chechen State Council Chairman Taus Dzhabrailov reportedly told the press in June that more than 160 thousand persons had been killed in Chechnya since 1994. Memorial has estimated that 75 thousand civilians and up to 14 thousand servicemen have died during the two Chechen conflicts.

Likewise, there were no reliable estimates of the number of those detained, abducted, or made to disappear. While Chechen rebels and criminals seeking ransom carried out many abductions and disappearances, federal and pro-Moscow Chechen forces were also involved. Government sources indicated that 67 people were abducted through mid-December compared to 168 in 2004, according to press reports. Chechen President Alu Alkhanov said 77 people were abducted in 2005, compared to 213 in 2004. Memorial reported that in the 25 to 30 percent of Chechnya to which its monitors had access, 316 persons were abducted during the year, of whom 151 were freed or ransomed, 23 were found dead, 15 were thought to be in detention, and 127 disappeared. Memorial reported that 448 persons were abducted in 2004 and has estimated that 3 thousand to 5 thousand have gone missing in Chechnya since 1999. Memorial reported that it has information on 1,200 cases where people disappeared after being detained by federal security forces since fall 1999. The federal prosecutor's office reported in December 2004 that 2,437 persons had been abducted in Chechnya in that period.

Abductions and disappearances continued to occur following operations conducted by federal forces, pro-Moscow Chechen forces, and joint operations involving Chechen and Russian units, according to various sources. Presidential Advisor Aslanbek Aslakhanov was cited in the press as saying that he could not rule out the involvement of forces under command of Chechen First Deputy Prime Minister Ramzan Kadyrov or federal forces in such activities. Colonel General Arkadiy Yedelev, head of the Russian forces general staff in the Northern Caucasus, acknowledged in February that federal forces and pro-Moscow Chechen forces had taken part in disappearances of civilians.

On April 15, security forces detained Murad Muradov, the director of the Chechen NGO "Let's Save the Generation" during a firefight between federal forces and Chechen fighters in Groznyy. According to human rights groups, Muradov was detained because he lived near the apartment where rebels were hiding. His whereabouts are unknown.

Following the numerous arrests made after the October attack on Nalchik, HRW reported that there were at least eight cases where detainees were ill treated and that lawyers for five detainees were barred from representing their clients on spurious grounds. Additionally, Ruslan Nakhushev, the head of the Islamic Research Institute in Nalchik who sought to promote dialogue between authorities and the Muslim community, disappeared on November 4 after being questioned by the Federal Security Service. Authorities had opened a criminal case against him in October for allegedly organizing the attack on Nalchik

There were no indications that the authorities intended to take action as a result of a January 2004 sweep of the town of Argun which resulted in the abduction and torture of a many residents and the killing of two. Only after mass protests in Argun were most of the detainees released. All showed signs of physical abuse and required medical attention.

Although incidents continued, the statistics of both the authorities and Memorial appeared to point to a decline in abductions and disappearances compared to previous years, but human rights groups and the authorities interpreted the data differently. Government spokesmen attributed the apparent decline in abductions to efforts begun by the Chechen government in June 2004 to reinforce existing requirements that military forces have license plates on their vehicles when entering a village, be accompanied by a representative of the prosecutor's office and local officials, identify themselves when entering a house, prepare lists of all persons arrested during the operation, and share those lists with local authorities. Chechen officials subsequently declared a ban on law enforcement officers wearing masks. Colonel General Arkadiy Yedelev, chief of counterterrorist operations in the Northern Caucasus, asserted that requirements that regional security headquarters approve all raids to detain suspected rebels and that Chechen prosecutors be notified of such operations in advance had led to a decrease in abductions.

Human rights groups attributed at least part of the statistical decline to the reluctance of detainees' relatives to complain to the authorities or human rights groups out of fear of reprisals. Citing numerous incidents in which unidentified armed men wearing camouflage broke into houses and abducted civilians, they expressed skepticism about government assertions that regulations governing the behavior of security forces were being more closely observed.

Although federal forces were believed to have engaged in fewer abductions, this was to some extent offset by the increasing role of the pro-Moscow Chechen security forces under the command of Deputy Prime Minister Ramzan Kadyrov, either by themselves or in joint operations with federal forces. Human rights groups reported that these forces were frequently suspected of disappearances and abductions, including those of family members of rebel commanders

and fighters. The International Helsinki Foundation for Human Rights estimated in a February report that Kadyrov's militia was responsible for up to 75 percent of the crimes in Chechnya. For example the press reported that a 25-year-old resident of Argun was found dead in a rock quarry in June after members of the militia arrested him. Two days after being arrested, the victim was released after having been badly beaten. A few days later, he was ordered to return for further questioning and was not seen again until his body was discovered.

According to human rights observers, government forces responding to Chechen attacks at times engaged in indiscriminate reprisals against combatants and noncombatants. Federal forces were believed to be responsible for the June 2004 killing of Umar Zabiyev, a civilian, near the Ingush village of Galashki.

AI reported federal and Chechen security forces increasingly targeted female civilians, both in response to terrorist bombings carried out by Chechen women and to put pressure on male relatives suspected of being rebels. According to AI security forces detained 70-year-old Maret Khutsaeva and her teenaged granddaughter on May 10. Armed men in camouflage, without masks and speaking Chechen, arrived at her home and reportedly asked her where her son Arbi Khutsayev was. The two were held for one day and released on the condition that Khutsayev give himself up, with the warning that they would be detained again if he did not do so. Security forces also detained Natasha Khumadova, the sister of Chechen field commander Doku Umarov.

The whereabouts of Milana Ozdoyeva, whom the security forces questioned twice in January 2004 about her alleged plans to become a suicide bomber, were unknown. In January 2004 several men entered her house and took her away, leaving her two children behind.

Troops also reportedly kidnapped and otherwise mistreated children (see section 5).

Abductions reportedly continued in Ingushetiya. Memorial stated that 33 people were reported abducted during the year. Of them, 9 were freed, 4 were found dead, and 10 others disappeared. The remaining 10 were later found in the custody of law enforcement agencies.

AI and other human rights groups reported that Adam Gorchkhanov disappeared from the village of Plievo, Ingushetiya, on May 23. Gorchkhanov was reportedly detained in a raid involving 40 members of an unknown security service. He and his younger brother were beaten and the house searched, although security forces presented no warrant. Relatives subsequently learned that he had been held in the pretrial detention center in Vladikavkaz, North Ossetia, and later transferred to the Regional Department for the Fight Against Organized Crime under the MVD. On May 28, relatives learned that he had been taken to a hospital where, according to police statements, he jumped from a fourth floor window. A doctor, however, later told Memorial that Gorchkhanov had been admitted with a serious head injury. He died on May 30 from his injuries.

AI reported that prosecutors were continuing their investigation into the March 2004 disappearance of Ingush deputy prosecutor Rashid Ozdoyev after he submitted a report on alleged FSB abuses in Ingushetiya. Ozdoyev's whereabouts remain unknown, and no suspect has been identified in the case.

Throughout the year security forces continued to conduct security sweeps and passport checks at temporary settlements in Ingushetiya housing internally displaced persons IDPs from Chechnya. These sweeps sometimes led to reports of human rights abuses or disappearances.

Following rebel attacks across Ingushetiya in June 2004, federal forces conducted sweeps in several settlements housing IDPs from Chechnya. Human rights groups reported cases in which military personnel beat or verbally abused persons during these sweeps; however, the 20 IDPs they arrested were all released. Human rights groups also reported that several dozen Ingush and Chechens disappeared in Ingushetiya. As with similar operations in Chechnya, reports of beatings, arbitrary detentions, and looting usually followed security sweeps. Five men remain missing following a 2003 incident in which, according to HRW, pro-Moscow Chechen police burst into a clinic in Ingushetiya and abducted the men, one of whom was injured. One of the policemen struck a doctor with a rifle.

Pro-Moscow Chechen forces commanded by Ramzan Kadyrov and federal troops continued to arrest relatives of Chechen separatist leaders and fighters in an effort to force them to surrender, according to human rights groups. They noted that this practice may be linked to an October 2004 speech by Prosecutor General Ustinov suggesting that authorities detain relatives of alleged members of armed opposition groups in response to their hostage-taking (see section 1.d.).

On March 28, according to Memorial, Zaudi Sadulayev, aged 65, and his son were detained by forces under the command of Kadyrov in the village of Mairtup. Another of Sadulayev's sons was allegedly a member of the Chechen resistance. Similar cases cited by Memorial included the detention of a 13-year-old boy in the village of Noviye Atagi by Kadyrov's

forces and the abduction of four members of the Sirazhdiyev family on May 26 by unknown security forces in revenge for the killing of a member of the Vostok battalion.

Press and human rights groups reported that in September 2004, during the hostage taking in Beslan, federal forces took into custody relatives of Aslan Maskhadov, Shamil Basayev, and Doku Umarov, whom authorities accused of organizing the terrorist attack. Federal forces stated this was for the relatives' protection, but human rights groups alleged that the relatives would be used in a potential trade for hostages at the school. The relatives were subsequently released, but in December 2004, according to Memorial, eight relatives of Chechen leader Aslan Maskhadov were abducted. Maskhadov's relatives were released in May 2005, after federal forces killed him in March (see section 1.d.).

Government forces and Chechen rebel fighters have used landmines extensively in Chechnya and Dagestan since 1999; but there were fewer civilian landmine victims in Chechnya during the year. Federal forces and their opponents continued to use antipersonnel mines in Chechnya, although the publication, *Landmine Monitor*, reported that Chechen fighters increasingly used improvised explosive devices. Reports suggested that the number of landmine casualties was declining over time. According to 2005 statistics, UNICEF recorded 24 new civilian mine/UXO (unexploded ordinance) casualties, including 14 killed and 10 injured; 7 were children (5 killed and 2 injured). According to UNICEF, as of December 31, there were 3,037 landmine and UXO casualties in Chechnya since 1995. Of these, 2,338 were wounded and 699 killed. Among the casualties were 739 children, 607 of whom were wounded and 132 were killed. Unlike previous years, there were no reports that Chechen rebels used children to plant mines and explosives.

Chechen officials acknowledged the presence of mass graves and dumping grounds for victims, but there were no reports that new mass graves were discovered during the year. Nurdi Nukhazhiyev, head of the Chechen administration's Committee for Protecting the Constitutional Rights of Citizens, reported as many as 52 mass graves in the republic, although this report resulted in no investigations. In April 2004 local residents near the village of Serzhen Yurt found the bodies of nine men in a ravine. According to AI, the bodies bore gunshot wounds and marks of torture. Federal forces had detained eight of the men in March 2004 in the village of Duba Yurt. The ninth man had disappeared from his home in Grozny, according to AI. There were no reports by year's end that the government had initiated any criminal cases related to the mass grave discoveries. Memorial reported that it was unaware of any charges brought against federal security officers in response to the discovery of any mass graves.

Armed forces and police units were reported to have routinely abused and tortured persons in holding facilities where federal authorities sorted out fighters or those suspected of aiding the rebels from civilians. For example, Timur Khambulatov, arrested in March 2004 for allegedly belonging to an illegal armed group, died in police custody in March 2004 reportedly due to mistreatment.

Federal forces and police units reportedly ransomed Chechen detainees (and, at times, their corpses) to their families for prices ranging from several hundred to thousands of dollars.

Citing antiterrorism laws, federal authorities refused to return the body of Chechen separatist leader Aslan Maskhadov after security forces killed him on March 8. In October the authorities also refused to return bodies of fighters who attacked the city of Nalchik.

Since the start of the Chechen conflict, there have been widespread reports that federal troops killed or tortured suspected rebel fighters they had detained and that rebel fighters killed or abused captured federal troops and pro-Moscow Chechen security forces. A policy of "no surrender" appeared to prevail in many units on both sides.

According to human rights NGOs, federal troops on numerous occasions looted valuables and foodstuffs in regions they controlled. Many IDPs reported that guards at checkpoints forced them to provide payments or harassed and pressured them. The indiscriminate use of force by federal troops caused destruction of housing and commercial and administrative structures.

A climate of lawlessness and corruption flourished in Chechnya. The government investigated and tried some members of the military for crimes against civilians in Chechnya; however, there were few convictions and reports concerning the number of convictions differed. President Putin stated in a May interview that hundreds of criminal cases had been opened into alleged crimes by Russian servicemen and that over 50 persons had been convicted and given various prison terms, but he provided no further details.

Authorities reportedly arrested four Russian servicemen for the November 16 killing of 3 Chechen civilians in the village of Staraya Sunzha. According to press reports, the victims were shot and stabbed by drunken soldiers, who were stopping vehicles and demanding money at a checkpoint.

A human rights NGO reported that during the year a Groznyy garrison military court convicted serviceman Sergey Belyayev in a retrial on charges related to the death of 16-year-old Dzhandar Arsanov in April 2000. He was sentenced to five years in prison.

According to statistics compiled by the general prosecutor's office, through mid-year, verdicts had been rendered in 103 cases involving federal servicemen charged with crimes against civilians since 1999. Of these, 27 were given prison sentences of from 1 to 18 years, 8 were acquitted, and 20 were amnestied. Sentences in the remainder were suspended or the guilty were fined, according to Memorial. Government statistics also showed that 34 law enforcement officers were charged with crimes against civilians, with 7 sentenced to prison and the rest convicted and given suspended sentences.

The general prosecutor's office released statistics to the press in early December 2004 indicating that since 2001, 1,749 criminal cases were initiated in Chechnya to investigate approximately 2,300 cases involving disappeared persons. Of these, only 50 cases reached the courts. Memorial concluded that the majority of cases opened for alleged crimes by federal servicemen against civilians resulted in no charges because of the absence of the bodies or an inability to identify a suspect.

According to Minister of Justice Yuriy Chayka, from the start of the conflict through November 2003, 54 servicemen, including 8 officers, had been found guilty of crimes against civilians in Chechnya. A third trial was ordered for Captain Eduard Ullman and three others for the 2002 murder charges of six Chechen civilians after a military appellate court overturned their acquittals for the second time (see section 1.a.).

In May a retrial began of interior ministry officers charged with murdering three civilians in Chechnya in 2003. The retrial of Yevgeniy Khudyakov and Sergey Arakcheyev began after the Supreme Court overturned the north Caucasus military district court's June 2004 acquittal of the two officers. A news service reported that the court found the jury for the trial was convened improperly. Khudyakov and Arakcheyev allegedly shot the three civilians in January 2003 after forcing them out of a truck near Groznyy. The suspects then allegedly doused the victims' bodies with gasoline and ignited them in attempt to cover up the crime. A jury acquitted them again in October.

In April 2004 then-Chechen president Akhmed Kadyrov asked that the State Duma extend an amnesty that had expired in September 2003. In June 2004 following his assassination, his son Ramzan stated that the amnesty program should be ended and gave fighters three days to turn in their weapons. Ramzan Kadyrov subsequently made claims that rebels who surrendered had been amnestied, although there is no longer any official amnesty program.

On February 25, the ECHR found in favor of six Chechen applicants to the court. The ECHR found Russia in violation of several articles of the European Convention on Human Rights and Fundamental Freedoms. Two of the cases concerned the killing and mutilation of the applicants' relatives in Groznyy in 2000. Three others were brought in response to the bombing of a convoy of civilians in 1999 by Russian military aircraft. The sixth case involved the artillery and aerial bombardment of the village of Katyr Yurt in 2000 that resulted in the death of one applicant's son and three other relatives (see section 4).

Government forces continued to abuse individuals seeking accountability for abuses in Chechnya and continued to harass applicants to the ECHR. AI and other human rights groups have reported reprisals against applicants to the court, including killings, disappearances, and intimidation. According to press reports and human rights NGOs, at least five applicants to ECHR have been killed or abducted. In April armed men took two ECHR applicants from their homes. The body of one of them was found in May, and the other person was still missing. Other applicants reported that they were offered pay-offs or were threatened in an effort to have them drop their cases.

The authorities continued to target the Russian-Chechen Friendship Society (RCFS). The RCFS has urged negotiations with Chechen separatists to settle the conflict and has reported on human rights abuses by security forces. RCFS offices in Nizhniy Novgorod were raided in January and separate criminal and tax cases were opened against RCFS' executive director and the organization (see section 4). In January 2004 human rights activist Aslan Davletukayev, an RCFS volunteer, was kidnapped, tortured, and killed in Chechnya under circumstances that suggested the involvement of government forces. He was the third volunteer with the RCFS to have been killed since December 2001. According to AI and other human rights groups, he had been in the custody of federal forces. A criminal investigation into the incident was inconclusive and no charges were brought. The RCFS reported that it received anonymous threats following the September 2004 seizure of the school in Beslan.

In 2003 Memorial reported that federal forces abducted Fatima Gazayeva of the human rights organization Echoes of War, a regional organization that reported on human rights abuses, and her husband Ilyas Atayev. They were released two days later but indicated they had no idea where they had been kept and by whom. They indicated that their captors had not treated them abusively.

Government oversight over human rights conditions in the Northern Caucasus remained weak. In January 2004 President Putin abolished the post of presidential Human Rights Representative to Chechnya on the grounds that no other region had an analogous representative and Chechnya no longer warranted special treatment. Putin handed full responsibility for the issue to then-Chechen president Akhmed Kadyrov. In June 2004 Chechen President Alu Alkhanov appointed Lema Khasuyev as the republic's human rights ombudsman. On June 15, 2005 Khasuyev said he would not cooperate with the human rights NGO Memorial, claiming that it was biased and was working in the interests of foreign donors.

The Independent Commission on Human Rights in the Northern Caucasus headed by the Chairman of the State Duma Committee on Legislation maintained a number of offices in Chechnya and Ingushetiya. It heard hundreds of complaints, ranging from destruction or theft of property to rape and murder; however, it was not empowered to investigate or prosecute alleged offenses and had to refer complaints to military or civil prosecutors. Almost all complainants alleged violations of military discipline and other crimes by federal and Chechen government forces.

Chechen rebel fighters also committed numerous serious human rights abuses. They committed terrorist acts against civilians in Chechnya and elsewhere in the country, killed civilians who would not assist them, used civilians as human shields, forced civilians to build fortifications, and prevented refugees from fleeing Chechnya. In several cases Chechen fighters killed elderly ethnic Russian civilians for no apparent reason other than their ethnicity. Verifying or investigating these incidents was difficult. Chechen Minister of Internal Affairs Ruslan Alkhanov identified 120 attacks that he characterized as terrorist in Chechnya in 2004, but it was unclear what methodology he used to cite that figure. Alkhanov said this figure was lower than in 2003.

Chechen rebels committed a number of terrorist acts involving bombings during the year. On July 19, a bomb planted by fighters killed 15 people including a number of civilians, and injured nearly 30 others in the Chechen village of Znamenskoye. Police were lured to the scene of the explosion after rebels placed a corpse in a stolen police car and made it appear as though a shooting was taking place. On August 15, a woman and a 12-year-old boy were killed in central Groznyy when a car bomb exploded near the government compound. Eleven others were wounded.

Chechen terrorist Shamil Basayev continued to take responsibility for rebel attacks outside Chechnya and to threaten new ones. In an interview in which he acknowledged he was a terrorist, Basayev said that attacks similar to that on the Beslan school were possible.

According to authorities, 12 civilians were killed during a large-scale rebel attack on Nalchik, capital of the Republic of Karbardino-Balkariya. The attackers, who numbered as many as 300, targeted military garrisons and police stations throughout the town. The death toll among military and law-enforcement personnel was reported to be 34. Chechen rebel leader Shamil Basayev claimed responsibility. Most observers appeared to believe that a majority of the attackers were natives of Karbardino-Balkariya.

There were also rebel attacks in other parts of the Northern Caucasus. Chechen rebels continued to launch attacks on government forces and police in Ingushetiya during the year.

These attacks follow a number of terrorist acts in 2004. In February 2004 Basayev claimed responsibility for an attack in which a suicide bomber blew up a car on the Moscow metro, killing 40 persons. In March 2004 terrorist Abu al-Walid stated that further attacks should be expected. In August 2004 suicide bombers from Chechnya were believed to have carried out the near-simultaneous downing of two civilian aircraft, killing 89 persons, and a suicide bombing later that month at a metro station in Moscow that killed ten persons. In September 2004 terrorists took an estimated 1,200 teachers, children and parents hostage in a school in Beslan, North Ossetia. During the hostage-taking and the rescue effort by troops and security forces, at least 330 hostages died. Security forces subsequently killed most of the hostage takers in a firefight that lasted several hours.

In other incidents, rebels took up positions in populated areas and fired on federal forces, thereby exposing civilians to federal counterattacks. When villagers protested, the rebels sometimes beat them or fired upon them. Chechen fighters also targeted civilian officials working for the pro-Moscow Chechen Administration. On November 29, about 100 Chechen rebels raided the village of Avtury, killing the head of the village administration Ibragim Umpashayev and his son Isa. In May 2004 Chechen president Akhmed Kadyrov was assassinated while attending a Victory Day celebration in Groznyy. Chechen fighters also reportedly abused, tortured, and killed federal soldiers whom they captured. Rebels continued a concerted campaign, begun in 2001, to kill civilian officials of the government-supported Chechen Administration. According to Chechen sources, rebel factions also used violence to eliminate economic rivals in illegal activities or to settle personal accounts.

Rebel field commanders reportedly resorted to drug smuggling and kidnapping to fund their units. As a result, distinguishing between rebel units and criminal gangs was often difficult if not impossible. Some rebels allegedly received financial and other forms of assistance from foreign supporters of international terrorism. Government officials continued to

maintain that there were two to three hundred foreign fighters in Chechnya.

International organizations estimated that the number of IDPs and refugees who left Chechnya as a result of the conflict reached a high of approximately 280 thousand in the spring of 2000 (see section 2.d.). At various times during the conflict, authorities restricted the movement of persons fleeing Chechnya and exerted pressure on them to return there (see section 2.d.).
At year's end, the Office of the UN High Commissioner for Refugees (UNHCR) estimated that 26,155 IDPs remained in Ingushetiya in private accommodations and in temporary settlements. Two hundred thousand displaced persons were estimated to live within Chechnya, including thousands living in temporary accommodation centers. Conditions in those centers reportedly failed to meet international standards.

Beginning in September 2004, authorities refused to grant the ICRC access, under ICRC's standard criteria, to those detained as part of the conflict in Chechnya, and the ICRC subsequently suspended its detention visits.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press; however, government pressure on the media persisted, resulting in numerous infringements of these rights. Faced with continuing financial difficulties, as well as pressure from the government and large private companies with links to the government, many media organizations saw their autonomy further weaken. The government used its controlling ownership interest in all national television and radio stations, as well as the majority of influential regional ones, to restrict access to information about issues deemed sensitive. It severely restricted coverage by all media of events in Chechnya. There were indications that government pressure frequently led reporters to engage in self-censorship. Nonetheless, on most subjects, the public continued to have access to a broad spectrum of viewpoints in the print media and, for those with access, on the Internet.

While the government generally respected citizens' rights to freedom of expression, it sometimes restricted this right with regard to issues such as the conduct of federal forces in Chechnya, discussions of religion, or controversial reforms in the social sector. Some regional and local authorities took advantage of the judicial system's procedural weaknesses to arrest persons for expressing views critical of the government (see section 1.d.). With some exceptions, judges appeared unwilling to challenge powerful federal and local officials who sought to prosecute journalists. These proceedings often resulted in stiff fines.

On March 28, Yuriy Samodurov and Lyudmila Vasilovskaya, employees of the Sakharov Center, were found guilty of inciting religious hatred and fined $3,500 (100 thousand rubles) each. The prosecution stemmed from an exhibit on religious subjects which they organized. The defendants were convicted, after a lengthy litigation process, of inciting national, racial, and religious hostility by organizing an exhibit at the Sakharov Center in Moscow in January 2003, which some viewed as being provocative on religious issues.

Although all but two national newspapers remained privately owned, as did more than 40 percent of the 45 thousand registered local newspapers and periodicals, the government attempted to influence the reporting of independent publications. In June Gazprom, a company in which the government owns a controlling stake, bought the daily newspaper *Izvestiya*. In the months before the sale the newspaper's critical coverage of governmental performance, and particularly its coverage of the Beslan school massacre, had reportedly aroused the ire of the Kremlin and given rise to significant editorial changes, including an increase of non-political content at the expense of political analysis, and resignations of senior editors critical of the Kremlin. Media freedom advocates viewed the paper's acquisition by Gazprom, which in 2003 had acquired the last major independent television channel, as further evidence of continuing Kremlin efforts to expand control of media beyond national television before the 2007-08 parliamentary and presidential elections. In late 2005, after a personnel change at *Izvestiya*, the newspaper's editorial staff was reportedly told on several occasions to be careful not to provoke Kremlin authorities. *Izvestiya*'s coverage of the late-2005 elections in Chechnya was allegedly less critical than might have been expected under the previous ownership.

Approximately two-thirds of the 2,500 television stations in the country were completely or partially owned by the federal and local governments, and the government indirectly influenced private broadcasting companies through partial ownership of such commercial structures as Gazprom and Eurofinance Bank, which in turn owned controlling or large stakes of media companies. Such influence was not uniform, however. Employees continued to exercise program control at the radio station Ekho Moskviy, although it is owned in part by Gazprom. The station maintained an independent editorial position, offering political figures across the entire political spectrum the opportunity to air their views and covering issues skirted by other electronic media. A similar stance was maintained by a number of sister stations that Ekho has established in other major cities.

Of the three national television stations, the government had a direct interest in two, the Rossiya Channel, which it owned outright, and the First Channel, in which it held a majority interest (the third national television network is NTV). The only remaining television network that had exhibited independence of the Kremlin, REN-TV, was sold during the year. REN-TV ended up under the shared control of Severstal Group and Surgutneftegas Company, each with 35 percent of the shares and both under the control of Kremlin allies. The German media company RTL owned the remaining 30 percent of REN-TV. Following the sale REN-TV observers alleged that the network's editorial line became more pro-Kremlin. The network's November 24 decision to cancel the news show "24," which was anchored by one of Russia's most outspoken journalists, Olga Romanova, was seen as evidence of this trend. A wave of resignations of REN-TV news staff ensued, amid allegations the network had started to practice self-censorship aimed at keeping the government happy.

In February the Ministry of Defense launched a new military-patriotic channel Zvezda featuring programs and movies focusing on the armed forces. In December the English-language channel Russia Today launched by the government officially began broadcasting; when the plans for the channel were originally announced the goal of the channel was "improving Russia's image" with Western audiences. Gazprom had a controlling ownership stake in NTV, the third national television station, which maintained a more independent editorial line. The government also maintained ownership of the largest radio stations, Radio Mayak and Radio Rossiya, and the news agencies ITAR-TASS and RIA-Novosti.

The government exerted its influence most directly on state-owned media. Journalists and news anchors of Rossiya and First Channel reported receiving "guidelines" from the management prepared by the Presidential Administration, indicating which politicians they should support and which they should criticize. The two networks promoted a positive image of President Putin and suppressed reporting on the war in Chechnya, the government's legal prosecution of Yukos, the electoral crisis in Ukraine, the nationwide public protests against unpopular welfare reform, and the elimination of gubernatorial elections. Apparently as a result of government influence, criticism of presidential policies was also muted on NTV. The federal government and some regional governments also sought through various means to dampen criticism in many privately owned print publications, although with little apparent effect.

During the year the government continued to circumscribe the editorial independence and political influence of NTV. On March 10, NTV management prohibited the airing of an investigative program about the 2000 killing of Ukrainian journalist Georgiy Gongadze. Media reports cited NTV sources as saying the program contained interviews with Ukrainian politicians and former senior government officials who made allegations of possible Russian government involvement in the killing. According to media freedom advocates, the program was pulled by order of Presidential Administration officials, who also demanded that NTV abstain from further reporting on Gongadze's case.

Government-controlled media exhibited considerable bias in favor of President Putin in its coverage of the March 2004 presidential campaign. President Putin did not actively campaign, but, as the OSCE election observation mission noted, he received coverage on the state-controlled television channels far beyond what was reasonably proportionate to his role as head of state. For example, the OSCE election observation mission reported that First Channel provided him with more than 4 hours of all-positive political and election coverage; the next most covered candidate received approximately 21 minutes of prime time coverage (see section 3).

The Ministry of Internal Affairs controlled media access to the area of the Chechen conflict.

In February the Ministry of Culture and Mass Communications issued a warning to the daily newspaper Kommersant for publishing on February 7 an interview with Chechen rebel leader Aslan Maskhadov. The ministry claimed the interview "justified extremist activities." Under legislation governing the media, multiple warnings might allow the ministry to suspend the newspaper's publication. On April 19, the Moscow arbitration court rejected the newspaper's appeal of the warning.

On June 1, police and FSB agents in Nazran, Ingushetia, detained Mariusz Pilis, Marcin Mamon, and Tomasz Glowacki, journalists of the Polish state television station TVP. The journalists, who were working on a documentary about Chechnya, had valid Russian visas and the necessary accreditation. After 14 hours in detention, the journalists' tapes were confiscated, and they were told their visas and accreditation cards were no longer valid and that they had to leave Ingushetia within 24 hours.

On July 28, a well-known foreign television company aired an interview with Chechen terrorist Shamil Basayev, despite requests from the Russian Government that the network cancel the broadcast. The Ministry of Foreign Affairs (MFA) said in a statement that the interview, recorded by journalist Andrey Babitskiy at the end of June, "allowed terrorists to use the media to intimidate the international community." The ministry declared any further contacts between the network and governmental agencies undesirable, and said its staff's accreditation would not be renewed. Foreign journalists are required to obtain accreditation from the ministry to work in the country. Minister of Defense Sergey Ivanov ordered all military personnel to avoid contact with the network.

Mistreatment of journalists by the authorities was not limited to Caucasus-related coverage. The Glasnost Defense Fund (GDF) and other media freedom monitoring organizations reported numerous abuses of journalists by police and other

security personnel elsewhere, including physical assault and damaging of equipment. In most instances, however, the mistreatment appeared to have been at the initiative of local or provincial officials.

For example, on March 30 police in Voronezh beat Vladimir Lavrov, photographer of the newspaper *Moyo*, who attempted to take pictures of police searching a group of young soccer fans near a stadium. Although Lavrov showed the police his press credentials, they knocked him down, beat him, and seized his digital camera's memory card. On May 31, police in Moscow's Red Square beat Aydar Buribayev, a correspondent for the daily *Gazeta*, and Shagen Ogandzhanyan, a correspondent for the daily *Novaya Gazeta*, who were covering a rally by a radical youth group. Buribayev, Ogandzhanyan, and *Novaya Gazeta* correspondent Irina Gordiyenko were subsequently taken to a police station, interrogated, and released after several hours. According to Oganidzhan, an officer of the Federal Guard Service whom he met at the police station threatened to withdraw *Novaya Gazeta's* Kremlin accreditation.

According to the GDF, 60 journalists were physically attacked during the first 11 months of the year and 6 were killed. At least three of the deaths may have been related to their work in journalism. In most cases authorities and observers were unable to establish a direct link between the assault and those who reportedly had taken offense at the reporting in question.

Independent media NGOs still characterized beatings of journalists by unknown assailants as "routine," noting that those who pursued investigative stories on corruption and organized crime found themselves at greatest risk.

In May Pavel Makeyev, a reporter from the local Rostov-on-Don TV company TNT-Plus, was found dead with multiple bruises and fractures on his body. His body was discovered in a ditch, and his equipment and cell phone were missing. He died shortly after beginning work on a story about illegal drag races. Some of his colleagues stated that Makeyev's death was linked to his work.

On June 28, unknown assailants in Makhachkala shot Magomedzagid Varisov, director of Center for Strategic Initiatives and Political Technologies and a columnist for the local weekly *Novoye Delo*. Varisov's colleagues said he received numerous threats in connection with his commentary on local politics. No progress in the investigation of Varisov's killing has been reported.

In October Tamirlan Kazikhanov, the Head of the Press Service of the Counter Terrorist Center of the Ministry of Interior in the Southern Federal District was killed by rebels during an assault on the center's office in Nalchik. A sniper fatally shot Kazikhanov after he took a camera and started to film the attack on the building. Kazikhanov had worked on several documentaries about counter-terrorist operations in the Northern Caucasus.

Other investigative journalists attacked during the year in circumstances suggesting that their professional work may have provided the motive for their attackers included Dmitriy Suryaninovii, General Director of Media-Samara company; Viktor Naikhin, *Komsomolskaya Pravda* correspondent in Voronezh; Yelena Rogacheva, correspondent of Radio Free Europe/Radio Liberty in Mari-El Republic; Sergey Lyubimov, correspondent of the newspaper *Bogatey* in Saratov; Aleksandr Boyko, *Komsomolskaya Pravda* correspondent in Moscow; Maksim Leonov, correspondent of the daily *Delo* in St. Petersburg; Andrey Zakharov, investigative reporter of *Pravda Severa* in Arkhangelsk; and Olga Kiriy, First Channel correspondent in Pyatigorsk.

High-profile cases of journalists killed or kidnapped in earlier years remained unsolved. The government announced that it had detained two of five Chechens suspected in the 2004 killing of Paul Klebnikov, the editor-in-chief of the magazine *Forbes Russia*. The others are fugitives. One of the suspects, former separatist Chechen figure Khoz-Akhmed Nukhayev was charged with ordering the killing. The trial of the two suspects in custody began on December 29. In accordance with the criminal code, a representative of the Klebnikov family was given access to the file on the case and President Putin met with the family in September to discuss the case.

No progress was reported in the investigations of the 2004 killing of Shangysh Mongush, a newspaper journalist in the Tuva Republic, or the 2003 killing of Aleksey Sidorov, editor-in-chief of daily newspaper *Tolyattinskoye Obozreniye* in Togliatti, Saratov. Other unresolved cases of missing or killed journalists from 2003 include: Dmitriy Shvets, deputy head of TV-21 in Murmansk; Alikhan Guliyev, a freelance journalist covering Chechnya for Television Center and the daily newspaper *Kommersant*; and Ali Astamirov, an Agence France-Presse correspondent kidnapped in Ingushetiya.

On March 11, the Military Collegium of the Supreme Court rejected the general prosecutor's appeal of the June 2004 Moscow circuit military court's acquittal of all the defendants accused of organizing the 1994 killing of Dmitriy Kholodov, military affairs correspondent for the daily newspaper *Moskovskiy Komsomolets* (see section 1.a.).

Authorities at all levels employed administrative measures to deter critical coverage by media and individual journalists.

One method was to deny the media access to events and information, including filming opportunities and statistics theoretically available to the public. For example, under the new media accreditation regulations adopted by the government of Karachayevo-Cherkesiya Republic in March, only media outlets providing "objective" reporting on the local government are allowed access to government media events. On June 8, traffic police in Kabardino-Balkariya stopped a vehicle taking a Ren-TV film crew to the town of Tyrnauz to report on a public rally. When the journalists pressed the police for an explanation, they were told that an order had been received not to allow the press into town. Fatima Tlisova, a correspondent of the Regnum information agency, who was also going to report on the rally, was stopped by two police officers, who got into her car and forcibly drove her back to the nearby town of Nalchik. On June 17, authorities in Yoshkar Ola, Mari-El Republic, denied Radio Liberty correspondent Yelena Rogacheva access to a press conference with Estonian, Finnish, and Hungarian ambassadors at the conclusion of their visit to the republic. According to Rogacheva, local authorities in Mari-El rarely allowed non-state media representatives to attend official press events. In August the Moscow city court introduced special accreditation for journalists to attend open court sessions. The accreditation rules allow authorities to deny journalists access to the court for "criticism devoid of evidence of judges and other court employees," and require journalists to give one-day advance notice of their visits.

At times officials or unidentified individuals used force or took extreme measures to prevent the circulation of publications that were not favored by the government. For example, on February 23 the administration of Krasnodar Kray purchased and destroyed the entire local issue of *Versiya* newspaper, which carried an article critical of Governor Aleksandr Tkachev. On March 17, police in Gus Khrustalniy, Vladimir Oblast, seized the entire issue of *Vladimirskiy Kray* daily. The newspaper's editor-in-chief, Irina Tabatskova, linked the seizure to the newspaper's criticism of local officials affiliated with the pro-Kremlin United Russia party. On May 26, unidentified individuals in Sokol, Vologda Oblast, forcibly seized from a distributor all the copies of the local newspaper *Nash Regyon*. The newspaper's employees said the issue contained articles critical of the mayor of Sokol and favorable to his rival in an upcoming election.

Legal actions against journalists and journalistic organizations were another tool employed by authorities at the federal and local levels, primarily in response to unfavorable coverage of government policy or operations. The GDF estimated that more than 100 such cases were brought during the first 6 months of the year. However, the utility of this tool was partially diminished as a result of a decision by the Supreme Court in December 2004 prohibiting courts from imposing sentences in libel and defamation cases that would bankrupt the media organization being sued. However, one NGO reported that the decision was not always implemented properly on the local level. The court's order stated that compensations "should be commensurate with the damage and not infringe upon press freedom."

In February Eduard Abrosimov, Public Relations Adviser to the governor of the Saratov Oblast and a columnist with a number of local newspapers, was arrested on libel charges for having publishing in December 2004 in *Sobesednik* newspaper a negative article about State Duma Deputy Chairman Vyacheslav Volodin. Investigators confiscated Abrosimov's computer and claimed to have found articles besmirching Volodin and a number of senior Saratov officials. The articles included a draft of a 2004 story accusing an official with the Saratov prosecutor's office of corruption. Although that accusation was edited out prior to the publication of the article, investigators used the unedited draft to bring libel charges against Abrosimov. According to an NGO that monitors press freedom, on June 23 Abrosimov was sentenced to seven months' imprisonment, and was later released in October for time served.

On June 1, the Moscow arbitration court reversed a 2004 decision and ordered Alpha-Bank to repay the newspaper *Kommersant Daily* $9.5 million (270 million rubles) of the original fine of $10.9 million (310.5 million rubles) fine it had been awarded as compensation for losses and damage to its reputation brought about by a July 2004 story about the bank's financial problems.

On June 6, a Smolensk district court sentenced Nikolay Goshko, deputy editor-in-chief of the local weekly *Odintsovskaya Nedelya*, to five years of hard labor as a result of a libel suit filed in 2000 by the governor and vice governor of Smolensk region. Goshko's articles and a radio program aired in 2000 accused the officials of masterminding the murder of Sergey Novikov, a Smolensk radio journalist who investigated corruption by local officials. Novikov's killers have never been found. Following Goshko's appeal of the sentence, the charge was reduced to criminal insult and in August he was released.

Authorities at various levels took advantage of the financial dependence of most major media organizations on the government or on major financial-industrial groups to undermine editorial independence and journalistic integrity in both the print and broadcast media. Government structures, banking interests, and the state-controlled energy giant Gazprom continued to dominate the Moscow media market and extend their influence into the regions. Most news organizations experienced continued financial difficulties during the year, which reinforced their dependence on private sponsors and, in many cases, on the federal and regional governments. As a result, the autonomy of the media and its ability to act as a watchdog remained weak.

The authorities also made use of the media's widespread dependence on governments for transmission facilities, access to property, and printing and distribution services to discourage critical reporting, according to the GDF and media NGOs. The GDF reported that approximately 90 percent of print media organizations relied on state-controlled organizations for

paper, printing, or distribution, and many television stations were forced to rely on the government (in particular, regional committees for the management of state property) for access to the airwaves and office space. The GDF also reported that officials continued to manipulate various other "instruments of leverage," including the price of printing at state-controlled publishing houses, to apply pressure on private media rivals. The GDF noted that this practice was more common outside the Moscow area than in the capital. For example, on January 13, city authorities in Petropavlovsk-Kamchatskiy abruptly cancelled a lease contract with Troyka media company, which includes three newspapers, a television station and a radio station, and demanded that the media outlets leave their city-owned premises in five days. Troyka's management said the company was being persecuted for its frequent criticism of local authorities. In June a printing plant in Prokhladniy, Kabardino-Balkariya Republic, refused to print the local newspaper *Islam and Society*, citing instructions from the republic's prosecutor general. According to GDF, law enforcement authorities accused the newspaper of supporting religious extremism. The journalists argued that the newspaper came under pressure when it began to reprint articles from the national press about the political and economic situation in the republic.

According to the GDF and other media NGOs, there were numerous instances of the use of taxation mechanisms to pressure media across the country.

The government generally did not restrict access to the Internet; however, it continued to require Internet service providers to provide dedicated lines to the security establishment so that police could track private e-mail communications and monitor Internet activity (see section 1.f.).

The government did not restrict academic freedom; however, human rights and academic organizations questioned whether the convictions of Sutyagin, Danilov, and others inhibited academic freedom and contact with foreigners on subjects that the authorities might deem sensitive (see section 1.e.).

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly and the government generally respected this right in practice; however, at times authorities restricted this right.

Organizations are required to obtain permits in order to hold public meetings. They must apply for these permits between 5 and 10 days before the scheduled event. Such permits were generally granted to both supporters and opponents of the government. For example early in the year groups that were opposed to a large-scale government program of welfare reforms demonstrated nationwide against the measures. Opponents of the reform also held some rallies without permits, and the authorities reportedly did not interfere. While the police often granted demonstration permits to both opponents and supporters of the government, local elected and administrative officials at times denied some groups permission to assemble. Religious gatherings and assemblies do not require permits, but in several instances the authorities denied religious groups access to venues where they could hold assemblies (see section 2.c.).

On May 30, Moscow police, after breaking up a demonstration in front of city hall, detained 10 congregants and supporters of the Emmanuel Pentecostal Church. Members and supporters of the church continued to demonstrate, alleging discrimination by authorities who had refused the church permission to construct a church and renovate buildings in Moscow and another district. In June several of these demonstrators were arrested during a demonstration. City authorities contended that the demonstrations were illegal and that they had advised the demonstrators to hold their protests at an alternative site. Protesters said that the demonstration was legal and that they had never received such instructions from city authorities. Several protesters were charged with holding an illegal demonstration and sentenced to five-day jail terms.

In September Moscow officials denied the request of the youth organization "We" to hold a protest. The youth organization's leader alleged that the request was denied because the organization had called for President Putin's resignation.

Some controversial political gatherings resulted in violence. On August 12, a group of young men reportedly attacked protesters rallying in support of Mikhail Khodorkovskiy. Also in August, individuals allegedly armed with clubs attacked a gathering of left-wing youth organizations in Moscow. Police reportedly confirmed that at least three persons were injured in the attack.

Freedom of Association

The law provides for freedom of association, and the government generally respected this right; however, the government

increasingly harassed several organizations of whose policies it disapproved. Public organizations must register their bylaws and the names of their leaders with the MOJ. There was no clear evidence that these registration requirements were being used to discourage or prevent the formation of associations; however, they afford an opening for abuse on the part of the authorities. The law requires that political parties have 50 thousand members nationwide, at least 500 representatives in each of half of the country's regions, and no fewer than 250 members in each of the remaining regions in order to be registered (see section 3). In addition the finances of registered organizations are subject to investigation by the tax authorities and foreign grants must be registered. The authorities subjected some NGOs to lengthy investigations of their finances or delayed the registration of their foreign financed programs. Some NGOs said that these actions were intended to restrict their activities (see section 4).

A number of senior officials made critical statements during the year that contributed to, and reflected, increased suspicion of NGO activity. For example, at a July 20 meeting of the Presidential Council on Promoting the Development of Institutions of Civil Society and Human Rights, President Putin stated that he objected to foreign financing of "political activity" in Russia. On May 12, FSB Director Nikolay Patrushev said that foreign NGOs were often used for espionage. In his May 2004 State of the Nation address, President Putin charged that some foreign-funded NGOs existed "to serve dubious groups."

On November 23, the State Duma passed an initial version of controversial NGO legislation. Elements of the legislation raised concerns that it would hinder the work of NGOs and the continued development of civil society in Russia. The final version of the legislation that was passed by the State Duma on December 23 and the Federation Council on December 27 contained a number of changes from the original version of the legislation. However, many international and domestic NGOs did not believe that the amended legislation fully addressed the concerns that were raised by them and foreign governments. At year's end President Putin had not signed the legislation.

Authorities in a number of regions continued operations against Hizb ut-Tahrir, which had been banned by the Supreme Court in 2003 as a terrorist organization, despite the organization's denials that it supported terrorism. For example, in Bashkortostan Republic, Tyumen and Chelyabinsk Oblasts, there were arrests and trials of alleged Hizb ut-Tahrir members. In August eight Hizb ut-Tahrir defendants were sentenced in Ufa, Bashkortostan to prison terms ranging from 3 1/2 to 8 1/2 years on charges of terrorism, forming a criminal group, involving others in terrorist crimes, illegal possession of arms, and sabotage. A ninth defendant was given a suspended sentence. The court hearings started in April.

On August 16, the Supreme Court overturned a June decision by a lower court forcing the closure of the radical National Bolshevik Party. On October 5, the Presidium of the Supreme Court canceled the August 16 decision of the Supreme Court and sent the case back for new hearings. On November 15, the Supreme Court ruled in favor previous Moscow Regional Court's decision to ban the party.

c. Freedom of Religion

The law provides for freedom of religion, and the government generally respected this right in practice; however, the authorities imposed restrictions on some groups. Although the law provides for the equality of all religions before the law and for the separation of church and state, the government did not always respect these provisions in practice.

On April 14, masked paramilitary troops stormed the Work of Faith Church in Izhevsk, Udmurtiya Republic, during a worship service. They reportedly took the worshippers outside, searched them without a warrant, and threatened some of the women with rape. Forty-six persons were detained for as long as 24 hours. Udmurtian officials claimed that there had been no time to get a warrant and that some police officials had been reprimanded for procedural irregularities. According to Udmurtian authorities, the raid was part of a murder investigation involving two former parishioners of the Work of Faith Church.

A 1997 law on "Freedom of Conscience" requires all religious organizations registered under the previous 1990 law to reregister by December 31, 2000. The law provides that a religious group that has existed for 15 years and has at least ten citizen members may register as a "local organization." It acquires the status of a juridical person and receives certain legal advantages. A group with three functioning local organizations in different regions may found a "centralized organization," which has the right to establish affiliated local organizations without meeting the 15-year-rule requirement. In practice the law places a hardship on groups that were previously unregistered and less well established, including groups new to the country. The process, which involves simultaneous registration at the federal and local levels, requires considerable time, effort, and legal expense.

A January amendment to the law requires all registered local religious organizations to inform the Federal Registration Service Department (FRSD) within three days of any change in leadership or legal address, which brought the treatment of religious organizations into conformity with that of other nongovernmental organizations. If a local organization fails to meet this requirement on two occasions, the FRSD may file suit to have it dissolved and stricken from the registry. The law

accords no explicit privileges or advantages to the Russian Orthodox Church (ROC) or the other groups formally designated as traditional religions--Judaism, Islam and Buddhism. However, many politicians and public figures argued for closer cooperation with those religions, above all with the ROC's Moscow Patriarchate. Many government officials and citizens appeared to equate Russian Orthodoxy with the Russian national identity. The ROC has a number of formal and informal agreements with government ministries on matters such as guidelines for public education, religious training for military personnel, and law enforcement and customs decisions. These agreements have given the ROC far greater access than other religious groups to public institutions such as schools, hospitals, prisons, the police, the FSB, and the army. Public statements by some government officials and anecdotal evidence from religious minorities suggest that the ROC has increasingly enjoyed a status that approaches official.

The MOJ reported that, as of May 2004, there were 21,664 registered organizations. Local courts largely upheld the right of nontraditional groups to register or reregister. Nonetheless, some religious groups continued to battle denials of registration in the courts. While such cases were often successful, administrative authorities were at times unwilling to implement court decisions. For example, the Moscow regional office of the MOJ has still not reregistered the Moscow branch of the Salvation Army, although the constitutional court found in 2003 that earlier rulings by Moscow courts dissolving the Moscow branch of the Salvation Army were unconstitutional. A court ruling against the Salvation Army's registration in Moscow's Presnenskiy District referred to the Salvation Army as a "militarized organization." A lawyer from the Slavic Center for Law and Justice was working with the Salvation Army at year's end to assist in registering. The ECHR ruled in June 2004 that the group's complaint that it had not been allowed to reregister was admissible but did not rule on the complaint itself during the year.

The Moscow branch of the Church of Scientology has continued to be denied reregistration by the Moscow authorities and is facing threats of dissolution. On February 4, a Moscow appeals court ordered regional officials to permit the Church to apply for reregistration and to examine the application on the merits. Since 1997, the Scientology Church in Moscow has been refused reregistration 15 times. In 2003 the Church of Scientology in St. Petersburg filed suit in response to local authorities' repeated refusal to register their branch. A June hearing was postponed for an unspecified time due to the illness of the presiding judge. The latest hearing took place on December 20 during which the judge ruled in favor of local authorities' refusal to register the branch. The ECHR found admissible a suit filed jointly by the Church of Scientology in Surgut, Khanty-Mansiyskiy Autonomous Okrug, and by the Church of Scientology in Nizhnekamsk, Tatarstan Republic, against Russian officials' refusal to register their branches of the church. Local officials continued to refuse to register the Church in Dmitrograd, Izhevsk, Magnitogorsk, and Ufa.

The Church of Jesus Christ of Latter-day Saints has sought without success to register a local religious organization in Kazan, Tatarstan, since 1998.

A more serious legal step than denying registration to an organization is banning, which prohibits all of the activities of a religious community. The June 2004 decision of the Moscow city court resulted in a city-wide ban of the Jehovah's Witnesses. The ban has had far-reaching consequences not just in Moscow. Many local congregations throughout the country reported that rental contracts on their buildings had been cancelled or appeared to be at risk of cancellation. In other instances, such as in 2004 in the Tatarstan Republic and Primorskiy Kray, the Witnesses won appeals that overturned dissolution orders issued by lower courts. The ban on the Islamic organization Hizb ut-Tahrir, which was declared to be a terrorist organization, remained in effect and a number of prosecutions were undertaken (see section 2.b.).

Treatment of religious organizations, particularly minority denominations, varied widely in the regions, depending on the decisions of local officials. In some areas local authorities prevented minority religious denominations from reregistering as local religious organizations, subjecting them to campaigns of legal harassment.

Contradictions between federal and local law in some regions and varying interpretations of the law provided some regional officials with opportunities to restrict the activities of religious minorities. According to many observers, an increasing susceptibility of local governments to discriminatory attitudes and lobbying by majority religions led to discriminatory practices at the local level. However, instances in which local officials detained individuals engaged in public discussion of their religious views remained isolated and were usually resolved quickly.

The issue of juridical status was not the only one faced by minority religious groups. Some local and municipal governments prevented minority religious groups from using venues for large gatherings and from acquiring property for religious uses. Regional and local authorities, as well as businessmen, on a number of occasions refused to lease facilities to local Jehovah's Witnesses communities. Longstanding rental contracts for Witnesses' meeting rooms were cancelled in Moscow, Sochi, Roshchino, Yekaterinburg, Chelyabinsk, Khabarovsk, and Ufa after the ban came into effect. During the year Jehovah's Witnesses religious assemblies were also disrupted or prevented in Yekaterinburg and Archangelsk. Witnesses reported that during the year, in Yekaterinburg, Arkhangelsk and elsewhere, authorities consulted with the ROC concerning meeting requests.

Jehovah's Witnesses reported continuing difficulties obtaining construction permits in Sosnovyy Bor, Leningrad Oblast. Local authorities there refused to let a Witnesses community use land to construct a prayer center, basing their refusal on a March 2004 referendum, in which 90 percent of voters opposed the construction. In Zlatoust, Chelyabinsk Oblast, local authorities withdrew a building permit issued to the Witnesses, and threatened to tear down a new Witnesses' prayer hall. Various minority religious organizations encountered similar difficulties in obtaining or renovating property. The mayor's office in Krasnodar failed to authorize the Muslim community to build a mosque in the city of Sochi. The Muslim community in Kaliningrad has sought unsuccessfully since 1993 to obtain permission to construct a mosque.

Human rights groups and religious minority groups criticized the federal prosecutor general for encouraging legal action against some minority religions and for giving an official imprimatur to materials that were biased against Jehovah's Witnesses, Mormons, and others. The FSB, the Office of the Prosecutor General, and other agencies conducted campaigns of harassment against some individual Muslims and Roman Catholics, as well as members of some Protestant groups and newer religious movements. Security services continued to treat the leadership of some minority religious groups, particularly Muslims and nontraditional religions, as security threats. Some religious groups were investigated for alleged criminal activity and violations of tax laws, landlords were pressured to renege on contracts, and in some cases the security services were thought to have influenced the MOJ to reject registration applications.

The authorities generally prohibited Islamic services at military facilities, and Muslim conscripts were generally not given time for daily prayers or alternatives to pork-based meals. The authorities permitted ROC chapels and priests on bases. Protestant groups were given limited access to military facilities.

There were occasional reports of short-term detentions on religious grounds, but such incidents were generally resolved quickly. The Jehovah's Witnesses organization reported a number of incidents in which its members were assaulted by other citizens or briefly detained by authorities while conducting lawful preaching activities. From January to April, Moscow police reportedly detained nine Jehovah's Witnesses in five separate incidents.

Human rights groups reported that following the 2004 hostage-taking in Beslan, police activity was stepped up in the northern Caucasus. Increasing numbers of Muslims, both Russian citizens and citizens of the predominately Muslim states bordering Russia, were charged with extremism. Memorial described 23 cases involving more than 80 individuals charged with extremism as "trumped-up." Of these, Memorial reported, 18 resulted in verdicts, only one of which was an acquittal. Some observers said that police harassment of Muslim clerics and alleged militants in the Republic of Kabardino-Balkariya, including torture and the closure of all but one of Nalchik's mosques, were part of the government's reaction to the October 13 rebel attack on Nalchik (see section 1.g.).

Nine female Muslim students at the Kabardino-Balkariya State University were reportedly detained in June and interrogated because they were wearing *hijab* and practicing group study of the Koran, which are against University statutes. The students were subsequently released. On October 22, in Maykop, Adygea Republic, police officers allegedly assaulted and apprehended a group of young Muslims, including the Maykop mosque's imam, as they were leaving a mosque. The imam told a journalist that masked policemen dragged the group to minibuses and took them to the Interior Ministry's Anti-Organized Crime Department where they were beaten and questioned about why there were wearing beards and why they were observing Islamic norms of hygiene. After a night in prison they were taken before a judge who ordered their immediate release.

Some religious personnel experienced visa difficulties while entering or leaving the country. On September 27, border guards at a Moscow airport denied reentry to the rabbi of the Moscow Choral Synagogue, Pinchas Goldschmidt. He has lived in Moscow since 1989 and his family resides in Moscow. The authorities did not tell Goldschmidt why they had annulled his visa. On December 2, Goldschmidt was issued a one-month religious worker's visa and returned to Moscow. His application for a one-year religious worker's visa was pending at year's end. Also by year's end the authorities had not responded to a request by the Dalai Lama for a visa to visit the Republic of Tuva. The Dalai Lama was permitted to visit the Republic of Kalmykia in 2004 after many years of denials. Catholic authorities reported a decrease in visa problems for Catholic priests during the year, although there was a report of one foreign priest whose visa was not renewed.

In March the government denied entry to high-ranking British and Danish Salvation Army officials who sought to attend a church congress. In explaining its decision to deny entry, the Moscow city branch of the federal MVD cited the provision of law under which foreigners may be denied entry "in the interests of state security."

Laws in three regions, Belgorod, Kursk, and Smolensk, forbid foreign visitors from engaging in missionary activity or preaching unless specifically authorized by their visas. According to local religious officials the laws were not enforced.

Restitution of religious property seized by the Communist regime remained an issue. Many properties used for religious services, including churches, synagogues, and mosques, have been returned, and more restitution cases were ongoing. The ROC appeared to have had greater success in gaining restitution of pre-revolutionary property than other groups,

although it continued to pursue property claims. The Jewish community was still seeking the return of a number of synagogues, religious scrolls, and cultural and religious artifacts, such as the Schneerson book collection, a revered collection of the Chabad Lubavitch.

Societal Abuses and Discrimination

While religious matters were not a source of societal hostility for most citizens, members of minority and "nontraditional" religions continued to encounter prejudice, societal discrimination, and in some cases physical attacks. Conservative activists claiming ties to the ROC disseminated negative publications and staged demonstrations throughout the country against minority religions. Some ROC leaders publicly expressed similar views. Authorities usually investigated incidents of religious vandalism and violence, but arrests of suspects were extremely infrequent and convictions were rare. Relations between non-traditional religious organizations and traditional ones frequently were tense, particularly at the leadership level.

Tensions between the ROC and the Catholic Church continued. The ROC often accused the Catholic Church of deliberately proselytizing among ROC faithful.

Popular attitudes toward traditionally Muslim ethnic groups remained negative in many regions, and there were manifestations of anti-Semitism as well as societal hostility toward Catholics and adherents of newer, non-Orthodox, religions. Racially or ethnically motivated attacks have increased significantly in recent years, although it has often been difficult to determine whether xenophobia, religion, or ethnic prejudices were the primary motivation. Ethnic tensions ran high in the predominantly Muslim northern Caucasus, and there were problems in some cities outside that region. Anti-Chechen and anti-"Wahhabist" sentiment increased after each terrorist attack tied to Chechen rebels and spiked in some regions after the September 2004 seizure of a school in Beslan, North Ossetia, in which hundreds of persons, including many children, died at the hands of terrorists (see section 1.g.). Government officials, journalists, and the public were quick to label Muslim organizations "Wahhabi," a term that has become associated with extremism. Such sentiment led to a formal ban on Wahhabism in Dagestan and Kabardino-Balkariya.

Muslim cemeteries and buildings were vandalized in Moscow and other regions. In January and February tombs in Muslim cemeteries in Moscow and Yoshkar-Oly, Mari-El Republic were desecrated. Although several teenagers were detained in the January incident, the suspects were not charged due to their age. Vandals continued to attack the Tauba mosque in Nizhniy Novgorod. In January swastikas were painted on the mosque walls. The local prosecutor's office did not find grounds to initiate a criminal case. The local Muslim Spiritual Administration appealed to local authorities to guard the mosque. A mosque in Penza was reportedly vandalized on August 22. Anti-Muslim slogans were painted on the wall and a brick was thrown through the window.

The number of underground nationalist-extremist organizations (as distinguished from such quasi-public groups as Russian National Unity) appeared to be growing (see section 5). Their targets included Muslims, Jews, and adherents of minority faiths they considered to be foreign in origin.

There was no progress in the investigation of the January 2004 explosion in a building belonging to a congregation of unregistered Baptists (known as *Initsiativniki*) in Tula Oblast. In September 2004 an *Initsiativniki* church in Lyubuchany, Moscow Oblast burned down. This followed efforts by local law enforcement officers to intimidate participants in an open air gathering for several thousand *Initsiativniki* from all over central Russia sponsored by the Lyubuchany church. The official investigative report on the fire attributed it to arson, but no one was charged in the incident.

Reports of harassment of evangelicals and Pentecostals continued during the year. Observers testified that churches and prayer houses were vandalized in several regions. A group of Pentecostals holding a demonstration on August 10 in Moscow reported being attacked by a group of youths who yelled "Burn the heretics," while assaulting them and destroying their posters. The Slavic Law Center reported that a Baptist Church in Chelyabinsk Oblast was firebombed on April 30. The Jehovah's Witnesses organization reported two incidents in March in which members were physically assaulted by residents where the Witnesseswere preaching, leaving one member with a concussion.

An estimated 600 thousand to 1 million Jews live in the country. The Federation of Jewish Communities (FJC) estimates that up to 500 thousand Jews live in Moscow and 100 thousand in St. Petersburg. These estimates significantly exceed the results of the official government census.

Many in the Jewish community said that conditions for Jews have improved, primarily due to the absence of official "state-sponsored" anti-Semitism and because the Jewish community has undergone a major institutional revival. Nonetheless, anti-Semitic incidents continued to occur. The FJC reported an increase in anti-Semitic attacks in late 2004 and the first months of 2005, but reported that this trend did not continue through the rest of the year. The Anti-Defamation League (ADL) reported the overall number of violent attacks against Jews did not rise throughout the year, but that a new trend of

increasing public actions, demonstrations, and political statements against Jews had appeared.

On the evening of January 18, in two separate incidents 15 minutes apart, several Orthodox Jews were attacked by a group of skinheads while walking in the vicinity of the Marina Roscha Synagogue. One of the victims required hospitalization. Although police arrested and convicted two suspects of disorderly conduct and of inflicting bodily injuries, the judge found insufficient evidence to recognize racial hatred as an aggravating circumstance. After this incident, and at the request of Jewish leaders, Moscow authorities increased the police presence in the vicinity of Marina Roscha Synagogue.

Several synagogues and Jewish community centers were damaged during the year. On May 10, a fire deemed by the authorities to be arson destroyed the historic synagogue of Malakhovka on the outskirts of Moscow. In December, according to a press report, a suspect was sentenced to four years in prison in connection with the arson. The Jewish community center in the Moscow suburb of Saltykovka was hit by arson on two separate occasions, once in January and once in February. The synagogue in the Perovo district of Moscow was vandalized in January and again in February. In July unknown culprits attempted to start a fire at the Jewish center in Penza and the Jewish Center in Taganrog was vandalized. Many Jewish cemeteries were desecrated, including in Izhevsk, Kazan, Moscow, Tambov, Tver, Smolensk, and St. Petersburg. Authorities in Kazan and Moscow judged the incidents there as hate crimes rather than hooliganism.

Nazi posters reportedly appeared in Petrozavodsk, Karelia Republic, on April 20, the anniversary of Hitler's birthday, and two students were arrested five days later.

In April 2004, according to ADL, two skinheads were arrested for the attack earlier in the month on Aleksey Kozlov in Voronezh. Kozlov is a human rights activist and anti-Semitism monitor. The crime was treated as a misdemeanor, and the case was later closed with no further action taken by the police.

Some State Duma deputies and other prominent figures expressed anti-Semitic sentiments. On January 24, some 500 persons, including 20 State Duma members, wrote to the Office of the Prosecutor General asking that he conduct an investigation of the country's Jewish organizations with the possibility of initiating proceedings to ban them. The letter charged that a Russian translation of a compilation of ancient Jewish law, the *Kitzur Shulchan Arukh*, incited hatred against non-Jews; the letter also accused Jews of ritual murders. The MFA condemned the letter on January 25, as did President Putin in remarks delivered in Krakow on January 27. On February 4, the State Duma passed a resolution condemning the January 24 letter. On March 21, approximately five thousand persons, reportedly including a number of ROC clerics and some prominent cultural figures, signed a similar anti-Semitic letter sent to the Office of the Prosecutor General. A Moscow district prosecutor opened an investigation into the Jewish organization that published the translation, as well as into charges brought by Jewish and human rights organizations that the letters violated federal laws against ethnic incitement, but closed both investigations on June 10 without bringing charges. Later in June, the Moscow city prosecutor ordered the district prosecutor to reopen the investigation into the Jewish organization. The prosecutor closed the investigation again on June 29.

According to the ADL there were several cases against the editors of regional newspapers for publishing anti-Semitic articles. In Ulyanovsk, in January preliminary hearings were held arising out of a criminal case initiated in 2002 against the editor of the local newspaper, *Orthodox Simbirsk*, who ran a number of articles demonizing Jews. The FJC reported that the editor of the newspaper was fired, although the ADL noted that on March 14, Ulyanovsk Governor Morozov promised to provide government financial support to keep the newspaper from going bankrupt. According to ADL, in February the St. Petersburg prosecutor's office reopened a case against "Our Fatherland" which has reportedly published anti-Semitic articles.

Anti-Semitic statements have been legally prosecuted and the government has publicly denounced nationalist ideology and expressed support for legal action against anti-Semitic acts; however, some lower-level officials remained reluctant to call such acts anything other than "hooliganism."

The support of federal authorities, and in many cases of regional and local authorities, facilitated the establishment of new Jewish institutions. Work began on the construction of a complex, on land donated by the Moscow city government, that will house Jewish community institutions including a school, a hospital, and a major new museum devoted to the history of Russia's Jews, the Holocaust, and tolerance.

For a more detailed discussion, see the *2005 International Religious Freedom Report*.

d. Freedom of Movement within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights; however, the government placed restrictions on freedom of movement within the country

and on migration.

All adults are issued internal passports, which they must carry while traveling internally, and they are expected to register with the local authorities within a specified time of their arrival at their new location. The authorities often refused to provide governmental services to individuals without internal passports or the proper registration. A government decree enacted in December 2004 extended the grace period for registration given to an individual arriving in a new location from 3 to 90 days; however, immediately following the law's announcement, the Moscow police chief ordered the police to continue its document checks on the streets to verify document authenticity. Darker skinned persons from the Caucasus or Central Asia were often singled out for document checks. There were many credible reports that police arbitrarily imposed fines on unregistered persons in excess of legal requirements and/or demanded bribes from them. The new law does not affect foreigners, who are still required to register within three business days of their arrival in a locality.

Although the law gives citizens the right to choose their place of residence freely, many regional governments continued to restrict this right through residential registration rules that closely resembled the Soviet-era "*propiska*" (pass) regulations. Citizens must register to live and work in a specific area within seven days of moving there. Citizens changing residence within the country, as well as persons with a legal claim to citizenship who decide to move to the country from other former Soviet republics, often faced great difficulties or simply were not permitted to register in some cities. Corruption in the registration process in local police precincts remained a problem. There were frequent reports of police demanding bribes when processing registration applications and during spot checks for registration documentation. The fees for permanent and temporary registration remained low. Moscow's registration requirement--which some police reportedly used to extort money--remained in force at year's end. In 2004 Krasnodar Kray authorities enacted a law that extended the definition of "illegal migrant" to include Russian citizens as well as foreign citizens and stateless persons.

While federal law provides for education for all children, regional authorities frequently denied access to schools to children of unregistered persons, asylum seekers, and migrants because they lacked residential registration.

Following the school tragedy in Beslan in September 2004, Moscow police rounded up more than 11 thousand citizens and foreigners on suspicion of living in the city without registration. The round-up led to 840 deportations (see section 1.g.).

Federal authorities restricted the entry of foreigners into many cities, including Norilsk and Novoye Urengoy. While the federal law permits entry restrictions for reasons of state security, according to press reports these cities sought the restrictions because of what authorities described as threats migrants posed to the local economy and society.

Krasnodar Kray authorities continued to deny the 10 thousand to 12 thousand Meskhetian Turks there the right to register as permanent residents, which deprived them of all rights of citizenship to which they were entitled under the law. They and some other small ethnic minorities living in Krasnodar were permitted only temporary registration and were subjected to special restrictions, such as being required to reregister every 45 days.

Krasnodar authorities also attempted to use economic measures to drive out the Meskhetian Turks who were not registered in Krasnodar. According to Memorial, they prohibited the Meskhetian Turks from leasing land, obtaining employment or engaging in commercial activity. The Meskhetian Turks have subsisted by leasing land through local residents with registration, doing so primarily in other districts of Krasnodar Kray but also other regions including Rostov, Volgograd, and Kalmykia. Because of the difficult conditions in Krasnodar, several thousand Meskhetian Turks applied for emigration to a third country, and Krasnodar officials cooperated in facilitating their departure. There have been reports, however, that police continued to arbitrarily fine those who were not emigrating. Human rights NGOs reported that the police stopped and checked persons who looked like Meskhetian Turks, immediately releasing those who declared their intention to emigrate and penalizing others.

The law provides for freedom to travel abroad and citizens generally traveled without restriction; however, there were exceptions. If a citizen had been given access to classified material, police and FSB clearances were necessary to receive an external passport. Persons denied travel documents on secrecy grounds could appeal the decision to an Interagency Commission on Secrecy chaired by the first deputy minister of foreign affairs.

The law prohibits forced exile, and the government did not employ it.

Emigrants who had resettled permanently abroad but were traveling on Russian passports generally were able to visit or repatriate without hindrance.

The law provides all citizens with the right to emigrate, and this right was generally respected. In some cases those trying to depart for countries that had granted them refugee status experienced logistical delays in gaining exit permission.

As of August 31, 15,615 Russian citizens had sought asylum in foreign countries a drop from the 22,046 appeals filed during the first three quarters of 2004. Many persons fleeing Chechnya applied for refugee status.

A 2002 Law on Citizenship, as amended in 2003, made access to citizenship more difficult for most foreigners by requiring possession of a residence permit or *propiska* and five years of uninterrupted residence after the *propiska* is issued. Applicants for citizenship must also demonstrate a lawful source of income, complete an application renouncing any previous citizenship, and establish a knowledge of the Russian language.

Amendments passed in 2002 and 2003 exempted the estimated 1.5 million former Soviet citizens residing in Russia without benefit of citizenship from having to meet most of these requirements. In essence, this reaffirmed earlier provisions that granted citizenship to those with Soviet citizenship who were legally in the Russian Federation as of February 6, 1992. However, the authorities have not always been willing to recognize the acquisition of citizenship on this basis. In December the State Duma and Federation Council passed amendments to the law, extending the deadline for former Soviet citizens to obtain Russian citizenship until January 1, 2008 and simplifying some of the earlier requirements. In addition the legislation extended the right to seek citizenship to those who obtained a resident permit in Russia after January 1, 2002, increasing the number of those potentially eligible for citizenship. At year's end the legislation was awaiting President Putin's signature.

The federal law on the legal status of foreign citizens permits foreigners to stay in the country for the duration of the validity of their visas. Those arriving under a visa-free regime are permitted to stay for 90 days. The law provides that those wishing to stay in the country may seek permission for a temporary stay of up to three years. This permission is the first step in seeking permanent resident status. In practical terms, however, this option is not available to those arriving without visas, as the process can take six months to complete, well beyond their allowed stay in the country. The law also requires that foreign citizens, with the exception of those from Ukraine, register with those local authorities within three days of their arrival. The law does not include an exhaustive list of documents required for official registration, leaving the MVD considerable discretion in registration matters.

International agreements permit persons with outstanding warrants from other former Soviet states to be detained for periods of up to one month while the prosecutor general. investigates the nature of those warrants. This system was reinforced by means of informal links among senior law enforcement and security officials in many of the republics of the former Soviet Union. Human rights groups continued to allege that this network was employed to detain opposition figures from the other former Soviet republics without legal grounds. According to Memorial, some detainees were kept in custody for more than one month. Authorities detained 12 Uzbek citizens, 1 Kyrgyz citizen, and 1 ethnic Uzbek with Russian citizenship in June on a request from Uzbek authorities. The arrests occurred in the aftermath of violence in the Uzbek city of Andijon. Their relationship to events in Andijon was unclear. They requested asylum in Russia because they feared persecution if they were sent back to Uzbekistan. At year's end the 13 were still in detention, with a judge rejecting their claims that the detentions were illegal. The Russian citizen was released and apparently fled the country. Two other Uzbek citizens were detained in Novosibirsk in November under a similar request from Uzbek authorities. A teacher of Arabic from Uzbekistan was detained in Saratov Oblast and spent a year in custody from 2002 to 2003 before the authorities decided not to carry out the Uzbek warrant of extradition. He was then released, but abducted by unknown parties in July 2004 and transported back to Uzbekistan where he was jailed.

Internally Displaced Persons (IDPs)

As of November 30, 26,883 IDPs from Chechnya were in temporary settlements or in the private sector in Ingushetiya; approximately 30 thousand Chechen IDPs reportedly were elsewhere in the country, and an estimated 200 thousand Chechens were living as IDPs within Chechnya itself. In addition to ethnic Chechen IDPs, almost the entire population of ethnic Russians, Armenians, and Jews left Chechnya during the strife of the past decade.

Throughout 2004 federal and local authorities consistently stated their determination to repatriate all IDPs back to Chechnya as soon as possible. Officials stated publicly that they would not pressure or compel IDPs to return to Chechnya, and Ingush president Zyazikov, whose republic is home to the largest number of Chechen IDPs, promised that accommodation would be found for those remaining in Ingushetiya. However, representatives of the Chechen administration visited camps in Ingushetiya to encourage IDPs to return to Chechnya, usually to temporary IDP facilities. In 2004 the authorities closed the last remaining three tent camps in Ingushetiya, which had housed 5,978 persons. The UNHCR reported that government officials stated their intention to de-register those IDPs who had received compensation from federal assistance lists and indicated that 52 families were de-registered in June. Those who were de-registered faced the threat of eviction from their accommodations in temporary settlements, despite their willingness to pay for the accommodation. Although some of the inhabitants chose to remain in Ingushetiya, the UNHCR estimated that 70 to 75 percent chose to return to Chechnya despite the inadequacy of the temporary lodging.

The UNHCR reported that despite passport checks and occasional security sweeps that continued in IDP settlements, the IDPs were generally able to remain in Ingushetiya without any pressure to return (see section 1.g.). However, other

international and domestic organizations expressed concerns during the year over the government's treatment of Chechen IDPs in Ingushetiya. The Norwegian Refugee Council noted that IDPs were frequently denied status as "forced migrants" under Russian law, which severely limited their access to social benefits and protection. Others living in regions outside Chechnya were often denied residential registration by local authorities, in what the council characterized as discriminatory practices against Chechens.

The UNHCR also reported that pro-Russian Chechen authorities undertook an extensive campaign to return Chechen refugees from Georgia, with the first returnees arriving in Chechnya in May. The UNHCR reported that the returns were voluntary.

Protection of Refugees

The law provides for granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, but the government has not established a system for providing protection to refugees. In practice, the government generally provided protection against *refoulement*, the return of persons to a country where they feared persecution; however, it rarely granted asylum. Individuals who sought entry into the country without proper documentation and who sought to claim asylum were often denied access to the Federal Migration Service by border guards and Aeroflot airlines and often returned them to their countries of origin, including in some cases to countries where they demonstrated a well-founded fear of persecution. The UNHCR stated that many refugee seekers at times faced detention, deportation, fines by the police, and racially motivated assaults, which sometimes even led to the loss of life.

The government cooperated with the UNHCR and the International Organization for Migration (IOM); both organizations assisted the government in trying to develop a more humane migration management system. The UNHCR reported improved communication with the Federal Migration Service on regulatory provisions and practices that do not meet international standards. Through August 31, the UNHCR had registered 414 new cases, or 606 persons, as asylum seekers or refugees. In total it had 3,789 active, registered cases. The government acted more expeditiously and with greater leniency in cases involving applicants who had been citizens of the former Soviet Union. Officials and would-be applicants continued to demonstrate widespread ignorance of refugee law.

According to the UNHCR from the beginning of the year through June, the Federal Migration Service granted refugee status to 16 people. From 1993 through June, Russian authorities granted refugee status to 568 persons. From the beginning of the year through July 31, two cases of deportation proceedings were reported to the UNHCR. In one case the deportee successfully appealed to the courts to block the deportation through the intervention of a UNHCR-provided lawyer. In another example, authorities in Tatarstan deported an Uzbek student to Uzbekistan, where he was held incommunicado for 10 days, after he refused to cooperate with them, according to the migrants' rights NGO Civic Assistance. The student was reportedly being pressured to provide false evidence against classmates who were accused of being members of the banned Hizb ut-Tahrir.

A number of workers and students from Africa and Asia who came to work or study in accordance with treaties between their countries and the former Soviet Union remained in the country. The government did not deport them but continued to encourage their return home. Through September 30, the UNHCR resettled a total of 288 persons.

A group of approximately 1,000 to 1,500 ethnic Armenian refugees evacuated from Azerbaijan in the late 1980s due to ethnic violence remained housed in "temporary quarters," primarily in Moscow hotels or workers' dormitories. However, as a result of a UNHCR project that had been providing legal assistance to the Baku Armenians since 2002, by the end of September 2005, approximately 250 of them had received Russian citizenship. An estimated 800 individuals were resettled under a resettlement project run by another government UNHCR's legal assistance project closed in October because all eligible Baku Armenians who were assisted by this project obtained Russian citizenship.

The UNHCR continued to be concerned about the situation of asylum seekers and refugees in the country. The UNHCR reported that undocumented asylum seekers continued to face problems with law enforcement bodies over their status in the country. The government does not issue documents to asylum seekers who are awaiting review of their requests for asylum; consequently, they remain vulnerable to fines and detention, as well as being denied access to government-provided assistance. At Sheremetyevo Airport, authorities systematically deported improperly documented passengers before they were able to file asylum claims with the Federal Migration Service, including persons who demonstrated a well-founded fear of persecution in their countries of origin. Legally bound to provide food and emergency medical care for undocumented travelers, the airlines returned them to their point of departure as quickly as possible; airlines were fined if an undocumented passenger was admitted to the country but not if the passenger was returned to the country of origin. The treatment of asylum seekers in the transit zone reportedly was harsh.

During the year the UNHCR reported that there were continued instances of would-be asylees becoming stranded at the

Sheremetyevo-2 airport, although authorities began housing them in a nearby hotel rather than requiring they remain in the transit zone. According to the UNHCR there were three cases involving six people who sought asylum upon entering the transit zone of the airport. None of these cases were recognized by either the Federal Migration Service or the UNHCR as a refugee. Russian authorities deported two people, and the remaining four were transferred to the hotel, where they remained at year's end.

There were 114 points of immigration control (PICs) at border crossings and international airports. To the UNHCR's knowledge, no asylum seeker arriving at Sheremetyevo-2 airport had been accepted as such by the PICs since at least 1999. Most such cases involved labor migrants entering or leaving the country, but a few cases involved asylum seekers. During the year, the UNHCR continued to examine each case and seek resettlement on an emergency basis for those deemed to be in need of international protection.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully; while citizens generally have exercised this right in practice, the March 2004 presidential elections that did not adequately reflect principles necessary for a healthy democratic election, particularly in equal access to the media by all candidates and secrecy of the ballot. A move away from the election of governors to their nomination by the president, subject to confirmation by regional legislatures, led some observers to complain about reduced accountability of regional leaders to those whom they govern. The fact that the president could dissolve a regional parliament that rejected presidential nominations three times further increased this concern. Corruption also limited accountability.

Elections and Political Participation

Incumbent President Vladimir Putin, who was first elected president in 2000, was reelected in March 2004 by a wide margin. The OSCE, which observed the elections, offered a positive evaluation of the technical conduct of the balloting but concluded that the overall election process, marred by widespread misuse of administrative resources, systematically biased campaign coverage, and inequitable treatment of political parties, failed to meet international standards. Although the legal requirements for televised political debates and free time for party candidates to present their views were observed, the government used its influence over the media, particularly the electronic media, to promote President Putin, resulting in coverage that was heavily biased (see section 2.a.).

In the 2003 parliamentary elections, opposition parties were allegedly hampered in their ability to obtain funding because of fears among potential donors elicited by the investigation and arrest of Yukos CEO Mikhail Khodorkovskiy, a step widely believed to have been prompted, at least in part, by the considerable financial support he provided to opposition groups. The progovernment forces, in contrast, drew heavily on "administrative" resources, using the power and influence of regional and local officials to maximize media coverage and campaign financing. In addition, in some instances local electoral commissions appeared to use it selectively to disqualify local opposition State Duma candidates, leading to a small number of questionable disqualifications. As a result, as noted by the OSCE, the parliamentary elections failed to satisfy a number of international criteria for democratic elections.

In the November 27 parliamentary elections in Chechnya, human rights groups and members of a Parliamentary Assembly of the Council of Europe fact-finding mission who were present on election day alleged that the official voter turnout numbers were artificially high. Human rights groups also concluded that poor security and continuing human rights violations did not allow for a free and fair election in Chechnya. Other reports suggested that results of the election were predetermined in favor of candidates loyal to then Acting Chechen Prime Minister Ramzan Kadyrov, although the Chechen Central Election Commission reported there were no complaints of election law violations filed by parties or candidates.

In the December 4 Moscow City legislative election, most observers did not identify significant electoral violations that would put the electoral results in question, but did note minor violations, such as the expulsion of some observers from polling stations before the final vote count. Some observers criticized Moscow Mayor Yuriy Luzhkov's use of administrative resources to support the United Russia party. Two days before the election, the Supreme Court upheld a Moscow city court decision to bar the Rodina party from the election due to a controversial campaign ad judged to have violated laws about inciting ethnic hatred.

Competitive elections for other regional and local offices were held throughout the year. Most observers viewed these elections as generally free and fair, although there were problems in some regions involving unequal access to the media and the use of administrative resources by incumbents to support their candidacies. The counting of the votes in most locations was professionally done.

Laws enacted and executed during the year, particularly the elimination of direct gubernatorial elections, continued the consolidation of political power in the Kremlin. Laws enacted in May and July changed the electoral system. They specified

that for future nationwide elections, the State Duma will be formed on a strictly party list basis. Electoral blocs will be banned and the requirement for a party seeking representation in the State Duma will be raised from 5 to 7 percent of the vote. According to some experts, the new laws work to the disadvantage of those parties not currently represented in the State Duma. In addition, the electoral legislation limits the domestic observation of federal elections, a provision that may have already created difficulties for NGOs hoping to observe one regional election. The new laws also provide that all regional legislative elections will be held on the same date and established a maximum barrier of 7 percent for parties to enter regional legislatures starting in 2006. Some commentators viewed these new laws as primarily benefiting the pro-presidential United Russia party and as limiting the ability of independent observers to monitor future elections.

The May and July laws followed another Kremlin-backed law enacted in December 2004 that eliminated the direct election of the country's regional leaders. That law provides that republic presidents and regional governors be nominated by the president subject to confirmation by regional legislatures. If a regional legislature fails to confirm the president's nominee three times, the legislature may be dissolved. Regional leaders in power at the time the law entered into force were given the option of either serving out their elected terms or resigning early and seeking a presidential appointment to serve a new term. The president also acquired the power to remove the regional leaders in whom he had lost confidence, including those who were popularly elected. At year's end the new system of choosing regional heads had been used in almost half of the country's regions. The law also increased the president's influence over the federal legislative branch since regional leaders appoint half of the upper house of that legislature, the Federation Council. On December 31, President Putin signed a new law which allows political parties that have won elections to regional parliaments to propose their own candidates for head of a region subject to approval by the president and that region's legislature.

Political parties historically have been weak. Although laws enacted in 2001 and 2002 included a number of measures that enlarged the role of political parties, particularly of established political groupings, they also gave the executive branch and prosecutor general broad powers to regulate, investigate, and close down parties. Other changes increased campaign spending limits, shortened the campaign period, limited the conditions under which candidates could be removed from the ballot, and imposed restrictions on media coverage. A law enacted in December 2004 raised the official membership requirements for political parties from 10 thousand to 50 thousand with at least 500 representatives in half of the country's regions, and no fewer than 250 members in the remaining regions, which may make it difficult for smaller parties to register.

There were 44 women in the 450-member State Duma and 10 in the Federation Council.

National minorities took an active part in political life; however, ethnic Russians, who by some estimates constitute approximately 80 percent of the population, dominated the political and administrative system, particularly at the federal level.

Government Corruption and Transparency

The country is still to complete the transition from a former communist state to a modern democratic society based fully on the rule of law and a free market economy. Corruption was widespread throughout society, a conclusion supported by domestic opinion surveys, and was extensive in the executive and legislative branches of government. Manifestations included bribery of officials, misuse of budgetary resources, theft of government property, extortion, and official collusion in criminal acts. International organizations gave the country poor marks on corruption issues. Many public institutions remained weak. The media lacked a strong tradition of investigative journalism, although a number of journalists throughout the country reported on corruption cases, sometimes resulting in prosecution of the alleged offenders. In general, however, citizens lacked a broad range of outlets to voice their views concerning corruption or to lodge complaints about its existence.

President Putin and senior government officials frequently addressed the issue in public statements, and many jurisdictions throughout the country established local anticorruption committees. Various initiatives were undertaken at the federal level, with indeterminate results. Most anticorruption campaigns tended to be limited in scope and focused mainly on lower level officials. Allegations of corruption were also used as a political tactic, which made it more difficult to determine the actual extent of corruption. No new major corruption convictions occurred during the year. However, there was a widely publicized allegation of major corruption in October involving the videotaped handover of $1 million (28.5 million rubles) to a federal tax inspector by an official with the Central Bank. Both individuals were charged and remained in detention, but the case had not yet reached court. In June a senior auditing official in the Ministry of Industry and Energy was arrested and indicted for allegedly accepting a bribe; the official was still awaiting trial.

The law authorizes public access to all government information resources unless the information is designated confidential or classified as a state secret, and refusal to provide access to open information or the groundless classification of information as a state secret has been successfully contested in court. However, access to information is often difficult and subject to prolonged bureaucratic procedures.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Although a number of domestic and international human rights groups operated in the country, investigating and publicly commenting on human rights problems, official harassment of NGOs increased. Authorities harassed some NGOs that focused on politically sensitive areas during the year, and other official actions and statements indicated a declining level of tolerance for unfettered NGO activity, particularly for those NGOs that received foreign funding. NGOs operating in the Northern Caucasus were at times hampered, although these organizations had wider access than in the past.

The NGO sector in Russia consisted of an estimated 450 thousand registered public associations and non-governmental non-commercial organizations. Experts estimated that 25 percent of them operated on a regular basis. There were several dozen large NGO umbrella organizations as well as thousands of small grassroots NGOs. There was often a large gap between these two categories of NGOs in terms of their organizational capacity. In the regions, NGO coalitions continued to advocate on such issues as the rights of the disabled and of entrepreneurs, environmental degradation, violations by law enforcement authorities, and the war in Chechnya.

Authorities filed criminal charges, tax claims, and a civil suit against the Russian-Chechen Friendship Society (RCFS) in what human rights NGOs said was a campaign to close the organization. On January 11, criminal proceedings were initiated against its *Pravozaschita* newspaper for publishing the statements of Chechen separatist leaders. On January 20, officers from the FSB raided the RCFS's office in Nizhniy Novgorod, seizing documents and computers. Authorities questioned several members of its staff in Nizhniy Novgorod and Chechnya. RCFS executive director Stanislav Dmitrievskiy was charged with inciting hatred or enmity on the basis of ethnicity and religion. The charge carries a maximum of five years imprisonment. In March tax inspectors began an audit of RCFS finances, which concluded that the group owed more than $35 thousand (1 million rubles) in back taxes for grants it received from foreign donors. On August 26, tax inspectors froze its bank accounts following the RCFS's unsuccessful appeal. On September 15, a judge in Nizhniy Novgorod ordered the accounts to be reopened pending a decision in the group's suit against the tax authorities. In November authorities denied entry into the country of human rights expert William Bowring, who intended to observe Dmitrievskiy's trial. The criminal trial and tax case were continuing at year's end.

Additionally, the MOJ filed a civil suit against the RCFS for failure to provide requested documents. This MOJ request for documents was made simultaneously with an audit by tax authorities, with ministry and tax officials demanding the same sets of original documents. In November a judge ruled in favor of RCFS in the suit brought by the MOJ, upholding the organization's registration. RCFS coeditor Oksana Chelysheva was also personally threatened in leaflets distributed near her home because of her work with RCFS. Authorities opened a criminal case, but no suspects have been identified.

In June authorities ordered the closure of the Nizhniy Novgorod Human Rights Society, a partner organization of the RCFS, on the grounds that it did not submit necessary documentation of its activities to the MOJ.

Authorities pursued legal action against the human rights NGO Chechen Committee for National Salvation (CCNS) during the year. In February the Supreme Court of Ingushetiya ordered a retrial of charges that the NGO violated the law "On Countering Extremism" because its press releases accused authorities of violating human rights. The organization had earlier been acquitted of the charges. Neither the committee's chairman Ruslan Badalov nor his lawyer were notified of the Supreme Court hearing. The retrial began in April, with the court ordering a new expert analysis of CCNS's press releases to determine if they promoted extremism or hatred. According to a human rights NGO the experts reportedly found no extremist content in the press releases and the case was ongoing at year's end.

On August 16, State Duma Deputy Nikolay Kuryanovich, who was criticized in a report by the Moscow Bureau for Human Rights (MBHR), sent a letter to the government asking for the MBHR to be liquidated and accusing it of collaboration with foreign intelligence.

On October 6, investigators from the general prosecutor's office accompanied by MVD officers raided the Moscow offices of Open Russia, an NGO founded and heavily funded by former Yukos CEO Mikhail Khodorkovskiy. The authorities seized documents reportedly related to an ongoing investigation of money laundering and investigation of possible embezzlement by Yukos employees. MVD officers reportedly prevented some of the employees from leaving the building during the raid. At year's end no charges had reportedly been brought against Open Russia as a result of the raid. In the regions, a few local officials harassed human rights monitors, and the government continued its 2002 refusal to renew an agreement with the OSCE Assistance Group, thus preventing the organization from conducting human rights monitoring in Chechnya. In 2003 dozens of men in camouflage raided the Moscow offices of the Soros Foundation's Open Society Institute. Some observers regarded the action as having been government-inspired, while others believed it resulted from a legal dispute between the institute and a businessman. The Open Society Institute has scaled back its presence in the country to a representational office.

Some government officials viewed the activities of some NGOs working on Chechnya with suspicion. For example, on June 15, Lema Khasuyev, the Chechen Republic's human rights ombudsman, stated that he would not cooperate with the human rights NGO Memorial, claiming that it was working in the interests of foreign donors. In his May 2004 State of the Nation speech, President Putin suggested that "far from all [NGOs] are geared toward defending people's real interests. For some of these organizations, the priority is rather different—obtaining funding from influential foreign or domestic foundations. For others it is servicing dubious group or commercial interests..."

On January 12, according to press reports, armed men broke into the office of the Information Center of the Council of NGOs in Nazran, Ingushetiya, searching the office without presenting a search warrant and claiming that they had entered because a group of bandits had been seen in the council's office. A man wearing civilian clothes, who claimed to be a member of the regional FSB office, checked the passports of four employees and three visitors in the office. The men also took away some office computers.

A foreign NGO reported that central authorities continued to pressure it and its domestic partner, the VOICE Association for Voters' Rights, during the year. Prosecutors opened an investigation of the Committee of Soldiers' Mothers in November 2004 following the committee's announcement that it intended to meet with Chechen rebel leader Aslan Maskhadov or his emissary Akhmed Zakayev. State Duma deputies had called for an investigation of the group and its finances. Tax inspectors later conducted an investigation, but reportedly found no violations.

At times the government's attitude towards human rights NGOs appeared to depend on the perceived threat to national security or level of criticism that an NGO might offer. In the view of some observers, NGOs working in the Caucasus were especially vulnerable to interference. For example, in April two expatriate staff members of the humanitarian aid NGO International Rescue Committee were denied entry into the country although they had valid passports, visas, and other necessary documents. Officials provided various explanations for the denial, and the two individuals were eventually told they could re-enter the country.

Officials, such as Human Rights Ombudsman Vladimir Lukin, regularly interacted and cooperated with NGOs. Government and legislative officials recognized and consulted with some NGOs on account of their expertise in certain fields, and such groups participated, with varying degrees of success, in drafting legislation and decrees. For example, a network of disability NGOs has worked successfully with local authorities in Moscow and elsewhere in the country on promoting the mainstreaming of students with disabilities into the school system and has engaged closely with both the Ministry of Education and a State Duma working group drafting education legislation.

Regional human rights groups, which generally received little international support or attention, often suffered from inadequate funding. They reported that at times local authorities obstructed their work. They were generally free to criticize government and regional authorities; however, in some areas, the authorities were intolerant of criticism. Local human rights groups in the regions had some opportunities to interact with legislators to develop draft laws; however, local authorities excluded some organizations from the process entirely.

The Siberian Civic Initiatives Support Centers in Omsk and Irkutsk worked with local governments to develop social policies on education, health care, and communal reforms. In the Jewish Autonomous Republic, Amur Oblast, and selected regions in Primorskiy Kray, NGOs worked with local governments to encourage citizen participation in local self–governance on issues related to implementation of the new law on local governance.

Some domestic NGOs involved in human rights advocacy reported receiving death threats from nationalist organizations.

Some international NGOs maintained small branch offices staffed by local employees in Chechnya; however, all of them were based outside of Chechnya (see section 1.g.).

By law every person within the jurisdiction of the Russian Federation may appeal to the ECHR about alleged human rights violations that occurred after May 1998, as long as they have exhausted "effective and ordinary" appeals in the Russian courts. This provision was usually satisfied by two appeals (first and cassation) in courts of ordinary jurisdiction or three (first, appeal, and cassation) in the commercial court system. As of July the ECHR had received more than approximately 22,500 complaints from Russia. Of those, about 14 thousand were declared inadmissible and about 8,500 were pending. More then 600 complaints were communicated to the Federation government, and the court found about 100 complaints admissible. Forty-nine final judgments were rendered, of which 43 were findings of violations. On February 25, the ECHR ruled in favor of six Chechen applicants to the court, finding Russia in violation of several articles of the European Convention on Human Rights and Fundamental Freedoms. In these cases the ECHR found the applicants had no effective remedy in domestic courts. The ECHR rejected a Russian government appeal of the rulings in July (see section 1.g.). The government generally paid money judgments ordered by the ECHR in a timely fashion; however, the Russian government issued blanket refusals in response to ECHR requests for disclosure of the domestic case files relating to alleged gross violations in Chechnya. The ECHR criticized this failure of disclosure.

Human rights institutions that were a part of the government itself rarely challenged government activities, but sought to promote the concept of human rights and to deal with specific complaints of abuses. Human Rights Ombudsman Vladimir Lukin commented on a broad range of human rights problems, such as the treatment of children and the rights of prisoners. Lukin's office had approximately 200 employees and several specialized sections responsible for investigating complaints. During the year the office published various reports on human rights issues such as the rights of conscript soldiers. However, Lukin's role remained primarily consultative and investigatory, without powers of enforcement. At the end of August, 31 of the country's 89 regions had regional human rights ombudsmen with responsibilities similar to Lukin's. However, the effectiveness of the regional ombudsmen varied significantly. In April Lukin reportedly criticized electoral legislation before the Federation Council, stating that his office should retain the right to independently invite election observers. Lukin also expressed concern about the initial drafts of the controversial NGO legislation.

The Presidential Council on Promoting the Development of Institutions of Civil Society and Human Rights, headed by Ella Pamfilova, and including a number of human rights activists, promoted NGO concerns and worked across a spectrum of contacts to advance human rights throughout the country. For example, at a meeting with President Putin in November, Pamfilova spoke out against controversial draft legislation that would that would impose restrictions on the work of NGOs. The council, established to replace the president's Human Rights Commission, was widely respected in the NGO community. President Putin met with members of the council and with Pamfilova during the year.

During the year legislation passed creating a Public Chamber of civil society representatives to serve as a link between the government and civil society. The Public Chamber's tasks were to include conducting studies and giving non-binding recommendations to the government and legislature. President Putin chose the first one-third of its members in October. They consisted of a wide range of individuals representing various aspects of civil society. Many observers noted that most of those members were generally supportive of the government. The first 42 members chose the second group in November, and the first two groups chose the final 42, who represented regional organizations, in December. Some prominent human rights groups said they would not participate in the Public Chamber out of concern that the government would use it to increase control over civil society. In December members of Public Chamber spoke out against the initial draft of controversial NGO legislation and asked that the chamber be granted time to examine it.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, gender, language, social status, or other circumstances; however, both governmental and societal discrimination persisted.

Women

Domestic violence, including spousal abuse, remained a major problem, and law enforcement authorities frequently failed to respond to incidents of domestic violence. An AI report estimated that approximately 36 thousand women were beaten by a husband or partner every day. Official estimates indicated that, on average, more than 250 thousand violent crimes were committed against women annually; however, such crimes usually were not reported. In 2003 32 percent (9,500) of all murder cases were committed by family members against other family members. Research by two sociologists cited in a 2004 report found that 18 percent of respondents were regularly beaten by their husbands, and that more than 60 percent of the beaten women suffered traumas of varying severity. Law enforcement personnel, the legal community, and society as a whole, lacked understanding of domestic violence as a public problem.

There is no legal definition of domestic violence. While the law prohibits battery, assault, threats, and murder, those of its provisions most commonly applied to cases of domestic violence (such as light injury) are not within the jurisdiction of the prosecutor's Office. Following amendments to the law in 2003, victims are required to prosecute such cases without state assistance, and their complaints must meet certain legal requirements, which victims without legal knowledge have difficulty meeting. As a result, few victims were prosecuted and there were few convictions. There are minimal remedies for domestic violence in the civil law; the most common are administrative fines and divorce.

There were 23 crisis centers for women that operated as part of a broader structure of social protection institutions. Crisis services are not focused exclusively on violence against women, although some do offer services to domestic violence victims. NGOs operated centers for victims of domestic violence throughout most of the country. An informal informational network affiliated with the NGO National Center for Prevention of Violence "Anna," received 85 thousand complaints of domestic violence in 2004. During the year "Anna" reported that 22 of the 170 organizations in its network closed, primarily due to lack of financing.

Rape was a problem. Rape, including theoretically spousal rape since the Criminal Code makes no distinction based on the relationship between the rapist and victim, is illegal. In 2004 8,795 rapes were registered, and in the first half of the year, 5,007 rapes were registered. However, according to NGOs, many victims never reported rape due to social stigma

and lack of government support. Rape victims can act as full legal parties to criminal cases brought against alleged assailants and can seek legal compensation as part of the verdict without seeking a separate civil action. Although some crisis centers may provide support to rape victims, anecdotal information suggested that women were discouraged from reporting rape cases by crisis center psychologists, who considered the investigation and prosecution process traumatizing; such advice did not reflect official policy. Members of the medical profession, including at hospitals and elsewhere, assisted women who were assaulted. However, to avoid spending long periods in court, some doctors were reluctant to ascertain the details of a sexual assault or collect physical evidence.

Spousal or acquaintance rape was not widely perceived as a problem by society or law enforcement; studies suggested that up to half of women and more men think that women cannot refuse sex in marriage. Women were unlikely to report cases of rape by people they know. Law enforcement and prosecutors held many of the same notions and allegedly did not encourage reporting or prosecution of such cases.

The organization and operation of a prostitution business is a crime, but selling sexual services is only an administrative offense. Prostitution remained widespread in the country, and some observers expressed concern about sex tourism. In addition, there were reports of the police taking bribes from prostitutes and of violence against prostitutes by police.

Trafficking of women for sexual exploitation or forced labor was a serious problem (see section 5, Trafficking).

No law prohibits sexual harassment, and women have no recourse when sexually harassed. Sexual harassment remained a widespread but mostly unacknowledged problem. NGOs operating hotlines reported that women routinely sought advice on the problem. However, due to the lack of legal remedies and limited economic opportunities, many women tolerated the harassment.

Although the law states that men and women have equal rights and opportunities to pursue those rights, credible evidence suggested that women encountered discrimination in employment. Job advertisements sometimes specified sex and age groups, and some ads specified desired physical appearance as well as a preference for applicants open to intimate relations with the prospective supervisor. Employers often preferred to hire men, thereby saving on maternity and childcare costs and avoiding the perceived unreliability that accompanies the hiring of women with small children. According to a 2001 report by the International Labor Organization (ILO), women accounted for approximately 47 percent of the working-age population but on average earned only two thirds as much as their male counterparts. Professions dominated by women were much more poorly paid than those dominated by men.

Children

The government was committed to children's rights and welfare; however, the resources it devoted to the welfare of children were limited. Children have the right to free education until grade 11 (or approximately age 17), and school is compulsory until approximately age 15 or 16. Primary education is compulsory, free, and, by law, universal. According to UNICEF statistics, 93 percent of school-age children attended school. The highest level achieved by most children was secondary education. Boys and girls were treated equally in the school system. While federal law provides for education for all children in the country, regional authorities frequently denied school access to the children of unregistered persons, including Roma, asylum seekers, and migrants (see section 2.d.).

Under the law health care for children is free; however, the quality varied, and individuals often incurred significant out-of-pocket expenses. More than five years after the start of the second conflict in Chechnya, much of that republic's social and physical infrastructure remains destroyed or seriously damaged. As a result, social services for children were inadequate, especially in the education, health and water, and sanitation sectors. These inadequacies, and the continued instability in the region, continued to threaten the health and well-being of children.

Although child abuse was a widespread problem, the majority of child abuse cases were not subject to legal action. The Moscow Human Rights Research Center estimated that approximately 50 thousand children run away from home annually to avoid domestic violence. The Moscow Helsinki Group indicated that each year approximately 2 million children under 14 years of age were victims of domestic violence.

Trafficking in children was a problem (see section 5, Trafficking).

Child labor was a problem (see section 6.d.)

There were reports that boys under 18 were detained as part of targeted raids and security sweeps conducted by Russian and pro-Moscow Chechen forces in Chechnya.

Troops in Chechnya reportedly placed Chechen boys ages 13 and older in filtration camps where some reportedly were beaten and raped by guards, soldiers, or other inmates. The women's action group White Kerchief (Belyy Platok) reported that some federal forces kidnapped children in Chechnya for ransom. In September 2004 at least 338 hostages, about half of them children, were killed after terrorists took an estimated 1,200 hostages at a school in North Ossetia (see section 1.g.).

Estimates of the number of homeless children ranged from 2 million to 5 million. According to the MVD, approximately 109 thousand vagrant minors were removed from the streets and public places in the first quarter of 2004 alone.

According to the Moscow Department of Social Security, 12 percent of street children who ended up in shelters have run away from orphanages or boarding schools. Law enforcement officials reportedly often abused street children, pinned the blame for otherwise unsolved crimes on them, and committed acts including extortion, illegal detention, and psychological and sexual violence against them. According to the Public Verdict Foundation, prosecutors refused to bring charges in 80 percent of cases of alleged police misconduct towards such minors. Homeless children often engaged in criminal activities, received no education, and were vulnerable to drug and alcohol abuse. Some young girls on the streets turned to, or were forced into, prostitution to survive.

Local and international NGOs provided a variety of services for the homeless. Many Moscow charitable organizations established productive relations with the city government to address the needs of children with disabilities, as well as other vulnerable groups. In St. Petersburg, local government and police ran various programs for homeless children and cooperated with local NGOs; however, resources were few and overall coordination remained poor. In St. Petersburg, NGOs ran seven drop-in centers.

Trafficking in Persons

The law prohibits trafficking in persons; however, trafficking continued to be a problem. Allegations continued that corrupt government officials facilitated trafficking, although it remained difficult to ascertain the scope of such corruption. The government at all levels remained committed to combat trafficking and prosecutions have increased since the State Duma amended the criminal code in 2003 to specifically outlaw human trafficking and the use of forced labor.

Under the law, if certain aggravating factors are established, trafficking and forced labor are punishable by a maximum of 15 years' imprisonment, recruitment into prostitution by a maximum of 8 years, organization of a prostitution business by a maximum of 10 years, and manufacture and distribution of child pornography by a maximum of 8 years. On January 1, new witness protection legislation went into effect that provides a mechanism to protect cooperating trafficking victims and their families against traffickers.

Law enforcement agencies increasingly investigated and prosecuted trafficking cases. A senior MVD official reported that he was aware of seven criminal cases involving 36 defendants in the first 6 months of the year; 4 cases involved sex trafficking and 3 involved labor trafficking. The MVD worked closely with foreign governments and continued to assist international human trafficking prosecutions. The MFA developed guidance for consular officers abroad on dealing with trafficking victims and expressed a commitment to assist with the repatriation of trafficking victims. The government cooperated with international trafficking investigations.

There were no reliable estimates of the scope of trafficking, but observers believe it remained widespread. The country continued to be a source, destination and transit country for human trafficking, particularly of women. While women and children were trafficked for sexual purposes, men were also trafficked into the country on a significant scale from former CIS countries, particularly for the construction industry.

According to the IOM, women have been trafficked to almost 50 countries, including every West European country, the United States, Canada, former Soviet republics, and Middle Eastern and Asian countries. Women who were trafficked abroad and returned to Russia seldom reported their experiences to the police, because they feared retaliation by traffickers. Traffickers usually targeted unemployed females between the ages of 14 and 45, with females between the ages of 15 and 25 being the primary targets. Traffickers often lured women with promises of economic opportunities. Some trafficking victims knowingly agreed to work in sex industries. However, all the victims interviewed in the IOM study stated that they never suspected the severity of the conditions and abuse to which they would be subjected.

Reports indicated that internal trafficking, fueled by poverty and unemployment, remained a problem. Women were recruited and transported from rural areas to urban centers typically to work in sex industries.

There were continued reports of child trafficking, primarily for sexual exploitation. The victims were usually homeless children or children in orphanages. There are no reliable estimates of how many children were trafficked. The country has become a major producer and distributor of Internet child pornography, leading to confirmed cases of child sex trafficking

and child sex tourism.

Information from foreign prosecutions, academic researchers, and law enforcement sources suggested that criminal groups carried out most trafficking with the assistance of front companies and more established organized crime groups. Typically, the traffickers used a front company--frequently an employment agency, travel agency or modeling company--to recruit victims with promises of well-paying work overseas. Many placed advertisements in newspapers or public places for overseas employment, some employed women to pose as returned workers to recruit victims, some placed Internet or other advertisements for mail order brides, and some victims were recruited by partners or friends. Once the victims reached the destination country, the traffickers typically confiscated their travel documents, kept them in a remote location, and forced them to work.

Reports indicated that employers or traffickers withheld workers' passports or other documentation. They threatened workers with deportation or prosecution if they demanded compensation. One trafficking researcher indicated that some local police cooperated with employers to "shake down" such workers to deprive them of their wages. Traffickers often used their ties to organized crime to threaten victims with harm to their families should they try to escape. They also relied on ties to organized crime in the destination countries to prevent the victims from leaving and to find employment for the victims in the local sex industry. Trafficking organizations typically paid domestic organized crime entities a percentage of their profits in return for "protection" and for assistance in identifying victims, procuring false documents, and corrupting law enforcement.

Journalists, politicians, NGOs, and academic experts stated that corrupt elements in the MVD and other law enforcement bodies facilitated and, in many cases, controlled trafficking. In addition, individual government officials reportedly took bribes from traffickers in return for false documents and facilitating visa fraud. Law enforcement sources agreed that document fraud was often committed in the process of obtaining external passports and visas, but they were uncertain to what extent this involved official corruption rather than individual or organized criminal activity. There were reports of prosecutions of officials involved in such corruption.

Many of the more than 120 crisis centers and antitrafficking NGOs throughout the country disseminated information on trafficking, and many provided assistance to victims. NGOs rescued victims and helped them to reintegrate upon return to the country. Such NGOs received varying degrees of support from regional and local governments. Some were invited to brief local officials and law enforcement personnel, and some provided training to local crisis centers and hospital staff. The State Duma Committee on Legislation involved a variety of NGOs in developing antitrafficking legislation.

Shelters run by local NGOs provided assistance to trafficking victims.

The government had no official comprehensive trafficking prevention program but continued to sponsor events designed to raise public awareness of the dangers of trafficking. The State Duma, with the support of the Presidential Administration, sponsored seven regional conferences designed to teach law enforcement officers, NGOs, and public officials about relevant laws and to encourage closer cooperation between police and NGOs. The MVD sponsored three "Train the Trainer" conferences for MVD training officers from regional academies throughout the country employing experts to develop well-trained antitrafficking investigators.

Persons with Disabilities

Several existing laws are intended to prohibit discrimination against persons with disabilities or to establish conditions of equal rights for them; however, the government generally did not enforce these laws. Citizens with disabilities continued to face discrimination and were denied equal opportunity to education, employment, and access to social life. Overall, the situation for persons with disabilities has reportedly worsened since the passage in August 2004 of a law which replaced government subsides for such items as transportation and medicine with cash payments. Some affluent regions like Moscow preserved benefits for the disabled at preexisting levels, but other regions discontinued them.

According to the ministries of education and of health and social development, there were an estimated 12.2 million persons with disabilities, of whom approximately 640 thousand were minors. Persons with disabilities were generally excluded from the social and political life of their communities and isolated from the mainstream community.

The residents of disabled adult institutions were mainly "graduates" of the institutions for children. Institutions often did not attempt to develop the abilities of the interned persons. The residents were frequently confined to the institutions and sometimes movement within the institutions was restricted. The use of psychotropic drugs as punishment was allegedly widespread. Conditions in the institutions were often poor, with unqualified staff and overcrowding.

Laws prescribe penalties for enterprises that fail to build ramps or other accessible features but contain no enforcement mechanisms. Federal law on the protection of persons with disabilities requires that buildings be made accessible to the

disabled, but the penalties for enterprises that failed to observe these requirements were not enforced and in practice most buildings were not accessible.

Approximately 90 percent of disabled persons were unemployed. Legislation providing employment quotas exists at the federal and local levels; however, some local authorities and private employers continued to discourage persons with disabilities from working, and no fine was mandated for not honoring these quotas.

The authorities generally segregated children with disabilities from mainstream society. A complex and cumbersome system has developed to manage the institutionalization of children until adulthood. Observers concluded that issues of children's welfare were lost within the bureaucracy, and little clear recourse existed in instances of abuse by the system. Human rights groups alleged that children in state institutions were provided for poorly and in some cases were physically abused by staff members. Life after institutionalization also posed serious problems; "graduates" often lacked the necessary social, educational, and vocational skills to function in society.

The assignment of categories of disability to mentally disabled children often followed them throughout their lives. The labels "imbecile" and "idiot," which are assigned by a commission that assesses all children with developmental problems at the age of three, and which signified that a child was uneducable, almost always was irrevocable. Even the label of "*debil*"--lightly retarded--followed an individual on official documents, creating barriers to employment and housing after graduation from state institutions. This designation was increasingly challenged in the case of children with parents or caregivers, but no one advocated for the rights of institutionalized children.

Youths with disabilities not in institutions faced significant barriers to education, including lack of access to schools. Education authorities often tried to keep youths with disabilities out of school due to lack of special programs. At the same time, the "home program" for children with disabilities was highly inferior to school classes. The majority of teachers and administrators in schools and universities had little or no understanding of disability issues. Parents of children without disabilities were often averse to their children studying with children with disabilities.

According to government reports, of approximately 400 thousand school-aged children with disabilities, approximately 170 thousand did not receive any education. Of the approximately 230 thousand who received an education, 137 thousand attended regular schools, 33,500 studied at home, and 60 thousand attended special schools. Because special schools comprised only 3 percent of all schools, most children with disabilities could not study in the community where they lived, were isolated from other members of the community, and received an inadequate education.

Disabled persons faced barriers to participation in political life, including inaccessible government buildings. The election laws contain no special polling-place accessibility provisions for persons with disabilities, and the majority of polling places were not accessible to them. However, the use of mobile ballot boxes permitted them to vote at home, although they thus lacked the access to information about candidates that was available at the voting place.

The government bodies specifically charged with protecting human rights also protect the rights of persons with disabilities. These include the human rights ombudsman and the regional ombudsmen, the Presidential Council on Promoting the Development of Institutions of Civil Society and Human Rights, and the prosecutor's office. These bodies have carried out a number of inspections in response to complaints from disability organizations and in some cases have subsequently appealed to the responsible agencies to remedy the situation. For example, the human rights ombudsman has conducted inspections of children's homes for mentally disabled children, which disclosed severe violations of children's rights and the existence of substandard conditions.

National/Racial/Ethnic Minorities

The law prohibits discrimination based on nationality; however, Roma, persons from the Caucasus and Central Asia, and dark skinned persons and foreigners faced widespread governmental and societal discrimination, which was often reflected in official attitudes and actions (see section 1.c.). Skinhead groups and other extreme nationalist organizations fomented racially motivated violence. Muslims and Jews continued to encounter prejudice and societal discrimination, although it was often difficult to separate religious from ethnic motivations (see section 2.c.). Human rights observers noted that racist propaganda and racially motivated violence are punishable by law, but despite some increases in law enforcement efforts, the law was employed infrequently. However, the authorities demonstrated an increased awareness of the problem. For example, on September 27, President Putin stated: "We will step up the law enforcement agencies' work in this area and will do all we can to make sure that skinheads and fascist-minded groups are no longer a part of this country's political landscape."

Federal and local measures to combat crime continued to be applied disproportionately to persons appearing to be from the Caucasus and Central Asia. Police reportedly beat, harassed, and demanded bribes from persons with dark skin, or who appeared to be from the Caucasus, Central Asia, or Africa. Ethnic Azerbaijani vendors alleged that police frequently used violence against them during document checks at markets in St. Petersburg.

Authorities in Moscow subjected dark-skinned persons to far more frequent document checks than others and frequently detained them or fined them in amounts that exceeded legally permissible penalties. Police often failed to record infractions against minorities or to issue a written record to the alleged perpetrators. Law enforcement authorities also targeted such persons for deportation from urban centers. In March the Institute for War and Peace Reporting noted that police arrested illegal migrant workers from Central Asia and illegally took their money and then took the workers to the outskirts of Moscow instead of deporting them. This practice reportedly allowed the police to pocket the cost of the deportation and leave the workers in Moscow for future arrests.

A report by the European Roma Rights Center issued in May noted "alarming patterns" of human rights abuse of Roma in the country. The report also asserted that the magnitude of the abuse was only comparable to that of the impunity of the perpetrators. The report said that the media's frequent association of Roma with drug dealing provided the context for many of the human rights violations against them. It provided evidence of widespread police violence against Roma and noted that the abuse was rarely reported to higher authorities.

On February 14, approximately 400 members of the Romani community fled the village of Iskitim, Novosibirsk Oblast, after a group of armed men attacked and burned a number of Romani houses in the village. According to NGOs, similar attacks took place in the village in January 2005 and December 2004. Members of the Romani community indicated that in the aftermath of those incidents, law enforcement and municipal authorities had done nothing to prevent further attacks. The police eventually arrested seven suspects and the Novosibirsk regional prosecutor's office took over the investigation. The case had reportedly not gone to court by year's end. There were also reports that warrants were issued for nine other suspects. On the night of November 10 two more Romani houses in Iskitim suffered arson attacks, in which a Romani woman and her child sustained injuries. The child later died from the injuries received during the attack.

There was also evidence of hostility on ethnic and racial grounds within the society at large. Despite appeals for tolerance during the year by senior officials, violence and societal prejudice against ethnic and national minorities, as well as against foreigners, remained a problem. In the view of some experts and human rights leaders, this phenomenon worsened, but others insisted that it reflected better reporting and greater media attention.

During the year numerous racially motivated attacks took place against members of minority groups and foreigners, particularly Asians and Africans. In some cases, observers believed the attacks were racially motivated. According to MVD statistics, 11,100 crimes were committed against foreign citizens and persons without citizenship from January to October. For example it was reported that on July 9, about a dozen skinheads beat a Vietnamese man to death in a Moscow park. On September 14, a Congolese student was killed in St. Petersburg. A year ago the same student was attacked and hospitalized, at which time he gave evidence that the attack was racially motivated. On October 9, in Voronezh, a Peruvian student was killed and two other students, from Spain and Peru, were badly injured when a group of youths attacked them. There had been several previous attacks on attacks on foreigners in Voronezh. Later in October, the authorities charged a Russian student with murder and another 13 youths with lesser crimes for participating in the attack.

Not all of the attacks against foreigners were fatal. On February 11, two Korean students were attacked and hospitalized in St. Petersburg. On March 14, four skinheads attacked an African student of a pedagogical university in Lipetsk. On March 26, a Chinese student was attacked during daylight on a major city street in St. Petersburg. According to the MVD, 557 crimes against foreigners were registered in St. Petersburg during the first seven months of the year. The city administration appeared to have begun to take hate crimes more seriously, but law enforcement agencies did not do enough to address the issue, in part because they lacked the necessary resources and, in some cases, because some working-level staff sympathized with the nationalistic causes.

Private individuals or small groups that espoused racial hatred generally carried out such attacks. Law enforcement authorities knew the identity of some of the attackers based on their racial intolerance or criminal records. During the year members of ethnic or racial minorities were the victims of beatings, extortion, and harassment by skinheads and members of other racist and extremist groups. Police investigations of such cases were frequently ineffective and authorities were often reluctant to acknowledge the racial or nationalistic element in the crimes. Many victims, particularly migrants and asylum seekers who lacked residence documents recognized by the police, chose not to report such attacks or experienced indifference on the part of police.

Skinhead activity continued to be a serious problem. Skinheads primarily targeted foreigners and individuals from the Northern Caucasus, although they also expressed anti-Muslim and anti-Semitic sentiments and hostility toward adherents of "foreign" religions (see section 2.c.). According to the MVD, neofascist movements have approximately 15 thousand to 20 thousand members, of which over 5 thousand were estimated to live in Moscow. According to the MHBR, there were

approximately 50 thousand skinheads in 85 cities. Skinhead groups were particularly numerous in Moscow, St. Petersburg, Nizhniy Novgorod, Yaroslavl, and Voronezh. According to one report, from January to early December skinheads attacked 125 people in Moscow, and 8 of the victims died.

There were indications that the authorities were increasingly willing to acknowledge racial, ethnic, or religious motivations for such criminal acts. For example, in St. Petersburg authorities have recently been willing to acknowledge the role of ethnic hatred in such crimes. Between January and July, 13 physical attacks were officially declared to have been motivated by racial or ethnic hatred. In all cases the attackers wore skinhead attire or proclaimed nationalist slogans. In September, for the first time, a Primorskiy Kray jury convicted a defendant of a crime motivated by ethnic hatred. Skinhead leader Ivan Nazarenko was found guilty of murder motivated by ethnic hatred for the killing of a Korean man in September 2004 and sentenced to 13 years' imprisonment. The same jury acquitted Nazarenko of the 2004 murder of a Chinese citizen.

In August five skinheads were convicted of murdering migrants in Surgut, Khanty-Mansiysk Okrug. Two of the teenage defendants were sentenced to 9 years, the rest to 8 1/2 years for murdering an Azeri and four Tajiks in separate incidents December 2003 and September 2004. The skinheads reportedly attacked and beat to death or stabbed people of a non-Slavic appearance on the streets with the aim of "cleansing the city." They allegedly confessed to the killings during the investigation but withdrew their confessions in court.

Also in August three skinheads were sentenced to one year imprisonment for assaulting ethnic Yakuts in Yekaterinburg. According to media reports, this was the first conviction for a hate crime in Sverdlovsk Oblast. In St. Petersburg, the trials of eight young men accused of attacking a Tajik family of three in 2004 continued, stabbing a 9-year-old Tajik girl to death. Only one of the men alleged to have been involved was being tried for murder.

In June 2004 Nikolay Girenko, an expert on hate crimes and senior researcher of the Museum of Anthropology and Ethnography at the Russian Academy of Sciences, was killed in his apartment in St. Petersburg. Shortly after his killing, a previously unknown organization, "Russian Republic," pronounced a death sentence on Girenko on its website and announced that the sentence had been carried out. St. Petersburg prosecutors reportedly issued a summons to the authors of the "Russian Republic" website, but according to an NGO, those behind the website had decided to ignore the summons. There continued to be no indication that the authorities had arrested any suspects in connection with Girenko's killing.

In March Pavel Ivanov resumed publication of *The Russkoye Veche,* a Velikiy Novgorod newspaper that printed articles hostile to minorities. Ivanov had been charged in 2002 with inflaming ethnic hatred and in February 2004 the court found him guilty and banned him from publishing for three years. Ivanov appealed the ruling and the ban was replaced with a $350 (10 thousand rubles) fine.

Indigenous People

The law provides for support of indigenous ethnic communities; it permits them to create self-governing bodies and allows them to seek compensation if economic development threatens their lands. In some regions local communities organized to study and make recommendations regarding the preservation of indigenous cultures. Groups such as the Buryats in Siberia and ethnic groups of the North (including the Enver, Tafarli, Chukchi, and others) continued to work actively to preserve and defend their cultures as well as the economic resources of their regions. Most affirmed that they received the same treatment as ethnic Russians, although some groups believed they were not represented or were underrepresented in regional governments. The principal problems of indigenous people remained the distribution of necessary supplies and services, particularly in the winter months for those who lived in the far north, and claims to profits from exploitation of natural resources.

According to an NGO in the Russian Far East, Aleuts on the remote Commander Islands were beginning to work in partnership with the local nature preserve. The local Aleut population and the nature preserve had been in dispute over the Aleuts' right to hunt protected seals.

Members of the Finno-Ugric Mari ethnic group were subjected to attacks. In late May a website reported that a group of 30 Russian skinheads beat up 15 leading Mari cultural figures in the republic's capital, Yoshkar-Ola. Mari opposition figures claimed that officials of the Mari-El Republic had instigated the attacks through the extremist Russian National Unity organization. On August 27, unidentified assailants attacked Vasiliy Petrov, chairman of the Youth Organization of Finno-Ugric Peoples, in his home village in Mari-El, according to the Information Center of Finno-Ugric Peoples. In May the European Parliament adopted a resolution criticizing Russia for violating the rights of the Mari. According to press reports, Russia in June blocked the release of a report by the Parliamentary Assembly of the Council of Europe that was critical of human rights abuses in the Republic of Mari-El.

Other Societal Abuses or Discrimination

Persons with HIV/AIDS often encountered discrimination. Federal AIDS law contains antidiscrimination provisions, but these were frequently not enforced. HRW reported that HIV-positive mothers and their children faced discrimination in accessing healthcare, employment, and education. Persons with HIV/AIDS found themselves alienated from their families, employers, and medical service providers. For example, a 2003 study of 470 citizens with HIV found that 10 percent had been forced to leave home by their families, 30 percent had been refused health care and 10 percent had been fired.

Although homosexuality is not illegal, many male homosexuals continued to suffer discrimination from all levels of society. Medical practitioners continued to limit or refuse their access to health services due to intolerance and prejudice. According to recent studies, male homosexuals were often refused work due to their sexuality. Openly gay men were targets for skinhead aggression, which was often met with law enforcement indifference.

Section 6 Worker Rights

a. The Right of Association

Although the law provides workers with the right to form and join unions, in practice government policy and the dominant position of the Federation of Independent Trade Unions of Russia (FNPR) limited the exercise of this right. Approximately 46 percent of an estimated work force of 69 million workers was unionized, and approximately 90 percent of union members belonged to the FNPR.

The FNPR and other trade union federations acted independently on the national political level, but in some cases FNPR unions were affiliated closely with local political structures, giving FNPR advantages over unions without such established political ties. FNPR unions frequently included management as part of the bargaining unit or elected management as delegates to its congresses.

While the law requires unions to register and specifies that registration requires a simple "notification" and submission of documents to the authorities, in practice many unions remained unregistered because local departments of the MOJ throughout the country continued to ignore the established procedures and refused to register new unions without changes in charter documents or confirmation of attendance at founding conferences. As a result, new organizations remained unregistered and existing organizations that had been required to reregister had not done so. Unregistered unions faced operational constraints, such as difficulty in opening bank accounts and collecting fees.

The law specifically prohibits antiunion discrimination, but it remained a problem. Union leaders were at times followed by the security services, detained for questioning by police, and subjected to heavy fines, losses of bonuses, and demotions.

b. The Right to Organize and Bargain Collectively

The rights of unions to conduct their activities without interference and the right to bargain collectively are recognized in law but other legal provisions give employers a strong role in dealing with labor relations. The law makes collective bargaining mandatory if either employer or employees request it; it obliges both sides to enter into such negotiations within seven days of receiving a such a request; and it sets a three-month time limit for concluding such agreements. Unresolved issues are to be included in a protocol of disagreement, which may be used to initiate a collective labor dispute. Despite these requirements, however, employers continued to ignore union requests to negotiate collective bargaining agreements. In July St. Petersburg dockworkers went on strike to protest management's refusal to sign a collective bargaining agreement.

Labor experts have criticized provisions in the law that favor the designation of a majority union as the exclusive bargaining agent, a provision that favors larger unions. They have also voiced concern about such provisions of the Labor Code as the stipulation that there be only one collective agreement per enterprise, covering all employees, which limits the ability of professional or "craft" unions (the majority of new unions in the country) to represent their members' interests. In May the ILO Committee on Freedom of Association renewed its request to the government that it amend the Labor Code to allow collective bargaining at the occupational level.

According to the International Confederation of Free Trade Unions, a 2004 law on commercial secrets specifies that information on wages in commercial companies is a commercial secret. Lack of access to this information disadvantaged unions engaged in collective bargaining.

Although collective bargaining agreements had been officially registered only by an estimated 16 to 18 percent of enterprises, the FNPR claimed that approximately 80 percent of its enterprises had concluded such agreements. This

apparent discrepancy appeared to be due in part to agreements that were concluded but not registered with the Ministry of Labor. The law states that collective agreements become effective upon signature, regardless of whether they are registered or not.

The law provides for the right to strike; however, this right remained difficult to exercise. Most strikes were considered technically illegal because they violated one or more of the exceedingly complex procedures governing disputes. A strike may be called at an enterprise only after approval by a majority vote at a conference composed of at least two-thirds of all personnel, including management.

The law specifies that a minimum level of essential services must be provided if a strike could affect the safety or health of citizens. Under this definition, most public sector employees could not strike and other provisions were often manipulated to prevent many would-be strikers from walking off the job. Strike actions were further discouraged by the fact that civil courts have the right to order confiscation of union property to settle damages and losses to an employer if a strike is found to be illegal and not discontinued before the decision goes into effect. As a result, labor actions were often organized by strike committees rather than by unions.

Although there were several strikes during the year, there were no prolonged strikes. Statistics were not available for the informal labor actions, which were more common. Court rulings have established the principle that nonpayment of wages--estimated to be the cause of 90 percent of labor disputes--is an individual matter and cannot be addressed collectively by unions. As a result a collective action based on nonpayment of wages was not recognized as a strike. The law does not protect individuals against being fired while on strike.

The law prohibits strikes in the railway and air traffic sectors, at nuclear power stations, and by members of the military, militia, government agencies, and disaster assistance organizations. As a result, workers in these professions at times resorted to other forms of protest, such as rallies, days of action, or hunger strikes. The law prohibits reprisals for strikes, but reprisals were common and included threats of night shifts, denial of benefits, blacklisting, and firing.

There are no export processing zones. There are no special labor laws or exemptions from regular labor laws in the special economic zones and free trade zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor; however, there were reports that such practices occurred. According to credible reports, significant numbers of illegally employed migrants from other countries of the former Soviet Union were forced to work without pay because the firms that brought them into the country held their passports (see section 5). According to an ILO study, employers of illegal migrants withheld passports in 20 percent of forced labor cases.

Most wages of the 7,500 North Koreans reported by the authorities to be employed in the Russian Far East were withheld until the laborers returned home, making the workers vulnerable to deception by North Korean authorities who promised relatively high payments. There were reported incidents throughout the year of military officers forcing soldiers under their charge to work for private citizens or organizations, often under abusive conditions. AI has charged that a 1995 bilateral agreement with North Korea allowed the exchange of free labor for debt repayment, although the government claimed that a 1999 intergovernmental agreement gave North Koreans working in the country the same legal protections as citizens.

In August 2004 the television station Rossiya reported that dozens of workers died at a slave labor camp in Western Siberia, where the owners of a logging company reportedly decided to increase their profits by using slave labor. The Kemerovo regional prosecutor's office was trying the case at year's end.

The law prohibits forced or bonded labor by children; however, such practices reportedly occurred (see sections 5 and 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The government did not effectively implement laws and policies to protect children from exploitation in the work place. The law prohibits most employment of children under the age of 16 and regulates the working conditions of children under the age of 18, including banning dangerous nighttime and overtime work; however, the Federal Labor and Employment Service and the MVD, which are responsible for child labor matters, did not enforce these laws effectively. Children are permitted, under certain conditions and with the approval of a parent or guardian, to work at the age of 14. Such work must not threaten the health or welfare of the children. The Federal Labor and Employment Service, under the auspices of the Ministry of Health and Social Development, is responsible for routinely checking enterprises and organizations for violations of labor and occupational health standards for minors. In 2004 approximately 8,300 cases of child labor

violations were reported. Most serious violations of child labor and occupational health standards were believed to occur in the informal sector. Local police investigations only occurred in response to complaints.

Accepted social prohibitions against employment of children and the availability of adult workers at low wages generally prevented widespread abuse of child labor. Nonetheless, children working and living on the streets remained a problem. Parents often used their children to lend credence to their poverty when begging or had them beg. Homeless children were at heightened risk for exploitation in prostitution or criminal activities (see section 5). Trafficking of children was also a problem (see section 5).

e. Acceptable Conditions of Work

The monthly minimum wage, essentially an accounting reference for calculating transfer payments, increased to $28 (800 rubles) on September 1, up from $26 (720 rubles). The monthly official subsistence level of approximately $86 (2,451 rubles) was not sufficient to provide a decent standard of living for a worker and family. Approximately 18 percent of the population had incomes below the official subsistence minimum. Average wages rose to approximately $304 (8,655 rubles) per month, compared with approximately $250 (7,126 rubles) per month in 2004.

The law provides a standard workweek of 40 hours, with at least one 24-hour rest period, and requires premium pay for overtime work or work on holidays; however, workers complained that employers required them to work in excess of the standard workweek, abrogated negotiated labor agreements, and of forced transferred them against their will.

Although nonpayment of wages declined, especially in the public sector, it continued to be the most widespread abuse of labor legislation. For example, the ITAR-Tass news agency reported on December 8 that utility workers in the town of Kimovsk, Tula Oblast, had begun a second week of "industrial action" to protest $400 thousand (11 million rubles) in unpaid wages. Wage arrears through July totaled $390 million (11.1 billion rubles), 50 percent less than the same period in 2004.

The law imposes penalties on employers who pay their employees late or make partial payments and requires them to pay two-thirds of a worker's salary if the worker remains idle by some fault of the employer. Proving that an employer was at fault, however, was difficult. Courts often were willing to rule in favor of employees seeking payment of back wages, but collection remained difficult. Courts often insisted that cases be filed individually, in contradiction to the Law on Trade Unions, thereby undercutting union attempts to include the entire membership in one case. Individually filed cases made for a lengthier process, one more difficult for the individual worker, and one that left them more exposed to possible retaliation (see section 6.b.).

Although the law establishes minimum conditions for workplace safety and worker health, the government did not allocate sufficient financial and human resources to enforce these standards effectively. In many cases, workers wore little protective equipment in factories, enterprises stored hazardous materials in open areas, emergency exits were locked, and smoking was permitted near containers of flammable substances.

The law provides workers the right to remove themselves from hazardous or life-threatening work situations without jeopardy to their continued employment; however, the government did not effectively enforce this right. The risk of industrial accidents or death for workers decreased but remained high. For the first half of the year, there were 1,960 work-related deaths, down from 2,021 in the first half of 2004.

The law entitles foreign workers residing and working legally in the country to the same rights and protections as citizens, and the law prohibits forced or compulsory labor; however, foreign workers reportedly were brought into the country to perform such labor (see section 6.c.). Foreign workers residing and working illegally in the country may be subject to deportation but may seek recourse through the court system. There were credible reports that hundreds of thousands of citizens of other CIS countries worked illegally in Moscow and other larger cities for lower wages than citizens and under generally poor conditions. There were reports that police abused and defrauded illegal migrant workers who were minorities (see section 5).