**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
-------------------------------------------------------x
                                                       )
RICHARD ALLEN, et al.                                  )
                                                       )
                   Plaintiffs,                         )   Case No: 1:05-cv-02077 (CKK)
                                                       )   Hon. Colleen Kollar-Kotelly
           v.                                          )
                                                       )
RUSSIAN FEDERATION, et al.                             )
                                                       )
                   Defendants.                         )
                                                       )
-------------------------------------------------------x
```

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# EXHIBIT 52

**U.S. DEPARTMENT of STATE**

**U.S. Government Assistance to and Cooperative Activities with Eurasia** -FY 2005
Released by the Bureau of European and Eurasian Affairs
January 2006

**Annex A: Assessments of Progress in Meeting the Standards of Section 498A of the Foreign Assistance Act of 1961 - Russia**

**CRITERIA FOR U.S. ASSISTANCE
UNDER SECTION 498A(a) OF THE FOREIGN ASSISTANCE ACT OF 1961**

**RUSSIAN FEDERATION**

**Section 201 of the FREEDOM Support Act amended Section 498A of the Foreign Assistance Act of 1961 to require that the President "take into account not only relative need but also the extent to which that independent state is acting to:"**

**Section 498A(a)(1): "make significant progress toward, and is committed to the comprehensive implementation of, a democratic system based on principles of the rule of law, individual freedoms, and representative government determined by free and fair elections."**

Russia's progress since 1991 towards building a society governed by law-based, democratic institutions has been substantial in some aspects, but uneven and beset by serious challenges. Over the past year, there has been significant weakening in many areas, raising serious questions about the strength and depth of the Russian Government's commitment to promoting human rights, democratic reform, religious freedom and the rule of law.

The 1993 Constitution established a governmental structure with a strong head of state (a President), a Government headed by a Prime Minister, and a bicameral legislature (Federal Assembly) consisting of the State Duma (lower house) and the Federation Council (upper house). President Vladimir Putin was re-elected in March 2004. OSCE election observers found that the election was well administered and "reflected the consistently high approval rating of the incumbent president, but lacked elements of a genuine democratic contest." The observers concluded that the election "failed to meet important commitments concerning treatment of candidates by the State-controlled media on a non-discriminatory basis, equal opportunities for all candidates and secrecy of the ballot." They also noted that the election process lacked "vibrant political discourse and meaningful pluralism."

At the beginning of 2005, party lists and single-mandate districts were used to elect Duma deputies, but, as detailed below, President Putin signed a law May 19 effectively eliminating single-mandate candidates. Regional governors and regional legislatures appoint members of the Federation Council: two from each of the 89 regions of the Federation. Duma elections, in 1993, 1995 and 1999 met international standards, despite some deficiencies in the 1999 elections. Regarding the December 2003 Duma elections, however, the International Election Observation Mission led by the Organization for Security and Co-operation in Europe (OSCE) reported that, while voting procedures were conducted in a technically correct way, the election process overall failed to meet many international standards. The OSCE expressed concerns about this step backwards, stating that "[t]his is a worrisome development that calls into question Russia's fundamental willingness to meet European and international standards for democratic elections."

Following the terrorist attack at a school in Beslan in September 2004, President Putin proposed a series of political measures that raised additional concerns that the Government of Russia was pulling back on some past democratic reforms. Over the next eight months, President Putin institutionalized all the major changes he proposed. On May 19, Putin signed the latest in a series of changes to Russia's electoral laws – effectively eliminating single mandate districts in the Duma. The lower house of parliament will be formed on a strictly party list basis starting in 2007. Many observers believe this reduces the ability to elect opposition parties or candidates with alternatives views to the Duma. Gubernatorial elections were eliminated at the end of 2004, a move that runs counter to the spirit of having officials directly accountable to the voters. Party registration requirements have also been toughened, and the barrier for party entry into the Duma has been increased to seven percent. Only registered political parties will be authorized to appoint observers during Duma elections. Other significant legislative changes to the electoral process lower the allowable margin of error in signature lists

for party registration from twenty-five to ten percent; punish deputies who defect from their parties; hold journalists liable for reporting false information during election campaigns; and consolidate regional and city elections on the same date. The changes appear to lay the groundwork to place the pro-Kremlin United Russia party in an advantageous position and raise the barriers for entry for opposition parties.

The Constitution provides for an independent judiciary, including a Supreme Court that hears appeals from the courts of general jurisdiction, and a Constitutional Court. The judiciary remains seriously impaired by a shortage of resources and by corruption and is still subject to undue influence from the executive branch. In September 2004, the Federation Council proposed legislation that would increase presidential control over the judiciary, allowing the president to nominate 10 of 21 members of the Supreme Collegium – who make decisions on appointing judges – and to choose one member himself. The judiciary is slowly undergoing other reforms; laws on judicial procedure, the status of judges, and the Constitutional Court, and a Code of Criminal Procedure, have been phased in over a three-year period (2002-2005). The judicial system continues to be plagued by large case backlogs and trial delays, though both the number of persons in pre-trial detention and the average length of time spent there have declined significantly.

Ongoing legal actions against Yukos, its former CEO Mikhail Khodorkovskiy, and other company officials raise serious concerns about the Russian Government's commitment to promote transparency and rule of law and its willingness to ensure that legal cases are judged fairly and in accordance with due process. On May 31, Khodorkovskiy was sentenced to nine years in prison for fraud and tax evasion. He had remained in detention since his arrest on October 25, 2003. The timing of his arrest, following his political activism and negotiations with Western energy companies to possibly sell Yukos assets, suggest his arrest and trial were politically motivated. In addition, there were concerns about the judiciary's lack of independence in its handling of the case and allegations of intimidation of witnesses and their family members.

Furthermore, there have been several prosecutions in relation to so-called "espionage" cases that raise questions about whether the accused are being punished for legitimate research or journalistic activity, for example, the cases of defense and arms control researcher Igor Sutyagin, who in April 2004 was sentenced to 15 years in prison on alleged espionage charges, physicist Valentin Danilov who in November 2004 was sentenced to 14 years in prison on alleged espionage charges, and Mikhail Trepashkin, who was rearrested in September 2005 after being released on parole before the end of his four-year sentence of forced labor for allegedly disclosing state secrets and illegal possession of a handgun and ammunition. They also raise concerns about due process and the apparent undue influence of the Federal Security Service (FSB).

Incidents of government harassment of NGOs in Russia have increased over the past two years, chilling the climate for civil society. While NGOs are hampered by a restrictive tax code and onerous registration process, increasing numbers of statements by Russian officials express the intent to ban foreign funding and restrict "political activities" of NGOs, further chilling the environment. In 2005, a serious worsening of the Government's treatment of NGOs took the form of intensified tax investigations, raids on offices, visa and registration problems, and intimidation of NGO officials and staff. The pattern of harassment against the human rights NGO Russian Chechen Friendship Society, for example, includes criminal charges in two cases against its executive director and editor-in-chief, Stanislav Dmitrievsky, intimidating leaflets against him and other staff, and the seizure and freezing of the organization's bank account by the tax police. Other NGOs that have experienced problems with registration, tax inspections or intimidation include NDI, Open Russia, and the United Civic Front, among many others. In November, the Duma began considering a bill that would impose severe new restrictions on NGOs. As of mid-December 2005, in the wake of international protests, the Kremlin and the Duma were considering how to modify some of the bill's more objectionable provisions. Although the bill was modified, it passed both houses of the Russian parliament in late December 2005 with some objectionable features.

Russia has yet to enact comprehensive anti-corruption legislation or to develop a multidisciplinary approach to address corruption. The Government has, however, begun to engage on the issue in multilateral fora, such as the UN, the G-8, OECD, and the Council of Europe.

**Section 498A(a)(2): "make significant progress in, and is committed to the comprehensive implementation of, economic reform based on market principles, private ownership, and integration into the world economy, including implementation of the legal and policy frameworks necessary for such reform (including protection of intellectual property and respect for contracts)."**

The Russian economy has undergone tremendous stress as it has moved from a centrally planned to a free-market system. Since 1991, Russia has succeeded in privatizing most of the formerly state-owned economy and freed business entities to trade and compete in a market where prices are generally set by supply and demand. The Russian Government officially estimates that more than 75 percent of manufacturing enterprises are fully or partially privatized. Eighty-five percent of current manufacturing output reportedly stems from such enterprises, and more than 80 percent of Russia's industrial workers work in these firms. The majority of Russia's financial sector is in private hands, but a number of state-owned banks (the largest being Sberbank, which controls most retail banking) remain from the Soviet era.

As of December 2005, the Russian economy was on track for 6.1 percent growth during 2005, down from 7.2 percent growth in 2004. Russia continues to maintain prudent macroeconomic policies which, when combined with higher-than-expected oil and commodity prices, has led to a projected 2005 budget surplus of approximately 7% of GDP. The current account surplus is forecast to be 12.3% of GDP for 2005, due to high commodity prices. Core inflation is expected to be 11.3% for 2005, a slight decrease from 11.7% in 2004. The exchange rate has appreciated slightly, and the Russian Government has accumulated international reserves of over $160 billion. Public external debt has fallen from 80% of GDP in 1999 to approximately 20% of GDP in 2005, eliminating concerns about debt servicing. Russia paid off its entire $3.3 billion IMF debt in February 2005 and plans to continue to use oil stabilization fund revenues to prepay existing debt, which would further reduce its debt stock.

The pace of reform has slowed considerably during Putin's second term from the relatively quick implementation of economic reforms 2000-2004. Much remains to be done to ensure Russia's sustained economic development. Even with the economic windfalls from energy exports, slow development and uneven enforcement of securities regulation, continued confusion caused by government restructuring, lack of a developed real property system, lack of financing due to political and economic uncertainty and a relatively weak banking system, uncertain rules of the road for foreign investors in the energy sector, and failure to enforce bankruptcy against insolvent enterprises continue to prevent the Russian economy from reaching its potential, and render it vulnerable to adverse external shocks. In addition, resistance by the bureaucracy and other vested interests has attempted to divert reforms from their original aims, and hampered implementation, especially at the local level.

Since 1995, Russia's trade regime has moved generally toward greater liberalization, eliminating an oil export quota, special exporter regime and export tariffs. Russia's trade surplus, fueled by high oil prices, was $60.5 billion in 2003 and continues to grow. Russia's economy – and its federal budget – is particularly vulnerable to the world energy markets. A provision for a stabilization fund appeared for the first time in the 2004 budget. The new stabilization fund has accumulated $38.5 billion. There are increasing calls for disbursement of stabilization fund monies, but the government thus far has only used the oil windfall to pay off Russia's external debt and fill the gap in the pension fund deficit. In 2006, however, the budget draws on the stabilization fund to pay for increases in healthcare and education spending.

Russia's economic team appears committed to a reformist agenda, but remaining reforms – breaking up the monopolies, fighting corruption, improving corporate governance, reducing dependence on a few sectors, reforming the public service and banking sectors, and more – will be difficult. Pursuant to a 1994 Presidential determination, subject to ongoing reporting requirements, Russia is in compliance with the freedom of emigration provisions of the Jackson-Vanik Amendment (Title IV of the Trade Act of 1974), allowing Russia to receive normal trade relations status. Russia joined the Asia-Pacific Economic Cooperation group in 1998. While the Russian Government is committed to further integration into the world economy, making the necessary reforms has proved politically difficult.

Russia's intellectual property rights (IPR) legislation provides some protection for patents, copyrights, trade and service marks, and semiconductor chip designs. In 2004, the Russian Government enacted amendments to its Copyright Law and Law on Commercial Secrets that made some progress in remedying deficiencies in its intellectual property legislation. The Russian Government has also promised additional legislation to make its IPR protection regime WTO-consistent. However, problems with inadequate enforcement against pervasive piracy continue, despite increased action by the Russian Government in recent months. The U.S. copyright industries estimate combined losses from unauthorized production and exports of optical disks by Russian entities at over $1 billion annually. Many of the pirated CDs and DVDs produced in Russia are exported worldwide, and internet piracy is also a growing problem. Russia remains on the U.S. Special 301 priority watch list. In 1998, Russia established a Patent Chamber, a specialized court for appellate review of patent disputes. It has also established an inter-ministerial IPR Commission chaired by Prime Minister Mikhail Fradkov. Inadequate intellectual property rights protection has been one of the main stumbling blocks in Russia's WTO accession talks, and intensive dialogue between the U.S. and Russia on this issue continues.

A bilateral investment treaty (BIT) was signed with Russia in 1992, but it has not entered into force because Russia has not ratified it. Russia also has an OPIC agreement, which entered into force in 1992.

**Section 498A(a)(3): "respect internationally recognized human rights, including the rights of minorities and the rights to freedom of religion and emigration."**

Russia's Constitution guarantees respect for internationally recognized human rights, but the Russian parliament has been slow to pass human rights legislation in many areas. The Government's respect for the human rights of its citizens was uneven and has significantly worsened in several areas.

There were continuing, numerous credible reports of human rights violations by Russian troops in Chechnya. (Chechnya is further addressed in the following section (a)(4).)

The treatment of prisoners and conditions in pretrial detention facilities and prisons remained extremely harsh and frequently life threatening. According to official accounts, in 2004 the official annual death rate in pretrial detention facilities was two thousand persons. Most died as a result of poor sanitary conditions or lack of medical care although some of the reported cases indicated habitual abuse by officers. Lack of respect for due process remains a serious shortcoming. There were credible reports that law enforcement personnel continued to torture, beat, and otherwise abuse detainees and suspects. In June 2004, Russian Human Rights Ombudsman Vladimir Lukin described violations of human rights by law enforcement agencies as "most serious and most blatant." Lukin announced a joint Internal Affairs Ministry-Ombudsman effort to create an agreement on cooperation to provide oversight in internal affairs agencies. Arbitrary arrest and detention remained problems, as did police corruption. The Government prosecuted some perpetrators of abuses, but many officials were not held accountable for their actions.

The Russian Constitution provides for freedom of expression and of the media. Nevertheless, a series of government actions over the past several years have contributed to a growing lack of diversity in the broadcast media, raising serious questions about the Russian Government's commitment to media freedom. These actions have included the take-over or closure of all independent nationwide television stations, the primary source of news for the overwhelming majority of the population. State-controlled television continues to provide little critical coverage of the Government or dissenting views; much attention is devoted to President Putin, mostly in a positive or neutral light, rarely in a negative light. For example, State-controlled television and pro-Kremlin newspapers presented almost exclusively the Government's account of the Yukos case, failed to provide balanced reporting of the facts of the case or Khodorkovskiy's defense, and were early to pronounce his guilt. In July, UES sold 70 percent of REN-TV, the last independent national TV station, to the Severstal Group, owner of Russia's largest steel maker. In September, Surgneftgaz bought 35 percent of Severstal's shares. Both of these sales were seen as efforts to further expand the control of the Kremlin over national television. State-controlled Gazprom's June 3 acquisition of prominent newspaper Izvestiya suggested that organizations close to the Kremlin were moving toward acquiring control of other mass media beyond national television. There has been no indication that OSCE concerns about biased media coverage during 2003 and 2004 national elections are being addressed by the Russian Government as it prepares for State Duma elections in 2007 and the Russian presidential elections in 2008. According to the Committee to Protect Journalists (CPJ), eleven journalists have been murdered in contract-style killings since 2000, and no one has been brought to justice in any of the cases. In addition, in July, the Government announced it would no longer permit ABC to have access to Government officials and briefings following its broadcast of an interview with Chechen terrorist Shamil Basayev. Respect for freedom of expression had been a hallmark of post-Soviet Russia; however, over the past year government pressure has undermined freedom of expression, including through the selective investigation and prosecution of journalists and civil society leaders under anti-incitement laws.

The Russian Constitution prohibits discrimination based on race, sex, religion, language, and social status. However, both official and societal discrimination still exist, despite appeals for tolerance by the President and other senior officials. Police and other security forces in various parts of Russia continue their practice of targeting citizens from the Caucasus and darker-skinned persons in general for arbitrary searches and detentions on the pretext of fighting crime and enforcing residential registration requirements. Human rights groups in Moscow continue to report increased detentions of people from the Caucasus. Roma, persons from the Caucasus and Central Asia, and dark-skinned persons faced widespread governmental and societal discrimination, which often is reflected in official attitudes and actions.

Religious freedom has greatly expanded in Russia since the end of the Soviet Union, and government policy allowed for the generally free practice of religion for most of the population. However, problems remain. Obstacles to registration under a complex 1997 law, "On Freedom of Conscience and Associations," continued to affect many religious groups considered nontraditional. For example, a March 2004 appeals court decision banned the Jehovah's Witnesses in Moscow, and had significant negative ramifications for the activities of the Jehovah's Witnesses. There have also been reports that the security services, including the Federal Security Service (FSB), increasingly treated the leadership of some minority religious groups as security threats, in addition to obstructing church meetings and threatening to confiscate church property. A number of regional governments and officials have taken actions against some minority religious organizations, including the Jehovah's Witnesses, the Church of Latter-day Saints ("Mormons"), the Church of Scientology, the Unification Church, and Pentecostals, and increasingly independent traditionally orthodox Muslims. In some areas with large Muslim populations, human rights groups and the religious press report that most if not all of the independent mosques have been closed, and Muslims at prayer have been arrested, beaten, and abused for their orthodox observance. Sometimes they have been accused of being extremists on the basis of their appearance or religious practice. Federal officials have not done enough to address actions taken at the local level or, when appropriate, to hold accountable the officials at fault. The USG and NGO community are monitoring this closely and have raised these issues with Russian officials at the highest levels.

Some regional governments severely restrict the constitutional right of citizens to freely choose their place of residence by requiring residence permits to live and work in a specific area. These restrictions, though repeatedly challenged in court, remain largely in force and are tolerated by the Federal Government. The presence of these restrictions demonstrated the continued obstacles to the enforcement of judicial rulings. Citizens may freely travel within Russia but must carry internal passports. Citizens are free to emigrate. However, individuals who, during the course of their work, had access to classified material can be refused permission to travel abroad for five years following the last date of access to such

material. The law allows for an additional period of five years, although in practice, restrictions of more than five years are rarely imposed.

Although the law provides workers with the right to form and join unions, in practice government policy and the dominant position of the Federation of Independent Trade Unions of Russia (FNPR) limited the exercise of this right. There were increasing limits on worker's rights, and there were reported instances of forced labor and child labor.

**Section 498A(a)(4): "respect international law and obligations and adhere to the Helsinki Final Act of the Conference on Security and Cooperation in Europe and the Charter of Paris, including the obligations to refrain from the threat or use of force and to settle disputes peacefully."**

Responding to attacks on Dagestan in July and August 1999 by extremist Chechen field commander Shamil Basayev and to the bombing of apartment buildings in Moscow and elsewhere, the Russian Government launched a military campaign to assert control over Chechnya. The indiscriminate use of force by both government and rebel troops resulted in widespread civilian casualties and the displacement of more than 250,000 people, the majority of whom sought refuge in the neighboring republic of Ingushetia. The situation in Chechnya, where the record of abuse by Russian troops continues to be poor and there has been little meaningful accountability, continues to be a problem. Unrest, violence, and abuses spread throughout the North Caucasus region in 2005. Pro-Moscow Chechen forces and Chechen rebels also have committed abuses and extremist elements in Chechnya and elsewhere have increasingly resorted to terrorism, both within Chechnya and beyond its borders, such as the October 13-14 attacks in Nacho, capital of the Republic of Kabardino-Balkaria, in which at least 12 civilians and 34 law enforcement officials were killed.

The Government continues to justify its military action in Chechnya as part of the international war against terrorism. Over the past several months, federal forces and pro-Moscow security forces have reduced the number of security sweeps in Chechen villages in favor of targeted night raids. This change has led to an overall reduction in the number of abuses – including extra-judicial killings, disappearances, torture, arbitrary detention and rape – committed by government forces. Human rights groups report such abuses continue, however, and have recently attributed some of the reported reductions in abductions and disappearances to victims' relatives' unwillingness to come forward for fear of reprisals. Pro-Moscow Chechen forces and Chechen rebels also have committed such abuses.

Command and control among military and special police units often appeared to be weak, and a culture of lawlessness and corruption has flourished. There have been individual acts of violence and looting against civilians and a general lack of accountability. While government prosecutors have ostensibly pursued investigations of some of these incidents, few cases have been brought to court. The Supreme Court overturned the May 19 acquittal of special forces Captain Eduard Ulman and three co-defendants of murder charges related to the killing of six Chechen civilians in 2002 and ordered a third trial in the case. The acquittal had generated a mass protest in Grozny. This was the defendants' second trial, after a previous acquittal was overturned by the Military Board of the Supreme Court. The defendants had fired at a car, killing one occupant immediately, and then proceeded to shoot the remaining five occupants and burn the car and the corpses. The defendants claimed they were following orders. Both human rights activists and prominent Chechens have welcomed the Supreme Court ruling.

According to UNHCR estimates, 5,997 people returned to Chechnya between January 1 and August 31, 2005. UNHCR said returns were generally voluntary. Humanitarian and human rights organizations have noted that utility shutoffs and other forms of pressure were sporadically applied to those in Ingushetia, but had been reduced over the past several months. Surveys of internally displaced persons have indicated that the majority does not wish to return to Chechnya until security there improves or until they are provided with adequate shelter. Russian and Ingush officials have pledged that all returns to Chechnya will be voluntary.

Russia's attitude toward the OSCE presence in Georgia and Moldova is mixed. Russia continues to agree to extend the mandate of both missions. However, despite instances of cooperation on the ground between the Russian peacekeeping presence and the OSCE Mission in Georgia, it is clear that the Russians have reservations about expanding OSCE's work on the South Ossetia conflict. Despite this, at the Ljubljana OSCE Ministerial in December 2005, Russia endorsed Georgia's peace plan for South Ossetia, which envisions increased OSCE engagement. In contrast, in 2004 Russia refused to extend the mandate of the OSCE Border Monitoring Operation (BMO), which was established to observe and report on movement across the border between Georgia and the Chechen Republic of the Russian Federation; the BMO was shut down in early 2005. The BMO had been established in December 1999 at Georgia's request in response to Russian allegations that Georgia was permitting fighters and arms to transit its territory into Chechnya and after violations of Georgian airspace by the Russian military. In its place, in 2005, the OSCE (with Russian acquiescence) established a "Training Assistance Program for Georgia Border Guards" that is expected to run until July 2006. The Government of Georgia continues to receive OSCE support for a U.S. Government bilateral assistance in controlling cross-border transit of Chechens in the Pankisi Gorge, located in the northeastern part of the country. The Russian-Georgian agreement of May 30, 2005, relative to key issues concerning withdrawal from two Russian bases in Georgia, is treated below.

Russian authorities work closely with the OSCE Mission in Moldova, although they have not been active in promoting constructive Transnistrian positions in negotiations on settlement of that conflict. Russian experts engaged actively to help the OSCE Mission develop a package of confidence and security building measures to present to the sides for consideration. As in Georgia, the Russian attitude is mixed. It is fair to say, however, that Russia has not sought to promote the OSCE's role in either Moldova or Georgia. Russian Foreign Minister Lavrov has objected to reference to the 1999 Istanbul commitments on Russian withdrawal of forces from Moldova or Georgia (despite some progress on withdrawals there), claiming these were "bilateral" in character and not a matter for OSCE consideration. In fact, these commitments were made at the 1999 OSCE Summit and are reflected in international documents agreed to there.

In its role as mediator in the Abkhazia and South Ossetia conflicts in Georgia and the Transnistria conflict in Moldova, Russia in 2005 acted mainly to preserve the status quo and to increase its influence over the conflict regions through actions such as accelerated issuance of Russian passports, deepening of direct economic links, and resisting calls for internationalization of Russian-controlled peacekeeping structures in the separatist regions. On the other hand, Russia has cooperated closely with the U.S. and the OSCE as a co-chair, along with the U.S. and France, of the OSCE's Minsk Group to facilitate a peaceful negotiated settlement of the Nagorno-Karabakh conflict.

**Section 498A(a)(5): "cooperate in seeking peaceful resolution of ethnic and regional conflicts."**

In 2005, Russia continued its more assertive foreign policy toward former Soviet states. With the exception of a positive approach in coordination with the U.S. and France as Co-Chairs of the OSCE's Minsk Group on Nagorno-Karabakh, Russia made little effort to resolve regional conflicts. Russia has been reluctant to use its undoubted influence on leaders of the separatist conflicts to bring about peaceful resolutions of the conflicts in Georgia and Moldova and has provided political and material support to the separatist regimes. In some instances, Russia has placed its own nationals in leadership positions in the separatist regimes. Russia continues to back Russian-dominated negotiating fora. Russia claims a strong interest in increasing stability and security along its borders to reduce the threats of terrorism, extremism, narcotics trafficking, and organized crime growing out of unresolved regional conflicts, but its failure to press genuine democratic reform and uprooting of corruption means its stated goals often remain elusive. Moscow, however, sometimes uses unresolved conflicts as leverage to pressure its neighbors. Russia's foreign policy remains committed to strengthening the Commonwealth of Independent States (CIS), preserving and enhancing Russia's influence in the region of the former Soviet Union and defending the interests of ethnic Russians in neighboring states.

Russia's involvement in Georgian separatist conflicts in 2005 has been characterized by Russia's desire to preserve the status quo while strengthening both South Ossetia's and Abkhazia's dependency on Russia. While continuing to function within the Joint Control Commission and Joint Peacekeeping Force, mechanisms to maintain control over the situation on the ground, Russia has been slow to support proposals for negotiations towards a final political settlement of the conflict. Until Russia demonstrates political will to solve the conflict and bring its influence to bear on separatist leaders, progress towards a solution is unlikely.

Russia plays a similar but sometimes even more complex role in Abkhazia. Following fall 2004 elections in which President Putin's favored candidate Raul Khajimba lost, Moscow attempted to mediate between the two candidates. In February 2005, Russia imposed a conclusion to the vexed election process in which Khajimba became "vice president" in a power sharing arrangement with "president" Sergey Bagapsh. Although Moscow says that it supports Georgian sovereignty and territorial integrity, it has taken few, if any, serious steps to press the Abkhaz to negotiate seriously toward a settlement. Georgia has expressed concern over Russia's accelerated issuance of passports to ethnic Russians living in Abkhazia (with 90 percent of the residents of Abkhazia now holding Russian passports). Even initiatives such as the opening of a UN Human Rights Office and the introduction of civil policing in the Gali district have been met with little support by Russia. As in South Ossetia, a peaceful resolution is unlikely in Abkhazia until Russia demonstrates political will to solve the conflict.

In both South Ossetia and Abkhazia, Russian peacekeeping forces play an important role. Their presence has a positive impact in terms of preventing large-scale resumption of hostilities; but the Russian presence also serves to support the continuation of these separatist regimes. While the Russian military presence in Georgia is controversial, important progress was made by Russia and Georgia in 2005 towards fulfillment of commitments made regarding the Russian military presence at the OSCE's Istanbul Summit in 1999. On May 30, 2005, Russia and Georgia agreed on key issues relating to timelines and conditions for withdrawal of two major Russian military bases in Georgia (Akhalkalaki and Batumi). The Joint Statement also addressed other Russian military facilities in Georgia, including the Gudauta base in Abkhazia. The May 30 Joint Statement envisions that Georgia and Russia would settle the status of the Russian presence at the facility after a team of international experts visits and reports on the situation at the base.

Russia, the United States, and France co-chair the Minsk Group peace process, which is the OSCE's negotiating forum for a peaceful settlement of the Nagorno-Karabakh conflict. Cooperation among the co-chairs has been excellent. The Co-Chairmen of the Minsk Group have been actively negotiating with the parties to reach a durable peace agreement. A Russian-brokered cease-fire has been in effect in Nagorno-Karabakh since May 1994 and has held, despite sporadic violations. The momentum of the peace process that picked up in 2004 has continued in 2005, with Presidents Aliyev and

Kocharian meeting in Warsaw in May and on the margins of the CIS Summit in Kazan during August. The two presidents charged the Minsk Group Co-Chairs with bringing new, creative solutions to the table, and 2006 appears to present a window of opportunity for a settlement agreement. All three Co-Chairs have continued to work together effectively.

Russia and Ukraine signed a Friendship and Cooperation Treaty in May 1997. The two sides also concluded agreements to resolve the issue of the Ukraine-based Black Sea fleet, which had been a source of disagreement since 1992. In 2003 unresolved border issues in the Sea of Azov and Kerch Strait grew contentious when local Russian engineers began constructing a causeway to link the Russian mainland to a Ukrainian island in the strait. Both sides traded accusations and counteraccusations for several weeks, but Presidents Putin and Kuchma signed a Treaty on the Sea of Azov and the Kerch Strait in December 2003. Questions related to the Kerch Strait were referred to expert commissions for further discussion, however, and a final delineation has yet to be agreed.

Russia made no secret that it favored Prime Minister Yanukovych to succeed President Kuchma in the Ukrainian presidential elections of October-November 2004. Kremlin-backed spinmeister Gleb Pavlovskiy opened a "Russia Club" in Kiev to coordinate Russian support for Yanukovych. In the clearest indication of support, President Putin met on a number of occasions with Yanukovych. Putin carried out a highly visible state visit to Kiev on the eve of the first round of elections in October and returned to Ukraine again in early November. When Yanukovych was pronounced the winner in the second round of voting despite widespread reports of fraud, Putin was the first and only major international leader to phone and congratulate Yanukovych. Russia took every opportunity to express its displeasure over the street demonstrations by supporters of opposition candidate Yushchenko and opposed calls to annul the election results. Russia accused the EU, the OSCE, and the U.S. of "double standards" and of meddling in Ukraine's internal affairs. Ukraine's "Orange Revolution" became a specter haunting Russian foreign policy throughout the year, with Moscow working to prevent repetition of similar "illegitimate" transfers of power in other post-Soviet states. The fallout between President Yushchenko and Prime Minister Tymoshenko received prominent attention in the Russian media, although Ukrainian-Russian relations remained "correct" throughout 2005. In December, Russia and Ukraine were embroiled in a dispute over pricing of Russian gas to Ukraine, an issue still unresolved when this report was submitted.

Russia played a significant role in facilitating the peace process in Tajikistan that led to a comprehensive settlement of the internal conflict there in June 1997. Russia's 201st Motorized Rifle Division and Russian Border Force (RBF), stationed in Tajikistan since Soviet times, are still present in the country. In October 2005, Russia turned over border patrol functions to the Tajiks. Following upon an agreement between Presidents Rahmonov and Putin, the 201st Motorized Division was reconstituted as a "base" with a permanent presence in the country. The enlisted manpower of both units is comprised mostly of Tajik nationals in Russian service. (The RBF is now a larger contingent – for the time being – than the 201st, which has shrunk considerably in the last few years.) The 201st Division supports the current regime and Russia's interests in the region and it cooperates with Tajik armed forces. Only a small RBF advisory group remains.

In Moldova, Russia's role in 2005 served more to maintain the frozen status quo than to resolve the conflict between Moldova and its secessionist region of Transnistria. Russia and Transnistria ultimately agreed to the participation of the U.S. and EU as observers in the five-sided settlement negotiation format in October 2005, in which Russia, Ukraine, and the OSCE serve as mediators between Moldova and the Transnistrian separatists. While the first 5+2 meeting represented a small step forward, in that negotiations were re-started after the summer 2004 breakdown following the closing of Latin-script schools by the Transnistrian authorities, the outcome of the renewed talks consisted of just small steps forward on confidence building measures. Russia remains unhelpful with respect to the determination of Transnistria's future status, having circulated a plan that would not appear to support Moldova's territorial integrity. Absent Russian willingness to use its influence on separatist leaders, the Transnistrian conflict will continue to fester.

In connection with the Transnistrian conflict, Russian forces have been stationed in Moldova since July 1992 pursuant to a bilateral peacekeeping arrangement. Additionally, remnants of the Soviet 14th Army, now referred to as the Operational Group of Russian Forces, are present in Moldova. At the Istanbul OSCE Summit in 1999, Russia agreed to withdraw all of its military forces from Moldova by December 31, 2002. The status of this commitment is discussed in the arms control section below (498A(a)(6)(A)). Withdrawal of arms and ammunition from Moldova was not completed by that deadline. At the OSCE Ministerial Meeting in Porto, Portugal (December 6-7, 2002), Russia agreed to complete the withdrawals by December 31, 2003. Important progress was made in 2003 on the withdrawal of stored Russian munitions from Moldova, but Russia did not meet that extended deadline. Although more than half of the Russian ammunition and military equipment has now been removed from Moldova, further progress has come to a halt with only one ammunition train leaving Moldova in the first eleven months of 2004. No further progress has been made in 2005. In 2005, Russia began arguing for a distinction between CFE-multilateral and Russian-Moldovan bilateral commitments on troop withdrawal, maintaining that the former had been fulfilled and, therefore, ratification of an adapted CFE Treaty should proceed. The U.S. and its allies reject this distinction.

Russia supported the Karimov regime during the May 2005 civil unrest in Andijon, Uzbekistan, and subsequently refused to condemn post-Andijon repression in Uzbekistan, arguing that Tashkent was grappling with a domestic Islamic terrorist insurgency. As the U.S. and EU criticized human rights repression in Uzbekistan, President Karimov reached agreement

with the Russians in November 2005 on a "strategic alliance" treaty between the two countries.

Russia has been generally constructive in mediating certain international conflicts, e.g. as a co-sponsor of the Middle East peace process, a former part of the international security presences in Kosovo (KFOR) and Bosnia (SFOR), a member of the Contact Group working with the UN to resolve the issue of Kosovo's future political status, a member of the Peace Implementation Council Steering Board in Bosnia, a party in the Six-Party Talks seeking to disarm North Korea, and a supporter of UN and other multinational peace initiatives in Africa.

**Section 498A(a)(6): "implement responsible security policies, including—**

**(A) adhering to arms control obligations derived from agreements signed by the former Soviet Union;**

**(B) reducing military forces and expenditures to a level consistent with legitimate defense requirements;**

**(C) not proliferating nuclear, biological, or chemical weapons, their delivery systems, or related technologies; and**

**(D) restraining conventional weapons transfers."**

**Arms Control:** The Government of Russia continues to make progress on resolving arms control issues inherited as a result of the disintegration of the Soviet Union, including the fulfillment of obligations undertaken in connection with bilateral and multilateral treaties such as the Intermediate Range Nuclear Forces (INF) Treaty, Strategic Arms Reduction Treaty (START), the 1972 Convention on the Prohibition on the Development, Production, and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction (BWC), and the Conventional Armed Forces in Europe (CFE) Treaty. Russia is also a party to the Chemical Weapons Convention (CWC). However, we continue to have concerns about Russia's current arms control compliance in some areas, notably biological and chemical weapons.

Since the START Treaty entered into force on December 5, 1994, Russia has verifiably eliminated substantial numbers of strategic offensive arms. Russia met its START Treaty reduction obligations by the December 5, 2001 deadline, and is in compliance with the Treaty's central limits. Nevertheless, Russia has failed to fulfill some of its other START obligations and in some cases has not allowed the United States to exercise fully its Treaty verification rights. The Parties continue to work through diplomatic channels, including the Joint Compliance and Inspection Commission (JCIC), the Treaty's implementing body, to resolve compliance issues and questions. The JCIC meets periodically in Geneva; a number of implementation questions have been resolved through this mechanism. The United States will continue to press Russia to take steps to resolve outstanding compliance issues.

Russia is in compliance with the INF Treaty. The Soviet Union completed its INF Treaty-required eliminations in May 1991. The INF inspection regime was successfully completed on May 31, 2001. Russia continues to observe its obligations under the INF Treaty, including participating in the Special Verification Commission (SVC), the mechanism for resolving implementation questions under the Treaty.

Russia continues to reaffirm its commitment to comply with the CFE Treaty and urges entry into force of the CFE Adaptation Agreement signed by the 30 States Parties at the OSCE Summit in November 1999. Russia complies with key elements of the CFE Treaty, although important longstanding compliance concerns remain.

According to its flank data as of July 1, 2005, and a related notification, Russian holdings of Treaty-limited equipment (TLE) continue to exceed most of the legally-binding limits for the original and revised flank areas. The 30 CFE States Parties agreed to higher flank ceilings for the Russian equipment under the Adapted CFE Treaty, which was signed in 1999 but has not yet entered into force. Russia now appears to be within the *future* limits of the Adapted CFE Treaty for TLE on Russian territory in the revised flank area (the "adapted flank" area).

Russian data as of January 1, 2005 showed compliance with overall limits for TLE, but Russia continued to exceed its overall limits for artillery and tanks in active units. While Russia has demonstrated a generally positive record of implementation of most CFE Treaty provisions, there have been some areas of non-compliance that the Administration has continued to monitor closely. These are reflected in detail in annual reports to Congress on treaty compliance/non-compliance.

In addition, for several years, there have been serious concerns about Russian forces stationed in Georgia and Moldova in spite of a CFE provision that requires the consent of those countries for the presence of Russian forces on their territory.

At the 1999 OSCE Summit in Istanbul, Russia committed to specific actions related to withdrawal of its forces and equipment from the territory of these two States Parties. Russia has fulfilled some of these commitments, in particular those that pertain directly to CFE TLE. But the issue of the continuing presence of Russian forces without host State consent and the failure of Russia to fulfill its remaining Istanbul commitments remains unresolved.

In Moldova, Russia fulfilled its Istanbul commitment to destroy or withdraw its declared TLE by the end of 2001. Fulfillment of the commitment to withdraw all Russian forces by the end of 2002 was hindered by political issues related to the Transnistrian separatist regime, which has obstructed the process, and by the magnitude of certain aspects of the withdrawal task, which includes the removal, destruction, or demilitarization of large quantities of stored Russian ammunition and Russian small arms. Some ammunition was withdrawn in 2002, encouraged in part by assistance from the OSCE via a Voluntary Fund. This withdrawal was confirmed using multinational OSCE and CFE inspection teams. At the 2002 OSCE Ministerial in Porto, Russia committed to complete the withdrawal as early as possible and stated its intention to do so by December 31, 2003. While important progress was made in 2003, withdrawal of Russian forces and munitions halted that year, following rejection by Moldovan authorities of a Russian-proposed plan for settling the Transnistrian conflict, Transnistrian obstructionism, and Russian failure consistently to use its political influence to surmount that obstructionism. Only one trainload of equipment was withdrawn in 2004, and none in 2005. At the December 2005 NATO Foreign Ministerial Meeting, NATO Allies called for resumption of the Russian military withdrawal, and this issue was highlighted by the United States and other states at the 2005 OSCE Ministerial meeting in Ljubljana, Slovenia. The U.S. and NATO allies have said that they will not move to ratify the Adapted CFE Treaty, signed at Istanbul in 1999, until remaining Istanbul commitments on Moldova and Georgia have been fulfilled.

In Georgia, Russia completed its Istanbul commitments to withdraw CFE TLE in excess of agreed levels by December 31, 2000, and closed and transferred to Georgia its base at Vaziani by July 1, 2001, as agreed at Istanbul. Important progress was made in 2005 on the requirement that Russia and Georgia agree on the duration of the Russian presence at the Akhalkalaki and Batumi bases. On May 30, 2005, the foreign ministers of Georgia and Russia agreed on a Joint Statement which settles the timelines for disbandment of those bases, and addresses a range of other issues related to other Russian facilities in Georgia. The Joint Statement was welcomed by NATO Allies as important progress towards completion of remaining Istanbul commitments. Additional steps, however, are needed to codify in a formal agreement the understandings reached regarding Akhalkalaki and Batumi and to resolve the status of the Russian presence at the Gudauta base in Abkhazia. Despite this progress, Russia continues to maintain that remaining Istanbul commitments involving both Georgia and Moldova are essentially bilateral and not an issue for international involvement. The U.S. rejects this argument – all the commitments at issue are reflected in international documents, specifically the CFE Final Act, agreed at the 1999 OSCE Istanbul Summit together with the Adapted CFE Treaty itself, and the Declaration of OSCE Heads of State and Government that was issued at the Summit.

Russia has submitted Vienna Document 1999 Confidence- and Security-Building Measures (CSBM) data declarations annually and has conducted and received CSBM inspections and evaluation visits in accordance with Vienna Document provisions.

Russia is also a party to the Treaty on Open Skies (OS), which establishes a regime of unarmed aerial observation flights over the territories of States Parties. (The Soviet Union was not a party to the OS Treaty.) The Treaty is a U.S. initiative designed to enhance mutual understanding and confidence and to promote openness and transparency in military forces and activities. Prior to the Treaty's entry into force on January 1, 2002, Russia cooperated with 26 other signatories during its period of provisional application. The Treaty has been successfully implemented since it entered into force, with Russia conducting over sixty missions, four of which were over the U.S. A number of implementation issues have arisen during the missions, some of which have required U.S. discussions with Russian counterparts regarding proper interpretation of treaty provisions. Russia has made corrections in its procedures accordingly. Additional issues remain to be resolved.

The Chemical Weapons Convention (CWC) requires Russia to declare and destroy its chemical weapons (CW) stocks and to forgo the development or possession of CW. (Russia itself signed and ratified the CWC, which was never an obligation of the Soviet Union, as the break-up of the Soviet Union pre-dated both the 1993 signature and the 1997 entry into force of the CWC). Russia has requested Cooperative Threat Reduction (CTR) assistance to destroy Russian chemical weapons stocks and to destroy several former chemical weapons production facilities (CWPFs) in accordance with the Convention. In May 1997, the Duma passed and President Yeltsin signed the Russian Federal Law on Chemical Weapons Destruction, approving implementation of the 1996 destruction plan. The plan has subsequently undergone several revisions, the latest in 2005.

In recent years, the Russian Federation has taken steps to strengthen its CW destruction program, including consolidating responsibility under civilian leadership and significantly increasing funding, admittedly from a low starting point. For both financial and bureaucratic reasons, progress toward fulfilling Russia's CWC destruction obligations has been slow in the past, but now appears to be accelerating. Russia indicated that it would spend roughly 11 billion rubles (approximately $400 million) on its CW destruction program in 2005, and plans to request a further increase for 2006 to over 18 billion rubles (approximately $640 million). Russia has requested extensions on its CW destruction deadlines from the Organization for the Prohibition of Chemical Weapons (OPCW). With international assistance, Russia in April 2003

completed the destruction of one percent of its Category 1 stockpile three years after the original CWC deadline for completing such destruction.

Under its recently revised overall CW destruction plan, Russia, with significant international assistance, will construct six CW destruction facilities, in addition to the one already operating at Gornyy. In order to meet its extended intermediate deadline for destroying 20% of Category 1 CW stocks by April 29, 2007, Russia's plan calls for facilities at Kambarka and Maradykovskiy to start destroying CW stocks by the end of 2005, and first half of 2006, respectively. Though Russia appears to have made great efforts to accelerate the construction of these facilities, we anticipate Russia may have to request an additional deadline extension. Russia's updated plan also calls for the completion and start-up of nerve agent destruction facilities at Shchuch'ye (operating 2008-2012), Pochep (2008-2012), Leonidovka (2008-2012) and Kizner (2009-2012). Even with increased domestic funding and significant international assistance, Russia is unlikely to meet these ambitious targets.

Since the December 1997 entry into force of the convention for Russia, the United States has considered the CWC provisions to be the appropriate basis for evaluating Russia's commitment toward CW disarmament. The CWC provides mechanisms under Article IX for pursuing concerns about Russia's compliance. Any development, production, stockpiling or retention of any agents that meet the definition of "chemical weapons" under the CWC is prohibited by that Convention. While Russia has declared CW agent and weapons at seven declared storage sites, the United States is concerned that Russia may possess chemical agent/munitions stocks in excess of what it declared under the CWC.

The Administration also believes that the Russian declaration of chemical weapons development facilities is incomplete. Moreover, there are facilities that Russia may be required but has failed to declare as chemical weapons production facilities (CWPF). In accordance with CWC procedures, rather than destroying many of its declared CWPFs, Russia is converting them into commercial chemical production facilities, making them sources of revenue. Once completed, the implementation of U.S.-negotiated changes at these converted facilities should allow them no greater capability than equivalent industrial facilities to produce CW, as required under the CWC. These facilities will be subject to OPCW inspections t at least through 2012, at which time CWC States Parties can review their status to determine if continued verification is warranted.

The USG and the Russian Federation continue to engage at senior levels and through expert-level bilateral consultations to address concerns about CW.

With respect to the 1972 Convention on the Prohibition on the Development, Production, and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction (the BWC), the United States has determined that the offensive biological weapons (BW) program Russia inherited from the Soviet Union violated the BWC at least through March 1992. Russia succeeded to the obligations of the Soviet Union under this Convention, which was originally adopted by the Soviet Union. In early 1992, President Yeltsin confirmed that the former Soviet Union had an offensive BW program and issued a decree prohibiting all activities that contravened the BWC. In June 2000, President Putin reiterated Russia's adherence to the BWC. By April 2001, the Duma voted to remove a Russian reservation to the 1925 Geneva Protocol that had allowed for Russia's retaliatory use of biological weapons.

Beginning in September 1992, U.S. and UK officials have met their Russian counterparts to discuss compliance issues related to the BWC. The so-called "Trilateral Process" has remained moribund recently primarily due to Russian refusal to allow access to military facilities suspected of having the capability to make offensive BW weapons. While there has been a significant increase in openness on an institutional level at key civilian facilities associated with the former Soviet BW program, the United States remains concerned about the activities taking place at former Soviet BW-related facilities, especially those controlled by the Russian Ministry of Defense.

**Reducing Forces and Expenditures:** Due to extreme budgetary constraints and a changing view of Russian military needs, military spending on equipment and manpower was drastically reduced during the period of 1992-1995. During this period, Russian troop strength was cut by approximately 35%, while tanks, ACVs and artillery were reduced by 50% or greater. Since 1995, Russian personnel strength has continued to drop sharply from a level of 1.7 million authorized military personnel to a present level of roughly one million. However, Russian equipment levels have declined to a lesser degree in this time period as the Russian military restructures its forces in accordance with planned military reforms.

We continue to have concerns about possible Russian offensive chemical and biological programs, as described in the previous section. Any such activities exceed legitimate defense requirements.

**Non-Proliferation:** The United States and Russia have continued their active dialogue concerning non-proliferation of nuclear, biological, and chemical weapons, their delivery systems, and related technologies. Moreover, nonproliferation has become a key part of the new relationship, with the agenda broadening to include regional issues. The United States and Russia are, for example, engaging in a high-level dialogue on Iran nonproliferation issues. Russia has joined the U.S.

and others in urging Iran to suspend all enrichment-related and reprocessing activities and to cooperate fully with the IAEA.

During their February 2005 meeting in Bratislava, Slovakia, Presidents Bush and Putin declared their commitment to enhance cooperation in increasing nuclear security and preventing the acquisition of fissile material by terrorists and proliferant entities. In their "Joint Statement on Nuclear Security Cooperation," the Presidents established the Senior Interagency Group (chaired by Energy Secretary Bodman and then-head of the Russian Federal Atomic Energy Agency Alexander Rumyantsev) to oversee the work. The Presidents committed to develop jointly an emergency response capability, provide for a dialogue on best practices for nuclear security (as well as fostering an overall "security culture"), and jointly develop low-enriched uranium fuel for U.S. and Russian design research reactors in third countries. The bilateral commitment to cooperate on nuclear security enjoyed an early success with the April 13 adoption by the UN General Assembly of the International Convention for the Suppression of Acts of Nuclear Terrorism, which was opened for signature on September 14, 2005. Progress continues to be made, and the Co-Chairmen of the Senior Interagency Group expect to forward their second joint progress report on nuclear security cooperation to the Presidents by December 31, 2005.

As a co-depositary government with the United States (and the UK) for the Treaty on the Non-proliferation of Nuclear Weapons (NPT), Russia continues to consult closely on matters relevant to this important Treaty. Russia concluded a safeguards agreement with the International Atomic Energy Agency that entered into Force on June 10, 1985. It signed an Additional Protocol on March 22, 2000, but this has not yet entered into force. In a joint statement of November 13, 2001, Presidents Bush and Putin endorsed efforts to strengthen the NPT. The Treaty of Moscow, which was signed May 24, 2002 and entered into force June 1, 2003, both refers to and furthers Russia's progress in meeting its disarmament obligations under the NPT. [The United States and Russia consulted prior to and at the first three sessions (2002-2004) of the Preparatory Committee for the 2005 NPT Review Conference, completed in May that year in New York. Although consensus was not reached at the conference, parties are committed to continue to mobilize collective efforts to improve implementation of the NPT.

Although economic difficulties have limited Russia's ability to provide resources for dismantling activities, we believe it remains committed to making a substantial investment in dismantling weapons of mass destruction.

The government-to-government Highly Enriched Uranium (HEU) Agreement between the United States and the Russian Federation, signed February 18, 1993, provided for conversion of 500 metric tons of HEU from dismantled Russian nuclear weapons into low enriched uranium fuel over a 20-year period.

The Agreement provides for the United States Enrichment Corporation (USEC), the U.S. Executive Agent under the agreement, to purchase highly enriched uranium (HEU) as HEU or in the form of Low Enriched Uranium (LEU) suitable for fabrication into fuel for commercial power reactors. Between June 23, 1995, the date of the first LEU delivery, and the end of December 2005, approximately 7,670 metric tons of LEU (equal to roughly 260 metric tons of HEU) have been delivered to USEC. The LEU is sold by USEC for use as fuel in commercial nuclear reactors. In 2002, the U.S. and Russian executive agents entered into an amendment to the implementing contract that provides the terms for LEU shipments through 2013.

In March 1999, agreement was reached concerning the disposition of the natural uranium component of material delivered under the HEU Agreement. Under this arrangement, the USG agreed to purchase natural uranium associated with material delivered in 1997 and 1998. Under the terms of a separate contract, a group of Western companies (Cameco, Cogema and NUKEM) have exercised options to buy a majority of the natural uranium component since 1999 through the end of the HEU Agreement in 2013. Techsnabexport Joint Stock Company (Tenex), the Russian Executive Agent, receives title to the natural uranium component from USEC in lieu of payment by USEC. Tenex retains part of the material and sells the majority of the material to Western companies under the commercial contract. Tenex sells a portion of its retained material to U.S. utilities under the USEC Privatization Act quota for sales in the U.S., and ships any excess to Russia for storage pending eventual use to make blend stock to downblend HEU. On May 23, 2005, Russian Federal Atomic Energy Director for External and International Cooperation Vladimir Kuchinov reported that Russia receives approximately $700 million each year from the HEU Agreement, including the sale of the natural uranium component annually.

Transparency measures have been agreed upon and are being implemented at U.S. and Russian facilities. Transparency provides confidence that the material purchased under the HEU Agreement is derived from HEU from dismantled Russian nuclear weapons, is downblended to LEU in Russia, and is used in the United States for peaceful purposes.

The United States and Russia are cooperating on a variety of other initiatives and programs related to fissile materials. Among these is the initiative by the United States and Russia each to dispose of 34 metric tons - 68 metric tons total - of weapon-grade plutonium that has been declared excess to defense needs. A bilateral agreement that contains these mutual obligations and provides a framework for cooperation on the construction and operation of industrial-scale

plutonium disposition facilities, including nonproliferation terms and conditions, was signed and began to be provisionally applied in September 2000. The two sides are seeking additional funding for Russia's disposition program through negotiations on a companion multilateral financing agreement with other G-8 countries. Another initiative involves the 1997 agreement between the United States and the Russian Federation that, among other things, provided for the shutdown of the last three Russian plutonium production reactors and monitoring of the plutonium in storage that is produced until shutdown. The 2003 amendment to that agreement provides for the replacement of those reactors with fossil-fuel power plants, for which the U.S. is providing assistance. The UK, Canada, and the Netherlands have also provided funding for this project.

The United States is also actively cooperating with Russia to improve security of fissile material stockpiles, combat illicit nuclear trafficking, protect radioactive sources and redirect the activities of weapons scientists and institutes, with the aim of reducing proliferation risks. Additionally, starting in December 1999 and continuing to the present, the United States, Russia, and the International Atomic Energy Agency have been working on a program to return Soviet- or Russian-supplied HEU fresh and spent fuel from foreign research reactors to Russia for downblending or management and future disposition. In May 2004, a U.S.-Russia government-to-government agreement was signed to provide the legal authority for the Russian Research Reactor Fuel Return (RRRFR) program. As of November 2005, a total of 122 kilograms of HEU fresh fuel have been returned to Russia from Serbia (48 kg), Romania (14 kg), Bulgaria (17 kg), Libya (17 kg), Uzbekistan (3 kg), the Czech Republic (6 kg from an institute in Rez and 14 kg from the Czech Technical University in Prague), and Latvia (3 kg).

Between 1996 and 2002, the United States, Russia, and the IAEA conducted a study of the technical. legal and financial issues associated with IAEA verification of weapon-origin fissile material released from defense programs in the two States. In 2002, the three parties concluded that this study had been successfully completed. Some technical work has continued.

Russia continues its efforts to strengthen its export controls on sensitive materials and technology. In 2002 and 2003 the Russian Government issued several regulations to implement the Federal Law on Export Controls, which was enacted in 1999. The United States continues to work closely with the Russian Government to aid in the effective implementation and enforcement of these laws and regulations. As part of this effort, Russia and the United States are working to educate Russian producers and exporters of sensitive technologies on the importance of export controls and of their obligations under Russian law, and to install internal compliance programs at individual Russian entities to help ensure that these entities fully comply with Russian export control laws and regulations. The United States is also helping to outfit key Russian border transit points with detection equipment to deter and interdict illicit transfers.

Russia joined the Missile Technology Control Regime (MTCR) in August 1995, became an original Subscribing State to the International Hague Code of Conduct Against Ballistic Missile Proliferation (HCOC) in November 2002, and has stated its commitment to missile nonproliferation, regional stability, and the goals of the MTCR. The Russian Government also has assured the United States of its commitment to the highest nonproliferation standards and has told us repeatedly that it does not support Iran's long-range missile development efforts. In this context, the United States has pursued a high-level dialogue with Russia aimed at finding ways to work together to cut off the flow of sensitive goods to Iran's ballistic missile development. The Russian Government has created the institutional foundations to implement a recently enacted nonproliferation policy and passed laws to punish wrongdoers. It also has passed export control legislation and adopted implementing regulations to tighten government control over sensitive technologies and continued a dialogue with the United States aimed at strengthening export control practices at Russian aerospace firms. However, while some progress has been made, there are reports of missile cooperation by Russian entities with Iran, in many cases apparently without the knowledge of the Russian Government. In sum, Russian entities have engaged in transfers that are inconsistent with Russia's international missile nonproliferation commitments, and the Russian Government should more effectively implement and enforce its missile-related export controls.

Russian entity support to sensitive nuclear programs in Iran remains a serious concern, and intensive discussions with Russia continue in order to find a satisfactory resolution of this issue. The United States also continues to press the Russian Government to take additional steps against entities involved in missile-related technology transfer to Iran. In July 1998 and January 1999, the United States imposed administrative measures pursuant to the provisions of Executive Order 12938, as amended, against a total of ten Russian entities involved in cooperation with Iran's missile or nuclear weapons programs. These measures (a ban on U.S. exports and U.S. Government assistance to these entities, and on imports and USG procurement from these entities) remain in force for four of the ten entities: Baltic State Technical University, Glavkosmos, D. Mendeleyev University of Chemical Technology, and Moscow Aviation Institute. The Executive Order penalties imposed in 1998 were lifted in November 2000 for entities INOR Scientific Center and Polyus Scientific Production Association; and in April 2004 for Europalace 2000, Grafit, and MOSO Company. In November 2004, we also imposed Executive Order penalties on a Russian entity (Federal Research and Production Complex Altay) for transfer of MTCR-controlled items to a non-MTCR country. We periodically receive reports potentially related to Russian entity transfers of material, equipment, or technology that could contribute to the ability of countries to manufacture missiles or weapons of mass destruction (WMD). We carefully review these reports in light of legal obligations under the applicable nonproliferation sanctions laws. None of these reports has resulted in a sanctions determination on the Government of

Russia for missile or WMD transfers during the reporting period.

**Conventional Arms:** The United States and Russia maintain active contacts on a wide range of conventional arms transfer issues. The Government of Russia has generally complied with its obligations to observe UN arms sanctions against Iraq and the former Yugoslavia, and has worked with the UN Sanctions Committee as questions have arisen. Russia has moved away from past policies of arms transfers for ideological or strategic purposes and now relies heavily on arms exports to maintain the viability of its military-industrial base. We have continuing concerns with respect to Russian arms sales to state sponsors of terrorism and regions of instability and are working with the Russian Government to address these concerns.

In March 1999, as a matter of policy, the U.S. Government imposed sanctions until further notice against three Russian entities for transfers of lethal military equipment to a state sponsor of terrorism. These measures included the denial of U.S. assistance to the entities, a ban on U.S. Government procurement, denial of new licenses and other approvals for defense articles and services for export to these entities. The procurement ban ended in March 2000 and remaining penalties were lifted on two of the entities in April 2004. In 2002 and 2003, the United States, as a matter of policy, imposed sanctions for one year against a total of four Russian entities for the transfer of lethal military equipment to state sponsors of terrorism. Lethal military equipment sanction were waived against the Russian Government in each of these cases. The United States periodically receives reports potentially related to Russian entity transfers of material, equipment, or technology that could contribute to the ability of countries to manufacture missiles or weapons of mass destruction or acquire advanced conventional weapons. Reports of transfers that raise questions under the applicable nonproliferation sanctions laws are under review.

Russia is state party to the Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects (CCW) and Protocols I – IV to the CCW. In 2004 Russia ratified Amended Protocol II to the CCW, which strengthens prohibitions and restrictions on the use of landmines.

Russia is state party to the Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects (CCW) and Protocols I – IV to the CCW. In 2004 Russia ratified Amended Protocol II to the CCW, which strengthens prohibitions and restrictions on the use of landmines.

**Section 498A(a)(7): "take constructive actions to protect the international environment, prevent significant transborder pollution, and promote sustainable use of natural resources."**

After the March 2004 governmental reorganization and the appointment of Minister Yuri Trutnev, the Ministry of Natural Resources (MNR) has begun to devote more attention to environmental issues. The reorganization established three federal agencies and one federal service under the control of the MNR. Federal agencies for water, forestry and mineral resources have broad regulatory powers over these sectors. These three agencies are well staffed with technical experts and have solid environmental protection offices. In addition, the Federal Service for the Management of Nature Use is responsible for the nation's national parks and wildlife protection areas.

The March reorganization also created the Federal Environmental, Industrial and Nuclear Supervision Service, reporting directly to the Prime Minister. The structure of this organization is still being developed, but the GOR is comparing its environmental capabilities and responsibilities to that of USEPA. The service has already shown a commitment to safety regulations and sustainable development and draws upon an experienced scientific and technical staff.

In recent years, the Ministry of Economic Development and Trade (MEDT) has taken a number of positive steps on the environment. It has re-inserted environmental language into Russia's Medium-Term Program of Socio-Economic Development, and it now requires Russia's regions to include an environmental chapter in their development plans. MEDT is also putting in place a countrywide system for financing environmental infrastructure. The system is capitalized by a World Bank loan of $55 million, and it now has a project portfolio on the order of $90 million. Particularly in the energy sector, MEDT is promoting efficiency and clean development.

Improvements in environmental quality have also been occurring as a result of actions taken in other Russian Government ministries and in certain sectors of the economy, primarily under the impact of economic and efficiency calculations. Energy-efficient building codes have been introduced countrywide in the construction sector, with concomitant reductions in energy use, greenhouse gas emissions, and emissions of conventional air pollutants. The phase-out of leaded gasoline is nearing completion, especially in European Russia.

**Climate Change and CFCs:** The United States and Russia announced in January 2003 the formation of an Inter-Ministerial Climate Change Policy Dialogue, one of several bilateral partnerships developed pursuant to President Bush's February 2002 announcement of a new U.S. approach to climate change. The third meeting of the U.S.-Russia Climate Change Policy Dialogue was held in Moscow in May, 2005 with both sides expressing interest in continuing close collaboration on climate-related projects, especially projects in the polar region. Russia participates actively in a number of U.S.-initiated multilateral climate partnerships: The Carbon Sequestration Leadership Forum, the International Partnership for the Hydrogen Economy, the Earth Observations Summit, and recently, the Methane to Markets initiative. Russia is a founding member of the U.S.-backed Methane to Markets Initiative, an action-oriented initiative that will reduce global methane emissions to enhance economic growth, promote energy security, improve the environment, and reduce greenhouse gases. Along with the U.S. and other key non-EU industrialized countries, Russia remains a member of the "Umbrella Group", a loose coalition for issues related to the U.N. Framework Convention on Climate Change (UNFCCC).

On February 15, 2005, the Kyoto Protocol entered into force in Russia. The GOR is now focused on implementing Kyoto and adopted a National Action Plan on Implementation in March 2005. In May, an inter-ministerial commission on implementation was created under the leadership of MEDT. The commission completed a coordinated implementation action plan in mid-November. As required under the Protocol, the GOR has begun to compile an inventory of greenhouse gases and develop national regulations on joint implementation approval procedures.

**Section 498A(a)(8): "deny support for acts of international terrorism."**

The Government of Russia does not grant sanctuary from prosecution to individuals or groups who have committed acts of international terrorism or otherwise support international terrorism. Since the September 11, 2001 attacks, the Government of Russia has provided significant and unprecedented diplomatic and intelligence support to the coalition against terrorism and to Operation Enduring Freedom. Russia provided U.S. military aircraft with access to its airspace and took measures to assist in strengthening border security on the frontlines.

The United States has conducted regular counter-terrorism consultations with Russia since June 1994. After September 11, 2001, counterterrorism cooperation with Russia expanded to unprecedented levels. Counterterrorism consultations with Russia in the Afghanistan Working Group, which began in August 2000, were expanded to cover terrorist threats around the world in the new Counterterrorism Working Group. This met for the first time with the new mandate in July 2002 and has met semiannually since then. Priority issues covered by the Working Group include weapons of mass destruction, intelligence sharing, law enforcement cooperation, building international will and capacity to fight terrorism, combating terrorist financing, UN issues, MANPADS, and aviation security.

Russia is a party to eleven of the international counter-terrorism conventions and has signed two others. Russia initiated consideration of the International Convention for the Suppression of Acts of Nuclear Terrorism, which was adopted by the UN General Assembly in April 2005. Russia and the United States continue to seek ways to enhance our cooperation in listing, through the 1267 Committee of the Security Council, individuals/entities that support terrorism.

**Section 498A(a)(9): "accept responsibility for paying an equitable portion of the indebtedness to United States firms incurred by the former Soviet Union."**

In October 1991, shortly before the Soviet Union dissolved, Russia and nine other Soviet republics signed a Memorandum of Understanding declaring themselves jointly and severally liable for the foreign debts of the former Soviet Union (FSU). In December 1991, Russia and seven other republics signed an agreement that assigned to each of the Newly Independent States (NIS) a share of all the external assets and foreign debt of the FSU. Russia's initial share of the roughly $57 billion in FSU debt was 61%.

Beginning in 1992, Russia sought to replace the joint and several liability principles with the so-called "double-zero option" agreement, whereby NIS countries would relinquish all Soviet-era assets and liabilities to Russia. By 1994 the Russian Government had signed the "double-zero option" agreement with Armenia, Azerbaijan, Belarus, Georgia, Moldova, Kazakhstan, Kyrgyzstan, Moldova, Tajikistan, Turkmenistan, Ukraine and Uzbekistan. Under those agreements, the Russian Government assumed liability for all FSU foreign debt in return for the external assets of the FSU held by these countries.

In August 2000, Russia finalized the agreement reached in February 2000 with the "London Club" of commercial creditors to restructure about $32 billion in Soviet-era commercial debt. The London Club agreed to write off $10.4 billion in exchange for $270 million in cash payment and $20.6 billion in Eurobond issuances, a reduction of approximately 35 percent in the face value of the original debt. In those negotiations, Russia sought to restructure amounts owed to banks that were not insured by official guarantees and that arose in connection with loans to or other claims on the FSU. Repayment of each category of debt is scheduled to begin after completion of a seven-year grace period. In 2002, work

began on restructuring foreign trade obligations – borrowings by Soviet companies without state guarantees – on similar terms.

In recent years, increased Russian Government revenues due to high oil prices have made debt repayment easier. An aggressive debt management strategy that includes buybacks on secondary markets and swaps with creditors continues to produce significant reductions in Russian external debt owed to commercial creditors. In January 2005, Russia prepaid its entire $3.3 billion IMF debt and made an early prepayment tranche of $15 billion to Paris Club creditors in August 2005. Russia still has approximately $30-35 billion in Paris Club debt, and is exploring other early prepayment possibilities, as it hopes to pay off its entire debt within two or three years.

**Section 498A(a)(10): "cooperate with the United States Government in uncovering all evidence regarding Americans listed as prisoners-of-war, or otherwise missing during American operations, who were detained in the former Soviet Union during the Cold War."**

The U.S. effort to uncover evidence of American POWs and MIAs who may have been taken to the former Soviet Union is being conducted through the U.S.-Russian Joint Commission on POW/MIAs, which was established by Presidents Yeltsin and Bush in March 1992. President Yeltsin and General Dmitriy Volkogonov, then chairman of the Russian side of the Commission, pledged their full cooperation. President Yeltsin directed all relevant Russian ministries to cooperate fully with the Commission. Until his death in December 1995, General Volkogonov oversaw a broad-based research effort conducted by Russian and American archivists in search of information on missing American servicemen. He also arranged for representatives of the U.S. side of the Commission to travel across Russia in order to interview Russian citizens and conduct research in national and regional archives. This level of U.S.-Russian cooperation on POWs/MIAs was unprecedented.

In March 1996 General-Major Vladimir Zolotaryev became the Russian Chairman of the Commission, replacing General Volkogonov. In December 1998 Major-General Roland Lajoie, USA, retired, became the U.S. Chairman, replacing Ambassador Malcolm Toon, who had served as U.S. Chairman since the Commission's inception. In June 2004 Deputy Assistant Secretary of Defense Jerry D. Jennings succeeded General Lajoie as U.S. chairman. Since 2004, the work of the Commission has been hampered as a result of the Presidential Administration's reorganization following President Putin's re-election in March 2004. In a presidential decree in April 2005, the Russians abolished the former Russian Commission under which the bilateral U.S.-Russia Commission was sponsored, constituted a newly-formed "Interagency Commission for Prisoners of War, Internees, and Missing in Action," and appointed V.A. Shamanov as Chairman. This appears to move the Russian side of the Commission from the Presidential Administration to the ministerial level (Ministry of Defense), an apparent downgrade in the Commission's status on the Russian side.

The Commission has held nineteen plenary sessions, the most recent in June 2005. Due to reorganization-associated disarray on the Russian side, the Commission has accomplished virtually nothing in the past year that can be attributed to bilateral cooperation. Nevertheless, the U.S. side has continued an aggressive and unilateral program of archival research, field investigations, and interviews with Soviet veterans of conflicts since World War II that has advanced the personnel accounting mission in the former Soviet Union. While not cooperative or supportive of these efforts, the Russian side also has not impeded progress. The U.S. side expects the Russian side to complete its reorganization in early 2006, after which it is expected that bilateral cooperation will again characterize the Commission's work.

**Section 498A(a)(11): "terminate support for the communist regime in Cuba, including removal of troops, closing of military and intelligence facilities, including the military and intelligence facilities at Lourdes and Cienfuegos, and ceasing trade subsidies and economic, nuclear, and other assistance."**

In 1991, Moscow ended its $4 billion-per-year subsidy of the Cuban economy. In 1992, Russia halted construction of the Juragua nuclear power plant near Cienfuegos, Cuba. Russia maintained a credit line for mothballing parts of the facility completed before suspension, but Castro announced in January 2001 that Cuba had decided against continuing with the project.

In 1993, Russia withdrew its last remaining combat troops from Cuba. On October 17, 2001 President Putin announced Russian withdrawal from Moscow's intelligence facility at Lourdes, Cuba. The Russians completed the dismantling of the Lourdes site by late summer 2002, and the Government of Cuba announced that it would convert the former listening post to a large computer science campus. With the closing of the facility, Russia ceased providing Cuba a $200 million annual payment for its use.

Russian officials continue to assert that Russia is not providing assistance to Cuba, and that all trade is conducted on a

commercial, non-preferential basis. Russian-Cuban economic interaction centers on oil-for-sugar barter arrangements and nickel plant investments, both part of a 2001-2005 trade plan agreement which established "recommended" trade targets. According to the agreement, Russia aims at delivering 1.5-2.0 million tons of oil per year to Cuba. Other Russian exports include spare parts, fertilizers, and steel. Cuba exports the lion's share of its sugar production to Russia each year, as well as nickel, medicines, vaccines and medical equipment, citrus fruits, cigarettes and rum. Russia and Cuba recently announced plans to increase mutual investment. Tourism, energy, and mining were noted as promising avenues of economic cooperation. Russia's ongoing claims of Soviet-era debt, and Cuba's rejection of those claims, are likely to continue to dampen any enhanced economic relations.

**CHECKLIST FOR GROUNDS OF INELIGIBILITY**
**UNDER SECTION 498A(b) OF THE FOREIGN ASSISTANCE ACT OF 1961**

**RUSSIA**

**Section 498A(b)(1): Has the President determined that the Government of Russia has "engaged in a consistent pattern of gross violations of internationally recognized human rights or of international law"?**

No. The President has not made such determination at this time. However, there are grounds for concern: continuing and credible reports of human rights violations and abuses by Russian military forces and rebels in Chechnya and the North Caucasus; generally poor treatment of prisoners and inadequate detention facilities; and continued increasing pressure on minority religious groups. As a result of adverse trends over the past year, the Secretary of State was for the second year in a row unable to certify the Russian Government's commitment to observe internationally recognized human rights under the Cooperative Threat Reduction (CTR) Act and Freedom Support Act Title V assistance for FY 2006. We will continue working to address existing problems in the area of democracy and human rights not only through diplomatic efforts but also through our assistance programs.

**Section 498A(b)(2): Has the President determined that the Government of Russia "has failed to take constructive actions to facilitate the effective implementation of applicable arms control obligations derived from agreements signed by the former Soviet Union"?**

The President has not made that determination, as the Russians have taken constructive steps in this area.

**Section 498A(b)(3): Has the President determined that, after October 24, 1992, the Government of Russia "knowingly transferred to another country":**

> **(A) missiles or missile technology inconsistent with the guidelines and parameters of the Missile Technology Control Regime; or**

> **(B) any material, equipment, or technology that would contribute significantly to the ability of such country to manufacture any weapon of mass destruction (including nuclear, chemical, and biological weapons) if the President determine[d] that the material, equipment, or technology was to be used by such country in the manufacture of such weapon"?**

During the reporting period, no determinations were made against the Government of Russia under this section.

Russia became an MTCR Partner in August 1995. Russia is a Party to the NPT, CWC, INF, START and BWC, and the Russian Government has demonstrated a commitment to the non-proliferation of weapons of mass destruction. There was no termination of assistance to Russia during the reporting year under section 498A(b)(3). Additional information related to implementation of this section, however, has previously been provided to Congress on a classified basis. (We periodically receive reports potentially related to Russian transfers of material, equipment, or technology that could contribute to the ability of countries to manufacture missiles or weapons of mass destruction. We have under review reports of transfers that raise questions under the applicable nonproliferation sanctions laws.)

**Section 498A(b)(4): Is the Government of Russia "prohibited from receiving such assistance by section 101 or 102**

**of the Arms Export Control Act or sections 306(a)(1) and 307 of the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991"?**

No. The Government of Russia is not prohibited from receiving assistance under these sections.

**Section 498A(b)(5): Has the President determined and certified to the appropriate congressional committees that the Government of Russia "is providing assistance for, or engaging in non-market-based trade (as defined in section 498B(k)(3)) with the Cuban Government? If so, has the President taken action to withhold assistance under the Foreign Assistance Act within 30 days of such a determination, or has Congress enacted legislation disapproving the determination within that 30 day period?"**

No. The President has not determined that the Government of Russia is providing assistance for, or engaging in any non-market-based trade with, the Cuban Government.

**Section 498A(b)(6): Has the Government of Russia "failed to make significant progress on the removal of Russian or Commonwealth of Independent States troops from Estonia, Latvia, and Lithuania" or "failed to undertake good faith efforts, such as negotiations, to end other military practices that violate the sovereignty of the Baltic states"?**

No. The process of Russian troop withdrawal from Lithuania was completed in 1993 and from Latvia and Estonia in 1994. Russia ceased operating its radar facility at Skrunda, Latvia, in August 1998 as called for in a bilateral agreement. Dismantling of the facility was completed ahead of schedule by September 1999 under OSCE supervision. The Baltic states joined NATO in 2004. Russia expressed concern that unless the Baltic states acceded to the Adapted Conventional Forces in Europe Treaty, their accession to NATO would raise security concerns for Russia. The Baltic states have indicated that they are ready to join CFE when that is possible. The current CFE Treaty does not permit accession by additional countries, however, so the Baltic states' accession is only possible under the Adapted CFE Treaty, which was signed in 1999 but not yet ratified by all 30 current CFE states. The United States and NATO Allies have made clear that Russia must first fulfill its 1999 OSCE Istanbul Summit commitments on withdrawal from Moldova and Georgia to create the conditions for ratification and entry into force of the Adapted CFE Treaty.

The Baltic states also complain of continuing incursions into their airspace by Russian aircraft, usually en route to Kaliningrad, and have noted the hazards Russian flight practices pose to local civil aviation. In September 2005, a Russian SU-27 military airplane, bound for Kaliningrad, crashed in Lithuania, resulted in protracted discussions over return of the pilot, the plane's flight recorder, debris, and payment of compensation. All three Baltic states strongly support the NATO air policing program in their airspace.

FY 2005