**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
------------------------------------------------------x
                                      )
RICHARD ALLEN, et al.                 )
                                      )
              Plaintiffs,             )      Case No: 1:05-cv-02077 (CKK)
                                      )      Hon. Colleen Kollar-Kotelly
      v.                              )
                                      )
RUSSIAN FEDERATION, et al.            )
                                      )
              Defendants.             )
                                      )
------------------------------------------------------x
```

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# EXHIBIT 58

LEXSEE 38 INT L LAW. 15

Copyright © 2004 American Bar Association
The International Lawyer

Spring, 2004

*38 Int'l Law. 15*

**LENGTH:** 13544 words

**SECTION:** ARTICLE.

**TITLE:** Corruption in the Russian Arbitrazh Courts: Will There Be Significant Progress in the Near Term?

**AUTHOR:** Ethan S. Burger *

\* Scholar-in-Residence, Transnational Crime & Corruption Center, School of International Service (www.american.edu/traccc); Adjunct Associate Professor, Washington College of Law, American University, Washington, D.C. 20016. Mr. Burger is also Managing Director of International Legal Malpractice Advisors, LLC (www.ilma.us).

**TEXT:**

### I. Introduction

For more than ten years, institutions such as the World Bank, European Bank for Reconstruction and Development, U.S. Agency for International Development, and others have invested significant resources in supporting the development of the Russian judiciary with the goal of furthering the establishment of the "rule of law" (as opposed to Russian President Vladimir Putin's "Dictatorship of Law") n1 in the country. n2 Sufficient time has passed to allow observers to take stock of these efforts. This article focuses on judicial corruption n3 in the Russian *Arbitrazh* [Commercial] Courts, n4 the fair operation of which influences Russia's economic development and its attractiveness to investors. n5 Despite the recognition of the problem of judicial corruption by foreign and domestic specialists, as well as commitments announced by Russian officials to address it, much remains to be done. n6

n1 *See* Ethan S. Burger & Evgenia Sorokina, *Vladimir Putin's 'Dictatorship of Law': Its Potential Implications for the Business and Legal Communities,* 13 BNA's E. EUR. REP., No. 12, at 19-23 (Dec. 2003).

n2 *See, e.g.,* World Bank, *available at* http://www-wds.worldbank.org/servlet/WDSContentServer/WDSP/IB/1996/05/21/000009265_3961214124817/Rendered/PDF/multi0page.pdf (last visited Mar. 12, 2004); U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF DEMOCRACY AND GOVERNANCE, BUREAU FOR GLOBAL PROGRAMS, FIELD SUPPORT AND RESEARCH, GUIDANCE FOR PROMOTING JUDICIAL INDEPENDENCE AND IMPARTIALITY, 53-71 (Washington D.C., revised ed. 2002) (citing Peter H. Solomon Jr. & Todd S. Vogelsong, *Courts in Transition in Russia: The Challenge of Judicial Reform* (Westview Press 2000)), *available at* http://www.usaid.gov/democracy/pdfs/pnacm007.pdf; http://www.parliament.the-stationery-office.co.uk/pa/cm199899/cmselect/cmfaff/815/9101202.htm (last visited Jan. 15, 2004) [hereinafter USAID, GUIDANCE FOR PROMOTING JUDICIAL IMPARTIALITY].

n3 There is no universally accepted definition of corruption. In fact, unlike numerous other instruments, including those of the Council of Europe (*see* http://www.greco.coe.int/ (last visited Mar. 6, 2004)), the November

The International Lawyer Spring, 2004

2003 U.N. Convention on Corruption does not include "corruption" as a defined term, *available at* http://www.jus.uio.no/lm/un.against.corruption.convention.2003 (last visited Mar. 11, 2004). Corruption is often defined narrowly as the 'use of office for personal gain.' But such a definition lacks context. Corruption takes many forms: an official advancing the interests of another (e.g., nepotism) or dealing with a matter in a fashion directed by another for political or other reasons, rather than on its merits. This latter form may be taking on increasing importance in Russia as evidenced by the YUKOS affair. For a useful framework for examining the issue of corruption, see the Website for the Carnegie Endowment for International Peace, which contains links to stories dealing with the YUKOS matter. Carnegie Endowment for International Peace, *at* http://www.ceip.org/files/Publications/khodorkovsky.asp?pr=2&from=pubdate (last visited Jan. 15, 2004). For the competing explanations of the motives behind the YUKOS affair, see the Websites of President Putin. President of Russia, *available at* http://www.kremlin.ru/ (last visited Jan. 15, 2004); Federation Government, *available at* http://www.government.ru/government/index.html?he_id=38 (last visited Jan. 15, 2004); YUKOS, *available at* http://www.yukos.com (last visited Jan. 15, 2004). *See also* SUSAN ROSE-ACKERMAN, CORRUPTION AND GOVERNMENT: CAUSES, CONSEQUENCES AND REFORM (Cambridge University Press 1999). For the purposes of this article "corruption" shall be understood as the use of authority for reasons not envisioned by law. For a particularly insightful and intellectually provocative analysis of the international policy context for the definition of corruption, see James W. Williams & Margaret E. Beare, *The Business of Bribery: Globalization, Economic Liberalization, and the 'Problem' of Corruption, in* CRITICAL REFLECTIONS ON TRANSNATIONAL ORGANIZED CRIME, MONEY LAUNDERING AND CORRUPTION 88-129 (Margaret E. Beare ed., University of Toronto Press 2003).

n4 In recent years, leading scholars and legal analysts produced a multitude of works on the development, operation, and performance of the Russian *arbitrazh* court system. Professor Kathryn Hendley of University of Wisconsin has written some of the most significant works in this area, including *Remaking an Institution: The Transition in Russia from State Arbitrazh to Arbitrazh Courts, 46 AM. J. COMP. L. 1 (1998); Growing Pains: Balancing Justice & Efficiency in the Russian Economic Courts, 12 TEMP. INT'L & COMP. L.J. 2 (1998);* with Peter Murrell, *Dispute Resolution in Russia: A Regional Perspective in Unleashing Russia's Business Potential: Lessons from the Regions for Building Market Institutions,* World Bank Discussion Paper No. 434 (March 2002); and *Enforcing Judgments in Russian Economic Courts,* 20 POST-SOVIET AFFAIRS, No. 1 (2004) (forthcoming). For a compendium of Professor Hendley's works, visit her Website. Hendley, *available at* http://www.polisci.wisc.edu/users/hendley/research.html (last visited Jan. 15, 2004).

Unfortunately, some of the other "literature" on the operation of the Russian court system exhibits qualities of "boosterism" that often lacks complete candor. This is understandable since many donor organizations and international financial institutions have a major stake in demonstrating through "sponsored research" that improvement in the quality of "justice" available in the Russian courts is occurring. The situation is further complicated since legal analysts are often dependent on maintaining good working relations with government and judicial officials to obtain access to data and the cooperation of the local authorities in order to continue their work. Furthermore, law firms, accounting firms and investment banks also have an incentive to demonstrate that the rule of law in the country is improving and gains are being made in the struggle against corruption. In addition, Russia's political and strategic importance limits the willingness of some governments to be publicly frank in their assessments of the role of corruption and political influence in judicial decision making. The interdependence of aid donors (and their agents) and local elites has been insightfully analyzed in the context of western advice on privatization in Poland and Russia. JANINE R. WEDEL, COLLISION AND COLLUSION: THE STRANGE CASE OF WESTERN AID TO EASTERN EUROPE 45-174 (Palgrave Macmillan 2001).

n5 Judicial corruption is not a problem peculiar to Russia. According to a 1999 study conducted by the Geneva-based Centre for the Independence of Judges and Lawyers, judicial corruption was "pervasive" in thirty of forty-eight countries examined. PETTER LANGSETH, CENTER FOR INTERNATIONAL CRIME PREVENTION, UNITED NATIONS OFFICE FOR DRUG CONTROL AND CRIME PREVENTION, STRENGTHENING JUDICIAL INTEGRITY AGAINST CORRUPTION 4 (Vienna 2001) (citing Centre for Independence of Judges and Lawyers' 9th Annual Report (Feb. 1999)).

n6 For an insightful Russian perspective on the issue of judicial corruption generally, see Galina E. Enyutina, *Korruptsiya v sudebnykh organanakh [Corruption in Russian Judicial Bodies], in* 1 *ORGANIZOVANNAYA PRESTUPNOST', TERRORIZM I KORRUPTSIYA* [ORGANIZED CRIME, TERRORISM & CORRUPTION] 18-30 (2002), *available at* http://www.mosorgcrimrescenter.ru/menu/viewer.htm (last visited Mar. 11, 2004). Ms. Enyutina's study outlines the structure of the Russian court system, the manner by which judges are selected, factors that contribute to the existence of corruption, and offers suggestions for improving the situation.

The Russian Criminal Code, adopted in May 1996, contains articles that prohibit the abuse of service positions as well as the receiving and paying of bribes (articles 285, 291, and 293). n7 In addition, the Criminal Code contains entire chapters on (i) Crimes against State Power, the Interests of State Service, and Service in Bodies of Local Self-Government; and (ii) Crimes against Court Processes (*Pravosudiya*). So the issue is not an absence of relevant legal norms, but the non-observance and/or non-enforcement of already existing law. n8 On at least two occasions, the Russian State *Duma* (the lower chamber of the Federal Assembly, the country's bicameral legislature) considered laws addressing the problem of corruption directly. This first happened in 1997, when both the State *Duma* and the Federation Council (the upper chamber of the Federal Assembly) n9 passed an anti-corruption law, only to have then-President Boris Yeltsin veto it. At the present time, the State *Duma* is working on yet another draft law concerning corruption--a version of this draft law passed on its first reading in November 2002, n10 but apparently there has not been any real progress towards the adoption since then. n11 Existing Russian legal norms do not adequately address the problem of the "revolving door," the situation where individuals leave state service only to take jobs with the very same enterprises they had dealings with while they held official positions. Similarly, Russian rules governing "conflict of interest" of state officials are fairly rudimentary.

n7 Under the Russian Federation Civil Code, the giving of a "gift" to a state or municipal official having a value of less than five times the minimum monthly wage (in recent years, below the rough equivalent of $ 60) is not considered a crime. *See* GK RF art. 575 (1996). This widespread practice may be the first step towards more significant bribery.

n8 The Russian Ministry of Affairs' Website presents aggregate statistics on the number of crimes registered and the number of cases prosecuted in the reporting period. The data it presents does not correspond to particular articles of the Russian Criminal Code. It also presents a breakout of crime by locality. Unfortunately, it does not set out crimes involving the judiciary in general or the *arbitrazh* courts in particular. Russian Ministry of Affairs, *at* http://www.mvdinform.ru/?docid=11 (last visited Jan. 15, 2004).

n9 Chapter V of the Russian Constitution describes the composition, structure, and powers of the Federal Assembly. Articles 105-108 within Chapter V set forth the process by which laws are enacted. *See* KONST. RF arts. 105-108.

n10 To follow this draft law's progress, see State *Duma, On Combating Corruption, at* http://www.duma.gov.ru/bot.html (last visited Mar. 11, 2004).

n11 *See* Russian Federation State *Duma, available at* http://www.akdi.ru/gd/proekt/GD01.HTM (last visited Mar. 11, 2004). To become law, a draft law must be approved on three readings by the State *Duma,* approved by the Council of the Federation and signed (or not vetoed) by the Russian President. *See* RFE/RL Newsline (Russia), *Yeltsin Vetoes Anti-Corruption Law,* Dec. 22, 1997, *available at* http://www.rferl.org/newsline/1997/12/221297.asp (last visited Jan. 15, 2004); BBC Summary of World Broadcasts, *Federation Council approves law against corruption,* Dec. 5, 1997 (citing RIA News Agency Moscow, in English.).

On November 26, 2003, President Putin issued an edict creating the Council for Combating Corruption. n12 Its membership includes: the Russian Prime Minister, the heads of both chambers of the National Assembly, and the Chairmen of the Constitutional, Supreme, and Supreme *Arbitrazh* Courts. Its declared objective is to assist the President in developing anti-corruption policies. In addition, a second commission was formed to examine issues, such as con-

flicts of interest. n13 It is premature to evaluate whether these new bodies will spearhead effective anticorruption efforts, or if they will suffer the same fate as anti-corruption bodies created during the Yeltsin years. n14 It is indeed possible, if not likely, that anti-corruption activities will be limited to persons "disfavored" by the authorities.

n12 Russian Federation Presidential Edict No. 1384, On the Council under the Auspices of the President of the Russian Federation for the Struggle with Corruption, Nov. 24, 2003, *available at* http://www.kremlin.ru/text/news/2003/11/56177.shtml. The timing of the issuance of this edict, just before the December 2003 State *Duma* elections, may not have been a mere coincidence.

n13 Aleksandr Kornilov & Sergei Sedelnikov, *Fighting corruption on a contract basis,* Nov. 25, 2003, *available at* http://www.gazeta.ru/2003/11/25/Fightingcorr.shtml (*in* Johnson's Russia List, No. 7437, Nov. 25, 2003).

n14 Russian Federation Presidential Edict, On Additional Measures to Enable the Interdepartmental Commission of RF Security Council to Combat Crime and Corruption More Effectively, June 23, 1993; Leyla Boulton, *Yeltsin's anti-graft chief to step down,* FIN. TIMES, Oct. 21, 1993, at 3 (suggesting that Mr. Andrei Makarov resigned since he lacked the ability to combat corruption among senior officials). There have also been legislative attempts to investigate corruption, including that of the Federation Council. *See* Lyudmila Yermakova, *Senators set up commission for anti-corruption problems,* TASS, Apr. 22, 1999.

Georgy A. Satarov, President of the INDEM Center for Applied Political Studies (INDEM), estimates that bribes, of all types, paid annually in Russia totaled more than the equivalent of U.S. $ 33 billion in 2001, more than the entire Russian federal budget. n15 He conservatively estimates that court officials, presumably including judges, annually received bribes equivalent to at least U.S. $ 274 million. n16 Of course, since neither bribe payers nor bribe recipients report the amount of money exchanged, there is no way to assess the accuracy of these estimates. n17

n15 In an interview given to Rossiiskaya gazeta, Dr. Satarov stated that according to corruption researchers, the Russian *arbitrazh* "courts are the weakest component of the legal system." *The Parties Are at the Helm,* Ross. GAZETA, Aug. 7, 2002.

n16 Interfax, *Russians spend at least $ 37 billion on bribes each year, in* Johnson's Russia List, # 6261, May 21, 2002, *available at* http://www.cdi.org/russia/johnson/6261.htm (last visited Mar. 6, 2004). *See* INDEM Foundation, *Russia vs. Corruption: Who Wins? at* http://www.glasnost.ru-indemfond/indfp2e.html (last visited June 22, 2003).

n17 According to a leading international specialist on the study of crime, Richard Rose, Director of the Center for the Study of Public Policy (University of Strathclyde, Glasgow Scotland), one survey of Russian citizens found 66 percent of the respondents saw the non-enforcement of laws and corruption "as the chief obstacle to Russia becoming a 'normal' society." *Russian's Challenge to Vladimir Putin, in* Johnson's Russia List, Aug. 28, 2002, *available at* http://www.cdi.org/russia/johnson/6409-6.cfm.

No one pays a bribe without expecting something of perceived greater value in return. Generally speaking, bribes fall into two categories: bribes to get an official to perform a task that he is required to perform, commonly known in the United States as "grease" payments (which are permissible under the U.S. Foreign Corrupt Practices Act), and bribes to obtain special treatment. In an interview with a correspondent from *Novaya Gazeta* [New Newspaper], Mr. Kirill Kabanov, then the acting Chairman of the Russian National Anti-Corruption Committee, indicated that the economic cost of corruption in Russia was approximately U.S. $ 38-40 billion in harm to the state and its citizens. Although he did not discuss the basis for this figure, Mr. Kabanov appeared to be well aware that corruption was pervasive throughout Russian society and that organized crime played a large role in corrupting law enforcement personnel. He offered certain suggestions, many of which were general in nature, concerning how corruption could be combated. Notably he called for a "judicial system with clear, distinct laws, with no gaps or loopholes." n18

The International Lawyer Spring, 2004

n18 Igor Bederov, *Turnover in the corruption market amounts to $ 40 billion a year,* NOVAYA GAZETA [NEW NEWSPAPER], Nov. 20, 2003, *in* Johnson's Russia List, No. 7431, Nov. 21, 2003, item 11 (citing WPS Monitoring Service), *available at* http://www.222.wps.ru/e-index.html.

As a preliminary matter, it is worth noting that judicial corruption is not a problem found only in Russia. n19 It occurs in most of the developing world, as well as in countries transitioning from a planned to a market-based economy. n20 What makes Russia unique, apart from its former status as a superpower, is its vast mineral wealth and educated population, which would appear to make it an attractive target for investment. This means that the consequences of corruption in Russia, more so than in most other countries, will be an issue that foreign courts and international arbitral bodies may confront.

n19 The U.S. Agency for International Development (USAID) and the World Bank have been leaders in promoting programs to combat corruption in general as well as judicial corruption. *See* USAID, GUIDANCE FOR PROMOTING JUDICIAL IMPARTIALITY, *supra* note 2; OFFICE OF DEMOCRACY AND GOVERNANCE, BUREAU FOR DEMOCRACY, CONFLICT AND HUMANITARIAN ASSISTANCE, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, PROMOTING TRANSPARENCY AND ACCOUNTABILITY: USAID's ANTI-CORRUPTION EXPERIENCE (Jan. 2002), *available at* http://www.usaid.org [hereinafter USAID, PROMOTING TRANSPARENCY AND ACCOUNTABILITY]; OFFICE OF DEMOCRACY AND GOVERNANCE, BUREAU FOR DEMOCRACY, CONFLICT AND HUMANITARIAN ASSISTANCE, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, A Handbook for Fighting Corruption (Feb. 1999), *available at* http://www.usaid.org [hereinafter USAID, A HANDBOOK FOR FIGHTING CORRUPTION]. The World Bank's Program on Legal and Judicial Reform maintains an excellent website that is broad both in subject matter and geographic scope. World Bank, *available at* http://www4.worldbank.org/legal/leglr/ (last visited Jan. 15, 2004). The fact that Russia is not unique in having a problem with judicial corruption can be shown by one study examining corruption in Argentina that found that over 70 percent of those surveyed believed corruption in the courts was the most important cause of corruption. Maria Dakolias & Kim Thachuk, *Attacking Corruption in the Judiciary: A Critical Process in Judicial Reform,* *18 WIS. INT'L L.J. 353, 370 (2000)* (citing Gustavo Beliz, *Aplicar Indices de Productividad y Eficiencia en el Trabajo de los Magistrados,* EXPOSICIONES Y DEBATES, at 39 (Aug. 1996)). A valuable source of information of a comparative nature is the United Nations Interregional Crime and Justice Research Institute (UNICRI). Its International Crime Victims Surveys provides a valuable source of information showing the geographic distribution of certain crimes, including some crimes related to corruption. UNICRI, International Crime Victims Surveys, *available at* http://www.unicri.it/icvs/index.htm (last visited Mar. 12, 2004).

n20 *See* USAID, PROMOTING TRANSPARENCY AND ACCOUNTABILITY, *supra* note 19; USAID, A HANDBOOK FOR FIGHTING CORRUPTION, *supra* note 19.

The issue of judicial corruption in Russia has been a factor in a number of cases heard in U.S. federal courts. In two 2003 cases concerning business disputes involving millions of dollars, the two U.S. federal judges hearing the matters came to opposite conclusions about whether Russian *arbitrazh* courts offer an adequate forum to resolve disputes. n21 In *Films by Jove,* the Court found that:

it [was] unnecessary to reach any broad conclusions as to the impartiality and essential fairness of the *arbitrazh* system as a whole. Plaintiffs have produced specific evidence in the form of documents obtained from the High *Arbitrazh* Court's file--of improprieties in the specific court proceedings . . . . n22

In contrast, the Court in *Base Metal Trading* granted the defendants' motion to dismiss. The Court first found that the plaintiffs' selection of the U.S. federal court system was not entitled to a high degree of deference because the Court found the events at issue took place in Russia. It then dismissed the case on *forum non-conveniens* grounds. n23 In its decision, the Court stated that the plaintiffs failed to make an adequate showing of the alleged corruption of the Russian courts with respect to the specific case before it. n24 In neither case did the U.S. courts deny the existence of corruption

in the Russian judiciary. n25 This issue is likely to continue to arise in future cases before U.S. courts and other judges and arbitrators.

n21 *Films by Jove, Inc. v. Berov, 250 F. Supp. 2d 156 (E.D.N.Y. 2003); Base Metal Trading, SA v. Russian Aluminum, 253 F. Supp. 2d 681 (S.D.N.Y. 2003).*

n22 *Films by Jove, Inc., 250 F. Supp. 2d at 207.*

n23 Application of this doctrine permits a U.S. court to dismiss a case in the interest of justice and the convenience of the parties. It assumes that an adequate alternative forum (i.e., a foreign court) exists to hear the case. The defendant(s) has the burden of proof to establish "(1) the existence of an adequate alternative forum, and (2) the balance of private and public factors favors dismissal [of the matter]." *Stalininski v. Bakoczy, 41 F. Supp. 2d 755, 758-59 (S.D. Ohio 1998).* The private factor includes whether the plaintiff's choice of forum would unnecessarily burden the defendant or the court, whereas the public factor concerns court congestion, avoidance of conflict of law issues, and problems in properly applying applicable (i.e., foreign law). *Id. at 763.* The existence of an adequate forum depends on two factors. First, all the parties must be amenable to service of process with the forum's jurisdiction. Second, the alternative forum does not deprive the parties of all remedies nor will they be unfairly treated. *Id. at 759.*

n24 *Base Metal Trading, SA, 253 F. Supp. 2d at 699.*

n25 The perception, if not the reality, of corruption in the Russian court system cannot be denied. *See* Enyutina, *supra* note 6. *See also* Derek Bloom, Corporate Takeovers, Russian Style and Necessary Legal Reform (Apr. 25, 2003), *available at* http://www.rid.ru/db.php?db-id=731&=en (presented at the Gorbachev Foundation of North America's Conference on Corporate Governance and Investment in Transitioning Economies, April 24-26, Boston, Massachusetts. Describing instances of corruption in the Russian court system and calling for the establishment of specialized corporate governance courts); *see also Potemkin Democracy,* WASH. POST, May 30, 2003 (stating that the [Russian] "judicial system is still corrupt" and calling for additional funding on programs to support the development of democracy in Russia).

The Russian public cannot rely on the promulgation of new rules governing the selection and training of judges, or improved systems for disciplining judges whose behavior does not correspond to these rules. Unfortunately, it remains unrealistic for the Russian populace to expect government officials, the press, or civil society to take the lead in combating judicial corruption.

## II. A Brief Overview of the Russian Court System

The Russian courts are divided into two distinct systems: *arbitrazh* (commercial) courts and courts of general jurisdiction. n26 The courts of general jurisdiction handle primarily non-commercial matters, such as disputes between neighbors, divorces, etc. Consequently, the problem of corruption seldom plays a major role in cases before this type of court.

n26 *See* U.S. DEPARTMENT OF COMMERCE'S INTERNATIONAL TRADE ADMINISTRATION, HANDBOOK ON COMMERCIAL DISPUTE RESOLUTION IN THE RUSSIAN FEDERATION (July 2000).

*Arbitrazh* courts resolve commercial disputes. It is important to bear in mind that the *arbitrazh* courts are part of the official Russian judicial system and must be distinguished from private arbitration, which is covered by separate legislative acts, such as the Russian Law "On International Arbitration," dated July 7, 1993, and the Regulations "On *Treteiskie* [private, or literally Third-Person's] *Courts,*" dated June 11, 1964.

The *arbitrazh* court system is divided into Courts of the First Instance (trial courts), Courts of the Appellate Instance, Federal *Arbitrazh* Circuit Courts (Cassation Courts), and the Supreme *Arbitrazh* Court. The Courts of the First Instance and Courts of the Appellate Instance are part of the same court physically and organizationally. They are lo-

cated in each of the eighty-nine Subjects [political subdivisions] n27 of the Russian Federation. n28 The Federal *Arbitrazh* Circuit Courts are located in the designated center of each of the ten judicial *okrugy* (circuits). The Supreme *Arbitrazh* Court is located in Moscow.

n27 The Russian Federation is divided into eighty-nine *subjects,* such as republics, *krais, oblasts,* and cities of a federal significance (i.e., Moscow and St. Petersburg). *See* KONST. RF art. 65.

n28 *See* FEDERAL CONSTITUTIONAL LAW ON THE JUDICIAL SYSTEM OF THE RUSSIAN FEDERATION (1996) art. 4, *available at* http://www.supcourt.ru/EN/jsystem.htm.

The Courts of the First Instance hear cases and make the initial judgments over disputes. Appeals from decisions of the Courts of the First Instance are heard in the Appellate Instance of the *Arbitrazh* Court. The Federal *Arbitrazh* Circuit Courts are the courts of the next level of appeal. A party may obtain jurisdiction in the Federal *Arbitrazh* Circuit Court by filing a Cassation Appeal (*zhaloba*). The Cassation Courts (the equivalent of the U.S. Federal Circuit Appeals Courts) have the right to suspend execution of a decision or ruling passed in the First Instance or Appellate Instance upon a party's application. The Supreme *Arbitrazh* Court is the final level of appeal. In certain instances, the Supreme *Arbitrazh* Court may rule on matters on direct appeal from the Court of the First Instance. For example, a party in a case, or the Court of the First Instance on its own initiative, may request that the Supreme *Arbitrazh* Court hear and decide an issue involving judicial conflicts of interests. In practice, this is not a frequent occurrence.

Logically, it should be easier to bribe a single trial court judge than a panel of appellate judges or even members of the Supreme *Arbitrazh* Court. Nonetheless, the lengthy process for having an appeal heard along with other factors, such as attorney fees, preservation of evidence, procurement of false documents by the other side in a dispute, lack of a trial transcript to help demonstrate that the trial court's decision was motivated by something other than the legitimate application of law to the facts, discourages many parties from pursuing appeals, particularly when the appellate court is located far away from where the case was originally heard.

## III. The Soviet Legacy of Political Interference in the Court System

Many respected scholars have written about the political dominance of the Russian court system by local political leaders, such as the governors of Russia's *Oblasts* [regions] or other political subdivisions. This local dominance is in part a legacy of the Soviet era's practice of "telephone justice," where a Communist Party official would call a judge to tell him how a particular case should be decided. n29

n29 *See* Louise L. Shelley, *Putin's Russia: Why a Corrupt State Can't be a Strong State in the Post-Yeltsin Era,* 9 E. EUR. CONST. REV. 12 (2000); *Prosecutors Say Russia Far From Law-Based State,* RFE/RL NEWSLINE, Jan. 15, 2001; Ronald R. Pope, *An Illinois Yankee in Tsar Yeltsin's Court: Justice in Russia,* DEMOCRATIZATIYA (Fall 1999).

Although the Russian Constitution now provides for a separation of powers and declares the judiciary to be independent n30 of the legislative and executive branches of government, judges are still frequently influenced by "suggestions" by governmental authorities, wealthy individuals, and enterprises seeking particular outcomes in cases. n31 The Russian Constitution's provisions, particularly those dealing with the courts, can be best understood as "declaratory." The section on the judiciary can only be implemented through the enactment of federal laws. n32 Although the Russian Constitution does not explicitly establish rules with respect to the court system's funding, it is implicit in a constitutional system envisioning a separation of powers that the judiciary has sufficient resources to perform its function adequately. Not to do so would defeat the reality of an independent judiciary. Unfortunately, as discussed below, this functional independence has not been achieved. n33

n30 According to a call in and online poll conducted by Ekho Moscow of its listeners, 96 percent of over 4,000 respondents indicated that they did not consider the Russian judicial system to be independent. Caroline McGregor, *Prosecutors Accused of Pressuring Court,* MOSCOW TIMES, Dec. 2, 2003, *available at* http://www.moscowtimes.ru/stories/2003/12/02/022.html.

n31 *See, e.g.,* Peter H. Solomon, Jr., Courts in Russia: Independence, Power and Accountability, (unpublished paper presented before the 9th Annual Conference on the Individual vs. the State, May 3-5, 2001); *see also* Geoffrey York, *Canadians Red-Faced as Russians Make a Farce of Bankruptcy Law,* THE GLOBE AND MAIL, Apr. 14, 2001. The intimidation of judges by government officials, influential persons, and organized crime cannot be ignored as having a significant impact on the behavior of individual judges. The methods of intimidation may vary from physical threats against judges and their families to forcing a judge to accept a bribe so that he might be subject to blackmail in the future.

n32 *See* KONST. RF ch. 7 (1993). Whether a sufficient number of voters participated in the referendum on the Russian Constitution is a subject of some dispute. Official data indicates that 54.8 percent of eligible voters participated in the referendum held on December 12, 1993 and that 58.4 percent voted in favor of the constitution. That is, only 30.7 percent of the Russian electorate voted in favor of the 1993 Russian Constitution. CENTER FOR RUSSIAN STUDIES, NEW FEDERAL CONSTITUTIONAL APPROVED, Dec. 12, 1993, *available at* http://www.nupi.no/cgi-win/Russland/krono.exe?910. At the time, there were many allegations of fraud. *See, e.g.,* Olivia Ward, *Yeltsin Faces Probe Over Claim of Fraud on Constitutional Vote,* TORONTO STAR, June 2, 1994, at A19 (reporting *Duma* initiated probe questioning legality of December 1993 vote adopting new Constitution). In any event, almost without exception all Russian political actors have accepted the legitimacy of the 1993 Russian Constitution.

n33 *See* Gregory Yavlinsky, *Reforms that Corrupted Russia,* FIN. TIMES, Sept. 3, 2003, at 9 (where Yavlinsky, the leader of the political party Yabloko, stated "the judicial system is corrupted by oligarchs and serves as an instrument for the authorities to settle scores by selective application of the law." Yavlinksy sees the manner of privatization in Russia as the origin of the problem).

During Soviet times, a judge might have been inclined to resolve disputes between two state enterprises on their merits. Today, judges are likely to favor large local enterprises over small and mediate enterprises, entrepreneurs, and foreigners, since the large local enterprises provide employment to the local population and taxes needed by the local governments (and are often controlled by politically well-connected individuals or industrial groups). Thus it appears that the judicial system is stacked against non-local and/or politically weaker parties, unless bribery occurs. Judges can often mask telephone justice by deciding cases on the basis of form over substance. For example, ruling on the basis of technicalities to dispose of troublesome cases, rather than resolving such cases on their merits. n34

n34 Apparently, state enterprises are less likely to pay bribes to obtain favorable judicial decisions than privately owned enterprises. This should not be a surprise since government workers are in most cases less likely to benefit personally from a favorable *arbitrazh* decision than the management or ownership of private enterprises. According to World Bank data, corruption overall in Russia from 1999-2002 has declined. See author's private correspondence with Ms. Randi Ryterman, Lead Economist, Europe and Central Asia Region, World Bank.

## IV. Perceptions on the Extent of Corruption in the Russian *Arbitrazh* Courts

In the absence of reliable statistics on the scope of judicial corruption, one is forced to rely on polling data and survey research. n35 According to Oleg Fyodorov, an advisor to the National Association of Securities Market Participants and the Investor's Rights Association, the Russian *Arbitrazh* Courts do not function as "courts" in the conventional sense. Where a case involves a dispute between "two parties of very different size [. . .] for instance, one very influential, very rich, and the other having only the law behind it--then almost no case is known of the court taking the side of the lesser-known side." n36 While such a remark is a bit of an overstatement, it is indicative of a significant problem that cannot be ignored.

n35 Irrespective of how Russian businesspersons may gauge the extent of corruption in the Russian *arbitrazh* courts, the number of cases filed in these courts has increased significantly from 1992-2001, from 497,740 to 745,626. This increase can be attributed to a number of factors including an increase in the larger number of

commercial disputes, more legally trained individuals capable of filing such cases, the growth in the number and complexity of Russian laws and other normative acts, and a decreased willingness to resolve commercial conflicts through "criminal" courts (i.e., organizations, legal or otherwise, that offer "protection," collection and similar services to business and individuals). *See* http://www.arbitr.ru/news/totals/10anniversary (last visited Mar. 12, 2004).

   n36 Sophie Lambroschini, *Russia: Judges, Plaintiffs, Defendants Face Arbitration Court Problems--Part 2,* RADIO FREE EUROPE/RADIO LIBERTY, Apr. 25, 2001, *available at* http://www.cdi.org/russia/Johnson/5223.html (quoting Fyodorov).

   Numerous sources indicate the perceived extent of corruption in the Russian court system. For example, the international non-governmental organization, Transparency International (TI), has for many years identified Russia as one of the most corrupt countries in which to do business. In the fall of 2003, TI ranked Russia tied for 86 out of 133 in its "2003 Corruption Perception Index" (the higher the ranking, the more corrupt a country is deemed). n37 For Russia, this represents an increase in the perceived impact of corruption over the prior two years. There are, however, certain problems in TI's methodology because cross-country comparisons completed by different respondents are inherently suspect. n38 In addition, the level of corruption within a particular country will differ by region, institution, etc. n39 Given the ambitious nature of the effort, the results are not always clear-cut:

   According to the generalized perception of respondents . . ., the Krasnoyarsk krai, the Saratov oblast, the Republic of Udmurtia, the Primorskiy krai, the Republic of Karelia are more than other regions contaminated by corruption. More objective indicators characterizing . . . corruption practices [rather] than the perception of corruption demonstrate a somewhat different picture. In this case, the Moscow, Nizhniy Novgorod and Saratov oblasts, the City of Moscow, the Chelyabinsk oblast and the City of St. Petersburg are the leaders in terms of corruption, while the regions least affected by corruption are the Republic of Karelia, the Yaroslavl, Tyumen, Arkhangelsk and Omsk oblasts. If we look at the geography of corruption, we see a "Southern belt" of regions affected by corruption, which stretches from the Rostov oblast to the Volga Region. n40

   n37 Transparency International, *Corruption Perception Index 2003, available at* http://www.transparency.org/cpi/2003/cpi2003.en.html (last visited Jan. 15, 2004).

   n38 In TI's 2002 bribe payer index, Russia ranked lowest among those countries ranked. That is, of those evaluated, Russian companies were considered to be the most likely to pay bribes. While this result does not mean that any specific Russian company (or individual) will pay a bribe in a given situation, it is nonetheless illustrative of attitudes towards bribery of government officials and, therefore, significant. *See* Transparency International, *Bribe Payers Index 2002* (May 14, 2002), *available at* http://www.transparency.org/cpi/2002/bpi2002.en.html; *see also* Transparency International, *Corruption Perception Index 2002: Background Information, available at* http://www.transparency.org/pressreleases_archive/2002/2002.08.28.cpi.en.html (last visited Jan. 15, 2004); PD Dr. Johann Graf Lambdsdorff, Transparency International and Gottingen University, *Background Paper to the 2001 Corruption Perception Index, How Precise are Perceived Levels of Corruption,* June 2001; PD Dr. Johann Graf Lambdsdorff, Transparency International and Gottingen University, *Background Paper to the 2001 Corruption Perception Index, Framework Document,* June 2001; OECD Observer, "Want Data?," July 7, 2000, *available at* www.oecdobserver.org/news/printpage/php/aid/296/Transparent_tables.html. *See also* Valeria Korchagina, *Russia Fares Better in Annual Corruption Perception Index,* MOSCOW TIMES, Aug. 29, 2002, *in* Johnson's Russia List, # 6411, *available at* www.cdi.org.

   n39 In 2003, the Russian Chapter of Transparency International and INDEM conducted a survey examining the level of corruption in forty Russian political subdivisions. The survey focused on both "everyday" corruption (responses of 5666 individuals) and "business" corruption (responses of 1838 entrepreneurs). The survey sought to distinguish corruption at the federal, regional, and local levels as well as institution (executive branch, legisla-

tive branch, judiciary, and law enforcement agencies). Russian Chapter of Transparency International, *available at* http://www.transparency.org.ru/proj_index_doc.asp (last visited Mar. 12, 2004).

n40 Press Release, Center Transparency-International Russia, Center for Anti-corruption Research and Initiative, *Regional Corruption Indices 2002,* at 1, *available at* http://www.transparency.org.ru/DOC/Presentation_index-englFinal.doc (last visited Mar. 12, 2004).

The study did not demonstrate significant distinctions in corruption levels between the executive branch, the legislative branch, judiciary, and law enforcement agencies by region or type of respondent. n41

n41 *See* Center Transparency-International Russia, Tables 7-2 (Indices of public trust--entrepreneurs), 8-2 (Corruption Perception Indices--individuals), and Table 9-2 (Corruption Perception Indices--entrepreneurs), *at* http://www.transparency.org.ru/DOC/Presentation_index-englFinal.doc (in English); http://www.transparency.org.ru/DOC/Presentation_index.doc (in Russian); and http://www.transparency.org.ru/DOC/Speczachistka-table.doc (last visited Mar. 12, 2004).

TI's Corruption Perception Index offers a useful, though methodologically flawed gauge of corruption throughout the world. While other organizations and individual academics have examined corruption on a comparative basis, none have been as successful as TI in raising public awareness with respect to the extent of corruption and its consequences.

In a survey conducted by TI of individuals engaged in international business in emerging market countries, 21 percent of 835 respondents identified the judiciary as the institution in most need of improvements against corruption. n42 Economists have found there is a strong correlation between levels of perceived corruption and foreign direct investment. This relationship affects the behavior of domestic investors as well. It appears that in practice an increase in corruption operates like an increase in taxes, and extreme corruption can, under certain conditions, prevent investment from occurring (at least in particular sectors). n43

n42 Solutions to corruption (Table 6), Transparency International, *Bribe Payers Index 2002* (May 14, 2002), *available at* http://www.transparency.org/cpi/2002/bpi2002.en.html. Another study examining corruption in Argentina found that over 70 percent of those surveyed believed corruption in the courts was the most important cause of corruption. Dakolias & Thachuk, *supra* note 19, at 370 (citing Gustavo Beliz, *Aplicar Indices de Productividad y Eficiencia en el Trabajo de los Magistrados,* EXPOSICIONES Y DEBATES, at 39 (Aug. 1996)).

n43 Daniel Kaufmann & Aart Kray, *Governance and growth in the very long run: updated indicators, new results,* THE GLOBAL CORRUPTION REPORT 2003 (Transparency International, Profile Books 2003); *see also* Shang-Jin Wei, *How Taxing is Corruption on International Investors? available at* http://www.transparency.org/iacc/8th_iacc/papers/jinwei.html (last visited Jan. 15, 2004).

Given its nature, it is difficult, if not impossible, to determine the exact extent of corruption in an institution. Although this issue can be studied through a combination of actual court cases, press reports, interviews, and formal surveys, the results are largely impressionistic and anecdotal. One can also examine what actions particular states have taken to address perceived problems of judicial corruption. While Susan Rose-Ackerman, among others, has argued that the judiciary is the branch of government most critical to a successful and comprehensive anti-corruption program, the judiciary alone cannot end corruption in a particular country. n44

n44 Dakolias & Thachuck, *supra* note 19, at 374, 378 (citing, *inter alia,* Susan Rose-Ackerman, *The Role of the World Bank in Controlling Corruption, 29 LAW & POL'Y INT'L BUS. 93, 106 (1997)).*

According to a survey conducted by INDEM, 72.2 percent of the respondents agreed with the statement that "many people do not want to seek redress in the courts, because the unofficial expenditures are too onerous." n45 Furthermore, 78.6 percent agreed with the statement that "many people do not resort to the courts because they do not expect to find justice there." n46

The International Lawyer Spring, 2004

n45 Mikhail Krasnov, *Is the "Concept of Judicial Reform" Timely?* 11 E. EUR. CONST. REV. 94 (2002).

n46 *Id.*

Not surprisingly, another survey of 500 Russian firms and their managerial staff in eight cities, which was conducted by VTsIOM, the All-Russian Center for the Study of Public Opinion, found that corruption played a role in many judicial proceedings in Russia. Although the respondents indicated that corruption played a lesser role in the judiciary than reported in some other studies, these results were probably influenced by the fact that the survey dealt with Russian enterprises' experience with various governmental bodies, and did not focus on matters involving foreign legal entities or disputes between private parties where the financial stakes were high. Nonetheless, the results are telling.

> Since those who influence court decisions are rarely willing to discuss it, the best we can do is ask how frequently others perceive such attempts. We asked: "Based on your experience and the experience of your colleagues, do you think that pressure is put on the decisions of the [*arbitrazh*] court in your region?" Of those questioned, 38 percent either did not answer the question or responded "Don't Know." This may indicate a genuine lack of knowledge or simply discomfort with the topic.

> Of those who did respond 66 percent believed that pressure regularly was placed on the decisions of [*arbitrazh*] court judges. Responses to this question varied little among the managers of the new, state-owned, or privatized firms. n47

n47 Timothy Frye, *The Two Faces of Russian Courts: Evidence from a Survey of Company Managers,* 11 E. EUR. CONST. REV. 128 (2002).

In a separate survey, VTsIOM asked one question that is particularly instructive as to the source of corruption in Russia. When asked, "Who do you think places pressure on the decisions of the arbitration court in your region?" n48 the responses were as follows: (i) Governor--42 percent; (ii) the Regional *Duma*--18 percent; (iii) the Regional Bureaucracy--40 percent; (iv) the Federal Bureaucracy--33 percent; (v) the Mayor--15 percent; (vi) the Security Forces (*siloviki*)--32 percent; (vii) influential private citizens, such as businessmen--54 percent; and (viii) criminal structures--32 percent. n49 These results illustrate the perceived influence of the regional authorities and prominent business figures [including some so-called "oligarchs"] (the former often acting on behalf of the latter) on the operation of the Russian *arbitrazh* courts.

n48 *Id.*

n49 *Id.* Respondents were able to identify more than one source of corruption or improper influence, which is why the percentages exceed 100 percent.

In January 2002, the Public Opinion Foundation reported on the results of its survey of 1,500 Russian respondents located in forty-four of Russia's political subdivisions. It found that 37 percent of those sampled believed corruption to be widespread in the courts and procuracy. n50

n50 *See* The Public Opinion Foundation, *at* http://English.fom.ru (last visited Jan. 15, 2004). In the Russian legal system, a procurator fulfills functions generally similar to that of a U.S. prosecutor. Traditionally, procurators operated primarily as advocates for the state rather than to uphold the law and protect the rights of citizens.

On the issue of the existence of political will on the part of the country's leadership to combat corruption, 82 percent of the Russian population believes that either: (1) the country's leadership wants to fight corruption, but cannot do so successfully; (2) the country's leadership can, but does not want to fight corruption successfully; or (3) the country's leadership does not want to and cannot successfully combat corruption. Not surprisingly, an overwhelming majority of the Russian population believes that the level of corruption in Russia has either increased or remained at the same level

over the last few years. It is unrealistic to expect that Russian judges are somehow immune to an affliction found throughout Russian society.

One leading scholar writing on corporate governance and corruption in Russia coauthored an article in the *Stanford Law Review,* which stated:

> [A] shareholder who sues a major company will usually lose at trial and first-level appeal, because of home-court bias, judicial corruption, or both. A shareholder with a strong case has a decent chance of getting an honest decision on further appeal, but that will take years. And judgments must be enforced (or, often, not enforced) by the same biased or corrupt lower court where the case began. n51

   n51 Bernard Black et al., *Russian Privatization and Corporate Governance: What Went Wrong? 52 STAN. L. REV. 1731, 1755 (July 2000).*

Some leading businessmen and lawyers have expressed similar views with respect to judicial corruption in Russia. In a speech made at an investment conference, the then acting President of the EBRD, Charles Frank, stated, "we know what foreign investors confront in Russia everyday, and we would like to see it made better." n52 Frank explained that "when we speak about the need for legal reforms, we are not speaking on a theoretical basis, but from experiences and lessons we have learned the hard way." n53 This was not simply a call for improving the manner in which business was conducted in the executive bodies, rather, the EBRD indicated that Russia needs a better-trained and better-paid judiciary to improve its court system and reduce the number of injustices in the country's judicial process. n54

   n52 Reuters, *EBRD Calls for Russian Legal Reform,* RUSSIA J., Apr. 24, 2000, *available at* http://www.russiajournal.com.weekly/article/shtml?ad=2761.

   n53 *Id.*

   n54 *Id.*

At an OECD Conference entitled "Corporate Governance in Russia," Jeffrey M. Hertzfeld, one of the leading western attorneys specializing in Russian law, noted that while Russian law provided for non-discriminatory treatment of foreign investors, "many foreign investors have found it difficult, if not impossible, to have their rights recognized, particularly when they find themselves in conflict with a politically powerful or well-connected Russian party." n55 Hertzfeld observed further that he read one estimate that 70 percent of all court decisions in Russia were tainted by corruption. While he acknowledged that he had no basis for knowing how the statistic had been derived, he observed that "it seems apparent that abuses are frequent and that they undermine the meaningfulness of Russian laws and regulations aimed at protecting shareholders' rights." n56 Hertzfeld concluded by calling for corrective action in this area to ensure that breaches of obligations to shareholders would be enforceable in Russian courts.

   n55 Jeffrey M. Hertzfeld, *Corporate Governance in Russia: The Foreign Direct Investor's Perspective,* May 31-June 2, 1999, at 6, *available at* http://www.oecd.org/dataoecd/55/47/1921803.pdf (last visited Mar. 6, 2004).

   n56 *Id.*

Thus, it should come as no surprise that experienced international lawyers insist on having dispute resolution clauses in their clients' commercial contracts where the value of the contract exceeds a certain amount (i.e., several million dollars, varying by the lawyer and the nature of the transaction) in order to avoid the Russian court system entirely. n57 These dispute resolution clauses usually provide for international arbitration in bodies such as the International Court of Arbitration of the International Chamber of Commerce in Paris, the London Court of International Arbitration, the Arbitration Institute of the Stockholm Chamber of Commerce, and even the Arbitration Court of the Russian Chamber of Commerce (the latter being a private arbitral body). Unfortunately, favorable arbitral awards are often difficult to

enforce in Russia, either under the 1958 New York Convention on the Recognition and Enforcement of International Arbitral Awards (New York Convention) or domestic Russian legislation. n58 Consequently, where the chance exists, a victorious party in arbitration may attempt to seize or attach a losing Russian party's assets in third countries, which have court systems that will honor the New York Convention's obligations.

n57 However, lawyers may choose not to follow this practice if the Russian counterpart has no assets abroad, which will make it necessary to enforce a foreign arbitral award through the Russian court system.

n58 The use of private arbitration in Russia does not avoid problems because awards may and are still challenged in the Russian courts on various grounds. *See* Ethan S. Burger, *Russian Legislation on Enforcement of Judicial and Arbitral Decisions,* 15 RUSSIA BUS. WATCH 3 (Summer/Fall 1997), *reprinted in* AMERICAN BAR ASSOCIATION, A LEGAL GUIDE TO DOING BUSINESS IN RUSSIA & THE FORMER REPUBLICS OF THE U.S.S.R. (February 2000); *see also* Russian Law, 'On International Arbitration', July 7, 1993.

At the World Bank's Second Global Conference on Legal and Judicial Reform in St. Petersburg, Russia in July 2001, World Bank President James Wolfensohn discussed in detail some of the problems of the Russian court system. n59 He later indicated that too much emphasis had been placed on increasing the number of judges, courts, and computers, and that judicial reform would fail without an improvement in judicial transparency. n60 Wolfensohn identified one of the "biggest obstacles to the development of legal and judicial systems [was] a situation in which the economic elites use the system in [their] own interests." According to him, corruption "too often seeps into the legal and judicial systems of some countries," including Russia.

n59 James D. Wolfensohn, Keynote Address to the Law and Justice Conference: Empowerment, Security and Opportunity through law and Justice (July 9, 2001), *available at* http://www.worldbank.org.

n60 *See Wolfensohn Warns Former Soviet Union on Corruption,* PRESS REVIEW, July 10, 2001, *available at* http://wbln0018.worldbank.org/NEWS/DEVNEWS.NSF/1a3beeaf8ef89e2085256704004d59.

Despite these surveys and widespread perceptions, at least one 1997 study conducted with the assistance of the Supreme *Arbitrazh* Court suggests that the problem of corruption may be exaggerated. n61 This study addressed the issue of whether the Russian courts are fair to foreigners--the presumption being that Russian companies and individuals were more likely than foreigners to obtain favorable judicial decisions through bribery than were their foreign equivalents. n62 The study, however, was based on data from less than one-half of Russia's *arbitrazh* courts, and is of limited analytical or practical value. Indeed, one of the study's investigators, Glenn P. Hendrix, acknowledged "severe limitations" in the data, including: (1) the Supreme *Arbitrazh* Court's refusal to supplement the report by obtaining copies of the underlying decisions, in part because of the financial burden of doing so; (2) the lack of information regarding the size of the parties or the amount in controversy; (3) the under-inclusiveness of the definition of "foreign entity" as including only foreign nationals; and (4) the lack of data as to whether any of the "favorable" decisions obtained by foreign entities were actually enforced. n63 Consequently, Hendrix warned readers of the study that "given the lack of opportunity to independently validate the statistics compiled by the lower court, one may, of course, question the reliability of the data" and that "it is also possible that foreign parties win cases against minor Russian firms with little political clout, but routinely lose when challenging entrenched interests. The data are not sufficiently detailed to test this thesis." n64 Moreover, Hendrix's use of the 1997 data is likely to have skewed his results because it was collected prior to the massive economic upheaval caused by the 1998 Russian financial crisis, which led to a large number of disputes between joint venture partners, suppliers, and customers.

n61 Glenn P. Hendrix, *The Experience of Foreign Litigants in Russia's Commercial Courts, in* ASSESSING THE VALUE OF LAW IN TRANSITION ECONOMIES (Peter Murrell ed., University of Michigan Press 2001), *available at* http://pewaa.umich.edu/pdf/09763-fm.pdf (last visited Jan. 26, 2004).

n62 While some people suggest that foreigners enjoy a "level playing field" when their disputes are heard in Russian *Arbitrazh* courts, others would strongly disagree. For example, "Sawyer Research Products, the leading U.S. crystal quartz producer, lost an $ 8.2 million investment in a plant in the Vladimir *oblast* in July 2001 when Sawyer's Russian partner took over the company with the backing of the local administration and the courts, which ruled the price Sawyer paid for its lease was too low." Caroline McGregor, *Russia Still Too Green for U.S. Money,* MOSCOW TIMES, June 19, 2003. *See also* Bill Nichols, *When it Comes to Russia, Let the Investor Beware,* USA TODAY, Apr. 10, 2002, at B-1 (describing Sawyer Research Products' problems with the Russian authorities and courts in general, as well as the intervention of U.S. Ambassador Alexander Vershbow with Russian President Putin on Sawyer's behalf).

n63 Hendrix, *supra* note 61, at 101-02.

n64 *Id.* at 101.

## V. How Corruption Operates in the Russian Court System

In common disputes not involving large sums of money, judicial corruption does not appear to be a major problem. Over the last decade, Russian citizens have increasingly begun using the Russian court system to resolve disputes. n65 But this does not necessarily mean they have great faith in the court system. It may only mean a greater number of commercial disputes are occurring, given the changes in the Russian economy. According to some Russian attorneys, a judge might first examine a case, decide which party should prevail on the merits, and then seek payment for issuing the proper decision. Other judges will simply favor the highest "bidder" for a favorable result.

n65 Data on the number of cases filed in the Russian *Arbitrazh* can be found on the Russian Supreme *Arbitrazh* Court's Website. Supreme *Arbitrazh* Court, *available at* http://www.arbitr.ru/news/totals/10anniversary/index.htm (last visited Jan. 15, 2004). From 1994-2001, the number of cases filed has increased over time. This trend reflects a number of factors, including the smaller role played by state enterprises in the Russian economy and the increase in the number of Russian lawyers.

This situation is made possible by the fact that the submission of an appeal of *arbitrazh* trial court decisions is often fruitless, since higher courts are not only reluctant to overturn lower court decisions, but are hindered in their ability to conduct effective judicial review because in most civil law systems, there is no official trial court transcript to examine. Consequently, appellate courts are limited to reviewing decisions for pure errors of law, and refrain from reviewing factual determinations or the misapplication of law to fact. To make matters worse, over the years, Russian appellate courts have suffered from inadequate technical and budgetary resources, thus hindering their ability to perform their legislatively-mandated functions. This situation appears to be slowly improving as the impact of judicial reforms is beginning to take effect.

Russian journalists who cover the issue of judicial corruption and the operation of the court system have noted that Russian appellate courts tend not to be overly inquisitive of lower court actions. As noted above, the Russian appellate courts lack the tools to properly perform their function. This would seem to explain why, according to Russian Legal Correspondent Konstantin Sklovskii, during the time period he examined, Russian appeals courts overturn a mere 0.05 percent of trial court decisions. n66

n66 Konstantin Sklovskii, *B interesakh chastnogo litsa [In the interests of a private person],* NEZAVISIMAYA GAZETA [INDEPENDENT NEWSPAPER], June 1, 2001. According to Sklovskii, even when a reviewing court discovers a mistake by a lower court, its response in 99 percent of the cases is simply to remand the case to the same lower court, which merely results in avoidable delays (usually favoring the party at fault). Such a system can and does contribute to corruption on the part of trial court judges.

## VI. Steps Russia is Taking Towards Judicial Reform and the Problem of Corruption

The International Lawyer Spring, 2004

In the 1990s, the Russian Federation took a series of significant measures in the creation of a viable judicial system, such as the adoption of a constitution, providing for an independent judiciary (1993), the adoption of a law on the status of judges (1992, and amended 1993, 1995, and 1996), the establishment of a Constitutional Court (1994), a new law on the *arbitrazh* courts (1995), a new law on courts of general jurisdiction (1996), and a law clarifying the jurisdiction of particular types of courts within the Russian court system (1996).

Within Russia, many interest groups and individuals having a strong commitment to judicial reform have emerged. The Russian legislature has enacted various laws aimed at dealing with some aspects of judicial reform, including provisions on corruption in the Russian Federation Criminal Code. A federal program for the improvement of the courts has been organized. n67

n67 *See* O Federal'noi Tselevoi Programme 'Razvitie sudebnoi sistemy na 2002 do 2006 [On the Federal Special Program 'The Development of a Judicial Program for 2002 to 2006], RF Govt'l Decree No. 805 (Nov. 20, 2001). Of course, it remains to be seen whether the funds necessary to implement this program have been allocated, for the manner in which it is carried out.

Despite the adoption of numerous laws on the judicial system, Russia lacks the necessary personnel to produce well-drafted legislation and normative acts implementing such legislation. This is not surprising since a large share of the Russian legislature and regulatory authorities are largely composed of non-lawyers with little legislative or rulemaking experience. The Russian government, legislature, and judiciary frequently have difficulty retaining highly competent individuals, in part due to the availability of more remunerative positions in the private sector, particularly for those with valuable governmental connections. n68

n68 *See generally* John Hewko, *Foreign Direct Investment: Does the Rule of Law Matter, in* CARNEGIE ENDOWMENT FOR INTERNATIONAL PEACE, at 10-12 (Democracy and Rule of Law Project, Working Papers No. 26, Apr. 2002), *available at* http://www.ceip.org/files/pdf/wp2b.pdf. Hewko's observation in this regard was made in specific reference to Ukraine, but the same situation is true with respect to Russia, although to a slightly lesser extent. Hewko, however, believes that businesses pursue projects where they see opportunity, and that weaknesses in a country's legal structure is a secondary consideration.

Russian legislation often contradicts other normative legal acts, n69 and is often so vague that it permits arbitrary conduct on the part of judges and state officials. This situation gives the judiciary excessive discretion in carrying out their duties, which is often used as a device to extort bribes. Furthermore, many *arbitrazh* judges lack experience in dealing with complex commercial matters, though there has been an increase in the training of judges both before and after taking the bench.

n69 A "normative act" is an act, in the form of an official document, that is issued by an authorized official in the constitutionally or legislatively-required manner, which establishes mandatory legal norms or procedures. These include presidential edicts, governmental decrees, instructions or regulations, etc., issued by an authorized body of the Russian Federation, regional governments, local self-administrations, or municipal governments. *See* Decree No. 5, *Plenum,* RF Supreme Court, On Some Questions Arising in the Course of the Examination of Cases pursuant to Petitions of *Procurators* regarding the Recognition of Legal Acts as Contrary to Law (Apr. 23, 1993).

One positive development not to be ignored is that the Presidium of the Supreme *Arbitrazh* Court has been issuing *Postanovlenie* [resolutions] that explain how particular cases are resolved. The quality of these resolutions has improved over time, and not only serve to educate judges on how to interpret certain laws or normative acts, but to inform all members of the legal community (and the public at large) on important legal issues, since they are available on the Internet. n70 Furthermore, they may serve as a tool for identifying when cases have not been decided on the merits (i.e., that the ruling was mistaken or the outcome was motivated by other factors).

The International Lawyer Spring, 2004

n70 Supreme *Arbitrazh* Court, *Postanovlenie, available at* http://frame.arbitr.ru:8080/law (last visited Jan. 16, 2004). The Supreme *Arbitrazh* Court even has a user friendly search engine for locating relevant resolutions, see http://arbitr.park.ru/default.asp?page=doc_search_form (last visited Jan. 16, 2004).

In his 2001 address to the Russian Federal Assembly, Russian President Putin noted the urgency of the need for judicial reforms:

> We set the goal: to build an efficiently working executive vertical, to achieve legal discipline and an effective judicial system.

> * * *

> Today, judicial reform is extremely necessary for us. The domestic judicial system [is deficient] in practice [and] does little to help the conduct of economic transformations. Not only for entrepreneurs, but also for many people, trying legally to restore their own rights, the courts have not become timely, correct and fair. I don't say "always," but in many cases, unfortunately, this is so. *Arbitrazh* practice also encounters barriers such as a contradictory and incomprehensible legislative basis. Bureaucratic norm-creation is one of the main obstacles to the development of entrepreneurship.

> * * *

> Now [I would like to address] the business climate in this country. Unfortunately, ownership rights are still badly protected. The quality of corporate governance remains poor. Wars between contenders for ownership do not cease even after courts render their decisions. And the decisions themselves are often based not on the laws but on the pressure of interested parties. n71

n71 President Vladimir Putin, Annual Address to the Federal Assembly of the Russian Federation (Apr. 3, 2001).

Today, however, it appears that Putin is less focused on the problem of judicial corruption than was promised in this address, though combating corruption has been a major theme of his 2004 re-election campaign. n72

n72 The extent to which the "rule of law" has taken hold in Russia remains a subject of considerable debate. Irrespective of one's view of the YUKOS affair, one cannot ignore what appears to have been the application of the law for political purposes--itself a form of corruption. The Russian Presidential Website has a section devoted to judicial reform; see http://www.kremlin.ru/eng/priorities/21897.shtml (in English) (last visited Jan. 16, 2004). *See also Poll: Vladimir Putin Receives 85% approval rating,* PRAVDA.RU, *available at* http://newsfromrussia.com/main/2004/02/02/52110.html (last visited Mar. 13, 2004) and *Putin puts his faith in security service,* GAZETA.RU, *available at* http://www.gazeta.ru/2004/01/16/Putinputshis.shtml (last visited Mar. 13, 2004).

In May 2002, the then Russian Procurator General Ustinov issued the Procuracy Annual Report for 2001 to the Federation Council (the upper Chamber of the Russian legislature). The Report discusses the activities of the Procuracy during 2001, including the Procuracy's anti-corruption campaign. While the Report outlined the overall situation in the country concerning crime, Procurator Ustinov painted a rather detailed and not optimistic picture of the Russian's struggle with corruption. n73

n73 Artyom Vernidoub, *Ustinov holds back on anticorruption campaign,* May 16, 2002, *reprinted in* Johnson's Russia List, # 6246 (Item 10), *available at* http://www.cdi.org/russia/johnson/6248.cfm.

The principal Russian official behind Russia's current judicial reform efforts, then Deputy Head of President Putin's administration, Dmitrii Kozak, observed:

The International Lawyer Spring, 2004

There was corruption within the Russian judicial system, and said the fact that only 15 judges out of 20,000 had been dismissed [in 2000] suggested that "we don't have an effective system to identify corruption." In a separate presentation, he outlined measures to make Russia's judges more accountable and a special supervisory board to implement them in the case of malpractice or misconduct. n74

n74 *Id.*

While Mr. Kozak is trying to rectify the situation, improvement will take time and require a concerted effort by all branches of the Russian government.

The Supreme Qualification Collegium of the Courts of the Russian Federation has principal responsibility for approving individuals to sit on all courts in the judicial system (including the *arbitrazh* courts) and oversees disciplinary matters concerning judges. It publishes a *Vestnik* [Herald] that contains important information on the state of the Russian courts. In 2003, it published the following data through 2002:

Materials, Declarations and Complaints Received by the Collegium n75

| Year | Number |
|------|--------|
| 1996 | 1839 |
| 1997 | 2740 |
| 1998 | 3655 |
| 1999 | 4740 |
| 2000 | 5463 |
| 2001 | 5850 |
| 2002 | 6993 |

These figures show an upward trend in communications concerning the conduct of judges sent to the Collegium. They probably indicate an increased public awareness of the Collegium's function and a greater willingness of the Russian population to publicly complain about a judge's conduct.

n75 *Vestnik Vyshei kvalifikatsionnoi kollegii sudii Rossiiskoi Federatisii [Herald of the Higher Qualification Collegium of the Courts of the Russian Federation],* Issue No. 2, 2003, Annex 1, at 64.

Though the number of complaints and other communications about improper judicial conduct which were sent to the Collegium shows a steady increase, the number of judges who were forced to step down from the bench for disciplinary reasons has declined since a high in 1998: n76

| Year | Number |
|------|--------|
| 1994 | 67 |
| 1995 | 50 |
| 1996 | 96 |
| 1997 | 75 |
| 1998 | 115 |
| 1999 | 92 |
| 2000 | 75 |
| 2001 | 45 |
| 2002 | 36 |

The data indicate that the official number of instances where judges were actually removed constitute a very small share of the number of complaints about judges, perhaps since they volunteered to step down from the bench rather than being removed.

The International Lawyer Spring, 2004

n76 *Id.* at 66.

The reasons that the Collegium removed judges were described as (i) violation of work discipline (13 percent), (ii) falsification of judicial documents (12 percent), (iii) other violations of the Judicial Code of Honor (8 percent), (iv) violation of substantive and procedural legislation of the Russian Federation (53 percent), and (vi) red-tape [presumably inefficiency] (14 percent). n77 It is interesting to note that the most senior judges (those with greater than ten years experience) and the most junior judges (those with less than three years experience) were the groups most frequently removed from their positions pursuant to the Russian Federation Law "On the Status of Judges in the Russian Federation," article 12.1, point 1. n78 Of course, these data identify instances where cases were actually brought to the attention of the Collegium. There is no way of knowing how representative the data are of the situation.

n77 *Id.* at 67 (It should be noted that these official data may be misleading as how a particular action might be categorized can be highly subjective. In addition, individuals may have stepped down from the bench to avoid their removal).

n78 *Id.* at 68.

Under the current circumstances, generalizing about the quality of the Russian judiciary is difficult. U.S. Ambassador to Russia Alexander Vershbow has candidly examined this problem:

There is a troubling pattern in many regions--the conflict of interests at the municipal and oblast levels of government that work to keep out competitors. This tendency is exacerbated by the weak and often corrupt judicial system that fails to uphold court decisions.

This is an all too frequent element in long-standing investment disputes involving foreign investors. At the federal level, policies are often pursued to support the interest of specific firms at the expense of competitors. n79

Thus, in the U.S. Ambassador's view, a foreign investor may be unable to receive a fair hearing of its case on the merits. That being said, even within a given judicial district, the quality of Russian judges from both a substantive and ethical standpoint is highly variable.

n79 Alexander Vershbow, May 22, 2003, *reprinted in* New Economic School, Moscow.

## VII. Final Observations on Russia's Response to Judicial Corruption

In the post-Soviet era, local governments would pay judges significant bonuses to supplement their incomes and provide them with apartments and utilities free of charge. n80 This situation has officially been abolished, though the practice appears to continue. The starting salaries for Russian trial judges have been increased to approximately the equivalent of U.S. $ 450-500 per month. n81 This increase in salaries seemed in part motivated by the belief that judges could not support their families on their salaries alone, and to reduce both judges' and local courts' dependence on local governments and enterprises for financial and other support. Since the break-up of the Soviet Union and the availability of opportunities in the private sector, relatively low salaries paid to judges have resulted in the judiciary's loss of experienced personnel. n82 On the other hand, such judges may have had greater difficulty adjusting to the country's new economic conditions, so their loss may have had some positive benefits.

n80 Lambroschini, *supra* note 36.

n81 *See* Russian Presidential Edict No. 1117, On the Increase of Monetary Compensation of Persons Occupying Various State Positions of the Federal State Service, and Monetary Benefits of Federal Workers, Sept. 23,

The International Lawyer Spring, 2004

2003; Russian Federal Law, On the Minimum Payment of Labor, June 19, 2000 (as amended July 26, 2002); Russian Federal Law, On Additional Guarantees of Social Protection of Judges and Workers of the Apparatus of the Courts of the Russian Federation, Jan. 10, 1996 (as amended June 28, 2002).

n82 According to the U.S. Department of State's Bureau of Democracy Human Rights and Labor's Country Report for Russia, "low salaries and a lack of prestige continued to make it difficult to attract talented new judges and contributed to the vulnerability of existing judges to bribery and corruption; however, judicial salaries were increased by 60 percent during the year. Working conditions for judges remained poor and lacking in physical security, and support personnel continued to be underpaid. Judges remained subject to intimidation and bribery from officials and others were inadequately protected from intimidation or threats from powerful criminal defendants." State Department, *County Report for Russia,* Mar. 31, 2003, *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18388.htm.

According to then Russian Prime Minister Mikhail Kasyanov, expenditures on the judicial system were to be increased by one-third in 2004. In the fall of 2003, judges' salaries were raised by 40 percent. n83 Whether this increase in salary will reduce corruption or outside political interference remains unclear, particularly within the *Arbitrazh* court system. As of October 1, 2003, the largest salary paid to state employees was R27,000/month, approximately U.S.$ 900 at current exchange rates. n84 This figure does not include the additional cost of benefits. Lower level officials receive significantly less. Thus, it is far from inconceivable that payment of a small bribe can result in the misplacement of a file or the alteration of a document, n85 factors that in some instances will have an impact on the outcome of a case.

n83 Andrei Malosolov, *Russian Prime Minister Sums Up First Results of Judicial Reform,* NOVOSTI, Jan. 21, 2003, *available at* http://www.cdi.org/russia/johnson/7027-8.cfm.

n84 *See* Tatiana Smol'iakova, *Povyshenie minimal'noi zarabotnoi platy v oktiabre 2003 roga: Denezhnoe udovol'stvie [Increase of the minimum working payment in 2003 in October 2003],* ROSS. GAZETA, Oct. 3, 2003, *available at* http://www.rg.ru/2003/10/13/denejnoeudovolstvie.html (noting that the salary for the highest ranked civil servant is R27,000/month).

n85 Such acts would be punishable under various articles within Chapter 30 of the Russian Federation Criminal Code. The sanctions for such offenses, however, are relatively small so that if a payoff is large, taking the risk to engage in improper conduct might be attractive to some individuals. The standards of conduct for Russian public officials is set out principally in *On the Principles of the Civil Service in the Russian Federation.* Federal Law No. 119-FZ, July 31, 1995 (as amended). A government official's salary is reflected in a state register developed pursuant to *On the Register of the State Ranks of Federal Governmental Employees.* Russian Presidential Edict No. 33, July 11, 1995 (as amended).

Salary increases alone will not solve the problem of judicial corruption. Russian Supreme *Arbitrazh* Court Chairman, Venyamin Yakovlev, recognizes the need to increase the accountability of judges in combating judicial corruption, although, his ability to achieve his declared goal remains unproven. n86 Speaking before the Council of Chairmen of the Russian Federation Courts, Chairman Yakovlev showed some candor in how to address the problem of corruption in the Russian Courts:

Transparency [and] openness of the judicial system is the fundamental factor for resolving the problem of judicial corruption. Though the absolute majority of *arbitrazh* judges are completely honest servants of justice, we all recognize the seriousness of the allegations against us. Corruption is a great evil, capable [of destroying] the justice in general. And this is really a serious danger at present. It is completely obvious that we must carefully implement systematic measures aimed at prohibiting or eliminating elements of corruption. To assure the trust in judges, we all must resolve this problem.

What is demanded? Obviously, openness. We do not have to hide anything. Justice must be transparent. That is why we are publishing all decisions of the Supreme *Arbitrazh* Court of the Russian Federation in generally accessible legal databases. The process of publication of judicial acts is being devel-

The International Lawyer Spring, 2004

oped--the ten [cassation] judicial district courts are implementing similar system. In the future, when we have sufficient funding, we will extend this practice to the courts in both the first and appellate levels. Eventually, absolutely all judicial decisions will be accessible to the public. Such transparency of our work and our decisions is the most effective method for combating corruption. Another important aspect is the openness of judicial hearings to both citizens and the mass media. n87

n86 V. F. Yakolev, *Vystuplenie Na Soveshchanii predstedatelei sovetov sudei RF v 'Prezident-otele'* [Speech at the Conference of Chairmen at the Council of RF Judges at the President Hotel], (June 16-20, 2003), *at* http://www.arbitr.ru/news/press/20030725/index.htm; *see also* Interview of Supreme Arbitration Court Chairman Venyamin F. Yakolev with B. K. Katanian, *Chestnomu biznesy sud ne strashen [The Court is Not Afraid of Honest Business],* Mar. 14, 2003, *at* http://www.arbitr.ru/news/press/20030314/index.htm (where Chairman Yakovlev acknowledged the problem of corruption in commercial cases and pledged that where appropriate, individuals would be prosecuted).

n87 Yekaterina Zapodinskaya, *Judges Help Expropriate Property,* KOMMERSANT, June 11, 2003, at 4, *available at* http://www.cdi.org/russia/johnson/7231-7.cfm.

Another change proposed by Chairman Yakovlev is a random, computerized system of assigning cases to judges, rather than the existing system where cases are allocated based on the caseload and specialization of the judges. In his view, this step might also reduce judicial corruption. n88

n88 *Id.*

Combating corruption is not merely a question of enacting laws, developing codes of ethics, and establishing training programs for judges--at a minimum it requires a change in governmental and societal attitudes, greater transparency, and an effective training and oversight system, where penalties for transgression are severe and fairly imposed. It also demands a great deal of political will to follow through on an anti-corruption program until the magnitude of the problem is significantly reduced. In the absence of effective legislative supervision of the courts, a fully independent and aggressive press, effective whistle-blowing legislation, and a well-functioning civil society, it is unrealistic to expect a significant change with regard to combating judicial corruption in Russia.