UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

RICHARD ALLEN, *et al.*

       Plaintiffs,

v.

RUSSIAN FEDERATION, *et al.*

       Defendants.

Case No: 1:05-cv-02077 (CKK)
Hon. Colleen Kollar-Kotelly

---

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# EXHIBIT 59

# East European Constitutional Review

Volume 9 Numbers 1/2                                                                        Winter/Spring 2000

Feature

# Putin's Russia
Why a Corrupt State can't be a Strong State
Corruption in the Post-Yeltsin Era
*Louise I. Shelley*

Historians analyzing the Soviet Union's collapse surely will conclude that the USSR imploded because of the state's weakness and corruption. Unfortunately, the demise of the USSR and the emergence of the Russian Federation did not end the pervasive corruption, and the transitional period of the Yeltsin presidency only increased the demands placed upon the Russian state. This progres-sive decline was exacerbated by a degree of corruption that grew in scale and assumed far more significant proportions with the demise of the Communist Party, the privatization of state resources, and the entry of Russia into the global economy. During the Yeltsin period, the state was simulta-neously privatized and stolen. Boris Yeltsin's family and entourage were inextricably linked with massive tax evasion, insider privatization and licensing, and the siphoning off of financial assets, natural resources, and the state's industrial output. In this context, the state could not deliver on its promised functions-to main-tain order or provide social and medical services, for example-because of corrupt state administrative structures and, as a partial consequence, inadequate revenues. The state failed to reconstruct a depleted infrastructure because officials charged with overseeing reconstruction diverted large sums from loans for that purpose, thereby ensuring that completed projects could not function. The capacity to repay debts was reduced because state assets, along with the profits from the sale of natural resources and industrial output, were transferred offshore rather than returned to the treasury. Inevitably, the domestic economic situ-ation worsened, and indebtedness to foreign and multilateral institutions increased. Now, with the Putin presidency in place, these questions arise: Will the post-Yeltsin period mark a significant break with the situation just described? Can Russia control the corruption that has grown so corrosive to state power? Vladimir Putin has proclaimed that state recon-struction is a primary objective of his presidency. That state power should be emphasized over individual rights is a refrain repeatedly heard in progovernment circles. The concomitant reduction of illegality is a largely util-itarian objective, however. Rule of law is not sought for its own sake but as a means to improve economic performance and produce a stronger state better able to govern Russia's vast territory. But the reconstruction of state power will require more than the assertion, for example, of military power. While the war in Chechnya has mobilized popular support, it cannot fix Russia's fundamental problems, and, although the war gave Putin the boost in popularity he needed to be elected president, now that he is in office he will have to use very different methods if he is to reverse the state's weakness. So far, his proposed means for enhancing state power include reducing corruption and capital flight and retaining Russia's immense resources within the country for economic development. Indeed, the Russian economy has begun, recently, to show some signs of growth after the economic meltdown of August 1998. For this new entrepreneurship to be sustained in the food produc-tion, telecommunications, and internet sectors, the government must curb the state bureaucracy's extrac-tive relationship to business. But this would

involve an upending of the state-business relationship that has existed since the USSR's collapse. Much more than this remains to be reversed, in fact, and Putin faces great difficulties as he seeks to confront the legacy of Yeltsin-era corruption. The Yeltsin government exited with more than its immu-nity: serious damage was done to key Russian institutions in the final months of the Yeltsin adminis- Corruption in the Post-Yeltsin Era Louise I. Shelley Why a corrupt state can't be a strong state. tration, compounding the cumulative harm of the previous decade. This damage is institutionalized and will not be easy to undo. The Russian procuracy, the central legal institu-tion, after making some progress toward greater independence in the 1990s, was humiliated, subordi-nated, and placed under intense political pressure after it decided to investigate corruption in Yeltsin's govern-ment. The parliamentary elections of 1999 allowed the oligarchs to obtain seats in the Duma, thereby acquiring parliamentary immunity. In the final months of 1999, major privatizations permitted members of the powerful elite to grab key Russian resources at bargain prices, perpetuating the insider deals of the loan-for-shares period in the mid-1990s. Despite Putin's professed desire to reduce corruption, his capacity may be limited by the debt he owes to Yeltsin's Kremlin and the oligarchs who engi-neered his rapid rise to power. Moreover, Putin himself is tainted by his association with the corrupt government of Anatoly Sobchak in Saint Petersburg and his own subsequent associations in Moscow. Further limiting his freedom to act, at least in the initial period of his presidency, is the kompromat (the files of discrediting material) that has been collected on him, some of which has already been leaked to the press in Russia and abroad. In Putin's favor, in addressing these problems, is the Saint Petersburg team he has assembled around him. Many are fellow graduates of the Saint Petersburg law school, with a faculty known for its efforts to promote transparency in the practice of law in the Saint Petersburg region, and for the modernization of its staff and programs. Putin sits on the advisory board of the law school and, despite his years of service in the KGB, retains close ties with the legal community. The key criteria, then, in determining Putin's capacity to address corruption, will be these: the extent of separation between the state and the world of business; the ability to restore the credibility and inde-pendence of the procuracy; and visible signs of greater transparency in the economic and legal spheres. Separating state and business In the Soviet period, all commercial activity belonged to the state, from the large-scale military-industrial complex to the consumer and service sectors. In the Yeltsin era, despite rapid and massive privatization of state resources, the rise of state-independent business did not take place. Instead, a new private economy arose, having a parasitic relationship to state institu-tions and resources. In the absence of conflict-of-interest laws, bureaucrats used their privileged posi-tions in government ministries to advance their own economic causes by establishing businesses in the very areas they were to regulate. The nomenklatura (along with organized crime) continues to be one of the greatest obstacles to entrepreneurs, because its members demand significant bribes to obtain neces-sary licenses, work permits, and access to facilities. Their constant rotation within state institutions creates unpredictability and jacks up the costs of corruption, since each new official must be bribed to ensure that work can continue unobstructed. State and industrial efficiency naturally declined, in such a milieu, because the managers of enterprises engaged in asset-stripping, tolling, and other mecha-nisms that pulled assets out of the system (and usually out of the country) rather than producing revenues for the state and profits for enterprises. Facilitating this theft was the managers' cozy relationship with state officials, who facilitated this trade in exchange for payoffs. Law enforcement was neutralized by corrup-tion, inadequate equipment, absence of qualified personnel, and the lack of authority to investigate the crimes of a market economy. To understand this phenomenal redistribution of property, consider the fact that the more equitable distribution of resources achieved by 70 years of Soviet rule was eradicated within a few years of its collapse. By the mid-1990s, less of the Russian economy was owned by the state than in Mexico and Italy. In a few years, Russia had privatized 15,000 industrial firms and tens of thousands of shops. A greater percentage of Russian output was now produced in the private sector than in Western Europe, where countries feature much stronger legal protections and safeguards within the private sector. By the fall of 1998, 40 percent of the Russian population lived below the poverty line, a figure reminiscent of the prerevolu-tionary period. A small elite came to possess almost all the wealth, and a secure middle class failed to emerge. To reverse the endemic corruption, a funda-mental change must occur in

privatization policy and business-government relations. This may include renationalization of certain businesses that were acquired through insider privatizations. The tactical alliance Putin made with the Communists in the Duma may make such a move possible, although the support many oligarchs have shown for Putin, and the obligations he feels toward them, may limit his scope of action. Certainly Boris Berezovsky and Roman Abramovich's recent domination of the aluminum sector does not suggest a major change in direction. But even if Putin is successful in stemming the influ-ence of the most visible oligarchs, behind these men stands a second tier of lesser figures who may be more difficult to control if only because they are not such conspicuous targets of citizen animosity. While reining in the oligarchs is now a popular theme in Western analyses of the Russian situation, insufficient attention is paid to the too-cozy relation-ship between regional governors and legislators and the business community. It is possible that some gover-nors, especially those who have faced difficult election campaigns, may now encourage investment in their communities rather than focusing on their own personal enrichment. Nonetheless, many others see their position in the regional parliament or as governor as a license to make money-through personal busi-nesses, or through associates, or from potential foreign investors. In the Urals, Siberia, and the Russian Far East, highly visible government officials are stifling local businesses in order to minimize competition for their own financial enterprises or to prevent any threats to their extraction and export of Russia's natural resources. The procuracy and the independence of legal institutions "Telephone justice" was a defining feature of the Soviet era. A telephone, linking the procurator and judge's chamber to the party offices, was a key element in ensuring that the justice system served the state and not its citizens. A key component of perestroika, in the late 1980s, was the reform of this arrangement. The following decade saw major changes, which gave procurators and judges greater independence, including the establishment of a jury system in a few regions of the country. While newly elected govern-ment officials continued to interfere in legal proceedings, it was no longer universally viewed as their automatic prerogative. In 1999, however, the achievements of the previous decade were seriously undermined. During the past year, the Kremlin has shown itself quite capable of using its political power to derail a serious criminal investigation into its own corruption; to depose a procurator confirmed and supported by the Duma; and to appoint lackeys who serve its interests rather than the rule of law. The consequences of these actions are felt throughout all of Russian society because the procuracy not only represents the prose-cutorial arm of the Russian state but is also the institution responsible for overseeing the observance of legality in all spheres of Russian life. Yuri Skuratov, removed by Yeltsin as procurator general, began his term as an obedient bureaucrat. He was ill prepared for his position, with very limited experience as a procurator, having spent his life in academia (at the Urals State Legal Academy) and in party work. At first, Skuratov tolerated the corruption of Yeltsin's inner circle. For example, no case was initi-ated after $500,000 in cash was intercepted as it was being removed from the Kremlin in clear violation of Russian election laws. As the political compromises demanded of Skuratov escalated, however, the procu-rator general began an active and highly revealing investigation of the corruption of the "family," the popular name for Yeltsin's actual family members as well as his close associates. Yeltsin's circle responded rapidly to Skuratov's revelations of bribes, corruption, and overseas bank accounts: a video of Skuratov cavorting with prostitutes was broadcast on television. This was not just another sex scandal but the beginning of a major and well-organized campaign against the procurator that would derail his investigation and discredit the institution of the procuracy. High-level associates of the procurator general who cooperated in Skuratov's persecution were rewarded with substantial governmental positions. Witnessing Skuratov's downfall, procurators-as members of a highly structured hierarchical organiza-tion- again understood that they were to serve the interests of the Kremlin and not the rule of law. The impact was immediate and visible in many of the procuracy's activities. Acting Procurator General Ustinov, Skuratov's replacement, frowns on interna-tional cooperation and professional training of procurators. Official Russian cooperation has come to a halt in important corruption cases, such as those into the Yeltsin entourage in Switzerland or the Bank of New York in the United States. Two heads of the procuracy training institutes in Moscow and Saint Petersburg, interested in developing cadres for a law-based state, have been removed. The institution is clearly in crisis, and its ills are aired publicly on national

television by the ousted Skuratov and followed avidly by a citizenry angered by years of crony capitalism. Even if Putin were to appoint a new procurator general with a reputation for integrity, and the Duma were to confirm the choice, this would not be suffi-cient- by itself-to undo the harm already inflicted on this central state institution. Putin and his government will need to provide consistent and sustained support to the institution if its current low standing and its subor-dination to the political elite is to be reversed. Transparency Greater transparency is needed throughout Russian society if the level of corruption is to be diminished. Steps toward this end must include media capable of freely investigating corruption; greater openness in legal processes and legal decision making; and more-extensive public records of ownership and the transfer of property from state to individuals. In recent years, the national media have been consolidated in the hands of the oligarchic few. Exposés of corruption are often used in the competi-tion for power, rather than in promoting transparency in society. One television station, NTV, for example, aired Skuratov's revelations of the Yeltsin circle's corruption not in order to clean up national politics, but only to settle scores in the preelection period. And on the regional level, many local newspapers and radio channels are tightly controlled by local governments. Nevertheless, certain journalistic bright spots do exist, including the Novaia Gazeta based in Moscow and an agency of investigative journalists that has emerged in Saint Petersburg. These media outlets have been able to pursue their investigations, publishing their reports without serious obstacles. In other parts of the country, the opportunities for investigative reporting are more limited. But even in Vladivostok and Yekaterinburg, both centers of crime, revealing articles have appeared in the newspapers disclosing corruption in high places. In some cases, these inves-tigative reports have led to prosecutions by law enforcement officials eager to combat the problem. Corruption is also pervasive in judicial decision making in many parts of Russia. Without declared precedents or published decisions, bribery can result in rulings that would not be sustainable in a more trans-parent system. In an effort to reduce chicanery and worse in legal proceedings, an important innovation was begun in 1995 in the Saint Petersburg region. Funds were raised from the banking, business, and legal communities to computerize the city, oblast, and arbi-tration courts. Each judge was provided with a computer and modem, as well as training in how to use the new equipment. Judicial decisions in all areas of civil law, criminal law, and arbitration practice are collected, analyzed, and published four times annually. The availability of the decisions has reduced corruption among members of the judiciary and has provided advocates the opportunity to challenge inconsistency in decision making, often an outward sign of corruption. Efforts such as these need to be extended to other communities. Only by increasing the trans-parency of the judicial decision-making process and by critiquing judicial decision making in individual cases, will the opportunities for malfeasance be diminished. Another area where similar efforts are needed is in the sphere of property rights. Russia has suffered such significant losses of capital, in part, because there has been no respect for minority shareholders' rights. Corporate directors have established secret trust agree-ments, moving the most lucrative elements of their companies offshore to privately held companies or fronts, where they are beyond the reach of the Russian courts and often even of international arbitration. The most profitable sectors of the economy, including banking, oil, and valuable minerals, have been those most subject to violations of shareholder rights, both foreign and domestic. Russia does not want another revolution. Its two revolutions in the twentieth century have caused fundamental redistributions of property. The bloody revolution of 1917 transferred property from individ-uals to the state, and the nearly bloodless revolution of the early 1990s reversed the process. After each revo-lution, enormous deprivation followed. Russia is not ready for a third. It must be accepted as given, perhaps, that any measures to address corruption by a Putin government will not produce a profound change in the distribution of wealth. Those who seized their riches, albeit illegally, will largely be able to hold on to their gains, and the vast majority of the population will be left with nothing. Under these conditions- where money and power are so inequitably distributed-most citizens lack the capacity to act effectively against corruption. While surveys reveal enormous resentment and dissat-isfaction, the impoverishment of much of the population has left most ordinary Russians without the time or resources to mobilize politically. In the absence of a developed civil society, and until the new financial elite determines that reduced corruption is in its finan- cial interests, there will not be a significant constituency to press for

reforms. Anticorruption measures may instead be dictated from the top, as in the Andropov period. The question is, Will such measures, under a Putin presidency, trickle down? And how far? The post-Yeltsin era will see a sharp dichotomy between the observance of laws and respect for human rights. Putin seeks a strong state, which will require a revitalized economy. Enhanced economic performance will demand greater adherence to civil and commercial law. As for individual rights, Putin has so far shown scant interest in the subject. The prospect is one of greater contentiousness as the government and individuals labor-whether in concert or mutually opposed-to undo the damage of the recent past. The coming struggle in Russia will be fascinating to watch from afar. Within Russia, it will be more uncomfortable.

*Louise I. Shelley is a professor and director of the Center for Transnational Crime and Corruption, American University, Washington, DC.*

*back*

A Quarterly Published by New York University Law School and Central European University

HOME | BACK ISSUES | MASTHEAD | SUBSCRIPTIONS | RUSSIAN EDITION | SUBMIT A MANUSCRIPT | BULLETIN BOARD | CALENDAR OF EVENTS

CONFERENCE MATERIALS | CONSTITUTIONAL CASE NOTES | LIBRARY OF ARTICLES | RESEARCH RESOURCES

CURRENT ISSUE | SEARCH THIS SITE | CONTACT US | NYU LAW HOMEPAGE

*Copyright© East European Constitutional Review. All rights reserved.*