# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
------------------------------------------------------x
                                        )
RICHARD ALLEN, et al.                   )
                                        )
            Plaintiffs,                 )     Case No: 1:05-cv-02077 (CKK)
                                        )     Hon. Colleen Kollar-Kotelly
      v.                                )
                                        )
RUSSIAN FEDERATION, et al.              )
                                        )
            Defendants.                 )
                                        )
------------------------------------------------------x
```

## CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# EXHIBIT 61



RUSSIAN
AXIS

10 Greycoat Place, London SW1P 1SB,
T +44 (0)20 7960 6011, F +44 (0)20 7960 6100



# THE JUDICIAL SYSTEM
# OF THE RUSSIAN FEDERATION:

## A System-Crisis of Independence



CONTENTS:

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    Reasons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    Outlook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

CHAPTER 1. LEGISLATIVE REGULATIONS PROVIDING THE MEANS FOR
    Structure of the judicial system of the Russian Federation . . . . . . . . . . . . . . . . . . . .8

    The financing of courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

    Formation of the judiciary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

CHAPTER 2. POLITICAL REASONS FOR THE CRISIS OF INDEPENDENCE
    OF THE JUDICIAL SYSTEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

CHAPTER 3. SOCIO-POLITICAL CONSEQUENCES OF THE CRISIS OF THE
    JUDICIAL SYSTEM'S INDEPENDENCE . . . . . . . . . . . . . . . . . . . . . . . . .31

    The subordinate role of the courts as a basic factor for distrust of judicial power . . . .31

    Judicial power in the mass media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

    How is society's discontent with judicial power expressed? . . . . . . . . . . . . . . . . . .37

CHAPTER 4: ECONOMIC CONSEQUENCES OF THE CRISIS OF INDEPENDENCE
    OF JUSTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

    Expert Poll Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

    The questionnaire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

    Questions for the interviews with experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49

LIST OF INTERVIEWED EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

3

# EXECUTIVE SUMMARY

The judicial and legal reform initiated in 1991 became the natural continuation of the Russian Federation's proclamation of a democratic rule-of-law state. Faced with the situation of a cardinal transformation of the socio-political system and the system of state governance, the functions of the judicial power needed a truly historical revision. In the Soviet period, courts were de facto part of the law-enforcement conveyor belt, which in essence only confirmed the charges prepared by the prosecution in criminal procedures, and a body litigating controversies within the framework of divorces and insignificant property deals in a civil court. Appeals against the actions of officials usually took place without a court's participation, by addressing the superior executive bodies and committees of the Communist Party.

With the beginning of democratic reforms, courts were given a new role: to become an independent arbiter between the citizen and the state, the guarantor in observing civil and political freedoms and human and property rights in Russia. Furthermore, the formation of a new element of the Russian judicial system - constitutional justice - meant that the courts would have supremacy over the legislative and rule-making activities of state power in cases where the latter violated the constitution.

Russian Axis carried out an analysis of the condition of the judicial system in Russia during which we tried to detect real models for making judicial decisions and schemes for manipulating judges. For this we carried out an expert poll, via phone interviews, of a sample population that represented professionals working in executive and judicial agencies, law offices and human rights organizations, both in Russia and abroad. We also used the method of in-depth thematic interviews with representatives of the judicial community (both public and anonymous). Extracts from these interviews are included in the report. For details on the expert poll and the methodology of its implementation, refer to Appendix p. 30.

The judicial authorities, together with the country, were going through a stage of "wild democracy" in the 1990s when they were trying to carry out their new mission. Along with other government agencies in Russia, they were subject to corruption and often served as an instrument of unfair competition, but on the whole the judicial system preserved at least some independence from the executive power and regularly issued decisions in favor of the citizen and against the state that violated his rights. When the "wild democracy" of the 1990s turned into "controlled democracy," the courts, just like the legislative authorities, started losing their independence from the Kremlin and law-enforcement bodies.
Thus, a partial restoration of the Soviet system is taking place under which the judicial power depends on the political administration and the "prosecution conveyor belt." This is accompanied by the preservation of the main 1990s models of corruption, when they do not contradict the political line and political decisions.

## REASONS

Russian legislation on courts, which proclaims the independence of the judicial system, leaves the executive power with a number of tools with which to influence courts and manipulate court decisions.
In particular the system of appointing judges and heads of courts is totally controlled by the president of Russia and, to be more precise, by the department of the president's administration that is responsible for human resource management. Regulating the financial security of court activities and judges' salaries also



4

gives the federal executive authorities an opportunity to influence the judicial system by making decisions about financing. In many democratic countries the authorities cannot use this type of legislative rule (for example, having a representative of the executive power appoint judges) as a way to manipulate courts because of political tradition and political competition.

Lacking both the political tradition and a real opposition, the executive power in Russia in fact widely uses these legislative rules to establish total control over the courts.
The poll by RA showed in particular that the most widespread instruments used by the executive authorities to influence judges are:

- Obtaining from judges a guarantee of political and personal loyalty while they are being appointed. For heads of key courts, this is secret political cooperation with the Kremlin and the special services;
- Taking into account the political loyalty and "correct conduct" of judges when making decisions about their promotion;
- Taking into account the political loyalty and "correct conduct" of judges when making decisions about their social guarantees and privileges;
- Threatening to have politically disloyal judges removed and disqualified by loyal authorities or loyal higher courts, with consequences for the statistics of reversed decisions.

For an analysis of the legislative opportunities for executive power to manipulate judges, see Chapter 1: "Legislative regulations providing the means for administrative influence", p.6.

Achieving the **political goals** of the Kremlin, which are connected with the **consolidation of power**, control over strategic resources and the abolition of the institutional foundations of the opposition, implies **the establishment of a controlled judicial system**. It is integrated into a controlled and selective form of justice that is applied to attain the political and business aims of the authorities.

Vladimir Putin accepted the judicial reform that began under Boris Yeltsin in his reform package, but never specified his position on that issue. On the one hand, liberal reforms by the former deputy head of the president's administration, Dmitry Kozak, (now chief of staff of the federal government) made provision by law for the transfer of many functions of the prosecutor, pertaining to supervising an investigation, over to judicial agencies.

On the other hand, the so-called siloviki, representatives of the law-enforcement and intelligence agencies, in Putin's team strengthened their position and obtained control over the procedure for appointing judges (overseen by Putin's assistant Viktor Ivanov, a former member of the Soviet KGB), and this contributed to the establishment of a controlled judicial system. The silovikis' desire to redistribute property, as well as their far from liberal ideas on the course of the country's development, are the key motives for actually abolishing the independence of the courts.

The Soviet system of justice and repressions is perceived by the siloviki as an example of how to solve tasks of state development efficiently. According to this "wing" of the president's team, restoring the political authorities' control over the courts and including courts in the prosecution conveyor belt of law-enforcement agencies is definitely to the country's benefit.



5

At the beginning of Putin's second term as president, the administrative pressure on the courts became more significant than the influence of corruption, even though a high level of bribery in courts is recorded in public polls, media publications and in public presentations by law-enforcement agency spokespersons.

Furthermore, the experts interviewed by RA talk about how the pressure of the administration and the pressure of corruption have compounded; as a result there is even more pressure on courts. This means that the authorities concede the existence of corruption where they see no competition to their interests. At the same time, the struggle against "competitive" corruption will be led in a "demonstrative" way; see Chapter 2: "Political reasons for the crisis of independence of the judicial system", p.14.

## CONSEQUENCES

The level of society's **discontent with the judicial system** detected in mass media publications and public opinion polls of Russians demonstrates that judicial reform has obviously not fulfilled society's hopes for it. A crisis of independence **leads to a crisis of confidence in judicial power** per se.

The discrepancies between practice and the stated declarations about the priority of the Constitution, the independence and irrevocability of judges and the right of all to a fair trial have become far too visible. Russian citizens do not trust courts, viewing them as biased institutions. The term "show trial" has reappeared in Russia, and just as in the past, trials of spies, businesspersons and terrorists are held in conditions where information is withheld from the public as much as possible, while the in fact predetermined results of the trials become an element of propaganda. The ordinary Russian citizen feels unprotected against arbitrariness: the courts are not able to protect his rights. He has nowhere to complain to. This contributes to the establishment of the so-called "authoritarian syndrome" in society: the population ceases to believe in rights and freedoms, does not perceive them as reality and relies only on the political loyalty of the authorities, who rule "with a rod of iron"; see Chapter 3: "Socio-political consequences of the crisis of independence of the judicial system," p.31.

The barefaced **manipulation of justice** and the lack of independence and efficiency in Russian courts result in the **deterioration of the country's investment climate**. For foreign institutional investors, the crisis of the independence of the courts means the absence of proper investment protection and an increase in political risks. For national investors, this means that they are completely unprotected from property redistribution by siloviki, and as a result, there is capital flight.

For the results of the April poll and the poll about oligarchs, as well as statistical data on capital flight, see Chapter 4: "Economic consequences of the crisis of independence of justice", p.40



6

## OUTLOOK

On the whole, the "siloviki wing", President Putin's team and the Kremlin, will most likely **continue to suppress the judicial system**. It is unlikely that the evidence of social, political and economic consequences will stop this process. The flagrant inconsistency between Russia's way of conducting justice and the standards of democratic countries may result in a **cooling of relations between Russia and its Western partners** and may raise questions about the effectiveness of cooperation in the legal sphere.

The analysis carried out by RA shows that the tightening of control over the appointment of judges when intelligence agencies are involved in reviewing candidates will only intensify in the future. It is possible that candidates will have to pass not only an anticorruption check but also, taking advantage of the closed nature of the proceedings, a test of loyalty to the intelligence agencies and the Kremlin. Since the judicial structure of the Russian Federation is in fact identical to the executive power structure, and the vertical structure of judicial power can be efficiently governed via heads of courts appointed by the president, by 2005 the process of rotation among the administrative elite will fully involve the judiciary.

The West's growing distrust of Russian justice could call into question the development of a legal mutual-assistance system and cooperation in this field. The fact that the overwhelming majority (three-quarters of all experts interview by RA) think that the level of justice in Russia totally or generally does not meet international standards, and that almost half of them (45%) believe that the situation regarding the independence of courts in Russia is getting worse speaks for itself.

# CHAPTER 1.

## LEGISLATIVE REGULATIONS PROVIDING THE MEANS FOR ADMINISTRATIVE INFLUENCE

The judicial power's declaration of independence in Russia, an essential element of a democratic law-governed state, still remains a beautiful showcase behind which the judicial system hides, controlled completely by the executive power. The main controls operating the courts are in the hands of the president of the Russian Federation, and the judiciary's vertical power structure in fact mirrors the executive's vertical power structure, creating additional conditions for dependence at the local level.

> In accordance with the Constitution of the Russian Federation, state power in the Russian Federation is broken down into the following branches: legislative, judicial and executive. The bodies of the legislative, judicial and executive powers are independent (Article 10 of the Constitution of the Russian Federation). The proclamation of independence by the judiciary in Russia became possible only because of the democratic transformations that started in the former USSR at the end of the 1980s. Ratified in 1993, the Constitution of the Russian Federation in essence laid down the important reference points that correspond to a government with a democratic system. A strong and independent judiciary was to become the most important guarantee for the formation of a law-governed state and a civil society. It was namely this power that should have done away with human rights violations by government agencies, and secured society's interests from arbitrary rule. When applied to the judicial system, these innovations have historical significance. Under the former USSR, the judicial system's servitude became a self-evident concept. Bolshevik ideology led the courts to become a tool of political struggle; even into the 1960s, courts were an instrument of repression and part of a punitive system.

A political landscape in which an independent judicial power is "engraved," merits special consideration. As is well known, the Figure of a presidential republic confirmed by the Constitution of the Russian Federation was the answer to the confrontation between President Yeltsin and the oppositional Russian Federation Supreme Court in 1993. Having prevailed in this political conflict, the presidential power tightened its superiority by putting into the Constitution of the Russian Federation a Figure for adopting state decisions that makes it difficult to ratify decisions to which the president does not agree.

*FIGURE 1 (state power in the Russian Federation)*

In decisions about key issues regarding the judicial power's role, the president of the Russian Federation also has the last and decisive word. This range of the president's powers is stated in the Constitution of the Russian Federation. First of all, the formation of the personnel of the courts depends on the president and his administration. It is the president who introduces candidates to the Federation Council for judicial appointment to the Russian Federation's Constitutional Court, Supreme Court and Higher Arbitration Court. Moreover, the president appoints the judges for all federal courts. The president's personal control over judicial proceedings allows him to ensure that there are no disloyal legislative initiatives that are inconvenient to the government, which could otherwise become actual laws. This condition means that, according to the Constitution, the basic ground rules according to which justice is carried out must be acceptable to the president.



# STRUCTURE OF THE JUDICIAL SYSTEM
# OF THE RUSSIAN FEDERATION

Despite the fact that during the process of reform in the Russian judicial system new elements have appeared (the Constitutional Court of the Russian Federation, jury courts, justices of the peace), structurally and administratively the judicial system in modern Russia is almost identical to the system in the former USSR. The judicial vertical power structure actually mirrors the executive branch's vertical power structure, and as a result this creates the conditions for dependence at the level of the members of the federation.

*According to the Constitution of the Russian Federation (Article 118):*

"Only the courts can enforce justice in the Russian Federation. Judicial power enforces justice by means of constitutional, civil, administrative and criminal proceedings. The judicial system of the Russian Federation is established by the Constitution of the Russian Federation and federal constitutional law. It is forbidden to establish extraordinary courts.

*According to Article 4 of the constitutional law:*

"On the judicial system of the Russian Federation," in the Russian Federation there are **federal courts, constitutional (statute) courts and justices of the peace in the members of the Russian Federation**, which all form the judicial system of the Russian Federation.

The constitutional (statute) courts of the Russian Federation's members are created only for handling issues on the conformity of laws and legal acts by state bodies and local self-government bodies of the members of the Russian Federation with the constitution (statute) of the member of the Russian Federation; they also interpret the constitution (statute) of the member of the Russian Federation.

Justices of the peace handle civil, administrative and criminal cases as a first instance court that has little power (criminal cases with a maximum two-year sentence, family cases and certain work and property-related disputes with claims amounting to less than 350 USD).

As a result of judicial reform, the new elements of the judicial system are the Constitutional Court, jury courts and justices of the peace. At the same time, the conceptual framework of the functioning of judicial power in Russia has not undergone significant changes since the period of the Soviet Union. The vertical power structure of the judicial system allows each judge's activities, overseen by a higher court, to be controlled; the overlap of judicial regions and districts with administrative and territorial divisions gives local authorities the opportunity to influence courts, and the fact that local authorities must agree to a judge's candidacy only strengthens the possibility of such pressure.



## THE FINANCING OF COURTS

The executive power always has the option of sequestrating the financial obligations of the state treasury towards courts. In this respect the financial dependence of courts is apparent both on the federal and regional level. In addition, every year the authority of Russian courts grows since more issues must be decided in court; consequently, the administrative workload on the judicial system and its general cost to the state treasury are constantly growing. However, the state's spending on the judicial system is not able to keep up with the growing workload of the courts. The financing of the Russian judicial system has a two-level principle: the federal budget pays for most of the judicial system's finances; however, within the framework of the capabilities of its regional budgets, local authorities take part in ensuring that courts located on their territory can operate. Regional authorities are responsible for financing the activities of justices of the peace. In addition, regional authorities vouch for the financial security of the state's social obligations towards judges.

Since Russia endured a severe budget crisis in the 1990s, the financial side of the judicial system's reforms was one of the most sensitive issues in relations between the courts and the executive power on different levels (at both federal and regional levels). Like any other line in the expenditure section of the Russian Federation's state budget, the authorities can reduce at any moment the section "spending on the judicial system", depending on the current situation with regard to tax collection and the receipt of foreign loans.

The federal constitutional law "On the judicial system", enacted in 1996, called for a special procedure by which cuts to the financing of the courts' budget would be agreed to, and established that budget funds set aside for the courts' financing in the current fiscal year could be lowered only by the organs of the community of judges (All-Russian Conference of Judges or the Council of Judges of the Russian Federation).

However, despite this, there were financial conflicts between the judicial and executive powers. So, at the beginning of 1998, without consulting the organs of the community of judges, the Russian Federation's Ministry of Finance cut that year's spending on maintaining the federal judicial system by almost a third.

Remember that in August 1998 the government of the Russian Federation announced a default on the internal state debt, and also froze payments to external creditors. Since there was an illegal cut in the state's obligations towards the judicial system, the Supreme Court turned to the Constitutional Court, which, in turn, admitted that the government's actions were illegal and were not in accordance with the Constitution. However, the Ministry of Finance did not observe the Constitutional Court's decision and did not renew its former level of financing. In September 1998 a presidium of the Judicial Council turned to the prosecutor general of the Russian Federation with the proposal to open a criminal case against the Ministry of Finance, according to articles 286 (exceeding its authority) and 315 of the Russian Federation's criminal code (failure to observe a court decision). As a result, the Ministry of Finance admitted that its actions were not in accordance with the law and pledged to pay off its debts.

Stabilization of state finances in 1999 allowed the court-financing situation to be ensured; however, even now the annual budget claims issued by the judicial department of the Russian Supreme Court and the Higher Russian Arbitration Court have not been paid off in full. Meanwhile, the number of disputes that are handled in judicial proceedings has grown every year. Changes in the economy have led to changes to legislation, and consequently to a rise in the types of issue settled by judicial proceedings. However, the necessary amount of funding has still not been allocated to support the tangible qualitative and quantitative changes that are increasing the authority of the courts.



10

In addition to the financial problems regarding the day-to-day functioning of the courts (payment of municipal expenditures, spending on communications and salaries of judges and court employees), there is the crucial issue of repairs and building construction. More than a thousand general jurisdiction court buildings, including military courts, are in need of either urgent major or running repairs. Most of these courts are ramshackle buildings that are not conducive for judges or citizens. The lack of the necessary number of courtrooms and limited space have become the identifying features of the Russian judicial system.

Under Vladimir Putin's administration budget wars between the judicial power and finance ministries are no longer happening. Since 2002 the federal special-purpose program "Development of the judicial system until 2006" has taken effect; the program allocates 45 billion rubles (slightly more than 1.5 billion USD) for capital development and to increase the number of judges and court officials and to raise their salaries. It is expected that after gradual increments in judges' salaries, by 2006 they should earn 30,000 rubles (approximately 1,000 USD). At the time that the program was launched in 2002, the average salary of a judge from a district branch was approximately 6,000 rubles (200 USD), and a judge's salary from regional courts was 8,500-9,000 rubles (280-300 USD).

**Table 1**

| Budget items for 2004 | Spending, c $ | % |
|---|---|---|
| eNational defense | $ 14,188,712 | 15.47% |
| Law-enforcement activities and ensuring the state's security | $ 10,709,554 | 11.68% |
| Servicing state and municipal debt | $ 9,916,227 | 10.81% |
| Social policy | $ 5,558,397 | 6.06% |
| Education | $ 4,061,789 | 4.43% |
| Highways sector | $ 2,728,734 | 2.98% |
| State and local administration | $ 2,654,040 | 2.89% |
| Industry, energy, construction | $ 2,330,989 | 2.54% |
| Public heath and physical education | $ 1,624,063 | 1.77% |
| Basic research and assistance of scientific and technological progress | $ 1,593,103 | 1.74% |
| International affairs | $ 1,554,663 | 1.70% |
| Judicial system | $ 1,146,579 | 1.25% |
| Agriculture and fisheries | $ 1,019,954 | 1.11% |
| Forecasting of natural disasters and recovery | $ 905,455 | 0.99% |
| Replenishing state supplies and reserves | $ 698,954 | 0.76% |
| Culture, art and cinematography | $ 555,213 | 0.61% |
| Environment and nature conservation | $ 427,330 | 0.47% |
| Financial assistance for other budgets of the budget system | $ 28,067,925 | 30.61% |
| Other items | $ 1,963,388 | 2.14% |
| **T O T A L** | **$ 91,705,069** | **100.00%** |



## FORMATION OF THE JUDICIARY

The judiciary of the Russian Federation is formed using the following principles:

- Judges are appointed (federal court judges are appointed by presidential order;

- Candidates for positions of judge in the Russian Federation's Constitutional Court, Supreme Court and the Higher Arbitration Court are approved by the parliament's upper chamber based on the president's recommendation);

- There is a system of reappointment (a federal court judge is appointed for the first time for a three-year term, at the end of which he can be reappointed to that position for an unlimited period until he reaches retirement age);

- There is an enforced retirement age for judges (65 years);

Tenure for justices of the peace and for judges of constitutional (statute) courts in members of the Russian Federation is stated in the laws and in other normative legislative acts by the members of the Federation. The first tenure of a justice of the peace cannot be more than five years; both a second and a subsequent tenure cannot be less than five years for a justice of the peace.

The formal requirements for candidate judges are stated in the law "On the status of judges in the Russian Federation." Any citizen who meets the requirements stated in the law can take a qualifying exam; after passing it, he has the right to apply to the appropriate qualifying judicial board to be recommended for a position as a judge.

The qualifying judicial board is a key body for preparing and making decisions about appointing, reappointing and ending the terms of judges, as well as for rating their performance. The judicial board is mainly made up of representatives of the judiciary; it is also mandatory that a representative of the president of the Russian Federation should be on the board. The law "On judicial bodies in the Russian Federation" states that there should be public representatives on the boards. As part of the Higher Qualifying Judicial Board of the Russian Federation, the upper chamber of the parliament appoints ten public representatives. The system of recommending public representatives to positions on the qualifying judicial boards of the members of the federation is not stated in the law, even though a quota has been established for such representatives on the qualifying judicial boards. Apart from the functions of selecting the membership of the community of judges, the qualifying judicial board has to supervise the judges' activities. If a judicial board receives complaints about a judge's activity, the judge could be subject a disciplinary penalty or suspended from his duties. In addition, it should especially be mentioned that for a citizen, the opportunity to address the qualifying judicial board does not mean that his appeal will be heard and that there will certainly be a formal conclusion to this appeal. The qualifying judicial board can examine such an appeal independently, or can send it to a presiding judge of the appropriate court for review.

Thus, the qualifying judicial board is simultaneously both a recruiting agency and a court for the actual body of the judiciary. However, in this case, reviewing citizens' appeals is not seen as a way of getting feedback from citizens, but of collecting compromising materials about judges without any guarantees for the plaintiff.



Nevertheless, the number of complaints about illegal activities of judges continues to grow every year. In 2003, 70 judges were stripped of their judicial status for committing acts that were outside their authority, and half of them had not served as a judge for more than three years. The main reason why they had to surrender their powers was for violating legislation and falsifying judicial documents.

*FIGURE 1*



Complaints against judges received by the Higher Qualifying Judicial Board
Period: 1996-2003
Source: Statistic of Higher Qualifying Judicial Board

No. of complaines per year

Today there are 23,000 working federal judges and 4,800 openings for this position. In January 2005 this number of openings will drastically increase because all judges over 65 will have to resign. Previously there was a temporary moratorium on this enforced retirement age. Accordingly, in 2005 the judges for many courts will be replaced simultaneously. This process will certainly affect the leaders of the courts because at least 20% of court leaders are older representatives of the judiciary.

The Russian judicial system's desire for new recruitment is usually explained by the judges' low level of financial remuneration. Indeed, a lot of social benefits and guarantees for judges cannot be provided because of the lack of finance in local budgets. In relation to the personal financing of judges, there is a distribution system that considers a region's federal system as it was during the USSR.

In other words, whether the basic social guarantees to the judiciary are realized or not depends in most cases on the capabilities of local budgets. However, another serious factor preventing successful and qualified jurists from joining the judicial system is that a jurist can only have a career as a judge by following the Soviet model. It is not a matter of prestige or prosperity, but of the impossibility for many professional jurists of consciously choosing to work in a law system which is totally controlled by the state.

It is for this reason that in Russia you cannot meet a judge who was once an attorney; in Russia it is almost impossible to have the sort of career that is typical for Western countries. At the same time, the career of judge is a completely logical choice for former employees of the Ministry of Internal Affairs and the prosecutor's office.



13

According to various estimates, almost a third of the entire body of judges consists of people who used to work in law-enforcement agencies. Moreover the influence of law-enforcement agencies over the formation of the judiciary could grow in the next few years because of a large-scale campaign underway to expose corrupt people in judges' robes and to prevent such people from becoming judges.

It is no longer a secret that when confirming candidates for judicial positions, the president's recruitment committee has made the process more rigorous.

"People who aspire to become judges don't just take exams," **Vyacheslav Lebedev**, the chairman of the Supreme Court, said to journalists. "They are now scrutinized in depth by the special services. These citizens should have a flawless past."

It is unlikely that somebody would openly oppose the necessity of scrutinizing a candidate for the position of judge, on the grounds that the candidate does not have connections to the criminal world and that there is no history of corruption from his professional past. However, nobody can guarantee that such steadfast attention by the special services is enough to prevent corruption.

# CHAPTER 2.
## POLITICAL REASONS FOR THE CRISIS OF INDEPENDENCE OF THE JUDICIAL SYSTEM

Although he included in his list of reforms the judicial reform that was started during Boris Yeltsin's presidential term, Vladimir Putin has never explained in detail his own position on this issue. At the beginning of Putin's first presidential term (2002/03), judicial and legal reform became one of the key reforms undertaken by the new president's team.

The next important step in the judicial reform was called the "Kozak reform" (Dmitry Kozak, deputy of the presidential administration head, was in charge of these actions; he is now plenipotentiary of the President in South Federal District).

The obvious liberal achievement of the Kozak reform is the fact that criminal and procedural legislation was reviewed (sanctions for arresting a person were transferred from the prosecution to the courts, and jury courts appeared).

However, the fact that the courts were given more authority was accompanied by substantial changes to the legislation concerning the judicial system of the Russian Federation and the status of judges. In particular, restrictions were imposed on the term that court administrators could act as judges and on age limits for judges, and a probationary period was introduced for first-appointment judges.

Included in Kozak's plans was a reduction of judicial immunity in order to simplify the procedure for prosecuting judges for administrative and criminal actions. However, judges and deputies desperately resisted these proposals; as a result, only administrative immunity was revoked. However, this defeat was compensated by the fact that the State Duma allowed the president to have his representatives on the qualifying judicial boards. From that moment, the procedure for prosecuting judges for criminal actions has been under the president's control.

Accordingly, the changes to the legislation on the judicial system, which were initiated in 2002 by the federal executive power, were directed in essence towards making courts independent from regional authorities. As a result, the already large influence of the vertical structure of presidential power over the judicial system has grown even stronger. The targeted integration of judicial power into the system of controlled democracy became one of the key factors in the failure of the judicial reform and in aggravating the previously known failings of the Russian judicial system (fair justice is not accessible to everyone, corruption, courts are subject to administrative pressure from government officials of various levels).

Most respondents questioned during RA's research (84%) believe that the goals declared at the conception of the judicial reform in 1991 have not been achieved. Only 2% of the experts expressed the opinion that the goals of the judicial reform have been completely met. oil) or belong to the more profitable markets.



*FIGURE 2*



Do you think that the goals stated in the judicial reform started in 1992 in Russia have been achieved?
Period: Jul-Aug 2004
Source: Russian Axis, Expert Poll, 102 people

They have generally not been achieved 41%

They have generally been achieved 14%

They have not been achieved at all 43%

They have been fully achieved 2%

I cannot answer 0,6%

In a more detailed analysis of the extent to which the judicial reform achieved its goals, respondents also stated that not one of the goals of the reform had been achieved.

*FIGURE 3*



From your point of view, which goals stated in the judicial reform have been achieved more and which have been achieved less?
Period: Jul-Aug 2004
Source: Russian Axis, Expert Poll, 102 people

% of those experts

☐ significant
☐ average
☐ insignificant
☐ not achieved

| Goal | significant | average | insignificant | not achieved |
|---|---|---|---|---|
| Establishing an independent judicial power | 4 | | 59 | 37 |
| Strengthening judicial control over the preliminary stage of an investigation | 16 | 24 | 27 | 33 |
| Implementing justice based on the adversarial principle and on equality of parties | 22 | 8 | 41 | 29 |
| Involving citizens in the implementation of justice as jurors and as arbitration assessors | 24 | 25 | 16 | 35 |
| Making justice more accessible to citizens | 27 | 19 | 27 | 27 |
| Raising the level of legal consciousness and legal culture of citizens | 37 | 12 | 26 | 25 |

0    20    40    60    80    100



It is evident that the experts polled by RA picked the lowest level in regard to whether or not the goal of "Creating an independent judicial power" had been achieved: only 4% of the polled experts believe that this goal has been reached, while 96% believe that it has not been reached or has not reached a significant enough level. It is important to pay particular attention to the goals that have been implemented least of all: (b) the implementation of justice based on the adversarial principle and the equality of parties, and (e) the strengthening of judicial control over the preliminary stage of an investigation. In respect of the declared goals, having an independent judicial system is a fundamental element. Without independent courts, it is impossible to have an adversarial process; likewise, it is impossible to have control over the actions of investigation agencies. The polled experts expressed the opinion that these goals were not significantly achieved; these same experts maintained that these goals were connected to the problem of the independence of the courts.

**Representatives of the bar and business and human right activists note that the most negative factor slowing down judicial reform is the dependence of Russian judicial power and the fact that government officials can easily influence it. These experts believe that in Russia today the equality of sides in disputes between citizens or businesspeople and the state does not exist because courts depend on the executive power. Judicial power in Russia is not sovereign, and depends on both the executive branch and on law-enforcement agencies**

**Petr Barenboim**, vice-president of the Union of Jurists of Russia, member of the board of the International Association of Jurists, chairman of the Moscow Stock Exchange Arbitration Commission:

> We have kept the Soviet tradition: if the state is one of the sides of a civil or administrative process, it has an advantage. Even Finance Minister Kudrin stated in London that nobody could argue with the state because the state is always right. Prosecutors and state officials also think the same. For this reason citizens are never equal to the state in a civil trial. The positive steps that have happened in the judicial system when compared to Soviet times disappear as soon as a politically motivated case arises.

**Sergei Pashin**, an expert on the Human Rights Commission, human rights activist and attorney, professor at the Moscow Institute of Politics, Economics and Law, distinguished lawyer of the Russian Federation:

> The independence of judicial power is a good idea, but judicial power does not have the funds to support it. Other branches of power are feeding judicial power, and most of the benefits continue to be allocated in a socialist manner. Who appoints judges and confirms their promotion? The presidential administration, or more specifically, the commission for preliminary discussions on candidates, which includes only three judges; all the others are members of the presidential administration and heads of siloviki departments that have the rank of deputy minister. Our judges pursue their careers in the organs of executive power.
> The judicial system does not work in a lawful way, but rather it fulfills the state's orders or operates as a conveyor belt, and this means that no time is spent on legal details. The Russian judicial system is a part of the executive power that governs the judicial system. The demands of power, by the way, are the same as before: the harsher the better, criminals should tremble. In arbitration courts, the state's interest is the most important.



**Sergei Nosov**, director of the litigations department at Ernst & Young:

>Judicial reform should nevertheless begin by separating this branch of power into an independent, third branch of power, as it is written in the Constitution. That's how it is de jure, but we all know perfectly well that representatives of the executive power can influence court decisions. The courts cannot guarantee that they will be granted a sufficient measure of independence. Seriously reforming the entire judicial system not only means that the process would be reformed, but that the prosecution, as a fundamental element of the judicial system, would also be reformed. At present the prosecutor's office acts as both prosecutor and investigator; it is directly connected to the judicial process. Reforming the prosecutor's office won't happen in the near future, and without it, it's difficult to discuss whether the judicial reform has fully achieved its initial goals.

**Maksim Sterin**, jurist of the international law company LeBoeuf, Lamb, Green & MacRae:

>In order for the principles of fair justice to start to actually work, you need to create, first and foremost, an independent court and an executive system that will be supported by a substantial amount of resources. The courts and the system of bailiffs should not be influenced by large oligarchic structures. As long as such influence and dependence exist, especially in the regions of Russia, all the principles will just remain on paper as declarations.

**Mikhail Barshchevsky**, lawyer, government representative of the Russian Federation at the Constitutional Court:

>Today the judicial system is in fact independent from the legislative branch of power, but not from the executive branch. Specifically, decisions on everyday issues of the judicial system and the community of judges (repairs and construction of buildings, salaries, secretarial staff, consultants, assistants, apartments for the judges, etc.) are dependent on the executive power. But that's not the most important thing. Appointing the presiding judges by presidential order (presiding judges of the Supreme and Higher Arbitration Court are appointed by the Federation Council as advised by the president) determines the "psychological guidelines" for the presiding judges. It would be an entirely different situation if judges of corresponding courts appointed presiding judges by themselves (as we can see in the Constitutional Court of the Russian Federation).

**Mara Polyakova**, director of the regional public organization Independent Council for Legal Expertise:

>Judges are dependent on presiding judges, prosecutors' offices and all branches of power. Unfortunately, for judges this is a question of surviving in the system. Presiding judges are appointed by the executive power. These people have the opportunity to determine the fate of any judge who is under their jurisdiction because a representation from a presiding judge to the qualifying judicial board or to the council of judges is enough to take away a judge's authority. If judges chose a presiding judge, he would most likely not have any influence over them. For example, in the Constitutional Court, judges of the Constitutional Court chose a presiding judge by themselves, and for this reason he cannot have any influence over them. Judges close their eyes to the fact that prosecutors manipulate information, so that they won't quarrel with them and tamper with their accounting figures. And judges are also close to prosecutors in their convictions.



18

**Judges are used to reporting only to the executive power that appoints them. For society, the judicial system remains a closed corporation**

**Georgy Satarov**, president of the Indem Foundation:

> Judges prefer having a closed judicial system. It is important to point out that not only judges promote this closure, but society on the whole because society is very indifferent to the judicial system. Last year we carried out a detailed monitoring of the political press, and made a thematic analysis. For example, in the media the subject of "executive power" was discussed seven or eight times more often than the subject of "judicial power." This is also a Soviet feature of sorts: just as in Soviet times, when judicial power was considered unimportant, so today society has very little interest in it, and only begins to take an interest when there is some kind of large scandal that demands a court decision.

**Vladislav Korochkin**, chairman of the Council of Directors, member of the Chamber of Commerce and Industry of the Russian Federation for enterprises in the agricultural and industrial sector:

> The conditions for justice in Russia have not been created because the system itself does not want to change. Only society can reform the courts, and society isn't allowed to.
> The system of appointing judges high up exhausted all its resources a long time ago, and judges and local authorities now have to be chosen by one way or another. Judicial power is a power that should represent society and be chosen by society.

**Yekaterina Zapodinskaya**, correspondent, Kommersant Publishing House:

> Judges believe that the people don't give them power, but rather it's the president's administration that appoints them. The president's administration appoints them, reviews them and sends them down a judicial career path. And they realize that they should be very good, especially for the president's administration, and secondly for ordinary plaintiffs, defendants and victims.

Nikolai Gagarin, attorney of the law bureau Gagarin, Reznik and Partners:

> Not one of the elements of the community of judges should be removed from society's control. Look how they have barricaded themselves in. Judges have spread the secrecy of the consultation room throughout the whole internal life of the community of judges. Today there is no department of officials more closed than the judicial department. Despite all the judicial reforms, our judicial system is simply a branch of officialdom with all the consequent outcomes.



**In their turn, active representatives of the judiciary believe that the problem of the independence of judicial power in Russia is due to the low level of funding for courts and judges' social benefits; stable and adequate funding of such expenditures is one of the main guarantees of the independence of the courts**

**Sergei Sarbash**, PhD, deputy head of the Higher Arbitration Court of the Russian Federation:

> The issue of the independence of judges is not so much a legal question, rather a politico-economical one. Who pays the judges' salaries after all? The state, on which judges depend, the State Duma because it confirms the budget, and the government that implements this budget. In such a situation, the independence of judges depends on how fairly they are rewarded.

**Tatiana Andreeva**, judge, deputy chairman of the Higher Arbitration Court of the Russian Federation:

> Not so long ago, as part of the administrative reforms, there were quite important changes to the structure of the organs of executive power. One of the aims of this reform was raising the financial support for the officials of the organs of executive power, quite a large increase. With respect to judges and court officials, nothing was done. If we talk about equality for all, it's impossible to use different ways to resolve such a significant question as financial support. After all, this is one of the most effective ways of ensuring independence. Nevertheless, we are again playing the role of beggars because we have to ask the government and the president for money, and prove that it's necessary to have an even-handed approach to resolving financial issues.

**Aleksandr Remigailo**, press secretary of the Moscow Arbitration Court:

> The principle of an independent judicial power has so far not been completely realized. The main reason is economic. In a number of cases financial support for judges and court employees has not allowed judges to solve the problem of their living conditions and questions about educating their children, without losing their independence.

**Some of the experts polled by RA believe that the weakness and second-rate status of judicial institutions are traditional problems for Russia. From a historical perspective, it is understandable why today's judicial power is incapable of opposing the pressure of the executive power, experts note**

**Vladimir Drachinsky**, head of the Moscow City Judicial Office:

> The courts have never assisted in governing Russia, and judicial power in Russia has never been a fully-fledged branch of power. Under the former socialist regime, there was an understandable system for governing the state; there was a party and a government that ruled everything. Now we have situations where, irrespective of the opinion of "the party and the government," the judicial system is capable of issuing a decision which would not be in the interests of the law and justice. In my opinion the situation has got worse.

**Sergei Sarbash**, PhD, deputy head of the Higher Arbitration Court of the Russian Federation:
> We often see how letters are sent from deputies to judges to discuss some kind of concrete dispute (this especially happens in cases involving bankruptcy). Deputies ask judges to take into consideration certain circumstances, and sometimes they give fair arguments about employees, etc. This kind of appeal is an attempt to influence a judge; in civilized countries, this is impossible. Officials do not understand that it is impossible to address judges in this way, to ask them to assess things that are subject to court proceedings.

**Lev Simkin**, attorney of the Latham & Watkans law firm:
> According to the feeling of state politics, a judge is nevertheless a state official. A judge instinctively knows the points that could be important for the authorities in court proceedings. On the other hand, the existence of things that are outside the state's control is always strange for the executive power. The power needs people to understand the state line. This is where the phenomenon appeared that has already been called "Basmanny justice."

**Vladimir Tumanov**, former chairman of the Constitutional Court:
> The legal attitude of the authorities is such that they think that it's possible to influence the courts, and it's difficult to fight against this influence. We still don't have one governor who has been charged with influencing the courts. If a judge is a brave enough person, he would fight against a mayor or a head of a district, and there would be a result, a goal would be reached. However, a judge shouldn't go to the barricades every day. He has other tasks, other work.

**Sociologists have record the systematic character of the dependence of judicial power. Thus, during social studies in 2001 and 2003, 70% of polled respondents noted that the courts in Russia were dependent and did not follow just the law**

*FIGURE 4*



Some people believe that the courts are independent and that they follow the existing law in making their decisions. Others believe that the courts are not independent and follow not just the existing law when making decisions, but other factors as well. Which point of view do you agree with?
Period: 2001-2003
Source: Public Opinion Foundation. Nationwide survey of population 18+
Sample size of 1,500 respondents

Results of the polling by RA about the dynamics of dependence of judicial power (respondents were asked to compare the current level of dependence of courts with the level in the past) also demonstrate the chronic character of this problem. Only 12% of polled experts at the time of the study believed that judicial bodies in Russia have become more independent within the last year. Forty-one percent of the respondents noted that courts have become more dependent, and 45% think that the situation with the dependence of the judicial system has remained the same since last year.

*FIGURE 5*



Do you think that during the past year law courts in Russia have become more independent of executive power, less independent, or has the situation not changed at all?
Period: Jul-Aug 2004
Source: Russian Axis, Expert Poll, 102 people

The courts have become more independent
12%

Don't now answer
2%

The courts have become less independent
41%

The situation has not changed
45%

When estimating the level of influence of different structures and institutions over judicial organs, experts polled by RA gave the following as the most influential: the president's administration of the Russian Federation, governors (the executive power of the regions), as well as the prosecutor general's office and the Federal Security Service ('siloviki').

It is noteworthy that in this rating of influence such institutions as political parties and mass media took last place. The influence of big business as well as the pressure of criminal structures on events taking place in the judicial system also have a low rating (some experts indicated this next to the "other" category). Only 4% of experts believe that courts in Russia are not dependent on any kind of structure or institution, and according to them the reason for a court's partiality is incompetence and the workload of judges, which does not allow them to study thoroughly the details of a case.







23

How can the executive power have such a strong influence over the courts? As it became evident from RA's study, the fact that the executive power has the authority to recruit is the most significant method for it to control the courts. According to the polled experts, above all the executive power threatens to disqualify disloyal judges as a way of putting pressure on judges.

*FIGURE 8*

Please evaluate on a 10-point scale the degree to which the executive power uses the following means to influence judges.

Period: Jul-Aug 2004
Source: Russian Axis, Expert Poll, 102 people

■ max value 10, min - 1

| | |
|---|---|
| It threaten to have a loyal administration disqualify a disloyal judge | 8 |
| It affirms the loyalty of a judge during his appointment procedure | 6 |
| It makes a decision about a judge's promotion | 6 |
| It makes a decision about whether social guarantees and privileges for judges are | 6 |
| It threatens to have a loyal higher court review the decision of a disloyal court or judge, the | 6 |
| It finances the maintenance of the courts (building, repairs, equipment, etc.) | 5 |

According to the experts polled by RA, the career of a disloyal to the power judge in fact always ends in his disqualification:

**Mara Polyakova**, director of the regional public organization Independent Council for Legal Expertise:

> The administrative mechanism is the main way of influencing judges. A presiding judge appointed by the state has the opportunity to control the fate of any judge who is under his jurisdiction. In order to take away a judge's authority, it is enough for a court administrator to send a recommendation to a qualifying judicial board or to a court of judges (the organs of the community of judges).
> How does this work? Any judge's work is evaluated by the number of cancelled or altered sentences. If these sentences are cancelled or altered by a higher court or if the judge violates procedural time limits (due to the large workload, there is no judge who has not violated these limits), then he can be stripped of his authority because of this. These circumstances are used as soon as a judge becomes unwanted. It's not a problem to get rid of a judge.

**Vladimir Drachinsky**, head of the Moscow City Law Bureau:

> I don't think that judges feel that they are any freer now than they were during the Soviet Union. How is their current situation any different from what it was in the past? Before they were told what to do, and this is still the case.

Apart from the threat of disqualifying a disloyal judge, the executive power has many other methods by which it can influence judges. In addition to the executive power's authority to recruit, experts polled by RA noted that it could influence judges by offering social guarantees (most often these include providing a place to live); experts noted that these two actions carry equal weight. The experts admitted that solving the problem of maintaining court premises was the least used way of influencing the courts.

As the study by RA shows, all court bodies depend on the executive power. In addition, the polled experts note that courts of general jurisdiction - Moscow City Court, courts of general jurisdiction in Moscow, as well as ordinary courts in the members of the federation - depend to the greatest degree on the executive power (2.7 and 2.2 points respectively).

media may be easily misinterpreted.

*FIGURE 9*



The experts believe that the Constitutional Court of the Russian Federation (average score: 0.5) and the federal arbitration courts of the regions (1.4) depend least on the executive power. The low level of influence by the administrative resource on these courts is explained in part by their particular powers and functions.

The Higher Arbitration Court (2.1), Moscow Arbitration Court (2.0) and the arbitration courts of the members of the federation (1.7) take a middle position within the hierarchy of dependence.

Since the administrative resource has a predominant influence, the problem of judicial corruption takes a new form. Over a period of many years, society and the expert community have accepted as a fundamental truth the fact that there is a high level of corruption in the Russian judicial system. Thus 48% of the respondents who took part in the public opinion poll by ROMIR Monitoring at the end of 2003 believed that most judges were corrupt; 29% of those polled agreed with the statement that there is some corruption; and only 2% of respondents thought that all judges were honest.



*FIGURE 10*



In your opinion, to what extent are Russian courts susceptible to corruption?
Period: October 2003
Source: Romir-Monitoring, National surrvey 18+

According to information from RA's expert poll in April 2004, the judicial system of the Russian Federation takes almost 6 billion dollars in bribes annually. It is notable that based on the results of the poll, the judicial system is in fourth place in the ratings in terms of the amount of bribes it takes; law-enforcement agencies take first place, followed by federal ministries and then regional authorities. In other words, the main centers of influence over the courts (siloviki and the executive power) take more bribes than judicial bodies. According to the Russian Axis expert poll, the lower limit of corruption is around 36.6 billion dollars per year; Russian experts believe that the level of corruption is higher, at 43 billion.

*FIGURE 11*



Estimates on the amount of bribes taken annually in Russia,
so-called "status" or "administrative-power" income
Period: June 2004
Source: Russian Axis, Expert Poll, 102 people



Law-enforcement agencies and federal ministries and organizations are in the lead when it comes to power, and they receive a minimum of 6.8-6.9 billion dollars. Almost as much, 6.5 billion dollars, goes to regional authorities. Judicial bodies and deputies to the Duma are second-rankers, with 5.9 and 5.1 billion respectively. Supervisory bodies and junior-rank bureaucrats take 2.8 and 2.5 billion dollars respectively.

At the same time, when comparing the INDEM corruption data for 2001 and the results of the expert survey by RA, the flow of bribes in 2004 changes as follows: the proportion of corrupt "income" going to the executive power dropped by 5% in favor of law-enforcement and judicial bodies, but the latter managed to accumulate a greater volume of bribes than the law-enforcement agencies.

*FIGURE 12*



Analysis of the above data taken from RA's expert poll shows that in recent years both the frequency of use and the degree of influence of bribes upon courts have become secondary when compared to administrative pressure on the courts. Public opinion polls show that the influence of business on the courts is less than the combined impact of executive power and the law-enforcement bodies.

According to the ROMIR Monitoring poll, respondents estimated the influence of business at 42 points, whereas the combined influence of the federal executive power, regional authorities and the law-enforcement bodies was estimated at 79 points (27, 26 and 26 respectively)

*FIGURE 13*



## Which of the following statements about Russian courts do you agree with? (any answers)

Period: October 2003
Source: Romir-Monitoring, National surrvey 18+

Russian courts are susceptible to the influence of...

% respondents

| | |
|---|---|
| business | 42 |
| federal executive power | 27 |
| regional executive power | 26 |
| investigation agencies and the prosecutor general's office | 26 |
| independent and follow mainly the law | 10 |
| Don't now answer | 9 |

0  5  10  15  20  25  30  35  40  45

**Polled RA experts said that corruption in the courts would not be possible without administrative support from officials.**

**Vladimir Lafitsky**, PhD, leading researcher, Russian Government Institute of Legislation and Comparative Law:

It is not surprising that monetary resources counterbalance pressure on the courts from the administrative sector. Often they complement each other. Many judges are bribed; however, no one can say for sure how far corruption stretches in the judicial bodies because corruption cases are rarely taken to court.

**Genrikh Padva**, attorney at law:

At present there are no effective mechanisms actually in place to stop both administrative pressure and corruption; they are only stated. The state should demonstrate that this must be prohibited, but it only says that it is. How often have you heard about some administrative official who has been put on trial (I'm not even talking about a high-ranking official) for putting pressure on a court? How many cases of corruption have been exposed? - Not many. On the one hand, the authorities tell judges: "You must be independent." Then on the other hand they start giving orders to judges.

In addition to this, the authorities' rhetoric on the corruption of judges has become tougher. This problem was mentioned in Putin's official address to the nation after a terrorist attack. Future actions of the Russian executive branch, however, can be easily predicted: it will again tighten the procedure for appointing judges, and perhaps some high-profile cases about corruption in courts will be presented to the public. It is obvious that the executive power is interested in keeping its dominating influence over judicial bodies, and will not allow corruption to compete for it.

This struggle between the executive power and corruption over who influences the court system will not bring any public benefit. Practice has shown that by no means all the judicial bodies' areas of power fall within the realm of the Kremlin's and the silovikis' obvious interests; thus the zone which is free from political control will remain susceptible to corruption.

Preservation of informational privacy relating to both the new criteria for selecting judges and for examining actual cases of bribery also testifies to the fact that political will solves the problem in the administration's interest. In other words, authority needs to ensure that courts work in such a way that corruption mechanisms would not compete with administrative ones. Many experts mentioned that the secrecy of the community of judges makes the state's task much easier because it allows it to "impose loyalty" upon judges who are caught taking bribes. A struggle against judicial corruption can become a good pretext for comprehensive staff transfers within the community of judges and for strengthening the executive power's influence over the judicial branch even more.

**Polled RA experts believe that the struggle against corruption is a way of suppressing disloyal judges.**

**Peter Barenboim**, vice-president of the Union of Advocates of Russia, executive board member of the International Association of Jurists, chairman of the Arbitration Commission of the Moscow Central Stock Exchange:

> Judges have to apply to the executive power to be approved as a judge, and it is assumed that discreditable information about a judge can surface during the appointment process. First of all, this is a very convenient way of suppressing any disloyal judge. Secondly, if a judge is dishonest, there is a legal mechanism in place to prove his guilt and to issue a sentence. We have gone down the road of collecting ambiguous negative information and making decisions based on preliminary data: this places judges under the state's complete control. In other words, it does not matter whether or not a judge takes bribes, a judge's attitude towards executive authority is more important. The appointment of judges is a totally closed procedure.

**Tamara Morchakova**, retired judge of the Constitutional Court of the Russian Federation:

> I am deeply convinced that one can succeed in the struggle against corruption only when there is genuine will. Some get prosecuted and some do not. Ideally, there should be criminal and public prosecutions for corruption. In this context, "public" does not mean that it would be accessible to the public, but that the state would fulfill its function in putting an end to corruption. However, the state does not perform its duties in this regard. I repeat that some get prosecuted and some do not.

**Summing up the results of Mr. Putin's first term of office with regard to the Russian judicial system, one can conclude:**

- Initially a weak and secondary branch of state power, judicial power in Russia has acquired new forms of dependence on the executive power, whose combined effect makes the judiciary a part of the state bureaucratic machine.

- The system of managed justice approved by the Kremlin is per se a modernized Soviet judicial system, designed to legalize the political and economic control of Russia's current political power.



●     Just like any bureaucracy, judges are susceptible to corruption. Unlike officials, however, they possess a quite wide immunity, which makes it difficult to prosecute judges for a criminal offense. Having strengthened its influence on judicial power, executive power has managed to decrease the impact of corruption. Now judicial corruption is impossible without administrative support. The combining of the effects of administrative and financial influence on the courts has only aggravated the situation.

●     Despite the fact that the basic objectives and principles of judicial reform started in 1991 had in fact been subverted by 2004, judicial reforms are still on Vladimir Putin's list of reforms.

However, their further pace and direction will be designed in accordance with Kremlin's current political goals: whether it is a fight against unpatriotic oligarchs, corruption in state power agencies and siloviki structures, spies, terrorists, etc.

Yet at a time when there are innovations to replace social benefits by cash payments, which could be quite painful for Russian society, there is a chance that ordinary Russians would not notice the shift in content of Putin's judicial reforms.

*FIGURE 14*



According to FOM's public opinion poll in April 2004, there is a vast difference between how Russians value the importance of the reforms and how V. Putin values them. The Russian population is concerned most of all with social reforms - health care, pensions, mortgage reforms and housing and communal reforms - whereas V. Putin's priorities, according to the population, are totally different: military, administrative and taxation policy reforms. It is notable that in respect of the importance of carrying out reforms within the judicial system, the Russian population places it at tenth place, both for the present president and for each citizen; for the overwhelming majority of the Russian population the issue of survival is much more important than the issue of protecting human rights.

30

*FIGURE 15*



**In your opinion, which of these reforms are more important for V. Putin to carry out within the next four years, assuming that there are objective conditions and tendencies?**

Period: June 2004

Source: Russian Axis, Poll of experts, 108 people

At the same time, both Russian and Western experts consider judicial, administrative and military reforms to be the most important for V. Putin.



# CHAPTER 3.

# SOCIO-POLITICAL CONSEQUENCES OF THE CRISIS OF THE JUDICIAL SYSTEM'S INDEPENDENCE

## THE SUBORDINATE ROLE OF THE COURTS AS A BASIC FACTOR FOR DISTRUST OF JUDICIAL POWER

RA's study shows that nowadays administrative pressure on courts is all-embracing when making decisions on legal disputes where the Kremlin or siloviki have a clearly visible interest:

- Criminal cases against prominent politicians and entrepreneurs;

- Appeals against actions and decisions by the state in the political sphere (elections, civil rights);

- Criminal cases based on charges of espionage and terrorism (within the competence of the Federal Security Service).

It is significant that the questionnaire survey revealed that the authorities and law-enforcement agencies have a medium level of influence during economic-related litigation:

- Major disputes with sections of the economy;

- Tax disputes between the state and private companies;

- Appeals against actions and decisions by the authorities in the economic sphere;

- Disputes involving medium and small economic entities.

The course towards state capitalism had become an obvious component of the Kremlin's economic policy by the end of Vladimir Putin's first presidential term: in other words, this impulse had not penetrated into the whole judicial system. Although the authorities have at their disposal a lot of judicial ways and means of redistributing property that were tested in the era of mass bankruptcies of Russian enterprises in the late 1990s, the authorities are in fact interested in a quiet redistribution of property without big court trials.

Finally, the most apolitical groups of cases noted by experts during RA's study are civil suits by ordinary citizens and criminal cases against ordinary citizens. The level that the administrative resource is brought to bear in these cases is minimal.



*FIGURE 16*



**In your opinion, what percentage of court decisions in Russia is made under the pressure or influence of executive authorities and law-enforcement agencies?**
Period: Jul-Aug 2004
Source: Russian Axis, Expert Poll, 102 people

It should be noted that the presence of a group of disputes in which the executive power interferes minimally does not mean that the judicial procedure in which ordinary citizens participate is carried out according to the principles of fair justice and equality of parties declared by the Constitution. In the area lying outside the interests of the Kremlin and law-enforcement agencies, corruption is used more frequently to influence judges.

In addition, it is during the thousands of ordinary court trials that the negative traits of the Russian legal profession are displayed, such as:

● Exceeding procedural time limits, drawing out trials;

● The rudeness of judges and the low professional level of judges and court employees.

The level noted by sociologists of the Russians' mistrust of the judicial system is growing. As the results of the Public Opinion Fund polls show, in the late 1990s the proportion between respondents who totally trust judicial power and respondents who totally distrust it was 20 to 40. The results of the 2003 poll demonstrate a sharp increase in the number of respondents who do not trust the judicial system, whereas the number of respondents who trust it has increased fractionally.

*FIGURE 17*



When talking about the reasons for citizens' mistrust of judicial power in Russia, the overwhelming majority of experts interviewed by RA named judicial corruption as the main reason and noted also such important factors as the non-observance of procedural time limits by judges and the low professional level of court employees.

**Maksim Sterin**, jurist of the international law company LeBoeuf, Lamb, Greene & MacRae:

Corruption is why there is mistrust of judicial authorities. A person going to court asks the question: against whom is he going to have legal proceedings? If the proceedings are against a large corporation, he starts fearing that the corporation could influence the judge. Beside this, another reason for mistrust is the high probability that the case will be drawn out because there aren't enough judges, especially in ordinary courts. Judges simply aren't able to observe procedural time limits.

**Tatiana Moskalkova**, deputy head of the General Legal Department of the Ministry of Internal Affairs of Russia:

There are several reasons for citizens' mistrust of the courts: corruption in the system, the enormous workload of judges and the general inefficiency of the system's functioning. A large proportion of the control and supervisory functions of prosecutors has been transferred to judges, and objectively they cannot cope with this volume. A judge cannot fully guarantee that there will be a quick examination of cases; queues emerge, and this in fact leads to solving problems over the phone (calls, gifts, etc).

**Georgy Satarov**, president of the INDEM Foundation:

The key factor for mistrust of courts is corruption. According to our research, approximately 75% of citizens think that courts are suborned. In the field of everyday corruption, the biggest bribes are in courts. This reduces the accessibility of judicial proceedings.

34

**Vladimir Tumanov**, former president of the Constitutional Court:

Firstly, citizens who lose their case for some reason are displeased. Secondly, it's a historical problem. We have never had such a high level of justice as England, for example. In Russia the situation involving the judicial system has always been worse. Of all the sayings and proverbs about courts, you won't find a single good one, only critical ones. Besides, people still remember the courts which existed in Soviet times; society over-exaggerates the dependence of the courts.

Their work is poorly organized. A man comes to court and there's a queue; the corridor is dirty; there's nowhere to sit down; he spends the whole day there and is then told: "Come back tomorrow." The ordinary person is guided more by emotions than by clear logical reasoning. He's not interested in whether that judge has been working, was busy or had only had one sandwich for lunch but still continued receiving people. A man only knows that it's meant to be organized so that he can see a judge, and he hasn't.

**Vladimir Lafitsky**, PhD, leading researcher, Russian Government Institute of Legislation and Comparative Law:

Probably nowhere are citizens exposed to such humiliation as they are in the courts: endless queues to see judges of lower courts, the rudeness of judges and minor court clerks, and legal procedures are shamefully disorganized (for example, at the Moscow City Court it is a common practice to schedule two or three cases to be heard at the same time).

We can add other "weaknesses" of the judicial system to the list: corruption, and the low moral and professional qualities of many judges. In the mind of the public, courts are not perceived as guardians of civil rights and freedoms, but as instruments of repression by the state. Unfortunately this assessment is in many ways fair.

**Peter Barenboim**, vice-president of Union of Advocates of Russia, executive board member of the International Association of Jurists, chairman of the Arbitration Commission of the Moscow Central Stock Exchange:

The reasons for citizens' low trust in the judicial system are that courts cannot provide a speedy examination of a case, or even a fitting reception of citizens. Court buildings are mostly in a pitiable condition; courts are not designed so that you can wait for a trial, or see a judge. In our towns court buildings are some of the worst.

**Sergei Sarbash**, PhD, deputy head of the Higher Arbitration Court of the Russian Federation:

The first reason is that judges are not always highly qualified. We are undergoing a period of growth, and judges are enormously overloaded with work. One judge is expected to examine 60 cases per month, sometimes very difficult ones. The second aspect is corruption. Many people think that all judges are corrupt. Sometimes representatives of the lawyers' community significantly exaggerate rumors about corruption, in order to get money from clients. There are many such instances and this gives society the impression that all judges take bribes.

**Nikolai Gagarin**, attorney of the law bureau Gagarin, Reznik and Partners:

Do an experiment: go to any court and think up five completely insignificant aims. Take for example some law concerning the judicial system, read up about citizens' rights and then try to put them into practice. If during the day, while you're putting your five aims into practice, a submachine gun isn't shoved in your face, or you aren't pushed around, or you don't come into conflict with a bailiff



35

or a secretary who isn't rude to you, or you aren't even let into the courtroom or on to court property, one of your five aims will certainly be marked "failed".

A huge number of citizens come to court and don't get the results they expected. The system works for itself.

**Valery Zorkin**, chairman of the Constitutional Court of the Russian Federation:

The low level of citizens' trust in the judicial system is in direct correlation to the high level of corruption in the judicial system.

**In their turn, representatives of the community of judges who took part in RA's poll commented that negative media coverage of courts is also one of the reasons for Russians' mass mistrust of judicial power.**

**Aleksandr Remigailo**, press secretary of the Moscow Arbitration Court:

The level of citizens' trust in the judicial system is defined first of all by the quality of the system's work. In many instances the quality depends on the workload of the judge; courts in Russia are often overloaded.

In addition, in many instances the level of trust is determined by the degree of the citizens' awareness of the activities of the judicial authorities in the country. People often judge the courts from negative material in the mass media.

**Alla Bursa**, judge of the Moscow Arbitration CourtL:

The main reason for the mistrust shared by a part of society, in my opinion, is negative material in the mass media and prejudiced speeches on TV, which distort the existing situation in the courts and the procedure for hearing cases.

## JUDICIAL POWER IN THE MASS MEDIA

At the same time, an analysis of the content of the Russian media by RA during its study shows that the negative tone of material on the judicial system is obviously an exaggerated problem. During the past four years, no more than ten percent of all the coverage of Russian mass media was on the subject of judicial power and judicial reforms. Moreover, noticeable bursts of coverage on these subjects in the news happened mostly during the time when the legislative package of Kozak's judicial reform was being reviewed by the Russian parliament and the laws were being brought into legal force. The last burst of media activity in which judicial power and reform were mentioned happened while the president's annual address to the Federal Assembly was being discussed, in which once again the high priority of judicial reform for 2004 was indicated.

Over the past four years, there has been steady coverage in the media on the subject of corruption, a sore subject for the community of judges. Furthermore, the insignificant increase in coverage on the subject of corruption came at a time when Kozak's legislative package was being discussed and approved in parliament.

It is notable that the Russian media hardly touch on the subject of administrative pressure on the courts; coverage of this subject in the news remains insignificant. Content analysis.



*FIGURE 18*



*The following materials were used to create the graph "Judicial power mentioned in the Russian media":*
*The total number of mass media items examined was 6,547,773. Among these, 2,483,273 articles were from national information agencies, 2,252,552 articles were from the Russian press, 859,196 items were from Russian TV and radio and 952,752 items were from federal Internet resources.*

*FIGURE 19*



*The following materials were used to create the graph "Share of the judicial reform, corruption and administrative pressure on Judicial power mentions in the Russian media":*
*The total number of mass media items examined was 6,547,773. Among these, 2,483,273 articles were from national information agencies, 2,252,552 articles were from the Russian press, 859,196 items were from Russian TV and radio and 952,752 items were from federal Internet resources.*



## HOW IS SOCIETY'S DISCONTENT
## WITH JUDICIAL POWER EXPRESSED?

At the same time, the number of disputes liable to examination by the courts is growing every year in Russia. Despite the low level of Russians' trust of judicial power and total suspicion of its dependence, Russian citizens still have to turn to the judicial system for its services. However, an assessment of the efficiency of such appeals corresponds to the level of society's overall trust of judicial power. For instance, according to the ROMIR Monitoring poll in 2003, only 17% of respondents note that the legal way of solving disputes is efficient, while 58% of those polled consider legal mechanisms hardly efficient and 17%, totally inefficient.

Statistics on the number of appeals to the European Court of Human Rights reveals, in part, the level of discontent with judicial power.

**Table. 2**

**Statistics of the number of appeals to the European Court of Human Rights**

| Category | 2001 | 2002 | 2003 |
|---|---|---|---|
| Registered complaints | 2105 | 3989 | 4738 |
| Complaints were acknowledged as inadmissible | 1253 | 2223 | 3206 |
| Complaints were redirected from ECHR to Russian Government | 21 | 59 | 170 |
| Complaints were acknowledged as admissible | 2 | 12 | 15 |
| Complaints were made the judgment | - | 2 | 5 |

Source: ECHR, www.echr.coe.int

In spite of the long examination procedure and unclear nature of the prospects relating to the acceptability of Russian complaints to the European Court of Human Rights, hundreds of Russian citizens resort to this opportunity to defend their rights.

In addition, at present complaints about the Russian Federation that are considered by this court are isolated. Nevertheless, most of the experts polled by RA have set high hopes on the European Court's practice, in that it could have a positive influence on Russia's legislative and law-enforcement practice.

**Vladimir Tumanov**, former chairman of the Constitutional Court:

Russia takes second place in the number of complaints that are currently filed in Strasburg. It proves that there is strong faith in this court; many citizens appeal to it. This court has already had a significant influence on our justice. For example, new articles have appeared in our criminal procedure code. If the Strasburg court makes a judgment in which it indicates deficiencies and drawbacks in Russian legislation, this becomes the basis for having the case re-examined. Russia is disciplined by this court's existence.

**Sergei Nosov**, director of the litigations department at Ernst & Young:

Appealing to international human rights organizations is only possible in cases when all national ways of protecting rights have been used. The European Court of Human Rights accepts petitions only if you have gone through all the channels of Russian judicial procedure. But this of course gives rise to a strong disciplinary influence on local court bodies.



**Nevertheless, the experts noted that it was not very effective for Russians who were interested in a fair examination of their cases to appeal to the European Court of Human Rights.**

**Tatiana Andreeva**, judge, deputy chairman of the Higher Arbitration Court of the Russian Federation:
From the viewpoint of efficiency, there are certain doubts. An international court does not work as promptly as a national court. It is a very long procedure. Besides, the applicant would need to hire a lawyer to represent his interests. Not every Russian citizen can afford that.
And yet those few cases that are brought to the European Court of Human Rights leave a significant mark on our practice and legislation.

**Yelena Liptser**, lawyer, expert of the International Protection Center
Appealing to the European Court cannot be considered efficient because there are long time-scales for examining complaints. However, if we consider this opportunity in terms of its influence on legislation and law-enforcement practice, the following interconnection is obvious: the more cases against the Russian Federation that are examined by the European Court, the stronger is the possibility that these decisions will influence law-enforcement practice. Poland and Bulgaria joined the Council of Europe before the Russian Federation, and started filing complaints earlier, and their legislation has been changed based on the European Court's judgments. However, it's hard to say when such impulses will reach Russia because complaints that we filed in 2000 are only now being examined. The European Court is trying to speed up the procedure and we are relying on this. When at least a thousand complaints from Russia have been examined, and five hundred are against Russia, our legislators might start thinking.

**Mara Polyakova**, director of the regional public organization Independent Council for Legal Expertise:
I always recommend appealing to the European court - it's a chance after all. Yes, everything moves very slowly there. I'm embarrassed by the way they solve problems in our secretariat; they frequently send replies about a complaint's inadmissibility, while the case is obviously admissible. There are difficulties concerning the European Court. But there is still a chance. And I hope that the working capacity of the European Court will change.

**Vladislav Korochkin**, chairman of the Council of Directors, member of the Chamber of Commerce and Industry of the Russian Federation for industries in the agricultural and industrial sector:
Appealing to the European Court might be effective if the court held a more active position. It seems to me that European courts are afraid of quarrelling with the Russian authorities; this is why they are not very resolute in defending the interests of Russian citizens.

**Yekaterina Makeeva**, head of the legal department at the National Association of Stock Market Participants:
The European Court is a rarity among court organizations for us, not least because it takes a long time for an appeal to be heard.
Besides, in terms of effectiveness, not only is the mechanism of decision-making important, but also the possibility that a decision made by the European Court is put into practice. The state, in the person of its own officials, simply doesn't hurry to implement these decisions. The trial itself is a rather long process, and whether the decision is implemented or not is questionable.



39

**Valery Zorkin,** chairman of the Constitutional Court of the Russia Federation:

> No court proceedings in international bodies for protecting for human rights and freedoms can lead to effective decisions if these rights and freedoms are not guaranteed by a specific state. For this reason, we need to develop feedback mechanisms between rulings of the European Court and their transformation into rulings by Russian courts.

If the effectiveness of appealing to the courts is low and opportunities to correct a judicial error (made by chance or as a result of administrative pressure or bribery) are difficult to obtain, then constitutional access to justice will itself become a fictitious result of reforms. RA's polling results show that most of the polled experts believe that the level of justice in Russia totally or generally does not correspond to international standards. Sixty-one percent of the respondents think that the level of justice does not correspond sufficiently to international standards; 14% of those polled believe that it does not correspond to universally accepted norms at all. And only 2% of the experts thought that the level of justice in Russia corresponds fully to international standards.

*FIGURE 20*



**Does level of justice on the whole meet international standarts in regard to observance of the adversarial principale of parties, procedural rights of parties and lawfulness of issued judgment ?**
Period: Jul-Aug 2004
Source: Russian Axis, Poll of experts, 102 people

Don't now answer
2%

They fully meet
international standards
2%

They do not meet
international standards
at all
14%

They generally meet
international standards
21%

They generally do not
meet international
standards
61%



# CHAPTER 4.

# ECONOMIC CONSEQUENCES OF THE CRISIS OF INDEPENDENCE OF JUSTICE

The judicial system built into the system of controlled democracy cannot perform its functions of the effective and impartial judicial protection of the rights and interests of investors and proprietors.

With regard to the extent to which Russia's judicial and legal system meets international standards, most experts in RA's poll thought that it did not adequately meet them. As for the extent to which the judicial system provides protection of the property rights and lawful interests of investors, the experts' opinions were significantly polarized. For instance, 27% of the experts polled thought that the Russian justice system did not provide any guarantees at all of investors' and proprietors' property interests. Eight percent of respondents had a positive view of law-enforcement practice in the sphere of protecting proprietors' rights, but only 2% thought that investors' rights were fully guaranteed.

Accordingly, the experts interviewed during RA's study detected an evident gap between the Constitution, legislation and actual court practice.

Legislation on the protection of private property rights corresponds on the whole to international standards, but the large number of violations of the rights of proprietors and investors devalues the actual merits of the legislation. This leads to a significant reduction in the number of opportunities available to the judicial system.

---

*FIGURE 21*

## Do you think the Russian judicial system ensures that property rights and investors' legitimate interests are protected?

Period: Jul-Aug 2004
Source: Russian Axis, Poll of experts, 102 people



Yes, it does fully
2%

Yes, in general it does
16%

Don't now answer
4%

No, not at all
27%

No, in general it does not
51%

---



**In the future, the gap between civilized laws and law-enforcement practice will grow.**

The areas where this discrepancy will reveal itself most clearly are evident even now:

- Tax disputes between the state and businesspeople;

- Disputes on the use of natural resources and any types of licensing of business activities;

- Disputes between shareholders of strategically important enterprises (in such cases the significance of the company is always defined tactically by the state representatives);

- Economic disputes involving institutions representing the economic interests of the Kremlin and the oligarchs close to the Kremlin.

Having become part of the state bureaucracy, the judicial establishment will continue standing up for state interests in Russia's economy. In this situation, a businessperson's opportunity to appeal to the courts when institutions controlled by the state act unlawfully seems doubtful and ineffective.
The predictable conduct of the courts leaves few alternatives for business: to put up with lawlessness, to bribe the courts or to resort to mediation by officials of the executive power (administrative corruption). It is evident that all of these variants are connected to an increase in costs to business structures for solving legal problems and are incompatible with economic growth.

The absence of efficient judicial mechanisms for protecting property rights is already affecting the conduct of Russian businesspeople and foreign investors.

**TABLE 3**

**Please tell me if you think each of the following is or is not a problem for the Russian economy and attracting foreign investment?**

| Main problems in the Russian economy for attract foreign investment (% who rate each a '4' or '5' using a scale of 1 to 5 where 1=not at all serious and 5=very serious) | % of experts |
|---|---|
| Corruption in the executive branch | 79% |
| Independence of the judicial branch | 65% |
| Insufficient laws and regulations protecting investors in Russia | 54% |
| Lack of understanding among potential western investors | 30% |
| Performance of the Russian economy | 25% |

Source: Russian Axis, Expert poll 108, April 2004

Russian political authorities have always understated the importance of having an independent judicial and legal system in forming a steady and favorable business climate in the country. In the president's annual address to the Federal Assembly in 2004, continuation of the judicial reforms and strengthening an independent judicial system were marked as high-priority aims for the authorities. Behind the meaningful notions, however, it is hard to distinguish what stimulus the executive power is ready to give in this sphere.



The existing practice of the selective use of legislation in regard to businesspeople who are disloyal to the Kremlin became possible just because there was not a strong and independent judicial power in Russia. In the 1990s, almost all Russian companies could violate laws with impunity, as the RA study shows.

*FIGURE 22*



Sixty-nine percent of experts think that almost all major companies violated laws in the 1990s, and 21% of them believe that more than half of large companies did. Fifty-one percent of experts shared the same opinion in regard to medium-size businesses and 43% in regard to small-size businesses.

All experts expressed the opinion that all companies representing medium- and large-size businesses violated laws in one or another way in the 1990s.

43

*FIGURE 23*



Sixty-nine percent of the experts admitted that there are legal foundations for raising claims against present owners of Russian companies in regard to violations during the privatization in the 1990s. Many of them specified that foundations exist formally but noted that at those times violations were everywhere and legislation was full of gaps and contradictions, and this left opportunities for selective prosecution.

Those experts who do not think that legal foundations for raising claims exist explained the presence of the latter by problems with the actual legislation, the difficulty of the reforms (Western experts) or stated that a period of initial capital accumulation always takes place outside the legal framework.

44

*FIGURE 24*



When explaining the foundations for raising claims, many experts noted corruption (13% of all experts and 23% of Russian experts); mainly Western experts (13.5%) noted an absence of rule of law and independent courts in Russia.

It should be mentioned that the selective use of legislation as a model for the existence of the judicial system may achieve the tactical goals of the executive power, but is not capable of providing fair justice for ordinary citizens. By holding show trials of businesspeople and other persons disloyal to the authorities, it is hard to convince society that judicial power can work for the public interest. It is not just a matter of the numerous procedural violations made during such trials, but the basic destructiveness of this approach.

By continuing to use the courts to redistribute property, the "siloviki wing" of the Russian executive power is heading towards the total devaluation of judicial power in Russia. Such a full-scale discrediting of the idea of independent courts will not only destroy the remnants of the Russians' trust in the judicial system, but will also significantly aggravate contact between the Russian Federation and international judicial and legal aid institutions.

Unfortunately the Russian authorities cannot see the threat of legal isolation as something significant and substantial, simply because such isolation is a familiar reality for both the president of the Russian Federation and for his closest circle.



# APPENDIX

## EXPERT POLL METHODOLOGY

One hundred Russian experts took part in the poll by RUSSIAN AXIS. The methods used were in-depth interviews and questionnaires. Participants in the expert discussions included representatives of the Government of the Russian Federation and the Pardoning Committee of the Russian Federation, State Duma deputies, representatives of the Constitutional Court and Arbitration Court of the Russian Federation, specialists from Moscow universities, attorneys, jurists from Russian and foreign companies, journalists who write on judicial topics, as well as staff and management from public and human rights organizations.

102 respondents took part in the questionnaire, including attorneys (40%), judges (4%), business consultants (20%), legal specialists from universities and scientific-research institutes (8%), staff and management of public and human rights organizations (18%) and journalists (10%). 52 of polled experts work for Russian organizations and 50 - represent foreign organisations.

## THE QUESTIONNAIRE

**1.** Do you think that the goals stated in the judicial reform started in 1992 in Russia have been achieved?
 a)  They have been fully achieved
 b)  They have generally been achieved
 c)  They have generally not been achieved
 d)  They have not been achieved at all
 e)  I cannot answer

**2.** From your point of view, which goals stated in the judicial reform have been achieved more and which have been achieved less?
 a)  Establishing an independent judicial power
 b)  Implementing justice based on the adversarial principle and on equality of parties
 c)  Raising the level of legal consciousness and legal culture of citizens
 d)  Involving citizens in the implementation of justice as jurors and as arbitration assessors
 e)  Strengthening judicial control over the preliminary stage of an investigation
 f)  Making justice more accessible to citizens

**3.** Do you think that during the past year law courts in Russia have become more independent of executive power, less independent, or has the situation not changed at all?
 a)  The courts have become more independent
 b)  The courts have become less independent
 c)  The situation has not changed
 d)  I cannot answer



**4.** On which structures or institutions do law courts in Russia depend more, de facto? Which structures influence or put pressure on legal proceedings and court decisions the most?

    a) The presidential administration
    b) The government
    c) The prosecutor general
    d) Governors
    e) The Ministry of Internal Affairs
    f) The Federal Security Service
    g) Political parties
    h) Mass media
    i) Others (specify_____)
    j) Nobody influences or puts pressure on legal proceedings and court decisions

**5.** Could you evaluate the degree of influence that the following factors have on the courts' methods and their decision-making process?

    a) The influence of the administrative resource
    b) The possibility of bribing judiciary board members who can influence a court's decision-making process
    c) The criminal risk (threatening to harm a judge)

**6.** If there is any pressure or influence, could you describe the mechanisms by which they influence the courts' decision-making process? (open question)

**7.** Please evaluate on a 10-point scale the degree to which the executive power uses the following means to influence judges:

    a) It affirms the loyalty of a judge during his appointment procedure
    b) It makes a decision about a judge's promotion
    c) It makes a decision about whether social guarantees and privileges for judges are granted
    d) It finances the maintenance of the courts (building, repairs, equipment, etc.)
    e) It threaten to have a loyal administration disqualify a disloyal judge
    f) It threatens to have a loyal higher court review the decision of a disloyal court or judge, the outcome of which might be used for statistics of reversed judgments
    g) Other means - what are they? _____



47

**8.** Please evaluate what percentage of court decisions in Russia are made under the influence or pressure of the executive power and law-enforcement agencies (according to these categories)

| Cases by category | Up to 10% | 10-20% | 20-30% | 30-40% | 40-50% | 50-60% | 60-70% | 70-80% | 80-90% | 90-100% |
|---|---|---|---|---|---|---|---|---|---|---|
| Criminal cases against prominent politicians and entrepreneurs | | | | | | | | | | |
| Criminal cases involving terrorism, espionage, etc. (within the competence of the Federal Security Service) | | | | | | | | | | |
| Criminal cases against ordinary citizens | | | | | | | | | | |
| Lawsuits by tax agencies against private companies | | | | | | | | | | |
| Disputes involving major commercial entities | | | | | | | | | | |
| Appeals against actions and decisions of government authorities in the economic field | | | | | | | | | | |
| Appeals against actions and decisions of government authorities in the political field (elections, civil rights, etc.) | | | | | | | | | | |
| Disputes involving medium and small-size commercial entities | | | | | | | | | | |
| Civil suits of ordinary citizens | | | | | | | | | | |

**9.** Could you evaluate on a 3-point scale the degree to which the following courts depend on the executive power and law-enforcement agencies?
- a) The Constitutional Court of the Russian Federation
- b) Constitutional (statute) courts in the members of the Russian Federation
- c) The Supreme Court of the Russian Federation
- d) The Moscow City Court (the place where state power bodies are situated) and courts of general jurisdiction in Moscow
- e) Courts of general jurisdiction in the members of the Russian Federation
- f) The Higher Arbitration Court
- g) The Moscow Arbitration Court
- h) Federal district arbitration courts
- i) Arbitration courts in the members of the Russian Federation

**10.** In your opinion does the level of justice on the whole meet international standards in regard to observance of the adversarial principle of parties, procedural rights of parties and lawfulness of issued judgments?
- a) They fully meet international standards
- b) They generally meet international standards
- c) They generally do not meet international standards
- d) They do not meet international standards at all
- e) I cannot answer

**11.** Do you think the Russian judicial system ensures that property rights and investors' legitimate interests are protected?
- a) Yes, it does fully
- b) Yes, in general it does
- c) No, in general it does not
- d) No, not at all
- e) I cannot answer



49

## QUESTIONS FOR THE IN-DEPTH INTERVIEWS WITH EXPERTS

**1.** The main goal of the judicial reform that began in 1992 was to provide an entire spectrum of conditions for implementing fair justice; this entailed in particular: openness of court trials, the principle of adversary and equality of parties, strict observance of the presumption of the innocence and good faith of the parties, observance of a reasonable time for judicial proceedings and the proscription of using evidence received unlawfully. In your opinion are these conditions now observed in practice? If not, why not?

**2.** How adequately is the principle of the independence of courts from other branches of power now implemented? What factors in your opinion interfere with the implementation of the principle of independence? If pressure or influence is used, could you describe in which ways they influence court judgments?

**3.** Are there any other ways of influencing or putting pressure on courts besides administrative pressure, and how is this done in practice?

**4.** Do you consider the present mechanism for suppressing violations of the law and corruption among representatives of the judicial system to be effective? If not, why not?

**5.** In your opinion what are the reasons why citizens have a low confidence in the judicial system?

**6.** Do you consider it effective to approach international agencies that protect human rights and liberties (for example the European Court of Human Rights) in cases where all methods of judicial protection in Russia have been exhausted?



## LIST OF EXPERTS FOR IN-DEPTH INTERVIEW

**Andreeva Tatiana**, judge, deputy chairman of the Higher Arbitration Court of the Russian Federation

**Arkhipov Alexei**, layer of the analytical department of the tax branch of United Consultants FDP

**Astakhov Pavel**, chairman of the International Bar

**Barenboim Petr**, vice-president of the Union of Jurists of Russia, member of the board of the International Association of Jurists, chairman of the Moscow Stock Exchange Arbitration Commission

**Barshchevsky Mikhail**, lawyer, government representative of the Russian Federation at the Constitutional Court

**Bursa Alla**, judge of the Moscow Arbitration Court

**Danilov Yury**, senior macroeconomic adviser of the Stock Market Development Fund

**Drachinsky Vladimir**, head of the Moscow City Judicial Office

**Gagarin Nikolai**, attorney of the law bureau Gagarin, Reznik and Partners

**Karasev Mikhail**, expert, judicial department of management personnel of RF

**Kormosh Yury**, PhD, executive vice-president of ARB

**Korochkin Vladislav**, chairman of the Council of Directors, member of the Chamber of Commerce and Industry of the Russian Federation for enterprises in the agricultural and industrial sector

**Krylova Dina**, head the of expertise center of business undertakings of OPORA

**Lafitsky Vladimir**, PhD, leading researcher, Russian Government Institute of Legislation and Comparative Law

**Liptser Elena**, expert, Center of assistance for the International Defence

**Lokotetskaya Maria**, reporter of the "Gazeta" newspaper

**Makeeva Ekaterina**, head of the legal department at the National Association of Stock Market Participants

**Morchakova Tamara**, retired judge of the Constitutional Court of the Russian Federation

**Nikolayeva Elena**, Head of executive committee of "Delovaya Rossia" (Business Russia)

**Nosov Sergei**, director of the litigations department at Ernst & Young

**Padva Genrikh**, attorney at law

**Pashin Sergei** an expert on the Human Rights Commission, human rights activist and attorney, professor at the Moscow Institute of Politics, Economics and Law, distinguished lawyer of the Russian Federation

**Pastukhov Vladimir**, since director of the Law and Public Politic Institute

**Polyakova Mara**, director of the regional public organization Independent Council for Legal Expertise

**Popov Sergey**, delegate of the State Duma, member of the Constitutional Legislation committee

**Remigailo Aleksandr**, press secretary of the Moscow Arbitration Court

**Sakovitch Vladimir**, deputy director of the Yakovlev & partners law firm

**Sarbash Sergei**, PhD, deputy head of the Higher Arbitration Court of the Russian Federation

**Satarov Georgy**, president of the Indem Foundation

**Simkin Lev**, attorney of the Latham & Watkans law firm

**Sterin Maksim**, jurist of the international law company LeBoeuf, Lamb, Green & MacRae

**Sterkin Phillip**, reporter of the IA "Strana.ru"

**Taraskin Vladimir**, head of law department of the Ministry of Industry and Energy

**Tumanov Vladimir**, former chairman of the Constitutional Court

**Tutyhin Valery**, the partner of the John Tyner and partners law firm

**Voskresensky Stanislav**, deputy chairman of the tax committee of RSPP

**Zapodinskaya Ekaterina**, correspondent, Kommersant Publishing House

**Zorkin Valery**, chairman of the Constitutional Court of the Russian Federation







The British-based information and analytical centre Russian Axis is an independent non-governmental organisation, providing Western experts on Russian affairs objective analysis including native perspectives and first-hand information. Russian Axis published reports to date include "The 2004 Presidential Campaign" (76 pages) and "Ten Years of the Russian Constitution" (44 pages). To view these studies and the current report visit our Web site at: www.russianaxis.org.

For additional information please contact:

Dr Vadim Malkin

Director General                                      10 Greycoat Place
                                                      London SW1P 1SB
Russian Axis                                          T + 44 (0) 207 960 6420
                                                      F + 44 (0) 207 960 6100
                                                      http://www.russianaxis.org