UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------x
)
RICHARD ALLEN, *et al.*                    )
)
       Plaintiffs,            )    Case No: 1:05-cv-02077 (CKK)
)    Hon. Colleen Kollar-Kotelly
  v.                                         )
)
RUSSIAN FEDERATION, *et al.*       )
)
       Defendants.          )
)
---------------------------------------------------------x


**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**


# EXHIBIT 62

**Organisation for Economic Co-operation and Development**



**Organisation de Coopération et de Développement Économiques**

*in co-operation with*

**the United States Agency for International Development (USAID)**

*and*

**the World Bank**

Conference on

**"CORPORATE GOVERNANCE IN RUSSIA"**

Jeffrey M. Hertzfeld

Salans Hertzfeld & Heilbronn

RUSSIAN CORPORATE GOVERNANCE:

## *THE FOREIGN DIRECT INVESTOR'S PERSPECTIVE*

*Moscow*
*31 May - 2 June 1999*

**Corporate Governance in Russia**
**Moscow, 31 May - 2 June 1999**

I have been invited to present a perspective on the status of corporate governance in Russian companies from my vantage point as a practicing international attorney who represents many foreign direct investors in Russia, and to identify some of their principal concerns.

For more than 30 years, I have been advising foreign companies large and small in their business dealings with Russia.

In the perestroika and post-perestroika periods, when the country became committed to developing a market economy based on principles of private ownership and profit and open to foreign direct investment, many of our clients seized this opportunity to enter the emerging Russian marketplace, typically creating a jointly owned corporate entity with a local Russian partner.

In the last twelve years, my firm has been called upon to assist in several hundred such investments, with activities ranging from food and consumer goods production to hotel ventures to infrastructure development to oil & gas projects. We have also extensively advised international financial institutions and private funds in conducting their due diligence of potential portfolio debt and equity investments. Through these activities, we have been faced daily with many of the issues of Russian corporate governance which have been the focus of the last two days' discussions.

What then, from this perspective, is the status of development of Russian corporate governance in law and in practice? I would like to make a few brief comments on three parts to this question: the law, the business culture and the enforcement of rights under the law.

**The Law**

You have already heard about the 1995 Russian Civil Code, the first part of which defines the forms of corporate entities and the basic principles of their governance, as well as the 1996 law on closed and open joint stock companies and the 1998 law on limited liability companies. I am not going to dwell on these because you are already familiar with them.

Another key piece of legislation regarding corporate governance, about which you have also heard, is the 1996 Federal Law on the Securities Market, which was amended in November 1998. Among other things, this law provides for the regulation of share emissions of joint stock companies on the secondary market

Copyright © OECD All rights reserved

**Corporate Governance in Russia**
**Moscow, 31 May - 2 June 1999**

and the establishment of the Federal Commission for the Securities Market for this purpose. A further Law on the Protection of the Rights and Legal Interests of Investors in Securities was enacted in March of this year aimed at providing increased protection for investors in joint stock companies on the secondary market by assuring greater transparency in the capital-raising process, greater responsibility on the part of issuers, independent appraisers and auditors for the disclosures made in the prospectuses which they sign, and broader and more flexible administrative powers to the Commission.

The Commission can and does play a very valuable role in safeguarding shareholders' rights, although its powers are still probably not as broad as those of comparable organs in many western countries and its resources are very limited. I took note of a statement by Mr. Vassilyev in a recent press interview that his Commission last year had brought 125 court cases for market abuses, including conduct which ignored voting rights or diluted shareholdings through the issuance of new shares without the necessary shareholder consent, and that it had won three-quarters of them. It would be interesting for my clients to know how many of these cases involved foreign shareholders and what the particular circumstances were.

To round out the legislative picture, I should also mention the 1991 Law on Foreign Investment in Russia, a new version of which is currently struggling along in the legislature, the Bankruptcy Law of 1998, and the Anti-Monopoly Law adopted in 1991 and then amended in 1995 and again in 1998.

Thus, in the short space of twelve years since the outset of foreign investment in Russia and only seven years after the dissolution of the Soviet Union, Russia has put in place a reasonably clear and modern set of corporate governance principles designed for use in a private enterprise context and which anticipates many of the points addressed in the new OECD Principles.

There is of course much room for improvement and clarification of the legislation, as many prior speakers have already discussed. For example, disclosure rules need to address more effectively share transactions involving affiliated entities; share purchasers routinely disguise the extent of their ownership interests in Russian entities by conducting one or a series of share purchases through one or more off-shore shell companies not traceably connected to the beneficial owner. This undermines the meaningfulness of rules against interested party transactions, insider dealing, conflicts of interest and anti-monopoly policies, all of which have found their place in Russian legislation as tools to protect investors, stakeholders, creditors and the public in general from unfair and abusive practices. It may also undermine State interests by concealing currency, tax and other violations.

Copyright © OECD All rights reserved

**Corporate Governance in Russia**
**Moscow, 31 May - 2 June 1999**

The need for tax reform and adoption of suitable accounting standards is critically clear, as is the need to modernize the labor legislation.

The Bankruptcy Law needs to address more effectively the mounting wave of so-called "pseudo-bankruptcies" which are highly prejudicial to the legitimate interests of minority shareholders and creditors. More generally, it is rapidly becoming apparent that the Law also needs to assure creditors more of a voice in the bankruptcy process. The highly publicized Sidanko bankruptcy proceedings are likely to keep an international spotlight on the strengths and shortcomings of the bankruptcy legislation as those proceedings unfold.

The governance principles set out in the Joint Stock Company and Limited Liability Company laws still require considerable practical interpretation, beyond the various commentaries which have been published and the limited interpretative guidelines issued jointly by the Presidia of the Supreme Arbitrazh Court and the Supreme Court. For example, experts still disagree on such basic questions as whether or not charter provisions calling for weighted majority voting at levels higher than those envisioned in the Law are permissible, whether voting agreements between shareholders are valid and binding, and whether there are legal limitations on the terms of contractual puts and calls and lock-up periods.

Much has been said about the need for greater protection of minority shareholders. A prime illustration is the case of the oil major, Yukos, vis-a-vis the foreign minority shareholders in its Samaraneftegaz, Tomskneft and Yuganskneftegaz subsidiaries. For its own financial benefit, it would appear that Yukos wishes to shift much of the value in these subsidiaries to other entities in the Yukos holding structure, a move which would have the obvious effect of diluting the value of the minority shareholders' investments in these subsidiaries and which they oppose. After having been locked out of shareholder meetings last March, it remains to be seen whether the minority shareholders will in the end find that Russian law adequately protects them against this threatened dilution. Of course, at stake here is not merely the interest of the particular minority shareholders, but the ability of Russian companies to return to the world capital markets with the credibility required to raise funds.

However, despite these and other shortcomings, it is fair to say that the laws now in place represent a remarkable drafting effort over an extremely short time period, and that Russia deserves considerable credit for having accomplished it. Indeed, the concerns of the foreign investor today tend to relate less to the laws themselves than to the business reality which they encounter in Russia in dealing with Russian managers and in seeking enforcement of legal rights before the courts.

Copyright © OECD All rights reserved

**Corporate Governance in Russia**
**Moscow, 31 May - 2 June 1999**

**Business Conduct**

A business culture meeting the expectations of the world business community has not yet emerged in Russia. Foreign direct investment implies a relationship of trust and confidence between management and shareholders. Such a business culture can not be imposed by legislation. It must be assimilated over time. Until managers in Russia demonstrate a willingness to abide by the letter and spirit of the legislative rules and by their company charter provisions, until they accept to honor principles of transparency in voting, in sharing financial information and in concluding corporate transactions, until they are prepared to treat minority shareholders on an equitable basis, and until they truly understand the notion of a fiduciary duty of a corporate board to the shareholders, the Russian legislation on corporate governance will provide little comfort to foreign investors.

The Russian Chamber of Commerce & Industry has undertaken a National Program aimed at instilling and promoting what it refers to as a Russian Business Culture which would correspond to internationally accepted standards of business behavior and would project a positive image of Russian business people at home and abroad. It is a complex and ambitious task, but is a step in the right direction to create favorable conditions for investment within the country.

In addition to the educational efforts of the Chamber and other organizations, the development of high standards of conduct both in corporate governance as well as other business contexts could be furthered by foreign investors themselves who could bring international standards and practices to their Russian enterprises and invest not only capital but management practices, experience and know-how. The Vimplecom experience, as described yesterday by Mr. Goldin, is an excellent case in point.

However, Russian managers on the whole have not proved particularly open to sharing management control with foreign investors and, indeed, this may be one of the reasons why foreign direct investment to date has been very small in comparison to the size of the Russian market. In 1998, foreign direct investment amounted to a meager $1.5 billion. However, in a period when access to international capital markets is likely to remain limited, many Russian companies may become more receptive to foreign strategic investors wishing to play an active role in the enterprise. This is not to say that Russian managers have nothing to contribute or that foreign managers have all of the answers or have always behaved with the highest standards. It is my belief that a new and distinctively Russian business culture could emerge from such an interaction and that this new Russian culture would find wide acceptance in the world business community.

Copyright © OECD All rights reserved

**Corporate Governance in Russia**
**Moscow, 31 May - 2 June 1999**

**Enforcement of Legal Rights**

I must now turn to the issue of enforcement of rights in Russia, which remains a particularly troubling concern to many foreign investors. It is well and good to have rights under the law, but they become meaningless if those rights in practice are unenforceable.

Foreign investors are assured non-discriminatory treatment in Russia by the law, by the Constitution and, in many cases, by international treaty. But, the fact is that many foreign investors have found it difficult, if not impossible, to have their rights recognized, particularly when they find themselves in conflict with a politically powerful or well-connected Russian party.

Why is this? The reasons are undoubtedly multiple. In some cases, it may be attributable to a genuine lack of understanding of the existing legislation by many judges and bureaucrats, since it reflects after all a cultural departure from the not so distant past. In some other cases, it may be due to a nationalistic bias in favor of the "home" party, which occurs from time to time in the courts of many countries. However, in many cases, the most likely explanation is that improper influence has been exerted either through inducements or coercion.

Someone recently estimated that 70% of all court decisions in Russia today are tainted by corruption. I have no idea how such a statistic could be arrived at. However, it seems apparent that abuses are frequent and that they undermine the meaningfulness of Russian laws and regulations aimed at protecting shareholders' rights.

To highlight the urgent need for corrective action in this area, without however speculating on the reasons which may have motivated the result, let me cite a couple of illustrations from my own experience where legally established rights arising out of breaches of corporate charters have proved to be unenforceable in Russian courts.

As you know, Russian legislation allows shareholders in companies with foreign investments to have their disputes settled through international arbitration if they so provide in their foundation agreements or the charter of their joint entity. The possibility of submitting shareholder disputes to a neutral third country forum has been widely applauded as providing a further assurance that foreign shareholder rights in Russian companies are well protected.

Copyright © OECD All rights reserved

**Corporate Governance in Russia**
**Moscow, 31 May - 2 June 1999**

Pursuant to such a consent to arbitration, we recently obtained on behalf of one of our clients, an investor in a Russian oil refinery venture, a multi-million dollar arbitration award in Stockholm against one of its Russian partners for material breach of the latter's charter obligations.

Upon application by our client for recognition and enforcement of the award in Russia, as contemplated by the NY Convention to which Russia is a party, the young judge sitting on the case at the judgment debtor's domicile refused enforcement by declaring that the arbitral tribunal had exceeded its jurisdiction. He did so despite the fact that the same jurisdictional argument had been fully pleaded before and considered by the arbitral tribunal and that that tribunal, comprised of three of the world's most eminent international arbitrators, had unanimously and expressly rejected the position, and despite the fact that a leading Russian professor in the field of international arbitration had submitted his opinion in support of the position taken in the award as a matter of Russian law.

And if this was not sufficient, the judge added a further ground for refusing to enforce the award. He blandly declared that, since the parent of the judgment debtor, one of Russia's largest oil companies, is a supplier of oil to the Russian Ministry of Defense, enforcement of the international arbitration award would violate Russian national security interests. The implications of such a ruling are too immense to begin to discuss here, but I am sure they will not escape any of you.

The Russian court hearing took place over two days. The judge indicated that he would decide the case on the second of the two days. Lead counsel for the Russian judgment debtor did not bother to return to the court on the second day to hear the decision, so confident was he of the outcome.

A performance of this kind is greatly damaging to foreign investor confidence in Russia. The case is now on appeal to the Supreme Court of Russia, so it would be inappropriate to identify the names of the parties at this time.

This is not an isolated case. Indeed, Russian courts have been regularly refusing to recognize and enforce international arbitration awards rendered against Russian parties. In another similar situation, we brought a Stockholm arbitration on behalf of a foreign investor against its Russian partner for having violated the management provisions of the charter of their jointly-owned Russian company. A Swedish award was obtained in favor of our client, but enforcement was rejected by the courts in Moscow. In that particular case, the judgment debtor had assets abroad and we therefore sought to have the award recognized in the Swedish, American and Canadian courts as well. All three of these jurisdictions recognized the same award which had been rejected by the Moscow courts. Our client was finally able to recover its damages

Copyright © OECD All rights reserved

**Corporate Governance in Russia**
**Moscow, 31 May - 2 June 1999**

by seizing assets in Canada. However, not all Russian judgment debtors have assets abroad, and in those cases, the foreign investor may be left without an effective remedy to enforce its rights as a shareholder.

While I have cited these court cases, I do not mean to suggest that the problem is specific to the judiciary; it is prevalent at all levels of government. How to instill high standards of integrity in dealings between business and public bodies as well as between companies themselves is, however, a subject which goes beyond my topic of corporate governance and reaches broader social issues, where much remains to be done in Russia.

Thank you for your attention.

Copyright © OECD All rights reserved