# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

RICHARD ALLEN, *et al.*

        Plaintiffs,

        v.

RUSSIAN FEDERATION, *et al.*

        Defendants.

Case No. 1:05-cv-02077 (CKK)

Hon. Colleen Kollar-Kotelly

## REPLY TO PLAINTIFFS' CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS ON BEHALF OF OAO GAZPROM AND ALEXEI B. MILLER

W. Gordon Dobie  (*pro hac vice*)
Greg Vamos  (*pro hac vice*)
Brooke B. Ward
Jennifer M. Erickson
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700

William M. Sullivan, Jr. (DC Bar No. 467269)
Jane E. Chang (DC Bar No. 476545)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone:  (202) 282-5000
Facsimile:  (202) 282-5100

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.      PERSONAL JURISDICTION OVER GAZPROM AND MILLER DOES NOT
        EXIST .................................................................................................................. 2

        A.      The Amended Complaint Does Not Allege Continuous And Systematic
                Contacts Sufficient To Create General Jurisdiction Over Gazprom ....................... 3

                1.      Plaintiffs misleadingly rely on specific jurisdiction principles ................... 3

                2.      Plaintiffs improperly continue to rely on post-filing "contacts" ................ 4

                3.      Plaintiffs' reliance on Gazprom ADRs is misplaced ................................ 5

                4.      Plaintiffs cannot rely on a new alleged Gazprom "subsidiary" ................ 6

                5.      Plaintiffs' claim that Gazprom "directed" statements here is false ........... 7

                6.      Plaintiffs fail to address Gazprom's arguments demonstrating that
                        even the "totality" of plaintiffs' allegations are insufficient ...................... 8

        B.      The Amended Complaint Does Not Allege Continuous And Systematic
                Contacts Sufficient To Create General Jurisdiction Over Miller ........................... 9

        C.      Forcing Gazprom Or Miller To Defend This Litigation In The District Of
                Columbia Would Violate Traditional Notions Of Fair Play And
                Substantial Justice ................................................................................................ 10

        D.      Personal Jurisdiction Cannot Exist Because Plaintiffs Failed To Properly
                Serve Gazprom And Miller.................................................................................. 11

II.     PLAINTIFFS' RESPONSE FAILS TO DEMONSTRATE A VIABLE
        SECURITIES FRAUD CLAIM ...................................................................... 13

        A.      Plaintiffs Have Not Alleged The Requisite Duty To Yukos Investors ................. 14

        B.      Plaintiffs Lack Standing And Statements By Defendants Were Not "In
                Connection With" The Purchase Or Sale Of A Security ...................................... 15

        C.      Plaintiffs' Response Fails To Demonstrate Loss Causation ................................. 17

        D.      Plaintiffs Cannot Establish Reliance On The Statements Of Unrelated
                Antagonistic Corporations And Other Entities .................................................... 18

E.    Plaintiffs Cannot Circumvent The Supreme Court's Central Bank Decision By Simply Referring To Defendants' Conduct As A "Manipulative or Deceptive Device" ......................................................................................... 20

F.    Plaintiffs' Response Makes Little Attempt To Overcome The Amended Complaint's Failure To Plead With Particularity Facts Giving Rise To A "Strong Inference" Of Scienter .......................................................................... 21

G.    Plaintiffs Do Not Allege A Misstatement .............................................. 24

III.    THE "INSIDER TRADING" COUNT AGAINST GAZPROM IS GROUNDLESS ................................................................................................... 25

A.    The Amended Complaint Fails To Support Reinhardt's "Tippee" Theory Of Insider Trading ................................................................................... 25

B.    Reinhardt Has No Standing To Pursue Any Insider Trading Claim .................... 27

C.    Plaintiffs' Response Shows That Securities "Of The Same Class" Were Not Traded ............................................................................................. 29

D.    The Insider Trading Claim Fails To Comply With The PSLRA ......................... 29

E.    The Amended Complaint Fails To Allege A Predicate Violation ....................... 30

IV.    PLAINTIFFS' RICO CLAIMS ARE BASELESS ............................................. 30

A.    Plaintiffs Lack RICO Standing .............................................................. 30

B.    Plaintiffs' RICO Claims Are Barred By The PSLRA ................................... 32

C.    Plaintiffs Fail to Allege A Pattern of Racketeering ...................................... 34

1.    Plaintiffs have not adequately alleged any violation of the Hobbs Act ............................................................................................... 34

2.    Plaintiffs have not adequately alleged any violation of the Bankruptcy Fraud Act .......................................................................... 35

3.    Plaintiffs have not adequately alleged any violation of the Travel Act ............................................................................................... 36

4.    Plaintiffs have not adequately alleged any transportation of stolen goods ................................................................................................ 37

5.    Plaintiffs have not adequately alleged mail or wire fraud ...................... 37

6.    Plaintiffs failed to plead a proper RICO pattern ................................. 38

D.    Plaintiffs Have Not Adequately Alleged Acquisition Of An Interest Or Control Over Yukos By Any RICO Defendant Required By § 1962(b) .............. 39

E.    Plaintiffs Have Not Adequately Alleged The Existence Of An Association-In-Fact Enterprise Or Any RICO Defendants' Participation Required By § 1962(c) ...................................................................... 39

F.    Plaintiffs Have Not Adequately Alleged A Conspiracy To Violate RICO Required By § 1962(d) .......................................................................... 40

V.    UNITED STATES RICO AND SECURITIES LAWS CANNOT BE APPLIED EXTRATERRITORIALLY TO THE ALLEGED CONDUCT ...................................... 41

VI.   PLAINTIFFS' COMMON LAW CAUSES OF ACTION FAIL UNDER U.S. LAW ...................................................................................................................... 43

A.    Plaintiffs Have Not Alleged The Elements Of Fraud ............................. 43

B.    Plaintiffs Have Not Alleged The Elements Of Conspiracy To Commit Fraud ........................................................................................................ 44

C.    Plaintiffs Have Not Alleged The Elements Of Aiding And Abetting Fraud ........ 44

CONCLUSION ................................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**

Adams v. Quattlebaum,
    219 F.R.D. 195 (D.D.C. 2004)............................................................. 4

Adler v. Berg Harmon Assoc.,
    790 F. Supp. 1222 (S.D.N.Y. 1992)................................................... 40

AGS Int'l Servs. S.A. v. Newmont USA Ltd.,
    346 F. Supp. 2d 64 (D.D.C. 2004) ...................................................... 4

Arbitraje Casa De Cambio, S.A. v. USPS,
    297 F. Supp. 2d 165 (D.D.C. 2003) ............................................. 26, 28

*Asahi Metal Indus. Co. v. Sup. Ct. of Ca.,
    480 U.S. 102 (1987)........................................................................... 10

Asahi Metal Indus. v. Sup. Ct.,
    480 U.S. 102 (1987)........................................................................... 11

Atlantigas Corp. v. Nisource, Inc.,
    290 F. Supp. 2d 34, 48 (D.D.C. 2003) ................................................ 7

*AUSA Life Ins. Co. v. Ernst & Young,
    206 F.3d 202 (2d Cir. 2000)............................................................... 24

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,
    189 F.3d 321 (3d Cir. 1999)............................................................... 33

Bancoult v. McNamara,
    214 F.R.D. 5 (D.D.C. 2003)................................................................. 7

Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n,
    366 F. Supp. 2d 792 (W.D. Wis. 2005) ........................................ 37, 40

Basic Inc. v. Levinson,
    485 U.S. 224 (1988)........................................................................... 18

Beachboard v. Trustees of Columbia Univ. in City of New York,
    475 A.2d 398 (D.C. 1984) ................................................................. 13

Beck v. Prupis,
    162 F.3d 1090 (11th Cir. 1998), aff'd, 529 U.S. 494 (2000)............. 31

Berman v. Metzger,
    No. 80-0394, 1981 WL 1596 (D.D.C. Feb. 9, 1981)......................... 15

Bersch v. Drexel Firestone, Inc.,
519 F.2d 974 (2d Cir. 1975) ........................................................ 41

Bivens Gardens Office Bldg., Inc. v. Barnett Banks, Inc.,
140 F.3d 898 (11th Cir. 1998) .................................................... 32

Blue Chip Stamps v. Manor Drug Stores,
421 U.S. 723, 743 (1975) ........................................................... 19

Borow v. nVIEW Corp.,
27 F.3d 562 (4th Cir. 1994) ....................................................... 44

Brady v. Livingood,
360 F. Supp. 2d 94 (D.D.C. 2004) ............................................. 44

Burger King Corp. v. Rudzewicz,
471 U.S. 462 (1985) .................................................................... 3

Calder v. Jones,
465 U.S. 783 (1984) .................................................................... 9

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
511 U.S. 164 (1994) .................................................................... 20

*Central Freight Lines, Inc. v. APA Transp. Corp.,
322 F.3d 376 (5th Cir. 2003) ...................................................... 8

Chiarella v. United States,
445 U.S. 222 (1980) .................................................................... 24

Cobbs v. Sheahan,
385 F. Supp. 2d 731 (N.D. Ill. 2005) ......................................... 34

Columbraria Ltd. v. Pimenta,
110 F. Supp. 2d 542 (S.D. Tex. 2000) ....................................... 32

Cowin v. Bresler,
741 F.2d 410 (D.C. Cir. 1984) ................................................... 31

Craig Outdoor Adv., Inc. v. Viacom Outdoor, Inc.,
No. 04-0074-CV-W-DW, 2005 WL 1279046 (W.D. Mo. May 25, 2005) ....................... 34

Dirks v. SEC,
463 U.S. 646 (1983) .................................................................... 27

District Telecomm. v. District Cablevision, Inc.,
638 F. Supp. 418 (D.D.C. 1985) ................................................ 40

*Doe I v. State of Israel,
   400 F. Supp. 2d 86 (D.D.C. 2005) .................................................................... 43

*Dooley v. United Techs. Corp.,
   803 F. Supp. 428 (D.D.C. 1992) ...................................................................... 34

*Dura Pharm., Inc. v. Broudo,
   544 U.S. 336 (2005) ......................................................................................... 17

El-Hadad v. Embassy of the United Arab Emirates,
   69 F. Supp. 2d 69 (D.D.C. 1999), reversed in other part, 216 F.3d 29 (D.C. Cir.
   2000) .................................................................................................................. 5

*Ellicott Mach. Corp. v. John Holland Party, Ltd.,
   995 F.2d 474 (4th Cir. 1993) ........................................................................... 11

First Capital Asset Mgmt. v. Satinwood, Inc.,
   385 F.3d 159 (2d Cir. 2004) ............................................................................ 34

Fla. Evergreen Foliage v. E.I. duPont de Nemours & Co.,
   165 F. Supp. 2d 1345 (S.D. Fla. 2001), aff'd, 341 F.3d 1292 (11th Cir. 2003) .............. 32

Fleet National Bank v. Boyle,
   No. Civ. A. 04CV1277LDD, 2005 WL 2455673 (E.D. Pa. Sept. 12, 2005) .................. 33

*Gatz v. Ponsoldt,
   297 F. Supp. 2d 719 (D. Del. 2003) ................................................................. 32

Giro v. Banco Espanol de Credito, S.A.,
   No. 98 Civ. 6195, 1999 WL 440462 (S.D.N.Y. June 28, 1999) ........................ 43

Greenberg v. Crossroads Sys., Inc.,
   364 F.3d 657 (5th Cir. 2004) ........................................................................... 19

H.J. Inc. v. Northwestern Bell Telephone Co.,
   492 U.S. 229 (1989) ......................................................................................... 38

Helicopteros Nacionales de Colombia, S.A. v. Hall,
   466 U.S. 408 (1984) ........................................................................................... 8

Hemispherx Biopharma, Inc. v. Asensio,
   No. Civ. A. 98-5204, 1999 WL 144109 (E.D. Pa. Mar. 15, 1999) ................... 33

Hollinger Int'l, Inc. v. Hollinger Inc.,
   No. 04 C 0668, 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004) ............................ 33

Holmes v. Sec. Investor Prot. Corp.,
   503 U.S. 258 (1992) ......................................................................................... 30

Howard v. America Online Inc.,
    208 F.3d 741 (9th Cir. 2000) ........................................................................ 32

*IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,
    136 F.3d 537 (7th Cir. 1998) ......................................................................... 7

In re American Bus. Computers Corp. Sec. Litig.,
    MDL No. 913, 1994 WL 848690 (S.D.N.Y. Feb. 24, 1994) ........................... 28

In re Atlantic Fin. Sec. Litig.,
    No. 89-0645, 1990 WL 171191 (E.D. Pa. Oct. 31, 1990) ............................... 44

In re Baan Co. Sec. Litig.,
    245 F. Supp. 2d 117 (D.D.C. 2003) ................................................................ 7

In re Enron Corp. Sec., Derivative & ERISA Litig.,
    284 F. Supp. 2d 511 (S.D. Tex. 2003) .......................................................... 32

*In re Enron Corp. Sec., Derivative & ERISA Litig.,
    439 F. Supp. 2d 692 (S.D. Tex. 2006) .......................................................... 14

In re Health Mgmt. Inc. Sec. Litig.,
    970 F. Supp. 192 (E.D.N.Y. 1997) ............................................................... 21

In re Lernout & Hauspie Sec. Litig.,
    236 F. Supp. 2d 161 (D. Mass. 2003) ........................................................... 21

In re MicroStrategy Inc. Sec. Litig.,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................... 29

*In re Newbridge Networks Sec. Litig.,
    926 F. Supp. 1163 (D.D.C. 1996) ................................................................ 43

In re Parmalat Sec. Litig.,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005).......................................................... 21

In re PolyMedica Corp. Sec. Litig.,
    432 F.3d 1 (1st Cir. 2005)............................................................................ 19

In re Sec. Litig. BMC Software, Inc.,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) .......................................................... 30

In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000,
    No. 1428 (SAS), 01 Civ. 7342, 2003 WL 1807148 (S.D.N.Y. Apr. 4, 2003)................... 5

In re USA Classic Sec. Litig.,
    No. 93 Civ. 6667, 1995 WL 363841 (S.D.N.Y. June 19, 1995)....................... 21

In re WorldCom, Inc. Sec. Litig.,
    336 F. Supp. 2d 310 (S.D.N.Y. 2004) ............................................................................ 44

In re Yukos Oil Co.,
    321 B.R. 396 (Bankr. S.D. Tex. 2005) ............................................................................ 12

Interbrew, S.A. v. EdperBrascan Corp.,
    23 F. Supp. 2d 425 (S.D.N.Y. 1998) ............................................................................ 41

Jacoboni v. KPMG LLP,
    314 F. Supp. 2d 1172 (M.D. Fla. 2004) ........................................................................ 33

Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,
    98 F. Supp. 2d 480 (S.D.N.Y. 2000) ............................................................................ 42

*Johnson v. Woodcock,
    444 F.3d 953 (8th Cir. 2006) .................................................................................... 4, 5

Jones v. Meridian Towers Apart., Inc.,
    816 F. Supp. 762 (D.D.C. 1993) .................................................................................. 40

Lance v. United Mine Workers of Am. 1974 Pension Trust,
    355 F. Supp. 2d 358 (D.D.C. 2005), vacated on other grounds, 400 F. Supp. 2d 29
    (D.D.C. 2005) ............................................................................................................ 7

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005) ........................................................................................ 17

Lewis v. Chrysler Corp.,
    949 F.2d 644 (3d Cir. 1991) ........................................................................................ 25

Macri v. Yamauchi,
    No. 01 C 50168, 2002 WL 390223 (N.D. Ill. Mar. 11, 2002) .................................. 12, 13

Maiz v. Virani,
    253 F.3d 641 (11th Cir. 2001) .................................................................................. 30, 31

Marcantonio v. Primorsk Shipping Corp.,
    206 F. Supp. 2d 54 (D. Mass. 2002) ............................................................................ 12

Martinez v. White,
    No. C 06-01595, 2006 WL 1530111 (N.D. Cal. June 2, 2006) .................................. 12, 13

Mazloum v. District of Columbia,
    442 F. Supp. 2d 1 (D.D.C. 2006) .............................................................................. 26, 28

McCreary v. Heath,
    No. Civ. A. 04-0623, 2005 WL 3276257 (D.D.C. Sept. 26, 2005) .................................. 44

Minpeco, S.A. v. Hunt,
       718 F. Supp. 168 (S.D.N.Y. 1989) .................................................................. 44

*Moncrief Oil Int'l, Inc. v. OAO Gazprom,
       Civ. A. No. 4:05-CV-353-Y (N.D. Tex. March 21, 2006) ................................ 11

Murphy v. Sofamor Danek Group, Inc.,
       123 F.3d 394 (6th Cir. 1997) ........................................................................ 43

Mwani v. bin Laden,
       417 F.3d 1 (D.C. Cir. 2005) ............................................................................ 3

Nathan Gordon Trust v. Northgate Expl., Ltd.,
       148 F.R.D. 105 (S.D.N.Y. 1993) ................................................................... 41

Newport Components, Inc. v. NEC Home Elecs. (U.S.A.), Inc.,
       671 F. Supp. 1525 (C.D. Cal. 1987) ................................................................ 6

*North South Fin. Corp. v. Al-Turki,
       100 F.3d 1046 (2d Cir. 1996) .................................................................. 41, 42

Novak v. Kasaks,
       216 F.3d 300 (2d Cir. 2000) ........................................................................ 23

O'Donnell v. Shalayev,
       No. 01-4721, 2004 WL 2958698 (D.N.J. Dec. 22, 2004) ............................... 12

O'Rourke v. Crosley,
       847 F. Supp. 1208 (D.N.J. 1994) .................................................................. 34

Oceanic Expl. Co. v. ConocoPhillips, Inc.,
       No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ............................... 42

OMI Holdings, Inc. v. Royal Ins. Co. of Canada,
       149 F.3d 1086 (10th Cir. 1998) ...................................................................... 4

One-O-One Enters. v. Caruso,
       848 F.2d 1283 (D.C. Cir. 1988) .................................................................... 44

*Ontario Public Service Employees Union v. Nortel Networks Corp.,
       369 F.3d 27 (2d Cir 2004) ....................................................................... 15, 16

*Pa. Ass'n of Edwards Heirs v. Rightenour,
       235 F.3d 839 (3d Cir. 2000) ......................................................................... 34

Pacific Lanes, Inc. v. Bowling Proprietors Ass'n of America,
       248 F. Supp. 347 (D. Or. 1965) .................................................................... 13

Panter v. Marshall Field & Co.,
    646 F.2d 271 (7th Cir. 1981) ........................................................................ 24

Pieczenik v. Cambridge Antibody Tech. Group,
    No. 03 Civ. 6336, 2004 WL 527045 (S.D.N.Y. Mar. 16, 2004) ......................... 5

Pinker v. Roche Holdings Ltd.,
    292 F.3d 361 (3d Cir. 2002)....................................................................... 6, 29

Reuther v. Smith,
    No. Civ. A. 01-3625, 2002 WL 1303119 (E.D. La. June 12, 2002) ........... 31, 32

Reves v. Ernst & Young,
    507 U.S. 170 (1993)..................................................................................... 40

Roeder v. Alpha Indus., Inc.,
    814 F.2d 22 (1st Cir. 1987)........................................................................... 14

Romand v. Zimmerman,
    881 F. Supp. 806 (N.D.N.Y. 1995) ................................................................ 13

Saleh v. Titan Corp.,
    436 F. Supp. 2d 55 (D.D.C. 2006) .................................................................. 2

Schwarzenegger v. Fred Martin Motor Co.,
    374 F.3d 797 (9th Cir. 2004) ..................................................................... 4, 9

SEC v. First Jersey Sec., Inc.,
    101 F.3d 1450 (2d Cir. 1996)........................................................................ 21

Securities Inv. Prot. Corp. v. BDO Seidman, LLP,
    222 F.3d 63 (2d Cir. 2000)............................................................................ 43

Semerenko v. Cendant Corp.,
    223 F.3d 165 (3d Cir. 2000)..................................................................... 15, 16

Shapiro v. Merrill Lynch, Pierce, Fenner & Smith,
    495 F.2d 228 (2d Cir. 1974).......................................................................... 28

Shaw v. District of Columbia,
    No. 05-1284, 2006 WL 1371681 (D.D.C. May 15, 2006)................................. 12

Sibley v. Breyer,
    __ F. Supp. 2d __, No. 06-107, 2006 WL 2874119 (D.D.C. Oct. 11, 2006).................... 7

Simpson v. AOL Time Warner Inc.,
    452 F.3d 1040 (9th Cir. 2006) ...................................................................... 21

Sperber v. Boesky,
    849 F.2d 60 (2d Cir. 1988).........................................................................30

Stephenson v. Deutsche Bank AG,
    282 F. Supp. 2d 1032 (D. Minn. 2003)....................................................33

Stirone v. United States,
    361 U.S. 212 (1960)..................................................................................35

Tel-Phonic Serv., Inc. v. TBS Int'l, Inc.,
    975 F.2d 1134 (5th Cir. 1992) ................................................................40

Tyrone Area School District v. Mid-State Bank & Trust Co.,
    No. Civ. 98-881, 1999 WL 703729 (W.D. Pa. Feb. 9, 1999)................33

United States v. Abadie,
    879 F.2d 1260 (5th Cir. 1989) ................................................................37

United States v. Arena,
    180 F.3d 380 (2d Cir. 1999).....................................................................35

United States v. Auerbach,
    913 F.2d 407 (7th Cir. 1990) ..................................................................37

United States v. Buffey,
    899 F.2d 1402 (4th Cir. 1990) ................................................................35

United States v. Cardall,
    885 F.2d 656 (10th Cir. 1989) ................................................................35

United States v. Chestman,
    947 F.2d 551 (2d Cir. 1991).....................................................................27

United States v. Crop Growers Corp.,
    954 F. Supp. 335 (D.D.C. 1997) .............................................................15

United States v. Edwards,
    324 F. Supp. 2d 10 (D.D.C. 2004)..........................................................35

United States v. Fetlow,
    21 F.3d 243 (8th Cir. 1994) ....................................................................37

United States v. Green,
    350 U.S. 415 (1956).................................................................................35

United States v. Hollis,
    725 F.2d 377 (6th Cir. 1984) ..................................................................37

United States v. Marcy,
    777 F. Supp. 1393 (N.D. Ill. 1991) ................................................................... 35

*United States v. Richardson,
    167 F.3d 621 (D.C. Cir. 1999) ......................................................................... 39

United States v. Saadey,
    393 F.3d 669 (6th Cir. 2005) ............................................................................ 35

United States v. Santoni,
    585 F.2d 667 (4th Cir. 1978) ............................................................................ 35

United States v. Stern,
    858 F.2d 1241 (7th Cir. 1988) .......................................................................... 37

United States v. Sutton,
    337 F.3d 792 (7th Cir. 2003) ............................................................................ 35

United States v. Tillem,
    906 F.2d 814 (2d Cir. 1990) ............................................................................. 35

United States v. Victor Teicher & Co.,
    785 F. Supp. 1137 (S.D.N.Y. 1992) ................................................................. 27

United States v. Wernikove,
    214 F. Supp. 112 (E.D. Pa. 1963) .................................................................... 36

*Western Assocs. Ltd. P'ship v. Market Square Assocs.,
    235 F.3d 629 (D.C. Cir. 2001) ......................................................................... 38

Wiwa v. Royal Dutch Petroleum Co.,
    96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ............................ 35

Zelman v. JDS Uniphase Corp.,
    376 F. Supp. 2d. 956 (N.D. Cal. 2005) ............................................................ 16

Ziemba v. Cascade Int'l, Inc.,
    256 F.3d 1194 (11th Cir. 2001) ....................................................................... 14

**Statutes**

15 U.S.C. § 78u-4(b)(2) ................................................................................................ 22

15 U.S.C. § 78u-4(b)(4) ................................................................................................ 17

18 U.S.C. § 152 ............................................................................................................. 35

18 U.S.C. § 1951(b)(2) ................................................................................................. 34

**Other Authorities**

4A Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1102 ....................... 13

**Rules**

Fed. R. Civ. P. 4(f)(2)(C)(ii) ......................................................................................... 12

## <u>INTRODUCTION</u>

Plaintiffs' opposition brief confirms that this lawsuit is nothing more than an effort to publicize Yukos' political grievances arising from the official conduct of a foreign sovereign, the Russian Federation. The baseless nature of – and plaintiffs' lack of standing to pursue – this action is demonstrated by plaintiffs' emphasis on the supposed "taking" of Yukos (as opposed to harm they individually suffered), by their fruitless attempts to explain away the core deficiencies in their amended complaint, and by their efforts to revise the amended complaint in their brief.

Plaintiffs cannot overcome the numerous hurdles presented by the fact that this litigation is centered in the Russian Federation and has no cognizable ties to the U.S. or this Court. Plaintiffs cannot support their theory that defendants OAO Gazprom or Alexei B. Miller have such systematic and sustained contacts with the U.S. that they could be sued here; nor could it be reasonably foreseeable, or fair, for Gazprom and Miller to be sued in the U.S. in light of the undisputed facts that the plaintiffs have no relationship with Gazprom or Miller and that neither Gazprom nor Miller engaged in even colorably actionable conduct. Moreover, plaintiffs' hodge-podge attempts at service do not comply with the requirements of the Federal Rules of Civil Procedure. As a result, Gazprom and Miller cannot be forced to defend this case in the United States.

Plaintiffs' opposition brief also serves to confirm that their amended complaint requires this Court to second-guess the actions and competency of the Russian Federation. Plaintiffs request that the Court reverse the legality of the Russian Federation's tax assessment against Yukos. For numerous reasons, this invitation must be declined. Moreover, plaintiffs cannot show a sufficient connection to the United States to overcome the basic presumption that federal laws will not be applied to primarily foreign conduct.

Even if plaintiffs could overcome the fatal jurisdictional shortcomings in their ability to maintain this action, substantive deficiencies in the underlying counts mandate their dismissal. As purchasers and holders of ADRs, plaintiffs do not have standing to assert seven of their fifteen counts, which seek recovery for alleged injuries to Yukos. Moreover, as is clear from plaintiffs' responses, the securities law and RICO counts have no basis in law. The common law counts fare no better in stating a viable claim. For these reasons, as discussed in detail below, the Court should dismiss plaintiffs' amended complaint in its entirety.[1]

## ARGUMENT

## I.    PERSONAL JURISDICTION OVER GAZPROM AND MILLER DOES NOT EXIST

In their opening brief, Gazprom and Miller demonstrated that, even under a "nationwide" contacts theory, the allegations in the amended complaint fall far short of providing a basis to assert personal jurisdiction over these Russian defendants. Plaintiffs' opposition brief is telling for what it concedes. First, plaintiffs make no effort to suggest that personal jurisdiction can exist over Gazprom or Miller in the District of Columbia. (Pl. Br. at 23.) Accordingly, in the event plaintiffs' federal claims are dismissed, as they should be, personal jurisdiction simply cannot be asserted over Gazprom or Miller. See Saleh v. Titan Corp., 436 F. Supp. 2d 55, 59 (D.D.C. 2006). Second, plaintiffs concede that *specific* personal jurisdiction cannot be asserted

---

[1]    In an effort to reduce the amount of materials defendants are submitting to the Court, Gazprom and Miller adopt and incorporate in this Reply Brief arguments advanced by certain other defendants in their reply briefs. Gazprom and Miller incorporate and adopt: (a) the Minister Defendants' Reply Brief and the Rosneft Defendants' Reply Brief demonstrating that plaintiffs' desperate attempt to assert personal jurisdiction through insubstantial and sporadic contacts must fail (Min. Rep. Br. § II; Ros. Rep. Br. § II); (b) the Minister Defendants' Reply Brief demonstrating that this action must be dismissed under principles preventing courts from adjudicating acts of state and political questions and from violating settled doctrines of international comity (Min. Rep. Br. §§ III, IV, V); (c) the Rosneft Defendants' Reply Brief demonstrating that Counts I, III, IV, V, VI and XIII of the amended complaint must be dismissed because, as ADR holders, plaintiffs do not have standing to recover for injuries allegedly suffered by Yukos (Ros. Rep. Br. § III); (d) the Rosneft Defendants' Reply Brief demonstrating that this action must be dismissed under the *forum non conveniens* doctrine (Ros. Rep. Br. § IV); (e) the Rosneft Defendants' Reply Brief demonstrating that Counts I and III (for conversion and conspiracy to commit conversion) must be dismissed (Ros. Rep. Br. § VI); and (f) the Rosneft Defendants' Reply Brief demonstrating that Count XIII (for expropriation in violation of international law) must be dismissed (Ros. Rep. Br. § VII).

over Gazprom or Miller (although plaintiffs improperly rely on specific-jurisdiction principles, as discussed below).  (Pl. Br. at 21 n.8 & 23.)

Instead, plaintiffs' only theory is that Gazprom and Miller are somehow subject to *general* personal jurisdiction, notwithstanding that neither foreign defendant has done anything approaching the level of systematic and sustained business in the U.S. that is required before general personal jurisdiction could exist.  Plaintiffs' opposition brief improperly relies on a combination of alleged contacts that are simply irrelevant, including post-filing "contacts," alleged plans for future activities (rather than actual contemporaneous contacts), protected "governmental contacts," and visits to the United States that Miller allegedly made *on behalf of* Gazprom.  These "contacts" are not properly considered nor are they sufficient to confer personal jurisdiction.  Further, even if plaintiffs had alleged sufficient contacts, the separate due process component of the jurisdictional analysis would still prevent the exercise of jurisdiction over these Russian defendants because they have no connection to these plaintiffs, did not receive any Yukos property, and have not engaged in any actionable conduct.

### A.    The Amended Complaint Does Not Allege Continuous And Systematic Contacts Sufficient To Create General Jurisdiction Over Gazprom

#### 1.    Plaintiffs misleadingly rely on specific jurisdiction principles

Despite having conceded that specific jurisdiction does not exist over Gazprom, plaintiffs nevertheless cite and rely on specific jurisdiction principles throughout their opposition brief. (E.g., Pl. Br. at 23-24 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985), and Mwani v. bin Laden, 417 F.3d 1, 12-13 (D.C. Cir. 2005)).)  As the Court is aware, specific jurisdiction focuses on whether the plaintiff's cause of action arises out of or is related to a specific act by the defendant in the forum.  Burger King Corp., 471 U.S. at 472-73.

The issue in a general jurisdiction contacts analysis is much different, and requires the defendant to have substantial contacts with the forum that "are so continuous and systematic that it could foresee being haled into a court" in the forum. AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64, 74 (D.D.C. 2004). As defendants explained in their opening brief, the level of minimum contacts required to establish general jurisdiction is both stringent and high. OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998). Indeed, for general jurisdiction to exist, the defendant's contacts must be so sustained and robust that they "approximate physical presence" – which is an "exacting standard." Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801 (9th Cir. 2004). As shown below, when analyzed under the proper (not plaintiffs') standards, the amended complaint does not come close to setting forth facts approximating either Gazprom's or Miller's physical presence in the U.S.

### 2. Plaintiffs improperly continue to rely on post-filing "contacts"

The law is clear: "Minimum contacts must exist either at the time the cause of action arose, the time the suit was filed, or within a reasonable period of time immediately prior to the filing of the lawsuit." Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006) (citation omitted). Plaintiffs make no effort to suggest that either Gazprom's or Miller's pre-filing "contacts" could conceivably establish general personal jurisdiction over them. Instead, plaintiffs assert that the relevant time frame for evaluating a defendant's contacts runs through the filing of an *amended* complaint (and even thereafter, as demonstrated by plaintiffs' reliance on alleged post-*amended* complaint events). (Pl. Br. at 25.) The two cases cited by plaintiffs, however, do not discuss personal jurisdiction analyses or issues at all, and stand only for the unrelated (and unremarkable) proposition that an amended complaint must be attacked in a new motion to dismiss. Adams v. Quattlebaum, 219 F.R.D. 195, 197 (D.D.C. 2004) (finding motion

to dismiss complaint could not be asserted against amended complaint); El-Hadad v. Embassy of the United Arab Emirates, 69 F. Supp. 2d 69, 71 n.1 (D.D.C. 1999) (same).

Beyond the fact that plaintiffs have no authority to support their contention, there are compelling reasons why their position must be rejected. A bedrock due process principle is that the defendant must receive "fair warning" that its acts may result in being hauled into court in a distant forum. Johnson, 444 F.3d at 955; AGS Int'l Servs., 346 F. Supp. 2d at 74 (contacts must be such that the defendant "could foresee being haled into" court in the forum). There can be no meaningful "warning" if contacts occurring long *after* the acts giving rise to the lawsuit, and/or *after* the lawsuit has already been filed, are used to establish personal jurisdiction. If plaintiffs' position is accepted, plaintiffs would be free to continue to "amend" their jurisdictional allegations as years go by and events change – a process that would be theoretically endless. Moreover, this Court's endorsement of such an approach would understandably deter foreign companies from increasing their business presence or operations in the U.S. Plaintiffs' position must be rejected.

### 3.    Plaintiffs' reliance on Gazprom ADRs is misplaced

Plaintiffs place undue emphasis on Gazprom's supposed "sponsorship" of its own ADRs as a jurisdictional contact. Plaintiffs readily concede, however, that Gazprom's ADRs were not allegedly "sponsored" until April 2006, many months after plaintiffs' October 2005 lawsuit was filed. (Pl. Br. at 25.) Moreover, regardless of the time frame, courts have found that ADRs – sponsored or not – simply cannot provide a basis for general jurisdiction. Pieczenik v. Cambridge Antibody Tech. Group, 2004 WL 527045, at *6 (S.D.N.Y. Mar. 16, 2004); In re Ski Train Fire in Kaprun, Austria, 2003 WL 1807148, at *6, n.12 (S.D.N.Y. Apr. 4, 2003).

The two cases plaintiffs cite to support their position are inapplicable. In <u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 368-73 (3d Cir. 2002), the defendant's ADRs were relevant to *specific* jurisdiction because the plaintiff's cause of action arose out of his purchase of those ADRs. In stark contrast to <u>Pinker</u>, plaintiffs have abandoned any theory of specific jurisdiction over Gazprom or Miller and there is no contention that plaintiffs' claims arise out of or are in any way related to Gazprom's ADRs. Plaintiffs' other case, <u>Newport Components, Inc. v. NEC Home Elecs. (U.S.A.), Inc.</u>, 671 F. Supp. 1525 (C.D. Cal. 1987), only supports this distinction. Far from finding sponsored ADRs "alone are sufficient to establish personal jurisdiction" (Pl. Br. at 25), the court stated, "it is proper to *consider* the trading of these securities for purposes of establishing personal jurisdiction. More information is needed, however, on the nature and volume of [the defendant's] trading activity." <u>Id.</u> at 1540 (emphasis added).[2] The court went on to find the existence of general jurisdiction *only after* establishing that the defendant had numerous *other* contacts to the United States – contacts that are not remotely present here. <u>Id.</u> at 1539-41.

### 4. Plaintiffs cannot rely on a new alleged Gazprom "subsidiary"

In addition to relying on numerous post-filing "contacts," plaintiffs resort to citing even more recent "facts" never mentioned in either their complaint or their amended complaint. (Pl. Br. at 27; Pl. Exs. 2, 3.) Plaintiffs now argue in their opposition brief that "as early as July 2006 Gazprom created a Houston-based subsidiary." (<u>Id.</u>) The Court, however, cannot consider these "facts" because they are far outside the allegations in the amended complaint. <u>Sibley v. Breyer</u>,

---

[2]    The court in <u>Newport</u> recognized that the defendant had ADRs on the U.S. markets for over 20 years – significantly longer than anything alleged by plaintiffs in this case – and still was unwilling to determine that this constituted "continuous and systematic" contacts without more information.

2006 WL 2874119, at *1 (D.D.C. Oct. 11, 2006).[3]  In addition, as discussed above, this "contact" should not be considered because it did not occur until after the filing of the lawsuit (October 25, 2005) *and* after the filing of the amended complaint (July 13, 2006).  Even if the Court were to consider this recent alleged development, it is black-letter law that the presence of a domestic subsidiary does not confer jurisdiction over its parent and that a subsidiary's contacts with the forum will not be imputed to its parent.  IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 540 (7th Cir. 1998); Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34, 48 (D.D.C. 2003); In re Baan Co. Sec. Litig., 245 F. Supp. 2d 117, 129 (D.D.C. 2003).  Accordingly, plaintiffs' new "subsidiary" claim fails as well.

### 5.    Plaintiffs' claim that Gazprom "directed" statements here is false

In an effort to shore up their deficient jurisdictional allegations, plaintiffs also inject a plain falsehood into their brief by claiming that "Gazprom also directed fraudulent statements at the U.S. market."  (Pl. Br. at 29.)  Not *one* of the 50+ allegations plaintiffs cite in support of this claim (Pl. Br. at 29 citing Am. Compl. ("AC") ¶¶ 142, 147-56, 174-76, 182-95, 223-39, 261-72, 282, 285-86) involves a *single* statement "directed" by Gazprom at the U.S.  Rather, plaintiffs offer broad, conclusory statements as to all defendants' alleged motive and direction.[4]

---

[3]    The wisdom of this rule is borne out by other, subsequent news articles.  Gazprom has recently announced its decision not to pursue the "plans" on which plaintiffs now focus.  (See INTERNATIONAL HERALD TRIBUNE article, attached hereto as Exhibit 1.)

[4]    See, e.g., AC ¶ 142 ("Defendants, individually and collectively . . . began to execute a scheme to . . . conceal their intentions through a series of misstatements and omissions of material fact directed at U.S. and global securities markets . . . .").  On its face, this type of allegation fails to meet basic pleading standards.  Lance v. United Mine Workers of Am. 1974 Pension Trust, 355 F. Supp. 2d 358, 363 (D.D.C. 2005) (use of the term "defendants" without reference to any specific defendant is insufficient to plead a fraudulent statement), vacated on other grounds, 400 F. Supp. 2d 29 (D.D.C. 2005).  Nor is this Court bound to accept such conclusory allegations.  Bancoult v. McNamara, 214 F.R.D. 5, 9 (D.D.C. 2003) ("Bare allegations and conclusory statements are insufficient" to support personal jurisdiction).  In fact, the majority of the alleged statements were made within Russia to the Russian press in the Russian language and belie any assertion they were "directed" at the United States.

**6.    Plaintiffs fail to address Gazprom's arguments demonstrating that even the "totality" of plaintiffs' allegations are insufficient**

Plaintiffs are simply unable to surmount the fact that Gazprom is a Russian corporation – incorporated and doing business in the Russian Federation, with its principal place of business in Moscow – and that it does not have any offices, employees or property in the United States, that it has no contracts to do business in the United States, and that all of the acts it was alleged to have committed concerning this litigation were in the Russian Federation. (Gaz. Br. at 19-20.) Rather than address Gazprom's argument and authorities showing that *all* of the allegations in the amended complaint fail to establish general jurisdiction, plaintiffs simply regurgitate and bullet-point the original alleged contacts listed in their amended complaint. Plaintiffs make no attempt to address Gazprom's arguments and citations showing: (1) meetings with U.S. officials are not properly considered; (2) future plans are not sufficient to confer jurisdiction; (3) financing related to the jurisdiction is not sufficient to confer jurisdiction; and (4) an agreement with a U.S. company for work abroad does not confer jurisdiction. (Gaz. Br. at 16-19.)

Nor do plaintiffs cite any cases supporting their contention that all of the alleged contacts they offer (consisting of a single shipment of gas to the U.S., memoranda of understanding with U.S. companies, a contract with a U.S. company for work to be performed in Russia, and scattered financing and ADRs) are sufficient to establish general jurisdiction. Indeed, these "contacts" are insufficient. See Gaz. Br. at 19-20; see also Central Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 381 (5th Cir. 2003) (holding no general personal jurisdiction despite allegations that defendant frequently shipped products to and from forum and claim that defendant's employees were in forum on a "regular basis" to conduct business); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984) (holding inference of continuous and systematic contacts not justified by the purchase of goods from the forum,

acceptance of money drawn from the forum, and multiple business trips to the forum).  The simple and inescapable fact is that even if all of plaintiffs' alleged contacts were considered as a whole, they do not come close to being so systematic and continuous that they meet the "exacting standard" of approximating a "physical presence."  Schwarzenegger, 374 F.3d at 801. Accordingly, there is no basis for general jurisdiction over Gazprom.

**B.    The Amended Complaint Does Not Allege Continuous And Systematic Contacts Sufficient To Create General Jurisdiction Over Miller**

Plaintiffs have made clear that they are pursuing only a general personal jurisdiction theory with respect to defendant Miller.  (Pl. Br. at 21, n.8.)  It is preposterous, however, to suggest that Miller has engaged in such extensive business conduct in the U.S. that it would be fair to equate it with a "physical presence."  Plaintiffs' opposition brief makes clear that the only contacts Mr. Miller has had with the United States – three isolated trips over a span of years – were conducted in a business capacity on behalf of Gazprom.  (E.g., Pl. Br. at 35 ("Miller visited the United States" to "discuss Gazprom's entry into the U.S. market").)  But contacts made on behalf of an employer do not confer jurisdiction over a defendant in an individual capacity (as the cases cited on pages 20-21 of Gazprom's opening brief make clear).

In response, plaintiffs argue that "employees are not somehow insulated from jurisdiction by their employers."  (Pl. Br. at 35.)  The decision plaintiffs cite, Calder v. Jones, 465 U.S. 783 (1984), however, is completely removed from the facts of this case.  Calder was a specific jurisdiction case, in which authors of an article were sued for libel.  Id. at 788-89.  The Court distinguished the individual defendants' contacts as constituting an intentional tort in the forum. Id. at 789-90.  Unlike the defendants in Calder, there is no suggestion that Mr. Miller's contacts with the United States gave rise to this lawsuit, much less that they constituted an intentional tort within the forum.  Accordingly, Mr. Miller's scant contacts to the United States simply cannot be

considered for the purposes of determining jurisdiction over him.[5]  Moreover, plaintiffs make no attempt to rebut defendants' argument that contacts with the forum made for the purpose of meeting with the federal government are immune.  (Gaz. Br. at 16.)  Yet plaintiffs freely admit that during all three of Mr. Miller's visits to the United States he met with U.S. officials.  (AC ¶ 77.)  Under these circumstances, general jurisdiction over Mr. Miller simply cannot exist.[6]

### C. Forcing Gazprom Or Miller To Defend This Litigation In The District Of Columbia Would Violate Traditional Notions Of Fair Play And Substantial Justice

Even if the amended complaint did allege facts establishing systematic contacts by Gazprom and Miller with the United States, due process would not permit these defendants to be sued in the U.S.  See Asahi Metal Indus. Co. v. Sup. Ct. of Ca., 480 U.S. 102, 114 (1987).  Plaintiffs offer only the bare contention that defendants "do not face a significant burden in defending the suit here, especially when weighed against the United States' interest in protecting American investors."  (Pl. Br. at 37.)  Plaintiffs avoid explaining how it would be anything other than a colossal and unfair burden to force these Russian citizens to travel thousands of miles to defend this case in the U.S., particularly when not one of the relevant alleged acts or events took place in the United States, and when neither Gazprom nor Miller had *any* relationship with these plaintiffs or is alleged to have "acquired" anything belonging to Yukos or the plaintiffs.  Nor did either defendant "direct" any allegedly wrongful conduct to the U.S. (or to plaintiffs), or engage

---

[5]     While plaintiffs also assert (as they did with Gazprom) that "Miller made several fraudulent statements aimed at the U.S. securities markets" (Pl. Br. at 35-36), this contention is specious.  None of the allegations on which plaintiffs rely (AC ¶¶ 233, 263, 267-69) even remotely support this claim.  See note 4, above.

[6]     To the extent plaintiffs suggest (without argument) that their "conspiracy theory" of personal jurisdiction may be used ensnare Mr. Miller (Pl. Br. at 36), Mr. Miller incorporates and adopts the argument in section II(A)(1) of the Minister Defendants' Reply Brief, and section II(D) of the Rosneft Defendants' Reply Brief.  There is no indication this Court has adopted the "conspiracy" theory of jurisdiction within the context of federal long-arm jurisdiction.  Moreover, this theory cannot exist in the absence of allegations of a substantial overt act within the forum or that Mr. Miller had knowledge or awareness of any alleged activities in furtherance of the conspiracy in the U.S.  Plaintiffs have made no such allegations here.

in any colorably "actionable" conduct.  The absence of a plausible connection between these foreign defendants and this lawsuit makes the unfairness of requiring them to participate in this litigation especially acute.  See Ellicott Mach. Corp. v. John Holland Party, Ltd., 995 F.2d 474, 479 (4th Cir. 1993) (explaining the court should employ a "more concerned focus on . . . 'fair play and substantial justice'" when the defendant lacks significant contacts with the forum and the case is substantially connected to a foreign forum).

Furthermore, the interests of the forum and plaintiffs' interests are comparatively minimal.  Plaintiffs' claims concern, at best, indirect harm to the plaintiffs themselves because the direct injury (if any) was suffered by Yukos, which itself is located in the Russian Federation.[7]  As Russian citizens, there can be no dispute that Gazprom and Miller would be substantially burdened by being compelled to travel from the Russian Federation to the District to have this case submitted to a foreign jurisdiction's judicial system.  See Asahi, 480 U.S. at 114.  Gazprom and Miller cannot be sued here consistent with fair play and substantial justice.

### D.    Personal Jurisdiction Cannot Exist Because Plaintiffs Failed To Properly Serve Gazprom And Miller

Plaintiffs admit that they never even attempted to serve Gazprom or Miller pursuant to the terms of the Hague Convention.  Without any support, plaintiffs claim that the Russian Federation does not "apply" the Hague Convention, but make no effort to distinguish recent case law to the contrary (see Gaz. Br. at 23).[8]  Nor do plaintiffs contend that they made any attempt at service under the Hague Convention that was rebuffed.

---

[7]    Nor do plaintiffs have an answer to the fact that the United States District Court for the Northern District of Texas recently held that compelling Gazprom to defend a diversity case in Texas would violate the Due Process Clause.  Moncrief Oil Int'l, Inc. v. OAO Gazprom, Civ. A. No. 4:05-CV-353-Y, slip op. at 20-22 (N.D. Tex. March 21, 2006) (attached hereto as Exhibit 2).  Plaintiffs have not shown that the application of due process under Texas law has any meaningful difference from federal long-arm jurisdiction; indeed, "the Texas long-arm statute has been held to extend personal jurisdiction to the permissible limits of the Constitution."  Id. at 7.

[8]    Instead, plaintiffs merely cite to a reservation to the Hague Convention set forth by the Russian Federation.  (Pl. Br. at 39.)  Far from being conclusive evidence that the Russian Federation refuses to enforce the Hague

Even if, assuming that the Hague Convention did not apply here, plaintiffs have not properly served Gazprom or Miller. While plaintiffs contend that they served Gazprom by registered mail pursuant to Fed. R. Civ. P. 4(f)(2)(C)(ii), this claim fails for at least two reasons. First, despite the fact that service under this provision – mail requiring a signed receipt, "to be addressed and dispatched by the clerk of the court" – is only valid if it is not "prohibited by the law of the foreign country," plaintiffs never even suggest that service via registered mail is permissible in the Russian Federation. See Shaw v. District of Columbia, 2006 WL 1371681, at *5 (D.D.C. May 15, 2006) (Kollar-Kotelly, J.) (plaintiffs bear burden of demonstrating proper service of process). This is a crucial omission when public information indicates that, in the Russian Federation, service by registered mail is prohibited.[9] Second, plaintiffs failed to comply with the plain language of the rule, which requires the appropriate papers to be "addressed and dispatched by the clerk of the court to the party to be served." Plaintiffs' own filings demonstrate that the Clerk did not do so. Martinez v. White, 2006 WL 1530111, at *1 (N.D. Cal. June 2, 2006) (service improper when clerk of court did not address and dispatch service); Macri v. Yamauchi, 2002 WL 390223, at *3 (N.D. Ill. Mar. 11, 2002) (same); O'Donnell v. Shalayev, 2004 WL 2958698, at *6 (D.N.J. Dec. 22, 2004) (same). Finally, plaintiffs' theory that they "served" Gazprom by handing papers to Minister Khristenko is not sustainable, as

---

Convention, this reservation merely repeats Article 12 of the Convention itself – that payment for service of process may arise only from (a) the employment of a judicial officer or of a person competent under the law of the State of destination, or (b) the use of a particular method of service. Plaintiffs have cited to no source indicating the United States imposes payments above and beyond these, nor does any part of the reservation raised by the Russian Federation make any mention of the United States. Instead, numerous federal courts have found service pursuant to the Hague Convention was necessary in the case of Russian defendants. E.g., In re Yukos Oil Co., 321 B.R. 396, 410 n.9 (Bankr. S.D. Tex. 2005) (noting Russian defendants must be served pursuant to the Hague Convention); Marcantonio v. Primorsk Shipping Corp., 206 F. Supp. 2d 54, 56-59 (D. Mass. 2002) (same).

[9]      See Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, Nov. 16, 1965, Russian Federation Reservation VI ("Service of documents by methods listed in Article 10 of the Convention [postal channels] is not permitted in the Russian Federation."), available at http://www.hcch.net/index_en.php?act= status.comment&csid=418&disp=resdn. The United States State Department also recognizes this reservation. See http://travel.state.gov/law/info/judicial/judicial_680.html.

plaintiffs have previously admitted.  (See Docket No. 7 (11/16/05 Letter to the Clerk of Court indicating service upon Gazprom had not been effected)).[10]  Because Gazprom and Miller[11] have not been properly served, there can be no personal jurisdiction over them.

## II.    PLAINTIFFS' RESPONSE FAILS TO DEMONSTRATE A VIABLE SECURITIES FRAUD CLAIM

The amended complaint alleges that defendants, including government officials (who were purportedly motivated by political justifications), and competitors (who were allegedly motivated by competitive concerns), made various misstatements upon which plaintiffs may or may not have actually relied, but which ultimately turned out not to be true.  Plaintiffs allege these statements then "damaged" them when a Yukos division was auctioned to satisfy Russian tax liabilities.  With no legal support, plaintiffs attempt to shoehorn this claim into a federal securities fraud cause of action.  Their attempt fails, given:  (a) defendants did not owe Yukos ADR purchasers a duty of disclosure; (b) plaintiffs lack standing and fail to satisfy the "in connection with" requirement; (c) plaintiffs have not and cannot plead loss causation; (d) plaintiffs do not establish reliance; (e) plaintiffs have not pled a primary violation as required by

---

[10]    Plaintiffs' original concession that they had not "served" Gazprom by handing papers to Minister Khristenko, which they demonstrated by attempting to serve Gazprom by mail long after the handing to Minister Khristenko occurred, was correct.  It is well settled that directors of corporations are not officers, managing or general agents for the purposes of service of process.  See, e.g., Beachboard v. Trustees of Columbia Univ. in City of New York, 475 A.2d 398, 400 (D.C. 1984) (holding service on university trustee was not valid because trustee was not an officer, managing agent or general agent) (citing Pacific Lanes, Inc. v. Bowling Proprietors Ass'n of America, 248 F. Supp. 347, 349 (D. Or. 1965) ("Generally, a director is not considered as a 'managing agent,' as such, or other corporate representative, as is subject to service of process.")); Romand v. Zimmerman, 881 F. Supp. 806, 810 (N.D.N.Y. 1995) (holding board of trustees chairperson was not an officer of the hospital for purposes of Rule 4(h)); 4A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1102.

[11]    While plaintiffs claim that Miller was "served" at "his place of business by hand delivery and registered mail" (Pl. Br. at 39), this is incorrect (and deficient).  The very docket entries plaintiffs cite (nos. 37 and 38) demonstrate that Miller was not personally delivered these materials; in the case of the alleged "hand delivery," plaintiffs' agents merely handed documents to an unidentified Gazprom employee (a security guard).  Service on Mr. Miller accordingly was not effective.  See Martinez, 2006 WL 1530111, at *1; Macri, 2002 WL 390223, at *3.  In addition, plaintiffs' claim that Mr. Miller was served by registered mail fails for the same reasons such alleged service was ineffective with respect to Gazprom.

Central Bank; (f) plaintiffs have not pled defendants' scienter with particularity as required by the PSLRA; and (g) the amended complaint does not allege false statements.

## A. Plaintiffs Have Not Alleged The Requisite Duty To Yukos Investors

In arguing that they have alleged a viable securities fraud claim, plaintiffs cite to Roeder v. Alpha Indus., Inc., 814 F.2d 22, 27 (1st Cir. 1987), for the proposition that, because Gazprom and other defendants allegedly discussed Yukos publicly, defendants therefore owed plaintiffs a "duty to make [a] complete and accurate" disclosure. (Pl. Br. at 96.) But as discussed below, the Roeder decision hardly supports this proposition. Indeed, plaintiffs have cited no authority supporting their argument – and defense counsel is aware of none – that a competitive company like Gazprom, Rozneft, or their executives owe a "duty of complete and accurate disclosure" to a competitor's securities holders when discussing their competitor.[12]

Instead, the principal case relied upon by plaintiffs involves the duty of a corporation *to its own stockholders*. Roeder, 814 F.2d at 27 (discussing a corporation's duty to its own stockholders and finding that the defendants did not have a duty of disclosure).[13] The cases that plaintiffs cite actually stand for the unremarkable proposition that corporations have a duty *to*

---

[12]    Not only is there no support for such an obligation generally, but to create such an obligation without any statutory support for companies headquartered and operating in other countries or for sitting foreign government officials, is obviously even more absurd.

[13]    The other cases cited in footnote 57 of plaintiffs' response brief are the same. None involve shareholders bringing suit against a competing corporation. Moreover, in most of these cases the court found the defendant *did not* have a duty to speak. For example, in Ziemba v. Cascade International, Inc., 256 F.3d 1194 (11th Cir. 2001), the Court found an accounting firm and law firm employed by the shareholder's corporation were not "primary actors" and were not liable for alleged omissions. Id. at 1206. The same is true in In re Enron Corp. Sec., Derivative & "ERISA" Litig., 439 F. Supp. 2d 692 (S.D. Tex. 2006), in which the plaintiffs (Enron investors) were suing a lender to Enron (Barclays). The court granted summary judgment for Barclays, finding "the claims against Barclays amount to aiding and abetting and do not constitute primary violations of § 10(b) and Rule 10b-5(a) and (c) as a matter of law." Id. at 724. Worse yet, the passage quoted by plaintiffs from this case is taken out of context (Pl. Br. at 96 n.57); the full text states that a discussion of when a defendant has a duty to speak is irrelevant because the plaintiffs in In re Enron had conceded they were not alleging Barclays made omissions. Finally, in Roeder, the plaintiffs were similarly unable to show a duty to disclose based on their allegations. The court explained: "Roeder claims that a corporation has an affirmative duty to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures. The prevailing view, however, is that there is no such affirmative duty of disclosure." 814 F.2d at 27.

*their own investors* such that when they do speak, they are to disclose complete and accurate material information.  The cases do not stand for the notion that all corporations, governments, and government officials – around the world – owe a duty to a third-party corporation's shareholders when discussing another corporation.  Otherwise, Ford stockholders would have a securities fraud claim against General Motors and its management every time that a GM executive publicly criticized Ford or its products but did not also disclose completely and accurately everything else that is potentially material to a Ford stockholder's investment decision.  Such a broad reading of Section 10 is not only inconsistent with the entire securities regulatory scheme for domestic corporations, but to apply this new requirement to competing companies overseas and to foreign governments would be absurd.  Gazprom, Miller, and the other defendants simply cannot be held liable by stockholders in another company for alleged misstatements when they had no duty under the securities laws.  See Gaz. Br. at 35; Ontario Pub. Serv. Empl. Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27, 33-34 (2d Cir. 2004) (rejecting claims of stockholders of a corporation that had a business relationship with defendant for lack of standing); Berman v. Metzger, 1981 WL 1596, at *6 (D.D.C. Feb. 9, 1981); United States v. Crop Growers Corp., 954 F. Supp. 335, 350 (D.D.C. 1997).

### B.    Plaintiffs Lack Standing And Statements By Defendants Were Not "In Connection With" The Purchase Or Sale Of A Security

Closely related to plaintiffs' inability to demonstrate that defendants owed them a duty, defendants' alleged statements were not made "in connection with" the purchase or sale of securities as required.  Plaintiffs attempt to circumvent this requirement by pointing to cases involving a corporation's public tender offer for another company's stock and other similar situations, which are not applicable here.  Plaintiffs' lead case, Semerenko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000) (Pl. Br. at 109), involved the disclosure obligations of a corporation that

had made a public tender offer to the stockholders of the target company in connection with a merger agreement. In other words, it would be as if Gazprom had made a tender offer and signed a merger agreement with Yukos and the corresponding obligations that Gazprom would owe in connection with statements to Yukos' stockholders when tendering for their shares. Only then did the Third Circuit remand the issue for consideration of whether the "in connection with" requirement was satisfied.[14]

Plaintiffs' other case, Zelman v. JDS Uniphase Corp., 376 F. Supp. 2d. 956 (N.D. Cal. 2005), fares no better. Zelman involved investors in "equity-linked debt securities" that had a contractually-defined redemption value by reference to the value of a stock in another company. Id. at 958. In buying the debt security, the investor/plaintiffs "bought a specific contractual right to receive [the defendants'] stock" and "became a contingent purchaser of [that] stock." Id. at 961-62. Given these ties and specific contractual link to the equity securities, the court held the "in connection with" requirement was satisfied, noting that the misstatements by the company that issued the security "bear a 'direct relationship' to the value of the" debt security. Id. at 961.

Here, plaintiffs do not allege Gazprom made a public tender offer for Yukos shares (in contrast to Semerenko), that Yukos ADRs were contractually linked to Gazprom's stock price (in contrast to Zelman), or that they had a significant business relationship (as was found to be insufficient in Ontario Public Service Employees). Plaintiffs, who purport to rely upon statements by Yukos' competitors and other defendants, do not have standing, and defendants' statements are not "in connection with" the purchase or sale of a security required by Rule 10b-5.

---

[14]    Indeed, as noted in the later decision of Ontario Public Service Employees, 369 F.3d at 33-34, the court observed that the defendant in Semerenko did not "present[] a compelling argument in favor of standing," but found the situation "easily distinguishable" as a situation involving a merger between two companies. In contrast, the Ontario Public Service Employees court rejected the claim of plaintiffs that "instead of purchasing securities of the entity that made the alleged misrepresentations, they purchased securities of a company that had a business relationship with the misrepresenter." Id. at 32.

### C.    Plaintiffs' Response Fails To Demonstrate Loss Causation

While playing lip service to the Supreme Court's decision <u>Dura Pharmaceuticals, Inc. v.</u> <u>Broudo</u>, 544 U.S. 336 (2005), plaintiffs' brief actually demonstrates a conflation of transaction and loss causation.  Defendants address the loss causation issue at length in their motions to dismiss, yet plaintiffs' one-page analysis sums up their position as follows (Pl. Br. at 113-14):

> ADR Purchasers have met this [<u>Dura</u>] requirement by alleging that the Fraud Defendants' material misstatements or omissions and manipulative or deceptive acts caused ADR Purchasers to purchase Yukos ADRs at artificially inflated prices and that, as the Fraud Defendants' scheme became evident, the price of Yukos ADRs fell to near zero.

Plaintiffs' formulation of loss causation demonstrates only that they have attempted to allege transaction causation (not loss causation), <u>i.e.</u>, they would not have bought Yukos' securities but for defendants' alleged misrepresentation.  This approach is precisely what the Supreme Court rejected in <u>Dura</u>:  "We consider a Ninth Circuit holding that a plaintiff can satisfy this requirement – a requirement that courts call 'loss causation' – simply by alleging in the complaint and subsequently establishing that 'the price' of the security '*on the date of the purchase* was inflated because of the misrepresentation.'  In our view is that the Ninth Circuit is wrong."  544 U.S. at 338 (citation omitted) (italics in original).  Indeed, after the PSLRA, this is a statutory requirement.  15 U.S.C. § 78u-4(b)(4).

In attempting to provide support for their claims, plaintiffs rely principally upon <u>Lentell</u> <u>v. Merrill Lynch & Co.</u>, 396 F.3d 161 (2d Cir. 2005).  But that case affirmed the dismissal of an investors' complaint on loss causation grounds:  "'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'"  <u>Id.</u> at 173 (citation omitted) (alterations in original).

Plaintiffs have not met the requisite standard.  Neither the amended complaint nor

plaintiffs' response brief makes any attempt to comply with the congressionally-mandated loss causation pleading requirement under the PSLRA and Dura.  Plaintiffs fail to allege how the truth of each of the defendants' specific alleged false statements caused the price of the shares to drop, or how the timing of the alleged misstatement corresponds to a loss suffered by any of the plaintiffs who sold their shares over an 18-month period.  In fact, plaintiffs actually argue to the contrary:  "*Plaintiffs' claim is not for the loss or diminished value of ADRs*.  Rather, Plaintiffs' claim is for the uncompensated taking of Yukos, the company, and the physical assets on which its business was based."  (Pl. Br. at 11 (emphasis added); see also Pl. Br. at 10.)  Further, plaintiffs' own amended complaint discusses the public disclosure of the auction in July 2004, months before many of the alleged misstatements that allegedly caused their loss.  (AC ¶ 261.) In sum, not only do plaintiffs fail to allege that the falsity of specific alleged representations caused their loss, but their own brief belies any pretense of doing so, opting instead to make media headline-type conclusions of injury suffered by a "taking" – all of which fall woefully short of meeting their congressionally-mandated loss causation burden.

> **D.    Plaintiffs Cannot Establish Reliance On The Statements Of Unrelated Antagonistic Corporations And Other Entities**

Plaintiffs' response brief adopts the facile argument that, despite numerous storm warnings and disclosures by their own company which warned of significant risk, they may nevertheless reasonably rely on the statements of unrelated and allegedly antagonistic corporations, the Russian government and various government officials pursuant to a "fraud-on-the-market theory."  (Pl. Br. at 111-13.)  However, *none* of the cases cited by plaintiffs support this unprecedented expansion of the fraud-on-the-market theory.  See Basic Inc. v. Levinson, 485 U.S. 224, 248-49 (1988) (holding rebuttal presumption of reliance existed in a case by stock sellers for misstatements by their own corporation); In re PolyMedica Corp. Sec. Litig., 432 F.3d

1, *18 (1st Cir. 2005) (holding district court improperly determined that the market for the corporation's stock was efficient in a case brought by investors against their own corporation); Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 663 (5th Cir. 2004) (involving class action by stockholders in Crossroads for misstatements and omissions by their own company).  In short, plaintiffs have not cited a single case permitting a presumption of reliance – under the fraud-on-the-market theory or otherwise – where the party making the alleged statement is a competitive corporation, its executives, or the government and its officials, let alone foreign parties.

Finally, even if plaintiffs were entitled to a fraud-on-the-market presumption of reliance, the presumption is rebuttable.  Defendants' opening briefs detail how the timing of plaintiffs' ADR purchases bears no relation to defendants' alleged misstatements.  (Gaz. Br. at 40; Ros. Br. at 52-54; Min. Br. at 47-48.)  Defendants further rebut plaintiffs' claim of reliance by referencing how Yukos itself warned of the very risks that plaintiffs now claim were concealed.  (Id.)  In other words, the instant factual case presents the poorest scenario for a presumption of reliance, particularly given the numerous storm warnings provided to investors as pointed out in defendants' opening briefs, and as the trading record appended to the amended complaint also makes clear.  Despite this, plaintiffs make no attempt to meet their burden.  Instead, they cling to the fraud-on-the-market theory without ever explaining that no court has ever permitted a plaintiff to circumvent the reliance requirement in asserting a Section 10 claim against a competitor company (let alone a government and its officials) for alleged misstatements concerning the company in which the plaintiffs invest.[15]

---

[15]     Indeed, permitting plaintiffs to proceed untethered from any true reliance requirement runs afoul of the policy concerns expressed in the Supreme Court's decision in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 743 (1975), in which the Court expressed the grave problem with potentially abusive securities litigation and plaintiffs making broad and difficult to confirm claims of reliance upon a defendant's alleged statements.  The court in Ontario Public Service Employees noted that claims predicated upon "oral testimony cannot be adequately evaluated until presented to a jury, [for that reason] the [Blue Chip Stamps] Court wanted to protect companies from having to defend and settle cases that relied heavily on that form of evidence."  369 F.3d at 33.

E.    **Plaintiffs Cannot Circumvent The Supreme Court's <u>Central Bank</u> Decision By Simply Referring To Defendants' Conduct As A "Manipulative or Deceptive Device"**

Under the Supreme Court decision of <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994), only "*primary* violators" are liable under Rule 10b-5. This doctrine provides defendants with yet an additional ground for dismissal. Plaintiffs, however, seek to avoid the teaching of <u>Central Bank</u> by arguing that defendants' conduct violated Section 10 as a "manipulative or deceptive device" – not a material misstatement or omission. (Pl. Br. at 97-100.) There are a number of problems with plaintiffs' latest theory. First, whether phrased as a misstatement of material fact or otherwise engaged in "manipulative conduct," defendants must still be primary violators. Thus, in a case like <u>Central Bank</u>, an indentured trustee was alleged to have provided "substantial assistance" to a fraud scheme, but was found not to be a primary violator under Section 10(b) – in contrast to the entity that issued the worthless bonds and the underwriter, who were found to be primary violators:

> As an initial matter, the rules for determining aiding and abetting liability are unclear . . . . That leads to the undesirable result of decisions "made on an ad hoc basis, offering little predictive value" to those who provide services to participants in the securities business. "[S]uch a shifting and highly fact-orientated disposition of the issue of who may [be liable for] a damages claim for violation of Rule 10b-5" is not a "satisfactory basis for a rule of liability imposed on the conduct of business transactions."

511 U.S. at 188 (internal citations omitted) (alterations in original). In other words, the Supreme Court has sought to narrow the group of potential defendants to those that are truly central participants in the violation of U.S. securities laws. In contrast, plaintiffs here would impose liability not on those that were actually involved in the transactions relating to the purchase or sale of securities (Yukos and its officers), but on various third parties far removed from such transactions.

Further, the cases that plaintiffs cite in support of their "manipulative conduct" argument are unavailing and simply confirm that the defendant must be a primary violator. SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996), is typical of plaintiffs' cases. In First Jersey, the defendant was a broker-dealer that had sold securities to its own customers with undisclosed and excessive markups and without disclosing its own position in the market. Id. at 1456-58. Plaintiffs' other "manipulative device" cases similarly involve stockholder claims against their own corporations, brokers, and others working with them to defraud investors.[16]

All of plaintiffs' cases involve the participation by the defendant in a scheme whereby it *worked with* the issuer or broker-dealer to defraud its own investors in the marketplace. Indeed, plaintiffs cite no precedent for reaching third parties who did not in any way work with Yukos to issue stock or collectively mislead the market. Rather, the allegations of the complaint are just to the contrary – that defendants are in fact quite antagonistic to Yukos.

### F.    Plaintiffs' Response Makes Little Attempt To Overcome The Amended Complaint's Failure To Plead With Particularity Facts Giving Rise To A "Strong Inference" Of Scienter

Plaintiffs apparently reject the PSLRA's requirement that their amended complaint "with respect to each act or omission alleged to violate [Section 10], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   15

---

[16]    See In re Health Mgmt. Inc. Sec. Litig., 970 F. Supp. 192 (E.D.N.Y. 1997) (finding securities liability extends to the corporation that defrauded its stockholders, and also to that corporation's insiders who were officers and had knowledge of the fraud and assisted in its perpetration); Simpson v. AOL Time Warner Inc., 452 F.3d 1040 (9th Cir. 2006) (rejecting claims against AOL and Cendent Corporation that worked with Homestore.com resulting in an overstatement of revenues which misled investors, but still did not allege a primary violation); In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161 (D. Mass. 2003) (defendants sued as primary violators for participating in a scheme to fund, own, and operate sham companies designed to enter into "bogus software licensing agreements" with the other defendant corporation, thereby artificially inflating its revenues); In re USA Classic Sec. Litig., 1995 WL 363841 (S.D.N.Y. June 19, 1995) (holding corporate officers and underwriters alleged to have directly participated in the issuance of prospectus and concealed material adverse information violated Rule 10b-5); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472 (S.D.N.Y. 2005) (action by investors against Parmalat, its officers, directors, and banks which were all alleged to have affirmatively committed deceptive acts in connection with the financing of Parmalat and the related issuance of securities).

U.S.C. § 78u-4(b)(2). Indeed, just as the amended complaint ignores this standard (see, e.g., AC ¶ 394), plaintiffs' response makes the same type of conclusory generalizations. Plaintiffs argue that defendants' collective goal of "[m]aintaining investor confidence in such [Russian] markets enabled the Fraud Defendants to stem capital flight that would have adversely affected their personal fortunes, business prospects, and, in the case of the Russian Federation, the national economy." (Pl. Br. at 107.) Plaintiffs' grandiose language falls woefully short of pleading, with respect to each defendant, particularized facts demonstrating that his/its statements were knowingly false.

For example, plaintiffs allege that Miller made a statement on October 2, 2004 that Gazprom "'was not considering the possibility of taking part in an auction' of Yukos assets ([AC] ¶ 268), yet Gazprom registered as a bidder in the auction of YNG just two months later." (Pl. Br. at 108.) But, plaintiffs' very citation to this allegation proves the deficiency of their complaint. Plaintiffs have not alleged that Miller knew that at the time that he made the October 2, 2004 statement that months later Gazprom would consider participating in the auction. (Ultimately, plaintiffs' own complaint alleges that Gazprom did not bid in the auction – making the weakness of their complaint even more apparent.) Further, plaintiffs admit that the auction was announced on July 20, 2004 – months before they were purportedly misled by Miller's October 2, 2004 statement. (See AC ¶ 261.)

Plaintiffs' response provides other examples which similarly reveal the deficiency of plaintiffs' scienter allegations. Defendants' alleged statements that "YNG would be auctioned off 'in accordance with the law'" or that "President Putin stated that the Russian Federation was 'not interested in seeing Yukos go bankrupt'" yet more than one and a half years later commenced "involuntary bankruptcy proceedings against the company [Yukos]" (Pl. Br. at 108),

do not plead with particularity how defendants' alleged statements were knowingly false when made. This is even more apparent given the wide publicity concerning the massive Yukos tax fraud, public disclosures that YNG would be auctioned and numerous other "storm warnings."

Indeed, the weakness of plaintiffs' amended complaint becomes even more striking when contrasted with the principal case relied on in their discussion of scienter. The case, Novak v. Kasaks, 216 F.3d 300, 304 (2d Cir. 2000) (Pl. Br. at 106), involved investors in AnnTaylor who alleged that the company's "box and hold" inventory practice presented a false and misleading picture of the financial performance of AnnTaylor because a substantial and growing quantity of out-of-date inventory was stored in warehouses without ever being marked down. The court found scienter properly pled given that the complaint detailed how: (a) each of the defendants had discussed the need to mark down the inventory but then failed to do so out of a concern that it would damage the company's financial prospects; (b) the defendants' box and hold inventory practice violated the company's own written mark down policy as stated in the company's public filings; and (c) the defendants had made "repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth." Id. at 311-12. Under those circumstances, the court held that plaintiffs had met their burden of pleading the requisite knowing misconduct against AnnTaylor insiders.

Here, there is simply nothing akin to this in plaintiffs' amended complaint. Plaintiffs have pled no facts – let alone with particularity – giving rise to the inference that defendants made knowing misstatements. Instead, the crux of plaintiffs' securities fraud claim is that Gazprom, Miller, and other defendants "falsely touted" Yukos, thereby inflating the value of the stock; but plaintiffs never really answer why the defendants would knowingly do so if their goal was to obtain control of Yukos' assets on the cheap. Instead, they make a circular argument

(relegated to footnote 66), that defendants wanted to "limit the damage" of an "expropriation" through a "rigged auction" and "false tax assessments" – which still does not plead why Gazprom or any of the other defendants would want to inflate the value of Yukos ADRs. Indeed, it would have been in Gazprom's interest to announce that it intended to participate in the auction (if it intended to do so), and then to talk down the value of Yukos assets – not inflate them. Thus, not only does the complaint plead conclusions only, but plaintiffs' illogical theory makes a poor case for relaxing a statutory mandate to plead scienter with particularity.

### G. Plaintiffs Do Not Allege A Misstatement

Plaintiffs spend significant time unjustly parsing the grammatical structure of the defendants' alleged misstatements in an effort to show they were, in fact, false or misleading. (Pl. Br. at 100-06.) However, this exercise is merely an attempt to distract the Court from the obvious holes in their theory.[17] First, plaintiffs do not answer the fundamental proposition that defendants have no duty to disclose their own internal deliberations. Chiarella v. United States, 445 U.S. 222, 230-33 (1980). This is especially true where plaintiffs' sole allegation is that such disclosures would have alerted plaintiffs to defendant's allegedly illegal scheme to "expropriate and re-nationalize Yukos without payment of any compensation to the company's owners."[18] E.g., AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 228 (2d Cir. 2000) ("the duty to disclose facts . . . does not entail a duty . . . to disclose culpability or impure motives"); Panter v. Marshall Field & Co., 646 F.2d 271, 288 (7th Cir. 1981) ("[S]ince a shareholder cannot recover

---

[17]    For example, plaintiffs make no answer to the fact that they have alleged no misstatements by Minister Sechin. (Pl. Br. at 100-06.)

[18]    E.g., AC ¶¶ 151-53 (alleging defendant Medvedev's failure to disclose that Khodorkovsky's arrest was "a step in the scheme to expropriate and re-nationalize Yukos without payment"); 176 (alleging defendant Yusufov's omission that the Russian Federation had no intention of allowing the acquisition of YukosSibneft by ExxonMobil because of "their fraudulent scheme to expropriate Yukos"); 194-95 (alleging defendant Medvedev's omission that defendants intended to "expropriate Yukos without compensation"); 236 (alleging defendant "Kudrin omitted the material fact that the Russian Federation's executive controls the judiciary, rendering the outcome of the investigation preordained"); 272 (alleging Khristenko "sidestepped the issue" of competition in the auction).

under 10b-5 for a breach of fiduciary duty, neither can he 'bootstrap' such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction."); Lewis v. Chrysler Corp., 949 F.2d 644, 651-52 (3d Cir. 1991) (same).

Additionally, plaintiffs' in-depth treatment of antecedent pronouns notwithstanding, they are still unable to disguise the fact that many of the alleged misstatements were simply taken out of context.  For example, in numerous cases, plaintiffs take general statements about the Russian Federation's policies and attempt to impute a Yukos-specific connotation.  (E.g., AC ¶¶ 151 (discussion about equal application of the law), 189 (discussion about direction of Russian economic policy).)  Plaintiffs admit as much in the case of defendant Medvedev's November 2, 2003 statement.  (Pl. Br. at 104.)  Similarly, plaintiffs attempt to contort otherwise benign statements to contain sinister meanings.  (AC ¶¶ 194-95 (statement about equal application of the law); 173 (statement that it would be positive if ExxonMobil acquired a stake in YukosSibneft).)  Plaintiffs' securities law claim should be dismissed.

## III.    THE "INSIDER TRADING" COUNT AGAINST GAZPROM IS GROUNDLESS

### A.    The Amended Complaint Fails To Support Reinhardt's "Tippee" Theory Of Insider Trading

In their response, plaintiffs freely and frequently make contentions and assertions contained nowhere in their amended complaint in a strained effort to hold Gazprom liable for insider trading as a "tippee" – a theory disclosed for the first time in plaintiffs' response brief.  As plaintiffs concede, this theory of insider trading requires allegations (and proof) that an "insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee, and the tippee knows or should know that there has been a breach."  Dirks v. SEC, 463 U.S. 646, 660 (1983).  The amended complaint, however, is silent about the "source" of

Gazprom's "inside" information and never alleges any facts suggesting that the (unidentified) source had breached any duty to anyone or that Gazprom (as the supposed tippee) knew or should have known that there had been a breach by the "tipper." On this key point, the amended complaint alleges only that "in late May 2004," Gazprom supposedly "received" information regarding the outcome Yukos' tax litigation. (AC ¶ 240.)

Plaintiffs' recognition of the deficiency of the actual allegations in the amended complaint is confirmed by their bald effort to rewrite their amended complaint. Plaintiffs' response states that "[t]he only manner in which Gazprom could have received this information is if a government official who knew the outcome to be preordained and breached a duty of trust or confidence, or a court employee breached a duty owed to the court to keep the information secret." (Pl. Br. at 124.) These contentions, of course, are not in the amended complaint, and plaintiffs cannot add by way of their brief what is not contained in the amended complaint itself. Arbitraje Casa De Cambio, S.A. v. USPS, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("'It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'"); Mazloum v. District of Columbia, 442 F. Supp. 2d 1, 26 n.7 (D.D.C. 2006) ("plaintiff cannot further amend his complaint through an opposition brief"). Moreover, plaintiffs are simply wrong to theorize in their response that the "only manner" in which Gazprom could have learned of the alleged information was from a court/government official who "breached" his or her duty: given the absence of any allegations as to the source of the supposed information or the manner in which Gazprom "received" the information, it is just as plausible that Gazprom "received" the information from a source many steps removed from the original "insider," and that the downstream source may not have owed (much less breached) a duty to anyone, or provided Gazprom with any reason to know of any breach of duty. The sparse

allegations plaintiffs actually included in the amended complaint conclusively demonstrate that a "tippee" theory of insider trading has not been properly alleged.[19]

### B.    Reinhardt Has No Standing To Pursue Any Insider Trading Claim

The amended complaint itself demonstrates that Reinhardt did not come close to trading contemporaneously with the alleged trade he challenges – indeed, his trades occurred two weeks before the challenged, alleged transaction and his others occurred months before and after it – and thus that he has no standing to pursue a section 20A(a) claim.  Plaintiffs make no effort to dispute or distinguish the numerous authorities Gazprom cited establishing (a) that a plaintiff bringing an insider trading claim cannot seek to recover for trades made before the defendant's trades, and (b) that the plaintiff must trade *when* the defendant trades to state a viable claim.  (Gaz. Br. at 48-50.)  Instead, plaintiffs again resort to "facts" outside the amended complaint and assert that the term "'contemporaneously' may embrace the entire period while relevant material non-public information remain[s] undisclosed."  Both positions are unfounded.

As a threshold matter, plaintiffs cannot be permitted to contradict their own amended complaint by making new, opposing claims in their response brief.  In their response brief, plaintiffs now assert that Yukos filed its tax appeal on May 6, 2004 and that "[i]mmediately after Yukos filed this appeal, an employee of the court informed Gazprom that . . . Yukos was to

---

[19]    The cases cited by plaintiffs in support of their "tippee" theory simply confirm that the amended complaint is deficient.  In Dirks v. SEC, 463 U.S. 646, 665-68 (1983), the Court ruled that there was no actionable insider trading because the insiders did not breach their fiduciary duty to the source of the information in passing information to the defendant, and therefore the defendant did nothing wrong by passing that information on to investors and the WALL STREET JOURNAL.  In United States v. Chestman, 947 F.2d 551, 570-75 (2d Cir. 1991), the court reversed a stockbroker's conviction for insider trading because the "tipper" did not have a fiduciary relationship with the source of the information.  In United States v. Victor Teicher & Co., 785 F. Supp. 1137 (S.D.N.Y. 1992), the court upheld an insider trading conviction because the evidence established that the insider/tippers owed their employers a fiduciary duty, that the tippers breached that duty by misappropriating confidential information and providing it to the defendant, and that defendant knew of the tipper's breach.  The fact that these cases turned on fine distinctions in the tipper's duty and breach of duty and/or the defendant/tippee's knowledge of such a breach perfectly illustrates that allegations on these issues had to be included in plaintiffs' amended complaint.  Because the amended complaint is silent on these critical facts, it cannot be sustained.

lose." (Pl. Br. at 125.) Plaintiffs, however, simply cannot amend, and contradict, their amended complaint by including in their response brief the suggestion that Gazprom "received" the information "immediately after" May 6, 2004, when the amended complaint itself very clearly and plainly alleges that Gazprom "received" the information on the outcome of Yukos' tax appeal in "late May 2004" (AC ¶ 240) (just as plaintiffs cannot gratuitously claim in their response that "an employee of the court informed Gazprom that . . . Yukos was to lose"). See Arbitraje Casa De Cambio, 297 F. Supp. 2d at 170; Mazloum, 442 F. Supp. 2d at 26 n.7. Thus, even if contemporaneity could be stretched to include the "entire period while relevant material non-public information remain[s] undisclosed," the amended complaint itself sets forth a very short period during which Gazprom allegedly had or acted on "nonpublic" information: from "late May 2004" (when it "received" the allegedly nonpublic information regarding Yukos' tax claim litigation), until May 26, 2004 (when the decision rejecting Yukos' tax appeal was announced). Reinhardt, however, either purchased ADRs long before Gazprom allegedly "received" or acted on any inside information (his first two purchases), or long after the tax decision was announced (his third and final purchase). Thus, even under plaintiffs' tortured definition of contemporaneity, Reinhardt still cannot pursue an insider trading claim.[20]

---

[20]    The sole case that plaintiffs cite in support of their unduly expansive definition of contemporaneity, In re American Bus. Computers Corp. Sec. Litig., 1994 WL 848690 (S.D.N.Y. Feb. 24, 1994), cannot serve to replace the very narrow definition of that term repeatedly and recently employed by numerous federal courts, as shown in Gazprom's opening brief at pages 48-49. First, the court in American Business Computers was presented with a class action in which it was alleged "that certain plaintiffs purchased on the same day as certain defendants sold" the subject stock. Id. at *4. Consistent with this, the court applied a rule that "a class action may be maintained on behalf of all persons who purchased stock . . . during the period the defendants were selling that stock on the basis of inside information." Id. Thus, the court in American Business Computers in fact employed a narrow definition of contemporaneity that, if applied to Reinhardt's supposed trades, would bar his claims because he did not come close to trading when Gazprom was supposedly short-selling stock "on the basis of inside information." Second, the dicta cited by plaintiffs from the American Business Computers opinion, in turn, relied on a 1974 opinion, Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, 495 F.2d 228 (2d Cir. 1974), which long preceded the enactment of section 20A in 1988. Tellingly, in Shapiro itself, a short and overlapping window for the defendants' and plaintiffs' trades was involved – June 20-24, 1966 – which, if applied here, again would bar Reinhardt's claims. Id. at 232-33. As shown in Gazprom's brief, the authorities applying section 20A(a) have overwhelmingly applied a very short window in determining whether contemporaneous trades occurred. The narrow time frame is "reasonable, if not inevitable, as the modern realities of the securities markets support an increasingly strict application of

C.     **Plaintiffs' Response Shows That Securities "Of The Same Class" Were Not Traded**

Plaintiffs' response also confirms that Reinhardt did not trade in "securities of the same class."  Indeed, the response makes clear that Gazprom supposedly traded Yukos common shares while Reinhardt traded in a separate and distinct security, ADRs.  (Pl. Br. at 125.)  Rather than even attempt to distinguish Gazprom's authorities establishing that these simply are not securities of the same class, plaintiffs baldly claim that "[i]n effect, . . . Yukos ADRs and Yukos shares are one and the same in that the ADRs are simply receipts that represent a specified number of the underlying shares."  (Id.)  The single case cited by plaintiffs, Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d Cir. 2002), however, did not address the question of whether ADRs are in the "same class" as common stock under section 20A and, indeed, observed that "the holder of an ADR is not the title owner of the underlying shares."  Id. at 367.  Because plaintiffs have offered no reason to doubt the conclusion that Reinhardt and Gazprom did not trade in "securities of the same class," Reinhardt's insider trading claim must be dismissed.

D.     **The Insider Trading Claim Fails To Comply With The PSLRA**

Plaintiffs' frequent attempts in their response brief to augment and add to the allegations in the amended complaint (for example, on their now divulged "tippee" theory and by attempting to advance the time at which Gazprom supposedly "received" information) highlights their failure to comply with the heightened pleading standards of the PSLRA.  This is also true of plaintiffs' improper attempt to rewrite the amended complaint in their brief by claiming that the amended complaint "plainly" alleges "that Gazprom received material, nonpublic information that stated that the Moscow Arbitration Court was to uphold [the] Russian Federation's tax

---

contemporaneity in order at once to satisfy the requirement's privity-substitute function and to guard against 'mak[ing] the insider liable to all the world.'"  In re MicroStrategy Inc. Sec. Litig., 115 F. Supp. 2d 620, 663 (E.D. Va. 2000) (citation omitted).

claims against Yukos." (Pl. Br. at 123.) This is untrue. The amended complaint alleges only that Gazprom "received material, nonpublic information regarding the outcome of Yukos's pending challenge to the Russian Federation's tax demands." (AC ¶ 240.) The actual allegations fall far short of the PSLRA and render the insider trading claims fatally deficient. See In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 916 (S.D. Tex. 2001).

### E.    The Amended Complaint Fails To Allege A Predicate Violation

Plaintiffs concede that a section 20A claim must be predicated on a separate violation of the 1934 Act or its rules and regulations. (Pl. Br. at 125-26.) Because plaintiffs' securities fraud theories cannot proceed, Reinhardt's insider trading claim fails for this reason as well.

## IV.    PLAINTIFFS' RICO CLAIMS ARE BASELESS

### A.    Plaintiffs Lack RICO Standing

No matter how hard plaintiffs' response brief tries to recast simple reality, the amended complaint is clear: as ADR holders in Yukos, these "RICO" plaintiffs' alleged injury arises solely from their status as shareholders in, and alleged harm in the first instance to, Yukos. (E.g., AC ¶¶ 10, 310.) Defendants demonstrated in their opening papers that these plaintiffs have no standing to pursue RICO claims. (Gaz. Br. at 51-52; Ros. Br. at 33-36; Min. Br. at 27-29.)[21]

Plaintiffs' authorities cited in support of their theory that they have suffered a unique, direct injury (Pl. Br. at 129-30) do not even suggest that a different conclusion is warranted. In Maiz v. Virani, 253 F.3d 641 (11th Cir. 2001), the plaintiffs alleged that, as individuals, they

---

[21]    Plaintiffs incorrectly argue that "[a] RICO plaintiff may even recover for injuries suffered indirectly as a result of the predicate acts, as long as the plaintiff's injuries flow 'from the total effect of the pattern of racketeering in the enterprise'" (Pl. Br. at 128-29), misquoting Sperber v. Boesky, 849 F.2d 60, 63 (2d Cir. 1988). Plaintiffs omit to state that the Supreme Court has held that a RICO plaintiff must satisfy three requirements: (i) injury to its business or property, (ii) that is directly caused, (iii) by a violation of § 1962. Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258 (1992). Proximate cause demands that there be a direct relationship between the injury asserted and the predicate act alleged. Id. at 268. Even the Sperber decision concluded that the plaintiffs did not have standing: "Plaintiffs here were neither the target of the racketeering enterprise nor the competitors nor the customers of the racketeer. . . . Congress did not intend us to allow RICO recovery to plaintiffs with claims as attenuated as these." 849 F.2d at 65.

were fraudulently solicited by defendants to invest in real estate.  Id. at 649-51.  After plaintiffs

made their individual investments, they formed several corporations to which they eventually

transferred their interests.  Id. at 654.  The court held that the defendants "targeted their wrongful

acts at the individual plaintiffs" and that "[d]efendants' scheme was not designed to inflict harm

on the corporations, but rather to damage the Plaintiffs."  Id.  In addition, the majority of the

alleged wrongdoing – including the primary wrong – occurred "well in advance of the chartering

of the corporations."  Id. at 655.  Not surprisingly, the court found that the plaintiffs had standing

to proceed with their RICO claims.  Id. at 655-56.  In the instant case, by contrast, plaintiffs have

not even attempted to plead any facts that a single ADR holder was individually targeted or

suffered any harm distinct from Yukos or other ADR holders.  By their own reckoning, these

ADR holders' only alleged injury occurred because Yukos was the alleged target of a scheme of

re-nationalization.  Maiz only serves to confirm that these plaintiffs lack standing.[22]

Plaintiffs' argument that shareholders supposedly have standing when a defendant

violates RICO to "seize" control of a company is also misplaced.  In the single case cited by

plaintiffs, Reuther v. Smith, 2002 WL 1303119, at *6 (E.D. La. June 12, 2002), the plaintiff was

a director, CEO and largest shareholder of several closely-held corporations, and the defendant

was the President and general counsel to the corporations.  Id. at *1.  The defendant pursued a

series of attacks specifically directed at the plaintiff, including discharging the plaintiff from his

positions.  Id. at *3.  Not surprisingly, the court held that the alleged goal was "to injure [the

---

[22]    Plaintiffs' other cases are equally unavailing.  In Beck v. Prupis, 162 F.3d 1090 (11th Cir. 1998), aff'd, 529
U.S. 494 (2000), a former president, director and creditor of a corporation claimed he was fired and fraudulently
induced by other directors of the corporation to make personal investments.  Id. at 1094.  The court held that even
though the plaintiff was a shareholder, his claims were not related to his status as a shareholder and, therefore, the
plaintiff had standing to sue on his own behalf.  Id. at 1096 n.10.  In plaintiffs' other case, Cowin v. Bresler, 741
F.2d 410, 416 (D.C. Cir. 1984), which was not even a RICO case, a shareholder was held not to have special injury
because it could not show that defendants breached any duty distinct to those owed to the corporation.

plaintiff] directly" and, therefore, the plaintiff had standing to sue on his own behalf.  Id. at *6.[23]

In the instant case, by contrast, the principal allegation is that the "goal" was to injure Yukos by "expropriating" its YNG asset.  Reuther simply confirms that the RICO plaintiffs lack standing and that Counts IV, V and VI must be dismissed.

### B.    Plaintiffs' RICO Claims Are Barred By The PSLRA

Plaintiffs cannot overcome the fact that it is not necessary that the *particular* RICO plaintiff be able to maintain a claim for securities fraud.  The law is clear that, if the alleged conduct is actionable as securities fraud, any RICO claim by any plaintiff is barred.  For example, in Gatz v. Ponsoldt, 297 F. Supp. 2d 719, 731 (D. Del. 2003), the plaintiffs contended, just as plaintiffs do here, that the PSLRA did not apply because the plaintiffs "have not alleged that they were purchasers or sellers of securities."  The court rejected the plaintiffs' contention, explaining that "[w]hether plaintiffs were purchasers or sellers of securities would only be relevant to the inquiry of their standing to bring a securities fraud claim, whereas the PSLRA's exclusion of securities fraud as a RICO predicate act applies regardless of whether a particular plaintiff has standing to bring a civil action under § 10b and Rule 10b-5."  Id.[24]  By filing an

---

[23]    Plaintiffs' citation to Bivens Gardens Office Bldg., Inc. v. Barnett Banks, Inc., 140 F.3d 898, 907 (11th Cir. 1998), is misplaced.  The Bivens court held that shareholders lacked standing because the actions of defendants were directed toward the corporation.  Id. at 908.  With respect to one plaintiff that alleged a separate injury to his particular shares, the court noted in dicta that the "alleged injury is direct" but did not analyze whether that plaintiff had standing to pursue the claim finding the claim was time-barred.  Id. at 907.

[24]    See also In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 619 (S.D. Tex. 2003) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws.  The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws; its wording ('no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962') does not make such a connection."); Fla. Evergreen Foliage v. E.I. duPont de Nemours & Co., 165 F. Supp. 2d 1345, 1358 (S.D. Fla. 2001) (holding "the fact that Plaintiff-Growers are not DuPont shareholders and therefore cannot bring a securities fraud claim against DuPont does not preclude the use of [the PSLRA] to bar their claim," court rejected plaintiffs' argument that PSLRA operates to bar RICO claims only if claims could be actionable by same plaintiff), aff'd, 341 F.3d 1292 (11th Cir. 2003); Howard v. America Online Inc., 208 F.3d 741, 749 (9th Cir. 2000) (barring RICO action where alleged conduct underlying claims could have been actionable securities fraud despite plaintiffs' lack of standing to assert those claims); Columbraria Ltd. v. Pimenta, 110 F. Supp. 2d 542, 548 (S.D. Tex. 2000) (holding RICO bar would apply even though particular plaintiff

amended complaint asserting a securities law claim for the same underlying alleged conduct, plaintiffs have eloquently illustrated their own belief that another plaintiff can attempt to bring a securities fraud claim.[25]  Thus, plaintiffs are forced to invent a nonexistent "conflict" among the courts.  The sole case cited by plaintiffs as an "example" of a conflicting authority is inapplicable – the case does not even involve securities.  In <u>Fleet National Bank v. Boyle</u>, 2005 WL 2455673 (E.D. Pa. Sept. 12, 2005), the plaintiff brought various causes of action against the defendants, including RICO, alleging that the defendants had a fraudulent scheme to obscure their true financial performance.  The defendants argued that the RICO claims should be barred under the PSLRA because Form 10-K annual reports signed by defendants were part of the allegedly fraudulent reports relied on by the plaintiff.  <u>Id.</u> at *4.  The court rejected this argument because the case did not involve the purchase or sale of securities at all.  Thus, <u>Fleet National Bank</u> is easily distinguishable because unlike the instant matter, securities simply had no role in the case.

Because plaintiffs' RICO claims are barred, the RICO counts must be dismissed.

---

was time-barred from suing under Rule 10b-5); <u>Hollinger Int'l, Inc. v. Hollinger Inc.</u>, 2004 WL 2278545, at *7 (N.D. Ill. Oct. 8, 2004) ("[T]he RICO bar operates irrespective of whether the RICO plaintiff has standing to bring a securities claim – <i>i.e.</i>, was a purchaser or seller of the company's stock – as long as another plaintiff could bring a securities action based on the alleged conduct."); <u>Hemispherx Biopharma, Inc. v. Asensio</u>, 1999 WL 144109, at *4 (E.D. Pa. Mar. 15, 1999) (holding that the RICO amendment barred suit even though particular plaintiffs had no cause of action under Section 10(b)).

[25]      Plaintiffs also argue that some of plaintiffs' RICO claims are not dependent upon their securities fraud claim and, therefore, should survive the PSLRA bar.  Plaintiffs have not, and cannot, separate their RICO claims from their overarching securities fraud theory:  according to plaintiffs, it was all part of the scheme to re-nationalize Yukos.  (<u>See, e.g.</u>, AC ¶ 386, incorporating all allegations in preceding paragraphs into securities fraud count.)  In determining whether the alleged predicate acts are barred, courts focus their analysis on whether the conduct pled as the predicate offense is "actionable" as securities fraud by carefully examining the predicate acts in relation to the overall fraudulent conduct to determine if they are part of a scheme that allegedly operated as a fraud on sellers or purchasers of securities.  <u>Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.</u>, 189 F.3d 321, 329-30 (3d Cir. 1999) (ignoring plaintiffs' "surgical precision" of the facts to avoid the PSLRA bar, court found that RICO predicate acts were an integral part of defendants' securities fraud scheme and, therefore, barred); <u>see also Jacoboni v. KPMG LLP</u>, 314 F. Supp. 2d 1172, 1179-80 (M.D. Fla. 2004) (barring RICO claims after finding predicate acts that were not actionable as securities fraud were alleged by plaintiff to be wrongful acts committed by defendant as part of a single fraudulent scheme, therefore, "all of the acts must be considered together for securities fraud purposes"); <u>Stephenson v. Deutsche Bank AG</u>, 282 F. Supp. 2d 1032, 1071-72 (D. Minn. 2003) (barring RICO claims, based on the same larger scheme, despite plaintiffs' attempt to plead RICO claim in the alternative to securities law claims); <u>Tyrone Area School District v. Mid-State Bank & Trust Co.</u>, 1999 WL 703729, at *4-*6 (W.D. Pa. Feb. 9, 1999) (despite "artfully craft[ing]" the RICO allegations to "avoid any mention of securities fraud," court found the racketeering activities were done in furtherance of scheme and were "inextricably linked" to the securities fraud).

### C.        Plaintiffs Fail to Allege A Pattern of Racketeering

Plaintiffs also have failed to allege the requisite pattern of racketeering against any of the defendants.  The amended complaint (and plaintiffs' response brief) cannot use a "group pleading" theory to establish racketeering activity: each defendant's conduct and liability for each predicate act must be established.  See, e.g., Dooley v. United Techs. Corp., 803 F. Supp. 428, 438 (D.D.C. 1992); First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 180 (2d Cir. 2004).  Moreover, after Central Bank, a defendant cannot be held liable for aiding and abetting another defendant's predicate acts.  Pa. Ass'n of Edwards Heirs v. Rightenour, 235 F.3d 839, 843-44 (3d Cir. 2000); Cobbs v. Sheahan, 385 F. Supp. 2d 731, 738-39 (N.D. Ill. 2005); Craig Outdoor Adv., Inc. v. Viacom Outdoor, Inc., 2005 WL 1279046, at *4 (W.D. Mo. May 25, 2005).  Plaintiffs have failed to allege that each defendant individually engaged in a pattern of racketeering activity and have failed to show that any of the five alleged predicate acts could have been or were committed by any of the defendants.

### 1.        Plaintiffs have not adequately alleged any violation of the Hobbs Act

Plaintiffs simply ignore that they cannot allege that *their* property was obtained by any defendant – much less all, which is required in order to state a claim under the Hobbs Act, 18 U.S.C. § 1951(b)(2).  O'Rourke v. Crosley, 847 F. Supp. 1208, 1215 & n.8 (D.N.J. 1994).  Nor can plaintiffs overcome the fact that none of the RICO Defendants obtained any property, whether it is Yukos' or plaintiffs' property.  Plaintiffs' Hobbs Act allegations are likewise fatally defective because they:  (1) have not alleged that any of their property was taken without their consent (and cannot, given that plaintiffs still hold their ADRs); (2) do not provide any authority to support their argument that the Hobbs Act should apply extraterritorially to foreign officials acting in their home country; and (3) cannot assert liability for this predicate act by arguing in

their response brief that the defendants "aided and abetted" other persons.[26]

### 2. Plaintiffs have not adequately alleged any violation of the Bankruptcy Fraud Act

Plaintiffs also fail to allege a predicate act against any RICO Defendant under the bankruptcy fraud act, 18 U.S.C. § 152. First, plaintiffs' amended complaint fails to assert any allegation that any of the RICO Defendants received any of Yukos' property at any time, including after Yukos filed its bankruptcy petition in Houston. Second, even assuming a RICO Defendant obtained Yukos' property (which none did), plaintiffs' novel attempt to create primary liability for all the defendants for allegedly aiding and abetting is baseless. As discussed above, courts no longer allow aiding and abetting to establish RICO predicate acts.

While plaintiffs suggest that a "conspiracy" to violate § 152 is a proper substitute for alleging facts establishing each defendant's commission of a predicate act, the cases plaintiffs cite do not even address this issue. See United States v. Cardall, 885 F.2d 656, 678 n.43 (10th Cir. 1989) (discussing jury instruction charging defendant with fraudulent actual receipt of

---

[26]    Plaintiffs fail to cite a single case that suggests that a violation of the Hobbs Act has been pled as to any of the RICO Defendants. For example, in Stirone v. United States, 361 U.S. 212, 213-19 (1960), the Court reversed a Hobbs Act conviction of a union officer accused of extorting cash from employers by threatening labor disputes and loss or obstruction of material supply. Likewise, in United States v. Buffey, 899 F.2d 1402, 1403-07 (4th Cir. 1990), the court reversed a Hobbs Act conviction for attempted extortion of Virginia businessman by use of an audio tape of his sexual encounter, finding no effect on interstate commerce. Plaintiffs' other cases are just as unhelpful. See United States v. Edwards, 324 F. Supp. 2d 10, 11-15 (D.D.C. 2004) (allowing Hobbs Act charges to proceed against D.C. department of health asbestos inspector for demanding bribe from asbestos removal contractor in Virginia to secure contract and proper permit); United States v. Sutton, 337 F.3d 792, 794-96 (7th Cir. 2003) (upholding Hobbs Act convictions for multiple armed robberies in Wisconsin); United States v. Arena, 180 F.3d 380, 389-96 (2d Cir. 1999) (affirming Hobbs Act convictions for acid attacks on New York medical facilities that provided abortion services); Wiwa v. Royal Dutch Petroleum Co., 2002 WL 319887, at *25 (S.D.N.Y. Feb. 28, 2002) (noting allegations against Nigerian military of murder, arson and violating Hobbs Act); United States v. Tillem, 906 F.2d 814, 821-24 (2d Cir. 1990) (upholding Hobbs Act convictions of New York health department employees for bribing restaurant owners; reversing conviction of non-health department employee for aiding and abetting); United States v. Green, 350 U.S. 415, 417-20 (1956) (sustaining Hobbs Act charges against Illinois union and union representative for exacting wages from employer for superfluous and fictitious services); United States v. Santoni, 585 F.2d 667, 670-73 (4th Cir. 1978) (affirming Hobbs Act convictions of Baltimore city officials extorting kickbacks for future contracts and evasion of inspections); United States v. Marcy, 777 F. Supp. 1393, 1395-97 (N.D. Ill. 1991) (allowing Hobbs Act claims to proceed against defendants alleged to be part of group in Chicago that accepted money in exchange for their influence over official decisions); United States v. Saadey, 393 F.3d 669, 672-76 (6th Cir. 2005) (reversing Hobbs Act conviction of non-government official who participated in bribery scheme to fix criminal cases by prosecutors, defense attorneys and judges in Ohio).

property belonging to a bankrupt's estate); <u>United States v. Wernikove</u>, 214 F. Supp. 112, 116 (E.D. Pa. 1963) (court merely noted that bankrupt's relatives were charged with conspiracy in ruling on discovery motion). Indeed, the RICO statute itself separates out conspiracy from primary liability (which plaintiffs have asserted in this case). Moreover, the conspiracy plaintiffs describe in their brief appears nowhere in the amended complaint. While plaintiffs' claim in their response brief that "they," <u>i.e.</u>, defendants, "set up . . . BFG as a vehicle for fraud, lent BFG money to purchase YNG," and "then had Rosneft acquire BFG" (Pl. Br. at 135), the allegations in the amended complaint fail to set forth "concerted" action by any of the RICO Defendants. Plaintiffs have not set forth any allegations that support a finding that any defendant violated the bankruptcy fraud statute (and fail to show that their fraud allegations were made with particularity). Accordingly, this theory fails.

### 3. Plaintiffs have not adequately alleged any violation of the Travel Act

Plaintiffs have not alleged facts meeting any of the required elements of the Travel Act for any defendant. As plaintiffs' response makes clear, plaintiffs rely solely on the alleged travel of two individual defendants, Khristenko and Borisenko (in October 2005) and Borisenko (in February and March 2006), to constitute this predicate act against all RICO Defendants. (Pl. Br. at 137-39.) Plaintiffs' sole theory is that this alleged travel was connected to a violation of the Hobbs Act. (<u>Id.</u>) As shown above, however, plaintiffs have failed to allege any violation by any defendant of the Hobbs Act. Moreover, even if plaintiffs had adequately alleged a Hobbs Act violation, plaintiffs have not alleged facts even suggesting that the travel (which occurred long after the events plaintiffs challenge) was plausibly connected to the alleged Hobbs Act violation (the supposed taking of Yukos' assets). Indeed, plaintiffs themselves explain that the purpose of the October 2005 travel was "to promote the sale of liquefied natural gas in the United States."

(Id. at 137.)  In addition, plaintiffs have not, and cannot, allege that there was any commission of an act in furtherance of the taking of Yukos' assets *after* the act of travel.[27]  Plaintiffs cannot support any claim that any defendant violated the Travel Act.[28]

### 4.    Plaintiffs have not adequately alleged any transportation of stolen goods

Plaintiffs make no effort to demonstrate that the amended complaint alleges transportation of stolen goods against any of the RICO Defendants.  Instead, plaintiffs argue that they need not plead the elements of the relevant statute.  However, only actions that satisfy the elements of the exclusive list of predicate acts can establish RICO liability.  E.g., Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n, 366 F. Supp. 2d 792, 806 (W.D. Wis. 2005).  Plaintiffs have failed to allege facts showing transportation of stolen goods.

### 5.    Plaintiffs have not adequately alleged mail or wire fraud

Plaintiffs fail to allege mail or wire fraud against any individual RICO Defendant.  Despite plaintiffs' conclusory argument in their response that they have alleged the requisite specificity to satisfy Rule 9(b), the actual allegations in the amended complaint are deficient.  More critically, their response brief does not explain how a single act or statement included in

---

[27]    The very cases plaintiffs cite establish the baseless nature of their Travel Act claim because the decisions show that the "travel" must be an integral component of the enumerated criminal activities.  See United States v. Fetlow, 21 F.3d 243, 246-47 (8th Cir. 1994) (affirming Travel Act conviction for travel from Missouri to California as part of conspiracy distribute cocaine and possess cocaine with intent to distribute); United States v. Hollis, 725 F.2d 377, 377-81 (6th Cir. 1984) (affirming Travel Act conviction for travel by General Counsel for Kentucky Department of Labor from Kentucky to Florida to collect bribe he extorted from physician in Florida); United States v. Abadie, 879 F.2d 1260, 1266 (5th Cir. 1989) (affirming Travel Act conviction for travel from Louisiana to Mississippi as part of conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute); United States v. Auerbach, 913 F.2d 407, 410-11 (7th Cir. 1990) (affirming Travel Act conviction for travel from Indiana to Kentucky as part of conspiracy to possess marijuana with intent to distribute); United States v. Stern, 858 F.2d 1241, 1248 (7th Cir. 1988) (affirming Travel Act conviction for use of interstate facilities in furtherance of prostitution).

[28]    Plaintiffs' efforts to tie Gazprom and Miller into a "Travel Act" violation demonstrate the baselessness of this theory.  Plaintiffs claim that "it is well-settled that a defendant who does not travel can violate the Travel Act if he aids and abets another's travel."  (Pl. Br. at 138.)  First, there are no allegations suggesting that Gazprom or Miller "aided or abetted" any other defendants' travel.  Second, plaintiffs' aiding and abetting and conspiracy contentions relating to this predicate act are misplaced:  as demonstrated above, each defendant's commission of a predicate act must be established independent of aiding and abetting theories.

the amended complaint could conceivably provide a basis to support a wire or mail fraud claim. Instead, plaintiffs mention two paragraphs in the amended complaint (¶¶ 288, 263), involving one statement from Minister Khristenko and one statement from a spokesperson for Miller to a Moscow radio station.  There are no allegations as to whom the statement was made or how the statement was allegedly mailed or sent over the wires, how any – much less all – of the RICO Defendants caused these statements to be made, that the statements furthered the scheme to defraud the ADR holders or that defendants intended the statements to be mailed or sent across the wires, or that the defendants could reasonably foresee that the statements would be made and sent by mail or wire.  The mail and wire fraud claims must be dismissed.

### 6.    Plaintiffs failed to plead a proper RICO pattern

The amended complaint plainly alleges only a single scheme, single injury, and few victims.  Plaintiffs now claim to have alleged a pattern of racketeering that allegedly remains ongoing.  (Pl. Br. at 144.)  To plead an ongoing, open-ended pattern of racketeering, however, plaintiffs must allege a specific threat of repetition extending indefinitely into the future.  H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 242 (1989); Western Assocs. Ltd. P'ship v. Market Square Assocs., 235 F.3d 629, 633-35 (D.C. Cir. 2001).  Plaintiffs' vague suggestion that the RICO Defendants are going to continue to acquire Yukos assets, a company in bankruptcy, does not approach satisfying this requirement.  Despite plaintiffs' attempt to recast their amended complaint, plaintiffs have pled only one supposed scheme – to expropriate Yukos – an act which is allegedly now complete.  Plaintiffs simply have not pled a RICO pattern. Additionally, as shown below, plaintiffs have failed to satisfy the particular requirements of the three sections of the RICO statute upon which plaintiffs brought Counts IV, V and VI.

**D.    Plaintiffs Have Not Adequately Alleged Acquisition Of An Interest Or Control Over Yukos By Any RICO Defendant Required By § 1962(b)**

Plaintiffs' response does not alter the absence of facts in the amended complaint that could support an inference that any RICO Defendant – much less all – secured a sufficient interest in or operational control over Yukos, plaintiffs' self-defined enterprise (AC ¶ 333), as required to state a claim under § 1962(b).  Plaintiffs' two explanations are completely deficient.  Plaintiffs' contention that Rosneft (not a RICO Defendant) acquired YNG, a former Yukos asset (assuming it would be sufficient to state a claim otherwise), does not come close to supplying the required facts to establish that a single RICO Defendant acquired control over Yukos through their pattern of racketeering activity.  Likewise, plaintiffs' argument that Yukos is in bankruptcy in the Russian Federation (which is not a RICO Defendant nor is the Russian bankruptcy trustee) does not supply the missing allegations showing that any of the RICO Defendants acquired control over Yukos through their pattern of racketeering activity.  Count IV must be dismissed.

**E.    Plaintiffs Have Not Adequately Alleged The Existence Of An Association-In-Fact Enterprise Or Any RICO Defendants' Participation Required By § 1962(c)**

Plaintiffs' conclusory allegation that the RICO Defendants are an association-in-fact enterprise fails because plaintiffs have not alleged facts establishing that the "enterprise" has a common purpose among the participants, organization, or continuity, required under § 1962(c).  E.g., United States v. Richardson, 167 F.3d 621, 625 (D.C. Cir. 1999).  Plaintiffs' response does not even suggest that they have alleged an enterprise with any organization or continuity.

Plaintiffs claim that the existence of the enterprise may be inferred from proof of the pattern and that plaintiffs can merely allege the existence of an enterprise to satisfy the requirement.  (Pl. Br. at 147.)  As shown above, however, plaintiffs have not alleged that each (or indeed any) RICO Defendant individually engaged in a pattern of racketeering activity.

Likewise, no reasonable inference of an association-in-fact enterprise exists given the wide range of RICO Defendants (a corporation, government officials, and individuals), the scattered and disparate alleged predicate acts, and plaintiffs' failure to present any argument as to the possible presence of structure, organization and continuity.   E.g., District Telecomm. v. District Cablevision, Inc., 638 F. Supp. 418, 421 (D.D.C. 1985).

Moreover, Count V fails because plaintiffs do not allege any facts demonstrating that each RICO Defendant "participate[d] in the operation or management of the enterprise itself" through the commission of predicate acts.  Reves v. Ernst & Young, 507 U.S. 170, 179, 185 (1993); Jones v. Meridian Towers Apart., Inc., 816 F. Supp. 762, 771-72 (D.D.C. 1993).  The required participation cannot be satisfied by aiding and abetting another party's participation. Reves, 507 U.S. at 178.  The amended complaint contains only conclusory allegations of the "defendants" generally and contains no specific allegations that each RICO Defendant participated in the operation of the alleged enterprise through any predicate acts.

### F.    Plaintiffs Have Not Adequately Alleged A Conspiracy To Violate RICO Required By § 1962(d)

Plaintiffs cannot claim that some defendants committed predicate acts and then simply assert, as they do here, that every defendant is involved in a "conspiracy."  Plaintiffs' contention that the RICO Defendants "agreed to commit, and/or caused to be committed a series of overt acts in furtherance of the conspiracy" (Pl. Br. at 149 (citing AC ¶ 352)), is precisely the type of conclusory allegation courts routinely dismiss.[29]  In addition, as shown above, plaintiffs have

---

[29]    See, e.g., Barry Aviation, Inc., 366 F. Supp. 2d at 806 (finding allegation that defendants "engaged in a conspiracy" failed because plaintiff did not allege any facts indicating an act of agreement among defendants, what roles each defendant would play or what agreement defendants reached to commit two predicate acts of racketeering); Tel-Phonic Serv., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139-40 (5th Cir. 1992) (holding "conclusory allegation that the Defendants 'conspired'" was insufficient); Adler v. Berg Harmon Assoc., 790 F. Supp. 1222, 1234 (S.D.N.Y. 1992) (finding allegation that "[a]ll of the defendants conspired among themselves to further the scheme to defraud" and "knowingly and willingly participating in the conspiracy" fell "short of alleging that each defendant personally agreed to commit two or more predicate acts").

failed to allege any underlying violation of RICO against *any* defendant and, thus, have failed to allege any conspiracy to violate RICO. Count VI must be dismissed.

## V.    UNITED STATES RICO AND SECURITIES LAWS CANNOT BE APPLIED EXTRATERRITORIALLY TO THE ALLEGED CONDUCT

Federal securities and RICO statutes do not apply to conduct abroad, absent significant direct effects in the United States, or to conduct alleged to have occurred in the United States unless the conduct was material to the commission of the alleged fraud and a direct cause of the alleged injury. E.g., Gaz. Br. at 32; North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1052-53 (2d Cir. 1996). In an effort to have the Court extend the reach of the federal securities laws in an unprecedented manner, plaintiffs rely on the supposedly substantial, direct effects in the United States. (Pl. Br. at 115.) Plaintiffs simply ignore, however, defendants' argument that the only type of "direct" injury contemplated by the case law is where the plaintiffs have purchased shares *in the defendant corporation* based on misrepresentations made by the defendant. See Interbrew, S.A. v. EdperBrascan Corp., 23 F. Supp. 2d 425, 429-30 (S.D.N.Y. 1998); cf. Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 989 (2d Cir. 1975). Plaintiffs have not identified a single case – nor could they – where federal securities laws were held to extend to a situation in which United States investors purchased shares in one foreign corporation allegedly based on statements made by unrelated (and indeed, antagonistic) foreign actors. Nor can plaintiffs support the claim in their brief that the amended complaint contains allegations that defendants intentionally "directed" the allegedly misleading communications at the U.S. or U.S. investors. (Pl. Br. at 115 n.73.) There is not one misstatement that is alleged to have been intentionally "directed" to the U.S. or U.S. investors.[30]

---

[30] Moreover, plaintiffs completely ignore the fact that three of the plaintiffs – accounting for over 60% of the shares in issue in this litigation – reside outside the United States. (AC ¶¶ 13, 25, 26.) Accordingly, at a minimum, these three plaintiffs' RICO and federal securities claims must be dismissed. Nathan Gordon Trust v. Northgate Expl., Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993).

With respect to their RICO claims, plaintiffs principally rely on the theory that certain defendants' travel to the United States over a year after the alleged expropriation of Yukos is sufficient to establish RICO jurisdiction. (Pl. Br. at 131.) This contention, however, is belied by the very cases plaintiffs cite. For example, in Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp., the court explained that jurisdiction exists when the "RICO predicate acts occurred *primarily* in the United States" and to acts "that were *material to the completion* of the alleged fraud." 98 F. Supp. 2d 480, 485-86 (S.D.N.Y. 2000) (emphasis added). Thus, the court found RICO jurisdiction because the defendant solicited the sale of and sold products in the United States that allegedly infringed on plaintiff's patent. Id.; see also Oceanic Expl. Co. v. ConocoPhillips, Inc., 2006 WL 2711527 (D.D.C. Sept. 21, 2006) (RICO applied to U.S. company that prevented another U.S. company from bidding on overseas contract).

Unlike the facts in their cited cases, plaintiffs here allege only that a few individuals traveled to the United States long after the December 2004 auction (and the preceding events) for the unrelated purpose of discussing development of oil and gas interests and raising money. It is well settled, however, that "conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." North South, 100 F.3d at 1051. The alleged trips relied upon by plaintiffs occurred after the fact and have no direct relation to plaintiffs' alleged injury whatsoever. The trips can hardly be characterized as "material to the completion" of the fraud; nor can it be said that the alleged fraud occurred "primarily" within the United States. Id. at 1053 (conduct that occurred in the U.S. *after* the fraud did not confer jurisdiction); Johnson Elec., 98 F. Supp. 2d at 485-86.

While plaintiffs argue that a conspiracy was undertaken to eliminate Yukos as a competitor in the United States market (Pl. Br. at 132), there is no link alleged in the amended

42

complaint between the predicate RICO acts and an effect on the U.S. oil market. The only allegation of an effect on the U.S. oil market is not specific to Yukos, and amounts to a single month in which the United States did not receive oil from the Russian Federation. (AC ¶ 273.)

Plaintiffs also point to the decrease in value of Yukos ADRs as a "direct" effect (a claim also offered in connection with the securities claims). (Pl. Br. at 132.) This assertion is baseless. Plaintiffs' amended complaint alleges that (certain of) the defendants desired to "expropriate" a Russian asset – not devalue the investment of some, unknown, United States citizens. (E.g., AC ¶ 261.) These types of allegations are precisely the "remote and indirect" effect that precludes extraterritorial application of RICO. Doe I v. State of Israel, 400 F. Supp. 2d 86, 115-16 (D.D.C. 2005) (no extraterritorial jurisdiction over "harms suffered overseas that only marginally – and tangentially – impact American commerce"); Giro v. Banco Espanol de Credito, S.A., 1999 WL 440462, *3 (S.D.N.Y. June 28, 1999) ("Transactions with only remote and indirect" U.S. effects are not "substantial.").

## VI.    PLAINTIFFS' COMMON LAW CAUSES OF ACTION FAIL UNDER U.S. LAW

### A.    Plaintiffs Have Not Alleged The Elements Of Fraud

Plaintiffs concede that the elements of their fraud count closely track their count for securities fraud. (E.g., Pl. Br. at 117-18.) Plaintiffs' fraud claim fails for all the same reasons. While plaintiffs argue they can rely on a fraud-on-the-market theory to circumvent their obligation to plead reasonable reliance, the vast majority of the courts have held that the theory is not applicable to common law claims, including a District of Columbia Court that found the theory inapplicable to a common law negligent misrepresentation claim. See In re Newbridge Networks Sec. Litig., 926 F. Supp. 1163, 1175 (D.D.C. 1996).[31]

---

[31]    See also Securities Inv. Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 72 (2d Cir. 2000); Murphy v. Sofamor Danek Group, Inc., 123 F.3d 394, 404 (6th Cir. 1997); Borow v. nVIEW Corp., 27 F.3d 562, at *2 (4th Cir.

Plaintiffs' fraud claims also must be dismissed because they have not alleged the "objectively reasonable" individual reliance necessary in order to assert a viable fraud claim. One-O-One Enters. v. Caruso, 848 F.2d 1283, 1286 (D.C. Cir. 1988).  Plaintiffs' claim of reasonable reliance is fully rebutted by the preceding two hundred-odd paragraphs of their amended complaint alleging a highly public campaign against Yukos.[32]  Counts VII, IX and X must be dismissed.

### B.    Plaintiffs Have Not Alleged The Elements Of Conspiracy To Commit Fraud

Instead of showing that they pled the elements of conspiracy to commit fraud with particularity, plaintiffs merely assert, in a conclusory manner, that "the Fraud Defendants, pursuant to an actual or tacit agreement and/or understanding, conspired to defraud Plaintiffs." (Pl. Br. at 122; see also AC ¶ 376.)  This is grossly insufficient.  "To survive a motion to dismiss, a plaintiff must set forth more than just conclusory allegations of an agreement."  McCreary v. Heath, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005); Brady v. Livingood, 360 F. Supp. 2d 94, 104 (D.D.C. 2004).  Count IX must be dismissed.

### C.    Plaintiffs Have Not Alleged The Elements Of Aiding And Abetting Fraud

Rather than plead the requisite facts for aiding and abetting fraud with any particularity, plaintiffs have only set forth bare, conclusory allegations such as: "Each Fraud Defendant aided

---

1994).  Plaintiffs cite two isolated district court cases from more than fifteen years ago, which are distinguishable. First, plaintiffs cite In re Atlantic Fin. Sec. Litig., 1990 WL 171191 (E.D. Pa. Oct. 31, 1990), a case discussing a claim of negligent misrepresentation, which is not applicable given contrary precedent in this Circuit.  Second, plaintiffs cite to a Southern District of New York case, Minpeco, S.A. v. Hunt, 718 F. Supp. 168, 176 (S.D.N.Y. 1989), despite a subsequent contrary holding by the Second Circuit in Securities Investor Protection Corp., 222 F.3d at 72-73.

[32]    In addition, plaintiffs' fraud damages are wholly speculative.  In their brief, plaintiffs baldly assert: "but for [defendants'] misstatements and omissions, Plaintiffs would have sold their ADRs at greater prices than they realized . . . or they would not have purchased the ADRs at artificially inflated prices, if at all."  (Pl. Br. at 120.) Even with this information, however, a plausible damages scenario would require the fact-finder to guess (1) when plaintiffs would have sold their stock and (2) the value that the stock would have had at the time of such a sale absent the alleged fraudulent misrepresentations.  Plaintiffs' fraud claim would also require the unwarranted assumption that plaintiffs would have been the only stockholders to "liquidate[] their Yukos ADRs" (AC ¶ 367). See In re WorldCom, Inc. Sec. Litig., 336 F. Supp. 2d 310, 320 (S.D.N.Y. 2004).

and abetted the fraud committed by each of the other Fraud Defendants" and "Each Fraud Defendant had actual knowledge of the fraud" and "knowingly or recklessly provided substantial assistance in the perpetration of the fraudulent conduct alleged herein." (AC ¶¶ 382-83.) There are no allegations of any defendant's specific role. Count X must be dismissed.[33]

## CONCLUSION

Defendants Gazprom and Miller respectfully request that the Court promptly dismiss plaintiffs' amended complaint in its entirety.

Dated: November 9, 2006

Respectfully submitted,

    /s/ William M. Sullivan Jr.
William M. Sullivan, Jr. (DC Bar No. 467269)
Jane E. Chang (DC Bar No. 476545)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone: (202) 282-5000
Facsimile: (202) 282-5100

W. Gordon Dobie  (*pro hac vice*)
Greg Vamos  (*pro hac vice*)
Brooke B. Ward
Jennifer M. Erickson
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

*Attorneys for OAO Gazprom and Alexei B. Miller*

---

[33]    Plaintiffs erroneously assert that defendants have not addressed their Russian common law claims. (Pl. Br. at 81.) As noted in Gazprom's opening brief, in the event this Court dismisses plaintiffs' U.S. statutory claims, the Court should likewise decline to exercise any pendent jurisdiction over any of plaintiffs' remaining claims against Gazprom, including the Russian-law claims (Counts II, VIII and XV). (Gaz. Br. at 64 n.36.) Moreover, as the Minister Defendants' opening brief made clear, based on the allegations of the amended complaint and for the purpose of the motion to dismiss, the law of this forum (D.C.) is presumed to apply to plaintiffs' foreign-law claims in the absence of a demonstrated conflict. (Min. Br. at 49 n.33.) Because plaintiffs have made no effort to identify any such conflict, the Court should dismiss plaintiffs' foreign-law claims if it dismisses plaintiffs' U.S. common law claims.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 9, 2006, this foregoing brief was electronically filed with the Clerk of the Court and that, in the same manner, an electronic copy was served on all counsel of record.

/s/ Jane E. Chang

Jane E. Chang
