IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MONCRIEF OIL INTERNATIONAL, | § | |
| INC., | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | Civil Action No. 4:05-CV-353-Y |
| | § | |
| OAO GAZPROM, et al., | § | |
| DEFENDANTS. | § | |

ORDER GRANTING MOTION TO DISMISS

Before the court for consideration is the motion of Defendants OAO Gazprom, OAO Zapsibgazprom, and OAO Severneftegazprom (collectively referred to as the Gazprom Defendants) to dismiss the complaint for lack of personal jurisdiction, or alternatively, for enforcement of mandatory arbitration or dismissal based on the doctrine of *forum non conveniens* [doc. # 8], filed August 2, 2005. Having reviewed the motion and arguments of the parties, the court finds that the motion to dismiss should be granted because personal jurisdiction cannot constitutionally be exercised over the Gazprom Defendants.

I. STATEMENT OF THE CASE[1]

Plaintiff Moncrief Oil International, Inc., ("Moncrief") is a Texas corporation. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶2.) Moncrief focuses its operations on identifying investments in unexplored and/or underdeveloped foreign oil and gas

---

[1] To the extent they are not controverted by affidavits or other competent evidence, the factual allegations in Plaintiff's First Amended Complaint are accepted as true for purposes of the pending motion to dismiss. *See Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).

projects. (*Id.*)  The Gazprom Defendants are joint-stock companies organized under the laws of the Russian Federation with their principal places of business in Moscow, Russia.  (First Am. Compl. ¶¶6-8.) OAO Gazprom ("Gazprom") is a majority shareowner of OAO Zapsibgazprom ("Zapsib"), and OAO Severneftegazprom ("Severnefte") is a wholly owned subsidiary of OAO Gazprom. (App. to Def. Mot. to Dismiss at 3, Alexandrovich Decl. ¶2; *Id.* at.6, Anatolyevna Decl. ¶2.)

In December 1993, Zapsib obtained a license from the appropriate Russian authorities to produce natural gas from the Yuzhno-Russkoye gas field (the "Y-R Field"), which is located within the Russian Federation.  (First Am. Compl. ¶¶10-11.) Moncrief and Zapsib began negotiations for the development of the Y-R Field, and on September 17, 1997, executed a document entitled "Investment Agreement." (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶5.)  An addendum to the Investment Agreement was executed on October 30, 1997.  (*Id.*)  Moncrief established an office in Moscow, but also advised Zapsib's General Director, V. Nikiforov, that Moncrief would primarily perform its obligations in Texas. (*Id.* ¶6.)  In November 1997, Gazprom issued a protocol approving Zapsib's development of the Y-R Field in accordance with the plans outlined in the Investment Agreement. (First Am. Compl., Ex. 3.)

Under the terms of the Investment Agreement, Moncrief was

-2-

granted an exclusive right to acquire a direct ownership interest in the Y-R Field in exchange for providing equity, technical and commercial services and arranging up to $800 million in financing to develop the field. (*Id.* ¶7; First Am. Compl., Ex. 1.) The Investment Agreement also contemplated the formation of a jointly owned entity to develop, finance and operate the Y-R Field. (First Am. Compl. Ex. 1.) Nikiforov indicated that Zapsib was interested in Moncrief because Moncrief had experience as an oil and gas producer, knew the latest oil and gas technology, and had access to Western capital for investment and funding purposes. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶3.)

At Moncrief's expense and invitation, Nikiforov traveled to Fort Worth, Texas, in December 1997. During the visit, the parties discussed their performance under the Investment Agreement and future action to be taken with respect to the Y-R Field. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶¶9-10.) On January 23, 1998, Moncrief and Zapsib executed a Framework Agreement to represent their agreement with respect to the contracting and cost structure for development of the Y-R Field. (*Id.* ¶¶13-14; First Am. Compl, Ex. 4.) In May 1998, Gazprom issued a second protocol approving the basic format that Moncrief had outlined in the Framework Agreement for development of the Y-R Field. (First Am. Compl., Ex. 5.)

In November 1998, Moncrief and Zapsib negotiated and executed

-3-

an agreement for cooperation and participation in the financing of the development of the Y-R Field, which the parties refer to as the "Cooperation Agreement." (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶15; First Am. Compl., Ex. 6.) The Cooperation Agreement provides that Zapsib would transfer the Y-R Field license to a separate enterprise and give Moncrief a twenty-percent ownership interest in that enterprise. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶16.) Severnefte was the enterprise designated to hold the license. (*Id.*) Moncrief asserts that Zapsib later agreed to increase Moncrief's ownership interest in Severnefte to forty percent. (*Id.*) The Cooperation Agreement provides for disputes and disagreements to be appealed to the International Commercial Arbitration Court of the Russian Federation, and further provides that the substantive law of the Russian Federation applies to the agreement. (First Am. Compl., Ex. 6, art. 7.)

In 2000, Moncrief began working directly with Gazprom.[2] (*Id.* ¶18.) Moncrief's Chairman, Richard Moncrief, met with Boris Yurlov, the Vice Chairman of Gazprom in Houston, Texas, in October 2002 during a joint United States-Russia Commercial Energy Summit. (*Id.* ¶19; App. to Plf. Resp. to Mot. to Dismiss, Ex. 5(A),

---

[2] According to Moncrief, a variety of unethical business practices flourished within Gazprom and Zapsib until 2000 when a series of economic reforms were implemented by Vladimir Putin following his election as president of the Russian Federation. (First Am. Compl. ¶¶22-26.) Thereafter, Gazprom regained a controlling interest in Zapsib and acquired full ownership of Severnefte and the license to develop the Y-R Field. (*Id.* ¶¶26-27.)

-4-

Tentative Summit Agenda.)  Yurlov agreed that Gazprom would work with Moncrief and honor the Investment Agreement, Framework Agreement, and Cooperation Agreement. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶19.)

Richard Moncrief met with Yurlov and Alexander Riazanov, another Vice Chairman with Gazprom, in November 2002.  Yurlov and Riazanov again represented that Gazprom would honor Zapsib's obligations under the Investment Agreement, Framework Agreement, and Cooperation Agreement. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶¶20-21.)  Moncrief relayed these representations to the United States Secretary of Commerce and various financial institutions, and based on these representations, continued to perform its obligations under the term of the agreements.  (*Id.*)  In November 2003, Moncrief and Severnefte executed another protocol, and throughout 2004, discussed rejuvenation of the Y-R Field project. (First Am. Compl. ¶29.)

Moncrief asserts that its performance under the parties' agreements has occurred almost entirely in Texas, which was a fact understood and approved by the Gazprom Defendants. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 1, Moncrief Decl.¶ 21-22.)  Moncrief also asserts that it spent over $7 million on development and financing plans for the Y-R Field. (App. to Plf. Resp. to Mot. to Dismiss, Ex. 2, Maconchy Decl.¶13.)  After Gazprom publicly announced in 2004 that it had partnered with two German entities to

-5-

develop the Y-R Field, Moncrief filed suit against the Gazprom Defendants. (First Am. Compl. ¶¶30, 35.)

Moncrief alleges that the district court has diversity jurisdiction over its claims for declaratory relief, breach of contract, promissory estoppel, and negligent misrepresentation, with estimated damages of several billion dollars. (First Am. Compl. ¶¶ 4, 32-43.) The Gazprom Defendants seek dismissal of the complaint for lack of personal jurisdiction. Alternatively, they contend that Moncrief's complaints are subject to mandatory arbitration. The Gazprom Defendants also invoke principles of *forum non conveniens* with respect to proceeding with this litigation in Texas, rather than Russia.

## II. PERSONAL JURISDICTION

### A. STANDARD OF REVIEW

A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction over the defendant[3] and the exercise of personal jurisdiction by the forum state is consistent with due process guarantees of the United

---

[3] As relevant for present purposes, the Texas long-arm statute reaches a nonresident who

> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; [or]
>
> (2) commits a tort in whole or in part in this state.

Tex. Rev. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997).

States Constitution.  *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999); *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997).  Because the Texas long-arm statute has been held to extend personal jurisdiction to the permissible limits of the Constitution, the determination of personal jurisdiction when Texas is the chosen forum state is solely an inquiry into whether the exercise of jurisdiction comports with federal due-process guarantees.  *See Latshaw*, 167 F.3d at 211; *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990).

The Due Process Clause permits the exercise of personal jurisdiction over a nonresident when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state, and (2) the exercise of personal jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice."  *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Latshaw*, 167 F.3d at 211.  *See also Allred*, 117 F.3d at 285.  Minimum contacts may arise incident to either general or specific jurisdiction: General jurisdiction requires the nonresident defendant to have continuous and systematic contacts with the forum state, while specific jurisdiction is invoked when the contacts with the state arise from or are directly related to the cause of action.  *See Allred*, 117 F.3d at 286; *Bullion*, 895 F.2d at 216.  Even when minimum contacts are found, the federal

court must decline jurisdiction if it would be unreasonable and unfair to require the nonresident defendant to defend the suit in the forum state. *Bullion*, 895 F.2d at 216.

When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction over the nonresident. *See Allred*, 117 F.3d at 281. In satisfying this burden when no evidentiary hearing is held, as in this case, the plaintiff need only present facts sufficient to constitute a prima-facie case of personal jurisdiction and is not required to establish jurisdiction by a preponderance of the evidence. *Bullion*, 895 F.2d at 217.

In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery. *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002). In determining whether a prima-facie case exists, the court must accept as true any uncontroverted allegations in the plaintiff's complaint and resolve any factual conflicts posed by the affidavits and other documentation in favor of the plaintiff. *Latshaw*, 167 F.3d at 211; *Bullion*, 895 F.2d at 217. The prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th

-8-

Cir. 2001).

B.   DISCUSSION

1.   Minimum Contacts

Moncrief does not assert, nor does the evidence suggest, that any of the moving defendants have the systematic and continuous contacts with Texas that would permit a finding of general jurisdiction.[4] Accordingly, the exercise of personal jurisdiction over the Gazprom Defendants depends on the existence of specific jurisdiction.   Specific jurisdiction is demonstrated if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries arising out of or related to those activities.   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Central Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003).

The Gazprom Defendants assert that personal jurisdiction does not exist because they are entities formed outside of the United States and have derived no income from Texas, own no property in Texas, are not registered to do business in Texas, do not advertise or market themselves in Texas, and have not transacted business in Texas.   The Gazprom Defendants provide declarations attesting to

---

[4] Moncrief notes in passing that Gazprom's website expresses the company's intention to expand its business into the United States; however, a website that is nothing more than a passive advertisement does not support the exercise of personal jurisdiction. *Mink v. AAAA Dev., LLC,* 190 F.3d 333, 336-337 (5th Cir. 1999).

each of the foregoing assertions.  (App. to Mot. to Dismiss.)

Moncrief contends that the exercise of personal jurisdiction over the Gazprom Defendants is reasonable because Zapsib and Gazprom entered into multiple agreements with Moncrief, knowing that Moncrief would perform substantially all of its obligations under those agreements in Texas; sent company executives to Texas in furtherance of the agreements and to advance the parties' long-term relationship; and made misrepresentations to Moncrief in Texas and abroad on which Moncrief relied. Moncrief also contends that the Gazprom Defendants have always been aware of Moncrief's status as a Texas corporation, and that personal jurisdiction is appropriate because the injuries Moncrief sustained due to the Gazprom Defendants' collective misconduct occurred in Texas.

It is axiomatic that the unilateral activities of the plaintiff or a third person do not satisfy the requirement of minimum contacts between the defendant and the forum state. *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026, 1028 (5th Cir. 1983). It is also permissible for a nonresident to structure his conduct to avoid being haled into court in a particular state.  *Stuart v. Spademan*, 772 F.2d 1185, 1190 (5th Cir. 1985)(citing *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Although a single act directed at the forum state can be enough to confer personal jurisdiction if that act gives rise to

the claim being asserted, merely contracting with a resident of the forum state is insufficient to establish minimum contacts. *Latshaw*, 167 F.3d at 211; *Hydrokinetics*, 700 F.2d at 1028. An exchange of communications in the course of developing and carrying out a contract is likewise insufficient in and of itself to constitute purposeful availment of the benefits and protections of Texas law. *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986). Otherwise, jurisdiction is being exercised based only on the fortuity that one party to the agreement resides in the forum state. *Id.* Instead, prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing must be evaluated to determine whether the defendant purposefully established minimum contacts within the forum. *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185. A defendant who has created continuing obligations between himself and residents of the forum can be said to have manifestly availed himself of the privilege of conducting business there, but random, fortuitous or attenuated contacts are not sufficient. *Id.* at 476, 105 S.Ct. at 2184.

Moncrief does not allege that the agreements that form the basis of this litigation were executed in Texas, although Moncrief has met with company executives for the Gazprom Defendants in Texas

-11-

on two occasions.[5]  Of the two documented Texas visits, one visit
was arranged at Moncrief's expense in December 1997, several months
after the execution of the Investment Agreement.   The second
meeting occurred almost five years later during a United States-
Russian energy summit.   Apparently other negotiations, meetings,
and execution of the subject agreements have occurred in Russia or
without personal appearances.  (*See* App. to Plf. Resp. to Mot. to
Dismiss, Ex. 1(C).)  The number of contacts with the forum state is
not determinative, but it is one factor to consider within the
totality of the circumstances in assessing whether the exercise of
personal jurisdiction is proper.  *Stuart*, 772 F.2d at 1192. It is
the quality of the contacts, not their absolute number, that
demonstrate purposeful availment. *Id*. at 1194.

    At most, Zapsib and Gazprom have expressed an interest in
obtaining Western capital and technology for a venture that has its
focus overseas, with no indication that Texas was of particular
interest, and no requirement that Moncrief perform its contractual
responsibilities in Texas.[6]  Moncrief's unilateral performance in

---

    [5] Jurisdiction is not necessarily defeated even if the defendant has not
physically entered the forum state, although such contacts reinforce the
reasonable foreseeability of suit in that forum.  *Burger King*, 471 U.S. at 476,
105 S.Ct. at 2184; *Central Freight Lines*, 322 F.3d at 385.  Modern commercial
life allows for a substantial amount of business to be transacted by mail and
wire communications, obviating the need for a physical presence within a state
in which business is being conducted. *Burger King*, 471 U.S. at 476, 105 S.Ct. at
2184.

    [6] Moncrief turned to international banking institutions in seeking
financing for the Y-R Field development.  (App. to Mot. to Dismiss, Ex. 1,
Moncrief Decl. ¶12.)

Texas seems a fortuitous matter of the location of Moncrief's headquarters, not the defendants' reaching out or purposeful availment of the benefits and protections of Texas law. Conversely, the Gazprom Defendants' performance substantially and necessarily would occur in Russia, involving the formation of a Russian joint-stock company and a shared interest in the development of a Russian gas field.  Additionally, though the parties initiated their relationship with the Investment Agreement and Framework Agreement, which contain no choice-of-law provisions, they cemented their relationship in the Cooperation Agreement, which expressly provides that the substantive law of the Russian Federation will govern and arbitration in the Russian Federation will be used if disputes arise.  The place of performance and choice-of-law provisions are relevant factors in determining whether personal jurisdiction exists.[7]  *See Burger King*, 471 U.S. at 481, 105 S.Ct. at 2187;

---

[7] These factors also distinguish Moncrief's case from *Central Freight Lines, Inc. v. APA Transport Corporation*, 322 F.3d 376, 381 (5th Cir. 2003). In *Central Freight Lines,* defendant APA was a New Jersey freight delivery company. APA sent two representatives to meet with Central Freight Lines (CFL) at its headquarters in Waco, Texas. APA wanted a freight-delivery partner in Texas to share shipping services or "interline" freight in their respective primary areas of operation.  *Id.* at 379. Thereafter, the parties negotiated and executed an Interline Agreement. CFL later sued APA in Texas for breach of the agreement, and APA moved for dismissal for lack of personal jurisdiction. The Fifth Circuit found APA was subject to personal jurisdiction in Texas.  The court was not preoccupied with the parties' dispute about where the formal negotiations occurred because APA had reached out to Texas by sending representatives to the state and by exchanging mail and telephone communications in the quest of establishing a long-term business relationship with a Texas corporation.  In fact, it appears that APA particularly desired a relationship with CFL because of CFL's location in Texas, but there is no such evidence that the Gazprom Defendants specifically sought Texas business partners.  Moreover, the Interline Agreement did not contain choice-of-law or forum selection clauses that might have given APA reason to think that it was or was not amenable to suit in Texas. *Id.* at 383.  Moncrief's reliance on *Central Freight* is unavailing.

Moncrief also relies on *Karl Rove & Co. v. Thornburgh*, 824 F.Supp. 662

-13-

*Panda Brandywine*, 253 F.3d at 869; *Holt Oil*, 801 F.2d at 778.

As for the location of injury, the Supreme Court has consistently held that foreseeability of causing injury in another state is not a sufficient benchmark for exercising personal jurisdiction. *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183. The critical foreseeability question is whether the defendant's conduct and connection with the forum state is such that he should reasonably anticipate being haled into court there. *Id*.

The jurisdictional facts in this case are similar to the facts presented in *Freudensprung v. Offshore Technical Services, Inc.,* a maritime action in which an injured seaman sought recovery from several entities, including his Texas-based employer and the Panamanian company, WWAI, that owned and operated the barge on which he was injured. *See Freudensprung v. Offshore Technical Servs., In*c., 379 F.3d 327 (5th Cir. 2004). The Fifth Circuit found insufficient minimum contacts to support the exercise of personnel

---

(W.D. Tex. 1993). Rove had contracted to handle fund-raising services for Thornburgh's campaign for the office of United States Senator in Pennsylvania. Rove's principal place of business was located in Austin, Texas, and the parties' proposed agreement specifically provided that performance would be in Texas and the agreement would be construed in accordance with Texas law. *Id*. at 666, 673. Thornburgh never executed the agreement, but the district court found that the parties subsequently conducted their business in accordance with the proposed contract terms. *Id*. at 666, 673. In addition, payments were made to Rove in Texas, the campaign committee regularly requested Rove's services by phone and letter, and the committee reviewed and revised drafts of campaign mailings that Rove designed and returned the marked-up copies to Rove in Texas. *Id.* at 671. The district court found that the campaign was actively involved and exercised significant control in the direct mail fund-raising services Rove was hired to perform, and was "no mere passive customer." *Id*. & n.12. Given that personal jurisdiction always requires a review of the totality of the circumstances, the court is not persuaded that *Rove* supports a finding of jurisdiction in the present case.

-14-

jurisdiction over the Panamanian company in Texas, despite the
following facts: WWAI had contracted with Freudensprung's employer
for a supply of personnel for WWAI's projects, initiated and
contemplated a long-term business relationship with Freudensprung's
employer, wired payments to Texas, communicated with the employer
concerning development and execution of the personnel contract, and
agreed to arbitrate any disputes under the contract in Texas.[8] *Id.*
at 344-45.

The Fifth Circuit found that none of the foregoing contacts
indicated that WWAI intended to avail itself of the privilege of
doing business in Texas or reflected WWAI's implied consent to the
jurisdiction of the Texas courts. *Id.* at 345. The Fifth Circuit
also found that the significance of WWAI's contacts with Texas was
diminished because the choice-of-law provision in the contract at
issue specified that English law would govern, and material
portions of the contract contemplated that personnel would be
supplied for WWAI's projects in West Africa, not Texas. *Id.* Like
the plaintiff in *Freudensprung,* Moncrief has failed to demonstrate
that the parties' contractual relationship presents a prima-facie
case of minimum contacts to support the exercise of personnel

---

[8] The court of appeals acknowledged that Freudensprung was not a party to
WWAI's contract with his employer, and thus, "strictly speaking," the litigation
did not arise out of or relate to WWAI's contacts with Texas for purposes of
specific jurisdiction; however, the court gave Freudensprung the benefit of the
doubt by assuming that the case was one arising out of the contract and proceeded
to review WWAI's relationship with Texas under a minimum-contacts analysis. *Id.*
at 344.

-15-

jurisdiction against the Gazprom Defendants in Texas.

Somewhat more troubling is Moncrief's contention of negligent misrepresentation.[9]  Moncrief's negligent-misrepresentation claim is based on Gazprom's promises on two occasions in 2002, including one occasion in Texas, to honor Zapsib's agreements with Moncrief and continue working with Moncrief in furtherance of the Y-R Field project.  The location of the one exchange in Texas appears fortuitous and does not weigh heavily in favor of finding personal jurisdiction. The parties met while in attendance at a joint international energy summit in Houston, Texas, where both Yurlov and Richard Moncrief were scheduled to speak.  (App. to Plf. Resp. to Mot. to Dismiss, Ex. 5(A) at 60-61.)  Moreover, Gazprom's promises related to cooperation in the anticipated development and production from the Y-R Field under the terms of an agreement already in place that is governed by Russian substantive law and subject to arbitration in Russia, even if Moncrief urges that it has sustained significant economic losses in Texas.

In limited circumstances, the federal courts have recognized instances of "effects jurisdiction." Even an act done outside the state that has consequences or effects within the state will

---

[9] The elements of negligent misrepresentation are: (1) a defendant provides information in the course of his business or in a transaction in which he has a pecuniary interest; (2) the information supplied is false; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relies on the information; and (5) the plaintiff suffers damages proximately caused by the reliance.  *Federal Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991).

suffice as a basis for personal jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.  *Guidry v. United States Tobacco Co., Inc.*, 188 F.3d 619, 628 (5th Cir. 1999).  But the "effects" test is not a substitute for minimum contacts demonstrating purposeful availment of the benefits of the forum state.  *Allred v. Moore & Peterson, P.C.*, 117 F.3d 278, 286 (5th Cir. 1997).  In fact, the Fifth Circuit has expressly declined to allow personal jurisdiction over a nonresident defendant for even an intentional tort simply because the complaint alleges injury to a Texas resident, and it disapproves of requiring a defendant, no matter how groundless or frivolous the suit may be, to appear and defend itself when there is otherwise no showing of purposeful availment or minimal contacts.[10]  *See Panda Brandywine*, 253 F.3d at 870.

The Texas Supreme Court has also recognized that a tort committed in Texas may satisfy the state long-arm statute, but not

---

[10]   Under the "effects" test, the courts have approved the exercise of personal jurisdiction over a nonresident defendant when the defendant directs intentional or physically harmful tortious conduct into a forum.  *See, e.g., Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)(permitting California to exercise personal jurisdiction over Florida newspapermen in libel action); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)(finding purposeful availment when content of communications with forum give rise to an intentional tort cause of action); *Guidry*, 188 F.3d 619, 628 (5th Cir. 1999)(exercising personal jurisdiction over tobacco companies and trade association for intentional misrepresentations, fraud and conspiracy). Those circumstances are factually distinguishable from the instant case.  Moreover, none of the cases carve out an exception to the axiom that it is the defendant's contacts with the forum that matter.

necessarily the Constitution. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788 (Tex. 2005). Jurisdiction depends on the defendant's relationship to the forum and litigation, not simply where the defendant "directed a tort" because that shifts the focus to the relationship among the plaintiff, the forum, and the litigation. *Id*. at 790. The court noted that the plaintiff in commerce cases often has the option of suing in contract or tort: If directing a tort at Texas is sufficient, then personal jurisdiction would exist when the plaintiff alleges a tort, but not a breach-of-contract action, and purposeful availment would depend on the form of claim the plaintiff selected. *Id*. at 791. The court was also concerned that jurisdiction would be confused with the merits of the plaintiff's tort claim, improperly putting the existence of personal jurisdiction at the mercy of the fact-finder at trial. *Id*. at 790-91. The court rationally concluded that specific jurisdiction cannot turn on whether the defendant's contacts are tortious, but only on the contacts themselves. *Id*. at 792.

Moncrief's allegations illustrate why the Texas Supreme Court has expressed concern about personal jurisdiction that depends on the outcome of the litigation. Although the merits of Moncrief's cause of action for negligent misrepresentation cannot be determined at this stage of the proceedings, Gazprom contends that this "eleventh hour" claim (raised for the first time in the

-18-

amended complaint that Moncrief filed the same day that it responded to the motion to dismiss) is nothing more than a disguised breach-of-contract claim and patently invalid.[11] If the claims of negligent misrepresentation are tried and not proved, then personal jurisdiction would have been exercised over a fortuitous meeting at a United States-Russian joint energy summit and similar representations that Moncrief concedes were made during a meeting that occurred thousands of miles from Texas.

The Gazprom Defendants openly pursued Western financing, but this goal in and of itself does not constitute purposeful availment of the laws and protections of Texas such that they could reasonably anticipate suit in Texas. There is no evidence that any of the agreements were executed in Texas or that Moncrief's Texas residency is anything more than incidental to the formation of the parties' relationship or their collective interest in developing and profiting from Russia's natural resources. The contacts alleged above, even viewed cumulatively, do not establish a level of intent or purposeful action directed toward Texas compatible with the minimum contacts contemplated by the Due Process Clause.[12]

---

[11] Gazprom deems the claim invalid on the basis that Moncrief is complaining of promises that address future action. Negligent misrepresentation under Texas law contemplates that the false information provided by the defendant is a misstatement of *existing* fact. *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 357 (5th Cir. 1996).

[12] Moncrief asserts that personal jurisdiction exists with respect to Severnefte because the facts giving rise to personal jurisdiction against Gazprom can be imputed to Severnefte as a wholly owned subsidiary. Having found that Gazprom lacks sufficient minimum contacts to support an exercise of personal jurisdiction, the court deems it unnecessary to address whether it would be

-19-

Considering the totality of the jurisdictional factors in this case, there is no evidence of the systematic and continuous contacts that would permit a finding of general jurisdiction, and insufficient evidence to support a prima-facie case of specific jurisdiction. Moreover, as discussed *infra*, an exercise of jurisdiction would not comport with fair play and substantial justice under the particular circumstances of this case.

2.   Fair Play and Substantial Justice

Once a plaintiff has established minimum contacts between a defendant and the forum state, the court must consider these contacts in light of other factors to determine whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184. The burden of proof shifts to the defendant to present a compelling case that other considerations render the exercise of jurisdiction unreasonable. *Id.* at 476-77, 105 S.Ct. at 2184-85; *Central Freight Lines*, 322 F.3d at 384. The Gazprom Defendants contend that exercising personal jurisdiction over them would offend traditional notions of fair play and substantial justice because the parties' dispute is one governed by Russian law, subject to Russian arbitration, and pertains to ownership of a Russian joint-stock company and development of a Russian gas field under the regulatory control of the Russian

---

appropriate to impute personal jurisdiction to Severnefte.

Federation.

In determining whether the exercise of jurisdiction would be unreasonable, the court considers the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Calif.*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). In cases where the court is addressing its jurisdiction over an alien defendant, the procedural and substantive interests of the other nation, as well as federal foreign-relations policies are best served by a careful inquiry into the reasonableness of asserting jurisdiction in a particular case, with an unwillingness to find the serious burdens on an alien defendant are outweighed by minimal interests on the part of the plaintiff or forum state. *Asahi*, 480 U.S. at 115, 107 S.Ct. at 1034. The Supreme Court has cautioned that great care and reserve should be exercised when extending notions of personal jurisdiction into the international field, *id.*, but the burden on the defendant of defending a suit in a foreign country may be justified if the interests of the plaintiff and forum are of

sufficient importance. *Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1074 (5th Cir. 1990).

After weighing all of the *Asahi* factors, as well as the nature of the Gazprom Defendants' contacts within Texas, the court finds that the exercise of jurisdiction would be unreasonable. Modern conveniences and transportation lighten the burden on a nonresident defending itself in a foreign forum, and Moncrief would doubtless prefer to litigate this matter in its home state. In addition, Texas has an undisputable interest in protecting the rights of its citizens. *See Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182. But it appears that a substantial part of this litigation invokes the protections of Russian law and contemplates appeal to the International Commercial Arbitration Court, which are issues that can be more efficiently handled within the Russian Federation. Further, Texas' interest in retaining this case is comparably minimal because it is primarily a business dispute over a Russian natural gas field that does not implicate matters of significant public policy in Texas. There is also no indication that fundamental social policies in the several states or the United States favor the exercise of personal jurisdiction.

Supreme Court precedent has expressed a preference for declining to extend our notions of personal jurisdiction into the international context when local interests are nominal. Based on the available record, and indulging all reasonable inferences in

favor of finding personal jurisdiction, it would offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over the Gazprom Defendants in a Texas forum.

Accordingly, it is ORDERED that the Gazprom Defendants' Motion to Dismiss the Complaint for Lack of Personal Jurisdiction is granted. It is further ORDERED that the Motion to Dismiss on grounds of mandatory arbitration provisions and *forum non conveniens* are denied as moot.

SIGNED March 21, 2006.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE