# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RICHARD ALLEN, *et al.* | ) | |
| | ) | Civil Action No.: 05-cv-02077 (CKK) |
| | ) | Hon. Colleen Kollar-Kotelly |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RUSSIAN FEDERATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY BRIEF IN FURTHER SUPPORT OF
## THE RUSSIAN FEDERATION'S MOTION TO DISMISS
## PLAINTIFFS' AMENDED COMPLAINT

Michael S. Goldberg
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

Jay L. Alexander (DC Bar No. 412905)
Ryan E. Bull (DC Bar No. 481473)
Richard P. Sobiecki (DC Bar No. 500163)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 585-4064

## Table of Contents

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................. 2

I.     THE "EXPROPRIATION" EXCEPTION IS INAPPLICABLE BECAUSE
       PLAINTIFFS' ALLEGATIONS SATISFY NONE OF ITS PRECONDITIONS ........ 3

   A.   Plaintiffs Only Rights In Property Are The Intangible Contractual Rights Created By
        Their ADRs ................................................................................................... 4

   B.   There Has Been No Taking Of Property In Violation Of International Law. ............... 9

        1.   This Court Must Find — As A Matter Of Law — That The Alleged Taking
             Was For Adequate Compensation ...................................................... 10

        2.   Because The Allegedly Seized Property Belonged Directly To A Russian
             National, There Is No Violation Of International Law ........................... 11

        3.   Plaintiffs' Failure To Exhaust Their Remedies In Russia Bars The Assertion
             Of An International Violation .............................................................. 12

   C.   The "Property" Allegedly Taken Lacks The Required Jurisdictional Nexus To The
        United States ................................................................................................. 13

        1.   Rosneft Is Not An "Agency or Instrumentality" Of The Russian Federation ...... 13

        2.   Rosneft Does Not Own Or Control The Alleged "Rights in Property"
             Supposedly Taken From Plaintiffs ...................................................... 18

        3.   Rosneft Is Not Engaged In Commercial Activity *In* The United States ............... 19

II.    THE COMMERCIAL ACTIVITY EXCEPTION IS INAPPLICABLE BECAUSE
       THE ALLEGED CONDUCT IS NOT "COMMERCIAL" AND HAD NO DIRECT
       EFFECT IN THE UNITED STATES. ........................................................... 20

   A.   Plaintiffs' Claims Flow From Sovereign Acts Of The Russian Federation ................. 20

   B.   The Alleged Conduct Has Had No Direct Effect In The United States ...................... 23

CONCLUSION ............................................................................................................. 25

i

## Table of Authorities

### CASES

*Acorn v. Household Int'l, Inc.*,
211 F. Supp. 2d 1160 (N.D. Cal. 2002) ........................................................17

*Banco Nacional de Cuba v. Chase Manhattan Bank*,
658 F.2d 875 (2d Cir. 1981)..........................................................................11

*Brewer v. Socialist People's Republic of Iraq*,
890 F.2d 97 (8th Cir. 1989) ............................................................................5

*Crist v. Republic of Turkey*,
107 F.3d 922 (D.C. Cir. 1997).......................................................................14

*Crist v. Republic of Turkey*,
995 F. Supp. 5 (D.D.C. 1998) .....................................................................9, 10

*De Sanchez v. Banco Central de Nicaragua*,
770 F.2d 1385 (5th Cir. 1985) ......................................................................12

*Demes v. United States*,
52 Fed. Cl. 365 (2002) ...................................................................................11

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) ...............................................................6, 8, 14, 15, 18

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)..........................................................................15, 16, 17

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
905 F.2d 438 (D.C. Cir. 1990)...................................................................22, 24

*Fry v. United States*,
72 Fed. Cl. 500 (2006) ...................................................................................11

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006)..........................................................................20

*Gutch v. Fed. Republic of Germany*,
444 F. Supp. 2d 1 (D.D.C. 2006) ..............................................................2, 5, 9

*Hirsch v. State of Israel*,
962 F. Supp. 377 (S.D.N.Y. 1997)..................................................................5

*Idas Res. N.V. v. Empresa Nacional de Diamantes de Angola E.P.*,
    No. 06-00570 (ESH), 2006 WL 3060017 (D.D.C. Oct. 26, 2006) ................................5, 19

*Intercontinental Dictionary Series v. De Gruyter*,
    822 F. Supp. 662 (C.D. Cal. 1993) ....................................................................................5

*Invacare Corp. v. Sunrise Med. Holdings, Inc.*,
    No. 1:04CV1439, 2004 WL 3418915 (N.D. Ohio Dec. 15, 2004) ....................................17

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*,
    616 F. Supp. 660 (W.D. Mich. 1985) ................................................................................7

*Kitt v. United States*,
    277 F.3d 1330 (Fed. Cir. 2002) .......................................................................................11

*Nielsen v. Sec'y of Treasury*,
    424 F.2d 833 (D.C. Cir. 1970) ..........................................................................................6

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
    No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ................................................24

*Peterson v. Royal Kingdom of Saudi Arabia*,
    416 F.3d 83 (D.C. Cir. 2005) ......................................................................................7, 24

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d. Cir. 2002) .............................................................................................5

*Ramirez de Arellano v. Weinberger*,
    745 F.2d 1500 (D.C. Cir. 1984) ........................................................................................6

*Ramirez de Arellano v. Weinberger*,
    788 F.2d 762 (D.C. Cir. 1986) ..........................................................................................6

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) .........................................................................................................21

*Riggs Nat'l Corp. v. Comm'r*,
    163 F.3d 1363 (D.C. Cir. 1999) ......................................................................................11

*\*Rong v. Liaoning Province Gov't*,
    452 F.3d 883 (D.C. Cir. 2006) ....................................................................1, 20, 22, 25

*Rong v. Liaoning Provincial Gov't*,
    362 F. Supp. 2d 83 (D.D.C. 2005) ....................................................................................6

*Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir. 1992) ....................................................................7, 8

*Smith v. Washington Sheraton Corp.*,
   135 F.3d 779 (D.C. Cir. 1998) .......................................................................6

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
   200 F.3d 843 (D.C. Cir. 2000) .....................................................................24

*United World Trade Co. v. Mangyshlakneft Oil Prod. Ass'n*,
   33 F.3d 1232 (10th Cir. 1994) .....................................................................25

*U.S. ex rel. Siewick v. Jamieson Sci. and Eng'g, Inc.*,
   191 F. Supp. 2d 17 (D.D.C. 2002) ...............................................................18

*Wahba v. Nat'l Bank of Egypt*,
   No. 2-03-CV-90, 2006 WL 2844905 (E.D. Tex. Sept. 29, 2006).................12

*Weinberger v. Ramirez de Arellano*,
   471 U.S. 1113 (1985)......................................................................................6

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*,
   215 F.3d 247 (2d Cir. 2000).........................................................................11

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*,
   No. 94 Civ. 1942 (KMW), 1996 WL 413680 (S.D.N.Y. July 24, 1996)...........5

## STATUTES

28 U.S.C. § 1332(c) ................................................................................................13

28 U.S.C. § 1603(b) ...............................................................................................15

28 U.S.C. § 1605......................................................................1, 13, 14, 19, 21, 24

## MISCELLANEOUS

American Depository Receipts, Securities Act of 1933, Exchange Act Release Nos. 33-
   6984, 34-29226, 1991 WL 294145 (May 23, 1991) ........................................5

W. M. Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS (rev ed.
   1999) ............................................................................................................6, 9

Brief of Petitioner, *Dead Sea Bromine Co., Ltd. v. Patrickson*, No. 01-594, 2002 WL
   1987405 (S. Ct. Aug. 22, 2003) ....................................................................16

**INTRODUCTION**

Plaintiffs do not dispute that the Russian Federation is entitled to a presumption of immunity.  Nor do they dispute that this immunity protects the Russian Federation from the "burdens of litigation" and, therefore, that this motion should be decided promptly.  Instead, plaintiffs argue that two exceptions to immunity — the expropriation exception (28 U.S.C. § 1605(a)(3)) and the commercial activity exception (28 U.S.C. §1605(a)(2)) — overcome the Russian Federation's presumption of immunity.  Plaintiffs' novel arguments, however, are foreclosed by the Supreme Court's recent decision in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), the D.C. Circuit's recent decision in *Rong v. Liaoning Province Gov't*, 452 F.3d 883 (D.C. Cir. 2006), and numerous other precedents.  For that reason, among others, this Court must respect the Russian Federation's immunity and dismiss this case.

In order to obtain jurisdiction over the Russian Federation pursuant to the "expropriation" exception, plaintiffs must establish that (i) their rights in property (ii) have been taken in violation of *international* law, and (iii) that their *property* (or property exchanged for that property) is now owned or operated by an *agency or instrumentality* of the Russian Federation that is engaged in commercial activity in the U.S.  Plaintiffs are unable to satisfy any of these elements, although they must prove all three.  First, as *Dole Food* and other precedent makes clear, plaintiffs have no rights in the property of Yukos Oil Company ("Yukos") that was allegedly taken.  Second, the enforcement of tax obligations by a sovereign against its own corporate citizens is not a "taking" in violation of international law.  Third, plaintiffs cannot establish that Rosneft Oil Company, which has acquired an interest in a Russian company once controlled by Yukos, is an agency or instrumentality of the Russian Federation, much less that Rosneft does business *in* the U.S.  *See*, *e.g.*, *Dole Food*, 538 U.S. at 474, 477.

1

Plaintiffs fare no better with the commercial activity exception.  To prevail on that theory of jurisdiction, plaintiffs must establish that their action is (i) based upon an act done "in connection with a commercial activity" that (ii) caused a "direct effect in the United States." Again, plaintiffs can satisfy none of the required elements.  First, although plaintiffs argue that the alleged *purpose* of the Russian Federation's supposed misconduct was to eliminate Yukos as a competitor in the oil and gas market and obtain Yukos's assets, plaintiffs' Opposition concedes, as it must, that the *nature* of the government's alleged misconduct was alleged abuse of its sovereign taxing and criminal prosecuting powers.  The D.C. Circuit's decision in *Rong* reinforces that the commercial activity exception is unavailable where a shareholder's alleged loss of his company flows from such sovereign activities.  Second, plaintiffs are also unable to establish that the Russian Federation's tax assessments and collections against a Russian corporation in Russia had a direct effect in the U.S.  The absence of any direct effect in the U.S from the Russian Federation's actions also renders the commercial activity exception inapplicable here.

Plaintiffs' theories of FSIA jurisdiction are unprecedented and insupportable efforts to call the Russian Federation into a U.S. court to defend its application of Russian tax laws to a Russian company, and to defend its criminal prosecution of Russian nationals for frauds committed in Russia.  The claims against the Russian Federation must be dismissed.

### ARGUMENT

For the reasons stated in the Russian Federation's Motion to Dismiss and as follows, plaintiffs have failed to bear their burden of establishing that any exception to sovereign immunity applies.  *See* Russian Federation's Motion to Dismiss Plaintiff's Amended Complaint ("RF Motion") at 4; *see also Gutch v. Fed. Republic of Germany*, 444 F. Supp. 2d 1, 6 (D.D.C. 2006) (where the parties agree on the sovereign status of a defendant, "the plaintiff bears the

burden to establish that one of the FSIA exceptions applies and allows his claims to proceed") (citation omitted).  Accordingly, all claims against the Russian Federation must be dismissed.

## I.    THE "EXPROPRIATION" EXCEPTION IS INAPPLICABLE BECAUSE PLAINTIFFS' ALLEGATIONS SATISFY NONE OF ITS PRECONDITIONS

Plaintiffs' Opposition does not dispute that the expropriation exception requires (i) the *plaintiffs'* rights in property (ii) to be taken in violation of *international* law and (iii) that the *property which has been taken* (or property exchanged for that property) be owned or operated by an *agency or instrumentality* of the Russian Federation that is engaged in commercial activity in the U.S.  Although plaintiffs must satisfy all three of these requirements, they cannot satisfy even one.

Central to this three part test is the identity of the "property" that has allegedly been taken.  The same property must be at issue in all three elements of the test, and only the alleged taking of that particular property can be claimed against the sovereign.  Thus, to satisfy the first part of the test, the plaintiff must have "rights" in particular property; to satisfy the second part, that *same* property must have been taken in violation of international law; to satisfy the third part, that *same* property must now be owned or operated by an "agency or instrumentality" of the foreign sovereign that is engaged in commercial activity in the U.S.  Plaintiffs, however, can identify *no* particular property that satisfies all three parts of the test.  Plaintiffs cannot establish rights in anything other than their ADRs, but their ADRs have not been taken.  To avoid this fundamental defect, plaintiffs argue (incorrectly) that the Russian Federation has expropriated Yukos from its owners, but plaintiffs claim that shares of Yuganskneftegaz — not Yukos — are now owned by a supposed "agency or instrumentality" of the Russian Federation.  Thus, not only is plaintiffs' argument contrary to controlling precedent

(as detailed below), but plaintiffs are unable even to identify any property that satisfies all three elements. These deficiencies are fatal to plaintiffs' reliance on the "expropriation" exception.

### A. Plaintiffs' Only Rights In Property Are The Intangible Contractual Rights Created By Their ADRs

Because it is indisputable that their ADRs have not been taken, plaintiffs argue that the "property" at issue in this case is not their ADRs, or the value of their ADRs, but "Yukos Oil Company and its assets." Opp. at 10. Because it is also undisputed that the Russian Federation did not "issue a simple decree to re-nationalize Yukos," plaintiffs argue that the Russian Federation has engaged in a "constructive taking of Yukos" by seizing "Yukos piece by piece." *Id.* at 1, 10. Specifically, plaintiffs contend that the Russian Federation "ha[s] levied illegal and confiscatory multi-billion dollar tax demands on Yukos sufficient to appropriate all of the company's economic value . . . and seized the company's principal production asset, Yugashneftegaz." *Id.* at 2. Yet, plaintiffs do not assert that Yukos no longer exists (nor even that their ADRs are no longer tradeable) because, as their own exhibits confirm, Yukos continues to employ 70,000 workers and to produce nearly half a million barrels of oil per day. *See* Opp. Ex. 15 at 3.

In reality, the only issue plaintiffs can possibly complain about is the investment loss they claim to have suffered from Yukos's financial difficulties, not a taking of any of *their* property. Trying to shoehorn themselves into the "expropriation" exception, however, plaintiffs argue that their ownership of Yukos ADRs gives them property rights in Yukos's tangible assets. Plaintiffs' argument is both (i) rejected by controlling precedent, and (ii) unsupported by the few non-controlling cases they cite.

First, the lynchpin of plaintiffs' argument is the remarkable assertion that "share ownership entails a property interest in a corporation's assets." Opp. at 12. This assertion is

4

both factually inapposite and legally indefensible. It is factually inapposite because ADRs are

not shares. ADRs only entitle their holders to certain contractually-defined rights with respect to

shares.[1] The well-settled view in this Circuit, and most others, is that contractual rights — such

as a bank depositor's right to its deposits or even a shareholder's interest in a corporation — are

intangible and, therefore, not "rights in property" for purposes of the "expropriation" exception.

*See* RF Motion at 9-10 & n.5 (citing cases); *Idas Res. N.V. v. Empresa Nacional de Diamantes*

*de Angola E.P.*, No. 06-00570 (ESH), 2006 WL 3060017, at *4 (D.D.C. Oct. 26, 2006)

(describing as "well-established" the law holding that the expropriation exception does not reach

intangible property rights); *Gutch*, 444 F. Supp. 2d at 10 (holding actual seizure of bank accounts

and corporate stocks does not trigger "expropriation" exception because they are not tangible

property, as required by the exception).[2] Thus, plaintiffs possess nothing more than intangible

contractual interests to Yukos shares, and, as explained in the next paragraph, even the Yukos

shares to which plaintiffs merely have contractual rights provide nothing more than an intangible

interest in Yukos, not rights in property to Yukos assets.[3] Plaintiffs are far removed from any

---

[1]    *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002) ("The holder of an ADR is not the title owner of the underlying shares; the title owner of the underlying shares is either the depositary, the custodian, or their agent. . . . An issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners. *The agreement establishes the terms of the ADRs and the rights and obligations of the parties, such as the ADR holders' voting rights*.") (emphasis added); American Depository Receipts, Securities Act of 1933, Exchange Act Release Nos. 33-6984, 34-29226, 1991 WL 294145, at *11 n.63 (May 23, 1991) ("[T]he deposit agreement constitutes the contract between the issuer of the deposited securities, the depository and the holders of ADRs. ADR holders are deemed to have agreed to all terms in the deposit agreement by their acceptance and holding of ADRs.").

[2]    *See also Brewer v. Socialist People's Republic of Iraq*, 890 F. 2d 97, 101 (8th Cir. 1989); *Hirsch v. State of Israel*, 962 F. Supp. 377, 383 (S.D.N.Y. 1997); *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, No. 94 Civ. 1942 (KMW), 1996 WL 413680, at *8 (S.D.N.Y. July 24, 1996); *Intercontinental Dictionary Series v. De Gruyter*, 822 F. Supp. 662, 678 (C.D. Cal. 1993).

[3]    The ADR Agreement governing ADRs in Yukos shares specifically explains that holders of Yukos ADRs are not guaranteed the same treatment as Yukos shareholders: "There can be no assurance that Holders [of ADRs] generally, or any Holder in particular, will be given the

property interest, much less a tangible property interest, in the Yukos assets that have allegedly been expropriated "piece by piece."

Plaintiffs' argument is legally indefensible because it is black letter law that even shareholders (much less ADR holders) have *no* property interest (tangible or intangible) in corporate assets. As the Supreme Court observed in *Dole Food*: "An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest." 538 U.S. at 475 (citing 1 W. M. Fletcher, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 31 (rev. ed. 1999)); *see also* RF Motion at 9.[4] In *Smith v. Washington Sheraton Corp.*, the D.C. Circuit emphasized this "fundamental principle of corporate law that '[t]he owner of the shares of stock in a company is not the owner of the corporation's property.'" 135 F.3d 779, 786 (D.C. Cir. 1998) (quoting *Rhode Island Hosp. Trust Co. v. Doughton*, 270 U.S. 69, 81 (1926)); *see also Nielsen v. Sec'y of Treasury*, 424 F.2d 833 (D.C. Cir. 1970) (refusing to recognize shareholder right to corporate assets in absence of veil piercing).[5] While it is true that this bedrock principle may be excused where the corporate veil is properly lifted and the shareholder bears both the rights *and*

---

opportunity to exercise rights on the same terms and conditions as the holders of [Yukos] Shares or to exercise such rights." *See* Opp. Ex. 1 (Yukos Oil Company Form F-6EF) at Ex. a (Deposit Agreement), § 4.04.

[4]     Russian law also denies participants in joint stock societies, such as Yukos, a property interest in the assets of the society. *See* Civil Code of the Russian Federation, Art. 48(1), (2).

[5]     We note that *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1518 (D.C. Cir. 1984), upon which plaintiffs rely, was vacated by the Supreme Court, 471 U.S. 1113 (1985), and has no precedential value. *See Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 100 n.13 (D.D.C. 2005). On remand from the Supreme Court, the D.C. Circuit reached the opposite result on other grounds. *Ramirez de Arellano v. Weinberger*, 788 F.2d 762 (D.C. Cir. 1986). Even the first *Ramirez* decision, however, addressed the standing of a U.S. citizen to assert constitutional claims under the U.S. Constitution; a far cry from the analysis of "rights in property" at issue under Section 1605(a)(3) of the FSIA.

*the liabilities* of the corporation, we note that neither the plaintiffs nor any Yukos shareholders propose to lift the corporate veil and assume responsibility for Yukos's liabilities.[6]

Second, plaintiffs' reliance on *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 616 F. Supp. 660 (W.D. Mich. 1985), and *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992), is misplaced.  In *Kalamazoo*, the plaintiff had a controlling 80% stake in a closely-held spice company before the Ethiopian government issued a decree expropriating a majority of the company's shares, taking control of the company, and then operating the company as an agency or instrumentality of the government.  *Kalamazoo*, 616 F. Supp. at 661.  The *Kalamazoo* court thus faced an actual taking of the plaintiffs' property rights (*i.e.* shares of the spice company), and then confronted the question whether a taking of intangible stock interests could ever fall within the "expropriation" exception.  The court reasoned that since the controlling block of shares taken by the Ethiopan government carried the ability to control the spice company's tangible assets, that block of shares functioned as a tangible property interest.  *Id*. at 663.

The *Siderman* case also involved the taking of control of a closely-held company; there, the plaintiffs were immediate members of the same family and had held a 100% interest in the company.  *Siderman*, 965 F.2d at 703.  The Argentine government seized the plaintiffs' company through a judicial intervention, and then retained the company despite a local court

---

[6]    Independent analysis of plaintiffs' alleged property rights under the reasoning of the D.C. Circuit's decision in *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 88 (D.C. Cir. 2005), leads to the same result.  In *Peterson*, the court evaluated whether plaintiff had a property right in contributions by his employers to a retirement and death benefits program.  The Court held that he did not because (i) the contributions were not earmarked in his name and (ii) he was entitled to an annuity, but not guaranteed a return of the contributions.  Similarly, corporate assets are not earmarked for particular (or all) shareholders, and no shareholder is guaranteed any return at all.  (The *Peterson* court also noted that the entire plan could have been unilaterally terminated for all workers, a point that the plaintiff there argued was relevant to his assertion that the alleged deprivation violated international law.)

order terminating the intervention.  *Id*. at 703-04.  In fact, the company in *Siderman* was so clearly expropriated *in toto* that the *Siderman* court held that the company had become an "agency or instrumentality" of the foreign state.  *Id.* at 712.  The *Siderman* court merely held that the plaintiffs' company was taken without actually addressing what tangible property rights *of the plaintiff* were taken, and certainly without holding that a nominal shareholder (much less ADR holder) in a publicly-traded company has any property right in the assets of her company.  *Id*. at 711-12.

Unlike the plaintiffs in *Kalamazoo* and *Siderman*, the plaintiffs here can claim no more than a nominal contractual stake in a publicly-traded company.  The plaintiffs here held ADRs representing interests in less than one-tenth of one percent of the outstanding shares of Yukos.  Plaintiffs do not allege (and could not allege) that they ever had control — either alone or as part of a closely-held group — of Yukos.[7]  Thus, even assuming *Kalamazoo* and *Siderman* were properly decided on their particular facts, this case is far closer to this Court's decision in *Gutch*, where some corporate stocks (and bank accounts) were seized by the German government

---

[7]    Although legally irrelevant since neither Yukos Universal Limited ("YUL") nor Hulley Enterprises ("Hulley") is a plaintiff in this case, plaintiffs' assertion that those two entities' 51 percent interest in Yukos was "seized" by the Russian Federation is misleading.  *See* Opp. at 2; AC, ¶182.  YUL and Hulley filed appearances in Yukos's Texas bankruptcy proceeding in 2005 confirming their continuing ownership of approximately 51 percent of Yukos's shares.  *See In re Yukos Oil Company*, Bankruptcy No. 04-47742-H3-11 (Bankr. S.D. Tex. Dec. 16, 2004), Docket Entry 131.  Consistent with that admission, the Russian prosecutor's office reported at the time of the attachment that the shares were being attached to ensure they would not be transferred; all other ownership rights (including voting rights) were completely unaffected.  *See* http://www.genproc.gov.ru/ru/news/news_current_print.shtml?2003/10/31_print.html (visited Nov. 9, 2006) (translated from the original Russian) ("The Department of Information and Public Relations emphasized that the freezing of common shares of Yukos Oil Company JSC was carried out pursuant to a court judgment.  The shares have been frozen but have not been seized. . . . The shares remain on accounts with the Trust Bank.  Only the shares of entities which are in criminal proceedings have been frozen.  The shares of other shareholders have not been frozen. In accordance with the standards of the Code of Criminal Procedure of the Russian Federation, there are certain restrictions regarding the disposal of such shares.  They may not be sold.  Any other transactions with frozen shares may be carried out.")

to pay a tax debt. Distinguishing *Kalamazoo* on the ground that the seized corporate stocks were not a controlling stake, the *Gutch* court held that the stocks (and bank accounts) were *not* "rights in property" for purposes of the "expropriation" exception. 444 F. Supp. 2d at 10-11; *see also* 12B W. M. Fletcher, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5911.50 (rev. ed. 1999) ("Courts sometimes recognize the right of a close corporation shareholder to sue directly, as an individual, on a cause of action that would normally have to be brought derivatively."). Of course, this case is even easier than *Gutch*, because plaintiffs cannot even claim that their ADRs have been taken.[8]

Plaintiffs' contractual ADR rights, which have not been taken from plaintiffs, do not provide any basis to rely upon the "expropriation" exception. A ruling to the contrary would invite individual investors in publicly-traded foreign companies to assert claims against foreign sovereigns for any disputed tax or regulatory actions that are financially disadvantageous to the foreign company. Accordingly, the first requirement of the "expropriation" exception is not satisfied because plaintiffs fail to identify any of their property rights that have been taken.

**B. There Has Been No Taking Of Property In Violation Of International Law.**

Plaintiffs' entire discussion to support the second requirement of the "expropriation" exception — that the plaintiffs' rights in property have been taken in violation of international law — amounts to a quotation from *Crist v. Republic of Turkey*, 995 F. Supp. 5 (D.D.C. 1998), a discussion of the futility exception to the international law requirement to exhaust local remedies, and the following sentence: "Plaintiffs have alleged that the Russian Federation has taken their property without just compensation." Opp. at 13. *Crist* is of no

---

[8]    Although the holdings of both *Kalamazoo* and *Siderman* are factually distinguishable from this case for all the reasons discussed above, they were also both decided prior to the Supreme Court's decision in *Dole Food*.

assistance to plaintiffs because the Turkish Cypriot government in that case had seized, without any compensation, real property to which the U.S. citizen plaintiffs held legal title. 995 F. Supp. 2d at 6-7.[9]  Moreover, plaintiffs' discussion of the futility exception is inapplicable here, as explained at pages 12-13, *infra*.  Finally, plaintiffs' one-sentence *ipse dixit* not only assumes plaintiffs' have a property right to Yukos's assets, but fails to confront two gaping legal holes in their argument.  <u>First</u>, plaintiffs fail to address the indisputable fact — which their Opposition concedes — that the alleged "taking" was compensated through an offset against the "multi-billion dollar tax demands on Yukos sufficient to appropriate all of the company's economic value."  Opp. at 2.  It is undisputed that compensated takings do not violate international law.  Opp. at 13.  <u>Second</u>, plaintiffs do not dispute that international law is not violated by a sovereign's seizure of property of its own nationals.  This concession is dispositive since the allegedly taken property — whatever supposed interest the plaintiffs claim to have had in it — was the property of Yukos, a Russian national.

> **1.    This Court Must Find — As A Matter of Law — That The Alleged Taking Was For Adequate Compensation**

According to plaintiffs, the Russian Federation has "seized Yukos piece by piece" (Opp. at 1) in compensation for "multi-billion dollar tax demands on Yukos [that were] sufficient to appropriate all of the company's economic value" (Opp. at 2).  Although plaintiffs allege that those tax demands are "illegal and confiscatory," those allegations are rhetoric without any legal significance.  Under the act of state doctrine, this Court is required to treat those tax decisions as "rules of decision" that are lawful and valid.  *See, e.g.*, *Riggs Nat'l Corp. v. Comm'r*, 163 F.3d

---

[9]    Even on the stark facts of *Crist*, however, the Court respected the Turkish Cypriot government's sovereign immunity because the plaintiffs' mere allegations and bald assertions regarding a nexus of the taking to the U.S. were "simply too tenuous" to support the assertion of jurisdiction over a foreign sovereign under the "expropriation" exception. *See id.* at 11.

1363, 1368 (D.C. Cir. 1999).  Accordingly, as explained in the Russian Federation's Motion to

Dismiss — and never disputed by the plaintiffs in their Opposition — the levying against Yukos

assets to pay outstanding tax debts is an offset of assets against liabilities that is *not* an

uncompensated taking of property.  RF Motion at 10-11; *cf. Fry v. United States*, 72 Fed. Cl.

500, 509 (2006) ("the lawful exercise of the Government's tax collection powers does not

amount to a taking"); *Kitt v. United States*, 277 F.3d 1330, 1336 (Fed. Cir. 2002) ("[T]he mere

imposition of an obligation to pay money . . . does not give rise to a claim under the Takings

Clause  . . . .") (internal quotations and citation omitted); *Demes v. United States*, 52 Fed. Cl.

365, 369 (2002) ("the imposition of a tax is not 'the taking of private property for public use in

the sense of the constitution'" ) (quoting *County of Mobile v. Kimball*, 102 U.S. 691, 703

(1880)).

      Put another way, the forcible collection of tax debts is neither expropriatory nor a

violation of international law.  *See Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d

875, 892 (2d Cir. 1981) (declining to hold that international law requires anything more or less

than "appropriate compensation" to be paid to owners of property that is allegedly expropriated

by the state); *Zappia Middle E. Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 252 (2d

Cir. 2000) ("expropriation" exception cannot apply where there is no "taking" of property by the

foreign sovereign).  Plaintiffs' argument to the contrary would subject the U.S. government to

claims under international law for every disputed tax levy that the IRS makes against a publicly-

traded company with at least one foreign shareholder.

      **2.**    **Because The Allegedly Seized Property Belonged Directly To A Russian National, There Is No Violation Of International Law**

      According to plaintiffs, the Russian Federation's alleged misconduct was to

"seiz[e] Yukos piece by piece."  Opp. at 1.  Each of those allegedly taken  "pieces," such as

Yukos's shares in its production subsidiary, Yuganskneftegaz, was directly owned by Yukos. The amended complaint clearly demonstrates that the plaintiffs are complaining about the Russian Federation's tax and criminal enforcement actions against the property of its own citizen — Yukos.

In all instances alleged in the amended complaint, the Russian Federation was enforcing Russian laws against a Russian corporation. Because the government's actions were directed toward a Russian citizen, the actions of the Russian government cannot violate international law. *See* RF Motion at 10-11; *see also De Sanchez v. Banco Cent. de Nicaragua*, 770 F.2d 1385, 1396-97 (5th Cir. 1985); *Wahba v. Nat'l Bank of Egypt*, No. 2-03-CV-90, 2006 WL 2844905, at *7 (E.D. Tex. Sept. 29, 2006) (dismissing claims by U.S. national shareholder of an Egyptian corporation for alleged expropriation of corporate assets because "[f]rom [the foreign sovereign's] perspective, it was dealing with Egyptian assets owned by Egyptian corporations, the principle agent of which was an Egyptian citizen").

### 3. Plaintiffs' Failure To Exhaust Their Remedies In Russia Bars The Assertion Of An International Violation

It is a general principal of international law, recognized in the U.S. and applied in the context of the FSIA, that an alien must pursue the local remedies made available by a foreign nation before accusing that nation of violating international law. RF Motion at 11-12. Plaintiffs do not dispute this principle, but argue that their compliance should be excused because they believe it would be futile. Notably, plaintiffs identify no case in which a U.S. court found that the pursuit of local remedies would be futile. That is because such a finding would represent an extraordinary ruling.

Plaintiffs bear a heavy burden in demonstrating futility. In support of their argument, plaintiffs have not alleged that foreign investors would be mistreated or denied justice

in the Russian courts.  Rather, they cite to the unsworn assertions of their own amended complaint, news articles and other hearsay that relate, virtually without exception, to the criminal prosecution of Mikhail Khodorkovsky and other Russian citizens.  *See* Opp. Exs. 4-17, 29-36. This hodgepodge of material says nothing about the Russian Federation's attitude toward foreign investors.  *Id.*  Far more telling is the conduct of Yukos, itself.  Plaintiffs concede that Yukos has repeatedly pursued relief in the local Russian courts, thereby revealing its conviction that the pursuit of local remedies is *not* futile.  AC, ¶¶ 213, 215.  The Russian Federation's right to sovereign immunity cannot be overcome by the plaintiffs' apparent preference for the publicity and procedures they can secure in the U.S.

## C. The "Property" Allegedly Taken Lacks The Required Jurisdictional Nexus To The United States

It is undisputed that the "expropriation" exception requires plaintiffs to establish that the allegedly expropriated property is either (i) present in the U.S. in connection with a foreign state's commercial activities here or (ii) "owned or operated by an agency or instrumentality of the foreign state [that] is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).  Plaintiffs rely on the second alternative, arguing that (i) Rosneft is an "agency or instrumentality" of the Russian Federation, (ii) Rosneft owns or controls Yuganskneftegaz, and (iii) Rosneft engages in commercial activity in the U.S.  Opp. at 10-11, 14-15.  Although plaintiffs must establish all three components, plaintiffs fail to establish even one.

### 1. Rosneft Is Not An "Agency or Instrumentality" Of The Russian Federation

Section 1605(a)(3) requires the allegedly taken property to be owned or controlled by an "agency or instrumentality of the foreign state."  28 U.S.C. § 1605(a)(3).  That term — "agency or instrumentality of the foreign state" — is expressly defined in the FSIA at 28 U.S.C.

§ 1603(b).  *See Crist v. Republic of Turkey*, 107 F.3d 922 (D.C. Cir. 1997); 28 U.S.C. § 1603(b).

[10]  Section 1603(b) defines the term as:

> any entity—
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in [28 U.S.C. § 1332(c) and (e)] nor created under the laws of any third country.

In *Dole Food*, the Supreme Court squarely held that the second element requires *direct* ownership by a foreign sovereign of a majority of the entity's shares:  "We hold that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement."  538 U.S. at 473-74.  The Supreme Court further held that Section 1603(b)(2) requires that the status of an entity as an "agency or instrumentality" must "be determined at the time suit is filed."  *Id.* at 478.  The Supreme Court explained that evaluating the entity's status at the time suit is filed — rather than the time of the alleged misconduct — is essential because "[f]oreign sovereign immunity . . . is not meant to avoid chilling foreign states or their instrumentalities in the conduct of their business but to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns."  *Id.* at 479.

It is undisputed that at the time this lawsuit was filed, Rosneft was virtually 100 percent owned by OAO Rosneftegaz ("Rosneftegaz"), and was *not*, therefore, directly owned by

---

[10]    A relationship of principal and agent is *not* adequate to bring an entity within the definition of "agency or instrumentality of a foreign state," and we do not understand plaintiffs' discussion of common law agency at page 5 of their Opposition to be arguing otherwise.

the Russian Federation.  AC, ¶ 74.  ***This single — undisputed — fact bars application of the "expropriation" exception in this case.***  In fact, plaintiffs admit that this "[c]ourt can <u>only</u> exercise jurisdiction over the Russian Federation pursuant to the expropriation exception if Rosneft . . . is considered an agency or instrumentality of the state."  Opp. at 9 (emphasis added).

Plaintiffs offer no principled or lawful basis to disregard Rosneftegaz's existence, and there is no basis for this Court to do so.  Although plaintiffs have sued Rosneftegaz as a separate corporate entity, they ask this Court to "disregard its existence for jurisdictional purposes [so that it can] treat Rosneft as an agency or instrumentality of the Russian Federation as if it were directly owned by the state."  Opp. at 8.  Plaintiffs' reasons for ignoring Rosneftegaz's existence are that (i) Rosneftegaz does not directly own productive assets, but instead holds shares of Rosneft and approximately 10 percent of the shares of Gazprom; (ii) the Russian Federation exercised extensive and direct control over Rosneft; and (iii) unless Rosneftegaz is ignored, the Russian Federation will be entitled to immunity under the FSIA.  Opp. at 8-9.  If, however, there had been any plausible basis for Rosneft to claim the protections of "agency or instrumentality" status under the FSIA, it surely would have done so.

Plaintiffs' argument violates controlling law and is utterly unprincipled and result-oriented.  In *Dole Food*, the Dead Sea Companies were indirectly owned by the Israeli government.  The Dead Sea Companies vigorously argued to the Supreme Court that Israel was not only the indirect owner of these companies, but actually exercised "pervasive control over . . . every facet of the company's operations and activities," including appointing government employees to the board of directors; terminating directors and specifying the content of board minutes; approving the selection and compensation of the chief executive officers, auditors and attorneys; selecting suppliers; setting executive compensation levels and approving employee

15

bonuses; issuing hiring and promotion directives; approving investments; and reviewing and

approving the budget, business plan and operations.  Brief of Petitioner at 14-15, *Dead Sea*

*Bromine Co., Ltd. v. Patrickson*, No. 01-594, 2002 WL 1987405 (S. Ct. Aug. 22, 2003).  Finding

this entire litany legally irrelevant in the face of the unambiguous statutory language requiring

direct majority ownership, the Supreme Court stated (538 U.S. at 474, 477):

> The Dead Sea Companies urge us to ignore corporate formalities and use
> the colloquial sense of that term. . . . We reject this analysis.  In issues of
> corporate law[,] structure often matters.  It is evident from the Act's text
> that Congress was aware of settled principles of corporate law and
> legislated within that context.  The language of § 1603(b)(2) refers to
> ownership of "shares," showing that Congress intended statutory coverage
> to turn on formal corporate ownership.
>
> * * *
>
> The Dead Sea Companies say that the State of Israel exercised
> considerable control over their operations, notwithstanding Israel's
> indirect relationship to those companies.  They appear to think that, in
> determining instrumentality status under the Act, control may be
> substituted for an ownership interest.  Control and ownership, however,
> are distinct concepts. . . . Majority ownership by a foreign state, not
> control, is the benchmark of instrumentality status.  We need not delve
> into Israeli law or examine the extent of Israel's involvement in the Dead
> Sea Companies' operations.  Even if Israel exerted the control [that] the
> Dead Sea Companies describe, that would not give Israel a "majority of
> [the companies'] shares or other ownership interest."  The statutory
> language will not support a control test that mandates inquiry in every case
> into the past details of a foreign nation's relation to a corporate entity in
> which it does not own a majority of the shares.

Thus, just three years ago, the Supreme Court unambiguously rejected precisely the argument

proffered by plaintiffs here.[11]

---

[11]    The Court in *Dole Food* further stated, without deciding whether piercing the corporate veil
could ever be used to evade the explicit statutory language of Section 1603(b), that the "doctrine
of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or
certain other exceptional circumstances."  538 U.S. at 475; *see also First Nat'l City Bank v.
Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626 (1983) ("*Bancec*") ("Freely
ignoring the separate status of government instrumentalities would result in substantial

Under the teaching of *Dole Food*, none of the three criteria proffered by plaintiffs in this case provide any basis to ignore Rosneftegaz's existence.  <u>First</u>, the fact that Rosneftegaz is a holding company without its own productive assets is irrelevant.  Holding companies routinely exist and are not pierced because they lack their own productive assets.  *See, e.g.*, *Invacare Corp. v. Sunrise Med. Holdings, Inc.*, No. 1:04CV1439, 2004 WL 3418915, at *8 (N.D. Ohio Dec. 15, 2004) (noting that there is nothing impermissible about "a holding company whose sole purpose is to hold the stock of its subsidiary, . . . ." and that no law had been presented "suggesting that this type of corporate structure automatically renders the parent and subsidiary alter egos of each other"); *Acorn v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160, 1165 (N.D. Cal. 2002) (rejecting a jurisdictional approach that would result in a rule that actions of a holding company's subsidiary are attributable to the holding company parent).  Plaintiffs do not claim that Rozneftegaz fails to maintain the appropriate corporate formalities.  Nor can they even claim that Rozneftegaz's sole purpose is to hold all Rosneft shares.  Rather, the amended complaint concedes that in June 2005, the same month that Rosneftegaz was formed, Rozneftegaz acquired a ten percent interest in Gazprom.  AC, ¶¶ 74, 129.  Nor is Rosneft even wholly-owned by Rozneftegaz since, earlier this year, Rosneft conducted an initial public offering through which a percentage of its shares were sold to private investors.  *See* Opp. at Ex. 38.  <u>Second</u>, *Dole Food* makes clear that plaintiffs' assertions regarding the Russian Federation's

---

uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality.  As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated.").  *Bancec*, even assuming it is applicable in the context of this case where there is an explicit statutory definition of "agency or instrumentality," does not create a general right to pierce the corporate veil of government-owned corporations.  To the contrary, *Bancec* limits such action to counterclaims under extraordinary circumstances that are not present here.  *See* 462 U.S. at 613-16, 633.

alleged control over Rosneft are legally irrelevant.  As the Court said, "[m]ajority ownership by a foreign state, not control, is the benchmark of instrumentality status. . . . The statutory language will not support a control test that mandates inquiry in every case into the past details of a foreign nation's relation to a corporate entity in which it does not own a majority of the shares." 538 U.S. at 477.  Third, plaintiffs' injustice argument is nothing more than an assertion that it would be unfair to follow the law and respect the Russian Federation's immunity.  As the Supreme Court made perfectly clear in *Dole Food*, such arguments have no place in FSIA analysis.[12]

Plaintiffs' results-oriented effort to ignore Rosneftegaz and treat Rosneft as an "agency or instrumentality" would have the effect of empowering Rosneft to assert the status of a "foreign state" in all U.S. proceedings against it.  Because Rosneft is not an "agency or instrumentality," that would be improper and unjust.

## 2. Rosneft Does Not Own Or Control The Alleged "Rights In Property" Supposedly Taken From Plaintiffs

Rosneft must not only be mischaracterized as an "agency or instrumentality" of the Russian Federation to satisfy the third requirement of the "expropriation" exception, Rosneft must also own or control the "right in property" that was allegedly taken from the plaintiffs in violation of international law.  Yuganskneftegaz — not Yukos — is the only supposedly taken property that the plaintiffs allege is owned or controlled by Rosneft.  Opp. at 10-11.  Thus, even if plaintiffs could somehow establish — despite *Dole Food* and black letter law (*see* text at 5-9, *supra*) — that their ADRs gave them some property interest in Yukos, itself, there is no

---

[12]    The injustice component of veil piercing in non-fraud cases focuses on whether the subsidiary entity was properly capitalized to cover the risks associated with its business activities.  *U.S. ex rel. Siewick v. Jamieson Sci. and Eng'g, Inc.*, 191 F. Supp. 2d 17, 21 (D.D.C. 2002) *aff'd*, 322 F.3d 738 (D.C. Cir. 2003).  Plaintiffs do not even attempt to assert any inadequacy in capitalization.

allegation (or basis to allege) that Rosneft owns or controls Yukos.  This mismatch between the property allegedly expropriated (*i.e.*, Yukos) and the property owned by Rosneft (*i.e.*, Yuganskneftegaz), alone, dooms plaintiffs' reliance on the "expropriation" exception.  And even beyond this mismatch problem, the alleged taking of Yuganskneftegaz from Yukos, a Russian entity, could never violate international law.  *See* text at 9-10, *supra*.

### 3.  Rosneft Is Not Engaged In Commercial Activity *In* The United States

Finally, even if Rosneft were an "agency or instrumentality" that owned or controlled the property allegedly taken from plaintiffs, the "expropriation" exception would still be inapplicable unless plaintiffs could show that Rosneft conducts commercial activity *in* — not directs activity *toward* — the U.S.  28 U.S.C. § 1605(a)(3); *Idas Resources*, 2006 WL 3060017, at *5.  Although plaintiffs recite a list of alleged commercial activities that purportedly have some connection to the U.S., that list is misleading because each of the listed activities actually relate to commercial activities by Rosneft *in* the Russian Federation.  Thus, plaintiffs' assertion regarding oil exports via the *Belokamenka* is premised on paragraph 122 of the amended complaint, which cites a May 25, 2006 article in *The Economist*.  That article reveals that the *Belokamenka* is a stationary vessel moored in Russian coastal waters, from which third parties acquire and receive oil.  *See Going Twice*, The Economist, http://www.economist.com/research/backgrounders/displaystory.cfm?story_id=6983104 (last visited Nov. 9, 2006).  The plaintiffs' assertions regarding dealings with Marathon, Strat Petroleum and various other U.S. companies likewise all relate to commercial activities *in Russia*.  Finally, plaintiffs' allegations regarding meetings in the U.S. allegedly about prospective investments in Rosneft do not establish commercial activities in the U.S., particularly where any investment was to be made *in Russia*.  These allegations, virtually identical to the allegations

presented in *Idas Resources*, fail to establish that Rosneft is engaged in commercial activities *in the U.S.*

In sum, none of the three independent preconditions to application of the expropriation exception applies: (i) the alleged misconduct did not result in any taking of any property of the plaintiffs (or of Yukos), (ii) the alleged misconduct did not violate international law, and (iii) the alleged misconduct lacks the necessary connection to the U.S.

## II. THE COMMERCIAL ACTIVITY EXCEPTION IS INAPPLICABLE BECAUSE THE ALLEGED CONDUCT IS NOT "COMMERCIAL" AND HAD NO DIRECT EFFECT IN THE UNITED STATES.

There is no dispute that to establish jurisdiction under the commercial activity exception, plaintiffs must demonstrate that their action is (i) based upon an act done "in connection with a commercial activity" that (ii) caused a "direct effect in the United States." *Rong*, 452 F.3d at 888. And, as the very recent decision of the D.C. Circuit in *Rong* makes clear, plaintiffs can do neither.

### A. Plaintiffs' Claims Flow From Sovereign Acts Of The Russian Federation

As explained in the Russian Federation's Motion to Dismiss, the "'threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception [is to] identify the act of the foreign sovereign state that serves as the basis for plaintiffs' claims." *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006); *see also Rong*, 452 F.3d at 888. If "the cause of action is based on a sovereign activity," the commercial activities exception does not apply. *Id.*

In this case, there is no genuine ground for disagreement about the conduct of the Russian Federation on which plaintiffs' claims are based. Plaintiffs assert that the basis of their claim is Rosneft's participation (allegedly as an agent of the Russian Federation) in a conspiracy to eliminate Yukos as a competitor and to acquire Yukos's assets. Opp. at 17. That characterization certainly describes plaintiffs' theory of the *purpose* for the alleged misconduct,

but it fails to describe the *nature* of the alleged misconduct.  In fact, the introduction to plaintiffs'

Opposition expressly characterizes the elimination of Yukos as a competitor and the gaining of

control over Yukos's assets as the *purpose* of the defendants' alleged attack on them.  Opp. at 1-

2.  After explaining the defendants' alleged *purpose* for the alleged misconduct, the Opposition's

introduction then immediately proceeds to describe the *nature* of the defendants' conduct that

allegedly effected their scheme (Opp. at 2):

> To effect their scheme, Defendants have levied illegal and confiscatory
> multi-billion dollar tax demands on Yukos sufficient to appropriate all of
> the company's economic value (*see* Am. Compl. ¶¶ 196-222), and seized
> the company's principal production asset, Yuganskneftegaz ("YNG"),
> through a[] [tax] auction that has been widely acknowledged as a sham.
> *See id.* ¶¶ 261-95.  Defendants also seized a majority of Yukos shares and
> imprisoned its executives, including the company's CEO Mikhail B.
> Khodorkovsky ("Khodorkovsky").  *See id.* ¶¶ 143-46, 157-68, 182-86.

Because Section 1603(d) of the FSIA makes clear that the "commercial character of an activity

shall be determined by reference to the *nature* of the course of conduct or particular transaction

or act, rather than by reference to its *purpose*," the only remaining question is whether levying

taxes and prosecuting criminals are the type of actions by which a private party engages in trade

and traffic or commerce.  28 U.S.C. §1603(d) (emphasis added); *Republic of Argentina v.

Weltover, Inc.*, 504 U.S. 607, 614 (1992).  There is no room to dispute that taxing and

prosecuting are sovereign acts.

       This Circuit's decisions in *Rong* and in *Foremost-McKesson, Inc. v. Islamic

Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990), are instructive.  Both decisions turn on the

threshold step of identifying the conduct on which the lawsuit is based.  And both confirm that

the commercial activities exception has no place here.

       *Rong* involved the seizure, following a decree of nationalization, by a Chinese

province of a controlling interest in an automobile manufacturing company controlled by

plaintiff Rong.  Following the seizure, the assets were sold to a wholly-owned state entity for approximately six percent of their market value.  Rong received no compensation.  Like the plaintiffs in this case, Rong characterized the government's actions as a corporate takeover for commercial purposes, with the ultimate result that the valuable commercial enterprise was owned by a state-owned entity.  The D.C. Circuit rejected Rong's characterization, focusing on the nature of the act that caused Mr. Rong's harm, rather than its motive or purpose.  As the Court explained, all of the alleged misconduct (*e.g.*, removing Rong from the company management and installing government officials, and transferring the company to the state entity) "flow[ed] from" the decree of nationalization — a sovereign, not commercial, act.  *Rong*, 452 F.3d at 889.  The Court explained that "[i]f Rong's interpretation of commercial activity were correct, then almost any subsequent disposition of expropriated property could allow the sovereign to be haled into federal court under FSIA.  Such a result is inconsistent with our precedent, the decisions of other circuits and the Act's purpose."  *Id.* at 890.

Rong carefully analyzes *Foremost-McKesson*, the case on which plaintiffs rely. The alleged misconduct in *Foremost-McKesson* did not flow from a sovereign act like an expropriation decree or a tax assessment, but instead it flowed from a commercial transaction between the plaintiff and instrumentalities of the Iranian government.  As the *Rong* Court explained:  "In *Foremost-McKesson*, however, the plaintiff and various instrumentalities of Iran entered into a formal contract for an agreed upon venture; the commercial activity there was the sovereign instrumentalities' use of their 'majority position to lock the appellee out of the management of the dairy and to deny the appellee its share of the company's earnings.'"  *Id*. (quoting *Foremost-McKesson*, 905 F.2d at 439).  The allegations in *Foremost-McKesson* thus "'sound[ed] in the nature of a corporate dispute between majority and minority shareholders' —

allegations of breach of contract and of the directors' duty of care, with the only distinction being that the majority shares were held by the Iranian government and its subsidiaries rather than by a private party." *Id.* (quoting *Foremost-McKesson*, 905 F.2d at 449-50).

Plaintiffs argue that this case is more like *Foremost-McKesson* than *Rong* because neither this case nor *Foremost-McKesson* involve a "government decree of nationalization." Opp. at 18. But a decree of nationalization is not the only type of sovereign activity. Taxing and prosecuting are just as sovereign as nationalizing. This case is just like *Rong* because the nature of the alleged misconduct from which plaintiffs' claims flow is sovereign. This case is utterly unlike *Foremost-McKesson* because plaintiffs' claims here do not arise out of a contractual relationship between the Russian Federation (or Rosneft) and plaintiffs, or a commercial, corporate dispute between majority and minority shareholders. As in *Rong*, the commercial activity exception is inapplicable.[13]

### B.  The Alleged Conduct Has Had No Direct Effect In The United States

Plaintiffs also fail to establish that the alleged conduct had a direct effect in the U.S. As explained in the Russian Federation's Motion, a "'direct effect' . . . is one which has no

---

[13]  Plaintiffs' argument that Rosneft is an agent of the Russian Federation for attribution purposes is both wrong and a red herring. It is wrong because the plaintiffs' allegations of a principal/agent relationship are based on the Russian Federation's role as Rosneft's ultimate beneficial owner, such as allegations that the Russian Federation has owned 100 percent of Rosneft's shares in the past, appoints government officials to represent it on Rosneft's Board of Directors, regulates Rosneft as the regulatory body responsible for oil and gas reserves and transmissions in the Russian Federation, and consults with Rosneft on an initial public offering of Rosneft's shares. Opp. at 6. All of these allegations are consistent with majority beneficial ownership, and the D.C. Circuit has expressly held under the FSIA that such allegations are insufficient to show a principal/agent relationship exists. *See Transamerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843, 849 (D.C. Cir. 2000); *Foremost-McKesson*, 905 F.2d at 448 (explaining that majority shareholding and majority control of a board of directors, without more, are *not* sufficient to establish a principal/agent relationship). Plaintiffs' argument is a red herring because, as explained in the text, plaintiffs' claims flow from the taxing and policing decisions of the Russian Federation, not any conduct by Rosneft.

intervening element, but, rather, flows in a straight line without deviation or interruption."
*Peterson*, 416 F.3d at 91 (quoting *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C.
Cir. 1994)).

      Plaintiffs contend that because the amended complaint "alleges that Rosneft

supplies the U.S. market with oil," they have established a direct effect in the U.S.  Even if

Rosneft sells oil to the U.S. market (an assertion that is contradicted by the news article plaintiffs

rely on to make it), it is the sovereign's commercial act *upon which the action is based* that must

have a "direct effect" in the U.S.  28 U.S.C. § 1605(a)(2).  Plaintiffs' claims are based upon the

taxing and prosecuting acts of the sovereign, not Rosneft's shipment of oil to the U.S.  *Cf.*

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527, at *6 (D.D.C.

Sept. 21, 2006) (explaining shipments and sale of oil in the U.S. had direct effect because claims

were based upon the "loss of opportunity in the post-independence period of East Timor to

compete or bid for rights to explore for and produce oil and natural gas from the seabed between

East Timor and Australia").

      Equally unpersuasive is plaintiffs' assertion that Yukos's nonpayment of

dividends had a direct effect in the U.S.  Unlike in *Weltover*, 504 U.S. at 618-19, where

Argentina's unilateral rescheduling of the maturity dates of bonds that were designated for

payment in the U.S. had a direct effect in the U.S., there is no relationship in this case between

the Russian Federation and plaintiffs.  The Russian Federation was not supposed to pay any

funds to plaintiffs anywhere.  And assuming the Russian Federation's enforcement of tax laws

caused Yukos to be unable to pay dividends in the U.S., that is just an *indirect* effect of the acts

challenged in this case.  *See United World Trade Co. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d

1232, 1239 (10th Cir. 1994); *see also Rong*, 452 F.3d at 891-92 (Henderson, J., concurring).[14]

Because plaintiffs' claims flow from sovereign conduct, and because that

sovereign conduct had its direct effect in Russia, not the U.S., the commercial activity exception

does not apply.

C ONCLUSION

Plaintiffs' allegations are precisely the kind that the FSIA deprives this Court of

jurisdiction to hear.  The Russian Federation is entitled to sovereign immunity, and that

immunity should be recognized without delay.  Accordingly, the Russian Federation requests

that this Court dismiss the amended complaint pursuant to the FSIA.

November 9, 2006                                   Respectfully submitted,

                                                  /s/ Jay L. Alexander
                                                  Jay L. Alexander (DC Bar No. 412905)
                                                  Ryan E. Bull (DC Bar No. 481473)
                                                  Richard P. Sobiecki (DC Bar No. 500163)
                                                  Baker Botts L.L.P.
                                                  1299 Pennsylvania Avenue, N.W.
                                                  Washington D.C.  20004
                                                  Telephone: (202) 639-7700
                                                  Facsimile:  (202) 585-4064

                                                  Michael S. Goldberg
                                                  Baker Botts L.L.P.
                                                  One Shell Plaza
                                                  910 Louisiana Street
                                                  Houston, Texas  77002
                                                  Telephone: (713) 229-1234
                                                  Facsimile: (713) 229-1522

                                                  *Counsel to the Russian Federation*

---

[14]    The "direct effect" of the alleged actions of the Russian government occurred in Russia, where Yukos violated Russian tax laws and was prosecuted for tax evasion; where shares of a Yukos subsidiary, Yuganskneftegaz, were auctioned; where criminal actions were prosecuted against Yukos employees; and where any additional alleged misconduct took place.

## **Certificate of Service**

I hereby certify that on November 9, 2006, the Reply Brief in Further Support of the Russian Federation's Motion to Dismiss Plaintiff's Amended Complaint was electronically filed with the Clerk of the Court, and that, in the same manner, an electronic copy was served on all counsel of record.

/s/ Ryan E. Bull
Ryan E. Bull