# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RICHARD ALLEN, *et al.* | ) | |
| | ) | Civil Action No.: 05-cv-02077 (CKK) |
| | ) | Hon. Colleen Kollar-Kotelly |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RUSSIAN FEDERATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY BRIEF IN FURTHER SUPPORT OF THE MOTION BY VIKTOR KHRISTENKO, ALEXEI KUDRIN, DMITRY MEDVEDEV, IGOR SECHIN AND IGOR YUSUFOV TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Michael S. Goldberg
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002
Telephone:  (713) 229-1234
Facsimile:  (713) 229-1522

Jay L. Alexander (DC Bar No. 412905)
Ryan E. Bull (DC Bar No. 481473)
Richard P. Sobiecki (DC Bar No. 500163)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington D.C.  20004
Telephone: (202) 639-7700
Facsimile:  (202) 585-4064

## Table of Contents

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.    BECAUSE PLAINTIFFS HAVE SUED THE MINISTERS IN THEIR
      OFFICIAL CAPACITIES, THE CLAIMS MUST BE DISMISSED ..................................3

II.   THIS COURT LACKS PERSONAL JURISDICTION OVER THE MINISTERS ..........4

      A. The Ministers' Sporadic (or Non-Existent) Contacts With The United States Are
         Insufficient To Establish General Jurisdiction.....................................................5

         1.   The Theory Of "Conspiracy Jurisdiction" Does Not Help Plaintiffs Establish
              The Necessary Minimum Contacts...........................................................7

         2.   The Alleged Personal Service In The District Of Columbia On Ministers
              Khristenko And Kudrin Cannot Substitute For The Absence Of Contacts ...............9

      B. Exercising Personal Jurisdiction Over Any Of The Ministers Would Violate
         Traditional Notions Of Fair Play And Substantial Justice.................................11

III.  THE ACT OF STATE DOCTRINE REQUIRES DISMISSAL OF THE
      AMENDED COMPLAINT ...................................................................................13

      A. There Is Neither A Settled Norms Of International Law Exception To The Act Of
         State Doctrine Nor Any Settled Norm That Would Be Relevant Here .............................14

      B. The Unratified U.S.-Russia BIT Of 1992 Provides No Basis To Disregard The
         Act Of State Doctrine...................................................................................17

         1.   The Supreme Court Has Never Adopted A So-Called "Treaty Exception" To
              The Act of State Doctrine ..........................................................................17

         2.   There Is No Ratified Investment Treaty Between The United States And
              Russia.........................................................................................18

         3.   Even If The Unratified Treaty Had Been Ratified, It Would Not Support An
              Exception To The Act Of State Doctrine..................................................20

      C. The Second Hickenlooper Amendment Provides No Basis To Disregard the Act
         of State Doctrine ..........................................................................................21

      D. The Act Of State Doctrine Bars All Of Plaintiffs' Claims ...............................23

IV.     PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE UNDER THE POLITICAL
        QUESTION DOCTRINE .................................................................................................24

V.      THE DOCTRINE OF INTERNATIONAL COMITY BARS THE REVIEW OF
        DISPUTES THAT HAVE ALREADY BEEN DECIDED IN RUSSIA...........................26

CONCLUSION.........................................................................................................................27

## Table of Authorities

### CASES

*Air France v. Saks*,
    470 U.S. 392 (1985).................................................................................................18

*\*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
    480 U.S. 102 (1987)..................................................................................4, 10, 11, 12

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings*,
    268 F.3d 103 (2d Cir. 2001).....................................................................................26

*Baker v. Carr*,
    369 U.S. 167 (1962).................................................................................................25

*Banco Nacional de Cuba v. Chemical Bank N.Y. Trust*,
    822 F.2d 230 (2d Cir. 1987).....................................................................................16

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964).................................................................................................15

*Burnham v. Superior Court of Cal.*,
    495 U.S. 604 (1990).................................................................................................10

*Callejo v. Bancomer, S.A.*,
    764 F.2d 1101 (5th Cir. 1985) ...................................................................16, 17, 18

*Chirila v. Conforte*,
    47 Fed. Appx. 838 (9th Cir. 2002)............................................................................7

*Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*,
    686 F.2d 322 (5th Cir. 1982) ..............................................................................21, 22

*Core-Vent Corp. v. Nobel Industries AB*,
    11 F.3d 1482 (9th Cir. 1993) ...................................................................................11

*Corre v. Caterpillar, Inc.*,
    403 F. Supp. 2d 1019 (W.D. Wash. 2005).............................................................26

*DSMC, Inc. v. Convera Corp.*,
    273 F. Supp. 2d 14 (D.D.C. 2002) ............................................................................7

*Dayton v. Czechoslovak Socialist Republic*,
    672 F. Supp. 7 (D.D.C. 1986) .................................................................................23

*Dayton v. Czechoslovak Socialist Republic,*
    834 F.2d 203 (D.C. Cir. 1987) ...................................................................15

*Doe I v. State of Israel,*
    400 F. Supp. 2d 86 (D.D.C. 2005) ..........................................................6, 26

*Dooley v. United Technologies Corp.,*
    786 F. Supp. 65 (D.D.C. 1992) .............................................................7, 8, 9

*Ellicott Mach. Corp. v. John Holland Party Ltd.,*
    995 F.2d 474 (4th Cir. 1993) ....................................................................13

*Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co.,*
    652 F.2d 231 (2d Cir. 1981) .....................................................................22

*Ferguson v. Christie,*
    No. Civ. A. 04-2289 (CKK), 2005 WL 3201065 (D.D.C. Oct. 12, 2005) ........................4

*First Nat'l City Bank v, Banco Nacional de Cuba,*
    406 U.S. 759 (1972) ................................................................................16

*Fogade v. ENB Revocable Trust,*
    263 F.3d 1274 (11th Cir. 2001) ...............................................................14

*Glen v. Club Mediterranee, S.A.,*
    450 F.3d 1251 (11th Cir. 2006) ...............................................................15

*Gorman v. Ameritrade Holding Corp.,*
    293 F.3d 506 (D.C. Cir. 2002) ..................................................................5

*Gregorian v. Izvestia,*
    871 F.2d 1515 (9th Cir. 1989) .................................................................24

*Harran Transp. Co. v. Nat'l Trailways Bus System,*
    Civ. A. No. 84-2864, 1985 WL 2349 (D.D.C. Aug. 5, 1985) ...........................5

*Heliocopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984) .................................................................................5

*Hwang Geum Joo v. Japan,*
    413 F.3d 45 (D.C. Cir. 2005) ...................................................................25

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
    307 F. Supp. 2d 145 (D. Me. 2004) ...........................................................8

*Int'l Transactions, Ltd. v. Embotelladora Agral Regimontana SA de CV,*
    347 F.3d 589 (5th Cir. 2003) .......................................................26

*Islamic Am. Relief Agency v. Unidentified FBI Agents,*
    394 F. Supp.2d 34 (D.D.C. 2005) ..............................................6

*\*Jungquist v. Sheikh bin Khalifa Al Nahyan,*
    115 F.3d 1020 (D.C. Cir. 1997) ...............................................3, 9

*Kadic v. Karadzic,*
    70 F.3d 232 (2d Cir. 1995)......................................................11, 15

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Ethiopia,*
    729 F.2d 422 (6th Cir. 1984) ...................................................17

*Kulko v. Superior Court of Cal.,*
    436 U.S. 84 (1978).....................................................................6

*Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,*
    26 F. Supp. 2d 593 (S.D.N.Y. 1998)........................................7

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,*
    84 F.3d 560 (2d Cir. 1996) .......................................................5

*Microsys Computing, Inc. v. Dynamic Data Sys., LLC,*
    No. 4:05 CV 2205, 2006 WL 2225821 (N.D. Ohio Aug. 2, 2006) ...................8

*Moore v. Mitchell,*
    30 F. 2d 600 (2d Cir. 1929).....................................................26

*Mujica v. Occidental Petroleum Corp.,*
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) ..................................25

*Presbyterian Church of Sudan v. Talisman Energy Corp. Inc.,*
    244 F. Supp. 2d 289 (S.D.N.Y. 2003)....................................15

*Price v. Socialist People's Libyan Arab Jamahiriya,*
    294 F.3d 82 (D.C. Cir. 2002) ...................................................4

*Ramirez de Arellano v. Weinberger,*
    745 F.2d 1500 (D.C. Cir. 1984) ..............................................22

*\*Riggs Nat'l Corp. v. Comm'r,*
    163 F.3d 1363 (D.C. Cir. 1999) ..............................................14, 16

*Rippey v. Smith*,
  16 Fed. Appx. 596 (9th Cir. 2001) ..................................................................13

*Robinson v. Dist. of Columbia*,
  403 F. Supp. 2d 39 (D.D.C. 2005) ...................................................................4

*Rong v. Liaoning Provincial Gov't*,
  362 F. Supp. 2d 83 (D.D.C. 2005) ..................................................................22

*Rong v. Liaoning Provincial Gov't*,
  452 F.3d 883 (D.C. Cir. 2006) .......................................................................22

*Saleh v. Titan Corp.*,
  436 F. Supp. 2d 55 (D.D.C. 2006) ...................................................................6

*Santana Products, Inc. v. Bobrick Washroom Equip.*,
  14 F. Supp. 2d 710 (M.D. Pa. 1998) ...............................................................7

*Saudi v. Northrup Gruman Corp.*,
  427 F.3d 271 (4th Cir. 2005) ..........................................................................5

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) .......................................................................24

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005) .........................................................................4

*Trans World Airlines, Inc. v. Franklin Mint Corp.*,
  466 U.S. 243 (1984) ........................................................................................18

*United States v. Kember*,
  685 F.2d 451 (D.C. Cir. 1982) .......................................................................18

*Vermont Castings, Inc. v. Evans Prod. Co.*,
  510 F. Supp. 940 (D. Vt. 1981) ........................................................................7

*Vine v. Republic of Iraq*,
  No. 01-02674, 2006 WL 2583696 (D.D.C. Sept. 7, 2006) .............................25

*World Wide Minerals v. Republic of Kazakhstan*,
  296 F.3d 1154 (D.C. Cir. 2002) ......................................................2, 14, 15, 16

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*,
  493 U.S. 400 (1990) ........................................................................................14

*Youming Jin v. Ministry of State Sec.*,
    335 F. Supp. 2d 72 (D.D.C. 2004) ...................................................................................7, 8

## RULES

Fed. R. Civ. P. 4(k)(2) ...................................................................................................6, 7

Fed. R. Civ. P. 12(b)(6) ................................................................................................3, 27

## MISCELLANEOUS

RESTATEMENT (THIRD) OF THE LAW OF FOREIGN RELATIONS OF THE UNITED STATES,
    (1987) ..............................................................................10, 19, 20, 21, 22, 26

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, 31
    I.L.M 808 ............................................................................................................18, 21

Vienna Convention On The Law of Treaties, 1155 U.N.T.S. 331 ...............................................18

Ann Althouse, *The Use of Conspiracy Theory to Establish in Personam Jurisdiction: A
    Due Process Analysis*, 52 Fordham L. Rev. 234 (1983).......................................................7

Joni S. Charme, *The Interim Obligations of Article 18 of the Vienna Convention on the
    Law of Treaties:  Making Sense of an Enigma*, 25 Geo. Wash. J. Int'l L. & Econ.
    71 (1992) ..............................................................................................................19, 20

## INTRODUCTION

Plaintiffs have failed — for a third time — to identify any *personal* act of misconduct by *any* of the Ministers.  Instead, plaintiffs suggest that even if the Ministers are found to have been sued for official capacity conduct, the Ministers are subject to jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") for the same alleged reasons as the Russian Federation.  Plaintiffs' Consolidated Opposition ("Opp.") at 22.  But plaintiffs have no basis to assert jurisdiction under the FSIA for their allegations in this case, as detailed in the Reply Brief in Further Support of the Russian Federation's Motion to Dismiss Plaintiff's Amended Complaint ("RF Reply"), which the Ministers join.  Moreover, because a suit against a government official for official conduct is the equivalent of a suit against the sovereign directly, the Ministers presence in this case is duplicative and unnecessary.  For that reason, the Ministers must be dismissed even before this Court assesses the sovereign immunity issues.

This Court not only lacks subject matter jurisdiction over the claims against the Ministers, it also lacks personal jurisdiction over them.  Plaintiffs argue that each of the Ministers is subject to *general jurisdiction* in the U.S.  Given the incredibly limited number of contacts by each Minister with this country, plaintiffs can point to no authority supporting such a dramatic consequence.  Beyond the absence of minimum contacts, traditional notions of fair play and justice bar the exercise of jurisdiction in cases like this one where the Ministers could not have reasonably expected to be sued — much less in a personal capacity — in the U.S. based on their fulfillment of official responsibilities as senior officials of the Russian Federation.  There is simply no basis for this Court to accept plaintiffs' unprecedented invitation to exercise personal jurisdiction here.

The Ministers need not say more, because the jurisdictional standards so clearly require dismissal of the claims against them.  But because the doctrines of act of state, political question and international comity are of such importance to international relations and the mutual

respect among sovereigns, the Ministers address those points in this Reply as well. Plaintiffs'

amended complaint is a direct assault on the sovereign acts of the Russian Federation. The act of

state doctrine exists to ensure respect for foreign sovereign acts in the face of such assaults, as the

English High Court has recently held on these same facts. *See* Statement of Points and Authorities

in Support of the Ministers Motion to Dismiss (the "Ministers' Motion") at Ex. J. Plaintiffs' effort

to muddle the act of state doctrine into a flexible canon of abstention necessarily founders on

controlling precedent, including the D.C. Circuit's recent decision in *World Wide Minerals v.*

*Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002). Because all of plaintiffs' claims depend

on this Court judging the validity of sovereign acts within the Russian Federation's own borders,

the act of state doctrine mandates dismissal of this entire case.

   The political question and international comity doctrines likewise compel this Court

to respect the authority of the Executive Branch over foreign affairs, the decisions of Russian courts

confirming the validity of the acts of the Russian Federation that plaintiffs seek to put at issue again,

and the decisions of the other branches of the Russian government. Whether to address allegations

that the Russian Federation is a criminal regime and its senior officials racketeers, or to continue to

work with the Russian Federation as a partner, is a judgment that is constitutionally committed to

the Executive Branch. For that reason, this Court should not accept jurisdiction over the amended

complaint. Similarly, international comity protects against plaintiffs' desire for this Court to retread

— rather than respect — the final decisions of the Russian courts.

   It is not necessary for the Ministers to reargue what they have already said about

either (i) the many legal defects in the plaintiffs' complaint, or (ii) the doctrine of forum non

conveniens. Not only is it inconceivable that this Court will not have dismissed this case before

reaching those issues, but the Ministers are confident that the arguments presented in their Motion,

together with the arguments presented by the other defendants in their replies (which the Ministers

join in relevant part), quite clearly establish that plaintiffs' amended complaint also fails under the scrutiny of Federal Rule of Civil Procedure 12(b)(6) and the doctrine of forum non conveniens.

<u>ARGUMENT</u>

I.    **BECAUSE PLAINTIFFS HAVE SUED THE MINISTERS IN THEIR OFFICIAL CAPACITIES, THE CLAIMS MUST BE DISMISSED**

Plaintiffs do not dispute that (i) the Ministers are protected by the FSIA for any alleged misconduct taken in their official capacities and (ii) this Court must evaluate the particular allegations against each Minister and cannot accept plaintiffs' conclusory assertions that the Ministers are being sued in their individual capacities. *Compare* Ministers' Motion at 11-12 *with* Opp. at 22. In response to the Ministers' detailed demonstration that the nature of their alleged misconduct is official and sovereign, plaintiffs say nothing except to repeat the conclusory assertion in their amended complaint that "[a]ll of the Individual Defendants acted in their individual capacities." *Compare* Ministers' Motion at 12-13 *with* Opp. at 22. Plaintiffs' inability to support their conclusory assertion (or even contest the Ministers' detailed explanation) is a tacit admission that this Court must treat the Ministers as officials of the Russian Federation entitled to immunity. *See Jungquist v. Sheikh bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997).

Plaintiffs' inability to substantiate or defend their conclusory assertion is completely dispositive of their claims against the Ministers. For two independent reasons, suit against the Ministers for alleged acts of an official nature must be dismissed. <u>First</u>, the Ministers are entitled to the protections of the FSIA. For all the reasons presented in the submissions of the Russian Federation, no exception to immunity could possibly apply to confer jurisdiction over the Ministers in this case. <u>Second</u>, both plaintiffs and the Ministers agree that "a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly." *See* Ministers' Motion at 13 n.14 (citing *Chuidian v. Phillipine Nat'l Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990)); Opp. at 22 (citing *Chuidian*, 912 F.2d at 1101). Because suit against both the

government and its officials in their official capacity is duplicative and redundant, the claims against the Ministers must be dismissed. *See* Ministers' Motion at 13 n.14 (citing *Chuidian*, 912 F.2d at 1101); *Ferguson v. Christie*, No. Civ. A. 04-2289 (CKK), 2005 WL 3201065, at *1 (D.D.C. Oct. 12, 2005); *cf. Robinson v. Dist. of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005) (explaining that "it is duplicative to name both a government entity and the entity's employees in their official capacity [and that] courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources") (internal quotation omitted).

This lawsuit cannot proceed against the Ministers, and must be dismissed before the Ministers are put to additional burden.

## II.    THIS COURT LACKS PERSONAL JURISDICTION OVER THE MINISTERS

Dismissal is required not only by sovereign immunity, but also because there is no basis to assert personal jurisdiction over any of the Ministers.[1]  Plaintiffs concede that there is no specific jurisdiction.  For that reason, plaintiffs are forced to prove that the Ministers, in their personal capacities, have the "continuous and systematic contacts with the United States" that are required to establish general jurisdiction.  Opp. at 34; *compare* Ministers' Motion at 13-15.  The "continuous and systematic" test for general jurisdiction, however, requires extensive interaction by the defendant with the forum and imposes a "more stringent minimum contacts test" than for

---

[1]    Citing *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005), plaintiffs argue that personal jurisdiction over the Ministers automatically exists if they are being sued in their official capacities.  Opp. at 21-22.  But *TMR Energy* does not relate to individual government officials.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 99-100 (D.C. Cir. 2002) (explaining that foreign states are not "persons" protected by the Fifth Amendment, but expressing no view as to whether that conclusion also applied to "other entities that fall within the FSIA's definition of 'foreign state' — including corporations in which a foreign state owns a majority interest").  We are aware of no authority that has denied an individual non-resident foreign alien the due process protections that the Fifth Amendment affords to all "persons" when determining whether the non-resident foreign alien can be haled to answer claims in a U.S. court.  *Cf. Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 115 (1987) (stressing that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field").

specific jurisdiction. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996), *cited with approval in Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 510 n.2 (D.C. Cir. 2002); *see also Saudi v. Northrup Gruman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) (general jurisdiction requires a "significantly higher" threshold of contacts); *Harran Transp. Co. v. Nat'l Trailways Bus System*, Civ. A. No. 84-2864, 1985 WL 2349, at *2 (D.D.C. 1985) (general jurisdiction requires "more substantial" contacts). A finding of general jurisdiction would represent a finding by this Court that each Minister has such a substantial presence in the U.S. that he could reasonably anticipate being haled into a U.S. court by any plaintiff for any claim. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984). Plaintiffs do not come close to satisfying this test.

### A. The Ministers' Sporadic (Or Non-Existent) Contacts With The United States Are Insufficient To Establish General Jurisdiction

In grossly exaggerated hyperbole, plaintiffs assert that "each Defendant has continuous and systematic contacts with the United States" and, indeed, that Minister Yusufov has "had numerous contacts." Opp. at 24, 34. Plaintiffs' assertion cannot be describing any of the Ministers unless "continuous[,] systematic [and] numerous" were to mean "rarely" or "never." Plaintiffs' amended complaint identifies no contacts by Ministers Medvedev and Sechin with the U.S., one contact by Minister Khristenko with the U.S., two contacts by Minister Yusufov with the U.S., and just six contacts by Minister Kudrin with the U.S. *See* Ministers' Motion at 14; AC, ¶¶ 75, 78-80, 82. Although plaintiffs' Opposition argues that a statement of Minister Yusufov in Moscow should also be treated as a relevant contact (Opp. at 34), the Opposition does not identify any additional contacts with the U.S. by any of the Ministers. Plaintiffs do not specifically allege, much less prove, that any of the Ministers has had the deep and extensive interaction with the U.S. — much less the District of Columbia — that is required to establish general jurisdiction. *Cf. Kulko v. Superior Court of Cal.*, 436 U.S. 84, 93 (1978) (observing that the exercise of personal

jurisdiction over a defendant on the basis of unrelated acts during two visits to the forum "would make a mockery of the limitations on state jurisdiction imposed by the Fourteenth Amendment").[2] Moreover, insofar as the few inconsequential contacts that are asserted occurred in each Minister's official capacity, those contacts cannot qualify as jurisdictionally relevant if the Ministers are deemed to have been sued in their individual capacities (or vice versa). *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 58 (D.D.C. 2005) (a court "cannot assert jurisdiction over an individual defendant based on his contacts taken pursuant to his employment").[3]

Plaintiffs try to cure the virtual absence of jurisdictional contacts with two arguments. First, plaintiffs call on the Court to adopt an unprecedented extension of the already controversial conspiracy theory of jurisdiction to the federal long-arm statute, yet fail even to establish the requisite existence of acts taken in the U.S. in furtherance of any alleged conspiracy (much less any Minister's involvement in that supposed conspiracy or knowledge of the U.S. acts). Second, with regard to Ministers Kudrin and Khristenko, plaintiffs seek to extend the transient jurisdiction doctrine into the international context by arguing that personal service within the U.S. is sufficient, *vel non*, to establish personal jurisdiction. Neither of these arguments remedies the absence of "continuous and systematic" contacts with the U.S.

---

[2]    Plaintiffs seek to rely upon their allegations of securities fraud and RICO violations to justify their dependence on the alleged nationwide, rather than District of Columbia, contacts of each Minister. *See* Opp. at 23-24 (relying on federal long-arm statute at Fed. R. Civ. P. 4(k)(2)). Because the securities fraud and RICO claims are baseless — indeed, frivolous — this Court should not look beyond any alleged District of Columbia contacts. *See Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 59 (D.D.C. 2006); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 120 (D.D.C. 2005). Because even the alleged nationwide contacts are so few or nonexistent, however, the Court may dismiss the case on jurisdictional grounds without even confronting the legal inadequacy of plaintiffs' RICO and securities fraud allegations.

[3]    If plaintiffs' sporadic business travel standard were the law of general jurisdiction in this country, many international business travelers would be subject to the general jurisdiction of U.S. courts. The ramifications for foreign diplomats who occasionally travel to the U.S. would be even more dramatic. The fact that no cases report the exercise of such jurisdiction confirms that plaintiffs incorrectly state the law.

1.  **The Theory Of "Conspiracy Jurisdiction" Does Not Help Plaintiffs Establish The Necessary Minimum Contacts**

Plaintiffs argue that merely by alleging the existence of a conspiracy and that an act in furtherance of that conspiracy was committed in the U.S., a court may exercise personal jurisdiction over all alleged co-conspirators if it actually has personal jurisdiction over any one of them.  Opp. at 36.  This conspiracy theory of jurisdiction — otherwise known as vicarious jurisdiction — still has "a great deal of doubt surrounding [its] legitimacy."  *Chirila v. Conforte*, 47 Fed. Appx. 838, 842 (9th Cir. 2002) (declining to address validity where plaintiff made only conclusory allegations of a conspiracy).  To reduce the constitutional doubts, many courts require that the out-of-state defendant have had awareness or knowledge of the co-conspirator's actions in furtherance of the conspiracy in the forum.  *See, e.g.*, *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 79 (D.D.C. 2004) (concluding that a failure to require awareness or knowledge would "sidestep an explicit due process analysis altogether").[4]

Although this Court has applied the conspiracy theory of jurisdiction under the D.C. long arm statute, *see, e.g.*, *DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 20 (D.D.C. 2002); *Dooley v. United Tech. Corp.*, 786 F. Supp. 65, 71, 78 (D.D.C. 1992), it has never applied the theory under the federal long-arm rule (Fed. R. Civ. P. 4(k)(2)).  The extension of vicarious jurisdiction to the federal long-arm rule would take a concept — nationwide contacts — that already stretches the bounds of due process and use it to ensnare foreign defendants who have absolutely *no contacts* with the U.S., much less the forum state.  As other courts have recognized, this

---

[4]  *See also Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593, 602 (S.D.N.Y. 1998); *Santana Prod., Inc. v. Bobrick Washroom Equip.*, 14 F. Supp. 2d 710, 718 (M.D. Pa. 1998); *Vermont Castings, Inc. v. Evans Prod. Co.*, 510 F. Supp. 940, 944 (D. Vt. 1981). *See also* Ann Althouse, *The Use of Conspiracy Theory to Establish in Personam Jurisdiction:  A Due Process Analysis*, 52 Fordham L. Rev. 234, 254-55 (1983) (arguing that due process requires conspiracy jurisdiction only be applied where (1) the act in furtherance of the conspiracy in the forum suffices as a basis to exercise personal jurisdiction over the actor and (2) the courts finds "some purposeful act on the part of each defendant that justifies the inference that he knew or should have known that that act entailed the risk of consequences in the forum state").

combination of nationwide contacts and vicarious jurisdiction is inconsistent with due process.  *See*

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 307 F. Supp. 2d 145, 158 (D. Me.

2004) (declining to apply the conspiracy theory of personal jurisdiction to Clayton Act claims); *cf.*

*Microsys Computing, Inc. v. Dynamic Data Sys., LLC*, No. 4:05 CV 2205, 2006 WL 2225821, at *9

n.8 (N.D. Ohio Aug. 2, 2006) ("neither the Ohio courts nor federal courts applying the Ohio long-

arm statute have adopted a conspiracy theory of personal jurisdiction which would impute an

alleged co-conspirator's jurisdictional contacts with the forum to a foreign defendant").

      Extension of the conspiracy theory to the federal long-arm rule would be particularly

inappropriate in this case because plaintiffs have not demonstrated that the circumstances for

application of the theory even exist here.  The conspiracy theory would require plaintiffs to

establish that (i) a conspiracy existed, (ii) an act in furtherance of the conspiracy occurred in the

U.S., (iii) each defendant had "knowledge or awareness" of the co-conspirators activities in

furtherance of the conspiracy in the U.S., and (iv) this Court actually has personal jurisdiction over

at least one co-conspirator.  *See Youming Jin*, 335 F. Supp. 2d at 78-79.  Although plaintiffs must

establish all four elements, they have not established even one.

      <u>First</u>, plaintiffs have failed to establish the existence of any conspiracy, much less

that any of the Ministers agreed with anyone to participate in a conspiracy.  *See generally* Ministers'

Motion at 51; Reply of OAO Rosneftegaz *et al*. to Plaintiffs' Consolidated Memorandum of Points

and Authorities in Opposition to Defendants' Motions to Dismiss at VI.C.  As the court in *Dooley*

explained, mere speculation of a conspiracy is insufficient to meet plaintiffs' burden.  786 F. Supp.

at 78.  Instead, the elements are subject to "unusually particularized pleading."  *Youming*, 335 F.

Supp. 2d at 78.  Certainly, no court may exercise personal jurisdiction over a foreign citizen on the

basis of an unsubstantiated and disputed assertion by plaintiffs that "all of the Individual Defendants

. . . are co-conspirators."  Opp. at 36; *see Jungquist*, 115 F.3d at 1031 ("[B]ald speculation or a

conclusionary statement that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory.") (internal quotation omitted).

Second, plaintiffs assert that "[o]ne or more Defendants have engaged in acts in furtherance of the conspiracy within the United States," but they fail to identify a single act within the U.S. *Id.* Instead, plaintiffs cross-reference to Section VIII of their Opposition. Section VIII also fails to identify any alleged acts in the U.S. (or elsewhere) in furtherance of the alleged conspiracy. Opp. at 86-88. Rather, Section VIII refers only to five conclusory assertions, none of which involves an act in the U.S. Plaintiffs' failure to establish any act in the U.S. in furtherance of the conspiracy precludes the imposition of even vicarious jurisdiction.

Third, because there is no act in the U.S. in furtherance of the alleged conspiracy, none of the Ministers could have had knowledge of an act in the U.S. in furtherance of the alleged conspiracy.

Fourth, for the reasons stated in the various motions to dismiss by all defendants in this case, this Court lacks personal jurisdiction over *any* of the defendants. Unable to show personal jurisdiction over any defendant, plaintiffs have nothing on which to anchor vicarious jurisdiction.

The ruling in *Dooley* highlights the inadequacy of plaintiffs' presentation here. In *Dooley*, the plaintiff set forth in "extraordinary detail" the alleged conspiracy and *each* defendant's alleged involvement. *Dooley*, 335 F. Supp. 2d at 78. For example, the *Dooley* plaintiff catalogued numerous meetings held by the co-conspirators, described the discussions at many of those meetings, and specified multiple acts committed in the forum by the co-conspirators in furtherance of the conspiracy. *Id.* Plaintiffs here offer none of that information.

### 2. The Alleged Personal Service In The District Of Columbia On Ministers Khristenko And Kudrin Cannot Substitute For The Absence Of Contacts

Plaintiffs argue that they effected personal service on Ministers Khristenko and Kudrin in the District of Columbia, and that this service, alone, "is sufficient to create personal

jurisdiction over an individual." Opp. at 32. In support of this argument, plaintiffs cite the plurality opinion in *Burnham v. Superior Court of California*, 495 U.S. 604 (1990). The Court in *Burnham*, however, was only called on to decide whether in-state service of a U.S. citizen who traveled from New Jersey to California was consistent with due process. *Id*. at 607-08. The Court did not extend the transient jurisdiction doctrine to the international context. *Compare Burnham*, 495 U.S. at 637 (Brennan, J., concurring) (explaining that a domestic transient rule is "consistent with reasonable expectations" of U.S. citizens traveling from one state to another) with RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 421(2) at cmt. e (1987) ("[T]ag jurisdiction . . . is not generally acceptable under international law.")

Nor can *Burnham* be extended. Only three years earlier, in *Asahi Metal Industry Co. v. Superior Court of California*, the Court stressed that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." 480 U.S. at 115 (citation omitted). The Court was specifically concerned about the federal government's interest in foreign relations — an interest that would be best served by an "unwillingness" to exercise jurisdiction over foreign defendants. *Id*. at 116. It is unreasonable to conclude that the Supreme Court would have, without a word, determined that the "great care and reserve" it called for in *Asahi* could be mooted by the mere happenstance presence of a foreign defendant in the U.S. and nothing more. That is particularly true when the non-resident aliens in question are sitting government officials of foreign governments who were allegedly served while conducting official business in Washington, D.C. *See, e.g.*, Docket Entry 10 (claiming service on Minister of Finance Kudrin as he was ascending stairs to the U.S. Treasury Department).

In sum, *Burnham* does not stand for the proposition that the doctrine of transient jurisdiction is a substitute for the "minimum contacts" otherwise required for a U.S. court to

exercise personal jurisdiction over a *non-resident foreign alien*.  And notably, plaintiffs do not cite, and we have not found, any decision that has held otherwise.[5]

### B. Exercising Personal Jurisdiction Over Any Of The Ministers Would Violate Traditional Notions Of Fair Play And Substantial Justice

Plaintiffs assert that it would not offend fair play and substantial justice to exercise personal jurisdiction over each of the Ministers, but do not confront the analysis presented by the Ministers.  *Compare* Ministers' Motion at 15-16 *with* Opp. at 36.  Thus, plaintiffs do not address why it would not be a tremendous and unjust burden to drag high ranking Russian government officials half-way around the world when they have had no contacts with the U.S. related to the claims in this case and virtually no contacts with the U.S. at all.  *See Asahi*, 480 U.S. at 113. Because there is no answer that could help the plaintiffs, they instead assert that the Ministers "regularly" travel to the U.S. (Opp. at 64) — a bizarre choice of words since they allege that Ministers Sechin and Medvedev have never traveled to the U.S., Minister Yusufov has traveled here twice (and both times more than three years ago), Minister Khristenko has traveled here only once, and Minister Kudrin has traveled here just six times since 2001.  *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993) ("The burden in this case is particularly great because the [defendants] have no ongoing connection to or relationship with the United States.").

Nor do plaintiffs offer any response to the fact that the burden that would be imposed here goes well beyond the individuals themselves.  *Asahi*, 480 U.S. at 115 (courts must consider "the procedural and substantive policies of other nations whose interests are affected by the

---

[5]    Certainly, as *Kadic v. Karadzic*, 70 F.3d 232, 246-47 (2d Cir. 1995), holds, actual personal service within the jurisdiction can, if properly accomplished, satisfy the service component of personal jurisdiction.  Moreover, actual personal service might even be a relevant fact in analyzing the existence of minimum contacts, since it suggests the defendant may have a relationship with the jurisdiction.  But when, as here, the alleged contacts between the defendant and the jurisdiction have no relationship to the litigation and are not continuous and systematic, the defendant's fortuitous presence within the jurisdiction at the moment of service is no substitute for establishing the existence of constitutional minimum contacts.  In this case, Ministers Khristenko and Kudrin were allegedly served while in the U.S. for diplomatic meetings that had no relationship to Yukos.

assertion of jurisdiction"). Exercising jurisdiction over the Ministers would place a great burden on the Russian Federation and set a precedent burdensome to all nations, including the U.S. First, the prospect of high ranking officials being summoned from their home countries to participate in U.S. litigation would raise significant national security and economic concerns. Second, such a precedent would encourage other persons to hale foreign government officials into their local courts whenever they believe that the regulatory or enforcement actions of a foreign government have affected the value of a stock investment. Thus, U.S. government officials might just as likely find themselves answering questions about U.S. government policy in Moscow. Third, the exercise of jurisdiction will burden the U.S. judicial system, providing a magnet for those unhappy shareholders. The net result of such a precedent would be to discourage diplomatic travel by all countries to the U.S., a result certainly not in the interests of the U.S. notwithstanding the purported interests of the plaintiffs in this case.

Finally, proceeding here will interfere with "the most efficient resolution of the controversies." See id. at 113. Despite plaintiffs' claim that the lawsuit should occur here for the benefit of the "thousands of U.S. investors injured," Opp. at 66, the reality of the situation is otherwise. The overwhelming majority of Yukos investors do not reside in the U.S. and, despite substantial advertising for additional plaintiffs (see Ministers' Motion at n.2), there are just 43 plaintiffs representing the equivalent of less than one-tenth of one percent Yukos's outstanding shares. Neither the Ministers nor any other defendant resides in the U.S. The witnesses are not in the U.S. The pertinent documents are not in the U.S. The alleged scheme was not allegedly planned, organized or implemented in the U.S. The entity at the center of the dispute, Yukos, is not located in the U.S. In no way would resolving the controversies here effect an efficient resolution, let alone the most efficient one. See, e.g., Rippey v. Smith, 16 Fed. Appx. 596, 600 (9th Cir. 2001) (concluding it would be unreasonable to exercise jurisdiction over defendants in part because all but

three witnesses resided in England, the vast majority of documents were in England, and all relevant events took place in England).

At a time when serious criminal and tax proceedings had already begun, plaintiffs knowingly purchased ADRs of a company that was located in Russia, run by Russians, overwhelmingly owned by Russians, and subject to Russian tax laws.  They were individuals who made a conscious choice to invest in a foreign business and should not now be surprised at the prospect of having to seek redress in the country of their investment.  *Cf. Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 479 (4th Cir. 1993) (forum's interest in adjudicating the dispute diminishes when its citizens "seek their fortune away from home").  Unlike plaintiffs, the Ministers made no decision that would justify subjecting them to the jurisdiction of a U.S. court.  It violates traditional notions of fair play and substantial justice for this Court to exercise personal jurisdiction in this case — and plaintiffs cannot identify a single case in which a U.S. court has ever exercised general jurisdiction over a foreign defendant based on jurisdictional allegations even remotely similar to those made by the plaintiffs here.

## III.    THE ACT OF STATE DOCTRINE REQUIRES DISMISSAL OF THE AMENDED COMPLAINT

Plaintiffs do not dispute that the central acts challenged by their Amended Complaint — (i) issuing and enforcing tax rulings and imposing back taxes, penalties and interest obligations in Russia; (ii) attaching, seizing and auctioning Yukos assets in Russia; (iii) pursuing criminal arrests and prosecutions in Russia; (iv) conducting searches of offices in Russia; and (v) publicly announcing Russian government policy relating to some of these official acts — are sovereign acts of the Russian government, taken within Russia.  Nor do they seriously contend that their claims can be resolved without this Court confronting the legality of those sovereign acts.  Instead, plaintiffs ask this Court for a "flexible" application of the act of state doctrine, asserting that it may be ignored in this case because of allegedly settled international norms, because of an unratified

treaty between the U.S. and Russia, and because of a statutory exception (the Second Hickenlooper Amendment) that only applies to claims to property located in the U.S. that was taken from the plaintiff in violation of international law.

Plaintiffs' plea for flexibility is a tacit recognition that the straightforward application of the act of state doctrine requires dismissal of their lawsuit.  Because "[t]he act of state doctrine is not some vague act of abstention but a '*principle of decision* binding on federal and state courts alike,'" the flexibility plaintiffs seek does not exist and plaintiffs' claims must be dismissed. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (emphasis in original) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964)); *see also World Wide Minerals,* 296 F.3d at 1165-66; *Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1293 (11th Cir. 2001) (explaining act of state doctrine "requires that 'the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid'") (quoting *Kirkpatrick*, 493 U.S. at 409); *Riggs Nat'l Corp. v. Comm'r*, 163 F.3d 1363, 1368 (D.C. Cir. 1999).

### A.  There Is Neither A "Settled Norms of International Law" Exception To The Act Of State Doctrine Nor Any Settled Norm That Would Be Relevant Here

Plaintiffs assert that this Court must disregard the act of state doctrine and adjudicate their allegations of the Russian Federation's taking of property without "prompt, just and effective compensation" because that alleged taking supposedly violates settled norms of international law. Opp. at 68-70.  Plaintiffs' argument is not only inconsistent with the act of state doctrine generally, but it is foreclosed by controlling District of Columbia Circuit precedent.

In *World Wide Minerals v. Republic of Kazakhstan*, the plaintiff ("World Wide") was a Canadian company with investments in Kazakhstan's uranium industry.  World Wide filed suit after Kazakhstan expropriated certain of its assets and took regulatory action that rendered the remainder of its investment unsuccessful.  Applying the act of state doctrine, the Court of Appeals held that World Wide's claim must be dismissed because:

> That kind of expropriation of property is the classic act of state addressed
> in the case law. And as the Supreme Court declared in *Sabbatino*, "the
> Judicial Branch will not examine the validity of a taking of property
> within its own territory by a foreign sovereign government."

*World Wide Minerals*, 296 F.3d at 1166. This Circuit's decision in *World Wide Minerals* is not

only controlling, but correct. *See Sabbatino*, 376 U.S. at 433 (holding that even if it were "patently

clear" that the taking violated international law, the act of state doctrine must still be applied); *Glen

v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1256-57 (11th Cir. 2006) (applying act of state to

alleged expropriation); *Dayton v. Czechoslovak Socialist Republic*, 834 F.2d 203, 206 (D.C. Cir.

1987) (same).

　　　　Plainly foreclosed by the law in this Circuit, plaintiffs attempt to defend their

position with *Kadic*, 70 F.3d at 250, and *Presbyterian Church of Sudan v. Talisman Energy Corp.*,

244 F. Supp. 2d 289, 345 (S.D.N.Y. 2003). Given this Circuit's decision in *World Wide Minerals*,

those cases could not help plaintiffs even if they supported plaintiffs' position. But those cases do

not even support plaintiffs' position. The act of state doctrine was not before the Second Circuit in

*Kadic*. *Kadic*, 70 F.3d at 250 ("As to the act of state doctrine, the doctrine was not asserted in the

District Court and is not before us on this appeal."). The Second Circuit did note in *Kadic* that the

act of state doctrine requires that "courts generally refrain from judging the acts of a foreign state

within its territory," but that "we doubt that the acts of even a state official, taken in violation of a

nation's fundamental law and wholly unratified by that nation's government, could properly be

characterized as an act of state." *Id.* Because it did not address acts of state, *Kadic* gives plaintiffs

no help here. *Talisman* is of no greater help to plaintiffs. That court simply ruled that *jus cogen*

violations (*e.g.*, genocide) are not subject to the act of state doctrine because all nations have

jurisdiction over such acts. *Talisman*, 244 F. Supp. 2d at 345. Whether *Talisman* is correct or not,

plaintiffs here concede that their allegations do "not rise[] to the level of a jus cogens norm."  Opp. at 93 n.51.[6]

The entire foregoing discussion rests, of course, on plaintiffs' characterization of the sovereign acts as expropriatory.  The actual acts at issue in the amended complaint, however, are tax and criminal enforcement measures, along with public policy statements about them, all of which are acts of state performed by every sovereign nation.  *See Riggs*, 163 F.3d at 1368 (treating tax measure as act of state); *World Wide Minerals*, 296 F.3d at 1165-66 (treating licensing decision as act of state); Ministers' Motion at Ex. J (English High Court decision treating acts at issue here as acts of state).  Thus, even if plaintiffs' inappropriate international law limitation to the act of state doctrine were legally viable, it would be irrelevant here because it cannot be disputed that tax and criminal enforcement measures do not violate norms of international law.  That is why plaintiffs seek to convert those tax and criminal measures into something else — an alleged expropriation — by arguing that the tax and criminal measures were "unlawful[]" (Opp. at 1) and "illegal" ( Opp. at 2).  But it is precisely that evaluation of whether sovereign acts are "unlawful" or "illegal" that is barred by the act of state doctrine.  Thus, plaintiffs' theory is not only legally barred by precedent such as *World Wide Minerals*, but it can never be reached here because it is indisputable that the tax

---

[6]    Plaintiffs also seek to rely upon two letters expressing the former views of the State Department regarding the applicability of the act of state doctrine in two expropriation cases over twenty years ago.  Opp. at 71-72.   The simple answer is that the former views of the State Department expressed in other cases plainly do not override this Circuit's decision in *World Wide Minerals*.  And, at any rate, the State Department has not expressed a view that this case can be decided by a U.S. court without violating act of state principles.  *See Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1114 n.14 (5th Cir. 1985) (declining to address the current status of the so-called *Bernstein* exception because the State Department had not expressed a view with respect to the case in question).  Even if the State Department had expressed a view as the applicability of the act of state doctrine in this case, it would not matter since the majority of the Supreme Court has declined to accept the view that the views of the State Department control application of the act of state doctrine.  *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 770-773 (1972) (Douglas, J., concurring); *Id*. at 773-776 (Powell, J. concurring); *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 822 F.2d 230, 236 (2d Cir. 1987).

and criminal enforcement actions must be treated as lawful and proper — not expropriatory — measures.

**B.  The Unratified U.S.-Russia BIT Of 1992 Provides No Basis To Disregard The Act Of State Doctrine.**

Relying on *dicta* from *Sabbatino*, plaintiffs next seek to develop a "treaty exception" to the act of state doctrine, and then argue that the exception applies to this case on the basis of a biliateral investment treaty between the U.S. and Russia that has stood unratified by the Russian Federation for almost fifteen years.  Opp. at 72-73.  Even if a treaty exception existed, it would be of no assistance to the plaintiffs in this case.

**1.  The Supreme Court Has Never Adopted A So-Called "Treaty Exception" To The Act Of State Doctrine**

Since *Sabbatino* was issued in 1967, only three courts have found a treaty exception to the act of state doctrine.[7]  These three courts each relied on a ratified treaty that was actually in force between the U.S. and the relevant foreign sovereign to hold that a takings claim against that foreign sovereign could be adjudicated based on that sovereign's acceptance of the terms of the treaty.  Notably, however, neither the Supreme Court nor the D.C. Circuit has ever endorsed the treaty exception.  The Fifth Circuit has noted that *Sabbatino* itself did not set forth affirmatively the existence of such an exception:

> The Court in *Sabbatino* articulated the treaty exception in negative rather than positive terms:  It stated that "the Judicial Branch will not examine the validity of a [foreign act of state] . . . in the absence of a treaty or other unambiguous agreement," but did not state the converse, namely, that if a treaty exists then the act of state doctrine does not apply.

---

[7]    Plaintiffs cite two decisions in their discussion of the so-called treaty exception.  Opp. at 73.  The only other case to have applied the so-called treaty exception is *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Ethiopia*, 729 F.2d 422 (6th Cir. 1984).  In *Kalamazoo Spice*, the Sixth Circuit held that the 1953 United States-Ethiopia Treaty of Amity and Economic Relations provided a legal standard for resolving nationalization claims against Ethiopia to which the Government of Ethiopia had consented.  *Id*. at 426-27.  As in the two cases cited by plaintiffs in their Opposition, the Government of Ethiopia did not dispute the validity and enforceability of the treaty.

*Callejo*, 764 F.2d at 1118 n.22 (internal citation omitted).  Because U.S. foreign relations may just as easily be impaired by the application of international standards by U.S. courts, the existence of a treaty exception is inconsistent with the modern act of state doctrine.  Accordingly, this Court should decline plaintiffs' invitation to recognize an exception to the act of state doctrine that neither the Supreme Court nor the D.C. Circuit has ever endorsed — particularly since, as explained below, there is not even a treaty between the U.S. and Russia to which this alleged exception could apply.

### 2.  There Is No Ratified Investment Treaty Between the United States and Russia

Plaintiffs ask this court to apply their supposed treaty exception on the basis of a proposed treaty that the Russian Federation has declined — for nearly fifteen years — to ratify.  It is undisputed that the proposed treaty — the Treaty Concerning the Encouragement and Reciprocal Protection of Investment (the "Unratified Treaty") — has not been ratified by the Russian Federation.  Opp. at 73.  Without ratification, the treaty has not — and cannot — enter into force: "This Treaty shall enter into force thirty days after the date of exchange of instruments of ratification."  Unratified Investment Treaty, art. XIII(1), 31 I.L.M 808.  United States and international law both require this Court to respect this clear and unambiguous language of the Unratified Treaty.  *See Air France v. Saks*, 470 U.S. 392, 397 (1985) (interpretation of an international treaty "begin[s] with the text of the treaty and the context in which the written words are used").[8]  Article 14 of the Vienna Convention on the Law of Treaties produces the same outcome:  "The consent of a State to be bound by a treaty is expressed by ratification when (a) the treaty provides for such consent to be expressed by means of ratification."  Vienna Convention on the Law of Treaties ("Vienna Convention"), art. 14, 1155 U.N.T.S. 331.  Without ratification by the

---

[8]    *See also Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253 (1984) (holding international treaties to be "in the nature of a contract between nations" to which "[g]eneral rules of construction apply"); *United States v. Kember*, 685 F.2d 451, 458 (D.C. Cir. 1982) ("the same rules of construction and reasoning which apply to the interpretation and construction of private contracts") (citations omitted).

Russian Federation, the Unratified Treaty is not in force and does not establish any legal principles binding on the Russian Federation.

Plaintiffs seek to ignore the express terms of the Unratified Treaty, arguing that Article 18 of the Vienna Convention requires a state that has signed but not ratified a treaty to refrain from taking acts that "would defeat the object and purpose" of the proposed treaty.  Opp. at 73-74.  Article 18, of course, must be read consistently with Article 14 of the Vienna Convention, which states that a nation is *not* bound by an unratified treaty if the terms of the proposed treaty — like the Unratified Treaty — require ratification.  Article 18 cannot, therefore, be read to require the Russian Federation to abide by the terms of an agreement that it has expressly said it is not bound to abide by until ratification.  Indeed, in both the U.S. and Russia, such an interpretation would violate constitutional separation of powers principles requiring ratification of treaties before they can become effective.

Consistent with the foregoing common sense, Article 18 is, with respect to treaties that expressly depend on ratification, at best, hortatory, and does *not* require nations to comply with unratified treaties.  Rather, Article 18 only says that nations should avoid taking action that would "defeat the object and purpose" of the unratified instrument.  Acts that "defeat the object and purpose" of a treaty are *not* acts that would violate the treaty if it were in force; they are acts that would render subsequent performance of the treaty meaningless or impossible.  *See* Joni S. Charme, *The Interim Obligation of Article 18 of the Vienna Convention on the Law of Treaties: Making Sense of an Enigma*, 25 Geo. Wash. J. Int'l L. & Econ. 71, 101-02 (1992) (citing Mark E. Villiger, *Customary International Law and Treaties* 322-26 (1985)).  For example, testing a weapon in contravention of a treaty provision prohibiting such a test would defeat the object and purpose of the treaty because the consequences of that test would be irreversible.  RESTATEMENT (THIRD) LAW OF FOREIGN RELATIONS OF THE UNITED STATES § 312 at cmt. i (1987).  On the other hand, "[f]ailing to dismantle a weapon scheduled to be dismantled under the [same] treaty might not defeat its

object, since the dismantling could be effected later." *Id*; *see also* Charme, *supra*, at 99 (providing as an example of violating Article 18: "A treaty provides for the return of art work taken from the territory of another state. Prior to ratification, the signatory either destroys or allows the destruction of the art work.").

The conduct alleged here, specifically the expropriation of Yukos's assets, does not render meaningless or impossible future performance of the Unratified Treaty and therefore does not defeat the object or purpose of the treaty. Even viewing the object and purpose standard generously, the Russian Federation's taxation and regulation of an oil company incorporated under its own laws (or even, allegedly, its expropriation of that oil company) does not render meaningless or impossible future economic cooperation or investment between the U.S. and the Russian Federation. Nor does the Russian Federation's regulation of one of its own companies eradicate even current economic cooperation and investment between the two nations.

### 3. Even If The Unratified Treaty Had Been Ratified, It Would Not Support An Exception To The Act Of State Doctrine

Plaintiffs argue that the Unratified Treaty establishes the Russian Federation's agreement to have this Court decide whether its conduct is inconsistent with the standards in that Unratified Treaty. Opp. at 73. As explained above, the fact that the Russian Federation has not ratified the document (indeed, has not done so for *fifteen* years) establishes that the Russian Federation has *not* agreed to be bound by the standards in the Unratified Treaty. Indeed, the fact that a treaty was prepared reveals that both the U.S. and the Russian Federation recognized that the requirements to be created upon ratification of that treaty do *not* currently exist.

Even if the Unratified Treaty had been ratified, it would not help plaintiffs because treaties must be interpreted as a whole. Vienna Convention, art. 31. The Unratified Treaty not only proposes to create various rights and obligations, but it also provides an explicit — non-judicial —

mechanism for addressing disputes arising out of those obligations and rights (Unratified Treaty, art. VI):

> In the event of an investment dispute between a Party and a national or company of the other Party, the parties to the dispute shall initially seek to resolve the dispute by consultation and negotiation. . . . [I]f the dispute cannot be resolved through consultation and negotiation, the dispute shall be submitted for settlement in accordance with previously agreed, applicable dispute-settlement procedures; any dispute-settlement procedures, including those relating to expropriation, . . . shall remain binding.

Given this provision — which was not found in the treaties at issue in the only three cases to have ever applied the so-called treaty exception — it is clear that the Russian Federation and the U.S. contemplated that, if the treaty were ratified and its standards imposed, each country's respective courts would *not* entertain actions to enforce terms of the treaty.

### C. The Second Hickenlooper Amendment Provides No Basis To Disregard The Act Of State Doctrine

Plaintiffs argue that the Second Hickenlooper Amendment authorizes this Court to disregard the act of state doctrine. Opp. at 74-75. The Second Hickenlooper Amendment, however, only applies when (i) a sovereign has taken property, (ii) in violation of international law, and (iii) the nationalized property (or its proceeds) is located in the U.S. *Id.*; *Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 327 (5th Cir. 1982); RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 444 at cmt. e (1987). Although plaintiffs must satisfy all three elements, they cannot establish even one.

First, as detailed in the Ministers' Motion, plaintiffs have not alleged a taking of any right in property that they have. Ministers' Motion at 56; *see also* Russian Federation's Motion to Dismiss Plaintiff's Amended Complaint ("RF Motion") at 8-12; RF Reply at 4-8. Moreover, not even Yukos, whose property was attached and applied to tax debts, could assert a taking of property because the Russian Federation's application of its tax laws to a Russian corporation, and

subsequent orders collecting back taxes from that corporation, are not takings of property for no compensation. *See id.*

Second, even if the Russian Federation's enforcement efforts against Yukos could constitute a taking, that taking would not violate international law because it involves a sovereign's taking of property from one of its own citizens. *Id.*; RF Reply at 10-11. Plaintiffs cannot avoid this outcome by attempting to allege generally the taking of Yukos from its owners. As detailed in the Russian Federation's submissions, Yukos has not been taken by the Russian Federation or any other defendant in this action.

Third, as plaintiffs acknowledge, the courts that have considered the Second Hickenlooper Amendment have uniformly held it inapplicable when "neither the nationalized property nor its proceeds are located in the United States." *Compania de Gas*, 686 F.2d at 327; *Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co.*, 652 F.2d 231, 237 (2d Cir. 1981) (applying the Second Hickenlooper Amendment "only to cases in which the expropriated property has found it way back into the United States"); *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83 (D.D.C. 2005); RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 444 at cmt. e (1987) ("In order for the Hickenlooper Amendment to apply, the plaintiff must allege and prove that the property that is the subject of the claim is in the U.S. or was there at the time the action was commenced").[9] Here, plaintiffs have not and could not establish that any allegedly taken property is in the U.S.; rather, Yukos itself is a Russian corporation with its assets in Russia. For

---

[9]     Plaintiffs contend that the D.C. Circuit's vacated decision in *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1541 n.180 (D.C. Cir. 1984) reached a contrary result. Because it was vacated, however, *Ramirez* no longer holds precedential value. *See Rong*, 362 F. Supp. 2d at 83, *aff'd on other grounds, Rong v. Liaoning Provincial Gov't*, 452 F.3d 883 (D.C. Cir. 2006). At any rate, the public acts of a foreign sovereign did not need to be questioned in *Ramirez*, according to the D.C. Circuit, for the plaintiffs' claims to be decided. *Ramirez*, 745 F.2d at 1541 n.180. Such is plainly not the case here.

each of these three reasons, plaintiffs cannot avoid the act of state doctrine through the Second Hickenlooper amendment.

### D.  The Act of State Doctrine Bars All Of Plaintiffs' Claims

Finally, plaintiffs are left to argue that the act of state doctrine does not compel dismissal of all of their claims.  Opp. at 75-76.  But the outcome of each of plaintiffs' claims turns upon the effect of official actions of the Russian Federation in Russia.  For that reason, the act of state doctrine compels dismissal of plaintiffs' entire complaint.

Plaintiffs suggest that their RICO, fraud and insider trading claims are not barred by the act of state doctrine.  Opp. at 76.  Plaintiffs argue that their RICO claims are brought exclusively against allegedly non-sovereign defendants.  Even if that were true (and it is not, since the Ministers are sovereign defendants and are named in the RICO counts), the act of state doctrine applies because it is concerned with the adjudication of a foreign sovereign's acts, regardless of whether the sovereign is present in the court.  *See* Ministers' Motion at 18 (citing *Callejo*, 764 F.2d at 1122 and *Riggs*, 163 F.3d at 1368).  Plaintiffs also argue that their RICO claims do not require a determination of the validity of sovereign acts.  That is not correct.  All of plaintiffs' RICO predicate acts turn upon the validity of the Russian Federation's sovereign acts.  The Hobbs Act allegation, the Travel Act allegation, the transportation of stolen property allegation, and the bankruptcy allegation, for example, each rely upon a decision that the tax assessments were illegal and, therefore, the tax auction of Yuganskneftegaz was improper.  *See* AC, ¶¶ 216, 271, 336(b), 336(d); *see also* Opp. at 134 (describing the alleged extortionate choice of Yukos as whether "to pay extortionate and illegitimate taxes"); Opp. at 138 (linking alleged travel act violation to alleged Hobbs Act violation); *cf. Dayton v. Czechoslovak Socialist Republic*, 672 F. Supp. 7, 12 (D.D.C. 1986) ("The Act of State Doctrine cannot be defeated by classifying all actions arising out of nationalizations of property as suits to remedy unjust enrichment.").

Likewise, plaintiffs' fraud claims turn upon establishing an alleged scheme "to expropriate and re-nationalize Yukos without payment of compensation to its owners."  AC, ¶¶ 151-153.  The alleged falsity and fraudulent intent behind the alleged misstatements depends on the existence and non-disclosure of this alleged scheme in a variety of public policy statements made by the Russian Federation and certain Ministers.  Plaintiffs do not deny that the policy statements by the Ministers were relevant only because of their official nature.  For that very reason, this Court must decline to question the validity of such public statements of the Russian Federation in Russia.  *See Gregorian v. Izvestia*, 871 F.2d 1515, 1522 (9th Cir. 1989) (agreeing with amicus curiae brief of the U.S. that a sovereign's public "commenting on events" constitutes "sovereign or governmental" activities).  Moreover, plaintiffs cannot deny that the alleged false or fraudulent statements or schemes of other defendants are only actionable if, among other elements, the plaintiffs establish that the Russian Federation's enforcement action was not valid.

## IV.   PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE UNDER THE POLITICAL QUESTION DOCTRINE

Plaintiffs contend that if they can establish jurisdiction under the FSIA (which they cannot) and challenge the validity of the Russian Federation's sovereign acts in Russian territory notwithstanding the act of state doctrine (which they cannot), this Court need not address the political question doctrine.  *See* Opp. at 77 (quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 798 n.10 (D.C. Cir. 1984) (Edwards, J., concurring)).  But the political question doctrine is jurisdictional, *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005), and requires this Court to decide whether resolution of plaintiffs' claims intrudes into areas of governance that are constitutionally reserved to the political branches.  Because plaintiffs' claims place this Court into a role reserved for the Executive Branch, the political question doctrine requires dismissal.

Plaintiffs suggest that the relationship between this case and foreign affairs is indirect or attenuated, relying on *Vine v. Republic of Iraq*, No. 01-02674, 2006 WL 2583696

(D.D.C. Sept. 7, 2006). But, unlike this case, *Vine* did "not require an evaluation of any executive or congressional policy decision or value judgment." *Vine*, 2006 WL 2583696, at *6. Rather, *Vine* involved claims by U.S. citizens held hostage by Saddam Hussein's Iraqi government during the first Gulf War, a regime that the Executive Branch went to war to topple. A judicial determination that Saddam Hussein's Iraq engaged in terrorist activity is aligned with the Executive Branch's longstanding position.

To be sure, *Baker v. Carr*, 369 U.S. 186 (1962), counsels that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211. But this litigation involves far more than merely "touch[ing]" foreign relations. Ruling in favor of plaintiffs in this case would require this Court to declare the Russian Federation a criminal regime and its Ministers racketeers. If the U.S. is to judge whether the Russian Federation is a criminal regime, and its Ministers racketeers, and suffer the extraordinary consequences to our bilateral relations, that is a judgment the Executive, not the judicial branch must make.[10] Accepting jurisdiction over this case thus may directly interfere with the ability of the U.S. to conduct foreign relations with an important ally in the war on terror and global nuclear proliferation, and to facilitate commercial relations with an important country in a strategic part of the world. In similar circumstances, courts have recognized the constitutional and prudential limits on their jurisdiction and dismissed the actions before them. *See, e.g.*, *Hwang Geum Joo v. Japan*, 413 F.3d 45, 49 (D.C. Cir. 2005) (affirming dismissal on political question grounds claims relating to alleged war crimes by Japanese soldiers during WWII because allowing the case to proceed would be inimical to the foreign policy interest of the U.S.); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164,

---

[10]    For example, the U.S. has never determined that the Russian Federation is "engaged in a consistent pattern of gross violations of internationally recognized human rights or of international law" that would render the Russian Federation ineligible for foreign aid. *See* Opp. Ex. 52 at 16. But that is precisely the sort of determination that plaintiffs' RICO claims would require this Court to make.

1168-69 (C.D. Cal. 2005) (dismissing federal and state common law claims against private actors on political question grounds because they would require judgments of Colombian military action on Columbia soil and interfere with U.S.-Colombia relations); *Corre v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032-33 (W.D. Wash. 2005); *Doe I*, 400 F. Supp. 2d at 96, 112.

## V.    THE DOCTRINE OF INTERNATIONAL COMITY BARS THE REVIEW OF DISPUTES THAT HAVE ALREADY BEEN DECIDED IN RUSSIA

Plaintiffs cannot dispute that the propriety of Russian tax assessments against Yukos is central to their claims. Nor can they contest that courts have long employed the revenue rule to avoid entanglement with a foreign sovereign's domestic enforcement of its own tax laws. *See Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings*, 268 F.3d 103, 111 (2d Cir. 2001); *Moore v. Mitchell*, 30 F. 2d 600, 604 (2d Cir. 1929); RESTATEMENT (THIRD) OF THE LAW OF FOREIGN RELATIONS OF THE UNITED STATES § 483 (1987). Nonetheless, plaintiffs effectively argue that they are free to re-litigate the Russian Federation's tax prosecution of Yukos in this Court by contending that "the Russian judicial proceedings against Yukos suffered from . . . infirmities." Opp. at 79. But plaintiffs cannot point to the kinds of procedural infirmities that might cause a U.S. court to accept the international consequences that arise from refusing to respect the legal proceedings of a friendly foreign sovereign.

Plaintiffs plainly disagree with the Russian court decisions affirming the assessment of taxes and penalties against Yukos. But that disagreement does not entitle them to re-litigate those issues again in the U.S. There is no doubt that Yukos received notice of and did indeed defend against the Russian Federation's tax claims against it. *Cf. Int'l Transactions, Ltd. v. Embotelladora Agral Regimontana SA de CV*, 347 F.3d 589, 594 (5th Cir. 2003) (declining to show comity to Mexican money judgment because "the record d[id] not indicate that any notice was given" to the judgment debtor of the proceeding giving rise to the judgment). Moreover, the procedural problems that plaintiffs allege to exist relate almost exclusively to the criminal

prosecution of Mikhail Khodorkovsky (which these plaintiffs have no standing or basis to challenge), not with the Yukos tax cases, which *Yukos* chose to litigate in the Russian courts. *See* Opp. at Exs. 1-14 and 29-36. In sum, for the reasons stated in the Ministers' Motion and here, this Court should dismiss this case as a matter of international comity.

## CONCLUSION

Plaintiffs' Opposition makes no effort to justify the pursuit of this lawsuit against the Ministers in their individual capacities. The Ministers must, therefore, be treated as officials of the Russian Federation and the claims against them dismissed under the FSIA and as duplicative of those pending against the Russian Federation. Plaintiffs have also failed to establish a basis on which this Court can lawfully exercise personal jurisdiction over the Ministers. These jurisdictional grounds, alone, require dismissal of all claims against each of the Ministers.

The act of state doctrine, political question doctrine and international comity each independently provide alternative grounds to dismiss plaintiffs' claims. And of course, although it is inconceivable that this Court will need to reach the legal validity of the particular claims under Rule 12(b)(6) and the forum non conveniens doctrine, it is plain that the complaint fails on irremediable defects there as well. Accordingly, and to avoid any further harassment of them, this Court should dismiss all claims against the Ministers promptly.

November 9, 2006                              Respectfully submitted,


                                             /s/ Jay L. Alexander
                                             _____

                                             Jay L. Alexander (DC Bar No. 412905)
                                             Ryan E. Bull (DC Bar No. 481473)
                                             Richard P. Sobiecki (DC Bar No. 500163)
                                             Baker Botts L.L.P.
                                             1299 Pennsylvania Avenue, N.W.
                                             Washington D.C.  20004
                                             Telephone: (202) 639-7700
                                             Facsimile:  (202) 585-4064

                                             Michael S. Goldberg
                                             (admitted *pro hac vice*)
                                             Baker Botts L.L.P.
                                             One Shell Plaza
                                             910 Louisiana Street
                                             Houston, Texas  77002
                                             Telephone: (713) 229-1234
                                             Facsimile: (713) 229-1522

                                             *Counsel to Minister Viktor Khristenko,
                                             Minister Alexei Kudrin, Minister Dmitry
                                             Medvedev, Deputy Head of the Presidential
                                             Administration Igor Sechin, and Ambassador
                                             Igor Yusufov*

**<u>Certificate of Service</u>**

I hereby certify that on November 9, 2006, this memorandum of law was electronically filed with the Clerk of the Court, and that, in the same manner, an electronic copy was served on counsel of record.

/s/ Ryan E. Bull

Ryan E. Bull