UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICHARD ALLEN, *et al.*,

 Plaintiffs,

 v.

RUSSIAN FEDERATION, *et al.*,

 Defendants.

Civil Action No. 05–2077 (CKK)

**MEMORANDUM OPINION**
(November 26, 2007)

 Presently before the Court is an action brought by a group of investors who own or used to own an interest in a Russian company called Yukos. The investors claim that the Russian Federation, acting in combination with senior Russian government officials and several Russian energy companies (and several executives of those companies), expropriated Yukos beginning in 2003. The Defendants allegedly levied illegal and confiscatory taxes on Yukos, forced a sham sale of Yukos's most important asset, seized a majority of Yukos shares, intimidated and harassed Yukos executives, and used bankruptcy proceedings to paralyze Yukos's non-Russian-based management team. These and other allegations contained throughout Plaintiffs' 116-page, 424-paragraph Complaint tell a troubling story if proven true.

 Notwithstanding the foregoing, this Court is one of limited jurisdiction. Defendants have brought four Motions to Dismiss arguing, *inter alia*, that this Court lacks jurisdiction to hear Plaintiffs' claims. The Motions decry Plaintiffs' decision to file a Complaint in this Court when the case involves the conduct of the Russian government, senior Russian government officials, Russian companies, and Russian citizens. After a thorough and dedicated review of the Parties'

lengthy submissions and the exhibits attached thereto, the record as a whole, applicable case law and statutory authority, the Court finds that it cannot reach the merits of Plaintiffs' claims based on the doctrines of sovereign immunity and personal jurisdiction. Accordingly, the Court shall GRANT Defendants' Motions to Dismiss for the reasons that follow.

## I. BACKGROUND

The scope of the Parties' submissions to the Court necessitates a thorough overview of the case.[1] The Court shall first provide an overview of the Parties, followed by a brief history of OAO NK Yukos Oil Company ("Yukos"), the company that is alleged to have been expropriated by Defendants. The Court shall then examine the specific allegations made against each of the Defendants, who shall be divided into three "Defendant Groups" based on their factual and legal positions in the case.

*A.    Parties*

The 43 Plaintiffs bringing this action are holders or former holders of Yukos American Depository Receipts ("ADRs") purchased on the over-the-counter ("OTC") market in the United States or the London Stock Exchange (collectively, "Plaintiffs").[2] Am. Compl. ¶¶ 12-59.

---

[1] Defendants filed four Motions to Dismiss on September 8, 2006, which the Court shall cite as follows: (1) on behalf of the Russian Federation, "RF Mot. to Dismiss"; (2) on behalf of Gazprom and Miller, "Gazprom Mot. to Dismiss"; (3) on behalf of Rosneft, Rosneftegaz, Bogdanchikov, and Borisenko, "Rosneft Mot. to Dismiss"; and (4) on behalf of Kudrin, Khristenko, Medvedev, Sechin, and Yusufov, "Kudrin Mot. to Dismiss." Plaintiffs filed a Consolidated Opposition to Defs.' Motions to Dismiss on October 13, 2006, which the Court shall cite as "Pls.' Opp'n." Defendants filed Replies on November 9, 2006, which the Court shall cite using the same conventions as above except for substituting "Reply" for "Mot. to Dismiss."

[2] Plaintiffs divide themselves into two groups, "Plaintiff Yukos ADR Holders" and "Plaintiff Yukos ADR Purchasers." Am. Compl. ¶¶ 17, 59. Based on the Court's disposition of Plaintiffs' claims, this distinction is immaterial.

Plaintiffs are all United States citizens, with three exceptions.[3]

Defendants fall into three "Defendant Groups." The first Defendant Group consists of the Russian Federation (or "Russia") and OAO Rosneftegaz ("Rosneftegaz"). Plaintiffs concede that Russia is a "foreign state" within the meaning of 28 U.S.C. § 1330 (incorporating the definition of "foreign state" included in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(a)). *See* Am. Compl. ¶ 60. Rosneftegaz is a wholly-owned direct subsidiary of the Russian Federation. *Id.* ¶ 74.

The second Defendant Group consists of five senior Russian government officials sued in their individual capacities (collectively, "Government Defendants"). *Id.* ¶¶ 78-83. First, Viktor B. Khristenko ("Minister Khristenko") is the Minister of Industry and Energy of the Russian Federation, a position he had held since March 2004. *Id.* ¶ 80. Minister Khristenko also served as First Deputy Prime Minister from May 2000 to March 2004. *Id.* He is also a Member of the Board of Directors of OAO Gazprom ("Gazprom"), a Defendant company described as part of the third Defendant Group below. *Id.* Second, Alexei Kudrin ("Minister Kudrin") is the Minister of Finance of the Russian Federation. *Id.* ¶ 78. He is also a former director of Gazprom. *Id.* Third, Dmitry A. Medvedev ("Minister Medvedev") is the First Deputy Prime Minister of the Russian Federation and was the Head of the Presidential Administration of the Russian Federation from October 2003 to November 2005. *Id.* ¶ 75. He is also Gazprom's Chairman of the Board. *Id.* Fourth, Igor Sechin ("Minister Sechin") is the Deputy Head of the Presidential Administration of Russia. *Id.* ¶ 82. He also serves as Chairman of the Board of

---

[3] The three Plaintiffs who are not United States citizens are William McDonnell, a citizen of St. Kitts & Nevis; Z.E. Thijssen, a citizen of the Netherlands; and FCT America Limited, a Cayman Islands corporation. Am. Compl. ¶¶ 13, 25, 26.

Directors of OAO Rosneft Oil Company ("Rosneft"), a Defendant company described as part of the third Defendant Group below. *Id.* In February 2006, Minister Sechin was also appointed to the Board of Directors of Rosneftegaz. *Id.* Fifth, Igor K. Yusufov ("Minister Yusufov") is a Special Representative of the President on International Energy Cooperation, a position he has held since July 2004. *Id.* ¶ 79. Minister Yusufov also previously served as Minister of Industry and Energy of the Russian Federation at times relevant to the instant Complaint. *Id.* He also is a Member of the Board of Directors of Gazprom, and previously served as Chairman of the Board at Rosneft. *Id.*

The third and final Defendant Group consists of five members, including two companies that are indirectly owned by the Russian Federation and three executives of those companies (collectively, "Non-Government Defendants"). First, Gazprom (referenced above in relation to several of the Government Defendants) is a publicly traded joint stock company organized under the laws of the Russian Federation with its principal place of business in Moscow. *Id.* ¶ 61. The Russian Federation directly owns 38.373 percent of Gazprom's shares through its Federal Agency for Management of Federal Property, 10.74 percent of Gazprom's shares through Rosneftegaz, and .889 percent through a non-party company (totaling 100%). *Id.* Gazprom produces about 90 percent of Russian gas and is responsible for eight percent of Russia's GDP. *Id.* ¶ 63. Gazprom is also a direct competitor of Yukos. *Id.* Second, Rosneft (referenced above in relation to several of the Government Defendants) is an oil and gas producing company. *Id.* ¶ 70. One share of Rosneft's stock is held by the Russian Federal Agency for Management of Federal Property, and the remainder is held by Rosneftegaz. *Id.* ¶ 70. Third, Alexei B. Miller ("Miller") is the Chairman of the Management Committee of Gazprom, Deputy Chairman of the

4

Board of Directors of Gazprom, and has previously served as Deputy Minister of Energy of the Russian Federation. *Id.* ¶ 76. <u>Fourth</u>, Sergey Bogdanchikov ("Bogdanchikov") is the President of both Rosneft and Rosneftegaz and is a member of each company's Board of Directors. *Id.* ¶ 81. Bogdanchikov was appointed as Rosneft's President and to the Rosneftegaz Board of Directors by the Russian Federation. *Id.* <u>Fifth</u>, Nikolai Borisenko ("Borisenko") is First Vice President of Rosneft and serves on the Board of Directors of Rosneftegaz. *Id.* ¶ 83.

   B.    *Overview of Yukos*

Following the collapse of the Soviet Union in the early 1990s, the Russian Federation's oil and gas industry consisted of hundreds of separate state-owned entities that survived through state support. *Id.* ¶ 97. In 1993, the Russian Federation sought to restructure the nation's oil-and-gas sector, primarily through privatization. *Id.* ¶ 98. As part of that effort, the Russian government founded Yukos as a separate legal entity on April 15, 1993, and consolidated certain state-owned producing, refining, and distribution entities into its structure. *Id.* Yukos became a very successful company, in part by implementing policies designed to attract foreign investment, *id.* ¶¶ 100-02, and also by implementing various other internal reforms. *Id.* ¶ 102. By 2003, Yukos's combined production of natural gas and oil rivaled both ChevronTexaco and Total, and the company began to compete with the Russian company Gazprom. *Id.* ¶ 103.

Yukos sought to expand its operations and become an energy supplier to the United States, *id.* ¶ 105, completing its first of eight crude oil shipments from Russia to the United States on July 3, 2002. *Id.* ¶ 105. Yukos announced that the initial shipment "signaled [the] Company's intention to supply the U.S. market," 105, and later announced that the eight shipments were part of its plans to create "a stable source of non-OPEC crude oil for the U.S."

*Id.* Yukos also had plans to increase its production of oil to the United States by constructing a pipeline that would link Yukos production to an Adriatic Sea terminal. *Id.* ¶ 107. In 2003, Yukos executives met with United States oil companies to discuss their potential acquisition of large stakes in Yukos. *Id.* ¶ 108. ExxonMobil apparently considered purchasing a large stake in Yukos following a potential merger with OAO Sibneft, a Russian oil company. *Id.* ¶¶ 91, 109. According to Plaintiffs, the Sibneft merger did not occur because of Defendants' conduct detailed below. *Id.* ¶ 92.

By October 2003, Yukos's market capitalization was estimated to exceed $30 billion and it was outperforming its Russian competitors, including Gazprom and Rosneft. *Id.* ¶ 110. Yukos also was paying significant dividends to its shareholders at this time, including its ADR holders. *Id.* ¶ 111. Yukos's biggest asset, Yugansknoftegaz ("YNG"), had grown to account for more than one percent of the world's annual oil production. *Id.* ¶ 90. Yukos's success provides the background to what Plaintiffs allege happened next – Defendants, individually and collectively, engaged in actions that effectively expropriated Yukos without compensating Plaintiffs who held ADRs in Yukos. *Id.* ¶ 310.

    C.    *Specific Allegations*

The Court shall review Plaintiffs' specific allegations with respect to each of the three Defendant Groups.

    1.    <u>Russian Federation and Rosneftegaz</u>

Plaintiffs allege that beginning in 2003, the Russian Federation launched an assault on Yukos and the individuals responsible for owning or running Yukos. *Id.* ¶ 142. Utilizing the

significant resources at its disposal,[4] Plaintiffs allege that the Russian government expropriated

Yukos through the following five means.

First, Plaintiffs allege that the Russian Federation arrested several of Yukos's owners,

directors, and counsel.  For example, on June 21, 2003, the Russian Federation arrested Alexei

Pichugin, Yukos security manager, on charges of committing, or directing the commission of,

murders or attempted murders.  *Id.* ¶ 143.  Plaintiffs allege that Pichugin's arrest was an attempt

to coerce him into implicating one or more of the founders of GML Limited, a company that

owns 51% of Yukos's stock.  *Id.*  Pichugin was later convicted of the charges.  *Id.*  On July 2,

2003, the Russian Federation arrested Platon Lebedev, Director of GML Limited, on charges of

theft of state property, tax evasion, and fraud.  *Id.* ¶¶ 144, 146.  Lebedev was found guilty of the

latter two charges and, after an eleven-month trial, sentenced to a nine-year prison term.  *Id.* ¶

163.  On October 25, 2003, the Russian Federation arrested Mikhail B. Khodorkovsky, the

founder of GML Limited, who was also a member of the Yukos Board of Directors and

Chairman of the Board of Directors of OOO Yukos-Moscow, the company responsible for

managing Yukos.  *Id.* ¶¶ 86, 145.  Khodorkovsky was charged with theft of state property, tax

evasion, and fraud, and was found guilty of the latter two charges.  *Id.* ¶¶ 146, 163.

Khodorkovsky received a nine-year prison sentence.  *Id.* ¶ 163.  Both Lebedev and

Khodorkovsky appealed their sentences, and in September 2005, their sentences were reduced

from nine to eight years, respectively. *Id.* ¶ 164.

The Russian Federation also filed charges against Leonid Nevzlin (former First Deputy

---

[4] Plaintiffs' allege that the Russian Federation had the ability to carry out the acts alleged
in the Amended Complaint because Russia is "a *de jure* super-presidential republic, function[ing]
akin to an autocracy, with nearly all power residing with its President."  Am. Compl. ¶ 156.

Chairman of Yukos), Mikhail Brudno (former First Vice President of Yukos Refining and

Marketing), and Vladimir Dubov (Yukos shareholder and associate of Khodorkovsky), and

several of Yukos's in-house or outside counsel.  *Id.* ¶¶ 157, 158.  One of Yukos's in-house

counsel, Sveltana Bakhmina, was sentenced to seven years in prison for tax evasion and

embezzlement.  *Id.* ¶ 158.  Plaintiffs allege that these charges, arrests, and convictions ultimately

forced Yukos's management team, including Yukos CEO Steven Theede, to relocate to London.

*Id.* ¶ 168.  In 2006, "two Moscow-based Yukos executives refused to take future direction from

Theede."  *Id.*

  Second, Plaintiffs allege that various departments of the Russian Federation Government,

"under the color of official right," began investigating Yukos and its affiliates, particularly in the

fall and summer of 2003.  *Id.* ¶ 154.  Officials from the Tax Ministry, together with "FSB

officers and armed militia," searched Yukos's offices, "intimidating personnel and seizing

documents and electronic files."  *Id.*  The Ministry of Natural Resources also reviewed Yukos's

production licenses for compliance violations, and "threatened several important licenses," but

did not interfere with them. *Id.*  On October 3, 2003, investigators and police searched a Yukos

business center, the home of Platon Lebedev, the offices of Vladimir Dubov, and a Yukos-funded

orphanage outside of Moscow.  *Id.* ¶ 171.

  The Russian Federation also sought assistance from other countries in the course of its

investigation.  In 2003, the Russian Federation asked the Attorney General of Liechtenstein "to

seize records allegedly located in Liechtenstein and relating to illegal activity on the part of

Khodorkovsky and GML Limited."  *Id.* ¶ 162.  Liechtenstein's highest court denied the request

after finding insufficient supporting evidence.  *Id.*  The Russian Federation also submitted

"requests for mutual legal assistance to the Attorney General of Switzerland requesting the seizure of business documents related to, *inter alia*, GML Limited, it subsidiaries and counsel, Khodorkovsky, Lebedev, Yukos, and Yukos-related trading companies." *Id.* ¶ 159.  In March 2004, the Russian Federation sought to freeze bank accounts located in Switzerland held in the names of the same entities and individuals.  *Id.*  The Swiss Attorney General froze accounts which held approximately $4.9 billion, but some of those accounts were subsequently released by order of the Swiss Federal Supreme Court.  *Id.*

Third, on October 30, 2003, the Russian Federation seized all of the shares of Yukos common stock owned by Yukos Universal Limited ("YUL") and Hulley Enterprises Limited ("Hulley"), two subsidiaries of GML Limited which own a combined 51% interest in Yukos.  *Id.* ¶ 182.  A spokeswoman for the Russian Federation indicated that the stock was seized in connection with the criminal case against Khodorkovsky (a founder of GML Limited and member of the Yukos Board of Directors) to satisfy his liabilities to the Russian Federation, a reason Plaintiffs characterize as pretextual.  *Id.* ¶ 183.  According to Plaintiffs, this stock seizure expropriated Yukos in two ways.  First, it transferred control of Yukos to the Russian Federation.  *Id.* ¶ 184.  Second, it prevented Yukos's principal shareholders from using their shares to facilitate a resolution of the tax claims (described below) against Yukos.  *Id.*

Fourth, Plaintiffs allege that the Russian Tax Ministry violated the Tax Code of the Russian Federation by assessing illegal and confiscatory taxes on Yukos.  *Id.* ¶ 196.  In December 2003, the Russian Federation conducted a "special" tax audit of Yukos.  *Id.* ¶ 203.  Whereas previous audits in 2003 revealed that Yukos had complied with its tax obligations, *id.* ¶ 204, the December 2003 audit resulted in an additional $3.4 billion in taxes, interest, and

penalties for the year 2000. *Id.* ¶ 205. Although Yukos representatives "identified numerous

errors in the tax calculations that resulted in an overstatement of the amount owed . . . rather than

reducing the tax assessment by these amounts, [the Russian Federation] created new 'violations'

that were equivalent to the originally assessed amounts." *Id.* ¶ 206. The $3.4 billion tax

assessment apparently stemmed from Yukos's "use of trading companies in tax havens," which

Plaintiffs characterize as a "tax-minimization program" that Yukos "voluntarily disclosed in its

public financial statements." *Id.* ¶¶ 210-12. Yukos objected to the tax assessment. *Id.* ¶ 213.

On April 14, 2004, the Tax Ministry issued a Resolution that adopted the findings of the "field

tax audit" and required Yukos to pay the $3.4 billion. *Id.* ¶ 214. In May 2004, Yukos filed an

"Application Seeking to Declare Unlawful the Resolution of the Ministry of Taxes of the Russian

Federation and Levies with the Moscow Arbitration Court." *Id.* ¶ 215. On May 26, 2004, the

Court of Arbitration upheld 99 percent of the government's tax claims. *Id.*

    Additional tax assessments and freezing of bank accounts followed. On April 15, 2004,

and June 30, 2004, the Russian Federation obtained *ex parte* injunctions to freeze Yukos assets

including, among other assets, Yukos's majority interest in YNG. *Id.* ¶ 216. On July 1, 2004,

the Russian Federation "directed Court officers to freeze all of Yukos's accounts in Russian

banks" and "directed the Tax Ministry to file an entirely new $3.4 billion tax claim against

Yukos, this time ostensibly for 2001 liabilities." *Id.* ¶ 218. On August 31, 2004, YNG's bank

accounts were frozen. *Id.* ¶ 219. On September 9, 2004, 13 additional freezing orders were

imposed on Yukos's other subsidiary operating accounts. *Id.* On September 3, 2004, the

Ministry of Tax levied a $4.1 billion tax levy on Yukos for the 2002 tax year. *Id.* ¶ 220. On

November 1, 2004, the Russian Federation announced additional tax liabilities for FY 2001 and

2002 adding another $10 billion in claims. *Id.* ¶ 221. The Russian Federation announced $8 billion in additional levies for 2003, and in December 2005 announced another tax levy of $3.5 billion for 2004. *Id.* The total amount of taxes levied against Yukos reached approximately $30 billion. *Id.*

Fifth, on July 20, 2004, the Russian Federation announced that it would auction off YNG, Yukos's biggest asset, to satisfy Yukos's tax assessments. *Id.* ¶¶ 261, 271. The auction was scheduled for December 19, 2004, *id.* ¶ 271, with three entities indicating an interest in bidding: (1) OOO Gazpromneft ("Gazpromneft"), a limited liability company created by resolution of Gazprom, *Id.* ¶ 66, (2) OAO First Venture Company ("First Venture"), and (3) ZAO Intercom ("Intercom").[5] *Id.* ¶ 275. To stave off the auction, Yukos filed for bankruptcy protection in the United States District Court for the Southern District of Texas. *Id.* ¶ 276; *In Re Yukos Oil Co.*, 320 B.R. 130 (S.D. Tex. 2004). Although the Court issued a temporary restraining order, Plaintiffs allege that Defendants evaded the order by replacing First Venture and Intercom in the auction and with BaikalFinansGroup ("BFG"), a sham company.[6] *See* Am. Compl. ¶ 277. BFG and Gazpromneft were the only two bidders on YNG, and BFG entered the winning bid at $9.3 billion. *Id.* ¶¶ 277, 278. Plaintiffs allege that BFG bid against itself "to achieve what appeared to be a predetermined auction price." *Id.* ¶ 279. Several days after the YNG auction, Rosneft (an indirect subsidiary of the Russian Federation) purchased BFG. *Id.* ¶ 284. The Russian

---

[5] The Amended Complaint states that First Venture and Intercom are known only by name, and no other information about them is known. *See* ¶ 91.

[6] Plaintiffs also indicate that the Texas Bankruptcy Court's Temporary Restraining Order caused Gazprom to announce a sell off of its wholly owned subsidiary, Defendant Gazpromneft. *See* Am. Compl. ¶ 277.

government "has admitted that BFG received its financing for the purchase of YNG from banks controlled by Defendant Russian Federation." *Id.* ¶ 287.

The allegations concerning the role of Rosneftegaz (a direct subsidiary of the Russian Federation) related to the foregoing conduct are relatively limited. Plaintiffs allege that the Russian Federation created Rosneftegaz as a special purpose vehicle in 2005, *Id.* ¶ 291, and that Rosneftegaz owns all but one share of Rosneft. *Id.* ¶ 70. In June 2005, Rosneftegaz entered into a $7.1 billion agreement to purchase a 10.74 percent interest in Gazprom. *Id.* ¶ 291. Therefore, Plaintiffs allege that the Russian Federation essentially has a controlling stake in both Gazprom and Rosneft, and that Rosneft was the ultimate recipient of YNG, Yukos's biggest asset. *Id.*

While the Russian Federation was carrying out the five types of activities described above, Plaintiffs also allege that Russia's President, Vladimir Putin, "made several misstatements and omissions of material fact directed at U.S. and global securities markets." *Id.* ¶ 147. *See also id.* ¶¶ 187, 190-92, 226, 227, 264, 266, 282, 285, 286. Although President Putin is not named as a Defendant in the instant action, Plaintiffs allege that these statements were made on behalf of the Russian Federation, Rosnefegaz, and Rosneft (a company described in the third Defendant Group below). *Id.*

According to Plaintiffs, the cumulative effect of the foregoing conduct reduced Russian crude shipments to the United States. By November 2004, such shipments, including those from Yukos, fell to zero. *Id.* ¶ 273. Plaintiffs allege that the Russian Federation has re-nationalized Yukos by seizing control of a majority of Yukos shares, transferring Yukos's most valuable assets to commercial entities controlled by the Russian Federation, and diverting to state-controlled entities all remaining benefits of owning an interest in Yukos. *Id.* ¶ 310. Plaintiffs

12

allege their ADRs are "now effectively worthless." *Id.*

      2.    <u>Government Defendants</u>

In connection with the events described above, Plaintiffs allege that the Government

Defendants used, and "direct[ed] the use of, color of official right to take Yukos from its owners

and to obtain control of key Yukos assets, all for the private and commercial benefit of

Defendants." *Id.* ¶¶ 75, 78, 79, 80, 82. In addition, Plaintiffs allege that four of the Government

Defendants made misstatements that were directed at the United States and global securities

markets that were designed to "deceive investors." *Id.* ¶¶ 172, 237. The Court shall identify

these statements below.

Minister Khristenko:

- *Platt's Oilgram News* (Nov. 22, 2004): "When the auction of [YNG] is finally held, little competition is expected. Energy Minister Viktor Khristenko sidestepped the issue of the starting price [on] Nov. 19, saying the auction would decide the firm's value."[7] *Id.* ¶ 272.

- *Interfax Energy Daily* (Dec. 30, 2004): "The assets of [YNG], the core production unit of Yukos sold at a December 19 auction, will be transferred to a separate, wholly state-owned company, the Russian Industry and Energy Ministry's Public Relations Center said in a statement, quoting Viktor Khristenko, the ministry's head. Khristenko was quoted as saying that up to 20% of the new company may be offered to China National Petroleum Corporation (CNPC)." Kudrin Mot. to Dismiss Ex. H at 1. Plaintiffs allege, based on these statements, that Minister "Khristenko stated that Rosneft did not intend to control YNG."

---

[7] Plaintiffs filed 65 exhibits with their Consolidated Opposition that may or may not include copies of the articles referenced in their Amended Complaint. These exhibits were not arranged in chronological order and were not accompanied by a table of contents. Plaintiffs' Opposition also fails to specifically cite to any exhibits that include the Minister's statements described herein. Accordingly, the Court shall quote from, and cite to, Plaintiffs' Amended Complaint, except where Defendants have included the referenced article as an exhibit to one of their Motions. In that circumstance, the Court will quote from, and cite to, that exhibit, as well cite to Plaintiffs' Amended Complaint.

Am. Compl. ¶ 288.

Minister Kudrin:

- *Kommersant* (Nov. 3, 2003): "I have heard [President Putin] saying myself that this was no redistribution of property." Kudrin Mot. to Dismiss Ex. C at 1; Am. Compl. ¶ 189. The article identifies Minister Kudrin as the Russian Federation Deputy Prime Minister and Minister of Finance. *Id.*

- *New York Times* (Jun. 21, 2004): "'As far as I know, Yukos has offered to cooperate with the tax ministry on settling the claims that have been made,' the finance minister, Aleksei L. Kudrin, told news agencies Monday. 'Cooperation on the possible settlement of the claims is under way. I think Yukos has enough funds to pay its liabilities.'" Kudrin Mot. to Dismiss Ex. F at 1; Am. Compl ¶ 231.

- *Platt's Energy Economist* (July 1, 2004): "[Minister] Kudrin in fact appeared in a relaxed mood, suggesting that the government would be happy for Yukos to sell assets on the open market, rather than to the state or to 'state-approved' companies, to pay off its debts." Am. Compl. ¶ 234. Plaintiffs' allege that Minister "Kudrin also maintained that the tax claims against Yukos were not political but were part of a 'routine' investigation." *Id.*

- *Financial Times* (Sept. 13, 2004): "The state will do everything possible to ensure a deal takes place in accordance with the law and in an absolutely transparent and market-oriented way,' [Minister Kudrin] said, implicitly confirming that asset sales through [the YNG] auction were likely to be part of a resolution to the company's stand-off with authorities." Kudrin Mot. to Dismiss Ex. G at 1; Am. Compl. ¶ 265. The article identifies Minister Kudrin as "Russia's finance minister." *Id.*

Minister Yusufov:

- *Moscow Times* (Oct. 13, 2003): "Energy Minister Igor Yusufov said Friday that Russia would welcome [a deal between YukosSibneft and ExxonMobil] as a 'positive step.' 'Of course, it fills us with pride that discussions are under way with the first company in the world, ExxonMobil,' Minister Yusufov said at a news conference for foreign reporters, AP reported." Kudrin Mot. to Dismiss Ex. I at 1; Am. Compl. ¶ 173.

Minister Medvedev:

- *Financial Times* (Jan. 20, 2004): Minister Medvedev submitted an editorial wherein he stated that "[a]n independent and competent judiciary, protecting the rights of everyone, is an essential part of a prosperous society. The importance that people attach to the judiciary helps explain why the Yukos case became such a talking point for Russian and foreign media just before the polls. Mikhail Khodorkovsky, head of the oil company, was accused of tax evasion and taken into custody. But whatever the outcome, one point should be noted: this is not a story about prosecutors 'hounding businessmen,' but about equality before the law for everyone, however wealthy." Kudrin Mot to Dismiss Ex. B at 2; Am. Compl. ¶ 194. Minister Medvedev is identified as "head of the Russian president's administration." *Id.*

- *Deutsche Presse-Agentur* (Nov. 2, 2004): "We are proceeding on the assumption that these matters will be exhaustively examined and that a verdict on the guilt of the person in question [Khodorkovsky] will only be reached in accordance with Russian law." Am. Compl. ¶ 151.

- *BBC Monitoring Service* (Nov. 2, 2004): "At the same time, it is very important that the law, including laws about responsibilities, is applied not selectively but across the board to all Russian citizens. . . . I believe that the state must help law-enforcement bodies and ensure their independence in everyday work, not allowing various forces to intervene in their activities." Defs.' Mot to Dismiss Ex. A at 2-3; Am. Compl. ¶ 151. Plaintiffs allege that Minister Medvedev made these statements as "Head of the Presidential Administration." Am. Compl. ¶ 151.

Although Plaintiffs do not allege that Minister Sechin made any misstatements, they allege that he "personally inspected the building where the sale of Yukos's assets took place," *id.* ¶ 281, and that an unnamed senior Russian official close to Minister Sechin "was shorting Yukos shares on Monday morning before the [re-] arrest of the [YNG] shares was announced." *Id.* ¶ 248.

### 3. Non-Government Defendants

In connection with the events described above, Plaintiffs also allege that the Non-

Government Defendants participated in the conspiracy to expropriate Yukos.

                                i.        Gazprom and Alexei Miller

Plaintiffs allege that Gazprom took part in the fraudulent auction of YNG by authorizing its subsidiary, Gazpromneft, to participate in the auction. *Id.* ¶ 274. According to Plaintiffs, Gazprom benefitted from its participation in the conspiracy to expropriate Yukos because Gazprom engaged in a short sale of Yukos stock having received information regarding the outcome of Yukos's pending challenge to the Russian Federation's tax demands.[8] *Id.* ¶ 240.

As with the Government Defendants, Plaintiffs allege that Miller (Chairman of the Management Committee of Gazprom and Deputy Chairman of the Board of Directors of Gazprom) made misstatements on behalf of himself and Gazprom that were directed at the United States and global securities markets. These statements included the following: (1) Gazprom did not seek to destabilize Yukos, but, "on the contrary, it wants to develop joint projects with the company," *id.* ¶ 233; (2) "Gazprom is not considering acquiring Yukos assets,"[9] *id.* ¶ 263; (3) "Gazprom does not have any plans to buy Yukos assets. We are interested in this company being stable," *id.* ¶ 267; (4) "We are not considering the possibility of taking part in an auction" of Yukos assets, *id.* ¶ 268; and (5) Miller has not "heard anything about this," referring to plans by Gazprom to take part in the auction of YNG, *id.* ¶ 269.

---

[8] Plaintiffs also assert, on information and belief, that "several of the other Defendants also engaged in Yukos stock trades based on material, nonpublic information." *Id.* ¶ 247. Plaintiffs do not identify the Defendants to which they are referring.

[9] This statement is alleged to have been made by Miller's spokesman. *See* Am. Compl. ¶ 263.

ii.    Rosneft, Sergey Bogdanchikov, and Nikolai Borisenko

Plaintiffs allege that Rosneft participated in the fraudulent transfer of Yukos' auctioned asset, YNG.  The winning bidder, BFG, was acquired by Rosneft days after the auction took place.  *Id.* ¶ 284.  Although the amount Rosneft paid for BFG was not revealed, Plaintiffs cite several press accounts suggesting that the price was "laughable" and a "monumental bargain." *Id.*

In April 2006, Rosneft allegedly warned banks not to pursue legal action against Rosneft to recover for YNG's liabilities "if the banks wanted to maintain good relations with the Kremlin."  *Id.* ¶ 294.  With respect to Yukos, Rosneft agreed to pay $455 million to buy Yukos's outstanding $482 million debt from a consortium of international banks "on the condition that those banks launch involuntary bankruptcy proceedings against Yukos in Moscow."  *Id.* ¶ 296. The banks accepted Rosneft's offer, "leaving Rosneft at the helm of the involuntary bankruptcy proceedings."  *Id.* ¶ 298.

Plaintiffs allege that Rosneft's President, Bogdanchikov, was involved in the conspiracy to expropriate Yukos, and cite to a *Financial Times* article from December 20, 2004, reporting that he was a "key player in the redistribution of Yukos assets."  *Id.* ¶ 281.  Similarly, Plaintiffs allege Rosneft's Vice President, Borisenko, was involved in the conspiracy, as he represented Gazpromneft at the YNG auction.  *Id.* ¶ 82.  Plaintiffs also allege that Borisenko was awarded the "Order for Services to the Fatherland, Second Class, under a Presidential Decree" in September 2005, presumably based on his conduct related to Yukos.  *Id.* ¶ 263.

Finally, Plaintiffs allege that Rosneft made misstatements directed at the United States and global securities markets.  Rosneft's press spokesman, Alexander Stepankenko, said that

Rosneft was "not planning any asset acquisitions in the near future.  None."  *Id.* ¶ 263.  On July

22, 2004, Rosneft "announced it [was] not interested in bidding for [YNG]."  *Id.* ¶ 263.

> D.    Claims

Plaintiffs allege 25 causes of action based on the foregoing facts, including: Common law

conversion under District of Columbia law, Conversion under the law of the Russian Federation,

Conspiracy to commit common law conversion under District of Columbia law, Expropriation in

violation of International law, Violations under RICO, 18 U.S.C. §§ 1962(b), (c), and (d),

Common law fraud and deceit under District of Columbia law, Fraud and deceit under the law of

the Russian Federation, Conspiracy to commit common law fraud and deceit under District of

Columbia law, Aiding and abetting common law fraud and deceit under District of Columbia

law, Securities fraud under 15 U.S.C. § 78(b), Violation of Section 20A of the Exchange Act, 15

U.S.C. § 78t-1(a), Restitution based on unjust enrichment under District of Columbia law, and

Restitution based on unjust enrichment under the law of the Russian Federation.  *Id.* ¶¶ 311-

424.[10]

## II.  LEGAL STANDARDS

> A.    Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, "provides

the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  It also sets forth

"the general rule that foreign states are immune from the jurisdiction of both federal and state

---

[10] Although Plaintiffs' Amended Complaint details which causes of action are asserted
against which Defendants, the Court's disposition of Plaintiffs' claims does not require a
recitation of the same.

courts in the United States, subject to certain exceptions." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992) (citing 28 U.S.C. §§ 1330(a), 1604). If no exception applies, the FSIA provides "immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Foremost-McKesson, Inc., et al. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990) (quoting *Rush-Presbyterian-St Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 576 n.2 (7th Cir. 1989)). In addition to the foreign state itself, the FSIA may also provide immunity for a foreign state's agencies or instrumentalities, *see* 28 U.S.C. § 1603(b), as well as a foreign state's officials acting in their official capacities, *see Jungquit, et al. v. Sheikh Sultan Bin Khalifa Al Nahyan, et al.*, 115 F.3d 1020, 1027 (D.C. Cir. 1997).

This Circuit set forth the framework for analyzing FSIA immunity in *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000). Once a defendant alleges that the FSIA provides immunity, the Court must determine whether one of the exceptions to immunity applies. "[T]he defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc.*, 216 F.3d at 40 (citing *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985)). Where a defendant challenges the legal sufficiency of a plaintiff's jurisdictional allegations, the Court shall "take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Id.* In the instant case, the Russian Federation, Rosnefetegaz, and the Government Defendants all challenge the legal sufficiency of the plaintiffs' jurisdiction allegations, and therefore, the Court and Defendants must treat all allegations of fact in Plaintiffs' Amended Complaint as true for

19

purposes of the Motions to Dismiss. *See* RF Mot. to Dismiss at 2 n.2; Kudrin Mot. to Dismiss at

2 n.1; Rosneft Mot. to Dismiss at 13.[11]

      B.       *Fed. R. Civ. P. 12(b)(2)*

      Unlike Defendants' burden with respect to the FSIA, Plaintiffs bear the burden of

establishing a factual basis for asserting personal jurisdiction over each individual Defendant.

*See* Fed. R. Civ. P. 12(b)(2); *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir.

1990). Accordingly, Plaintiffs must allege specific acts connecting each Defendant with the

forum. *See Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C.

Cir. 2001). In contrast to a Motion to Dismiss brought under Fed. R. Civ. P. 12(b)(6), the Court

need not treat all of Plaintiffs' allegations as true when determining whether personal jurisdiction

exists over Defendants. Instead, the Court "may receive and weigh affidavits and any other

relevant matter to assist it in determining the jurisdictional facts." *United States v. Phillip

Morris, Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) (citation omitted). However, the Court

must resolve any factual discrepancies with regard to the existence of personal jurisdiction in

favor of the plaintiff. *See Crane*, 894 F.2d at 456.

### III. DISCUSSION

      With this background and these legal standards in place, the Court shall proceed to

discuss Plaintiffs' allegations and claims against each of the three Defendant Groups.

---

[11] The Court may also consider documents that have been incorporated by reference in
Plaintiffs' Amended Complaint. *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d
1154, 1157 N.2 (D.C. Cir. 2002), *cert. denied*, 537 U.S. 1187 (2003).

A.      *Russian Federation and Rosneftegaz*

The FSIA applies to foreign states and to a foreign state's majority-owned direct

subsidiaries.  *See* 28 U.S.C. § 1604 (explaining that a "foreign state shall be immune from the

jurisdiction of the courts of the United States and of the States" unless an exception applies); *id.*

§ 1603(a) (defining a "foreign state" to include "agencies and instrumentalities of the foreign

state"); *Dole Food Co., et al. v. Patrickson*, *et al.*, 538 U.S. 468, 474 (2003) (defining "agencies

and instrumentalities of a foreign state" to include majority-owned direct subsidiaries of the

foreign state).  Plaintiffs allege that the Russian Federation is a "foreign state" within the

meaning of 28 U.S.C. § 1330, *see* Am. Compl. ¶ 60, and allege that Rosneftegaz is a wholly-

owned direct subsidiary of the Russian Federation, *id.* ¶ 70.  Accordingly, FSIA immunity exists

for both the Russian Federation and Rosneftegaz unless an exception to the FSIA applies.

Plaintiffs identify two such exceptions – the "expropriation" exception pursuant to 28

U.S.C. §1605(a)(3), and the "commercial activities" exception pursuant to 28 U.S.C.

§1605(a)(2).  While the Court shall proceed to discuss both of these exceptions, it shall first

consider the status of Defendant Rosneft, as the resolution of Rosneft's status bears significantly

on these FSIA exceptions.  Plaintiffs argue that the Court should find that Rosneft is an agency or

instrumentality of the Russian Federation, such that its acts are attributable to the Russian

Federation. Pls.' Opp'n at 4-9.  Defendants argue that binding Supreme Court precedent prevents

the Court from finding that Rosneft, an indirect subsidiary of the Russian Federation, is an

agency or instrumentality of the Russian Federation.  RF Reply at 13-18.  Plaintiffs concede that

if Rosneft is not considered an agency or instrumentality of the Russian Federation, the

expropriation exception to the FSIA is inapplicable to the instant case.  *See* Pls.' Opp'n at 9

(conceding that this Court "can only exercise jurisdiction over the Russian Federation pursuant to the expropriation exception if Rosneft . . . is considered an agency or instrumentality of the State").  For the reasons set forth below, the Court finds that Rosneft is not an agency or instrumentality of the Russian Federation, and that neither the expropriation nor commercial activities exceptions apply to the Russian Federation and Rosneftegaz.  Accordingly, the Russian Federation and Rosneftegaz shall be dismissed from the instant action.

### 1. The Status of Rosneft under the FSIA

Rosneft may be considered an agency or instrumentality of the Russian Federation if it meets the requirements of 28 U.S.C. § 1603(b), part of the FSIA, which defines "agency or instrumentality of a foreign state" as:

> Any entity –
> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country

The Supreme Court's opinion in *Dole Food Co., et al. v. Patrickson, et al.*, provides the controlling interpretation of this provision.  538 U.S. 468 (2003).  In that case, the plaintiffs impleaded two corporations, the Dead Sea Bromine Co., Ltd. and Bromine Compounds, Ltd. (following the Supreme Court's convention in the case, collectively referred to as "the Dead Sea Companies").  *Id.* at 471.  The Dead Sea Companies sought to remove the action to federal court claiming to be instrumentalities of a foreign state.  *Id.* at 472.  The District Court held the companies were not instrumentalities under the FSIA and the Court of Appeals reversed.  *Id.* The case presented the Supreme Court with two questions:  "The first is whether a corporate

22

subsidiary can claim instrumentality status where the foreign state does not own a majority of its shares but does own a majority of the shares of a corporate parent one or more tiers above the subsidiary.  The second question is whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other hand, at the time suit is filed."  *Id.* at 471.  Both questions bear on the instant case.

As to the first question, the Supreme Court held that "only direct ownership of a majority of shares by the foreign state satisfies the statutory [FSIA] requirement."  *Id.* at 474.  The Court held that the Dead Sea Companies, as indirect subsidiaries of the State of Israel that were separated by one or more intermediate corporate tiers, were not instrumentalities of a foreign state because § 1603(b) makes clear that instrumentality status is provided only for those entities a "majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  *Id.* at 473, 474 (quoting § 1603(b)(2)).

The Dead Sea Companies, while acknowledging they were not direct subsidiaries, argued that Israel exercised "considerable control over [their] operations."  *Id.* at 477.  The Dead Sea Companies' legal briefs illuminate the extent of this control, indicating that Israel's control of these companies involved "the highest ranking officials and bodies of the Israeli government." *Dead Sea Bromine Co., Ltd. v. Patrickson*, Civ. A No. 01-594, 2002 WL 1987405 *9 (S. Ct. Aug. 22, 2003) (Pet'rs Br.)   The government, among other actions, approved the selection and compensation of the chief executive officers, and "approved and made recommendations with respect to [the companies'] budget, business plan and operations." *Id.* at *14-*15.  The Supreme Court found Israel's control over the indirect subsidiaries to be irrelevant, indicating that "[c]ontrol and ownership . . . are distinct concepts . . . . Majority ownership by a foreign state, not

23

control, is the benchmark of instrumentality status." *Dole Food Co.*, 538 U.S. at 477.

As to the second question presented in *Dole Food Co.*, the Supreme Court held "the plain text of this provision . . . requires that instrumentality status be determined at the time suit is filed." 538 U.S. at 478. The Court reasoned that the present tense language of the statute "has real significance" because it is consistent with the "'longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" *Id.* at 478 (quoting *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993)).

In the instant case, Plaintiffs argue that Rosneft is an agency or instrumentality of the Russian Federation despite its status as an indirect subsidiary of the Russian Federation. *See* Pls.' Opp'n at 8; Am. Compl. ¶ 70 (Rosneft is majority-owned by Rosneftegaz, which in turn is a wholly-owned subsidiary of the Russian Federation). Similar to the Dead Sea Companies in *Dole*, Plaintiffs argue that Rosneft may be considered an agency or instrumentality for two reasons. First, Plaintiffs argue that "the state may be found to exercise such extensive control over the entity that a relationship of principal and agent is created." Pl.'s Opp'n at 4-5 (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983)). Second, Plaintiffs argue that Rosneftegaz is a sham entity and invite the Court to pierce the corporate veil separating the Russian Federation and Rosneftegaz and treat Rosneft as an agency or instrumentality of the Russian Federation. *Id.* at 5.

Plaintiffs' first argument is nothing more than a frontal assault on the Supreme Court's decision in *Dole*. Plaintiffs highlight the various ways in which the Russian Federation asserts control over Rosneft, including Russia's indirect ownership, its domination of its Board of Directors, business strategies, and other decisions. *Id.* at 6. This analysis does not advance

24

Plaintiffs' argument because the Supreme Court specifically stated in *Dole* that "[m]ajority

ownership by a foreign state, not control, is the benchmark of instrumentality status." *Dole Food*

*Co.*, 538 U.S. at 477.  The Dead Sea Companies in *Dole* marshaled evidence similar to that

offered by Plaintiffs in the instant case, and the Supreme Court found it irrelevant to the

instrumentality inquiry.  *Id.*  Accordingly, this Court shall follow the *Dole* precedent and reject

Plaintiffs argument on this basis.

Plaintiffs' second argument invites the court to pierce the corporate veil separating

Rosneftegaz and the Russian Federation and to treat them as a single entity for purposes of the

instrumentality inquiry.  *See* Pls.' Opp'n at 8.  In *Dole*, the Court indicated that "[t]he veil

separating corporations and their shareholders may be pierced in some circumstances," but these

instances are the "rare exception, applied in the case of fraud or certain other exceptional

circumstances."  *Id.* at 475.  Plaintiffs do not allege that Rosneftegaz failed to follow corporate

formalities, was intentionally undercapitalized, or commingled funds, *see Labadie Coal Co. v.*

*Black*, 672 F.2d 92, 96-99 (D.C. Cir. 1982) (emphasizing factors a court should consider in a

veil-piercing inquiry), but instead argue that Rosneftegaz "is a sham organization, with no

purpose other than to act as a vehicle for the Russian Federation's shareholding in state-owned

oil and gas companies."[12]  Pls.' Opp'n at 8.  This argument, however, is simply an attempt to

circumvent the *Dole* holding.  The Supreme Court explained in *Dole* that "[e]ven if Israel exerted

---

[12] The Court does not interpret Plaintiffs' Consolidated Opposition as arguing that Rosneftegaz, to the extent it performs the functions of a holding company, should have its corporate veil pierced based on its "holding company" status.  *See* RF Reply at 17 (citing *Invacare Corp. v. Sunrise Med. Holdings, Inc.*, Civ. A. No. 04-1439, 2004 WL 3418915, at *8 (N.D. Ohio Dec. 15, 2004) (finding that a "holding company" is not automatically rendered an alter ego of its parent).

the control the Dead Sea Companies describe, that would not give Israel a 'majority of [the companies'] shares or other ownership interest.' The statutory language will not support a control test that mandates inquiry in every case into the past details of a foreign nation's relation to a corporate entity in which it does not own a majority of the shares." *Dole Food Co.*, 538 U.S. at 477 (quoting § 1603(b)(2)). Given this holding, Plaintiffs must show something more than control exerted by the Russian Federation – otherwise the Supreme Court's holding that control is legally irrelevant would be rendered meaningless and its reference to the rarity of veil piercing would constitute mere surplusage.

Plaintiffs' only argument that goes beyond the Russian Federation's alleged control over its subsidiaries is that "an inequitable result will certainly follow if Rosneftegaz is treated as an entity with an existence independent of the Russian Federation and therefore capable of shielding Rosneft from agency or instrumentality status . . . ." Pls.' Opp'n at 9. Specifically, Plaintiffs explain that Rosneft was directly owned by the Russian Federation prior to June 2005, and that most of the conduct alleged in the Amended Complaint occurred prior to June 2005. *Id.* The problem with Plaintiffs' argument is that the Supreme Court held in *Dole* that "instrumentality status [must] be determined at the time suit is filed." *Dole Food Co.*, 538 U.S. at 478. While Plaintiffs acknowledge that holding, they explain that "[u]nless the Court pierces the corporate veil with respect to Rosneftegaz . . . [the court] must regard Rosneft as a non-agency or instrumentality for all periods described in the Amended Complaint," Pls.' Opp'n at 9 n.1, which Plaintiffs argue is inequitable. Plaintiffs' argument, in essence, is that the Court should pierce the corporate veil with respect to Rosneftegaz because otherwise the Supreme Court's holding in *Dole* will prevent them from maintaining arguments that the *Dole* holding prevents them from

26

making.  Needless to say, the Court is not inclined to adopt such a position.[13]

Because the Court cannot find that Rosneft, as an indirect subsidiary of the Russian Federation, is an agency or instrumentality of a foreign state under § 1603(b) of the FSIA, the Court holds that its acts shall not be attributable to the Russian Federation.  While this holding does not dispose of any party or claim in the instant case, it frames the issues with respect to the expropriation and commercial activities exceptions to the FSIA, to which the Court will now turn.

> 2.    <u>Expropriation Exception</u>

28 U.S.C. § 1605(a)(3) provides an "expropriation" exception to FSIA immunity in any case:

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by a foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

Pursuant to this provision, Plaintiffs must show that the allegedly expropriated property (in this case, alleged to be Yukos), was either (i) present in the United States in connection with a foreign state's commercial activities here, or (ii) owned or operated by an agency or instrumentality of the foreign state that engages in commercial activity in the United States.

---

[13] An additional problem with Plaintiffs' "equitable" argument is that it produces an anomalous result with the potential for inequitable future results.  If Plaintiffs' argument is accepted, Rosneft would have an avenue to assert the status of a "foreign state" in all United States proceedings against it, even though the Russian Federation does not have direct ownership of it.

Plaintiffs allege that the second prong is met because Rosneft is an agency or instrumentality of the Russian Federation that is engaged in commercial activities in the United States. Pls.' Opp'n at 10-11. As the Court held above, however, Rosneft is not an agency or instrumentality of the Russian Federation. Because Plaintiffs concede that "the Court can only exercise jurisdiction over the Russian Federation pursuant to the expropriation exception if Rosneft . . . is considered an agency or instrumentality of the state," Pls.' Opp'n at 9, the Court holds that the expropriation exception does not apply in the instant case.

Even without Plaintiffs' concession, however, the Court finds the expropriation exception inapplicable on the present facts because Plaintiffs have not alleged they had a "right" in the property allegedly taken. *See* 1605(a)(3) (requiring Plaintiffs to show that "rights in property [were] taken"). Plaintiffs do not allege that their ADRs have been frozen or seized by the Russian Federation. *See* Am. Compl. ¶¶ 12-58 & Ex. A (showing ownership of the ADRs). Instead, the Complaint alleges that the Russian Government gained a controlling interest in Yukos by seizing the shares owned by Hulley and YUL, two non-Plaintiff companies. *Id.* ¶¶ 182-84. Plaintiffs also allege that bank accounts owned by Yukos and its affiliates were frozen by the Russian Federation, *id.* ¶¶ 216-21, but Plaintiffs did not possess any "rights" in that property. *See Dole Food Co.*, 538 U.S. at 475 ("[an] individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets"); *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 786 (D.C. Cir. 1998) ("'[t]he owner of the shares of stock in a company is not the owner of the corporation's property'"). Nor do Plaintiffs have a right in the property based on some indefinite investment return. *See Peterson v. Royal Kingdom of Saudi Arabia, et al.*, 416 F.3d 83, 88 (D.C. Cir. 2005) (finding no right in allegedly expropriated property where

28

Plaintiff did not have a right to a guaranteed rate of return in the property). *See also Gutch v. Fed. Republic of Germany*, 444 F. Supp. 2d 1, 10 (D.D.C. 2006) ("Most courts maintain that the expropriation exception applies only when the property as issue is "tangible," and finding bank accounts to be "intangible"), *aff'd*, 2007 U.S. App. LEXIS 25574 (2007) (per curium).

 The two cases cited by Plaintiffs do not suggest an alternate finding. In *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, the plaintiff had a controlling 80% stake in a closely-held company prior to a government decree that expropriated a majority of the company's shares. 616 F. Supp. 660, 661 (W.D. Mich. 1985). The court found there was an actual taking of the plaintiffs' property rights (i.e., the actual shares of the company) – an allegation that is not made in the present case. *Id.* In *Siderman de Blake v. Republic of Argentina*, the plaintiffs were immediate members of a family that held a 100% interest in the company. 965 F.2d 699, 703 (9th Cir. 1992). The Argentine government seized the company and its funds, and sold off its assets. *Id.* at 704-04. In reaching its decision as to FSIA immunity, the court did not address what tangible property rights of the plaintiffs were taken. In neither case did a court determine, as argued by Plaintiffs here, that a nominal shareholder has property rights in corporate assets for purposes of the FSIA's expropriation exception.[14]

 Because Plaintiffs have failed to identify property that is "owned or operated by an agency or instrumentality of the [Russian Federation that] that engage[s] in a commercial activity in the United States," *see* 1605(a)(3), and because Plaintiffs have failed to identify expropriated property in which they had "rights," *id.*, the Court finds that the expropriation exception is

---

 [14] It appears that Plaintiffs owned less than 1% of Yukos's total equity. *Compare* Am. Compl. Ex. A (value of ADRs) *with* Am. Compl. ¶ 110 (alleging $30 billion in total equity).

inapplicable in the instant case.

3.    Commercial Activities Exception

Section 1605(a)(2) provides a "commercial activities" exception to FSIA immunity in any

case:

> in which the action is based upon a commercial activity carried on
> in the United States by the foreign state; or upon an act performed
> in the United States in connection with a commercial activity of the
> foreign state elsewhere; or upon an act outside the territory of the
> United States in connection with a commercial activity of the
> foreign state elsewhere and that act causes a direct effect in the
> United States.

Plaintiffs allege that under this commercial activities exception, the conduct of the Russian

Federation occurred "in connection with a commercial activity" and that such conduct caused a

"direct effect in the United States."  Pls.' Opp'n at 16.

Pursuant to the commercial activities exception, the Court must determine whether the

nature of Defendants' alleged conduct is peculiar to sovereigns.  *See Saudi Arabia v. Nelson*, 507

U.S. 349, 360-61 (1993).  The Supreme Court has held that "the [relevant] question is not

whether the foreign government is acting with a profit motive or instead with the aim of fulfilling

uniquely sovereign objectives.  Rather, the issue is whether the particular actions that the foreign

state performs (whatever the motive behind them) are the *type* of actions by which a private party

engages in 'trade and traffic or commerce.'" *Id.* at 360-61 (quoting *Republic of Argentina v.*

*Weltover Inc.*, 504 U.S. 607, 614 (1992)).

In the instant case, Plaintiffs allege that the Russian Federation engaged in five types of

conduct that ultimately led to the expropriation of Yukos: (1) arresting several of Yukos's

principal owners, executives, and counsel; (2) investigating Yukos and its affiliates; (3) seizing

Yukos stock owned by YUL and Hulley; (4) initiating tax proceedings and assessing tax penalties on Yukos; and (5) auctioning YNG to satisfy Yukos's tax assessments.  *See* section I.C.1, *supra*.  Plaintiffs concede that certain of these activities were undertaken "under the color of official right."  *See* Am. Compl. ¶ 154.  Moreover, arrests, investigations, and seizing and auctioning assets as part of a criminal investigation are all activities undertaken by sovereigns that could not be undertaken by private citizens.  *See Mwani v. Bid Laden*, 417 F.3d 1, 16 (D.C. Cir. 2005) ("[e]xercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.  Such acts as legislation, or the expulsion of an alien, or a denial of justice, cannot be performed by an individual acting in his own name.  They can be performed only by the state acting as such").

Plaintiffs argue that the activities undertaken by the Russian Federation are commercial because they benefitted Rosneft and Gazprom.  Plaintiffs also argue that "Rosneft's participation in a conspiracy to eliminate Yukos as a competitor for sales of Russian petroleum in the United States and other international markets is quite clearly an act in connection with Rosneft's commercial activities in the oil industry.  The same is true of the acquisition by Rosneft of oil-producing assets formerly owned by Yukos."[15]  Pls.' Opp'n at 17.  Plaintiffs' arguments incorrectly focus on the intent or effect of the conduct that allegedly expropriated Yukos.  *See Mwani* ("[t]he key inquiry in determining whether particular conduct constitute commercial activity is not to ask whether its purpose is to obtain money, but rather whether it is 'the sort of

---

[15] The Court found that Rosneft is not an agency or instrumentality of the Russian Federation.  *See* section III.A.1, *supra*.  Even if the Court nonetheless considered Rosneft's activities as attributable to the Russian Federation, those activities would be insufficient for purposes of the commercial activities exception for the reasons stated herein.

action by which private parties can engage in commerce'") (quoting *Nelson*, 507 U.S. at 362));

*Doe I, et al. v. State of Israel, et al.*, 400 F. Supp. 2d 86, 106 (D.D.C. 2005) (holding that

settlement activities were only possible by virtue of the fact that the actors were "infused with the

force and power of the Israeli government" and finding that "[t]he [commercial activities

exception] analysis focuses on whether the distinct action – not a broad characterization thereof –

is commercial, rather than sovereign").

This Circuit has previously considered the type of "commercial activities" advanced by

Plaintiffs and rejected them as insufficient for purposes of the commercial activities exception.

In *Rong*, *et al*. *v. Liaoning Province Gov.'t*, a Chinese province seized a controlling interest in an

automobile manufacturing company controlled by the plaintiff.  452 F.3d 883, 886.  Following

the seizure, the assets were sold to a wholly-owned state entity for approximately six percent of

their market value, with Rong receiving no compensation.  *Id.* at 887.  Rong characterized the

government's actions as commercial, but the D.C. Circuit rejected the characterization.  *Id.* at

890.  The court held that "[i]f Rong's interpretation of the commercial activity were correct then

almost any subsequent disposition of expropriated property could allow the sovereign to be haled

into federal court under FSIA.  Such a result is inconsistent with our precedent, the decisions of

other circuits and the [FSIA's] purpose." *Id.  See also Cicippio v. Islamic Republic of Iran*, 30

F.3d 164, 168 (D.C. Cir. 1994) (hostage-taking for profit did not fall within the commercial

activity exception), *cert. denied*, 513 U.S. 1078 (1995).

In contrast to Plaintiffs' allegations, cases where the commercial activities exception has

been applied are those where the claims arise directly out of actual commercial activities.  *See,*

*e.g.*, *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 580-81 (7th Cir.

1989) (applying commercial activities exception where Greece had contracted with hospitals in the United States for medical services and claim arose out of those contracts), *cert. denied*, 493 U.S. 937 (1989); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449-50 (D.C. Cir. 1990) (finding commercial activities exception applicable where the nature of the claim was "a corporate dispute between majority and minority shareholders," with the majority of shares held by the Iranian government rather than by a private party).  Accordingly, Defendants are correct that the conduct of the Russian Federation cannot be considered commercial pursuant to these precedents.

    Application of the commercial activities exception is inappropriate for a second reason – the activities forming the basis for Plaintiffs claims did not cause a direct effect in the United States.  A "direct effect" is one "'which has no intervening element, but, rather, flows in a straight line without deviation or interruption.'"  *Peterson*, 416 F.3d at 91 (quoting *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994)).  Plaintiffs attempt to identify a direct effect in the United States by explaining that Rosneft supplies the United States market with oil.  Pls.' Opp'n at 19.  According to Plaintiff, this "is sufficient to establish the requisite direct effect in the United States."  Pls.' Opp'n at 19.  The Court finds this fact insufficient because it is not one on which Plaintiffs' claims are based.  Plaintiffs' allegations against the Russian Federation, as recounted above, are not based on the shipment of oil to the United States by Rosneft, but rather on the sovereign acts of the Russian Federation within the territory of the Russian Federation.  The Supreme Court addressed a similar factual scenario in *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993).  In that case, Saudi Arabia had recruited Nelson in the United States and contracted with him to work in a Saudi Arabian government hospital.  *Id.* at 358.

33

Although that activity may have constituted commercial activity within the meaning of the FSIA, that activity did not form the basis of Nelson's suit.  Instead, he alleged that he was detained and tortured while in Saudi Arabia.  *Id.*  The Court rejected application of the commercial activities exception because the commercial activities were not those on which Nelson's claims were based.  *Id.* at 358-59.

The same analysis explains why the Court finds the commercial activities exception inapplicable to Rosneftegaz.  Under the exception, the commercial activities that are identified must be the same activities that give rise to Plaintiffs' claims.  In this regard, Plaintiffs allege that Rosneftegaz is a Russian company wholly owned by the Russian Federation and that it owns all but one share of Rosneft's stock.  *See* Am. Compl. ¶ 70.  Plaintiffs allege that Rosneftegaz is a holding company that "entered into a $7.1 billion agreement to purchase a 10.7 percent stake in Gazprom." *Id.* ¶ 129.  As explained above, none of these allegations forms the basis for Plaintiffs' claims, which relate to the sovereign activities undertaken by the Russian Federation affecting the expropriation of Yukos, not from the commercial activities of Rosneftegaz.

Plaintiffs' final argument concerning the direct of effect of the Russian Federation and Rosneftegaz's activities is that "a direct effect exists if 'money that was supposed to have been delivered [in the United States] was not forthcoming.'" Pls.' Opp'n at 19 (quoting *Weltover*, 504 U.S. at 619).  Here, Plaintiffs allege that as a result of the activities of the Russian Federation, their ADRs are "effectively worthless."  Am. Compl. ¶ 310.  This type of financial injury cannot be characterized as a "direct effect" under the commercial activities exception because a "mere financial loss" to United States residents, without more, is not a "direct effect" in the United States.  *Rong*, 452 F.3d at 891 (Henderson, J., concurring); *Zedan v. Kingdom of Saudi Arabia*,

849 F.2d 1511, 1514 (D.C. Cir. 1988) (finding there was no direct effect in breach of

employment contract with American citizen employed abroad).  The cases cited by Plaintiffs in

support of their position involve instances where the foreign state was obligated to direct funds to

individuals in the United States.  Pls.' Opp'n at 19-20.  Such is clearly not the case here, where

the Russian Federation is accused of engaging in conduct (in coordination with Rosneftegaz and

the other Defendants) within its own territory that resulted in reduced funds flowing to the

investors in a Russian company.  To say the least, this type of effect cannot be characterized as

"direct."  *See United World Trade Co. v. Mangyshlakneft Oil Prod. Ass'n, et al.*, 33 F.3d 1232,

1239 (10th Cir. 1994) ("the fact that [Plaintiff] is an American corporation that suffered a

financial loss [is not] sufficient to place the direct effect of Defendant's actions" in the United

States").

      Because neither the expropriation nor commercial activities exceptions apply to the

instant case, the Court finds that the FSIA provides immunity from suit for the Russian

Federation and Rosneftegaz.   Accordingly, these two parties shall be dismissed from the instant

action.

      **B.**    *Government Defendants*

      Individuals may be considered "agencies or instrumentalities of a foreign state" if they act

in their official, and not individual, capacities.  *See Jungquist, et al. v. Sheikh Sultan Bin Khalifa

Al Nahyan, et al.*, 115 F.3d 1020, 1027 (D.C. Cir. 1997).  Although Plaintiffs have alleged the

Government Defendants acted in their individual capacities, the Court is not bound to accept

those conclusory allegations as true.  *See Jungquist*, 115 F.3d at 1027-28 ("[w]here [a] motion to

dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit

35

and not merely a defense to liability . . . the court must engage in sufficient pretrial factual and

legal determinations to 'satisfy itself of its authority to hear the case' before trial.") (quoting

*Foremost-McKesson*, 905 F.2d at 449)).  Because the Court has found the Russian Federation to

be immune from suit based on the FSIA, if the Government Defendants are found to have acted

in their official capacities, Plaintiffs concede that they will also be immune from suit.  *See* Pls.'

Opp'n at 22 (conceding that the immunity of the Government Defendants "rises or falls with that

of the Russian Federation . . . .").

    To determine whether the Government Defendants acted in their official capacities, "the

relevant inquiry . . . focuses on the nature of the individual's alleged actions, rather than the

alleged motives underlying them." *Jungquist*, 115 F.3d at 1028.  Even if an official's conduct is

based on both official duties and personal interest, the conduct is still considered official.  *See*

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F.Supp 2d. 9, 14 (D.D.C. 2003).  In the present case,

Plaintiffs allege that four of the Government Defendants made misstatements directed at the

United States and Global securities markets.  *See, e.g.*, Am. Compl. ¶¶ 172, 237.  The Court finds

that the Government Defendants made these statements in their official capacities based on the

uncontested facts.

    First, all of the statements were made while the Government Defendants were employed

as senior government officials for the Russian Federation.  Specifically, Minister Medvedev was

the First Deputy Prime Minister of the Russian Federation and was Head of the Presidential

Administration of the Russian Federation; Minister Khristenko was the Minister of Industry and

Energy of the Russian Federation; Minister Kudrin was the Minister of Finance of the Russian

Federation and the Russian Federation's Deputy Prime Minister; and Minister Yusufov was a

Special Representative of the President on International Energy Cooperation and was the

Minister of Industry and Energy of the Russian Federation.  *See* Am. Compl. ¶¶ 75, 78-80, 82.

Second, the publications reporting the Government Defendants' statements identified the

Government Defendants in their official capacities.[16]  In addition, the statements concerned the

alleged expropriation of Yukos, Russian law enforcement, or Russian judicial proceedings.

These subjects concern the sovereign activities of the Russian Federation for the reasons stated in

section III.A, *supra*.

Third, Plaintiffs do not allege that the Government Defendants were not authorized by the

Russian Federation to make the statements attributed to them, nor do Plaintiffs allege that the

Defendants exceeded the scope of their official duties by making any of the statements.  *See Doe*

*I, et al. v. State of Israel, et al.*, 400 F. Supp. 2d 86, 104 (D.D.C. 2005) ("suits against officers in

their personal capacities must pertain to private action – that is, to actions that exceed the scope

of authority vested in that official so that the official cannot be said to have acted on behalf of the

state").  *See also El Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996)

(affirming district court's finding that official did not act in an individual capacity where plaintiff

presented no evidence of the same).  For these reasons, the Court finds that the statements made

by the Government Defendants were made in their official, and not individual, capacities.

Finally, Plaintiffs concede that the Government Defendants acted in an official capacity to

the extent they were otherwise involved in the alleged expropriation of Yukos.  *See* Am. Compl.

¶¶ 75, 78, 79, 80, 82 (referring to each of the Government Defendants and alleging that each

---

[16] This statement is based on the allegations contained in Plaintiffs' Amended Complaint and the Court's review of the articles (when included as exhibits to a Defendants' Mot. to Dismiss).

used, or "direct[ed] the use of, color of official right to take Yukos from its owners and to obtain

control of key Yukos assets, all for the private and commercial benefit of Defendants."[17]

Accordingly, the Court finds that the Government Defendants acted in their official (and

not individual) capacities, and as such, shall be dismissed from the present action as immune

from suit under the FSIA.

C.    *Non-Government Defendants*

The last Defendant Group consists of two companies and three individuals who are not

immune from suit under the FSIA because they are not majority-owned subsidiaries of the

Russian Federation, *see* 28 U.S.C. 1603(b), nor government officials acting in their official

capacities, *id.*  Nevertheless, these Non-Government Defendants seek dismissal of this action

against them based on a lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2).

Plaintiffs argue that personal jurisdiction exists as to four of these Defendants based on

the federal long-arm provision contained in the Federal Rules of Civil Procedure.[18]  *See* Fed. R.

Civ. P. 4(k)(2); Pls.' Opp'n at 21 n.8.  Under Fed. R. Civ. P. 4(k)(2), a federal court may exercise

personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a

summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state

---

[17] Plaintiffs' Amended Complaint contains miscellaneous allegations concerning the Government Defendants, but Plaintiffs' Consolidated Opposition does not allege that any forms a basis for suit in an individual capacity.  For example, the Amended Complaint alleges that Minister Sechin "personally inspected the building where the sale of Yukos's assets took place," ¶ 281, but Plaintiffs do not allege that this activity was undertaken in an individual and not official capacity.

[18] With respect to the fifth Non-Government Defendant, Plaintiffs allege that Borisenko is subject to the Court's jurisdiction under a theory of conspiracy jurisdiction.  *See* Pls.' Opp'n at 36.

court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States.  Defendants argue that Plaintiffs fail to meet the first, second, and fourth conditions of the long-arm statute.  The Court notes that Defendants raise significant questions with respect to Plaintiffs' federal law claims and the sufficiency of service of process. Nevertheless, the Court shall assume, without deciding, that both conditions are met, because it is clear to the Court that Plaintiffs cannot meet their burden with respect to the fourth condition.

Where, as here, Plaintiffs seek to assert general personal jurisdiction over each of the Defendants, *see* Pls.' Opp'n at 21 n.8 ("this Court has general jurisdiction over the non-sovereign defendants"),[19] Plaintiffs must show that each Defendant's contacts with the forum are "continuous and systematic," *Helicopteros Nacionales de Colom., S.A. v. Hall, et al.*, 466 U.S. 408 (1984), such that due process is not offended by allowing a United States court to hale the defendant into the forum "over any matter involving the defendant," *Doe I*, 400 F Supp. 2d at 108.  *See also Purdue Research Found. v. Sanofi-Synthelabo, S.A., et al.*, 338 F.3d 773, 787 (7th Cir. 2003) (holding that "the constitutional requirement for general jurisdiction is 'considerably more stringent' than that required for specific jurisdiction," and that contacts must "be so extensive to be tantamount to [a defendant's] being constructively present" in the forum) (quoting *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001)).

The Supreme Court provided the relevant analysis for general personal jurisdiction inquiries in *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 416-19 (1984).  In

---

[19] Plaintiffs do not allege that specific personal jurisdiction exists.  *See* Pls.' Opp'n at 21 n.8; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (holding that specific personal jurisdiction exists when the defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities").

that case, a Colombian corporation entered into contract negotiations in Texas to provide

helicopter services. *Id.* at 410-11. The corporation did not maintain an office in Texas, but it did

purchase helicopters (approximately 80% of its fleet), spare parts, and accessories from a Texas

company. *Id.* at 411. It also sent prospective pilots to Texas for training, and sent management

and maintenance personnel to visit Texas during the same period to receive "plant

familiarization" training and for technical consultations. *Id.* The company also received funds

into its New York and Florida bank accounts, which were drawn from a bank in Texas. *Id.*

Based on the foregoing, the Supreme Court found that these contacts were insufficient to

establish general personal jurisdiction. The Court held that "mere purchases, even if occurring at

regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a

nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at

418. The Court also found that "[t]he brief presence of [] employees in Texas for the purpose of

attending the training sessions is no more a significant contact that were the trips to New York

made by the buyer for the retail store in *Rosenberg*." Id. (referencing *Rosenberg Bros. & Co. v.*

*Curtis Brown Co.*, 260 U.S. 516 (1923), where the Supreme Court found that purchases and

related trips in a particular forum were an insufficient basis for assertion of general personal

jurisdiction). In sum, based on *Helicopertos Nacionales De Colom.*, Plaintiffs in the instant

matter must show that each Defendant engaged in "continuous and systematic" contacts that are

extensive enough to justify imposition of general personal jurisdiction for each Defendant.

### 1. Post-Complaint Contacts

As a preliminary matter, Plaintiffs seek to establish general personal jurisdiction for

Defendants by using, in part, Defendants' contacts with the United States that arose *after* the

filing of Plaintiffs' Original Complaint (dated October 24, 2005) but *before* the filing of

Plaintiffs' Amended Complaint (dated July 13, 2006). *See* Pls.' Opp'n at 25 n. 14 ("personal

jurisdiction can be created through contacts alleged before the Amended Complaint is filed . . .

"'[o]nce an amended pleading is interposed, the original pleading no longer performs any

function in the case'" (quoting 6 Wright & Miller, Fed. Prac. & Proc. § 1476 (2d ed. 1990)).

Plaintiffs' ability to rely on post-complaint contacts to establish jurisdiction is vigorously

contested by Defendants, who argue that such contacts (which constitute many, if not most, of

the contacts identified by Plaintiff) cannot be used. *See, e.g.*, Rosneft Mot. to Dismiss at 23

("post-complaint contacts are not relevant to the personal-jurisdiction inquiry").  Neither Party is

able to identify a case that discusses the use of post-complaint, pre-amended complaint contacts

to establish jurisdiction. *See Id.* (citing cases describing the general rule that contacts arising

after the filing of a complaint may not be used to establish jurisdiction, but failing to address the

effect of an amended complaint); Pls.' Opp'n at 25 n. 14. (citing several cases for the general

position that an original complaint is superceded by an amended complaint).[20]

   After considering the foregoing, the Court finds that contacts arising after the filing of an

original complaint, but prior to the filing of an amended complaint, likely cannot be used to

establish jurisdiction for two reasons.  First, the filing of a "lawsuit" (not a complaint) determines

---

[20] Gazprom also argues that "[a] bedrock due process principle is that a defendant must receive 'fair warning' that its acts may result in being hauled into court in a distant forum . . . [and] [t]here can be no meaningful 'warning' if contacts occurring long *after* the acts giving rise to the lawsuit, and/or *after* the lawsuit has already been filed, are used to establish personal jurisdiction."  Gazprom Reply at 5 (citations omitted) (emphasis in original).  While this is true, once a defendant has received notice of a lawsuit in a particular jurisdiction, and especially where a defendant asserts it is not subject to a particular forum's jurisdiction, it appears the defendant has more than enough fair notice that entering the forum or otherwise creating contacts with the forum might subject it to the forum's jurisdiction.

the time in which personal jurisdiction contacts are considered. *See Dole Food Co.*, 538 U.S. at

478 (referring to the longstanding principle that "'jurisdiction of the Court depends upon the state

of things at the time of the *action* brought'" (emphasis added) (quoting *Keene Corp. v. United

States*, 508 U.S. 200, 207 (1993)); 6 Wright & Miller, Fed. Prac. & Proc. § 1051 at 161-62

(referring to the filing of a "lawsuit" as marking the point in time in which a court must consider

"whether personal jurisdiction, diversity jurisdiction, and proper venue exist."  While the filing

of a "complaint" commences a lawsuit, *see* Fed. R. Civ. P. 3, it does not follow that the filing of

an "amended complaint" creates a new lawsuit.  Accordingly, personal jurisdiction contacts are

determined at the time the initial complaint is filed, and that does not change even when an

amended complaint is filed. *See Klinghoffer v. S.N.C. Achile Lauro*, 937 F.2d 44, 52 n.9 (2d Cir.

1991) (distinguishing between amendments to an original complaint and "new actions entirely"

for purposes of jurisdiction).  Second, it is well established that a defendant who is subject to

personal jurisdiction at the time a lawsuit is filed cannot later defeat personal jurisdiction by

removing himself from the jurisdiction and claiming a lack of contact with the forum. *See, e.g.*,

*Herpst v. S.B.I. Liquidating Corp*., 279 F. Supp. 928, 930 (E.D. Pa. 1968) (finding personal

jurisdiction where the defendant was not incorporated in Pennsylvania or doing business in the

forum following the filing of a complaint).  If Defendants cannot defeat personal jurisdiction by

engaging in strategic post-Complaint behavior (diminishing contacts with a forum to avoid

personal jurisdiction), it would be anomalous to suggest that Plaintiffs could gain an advantage

by engaging in certain other strategic post-Complaint behavior (filing motions for leave to amend

after additional contacts with a forum arise).

  Based on the forgoing, the Court is inclined to reject Plaintiffs' argument that post-

complaint contacts may be used to establish personal jurisdiction once an amended complaint is filed. Nevertheless, the Court need not make a definitive determination because, even assuming *arguendo* that these contacts may be considered by the Court, Plaintiffs have not met their burden of showing that Defendants' contacts with the forum are so "continuous and systematic" that Defendants are subject to general personal jurisdiction in this Court.[21]

   2. <u>Personal Jurisdiction over Non-Government Defendants</u>

     i. Gazprom

   Gazprom is a publicly traded joint stock company organized under the laws of the Russian Federation with its principal place of business in Moscow. Am. Compl. ¶ 61. Plaintiffs allege that Gazprom has had sufficient contacts with the United States to justify imposition of general personal jurisdiction in this forum. To support its argument, Plaintiffs identify Gazprom's financing efforts, trips to the United States, various agreements signed with United States-based companies, shipments of Liquified Natural Gas to the United States, and a few other contacts. The Court finds that Gazprom's contacts do not, individually or collectively, establish that Gazprom has been "continuously and systematically" engaged in the United States to the extent necessary for imposition of general jurisdiction.

   Initially, Plaintiffs identify certain of Gazprom's contacts with the United States that are entitled to little or no weight in the Court's jurisdictional analysis. For example, Plaintiffs allege that "non-sponsored Gazprom ADRs have actively traded on U.S. securities markets for nearly a

---

[21] Plaintiffs also identify post-amended complaint contacts in their Opposition. Plaintiffs make no argument that contacts arising after the filing of their amended complaint may be considered in the Court's jurisdictional analysis, and accordingly, the Court shall not identify nor consider them in its analysis.

decade." Pls.' Opp'n at 25. Plaintiffs fail to allege that Gazprom or its officers had any contact

with the United States with respect to these non-sponsored ADRs, and the Supreme Court has

held that "unilateral activity of another party or a third person is not an appropriate consideration

when determining whether a defendant has sufficient contacts with a forum [] to justify an

assertion of jurisdiction." *Helicopteros Nacionales de Colom.* at 417. Plaintiffs allege that in

May 2006, Gazprom revealed *plans* to issue $500 million in bonds using U.S. investment banks

to arrange the bond placement. *See* Pls.' Opp'n at 29. Such "aspirational" or "future" contacts

are not entitled to significant weight in a general jurisdiction analysis. *See, e.g.*, *Erne Shipping*

*Inc. v. HBC Hamburg Bulk Carriers GMBH & Co. KG*, 409 F. Supp. 2d 427, 434 (S.D.N.Y.)

("plans to someday open an office in New York," along with other contacts, were ruled

insufficient to establish general jurisdiction). Plaintiffs allege that in July 2006, Gazprom created

a Houston-based subsidiary, Gazprom Marketing and Trading USA. *See* Pls.' Opp'n at 27. The

acts of a subsidiary operating within a particular forum, however, are not ordinarily attributable

to a foreign parent corporation. *See El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 675-76

(D.C. Cir. 1996). While an exception exists for subsidiaries that are "nothing more than the alter

ego[s] of an affiliated corporation," *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 48

(D.D.C. 2003)*,* Plaintiffs do not argue that such is the case with Gazprom and its subsidiary. *See*

Pls.' Opp'n 27-28.

        Plaintiffs also overstate the importance of several of Gazprom's other contacts with the

United States. For example, Plaintiffs allege that in April 2006, Gazprom sponsored Level-I

ADRs in the United States, using the Bank of New York as the depository bank. *Id.* at 25.

Plaintiffs argue that Gazprom's "sponsored ADRs, which trade on U.S. securities markets, alone

are sufficient to establish jurisdiction." *Id.* That argument clearly lacks merit. The case on which Plaintiffs rely for that proposition, *Pinker v. Roche Holdings, Ltd.*, found that a plaintiff's ADRs were relevant to *specific* jurisdiction because the plaintiff's cause of action arose out of his purchase of those ADRs. 292 F.3d 361, 371-72 (3d Cir. 2002). A much more modest and reasonable reading of *Pinker* suggests that the existence of sponsored ADRs may be considered by a court as one factor supporting general jurisdiction, a proposition supported by another of Plaintiffs' cited cases, *Newport Components, Inc. v. NEC Home Elecs. (U.S.A.)*, 671 F. Supp. 1525, 1540 (C.D. Cal. 1987) (finding that defendant's sponsored ADRs, in addition to other contacts, established general personal jurisdiction). Another example is Plaintiffs' discussion of Gazprom's shipments of Liquified Natural Gas ("LNG") to the United States beginning in September 2005. *See* Pl.'s Opp'n at 27. While this type of jurisdictional contact is properly included in the Court's jurisdictional analysis, the mere shipment of products to the United States is not a substantial contact with the forum. *See, e.g., BP Chemicals Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 262 (3d Cir. 2000) (rejecting general jurisdiction despite the foreign corporation's exports of its products to the United States). Similarly, in 2004, Plaintiffs allege that Gazprom used U.S. investment banks to manage a $1 billion bond issue. *See* Pls.' Opp'n at 29. While properly considered by the Court, often these types of financing contacts (particularly where, as here, they are alleged to be one-time events) cannot be characterized as "continuous and systematic." *See, e.g., Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*, 400 F. Supp. 810, 812 (D.D.C. 1975).

  The remaining contacts identified by Plaintiffs bear a striking similarity to those held by the Supreme Court in *Helicopteros Nacionales de Colom.* as insufficient to establish general

personal jurisdiction.  Plaintiffs allege that Miller, on behalf of Gazprom, met with United States

officials in 2003, 2004, and 2005, and that Gazprom's Vice Chairman Boris Yurlov visited

Houston in October 2002.  Plaintiffs also allege that Gazprom entered into agreements with U.S.-

based companies for various projects, including several memoranda of understanding.[22]  The

Supreme Court's *Helicopertors Nacionales de Colom.* decision explains that sporadic visits by

company executives, contracts for the shipment or receipt of products in the United States, and

various other sporadic contacts with a forum are not "continuous and systematic."  466 U.S. at

417-18.

After considering all of Gazprom's contacts identified by Plaintiffs, both individually and

collectively, the Court finds that general personal jurisdiction is not properly asserted against

Gazprom.  Plaintiffs do not allege that Gazprom has any offices, assets, personnel, or a physical

business presence in the United States, *see id.*, 466 U.S. at 411 (listing some of the general

personal jurisdiction considerations), and the contacts that are alleged are too sporadic to

constitute the "continuous and systematic" contacts necessary for the Court to impose general

jurisdiction on a foreign defendant.[23]

---

[22] These agreements include: (1) several contracts with Moncrief Oil in Texas for joint development of an oil field in Russia, Am. Compl. ¶ 28; (2) a memorandum of understanding with ChevronTexaco "pursuant to which Gazprom would participate in a ChevronTexaco-led natural gas-import-terminal project in North America," *id.*; (3) a memorandum of understanding with U.S.-based Sempra Energy "providing for the importation of Gazprom LNG into Sempra's terminals in Texas," *id.*; (4) an agreement with Gaz de France to Supply LNG to the United States, *Id.*, and (5) a partnership with Itera, a Florida-registered corporation that trades and produces gas, *id.* ¶ 29.  The Court notes that some of these agreements do not appear to relate to projects in the United States, and others involve the development of *future* projects.

[23] Plaintiffs also allege that Gazprom, as with most of the Defendants, directed fraudulent statements at the United States securities market.  *See* Pls.' Opp'n at 29.  Plaintiffs cannot predicate general personal jurisdiction over Defendants based on this allegation because

ii.    Alexei Miller

Miller is the Chairman of the Management Committee of Gazprom, Deputy Chairman of

the Board of Directors of Gazprom, and previously served as Deputy Minister of Energy of the

Russian Federation. *See* Am. Compl. ¶ 76. Plaintiffs allege that Miller has had continuous and

systematic contacts with the United States based primarily on his visits to the United States and

his activities undertaken on behalf of Gazprom. Pls.' Opp'n at 35. Miller visited the United

States once a year from 2003 to 2005. *Id.* During these trips, Miller met with executives from

various petroleum and energy companies and United States government officials. *Id.* at 36.

Miller also signed, on behalf of Gazprom, a memorandum of understanding with

ChevronTexaco. *Id*.

These contacts are insufficient to establish general personal jurisdiction. *See*

*Helicopteros Nacionales De Colom.*, 466 U.S. at 417 ("purchases and related trips, standing

alone, are not a sufficient basis for a State's assertion of jurisdiction") (citing *Rosenberg Bros. &*

*Co. v. Curtis Brown Co.*, 260 U.S. 516 (1923)). Because Miller only had sporadic contacts with

the United States, he is not subject to general personal jurisdiction in this Court.

iii.    Rosneft

Rosneft is a Russian oil and gas company that is owned by Rosneftegaz and the Russian

Federation. Am. Compl. ¶ 70. Plaintiffs allege that Rosneft has had sufficient contacts with the

United States to justify Rosneft's general personal jurisdiction in this forum. Plaintiffs support

---

statements made in a foreign venue, particular where the statements themselves are so sporadic,
cannot possibly constitute "continuous and systematic" contacts that are so substantial with the
United States that it would be fundamentally fair to hale those making such statements into any
United States court.

their argument by identifying contacts similar to those used for Gazprom, including Rosneft

executives' trips to the United States, various agreements with United States companies, the

shipment of its products to the United States, and various financing activities in the United

States. Just as with Gazprom, however, the Court finds that these identified contacts do not,

individually or collectively, establish that Rosneft has been "continuously and systematically"

engaged in the United States to the extent necessary for imposition of general jurisdiction.

 As an initial matter, Plaintiffs allege that Rosneft supplies oil to the United States market

through its tanker station *Belokamenka*, with 20 percent of *Belokamenka's* oil delivered to the

United States. Pls.' Opp'n at 29. Although this contact is proper for consideration in the Court's

jurisdictional analysis, it is not a substantial contact with the forum. *See BP Chemicals Ltd.*, 229

F.3d at 262 (finding that product exports to the United States did not constitute a continuous

business presence for purposes of general personal jurisdiction).

 Plaintiffs allege that Rosneft's executives have made numerous trips to the United States.

*See* Pls.' Opp'n at 30. The Russian Federation sponsored a road show in the United States in

June 1998 to attract investors in anticipation of Rosneft's privatization. *Id.* In February and

March 2006, Rosneft's President, Bogdanchikov, and Rosneft's Vice President for Finance,

Anatoly Baranovsky, led a delegation that traveled throughout the United States and met with

numerous banks and investment funds. *Id.* A second road show brought Rosneft officials to the

United States in July 2006. *Id.* Rosneft also apparently sought investment capital in the United

States through Russian Federation officials. *Id.* at 31.

 Finally, like Gazprom, Rosneft appears to have signed a number of agreements with

United States-based companies. Rosneft partnered with U.S. companies ExxonMobil and

ChevronTexaco to submit a winning bid in a 1993 tender for an oil and gas project in Russia.  *Id.*

In May 1995, Rosneft signed a three-year non-disclosure agreement with an Illinois partnership

whereby Rosneft sought "advice and assistance" with regard to the potential sale of its securities

in the United States.  *Id.*  In October 2002, Rosneft signed a letter of intent with U.S. corporation

Marathon Oil to transport crude oil from the Ural Mountains to the United States.  *Id.*  Rosneft

contracted with a U.S.-headquartered firm, Strat Petroleum, to service a YNG oil field.  *Id.*

United States and other Western banks participated as lead managers in the Rosneft IPO,

scheduled for mid-July 2006, and raised more than $10 billion for Rosneft.[24]  *Id.*

    After considering all of these contacts, individually and collectively, the Court finds that

general jurisdiction is not properly asserted against Rosneft.  Plaintiffs do not allege that Rosneft

has any offices, assets, personnel, or a physical business presence in the United States, and

similar to Gazprom above, the contacts that Plaintiffs identify are too sporadic to subject Rosneft

to general personal jurisdiction in this forum.

                    iv.    Sergey Bogdanchikov

    Bogdanchikov is the President of both Rosneft and Rosneftegaz and is a member of each

company's board of directors.  Am. Compl. ¶ 24.  Plaintiffs predicate general personal

jurisdiction over Bogdanchikov based on his post-complaint travels to the United States.

Specifically, Bogdanchikov traveled to the United States in February and March 2006, meeting

with various banks and investment funds.  Pls.' Opp'n at 34.  As is apparent from the Court's

discussion of general jurisdiction for the other Non-Government Defendants described above,

---

    [24] It is unclear from Plaintiffs' allegations whether this contact occurred prior to the filing
of the Amended Complaint.

these trips are insufficient contacts with the United States to subject Bogdanchikov to general personal jurisdiction in this forum. *See Helicopteros Nacionales De Colom.*, 466 U.S. 408, 418 (describing brief presence in forum as an insignificant contact for purposes of general jurisdiction).

v.  Nikolai Borisenko

Borisenko is First Vice President of Rosneft and serves on the Board of Directors of Rosneftegaz. *See* Am. Compl. ¶ 83. Although Plaintiffs fail to identify any contact Borisenko has had with the United States, Plaintiffs allege that he is subject to general personal jurisdiction as a co-conspirator because "an act in furtherance of the conspiracy occurred in the United States." *See* Pls.' Opp'n at 36. Plaintiffs' argument lacks merit. In *DSMC, Inc. v. Convera Corp.*, a case on which Plaintiffs rely in support of their argument, the court acknowledged the theory of conspiracy jurisdiction but noted that courts in this Circuit apply it "warily." 273 F. Supp. 2d 14, 20 (D.D.C. 2002). The theory requires particularized pleading of the conspiracy as well as the "overt acts within the forum taken in furtherance of the conspiracy." *Id.* While Plaintiffs' Amended Complaint contains allegations concerning the *effects* in the United States of a conspiracy to expropriate Yukos (specifically, the loss value for Plaintiffs' ADRs), the acts that gave rise to Plaintiffs' claims unquestionably occurred in the Russian Federation – not the United States. *See* section III.A, *supra*. Accordingly, the Court cannot assert jurisdiction over Borisenko based on conspiracy jurisdiction.[25]

---

[25] Another problem with Plaintiffs' argument is that *DSMC* acknowledged the use of conspiracy jurisdiction in the context of *specific* personal jurisdiction. *DSMC, Inc.*, 273 F. Supp. at 20. It is unlikely that such jurisdiction would comport with due process limitations if applied as broadly as Plaintiffs suggest.

**IV.  CONCLUSION**

For the reasons set forth above, the Court shall GRANT Defendants' [52, 53, 54, 55]

Motions to Dismiss.  The Russian Federation, Rosneftegaz, Minister Khristenko, Minister

Kudrin, Minister Medvedev, Minister Sechin, and Minister Yusufov are immune from the

present suit pursuant to the Foreign Sovereign Immunities Act.  Gazprom, Miller, Rosneft,

Borisenko, and Bogdanchikov are not subject to general personal jurisdiction in this forum.  All

of the foregoing named Defendants shall be dismissed from this action.[26]


Date:    November 26, 2007


                                          _/s/_____
                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge

---

[26] The two remaining Defendants in this action are Gazpromneft and BaikalFinansGroup.
Neither Defendant has filed an appearance in this action.  Plaintiffs filed a Motion to serve
Gazpromneft by publication on November 20, 2007.  The Court shall address that Motion and
the status of BaikalFinansGroup in a subsequent Order.